*HHN*

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

JUL 0 1 2008 **YM**

7- 1- 2 0 0 8

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT,

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. TONY HILLARD, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No.  08 C 1775 |
| KEITH ANGLIN, Warden, Danville Correctional Center,[1] | ) ) ) | The Honorable Robert W. Gettleman, |
| Respondent. | ) ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

In compliance with Rule 5 of the Rules Governing Section 2254 Cases in the

United States District Courts, the attached Exhibits to respondent's Answer to

petitioner's Petition for Writ of Habeas Corpus are hereby filed with this Court:

Exhibit T:    Transcript of Petitioner's Jury Trial, *People v. Hillard*, No. 97 CR 30453, Circuit Court of Cook County (July 13, 14, 15, 1998).

---

[1] Keith Anglin is currently the warden at Danville Correctional Center where petitioner is presently imprisoned and therefore should be substituted in place of the named respondent Joseph Loftus.  *See* Rule 2(a) of the Rules Governing Section 2254 cases in the United States District Courts; Fed. R. Civ. P. 25(d)(1); *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (citing *Hogan v. Hanks*, 97 F.3d 189, 190 (7th Cir. 1996)); *Bridges v. Chambers*, 425 F.3d 1048, 1049-50 (7th Cir. 2005)

July 1, 2008

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois


By: _____

CHARLES REDFERN, Bar No. 6283811
Assistant Attorney General
100 W. Randolph Street, 12th Floor
Chicago, IL 60601-3218
PHONE: (312) 814-3565
FAX: (312) 814-2253
EMAIL: credfern@atg.state.il.us

1   STATE OF ILLINOIS    )
                         )   SS:
2   COUNTY OF COOK       )

3            IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION
4
    THE PEOPLE OF THE        ) Case No. 97 CR 30453
5   STATE OF ILLINOIS        ) Charge:  Att. Murder
          vs                 ) Before:  JUDGE MICHAEL P.
6                            )                    TOOMIN
    TONY HILLARD             ) July 13, 1998
7
                      JURY TRIAL
8
    RECORD OF PROCEEDINGS had in the hearing of the
9
    above-entitled cause.
10
    APPEARANCES:
11
              HON. RICHARD A. DEVINE,
12                 State's Attorney of Cook County, by
              MR. JOSEPH RODDY,
13            MS. GINA SAVINI, and
              MS. ANN CURTISS,
14                 Assistant State's Attorneys,
                   appeared on behalf of the People of
15                 the State of Illinois;

16            MS. RITA A. FRY,
                   PUBLIC DEFENDER OF COOK COUNTY, by
17            MS. CHERYL BORMANN and
              MS. RUTH McBETH,
18                 Assistant Public Defenders,
                   appeared on behalf of the Defendant.
19

20

21
    ROCHINA V. DeBARTOLO
22  LICENSE NO. 084-000824
    Official Court Reporter
23  2650 S. California
    Chicago, Illinois 60608
24

                      EXHIBIT T

                        C-1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    <u>DATE OF HEARING:</u>  July 13, 1998

2    <u>PAGE NUMBERS:</u> C-1 to C-261

3

4    <u>LIST OF WITNESSES</u>     <u>DX</u>    <u>CX</u>    <u>RDX</u>    <u>RCX</u>    <u>RDX</u>

5    MOTIONS------------------------------------------3

6    JURY SELECTION-----------------------------------28

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    THE COURT:  Erven Walls and Tony Hillard;

2  custody.

3    THE CLERK: Tony Hillard and Erven Walls.

4    THE COURT:  Is that the defendant coming out?

5    MS. BORMANN: I think he's getting dressed. He

6  was not originally called.

7    THE SHERIFF: Just gave him his clothes.

8    THE COURT:  All right.  Both defendants are

9  before the Court.

10    MR. RODDY: For the record Assistant State's

11  Attorney Joseph Roddy on behalf of the People, along

12  with my partner, Ann Curtis.

13    MR. FRANKS: For the record Dan Franks.  I

14  represent Erven Walls.

15    MS. BORMANN: My name is Cheryl Bormann.  I

16  represent Mr. Tony Hillard.

17    The matter is set for trial today.

18    I am asking leave to file a Motion for

19  Severance on the UUW by Felon count.

20    There are four, essentially the final four

21  counts of the indictment allege unlawful use of a

22  weapon by a felon regarding my client, Mr. Hillard.

23    In order to prove those allegations the

24  State will have to prove that my client was

1    convicted of a prior felony of possession with

2    intent to deliver under the case number alleged in

3    that.

4            Because of that issue and because of the

5    prejudice with respect to the other counts I'm

6    asking that those counts be severed.

7        THE COURT:  Does the State have any response?

8        MR. RODDY:  No, Judge.  No objection.

9        MR. FRANKS: I would make a motion regarding Mr.

10   Walls based on the same theory, the counts just

11   prior to Mr. Hillard that relate to Mr. Walls has a

12   UUW by felon.

13       MR. RODDY: No objection, Judge.

14       THE COURT:  All right.  The Court will grant the

15   motion for the severance on the UUW counts for both

16   defendants.

17       MS. BORMANN: Your Honor, also I was tendered

18   this morning some discovery by Mr. Roddy.  I have

19   not had a chance to look at that.  I was told that

20   it was medical records with respect to Erven Walls,

21   and also a letter purportedly written by Miss Jinadu

22   to the alleged victim in this case.

23            I have earlier moved for a severance in

24   this matter because the statement of the codefendant

1  would implicate my client.

2              I know the State on that date had no

3  objection that we would be proceeding on the

4  assumption that the trials would be severed today.

5              So I'm assuming that the State would not

6  seek to introduce those pieces of evidence in the

7  the trial against Tony Hillard  as they are not

8  relevant with respect to Tony Hillard and they are

9  prejudicial and they violate Bruton.

10      Mr. RODDY: Judge, I have no objection to that.

11              What I have tendered today is what I -- We

12  have subpoenaed previous to the trial date the

13  Bruise Sheets and records at Cermak relating to Mr.

14  Walls.  We have received them.

15              I was faxed over the weekend a letter

16  written by Dolores Jinadu, to the victim, Yinka

17  Jinadu, which we found out about first on Friday

18  afternoon.

19              We contacted the person who had possession

20  of the fax this weekend and gave copies to Mr.

21  Franks and Miss Bormann.

22              I haven't seen Miss Jinadu's attorney in

23  court here today.

24      MR. FRANKS: Acknowledge receipt of those items.

1          MS. BORMANN: Also I have one further motion and

2     that motion is in the nature of a motion to dismiss

3     the first count, which is attempt first degree

4     murder with respect to Mr. Hillard.

5          If you will beer with me, your Honor,

6     earlier in the case my client was originally

7     indicted along with 97 CR 15947. Those charges have

8     since been nollied. They were nollied in November

9     of 1997.

10          He was indicted, and specifically on June

11    16th the case went before the Grand Jury on the date

12    of June 16, 1997, titled People versus Tony

13    Hillard. The Grand Jury number is 283.

14       THE COURT: Where is your motion?

15       MS. BORMANN: I am making it orally. I have not

16    had an opportunity to put it in writing.

17       THE COURT: You know, motions are supposed to be

18    in writing. We are talking about nollied cases and

19    I can't follow this. They should be in writing.

20    That is the whole reason to do that.

21          What is the basis of your motion?

22       MS. BORMANN:  Judge, in the original

23    indictment --

24       THE COURT: Where is the original indictment?

1    You don't have that either?

2        MS. BORMANN: In the original transcript, I am

3    handing you the transcript from the original hearing

4    where a True Bill was issued.

5            The State's Attorney, if you will refer to

6    Page 2, asked for a True Bill regarding certain

7    counts.  Attempted murder is not one of them, as you

8    can see.

9            At the end of the Grand Jury transcript

10   there is a True Bill issued on the counts that the

11   State asked for.

12           When the case then appeared before your

13   Honor under that indictment number there was a count

14   of attempted murder, which I don't know how it

15   appeared there but it did.

16           It was never an issue because that case was

17   nollied.

18           What happened was then the State after the

19   120 days under People versus King then indicted my

20   client, again alleging attempted murder.

21           Our position, your Honor, is, No. 1 --

22       THE COURT:  Was attempt murder in the first

23   indictment?

24       MS. BORMANN: It was not asked for by the State.

1      THE COURT:  Was it in the first indictment?

2      MS. BORMANN: Yes, it was.  It was --

3  erroneously, because they never asked for it.

4           Our position is that the first indictment

5  was defective with respect to the attempted murder

6  charge because the State failed to ask for that and

7  in fact there is no evidence elicited by the Grand

8  Jury or put in front of the Grand Jury that would

9  support a charge of attempted murder.

10           Then some six months later my client is

11  reindicted and charged.  And at that point evidence

12  is put in front of the Grand Jury and the additional

13  charge of attempted murder is requested in front of

14  the Grand Jury and its legal issues.

15           That violates the compulsory joinder rule

16  here in Illinois which requires that the State

17  allege all charges arising out of the same conduct

18  within -- at the same time.

19      THE COURT:  They did.

20      MS. BORMANN: Well, actually they didn't, because

21  our position is, your Honor, when the State fails to

22  ask for it --

23      THE COURT:  Why do they have to ask for it?

24      MS. BORMANN: Because they are asking the Grand

1  Jury.

2       THE COURT:  Grand Jury is an autonomous body.

3  They can return charges for whatever crimes they

4  feel were committed.

5            The State does not have to ask for them.

6  Show me where they have to ask for them.

7       MS. BORMANN: Well, Judge, it simply is a matter

8  of logic.  If the State does not ask the Grand Jury

9  in the same proceeding where the Grand Jury returns

10  the indictment to issue a True Bill regarding that

11  charge then the charge would not lie.

12       THE COURT:  You got to show me some law on that.

13  I don't believe that at all.

14            The Grand Jury on the basis of the

15  testimony that they heard from Detective Bradley

16  discerned for whatever reasons they did that a

17  charge of attempt murder should lie in addition to

18  armed robbery, aggravated kidnapping, armed

19  violence, aggravated battery, and UUW by a felon.

20       MS. BORMANN: As I have indicated, your Honor, my

21  motion would be a Motion to Dismiss that count based

22  upon the fact that the State never requested and

23  never put in front of the Grand Jury --

24       THE COURT:  Certainly does not violate

1    compulsory joinder because the charge was contained

2    in the first charging instrument.

3        MS. BORMANN: Our position is that it was

4    erroneous, your Honor.

5        THE COURT:  Mr. Roddy, what do you have to say?

6        MR. RODDY:   Judge, I would note that the

7    indictment alleging first degree murder states that

8    the victim was struck with a baseball bat.

9            The aggravated battery count also in the

10   indictment states that he was -- he received bodily

11   harm by being struck by the baseball bat.  And there

12   is evidence in the record sufficient to support both

13   of those counts.

14           Therefore I say the motion should be denied

15    -- the oral motion.

16       THE COURT:  Motion to dismiss Count 1 as to Tony

17   Hillard is denied.

18           What else?

19       MS. BORMANN: I also have motions to dismiss the

20   Armed Violence counts.

21           I spoke with Miss Savini regarding this

22   matter and she indicated that it may be the state's

23   position to nolle those counts anyway.

24           I don't know whether or not this is

1    premature at this point because I don't know what
2    the State's position.

3        THE COURT: You should know.  That is why I
4    called the case.

5        MR. RODDY: It's not our intention to nolle the
6    armed violence counts based on the two counts.

7            We would be nolling the armed violence
8    counts based on the bat, which is.

9        MR. FRANKS: Count 2.

10           I have my sheet that says original file, do
11   not remove.  That was tendered to me and I have made
12   notes on it.

13           But I just wanted you to know the Court may
14   have a copy and I may have the original.  If that
15   bothers the Court in any way.

16           There is two originals then.  All right.
17   Then it must just have been copied from the
18   original.

19       MR. RODDY: Count 16 of the armed violence based
20   on the --

21       THE COURT:  16; you would nolle that?

22       MR. RODDY: Yes, Judge.

23       MS. BORMANN: And that is a Category 2 weapon.

24       MR. RODDY: As to Counts 4 and 5 there is no

1    motion at all.

2        MR. FRANKS: Those are actually the aggravated

3    battery.

4        MR. RODDY:  Yes.

5        MS. BORMANN: May I?    I have an armed robbery as

6    Count 2.

7        THE COURT:  Yes.

8        MS. BORMANN: And an armed robbery as Count 3.  I

9    am not moving to dismiss those counts, your Honor.

10        I am moving to dismiss the armed violence

11    count.  Under my -- In my copy of the indictment

12    they are Counts 4 and 5.

13        In fact they are titled such -- In my copy

14    of the indictment, Counts 4 and 5.

15        THE COURT:  This is based on 22 and 38.

16        What is the basis of your motion?

17        MS. BORMANN: Your Honor, the basis of my motion

18    is the case law -- People versus Christy and People

19    versus Lewis.

20        The Supreme Court has ruled and in fact the

21    State of the law in Illinois is that when a greater

22    sentence than is disproportionate to a more culpable

23    crime is contemplated then with respect to the

24    application in this case, these Counts are

1   unconstitutional.

2   I feel the charge of attempted murder is
3   clearly a more preferable offense than armed
4   violence because it contemplates and in fact the
5   State must prove intent to kill.

6   And in this case we have armed violence,
7   and that case carries a minimum of six, maximum of
8   thirty on first degree murder.

9   The armed violence count carries a minimum
10  of 15 and maximum of 40.  That is almost three times
11  the minimum sentence as the attempt first degree
12  murder count in this case, and therefore I am making
13  that Motion to Dismiss based upon the
14  constitutionality as it applies in this case.

15  THE COURT:  Mr. Franks, do you have anything to
16  say?

17  MR. FRANKS:  Judge, I'll join in the motion.

18  THE COURT:  Do you have any response?

19  MR. RODDY:  Judge, I will note I did receive
20  notice from one of my partners Friday that this
21  would be coming.  So I at least had a chance to
22  prepare for it somewhat.

23  Basically the armed violence statute as is
24  charged today is charged under the -- that an

1    offense was committed while armed with a handgun and
2    that offense is aggravated battery, great bodily
3    harm.

4          That requires completely different elements
5    than attempt first degree murder which would require
6    a specific intent to kill.

7          And since aggravated battery, great bodily
8    harm can be committed with a gun or without a gun
9    there is no disproportionality with regards to that,
10   and since there are clearly different elements with
11   proving the armed violence we must prove (1)
12   aggravated battery, great bodily harm and (2) that
13   the person committed this while armed with a
14   Category 1 weapon.  That is completely different
15   than us proving the count of attempt first degree
16   murder which can be proved -- we have to prove
17   specific intent to kill.

18         And I should note that attempt first degree
19   murder can be charged and proven without a gun ever
20   being a part of it.  So I would ask your Honor to
21   dismiss that oral motion.

22      THE COURT:  It seems to me that these are based
23   upon separate acts.  The attempt murder is based
24   upon the use of a baseball bat, whereas the armed

1    violence is based upon the use of being armed with a

2    handgun or two handguns -- a .22 and a .38 and

3    causing bodily harm.

4            Isn't that a distinction here?

5        MS. BORMANN: Well, there is a distinction

6    without a difference.  The situation still remains

7    that the more culpable offense, that is the

8    attempted murder, which requires the State to prove

9    intent to kill, it bears a lesser sentence than the

10   armed violence.

11           For instance, and this is not charged in

12   this case, aggravated battery with a firearm

13   basically is the same charge that you have before

14   you with an armed violence.

15       THE COURT:  I agree.

16       MS. BORMANN: In this case nobody was shot.

17   Armed violence is a less culpable -- I'm sorry,

18   aggravated battery with a firearm is a less culpable

19   offense than attempted murder.

20           Yet aggravated battery with a firearm,

21   which basically alleges the same, the same elements

22   as the armed violence as you have before you, also

23   carries a minimum of six to maximum of thirty.

24           In this case the armed violence carries a

1   minimum of fifteen, where an aggravated battery with
2   a firearm would carry a minimum of six.

3          And in this case nobody is alleging that
4   the victim was injured with the use of a handgun.

5      THE COURT:  That's why you wouldn't have an
6   aggravated battery with a firearm.

7      MS. BORMANN: Correct.

8          So it is a far less culpable offense than
9   aggravated battery with a firearm, which would again
10  carry a minute of six, maximum of thirty.

11     THE COURT:  It may be a far less culpable
12  offense but a distinctly different offense because
13  of what is alleged here.

14        I don't see that these are similar,
15  identical, or even similar crimes.

16     MR. FRANKS: If I may, the armed violence --
17  excuse me -- the attempt murder is based on striking
18  the victim with a bat.

19     THE COURT:  Go ahead.

20     MR. FRANKS: And the aggravated battery portion
21  or the great bodily harm portion of the armed
22  violence, which is an element, is based on the same
23  injuries that were caused by the same bat that is
24  alleged in the attempt murder.

1    THE COURT:  I don't know that is true at all.
2    It doesn't say that.
3    MR. FRANKS: It says causing great bodily harm.
4    THE COURT:  That's right.
5    MR. FRANKS: And it is not with a firearm.  It's
6    with the same -- It's the same injuries that are
7    alleged in the attempt murder.
8    THE COURT:  I can't tell that from the
9    pleading.  That may come out in the proof.
10    So it may be a situation to address later
11    at sentencing if we get to that.
12    MR. FRANKS: Or a motion for a directed finding
13    based on the same argument.
14    THE COURT:  Possibly.  Possibly.
15    MS. BORMANN: Judge, if you look at the
16    aggravated battery counts later listed in the --
17    they are Count 17, 18, and 19 -- they allege great
18    bodily harm.  19 does with a bat as does 17 --
19    baseball bat and a chisel.  And there is no weapon
20    alleged in Count No. 18 but that is the weapon
21    involved here, your Honor, -- the baseball bat.
22    THE COURT:  I can't make this decision based
23    upon pleadings.
24    I will deny the Motion to Dismiss Counts 4

1    and 5.

2         MR. FRANKS: Judge, in terms of issues regarding

3    severance I don't think that there is any dispute as

4    to how we are going to proceed based on my client's

5    statement.

6         I think it has been agreed before I even

7    became involved in the case that there would be

8    severances issued regarding all three of the

9    defendants; is that correct?

10        THE COURT:  No.  That is why we are having a

11   double jury.

12        MR. FRANKS: I understand.

13        THE COURT:  That is true, and I understood this

14   was based on Bruton, there are statements.

15        MS. BORMANN: There are statements, also

16   antagonistic defenses.

17        I would inform Mr. Franks my position in

18   the case is that Mr. Walls and Miss Jinadu, because

19   they were originally named offenders in this matter,

20   are guilty as charged and that my client was not in

21   the original and not described and is innocent.

22        So that is my position and I know with

23   respect to Miss Jinadu she is alleged to be --

24        THE COURT:  Miss Jinadu, I don't care about.

1    MS. BORMANN: If you will allow me, Judge, Miss

2    Jinadu has alleged from the defense of compulsion

3    indicating she was forced to do so by my client

4    along with some other male blacks and I know Mr.

5    Franks has indicated to me that his defense is also

6    antagonistic to ours as well.

7         So with respect to how we can mechanically

8    do this, I don't know if you want to do that

9    tomorrow when we begin evidence?

10    THE COURT:  I'd rather get the juries selected

11    and address -- As I understand there is really one

12    eyewitness here that necessitates separate cross

13    examination.

14    MR. FRANKS: Yes, Judge.

15    THE COURT:  We can address that tomorrow.

16    MR. FRANKS:  Very well.

17    MR. RODDY: I would just ask what the

18    antagonistic defenses are?

19    MS. BORMANN: Compulsion.

20    MR. RODDY: That is Miss Jinadu's, I believe.

21    MS. BORMANN: Right

22    MR. RODDY: She is not a part of the double jury.

23    MS. BORMANN: And Bruton applies to Mr. Walls.

24    Mr. RODDY: That is not a defense.

1      MS. BORMANN: No, and that is the reason for

2    severance.

3      MR. RODDY: So it's just based on Bruton, not

4    antagonistic defenses?

5      MR. FRANKS: Well, the statement my client

6    allegedly made, he inculpates Mr. Hillard.

7      MR. RODDY: Which is a Bruton --

8      MR. FRANKS: Which is Bruton.

9      THE COURT:  That will not come out before the

10   two juries.

11     MR. FRANKS: Judge, I have no reason to pursue

12   this matter at this time.  My issues are mechanical

13    -- whose crosses will my jury hear.

14          We can address those tomorrow.

15     MR. RODDY: I just wanted it, so I am aware.

16     THE COURT:  Then we had indicated that Mr.

17   Hillard, you will stay here to have the jury

18   selected here.  And who is going to do that?

19     MR. RODDY: Miss Savini and Miss Curtis.

20     THE COURT:  Miss Curtis and Miss Savini.

21          And I will deal with Mr. Franks and we will

22   have to find out where Judge Wadas is, Miss

23   Johnson, --

24     THE CLERK: Okay.

1    THE COURT:  -- to select another jury.

2         If you can do that right now we will be

3    ready to start with Mr. Franks.

4    MS. BORMANN: I just need to staighten out the

5    clothing situation with my client.

6    THE COURT:  Sure.  We will have time.

7    MS. BORMANN: Thank you.

8    THE COURT:  Who will be trying the case with

9    you?

10   MS. BORMANN: Miss McBeth.

11   THE COURT:  We will be sending for the jury as

12   soon as we hear the court call.

13   MS. BORMANN: Thank you.

14

15        (Whereupon the case was passed.)

16

17            *    *    *    *

18

19   THE COURT:  On the case of Mr. Erven Walls,

20   Judge Wadas, 207, wants everybody together down

21   there.

22

23        (Whereupon the case was passed.)

24

1                   *       *       *       *       *

2

3        THE COURT:  On the case of Mr. Erven Walls,

4   Judge Wadas 207, and he wants everybody to go down

5   there.

6              Mr. Franks, I don't believe we need to

7   bring out your client on your case.

8              The court coordinator indicates Judge Wadas

9   is available.  He's in Room 207.

10             We will send Mr. Walls down there.

11             I think we will keep the file here.  You

12  have a copy of the charges?

13       MR. RODDY: I do.  I was going to ask it -- to

14  recall it.  I was going to have motions on several

15  counts.

16       THE COURT:  Let's bring out both defendants

17  then.

18       THE CLERK: Erven Walls and Tony Hillard.

19       MR. RODDY: I am going to go on Count 1, 3.

20       THE COURT:  Nolle Count 2?

21       MR. RODDY: Yes.  Count 3, 4, 5.  Count 12.

22       THE COURT:  Nolling 6 through 11?

23       MR. RODDY: Yes.

24       MR. FRANKS: That is starting with aggravated

1    kidnapping?

2        MR. RODDY: Yes.

3        THE COURT: You are going on 12?

4        MR. RODDY: 12.

5        THE COURT:  And nolling 13?

6        MR. RODDY: 13 through 16.

7            Count 17, I will be seeking leave --

8        THE COURT:  16 is what?

9        MR. RODDY: On 17, to strike certain surplusage

10   on Count 17.

11       THE COURT:  What are you going to strike?

12       MR. RODDY: Striking -- Seeking to strike a skull

13   fracture and a broken nose.

14       MR. FRANKS: And broken nose.  So you are leaving

15   leg injuries and a broken facial bone?

16       MR. RODDY: Yes; and Count 19.

17       THE COURT:  What about 18?

18       MR. RODDY: That will be nollied.

19       THE COURT:  And you will go on 19 and the rest

20   is severed?

21       MS. BORMANN: So on 17 it is striking the

22   language?

23       MR. RODDY: Skull fracture and broken nose.

24       THE COURT:  All right.

1    MR. RODDY: So it is 1, 3, 4, 5, 12, 17, 19.

2    MR. FRANKS:  Okay.

3    THE COURT:  Do you have a separate list of

4    witnesses for Judge Wadas?

5    MR. RODDY: I will create that.  Should not take

6    long.

7    THE COURT:  Then what I will do is Mr. Walls'

8    case will be transferred Order of Court to Judge

9    Wadas in Room 207 instanter for jury selection.

10    And I would like to have Mr. Walls' jury

11    come back here tomorrow morning at 10:00 o'clock and

12    we will send the other jury perhaps to Judge Himel

13    or some other place.

14    But at least you will know where to bring

15    your jury.

16    If there is any questions Judge Wadas can

17    contact me.  I don't know how long of a call he has

18    but we can send him the jury as soon as he is able

19    to do that.

20    So our sheriff will take Mr. Walls down to

21    Judge Wadas to be ready to start.

22    MR. RODDY: I have all the inventoried property

23    from ERPS.

24    Counsel can look at it today or tomorrow

1   morning, the first thing.

2       MR. FRANKS: Can we bring it down?

3       MR. RODDY: It will probably stay up here.

4       MR. FRANKS:  I will look at it tomorrow.

5       MS. BORMANN: Just as a matter of housekeeping

6   here I have subpoenaed the officers with respect to

7   the general -- the original officer, an officer by

8   the name of Schmidt, S-C-H-M-I-D-T, as well as the

9   two detectives on the case, Bradley and Jackson, as

10  well as a Dominique Chase from the Police Department

11  on the gun theft case report.

12          Miss Chase I have spoken with.  She is

13  attending more training at the Academy right now.

14  She will be here first thing on Wednesday morning,

15  9:30.

16          But I don't know if the other officers are

17  here.

18      MR. RODDY: All here.  All here today.

19      MS. BORMANN: Just wanted to make sure we were

20  ready to go.

21                      (Whereupon further proceedings on

22

23

24

1                    the Walls case were heard before

2                    Judge Kenneth Wadas.)

3          (Whereupon the case was passed.)

4

5                *    *    *    *    *

6

7                    The Hillard jury selection was

8                    then commenced before Judge

9                    Toomin.)

10      MS. BORMANN: My list would be the same as the

11   State as far as witnesses except that -- The third

12   name down we may call.  We don't have her yet.  We

13   don't have her yet.

14      THE COURT:  So it's Officer Smith and Ramirez

15   from Summerdale, two detectives, the victim, and

16   Aretha Hillard.

17      MS. SAVINI: And the State's Attorney.

18      THE COURT:  And the ASA.  That's it.

19          Anything else before bringing the jury in?

20      MS. CURTISS: There was one amendment that we had

21   spoken about with counsel about as to the type of

22   weapon, changing the Counts that contained .38

23   caliber to .357 caliber.

24          I was not present when Mr. Roddy nollied

1    some of the counts.

2        MS. BORMANN: We have 1, 3, 4, 5.

3        THE COURT:  On 5 you want to change to .357?

4        MS. CURTISS: Yes.

5        THE COURT:  Any objection?

6        MS. BORMANN: Well, Judge, I believe it's a

7    substantive change from a .38 caliber to .357.  So,

8    yes, there would be an objection.

9        THE COURT: You want to strike .38 caliber and

10   make it a handgun?

11       MS. SAVINI: We can do that since all we have to

12   prove is that a handgun was used.

13       THE COURT:  Surplusage anyway.

14           Strike the .38 caliber.

15           To be consistent you have two counts that

16   are going to say a handgun.

17       MS. SAVINI: That's correct.

18           Judge, what we can do is I think on Count 4

19   and Count 5, those both still stand, the two armed

20   violences?

21       MS. BORMANN: Yes.  Those were not nollied.

22       THE COURT: Just have separate guns.

23       MS. SAVINI: We can go on one count of armed

24   violence and just allege handgun.

1          So why don't we just go on Count 4, strike

2   the specifics as to the handgun?

3      THE COURT:  Nolle Count 5?

4      MS. SAVINI: That's correct.

5      THE COURT:  To recap for the Clerk it's going to

6   be Motion State nolle Count 2, 5, 6, 7, 8, 9 and 10,

7   11, 13, 14, 15, 16. 17 stays in.  18 is nollied.

8   19 is in.  And then the remaining Counts 20 through

9   27 are severed at this point.

10     MS. SAVINI: Judge, actually I was just thinking

11  as you said Mr. O'Malley, I don't believe he will be

12  testifying against this defendant.

13     MS. BORMANN: I would doubt it since he was not

14  involved in the investigation or arrest.

15     MS. SAVINI: You may be correct.  You may not

16  want to read this to the jury.

17     THE COURT:  Okay.  Fine.

18          Bring in the jury then and at least get

19  started.

20          Off the record.

21          (Whereupon a discussion was had off

22           the record.)

23     THE COURT:  Good afternoon, ladies and

24  gentlemen.  My name is Michael Toomin.  I'm a judge

1    of the Circuit Court of Cook County.

2            I've asked that you come over here today as

3    prospective jurors in a case that has been pending

4    on this call for several months.

5            At this time I would like you all to be

6    stand and be sworn as prospective jurors.

7            Please rise.

8                    (Whereupon the prospective jurors

9                     were sworn.)

10   THE COURT:  The two ladies who just came in

11   please stand up to be sworn.

12                   (Whereupon the prospective jurors

13                    were sworn.)

14   THE COURT:  Can't you bring them all in at once?

15           All right.  There is another two ladies

16   that just came in.  Please stand to be sworn.

17                   (Whereupon the prospective jurors

18                    were sworn.)

19   THE COURT: Ladies and gentlemen, the case that

20   brings you here today is entitled the People of the

21   State of Illinois versus Tony Hillard.

22           The defendant, Mr. Hillard, is here, also

23   with another defendant, two other defendants who

24   will be on trial, but not before this jury, and I

1    will tell you more about that as we go on.

2              The People will be represented here by two

3    Assistant State's Attorneys who are representatives

4    of your elected State's Attorney Dick Devine.  They

5    are Miss Gina Savini.

6         MS. SAVINI: Good afternoon, ladies and

7    gentlemen.

8         THE COURT:  And Miss Ann Curtiss.

9         MS. CURTISS: Good afternoon.  Hello.

10        THE COURT:  The defendant, Mr. Hillard, is

11   represented by his counsel, Miss Cheryl Bormann.

12        MS. BORMANN:  Good afternoon.

13        THE COURT:  And Miss Ruth McBeth.

14        MS. McBETH: Good afternoon, ladies and

15   gentlemen.

16        THE COURT:  And Mr. Hillard is to the right of

17   Miss McBeth.

18             You may stand.

19        DEFENDANT HILLARD: Good afternoon.

20        THE COURT:  Actually Miss Savini will not be

21   trying the case with Miss Curtiss but she is here

22   for jury selection.

23             Mr. Joseph Roddy, who is the other attorney

24   who will be handling the case with Miss Curtiss is

1   selecting another jury today to be heard in this

2   case as well.

3          Two defendants will be having jury trials.

4   One defendant has elected to be tried by bench.   So

5   I will be responsible for that side of the case.

6          Mr. Hillard is here in a multiple count

7   indictment charged with the other codefendants and

8   the charges are as follows.

9          First count alleges that on or about May

10  10th of 1997, in Cook County, Erven Walls, Dolores

11  Jinadu and Tony Hillard committed the offense of

12  attempt first degree murder in that they without

13  lawful justification with the intent to kill Yinka

14  Jinadu, did an act, specifically struck Yinka Jinadu

15  repeatedly with a baseball bat which constituted a

16  substantial step toward the commission of the crime

17  of first degree murder.

18          The second count alleges that at the same

19  time and place the defendants, Walls, Jinadu, and

20  Hillard, committed the crime of armed robbery in

21  that they by the use of force or by threating the

22  imminent use of force while armed with a dangerous

23  weapon, to wit a gun, took a beeper and a cellular

24  phone from the person and presence of Yinka Jinadu.

1              The third count alleges that at the same

2      time and place the defendants Walls, Jinadu and

3      Hillard committed the offense of armed violence in

4      that they while armed with a dangerous weapon, to

5      wit a handgun, committed a felony defined by

6      Illinois law, specifically aggravated battery,

7      causing great bodily harm to Yinka Jinadu.

8              The defendants Walls, Jinadu, and Hillard

9      are also charged with having, on the same date of

10     May 10th, 1997, committed the offense of aggravated

11     kidnapping in that they knowingly and secretly

12     confined Yinka Jinadu against his will while armed

13     with a dangerous weapon, a handgun, in violation of

14     the law.

15             And the defendants also are charged with

16     the offense of aggravated battery on the same date,

17     it being alleged that the defendants Walls, Jinadu,

18     and Hillard in committing a battery on Yinka Jinadu

19     intentionally or knowingly without legal

20     justification caused bodily harm to him by striking

21     him about the head and body with a baseball bat and

22     chisel and causing leg injuries and broken facial

23     bones in violation of the law.

24             And finally the last count alleges that at

1   the same time and place the defendants committed the

2   offense of aggravated battery in that they in

3   committing a battery on Yinka Jinadu intentionally

4   or knowingly without legal justification caused

5   bodily harm to him while using a deadly weapon other

6   than the discharge of a firearm, specifically by

7   striking him with a baseball bat.

8         Those are the charges that would be before

9   this jury.  Those are the charges that bring Mr.

10  Hillard to this place in the trial.

11        The charges that I have read to you, ladies

12  and gentlemen, are not to be taken by you as any

13  evidence of the defendant's guilt.  They are the

14  formal machinery necessary to bring him to the point

15  in the proceedings where he is called upon to answer

16  to these charges.

17        Mr. Hillard, as with all other persons

18  accused of crimes in this building, in this county,

19  in this state, is presumed to be innocent of the

20  charges that bring him here.  That presumption

21  cloaks him now at the onset of the trial and will

22  continue to cloak him throughout the course of the

23  proceedings.  That is, during jury selection, during

24  the opening statements that counsel will have an

1  opportunity to make to you, during the presentation

2  of the evidence, during the final arguments, during

3  the instructions of law that I will give to you and

4  on into your deliberations unless each of you

5  individually and collectively are convinced from the

6  evidence that the defendant is guilty of these

7  charges beyond a reasonable doubt.

8      So it is absolutely important at this point

9  that each of you understand and moreover accept

10 these fundamental principles that the defendant is

11 presumed innocent and has no burden to prove himself

12 innocent, but rather it is the State's burden to

13 prove him guilty and prove him guilty beyond a

14 reasonable doubt.

15     What that means practically speaking is

16 because of this presumption of innocence the

17 defendant is not required to prove his innocence by

18 testifying, taking the witness stand, by calling any

19 witness, or presenting any evidence.  If he does

20 elect to not call witnesses or not to testify he may

21 do nothing but sit here and rely upon what he and

22 his attorneys perceive to be the inability of the

23 people to prove him guilty beyond a reasonable

24 doubt.

1    Should that happen you will have to decide

2    the case solely on the evidence presented by the

3    prosecution.

4    If on the other hand Mr. Hillard does elect

5    to testify or present witnesses I will tell you now

6    you will be instructed later that you will listen to

7    and consider that evidence in the same manner as you

8    will consider evidence presented by the

9    prosecution.

10    I might also add for your information that

11    this offense is alleged to have been committed at

12    5851 North Winthrop in the City of Chicago, in Cook

13    County.

14    And you may hear from the following

15    witnesses:

16    Yinka Jinadu and Loretha (ph. sp.) Hillard;

17    also from two officers from the 20th

18    District.  That is the Summerdale District on Foster

19    Avenue.  They are Officers Smith and Ramirez.

20    Ramirez is now assigned to the 19th District.

21    And two detectives from Area 3 Violent

22    Crimes, a police facility at Western and Belmont.

23    And they are Detective Jackson and Detective

24    Bradley.

1          This case is not anticipated to take a long

2     time as far as trials go.  We anticipate to be done

3     sometime Wednesday.

4          A few words as to the roles of the various

5     participants here, including yourselves.

6          The State's Attorneys that I introduced to

7     you, Miss Savini and Miss Curtiss, are here to

8     represent the People, to introduce evidence in

9     support of the charges that had been returned by the

10    Grand Jury, and also to make appropriate arguments

11    to you at points in the proceeding in support for

12    the verdicts that they are seeking.

13         The evidence that you will hear and

14    consider in this case will not be confined to this

15    case alone.  I think we can safely predict that the

16    evidence will fall within two general categories;

17    that is testimonial evidence, evidence that you will

18    hear from witness who have be placed under oath, and

19    in response to questions put to them will make

20    answers that will be competent evidence for you

21    folks to consider.

22         The other general type of evidence is

23    tangible evidence -- things or objects other than

24    the spoken word that you may perceive through other

1    than your hearing or auditory senses, which could be

2    photographs, books, objects, weapons, things of that

3    nature.

4          Evidence may also be received by

5    stipulation.  It simply means that the parties have

6    no contest as to the admissibility of that evidence

7    and it will be presented by the agreement of the

8    parties.

9          Also defense counsel who is here, Miss

10   Bormann and Miss McBeth, are here to represent Mr.

11   Hillard to insure that the evidence that is

12   introduced against him is competent, relevant, and

13   material to the charges here.  Also to insure that

14   the prosecution is held to its burden of proof and

15   to introduce such evidence as they may elect to do,

16   bearing in mind what I previously told you, and that

17   is they have no legal obligation to do that, and

18   also they will be given the opportunity as well to

19   make arguments to you at appropriate points in the

20   proceedings in support of the verdicts that they are

21   seeking.

22          I neglected to read one name of a possible

23   witness, who is Off. Chase from the 18th District on

24   East Chicago Avenue.

1          The Court, and I refer to myself in that
2     capacity, serves a several-fold function in a jury
3     trial.  One of course will be to insure that only
4     competent and proper evidence is introduced in the
5     proceedings and in that capacity I no doubt will
6     will have occasion to rule on objections and offers
7     of evidence that may be made by one side or the
8     other.
9          I will also have the occasion to instruct
10    you on the law at the end of the case before you
11    begin your deliberations.
12         Some of the things I am telling you now
13    will be repeated, but you will have those
14    instructions in writing to take back with you to the
15    jury room to refer to during the course of your
16    deliberations.
17         You, ladies and gentlemen in the jury
18    trial, occupy a rather unique province or function
19    under our system of law.  You are the judges of the
20    facts.  That is you will decide what the facts are.
21    Nobody will tell you that but you will learn that
22    from one source and one source alone, and that is
23    from the evidence that will unfold here over the
24    next several days.

1        Facts do not become facts automatically or
2   because somebody says or thinks they are.  That is
3   for you to decide and you will do that from your
4   observations of the witnesses, from their demeanor,
5   from the reasonableness or unreasonableness of what
6   they have to say as perhaps corroborated or
7   contradicted by other credible evidence that you
8   find to exist.

9        You will apply the law that I give you to
10  to the facts as you decide them to be and in that
11  way you will decide the case.  Your decision or
12  verdict as we call it here must be unanimous and it
13  must be delivered in writing in open court on the
14  verdict forms that we will give to you, guilty or
15  not guilty, signed by your foreperson who you will
16  elect later, and the other eleven members of the
17  jury as to each charge.

18       The question of punishment will not be your
19  concern, it will be my concern if and only if there
20  is one or more verdicts finding the defendant to be
21  guilty as charged.

22       I think you can surmise from the nature of
23  the charges that I have read and summarized to you
24  that this is a very serious case.  All cases that

1    are tried in this building, in this courtroom, are

2    serious cases.  And I think it is fair to assume

3    that in selecting a jury both sides, the prosecution

4    and the defense, are seeking people who will be fair

5    and impartial to both sides, people who will be

6    openminded as you sit here now, that is without

7    fixed opinions as to the defendant, as to the

8    charges, or as to what the result should be without

9    having heard any evidence in this case.

10         What we are looking for are people who can

11   decide the case based on the evidence and the law

12   that I will give to you without any collateral

13   influences bearing upon that decision, such as

14   influences from what you may see or hear in the

15   media, radio or television, or things of that

16   nature, without sympathy and without prejudice to

17   either side.

18         In fulfilling this objective it will be

19   necessary for questions to be asked of you by the

20   lawyers, perhaps by myself touching upon your

21   qualifications to sit as jurors in a case such as

22   this.

23         The questions that will be asked of you are

24   questions routinely asked of all jurors sitting in

1    the chairs you are in now and the questions that

2    will be asked by the lawyers will be seeking to

3    learn a little bit about you, type of background

4    that you have, type of work that you do, but more

5    importantly your experiences with the law, with the

6    lawyers, with police officers, with judges, any

7    experiences you may have had in court with crime,

8    either as complainants or victims or persons who

9    have been arrested and charged with crimes.

10            The questions that are asked of you will

11   not be asked in any effort to pry into your personal

12   affairs.  If there is any question that is asked

13   that you feel might cause you some embarrassment

14   just alert me to that and I will take your answer in

15   chambers.

16            At this time I am going to ask the clerk to

17   call twelve of you into the jury box and as you are

18   called the first person called will take the first

19   seat closest to me, the second person will take the

20   second seat, third, fourth, fifth, and sixth will

21   occupy the front row.  No. 7 through 12 will occupy

22   the rear row.

23            When your name is called if you will enter

24   from the back of the jury box there where it is cut

1   out you can avoid stepping on each other's toes as

2   you move forward.

3        You may call the names.

4        THE CLERK:  Katherine Lease.  Linda Green.

5   Norma Miller.  Dean Maiben.  Evangeline Kurtzer.

6   Virginia Harris.  Stephen Hinds.  Carl Windell.

7   Mary Arundel.  Janet McIe.  Stanlislava Petric.

8   Frederick Pannkoke.

9        THE COURT: You may proceed, Miss Savini.

10       MS. SAVINI:  Thank you, Judge.

11

12            K A T H E R I N E    L E A S E,

13

14   called as a prospective juror herein, having been

15   first duly sworn was questioned and responded as

16   follows:

17

18                    EXAMINATION

19                    By: Ms. Savini

20

21       Q.   Miss Lease, I see that you live in the

22   downtown area?

23       A.   Yes.

24       Q.   How long have you lived at that location?

C-43

1          A.    About three years.

2          Q.    Prior to that were you from the Chicagoland

3    area or another state?

4          A.    Another state.

5          Q.    What state was that?

6          A.    Indiana.

7          Q.    How long did you live in Indiana?

8          A.    Four years.

9          Q.    If you could, keep your voice up the court

10   reporter has to take down everything you are saying

11   and the lawyers on the other side of the room have

12   to hear you also?

13         A.    All right.

14         Q.    Was it work that brought you to Chicago?

15         A.    Yes.

16         Q.    You are currently a loan officer?

17         A.    Yes.

18         Q.    Was that with a bank?

19         A.    Commercial real estate company.

20         Q.    How long have you been in that line of

21   work?

22         A.    Twelve years.

23         Q.    With the same company or different

24   companies?

1       A.    Same company.

2       Q.    Prior to that did you hold any different

3    occupation or were you in school?

4       A.    Insurance in Indiana.

5       Q.    What type of insurance?

6       A.    Insurance agency.

7       Q.    Were you an agent?

8       A.    No.  Secretary/receptionist.

9       Q.    You are currently divorced?

10      A.    Yes.

11      Q.    Has it been within the pass ten years that

12   you were divorced?

13      A.    Yes.

14      Q.    What did your husband do?

15      A.    Musician.

16      Q.    Was he also from Indiana or Chicago?

17      A.    Indiana.

18      Q.    Have you ever been the accused, meaning the

19   person arrested, you yourself, the complainant, or

20   witness in a criminal case?

21      A.    No.

22      Q.    I see that you have never been the victim

23   of a crime nor do you have any family members that

24   have been the victim of a crime?

1     A.    No.

2     Q.    What type of things do you like to do in

3   your spare time?

4     A.    Work out, roller blade.

5     Q.    So living downtown puts you nice and close

6   to the lake?

7     A.    Go to the beach, yes.

8     Q.    Great.  I want to ask you a couple

9   questions.  At the close of the evidence in this

10  case if you feel that we have proven the defendant

11  guilty beyond a reasonable doubt could you and would

12  you in fact sign a guilty verdict?

13    A.    Yes.

14    Q.    On the flip side because I am sure his

15  lawyer will ask you in a few minutes if you felt we

16  didn't prove him guilty would you sign a not guilty

17  verdict?

18    A.    Yes.

19    Q.    Do you feel you can be fair to both the

20  victim and the defendant in this case?

21    A.    Yes.

22    Q.    The judge read you a list of witnesses that

23  may or may not be called in this case.

24          Did any of you recognize the names of those

1  people?

2        No.

3     THE COURT: For the record all jurors have

4  indicated they have not.

5     MS. SAVINI:  Thank you very much.

6     MS. BORMANN: Judge, may we have a side-bar?

7     THE COURT: You want the reporter?

8     MR. BORMANN:  No.

9        (Whereupon a discussion was had off

10        the record.)

11

12           L I N D A   G R E E N,

13

14  called as a prospective juror herein, having been

15  first duly sworn was questioned and responded as

16  follows:

17

18              EXAMINATION

19              By: Ms. Savini

20

21     Q.   Miss Green, you live in a western suburb?

22     A.   Yes.

23     Q.   How long?

24     A.   Four years.

1    Q.    Prior to that?

2    A.    South side of Chicago.

3    Q.    How long there?

4    A.    30 years.

5    Q.    Pretty much the whole life on the south

6    side until you moved to the suburbs?

7    A.    Yes.

8    Q.    You are currently a postal worker?

9    A.    Yes.

10    Q.    For an Indiana company?

11    A.    No.  United States Post Office.

12    Q.    How long have you held that position?

13    A.    Four years.

14    Q.    Prior to that employed in another

15    capacity?

16    A.    Retail sales.

17    Q.    How many years did you spend in retail

18    sales?

19    A.    Fifteen.

20    Q.    And you are married and your husband is

21    also a postal worker?

22    A.    Right.

23    Q.    How long has he been in that line of work?

24    A.    Three years.

1    Q.   Prior to that do you know what his

2  occupation was?

3    A.   Also a retailer.

4    Q.   Have you yourself ever been the accused,

5  meaning the person arrested, a complainant or

6  witness in a criminal case?

7    A.   No.

8    Q.   You have, however, been the victim of a

9  crime?

10    A.   Yes.

11    Q.   Can you tell me what crime that was and

12  when that occurred?

13    A.   I can't give you the year.  I can give you

14  the crimes.

15    Q.   What's the crime?

16    A.   Apartment that I was in was broken into.

17    Q.   Here in the city or suburbs?

18    A.   City.

19    Q.   At least four years ago?

20    A.   Yes.

21    Q.   In that case where your apartment was

22  broken into, were you home at the time?

23    A.   No.

24    Q.   Do you know if the police were called?

1      A.    Yes.

2      Q.    Was anybody caught in that case?

3      A.    No.

4      Q.    When is the next time that you had been the

5   victim of a crime?

6      A.    Couple stolen cars were recovered.  I can't

7   give you the years.

8      Q.    That was also in the city or suburbs?

9      A.    City.

10     Q.    In those cases did you call the police each

11  time your car was stolen?

12     A.    Yes.

13     Q.    In any of those cases was the perpetrator

14  ever caught?

15     A.    No.

16     Q.    Were the cars recovered?

17     A.    They were but the person that stole them

18  was not caught.

19     Q.    Any other times that you have been

20  victimized?

21     A.    Yes.  On buses with jewelry and on els with

22  jewelry.

23     Q.    Robberies?

24     A.    Yes.  I guess you call it robbery.

1   Snatching jewelry, things like that.

2       Q.   In any of those cases did you call the

3   police?

4       A.   No.

5       Q.   All right.  Anything about your experience

6   with being a victim of crime that would prevent you

7   from being fair and impartial here in this case?

8       A.   Yes.

9       Q.   What is it about your experiences that

10  would prevent from you being fair here?

11      A.   I just don't think I could be fair to the

12  person.  I know it was small crimes, but, you know.

13      Q.   You mean the person on trial you couldn't

14  be fair to?

15      A.   Yes.

16      Q.   Because of the things that have happened to

17  you in your life?

18      A.   Yes.

19      Q.   You are saying you would hold that against

20  him, the person on trial?

21      A.   Not against him but I don't think I could

22  be fair.

23      Q.   If not for holding it against him in what

24  way could you not be fair?

1      A.    I guess I would always be thinking there is

2   a better way or something, I guess.  I guess I

3   couldn't be impartial.

4      Q.    Do you base that on your experiences with

5   crime?

6      A.    Yes.

7      Q.    It shows here that you -- not only you but

8   your family member and friends have also been

9   victims of crime?

10     A.    Yes.

11     Q.    Can you tell me what people, either in your

12  family or friends, have been victimized and what

13  those crimes were?

14     A.    My mom was in a stickup at a grocery store.

15     Q.    Armed robbery?

16     A.    Yes.

17     Q.    And was she a victim in that case?

18     A.    No, she wasn't hurt, but, you know, she

19  told us about it and she didn't call the police, so

20  there is no report or anything.

21     Q.    Was she the person that was robbed or other

22  people in the store were robbed?

23     A.    She was the person.

24     Q.    For some reason she chose not to call the

1    police on that?

2        A.    Yes.

3        Q.    In addition to that case where your mother

4    was the victim there are any other people either

5    your family or friends that have been victims of a

6    crime?

7        A.    My sister was victimized the same way that

8    I was, with break-ins and car theft.

9        Q.    The whole multitude of different types of

10   crimes?

11       A.    Yes.

12       Q.    And you have discussed that with your

13   sister?

14       A.    Yes.

15       Q.    Is there anything about the fact that your

16   mother and sister had been victims of crime that

17   would prevent you from being fair and impartial in

18   this case?

19       A.    No.

20       Q.    In that situation could you understand and

21   separate that this case has nothing to do with your

22   family's unfortunate experiences?

23       A.    Yes.

24       Q.    You just feel that with yourself that that

1    would interfere with your ability to be fair because

2    you have been victimized?

3         A.   Yes.

4         Q.   What type of things do you like to do in

5    your spare time.

6         A.   I read.

7         MS. BORMANN: I'm sorry?

8         THE WITNESS: I read and browse bookstores.

9    BY MS. SAVINI:

10        Q.   Browse bookstores.  Okay.

11             What types of things do you like to read?

12        A.   I read basically anything; family books,

13   crime books, self-help books.

14        Q.   Let me ask you the same type of questions

15   that I have already asked.  At the close of the

16   evidence in this case if you feel that we have

17   proven the defendant guilty beyond a reasonable

18   doubt would you and could you sign a guilty verdict?

19        A.   Yes.

20        Q.   On the flip side if you felt we had not

21   would you sign a not guilty verdict?

22        A.   Yes.

23        Q.   I am going to ask you this question one

24   last time.  Do you feel you can be fair and

1    impartial to both sides in this case?

2        A.    No.

3        Q.    And why is it you feel you cannot be fair?

4        A.    Well, you kind of told me the case and I

5    have kind of heard it already but I have not heard

6    the evidence.

7        Q.    At this point you have not heard any of the

8    evidence so we wouldn't ask you to make a judgment

9    on it only until after you heard the evidence.

10            What I am asking you is could you listen to

11   the evidence in this case and with your fellow

12   jurors go back in the jury room, deliberate, reach a

13   decision, reach a verdict in this case?  Could you

14   do that fairly?

15       A.    Okay; yes.

16       Q.    What I want to ask you, I want to make sure

17   I am clear on this because you just told us pretty

18   much in the same few minutes that you couldn't be

19   fair because you had been a victim of so many

20   crimes?

21       A.    Yes.

22       Q.    What happened in the past few minutes that

23   made you now change your mind and you could be fair?

24       A.    You said listen to the evidence and

1   deliberate with them.

2       Q.    You understand that?

3       A.    Yes.

4       Q.    You understand that whatever happen to you

5   in your cases, where you are a victim, has nothing

6   really to do with this case on trial today and we

7   are asking every juror in here to listen to the

8   evidence and make a decision based on evidence, not

9   on the times that you have been the victim of crime?

10      A.    Okay.

11      Q.    Do you feel that you can do that?

12      A.    Yes.

13  MS. SAVINI:    Thank you.

14

15              N O R M A    M I L L E R,

16

17  called as a prospective juror herein, having been

18  first duly sworn was questioned and responded as

19  follows:

20

21                  EXAMINATION

22                  By: Ms. Savini

23

24      Q.    Miss Miller?

1      A.    Yes.

2      Q.    I see that you live in -- would that be a

3  near southwest suburb?

4      A.    Southern.

5      Q.    How long have you lived at that location?

6      A.    21 years.

7      Q.    And that location you currently own; is

8  that correct?

9      A.    Yes.

10     Q.    And you yourself -- Well, prior to living

11  in that location where were you from?

12     A.    We lived three years in University Park,

13  just a little bit further south.

14     Q.    Before that?

15     A.    Before that would I lived in the St. Louis

16  area and my husband had a job where we traveled a

17  lot.  So I have lived --

18     Q.    You lived a lot of places?

19     A.    Florida, California.

20     Q.    Where are you originally from?

21     A.    Southern Illinois.

22     Q.    You are currently retired?

23     A.    Yes.

24     Q.    What occupation did you retire  from?

1      A.    I worked in a cash office at Marshall

2  Fields.

3      Q.    How long?

4      A.    Ten years.

5      Q.    Prior to that were you employed?

6      A.    No.  I was raising a family.  I mean years

7  previously before raising a family I worked at Scott

8  Air Base in Southern Illinois.

9      Q.    What did you do for them?

10     A.    Worked at Scott Air Base, Southern

11  Illinois.

12     Q.    What did you do there?

13     A.    Clerk typist type of job.

14     Q.    Raised the kids and went back to work after

15  the kids were out of your hair?

16     A.    Yes.

17     Q.    Your husband is a truck driver and it is

18  his trucking company that brought him and you from

19  state to state?

20     A.    No.  Actually he was an engineer previous

21  to that.  That is how we did our traveling.  Quality

22  control engineer.  That is how we got in Chicago.

23          He was transferred and went -- with that

24  job and went into trucking.

C-58

1      Q.   How long has he been in trucking?

2      A.   I guess about 20 years.

3      Q.   Prior to that everything was engineering?

4      A.   Yes.

5      Q.   Now I come to the five children question so

6  I can see why you needed to take some time off.

7           Fortunately four, they appear to be grown

8  up, and I hope they are out of the home?

9      A.   I have one at home now.

10     Q.   Okay.  We will work on that.

11          If you can start with the oldest and go to

12  the youngest and tell me if that person is married,

13  whether or not they have children, and what his or

14  her occupation is?

15     A.   All right.  Oldest daughter is not

16  married.  Never has been.

17     Q.   Is she employed?

18     A.   Yes.  She works at Dominick's as a cashier.

19     Q.   Here in the Chicagoland area?

20     A.   Matteson.

21     Q.   Okay.  Next one?

22     A.   Johnna.  She was married.  She in the

23  process of getting a divorce.  She has three

24  children, my only grandchildren; two boys and a

1    girl.

2        Q.    Does she work?

3        A.    She works at Dominick's also in the

4    customer service.

5        Q.    The next?

6        A.    My son, Matt, now works at Dynamic

7    Transport.

8        Q.    What does he do for them?

9        A.    I don't really know his job title.  He

10   travels for the business and stuff, a trucking

11   business.

12       Q.    Is he married with children?

13       A.    No.  He is the one I have at home yet.

14       Q.    The middle one stayed home.

15             How about the next one?

16       A.    Michael works for, he did work for J.B.

17   Hunt.  He works for Roadway Trucking Company. He is

18   a driver.

19       Q.    Another trucker.  Is he married with any

20   children?

21       A.    Owns his own home.  Never has been.  No

22   children.

23       Q.    The baby?

24       A.    The baby is living with my son, Michael,

1    the previous one.  He not married.  No children.

2    Works at electrical company in Chicago Heights.

3        Q.    Have you ever been the accused, meaning the

4    person arrested, the complainant, or witness in a

5    criminal case?

6        A.    No.

7        Q.    I see here that you have been the victim of

8    a crime.

9        A.    Yah.  I wanted to -- I couldn't remember

10   did that say violent crime or just crime?

11       Q.    Nope.  Just a crime?

12       A.    Just crime, because I had my wallet stolen

13   and we have had bicycles stolen, personal property.

14       Q.    How long ago did those things happen?

15       A.    Probably over five years ago.

16       Q.    A while?

17       A.    Yes.

18       Q.    In any of those cases were the police ever

19   called?

20       A.    Yes.

21       Q.    And --

22       A.    I guess in all of them.

23       Q.    Was anyone ever caught in any of those

24   cases?

1      A.    No.   I think the wallet incident, someone

2   was caught because there was -- there were two

3   victims that night or maybe numerous victims and

4   they did catch the offender.

5      Q.    Did you ever have to go to court?

6      A.    No.

7      Q.    Do you know what happened in court with

8   that case after the person was caught?

9      A.    No.

10     Q.    Anything about those experiences where you

11  were victimized that would prevent you from being

12  fair and impartial in this case?

13     A.    No.

14     Q.    You also have checked here your family

15  members or friends have been the victim of crime.

16          Can you tell me who that involved?

17     A.    I did check that?

18     Q.    Yes.

19     A.    Maybe having the bicycles stolen.

20     Q.    The bikes were the kids?

21     A.    Yes.

22     Q.    Pretty much the same incident.

23     A.    I think my son Jack one night was assaulted

24  in our driveway.   It was a minor incident between

1    him and one of his buddies.  And the police were

2    notified of that.

3         Q.    Do you know if it ever went any further

4    than that?

5         A.    No.  I think it was resolved between the

6    two.

7         Q.    What types of things do you like to do in

8    your spare time?

9         A.    I play the piano and play bingo, go to

10   garage sales.

11        Q.    If at the close of the evidence in this

12   case if you feel that we have proved the defendant

13   guilty beyond a reasonable doubt would you and could

14   you sign a guilty verdict?

15        A.    Yes.

16        Q.    Do you feel you could be fair and impartial

17   to both sides in this case?

18        A.    Yes.

19        Q.    One other thing I want to ask you about is

20   something the judge instructed you on and that is

21   the law of accountability.  And all that means is

22   the law of legal responsibility.  What that means is

23   the judge is going to tell you what the law is

24   about, legal responsibility, and that means when two

1   or more people join together, either to plan or

2   commit a crime and those people in fact do commit a

3   crime they are not responsible only for their own

4   actions but they are responsible for the actions of

5   the whole group because of that criminal enterprise?

6        A.    Yes.

7        Q.    Do you understand that proposition of law?

8        A.    Yes.

9        Q.    If instructed on that would you and could

10  you follow that instruction of law?

11       A.    Yes.

12       MS. SAVINI:   Thank you.

13

14                  D E A N   M A I B E N,

15

16  called as a prospective juror herein, having been

17  first duly sworn was questioned and responded as

18  follows:

19

20                      EXAMINATION

21                   By: Ms. Savini

22

23       Q.    Mr. Maiben?

24       A.    Yes.

1      Q.    I see that you live in a far northwestern

2   suburb?

3      A.    Yes.

4      Q.    At that location you currently own your

5   home?

6      A.    Yes.

7      Q.    How long have you been out in that suburb?

8      A.    28 years.

9      Q.    Prior to that where were you from?

10     A.    I was born in Utah.  Lived in Florida, in

11  New York.  Lived in Lake Forest before moving here.

12     Q.    How long did you live in Lake Forest for?

13     A.    One year.

14     Q.    What was it that brought you here to the

15  Chicagoland area?

16     A.    I am a city manager, became a city manager.

17     Q.    Is that the reason for the move in the

18  other states -- city manager of different towns?

19     A.    Yes.

20     Q.    Have you ever served in the military?

21     A.    No.

22     Q.    Currently you work for Cook County?

23     A.    Yes.

24     Q.    How many years have you been with Cook

1  County as a planner?

2      A.   Ten years.

3      Q.   Prior to that you lived in the Chicagoland

4  area.

5           What type of work were you doing?

6      A.   City management.

7      Q.   For a different county or different city?

8      A.   For different cities around this county.

9      Q.   You are married?

10     A.   Yes.

11     Q.   Your wife is a teacher?

12     A.   Right.

13     Q.   How long has she been a teacher?

14     A.   Fifteen, twenty years.

15     Q.   I see that you have three grown children.

16     A.   Yes.

17     Q.   And again could you start with the oldest

18  and tell me what he or she does and whether or not

19  they are married with any children?

20     A.   My oldest is a son.  He is in construction

21  trades.  He is not married.

22          Second is a son and he is married, has a

23  child.  He is also in construction trades.

24          My daughter is in school out in Utah.

1    Q.   She is still in school?

2    A.   Yes.

3    Q.   Have you ever been the accused, meaning the

4    person arrested, you, yourself, a complainant, or

5    witness in a criminal case?

6    A.   No.

7    Q.   You have not been the victim of a crime but

8    family or friend has?

9    A.   Yes.

10    Q.   Can you tell me a little about that?

11    A.   My son was doing some work on the third

12    story scaffold and somehow fell off it.  While

13    laying on the sidewalk with a broken back somebody

14    walked up, took his wallet and funds.

15    Q.   He was robbed?

16    A.   Yes.

17    Q.   Do you know if anyone was ever caught in

18    that case?

19    A.   Only thing the police really pursued is --

20    due to the nature of the injury I didn't think he

21    was able to pursue.

22    Q.   Was he conscious when this happened to him?

23    A.   Yes.

24    Q.   Anything about that experience with your

1    son that would prevent you from being fair and

2    impartial in this case?

3        A.    No.

4        Q.    Looks like you have been a party to a

5    lawsuit.

6              You currently have no lawsuits pending in

7    the Circuit Court of Cook County; do you?

8        A.    No.

9        Q.    What is the lawsuit that you had been a

10   party to?

11       A.    I had an employment contract and had some

12   difficulty agreeing to termination of that contract

13   and was not satisfied with it.

14       Q.    Did you in fact resolve that lawsuit?

15       A.    Yes.

16       Q.    Did it go to trial or was it resolved short

17   of that?

18       A.    Resolved short of that.

19       Q.    Anything about your experience with the

20   court systems in that civil type of a setting that

21   would prevent you from being fair and impartial here

22   in this criminal case?

23       A.    No.

24       Q.    So a family member or friend has been the

1    party to a lawsuit.  Who is that?

2        A.    That is, I must have mistakenly checked it.

3        Q.    You kind of half checked no and you checked

4    yes.  So that should be a?

5        A.    No; correct.

6        Q.    What type of things do you like to do when

7    you have some spare time.

8        A.    I am involved in community history

9    rehabilitation of or preservation of historic

10   buildings, that sort of thing.

11       Q.    And I want to ask you also at the close of

12   the evidence in this case if you feel we have proven

13   the defendant guilty would you and could you sign a

14   guilty verdict?

15       A.    Yes.

16       Q.    Do you feel you could be the fair and

17   impartial juror that we are looking for?

18       A.    Yes.

19       MS. SAVINI: Thank you.

20

21        E V A N G E L I N E   K U R T Z E R,

22

23   called as a prospective juror herein, having been

24   first duly sworn was questioned and responded as

1    follows:

2

3                   EXAMINATION

4                   By: Ms. Savini

5

6       Q.    Miss Kurtzer?

7       A.    Yes.

8       Q.    You live in a near north suburb?

9       A.    Yes.

10      Q.    At that location you own your home?

11      A.    Yes.

12      Q.    How long have you owned in that area?

13      A.    37 years.

14      Q.    A long time.  Prior to that where did you

15   live?

16      A.    In Chicago on Montrose.

17      Q.    You are from the city.

18      A.    Not originally.

19      Q.    Where originally?

20      A.    Northwest Indiana.

21      Q.    And then you came to Chicago?

22      A.    After school.

23      Q.    You work for a bank.  What exactly do you

24   do for the bank?

1      A.    I am in a commercial loan department.    I am
2   a division assistant assigned -- administrative
3   assistant.
4      Q.    Do you yourself get involved in the
5   processing of the loans?
6      A.    Somewhat.    I mean I know -- I don't do the
7   documentation but really more of a customer service.
8      Q.    On the people end of the job?
9      A.    Yes.
10     Q.    How long have you been doing that?
11     A.    Ten years.
12     Q.    Prior to that were you employed outside the
13  home?
14     A.    Yes.    I worked in retail.    I did retail
15  management and worked part time when the kids were
16  little, which developed into full time now.
17     Q.    So retail for quite a while?
18     A.    Yes; for about 15 years.
19     Q.    And I see that your husband is retired?
20     A.    Yes.
21     Q.    What is it that he retired from?
22     A.    He retired from shipping and handling but
23  prior to that he had been printing.
24     Q.    And that was a career?

1      A.    Yes.

2      Q.    You have two grown children?

3      A.    Yes.

4      Q.    And can you tell me what they do and

5  whether or not they are married?

6      A.    My oldest one lives on the east coast,

7  married for ten years, no children.  He sells

8  automotive parts.  He is a sales manager for the

9  northeastern part of the United States.

10      Q.    The baby?

11      A.    My youngest son lives in the suburbs.  He

12  is married just a short time.  No children.  And he

13  does inside sales for a company that sells toner and

14  all that type of thing.

15      Q.    For like the copy machines?

16      A.    Yes, you know, that sort of thing.

17      Q.    All right.  I see that you have either a

18  family member or close friend that is a police

19  officer?

20      A.    Yes; a nephew.

21      Q.    Is that a Chicago Police Officer?

22      A.    Yes.

23      Q.    Do you know what district he is out of?

24      A.    Not really.

1          Q.    So how often would you say you even see

2    him?

3          A.    I seem about four times a year.

4          Q.    When you see him do you discuss his work or

5    its nature?

6          A.    Little bit because he's in a bad area.

7          Q.    Some district that is not a good district?

8          A.    Right, but he likes it.

9          Q.    Probably keeps him busy.

10              Anything about your relationship with your

11   nephew that is a police officer that would prevent

12   you from being fair and impartial in this case?

13         A.    No.

14         Q.    His name was not one of the announced?

15         A.    No.

16         Q.    Have you ever been the accused, meaning

17   you, yourself, the complainant, or witness in a

18   criminal case?

19         A.    No.

20         Q.    You have, however, been the victim of a

21   crime?

22         A.    We have had a car stolen and years ago when

23   we lived in the apartment in the city we had a

24   burglary during the day while we were not at home.

1    Q.    In reference to the earlier cases have

2    those happened within the past ten years or so?

3    A.    Come to think of it my husband had his

4    pocket picked.  My husband had his pocket picked

5    within the last ten years, and he knew that it was

6    happening but couldn't catch the guy.

7    Q.    In any of those cases and even in the one

8    with your husband do you know if the police were

9    ever called?

10    A.    Yes, the police were called in all of them.

11    Q.    Do you know if anyone was ever caught in

12    any of them?

13    A.    No.

14    Q.    Anything about your experience and your

15    family's experience as victims that would prevent

16    you from being fair and impartial here in this case?

17    A.    I don't think so.

18    Q.    Do you understand the facts in this case

19    have absolutely nothing to do with any of those

20    circumstances?  Yes?

21    A.    Yes, I do.

22    Q.    What types of things do you like to do in

23    your spare time?

24    A.    Reading.  I do some tutoring at the library

1    for learning to read for adults.

2         Q.   Learning to read for adults?

3         A.   Yes.

4         Q.   Anything in particular you yourself like to

5    read?

6         A.   I like to read a lot of different kinds of

7    things.

8         Q.   A variety?

9         A.   Yes; fiction and nonfiction.

10        Q.   At the close of the evidence in this case

11   if you feel we have proven the defendant guilty

12   beyond a reasonable doubt would you and could you

13   sign a guilty verdict?

14        A.   Believe so.

15        Q.   On the flip side I am sure they are going

16   to ask you if you felt we didn't would you sign a

17   not guilty verdict?

18        A.   Sure.

19        Q.   You think you might be able to sign a

20   guilty verdict but are sure you can sign a not

21   guilty?

22        A.   I'm sorry.  I sometimes can see both sides

23   and I get confused.

24        Q.   You understand all we are going to ask you

1    to do in this case is listen to the evidence and

2    listen to the law as Judge Toomin instructs you and

3    make a decision and you will do that with the help

4    of your fellow jurors?

5           At the close of the evidence what I am

6    asking you again is if you felt we did prove him

7    guilty beyond a reasonable doubt would you be able

8    to sign that guilty verdict?

9        A.    Yes.

10       Q.    Do you feel you could be fair and impartial

11   to both sides in this case?

12       A.    Yes, I do.

13       MS. SAVINI:    Thank you.

14       THE COURT: I think this would be an appropriate

15   time for us to stop.

16           Ladies and gentlemen, we will recess for

17   lunch.

18           The twelve people in the jury box have

19   lunch provided by the Sheriff of Cook County.    We

20   have special dining areas over in the administration

21   building that you reported to earlier.

22           Those of you out in the gallery seats,

23   folks, there is a cafeteria on the second floor of

24   the building you reported to this morning and there

1     is a snack shop in between the two buildings you

2     passed by on your way over here.

3           I am going to ask that over the noon or

4     lunch recess you do not discuss the case amongst

5     yourself.  That is all of you -- those in the jury

6     box, those in the gallery seats.

7           If anybody should endeavor to speak to you

8     about the case that would be improper and please

9     bring that to the attention of the sheriffs who are

10     attending to the jury.

11           Actually there is very little you would

12     have to discuss about the case because all you have

13     heard are the charges that bring the defendants here

14     and of course is not evidence.

15           We will reconvene here at a quarter of

16     3:00, 2:45.  This is Room 400.  My name is Toomin.

17           And those of you in the back you may feel

18     free to leave at this point and see you back here at

19     a quarter of 3:00.

20           You folks can step back in the jury room

21     with Deputy Murphy and she will escort you to

22     lunch.

23           (Whereupon a recess was taken.)

24

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME . . 1 . . . OF . . 7 . . VOLUME . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED . . PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE . COURT NO. 99-0152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . . . . TONY HILLARD . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness: AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . APRIL 23, . . . . . . . . . . . . . ., 19 . 99 .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

APR 2 2 1999

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

1  STATE OF ILLINOIS    )
                        )   SS:
2  COUNTY OF COOK       )

3          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION
4
   THE PEOPLE OF THE        ) Case No.  08 CR 30453
5  STATE OF ILLINOIS        ) Charge:   Murder
          vs               ) Before:   JUDGE MICHAEL
6                          )                    TOOMIN
   TONY HILLARD             ) July 13, 1998
7
                        JURY TRIAL
8
   RECORD OF PROCEEDINGS had in the hearing of the
9
   above-entitled cause.
10
   APPEARANCES:
11
              HON. RICHARD A. DEVINE,
12                 State's Attorney of Cook County, by
              MS. GINA SAVINI and
13            MS. ANN CURTISS,
                   Assistant State's Attorneys,
14                 appeared on behalf of the People of
                   the State of Illinois;
15
              MS. RITA A. FRY,
16                 Public Defender of Cook County, by
              MS. CHERYL BORMANN,
17                 Assistant Public Defender,
                   appeared on behalf of the Defendant.
18

19

20

21
   ROCHINA V. DeBARTOLO
22 LICENSE NO. 084-000824
   Official Court Reporter
23 2650 S. California
   Chicago, Illinois 60608
24

1        THE CLERK: People of the State of Illinois
2   versus Hillard.
3
4              V I R G I N I A   H A R R I S,
5
6   called as a prospective juror herein, having been
7   first duly sworn was questioned and responded as
8   follows:
9
10                    EXAMINATION
11                  By: Ms. Curtiss
12
13      Q.   Miss Harris, it indicates you life on the
14   near west side?
15      A.   Yes.
16      Q.   How long have you lived there?
17      A.   About five years.
18      Q.   Prior to living there where did you live?
19      A.   River Grove.
20      Q.   How long there?
21      A.   About eight years.
22      Q.   You are a homemaker?
23      A.   Yes.
24      Q.   How long have you been a homemaker?

1          A.    About 46 years.

2          Q.    Your husband, it indicates, is retired?

3          A.    Yes.

4          Q.    Prior to his retirement what did he do?

5          A.    Restaurant.  He was with restaurant for his

6    father.

7          Q.    He works for a restaurant that is father

8    owned?

9          A.    Yes.

10         Q.    Did he do that for moves his career?

11         A.    Most of it.

12         Q.    About how long did he work for his father?

13         A.    Quite some time.  Then he went into

14   trucking.

15         Q.    When he retired what business was he in?

16         A.    In between.  Little bit of both.

17         Q.    How long in the trucking business?

18         A.    Eight year.

19         Q.    Indicates here you have five children?

20         A.    Yes .

21         Q.    Could you please tell me starting with the

22   eldest what they do for a living, whether or not

23   they are married or single?

24         A.    Eldest is married.  He has four children.

1       Q.    What does he do for a living?

2       A.    Car salesman.

3       Q.    Car salesman?

4       A.    Yes.  My second one is Board of Trade.

5       Q.    Board of Trade?

6       A.    Yes.  Third works as a fundraiser.

7       Q.    Is he single or married?

8       A.    Married.

9       Q.    Okay.

10      A.    Then my youngest one, he is also a male.

11      Q.    I think I am missing one.  This the four.

12      A.    Yes, this is the four.  They are all males

13  except for the youngest at home now.  The last one

14  is in restaurant also.

15      Q.    Youngest is at home? .

16      A.    Yes.  She is disabled.

17      Q.    All right.  Indicates that you have served

18  on a jury before?

19      A.    Yes.

20      Q.    What type of case was that?

21      A.    Realty.

22      Q.    That was a civil case then?

23      A.    Yes.

24      Q.    Did your jury deliberate to a verdict in

1   that case?

2       A.   Yes.

3       Q.   Is there anything about that experience

4   that would impair your ability to be fair and

5   impartial in this case?

6       A.   Not at all.

7       Q.   Indicates here also you have been the

8   victim of a crime?

9       A.   Yes.

10      Q.   What type of crime was that?

11      A.   Twice.

12      Q.   What was that?

13      A.   Male accosted on the street once and

14  someone entered my home.

15      Q.   In the first instance when you were

16  accosted on the street were the police brought in?

17      A.   Both times.

18      Q.   Did you have to appear in court?

19      A.   No.

20      Q.   On either of them?

21      A.   No.

22      Q.   Anything about those experiences that would

23  affect your ability here or the next couple of days

24  to be fair and impartial?

1    A.    Not at all.

2    Q.    What do you do in your spare time?

3    A.    Well, I'm a chairperson for fundraising for

4  Newsome Special School where my daughter is at.

5    Q.    How long have you been involved in

6  fundraising for that school?

7    A.    About a year.

8    Q.    What sort of things do you do in your

9  fundraising effort?

10    A.    Talk to everybody.  Try to get them

11  interested in the program that we have.

12          I was trying to get my daughter there.  She

13  is 28 now.  I was not able to do this.  And finally

14  able to accomplish that and get her into a working

15  type of school center.  Very satisfied with it so I

16  have given them all my time that I am able to give.

17    Q.    Outstanding.

18    A.    As a volunteer.

19    Q.    And, ma'am, at the end of the case if you

20  felt that the people had proven their case beyond a

21  reasonable doubt would you be able to sign a guilty

22  verdict?

23    A.    Definitely.

24    Q.    In the alternative if you felt we had not

1    proven our case beyond a reasonable doubt would you

2    be able to sign a not guilty verdict?

3        A.    Yes.

4

5                    S T E P H E N    H I N D S,

6

7    called as a prospective juror herein, having been

8    first duly sworn was questioned and responded as

9    follows:

10

11                        EXAMINATION

12                        By: Ms. Curtiss

13

14       Q.    Mr. Hinds?

15       A.    Yes.

16       Q.    Sir, indicates here that you are a

17   fabricator.  What exactly is that?

18       A.    I manufacture signage.

19       Q.    How long have you been doing that?

20       A.    23 years.

21       Q.    And you currently own your home; is that

22   correct?

23       A.    Condominium.

24       Q.    How long have you owned your home?

1      A.    Actually the one I am in currently only a

2    year.

3      Q.    A year.  Prior to owning your current home

4    where did you live?

5      A.    Lansing also.

6      Q.    How long have you lived in Lansing?

7      A.    My entire life.

8      Q.    Here it indicates that you have served on a

9    jury?

10      A.    Actually I have be called for jury duty

11    before.

12      Q.    Just like here today?

13      A.    Yes.

14      Q.    However, you were not selected to

15    deliberate or decide?

16      A.    Yes.

17      Q.    Also indicates that you have a member of

18    your immediate family or close friend who is a

19    police officer?

20      A.    My parents' next door neighbor is a state

21    police officer.

22      Q.    Indicates that you have friend or family

23    member who is a lawyer?

24      A.    Close friend that is a U.S. Attorney

General.   Works for the office downtown.

Q.    How frequently would you say you see this friend?

A.    Three or four times a year usually.

Q.    Does this friend discuss what he or she does for a living?

A.    On occasion; yes.

Q.    Anything about those conversations that would make you unable to be a fair and impartial juror in this case?

A.    Don't think so.

Q.    Indicates here that you have been the victim of a crime?

A.    Bikes and things to that effect stolen as a child.

Q.    Nothing within the last ten years?

A.    No.

Q.    Indicates also that a close friend or family member has been the victim of a crime?

A.    My parents were robbed at gunpoint in Washington, D.C. of all places.

Q.    How long ago was that?

A.    Five years ago.

Q.    Anything about that experience that

1  happened to your parents that would make you unable

2  to be fair and impartial here today?

3      A.    I don't think anything would effect my

4  judgment.

5      Q.    Okay.  What sort of activities do you

6  occupy yourself with in your spare time?

7      A.    Spare time?

8      Q.    If you have any.

9      A.    Right.  I am helping a friend in Logan

10  Square rehab a residence right now and that takes up

11  quite a bit of my free time.

12      Q.    If the people proof the case to you and

13  when you deliberate feel they have proved the case

14  beyond a reasonable doubt would you and could you

15  sign a guilty verdict?

16      A.    Yes.

17      Q.    In the alternative if we didn't prove our

18  case beyond a reasonable doubt would you and could

19  you sign a not guilty verdict?

20      A.    Yes.

21

22           C A R L    W E N D E L L,

23

24  called as a prospective juror herein, having been

87

first duly sworn was questioned and responded as
follows:

EXAMINATION

By: Ms. Curtiss

Q.    Mr. Wendell?

A.    Yes, ma'am.

Q.    You are in a sort of far south suburb?

A.    Yes.

Q.    Okay.

A.    Back in the present location 12 years.    In
the area since 1951.

Q.    Indicates you have retired.    How long?

A.    Three years, first of September.

Q.    What did you do before you retired?

A.    Railroad conductor.

Q.    Railroad conductor?

A.    Yes, ma'am.

Q.    Your wife is also retired?

A.    Yes.    She retired from Ameritech, Illinois
Bell in Homewood.

Q.    How long had she worked for them?

A.    35 years.

1      Q.   Indicates you have three children that look

2  to be of grown ages?

3      A.   Yes.

4      Q.   Tell me from the eldest what he or she

5  does, whether they are single or married?

6      A.   Oldest, general manager of a steel company

7  in the city.  Currently is single, one child, 12.

8      Q.   Middle child?

9      A.   David is 43 on the west coast.  Four

10 children. He is a business consultant, has a

11 business consulting business of his own.

12     Q.   Youngest?

13     A.   Engineer with a multinational construction

14 company.

15     Q.   Youngest lives in Chicago?

16     A.   Kalamazoo, Michigan.

17     Q.   Youngest married or single?

18     A.   Married with one child and one almost here.

19     Q.   Almost here?

20     A.   Almost.

21     Q.   Indicates here that you have been a party

22 to a lawsuit?

23     A.   Personal injury case involved myself.

24     Q.   Has that been resolved?

1      A.    Number of years ago resolved out of court.

2      Q.    Anything about that experience that would

3   impair your ability to be fair and impartial in this

4   instance?

5      A.    No.

6      Q.    If the people prove the defendant was

7   guilty in this instance would you and could you sign

8   a guilty verdict?

9      A.    Yes.

10     Q.    On the other hand if the people were unable

11  to prove the defendant guilty beyond a reasonable

12  doubt could you sign a not guilty verdict?

13     A.    Yes, ma'am, I could.

14     Q.    In your spare time what do you do?

15     A.    Very involved with our grandchildren,

16  traveling, and woodworking.

17     Q.    Woodworking?

18     A.    Yes, ma'am.

19

20              M A R Y   A R U N D E L,

21

22  called as a prospective juror herein, having been

23  first duly sworn was questioned and responded as

24  follows:

1

2                              EXAMINATION

3                           By: The Court

4

5        Q.    Miss Arundel, looks like you are a Public

6   Defender?

7        A.    Yes.

8        Q.    Where are you working?

9        A.    Markham.

10        Q.    How long have you been a Public Defender?

11        A.    '89.

12        Q.    Since 1989?

13        A.    Yes.

14        Q.    What sorts of cases do you handle out in

15   Markham?

16        A.    Felonies.

17        Q.    Indicates here your husband is employed.

18   How is he employed?

19        A.    Works for Signature Flight Corporation.

20        Q.    What sort of things do they do?

21        A.    I guess when important people come to town

22   they are involved with all sorts of things related

23   to the flight and I am not sure exactly what it is.

24   He's a manager there.  I don't know exactly what he

91

1   does.

2      Q.   You have served on a jury?

3      A.   Yes.

4      Q.   What type?

5      A.   Civil.  Medical malpractice.

6      Q.   In that case did the jury deliberate to a

7   verdict?

8      A.   Yes.

9      Q.   Anything about that experience that would

10  make you unable to be fair and impartial here?

11     A.   No.

12     Q.   Obviously you have some friends that are

13  Public Defenders?

14     A.   Yes.

15     Q.   I imagine you have friends that are police

16  officers, State's Attorneys.

17         Is there anything about your current

18  employment that would make you unable to be fair and

19  impartial for this deliberation?

20     A.   I think so.

21     Q.   You think so?

22     A.   Yes.

23     Q.   What is it about your employment that would

24  make you unable to be fair here?

1    A.    I have been in the court since '92 and just
2    done a lot of cases and seen a lot of things.   I
3    just don't think I can be completely fair.   Being
4    honest to you.
5        Q.    Absolutely.   Thank you.
6            Now based on your past experience you
7    wouldn't be able to hear the testimony, see the
8    evidence presented, and be fair and impartial as far
9    as deciding guilt or innocence?
10       A.    No.
11       Q.    And, it is because of your prior
12   experiences that have made you unable to be fair?
13       A.    I would say yes.
14
15                J A N E T   M c   I E,
16
17   called as a prospective juror herein, having been
18   first duly sworn was questioned and responded as
19   follows:
20
21                    EXAMINATION
22                    By: Ms. Curtiss
23
24       Q.    Miss McIe?

93

1     A.   McIe.

2     Q.   Must be a letter missing, sorry.

3         You live in the suburbs?

4     A.   Yes.

5     Q.   How long have you been living there?

6     A.   22 years.

7     Q.   You are currently employed as an

8 administrative assistant at Diversified

9 Distribution?

10    A.   Yes.

11    Q.   How long there?

12    A.   One year.

13    Q.   Prior to that where were you working?

14    A.   I was a homemaker.

15    Q.   How long did you stay at home with the

16 children?

17    A.   Ten years.  13 years.

18    Q.   You have two children.  Looks like they are

19 both school age?

20    A.   Yes.

21    Q.   Says here you have a very close friend or

22 immediate -- friend of your immediate family who is

23 a police officer?

24    A.   I have some relatives that are.

1    Q.    Are they employed by the Chicago Police
2    Department?
3    A.    I have one that is a police officer in the
4    Gresham District and then two that are Cook County
5    Sheriffs Police.
6    Q.    And those are relatives?
7    A.    Well, one is my sister-in-law's sister and
8    the other ones are cousins of mine.
9    Q.    How often would the sister-in-law's sister
10   -- This is the person employed in the Gresham
11   District?
12   A.    Yes.
13   Q.    How frequently do you see this person?
14   A.    Two or three times a year.
15   Q.    Ever discuss the case she is working on?
16   A.    No.
17   Q.    Anything about conversations or
18   relationship with her that would make you unable to
19   be fair and impartial?
20   A.    No.
21   Q.    You said the others were Cook County
22   Sheriffs Police?
23   A.    Yes.
24   Q.    How frequently do you see them?

1      A.    Two or three times a year.

2      Q.    Talk to them about what they do for a

3   living?

4      A.    No.

5      Q.    Anything about your relationship with them

6   or conversations that you had with them that would

7   make you unable to be fair and impartial here?

8      A.    No.

9      Q.    You have indicated that you have been the

10  victim of a crime?

11     A.    Yes.

12     Q.    When was that?

13     A.    Vandalism.

14     Q.    When was that?

15     A.    Probably most recent, last summer.

16     Q.    Was anyone ever caught?

17     A.    No.

18     Q.    You also indicate that a very close friend

19  or immediate family member has been the victim of a

20  crime?

21     A.    My mother has been robbed several times.

22     Q.    Have they ever caught anybody that has

23  robbed her?

24     A.    Yes.

1     Q.   Has she ever gone to Court?

2     A.   They settled right before they went to

3 court.

4     Q.   Anything about the experiences that your

5 mother has had that would make you unable to be fair

6 and impartial in this deliberation?

7     A.   No.

8     Q.   If we proved our case beyond a reasonable

9 doubt would you and could you sign a guilty verdict?

10     A.   Yes.

11     Q.   If on the other hand we did not prove our

12 case beyond a reasonable doubt would you and could

13 you sign a not guilty verdict?

14     A.   Yes.

15     Q.   Anything that would make unable to be fair

16 and impartial here?

17     A.   No.

18

19       S T A N I S L A V A    P E T R I C,

20

21 called as a prospective juror herein, having been

22 first duly sworn was questioned and responded as

23 follows:

24

1                        EXAMINATION

2                     By: Ms. Curtiss

3

4      Q.    Stanislava Petric?

5      A.    Yes.

6      Q.    Indicates here that you are retired?

7      A.    Yes.

8      Q.    What did you do you before you were

9   retired?

10     A.    I did some -- Last job I had inspection in

11  factory.

12     Q.    The last job you had was in a factory?

13     A.    Yes.

14     Q.    How long ago was that?

15     A.    Couple year.  Maybe five, six, seven.

16     Q.    About five, six, years ago you were working

17  in a factory?

18     A.    Long time ago before that I was real estate

19  and computers and after that when I got laid off, I

20  didn't work.  None waiting for retirement.

21     Q.    And you live in Chicago?

22     A.    Yes.

23     Q.    How long have you lived in Chicago?

24     A.    Same place about 20 years.

1    Q.    20 year?

2    A.    Yes.

3    Q.    And you rent?

4    A.    Yes.

5    Q.    Is that correct?

6    A.    Yes.

7    Q.    Have you ever been accused of being or --

8    an accused, a complainant or witness in a criminal

9    case?  By that I mean has anyone ever signed a

10   complaint saying you did something wrong?

11   A.    No.  One time I didn't sign but one time

12   they stole my bicycle.

13   Q.    Someone stole your bicycle?

14   A.    Yes, and the policeman man reported and

15   everything and they call me but they never found it.

16   Q.    Never found the person?

17   A.    No.

18   Q.    How long ago was that?

19   A.    About maybe three years.

20   Q.    Three years.

21        Anything about that experience that would

22   make you unable to be fair and impartial?

23   A.    Not really.

24   Q.    What sort of things do you do in your spare

1    time?

2        A.    At the present time you mean?

3        Q.    Yes.

4        A.    I usually do income tax and somebody else

5    doing income tax.

6        Q.    You do income tax?

7        A.    Yes.

8        Q.    What sort of things do you do when you say

9    you do income tax?

10       A.    I didn't go no place to go and I did my

11   income tax and help someone before with the filing.

12       Q.    And now that tax season is over are you

13   doing anything?

14       A.    Not really.  Some reading and that kind of

15   stuff.

16       Q.    What kinds of things do you like to read?

17       A.    Many things.  Many times criminal stuff.

18       Q.    Criminal stuff?

19       A.    Yes.

20       Q.    If we proved our case beyond a reasonable

21   doubt would you and could you sign a guilty verdict?

22       A.    Yes.

23       Q.    If on the other hand we were unable to

24   prove our case beyond a reasonable doubt would and

1   could you sign a not guilty verdict?

2       A.   Yes.

3

4           F R E D E R I C K    P A N N K O K E,

5

6   called as a prospective juror herein, having been

7   first duly sworn was questioned and responded as

8   follows:

9

10                   EXAMINATION

11                   By: Ms. Curtiss

12

13      Q.   Mr. Pannkoke?

14      A.   Right.

15      Q.   You live in the southwest suburbs?

16      A.   Near west suburbs.

17      Q.   How long have you lived there?

18      A.   18 or 19 years.

19      Q.   Is that where you grew up?

20      A.   Yes.

21      Q.   Indicates here you are a student?

22      A.   Yes.

23      Q.   Where are you at school and what are you

24   studying?

1      A.    Southern Illinois University, cinema
2  photography major.
3      Q.    What year are you there?
4      A.    Sophomore.
5      Q.    You have a question mark here by the
6  question have you ever been an accused, a
7  complainant or witness in a criminal case.  That
8  means anything, you know, from traffic to
9  misdemeanors.
10     A.    Yes, I have.
11     Q.    Have you ever been an accused, a
12 complainant --
13     A.    I have been convicted of D.U.I..
14     Q.    How long ago was that?
15     A.    February of '97.
16     Q.    February of '97.  Is there anything about
17 that experience that would make you unable to be
18 fair and impartial in deliberating in this case?
19     A.    No.
20     Q.    You also wrote that you have had a friend
21 or member of your immediate family that was the
22 victim of a crime?
23     A.    My parent had their car stolen about ten
24 years ago.

**File Date:** _____ 7-1-2008 _____

**Case No:** _____ 08cv1775 _____

**ATTACHMENT #** _____

**EXHIBIT** _____ T - part 2 _____

**TAB (DESCRIPTION)**

_____



1    Q.    Did they catch the guy that took the car?

2    A.    No.

3    Q.    Are you working this summer?

4    A.    I am in between jobs now.  I had one but I

5    what laid off because the store went out of

6    business.

7              And I have a line on another job but

8    waiting to hear after this.

9    Q.    What sorts of things do you do in your

10   spare time?

11   A.    Photography, camping, hiking, fishing.

12   Q.    If we proved the case that the defendant

13   was guilty would you be able to sign a guilty

14   verdict?

15   A.    Yes.

16   Q.    On the other hand if you felt we didn't

17   prove our case beyond a reasonable doubt would you

18   and could you sign a not guilty verdict?

19   A.    Yes.

20   MS. CURTISS: Judge, may I have a moment,

21   please?

22   THE COURT:  Uh-hum.

23                    (brief pause)

24   MS. SAVINI: Judge, could we have a side-bar?

1       THE COURT:  Yes.

2             (Whereupon there was a side-bar.)

3       MS. SAVINI: Judge, we make a motion for cause as

4   to Miss Arundel, the Public Defender.

5             Several times Miss Curtiss asked her if she

6   could be fair and what it was that would cause her

7   to be unfair and she kept saying her experience and

8   quoting her years in the Public Defender's Office

9   and in the courthouse.

10            I just think she is either being quite

11  honest and does not want to serve and has stated she

12  cannot be fair.

13      MS. BORMANN:  No objection.

14      THE COURT:  No objection?

15      MS. BORMANN:  No.

16      THE COURT:  Anybody else?

17      MS. SAVINI: That is the only person for cause.

18      MS. BORMANN: Does Miss Green have a prior

19  arrest?

20      MS. SAVINI: For the record we have a criminal

21  history by name and lists Miss Green, then gives

22  about a 15-page rap sheet.  Never anywhere in that

23  rap sheet does the name Linda Green ever appear.

24            As far as the age it is close.  Maybe off

1   by a year or two.  And as far as the address most of

2   the arrests occur at an address of 534 West

3   Division, which would be in the Cabrini Green area.

4           I believe when I questioned her she stated

5   for the past four years in Oak Park and prior to

6   that in the south side of the city.

7           I have no reason to believe she is the

8   person.  Our system is only by name check and no

9   corresponding name.

10      MS. BORMANN: Do you have a date of birth?  Does

11  the age match?

12      MS. SAVINI: I don't know her exact date of

13  birth.  I think they are -- card stated she was

14  approximately 40 and she would be about 41 or 42

15  based on the rap sheet.

16      THE COURT:  Okay.  You are satisfied she is

17  not?

18      MS. SAVINI: Right.

19      THE COURT: Okay.

20          (Whereupon the jury selection was resumed

21              in open court.)

22      THE COURT:  Miss Arundel, I will excuse you.

23  Thank you.

24          Would you ladies and gentlemen in the rear

1    row move down one seat, please?

2              Call another juror, please.

3        THE CLERK: William Swanigan.

4

5              W I L L I A M   S W A N I G A N,

6

7    called as a prospective juror herein, having been

8    first duly sworn was questioned and responded as

9    follows:

10

11                    EXAMINATION

12                    By: Ms. Curtiss

13

14    Q.    Sir, you live in Chicago?

15    A.    Yes.

16    Q.    How long have you lived in Chicago?

17    A.    20 years.

18    Q.    Would that be you are whole life?

19    A.    Yes.

20    Q.    You are currently employed by the Tribune?

21    A.    Yes.

22    Q.    How long there?

23    A.    Two years, ten months.

24    Q.    Two years, ten months?

1      A.   Yes.

2      Q.   What sort of thing do you do?

3      A.   Packaging department.

4      Q.   Prior to that were you working?

5      A.   Yes.

6      Q.   What did you do?

7      A.   Shoe salesman for the Wild Pair, Evergreen

8  Plaza.

9      Q.   How long were you a shoe salesman there?

10     A.   About a year and three months.

11     Q.   Before that did you have a different

12  employment?

13     A.   No.

14     Q.   Were you in school?

15     A.   Yes.

16     Q.   You indicate that a member of your family

17  or very close friend has been the victim of a crime?

18     A.   Victim of a crime?

19     Q.   Yes.  You marked that off, is that right,

20  or did you mismark it?

21     A.   That was a mismark.

22     Q.   Have you ever been the victim of a crime?

23     A.   No.

24     Q.   You checked off a member of your immediate

1    family has been the party to a lawsuit?

2        A.    No.

3        Q.    Okay.

4              You marked off that you or someone you know

5    has been involved an accident where a person was

6    injured?

7        A.    Yes.

8        Q.    What was that about?

9        A.    I was in a car accident.

10       Q.    Car accident.  Was there any kind of civil

11   lawsuit that arose in that -- some inches company

12   suing each other?

13       A.    No.

14       Q.    Were you sued?

15       A.    No.

16       Q.    Anything about that experience that would

17   affect your ability to be fair and impartial in

18   deliberating?

19       A.    No.

20       Q.    What sort of things do you do in your spare

21   time?

22       A.    Play basketball.  That's about it.

23       Q.    If we proved our case beyond a reasonable

24   doubt would you and could you be able to sign a

1  guilty verdict?

2      A.   Yes.

3      Q.   If on the other hand we do not prove our

4  case beyond a reasonable doubt would you and could

5  you sign a not guilty verdict?

6      A.   Yes.

7      Q.   Have you ever been an accused, a

8  complainant, or witness in a criminal case?

9      A.   No.

10     Q.   By that I mean like traffic court,

11 misdemeanor, anything like that?

12     A.   You mean like a traffic violation?  Yes, I

13 had a ticket.

14     Q.   But you never had to go like traffic court

15 or something?

16     A.   No.

17     Q.   Have you ever been arrested for anything

18 else?

19     A.   No.

20     MS. SAVINI: Just one moment, Judge.

21          May we approach again, Judge?

22     THE COURT: Yes.

23          (Whereupon there was a side-bar.)

24     MS. SAVINI: Judge, Mr. Swanigan has a criminal

1   history, has an arrest for battery in August of

2   1996, stricken on leave in September, 1996.

3           I think Miss Curtiss was pretty thorough in

4   explaining to him anything, even something as slight

5   as a traffic violation we would need to know about.

6           Why he failed to tell us about the battery

7   I am not sure since he was pretty open with the

8   traffic.

9           Based on that ask that he be excused for

10  cause.  He is 20 years old.  Date of birth in rap

11  sheet is 1977, August 1.

12      THE COURT: Is the address the same?

13      MS. SAVINI: Don't have an address on the state

14  sheet.

15      MS. BORMANN: I have represented a gentlemen

16  named William Swanigan in the past, not this

17  gentleman.

18      MS. SAVINI: If the court wants to inquire you

19  can specifically ask him about the battery.  The

20  list is only as good as the name check can be.

21      THE COURT: Okay.  Want to ask?

22      MS. CURTISS: Sure.

23          (Whereupon the trial was resumed in

24           open court.)

1  BY MS. CURTISS:

2       Q.   Mr. Swanigan, what is your date of birth?

3       A.   8/1/77.

4       Q.   Have you ever been arrested for a battery?

5       A.   Yes.  I had a battery charge.

6       Q.   Did you have to go to court for that?

7       A.   Yes.  It was thrown out.

8       Q.   It was thrown out?

9       A.   Yes.

10      Q.   How long ago was that?

11      A.   About a year-and-a-half?

12      Q.   Okay.  Was there anything about that

13  experience that would make you unable to be fair and

14  impartial in deliberating in the case here?

15      A.   No.

16      Q.   I guess I was a little confused.  I asked

17  you if you had ever been an accused, a complainant

18  in a crime.

19      A.   I thought you mean like convicted.

20      Q.   No, no. Just been accused.

21      A.   Uh-hum.

22      Q.   But nothing about that experience would

23  make you unable to be fair and impartial here; is

24  that right?

1     A.   No.

2     Q.   If we proved our case beyond a reasonable

3  doubt you could and would sign a guilty verdict; is

4  that right?

5     A.   Yes.

6     MS. SAVINI: Just one moment, Judge.

7                (brief pause)

8     MS. SAVINI: Judge, at this time we would accept

9  and tender the panel.

10    THE COURT:  Very well.

11    MS. BORMANN: May I, Judge?

12    THE COURT:  Yes.

13    MS. BORMANN:  Thank you.

14

15                 EXAMINATION

16             By:  Mr. Ms. Bormann

17

18     Q.   Good afternoon, ladies and gentlemen.

19          I am trying to do this in an orderly

20  fashion so as not to get confused.

21          I will start with the first lady first;

22  Miss Lease.

23          You are a loan servicing officer; is that

24  right?

1      A.    Yes.

2      Q.    And you said that you had been doing that

3  for how many years, ma'am?

4      A.    12.

5      Q.    12 years.  And you are originally from

6  Indiana; is that right?

7      A.    Yes.

8      Q.    As a loan servicing officer exactly what do

9  you do?

10     A.    I'm in the servicing department, so I make

11 sure that taxes and insurance are paid up to date.

12     Q.    You don't actually process the loan

13 application?

14     A.    No.

15     Q.    So you actually make sure that once a loan

16 has already been made that the paperwork is correct

17 in terms of the IRS and other governmental

18 agencies?

19     A.    No.  You pay tax bills.

20     Q.    Do the escrow stuff?

21     A.    Yes.

22     Q.    Okay.  All right.

23           As part of your job do you have to pay

24 attention to the detail?

1    A.    Very much.

2    Q.    What happens when the details are not a

3    paid attention to in your job?

4    MS. SAVINI: Objection.

5    THE COURT:  Overruled.

6    BY MS. BORMANN:

7    Q.    Go ahead?

8    A.    Depends on what the mistake is.

9    Q.    If somebody puts the wrong tax figure down

10   for instance?

11   A.    You would be charged penalties.  The

12   company has policies to cover that; insurance

13   policy.

14   Q.    Now, you said that -- Let's see.  Let's

15   look at your card here.  I can't read my own writing

16   so you will have to forgive me.

17         I don't know if Miss Savini asked you but

18   you indicated that she asked you when you were

19   divorced that your ex-husband was a musician?

20   A.    Yes.

21   Q.    What type of instrument did he play?

22   A.    Little bit of everything, what they call a

23   one-man band.

24   Q.    Is he in Indiana or here in Chicago?

1    A.    He lives in Indiana but plays in Illinois.

2    Q.    I have a couple other questions and I am

3    going to pretty much ask everybody, and those

4    questions involve what the judge already told but

5    which is the presumption of innocence.

6         Tony Hillard, as he is sitting here right

7    now, is presumed innocent and that presumption

8    remains with him throughout the pendency of this

9    trial and only is taken away if you all find the

10   State has proved beyond a reasonable doubt that he

11   is guilty of these crimes.

12        Our position obviously is that that is not

13   going to happen.

14        What I am going to ask you is if you have

15   any difficulty with following that presumption of

16   the law?

17   A.    No, I don't.

18   Q.    Okay.  Now the judge also told us that and

19   will instruct you again that the defense in a

20   criminal matter does not have to put on any

21   evidence, which means that the burden is on the

22   State to bring forth evidence to prove beyond a

23   reasonable doubt that anyone, and that includes Mr.

24   Hillard, is guilty beyond a reasonable doubt.

1          Do you have any problem with the notion,

2    with the legal principle that the defense does not

3    have to bring forth any evidence?

4        A.    No.

5        Q.    Now part of that also means that Mr.

6    Hillard in consultation with his lawyers may decide

7    not to testify.

8          If Mr. Hillard decides not to testify would

9    you hold that against him during your deliberations

10   in determining whether or not he is guilty?

11       A.    No.

12       Q.    Thank you.  We talked a little bit about

13   the burden of proof and the burden of proof in a

14   criminal case is beyond a reasonable doubt.  Would

15   you have any problem holding the state to that

16   burden beyond a reasonable doubt?

17       A.    No.

18   BY MS. BORMANN:

19       Q.    Thank you.

20          The judge also told you, Miss Lease, that

21   facts don't become facts just because someone says

22   they are.  So will you be able to listen to the

23   testimony from the witness stand and judge it,

24   either believing it or not believing it, using your

1    common sense and the things that you take the

2    reasonableness of the testimony in light of the

3    other evidence in the case?

4        A.    I am not sure.  I don't know.

5        Q.    Well, do you have a problem with the

6    principle that if someone gets on the stand they can

7    either be telling the truth or sometimes not be

8    telling the truth, be mistaken or not be mistaken?

9    Do you have any argument with that principle?

10       A.    No.

11       Q.    So what I am asking you is knowing that,

12   just because someone takes the stand and says that

13   something is a fact do you have a problem with the

14   concept that that does not necessarily make it so?

15       A.    No.

16       Q.    Good.  Thank you.

17

18                         EXAMINATION

19                   By:  Ms. Bormann

20

21       Q.    Miss Green, how are you?

22       A.    Okay.

23       Q.    Good.  Now originally when Miss Savini

24   asked you about whether or not you could be fair in

1    this case you originally, in fact quite a few time

2    said you couldn't be and then right at the very end

3    you said yes you could be; right?

4        A.    Right.

5        Q.    Okay.  Now you have had a little time to

6    think about that over the lunch hour, I am going to

7    ask you again.  I know you said you have been

8    through a lot, your family has been through a lot.

9             Do you think that that would affect your

10   ability to be fair in this case?

11       A.    Yes.

12       Q.    How would it affect your ability to be fair

13   in this case?

14       A.    How can I put it?  It would affect me

15   because I feel I couldn't be fair.  You are asking

16   me for an honest answer.  I just can't reason it

17   out.

18       Q.    That is all any of us expect of you, Miss

19   Green.

20            Now you understand obviously, and I am not

21   trying to argue with you, but I guess this is for

22   everybody, what happened to you and your family has

23   nothing to do with what this case is about and Mr.

24   Hillard's guilt or innocence; right?

1        So despite knowing all of that do you still

2   think you can't be fair in this case?

3       A.   I still think I couldn't be fair.

4       Q.   Thank you.

5

6                      EXAMINATION

7                   By:  Ms. Bormann

8

9       Q.   Miss Miller?

10      A.   Yes.

11      Q.   How are you?

12      A.   Yes.

13      Q.   You have raised some truckers and you have

14  a husband who is one.  That is what I got this

15  morning.

16       How long has your husband been in the

17  trucking business?

18      A.   I'd say twenty something years.

19      Q.   23?

20      A.   20 something.  I'm not sure.

21      Q.   Sure.  That's okay.

22       During that time you raised some kids;

23  right?

24      A.   Yes.

1    Q.   And put those kids through school at least
2    to a certain extent?
3    A.   Right.
4    Q.   Does he work for an established truck
5    company?
6    A.   Preston.
7    Q.   He is the president?
8    A.   Preston.  Preston Trucking Company.
9    Q.   Okay.  And you said one of your boys works
10   for J.B. Hunt.
11   A.   He did.  He works for Roadway.
12   Q.   Now he works for Roadway.  You had one
13   other one involved in trucking; is that right?
14   A.   Dynamic Transport.  He is not a driver.  He
15   works in the office.  I don't know exactly the
16   title, job title.
17   Q.   Those businesses that they work for, they
18   all have established locations where those
19   businesses are at throughout the Chicago area where
20   you are husband works and two sons?
21   A.   My husband is on 37th Street and my son is
22   in University Park and the other one is over in Ford
23   Heights, next to Ford Heights.
24   Q.   You are retired; right?

1      A.   Yes; temporarily.

2      Q.   And you are temporarily retired?

3      A.   Yes.

4      Q.   Thinking about going back to work?

5      A.   Yes.

6      Q.   Thinking about where you want to be at?

7      A.   No.  I have a job at Prairie State College.

8      Q.   Doing what?

9      A.   Working in the office. Cashier.

10     Q.   Now when you worked for Marshall Fields how

11  long did you work there?

12     A.   Ten years.

13     Q.   You worked in their cash office?

14     A.   Yes.

15     Q.   Were you a cashier with them?

16     A.   Cashier.  Also kind of sales, made the

17  deposits, kept a going currency supply, balanced all

18  the stuff.

19     Q.   Is that the same a being a teller or

20  something different?

21     A.   Something like that.

22     Q.   So you have to balance out your sheet at

23  the end of the day?

24     A.   Yes.

1      Q.    It's important to pay attention to the
2    details?
3      A.    Yes.
4      Q.    What happens if you don't pay attention to
5    the detail?
6      A.    We have mistakes, we have to go check and
7    find it.
8      Q.    Okay.  Is there several ways to try -- I
9    mean do you cross-check things?
10     A.    We had a way of getting it down, narrowing
11   it down.  Most of the time you find there is very
12   few.
13     Q.    When we talk about cross-check you like
14   take one document and compare that with another
15   document and then the things?
16     A.    These were registers.
17     Q.    Okay.
18     A.    So start a zero down to, see what they had
19   in the register.
20     Q.    Look at the tape in the register and count
21   what was in the register.  If that didn't match up
22   that was a problem and had to go back and look at
23   more closely.
24     A.    Yes.

1     Q.   Now, Miss Savini asked you whether or not,

2  I know, about hobbies.  You say you made the piano.

3          How long have you been doing that?

4     A.   Started taking lessons in fifth grade and

5  started taking for four more years and basically

6  taught myself for a while, took them later in life

7  for maybe another year.  It's mostly a hobby.

8     Q.   Have you ever taught it?

9     A.   No.

10     Q.   How often do you play?

11     A.   I try to play at least once a day.

12     Q.   I'm impressed.  I am just very impressed

13  with that.  Do you still like to play bingo and

14  garage sales?

15     A.   Yes.

16     Q.   Junk shopping at garage sales?

17     A.   Sometimes treasures.

18     Q.   One person's junk is another person's

19  treasures.

20          Do you read at all?

21     A.   Yes.  I have an affection for poetry.

22     Q.   Who is your favorite poet?

23     A.   I don't really have a favorite.  A variety

24  of poetry books.

1      Q.    Thank you very much.

2

3                         EXAMINATION

4                     By:  Ms. Bormann

5

6      Q.    I'm going to botch your name.  I am going

7    to look at the card because again I can't read my

8    own writing.  You will have to bear with me.

9    Maiben.

10            How are you this afternoon?

11     A.    Fine, thank you.

12     Q.    Good.  I'm glad to hear that.

13            You are up in the northern suburbs; right?

14   Way up there?

15     A.    Northwest.

16     Q.    So a little northwest of Lake Forest?

17     A.    Little bit northwest of Palatine.

18     Q.    All right.  Way in the upper reaches of the

19   county.

20            I think you said that you had lived pretty

21   much in a lot of places going all over the United

22   States.  I think you said Utah, Florida, and one

23   other state?

24     A.    Missouri.

1  Q.  What brought you to my store?

2  A.  Right.  I was a city planner.

3  Q.  For what city in Missouri?

4  A.  Maryville.

5  Q.  Where is Maryville located?

6  A.  In the northwest corner.

7  Q.  How long were you in Missouri?

8  A.  Three years.

9  Q.  As a city planner does it require you move

10  from one place?  In other words what I am asking is

11  the nature of your job, is it like a contractor,

12  expires, say, when they are doing major development

13  and you move on or pretty much a full time position

14  in a city all the time?

15  A.  Well, it supposed to be a full-time

16  position.  It's a career position, but it's at very

17  political kind of work.  The nature of the work is,

18  the longevity is about six years.

19  Q.  Okay.  Now can you tell me because I

20  honestly don't know what your duties consist of?

21  You are currently a city planner where?

22  A.  I am working for Cook County now.  I am

23  basically in a situation where our division rehabs

24  houses in the southern suburbs for low income

1    people.

2         I am involved in contract mediation,

3    basically disputes between owners and contractors.

4         Q.   Now when you say disputes between owners

5    and contractors, do you mean people that purchase

6    the homes or do the rehab work?

7         A.   Sometimes.

8         Q.   Sometimes.  Is there sometimes disputes

9    between, say, those who administer the loans and

10   things?

11        A.   Our division?

12        Q.   Your division.

13        A.   Yes.

14        Q.   Are you involved with administrative loans

15   at all?

16        A.   Yes.

17        Q.   And in what capacity are you involved with

18   that aspect?

19        A.   We determine whether a person is eligible

20   for a loan and determine how much we can loan them

21    -- how much the building is worth.  It's a regular

22   mortgage instrument.

23        Q.   Okay.  And do you have the decision making

24   power over that or does somebody else there?

1      A.    It's a hierarchy and I'm in that
2    hierarchy.  I make decisions.  Sometimes those
3    decisions are disputed.
4      Q.    So you wouldn't be involved in the
5    mediation obviously of a decision regarding
6    yourself, then somebody else would look at that and
7    mediate that?
8      A.    Yes.
9      Q.    Do you rely, sir, on a series of details in
10   making those decisions in your professional life?
11     A.    Yes; sure.
12     Q.    You said your hobby, and this kind of
13   struck me as another detail oriented thing is the
14   restoration of historical homes; right?
15     A.    I am president of a local historical
16   society and we are restoring several homes, is one
17   of the things we do.
18     Q.    Where are those located?  Are they
19   throughout the city and suburbs?
20     A.    Locally in the community I reside.
21     Q.    In the northwest?
22     A.    Uh-hum.
23     Q.    And when we are talking about preserving
24   are we talking about people who currently own them?

1              In Oak Park for instance when you own a

2    historical home and want to have some work done on

3    it you have to apply and receive permission for

4    certain changes because it's a historical home.

5    That's what we are talking about?

6        A.    We buy the property and restore it

7    ourselves.

8        Q.    So the association that you are in is

9    actually putting up the money to buy the home and

10   you do the restoration?

11       A.    Yes.

12       Q.    That would be more detail oriented type of

13   work?

14       A.    Yes.

15       Q.    We are talking about restoring a home.  We

16   are talking about restoring it to something, it's

17   former luster; right?

18       A.    Yes.

19       Q.    Thank you.  I do have one question.  You

20   told Miss Savini that you had been involved formerly

21   in an employment lawsuit that was resolved.  Was the

22   suit actually filed in that?

23       A.    I filed the suit.

24       Q.    In civil court?

1      A.    Yes.

2      Q.    Now the law is, and the judge will instruct

3   you that in a criminal case the burden is on the

4   State to prove any defendant guilty beyond a

5   reasonable doubt but in a civil case there is no

6   such burden; the burden  is by a preponderance of

7   the evidence, a much lower standard.

8          Do you understand the difference between a

9   preponderance of the evidence and proof beyond a

10  reasonable doubt?

11     A.    I do.

12     MS. BORMANN: Thank you.

13

14                      EXAMINATION

15                 By:  Ms. Bormann

16

17     Q.    Miss Kurtzer, how are you?

18     A.    Fine, thank you.

19     Q.    These are the first chances that I have had

20  to look at your cards.  Bear with me while I go

21  through them a little bit.

22          You also work in the loan servicing

23  industry although you are an administrative

24  assistant?

1      A.    Pretty much commercial bank service, bank's

2   relationship of the loan, the bread and butter.

3      Q.    Do you work -- You work for a bank that

4   does a lot of commercial lending?

5      A.    Right.

6      Q.    Sort of bank to business relationship?

7      A.    Commercial officers that we have, the whole

8   bank relationship.

9      Q.    And you work for those officers?

10     A.    Yes.

11     Q.    Do you do a lot of the paperwork involved

12  or what exactly do you do?

13     A.    Well, really it is, we work all divisional

14  systems, really customer service, and maintain the

15  relationship and handle all the nitty-gritty, all

16  the problems that you may have with accounts;

17  getting new accounts opened, correct names, all that

18  kind of thing that comes up.

19     Q.    So when a customer has a problem they would

20  be referred to you and you would deal with them on a

21  personal level and try to resolve it?

22     A.    Yes.

23     Q.    Got it.  Okay.

24            You said your nephew is a Chicago police

1   officer?

2       A.   Yes.

3       Q.   You see him about four times a year?

4       A.   Yes.

5       Q.   Sometimes you talk about it because he

6   works in a bad neighborhood?

7       A.   Yah.  But we don't get into things too

8   much.

9       Q.   You don't know what district he works in or

10  what area of the city?

11      A.   No.  Somewhere around Maxwell Street by the

12  old Maxwell Street, by the University of Illinois

13  Circle Campus.  I really don't know.

14      Q.   That's okay.  That's fine.

15           Is there anything about the conversations

16  that you have had with your nephew that would cause

17  you to not be fair to the other side of this case?

18      A.   Can't think of any.

19      Q.   Good.  I am going to ask you the same

20  question I asked Miss Lease.  I am going to assume

21  everybody here agrees with those concepts of law,

22  and correct me if I am wrong, but the judge has

23  already told you that Mr. Hillard is presumed

24  innocent and that presumption of innocence stays

1  with him throughout the entire trial, throughout

2  deliberations and only if you overcome, all of you

3  unanimously agree the State has proven him guilty

4  beyond a reasonable doubt.

5      Do you have any problem with that concept?

6      A.  No.

7      Q.  In a criminal case unlike a civil case

8  there is no burden by the defense to put on any

9  evidence because it is our constitution.  That is

10  the way this country is.  It's a good thing.

11     MS. SAVINI: Objection.  I object to the comments

12  on the constitutionality of the law.

13     THE COURT:  Overruled.

14  BY MS. BORMANN:

15     Q.  At any rate what I mean, what I guess I am

16  getting to is if you have any problem at all

17  following that, any problem following the law that

18  the defense does not have to put forth any evidence

19  and you can rely upon the State's inability to prove

20  Mr. Hillard guilty beyond any reasonable doubt and

21  simply rest without putting on any evidence.

22     Do you have any problem with that part of

23  the law?

24     A.  No.

1    Q.   Good.  So consequently if Mr. Hillard along

2   with the Constitution and his attorneys decided not

3   to testify and you rely on the state's ability to

4   hold up their end of the law would you hold that

5   against him during deliberations?

6    A.   No.

7    MS. BORMANN: Thank you.

8

9                      EXAMINATION

10                  By:  Ms. Bormann

11

12    Q.   Hi, Miss Harris.  How are you?

13    A.   Good.

14    Q.   You said you lived in Elmwood -- You live

15   in the west suburbs; is that right?

16         And you lived there for about five years?

17    A.   Yes.

18    Q.   You had moved from River Grove?

19    A.   Yes.

20    Q.   Now you did have prior jury service and it

21   was civil; right?

22    A.   Right.

23    Q.   Which means unlike -- I can't remember

24   which gentleman up here -- it was you, sir, -- had

1    said that you actually sat in a jury and heard

2    testimony from the witness box?

3         A.   Right.

4         Q.   And deliberated with the other jurors and

5    came to a verdict?

6         A.   Yes.

7         Q.   That was in civil court for money damages?

8         A.   Yes.

9         Q.   How long ago was that?

10        A.   Quite a while.  I'd say about, maybe about

11   ten years ago, maybe even less.  I don't know.

12   Don't remember.

13        Q.   I'm sorry.  Didn't mean to cut you off.

14        A.   Quite some time.

15        Q.   There is a difference in the burden of

16   proof obviously what I discussed earlier between a

17   civil and criminal case.

18             And in a civil case the plaintiff or the

19   person bringing the lawsuit has the burden of

20   proving the defendant's liability by something

21   called a preponderance of the evidence.

22             In a criminal case the plaintiff is the

23   state, the State's Attorney here in Cook County, and

24   they have the burden of proving beyond a reasonable

1   doubt.

2           Do you have understand the difference in

3   the burdens?

4       A.    Yes.

5       Q.    Would you hold the State to that burden

6   making them prove the case beyond a reasonable

7   doubt?

8       A.    You know, I won't.

9       Q.    You won't.

10      A.    No, I won't.

11      Q.    Why couldn't you hold them to making sure

12  they prove the case beyond a reasonable doubt?

13      A.    Because I would have to be satisfied.

14      Q.    I'm sorry?

15      A.    That's what I'm saying.

16      Q.    I guess we are getting a little confused.

17  Would you hold them to that burden?

18      A.    Yes.

19      Q.    If they didn't prove it beyond a reasonable

20  doubt you would have no problem signing a not guilty

21  verdict; would you?

22      A.    Right.   Right.   Sure.

23      MS. BORMANN: Good.

24

                              EXAMINATION

                          By:  Ms. Bormann


     Q.    Back this way, Mr. Hinds, how are you?

     A.    Okay.

     Q.    All right.  You talked about Lansing and I
have to confess ignorance.  Is it south?

     A.    Yes.

     Q.    Quite a ways south?

     A.    The other side of Calumet City.

     Q.    Okay.  I'm getting a general -- So what's
the county next to you when Cook County ends?

     A.    I'm on the Indiana/Illinois border.

     Q.    You are southeast?

     A.    Right.

     Q.    Thank you.  You are a fabricator of
signage.  I know you said that.

           What exactly is that?

     A.    Neon signs and all that.  Will actually
make the patterns up and cut out the metal work and
actually build.

     Q.    You do the whole thing from design to --

     A.    Fabricating the building to finishing; the
whole shebang.

1     Q.   Do you actually pump the gas in that lights

2  up?

3     A.   No.  We have a neon man.

4     Q.   That part you don't do?

5     A.   Right.

6     Q.   You have been doing that, you said, for 23

7  years, which means you started when you were 15;

8  right?

9     A.   Yes.

10     Q.   You were in high school?

11     A.   Diversified occupations.

12     Q.   I would say.  Now you said that your

13  parents were the victim of an armed robbery in

14  Washington, D.C. where they were held up by a gun?

15     A.   Right outside the Washington Hilton.

16     Q.   Did the DC police ever catch anybody with

17  that?

18     A.   No.

19     Q.   Anything about that at all that would cause

20  you to be unfair in this case?

21     A.   Not intentionally.

22     Q.   You understand that Mr. Hillard had

23  absolutely nothing to do with whatever happened in

24  Washington, DC?

1    A.    Correct.

2    Q.    Could you listen to the evidence as it

3 comes from the witness box, decide whether or not

4 you believed it, examined it, use your common sense

5 and putting it in a light, the reasonableness of the

6 rest of the evidence in the case and then deliberate

7 and come to your verdict based on that?

8    A.    Yes.

9    MS. BORMANN: Good.   Thank you.

10

11                    EXAMINATION

12               By:  Ms. Bormann

13

14    Q.    Good afternoon, Mr. Wendell, how are you?

15    A.    Fine, thank you.

16    Q.    I'm sorry.   I could barely hear you over

17 there.

18    A.    I'm fine.

19    Q.    I will ask you to speak up a little bit.

20    A.    Certainly.

21    Q.    So everybody else can hear you.

22          Congratulations on your retirement.

23    A.    Thank you.

24    Q.    Now that you and your wife are both retired

1    you said you like to travel.  I remember you saying

2    that.

3              Where do you travel to?

4    A.    Went to Europe, Alaska.

5    Q.    When?

6    A.    Europe three years ago, in '95.

7    Q.    How long did you go?

8    A.    Two weeks.

9    Q.    Where did you go?

10   A.    Switzerland as opposed to Europe itself.

11   Q.    You spent all two weeks in Switzerland?

12   A.    Yes, and bus trips from where we were

13   staying.

14   Q.    How was it?

15   A.    Fantastic.

16   Q.    Did you go in the summer or winter?

17   A.    June.

18   Q.    It's beautiful at that time.

19             You probably do a lot of travel together.

20             Do you go see grandkids, because they live

21   out of state?

22   A.    Yes.

23   Q.    You said you had been somewhere else that

24   was not Europe.

1    A.    Alaska, far west, the northwest, quite a

2  bit when our son was working in Washington.

3    Q.    Did you do a cruise in Alaska?

4    A.    As a matter of fact we did.

5    Q.    How did I know that?

6    A.    I suppose just a good guess.

7    Q.    Exactly.  How long did the cruise last?

8    A.    Two weeks also.

9    Q.    Did it stop like in Anchorage?

10   A.    Flew to Fairbanks, train on to -- train to

11  Anchorage, ship to Vancouver.

12   Q.    Which was prettier -- Switzerland or

13  Alaska?

14   A.    Unfair.  They are both gorgeous.

15   Q.    I'm sorry.  I won't ask any further

16  questions.

17         I am going to ask you this the same thing,

18  Mr. Wendell, about the presumption of innocence.

19         Do you have any problem with the idea Mr.

20  Hillard is presumed innocent in this case?

21   A.    No, ma'am.

22   Q.    Do you have any problem with the concept

23  the defense, that is myself and -- Miss McBeth and I

24  don't have to put forth any evidence whatsoever and

1  rely on the State's inability to prove Mr. Hillard

2  guilty beyond a reasonable doubt?

3       A.   Yes.

4       Q.   Can you agree with that concept?

5       A.   Yes, I do.

6       Q.   Good.  So consequently you would not hold

7  it against Mr. Hillard if in consultation with his

8  attorneys, myself and Miss McBeth, if he decided not

9  to testify in relying upon the state's inability to

10 prove him guilty?

11      A.   No, I would not.

12      MS. BORMANN: Thank you.

13

14                      EXAMINATION

15                      By:  Ms. McIe

16

17      Q.   Ms. McIe?

18      A.   McIe.

19      Q.   I'm sorry.  We have all butchered it.  I'm

20 sorry.

21           It's south suburbs; right?

22      A.   Yes.

23      Q.   You have been back in the work force for

24 about a year.

1           How do you like it?

2     A.    It's okay.

3     Q.    Okay.

4     A.    Different.

5     Q.    Just okay?  Just okay?

6     A.    Yah.

7     Q.    How old -- Let's look at the card.

8           How old is your oldest?

9     A.    18.

10    Q.    And the youngest?

11    A.    13.

12    Q.    So everybody is in school when you are --

13    not in the summers, during the winter time?

14    A.    Yes.

15    Q.    Is your oldest graduated from high school

16    yet?

17    A.    Yes.

18    Q.    This past year?

19    A.    Yes.

20    Q.    Is it a he or she?

21    A.    She's a she.

22    Q.    She's a she.

23          Is she going on to college or not?

24    A.    Yes.

1    Q.    That start in the fall?

2    A.    Yes.

3    Q.    Going out of state or here?

4    A.    Going to Morraine Valley.

5    Q.    Going to the community college.

6          Is she working this summer?

7    A.    Yes.

8    Q.    What is she doing?

9    A.    Teaches swim lessons.  Also Assistant State

10   Swim Coach and also a photographer.

11   Q.    I would guess she is a swimmer?

12   A.    Yes.

13   Q.    And the 13-year-old, I am going to guess,

14   is going to high school?

15   A.    8th grade.

16   Q.    Is that he or she?

17   A.    He's a he.

18   Q.    He's obviously not working in summer?

19   A.    No.

20   Q.    He's enjoying this summer?

21   A.    Yes.

22   Q.    Probably now that mom does not work

23   probably a little more?

24   A.    Yes.

1      Q.    Thank you.   One question for you, actually

2   the same series of questions.

3           The presumption of innocence, the fact the

4   defense is under no obligation to put on any

5   evidence and rely on the State's inability to prove

6   their case beyond a reasonable doubt, and the fact

7   as a result of that the defendant and as a result of

8   his consultation with his attorney decides not to

9   testify, any of those concepts cause you a problem?

10     A.    No.

11     Q.    You would not hold it against Mr. Hillard

12  if he chose not to testify in this case; is that

13  right?

14     A.    Right.

15

16                       EXAMINATION

17                  By:  Mr. Petric

18

19     Q.    Hi. How are you.   Now you said you have

20  lived in the same place, Miss Petric, for how many

21  years?

22     A.    20 1/2.

23     Q.    20 years?

24     A.    Yes.

1  Q. Is that the same exact apartment?

2  A. Yes.  But I was a couple years, a couple

3 months or year in Europe.

4  Q. You would go to Europe for a while and come

5 back?

6  A. Yes.

7  Q. Keep the same apartment while you were in

8 Europe?

9  A. Yes.

10  Q. Lucky you.  Now that area of the -- That is

11 near northwest side?

12  A. Yes.  It is close to Ashland and North

13 Avenue.  Seven minutes to lake.

14  Q. Prior to moving to the city where did you

15 live?

16  A. Say that again?

17  Q. Prior to moving to that area of the city

18 where did you live?

19  A. I live a lot closer to the lake.

20  Q. Closer to the lake?

21  A. Yes.

22  Q. Before you moved into the apartment?

23  A. Yes.

24  Q. You were living closer to the lake?

1        A.    Yes.   About two blocks from Clark.

2        Q.    With your born here in Chicago?

3        A.    No.

4        Q.    All right.   When did you move to Chicago?

5   Were you a child or grown-up?

6        A.    Grown-up.

7        Q.    How old were you when you moved to Chicago?

8        A.    Over 20.

9        Q.    20.   So you were definitely a grown-up?

10       A.    Yes.

11       Q.    You said that you worked in -- doing

12  inspection in a factory?

13       A.    Yes.

14       Q.    How long did you do that?

15       A.    Almost nine years.

16       Q.    And you quit that and that is when you went

17  into real estate?

18       A.    No.   Before I was in real estate then I was

19  in some office, so company for a couple years.

20       Q.    Before you worked in the factory?

21       A.    Yes, and then I was without job and then I

22  accepted factory position.

23       Q.    Now you do people's income tax as a hobby?

24       A.    Not really as hobby because I needed that.

1   It was my income, doing tax, about a couple years

2   and then after helped somebody doing something for

3   me during summertime sometime and about March

4   regular time for income tax.

5       Q.    Okay. I think I understand.

6           Miss Petric, the concepts that I talked

7   about, the fact that Mr. Hillard is presumed

8   innocent, that the State has the burden of proof

9   beyond a reasonable doubt, do you understand all

10  those legal concepts?

11      A.    Yes.

12      Q.    Do you agree with those legal concepts?

13      MS. SAVINI: Objection to whether she agrees with

14  them.

15      THE COURT:  No.  Overruled.

16  BY MS. BORMANN:

17      Q.    Do you?

18      A.    Yes.

19      MS. BORMANN: Thank you.

20

21                      EXAMINATION

22                  By:  Mr. Pannkoke

23

24      Q.    Hi, how are you.  Mr. Pannkoke; right?

1      A.   Yes.

2      Q.   You live in the western suburbs and I think

3  you said you lived there most of your life; right?

4      A.   Yes.

5      Q.   Did you go to high school out there?

6      A.   Yes.

7      Q.   LTHS?

8      A.   Yes.

9      Q.   Now you are in SIU down in Carbondale?

10     A.   Cinema and photography.

11     Q.   See, I thought it was cinema photography.

12  Cinema and photography?

13     A.   It's the same major.  I have not decided

14  which to go into -- cinema or photography.

15     Q.   What year are you in?

16     A.   Sophomore.

17     Q.   You have to decide soon?

18     A.   Yes.

19     Q.   Is that fine arts?

20     A.   Communications.

21     Q.   And you are a full-time student do you know

22  there in the school year?

23     A.   Yes; full time.

24     Q.   You come up here every summer and stay with

1    your folks?

2        A.    This summer I am living down there.

3        Q.    I didn't know that.  And that is the

4    situation with the job, you said you are kind of in

5    between jobs.

6            So what you are saying is you are in

7    between jobs, those jobs down in Carbondale?

8        A.    Yes.

9        Q.    I said I am going to ask you the same thing

10   about the presumption of innocence.

11           Do you -- Can you follow the law on

12   presuming that Mr. Hillard is innocent of these

13   charges at this point and throughout the pendency of

14   the trial and that is only if at the end of all of

15   the evidence you all believe it and determine that

16   it proves him guilty beyond a reasonable doubt?

17       A.    Yes.

18       Q.    Would you hold it against Mr. Hillard in

19   consultation with Miss McBeth and myself if he chose

20   not to put on any evidence in the defense case,

21   including me not calling him to testify because we

22   are relying on the fact the State can't prove their

23   case?

24       A.    I think I could.

1    MS. BORMANN: Thank you very much.  That is all

2    we can ask.

3

4                         EXAMINATION

5                    By:  Mr. Swanigan

6

7    Q.   Hi. How are you?

8    A.   How you doing?

9    Q.   Okay.  Try to make this real quick.

10        Mr. Swanigan, you are a south sider?

11   A.   Yes.

12   Q.   You have been here all your life?

13   A.   Yes.

14   Q.   Good.  Now let's see.  You said you worked

15   for the Chicago Tribune; right?

16   A.   Yes.

17   Q.   For about a year-and-a-half?

18   A.   Going on three years.

19   Q.   I'm sorry, three years?

20   A.   Yes.

21   Q.   I misunderstood.  You work in packing?

22   A.   I work in the press.

23   Q.   I really didn't hear you.

24        What exactly do you do when you work on

1  press?

2      A.    Piles bundled on pallets.  Watch the papers

3  go through the system.  Make sure nothing jams.

4  Make sure they are strapped right, and wrapped.

5      Q.    Is it important in your job to pay

6  attention to the details in terms as the stuff comes

7  through?

8      A.    That is part of the job.

9      Q.    What happens if you don't?

10      A.    You might you get in trouble if you are not

11  paying attention, like, you know, if you turn your

12  back and such.

13      Q.    Sir, would you hold the State to that

14  burden beyond a reasonable doubt?  In other words

15  would you make the State prove it beyond a

16  reasonable doubt -- the case against Mr. Hillard

17  beyond a reasonable doubt -- and if they didn't

18  would you go right in there and sign that not guilty

19  verdict?

20      A.    I don't understand that.

21      Q.    Let's start again.  The State has the

22  burden in a criminal case of proving anybody they

23  charge, the State brings the charge so they have the

24  burden of proving the case beyond a reasonable

1  doubt?

2     A.   Right.

3     Q.   You understand that?

4     A.   Yes.

5     Q.   In this case with Mr. Hillard they have the

6  burden of proving Mr. Hillard is guilty beyond a

7  reasonable doubt.

8     A.   Yes.

9     Q.   If they fail to do that, if they put up

10 witnesses you don't believe or fail in some other

11 evidentiary way to prove beyond a reasonable doubt

12 would you and could you sign a not guilty verdict?

13    A.   Not guilty if they fail?

14    Q.   Yes.

15    A.   Yes, I guess.

16    Q.   If they failed to prove it beyond a

17 reasonable doubt it will be your duty to sign a not

18 guilty verdict.  Can you do that?

19    A.   Yes.

20    MS. BORMANN: May I have a moment, Judge?

21    THE COURT:  Yes.

22    MS. BORMANN: May we have a side-bar, please?

23    THE COURT:  Excuse us.

24         (Whereupon there was a side-bar.)

1    MR. FRANKS: Your Honor I have a motion for cause

2    with respect to Miss Green.

3         She indicated as she had previously when

4    Miss Savini asked her that she couldn't be impartial

5    in this case.

6    MS. SAVINI:  No objection.

7    THE COURT: She is all over the waterfront.

8    Okay.

9    MS. BORMANN: Also Mr. Hillard has to use the

10   facilities.  He has to for about twenty-minutes or

11   so.

12   THE COURT:  Who?

13   MS. BORMANN: Defendant has to use the bathroom.

14   He told me that about twenty minutes or so ago.

15   THE COURT:  We will excuse Miss green and I will

16   give them a short recess.

17            (Whereupon the trial was resumed in

18             open court.)

19   THE COURT:  Mrs. Green, I will excuse you.

20   Thank you.  You may step down.

21   THE COURT:  Please move down, this lady here.

22            Call another juror.

23   THE CLERK: Kenyon Ward.

24   THE COURT: Before we move forward there will be

1    a short recess.

2                 Folks, you want to step back in the jury

3    room?  You folks in the gallery seats step outside,

4    stretch your legs for a few minutes.  We will be

5    back shortly.

6                 (Whereupon a recess was taken.)

7        THE COURT:  Please be seated, ladies and

8    gentlemen.

9                 You may continue, Miss McBeth.

10       MS. BORMANN: Thank you, your Honor.

11

12                 K E N Y O N    W A R D,

13

14   called as a prospective juror herein, having been

15   first duly sworn was questioned and responded as

16   follows:

17

18                     EXAMINATION

19                   By: Ms. Bormann

20

21       Q.    Good afternoon, whatever.  You live in one

22   of the southern suburbs?

23       A.    No.  Not anymore.

24       Q.    How long did you live there?

1    A.    18, 19 years.

2    Q.    Just about your whole life?

3    A.    Yes.

4    Q.    You are working as an intern at Chicago

5    Board of Education?

6    A.    Yes.

7    Q.    What do they have you do there?

8    A.    Research proposals, type responses.

9    Q.    Are you in school?

10    A.    Alabama State.

11    Q.    What year are you in?

12    A.    They have me classified as a junior.

13    Q.    What is your field of study?

14    A.    Physical education.

15    Q.    You folks live in Dalton?

16    A.    Yes.

17    Q.    Now you have never served on a jury; is

18    that correct?

19    A.    Correct.

20    Q.    You noted on your card that someone in your

21    immediate family or very close friend is a police

22    officer; is that right?

23    A.    My father's brother.

24    Q.    Your uncle is a police officer?

1     A.    Yes.

2     Q.    Is that in Dalton?

3     A.    Chicago.

4     Q.    Do you know what district?

5     A.    No.

6     Q.    About how often do you see him?

7     A.    Maybe about once a month.

8     Q.    Do you talk to him about his work?

9     A.    No.

10    Q.    Is he a detective or patrolman?

11    A.    Patrolman.

12    Q.    Anything about the fact that your uncle is

13   a police officer for Chicago that would cause you to

14   not be able to be fair and impartial?

15    A.    No.

16    Q.    The next question is have you ever been an

17   accused, a complainant, or witness in a criminal

18   case?

19          There is some confusion about that.  That

20   means like ever arrested or ever charged with

21   anything -- traffic or anything like that?

22    A.    I put no but I had something happen when I

23   was a minor.  The judge threw it out.

24    Q.    That is when you were under 17?

1      A.   Uh-hum.

2      Q.   What that one or a couple times?

3      A.   One time.

4      Q.   And that's -- You said the judge threw that

5 out?

6      A.   Uh-hum.

7      Q.   Anything about that experience that would

8 cause you to be -- not be fair and impartial?

9      A.   No.

10     Q.   You have been the victim of a crime; is

11 that right?

12     A.   Yes.

13     Q.   When was that?

14     A.   Like a long time ago.  Somebody tried to

15 take my coat.  Some guys tried to take my coat.

16     Q.   A robbery?

17     A.   They never got it.

18     Q.   Did you call the police about that?

19     A.   The police came.

20     Q.   Did they arrest the guy?

21     A.   Yes.

22     Q.   Did you have to go to court for that?

23     A.   Uh-hum.

24     Q.   And did you testify in court?

1    A.   I didn't have to.

2    Q.   Anything about the fact that you were a

3  victim of an attempted robbery that would cause you

4  to have a problem?

5    A.   I'm not mad at that.  Shouldn't have

6  anything to do with me being fair.

7    Q.   Great.  You have also been a party to a

8  lawsuit; is that right?

9    A.   Yes.

10    Q.   What was that about?

11    A.   Hit and run.  Car hit my mother's car and

12  drove off.  They wanted, they tried to put the blame

13  on each other, see who would be blamed.  That's all

14  I know.

15    Q.   So the insurance companies filed a lawsuit

16  about that?

17    A.   Uh-hum.

18    Q.   Was that right?

19    A.   Yes.

20    Q.   Is that in Cook County?

21    A.   Yes.

22    Q.   Is that case over with or still going on?

23    A.   Still going on.

24    Q.   In the lawsuit when it says who the party

1    is bringing the suit, the plaintiff versus the

2    defendant, did they put you down as the plaintiff or

3    somebody else's name?

4         A.    Probably my name and my mother's name.

5         Q.    So as far as you know you are the plaintiff

6    and it is still going on?

7         A.    Uh-hum.

8         Q.    What kind of things do you like to do?

9         A.    Like to read and music.

10        Q.    What kind of music?

11        A.    Rap music.

12        Q.    You heard, I think you heard some of the

13   questions about the presumption of innocence and

14   burden of proof.

15             Did you hear other jurors when they were

16   questioned about that?  You understand Mr. Hillard

17   does not have to prove anything when he comes to

18   court?  The burden is always on the State's

19   Attorney.

20        A.    Uh-hum.

21        Q.    You know their burden is proof beyond a

22   reasonable doubt?

23        A.    Right.

24        Q.    If you hear all the evidence and decide

1    they have not proven the case beyond a reasonable

2    doubt would you be able to sign a not guilty verdict

3    in that case?

4        A.    Yes.

5        Q.    If Mr. Hillard decides after consulting

6    with me and Miss Bormann not to testify in this case

7    would you hold that against him?

8        A.    No.

9        MS. MILLER: No one asked me that question and I

10   think it would be a deciding factor but I would have

11   a doubt if he wouldn't want to testify.

12       MS. BORMANN: You think it would enter into your

13   decision.

14       MS. MILLER: Wouldn't be a deciding factor but it

15   would enter into it; yes.

16       MS. BORMANN: Ma'am, I anticipate the judge will

17   tell you that, the judge will tell you that the law

18   is you may not consider his decision not to testify

19   you, may not consider that in any way in arriving at

20   your verdict.

21           Could you put aside your feelings that you

22   just told me now and follow the judge's

23   instruction?

24       MS. MILLER: If the judge instructed me to do

1    that I would.

2          But in all honesty my basic feeling would

3    be it is just a part of what I am.

4       MS. BORMANN: Thank you very much.

5       MS. MILLER: The other defense attorney said to

6    the gal sitting here that when the witnesses come up

7    we are not -- I don't know if I say it right, I

8    should have stopped you right then.  But when they

9    say something we're not supposed to take that as

10   what actually happened?

11      MS. BORMANN: The rule is if you sit on the jury

12   you and the other juror will be the judges of the

13   credibility of the witness.  It for you to decide

14   how much and what weight to give to the testimony.

15   It is totally up to you.

16      MS. MILLER: Totally our own decision.

17      MS. BORMANN: You can believe one witness and not

18   another, and some of what a witness tells you and

19   not everything.  It is your decision to make as

20   jurors.

21      MS. MILLER: Because another thing I think when

22   you step up in that box I am expecting you to be

23   telling the truth because if you are not you are

24   perjuring yourself.

1       I expect them to be telling the truth but I

2  know you can still reason and there is signs as to

3  someone's credibility.

4       MS. BORMANN: Would you be able to go back after

5  you heard the witnesses' testimony and go back and

6  use your common sense and everyday experience to

7  decide whether or not the witnesses are telling the

8  truth?

9       MS. MILLER: Yes.

10       MS. BORMANN: Thank you.

11           I need a minute.

12               (brief pause)

13       MS. BORMANN: Mr. Ward, the hit and run you were

14  in, you were in your mother's car?

15       MR. WARD: Yes.

16       MS. BORMANN: She's the one that insured the

17  car?

18       MR. WARD: Yes.

19       MS. BORMANN: Is it her name on the lawsuit that

20  your insurance company filed against the other

21  people?

22       MR. WARD: I took the initiative to go to the

23  lawyer.

24       MS. BORMANN: You talked to the lawyer?

1      MR. WARD: Yes.

2      MS. BORMANN: Did he file suit in your mother's

3  name because it was her car and her insurance

4  company.

5      MR. WARD: I couldn't even tell.

6      MS. BORMANN: You went with your mother to the

7  lawyer's office?

8      MR. WARD:  By myself with the people in the car

9  with me.

10      MS. BORMANN: And as far as you know it's

11  basically the insurance companies that are fighting

12  it out about who should pay for that accident.

13      MR. WARD: Who is liable for the accident.

14      MS. BORMANN: Who is liable for that accident

15  where somebody hit you when you were driving your

16  mother's car.

17          Is it -- Well, you say you are not sure if

18  your name is on the lawsuit?

19      MR. WARD: Probably it is.  I was driving.

20      MS. BORMANN: But it is your mother's car?

21      MR. WARD: I am on the insurance.

22      MS. BORMANN: On the insurance as somebody that

23  she has permitted to let drive her car?

24      MR. WARD:  Yes.

1       MS. BORMANN: Have you ever seen any paperwork

2   that shows that a lawsuit has been filed or are they

3   still talking about it -- the insurance companies?

4       MR. WARD: This happened like January 1st, 1996.

5   I did like all that.  Must have been like two days

6   where I went up.  I have not seen anything.

7       MS. BORMANN: Then you went back to school down

8   south?

9       MR. WARD: Yes.

10      MS. BORMANN: You have never been called to have

11  a deposition where you have to go in and answer

12  questions with a court reporter?

13      MR. WARD: No.

14      MS. BORMANN: So it may be that there is not a

15  lawsuit; is that correct?

16      MR. WARD: There is a lawsuit.

17      MS. BORMANN: Okay.

18          Let me be very precise.  When I am saying

19  that it may be that there is no actual paper filed

20  in court they may still be negotiating -- the

21  insurance companies that is; right?

22      MR. WARD: I guess so; yes.

23      MS. BORMANN: Miss Miller, you told us that we

24  should have asked you about the defendant testifying

1    before and you told us you had some question about

2    how to judge the witnesses when they testify.

3            Is there anything else?  Nothing that we

4    didn't ask you about?

5        MS. MILLER: Those were the only two things.  She

6    asked the girl sitting here or else this girl and

7    when they came to me they didn't ask that and it has

8    been bothering me ever since.  I thought I should

9    say something.

10        MS. BORMANN: When I went back to Mr. Ward and

11    asked him about the auto accident you had a chance

12    to think about it.

13            Could you follow the judge's instructions

14    that you are not to consider Mr. Hillard's not

15    testifying in any way?

16        A.    Yes; if the judge said that.

17        MS. SAVINI:  Okay.

18        THE COURT:  She answered it before you asked

19    it.  She answered it.

20            Go on to something else.

21        MS. BORMANN: Thank you, Judge.

22            Judge, with our thanks we would excuse Mrs.

23    Harris, Mrs. McIe, and Miss Petric.

24        THE COURT: I can't hear you when you have your

1    head down.

2        MS. BORMANN: I'm sorry.

3            We ask that you excuse Mrs. Harris, Mrs.

4    McIe and Miss Petric.  I'm sorry.

5        THE COURT:  Ladies, you are excused; McIe,

6    Harris and Petric.

7            Mr. Victor Flores, Michael Vender And

8    Malika Cooper, last seat in rear row.

9            No, sir, in -- You are the right seat.

10           You may proceed.

11       MS. McBETH: Thank you.

12

13           V I C T O R    F L O R E S,

14

15   called as a prospective juror herein, having been

16   first duly sworn was questioned and responded as

17   follows:

18

19                   EXAMINATION

20                By: Ms. Mc Beth

21

22       Q.   Mr. Flores, you live on the west side of

23   Chicago?

24       A.   That's right.

1      Q.    How long have you lived at your current

2   address?

3      A.    Nine years.

4      Q.    And before that?

5      A.    I used to live on Artesian.

6      Q.    You are retired; is that right?

7      A.    Correct.

8      Q.    What did you do for a living before you

9   retired?

10     A.    Crane operator.

11     Q.    How long did you do that, sir?

12     A.    Well, I do that for eight years but

13   previous to that we -- I was moved from department

14   to department.  In all I put 36 years for the

15   company.

16     Q.    That is a company here in Chicago?

17     A.    That's right.

18     Q.    And how long have you been retired?

19     A.    Four years.

20     Q.    And your wife does not work outside the

21   home; is that right?

22     A.    That's correct.

23     Q.    Has she always been a homemaker?

24     A.    That's right.

1      Q.   You have never served on a jury before;
2  is that right?

3      A.   No.

4      Q.   And you know someone who is a very close
5  friend or someone in your immediate family who is a
6  police officer?

7      A.   A son.

8      Q.   Your son is a police officer?

9      A.   Yes.

10     Q.   For Chicago?

11     A.   Yes.

12     Q.   Which district is your son assigned to?

13     A.   I do not know the district but over here on
14 Damen.

15     Q.   On Damen?

16     A.   Yes.

17     Q.   How long has he been a police officer?

18     A.   I believe two years.

19     Q.   You talk to him about his work.

20     A.   No.

21     Q.   Anything about the fact that your son is a
22 Chicago police officer that would you to not be fair
23 and impartial?

24     A.   Don't think so.

1    Q.   Do you have any other children besides the
2  child that is a police officer?
3    A.   I have twelve in the family.
4    Q.   Twelve children?  Are any of the other ones
5  in law enforcement?
6    A.   One of my son's works as correctional
7  officer in this building.
8    Q.   For about how long?
9    A.   Three or four years; something like that.
10    Q.   And anything about the fact your son is a
11  correctional officer that would cause you difficulty
12  in being fair and impartial?
13    A.   Don't think so.
14    Q.   Any other children involved in the court
15  system or law enforcement?
16    A.   No.
17    Q.   I notice that you have been the victim of a
18  crime; is that correct?
19    A.   Yes.
20    Q.   When was that?
21    A.   Happened long time ago.  In 60s.  Three
22  guys jump me and I was asking to call the police and
23  they said no.
24    Q.   I'm sorry, I didn't understand you.  You

1    were asked if you --

2         A.    You was asking if I did call the police at

3    that time, because I went for physical examination

4    because I fear it was happening inside.

5              And they said what you need.   They let me

6    go.   They didn't bother me anymore.

7              At that time I didn't call the police

8    because I went to the house bleeding.   My wife was

9    fainting so I took care of her and I forget all

10   about anything else.

11        Q.    Anything about that experience that would

12   make it difficult for you to be fair and impartial

13   here?

14        A.    No.

15        Q.    Any other times that you have been a

16   victim, sir?

17        A.    No.

18        Q.    No other members of your family or close

19   friends that have also be the victims of crimes; is

20   that correct?

21        A.    I don't remember; no.

22        Q.    Nobody you can think of at this point that

23   is in your immediate familiar or close friend?

24        A.    No.

1    Q.   And you note that you have been a party to

2  a lawsuit; is that right?

3    A.   Well, yah.   One time I was in an accident

4  going to Mexico.   Somebody hit us from behind and

5  that kind of a thing.

6        Went to the lawyer with the case.

7    Q.   Was there a lawsuit filed?

8    A.   Pardon me?

9    Q.   Was there a lawsuit filed -- papers filed?

10   A.   Yes.

11   Q.   When was that, sir?

12   A.   Also about -- years ago.   Thirteen, ten

13  year ago.

14   Q.   That case is over with now, sir?

15   A.   Yes.

16   Q.   You also note that a member of your

17  immediate family has been the party to a lawsuit.

18        Is that the same automobile accident or

19  another matter?

20   A.   I believe that was a car accident; yes.

21        Also grocery store accident.   She was

22  walking the store and things pile up, fall on her,

23  and sued against the company.

24   Q.   Is that your wife, sir?

1      A.    No; my daughter.

2      Q.    Anything about the fact that you and your

3    daughter were involved in accidents and there were

4    lawsuits filed that would make it difficult for you

5    to be fair in this case?

6      A.    No.

7      Q.    Do you understand, sir, that the state's

8    Attorneys here have a burden of proving the case

9    beyond a reasonable doubt?

10     A.    Well, to be honest about it all these is

11   very new to me, all that.

12           I am working.  I never was involved in any

13   understanding of how the law function.  It is very

14   new to me, even the terminology that you use I do

15   not understand.

16     Q.    Do you understand, sir, that Mr. Hillard,

17   the man on trial here, he does not have to bring

18   witnesses to you -- present witnesses to you?

19     A.    I think so.  I saw a case on television and

20   I believe this is right.

21     Q.    You understand that it is the prosecutors

22   that have to bring the witness to you here and not

23   Miss Bormann and I -- the lawyers for Mr. Hillard?

24     A.    Truly I do not.  Well, I say if it is the

172

1   case it will be the case; yes.

2       Q.   I'm sorry?

3       A.   I could not understand.  I do not

4   understand, you know.  I don't find the words to

5   understand it or to tell you if it is this or that.

6           Can you explain to me?

7       Q.   You understand that evidence is witnesses

8   testifying, saying under oath what happened?

9       A.   Yes.

10      Q.   You understand that?

11      A.   Yes.

12      Q.   You understand that evidence can also be

13  physical evidence?

14      A.   Yes.

15      Q.   Guns, physical things that you can touch?

16      A.   Okay.

17      Q.   There can sometimes be evidence where both

18  sides agree that this is what the evidence would be,

19  that is called a stipulation?

20      A.   Yes.

21      Q.   You understand that?

22      A.   If I answered yes it would be a lie.

23      Q.   Not really, you don't understand that?

24      A.   No.

1    Q.   Some of the evidence will be witnesses.
2 You understand that the witness can tell what
3 happened and some of the evidence will be things
4 that you can look at; is that right?

5    A.   Yes.

6    Q.   And some of the evidence will be statements
7 that the lawyers stand up and say we agree that that
8 is what the witness would say?

9    A.   Yes.

10    Q.   Do you understand that?

11    A.   Yes.

12    Q.   If you heard all of those kinds of evidence
13 in the case do you understand when you went back it
14 would be your job to decide whether there is enough
15 evidence in the case?

16    A.   Sure.

17    Q.   And the amount of evidence that you have to
18 hear is what is called proof beyond a reasonable
19 doubt?

20    A.   Uh-hum.

21    Q.   Do you understand that?

22    A.   Yes.

23    Q.   And the law that the judge will tell you is
24 if you do not hear proof beyond a reasonable doubt

1  then you must find Mr. Hillard not guilty?

2      A.    True.

3      Q.    You understand that?

4      A.    Yes.

5      Q.    And it is only if you hear what you and

6  your other jurors vote is proof beyond a reasonable

7  doubt, that is the only time that you may sign

8  guilty?  Understand that?

9      A.    Yes.  Yes.

10      Q.    If Mr. Hillard decides he does not want to

11  testify and say anything you are not allowed to

12  think about that when deciding the case; okay?

13      A.    That's okay.

14      Q.    Do you understand that?

15      A.    Yes.

16      Q.    Can you follow that rule?

17      A.    Yes.

18      Q.    If he decides that he does not want to have

19  us, his lawyers, to put any other witnesses up there

20  and we decide that then he does not have to;

21  understand that?

22      A.    Yes.  Okay.  True.

23      Q.    Thank you.

24            Do you have any problem with the rules and

1  the law that I am explaining to you now?

2       A.    No, not that you explain to me.

3       Q.    Thank you very much.

4             If you decide after you talked to your

5  other jurors that they don't have proof beyond a

6  reasonable doubt could you sign the papers saying

7  not guilty?

8       A.    Sure.

9       Q.    Okay.  And if you decide with your fellow

10 jurors that they do have the proof you can sign the

11 papers saying guilty?

12      A.    Sure.

13      Q.    What do you like to do in your spare time,

14 sir?

15      A.    Well, ride a bike.

16      Q.    That's nice.  Do you like to read at all?

17      A.    Not very much.

18      MS. McBETH: Thank you, Mr. Flores.

19

20             M I C H A E L    V E N D E R,

21

22 called as a prospective juror herein, having been

23 first duly sworn was questioned and responded as

24 follows:

1

2                           EXAMINATION

3                          By: Ms. McBeth

4

5        Q.    Mr. Vender, how are you?

6        A.    Yes.

7        Q.    You live in the northern suburbs?

8        A.    Yes.

9        Q.    How long have you lived at your current

10   address?

11       A.    Nine years.

12       Q.    You are a hand surgeon; is that right?

13       A.    Yes.

14       Q.    You are married but your wife does not work

15   outside the home; is that right?

16       A.    Yes.

17       Q.    You have two school-aged children?

18       A.    Yes.

19       Q.    You own your home at that address?

20       A.    Yes.

21       Q.    Where did you go to school for your

22   training in surgery?

23       A.    University of Illinois College of

24   Medicine.  Trained in orthopedics at Northwestern

1    University and did a fellowship in hand surgery in

2    Connecticut.

3         Q.    How long have you been in Chicago?

4         A.    Born and raised here.  Been in practice

5    since 1986.

6         Q.    You have never served on a jury before?

7         A.    Right.

8         Q.    And there is somebody who is a member of

9    your immediate family or close friend who is a

10   lawyer?

11        A.    Yes.

12        Q.    Who is that?

13        A.    I'm sorry; friends.

14        Q.    It says, question calls for somebody that

15   is an immediate family member or close friend and

16   you checked?

17        A.    Not family but close friends.

18        Q.    Are those neighbors or friends from

19   school?

20        A.    Half the people in my neighborhood are

21   lawyers and nature of my business I work with

22   lawyers and do expert testimony, consulting,

23   worker's compensation.  Part of my practice was the

24   social people that I know.

1    Q.   Any of the friends you know socially

2    involved in either criminal defense or prosecution?

3    A.   Both.

4    Q.   You have also told us that you testified as

5    an expert witness; is that correct?

6    A.   Yes.

7    Q.   Anything about the fact you know lawyers

8    that have been involved as a witness that would make

9    it difficult for you to be fair to either side in

10   this case?

11   A.   Probably not.  I do a lot for the City of

12   Chicago, Cook County, State of Illinois.  I don't

13   think it would be a difference.

14   Q.   You do a lot as an expert.  You mean they

15   call you frequently as an expert?

16   A.   Yes.

17   Q.   How many times view testified as an expert?

18   A.   Several times a year in general.

19   Q.   You said probably not anything about those

20   relationships or your role as an expert.  I mean we

21   would like you to tell us if you can't be fair,

22   anything about that.

23   A.   I like to think I am objective.

24   Q.   Thank you.  You have never been the

1    accused, a complainant, or witness in a criminal

2    case; is that right?

3        A.    That's correct.

4        Q.    So all of your testimony has been in civil

5    cases, malpractice cases?

6        A.    That's correct.

7        Q.    But you have been the victim of a crime?

8        A.    Robbery.  Not me personally but house broke

9    in.

10       Q.    When was your house broken into?

11       A.    Growing up, my parents' house.

12       Q.    Were the police called?

13       A.    Yes.

14       Q.    Did they catch anyone?

15       A.    Not that I know.

16       Q.    Anything that experience that would start

17   you out -- Let me ask you, anything about that

18   experience that would make it difficult for you to

19   be fair to both sides in the case?

20       A.    No.

21       Q.    Your family has also be the victim of a

22   crime; is that right?

23       A.    Yes.

24       Q.    And that is what you described to your

1  house when you were growing up?

2        A.    Wife was burglarized and stolen purse,

3  things like that.

4        Q.    Was anyone caught in those incidents?

5        A.    Don't believe so.

6        Q.    Could you set aside what you know about

7  what happened to your wife and judge this case

8  solely on the evidence here?

9        A.    Yes.

10       Q.    You have also been a party to a lawsuit; is

11 that correct?

12       A.    Just as a participant as I described.

13       Q.    Not as a named party?

14       A.    One that was dropped.  No proceedings.

15       Q.    And then nothing about that experience that

16 would make it difficult for you to be fair; is that

17 correct?

18       A.    Don't believe so.

19       Q.    Could you follow the principle of law that

20 we have been talking about -- presumption of

21 innocence and burden of proof?

22       A.    Yes.

23       Q.    And you would not hold it against Mr.

24 Hillard if in consultation with his lawyers he

1    decided not to testify?

2        A.    No.

3        Q.    You do check that you have been involved in

4    an accident where a person was injured; is that

5    correct?

6        A.    Yes.

7        Q.    When was that, sir?

8        A.    I have been in various car accidents over

9    the years.

10       Q.    Anything about those experiences that would

11   make it difficult for you to be fair and impartial

12   in this case?

13       A.    No.

14       Q.    If you after hearing all of the evidence

15   and talking to your fellow jurors believe that the

16   State had not proved the defendant guilty beyond a

17   reasonable doubt would you be able to sign a not

18   guilty verdict??

19       A.    Yes.

20       MS. McBETH: Thank you.

21

22            M A L I K A   C O O P E R,

23

24   called as a prospective juror herein, having been

1  first duly sworn was questioned and responded as

2  follows:

3

4                    EXAMINATION

5                    By: The Court

6

7     Q.   Hello, Miss Cooper, how are you?

8     A.   Fine.

9     Q.   You live in the southern suburbs?

10    A.   Yes.

11    Q.   How long?

12    A.   7, eight years.

13    Q.   What about before that?

14    A.   Before that I lived in Illinois;

15  Belleville, Illinois.

16    Q.   Out west?

17    A.   Yes.

18    Q.   And you are single.  Right now you are a

19  teacher and owner of ASS?

20    A.   A home day care.

21    Q.   Home day care center.

22         How many children do you watch?

23    A.   Nine.

24    Q.   How long have you been doing that?

1      A.    I have had a home day care for like a year

2   now.

3      Q.    Before that you were at another day care

4   center?

5      A.    Yes.

6      Q.    How long did you do that?

7      A.    For like six years.

8      Q.    You rent where you live now?

9      A.    Yes.

10     Q.    You never served on a jury; is that right?

11     A.    No.

12     Q.    You have never been a party to a lawsuit

13  but someone in your family has?

14     A.    My aunt.

15     Q.    What happened to your aunt?

16     A.    She was in a car accident.

17     Q.    Is that case still going on?

18     A.    No.

19     Q.    Anything about the fact your aunt was in a

20  lawsuit that would make it difficult to be fair

21  here?

22     A.    No.

23     Q.    Could you follow the rules of law that --

24  the presumption of innocence that Mr. Hillard as he

1  sits here is presumed innocent?

2      A.    Yes.

3      Q.    And that the State has the burden of

4  proving the charges in this case beyond a reasonable

5  doubt?

6      A.    Yes.

7      Q.    If you went back and talked to your fellow

8  jurors and were not convinced that they had proved

9  the charges beyond a reasonable doubt could you sign

10  not guilty verdicts?

11      A.    Yes.

12      Q.    You would not hold it against Mr. Hillard

13  if he decided not to testify in the case?

14      A.    No.

15      Q.    What do you like to do in your spare time?

16      A.    Like to spend time with kids.

17      Q.    I bet you do.  Thank you very much.

18            If I can have a minute, your Honor?

19                        (brief pause)

20  BY MS. McBETH:

21      Q.    Doctor Vender, you told us that you

22  testified quite a bit for the county and city; is

23  that right?

24      A.    Yes.

185

1      Q.    So generally you are the defense witness in

2  those cases; is that right?

3      A.    That would be defense witnesses; correct.

4      Q.    Do you ever testify as an expert for the

5  plaintiffs in those types of cases?

6      A.    Don't believe so.

7      Q.    So you have always been a defense witness?

8      A.    Correct.

9      MS. McBETH: Thank you very much.

10         With our thanks we would ask that you

11  excuse Mr. Flores.

12     THE COURT:  Mr. Flores, thank you very much,

13  sir.  You are excused.

14         Call another juror, please.

15     THE CLERK: Roger Thompson.

16     THE COURT: Mr. Thompson, if you take the second

17  seat in the front row, please.

18

19         R O G E R   T H O M P S O N,

20

21  called as a prospective juror herein, having been

22  first duly sworn was questioned and responded as

23  follows:

24

EXAMINATION

By: Ms. McBeth


    Q.   Good afternoon, Mr. Thompson.  How are
you?

    A.   Fine.

    Q.   You live on the south side of the city; is
that right?

    A.   Right.

    Q.   How long have you lived at that address?

    A.   Little over a year.

    Q.   We are not interested in the specific
address.  But what part of the city or county did
you live before you lived at that address?

    A.   What part of the city?

    Q.   Yes.

    A.   You mean the area?

    Q.   Yes.  North?  South?

    A.   South side.

    Q.   How long have you lived on the south side
all together?

    A.   28 years.

    Q.   And you note here that you are retired; is
that right?

1    A.   Yes.

2    Q.   You used to sell insurance?

3    A.   Yes.

4    Q.   How long have you been retired?

5    A.   Three years.

6    Q.   And how long were you in the insurance

7 business?

8    A.   30 years.

9    Q.   Always in Chicago?

10   A.   Yes.

11   Q.   You have three grown children; is that

12 right?

13   A.   Right.

14   Q.   What did they do for a living?

15   A.   My son works for the Board of Education.

16 Daughter works for Board of Education, Navy Pier.

17 And other son works for factory.  I don't remember

18 where it is at.

19   Q.   The son that works for the Board of

20 Education, is he a teacher?

21   A.   Yes.

22   Q.   Is he married?

23   A.   Pardon?

24   Q.   Is he married?

1    A.   No.

2    Q.   What about your daughter?  Is she a teacher

3 as well?

4    A.   Yes.

5    Q.   Is she married?

6    A.   No.

7    Q.   You said your youngest son works?

8    A.   For a company somewhere in Harvey, Illinois

9 on Caldwell.

10    Q.   Is he married?

11    A.   No.

12    Q.   You have served on a jury before?

13    A.   Pardon?

14    Q.   You've served on a jury before?

15    A.   About 20 years ago.

16    Q.   Where was that?

17    A.   Here.

18    Q.   Here at the criminal court building?

19    A.   Yes.

20    Q.   Were you selected to be on the jury and

21 deliberate to jury?

22    A.   Pardon?

23    Q.   Were you actually selected to be on the

24 jury?

1      A.   Yes.

2      Q.   Did your jury reach a verdict?

3      A.   Yes.

4      Q.   Anything about that experience that would

5   make it difficult for you to be fair in this case?

6      A.   No.

7      Q.   Everything else you checked no.

8           What do you like to do in your spare time

9   now that you are retired?

10     A.   Play golf.

11     Q.   Would you be able to hold the State

12   Attorneys to their burden of proof in this case of

13   proof beyond a reasonable doubt?

14     A.   Yes.

15     Q.   Would you have any problems signing a not

16   guilty verdict if you were convinced after hearing

17   all the evidence that they had not proved the case

18   beyond a reasonable doubt?

19     A.   No.

20     Q.   You would not hold it against Mr. Hillard

21   if he in consultation with his lawyers decided not

22   to testify?

23     A.   No.

24          MS. McBETH: Thank you.

1

2                        EXAMINATION

3                    By:  Mr. Thompson

4

5        Q.   Mr. Thompson, after your prior jury service

6    was there anything about that that you had any

7    reservations about?

8        A.   No.

9        Q.   Did you talk to anybody about that after

10   you reached your verdict?

11       MS. SAVINI: RODDY: Objection.

12       THE COURT:  Sustained.  You need not answer that

13   question.

14       MS. BORMANN: Your Honor, we would accept and

15   tender the panel.

16       THE COURT:  Very well.

17

18                       EXAMINATION

19                    By:  Ms. Curtiss

20

21       Q.   Mr. Ward, I just had a couple questions

22   regarding the car accident.

23            When did this occur?

24       A.   January 1st, 1969.

1      Q.    Was it an instance where there was a car

2    crash?

3      A.    I was in the stop sign.  Somebody hit the

4    back of the car.

5      Q.    You were the driver?

6      A.    Yes.

7      Q.    People in your car?

8      A.    Yes.

9      Q.    The people that crashed into you, did they

10   flee from the scene or remain?

11     A.    They stayed on the scene for about a minute

12   and then left.  The license plate got knocked off

13   the truck.  That's why I got -- how I could report

14   it was a rental truck.

15     Q.    Was anyone hurt in your car?

16     A.    Yes.

17     Q.    You went to a lawyer and filed a suit

18   against these people?

19     A.    Yes.

20     Q.    Were they ever found?

21     A.    Yes.

22     Q.    Yes?

23     A.    Yes.

24     MS. CURTISS: All of you sitting, the judge

1    earlier on mentioned a number of names.

2            Do any of you recognize any of the names of

3    the people that will be witnesses here tomorrow

4    testifying?

5            Your Honor, may we have a side-bar,

6    please?

7        THE COURT: Side-bar.

8            (Whereupon there was a side-bar.)

9        THE COURT:  Yes?

10    MS. SAVINI: We would have a motion for cause as

11    to Mr. Ward.  I think he has been asked several time

12    now and I think it is apparent he has a lawsuit in

13    his name pending.  It's from January 1st, 1969.  He

14    said he contacted lawyers within two days.

15            The case is still pending.  He knows it

16    will take time.  He himself went to the lawyer, said

17    he initiated the process.

18            I think if he didn't do it within a certain

19    amount of time there would be a statute of

20    limitations.  He stated many times as far as he

21    knows it is a lawsuit pending in his name -- driver

22    of the car.  Clearly a liability issue.  I don't

23    think it matters that it's his mom's insurance or

24    somebody else's insurance.

1     THE COURT:  I don't think you have established

2    it is in his name at all how old is he?

3     MS. BORMANN: 21.

4     THE COURT: He would have had additional time to

5    file a lawsuit if he was a minor when it happened.

6        In  '96 he would have been -- he would have

7    been 19.  Does not mean the statute has run.

8        He didn't check the card; did he?

9     MS. SAVINI: He checked that he has been a party

10   to a lawsuit.  Didn't check as to whether or not it

11   is pending right now.

12    THE COURT: Beat a dead horse, start to ask a lot

13   of questions and put ideas in people's mouths.  That

14   is what happened.

15       Man didn't check that he had a case pending

16   and that should have been the end of it.

17       Anything else?

18    MS. SAVINI:  No.

19       (Whereupon the trial was resumed in

20        open court.)

21    MS. CURTISS: Your Honor, with great thanks the

22   People wish to thank Mr. Ward.

23    THE COURT:  Mr. Ward, thank you.  You may step

24   down.

1      MS. CURTISS: Also, your Honor, with great thanks

2  People wish to thank and excuse Mr. Vender.

3      THE COURT:  Mr. Vender, Doctor Vender, thank

4  you.

5        Please move down towards me.  Mr. Thompson

6  move down one seat, please.

7      THE COURT:  Call two more jurors.

8      THE CLERK: Joseph Koniewicz.  Vivian Curran.

9

10         J O S E P H    K O N I E W I C Z,

11

12  called as a prospective juror herein, having been

13  first duly sworn was questioned and responded as

14  follows:

15

16              EXAMINATION

17             By: Ms. Curtiss

18

19    Q.    Mr. Koniewicz?

20    A.    Yes.

21    Q.    You live in the south suburbs?

22    A.    Yes.  Western suburbs.

23    Q.    How long have you been living there?

24    A.    Four years.

1  Q. Prior to that?

2  A. I lived in the Town of Cicero for like 12

3 years.

4  Q. Says here that you are an operations

5 supervisor for a freight company?

6  A. Yes.

7  Q. What exactly are your responsibilities?

8  A. Make sure the routes are routed correctly,

9 all the freight is broken down and out on the

10 streets in proper time and make sure the place is

11 cleaned up.

12  Q. How long have you had that position?

13  A. Two years.

14  Q. Prior to that were you employed, or still

15 employed by the freightway company?

16  A. Yes.

17  Q. What before that?

18  A. First working the freight, then crew

19 leader.  Make sure the crew have no problems.

20  Q. How many years working for them?

21  A. Six years.

22  Q. You indicate that your wife is a legal

23 assistant?

24  A. Yes.

1    Q.   Lawyer?

2    A.   No.  Just assistant.

3    Q.   How long has she been working for Habitat

4 Corporation?

5    A.   Four years.

6    Q.   Prior to that?

7    A.   She worked for McDermott, Will and Emery.

8    Q.   Doing the same sort of work?

9    A.   Yes.

10    Q.   Through her work have you had an

11 opportunity to talk with different lawyers in those

12 fields?

13    A.   No.

14    Q.   Appears you have two very small children?

15    A.   Yes.

16    Q.   Very small.  You have indicated a member of

17 your immediate family or close friend has been the

18 victim of a crime?

19    A.   Yes.

20    Q.   What did that entail?

21    A.   Uncle was murdered years ago.  I was like

22 three years old.

23    Q.   Did they catch the guy that killed him?

24    A.   No.

1  Q. Never did?

2  A. No.

3  Q. Anything about that, any repercussions that

4 would impair --

5  A. No.

6  Q. -- your ability --

7  A. No.

8  Q. -- to be fair and impartial?

9  A. No.

10  Q. Have you ever been an accused, a

11 complainant, or witness in a criminal case?

12  A. I was a witness in a case where there was a

13 lawsuit against -- There was -- I was working for a

14 bear company and the truck tapped a car, the person

15 panicked and drove over another person and so I had

16 to go and testify that we weren't driving, doing

17 anything fast like that.  I was like the second

18 witness.  So, like five minutes on the stand.

19  Q. That was a civil lawsuit?

20  A. Yes.

21  Q. Anything about that that would affect your

22 ability to be fair and impartial?

23  A. No.

24  Q. In your spare time what sort of things do

1    you like to do?

2        A.    Spend a lot of time with my two little

3    kids.  Play softball and try to work on the house if

4    anything fits in.

5        Q.    If we proved our case beyond a reasonable

6    doubt would you and could you sign a guilty verdict?

7        A.    Yes.

8        Q.    On the other hand, if we didn't could you

9    and would you sign a not guilty verdict?

10       A.    Yes.

11       Q.    The judge is going to instruct you on the

12   law, the law of accountability, which is really the

13   law of legal responsibility.

14            The judge is going to tell you that to

15   commit a crime they are both responsible for their

16   own action and the action of his other partner in

17   crime.

18            Do you understand?

19       A.    If you are all of the sane mind; is that

20   correct?  If, say, one of the persons was, say,

21   retarded?  Of a sane mind.  If one of the person's

22   couldn't comprehend, otherwise, yes, I understand

23   that law.

24       Q.    What you are saying is if someone was

1    unable because of their mental capabilities to fully

2    understand what was going on that would be

3    different?

4        A.    Yes.

5        Q.    Otherwise if the judge were to instruct you

6    on the law of accountability you could follow that?

7        A.    Yes.

8

9                V I V I A N   C U R R A N,

10

11   called as a prospective juror herein, having been

12   first duly sworn was questioned and responded as

13   follows:

14

15                    EXAMINATION

16                    By: Ms. Curtiss

17

18       Q.    Miss  Curran?

19       A.    Yes.

20       Q.    You are a Benefits Administrator for a

21   manufacturing company?

22       A.    Yes.

23       Q.    How long?

24       A.    Three years.

1   Q.   How long have you worked for that company?

2   A.   36 years.

3   Q.   How many?

4   A.   36 years.  A lifetime.

5   Q.   Prior to your current position what do you

6   do for them?

7   A.   Office management and other personnel work.

8   Q.   Your husband is retired?

9   A.   Yes.

10  Q.   What did he do before retiring?

11  A.   Accountant.

12  Q.   Where did he work?

13  A.   Home.

14  Q.   How long did he do that?

15  A.   15 years.

16  Q.   And you live in the city?

17  A.   Yes.

18  Q.   How long have you lived in the city?

19  A.   All my life.

20  Q.   Have you ever been an accused, a

21  complainant, or witness in a criminal case?

22  A.   Never.

23  Q.   What do you like to do in your spare time?

24  A.   Read, socialize, and do crossword puzzles.

1    Q.    What kind of things do you do?

2    A.    Mysteries, gardening.

3    Q.    Your husband, how does he occupy his time

4    now that he is retired?

5    A.    He does the housework.  He golfs.

6    Q.    Do you golf with him?

7    A.    No.

8    Q.    If the we were able to prove our case

9    beyond a reasonable doubt would you and could you

10   sign a guilty verdict?

11   A.    Yes.

12   Q.    On the other hand if we did not prove our

13   case beyond a reasonable doubt would you and could

14   you sign a not guilty verdict?

15   A.    Yes.

16   MS. CURTISS: Your Honor, we would accept and

17   tender the panel.

18   THE COURT:  Very well.

19   MS. BORMANN: Good afternoon.

20       Miss Curran, I will start with you since

21   you are a lady.

22

23                    EXAMINATION

24                    By:  Ms. Bormann

1

2          Q.    How are you?

3          A.    Fine.

4          Q.    You live in Bridgeport; is that right?

5          A.    Close.

6          Q.    How long have you lived there?

7          A.    All my life.

8          Q.    And you got married, you stayed in

9     Bridgeport?

10         A.    Yes.

11         Q.    Your husband is also from that area of the

12    city?

13         A.    No.  From another part.

14         Q.    In the city or suburbs?

15         A.    City.

16         Q.    Mt. Greenwood?

17         A.    Not that far.

18         Q.    You said that you are a benefits

19    administrator for a company for 36 years.

20               What exactly does a benefits administer

21    have to do?

22         A.    I handle employee problems with their

23    benefits, with insurance, medical, pension.

24         Q.    Court reporter can't hear you.

File Date: _____7-1-2008_____

Case No: _____08cv1775_____

ATTACHMENT # _____

EXHIBIT _____I - part 3_____

TAB (DESCRIPTION)

_____

1     A.   Problems with medical situations that

2  employees have and retiring pension benefits and

3  that is it.

4     Q.   Is that through the Human Resource

5  Department of the company?

6     A.   Yes.

7     Q.   So you are pretty much a problem solver for

8  folks that come in that have problems with their

9  benefits?

10     A.   Yes.

11     Q.   Okay.  Before that you said that you were

12  an office manager.

13         Was that for the same company?

14     A.   Yes.

15     Q.   Your entire career outside of your home has

16  been spent with the same company?

17     A.   Yes.

18     Q.   Now I believe you said your husband is a

19  retired accountant?

20     A.   Correct.

21     Q.   And he was doing that for about 15 years.

22         Prior to that what did he do?

23     A.   Worked for another division of the company

24  before that.

1    Q.    Not in accounting, something different?

2    A.    No.   Always in accounting.

3    Q.    That is how I misunderstood.   In

4    accounting.

5         Ma'am, we talked a little earlier, the

6    judge did instruct you all that Mr. Hillard is

7    presumed innocent of the charges unless after all

8    your deliberations you and you are fellow jurors

9    determine that the State has proven the charges

10   beyond a reasonable doubt.

11        Do you have any problems with that concept

12   of the law?

13   A.    No.

14   Q.    The judge has also told you and will tell

15   you and all your fellow jurors, did tell all of your

16   jurors, fellow jurors that Mr. Hillard and the

17   defense in this case is not required to put forth

18   any evidence; that he has plead had not guilty and

19   as a result of that can rely upon the fact that the

20   State cannot prove him guilty.

21        Do you understand that?

22   A.    Okay.

23   Q.    Would you then hold it against Mr. Hillard

24   if he relied on the fact that he plead not guilty,

1    chose not to put on any evidence, including his own

2    testimony because he and his lawyers believed the

3    State did not prove him guilty beyond a reasonable

4    doubt?

5        MS. SAVINI: Objection.

6        THE COURT:  Sustained.

7        MS. BORMANN:  Okay.

8    BY MS. BORMANN:

9        Q.   Would you hold it against Mr. Hillard if he

10   didn't testify?

11       A.   No.

12       Q.   Good.   Thank you.

13

14                    EXAMINATION

15                    By:  Ms. Bormann

16

17       Q.   Mr. Koniewicz?

18            Mr. Koniewicz, did you grow up in Cicero?

19       A.   From third grade on.

20       Q.   Did you go to high school in Cicero?

21       A.   Yes.

22       Q.   One of the Mortons?

23       A.   Yes.

24       Q.   Morton East?

1          A.    Yes.

2          Q.    Good.   Then you got married and moved to a

3     little further west?

4          A.    Correct.

5          Q.    Now you moved.

6                I won't ask you again to go into exactly

7     what you do but sounds like a pretty detail oriented

8     job?

9          A.    Yes.

10         Q.    You have to pay attention to what other

11    people are doing and make sure things run smoothly?

12    That is pretty much the way it happens?

13         A.    Yes.

14         Q.    Now, you have -- I am going to ask you the

15    same questions.

16               Mr. Hillard is presumed innocent of the

17    charges at this time.   Any problem with that?

18         A.    No.

19         Q.    Any problem with the concept the State has

20    the burden of proof beyond a reasonable doubt of all

21    the charges in this case?

22         A.    No.

23         Q.    Any problem with the concept that Mr.

24    Hillard and in consultation with Miss McBeth and

1  myself does not have to put on any evidence in this

2  case?

3       A.   No.

4       Q.   Would you hold it against Mr. Hillard if he

5  chose not to testify?

6       A.   No.

7       Q.   Could you listen to the evidence as it

8  comes from the witness stand, view the exhibits and

9  judge whether or not you believe that evidence taken

10 in the light of the reasonableness of the other

11 testimony in the case, deliberate with your fellow

12 jurors, and reach a verdict in this case?

13      A.   Yes.

14      MS. SAVINI: Objection to the form of that

15 question.

16      THE COURT:  Sustained.

17 BY MS. BORMANN:

18      Q.   Could you, if the State failed to prove the

19 charges in this case beyond a reasonable doubt,

20 could you and would you sign a not guilty verdict?

21      A.   Yes.

22      Q.   Thank you.

23      MS. BORMANN: With our thanks we ask to excuse

24 Miss Curran.

1     THE COURT:  Miss Curran, thank you.

2         Call another juror.

3     THE CLERK: Tricia Hart.

4

5             T R I C I A   H A R T,

6

7   called as a prospective juror herein, having been

8   first duly sworn was questioned and responded as

9   follows:

10

11                EXAMINATION

12             By: Ms. Bormann

13

14    Q.   Good afternoon, Miss Hart.

15         Miss Hart, you live in the western

16   suburbs?

17    A.   Yes, I do.

18    Q.   How long have you lived there?

19    A.   21 years.

20    Q.   Have your life?

21    A.   Exactly.

22    Q.   Born and raised.

23         You are not married; right?

24    A.   No.

1    Q.   Do you rent?

2    A.   I live with my parent.

3    Q.   You are employed right now?

4    A.   Right.  I am a receptionist and student.

5    Q.   Full time receptionist?

6    A.   Yes; in the summer.

7    Q.   In the summer?

8    A.   Yes.

9    Q.   Says here the company you work for is

10   located where?

11        Is that the one on Harlem Avenue there?

12   A.   Yes.

13   Q.   Now in the wintertime while schools are in

14   you employed full time at that point?

15   A.   No.

16   Q.   Are you a full-tie student?

17   A.   Yes.

18   Q.   Where do you attend school?

19   A.   John Marshall.

20   Q.   You are a law student?

21   A.   Yes.

22   Q.   What year?

23   A.   First.

24   Q.   You just finished your first?

1      A.   No.  Starting my first.

2      Q.   Where did you go to school?

3      A.   Dominican University.

4      Q.   When does school start?

5      A.   August 20th.

6      Q.   Are you excited?

7      A.   Sure.

8      Q.   You never been on the jury?

9      A.   No.

10     Q.   Never been a complainant, a witness, or

11   accused in a criminal case?

12     A.   No.

13     Q.   Checking no on everything else.

14          Miss Hart, do you have any problem with the

15   concept of presumption of innocence for a defendant

16   in a criminal case?

17     A.   No.

18     Q.   Do you have any problem withholding the

19   State to the burden of proof which is beyond a

20   reasonable doubt in a criminal case?

21     A.   No.

22     Q.   Would you hold it against Mr. Hillard if

23   after hearing the evidence and in consultation with

24   myself and Miss McBeth he chose not to identify?

1    A.    Personally I understand that it is a legal

2    concept not to hold against him, he has a right not

3    to testify.

4    Q.    It's the law actually and if the judge

5    instructed you that you could not consider that,

6    whether Mr. Hillard -- you could not consider the

7    fact Mr. Hillard didn't testify at all in reaching

8    your decision and tell you that is the law and --

9    A.    I understand it is the law.  You asked if I

10   would consider it.  I personally wouldn't but

11   probably would effect --

12   Q.    Miss Hart, if someone is accused of a crime

13   and pleads not guilty, they are not there and they

14   plead not guilty, they deny doing it, if they choose

15   not to testify --

16   MS. SAVINI: Objection.

17   THE COURT:  Sustained.

18   BY MS. BORMANN:

19   Q.    All right.

20         How do we put this?  The defendant does not

21   have to put on a case.  It is the State's burden

22   because they choose to bring the case to begin with.

23         Do you understand that?

24   A.    Yes, I understand that.

212

1      Q.   Okay.  If the defense does not have

2  anything to add because the State can't prove their

3  case would you hold that against the defendant in

4  deliberating?

5      MS. SAVINI: Objection to the form of the

6  question.

7      THE COURT:  Well, let me see if I can clear this

8  up.

9           Miss Hart, if you are selected to serve as

10  a juror here and the defendant does not elect to

11  testify, I will, as I am required, to in all cases

12  instruct the jury the fact that the defendant did

13  not testify may not be considered by you in arriving

14  at your verdict.

15           That is the law in this building, in this

16  county, in this state, and in this country.  The

17  reason is because the defendant is presumed to be

18  innocent of the charges here, if he is presumed

19  innocent and the state does not prove him guilty

20  beyond a reasonable doubt, whether he testifies or

21  calls witnesses, makes no difference whatsoever.

22  You have to decide the case on the basis of what the

23  State has presented; understand that?

24      A.   I do.

1      THE COURT:  You might wonder why a defendant

2   would not testify.  But the fact that you might

3   wonder is not really relevant.  The fact is are you

4   able to abide by the instructions that I will give

5   if he does not testify?

6      A.   Yes, I am.

7      MS. BORMANN:  Thank you.

8          Thank you, Judge.

9      MS. BORMANN: With our thanks we ask to excuse

10  Miss Hart.

11     THE COURT:  Thank you, Miss Hart.

12         Call another juror.

13     THE CLERK: Kelly Lukes.

14

15              K E L L Y    L U K E S,

16

17  called as a prospective juror herein, having been

18  first duly sworn was questioned and responded as

19  follows:

20

21                 EXAMINATION

22               By: Ms. Bormann

23

24     Q.   Good afternoon, Miss Lukes.

1       A.    Yes.

2       Q.    You live in the south suburbs?

3       A.    Yes.

4       Q.    You live there how long?

5       A.    Six years.

6       Q.    Prior to that where did you live?

7       A.    Chicago.

8       Q.    What part of the city?

9       A.    South side.

10      Q.    You are a teacher?

11      A.    Yes.

12      Q.    Where at?

13      A.    Dalton and Riverdale.

14      Q.    So south suburbs?

15      A.    Yes.

16      Q.    Is that elementary school?  High school?

17      A.    Pre-K and Special Ed Kindergarten.

18      Q.    You are a Special Ed teacher?

19      A.    Yes.

20      Q.    Pre-K at Reick?

21      A.    An inclusion classroom.  I have regular and

22  special ed.

23      Q.    So prior to Pre-K means prior to

24  kindergarten, 3 and 4 year olds that will be

215

```
1   mainstreamed into the program?

2       A.   Exactly.

3       Q.   You are not married?

4       A.   I am engagegd.

5       Q.   When is the marriage planned?

6       A.   July of next year.

7       Q.   What does your fiancee do?

8       A.   Commodities trader for the Chicago

9   Mercantile Exchange.

10      Q.   You rent?

11      A.   From my parents.

12      Q.   So you live at home?

13      A.   Yes.

14      Q.   You never served on a jury?

15      A.   No. That's correct.

16      Q.   You do know a lawyer?  I'm sorry?

17      A.   My cousin and my uncle.

18      Q.   Both of them?

19      A.   Yes.  They are divorce attorneys.

20      Q.   Both of them?

21      A.   Yes.

22      Q.   Do they work together?

23      A.   No.

24      Q.   Both separate lawyers working separately
```

1   but do different work?

2      A.   Yes.

3      Q.   Do either of them ever handle any criminal

4   matters?

5      A.   Couldn't tell you for sure.

6      Q.   Ever discuss their work with them?

7      A.   Not really.

8      Q.   Would the fact that you have an uncle and

9   cousin who are divorce attorneys affect you in any

10   way with respect to this case?

11      A.   No.

12      Q.   Says that you have been a victim of a

13   crime.  When did that occur?

14      A.   I was probably about six.

15      Q.   Was your bicycle stolen as a kid?

16      A.   Yes.

17      Q.   Is there anything about the fact that when

18   you were six your bicycle was taken, that would

19   affect you in this case?

20      A.   No.

21      Q.   Also says a member of your immediate family

22   or very close friend has also been the victim of a

23   crime?

24      A.   Yes.

1     Q.   Who what that?  When did that happen?

2     A.   My father was robbed at gunpoint.

3     Q.   When did that occur?

4     A.   I believe about six or seven years ago.

5     Q.   And was anybody ever caught?

6     A.   No.

7     Q.   Is there anything about the fact that your

8 father was a victim of an armed robbery six or seven

9 years ago that would not allow you to be fair in

10 this case?

11     A.   No.

12     Q.   You have marked that you have never been a

13 party to a lawsuit; is that correct?

14     A.   Right.

15     Q.   You don't have one currently pending?

16     A.   No.

17     Q.   But that a member of your immediate family

18 was a party to a lawsuit?

19     A.   My mother and father.  My mother, they were

20 divorced and she sued for, I don't know it is termed

21  -- college expenses.

22     Q.   Okay.

23     A.   So part of the divorce, divorce decree.

24     Q.   So is there anything about that fact that

1    would not permit you to be fair in this case?

2        A.    No.

3        Q.    Ma'am, the concept that Mr. Hillard is

4    presumed innocent in this case, the judge just

5    explained to all of us, any problems with that

6    concept?

7        A.    No.

8        Q.    Can you follow the law with respect to not

9    considering the fact that Tony Hillard may not

10   testify in your deliberations in this case?

11       A.    Yes.

12       Q.    And do you have any problem with the

13   concept that the defense does not have to prove

14   anything in this case, the burden of proof is on the

15   State to prove the charges beyond a reasonable

16   doubt?

17       A.    Yes.

18       Q.    Do you have a problem with that?

19       A.    No.  I understand.  I don't have a problem.

20       Q.    My fault for phrasing the question like

21   such.  Thank you.

22       MS. BORMANN: Your Honor, we accept and tender

23   this panel.

24       MS. SAVINI: May I, Judge?

1

2                          EXAMINATION

3                       By:  Ms. Savini

4

5      Q.   Miss Lukes, did you hear the names of all

6  of the witnesses that the judge read off earlier

7  today?

8      A.   Yes.

9      Q.   And you didn't recognize any of those

10 names?

11     A.   No, I did not.

12     Q.   At the close of the evidence in the case if

13 you feel we proved the defendant guilty would you

14 and could you sign a guilty verdict?

15     A.   Yes.

16     Q.   One of the other areas of law that you will

17 hear about in the case is the law of

18 accountability.  That means legal responsibility.

19 That means when one or more people join together

20 with the idea to commit a crime they are each

21 responsible for the acts or crimes committed by the

22 others regardless of which one they themselves

23 committed.

24          You understand that?

1        A.    Yes.

2        Q.    That is a concept of law that you will

3   follow after being instructed by the judge?

4        A.    Yes.

5        Q.    Do you feel you can be fair and impartial

6   to both sides in the case?

7        A.    Yes.

8        MS. SAVINI:    Thank you.

9            Judge, we would accept the panel.

10       THE COURT:    All right, ladies and gentlemen,

11   would you please step back in the jury room for a

12   few minutes?

13       MS. LUKES: Your Honor, can I get my books?

14       THE COURT:    Sure.  Go ahead.

15            Ladies and gentlemen, we are not quite

16   finished just yet.  When a case goes over one trial

17   day, as most do, we routinely select two alternate

18   jurors for the reason that you never know whether

19   accidents or sickness may prevent one of the number

20   of regular panel of twelve jurors to be here at that

21   time that the case is out for deliberations.

22            So we will be selecting two alternates and

23   since I will be asking the questions it may go a

24   little faster.

1        Call four names.  Take the first four seats
2   in the first row.
3       THE CLERK: Michael Birdsell.
4       THE COURT:  Mr. Birdsell, take No. 1 seat
5   closest to me.
6       THE CLERK: Carla Johns.
7       THE COURT:  Miss Johns, take the second seat.
8       THE CLERK: Alexandra Haddad.
9       THE COURT:  Miss Haddad, the third seat.
10      THE CLERK: Roger Smart.
11      THE COURT:  Mr. Smart, the fourth seat.
12        Okay, ladies gentlemen, I am going to ask
13  you some questions individually and then as a
14  group.
15
16        M I C H A E L   B I R D S E L L,
17
18  called as a prospective juror herein, having been
19  first duly sworn was questioned and responded as
20  follows:
21
22                  EXAMINATION
23                  By: The Court
24

1      Q.    Mr. Birdsell is in the first seat.

2            You are from the northwest suburban area,

3      sir?

4      A.    Yes, sir.

5      Q.    How long have you been out there?

6      A.    25 years.

7      Q.    And can you tell us what type of work you

8      do?

9      A.    I print label for different manufacturers.

10     Q.    Okay.

11           You have been doing that most of your adult

12     life?

13     A.    Yes.

14     Q.    Is Mrs. Birdsell employed outside the home?

15     A.    No.

16     Q.    Has she been in the last five years?  Yes?

17     A.    Yes.

18     Q.    What did she do?

19     A.    Inside sales for a steel company.

20     Q.    Okay.  And you have two twins, a

21     year-and-a-half, and then another child who is what

22     -- in grammar school?

23     A.    Right.

24     Q.    You never served on a jury before?

1      A.    No.  I have a civil case about 15 years ago

2  but it was settled out of court.

3      Q.    So you didn't actually decide the case?

4      A.    No.

5      Q.    Okay.  You do not have any family members

6  or close friends who are in law enforcement?

7      A.    No.

8      Q.    Or the legal profession?

9      A.    No.

10     Q.    Or work for the court systems?

11     A.    No.

12     Q.    Have you ever been in the military service?

13     A.    No.

14     Q.    Do you have any hobbies or pursuits you

15  follow in your spare time?

16     A.    Watching the kids.  That's about it.

17     THE COURT:  I will be back to you in minute or

18  two.

19

20               C A R L A   J O H N S,

21

22  called as a prospective juror herein, having been

23  first duly sworn was questioned and responded as

24  follows:

1
2                    EXAMINATION
3                  By: The Court
4
5      Q.   Next juror is Miss Carla Johns?
6      A.   Yes.
7      Q.   And you live in the northwest suburban
8  area?
9      A.   Yes.
10     Q.   How long have you been out there, Miss
11 Johns?
12     A.   About three years.
13     Q.   Before that?
14     A.   Western suburbs for about two years.
15     Q.   Before that?
16     A.   Southern Indiana.
17     Q.   Southern Indiana?
18     A.   Yes.
19     Q.   You came to Chicago from here five years
20 ago or so?
21     A.   Yes.
22     Q.   Was that your native area?
23     A.   No.   Grew up in Pennsylvania.
24     Q.   Could you tell us what you do for a

1  living?

2       A.    Industrial Engineer.

3       Q.    What type of company do you work for?

4  What's their product?

5       A.    Presently right now plastics company.

6       Q.    You are single?

7       A.    Yes.

8       Q.    You have never served on a jury before?

9       A.    No.

10      Q.    Any member of your family or close friends

11  in law enforcement?

12      A.    No.

13      Q.    The legal profession?

14      A.    No.

15      Q.    Work for the court systems -- federal or

16  state?

17      A.    No.

18      Q.    Do you belong to any groups, clubs,

19  organizations other than of a religious nature?

20      A.    No.

21      THE COURT: How but you, Mr. Birdsell, do you?

22      MR. BIRDSELL: No.

23  BY THE COURT:

24      Q.    Do you have any hobbies or pursuits you

1    follow in your spare time, Miss Johnson?

2         A.    Just work on the house and garden.

3         Q.    Okay.  All right.  I will be back to you

4    shortly.

5

6              A L E X A N D R A   H A D D A D,

7

8    called as a prospective juror herein, having been

9    first duly sworn was questioned and responded as

10   follows:

11

12                    EXAMINATION

13                    By: The Court

14

15        Q.    And the next juror is Miss Haddad?

16        A.    Yes.

17        Q.    Miss Haddad, you live in the near north

18   side?

19        A.    Yes.

20        Q.    Very near north side?

21        A.    Yes.

22        Q.    How long have you been there?

23        A.    Two years.

24        Q.    Before that?

```
 1        A.    Lived at home in the western suburbs.

 2        Q.    Western suburbs?

 3        A.    Yes.

 4        Q.    For most of your life?

 5        A.    Yes.

 6        Q.    What type of work do you do?

 7        A.    Aspiring singer/actress.  Right now working

 8   as a hostess in a restaurant.

 9        Q.    How long have you been doing that?

10        A.    On and off in retail and presently I have

11   worked for the last few years.

12        Q.    You have not served on a jury before?

13        A.    I was called to go to the Daley Center and

14   then they settled the case.

15        Q.    You didn't go into a courtroom then?

16        A.    Right.

17        Q.    You indicate that you have a family member

18   or close friend who is a police officer?

19        A.    Why, yah.  My uncle is a retired police

20   officer.

21        Q.    Retired?

22        A.    Yes.

23        Q.    What police force was he with?

24        A.    White Pines, New Jersey.
```

1      Q.    New Jersey?

2      A.    Yes.

3      Q.    How often do you see him over the year?

4      A.    Once or twice a year.

5      Q.    Did you ever discuss his police business

6   with him?

7      A.    No.

8      Q.    Anything about that relationship that would

9   effect your ability to be fair and impartial here?

10      A.    No.

11      Q.    You also indicated that you have a family

12   member or close friend who is an attorney?

13      A.    Mother is an attorney.

14      Q.    Your mother is?

15      A.    Yes.

16      Q.    Is her name Susan?

17      A.    No.

18      Q.    And she does civil work; doesn't she?

19      A.    Yes.

20      Q.    What firm is she with?

21      A.    My mother is Mary Lou Haddad, an estate

22   planner with Greenberg, Kress, and Tannenbaum.

23      Q.    She has not done criminal work to your

24   knowledge?

1      A.    Never.

2      Q.    Do you belong to any groups, clubs,

3  organizations other than of a religious nature?

4      A.    Just Chicago Area Runners Association.

5      Q.    Any hobbies or pursuits you follow in your

6  spare time?

7      A.    Horseback riding, running.

8

9              R O G E R    S M A R T,

10

11  called as a prospective juror herein, having been

12  first duly sworn was questioned and responded as

13  follows:

14

15                  EXAMINATION

16                  By: The Court

17

18      Q.    And the final gentleman, Mr. Smart?

19      A.    Yes.

20      Q.    Mr. Smart, you live on the west side of the

21  city?

22      A.    Yes.

23      Q.    How long have you been in that

24  neighborhood?

1    A.    About 23 years.  23, 24 years.

2    Q.    About what?

3    A.    23, 24 years.

4    Q.    Okay.  And you are presently not employed?

5    A.    No.

6    Q.    What did you do when you were working?

7    A.    Laborer.

8    Q.    Laborer?

9    A.    Yes.

10    Q.    How long has it been since you were

11    working?

12    A.    About six, seven years.

13    Q.    And you are single?

14    A.    Yes.

15    Q.    One child 14.  Is that a boy or girl?

16    A.    Boy.

17    Q.    Living with his mother?

18    A.    No.  The mother has been passed.  Living

19    with his grandmother.

20    Q.    Grandmother.

21          Have you ever served on a jury before?

22    A.    No.

23    Q.    Ever been in the military service?

24    A.    No.

1      Q.   Do you have any groups or hobbies or clubs

2   that you belong to?

3      A.   No.

4      Q.   You have no family members or close friends

5   who are police officers or who are in the legal

6   profession?

7      A.   No.

8      Q.   Or work for the court systems?

9      A.   No.

10     Q.   Do you have any hobbies that you pursue in

11  your spare time?

12     A.   No.  Just mechanic work.  Painting,

13  something like that.

14     THE COURT:  Okay.  All right.  Ladies and

15  gentlemen, the next series of questions will be as a

16  group.  If you have an affirmative answer raise your

17  hand and tell us.

18          Have any of you ever been involved in a

19  criminal case like the case here as a complainant,

20  that is one who signs the complaint as a witness,

21  that is one who comes to court to testify, or as a

22  person who was arrested and accused of a crime?

23  Whether or not you were convicted is not important.

24          Do any of you fall into that category?

1      MS. JOHNS: That is filing a complaint?  I had a

2   purse stolen and I had to fill out a report.

3      THE COURT:  What was the incident about?

4      THE WITNESS: I just had a purse stolen.  I had

5   to fill out the complaint.

6      THE COURT:  Was it taken from your immediate

7   presence?

8      MS. JOHNS: Yes.

9      THE COURT:  Was it pulled from you?

10      MS. JOHNS: No.  I was in a restaurant.

11      THE COURT:  You reported it to who -- the

12   police?

13      MS. JOHNS: Yes.

14      THE COURT:  Did they respond to your call?

15      MS. JOHNS: Yes.  They didn't get it.

16      THE COURT:  Nobody was apprehended.

17      MS. JOHNS: Yes.

18      THE COURT:  How long ago was that?

19      MS. JOHNS: About ten years ago.

20      THE COURT: Anything about that that would effect

21   your ability to be fair and impartial?

22      MS. JOHNS: No.

23      THE COURT:  Mr. Smart, you raised your hand.

24      MR. SMART: Yes.  I had a DUI once before.  DUI.

1      THE COURT:  What?

2      MR. SMART: DUI?

3      THE COURT: Here.

4      MR. SMART: Yes.

5      THE COURT:  How long ago?

6      MR. SMART: '77.  Back in '77.

7      THE COURT:  So you were arrested for that?

8      MR. SMART: Yes.

9      THE COURT:  You went to court?

10     MR. SMART: Yes.

11     THE COURT:  Prosecuted by the State's Attorney?

12     MR. SMART: Right.

13     THE COURT:  Anything about that experience that

14     would affect your ability to be fair and impartial

15     here?

16     MR. SMART: No.

17     THE COURT:  Miss Haddad?

18     MS. HADDAD: Yah.  Well I just was robbed when I

19     was at -- I don't know, robbed, petty theft, in a

20     book store that I work at and I was the person that

21     complained.

22     THE COURT:  You say a theft rather than a

23     robbery?

24     MS. HADDAD: Right.  Nobody took it personally by

1   force.

2       THE COURT:  Anybody arrested?

3       MS. HADDAD: No.

4       THE COURT:  Anything about that event that would

5   affect your ability to be fair and impartial here?

6       MS. HADDAD: No.

7       THE COURT:  The next question I may have already

8   covered for some of you.

9           Have any of you ever been the victim of a

10  crime other than what you told me?

11          Mr. Birdsell?

12      MR. BIRDSELL: Vandalism.

13      THE COURT:  To what -- your house or car?

14      MR. BIRDSELL: House.

15      THE COURT:  When did that happen?

16      MR. BIRDSELL: Four years ago.

17      THE COURT:  Were the police notified?

18      MR. BIRDSELL: Yes.

19      THE COURT:  Was anybody apprehended.

20      MR. BIRDSELL: Yes.

21      THE COURT:  Were they adults or juveniles?

22      MR. BIRDSELL: Juveniles.

23      THE COURT:  Were they prosecuted in juvenile

24  court?

235

1     MR. BIRDSELL: Yes.

2     THE COURT:  Anything about that incident that

3 would affect your ability to be fair and impartial

4 here?

5     MR. BIRDSELL: No.

6     THE COURT:  Anybody else?

7       Miss Haddad?

8     MS. HADDAD: Well, I when I was a teenager I was

9 assaulted -- sexually assaulted.

10    THE COURT:  Where did that take place?

11    MS. HADDAD: In my home.

12    THE COURT:  In your home?

13    MS. HADDAD: Yes.

14    THE COURT:  Were you hospitalized as a result of

15 this?

16    MS. HADDAD: No.

17    THE COURT:  Was it reported to the police?

18    MS. HADDAD: It was a sexual assault.

19    THE COURT:  Was it reported to the police?

20    MS. HADDAD:  I filed a police report but nothing

21 was ever -- we never found the person.

22    THE COURT:  Nobody was caught?

23    MS. HADDAD: Correct.

24    THE COURT:  How many years ago was that?

1          MS. HADDAD: 16.

2          THE COURT: Anything about that event that would

3    affect your ability to be fair and impartial here?

4          MS. HADDAD: No.  Guess not.

5          THE COURT: Have any of you ever been a party to

6    a civil lawsuit where you sued somebody or somebody

7    sued yourself?

8                Indicate no affirmative response.

9                Yes, Mr. Smart?

10         MR. SMART: I had a car accident.

11         THE COURT:  How long ago was that?

12         MR. SMART: About the same.  About '77, something

13   like that.

14         THE COURT:  Did that go to court at all?

15         MR. SMART: Yes.

16         THE COURT:  Were you sued or did you sue

17   somebody yourself?

18         MR. SMART:  No, they were suing me.

19         THE COURT:  They sued you?

20         MR. SMART: Yes.

21         THE COURT:  Did the case go to trial?

22         MR. SMART: Yes.

23         THE COURT:  Did you testify?

24         MR. SMART: No.

1          THE COURT:  Anything about that event that would

2     affect your ability to be fair and impartial in the

3     case.

4          MR. SMART: No.

5          THE COURT:  Did any of you have any family

6     members or close friends that have been victims of

7     crimes, other than what you told me?

8               Mr. Birdsell?

9          MR. BIRDSELL: My mother had her purse stolen 30

10    years ago.

11         THE COURT:  I take it that wouldn't have any

12    affect on you here?

13         MR. BIRDSELL: No.

14         THE COURT:  Thank you.

15              You have heard mention of some of the

16    guiding principles that you are to follow in

17    criminal cases, one of those being that all

18    defendants are presumed to be innocent of the

19    charges that bring them here.

20              Do any of you have any quarrel or problem

21    with that principle of law?

22              In the event -- In keeping with that

23    principle in the event the defendant chose not to

24    testify in this case would any of you hold that

1    against him in arriving at your verdicts?

2            In the event after the case had been

3    concluded and you were deliberating with your fellow

4    jurors and you came to the conclusion that the State

5    had not proved the charges here beyond a reasonable

6    doubt would any of you have any hesitancy or

7    difficulty signing a verdict of guilty under those

8    circumstances?

9            On the other hand if you did have a

10   reasonable doubt as to the guilt of the defendant as

11   to any of the charges would any of you have any

12   difficulty or hesitancy signing verdicts of not

13   guilty?

14           Indicate no affirmative response.

15           At this point I will tender to the State as

16   first alternate Michael Birdsell.

17       MS. SAVINI: We would accept him.

18       MS. BORMANN: We would ask to excuse Mr.

19   Birdsell.

20       THE COURT:  Mr. Birdsell, thank you very much.

21   You are excused.

22           That's fine.

23           I will tender to defense as first alternate

24   Miss Carla Johns.

1      MS. BORMANN: We accept Miss Johns.

2      MS. SAVINI:  Likewise.

3      THE COURT:  Miss Johns, if you will step back

4  into the jury room you will be the first alternate.

5          I will tender to the State as second

6  alternate Miss Alexandra Haddad.

7      MS. SAVINI: We would accept Miss Haddad.

8      MS. BORMANN: We would ask to excuse Miss Haddad.

9      THE COURT:  Thank you.

10         Miss Haddad, you are excused.

11         Then I will tender to the defense as second

12  alternate Roger Smart.

13     MS. BORMANN: We accept him.

14     THE COURT:  Mr. Smart would be the second

15  alternate.

16         Would you step back in the jury room,

17  please?

18         Ladies and gentlemen, with the selection of

19  the twelve regular and two alternate jurors this

20  will complete the jury selection in this case and

21  your service here on one trial -- one day or one

22  trial.  All of you I think received your checks.

23         If not I will have Deputy Murphy take care

24  of it in a minute.

1      MS. SAVINI: Before you excuse everyone if I can

2    make one point of record as a side-bar?

3        THE COURT:   Yes.

4              (Whereupon there was a side-bar.)

5      MS. SAVINI: Yes, I thought we should do it as a

6    side-bar.

7              The issue was as to cause.  I am assuming

8    that even though those are alternates we would be

9    able to make motion for cause.

10             Mr. Smart has a lengthy arrest record.

11             All he told was a DUI.  I do show that he

12   has arrest for October of 1976.  Placed on

13   supervision.  Battery in '78.  He has a PSMV in

14    '85.  He HAS a disorderly conduct in '86.

15             Most recently a probation violation plus

16   been out of another county or district in March of

17   '97 and in September of '97 arrested for possession

18   of cocaine.

19             So I don't feel he was quite truthful.  He

20   remembered two things from '77, however he failed to

21   account for --

22       THE COURT: Why didn't you tell me this before

23   all this happened?

24       MS. SAVINI: Well, you accepted them without

1    tendering.  I was not tendered him.  He was just
2    tendered to the defense.
3         THE COURT: Because you had struck the other
4    jurors.
5         MS. SAVINI: I didn't use any strikes.  You
6    tendered both to the defense.  I am not quite sure
7    why the person, the second person was accepted
8    without my approval although I would have accepted
9    that person.
10        MS. BORMANN: Do we know this is the same
11   person?
12        MS. SAVINI: I don't have his card in front of
13   me.
14        THE COURT: What is his date of birth?
15        MS. BORMANN: 1/28/58.
16        MS. SAVINI: He still lives at the same address,
17   which is where all the arrests are at.  It is on
18   Congress.
19        THE COURT: Okay.  What about --
20        MS. BORMANN: My notes show that you asked
21   everyone as a group, everyone questions.  He said
22   yes, he did fit the category of complaining witness,
23   witness arrested on a DUI once before 1977 and he
24   said -- and Miss Johns started talking, had a purse

1    stolen, had to fill out the report. Perhaps he was

2    going to answer with the rest of them. I don't

3    know. And we went off to another topic.

4        THE COURT: He certainly only mentioned it. It

5    is very unusual he would mention the drunken driving

6    and has things as recent as '97, two in '97, one

7    23486 one 23485, and then back to the 70s.

8        THE COURT: Well, what do you want to do?

9        MS. SAVINI: Needs to be called back out and

10    questioned.

11        Right now I ask he be excused for cause.

12        THE COURT: We will question him.

13        Miss Murphy, bring out the second

14    alternate.

15        Mr. Smart, take the first seat there,

16    please.

17                 EXAMINATION

18             By: The Court

19

20        Q.  Mr. Smart, when I was asking you questions

21    about whether or not you had ever been involved in a

22    criminal proceeding you indicated that you had a DUI

23    arrest?

24        A.  Yes.

1       Q.    Is that the only thing?

2       A.    Except for back here, attempted theft.

3       Q.    I am asking you was the DUI the only matter

4    that you were ever arrested for?

5       A.    I had a few of those.

6       Q.    A few of those?

7       A.    Yes.

8       Q.    Why didn't you tell me about it before?

9       A.    I --

10      Q.    Do you realize you are under oath at this

11   time?  You were under oath since you came in the

12   courtroom.

13            You were arrested in 1985 for possession of

14   a stolen motor vehicle?

15      A.    No.  They dismissed it.

16      Q.    I don't care if they dismissed it. I asked

17   you if you were arrested.  That was the question --

18   were you arrested?

19      A.    I thought you meant being convicted.

20      Q.    I didn't say convicted.  I said have you

21   ever been arrested or accused and you were arrested

22   in 1986 for a disorderly conduct; weren't you?

23      A.    Yes.

24      Q.    And you were arrested in 1997 for probation

1    violation?

2        A.    Right.

3        Q.    And you were arrested in -- last September

4    for possession of less than 15 grams of cocaine?

5        A.    Right.

6        Q.    What happened to that case?

7        A.    They dropped it.

8        Q.    So you got four or five arrests other than

9    this driving under the influence?

10       A.    Yes.

11       THE COURT:  You are excused.

12       MR. SMART:  Okay.

13       THE COURT:  Not quite finished.

14            Call two more.

15       THE COURT:  John Lee Hubbard.  Martha

16   Meadowcroft.

17       THE COURT:  Mr. Hubbard, if you will take the

18   first seat closest to me.

19            Mrs. Meadowcroft, the second seat, please.

20

21       J O H N   L E E   M E A D O W C R O F T,

22

23   called as a prospective juror herein, having been

24   first duly sworn was questioned and responded as

```
 1    follows:

 2

 3                        EXAMINATION

 4                       By: The Court

 5

 6        Q.   Okay.  Mr. Hubbard, you live out in the far

 7    south side of the city; right?

 8        A.   Yes, sir.

 9        Q.   How long have you been out there, sir?

10        A.   About 32 years.

11        Q.   And you are retired at the present time?

12        A.   Yes, I am.

13        Q.   What did you do when you were working?

14        A.   Doorman.

15        Q.   Pardon me?

16        A.   Doorman at Chicago Athletic Association.

17        Q.   At CAA?

18        A.   Yes.

19        Q.   How long there?

20        A.   Eight years.

21        Q.   Before that?

22        A.   Before then I work for Leeland Printing

23    Company for 27 years.

24        Q.   I see.  Okay.  And you are presently
```

1    divorced?

2        A.    Yes.

3        Q.    You have one child.  That is a son or

4    daughter?

5        A.    Daughter.

6        Q.    What's she doing?

7        A.    Works at the bank, East Side Bank, downtown

8    Loop.

9        Q.    She is 23 years old?

10       A.    Yes.

11       Q.    You indicate that you have served on a jury

12   before.  When and where was that?

13       A.    That was down at Daley Center for about

14   seven years ago maybe.

15       Q.    And was that a civil case you sat on?

16       A.    Yes.

17       Q.    Did you sit on a case that actually went to

18   verdict that you decided?

19       A.    No.  As a matter of fact I had taken sick

20   about three days into the thing and I went to the

21   hospital.

22       Q.    You did?

23       A.    Yes.

24       Q.    So you didn't decide the case?

1      A.    No, I didn't.

2      Q.    An alternate did?

3      A.    I went to the hospital.

4      Q.    Sorry to hear that.

5            Have you ever been in the military service?

6      A.    Yes.

7      Q.    What branch?

8      A.    Army.

9      Q.    What years were you in?

10     A.    In '57.

11     Q.    '57?

12     A.    Yes.

13     Q.    Did you serve outside the continental limit

14     of the United States?  What was your specialty, your

15     MOS?

16     A.    Infantry.

17     Q.    Infantry?

18     A.    Yes.

19     Q.    Did you ever serve as a military policeman?

20     A.    No.

21     Q.    Did you ever sit on any court martial?

22     A.    No.

23     Q.    You indicate you have a family member or

24     close friend who is a police officer?

1    A.    Two nephews.

2    Q.    Are they Chicago officers?

3    A.    One of them.

4    Q.    Once?

5    A.    Yes.

6    Q.    Do you know where he is assigned?

7    A.    Yes.   7th District.

8    Q.    63rd, 61st and Racine?

9    A.    51st.

10    Q.    Second district?

11    A.    Yes.

12    Q.    What does he do?

13    A.    He is on the street, I guess.

14    Q.    Patrolman?

15    A.    Yes.

16    Q.    And the other nephew?

17    A.    He moved back to Atlanta.

18    Q.    In the east?

19    A.    He's a police down there in Atlanta.

20    Q.    Ever discuss any police business with

21    them?

22    A.    No.

23    Q.    Anything about those relationships that

24    would affect your ability to be fair and impartial

1    in this case?

2        A.    No.

3        Q.    What are you doing now that you are

4    retired?

5        A.    Well, I do a little odds and ends.  Paint.

6    Decorate.

7        Q.    Belong to any groups or clubs?

8        A.    You know, senior citizen club.

9        Q.    Do you have any hobbies that you pursue?

10       A.    Decorating, painting.

11       THE COURT:  I will be back to you in a minute,

12   Mr. Hubbard.

13

14           M A R T H A   M E A D O W C R O F T,

15

16   called as a prospective juror herein, having been

17   first duly sworn was questioned and responded as

18   follows:

19

20                     EXAMINATION

21                     By: The Court

22

23       Q.    Mrs. Meadowcroft, you live in the west

24   suburban area?

1     A.    Yes.

2     Q.    How long have you been out there, ma'am?

3     A.    Fifty years except for seven years of

4  school.

5     Q.    And you are working as a librarian?

6     A.    Yes.

7     Q.    How long have you been doing that?

8     A.    About eight years.

9     Q.    Card says that your husband is an attorney?

10     A.    Yes.

11     Q.    And the firm is a firm that his name -- he

12  is a named partner?

13     A.    Yes.

14     Q.    What type of work do they do?

15     A.    They do everything.

16     Q.    Everything?

17     A.    A little bit of everything.  He does mostly

18  real estate, probate.  Not much litigation.  He does

19  not do litigation.

20     Q.    Any criminal defense work ever?

21     A.    No.

22     Q.    Ever been a prosecutor to your knowledge?

23     A.    No.

24     Q.    You have two children.  Are they twins?

1   A.   Yes.

2   Q.   What are they doing -- boys or girls?

3   A.   Two boys; going to school and working.

4   Q.   What do they take up in school?

5   A.   Well, just general subjects so far.

6   Q.   Nobody is in law school yet?

7   A.   No.

8   Q.   You have never served on a jury?

9   A.   Never.

10   Q.   And you indicate a family member or close

11   friend is a lawyer.

12        Somebody other than your husband that you

13   checked here?

14   A.   No.

15   Q.   Do you belong to any groups or clubs other

16   than of a religious nature?

17   A.   No.

18   Q.   Do you have any hobbies or pursuits that

19   you follow in your spare time?

20   A.   Reading and tennis and golf.

21   Q.   What types of subjects do you read or like

22   to read?

23   A.   Really a little of everything.  I'm a

24   librarian.  So whatever looks good to me.

1      Q.    Okay.

2            To both of you I am going to ask have you

3      ever been involved in a criminal case as a

4      complaining witness, a witness or a person arrested

5      or accused of a crime?

6            MR. HUBBARD: No.

7            MS. MEADCROFT: Never.

8            THE COURT:  Indicate no affirmative responses.

9            Have either of you ever been the victim of

10     a crime?

11           Miss Meadowcroft?

12           MS. MEADOWCROFT: No.

13           THE COURT:  You checked the card that you were.

14           MS. MEADOWCROFT:  I'm trying to think.   My

15     husband was.

16           THE COURT: Your husband was?

17           MS. MEADOWCROFT:  That's what I checked?

18           THE COURT: You checked that you had been and

19     also checked that a family member had been, so you

20     were mistaken as to yourself?

21           MS. MEADOWCROFT: Actually I had a ring stolen.

22     I forgot.

23           THE COURT:  How long ago was that?

24           MS. MEADOWCROFT: My purse.  That is what it was;

1    my purse.  Wallet pickpocketed at the Museum of

2    Science and Industry.

3         THE COURT:  How long ago was that?

4         MS. MEADOWCROFT: Probably 20 years ago.

5         THE COURT:  Anybody arrested for that?

6         MS. MEADOWCROFT: No.

7         THE COURT:  How about your husband?

8         MS. MEADOWCROFT: His office, when he first

9    practiced law was firebombed.

10        THE COURT:  Firebombed?

11        MS. MEADOWCROFT: Yes, or whatever.  Yes, started

12   on fire.

13        THE COURT:  Was that in the suburbs or

14   downtown?

15        MS. MEADOWCROFT: Suburbs.

16        THE COURT: Was anybody arrested for that?

17        MS. MEADOWCROFT: Yes.

18        THE COURT:  Prosecuted?

19        MS. MEADOWCROFT: Yes.

20        THE COURT:  Did you go to court in those cases?

21        MS. MEADOWCROFT: No.

22        THE COURT:  Anything about either of those

23   events that would effect your ability to be fair and

24   impartial in this case?

1      MS. MEADOWCROFT: No.

2      THE COURT:  Have any of you ever been involved

3  in a civil lawsuit where you sued somebody or

4  somebody sued yourself?

5      MS. MEADOWCROFT: No.

6      THE COURT:  You have, Mr. Hubbard?

7      MR. HUBBARD: Yes.  Well, I had a car ran in the

8  back of me up on Lake Shore Drive about 30 years ago

9  where I sued the insurance company.

10      THE COURT: All right.  Excuse me.  Let me see

11  counsel for a minute.

12          (Whereupon there was a side-bar.)

13      THE COURT: All right.  Side-bar.

14          Want to make sure you are in tune with

15  whose turn it is to do what.

16          You excused, you tendered Miss Haddad.

17      MS. SAVINI: I have accepted everyone.

18      THE COURT: I think you struck Miss Haddad.

19      MS. BORMANN: Yes.

20      THE COURT:  And you got Mr. Smart.  Mr. Smart

21  was challenged for cause.  So actually the tender

22  should go to you.

23      MS. BORMANN: We accept.

24      THE COURT:  If they have any challenges as to

1    the second alternate --

2         MS. BORMANN: We accept.

3         MS. SAVINI: So would we.

4         THE COURT:  Mr. Hubbard.  All right.  All

5    right.

6              Miss Bormann, Miss McBeth, I will tender as

7    your second alternate Mr. John Hubbard.

8         MS. BORMANN: Your Honor, we accept Mr. Hubbard.

9         MS. SAVINI: We also accept him, Judge.

10                   (Whereupon the trial was resumed in

11                    open court.)

12        THE COURT:  Mr. Hubbard, you will be the second

13   alternate.

14             If you step back.  Thank you.

15             Now folks, we have two alternates and

16   twelve regular jurors so all of you have received

17   your becks now, I hope so, and you are excused.

18             Thank you very much for your

19   participation.

20                   (Whereupon the jury was returned

21                    to open court.)

22        THE COURT:  Please remain standing to be sworn

23   as a jury.

24             Please raise your right hands, please.

1          (Whereupon the jurors were sworn.)

2      THE COURT:  Be seated, please.

3          All right, ladies and gentlemen, having

4   selected the jury this is as far as we are going to

5   go today.  Tomorrow you will be back and there will

6   be a full day of evidence for you.

7          As I have indicated my timetable is to wind

8   this case up no later than Wednesday.

9          I indicated when you came in the courtroom

10  that there were two other persons charged with the

11  same offenses as Mr. Hillard -- Erven Walls and

12  Dolores Jinadu.  They will be on trial in this

13  courtroom, although not the subject of your decision

14  or your deliberations.

15         What we are doing here is another jury was

16  selected today by a fellow judge for Mr. Walls and

17  Miss Jinadu has elected to have a bench trial.  So I

18  will be deciding her case.

19         You will be in the courtroom together with

20  the other jury for a portion of these proceedings.

21  The reason we employ that proceeding is that there

22  is certain evidence in the case that may affect one

23  defendant and not the other, so we will not burden

24  one jury with factors that you are not concerned

1    with that do not involve the defendant who is before
2    you, Mr. Hillard.

3                But nonetheless all three are charged with
4    the same offenses.  They will be here in the
5    courtroom during a good portion of the proceedings
6    and their lawyers will be here.

7                Also you will be introduced to them
8    tomorrow.  We will have chairs set up in front of
9    the jury box that will be facing the witness chair
10   right here and we will rotate you and the other jury
11   between those chairs and the softer chairs in the
12   jury box so that we will make it even for you.

13               It is not going to be a long case but it is
14   important that you pay close attention nonetheless
15   and tomorrow when you come back I am going to ask
16   that you go to Courtroom 404.  Deputy Murphy will
17   show you where that is.  That is the courtroom in
18   the southwest corner of this floor in other words
19   all the way kitty corner down the hall.  Judge Himel
20   is the judge whose name is a the courtroom door and
21   we will have sheriffs there ready to meet you
22   tomorrow morning.

23               And I ask you to come in at 10:00 o'clock
24   and we will have coffee and rolls for you as well.

1  Your meals will be provided for you while you are

2  here.

3          I am going to ask that you discuss the case

4  -- not to discuss the case from this point on among

5  yourselves or anybody else.  If anybody should

6  endeavor to speak to you about it please bring that

7  to the attention of the sheriffs tending to the

8  jury.

9          Also in leaving tonight and also perhaps

10  coming back in the morning and for the trial you may

11  find yourself in the hallway or at the elevator in

12  contact with the State's Attorneys and defense

13  counsel trying the case.

14          If they don't speak to you or even

15  acknowledge your presence don't be hurt or

16  offended.  They are officers of the court and they

17  are aware of their professional responsibility to

18  have no contact with the jurors while the case is in

19  a trial posture.

20          So the time that you will have to talk

21  about the case is when the evidence and arguments

22  and instructions of law have been given to you and

23  you have actually retired to decide the case in your

24  deliberations.

1          So that basically it will be -- the way it

2     will be going, what I do is put off until the day we

3     actually start the evidence a little more

4     explanation as to how the trial will be given to

5     you, the various stages of the trial, some of the

6     rules that we follow, some of the things I will be

7     doing, that you will be doing, hopefully, to make

8     your task easier, hold that for you tomorrow.

9          I don't want to give you too much today to

10    burden you with. It is late.  We have been here all

11    day just about.

12         Court is in recess.  Deputy Murphy will

13    show you out and also how to report to him.

14         Have a pleasant evening.

15

16               (Which were all the proceedings had

17                at the hearing of the above-entitled

18                cause.  Case continued to July 13,

19                1999.)

20

21

22

23

24

1

2

STATE OF ILLINOIS      )
                       )     SS:
3
COUNTY OF COOK         )

4

5                        I, ROCHINA V. DeBARTOLO,

6  Official Court Reporter of the Circuit Court of Cook

7  County, County Department-Criminal Division, do

8  hereby certify that I reported in shorthand the proceed

9  had in the above-entitled cause, that I thereafter

10 caused to be transcribed into typewriting the above

11 Report of Proceedings which I hereby certify is a

12 true and correct transcript of the proceedings had

13 before the Honorable MICHAEL P. TOOMIN, Judge of

14 said Court.

15

16 _____

17         Official Court Reporter of the

18            Circuit Court of Cook County

19               LICENSE #084-000824

20

21

22

23

24

(Rev. 2/18/93) CCCR-56

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME . 2 . . . . OF . 7 . VOLUME RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 99-0152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois . . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and . . . . . . . . . . . . . . . . . . . . . . TONY HILLARD . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness: AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . APRIL 23, . . . . . . . . . . . , 19 . 99 .

. . . . . . . . . . . . . . . . . . . . . _[signature]_
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

APR 2 2 1999

AURELIA ~~~~~~~
CLERK OF CIRCUIT COURT

```
 1    STATE OF ILLINOIS    )
                           )   SS:
 2    COUNTY OF C O O K    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
      THE PEOPLE OF THE              )
 5    STATE OF ILLINOIS              )
                                     )
 6             vs.                   )  No. 97 CR 30453
                                     )
 7    ERVEN WALLS, TONY HILLARD,     )
      and DELORES JINADU             )
 8

 9                  REPORT OF PROCEEDINGS at the trial
      of the above-entitled cause, had before the
10    HONORABLE MICHAEL P. TOOMIN (and two juries) on
      the 14th day of July 1998 at 10:30 o'clock a.m.
11

12    A P P E A R A N C E S:
                    HON. RICHARD A. DEVINE
13                  State's Attorney of Cook County
                    BY:  MR. JOSEPH RODDY and
14                       MS. ANN CURTIS
                         Assistant State's Attorneys
15                       Appeared on behalf of the People;

16                  MR. DANIEL FRANKS
                         Appeared on behalf of Erven Walls;
17
                    MS. RITA FRY
18                  Cook County Public Defender
                    BY:  MS. CHERYL T. BORMANN and
19                       MS. RUTH MC BETH
                         Assistant Public Defenders
20                       Appeared on behalf of Tony Hillard;
                              and
21                       MR. BRIAN DOSCH
                         Assistant Public Defender
22                       Appeared on behalf of Delores
                         Jinadu.
23
      JO ANN KROLICKI, CSR
24    Official Court Reporter
      Illinois License No. 084-002215
```

D-1

1                           (WHEREUPON, the following was
2                           had in open court, outside the
3                           presence of the juries:)
4              THE CLERK: Delores Jinadu.
5              THE COURT: All right. The state is
6     ready to proceed on this?
7              MR. RODDY: Yes, Judge, we are.
8              THE COURT: I have here a jury waiver.
9     Miss Jinadu, did you sign this?
10             THE DEFENDANT JINADU: Yes.
11             THE COURT: By signing this document,
12    you are asking to waive or give up your right to a
13    jury trial. Is that what you wish to do?
14             THE DEFENDANT JINADU: Yes, sir.
15             THE COURT: Do you understand you do
16    have a right to proceed before a jury as are your
17    codefendants, and if you did that, your lawyer
18    and the State's Attorney will select twelve people
19    from among people who live in the community.
20    They would take their place in the jury box, and
21    their job would be to listen to the evidence, and
22    from the evidence, decide whether you have been
23    proved guilty as charged beyond a reasonable
24    doubt.

1              When you have a jury trial, you

2    cannot be found guilty unless all twelve jurors

3    unanimously make that decision.

4              When you waive your right to a

5    jury trial, you're asking that I sit as the jury.

6    I, too, will be bound by the same standard or

7    burden of proof.  That is, I could not find you

8    guilty unless I, likewise, were convinced that you

9    were guilty beyond a reasonable doubt.

10             Understanding that, is it still

11   your decision and desire to give up your right to

12   a jury trial and have me decide the case?

13        THE DEFENDANT JINADU:  Yes, sir.

14        THE COURT:  The jury waiver will be

15   accepted then and spread of record.

16             Any further matters as to

17   Miss Jinadu at this point?

18        MR. RODDY:  As to all three, we'll have

19   preliminary matters, but none as to her

20   specifically.

21        THE COURT:  Let's bring out the other

22   two defendants, and then you can proceed with

23   that.

24        THE CLERK:  Erven Walls, Tony Hillard,

D-4

1    and Delores Jinadu.

2                         (Brief pause.)

3                         (Defendants present.)

4            MS. BORMANN:  Your Honor, my name is

5    Cheryl Bormann.  I represent Tony Hillard, who is

6    present before the Court.

7            MS. MC BETH:  Ruth McBeth, Assistant

8    Public Defender, on behalf of Tony Hillard.

9            MR. DOSCH:  Brian Dosch, Assistant

10   Public Defender, on behalf of Delores Jinadu.

11           MR. FRANKS:  Dan Franks for Erven Walls.

12           MR. RODDY:  Joseph Roddy on behalf of

13   the People.

14           MS. CURTIS:  Ann Curtis on behalf of the

15   People.

16           MR. RODDY:  Judge, at this time, we'd

17   have a few motions in limine.  One would be a

18   motion to exclude witnesses during the trial.

19           THE COURT:  That will be reciprocal.

20           MS. BORMANN:  We would join, yes.

21           MR. RODDY:  Initially, Judge, I would

22   make a motion that the defense counsels be

23   precluded from questioning the victim, Yinka

24   Jinadu, on any type of drug relationships he has,

1     any type of drug activity he's been involved in.

2                          There is absolutely no evidence of

3     that that we've been able to find, and we've been

4     doing exhaustive searches.   Even before I got into

5     the case, I know the other assistants in this

6     courtroom have made attempts, and there's no

7     evidence that we've found or been made aware of.

8     So I would ask that line of questioning be

9     excluded.

10                       THE COURT:   Does anybody intend to

11    pursue that line of questioning?

12                       MR. FRANKS:   Judge, I assume then if

13    that is the state's position, that they're not

14    putting in any statement of my client.   Is that

15    also their decision, to not put in any statements

16    of my client?

17                       THE COURT:   I don't know what your

18    client's statement said, and I don't know what

19    their position is.

20                       MR. FRANKS:   Well, my client stated that

21    he is a drug dealer and he had a weapon with him.

22    As a drug dealer, that he owed him money for

23    drugs, and that he bought substantial quantities

24    of drugs from him.

D-6

1                    So, obviously, there is

2    information that I assumed the state was going to

3    use that directly suggests that the complaining

4    witness in this case is a drug dealer.  If they

5    are not using my client's statement, I have

6    absolutely no problem with not going into drug

7    dealing of Mr. Jinadu.

8            THE COURT:  Well, I don't know that that

9    establishes that he's a drug dealer or had any

10   relations with your client simply because it's in

11   your client's statement that he says that's what

12   he was.

13           MR. FRANKS:  Well, isn't -- Judge,

14   obviously, if he says that as part of his

15   statement, and the state's position is that is an

16   inculpatory statement, then I think I have the

17   right to exhaustively determine whether or not the

18   information in that statement is correct, what

19   parts of it are correct, and go into it.

20                    I don't need to show that

21   Mr. Jinadu is bringing Nigerian women in through

22   O'Hare and getting narcotics from them on a

23   regular basis.  That's not what I have to prove

24   here.

1             But if my client said certain

2     things to the Assistant State's Attorneys and to

3     detectives that directly goes to their

4     relationship -- and this is an identification

5     case.  Obviously, this is very important, how this

6     man knows my client and what relationship they had

7     with each other.

8             THE COURT:  Mr. Roddy?

9             MR. RODDY:  Well, Judge, I think the

10    cart is going a little bit ahead of the horse

11    here.  I was going to make another motion to

12    preclude -- and this probably relates solely to

13    Mr. Walls -- any mention of statements not gone

14    into by the state.

15            If we choose to go into a

16    statement that occurred on a certain day, I would

17    ask that the defense not be allowed to go into

18    statements made earlier by the defendants since

19    we're not offering it.

20            If the defendant chooses to get up

21    and offer that information, that's his right, but

22    I don't think it's proper for them to get into

23    statements made prior to another statement that we

24    don't offer.  As the party opponent, I don't think

D-8

1    it's an exception to hearsay.

2              MR. DOSCH:  My client's statement also

3    mentions the fact that the victim in this case was

4    a heroin distributor.

5              THE COURT:  Well, basically, the

6    statements can be utilized by the party opponent

7    against the defendants.  They're not introducible

8    by the defendants in their own defense.   No

9    statements are.  It's also hearsay.

10             MR. DOSCH:  I anticipate the state will

11   not use our statement.  I anticipate that.

12             THE COURT:  Is that right?

13             MR. RODDY:  That's a good anticipation.

14             THE COURT:  How about Miss Bormann's

15   client?

16             MR. RODDY:  No.

17             MS. BORMANN:  Judge, my client didn't

18   make a statement.  However, there is information

19   elicited through the detective, actually in a

20   couple of different places, where the victim in

21   this case has told those detectives that what they

22   were demanding of the victim on that date was

23   money and drugs.

24                  There's also information which

1   will be elicited through police officers that the

2   home that this occurred in Mr. Jinadu was in, and,

3   in fact, Mr. Jinadu will testify that he's been

4   in that home before, and that there was a myriad

5   of packaging material along with scales and a

6   number of other indications of a drug lab.  This

7   was a drug lab in this house where his ex-wife

8   lived that he still befriended and felt

9   comfortable enough to go to the home.

10                    So for the state to suggest that

11   there's absolutely no indication in this case

12   taking all of the statements of the -- both

13   codefendants in this case, which obviously don't

14   come in in our case, plus the, actually,

15   undisputed evidence of drug lab evidence found in

16   the home where this happened where Mr. Jinadu was

17   a guest and --

18                    THE COURT:  A guest?

19                    MS. BORMANN:  Well, he was then

20   attacked.  There's no doubt that he was an invitee

21   and that he had been in the home before.

22                    THE COURT:  Stretching the terminology,

23   "guest," I would say.

24                    MS. BORMANN:  Well, that was presumably

1    the reason that he came there.  I'm sure he didn't

2    come there because he --

3                THE COURT:  He didn't come there to

4    suffer a beating.

5                MS. BORMANN:  My point exactly.  Then

6    the victim, himself, has said on numerous

7    occasions that they demanded drugs of him as part

8    of his ransom.  I mean --

9                THE COURT:  Is that true?

10               MR. RODDY:  There were statements that

11   they were asking for money, drugs, and stuff,

12   cars.

13               THE COURT:  How can you bar any

14   examination on that?

15               MR. RODDY:  I can't from what they said,

16   but I think there's no evidence at all that we've

17   been furnished or found to show that Mr. Jinadu

18   was involved in narcotics whatsoever.

19               MR. FRANKS:  Well, he can deny it.  He

20   can deny anything he wants on the witness stand.

21               MR. RODDY:  I think there has to be a

22   basis for asking that question.  He didn't live

23   there.  Miss Jinadu lived there.  He went there to

24   pick her up at her request.

1          To impute everything inside that
2   apartment to him I think stretches the law of
3   possession quite a bit. Miss Jinadu lived there.
4   These two defendants and two others were present
5   when he arrived. So when he comes over, how can
6   all that be his? I don't think it can be inferred
7   to be against him.

8          MS. BORMANN: Judge, our position on
9   this case from the inferences to be drawn from the
10  evidence is that from the statements of the
11  codefendants and also from what's found in that
12  apartment and also from what the victim, himself,
13  says was the demand made of him as the ransom in
14  this case --

15         THE COURT: You can certainly go into
16  things that he has told the police. As far as
17  evidence showing he's a drug dealer, I don't know
18  where that comes from. You can't do it from the
19  codefendant's statements, and you can't do it from
20  defendant's statements that are made unless the
21  state is going to introduce them.

22              Mr. Franks?

23         MR. FRANKS: Judge, it's my defense that
24  my client and Mr. Jinadu had a relationship that

1    had to do with drugs; okay?  There is -- I'm not

2    just saying that now.  That is part of the

3    statements he made to the police.

4         THE COURT:  Who made to the police?

5         MR. FRANKS:  My client.

6         THE COURT:  Is he going to testify to

7    that?

8         MR. FRANKS:  He may.

9         THE COURT:  If he testifies to that,

10   that's fine.

11        MR. FRANKS:  Why is it just fine from

12   that?  As a matter of completeness, Judge --

13        THE COURT:  There's no completeness.

14   Don't give me this completeness.

15        MR. FRANKS:  It's the same statement.

16        THE COURT:  It's not the same statement.

17        MR. FRANKS:  How do you know that?

18        THE COURT:  Mr. Roddy represented it

19   wasn't the same piece of paper.

20        MR. FRANKS:  There is nothing signed.

21   There is not a single signed statement in this

22   case, your Honor.  My client made statements on

23   September 17th and September 18th.

24        THE COURT:  Which ones are you going to

D-13

1      use?

2                  MR. RODDY:  September 18th.

3                  THE COURT:  Forget about September

4      17th.  There's no completeness doctrine on what

5      happened on September 17th.

6                  MR. FRANKS:  Excuse me, Judge.

7                       (Brief pause.)

8                  MR. FRANKS:  Judge, the statement in

9      that case on the 18th talks about how many grams

10     of heroin Mr. Walls was going to get from the

11     proceeds of what they got from the victim.

12                 MR. RODDY:  That's not what it says,

13     Judge.  If I can interrupt and summarize, it

14     speaks that if he agrees to go in with this plan

15     to rob the victim, he will be paid off, along with

16     Delores Jinadu, in the amount of ten grams of

17     heroin.

18                       That's what it says, Dan.

19                 MR. FRANKS:  We can go through the whole

20     trial now.

21                 THE COURT:  Do you want to give me the

22     statement?  Do you disagree to what was said?

23                 MR. FRANKS:  I'll get the detective's

24     statement of what the same conversation was.

```
1                  MR. RODDY:  Judge, I'm not introducing

2     the detective's statement.

3                  MR. FRANKS:  Judge, the detective was

4     right there.  They can't have it both ways.

5     Detective Bradley was present.  They just want to

6     put in those notes of the Assistant State's

7     Attorney when it is the detective that was present

8     for the same conversation.

9                  THE COURT:  He says it was a different

10    date.

11                 MR. FRANKS:  No, Judge.  I'll get it for

12    you.

13                 THE COURT:  Yes.

14                      (Brief pause.)

15                 MR. FRANKS:  Judge, this is the GPR from

16    Detective Bradley, the second page.  If you want

17    to see the first page --

18                 THE COURT:  All right.  So what are you

19    saying?

20                 MR. FRANKS:  Judge, what I'm saying is

21    that at the 11th hour here, after we already

22    picked the jury, and motions in limine were never

23    filed in writing, the state comes in here and

24    tries to emasculate the defendant's defense.
```

D-15

1           It has been clear from the
2    beginning of this case -- and I came into it
3    late.  This could have been done a year ago --
4    that the defendant and the complaining witness in
5    this case had a relationship.

6           This is an identification case.
7    If they know each other, obviously, that is the
8    most material fact this jury needs to know about.
9    I think I should have extraordinary latitude to
10   determine what the relationship is and whether
11   these two men knew each other prior to this
12   incident.  I can't imagine not asking any question
13   relating to whether these two men ever had contact
14   with each other.

15          Mr. Jinadu is saying they never
16   have seen each other before.  That's a total lie.
17   So I should have a right to explore that to the
18   fullest.

19          Now, their relationship is borne
20   out by the questions that all these masked men, or
21   whatever garb they were in or whatever they were
22   doing, asked this man whether or not he had money
23   on him, whether he had drugs available.  That is
24   what this was about.  This was a drug rip-off.

1       That is what was happening here.

2                   How can the Court at this point

3       after a jury is selected tell me that I can't ask

4       questions of this man about the fact that everyone

5       that was trying to rob him was trying to get drugs

6       and money and anything related to narcotics?

7       That's what the case is about.

8                   Just because it hurts the state

9       doesn't mean that they should have a right now to

10      say, well, this case should only be about that

11      evidence that is beneficial to the state.  And

12      that is what they're asking you to do.

13                  THE COURT:  I don't think they're asking

14      to do that at all.

15                  MR. FRANKS:  Is this not a case about a

16      drug rip-off and trying to rip off a drug dealer?

17                  MR. RODDY:  That's not our theory.

18                  MR. FRANKS:  Well, it's mine.

19                  THE COURT:  If this is what Mr. Jinadu

20      said that was mentioned at the time he came in the

21      apartment that they were talking about drugs and

22      money, certainly you can go into that.

23                  MR. FRANKS:  Well, thank you.  Then what

24      are we arguing about here?  I am saying that this

1       man -- there is evidence in this record, and I

2       intend to go into it, that this man was involved

3       in narcotics.  I have a right to argue that based

4       on my client's relationship with him.

5                    MR. RODDY:  Judge, the only evidence of

6       drugs at all is what the defendants and their

7       partners asked for, and the only evidence of any

8       relationship between Walls and Mr. Jinadu comes

9       from the words of Mr. Walls.  And if he wants to

10      bring that out, that is his constitutional right

11      to get up there and bring that out.

12                   My position is that should not and

13      legally cannot be brought out through his prior

14      exculpatory statements to the detectives on the

15      17th.

16                   THE COURT:  It won't be brought out

17      through his prior exculpatory statement.  It will

18      be brought out, I assume, through

19      cross-examination.

20                   MR. RODDY:  Of?

21                   THE COURT:  Of the victim.

22                   MR. FRANKS:  Absolutely.

23                   THE COURT:  If the answer is no, it

24      establishes nothing.

```
1              MR. RODDY:  My motion is to make sure
2     the prior statements of the defendant don't come
3     in.
4              THE COURT:  Those statements aren't
5     coming in.
6              MR. FRANKS:  Is it the state's position
7     that not a single question is going to be elicited
8     from any detective or Assistant State's Attorney
9     from the time he is arrested -- I believe it's
10    noon on the 17th of September -- all the way to
11    the evening of September 18th?  Is that the
12    state's position, not a single question?
13             MR. RODDY:  Judge, I thought as the
14    state we had an opportunity to try our own
15    cases.
16             MR. FRANKS:  I'm being told that some
17    statements that are only helpful to the state are
18    going in, and in the same conversations, those
19    that are helpful to the defense are not going in.
20    I take great exception to that.
21             THE COURT:  You're going to have to
22    establish that they're part of the same
23    conversation.
24             MR. FRANKS:  If there's any conversation
```

1   related to the 17th of September, it's the same
2   conversation.
3           THE COURT:  No, no, they're not.
4           MR. FRANKS:  How are they not?
5           MR. RODDY:  I'm not introducing any
6   statements of Mr. Walls on the 17th.  The only
7   statement going in on the state's case is from
8   State's Attorney O'Malley in the conversation he
9   had with him on the 18th.
10          THE COURT:  Okay.
11          MR. RODDY:  And I don't want any
12  cross -- I don't want the defense to attempt to
13  get into the exculpatory statements the defendant
14  gave on the 17th.
15          MR. FRANKS:  Judge, we will
16  cross-examine the Assistant State's Attorney with
17  that understanding.
18          MR. DOSCH:  This only applies to
19  cross-examination, just so I'm clear, as to the
20  motion; correct?
21          THE COURT:  We're talking about separate
22  things because you won't be part of the
23  cross-examination of the Assistant State's
24  Attorney.

D-20

1                    MR. DOSCH:  No.

2                    THE COURT:  That will be on Mr. Franks'

3      case.

4                    MR. DOSCH:  That's true.

5                    THE COURT:  Now, as far as the victim

6      goes, we haven't approached that yet, but we

7      probably should.  My inclination is that the

8      cross-examination of Mr. Jinadu will be done in

9      front of the two juries and myself.

10                          Now, if there's some reason why it

11     shouldn't be, you can alert me to that.  Or if it

12     appears that somebody is stepping on somebody

13     else's toes, then you can alert me to that.

14                          But I haven't heard -- the reason

15     for the severance was not because of antagonistic

16     defenses.  The reason for the severance was

17     because of Brutton problems, and that was what was

18     anticipated, which may or may not develop.  I

19     don't know.

20                    MR. FRANKS:  Judge, I believe that there

21     is some agreement between Miss Bormann and myself

22     relative to the cross.  Certainly the direct

23     examinations of Mr. Jinadu, you know, can be

24     joint.

1          THE COURT:  Okay.

2          MR. FRANKS:  And I, apparently, will do

3     the first cross-examination.  But, you know, I am

4     going to certainly not deny that Mr. Hillard was

5     there, and my cross-examination will be such that

6     we'll probably assert that Mr. Hillard may be one

7     of the offenders that attacked Mr. Jinadu, and

8     that may have a -- certainly a negative impact on

9     Miss Bormann's client.

10                  And I think it is antagonistic

11    because it will be my position to the jury

12    certainly when I argue that Mr. Hillard was

13    probably one of the offenders.

14          THE COURT:  When you argue is not going

15    to be a problem with Miss Bormann because your

16    jury will -- her jury will not be hearing your

17    argument.

18          MR. FRANKS:  I think for safety's

19    sake -- and certainly there's no reason from a

20    judicial economy standpoint that when the jury is

21    hearing the cross-examination by Miss Bormann or

22    counsel for Mr. Hillard, my jury does not have to

23    be present.

24                  They have already heard my

1    cross-examination.  There's no reason for them to

2    be in any way exposed to Miss Bormann's

3    cross-examination because it will be her position,

4    and she's made it clear that she is saying that

5    it was my client that was present, and she's going

6    to bring out certain identification things, and

7    it will all have a very negative impact on my

8    client.

9          THE COURT:  Well, is anybody denying

10   that both defendants were there?

11         MS. BORMANN:  Absolutely.  That's our

12   defense, Judge.  We have no statement.  We have

13   five identifications given by the victim,

14   descriptions that don't match my client, four

15   names that are attached to those that aren't my

16   client, and ours is a strict identification

17   case.

18              Mr. Franks has indicated to me

19   that what he's going to do on cross-examination is

20   point the finger at Tony Hillard.  If Mr. Franks

21   intends to do that, that's part of his defense --

22         THE COURT:  How does that help

23   Mr. Walls, to point the finger at Mr. Hillard?  I

24   will wait and see if you do it.  Then I'll move

1      the jury out.

2                      I don't know why somebody who says

3      their client wasn't there has to point the finger

4      at another defendant and say he was there.  That

5      doesn't establish that your guy wasn't there.

6                      And the same goes true for you,

7      Mr. Franks, but we'll wait and see.

8                      MR. FRANKS:  How would the trial be

9      affected in a negative way from your standpoint,

10     Judge, in terms of judicial economy or any reason,

11     if the cross-examination by Hillard's attorney is

12     not heard by my jury?

13                     THE COURT:  It's a question of

14     necessity.  If there's a reason for it, it can be

15     done.

16                     MR. FRANKS:  She has indicated that she

17     is going to claim that it was my client that was

18     present there and did these particular acts.  This

19     is a separate jury.  We're not doing a joint trial

20     here.

21                     MR. RODDY:  But, Judge, the issue is --

22     as you correctly stated, it's Brutton.  I'm going

23     to tell his jury that they were all there, and

24     they're going to hear that on everything.

1          THE COURT:  Why does it get any worse if
2     you hear it again twice on cross-examination?
3          MR. FRANKS:  Because it will be her job
4     to say that all the evidence in terms of
5     cross-examination points just to my client, and
6     it's going to --
7          THE COURT:  I hear this from lawyers
8     every time it comes up, and we go into the
9     cross-examination, and it just doesn't happen.
10    We'll have to wait and see if it happens.
11               If it happens, I'll move the jury
12    out to protect whatever defendant's rights have to
13    be protected.  To me, this is nonsense.  It's a
14    lot of fiction that one has to point the finger to
15    make a separate cross-examination and represent to
16    me, I'm going to pin it on this guy in front of
17    his jury, when it doesn't make any sense or rhyme,
18    reason, or rationale why she would do that if her
19    client wasn't there.  But I'll hear it when I hear
20    it.
21         MR. FRANKS:  Judge, with all due
22    respect, I think both defendants have the right to
23    present the defense of their choice, and if it's
24    nonsense and the jury believes it, so be it.

1           But I really don't understand why

2     this Court, without hearing the testimony, is

3     declaring it nonsense.  The statement that was

4     made by my client, which they have now decided not

5     to use three fourths of it --

6           THE COURT:  I'm going to wait until I

7     hear it.

8           MR. FRANKS:  Frankly, if you wait for

9     the cross-examination --

10          THE COURT:  Let me worry about that,

11    Mr. Franks.

12          MR. DOSCH:  You're aware, your Honor,

13    that we filed a compulsion defense.

14          THE COURT:  Yes.  And I assume that will

15    come out on the defense side of the case.

16          MR. FRANKS:  Now, is the defense's cross

17    based on compulsion of Delores Jinadu going to be

18    part of the jury?  Will the jury hear any of that

19    cross-examination?

20          THE COURT:  I don't know.

21          MR. FRANKS:  Judge, is a compulsion

22    defense not inherently antagonistic to an

23    identification defense?

24          THE COURT:  I don't know.  I don't know

1      if her position is that these individuals had

2      anything to do with compelling her or somebody

3      else did.

4             MS. BORMANN:  I can tell you, Judge,

5      based upon my conversations with Mr. Dosch and the

6      discovery tendered to me, that the compulsion

7      defense in this case specifically names Tony

8      Hillard, and specifically, the compulsion defense

9      will allege and Mr. Dosch's cross-examination will

10     be that my client forced his client to do

11     something.

12            THE COURT:  Cross-examination of who?

13            MS. BORMANN:  Of the victim.

14            THE COURT:  Of the victim?

15            MS. BORMANN:  Of the victim.

16            THE COURT:  Is that right, Mr. Dosch?

17            MR. DOSCH:  Say that again.

18            MS. BORMANN:  Mr. Dosch will bring out

19     on cross-examination of Mr. Jinadu the actions

20     that my client did, holding a gun, so forth and so

21     on, with respect to Miss Jinadu to force her to go

22     along with this.  That's their defense.  He has to

23     do that.

24            THE COURT:  With this witness?

1          MS. BORMANN:  With this -- he was an

2     eye witness.  He's the only eye witness other than

3     the offenders in this case.

4          THE COURT:  I understand he was

5     unconscious for a period of time so I don't know

6     how much he witnessed.

7          MS. BORMANN:  Two out of the nine hours.

8          THE COURT:  Well, it's funny how

9     Mr. Franks speaks for you and you speak for

10    Mr. Dosch of what you're going to do and what he's

11    going to do.

12         MR. DOSCH:  I'll tell you what.  I don't

13    know what I'm going to do.  It depends on what he

14    says on the stand.  I shouldn't be -- I've got no

15    problems going all over the place with Mr. Jinadu

16    if it's relevant and it's germane to his

17    testimony.

18              I don't know what he's going to

19    testify to.  I know what he testified to at a

20    preliminary hearing, and I know what he told the

21    police on several different occasions.

22         THE COURT:  Fine.

23         MR. FRANKS:  Judge, all we are asking,

24    since Mr. Dosch has every right to go wherever the

1    evidence leads, is that there is no reason when we

2    have separate juries impaneled why my jury has to

3    hear the cross-examinations of the other

4    attorneys.

5             THE COURT:   Unless there's antagonism by

6    law shown by the examination, the same examination

7    will be done in front of the two juries and me.

8             If there is a reason for separate

9    cross-examinations, we will do that.   But I

10    can't rely upon your representations at this point

11    that the things you predict are going to happen

12    will happen, and oftentimes, lawyers make these

13    predictions, and they don't.   They simply don't.

14             MR. FRANKS:   Judge, all I can say is you

15    have on record a compulsion defense.

16             THE COURT:   You have said enough.

17             MR. FRANKS:   Very well, Judge.

18             MS. BORMANN:   Judge, I want to get back

19    to an issue that was addressed.   The state's

20    earlier motion in limine was to preclude us from

21    asking any questions regarding drugs to

22    Mr. Jinadu.   That was their earlier request of

23    your Honor, and then we got off on to whether or

24    not Mr. Walls was going to be able to go into his

1    prior statements.

2                    We have a good faith basis based

3    upon all of the discovery that was given to us

4    that this man was involved and actually

5    specifically bringing heroin that day to that

6    place.

7                    And based upon all of the other

8    evidence in the case, including the drug

9    paraphernalia, that's a drug lab there waiting for

10   the heroin to arrive, and the fact that he

11   indicates that the request -- this is about

12   drugs.  I mean, he's going to say and did tell the

13   police that they wanted the drugs.

14                    THE COURT:  I said that you can go into

15   that.

16                    MS. BORMANN:  Good.  I'm just making

17   sure because it was unclear to me.  Thank you.

18                    THE COURT:  If you think that that is

19   something you want to go into when your client

20   wasn't even there and had nothing to do with it,

21   you know --

22                    MS. BORMANN:  Thank you, Judge.

23                    THE COURT:  You need a little tunnel

24   vision, I think, in deciding what you want to go

1    into.  If you think that that's something that

2    helps your client when he wasn't even there, you

3    know, go ahead and do it.  You can try the case

4    the way you want to try it.

5                    Anything else?

6                    MR. RODDY:  The one thing I wanted to

7    conclude from yesterday that my partners started,

8    with regards to the gun registration, we are

9    seeking to introduce the certified copy of the gun

10    registration.

11                    And I think our basis for that is

12    that it's relevant evidence.  It's circumstantial

13    evidence.  And we're offering it to show that when

14    the police officers found these guns, one of them

15    they checked and found to register to a

16    Miss Laretha Hillard, and then they spoke to

17    Miss Laretha Hillard.

18                    It's not our intention to get into

19    the content of the conversation with

20    Miss Hillard.  After speaking with her in the

21    course of their conduct and investigation, they

22    then went to the next location, and that is when

23    they arrested Tony Hillard at 714 West Division.

24                    I think it's relevant that the gun

1   found in the house is owned by Laretha Hillard.   I

2   think the jury can draw the reasonable and logical

3   inference that there may be some type of

4   relationship between Laretha Hillard and Tony

5   Hillard.

6               We have made attempts to locate

7   Miss Hillard and have been unsuccessful.  I think

8   the jury should be able to hear that evidence

9   found in there registers to a person -- and this

10  is not a Jones or a Smith.  Even if it were, I

11  think that would be relevant.  And that we can

12  argue the reasonable inference that a person with

13  the last name of Hillard owned this gun, and it's

14  found at the scene of where this brutal event

15  occurred.

16              THE COURT:  You looked at that exhibit

17  last night.  It has two parts to it.

18              MS. BORMANN:  Here it is, Judge.

19              MR. RODDY:  I'm seeking just to put in

20  the bottom part, which would be the actual gun --

21  firearm registration.

22              THE COURT:  All right.  Miss Bormann?

23              MS. BORMANN:  Judge, I have two

24  objections to that, and actually, we'll put the

1      cart before the horse.  The state is aware of

2      this, and so is your Honor.

3                    Our position on the gun

4      registration, it's a Chicago Police firearms

5      registration.  It's not through the State of

6      Illinois.  It's not an FOID as we normally

7      consider it.  It's kept in the ordinary course of

8      police business, which is prohibited as a business

9      record in the State of Illinois because that's

10     kept by the police in preparation for possible

11     litigation --

12               THE COURT:  Wait a minute.  Why is this

13     kept by police in anticipation of litigation?

14               MS. BORMANN:  I don't know why they do

15     it.

16               THE COURT:  This is a record keeping

17     device.

18               MS. BORMANN:  This is not an FOID

19     registration, Judge.  This is something the police

20     department does.  The Chicago Police Department is

21     the only one that has this.  This is not

22     registered with the State of Illinois.  This is a

23     Chicago Police Department function.  It's

24     725-5/115-5.

1          MR. RODDY: Judge, it's just like

2     registering your car. It's required in order

3     to -- I think to stay in the city. They have

4     the right to require certain registrations for

5     types of objects. They do it with cars. In

6     order to have your car, you need to have it

7     registered.

8          This is done as both a safety

9     mechanism and also to keep track of the guns

10    that are properly owned by people in law

11    enforcement, people who have a right to register

12    them in the city. This is not for any type of

13    litigation.

14          And it shows this is an expiration

15    period of one year. So how can they keep a

16    document saying we might need it for two years

17    from now for litigation? Clearly, this is a

18    self-authenticating document, and it is a business

19    record.

20          THE COURT: When I look at the business

21    record provision, 5-115-5, it appears to me that

22    the law has certainly changed. This does not

23    rule out all police department records. It used

24    to.

```
1                       Police reports.  This isn't even a
2      police report.  This is a registration certificate
3      that was made and maintained by the city of
4      Chicago in the ordinary course of business.
5                       It is not made during an
6      investigation of an alleged offense.  It's
7      something that was issued long before the offense,
8      and it was not during an investigation relating to
9      or anticipating litigation of any kind.  This is
10     simply a registration device.
11               MS. BORMANN:  This is kept in the
12     ordinary course of the -- it was kept in the
13     ordinary of course of the City of Chicago
14     Department of Police.
15               THE COURT:  Where does it say here that
16     is inadmissible?
17               MS. BORMANN:  Our position is that it's
18     prepared and kept by the Chicago Police Department
19     for specifically that reason, in anticipation that
20     there is a problem and that they may be able to
21     pull up that record and determine whose gun it is
22     for purposes of litigation.
23                       Because there are separate records
24     under state identification requirements of FOID
```

1    that are kept by the State of Illinois, and, in

2    fact, that registration is not kept by a police

3    department.  That's kept by the State of

4    Illinois.

5              That's a different situation.

6    That's not what we have here.  We have a separate

7    registration kept by a police department, a law

8    enforcement agency.

9              MR. RODDY:  It's also a separate

10   division of government.

11             THE COURT:  Separate from any

12   investigation, and it's separate from any pending

13   or anticipated litigation.  So I will overrule

14   your objection to that exhibit coming in as an

15   official record --

16             MS. BORMANN:  Thank you.

17             THE COURT:  -- certified record.

18             MS. BORMANN:  I have a second argument

19   with respect to it, and this goes to its

20   relevancy and the evidence that the jury is going

21   to hear.

22             The state has told you that they

23   are going to argue and they believe that the jury

24   can reasonably infer from the fact that this

D-36

1    registration has the same last name as my client
2    that there is some relationship.  There will be no
3    testimony to that because the testimony to that
4    would be hearsay, out and out.

5              And I have a motion in limine --
6    well, there won't be.  They're not intending to
7    call a person named Laretha Hillard purported to
8    be my client's sister.

9              Now, when the state puts on the
10   detective, they're going to attempt to elicit --
11   and my motion in limine is specifically asking to
12   preclude them from doing that -- going to attempt
13   to elicit that a detective had a phone
14   conversation with someone who identified
15   themselves as Laretha Hillard.

16             We already know, because the
17   detective testified in a motion before your Honor
18   at an earlier date, that he did not know Laretha
19   Hillard prior to this incident, did not recognize
20   her voice from prior contact with her, and the
21   only reason he suspects it's Laretha Hillard is
22   because she identified herself as such.

23             In this case, that is hearsay
24   because it is introduced to prove the truth of the

1    matter asserted, which is that it was Laretha

2    Hillard.  So with respect to that, I would be

3    asking that you prevent them from doing so.

4                     Secondly, according to the

5    detective when he testified at the motion, that

6    person identified herself as my client's sister.

7    That is also hearsay, the basis of the

8    relationship, because the detective doesn't have

9    any personal knowledge of that.  That would be

10   based upon hearsay.

11                    Further, that they had a

12   conversation regarding the gun.  That's clearly

13   hearsay, and the state has conceded that.

14                    What the state is attempting to do

15   is to lead the jury down the path that my client,

16   because he has the same last name as appears on

17   this gun registration, had something to do with

18   this gun without putting in any proof of it.

19   There's no proof of it.  And the fact --

20             THE COURT:  Somebody is going to testify

21   that he was in the apartment.

22             MR. RODDY:  With a gun.

23             MS. BORMANN:  I understand that, but the

24   bottom line is that -- they're going to say he had

1    a gun.  The victim is not going to be able to say

2    who had what gun.

3             MR. RODDY:  That's interesting.

4             MS. BORMANN:  Well, the victim hasn't

5    been able to yet.

6             THE COURT:  Well, let me ask you,

7    Mr. Roddy, was there an in-person conversation, or

8    was it all by telephone?

9             MR. RODDY:  Phone.

10            THE COURT:  How do you propose to lay a

11   foundation for that?

12            MR. RODDY:  That the detectives in the

13   course of their investigation found out that one

14   of the guns there was registered in the city.

15   That it was registered in the name of Laretha

16   Hillard.  That the detectives in their

17   investigation contacted a person by the name of

18   Laretha Hillard who lived at 1230 North Larrabee

19   by the phone.  That the person on the other end

20   identified themselves as Laretha Hillard.  That

21   after speaking to her, they then continued their

22   investigation, went to 617 West Division on a

23   later date where they arrested Mr. Hillard.

24            THE COURT:  Miss Bormann inserted

1    something you left out.  She claims that in the

2    course of the investigation, they will say that

3    they learned that Tony Hillard was the brother of

4    Laretha Hillard.

5         MR. RODDY:  They did learn that.

6         THE COURT:  Are they going to testify to

7    that?

8         MR. RODDY:  No.  That's hearsay.  I'm

9    not getting into the substance of the

10   conversation.  That would be the substance.

11        MS. BORMANN:  The substance is also her

12   name.  How do we know that the detective actually

13   talked to a person who is actually Laretha

14   Hillard?

15        THE COURT:  What more need they do to

16   introduce that fact?  He doesn't have to recognize

17   her voice.

18        MS. BORMANN:  That is out and out

19   hearsay.

20        THE COURT:  No, it's not hearsay.

21        MS. BORMANN:  Well, in this case --

22   normally, it wouldn't be because you wouldn't be

23   getting into it.  But in this case, the state is

24   seeking to introduce that name specifically to

1    make the jury believe that that person had the

2    conversation.

3            THE COURT:  That name is already on the

4    gun registration.

5            MS. BORMANN:  Understood.  But I'm not

6    talking about -- the gun registration in and of

7    itself has the same name as my client.  That's

8    basically what the state is asking to have the

9    jury hear and see.  That it has the same last

10   name, and then be able to draw impermissible

11   conclusions from that.

12           THE COURT:  It's inferences, that's all.

13           MS. BORMANN:  Inferences that because

14   they share the same last name, Mr. Hillard had

15   something to do with a gun that was found at the

16   apartment where this happened.

17           THE COURT:  Well, if that were the

18   only evidence that is going to be heard by the

19   jury, I think you might have a point, but that's

20   not.

21           MS. BORMANN:  Well, Judge, actually, in

22   this case, because my client was not described nor

23   named early in this case, this is a strict

24   identification case.

D-41

1          THE COURT:  Fine.  Somebody is going to

2     come in here and identify him as one of the people

3     there, and you say he's not.

4          MS. BORMANN:  Understood.  So to allow

5     the state to bootstrap this, to circumvent the

6     hearsay rule by talking about course of

7     investigation --

8          THE COURT:  I'm not circumventing

9     anything.  I don't believe it's hearsay, and I

10    will deny your motion in limine.  The state may

11    use the course of investigation exception to the

12    hearsay rule if this is hearsay.  I don't perceive

13    any hearsay coming in other than the identity of

14    the woman who answers the phone, and if she says

15    she is Laretha Hillard, then so be it.

16          Would it be any different if the

17    police came over and rang the doorbell and said

18    somebody answered the door and they identified

19    themselves as Mr. Smith?  It's no different

20    because it's on the telephone.  The rules of

21    evidence don't change certainly.

22          MS. BORMANN:  Judge, if they had

23    actually spoken to this person in person, there's

24    a photograph on the registration that the state

D-42

File Date: _____7 - 1 - 2 0 0 8_____

Case No: _____0 8 c v 1 7 7 5_____

ATTACHMENT # _____

EXHIBIT _____T - part 4_____

TAB (DESCRIPTION)

_____

1    can tie up and say, yeah, that was the lady I
2    spoke to.

3              THE COURT:  The investigation exception
4    does not require identification of these people to
5    be proved to the extent you're suggesting.  They
6    go from one house to the next house to the next
7    house and talk to people, and none of that comes
8    in.

9              As we know, under the Gaucho case,
10   the fact they were led from A to B to C to D,
11   those are just steps the police take in arriving
12   at their final case.  That's part of the
13   investigation exception, and I'm not going to bury
14   that here simply because this is an identification
15   case.

16             MS. BORMANN:  Judge, I also have --
17             THE COURT:  Are we going to get started
18   here?

19             MS. BORMANN:  I just have one more.
20             THE COURT:  Go ahead.

21             MS. BORMANN:  On Friday, Miss Savini
22   tendered to me a two-page supplementary report by
23   Detective Bradley and by Detective Jackson signed
24   and dated the 6th of July 1998, something that

D-43

1    just happened, saying that they arrested somebody

2    by the name of Montrel Harris, and that that

3    person was placed in a lineup, Mr. Jinadu viewed

4    it and did not identify anybody.

5              In the State of Illinois, a

6    negative lineup is not admissible hearsay.  Prior

7    identification when the person making the

8    identification testifies and is subject to cross

9    is, but this does not fall under one of the

10   hearsay exceptions.  I'm asking with respect to

11   Mr. Hillard's case it not be admitted.

12             THE COURT:  I wouldn't suspect, the

13   little I know about the reports in this case, that

14   the state is going to seek to introduce that type

15   of evidence.  It's barred by People versus Hayes,

16   an Illinois Supreme Court case, and they're aware

17   of that.

18             MR. RODDY:  I had no intention of

19   introducing it.  We tendered it because there's

20   still two people out there the police are looking

21   for, and the discovery is ongoing.

22             MR. FRANKS:  Judge, may I ask, there are

23   no other supplementary reports that describe any

24   arrest of Mr. Harris or statements or anything

1    else?

2              MR. RODDY:  No.  I have not been

3    provided any.

4              MR. FRANKS:  Judge, I just have one very

5    brief motion in limine.  There is -- my client was

6    arrested in the company of Delores Jinadu in a

7    court -- outside of a courtroom at 11th and

8    State.

9              I would just ask if there's any

10   reference to how they were stopped that it just be

11   indicated that it wasn't in a courtroom, that it

12   was in any unknown location.  There's no reason to

13   bring out the fact that an unrelated matter may

14   have been involved in a court case.

15             I don't know if the state has any

16   objection to that or not.

17             MR. RODDY:  Judge, the officers intend

18   to testify that they received information that

19   he'd be at 11th and State, and they went there,

20   they waited, and they saw him in the courtroom.

21   They waited until he got outside.  He walked out

22   with Miss Jinadu.  They were both arrested.

23   That's what they're going to testify to.

24             MR. FRANKS:  Judge, the jury could

1    speculate as to the reason he was going to court,

2    whether it's a misdemeanor, whether it's a

3    felony.

4             MR. RODDY:  He could have been a victim,

5    too.

6             MR. FRANKS:  Well, that's not -- if the

7    state wants to put it in those terms, but they're

8    saying he had a court case at such and such a date

9    at such a location.

10            THE COURT:  He didn't say he had a court

11   case.  He said they learned he would be there.

12            MR. RODDY:  That's how I intend to do

13   it.

14            MR. FRANKS:  Judge, I still have an

15   objection just because it infers that he may have

16   had another matter, and then it puts me in a

17   position where I have to explain that only

18   misdemeanor cases are heard there so they don't

19   believe it's a felony case.

20                    I don't want the jury to speculate

21   as to the reason why he should be in court.  I

22   don't think it's fair.

23            THE COURT:  I don't know why I should

24   change the facts from what the facts are.  That's

1    where he was.  That's where he was arrested.  I'll

2    deny your motion.

3            MR. FRANKS:  The only other matter I

4    have, Judge, is there's an identification that is

5    a SWAP identification card that has the likeness

6    of my client on it, and it may be used for

7    identification purposes.

8                    Can we redact just the information

9    on the card?  Not the photograph, itself, but the

10   information that indicates the type of card it

11   is?  It's a Sheriff's Work Program card.

12           THE COURT:  This was found at the

13   scene?

14           MR. RODDY:  Yes, Judge.

15           THE COURT:  What about that?

16           MR. RODDY:  We do have it.  We intend to

17   introduce it as evidence found there.  Our

18   position is it says, Sheriff's Work Alternative

19   Program.  I don't know if the jury is familiar

20   with that.  It doesn't say he's a convicted

21   criminal for anything.

22           THE COURT:  That's getting pretty close.

23           MR. RODDY:  If you want it redacted,

24   we'll do that.

D-47

1           THE COURT:  Maybe you can reach some

2       agreement on how you want to refer to that as an

3       identification card, but I don't think you want to

4       put in things that suggest that Mr. Walls is on

5       probation or has a conviction for something else.

6       I think that's a proper objection.

7           MR. RODDY:  If it's allowed to go back

8       and published to the jury, we will have it

9       redacted.

10          MS. BORMANN:  I'm asking it be redacted

11      certainly if the jury gets to see it.  Also, in

12      reference to it, that no reference be made to the

13      type of card it is.

14          MR. RODDY:  It will not.

15          THE COURT:  It will be referred to as an

16      identification card.

17          MR. FRANKS:  That's fine.

18          MS. BORMANN:  Judge, as a followup

19      issue, I'm asking that the state with respect to

20      the case of Tony Hillard not be allowed to have

21      any witness testify to this fact and not be

22      allowed to mention in opening or closing that

23      Erven Walls has an alias of Jermaine Craine.  It's

24      a statement that Mr. Walls made.  He's not subject

1    to cross-examination, and we don't have a right to
2    cross-examine Mr. Walls regarding his use of that
3    alias.

4                      So we would be asking that state
5    be prohibited from eliciting from any of their
6    witnesses that information because it would be
7    based upon hearsay.

8               MR. RODDY:  Judge, I'm not sure I
9    follow that.  My response would be the SWAP card
10   that's recovered has the name Jermaine Craine on
11   it, and a picture of the defendant, and I don't
12   see --

13              MS. BORMANN:  Judge, I looked at the
14   picture, and I'm not sure that the jury is going
15   to determine that it actually looks like Erven
16   Walls.  So I would ask that there be no reference
17   made to that because that testimony would be
18   simply based on hearsay and impermissible hearsay
19   since they're severed trials.

20              THE COURT:  I don't understand how that
21   affects you at all.  That's Mr. Walls' case.

22              MS. BORMANN:  That's exactly right, and
23   I want to make sure that the two don't get mixed
24   up.

                        D-49

1           THE COURT:  Well, the officer that comes
2    in and collects the evidence at the scene is going
3    to, I assume, identify guns, identification cards,
4    and things like that.

5           MS. BORMANN:  Absolutely.  I guess the
6    basis for my motion in limine -- I'm not talking
7    about precluding the officer from identifying
8    there were various pieces of identification found
9    there, but I'm asking the state be prohibited from
10   saying whether or not that's an a/k/a in front of
11   my jury.

12          THE COURT:  Of which officer?

13          MS. BORMANN:  Of any of the officers,
14   because it's hearsay.

15          THE COURT:  I don't follow how it's
16   going to be introduced at your trial in any
17   event.

18          MS. BORMANN:  Judge, I don't know.  And
19   maybe the state can tell us that they're not going
20   to seek to introduce that information.

21          MS. CURTIS:  We're not going to say that
22   because the name is on the identification card,
23   and it is his picture.  So his name is going to be
24   linked up with this gentleman here.  We're not

1   going to ask a police officer, do you know him to

2   be named as --

3           THE COURT:  Is that going to come in

4   your case-in-chief against both defendants?

5           MS. CURTIS:  Yes.  Because we will put

6   on the one police officer who recovered all the

7   evidence from the scene, including the guns and

8   identification, all of which goes to this

9   gentleman in various different ways.

10          THE COURT:  That does not go further to

11  the arrest at 11th and State?

12          MS. BORMANN:  No.  What Miss Curtis just

13  said is what I'm seeking to prohibit.  They found

14  a person who had a social security card registered

15  to a Zachery Taylor, a social security card

16  registered to a Dermaine Walls, a SWAP ID card

17  registered to a Jermaine Craine, and tickets that

18  belonged to Erven Walls.

19                      What I'm seeking to prohibit is

20  the hearsay that those are a/k/as of Erven Walls.

21  I can't cross on that.  I don't know if they are

22  or not.  Nobody has any personal knowledge of

23  that.  How do we know that Zachery Taylor is Erven

24  Walls?  There's no photograph.

1              THE COURT:  Apparently there's a

2    photograph of Mr. Walls on Jermaine Craine's ID

3    card.  How do you change that?

4              MS. BORMANN:  I'm not asking to change

5    that.  I'm asking to let my jury look at that and

6    determine whether or not that's Erven Walls or

7    whether or not that's, indeed, somebody else.

8              THE COURT:  If it's evidence introduced

9    and goes back to the jury room, fine.  Your

10   position is different from Mr. Franks.  He doesn't

11   want it to go back.

12             MS. BORMANN:  I don't have any problem

13   with it going back.

14             THE COURT:  Even though it's hearsay

15   according to you.

16             MS. BORMANN:  No.  The photograph isn't

17   hearsay, your Honor.  That was physical evidence

18   found at the scene.

19                  The hearsay I'm attempting to

20   exclude is any testimony by any witnesses or any

21   state witness that Erven Walls is the same person

22   as Jermaine Craine is the same person as Zachery

23   Taylor.

24             THE COURT:  That's a conclusion which

1    somebody else will have to draw besides a police
2    witness.
3            MS. BORMANN:  So is my motion granted
4    then?
5            THE COURT:  Yes.
6            MS. BORMANN:  Thank you.
7            THE COURT:  Anything else?
8            MR. DOSCH:  Judge, I just need
9    clarification.  The one motion in limine that
10   applies to me deals with cross-examination of the
11   victim regarding his being involved in any drug
12   transaction; is that correct?
13           MS. BORMANN:  No, he denied that.
14           THE COURT:  No.
15           MR. FRANKS:  Fine.  Judge, I will
16   cross-examine first if that's all right with the
17   parties since my defendant is named first.  May I
18   just be excused for ten minutes maybe while
19   another trial begins?
20           THE COURT:  We'll proceed with the
21   opening statement, and I have to speak to the jury
22   for about five minutes.  He doesn't have to give
23   his opening statement first.
24           MR. RODDY:  We'll proceed on Hillard

1    first.

2                MS. BORMANN:  Do you want -- since I'm

3    going to go first, why don't I go first?

4                MR. FRANKS:  First on what?

5                MS. BORMANN:  On cross and all that.

6                MR. FRANKS:  No.  Then I'll stay.  I

7    would like to go first.

8                THE COURT:  He's named first, he goes

9    first.  What I propose to do, though, I'm not

10   going to bring Mr. Walls out again.  He can sit

11   here during the opening statement if you don't

12   have any problem with that.

13               MR. FRANKS:  The opening statement on

14   Hillard's jury?

15               THE COURT:  Right.

16               MR. FRANKS:  No, I have no problem with

17   that.

18               THE COURT:  And Miss Jinadu will be

19   here, too.

20               MS. BORMANN:  In terms of the other

21   mechanics, if there becomes an issue during

22   cross-examination, it's hard for me to object in

23   Mr. Frank's case.  It appears kind of strange

24   since I'm not the attorney of record.  Do you want

1      me to object if I perceive a problem with the

2      antagonistic defenses?

3                THE COURT:  Yes.  You're the only one

4      who can object to it.

5                MS. BORMANN:  Then I'm just going to be

6      objecting during Mr. Franks' cross.

7                THE COURT:  If you have some basis to

8      object.

9                MS. BORMANN:  I'm assuming that I will,

10     Judge.  This is why we need this of record.

11               THE COURT:  All right.  Let's do this.

12     Have the defendants seated, all of them.

13                    Mr. Franks, you're excused for

14     about ten minutes.  Your jury is here, so we'll

15     bring the other jury over from Judge Himel's

16     courtroom and proceed with the opening remarks.

17                    (Brief pause.)

18               THE COURT:  Mr. Roddy, was your jury

19     sworn last night?

20               MR. RODDY:  They were sworn in

21     individual panels of four, but not as a jury.

22               THE COURT:  Mr. Dosch, are you going

23     have an opening statement to make?

24               MR. DOSCH:  Just basically my opening

```
 1      statement is my answer, Judge.
 2                THE COURT:  Defense of compulsion?
 3                MR. DOSCH:  Yes.
 4                THE COURT:  All right.  Fine.  That's
 5      sufficient.
 6                          (WHEREUPON, the following was
 7                           had in open court, in the
 8                           presence of the Tony Hillard
 9                           jury:)
10                THE COURT:  Please be seated, ladies and
11      gentlemen.
12                          (Brief pause.)
13                THE COURT:  Good morning.
14                THE JURY:  Good morning.
15                THE COURT:  We are about prepared to
16      start with the beginnings of the trial proper, and
17      before we do that, I'm going to introduce some
18      people who were not here last night, and there
19      will be others arriving.
20                     Mr. Joseph Roddy seated at counsel
21      table, he will be the State's Attorney who will be
22      trying the case along with Miss Curtis.  Mr. Roddy
23      was selecting the other jury yesterday while this
24      jury was being selected.
```

1              Also, to my left -- last night you
2    were introduced to Miss Bormann and Miss McBeth
3    and Mr. Hillard.  To the left of Miss Bormann is
4    one of the other defendants, Delores Jinadu, and
5    next to her is her attorney, Mr. Brian Dosch.
6              MR. DOSCH:  How do you do?
7              THE COURT:  And to the left of Mr. Dosch
8    is the third defendant, Erven Walls.  His counsel
9    is presently before another judge.  He will be
10   here for his opening statement in a few minutes.
11             As I indicated, both juries will
12   be in the courtroom during a good portion of the
13   trial.
14             Also, last night before we
15   recessed, I told you that I customarily spend a
16   few minutes with the juries before we start with
17   the further stages of the trial and to acquaint
18   you with some of the ground rules that we'll be
19   following here.
20             Having completed jury selection,
21   the next phase of the trial will be opening
22   statements, and during this procedure, each side
23   has the opportunity to speak to you through their
24   counsel to describe to you what they believe the

1    evidence will show as it unfolds here today or
2    possibly tomorrow.

3                    Their comments to you, of course,
4    are not evidence, but you may accept them as an
5    outline or a blueprint of what is to follow and
6    will be filled in by the evidence that unfolds
7    here.   The state has the opportunity to go first
8    followed by defense counsel.

9                    After the opening statements have
10   been completed, the state is given the opportunity
11   to present its case-in-chief through the calling
12   of witnesses and the introduction of such physical
13   evidence as may be pertinent and relevant to the
14   charges here.

15                   When the state calls a witness,
16   the witness will be sworn under oath and come up
17   alongside of me, take their place in the witness
18   chair, and will then be asked questions by the
19   State's Attorney initially.

20                    The state performs what we call a
21   direct examination.   The answers that are elicited
22   to questions put to the witness will be competent
23   evidence for you folks to consider.

24                   When the state has completed its

1    examination, defense counsel is given the

2    opportunity to conduct a cross-examination.  The

3    rules are somewhat different between cross and

4    direct, but that should not be any concern of

5    yours.  Your concern should simply be with what

6    comes from the lips of the witness who has been

7    sworn and is giving testimony.

8              If there are matters that are

9    raised on cross-examination that the state's

10   attorneys feel warrant further inquiry, they may

11   conduct a redirect examination.  By the same

12   token, if the redirect examination yields other

13   information that defense counsel feels warrants

14   further inquiry, they will conduct a recross

15   examination and so on.

16             We allow the lawyers to do this

17   for one purpose and one purpose alone, and that is

18   to exhaust to your satisfaction as the judges of

19   the facts everything that a witness has to bear

20   upon a given aspect of the case.  So that is why

21   we do that.

22             When questions are asked by one

23   side or the other, opposing counsel may have an

24   objection to the question asked, to the manner of

1    the question asked, to the form of the question,
2    or to the answer that is sought to be elicited.
3    Objections are made for many, many different
4    reasons, constitutional reasons, hearsay reasons,
5    procedural reasons, evidentiary reasons, and it is
6    my duty to rule upon those objections as they are
7    made.
8                    If I believe that the objection is
9    well-placed and has merit, I will sustain the
10   objection, which means you will not hear the
11   answer called for by that question.
12                   If, however, I determine that the
13   objection does not have legal merit, I will
14   overrule it, and you will hear the answer.
15                   Sometimes it happens that we have
16   witnesses who may not be schooled in courtroom
17   procedure who may blurt out an answer before an
18   objection is made or, perhaps, while I'm mulling
19   over the ruling that I would make on it.  If that
20   happens and I determine that the objection was a
21   proper one and I sustain it, I would not only
22   sustain the objection, I would strike from the
23   record what the witness had said and instruct you,
24   ladies and gentlemen, to disregard it even though

1    inadvertently it was uttered or placed before
2    you.

3              Obviously, I can't predict in any
4    trial whether that's going to happen.  Sometimes
5    it does; sometimes it doesn't.  If it does, you'll
6    know how to handle it.

7              Most of the time, at least,
8    hopefully, I'm able to rule on objections as I sit
9    here at the bench.  Sometimes, however, it's
10   necessary for me to withdraw from your immediate
11   presence to what we call a sidebar where I may
12   hear more fully the legal reasonings in support of
13   and in opposition to a legal objection.

14             When we do this, we do not do this
15   in any effort to hide things from you, but it's
16   simply a recognition of the roles that you fill
17   and that I fill here.  My role is to be the judge
18   of the law, to ensure that only competent, proper,
19   relevant, material evidence is placed before you
20   for your consideration, and it really is no
21   concern of yours that I may overrule or sustain an
22   objection because it's based on hearsay, because
23   it's a leading question, because it assumes facts
24   not in evidence, or for many, many other reasons

1          that I may have for ruling on an objection.

2                          By the same token, we don't

3          interfere or intrude into your function, which is

4          to decide what the facts are in this case from the

5          evidence that is actually placed before you.  So

6          when we do withdraw from your presence, we do that

7          to avoid confusion between your role and the role

8          of the Court in the trial of a jury case.

9                          When the evidence has been

10         completed by the state, defense counsel will have

11         an opportunity to present such evidence as they

12         may elect to do bearing in mind what we went over

13         yesterday, and that is, of course, that they have

14         no burden to present any evidence here because of

15         the presumption of innocence that cloaks

16         Mr. Hillard.

17                         But if they do present evidence,

18         you will listen to that and consider it by the

19         same tools and standards that you will use to

20         judge evidence presented by the prosecution.

21                         When all the evidence has been

22         completed, the lawyers will then be given another

23         opportunity to speak to you in that phase of the

24         trial which is called closing arguments or

1    summation.  Again, their comments to you will not

2    be evidence, but their opinions on what the

3    evidence will have established from that vantage

4    point.

5                    After that, I will be talking to

6    you again, reading to you the instructions of law

7    that will guide you in your deliberations, and

8    those instructions, of course, will be taken back

9    to the jury room with you during your

10    deliberations together with any physical evidence

11    that I may have introduced in the proceedings at

12    that point.  That basically is the way the trial

13    will be progressing.

14                    At this point, I see Mr. Franks is

15    here.  Mr. Franks, I'll introduce you.

16                    He is the attorney for Erven Walls

17    who I previously introduced to you.

18                    State may address the jury insofar

19    as Mr. Hillard is concerned.

20            MS. CURTIS:  Thank you, your Honor.

21                 OPENING STATEMENT

22                 BY MS. CURTIS:

23                    Yinka Jinadu came to the

24    United States in 1994 from his native Nigeria.  He

1    came to the United States for a better life and
2    for a happier life.

3                      And when he came to the
4    United States, he met a woman named Delores,
5    Delores Jinadu, fell in love with her and married
6    her.

7                      In 1996, he began his own trucking
8    company.  From '94 through '96, he had been
9    working with cars.  And unfortunately, in October
10   of 1996, Mr. Jinadu was separated from Delores.

11                     However, in April of '97, he
12   employed Delores.  He employed her at his trucking
13   business to help answer the phone.  She had moved
14   out and was living at 5851 North Winthrop, but he
15   also helped her with paying the rent.

16                     On May 10th of 1997, there was a
17   collision.  There was a collision between Yinka
18   Jinadu's lust for life and these defendants' lust
19   for money.

20                     It was Saturday, and Yinka was at
21   work.  Delores had not shown up for work, and so
22   they spoke on the phone.  Delores had indicated
23   that her car was in need of repair, and she needed
24   a ride to work, and, Yinka, could you come pick me

1    up at my home and take me to work.  And he did
2    so.

3                     Once he got to Delores' home, they
4    spoke through the intercom.  She indicated she
5    wasn't ready, so she buzzed him up.  Yinka walked
6    up to Apartment 403.  Delores opened the door with
7    a smile and lured Yinka in.

8                     And when Yinka walked into that
9    room, he was greeted by another person yielding a
10   baseball bat who clubbed him over the head.  Yinka
11   was knocked unconscious for two hours, and when
12   Yinka awoke, he had no clothes except for his
13   underwear.

14                    He had come there with keys.  He
15   had come there with a pager.  He had come there
16   with a telephone.  It was all gone.  When he woke
17   up, he was in his underwear, and his legs were
18   bound with electrical cord.

19                    And when he woke up, Delores was
20   there, the guy with the baseball bat was there,
21   and Tony Hillard was there.  Tony Hillard was
22   there with a handgun.  Mr. Hillard, along with
23   Mr. Walls, was also there, and Mr. Walls had a
24   handgun.  The gentleman with the baseball bat had

1      a handgun, and there was a fourth individual

2      there.  He, too, had a handgun.

3                   About two hours had elapsed, and

4      when Yinka awoke, the gentleman with the baseball

5      bat who had clubbed him earlier had a chisel, hit

6      him in the head again, hitting him in the head and

7      in the eye area.

8                   Mr. Hillard, with the handgun,

9      when Yinka woke put the gun up to his temple.

10     Where is the money?

11                  At that juncture, Mr. Walls took

12     some handcuffs and handcuffed Yinka's hands in the

13     back.  Mr. Walls then put a gun into Yinka's

14     mouth.  Where's the money?

15                  At this point, Mr. Walls took the

16     chisel, the same chisel the gentleman earlier had

17     used, the gentleman with the baseball bat, and

18     again clubbed Yinka in the eye area.  At this

19     point, he's bleeding from the head, and he's

20     bleeding from the eye.  He sustained fractures to

21     the orbital bone and to the face bone.

22                  Again, Mr. Hillard walks up and

23     puts the gun in Yinka's mouth.  Where's the

24     money?

1              The gentleman with the baseball

2    bat, Hillard, and Walls then drag Yinka into the

3    bathroom.  They tape his hands with electrical

4    tape, they tape his feet, and they tape his mouth,

5    put him in the bathtub.  There the guy with the

6    baseball bat again wields his weapon, hits Yinka

7    in the knees.

8              Time has elapsed.  Yinka got there

9    at 10:30 in the morning.  It's probably

10   mid-afternoon at this point.  And again, Hillard

11   comes into the bathroom, this time with a pillow.

12   He says, It's time to die.

13             The baseball-bat-wielding man

14   says, Not yet.

15             It's a hot day.  Yinka is in the

16   bathtub, and the three defendants, the defendant

17   and his partners, put towels on him and turn on

18   the shower.  Yinka is bleeding.  He's in the

19   bathtub.  He's bound every which way, and the

20   water is coming down on him.

21             Time elapses.  Yinka no longer

22   hears people outside, and because of the water

23   coming from the shower, it loosens the tape that

24   is around his -- that is around his ankles, and

1    he's able to maneuver himself up out of the

2    bathtub.  He is then able to maneuver his

3    handcuffed hands so they're in the front, and with

4    his hands, he is able then to untie his feet.  He,

5    again, is naked except for underwear and in

6    handcuffs.

7                     He leaves the apartment.  He gets

8    himself downstairs.  Naked on the street at about

9    7:05 at night.  And you can imagine, someone saw

10   him, and someone called the police.

11                    When he came out that day, though,

12   he looked at the corner, and he saw some of

13   Hillard's partners at the corner.  They then

14   left.

15                    The police then were able to take

16   Yinka to safety.  They went back up to the

17   apartment and recovered some of the physical

18   evidence that will be presented to you today.

19                    The next time Yinka saw Hillard

20   was after Hillard had been arrested on June 3rd.

21   He identified him in a lineup.

22                    The next time that he saw Delores

23   and Walls was September 17th.  Earlier that day,

24   Walls and Jinadu, Delores Jinadu, had been

1    arrested together, and that evening, Yinka again

2    identified Mr. Walls as one of the people that had

3    bound and tried to kill him on May 10th of 1997.

4               Now, you took an oath. The judge

5    gave you an oath, and the oath says that you

6    will render a verdict that does justice. I'm

7    confident that when you hear all of the credible

8    evidence in this case, justice will dictate one

9    thing, finding Mr. Hillard guilty of all the

10   crimes charged.

11            THE COURT: Miss McBeth?

12            MS. MC BETH: Thank you.

13            OPENING STATEMENT

14            BY MS. MC BETH:

15            Good morning, ladies and

16   gentlemen. As you know, my name is Ruth McBeth,

17   and it is my pleasure to represent one of the

18   people of the State of Illinois, Tony Hillard.

19            Ladies and gentlemen, we believe

20   the evidence will show that Tony Hillard is not

21   guilty. Tony Hillard did not commit any of these

22   crimes. He did not commit any of them. He did

23   not commit one of them. He didn't commit any of

24   them. He was not present in Delores Jinadu's

1    apartment on May 10, 1997, when her husband,

2    Mr. Jinadu, was assaulted and robbed and

3    kidnapped.  Tony Hillard was not there.

4              Now, the State's Attorney has told

5    you about the ordeal that Mr. Jinadu suffered, but

6    one of the things that she didn't tell you about

7    was the police investigation to recover the

8    information that they were able to get, and I

9    would ask you when you're listening to the

10   evidence to listen to what the victim has to say,

11   but also to listen to the police testimony in this

12   case, because that's a very important part of what

13   the state has and, more importantly, what they

14   don't have here.

15             You will not be getting copies of

16   the police reports.  There were police reports

17   generated, many, many police reports generated in

18   connection with this case, because it was a

19   serious case and it was ongoing, but you will not

20   be getting copies of those.

21             However, there will be testimony

22   about what is in those police reports, and

23   testimony about the police reports is evidence,

24   just like testimony about anything else.

D-70

1　　　　　　　　So I'd ask you to pay particular

2　attention to that, as close attention to that as

3　you do to everything else.

4　　　　　　　　When Mr. Jinadu was rescued on the

5　street, there were two police officers who

6　responded, and they are Officers Ramirez and

7　Schmidt, and I believe that you will hear from

8　those officers.  They will tell you that they

9　took Mr. Jinadu back to the apartment and that

10　they recovered the physical evidence that

11　Miss Curtis alluded to.  You will find out that

12　they talked to him about who did this to him, and

13　you will find out that four of the offenders were

14　known to him.

15　　　　　　　　You will learn that the officers,

16　as is required by their job, prepared a report in

17　connection with this and detailed all the

18　information so it's not lost to us and we're not

19　required to rely on people's memory of what

20　happened over a year ago, but this was recorded in

21　a police report.

22　　　　　　　　Mr. Jinadu told you -- told those

23　officers, and we believe will tell you, that there

24　were five offenders.  Four of them were known to

1    him.  One of them was his wife, Delores.  One of

2    them was Mr. Walls -- excuse me.  Let me go in the

3    correct order.

4                    The first offender is

5    Miss Jinadu.  The second one is -- and he gave, of

6    course, her address and her height and weight

7    because he knows her.  He was married to her.

8                    And the second offender is a male

9    black named Jermaine Craine, who was wearing blue

10   jeans and a red jacket --

11             MS. CURTIS:  Objection, your Honor.

12   She's reading from a police report.

13             THE COURT:  Overruled.  She says this is

14   what the evidence will show.

15             MS. MC BETH:  That that second person,

16   Jermaine Craine, was of an unknown height, weighed

17   160 pounds.

18                    There was a third offender that

19   Mr. Jinadu identified for those police and told

20   them about, and he could do this because those

21   offenders left some identification there, and he

22   could compare it with the identification left in

23   the house and tell those officers that these are

24   the offenders.  The third offender is Erven Walls,

1    and he gave his address and he gave his height,

2    five foot 11, and his weight, 165 pounds.

3                      The fourth offender, he did not

4    know that person's name.  That was a male black

5    who was five foot ten and 200 pounds wearing black

6    jeans and a red pullover, and he had no further

7    information about that fellow.

8                      The fifth offender was a male

9    black who was five foot five inches tall, 140

10   pounds, wearing a blue jacket, gray jeans, named

11   Dermaine Walls.

12                     And you will hear from the

13   officers, and we expect that you'll hear from

14   Mr. Jinadu, too, that he identified those four

15   people that he knew the names of and gave the

16   descriptions of the four people to the police and

17   compared them up with the physical identification

18   that you're going to see in a few minutes.  He

19   also identified as best he could that fifth person

20   that he didn't know with a height and weight and

21   clothing description.

22                     You will also hear about the

23   police investigation.  And when they picked up

24   Tony Hillard, they prepared more reports.  Of

1    course, they prepared a report talking about the

2    arrest of Tony Hillard, and you'll hear how tall

3    he was and how much he weighed when he was

4    arrested, and it will be for you to determine

5    whether he matches that description.

6              But the detectives continued in

7    their investigation because they were looking for

8    other people, and after they had arrested Tony

9    Hillard, the first person arrested here, they are

10   looking for Miss Jinadu, number three, number

11   four, and number five.

12             So at that time, the detective is

13   believing that if Tony Hillard matches any of

14   these descriptions, he's got to be number two,

15   Jermaine Craine.

16             A very interesting piece of

17   evidence in this case, ladies and gentlemen,

18   there's a photo identification of Jermaine Craine

19   recovered at the scene, and you will get to take

20   that back with you and look at it, and you will

21   get to look at it and see whether it matches the

22   description of Tony Hillard, the description that

23   Tony Hillard actually fit when he was arrested and

24   what he looks like now.  We submit he does not,

D-74

1    because he is not the right person.

2                    Where do all of these conflicting
3    descriptions come from?  The state told you what
4    an ordeal it was for Mr. Jinadu.  They didn't tell
5    you that these offenders were masked.  Now, we're
6    not trying to hide anything here.  There were
7    points during this long ordeal when they're
8    masked, and there are points where maybe they're
9    taking off some of the masks.

10                   I'd ask you to listen to
11   Mr. Jinadu's testimony and compare it with what he
12   said earlier about where these things took place,
13   because Mr. Jinadu is having trouble being
14   consistent about what happened there.  He, at one
15   point, will tell police officers that the ordeal
16   of the tying up and the being beaten happened in
17   the living room or the main room of the studio
18   apartment.  At another point, he will say, no,
19   that didn't happen in there.  It was after I was
20   dragged into the bathroom where the tying up and
21   the being beaten happened.

22                   He gives different descriptions
23   about which of these four men are tying him up.
24   He gives different descriptions about which of the

1    men are waiting outside when he flees.  And at
2    certain points, he mentions the chisel, and at
3    other points, he doesn't mention the chisel.

4                      There are many, many conflicting
5    things in his story, and it's understandable
6    because you'll learn about what he did endure and
7    the medical treatment necessary to treat him for
8    these injuries.  He had a broken eye socket bone
9    here.  And he had a concussion, and he lost
10   consciousness.  And he had to go to Illinois
11   Masonic Hospital immediately after that and remain
12   there for three days for observation, as is
13   reasonable.  You have to go and stay for
14   observation when you have had a loss of
15   consciousness and serious damage to -- head trauma
16   and a fractured bone.

17                      He did not have any insurance to
18   pay for his medical treatment, so he was released
19   from that hospital and given an appointment to go
20   to the public hospital, Cook County Hospital, for
21   the reconstructive surgery on that eye bone, and
22   you'll hear that he went back into the hospital
23   and had that.

24                      So it's understandable why he

1    would have trouble keeping straight what happened
2    to him, but it's also, we submit, what's going to
3    lead you to a reasonable doubt that Tony Hillard
4    was there.

5              There are no fingerprints from
6    Tony Hillard in this apartment despite the fact
7    that this ordeal supposedly lasted for nine hours
8    and these men were in there.  There are guns
9    recovered.  There are no fingerprints on the guns
10   to match Tony Hillard.

11             You'll get to see the lineup, and
12   you'll get to conclude for yourself what it was
13   about that lineup that suggested to Mr. Jinadu to
14   pick Tony Hillard, and we'd ask you to look
15   at all that evidence very closely because the
16   state will not be able to prove that Tony Hillard
17   was there and committed these crimes.  He is
18   not guilty of these crimes, and we will ask you
19   to so find.

20             THE COURT:  Very well.  Deputy Murphy,
21   would you take this jury out for a few minutes
22   while we have the opening statements before the
23   other jury?

24             We'll be resuming shortly, ladies

```
 1    and gentlemen.
 2                        (Brief pause.)
 3                        (WHEREUPON, the following was
 4                         had in open court, in the
 5                         presence of the Erven Walls
 6                         jury:)
 7         THE COURT: Good afternoon, ladies and
 8    gentlemen. I understand you have not been sworn
 9    as a jury at this point.
10                   Would you please administer the
11    oath to the jury?
12         THE CLERK:  Please raise your right
13    hands.
14                        (Jury sworn.)
15         THE COURT:  Be seated, please.
16                   I think some introductions are in
17    order before we proceed further.  My name is
18    Michael Toomin.  I'm a Judge of the Circuit Court
19    of Cook County.  I will be presiding over the
20    joint trial of the defendants in this case.  Judge
21    Wadas was very helpful yesterday in selecting you
22    as a jury.
23                   One of the state's attorneys and
24    defense counsel while we were selecting the second
```

1      jury in this case, Mr. Joseph Roddy, was with you

2      last evening.  Miss Ann Curtis will be the other

3      State's Attorney who will be trying the case, and

4      you previously met Mr. Franks and Mr. Walls last

5      night.

6                  The other defendants and their

7      lawyers are here at this time.  Seated next to

8      Mr. Walls is Mr. Brian Dosch.

9                  MR. DOSCH:  How do you do?

10                 THE COURT:  And his client is

11     Miss Delores Jinadu.

12                 And next to Miss Jinadu is

13     Miss Cheryl Bormann.

14                 MS. BORMANN:  Good afternoon.

15                 THE COURT:  Miss Ruth McBeth.

16                 MS. MC BETH:  Good afternoon.

17                 THE COURT:  They are the lawyers for

18     Mr. Tony Hillard, who is at the extreme right of

19     the table.

20                 THE DEFENDANT HILLARD:  Good afternoon.

21                 THE COURT:  As Judge Wadas may have

22     explained to you, we are employing this procedure

23     of having a double jury in the courtroom for much

24     of the trial, and the reason for this simply is

1      that there is evidence in this case that is

2      relevant to the case of one of the defendants,

3      Mr. Hillard, and some other evidence that's

4      pertinent to Mr. Walls and to Miss Jinadu.

5                    Miss Jinadu has elected to have a

6      bench trial, so I will be the one who will be

7      deciding her case.

8                    We have employed this procedure

9      many times in the circuit court, and it's done for

10     reasons that may become apparent to you during the

11     course of the trial and that I may have an

12     opportunity to share with you after the trial if

13     you have any questions about it.

14                   I find it helpful with the jury to

15     spend a few minutes with you before we move into

16     the next phase of the trial to spell out for you

17     the various procedures of the case and also some

18     of the ground rules we will be following here as

19     we do in the trial of all criminal cases here.

20                   Having selected a jury last

21     evening, we're going to move into the next phase

22     of the trial which we call opening statements.

23     During this procedure, each side has an

24     opportunity to address you through their counsel,

1   to speak to you and to discuss with you what they
2   believe the evidence will show that will be
3   unfolding here today and tomorrow.
4            Their comments to you, of course,
5   are not evidence, but simply a blueprint or
6   capsulized view of what they believe the evidence
7   will be that will be presented here, and you may
8   accept those statements as such.  The state has
9   the opportunity to speak to you first followed by
10  defense counsel.
11           After the opening statements have
12  been delivered, the state will move into the
13  presentation of its case-in-chief through the
14  calling of witnesses and the introduction of such
15  physical evidence as may be pertinent and relevant
16  to the charges before you.
17           When the state calls a witness,
18  the witness will be called to the witness chair to
19  my right, will be placed under oath, take their
20  seat, and then in response to questions put to
21  them, will make answers that will be competent
22  evidence for you, ladies and gentlemen, to
23  consider.
24           The state conducts what we call a

1   direct examination first, and that will be

2   followed by defense counsel, who will be given an

3   opportunity to conduct a cross-examination.  The

4   rules governing those examinations are somewhat

5   different, but that should be no concern of

6   yours.  Your concern should simply be what the

7   witness has to say in response to the questions

8   directed to them.

9               When the state completes the

10  direct examination, counsel will be given an

11  opportunity to do cross-examination.  If there are

12  matters brought out on cross-examination that the

13  state's attorneys feel warrant further inquiry,

14  they may conduct a redirect examination.  By the

15  same token, if defense counsel thereafter believes

16  that there is other material that should be delved

17  into that warrants further inquiry, they may

18  conduct recross-examination and so on.

19              We allow the lawyers to do that

20  for one reason alone, and that is to exhaust for

21  your satisfaction whatever light the witness may

22  have to shed upon a given aspect of the case.

23              When questions are asked by one

24  side, opposing counsel may have an objection to

1    the question or to the answer sought to be
2    elicited.   Lawyers are obligated to make
3    objections where they believe that they are
4    legally warranted.
5                      By the same token, when objections
6    are made, it is my responsibility to rule upon
7    them.   If I determine that an objection does have
8    legal merit, I will sustain it.   That means you
9    will not hear the answer to that question.   If,
10   however, I determine that the objection does not
11   have legal merit, I will overrule it, and you will
12   hear the answer.
13                      Sometimes it happens that we have
14   witnesses who may not be schooled in courtroom
15   procedures who may blurt out an answer before an
16   objection is made or, perhaps, while I am thinking
17   or mulling over the ruling that I would make.   If
18   that does happen and I do sustain the objection, I
19   would not only sustain it, but I would also strike
20   it from the record and instruct you, ladies and
21   gentlemen, to disregard it even though
22   inadvertently it had been placed before you and it
23   should not have anyplace in the evidence.
24                      I cannot predict, obviously, as I

1   sit here now whether this will happen in any given

2   trial, but if it does, you'll know how to handle

3   it, in any event.

4                When the examinations -- when the

5   evidence has been completed that will be presented

6   by the prosecution, the defense will be given an

7   opportunity to present such evidence as they may

8   elect to do bearing in mind that they have no

9   legal obligation under our system of law to call

10  any witnesses or present any evidence, and that

11  is because the defendant is presumed to be

12  innocent.

13               If they do present evidence, you

14  will listen to it and consider it by the same

15  standards and using the same tools that you will

16  use to judge evidence presented by the

17  prosecution.  It makes no difference who calls the

18  witnesses.  It's what they have to say that is

19  significant.

20               After all of the evidence has been

21  completed, the lawyers will then be given an

22  opportunity to speak to you again in what we call

23  closing arguments or summation to discuss with you

24  from that vantage point what they believe the

1    evidence has then established.  Their comments to
2    you, again, will not be evidence, but simply their
3    opinions as to what has been established through
4    the witnesses that will have testified.
5            After the closing arguments have
6    been completed, I again will be given an
7    opportunity to speak to you, to read to you the
8    instructions of law that will guide you in your
9    deliberations.  They will be given to you for your
10   use in the jury room to assist you in your
11   deliberations upon the verdicts, and you will have
12   those instructions together with any physical
13   evidence that I will have then introduced into the
14   proceedings.
15           That basically will be the way the
16   trial will be proceeding.  A portion of the trial,
17   as I have indicated, will be before both juries,
18   and there will be some parts of the trial, such as
19   the opening statements, the closing arguments, and
20   perhaps some of the evidence, where you will be
21   alone in the courtroom.
22           You'll see that the seats that are
23   down in the floor area are set up for the other
24   jury.  You'll be sharing those seats with the

1    other jury as well so nobody gets too much of the

2    soft seats as against the hard seats, but we'll

3    try to make it as easy as we can for you.

4                    At this time, the state will have

5    an opportunity to speak to you.

6                    State, you may address the jury.

7              MR. RODDY:  Thank you, your Honor.

8                    OPENING STATEMENT

9                    BY MR. RODDY:

10                   The year was 1994, and a man by

11   the name of Yinka Jinadu came to the

12   United States, and he came here as so many other

13   people before him and so many other people from

14   other countries come here, looking for certain

15   things.  He wanted to find a job, he wanted to

16   make a better life for himself, and he wanted to

17   find a woman to share his life with.

18                   In 1994, he found that woman,

19   Delores Carter Jinadu.  And they dated, and they

20   eventually married in 1995.

21                   While they were dating and in part

22   of their marriage, he started working as a car

23   dealer.  He had a friend dealing cars.  He then

24   saved up enough money and started his own trucking

D-86

1    business on the west side of Chicago.  He was

2    living the American dream.  He had come here

3    seeking things.  He had found them.  His life was

4    good.

5                        1995 and 1996, his trouble began

6    developing with his marriage with Delores, and

7    things broke down, and they separated.  But it

8    wasn't the end of their relationship.  They were

9    still friends.  They still helped one another

10   out.  He helped in her expenses at the apartment.

11   She worked for him at his business.

12                       On the night of May 10, 1997, that

13   American dream of Yinka Jinadu turned into the

14   American nightmare.  Delores Jinadu buzzes and --

15   pages him at the job.  I need someone to come pick

16   me up.

17                       He comes over, comes to pick her

18   up for work that day.  Goes to the buzzer and

19   says, I'm here, come on down.

20                       Delores isn't ready yet.  Come on

21   up.

22                       He comes up, and he sees that

23   face, that face that he's known and trusted for so

24   long.  And she says, come on in, with a big

1       smile.

2                       And little did he know, ladies and

3       gentlemen, on that night, that he was walking into

4       the American tragedy.  Because waiting for him was

5       Tony Hillard, armed with a gun, wearing a bandanna

6       across his face at the beginning, and Erven Walls,

7       armed with a gun and a chisel or metal rod

8       throughout the time.

9                       Before he ever saw those faces, he

10      was hit in the head with a baseball bat by the two

11      other partners of these three defendants and

12      passed out for two hours.

13                      Ladies and gentlemen, as you found

14      out yesterday, my name is Joseph Roddy.  I'm an

15      Assistant State's Attorney on behalf of the

16      People.  My partner, Ann Curtis here, was over

17      here with Judge Toomin picking the other jury.

18                      The next couple of hours and maybe

19      into tomorrow, we're going to show you what

20      happened on that day.  We're going to tell you the

21      story of Yinka Jinadu.  We're going to do it

22      through our questions.  He's going to do it

23      through his mouth and the experiences he lived on

24      that day.

1                    And he's going to tell you that he
2       awoke from getting hit on the head and cracking
3       open his head that resulted in numerous stitches
4       later at Illinois Masonic, and when he woke up, he
5       saw four men, Hillard, Walls, and two other men
6       that he described, and his ex-wife, Delores
7       Jinadu.
8                    And he's going to tell you of the
9       torture that he endured for many, many hours,
10      about how he was bound with electrical cord, how
11      Erven Walls handcuffed him with his hands behind
12      him so he couldn't move at all, how his arms were
13      bound together with tape, given no dignity
14      whatsoever.  You wouldn't treat a dog or an animal
15      the way he was treated that day.
16                   He was then wrapped up with tape
17      around his mouth, hands, around his feet,
18      subjected to brutal attacks.  Tony Hillard put a
19      gun in his mouth.  Where is the money at?  Where
20      is the money at?  I'm going to knock you out.
21      It's time for you to die.  Those were Tony
22      Hillard's words.
23                   You'll hear how Erven Walls had
24      that gun to his head, too, numerous times.  Where

1    is the money?  Where is it at?  Give me that

2    chisel.  Erven Walls takes that chisel, pummels

3    his face with that chisel, breaking the orbital

4    bone, causing the man to live with a plate in his

5    head for the rest of his life.

6                    You'll hear how throughout the

7    time, he heard Delores talking with the other

8    partners, the two defendants here and the other

9    two who are still out there, talking with them

10   about getting the money and getting the key to his

11   office where this money was kept.  You're going to

12   hear how he was taken into a bathroom, bleeding,

13   gash to his head, eye opened up.  How he spent

14   time, almost nine hours, in that apartment.

15                   And throughout the tragedy and the

16   time he is kept there, he sees this face numerous

17   times, Tony Hillard, with his bandanna, without

18   his bandanna.  He sees him put that gun right

19   inside his mouth and talk to him about that

20   money.

21                   And he sees this face the whole

22   time never without a bandanna on.  He sees that

23   face and knows that face because he's seen it once

24   before when he was over visiting Delores on a

D-90

1     prior occasion at 5851 Winthrop.

2                    You're going to hear how this

3     endured and went on and on until he finally heard

4     no talking, and he thought he might take a look.

5     The water had taken away some of the tension that

6     he was able to free his feet a bit.  He was able

7     to free his arms.

8                    He climbs out of the tub, goes

9     out, and sees that no one is there.  Runs down,

10    bound with handcuffs behind him, tape still around

11    his neck, in his underwear, gushing blood.

12                    Someone calls the police.  Two

13    officers from the north side district come, and

14    they are met by Yinka Jinadu.  He's able to tell

15    them what has happened somewhat and take them to

16    where it happened, and where it happened is

17    Delores Jinadu's apartment at 5851 Winthrop.

18                    They go in, and what do they

19    find?  They find a bloody scene with blood all

20    over the walls.  They find two guns, two

21    revolvers, the guns that were held by Erven Walls

22    and by Tony Hillard.  They find electrical tape

23    similar to the tape wrapped around his hands.

24    They find the cords that were wrapped around his

1    arms and legs.  They find identification

2    eventually tied up to Erven Walls being there.

3                    The defendant is taken to Illinois

4    Masonic, treated, taken to Cook County nine days

5    later, surgery, treated there again.

6                    Two detectives are called from

7    Violent Crimes at Belmont and Western, Detective

8    Wesley and Bradley.  They take the case, begin the

9    investigation.  They learn information about one

10   of the guns, who it's registered to.  They talk to

11   that person, Laretha Hillard.

12                   After talking with her, they go to

13   617 West Division on June 3, 1997, and they arrest

14   Tony Hillard, that man right there.  He's brought

15   down for questioning.  A lineup is conducted.

16   Yinka Jinadu looks at that lineup and identifies

17   one person, Tony Hillard, as the man who had the

18   gun and robbed him of his property, you see,

19   because when he went there, he had his pager, his

20   cell phone, and he had keys on him, and when he

21   left there, he had none of that.

22                   Police officers continued their

23   investigation, looking for the four other people.

24   They developed leads, received information that

1    Erven Walls would be at 11th and State, would be

2    in Courtroom 900.  They went there on September

3    17, 1997, and lo and behold, there's Erven Walls.

4    And they waited for him, and when he got outside,

5    they talked to him, and they arrested him.

6                     But he wasn't alone.  You see,

7    Erven was with Delores Jinadu.  They were there

8    together.  They were both placed under arrest,

9    taken back to the Detectives Division.

10                     A lineup was conducted with

11   regards to Erven Walls.  Yinka Jinadu looked at

12   those five people, completely different than what

13   he saw with Tony Hillard, and he identified one

14   person, Erven Walls, as the man who put handcuffs

15   on him, who took a chisel or metal rod, as he

16   described, and pummeled his eye resulting in the

17   orbital fracture, and the man who was armed with a

18   handgun throughout this nine hour ordeal where his

19   property was taken and he was subjected to this

20   torture.

21                     You'll hear that after that, an

22   Assistant State's Attorney, the same office that

23   we work in working in a division of the Felony

24   Review Unit, came out and spoke with Mr. Walls on

1       September 18, 1997.  He advised him of his rights,

2       asked him if he knew anything about what

3       happened.

4                       And you will hear what Mr. Walls

5       told Assistant State's Attorney Michael O'Malley,

6       how he told him that he was brought into this

7       group, this partnership, which the goal was to rob

8       Yinka Jinadu, and Yinka, they knew, was the

9       ex-husband of Delores, and how he was told to come

10      on in because he's going to get some heroin as his

11      cut and how he was there with other people and how

12      one of those people was Tony Hillard.

13                      You're going to hear what he told

14      about how in his mind he knew exactly what was

15      going on there and that he wanted to be a part of

16      that for his own gain and that he agreed to do

17      that.

18                      That is the evidence that we're

19      going to present to you, the testimony.  You'll

20      see the two guns.  You'll see the handcuffs that

21      bound Yinka Jinadu for nine hours.  You'll hear

22      them tell you that they were cut off while he was

23      in Illinois Masonic because no one could get them

24      off.

1              You'll see Yinka Jinadu how he

2    appears today.  You're also going to see how he

3    looked on May 10, 1997, and they're not even

4    close.

5              When we're all done and we've

6    shown you all the evidence, Ann and I are going to

7    come back and ask you to do one thing, to follow

8    the oath that Judge Wadas gave you yesterday and

9    that you received questions on and were questioned

10   for a long period of time.  We're going to come

11   back and ask you to do one thing, do your job.

12             We're going to ask you to look at

13   Erven Walls and tell him that he's responsible for

14   what he did that night, and he's responsible for

15   trying to kill Yinka Jinadu.  He's responsible for

16   being a part of that armed robbery.  He's

17   responsible for everything that he did, and he's

18   responsible for everything his partners did and

19   those two people out there we're still looking

20   for.  And we're going to ask you to find him

21   guilty.

22             Thank you.

23             THE COURT:  Mr. Franks?

24

1                      OPENING STATEMENT

2                 BY MR. FRANKS:

3                      Ladies and gentlemen of the jury,

4      this is my first opportunity to address you

5      directly.  I'm Dan Franks.  I represent Erven

6      Walls and Erven Walls only.

7                      What's important for me to say

8      right now is that I want you to listen to all of

9      the evidence.

10                     You have heard opening statement

11     by the state.  What is probably more important

12     than what was just said is what was not said.  The

13     questions that will be raised during the course of

14     this trial are going to be substantial.  There

15     will be many reasonable doubts that are going to

16     arise out of the circumstances that you will have

17     heard in this courtroom.  The burden is that to

18     find Erven Walls guilty, you must find no

19     reasonable doubt.

20                 MR. RODDY:  Objection, Judge.

21                 THE COURT:  The objection is sustained.

22     That's not the correct standard.  I'll strike that

23     and instruct the jury to disregard it.

24                 MR. FRANKS:  Every time Yinka Jinadu

1   talked about this case, he said something totally

2   different.  Every time he was interviewed by a

3   detective or talked to a State's Attorney in the

4   grand jury, every single time, it was a different

5   story.

6                    There is no question that Yinka

7   Jinadu knows my client.  A lineup in this case is

8   meaningless.  They know each other.  After your

9   spending a couple of days with each other as

10  jurors, if you recognize each other and one is a

11  put in a lineup, it's meaningless.  You know each

12  other.

13                   The state has slipped in there,

14  they know each other, they saw each other one time

15  in her house.  I found that interesting.  Well,

16  the relationship is much, much deeper than that.

17                   You are going to hear evidence

18  that there was a virtual drug lab located in

19  Delores Jinadu's house.  I did not hear the state

20  mention anything about that.  They talked about

21  IDs.  They didn't talk about all the paraphernalia

22  that clearly indicated that this was a drug

23  dealing lab.

24                   MR. RODDY:  Objection to the argument.

D-97

1          THE COURT:  Objection sustained.  This

2    is not closing argument.  This is an opening

3    statement.  Just tell the jury in plain terms what

4    you believe the evidence will show.

5          MR. FRANKS:  The evidence will show that

6    this was a drug lab.  The evidence will show that

7    the reason for this abduction, kidnapping, beating

8    of Mr. Jinadu was because these people that did it

9    believed he was a drug dealer.  They demanded

10   money.  They demanded drugs.  They demanded Lexus

11   cars.  That's what they were about.

12              The defendant is the boyfriend of

13   Delores, who lives there.  That is the

14   connection.  His identifications were inside of

15   the apartment.  That is true.

16              The police found those

17   identifications as part of their investigation

18   besides all this drug paraphernalia, and showed

19   that identification to the defendant -- excuse

20   me -- to Yinka Jinadu.  And he then became the

21   suspect.  Not because he was there, but because

22   his identifications were there.  That is how it

23   all happened.

24              The defendant had a relationship

```
 1    with Yinka Jinadu that may have gone beyond the
 2    fact that he is the boyfriend of his separated
 3    wife.  Drugs may be very much a part of this
 4    case --
 5              MR. RODDY:  Objection, Judge, to the
 6    argument.
 7              THE COURT:  Sustained.  I'll strike it
 8    and instruct the jury to disregard.
 9              MR. FRANKS:  You will have to determine
10    from the evidence you hear what is the
11    relationship between Yinka Jinadu and my client,
12    and you will have to determine what the
13    credibility is of Yinka Jinadu.
14                   Reasonable doubt -- strike that.
15                   If the people involved in this
16    case that were the offenders that brutalized Yinka
17    Jinadu, and there's no question things happened to
18    him there, but if these men were wearing masks,
19    would that have affect on whether or not Yinka
20    Jinadu could make an identification in this case.
21              MR. RODDY:  Object to the argument,
22    Judge.
23              THE COURT:  Sustained.
24              MR. FRANKS:  The evidence will show,
```

1    ladies and gentlemen, that Yinka Jinadu has

2    testified under oath that these men were wearing

3    masks, but he never says that to the police in all

4    of the earlier versions of this case.

5              The statement that my client made

6    after being in custody for -- what? -- 36 hours or

7    more included in that same statement an absolute

8    denial --

9              MR. RODDY:  Objection, Judge.

10             MR. FRANKS:  That's the evidence.

11             THE COURT:  Objection sustained.

12             MR. RODDY:  Ask to strike that.

13             THE COURT:  I'll strike the statement

14   and instruct the jury to disregard it.

15             MR. FRANKS:  Well, you will hear the

16   statement that supposedly the Assistant State's

17   Attorney took.  You will see the condition of my

18   client at the time the lineup occurred and what,

19   if any, injuries were on or about his person at

20   the time that the lineup occurred.

21             MR. RODDY:  Objection to the argument

22   again, Judge.

23             THE COURT:  Overruled.

24             MR. FRANKS:  That will be the evidence

1    in this case.

2                    And, ladies and gentlemen, at the

3    conclusion of all the evidence, after you have

4    heard and listened to not just Yinka Jinadu, but

5    how the scene was processed, the fact that there

6    are no fingerprints, there's no corroboration,

7    there's no other witness saying my client did

8    anything other than Yinka Jinadu, I believe,

9    ladies and gentlemen, after hearing everything,

10   there will be no other conclusion that you can

11   reach that there are reasonable doubts in this

12   case and that, in fact, my client was not present

13   at the time that this incident occurred and that

14   his connections with these people do not rise to

15   the level of just because Yinka Jinadu knows him

16   and him only that he was actually there, and

17   whatever jealousies or angers he has over what

18   happened to him, the fact that he focused it on my

19   client should not lead to the level of a

20   conviction.

21                   Now, whether this is an American

22   tragedy or not, I don't want this Court or this

23   jury exposed to just hyperbole.  I care about the

24   facts.  That's why you, ladies and gentlemen, were

D-101

```
 1    chosen, because I believed you could look at the
 2    facts dispassionately.  And at end of the case,
 3    we'll be asking for a not guilty.
 4                      Thank you.
 5              THE COURT:  Bring in the jury, please.
 6                        (WHEREUPON, the following was
 7                        had in open court, in the
 8                        presence of the Erven Walls and
 9                        Tony Hillard juries:)
10              THE COURT:  You may be seated, folks.
11                    All right.  Both juries are
12    assembled in the courtroom.  State may call its
13    first witness.
14              MR. RODDY:  Judge, we call to the stand
15    Mr. Yinka Jinadu.
16              THE COURT:  You may step forward,
17    Mr. Jinadu.  Right up here.  Stand up, face this
18    way, and raise your right hand, please.
19                        (Witness sworn.)
20              THE CLERK:  Please be seated, sir.
21              THE COURT:  Keep your voice up loud and
22    clear, please.
23              MR. RODDY:  May I proceed, Judge?
24              THE COURT:  You may.
```

```
 1      WHEREUPON,

 2                      YINKA JINADU,

 3      called as a witness on behalf of the People of

 4      the State of Illinois, having been first duly

 5      sworn, under oath was examined and testified as

 6      follows:

 7                      DIRECT EXAMINATION

 8                      BY MR. RODDY:

 9          Q.   Sir, in a loud voice, would you introduce

10      yourself to all the ladies and gentlemen of both

11      juries, speak loudly and spell your last name?

12          A.   My last name is J-i-n-a-d-u, Jinadu.

13          Q.   And your first name?

14          A.   Y-i-n-k-a, Yinka.

15          Q.   How old are you, sir?

16          A.   I'm 30.

17          Q.   30?

18          A.   30 years, yes.

19          Q.   And do you work?

20          A.   Yes.

21          Q.   What do you do?

22          A.   I have a -- I own a trucking company.

23          Q.   Is that here in Chicago?

24          A.   Yes.
```

1         Q.    When did you come to the United States,

2    sir?

3         A.    August 1994.

4         Q.    And what is your native homeland?

5         A.    I beg your pardon?

6         Q.    Where are you from?  Your native land?

7         A.    I'm from Nigeria, Lagos.

8         Q.    When you came over here, what did you do?

9         A.    I was working at a car dealership.

10        Q.    And did you meet anyone here that you

11   later married?

12        A.    Yes.

13        Q.    What was that woman's name?

14        A.    Delores Diana Carter.

15        Q.    Delores Carter?

16        A.    Yes.

17        Q.    I'll ask you to look around this

18   courtroom and see if you see the person you know

19   as Delores Carter that you married?

20        A.    Yes.  She's right here (indicating.)

21        Q.    Would you please tell me what she's

22   wearing?

23        A.    Pardon me?

24        Q.    Would you describe -- describe an article

1     of clothing she has on?

2          A.   She has a black -- blue and white shirt,

3     in the middle right there (indicating.)

4               MR. RODDY:   May the record reflect the

5     identification of the defendant, Delores Jinadu?

6               THE COURT:   The record may reflect the

7     witness has identified Delores Jinadu in open

8     court.

9               MR. RODDY:   Thank you

10    BY MR. RODDY:

11         Q.   When did you meet Delores Jinadu?

12         A.   I met Delores at a club called Club Dread

13    in 1994.

14         Q.   Did you then begin a relationship with

15    her?

16         A.   Yes.

17         Q.   Did you ever marry her?

18         A.   Yes, I do.

19         Q.   When did you marry her?

20         A.   I married her February '95.

21         Q.   Where were you living at that time?

22         A.   Say that again?

23         Q.   Where were you living when you and

24    Delores got married?

1       A.    We was living 5910 North Sheridan Road,

2   Chicago.

3       Q.    Where was your job apartment, your

4   business?

5       A.    3827 West Harrison Street, Chicago.

6       Q.    What was that business, sir?

7       A.    It's a trucking company.

8       Q.    Do you still have that now?

9       A.    Yes, I do.

10       Q.    Now, did you eventually separate from

11   Delores?

12       A.    Yes.  We separated, 1996.

13       Q.    After you separated, did you still keep

14   in contact with Delores?

15       A.    Yes.

16       Q.    Tell us how that was?

17       A.    When she was -- when we separate, she --

18   we have an agreement of we live separate, and she

19   living by herself, and every end of the month, she

20   used to call me, and I give her a little bit

21   assistance to pay her rent.

22       Q.    Where was Delores Jinadu living then when

23   you separated?

24       A.    She was living 5840 North Winthrop.

1        Q.   And where were you living, sir?

2        A.   I was living 1642 East 56th Street,

3    Chicago.

4        Q.   That's here on the south side?

5        A.   Yes.

6        Q.   Now, did Delores ever work for you?

7        A.   Yeah.

8        Q.   When did she start to work for you?

9        A.   April 1997.

10       Q.   Why was that?

11       A.   Because she can't keep any job she got.

12       Q.   Did you make any -- make any efforts to

13   help her out?

14       A.   Yes.

15       Q.   What did you do?

16       A.   I call her up one day, and I tell her, I

17   say, okay, you can be my secretary, so you be in

18   my office, and I'll pay you 8.50 per hour.

19       Q.   Did she come in and work for you for

20   approximately a month?

21       A.   Yes.

22       Q.   What would she do at your office?

23       A.   She'd answer the phone and typing and

24   photocopy machine, copy when I need to copy

1    anything.

2         Q.   Mr. Jinadu, I'd like to talk to you

3    about May 10th of 1997.  Do you remember that day,

4    sir?

5         A.   Yes, I do.

6         Q.   Where were you at in the morning,

7    approximately 9:00 a.m.?

8         A.   I was in my office at 3827 West Harrison

9    Street.

10        Q.   Was anyone there with you?

11        A.   Nobody.

12        Q.   Was anyone supposed to be there with you?

13        A.   Yes.

14        Q.   Who is that?

15        A.   My wife, Delores.

16        Q.   Tell us what happened that morning.

17        A.   That morning, I got -- when I got to my

18   office at 9:30, she was supposed to be there

19   before I got there.  So I didn't see her, and I

20   paged her to see what happened to her, how come

21   she didn't show up.

22              She called back.  She told me her

23   car was broke down, her car wouldn't start.

24        Q.   Did you then have a further conversation

D-108

1     with Delores Jinadu on the phone?

2         A.   Yes.

3         Q.   Tell us about that.

4         A.   She told me her car broke down.  She

5     would not be able to get to the job right now.  If

6     I can come and pick her up, she will come over

7     here to my office.

8                    I said, okay.  If that should be

9     the case, I'm on my way right away.

10        Q.   Did you go then to pick her up?

11        A.   Yes.  I went, yes.

12        Q.   Did you go to 5851 North Winthrop, her

13    apartment?

14        A.   Yes, I do.

15        Q.   Had you been there before on other

16    occasions?

17        A.   Yes, I been there before.

18        Q.   Approximately what time did you get

19    there?  Do you remember?

20        A.   Yes.  Approximately, about 10:15.

21        Q.   Did you have any money with you when you

22    got there?

23        A.   No, I don't.

24        Q.   Did you have any other pieces of property

D-109

1      of your own on your person?

2          A.    Yes, I do.  I have my cellular phone with

3      me and my pager.

4          Q.    Your pager?

5          A.    Yes.

6          Q.    Where was your money at that day?

7          A.    It was in -- on the table in my office.

8          Q.    At Harrison Street?

9          A.    Yes.

10         Q.    When you got to 5851 North Winthrop, tell

11     the ladies and gentlemen what you did?

12         A.    When I got to that building -- to the

13     building, I rang the bell, the doorbell, and she

14     answered the doorbell.

15                      I say, I'm downstairs.  I'm

16     waiting.

17                      She said, well, why don't you come

18     up?  Because I've got to change my clothes.

19         Q.    You said she answered, and she spoke to

20     you?

21         A.    Yes.

22         Q.    Whose voice was that you heard?

23         A.    'Delores, my ex-wife.

24         Q.    Did you go upstairs when she asked you to

D-110

1      come upstairs?

2          A.   Yes, I do.

3          Q.   What floor does she live on, sir?

4          A.   On the fourth floor.

5          Q.   Tell the judge and the ladies and

6      gentlemen of the jury what happened then?

7          A.   When I go to the fourth floor, I went

8      straight to the door to her apartment, and I knock

9      the front door.  And she opened the door, and she

10     smiled to me --

11              MR. FRANKS:  Judge, I'm sorry.  I could

12     not hear what he said.

13              THE COURT:  Slow down and keep your

14     voice up, please, Mr. Jinadu.

15     BY THE WITNESS:

16         A.   When I go upstairs to the fourth floor, I

17     walk straight to the front door, knock the door,

18     and she opened the door for me.

19                   She smile at me and say, it's just

20     going to be a minute.  Just come in and have a

21     seat.

22     BY MR. RODDY:

23         Q.   Did you come into Delores' apartment?

24         A.   Yes.

1          Q.    Tell the ladies and gentlemen what
2     happened when you walked into the apartment?
3          A.    As soon as I walked into the apartment, I
4     just -- I hear somebody hit me on my -- on top of
5     my head with a baseball bat.
6               MR. RODDY:   Indicating for the record
7     Mr. Jinadu pointed to the front, right part of his
8     head.
9     BY MR. RODDY:
10         Q.    Did you see the person who did that?
11         A.    At that time?
12         Q.    Yes, sir.
13         A.    No, I didn't see, but I seen the hand.   I
14    didn't see that person.
15         Q.    Prior to being hit in the head with the
16    baseball bat, had you seen anyone in the apartment
17    other than Delores?
18         A.    Repeat that question again?
19         Q.    When you first walked in --
20         A.    Okay.
21         Q.    -- before you were hit in the head with
22    the baseball bat, did you see anybody inside that
23    apartment except for Delores?
24         A.    No, I don't.

1        Q.   After you were struck on the head, what

2   happened if you remember?

3        A.   I know that I lose conscious.  I fell

4   into the floor.  I don't know what's going on no

5   more.

6        Q.   Did you ever regain consciousness that

7   morning?

8        A.   Yes, after two hours.

9        Q.   What time was it when you finally

10  regained consciousness?

11       A.   Probably, you can say, after 12:00.  You

12  can say about 12:10 or something like that when I

13  look at the time on my hand.

14       Q.   Did you have any injuries to your head?

15       A.   Yes.

16       Q.   Would you tell the ladies and gentlemen

17  what injuries you had?

18       A.   It was a very wide open wound here,

19  and the blood was going down from my head to my

20  face.

21       Q.   When you woke up and saw that injury and

22  felt that injury, tell the ladies and gentlemen

23  what your condition was?

24       A.   I was -- when I find myself, I was

1    completely naked with my -- I have only underwear
2    on at the time.  I was naked.
3         Q.   You were in your underwear?
4         A.   Yes.
5         Q.   Can you tell us anything else, sir?
6         A.   I find my legs being tied.  They had tied
7    my legs with electrical cord -- cable.
8         Q.   What happened then?
9         A.   Then -- that's the wrong guy -- the same
10   guy -- when I woke up, I see the guy with the
11   baseball bat in his hand.
12             MR. FRANKS:  Judge, I'm sorry.  I'm
13   having trouble hearing what he's saying.  I'd ask
14   just that last part to be repeated.
15             THE COURT:  Repeat the answer for
16   Mr. Franks, Miss Reporter.
17                       (WHEREUPON, the record was
18                        read as requested.)
19             THE COURT:  Continue.
20             MR. RODDY:  Thank you, Judge.
21   BY MR. RODDY:
22        Q.   Could you describe that person, what he
23   looked like, with the baseball bat?
24        A.   He's about five eight.  He's about almost

1    six feet tall, and a black -- a black -- you know,

2    black complexion, a little dark complexion, and

3    he's very huge and tall.

4         Q.    Very tall?

5         A.    Yeah.

6         Q.    Did he still have the baseball bat?

7         A.    Yes.  He had the baseball bat in his left

8    hand; he has a gun in the right hand.

9         Q.    Could you tell what kind of gun that

10   was?

11        A.    It looked like an automatic, automatic

12   gun.

13        Q.    Had you ever seen that person before May

14   10th?

15        A.    Before that?

16        Q.    Yes.

17        A.    No, I never seen that person before.

18        Q.    Was he wearing anything on his face?

19        A.    Yes.  He put a scarf.  He put something

20   like a handkerchief, to tie it.

21        Q.    A handkerchief?

22        A.    Yeah, something like that.

23             MR. RODDY:  Indicating for the record

24   Mr. Jinadu has indicated a handkerchief below the

D-115

1     eyes.

2     BY THE WITNESS:

3          A.   Yeah, and cover the mouth.

4     BY MR. RODDY:

5          Q.   Was anybody else there other than this

6     tall man and Delores?

7          A.   Yes.

8          Q.   How many people?

9          A.   Three -- four guys.

10         Q.   And Delores was there?

11         A.   Yeah, Delores was there, too.

12         Q.   Do you see any of those four guys in

13    court today?  And if so, would you please point

14    them out and tell me what each one of them is

15    wearing?

16         A.   That guy right there, and the one over

17    there (indicating.)

18         Q.   Could you tell me what they're wearing,

19    sir?

20         A.   The gentleman with the suit with the tie

21    here (indicating.)

22              MR. RODDY:  Indicating for the record

23    he's pointed to Tony Hillard.

24              THE COURT:  The record may so reflect.

1    BY MR. RODDY:

2         Q.   Anybody else?

3         A.   The one on the second -- next to the man

4    with the suit (indicating.)

5              MR. RODDY:  Indicating he's pointing to

6    the defendant, Erven Walls.

7              THE COURT:  The record may so reflect.

8    BY MR. RODDY:

9         Q.   Had you ever seen Tony Hillard before

10   that day?

11        A.   No.

12        Q.   Had you ever seen Erven Walls before that

13   day?

14        A.   Yes, I did.

15        Q.   How many times?

16        A.   Two times.

17        Q.   Where at?

18        A.   One time at Delores' house, Delores'

19   apartments, and the second time, I was in my

20   office, and Delores -- I mean, he dropped Delores

21   off to my job.

22        Q.   Did you ever talk --

23             MR. FRANKS:  Excuse me, Judge.  May I

24   have that repeated?

D-117

1          THE COURT:  Please repeat it.

2                    (WHEREUPON, the record was

3                    read as requested.)

4          THE COURT:  Continue.

5     BY MR. RODDY:

6          Q.   On any of those two occasions, did you

7     ever talk to Mr. Walls?

8          A.   No.

9          Q.   You said you saw Defendant Hillard in

10    there.  Tell us what he looked like.

11         A.   He has his low cut skin, you know, and he

12    got -- he has a low cut haircut.  You know, it was

13    low.

14         Q.   His hair was shorter?

15         A.   It was shorter than this one and --

16         Q.   Did you notice anything about his hands?

17         A.   Yes.  He has a handgun.  He has a gun in

18    his hand.

19         Q.   Could you tell what kind of gun Hillard

20    has?

21         A.   Yeah.  He has a revolver.  It looked like

22    a revolver gun.

23         Q.   Did he have anything on his face?

24         A.   Yes, that time when I wake up.

D-118

1      Q.    What did he have on his face when you
2  first woke up?

3      A.    He has a -- the same handkerchief.  It
4  looked like a piece of handkerchief that people
5  used to put on his head, the same way the guy with
6  the baseball bat in his hand do.

7      Q.    And did you notice anything about Erven
8  Walls, if he had anything in his hands?

9      A.    No, he don't have anything on at all.

10     Q.    Did you notice anything about the way he
11  looked, his face?

12     A.    At that time, he was having braid, like.
13  You know, he has a braid on his head all the way
14  to the back.

15     Q.    Did you say earlier he did not have a
16  mask on?

17     A.    Him?

18     Q.    Mr. Walls?

19     A.    No, he don't have.  No, nothing on.  He
20  don't have no mask on, no.

21     Q.    Did he have anything in his hand?

22     A.    He has a gun.  He has a gun, too.

23     Q.    What kind of gun did you see in his hand?

24     A.    A revolver, a revolver handgun.

D-119

1        Q.    Is there another person you saw?

2        A.    Yes, another person I saw, but he's not

3    here.

4        Q.    Could you describe that person to the

5    ladies and gentlemen, that fourth man?

6        A.    The guy -- the other guy, they look

7    alike, because he had the same style, and the face

8    look the same like him (indicating.)

9        Q.    Indicating for the record, are you

10   pointing to Mr. Walls?

11       A.    Walls, yes.

12       Q.    Now, tell us what happened when you

13   awoke, and you saw the two defendants and Delores?

14       A.    When I woke up, the guy with the baseball

15   bat in his hand, he is the first person that I can

16   open my eye and see sitting down straight in front

17   of me.

18                  And he comes to me and says, close

19   your eyes, bitch, and he hit me on my face with

20   the strong iron.

21       Q.    This man with the bat, he had an iron in

22   his hand?

23       A.    Yes.

24       Q.    Can you describe to the ladies and

1    gentlemen what you mean by an iron?

2        A.   The iron that I'm talking about look like

3    chisel.

4        Q.   Chisel?

5        A.   Yes.

6        Q.   He struck you one time?

7        A.   He struck me one time in the head and

8    went back and sit down to where he was.

9        Q.   Were you ever struck with that chisel

10   again?

11       A.   Yes.

12       Q.   Who hit you with that?

13       A.   The guy, Walls, or whatever his name.

14   I'm sorry.  He come back with that chisel, and he

15   put his left leg on top of me and continuously hit

16   me on to the --

17       Q.   Where was Walls striking you with this

18   chisel?

19       A.   Right here where I have the fracture here

20   (indicating.)

21           MR. RODDY:  Indicating for the record

22   his right eye.

23   BY THE WITNESS:

24       A.   My right eye, until I cannot see anything

1    no more.

2    BY MR. RODDY:

3        Q.    Now, what happened after you were struck

4    by Erven Walls in the eye with this chisel?

5        A.    Huh?

6        Q.    What happened after that?

7        A.    After that, he pulled -- he pulled me

8    in my leg.  He pulled me all the way to the

9    bathroom.

10        Q.    Who pulled you?

11        A.    Walls.

12        Q.    Did anyone help him?

13        A.    Yeah, the other guy with the baseball bat

14    in his hand.

15        Q.    When Erven Walls pulled you into the

16    back, did he still have the gun on him?

17        A.    He don't have the gun in his hand at that

18    time.  He used two hands to pull me into the

19    bathroom.

20        Q.    Did the guy with the baseball bat have

21    the gun?

22        A.    Yes.

23        Q.    Tell us what happened when you pulled

24    back into the bathroom?

 1        A.    The guy right there, he come to the

 2    bathroom and put a gun in my mouth (indicating.)

 3             MR. RODDY:   Indicating for the record

 4    he's pointing to Tony Hillard.

 5    BY THE WITNESS:

 6        A.    Yeah.

 7    BY MR. RODDY:

 8        Q.    Let me step back for one second.  Can you

 9    describe to the ladies and gentlemen this

10    apartment?

11        A.    The apartment is a studio apartment, and

12    it has a separate bathroom.

13        Q.    So there's two rooms?

14        A.    Bathroom and the living room, studio,

15    where you can put a bed.  That's it.

16        Q.    You were brought into the bathroom?

17        A.    Yes.

18        Q.    You said Hillard put a gun in your

19    mouth.  What happened then?

20        A.    When he put a gun in my mouth, he said,

21    look, this is no joke.  If you don't tell us where

22    your car, where your money at, we going to knock

23    you out.

24        Q.    What happened then, sir?

1        A.    Then after that, he went back outside to

2    the living room, left me in the bathroom.

3        Q.    When you say "he," are you referring to

4    Tony Hillard?

5        A.    Yeah, him (indicating.)

6        Q.    Tell us what you were like in the

7    bathroom?

8        A.    I was laid close to the toilet, and after

9    he went back outside, Walls come back in with the

10   handcuffs.

11       Q.    Walls had handcuffs?

12       A.    Yeah, he got the handcuffs in his hand.

13       Q.    Had you ever seen the handcuffs before

14   that?

15       A.    No, I never seen it before.

16       Q.    What did he do?

17       A.    He handcuffed my hands all the way to the

18   back.

19       Q.    Did anything else happen with regards to

20   your hands and legs?

21       A.    Pardon me?

22       Q.    Did anything else happen with your hands

23   and legs in the back?

24       A.    Yeah.  He put the tape.  He put the tape

1    on my hand like this (indicating.)

2        Q.   Who taped up your hands?

3        A.   Him, Walls.

4            MR. RODDY:   Indicating for the record

5    he's pointing to the defendant, Walls.

6    BY THE WITNESS:

7        A.   Yes.

8    BY MR. RODDY:

9        Q.   Did anyone help him?

10       A.   Yes.

11       Q.   Who helped him?

12       A.   The gentleman here, Tony Hillard

13   (indicating.)

14       Q.   Was tape placed anywhere else on your

15   hands?

16       A.   Yeah.   They wrapped me with tape all the

17   way from my legs, where they had already been tied

18   already, to make sure, they wrapped it all the way

19   to the top of my lap.

20       Q.   Who tied you there from below your waist?

21       A.   Him (indicating.)

22           MR. RODDY:   Indicating for the record

23   Hillard.

24


D-125

1    BY THE WITNESS:

2         A.   Yes.

3    BY MR. RODDY:

4         Q.   Tell us what happened next, sir?

5         A.   Then after that, both of them went back

6    out, went back to the living room so -- you know,

7    the studio.  And again, he come back, the

8    light-skinned guy, Tony.

9              MR. RODDY:  Indicating for the record,

10   Mr. Hillard.

11   BY THE WITNESS:

12        A.   Tony come back to the bathroom and tell

13   me, hey.  He hold -- he has this pillow case in

14   his hand, and he put it to my face, and he says,

15   it's time for you to die.  You think it's a

16   joke.

17              And the other guy with a baseball

18   bat in his hand come quickly.  He just pull him.

19   He said, look, don't kill him yet.  Wait until

20   they come back.

21   BY MR. RODDY:

22        Q.   When Tony Hillard came in and had that

23   pillow, did he have anything else in his hand?

24        A.   A gun.  He has a pillow and a gun in his

1     hand.

2         Q.   Where did he put the gun when he said

3     it's time to die?

4         A.   He put the pillow like this and put the

5     gun like this, and the guy grabbed him and said,

6     don't kill him.  Not yet.  Wait until they come

7     back.

8         Q.   While you were in the bathroom, do you

9     ever see or hear Delores?

10        A.   Yeah, I heard her.  I heard her in the

11    living room.  She say, well, where is the -- where

12    is -- I guess -- she don't ask me.  She said, did

13    anybody see the key.

14        Q.   What was that a key to?

15        A.   It's a key to my office, to my house.

16        Q.   Did anybody else come into that bathroom

17    while you were in there?

18        A.   Yeah.  There's a guy -- the guy who look

19    like him, like that guy right there.  He came back

20    to the bathroom.  He standing there, just points

21    the gun to me like this.  He just points the gun.

22    He don't say nothing.

23        Q.   How long were you in that bathroom, sir,

24    if you remember?

D-127

1      A.    Approximately about five hours.

2      Q.    During that whole five-hour period,

3  people kept coming back and forth?

4      A.    No.   They keep coming back until, like,

5  3:00 o'clock.   Then nobody come no more.   They

6  lock the door and turn the light off.

7      Q.    At any time did Defendant Erven Walls

8  come into the bathroom with a gun?

9            MR. FRANKS:   Objection, leading.

10           THE COURT:   Overruled.

11           THE WITNESS:   Repeat the question?

12  BY MR. RODDY:

13     Q.    At any time did Erven Walls come into

14  that bathroom with a gun?

15     A.    Yeah.   He came back with a gun to the

16  bathroom, yeah.

17     Q.    What did he do with that gun?

18     A.    He put the gun -- he put it on my head.

19     Q.    Did he say anything?

20     A.    Yeah.   He say, if you don't tell us

21  where all your money at, then we going to knock

22  you out.

23     Q.    You said you were in the bathroom for

24  several hours; correct, sir?

1      A.   In the bathtub.

2      Q.   In the bathtub?

3      A.   Yeah.

4      Q.   Did anything else happen while were you

5  in the bathtub?

6      A.   Yes.  Right before they shut the light

7  off, there was a piece of -- a couple of towels.

8  You know, towel.  They dumped that towel on top of

9  me and opened the shower, opened the water to make

10 the water fall on me where I was laying in the

11 bathroom.

12         MS. BORMANN:  Judge, I'll object.  I

13 don't know who "he" is.

14         THE COURT:  Sustained.

15 BY MR. RODDY:

16     Q.   You said he put towels on you and turned

17 the water on?

18     A.   Yes.

19     Q.   Could you please point to that person if

20 he's here who you're referring to as "he"?

21     A.   He?

22     Q.   Which person?

23     A.   Tony, Tony Hillard.

24         MR. RODDY:  Indicating for the record,

1      Tony Hillard.

2      BY THE WITNESS:

3          A.   Yes.

4      BY MR. RODDY:

5          Q.   Was anyone else in there at all while

6      the water was coming on to you and towels were on

7      you?

8          A.   Just Tony and Walls.

9          Q.   The light was then turned out?

10         A.   Then after they shut the light off,

11     there's nobody there no more.

12         Q.   Sir, were you ever able to leave that

13     bathroom?

14         A.   Yeah, later on.  Around 7:00 o'clock.

15         Q.   How was it that you were able to get out

16     of that bathtub and out of the bathroom?

17         A.   Actually, I was thirsty.  I wanted to

18     drink some water.  Because then I intentionally

19     tried to -- I was knocking the -- I was knocking

20     something to make them hear me and say I wanted

21     them to give me some water to drink, if anybody

22     can do that.

23                    And I didn't hear no -- at this

24     point, nothing.  Then I managed to throw myself on

1        the floor from the bathtub, and I rolled straight

2        to the bathroom door.  And I backed the door like

3        this (indicating.)  Because during that time when

4        I was in the bathtub, the water that fall on me

5        already make all this tape loose, the black tape.

6        I can move this hand a little bit.

7               Q.   Were you able to free yourself then?

8               A.   Yeah, all the way from the back.

9               Q.   What happened then?

10              A.   Then I opened the bathroom door to talk

11       to somebody in the living room, and I only see TV,

12       television.  It was loud.  Nobody there.

13              Q.   What happened next?

14              A.   And I went back to the -- I went to the

15       front door, the entry door, to see if somebody is

16       in front of the door.  Maybe they're just hiding

17       there.  And nobody.

18                   I went back to the bathroom.  I

19       sat down on the toilet, and when I sat down on the

20       toilet, I was thinking about what to do.  And I

21       can -- when I stood up, I can barely move my hands

22       all the way from my back.  I turn to the front,

23       and I use my --

24                   MR. FRANKS:  Judge, I'm sorry.  Can

1    someone explain what the witness just did?  Judge,

2    I'll do it on cross.

3              MR. RODDY:  May I proceed, Judge?

4              THE COURT:  Yes.

5    BY MR. RODDY:

6         Q.   Were you able to then -- did you ever

7    leave that bathroom?

8         A.   Yes.

9         Q.   Tell us what happened, how you left that

10   bathroom?

11        A.   I use my teeth, my mouth, to cause the

12   tape in my hand to make -- to have -- you know, I.

13   can have free movement of my fingers.  When I do

14   that, I use my hand to loose the rope, the rope

15   they used to tie my leg already.  I loose the

16   rope, and I can move my leg, and I can walk

17   free.

18        Q.   Were you able to get the handcuffs off?

19        A.   No.

20        Q.   When did you leave that apartment, sir?

21        A.   7:15 or 7:00 o'clock.

22        Q.   Tell the ladies and gentlemen what you

23   did when you left that apartment?

24        A.   When I left that apartment, I run out.  I

1    went to the street, to the Winthrop Street in

2    public.  And when I got to the front of the

3    building, I saw the guy with the baseball bat

4    and this gentleman (indicating) in front of the

5    house.

6              MR. RODDY:  Indicating for the record,

7    he's pointing to Tony.

8    BY THE WITNESS:

9         A.   Tony Hillard.  I'm sorry.

10   BY MR. RODDY:

11        Q.   What do Tony Hillard and the man with the

12   baseball bat do when you come outside?

13        A.   They run.  They take off.

14        Q.   What did you do?

15        A.   I went to the next -- to the next

16   neighbor.  I tell that person to help me, call the

17   police.

18        Q.   How were you dressed when you went out to

19   the street?

20        A.   I was naked.  I was completely naked.

21        Q.   Were you still handcuffed?

22        A.   I was still handcuffed in front.

23        Q.   Were you bleeding from the head?

24        A.   Yeah, I was bleeding seriously.

D-133

1        Q.    Did the police arrive then at that time?

2        A.    Yeah, the police came.

3        Q.    Did you explain to them what had

4    happened?

5        A.    Yeah.   They asked me -- yeah.

6        Q.    What did you do when the place came?

7        A.    They asked me to take them to where the

8    incident happened.

9        Q.    Did you do that?

10       A.    Yes, I do.

11       Q.    Were the police officers able to get the

12   handcuffs off you?

13       A.    They tried to.   They can't get it off.

14       Q.    Were you then taken anywhere after you

15   showed the police where this happened?

16       A.    Yeah.   I was taken to the Illinois

17   Masonic Hospital.

18       Q.    For what purpose?

19       A.    Because of the -- to have stitches in the

20   skin on my head and my fracture, to treat me.

21       Q.    Earlier, you said that Tony Hillard had a

22   mask on or a bandana.   Did he have that

23   handkerchief or bandana on the entire time?

24       A.    No.   See, when it got to -- get to

D-134

1    3:00 o'clock, 3:00 p.m., around that time, there's

2    nobody -- nobody have nothing on no more.  They

3    don't have -- what I mean, they don't have no

4    masks on, all of them.  You can see them like I'm

5    seeing everybody right here now.

6        Q.   Did you also see Delores during that

7    time, too?

8        A.   Yeah.

9        Q.   How long were you at Illinois Masonic,

10   sir?

11       A.   For about seven days.

12       Q.   Were you transferred anywhere after that?

13       A.   Yeah, to Cook County.

14       Q.   Did you have surgery there?

15       A.   Yeah, I have surgery.

16       Q.   What kind of surgery did you have?

17       A.   I have eye surgery.  They treat my eye

18   and my bone, my jaw.

19       Q.   Did you have any injuries to your legs at

20   all?

21       A.   Yeah, my left leg.

22       Q.   How did that result?

23       A.   Say --

24       Q.   Strike that.  How did you get that injury

1     to your leg?

2          A.    There was somebody -- the other guy with

3     the baseball bat hit me in my leg when I was in

4     the bathroom laying down like this (indicating.)

5          Q.    Eventually, you were released from

6     Cook County Hospital?

7          A.    Yeah, after nine days.

8          Q.    Now, did you speak with some detectives

9     about what had happened to you while you were at

10    Illinois Masonic Hospital?

11    .    A.    Yes.

12         Q.    Did you eventually go down to Belmont and

13    Western on June 3, 1997, and look at a lineup?

14         A.    Yes.

15         Q.    How many people were in that lineup?

16         A.    About five, five or six people.

17    .    Q.    Did you recognize any of those people on

18    June 3rd that you saw?

19         A.    Yes.

20         Q.    And can you see that person in court that

21    you saw?

22         A.    Yes.

23         Q.    The first one, who is that?

24         A.    Tony Hillard.

1        Q.    Indicating for the record Tony Hillard?

2        A.    Yes.

3        Q.    And why was it that you recognized him?

4        A.    I can recognize him because of his face

5    and for -- you know, he is the -- I can tell

6    he's the one that put the gun in my mouth at that

7    time.

8        Q.    Later on, did you go back to Belmont and

9    Western in September of 1997 and look at a second

10    lineup?

11        A.    Yes, I do.

12        Q.    Were there also five people in that

13    lineup?

14        A.    Yes.

15        Q.    Did you see anyone you recognized out of

16    those five?

17        A.    Yes, I do.

18        Q.    Who did you recognize?

19        A.    Walls, the guy right here (indicating.)

20        Q.    Indicating for the record, Erven Walls?

21        A.    Yes.

22        Q.    And what did you recognize him as?

23        A.    I said someone who handcuffed me and put

24    a gun to my head.

1          Q.    Did you recognize him as doing anything

2    else to you?

3          A.    Yeah.  I recognize him putting tape on me

4    and hit me with a chisel in my face.

5          Q.    Did you ever get back your pager or

6    cellular phone, sir?

7          A.    No, I didn't get it back.

8                MR. RODDY:  May I approach, Judge?

9                THE COURT:  Yes.

10                         (WHEREUPON, People's Exhibit

11                          Number 1 was marked for

12                          identification.)

13   BY MR. RODDY:

14         Q.    Sir, I'm going to show you a series of

15   photos, People's Exhibit Number 1, and ask you

16   if you recognize what's shown in that picture,

17   sir?

18         A.    Yes, I do.

19         Q.    What is that a picture of?

20         A.    This is a picture of the bathroom that I

21   was in and put down into the bathtub.

22         Q.    Does that picture fairly and accurately

23   depict the way that bathroom looked when you were

24   in there on May 10, 1997?

D-138

1          A.    Yes.

2          Q.    Do you notice anything about the wall

3     there, sir?

4          A.    Yeah.   I notice this is my blood on the

5     wall.

6                              (WHEREUPON, People's Exhibit

7                              Number 2 was marked for

8                              identification.)

9     BY MR. RODDY:

10         Q.    I show you what I'll mark as People's

11    Exhibit Number 2 for identification.   Do you

12    recognize what that's a picture of?

13         A.    Yes.   Number 2?

14         Q.    What is that a picture of?

15         A.    The picture -- this is a picture of the

16    police department where they ask me to come and

17    view the lineup.

18         Q.    Does that picture fairly and accurately

19    depict the lineup you saw on June 3, 1997?

20         A.    Yeah.

21         Q.    And did you identify anyone in that

22    picture?

23         A.    Yes, I do.   I do identify somebody.

24         Q.    I'm going to give you my pen, sir, and

1       ask you to place an X above the head of the person

2       that you identified on June 3, 1997?

3            A.   (Indicating.)

4                 MR. RODDY:  May the record reflect he's

5       placed an X over the head of the man second from

6       the left?

7                 THE COURT:  Yes.

8       BY MR. RODDY:

9            Q.   And who is that person that you

10      identified?

11           A.   That's the person who put a gun in my

12      mouth.

13           Q.   Do you see him here in court today?

14           A.   Yes, I do.

15           Q.   Please point him out for the record.

16           A.   Right over there (indicating.)

17           Q.   Indicating for the record, the defendant,

18      Tony Hillard?

19           A.   Tony Hillard.

20                          (WHEREUPON, People's Exhibit

21                          Number 3 was marked for

22                          identification.)

23      BY MR. RODDY:

24           Q.   I'll show you what's been marked as

D-140

1    People's Exhibit Number 3 for identification.  Do

2    you recognize that photo?

3         A.   Yes, I do.

4         Q.   What is that a picture of?

5         A.   This is a picture of Mr. Tony Hillard.

6         Q.   Does that picture truly show the way he

7    looked when you picked him out of the lineup?

8         A.   Exactly.  That's the way he looked when

9    he come over there, too.

10                        (WHEREUPON, People's Exhibit

11                        Number 4 was marked for

12                        identification.)

13   BY MR. RODDY:

14        Q.   I have shown you what I'll mark People's

15   4 for identification.  Do you recognize that

16   photo?

17        A.   Yes, I do recognize it.

18        Q.   What do you recognize that photo as?

19        A.   I recognize this photo as the police

20   department on Belmont.

21        Q.   Does that picture, People's Number 4,

22   truly and accurately depict the way the lineup

23   appeared when you looked at it on December 17th of

24   1997?

D-141

1        A.    Yes.

2        Q.    I'd ask you to take that pen and place an

3     X over the head of the person you identified.

4        A.    Right here (indicating.)

5              MR. RODDY:  May the record reflect he's

6     placed an X above the head of the man who is

7     second to the left?

8              THE COURT:  The record may so reflect.

9     BY MR. RODDY:

10       Q.    Who is that person you placed an X

11    over?

12       A.    That's the gentleman over there, Walls.

13             MR. RODDY:  Indicating for the record,

14    the defendant, Erven Walls.

15    BY MR. RODDY:

16       Q.    And what did you recognize him as being

17    the person that did to you on May 10, 1997?

18       A.    I recognize him as the person who

19    handcuffed me and put a gun on my head and who hit

20    me on my face.

21                           (WHEREUPON, People's Exhibit

22                           Number 5 was marked for

23                           identification.)

24

D-142

1    BY MR. RODDY:

2        Q.    Showing you People's Exhibit Number 5.

3    Do you recognize that?

4        A.    Yes.  Yes.

5        Q.    What's that a picture of, sir?

6        A.    That's a picture of the man who hit me in

7    my face.

8        Q.    Is that a picture of Erven Walls?

9        A.    This is exactly how he looked at that

10   time.

11       Q.    That picture truly shows how he looked

12   that night?

13       A.    Yes.

14            MR. RODDY:  Thank you, sir.

15                        (WHEREUPON, People's Exhibit

16                        Number 6 was marked for

17                        identification.)

18   BY MR. RODDY:

19       Q.    Sir, I'm going to show you what's been

20   marked as People's Exhibit Number 6.  Do you

21   recognize what's contained inside that evidence

22   bag?

23       A.    Yes, I do.

24       Q.    Would you please open that evidence bag

File Date: _____7-1-2008_____

Case No: _____08cv1775_____

ATTACHMENT # _____

EXHIBIT _____T-part5_____

TAB (DESCRIPTION)

_____

```
1      up and tell the ladies and gentlemen what is
2      inside there?
3           A.   The handcuff.  This is the handcuff they
4      used -- he used to handcuff my hand.
5           Q.   And are those the handcuffs that were put
6      on you by the defendant, Erven Walls, on May 10,
7      1997?
8           A.   Yes.
9           Q.   Now, they're not in the same condition
10     today as they were then; is that correct?
11          A.   Say again?
12          Q.   Are they in the same condition now as
13     they were when they were on your hands?
14          A.   No.
15          Q.   Is there anything different about them
16     today?
17          A.   Yeah, something different.
18          Q.   Speaking about the handcuffs.
19          A.   Oh, the handcuffs, yeah.  It's been cut
20     into pieces.
21          Q.   Where was this done?
22          A.   At the hospital, Illinois Masonic.
23          Q.   They were cut off your hands?
24          A.   Yeah, they had somebody come to cut it
```

```
1    off.

2              MR. RODDY:  Thank you.

3                   May I approach, Judge?

4              THE COURT:  Yes.

5                        (WHEREUPON, People's Exhibit

6                         Number 7 was marked for

7                         identification.)

8    BY MR. RODDY:

9         Q.   Mr. Jinadu, sir, I'm going to show you

10   what we have marked as People's Group Exhibit

11   Number 7, and I'm also going to provide to you

12   these gloves, if you could place them on so that I

13   can show it to you.

14                   Do you recognize what's inside

15   that group exhibit, sir?

16        A.   Yeah, I recognize it.

17        Q.   I'd ask you if you can just take it out

18   and show it to the ladies and gentlemen of the

19   jury what it is that's in there?

20        A.   Yeah.  This is the rope they used to

21   tie -- used to tie my legs, and this is the tape

22   they used to tape my neck and my mouth and my

23   hand, too.

24        Q.   And are these in the same condition today
```

1    as they were when they were taken off you on May

2    10, 1997?

3         A.    Yeah.

4         Q.    And who was it that put this tape and

5    this cord around your legs and your hands?

6         A.    It was Walls and Tony Hillard.

7              MR. RODDY:  Indicating for the record

8    the defendant, Erven Walls, and the defendant,

9    Tony Hillard.

10             Judge, when I handle these guns,

11   they are not loaded at all so the jurors are aware

12   of it.

13             THE COURT:  Well, open the cylinder.

14             MR. RODDY:  Judge, we attempted to.

15   It's jammed.  It was opened yesterday by the

16   police, and they checked it.

17             THE COURT:  It has been checked.  Okay.

18             MR. RODDY:  It's been in our custody the

19   whole time.

20             THE COURT:  Proceed.

21                       (WHEREUPON, People's Exhibit

22                        Number 8 was marked for

23                        identification.)

24

1    BY MR. RODDY:

2         Q.    Sir, I'll show you what's been marked as

3    People's Exhibit Number 8 for identification.    Do

4    you recognize this, sir?

5         A.    Yes, I do.

6         Q.    What do you recognize this as?

7         A.    As a revolver that Walls -- that's the

8    gun he -- that's the gun he used to point to my

9    head.

10        Q.    And you recognize this how, sir?

11        A.    As a revolver, as a handgun.

12        Q.    Was this one of the guns used against you

13   that night?

14        A.    Yes.    That's the gun that guy right there

15   hold (indicating.)

16        Q.    Indicating -- for the record, who are you

17   pointing to?

18        A.    Walls.

19        Q.    Indicating Mr. Walls?

20        A.    Yes.

21        Q.    It's in the same condition today as it

22   was when you saw it then except for the exhibit

23   sticker?

24        A.    Yes.    It was the same condition.

D-147

1                    MR. RODDY:  May I approach, Judge?

2                    THE COURT:  Yes.

3                              (WHEREUPON, People's Exhibit

4                              Number 9 was marked for

5                              identification.)

6      BY MR. RODDY:

7          Q.   Sir, I'll ask if you recognize what's

8      been marked as People's Exhibit Number 9 for

9      identification.  Do you recognize that?

10         A.   Yes, I do.

11         Q.   What is that?

12         A.   That's the gun that Mr. Tony Hillard

13     used -- that's the gun he put in my mouth.

14         Q.   How do you recognize this gun, sir?

15         A.   I recognize it as the same gun they used

16     to put in my mouth on May 10th.

17         Q.   Is it in the same condition today as it

18     was --

19         A.   It's the same condition, yes.

20         Q.   -- as it was on May 10, 1977?

21         A.   Yes.  That's how it was, yeah.

22                    MR. RODDY:  If I can have one second,

23     Judge?

24                    THE COURT:  Mm-hmm.

D-148

1                    (Brief pause.)

2        BY MR. RODDY:

3            Q.    You said, sir, if I can backtrack, you

4        drove over from your business to 5851 North

5        Winthrop?

6            A.    Yes.

7            Q.    What kind of car did you drive over

8        there?

9            A.    My girlfriend's car.

10           Q.    What kind of car was that?

11           A.    Toyota Tercel.

12           Q.    Did you have another car?

13           A.    Yeah, I have a Lexus.

14           Q.    Where was that car parked?

15           A.    It was parked in my garage, in my house.

16       I didn't use it that day.

17                 MR. RODDY:  I have nothing further of

18       Mr. Jinadu.

19                 THE COURT:  Ladies and gentlemen, each

20       attorney will have an opportunity to conduct

21       cross-examination, and this might be an

22       appropriate time for us to recess for lunch.

23                         Lunch will be provided by the

24       sheriffs.  There are separate dining areas over on

1          the second floor of the Administration Building,

2          and you'll be taken there by the respective

3          sheriffs who are tending to the juries.

4                         Please do not discuss the case

5          over the lunch recess.  We'll resume here at about

6          2:20 to continue with the trial.

7                         Let's have the jury that came from

8          Judge Himel's courtroom -- I believe that's the

9          Walls jury.  If you'll step back in the jury room,

10         and this jury, Mr. Hillard's, will be taken either

11         back to the other courtroom or right to lunch.

12                         (Brief pause.)

13                    THE COURT:  Please take this jury to

14         lunch.

15                         (WHEREUPON, the following was

16                         had in open court outside the

17                         presence of the juries:)

18                    THE COURT:  All right.  Mr. Jinadu,

19         don't discuss your testimony with anybody over the

20         lunch recess.  You may step down, sir.

21                         Anything further before we break

22         for lunch?

23                    MS. BORMANN:  No, your Honor.

24                    THE COURT:  We'll resume at 2:30 then.

1          MR. RODDY:  Judge, we have preliminary

2     jury instructions prepared.  Should we collate

3     them and distribute them today?

4          THE COURT:  If you can, sure.

5                    (WHEREUPON, the above matter

6                    was continued to

7                    2:30 o'clock p.m. this same

8                    day.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1     STATE OF ILLINOIS   )

 2                         ) SS:

 3     COUNTY OF C O O K   )

 4               I, JO ANN KROLICKI, an Official Shorthand

 5     Reporter for the Circuit Court of Cook County,

 6     County Department, Criminal Division, do hereby

 7     certify that I reported in shorthand the

 8     proceedings had in the above-entitled cause, and

 9     that the foregoing is a true and correct

10     transcript of my shorthand notes so taken before

11     Judge Michael P. Toomin on July 14, 1998.

12

13     _____

14     JO ANN KROLICKI, CSR, RPR
       OFFICIAL COURT REPORTER
15     ILLINOIS LICENSE NO. 084-002215

16

17

18

19

20

21

22

23

24
```

(Rev. 2/18/93) CCCR-56

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME  3  . OF  7  VOLUME RECORD CONSISTING OF THE REPORT OF PROCEEDINGS.  NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 99-0152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois. . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and . . . . . . . . . . . . . . . . . . . . . . TONY HILLARD . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . APRIL 23, . . . . . . . . . . . . . 19 .99 .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . VB
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

FILED

APR 2 2 1999

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

1   STATE OF ILLINOIS  )
                       )  SS:
2   COUNTY OF C O O K  )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - CRIMINAL DIVISION
4
    THE PEOPLE OF THE            )
5   STATE OF ILLINOIS            )
                                 )
6          vs.                   )  No. 97 CR 30453
                                 )
7   ERVEN WALLS, TONY HILLARD,   )
    and DELORES JINADU           )
8
                    REPORT OF PROCEEDINGS at the
9   trial of the above-entitled cause, had before the
    HONORABLE MICHAEL P. TOOMIN (and two juries) on
10  the 14th day of July 1998 at 2:30 o'clock p.m.

11
    A P P E A R A N C E S:
12
              (Same as heretofore noted.)
13

14

15

16

17

18

19

20

21

22

23  JO ANN KROLICKI, CSR
    Official Court Reporter
24  Illinois License No. 084-002215


                        D-153

```
1                      AFTERNOON SESSION

2                            (WHEREUPON, the following was

3                             had in open court, in the

4                             presence of the Erven Walls

5                             jury and the Tony Hillard

6                             jury:)

7              THE COURT:  Please be seated, ladies and

8       gentlemen.

9                       Proceed.

10              MR. FRANKS:  Thank you, your Honor.

11              CROSS EXAMINATION

12              BY MR. FRANKS:

13        Q.    Sir, can you pronounce your last name for

14      me?

15        A.    Yes.  My last name is Jinadu.

16        Q.    Jinadu, all right.  I'll try to remember

17      that.

18                      You indicated earlier that during

19      this incident, you were handcuffed; is that

20      correct?

21        A.    Yes.

22        Q.    And People's Exhibit Number 6 that you

23      were shown before are the handcuffs that were

24      placed on you; is that right?
```

1       A.   Yes.

2            Q.   And these handcuffs were strong enough

3       that they had to be cut from your hands when you

4       got to the hospital; is that correct?

5            A.   Yes.

6            Q.   Now, you testified today that someone put

7       these handcuffs on you; is that right?

8            A.   Yes.

9            Q.   Who put those handcuffs on you?

10           A.   Walls, that guy right there (indicating.)

11           Q.   And when did he do that?

12           A.   After -- after I regained conscious,

13      after I woke up.

14           Q.   After you woke up?

15           A.   Yes.

16           Q.   So you were not handcuffed when you woke

17      up?

18           A.   No.

19           Q.   You were handcuffed after you became

20      awake?

21           A.   Yes.

22           Q.   What room of the studio apartment were

23      you in when you were handcuffed?

24           A.   In the bathroom.

1            MS. BORMANN:  I'm sorry.  I didn't hear

2     that response.

3            THE COURT:  Miss Reporter, repeat that,

4     please.

5                        (WHEREUPON, the record was

6                         read as requested.)

7     BY MR. FRANKS:

8        Q.  Did you wake up in the bathroom, or did

9     you wake up in the living room?

10       A.  I wake up in the living room.

11       Q.  So someone took you into the bathroom; is

12    that correct?

13       A.  Yes.

14       Q.  And at the time that you were taken into

15    the bathroom, you were already bound up; is that

16    right?

17       A.  I'm sorry.  I don't understand what bound

18    up means.

19       Q.  Well, I'll rephrase it.  You were tied

20    up; is that correct?

21       A.  My legs.

22       Q.  Just your legs?

23       A.  Yes.

24       Q.  Nothing on your hands?

1        A.    No.

2        Q.    Well, when you were handcuffed, was that

3    the first thing that was done to your hands?

4        A.    Yes.

5        Q.    And you were handcuffed behind your back;

6    is that correct?

7        A.    Yes.

8        Q.    Like this (indicating)?

9        A.    Yeah.

10           MR. FRANKS:   Indicating for the record,

11   your Honor, I have my hands behind my back.

12   BY MR. FRANKS:

13       Q.    So the two -- the cuffs were on each hand

14   behind your back; is that correct?

15       A.    Yes.

16       Q.    And you did not ever break out of those

17   handcuffs, did you?

18       A.    No, I don't.

19       Q.    Well, at some point, sir, you indicated

20   that after everybody just left, you let yourself

21   out of the bathroom; is that correct?

22       A.    If I left -- repeat that question.

23       Q.    Towards the end of the incident --

24       A.    Mm-hmm.

D-158

1        Q.    -- suddenly no one was left in the

2     apartment but you; is that correct?

3        A.    Yes.   Yes.

4        Q.    Everybody left?

5        A.    Yeah.

6        Q.    And you got out of the bathtub?

7        A.    Mm-hmm.

8        Q.    Is that correct?

9        A.    Yes.

10       Q.    And your hands were still handcuffed

11    behind your back?

12       A.    Yeah.

13       Q.    And you said, if I'm not mistaken, sir,

14    that somehow you brought the handcuffs in front of

15    you?

16       A.    Yeah.

17       Q.    Is that correct?

18       A.    Yeah.

19       Q.    How did you do that?

20       A.    It's possible.

21       Q.    It's possible?

22       A.    Yeah.

23       Q.    Now, in what year did you get married to

24    Delores?

D-159

1        A.    February '95.

2        Q.    And you were not an American citizen at

3   that time, were you?

4        A.    No, I'm not.

5        Q.    And you're trying to become an American

6   citizen, are you not?

7        A.    Yes.

8        Q.    And there is currently an investigation

9   with the INS regarding your citizenship; is that

10  correct?

11            MR. RODDY:   Objection.

12            THE COURT:   Sustained.

13  BY MR. FRANKS:

14       Q.    Well, did you pay Delores to marry you?

15            MR. RODDY:   Objection.

16            THE COURT:   Sustained.

17  BY THE WITNESS:

18       A.    No.

19            THE COURT:   Do not answer before I rule.

20            THE WITNESS:   Okay.

21            THE COURT:   I'll strike the answer and

22  instruct the jury to disregard it.  The objection

23  was sustained on the grounds of relevance.

24

```
 1    BY MR. FRANKS:

 2        Q.   Did you give her any money at the time

 3    you got married?

 4             MR. RODDY:  Objection.

 5             THE COURT:  Sustained.

 6    BY MR. FRANKS:

 7        Q.   You indicated, sir, that you pay Delores

 8    every month; is that right?

 9             MR. RODDY:  Objection.  That's not what

10    he stated.

11             THE COURT:  Overruled.

12    BY MR. FRANKS:

13        Q.   Is that right?

14        A.   No, that's not what I mean.

15        Q.   Well, you said at the end of every

16    month --

17        A.   Yeah.

18        Q.   -- you pay certain of her expenses, do

19    you not?

20        A.   I said I pay the rent.

21        Q.   You pay her rent?

22        A.   Yeah.

23        Q.   And that is the rent that she has at

24    Winthrop; is that correct?
```

```
 1      A.    Yeah.

 2      Q.    Is that right?

 3      A.    Yes.

 4      Q.    And you have your own place that you

 5   rent, do you not?

 6      A.    Yes, I do.

 7      Q.    And where is that, sir?

 8      A.    1642 East 56th Street.

 9      Q.    And you have what you said is a trucking

10   business; is that correct?

11      A.    Exactly, yes.

12      Q.    And what is the name of that company?

13      A.    Yinka Freight and Haulers, Incorporated.

14      Q.    Yinka Freight?

15      A.    And Haulers, Incorporation.

16      Q.    How many trucks do you have, sir?

17      A.    Three.

18      Q.    Do they even have rigs, or are they just

19   the cabs?

20      A.    Can you repeat that?

21      Q.    Do you own the rigs, or do you just have

22   the cabs for --

23      A.    When you say "rigs," are you talking

24   about the trailer?
```

```
1        Q.    Yes.

2        A.    Yes, I have it.

3        Q.    And how many employees do you have?

4              MR. RODDY:  Objection, Judge.

5              THE COURT:  Overruled.

6   BY THE WITNESS:

7        A.    I've got two.

8   BY MR. FRANKS:

9        Q.    Two employees?

10       A.    For driving.

11       Q.    For the three trucks?

12       A.    Yeah.

13       Q.    Okay.  And you never had a secretary

14  before Delores?

15       A.    No.

16       Q.    And Delores only came to work for you

17  supposedly in April before this incident happened;

18  is that right?

19       A.    Yes.

20       Q.    So how many times had she even been

21  inside of your company working as a secretary?

22       A.    Approximately 18 days.

23       Q.    18 days?

24       A.    Yes.
```

1       Q.   And was she on your payroll?

2       A.   No.

3           MR. RODDY:  Objection.

4           THE COURT:  Can you not state anything

5  until I rule?

6           THE WITNESS:  I'm sorry.

7           THE COURT:  The objection is overruled.

8  BY MR. FRANKS:

9       Q.   Were you paying social security for her?

10      A.   Yes.

11          MR. RODDY:  Objection to the relevance,

12  Judge.

13          THE COURT:  You'd better object before

14  he answers.  Overruled.

15  BY MR. FRANKS:

16      Q.   You paid her in cash?

17      A.   Yes.

18      Q.   And she was expected to be in your office

19  before you got there; is that correct?

20      A.   I don't understand what you mean.

21      Q.   Well, was she supposed to open up the

22  office as the secretary?

23      A.   The day of the incident, or period?  I

24  don't understand what you mean.

1        Q.    I cannot hear you, sir.  I'll withdraw

2    the question.

3                    Was Delores supposed to come to

4    your office and open it up before you got

5    there?

6        A.    Oh, yes.

7        Q.    Yes?  So she had the keys?

8        A.    She do.

9        Q.    She do.  All right.

10                   And did you have money in your

11   office regularly?

12       A.    No.

13       Q.    Well, on the day this occurred, which was

14   May 10th of 1997, did you have money in your

15   office?

16       A.    Yes, I have.

17       Q.    And how much money in cash did you have

18   in your office?

19       A.    800.  800 dollars.

20       Q.    800 dollars?

21       A.    Yes.

22       Q.    And where was that money?

23       A.    In my wallet.

24       Q.    Did you have any other cash in any kind

1     of a strongbox or safe or anywhere else in your

2     office?

3          A.   No.

4          Q.   And this office of yours is just a single

5     room with a computer and a phone in it; isn't that

6     right?

7          A.   It's no single room.

8          Q.   How big is it?

9          A.   It's about a two bedroom apartment.

10         Q.   Your office is in an apartment?

11         A.   I make description for you.

12         Q.   I'm listening.

13         A.   Mm-hmm.

14         Q.   It's a bedroom apartment in your office?

15         A.   Yeah, that's what the office looks like.

16         Q.   That's what it looks like?

17         A.   Yes.

18         Q.   Do you keep anything there other than

19    office materials?

20         A.   No.

21         Q.   Do people come to your office to handle

22    any business?

23         A.   No.

24         Q.   Well, this is a Saturday morning; is that

1    right?  This incident happened to you?

2        A.    Yes.

3        Q.    And is your office normally open on

4    Saturdays?

5        A.    Every Saturday since I --

6        Q.    But you don't transact any business in

7    your office; is that right?

8              MR. RODDY:  Objection, asked and

9    answered.

10             THE COURT:  Overruled.

11   BY MR. FRANKS:

12       Q.    Is that right?

13       A.    What do you mean by transact business?

14       Q.    Well, nobody comes to your office to do

15   business ever?

16       A.    To do my business, yeah.

17       Q.    You do your business?

18       A.    Maybe you can repeat your question for

19   me.

20       Q.    Do customers of any type come to your

21   office to transact any kinds of business, sir?

22       A.    Yeah.  When they need a truck, yeah.

23       Q.    They do?

24       A.    Yes.

1          Q.    And do they do that on Saturdays?

2          A.    They do, yes.

3          Q.    And what time does your office normally

4    open?

5          A.    9:30.

6          Q.    It only opens at 9:30?

7          A.    Yeah.  On Saturday, yeah.

8          Q.    Well, on other days of the week, what

9    time does it open?

10         A.    9:00 o'clock.

11         Q.    Don't truckers get out on the road

12   early?

13               MR. RODDY:  Objection, Judge.

14               THE COURT:  Sustained.

15   BY MR. FRANKS:

16         Q.    Your office is never open before

17   9:00 o'clock?

18               MR. RODDY:  Objection.  He's answered

19   the question.

20               THE COURT:  Sustained.

21   BY MR. FRANKS:

22         Q.    But 9:30 on Saturday, you expected

23   Delores to be there; is that right?

24         A.    Yes.

1         Q.   But you knew she had -- her car had been

2    in a car accident; is that correct?

3         A.   No, that's not correct.

4         Q.   Before this happened, you did not know

5    that her car had been in the shop or was in a car

6    accident?

7         A.   No.

8         Q.   You didn't?

9         A.   No.

10        Q.   All right.  What kind of a car does

11   Delores drive?

12        A.   Mitsubishi.

13        Q.   How about a blue Honda?  Does that sound

14   familiar?

15        A.   No.

16             MR. RODDY:  Objection, Judge.  He

17   answered the question.

18             THE COURT:  Will you please not answer

19   the question when there's an objection, sir?

20             THE WITNESS:  I'm sorry.

21             THE COURT:  Overruled.

22   BY MR. FRANKS:

23        Q.   Have you ever seen Delores driving a blue

24   Honda?

```
 1        A.   No.

 2        Q.   The car you believe she drives is what

 3   color?

 4        A.   It's blue Mitsubishi.

 5        Q.   It's a Mitsubishi?

 6        A.   Yes.

 7        Q.   You didn't buy it for her, did you?

 8        A.   No, I didn't.

 9        Q.   You have your own cars, do you not?

10        A.   Yes.

11        Q.   And you have more than one?

12        A.   No.

13        Q.   Do you have a Bonneville?

14        A.   Bonneville?

15        Q.   Yes.

16        A.   No, I don't.

17        Q.   Do you have a Grand Am?

18        A.   No, I don't.

19        Q.   But you have a Lexus, don't you?

20        A.   Yes, I do.

21        Q.   And it was a new Lexus at the time, in

22   '97?

23        A.   No.

24        Q.   How old was your Lexus?
```

1          A.    About four years old.

2          Q.    Four years old?

3          A.    Yes.

4          Q.    So what year was it?

5          A.    '94.

6          Q.    Did anybody ever mention a Lexus while

7     you were in the apartment on the 10th of May?

8          A.    What apartment?

9          Q.    On Winthrop?

10         A.    Yes.

11         Q.    Who mentioned a Lexus?

12         A.    What his name?  Walls.

13         Q.    Wall?  Walls mentioned a Lexus?

14         A.    Yes.

15         Q.    Did you ever tell any policemen or

16    state's attorney that it was Erven Walls that ever

17    mentioned a Lexus to you?

18              MR. RODDY:  Objection, Judge.

19              THE COURT:  Sustained.

20    BY MR. FRANKS:

21         Q.    Had Erven Walls ever seen you riding that

22    Lexus?

23              MR. RODDY:  Objection.

24              THE COURT:  Sustained.

1    BY MR. FRANKS:

2        Q.   Had you ever been in Erven Walls' company

3    when you were driving that Lexus?

4        A.   No.

5        Q.   Now, you say that at a certain time you

6    got to your office, and you realized Delores was

7    not there; is that correct?  This is on the 10th

8    of May?

9        A.   Yes.

10       Q.   And it was what time when you got to your

11   office?

12       A.   I got to my office around 9:20.

13       Q.   All right.  Could it have been 9:30?

14       A.   Yes.

15            MR. RODDY:  Objection, Judge.  He just

16   answered the question.

17            THE COURT:  Well, I don't know.  How I

18   can keep ruling if you keep talking?

19            THE WITNESS:  I'm so sorry.  This is my

20   first time.

21            THE COURT:  If you listen, if somebody

22   says, "objection," don't answer the question.

23            THE WITNESS:  Okay.

24            THE COURT:  Objection overruled.

1    BY MR. FRANKS:

2         Q.   You indicate it could have been 9:30; is

3    that correct?

4         A.   Yes.

5         Q.   Yes.  All right.

6                   After you got to your office then,

7    who called who from the office?  Did you call

8    Delores, or did Delores call you?

9         A.   I paged her.

10        Q.   You paged her?

11        A.   Yes.

12        Q.   And what happened after you paged her?

13        A.   She called me back.

14        Q.   And she called you back at the office; is

15   that correct?

16        A.   Yes.

17        Q.   Did she tell you that her car had been in

18   an accident?

19        A.   No, she didn't say that.  That's not what

20   she said.

21        Q.   Were you ever interviewed by any

22   detectives from the Chicago Police Department?

23        A.   Yes.

24        Q.   And you were interviewed on more than one

D-173

1    occasion; is that correct?

2        A.    Yes.

3        Q.    And were you questioned by a Detective

4    Vernon Bradley at one point?

5        A.    Yes.

6        Q.    And were you interviewed by Detective

7    Bradley more than once?

8        A.    Yes.

9        Q.    Were you interviewed by Detective Bradley

10   and, I believe, a partner when you were at

11   Illinois Masonic Hospital?

12       A.    Yes.

13       Q.    And were you interviewed then at your --

14   at your home some time after that?

15       A.    Yes.

16       Q.    And were you interviewed by those same

17   detectives, Detective Bradley and his partner,

18   again at various times when you came to the police

19   station?

20       A.    Yes.

21       Q.    Now, did you tell Detective Bradley

22   before June 6th of 1997 that you were aware of the

23   fact that Delores had an automobile accident in

24   her vehicle and that it might be undrivable on the

D-174

1    day of the incident, May 10, 1997?  Did you tell

2    the detective that information about your

3    conversation with Delores?

4        A.   About the -- no, not the accident.

5    That's not what I said.

6             MR. FRANKS:  Judge, I could not hear the

7    response.

8             THE COURT:  Miss Reporter, repeat the

9    response.

10                        (WHEREUPON, the record was

11                         read as requested.)

12   BY MR. FRANKS:

13       Q.   All right.  So you never -- that

14   information I just read, you never gave that

15   information to Detective Bradley; is that correct?

16            MR. RODDY:  Objection, Judge.

17            THE COURT:  Sustained.

18   BY MR. FRANKS:

19       Q.   Now, sir, the first officers you spoke to

20   were the ones that helped you out on the street

21   when you were all tied up and so forth; is that

22   correct?

23       A.   There's a lot of them.  I don't recall.

24   There's a lot of officers.  It's not the only one

1    officer.

2         Q.    There were many officers involved after

3    you made your presence known on the street?

4         A.    Yes.

5         Q.    And some of those policemen you spoke to

6    and told what had happened to you; is that

7    correct?

8         A.    Yes.

9         Q.    All right.  And two of those officers

10   that you spoke to were Officers Schmidt and

11   Officer Ramirez; is that correct?

12        A.    I don't know.

13        Q.    You don't remember their names?

14        A.    Yes.

15        Q.    But you were aware that certain officers

16   were taking information from you to put in a

17   police report to try to find out who it was that

18   had hurt you; is that correct?

19        A.    Yes.  Yes.

20        Q.    And you gave them at that time the best

21   information you could so that the people that had

22   done these things to you would be caught; is that

23   right?

24        A.    Yes.

D-176

1        Q.    When did you -- where did you talk to
2    these officers?

3        A.    What do you mean?  I'm sorry.  I don't
4    know what you mean.

5        Q.    All right.  Well, you came running out
6    onto the street; is that correct?

7        A.    Yes.

8        Q.    And did the police officers ever take
9    you up into the apartment where this had
10   happened?

11       A.    Yes.

12       Q.    Did you tell the police what had happened
13   to you in the apartment, or did you tell the
14   police what had happened to you in a different
15   location?

16       A.    I tell the officer what happened to me in
17   the apartment.

18       Q.    In the apartment on Winthrop?

19       A.    Yes.

20       Q.    And that would have been at about what
21   time, sir?

22       A.    It should be around 7:00 to 8:00 o'clock.

23       Q.    In the evening?

24       A.    7:30 to 8:00 o'clock, yes.

D-177

1        Q.    At nighttime?

2        A.    Yeah.

3        Q.    Now, at the time the police officers

4    spoke to you then and saw you out on the street,

5    you were handcuffed in front of you; is that

6    correct?

7        A.    I'm sorry.  I would like to say they

8    don't stop me on the street.  I call the police to

9    come.

10       Q.    You called the police to you?

11       A.    Yeah.

12       Q.    When the police came to you, you were

13   handcuffed in front of you; is that correct?

14       A.    Yes.

15       Q.    Now, when you talked to the police about

16   your conversation with Delores about coming over,

17   did you tell those police officers that you first

18   talked to that your wife had called that morning

19   and asked you to come to her apartment to discuss

20   business?

21       A.    No.

22       Q.    Is that what you said to the officers

23   about what was going on between you and Delores

24   that morning?

1              MR. RODDY:  Objection.  He answered the

2     question.

3              THE COURT:  He said, "no."

4     BY MR. FRANKS:

5         Q.   When you were in the apartment while the

6     incident was going on, were you aware that there

7     were large quantities of drug paraphernalia in the

8     apartment?

9         A.   No, no.

10        Q.   When the police officers brought you back

11    up into the Winthrop apartment where this had all

12    happened to you, did you see in that small

13    apartment all of the drug paraphernalia that the

14    police found and inventoried?

15             MR. RODDY:  I'll object.  I'm not clear

16    what counsel is speaking of.

17             THE COURT:  Pardon me?

18             MR. RODDY:  He said, "all of the drug

19    paraphernalia."  I'd ask he be more specific.  I

20    don't know what he's speaking of.

21             THE COURT:  Overruled.

22    BY MR. FRANKS:

23        Q.   You may answer the question.

24        A.   Can you repeat that question?

1     Q.   Certainly.  I'll rephrase it.

2               Did you see hundreds of plastic

3    bags?

4     A.   I don't know.

5     Q.   You don't know?

6     A.   I do not see any plastic bags.

7     Q.   At no time did the police show you any

8    plastic bags?

9               MR. RODDY:  Objection.  He just stated

10   he didn't see any.

11              MR. FRANKS:  He said he didn't know.

12              THE COURT:  Overruled.

13              THE WITNESS:  No, I didn't say I didn't

14   know.

15   BY MR. FRANKS:

16    Q.   You did not see them?

17    A.   Yes.

18    Q.   Did you see rolls of tinfoil?

19    A.   I'm sorry.  What does that mean?

20    Q.   You don't know what tinfoil is?

21    A.   Tin what?

22    Q.   Tinfoil?  What we package narcotics in?

23    A.   No, I didn't see nothing like that.

24              MR. RODDY:  Objection, Judge.

1                          I'll withdraw it.

2        BY MR. FRANKS:

3            Q.    Numerous bottles of Super Latex, did you

4        see any of those?

5            A.    I don't know.  What's that mean?

6            Q.    You don't know what that means?

7            A.    Yes, I don't.

8            Q.    Breathing masks?  Did you see breathing

9        masks around the apartment?

10           A.    No, I don't.

11           Q.    How about any scales and a worktable?

12       Did you see that in the apartment at any time?

13           A.    No, I don't.

14           Q.    Nothing?

15           A.    Un-uhn.

16           Q.    Did you have any business to do with

17       Delores that day?

18           A.    No, I don't, but to come to my office.

19           Q.    She was just coming to your office at

20       8.50 an hour to be a secretary?

21           A.    9:30.

22           Q.    No.  You were going to pay her 8.50 an

23       hour?

24           A.    Yes.

1        Q.   Now, was she supposed to bring any money

2   to the office that morning?

3        A.   No.

4        Q.   Were you supposed to give her any money

5   that morning?

6        A.   I was supposed to be giving her 475.

7        Q.   I'm sorry?

8        A.   I supposed to be giving Delores

9   475 dollars for two weeks she already worked for

10  me.

11       Q.   475 dollars?

12       A.   Yes.

13       Q.   Well, did you discuss the fact that you

14  were going to give her this money on the phone?

15       A.   No.

16       Q.   Page 4 of the grand jury.

17                 Sir, I want to direct your

18  attention to September 29th of 1997.  Did you

19  testify in the grand jury on that date?

20       A.   Yes, I do.

21       Q.   And you were sworn to tell the truth; is

22  that correct?

23       A.   Yes.

24       Q.   And under oath were you asked -- starting

D-182

1    on line 7.

2               "Question:"  This is a question

3    from an Assistant State's Attorney.

4               "And what did she say to you,

5      and what did you say to her?"

6               And your answer is:

7               "I got the money.  I was

8      expecting her.  She was supposed to be in

9      my office working that Saturday morning."

10             Is that what you said in the

11   grand jury?

12     A.   That is not what I said.

13     Q.   You never said that?

14     A.   I got the money?  No.

15     Q.   Those are the words.  Not show me the

16   money, but I got the money?

17        MR. RODDY:  Objection.  He answered the

18   question, Judge.

19        THE COURT:  Sustained.

20   BY MR. FRANKS:

21     Q.   You never said those words?

22     A.   No.

23        MR. RODDY:  Objection.

24

1    BY MR. FRANKS:

2         Q.   Sir, you didn't have any health

3    insurance, did you?

4         A.   No, not that particular time.  I don't

5    have no health insurance at that time.

6         Q.   All right.  So you had no health

7    insurance through your trucking company, did you?

8         A.   No.

9              MR. RODDY:  Objection.

10   BY THE WITNESS:

11        A.   I thought you were talking about for me.

12   Yeah, I have one for my company.

13   BY MR. FRANKS:

14        Q.   I'm not talking about insurance for

15   driving.  I'm talking about health insurance for

16   your body.

17             MR. RODDY:  Judge, I'll object.  He

18   answered the question already, "no."

19             THE COURT:  Overruled.

20   BY THE WITNESS:

21        A.   For bank?  I don't have any insurance for

22   bank.  I don't know what you mean.  I'm sorry.

23   BY MR. FRANKS:

24        Q.   Well, people that run businesses normally

D-184

1    have health insurance.  Did you have health

2    insurance?

3        A.   Oh, it's in the process.  Because my

4    business is a new business.  We just started.

5        Q.   You just started it?

6        A.   Yes.

7        Q.   But you drive Lexuses, and you have two

8    drivers for three trucks?

9             MR. RODDY:  Objection, Judge.

10            THE COURT:  Objection sustained.

11   BY MR. FRANKS:

12       Q.   Did you know that Erven Walls was

13   Delores' boyfriend?

14       A.   Yes.

15       Q.   And you knew that on May 10, 1997; is

16   that correct?

17       A.   Repeat that question?

18       Q.   It's a very simple one.  On the day you

19   got hurt, did you know that Mr. Walls was Delores'

20   boyfriend?

21       A.   Yeah.

22       Q.   Well, you know, there was a lot of

23   policemen out on the street trying to help you

24   that day; is that right?

1        A.   No, that's not correct.

2        Q.   That's not correct?

3        A.   Yes.

4        Q.   When you came out on the street all

5    handcuffed and beat up, did a lot of policemen

6    come to try to help you?

7        A.   Yes.

8        Q.   And they were trying to find out who did

9    this to you; is that right?

10       A.   They do.

11       Q.   Did you tell them that the man that hit

12   you with a chisel and did all of these -- some of

13   these things to you was Mr. Walls, the boyfriend

14   of my wife?

15            MR. RODDY:   Objection.

16            THE COURT:   Overruled.

17   BY THE WITNESS:

18       A.   No, not at the time.  No, I didn't know

19   if that was him.

20   BY MR. FRANKS:

21       Q.   You didn't know it at that time?

22       A.   I didn't know that was her boyfriend at

23   that time.

24       Q.   Wait a minute.  Wait a minute.  It was 30

1     seconds ago, sir, I asked you the simple question
2     that you asked me to repeat.  Did you know on May
3     10, 1997, if Mr. Walls was the boyfriend of
4     Delores?
5          A.   Yes, I do, I know.
6          Q.   On May 10th, did you know that?
7          A.   Even before that, yeah, yeah.
8          Q.   Yes.  So did you tell the police when you
9     just got beat up -- I mean, your eye was seriously
10    injured, wasn't it?
11         A.   Yes.
12         Q.   You had a serious operation?
13         A.   Yes.
14         Q.   You are lucky you can still see, aren't
15    you?
16         A.   Yes.
17         Q.   All right.  This man that supposedly did
18    all these terrible things to you, did you tell the
19    police the most rudimentary information -- do you
20    understand what I'm saying?
21              MR. RODDY:  Objection.
22              THE COURT:  I don't think he understands
23    that.
24              MR. FRANKS:  I realized it as I said it,

D-187

1    Judge.  I'll withdraw it.

2    BY MR. FRANKS:

3        Q.   Did you tell the police right away that

4    the person that hurt you was the boyfriend of your

5    wife?

6        A.   I tell them after they show me the ID.

7        Q.   Did you say, I know that man?  That's my

8    wife's boyfriend?

9        A.   Yeah, I tell them.

10       Q.   You told them that?

11       A.   Yes.

12       Q.   Certainly, you did.

13           MR. RODDY:  Objection, Judge.

14           THE COURT:  Sustained.

15           MR. RODDY:  Move to strike his comments.

16           THE COURT:  I'll strike that comment.

17   Just put questions to the witness, Counsel.

18   BY MR. FRANKS:

19       Q.   Did you tell these officers that first

20   talked to you in the apartment at Winthrop that

21   the offenders called the victim's friends and

22   associates demanding money or drugs for his

23   release?  Did you give that information to the

24   officers that you first talked to?

1          A.    No, sir.

2          Q.    You never told them that?

3          A.    No.

4          Q.    Well, they did -- these offenders --

5     you do understand the word "offenders," do you

6     not?

7          A.    If I understand "offender"?

8          Q.    Do you understand when I say the word

9     "offender" what I'm talking about?

10         A.    No, I don't.  I don't know, but I know

11    what "offender" mean in English.

12         Q.    All right.  That's what I'm asking you.

13               Did these people that were

14    hurting you, did they, in fact, demand money from

15    you?

16         A.    Yes.

17         Q.    And did they demand that that money be

18    given to them before you were released?

19         A.    Repeat that?

20         Q.    Did the men that were holding you and had

21    hurt you, did they demand money from you before

22    they were going to let you go?

23         A.    Yes.  They wanted money from me, yeah.

24         Q.    And did they then call your friends or

1    associates -- do you understand what I mean by

2    "associates"?

3         A.   No, I don't understand what you mean by

4    "associate."

5         Q.   People that you work with or you know.

6    All right?

7                   Did you tell the police that these

8    people that were holding you called your friends

9    or people that you know to try to get money to get

10   you out of this situation?

11              MR. RODDY:  Objection.

12              THE COURT:  Overruled.

13   BY THE WITNESS:

14        A.   No, I do not.  I never said that.  I

15   never said that.

16   BY MR. FRANKS:

17        Q.   The -- you were never at this point shown

18   any photo IDs of any sort, have you, in this

19   courtroom?

20        A.   Photo ID?

21        Q.   Yes.

22        A.   No.

23        Q.   All right.  Well, at some point, were you

24   ever shown a photo ID?

D-190

```
 1        A.   Yeah.  I mean, on May 10th.

 2        Q.   On May 10th, you were shown a photo ID?

 3        A.   Yeah.  The police showed me a photo ID.

 4        Q.   And where were you when they showed this

 5   to you?

 6        A.   In the hallway.

 7        Q.   Where?

 8        A.   Of 5810 Winthrop.

 9        Q.   All right.  So you're saying you were not

10   actually in the apartment, you were in the hallway

11   outside of the apartment?

12        A.   Yeah.

13        Q.   Is that right?

14        A.   Yes.

15        Q.   And you were able to stand, you were able

16   to --

17        A.   No.

18        Q.   You weren't able to stand?

19        A.   Yeah, I was on the floor.

20        Q.   You were sitting on the floor in the

21   hallway?

22        A.   Lying on the floor.  I was lying down on

23   the floor by the police.

24        Q.   And were you able to see?
```

```
 1       A.    Yeah, with my left eye.
 2       Q.    And they showed you a photograph; is that
 3  right?
 4       A.    They don't show me no photograph.
 5       Q.    Well, a photo ID?  A card?  A small card?
 6       A.    They showed me a photo ID.
 7       Q.    And what did you say when you saw this
 8  card?
 9       A.    That was the time that I tell the police,
10  that's the boyfriend.
11       Q.    Then you told them it was the boyfriend
12  then?
13       A.    Yeah.  That's what I'm trying to tell
14  you.  At that time, I didn't tell them until they
15  show me the ID.
16       Q.    I see.  Is that the same person that hit
17  you over the head with a bat?
18       A.    No.
19       Q.    It's a different person?
20       A.    Yes.
21       Q.    All right.  Did you ever tell those
22  police officers that the person whose picture is
23  in the ID is the same person that hit you with a
24  bat?
```

1         A.    No, I didn't tell them that.

2         Q.    You told them it was a different person

3    altogether; right?

4         A.    Yes.

5         Q.    Did you ever identify anybody as the

6    person that hit you with the bat?

7         A.    Yeah, I describe him.

8         Q.    You just described him but --

9         A.    Yes.

10        Q.    -- but you have never seen him in person,

11   and you never saw a picture ID of him; is that

12   correct?

13        A.    I'm sorry.  When you say I never saw the

14   actual person, I never saw the --

15        Q.    I'll withdraw the question.

16              Has anyone shown you a picture ID

17   at the Winthrop apartment, or have you ever seen

18   in a lineup, the person that hit you with a bat?

19        A.    No.

20        Q.    Well, when you came into the apartment,

21   did someone pull you into the apartment, or did

22   you just walk into the apartment on your own?

23        A.    I walked into the apartment in the front

24   door.  She -- my ex-wife opened the door, and I

1    walked into -- I make an attempt to walk into the
2    door.

3         Q.   You made an attempt to walk in the door.
4    Did anybody grab you and pull you into the
5    apartment?

6         A.   Nobody grabbed me, not to my recall.  I
7    don't recall nothing after he hit me in the head.
8    I don't recall that nobody pulled me.

9         Q.   So if I understand, you walked on your
10   own a couple of steps into the apartment; would
11   that be correct?

12        A.   Yes, that's correct.

13        Q.   And then someone hit you with a bat?

14        A.   After she opened the door.

15        Q.   After she opened the door, you walked in
16   on your own into -- into the apartment?

17        A.   Yes.

18        Q.   And where was this person standing, if
19   you know, that hit you with the bat?

20        A.   The doorway opened to the one side.
21   That's where -- that's the same spot he was
22   standing.

23        Q.   Where the door was?

24        A.   You know --

1      Q.   On the other side of the door?

2      A.   Like if somebody opened the door like

3   this, the door open to one side, to the right

4   side of the apartment.  That's the way he was

5   coming.

6      Q.   So the door was opening in such a way

7   that it would have hit him in the face as it

8   opened?

9           MR. RODDY:  Objection.

10  BY MR. FRANKS:

11     Q.   Is that what you're saying?

12          THE COURT:  Sustained.

13  BY MR. FRANKS:

14     Q.   All right.  Was he standing then behind

15  the door or to the side of the door?  Where was he

16  in relation to the door as it opened?

17     A.   I'm giving you the direction where he was

18  standing.  He was standing the same side when the

19  door go -- when you open the door.  That's where

20  he was standing.

21     Q.   How many feet into the apartment was he

22  standing?

23     A.   I don't recall.  I don't know about the

24  feet and stuff.

1      Q.   Well, you could see him then as you

2  walked into the apartment; is that correct?

3      A.   No, I couldn't see him.

4      Q.   Could you see what clothing he had on?

5      A.   I see the hand.

6      Q.   That's all you can see?

7      A.   Yeah.  When the hand was coming, because

8  it was right in my front, right here to the right

9  side of the door.

10         MR. FRANKS:  Indicating that the witness

11  is pointing towards -- to the right front of his

12  head.

13  BY MR. FRANKS:

14     Q.   Well, could you see the bat coming

15  towards your head?

16     A.   Yes, with the hand.

17     Q.   You didn't duck?

18     A.   I beg your pardon?

19     Q.   You didn't duck, did you?

20     A.   I didn't what?

21     Q.   Duck?  Get out of the way?

22     A.   No, I didn't.

23     Q.   Did you see the clothing this man had on

24  as he was hitting you?

D-196

1          A.    On his arm.

2          Q.    That's all you saw?

3          A.    Yes.

4          Q.    Well, again, I want to talk to you about

5    the police officers that took care of you and

6    talked to you right after this incident happened.

7    Did you tell them that one of the offenders pulled

8    you inside the apartment and hit you in the head

9    with a baseball bat?

10         A.    No, I didn't.

11         Q.    Did you tell the police, the first people

12   that talked to you, that you were pulled into the

13   apartment?

14         A.    I told the police I was pulled in from

15   the apartment to the bathroom after I woke up.

16         Q.    I'm just asking you about how you got

17   into the apartment.

18         A.    Okay.

19         Q.    Did you tell the police you were pulled

20   into the apartment?

21         A.    No, I did not say that.

22         Q.    Did you tell them that after you were

23   pulled into the apartment, offenders -- and it

24   mentions two, three, four, and five.  So four

1      different people, including the person that had

2      pulled you and hit you with the baseball bat,

3      approached you, each pointing a handgun?  Did you

4      tell the police that?

5          A.   That question is too much.  Can you

6      repeat it?

7          Q.   It is a long question.

8          A.   Yes.

9          Q.   Did you say that immediately upon being

10     hit with the baseball bat, the man with the

11     baseball bat and three other men approached each

12     pointing a handgun at you?  Did you tell them

13     that?

14         A.   After two hours.  After I wake up.

15     There's nothing that happen after this man hit me

16     on the head.  I fell.  I know that I collapsed.  I

17     lose conscious.  I don't know what's going on no

18     more.

19         Q.   Did you tell these police officers you

20     were unconscious for any time?

21         A.   Yes.

22         Q.   All right.  Let me understand then what

23     you're trying to say.  You're saying you were hit

24     over the head with a baseball bat, and you don't

D-198

1     remember anything then for two hours?

2         A.    Exactly.

3         Q.    Exactly.  And when you woke up, you were

4     in the living room; is that right?

5         A.    Yes.

6         Q.    And you were already undressed; is that

7     correct?

8         A.    Yes.

9         Q.    Now, were you naked, or did you have

10    underwear on?

11        A.    I probably don't remember.  I think maybe

12    I have underwear on, but I know I was naked.

13        Q.    Well, naked means you have no clothes on

14    at all.

15        A.    I have underwear on.

16        Q.    You had underwear?

17        A.    Yes.

18        Q.    You had underwear on.

19                  And were any of your hands or arms

20    already tied up when you woke up?

21            MR. RODDY:  Judge, I object.  This was

22    gone over already.

23            THE COURT:  Sustained.

24

1    BY MR. FRANKS:

2         Q.   When you woke up then, you're saying you

3    saw four men and a woman; is that correct?

4         A.   That's right.  That's correct.

5         Q.   And even though you had been sleeping for

6    two hours or unconscious for two hours --

7              MR. RODDY:  Objection to the statement,

8·   "sleeping."

9              THE COURT:  Sustained.  Rephrase it.

10   BY MR. FRANKS:

11        Q.   After you woke up from being unconscious,

12   some of the men had on things covering parts of

13   their face; is that correct?

14        A.   Three of them.

15        Q.·  Three of them.

16             And the three men that had masks

17   on you had never seen before; is that correct?

18        A.   Yes, that's correct.

19        Q.   But the one man that you knew didn't have

20   a mask on?

21        A.   Yes.

22        Q.   And at some point during this

23   incident, the men that had had the masks on took

24   them off?

1        A.    Yes, later on.   Later, after awhile.

2        Q.    After awhile?

3        A.    About 3:00 o'clock.

4        Q.    All right.   But you didn't know how long

5    exactly?   You were unconscious, weren't you?

6        A.    I want you to remember that I had a watch

7    on me.

8        Q.    You had a watch?

9        A.    Yes.

10       Q.    So you looked at your watch when you woke

11   up?

12       A.    When I woke up, yeah, I could see the

13   watch, and she got a wall clock.

14       Q.    Were you concerned about your safety and

15   your life at that moment?

16       A.    Of course.

17       Q.    Yeah.   And these men that had these

18   bandanas -- were they bandanas or some other type

19   of a mask?

20       A.    It's a scarf.   It's like a handkerchief.

21       Q.    How was this handkerchief around their

22   faces?

23       A.    Okay.   I'm going to describe it to you.

24   It's a handkerchief.   It's a different color of

```
 1       this handkerchief they're selling on the street.

 2       It was tied, you know, like a woman handkerchief.

 3       It's like a piece of cloth.

 4            Q.    Kind of like outlaws in the Old West?

 5            A.    What?

 6            Q.    Is that what you're talking about?  Did

 7       you ever see any cowboy movies?

 8                 MR. RODDY:  Objection, Judge.

 9                 THE COURT:  Overruled.

10       BY MR. FRANKS:

11            Q.    Do you know what I mean by cowboy movies?

12            A.    I don't know what you mean by cowboy

13       movies.

14            Q.    You never saw any cowboy movies in

15       Nigeria?

16            A.    I saw cowboy movies before.

17            Q.    Remember?  Like the Lone Ranger?  The bad

18       guys would always have a mask around covering

19       like --

20            A.    Oh, it's not big like that.  It's a

21       cloth.

22            Q.    When did these men --

23                 THE COURT:  Hold it up.

24                      (Brief pause.)
```

1                    THE COURT:  Continue, Mr. Franks.

2                    MR. FRANKS:  Thank you, Judge.

3    BY MR. FRANKS:

4        Q.   Sir, when you -- strike that.

5                    How long, if you know, did these

6    men wear the masks from the time you got into the

7    apartment to the time you saw them?

8        A.   When I gained conscious, when I wake up,

9    you know, I can recall that it took about an

10   hour -- one hour to one hour and a half, one hour,

11   30 minutes, to see how they had something on.

12       Q.   You saw the masks on their faces an hour

13   to an hour and a half?

14       A.   Yes.

15       Q.   Well, you were unconscious for two hours,

16   you think; is that right?

17                  MR. RODDY:  Objection, Judge.

18                  THE COURT:  Sustained.

19   BY MR. FRANKS:

20       Q.   Were they wearing masks while you were

21   unconscious?

22                  THE COURT:  How would he know that?

23   Objection sustained.

24

D-203

1    BY MR. FRANKS:

2        Q.    When you woke up, you saw these men

3    standing in front of you wearing masks; is that

4    correct?

5              MR. RODDY:    Objection.

6              THE COURT:    Sustained.

7    BY MR. FRANKS:

8        Q.    Did all four men -- were they all

9    pointing guns at you at the same time when you

10   woke up?

11       A.    Not all of them at the same time.

12       Q.    I can't hear you.

13       A.    Not all of them at the same time.

14       Q.    Well, how many of them?

15       A.    How many of them point a gun on me?

16       Q.    Yeah.

17       A.    Two.

18       Q.    And which two were they?

19       A.    One is not here today, and one is here

20   today.

21       Q.    And which is the one that's here today?

22       A.    Tony Hillard.

23       Q.    Okay.

24       A.    Yeah.

D-204

1        Q.   But you're saying that all four of

2   the men were holding guns at the moment you woke

3   up?

4        A.   Exactly, yes.  That's what I said,

5   exactly.

6        Q.   They didn't have it sitting on a table or

7   on the floor?  They all had guns in their hands?

8        A.   Yes.

9             MR. RODDY:  Objection.

10            THE COURT:  Overruled.

11   BY MR. FRANKS:

12        Q.   Did any of them ask you for drugs?

13        A.   None of them.

14            MS. BORMANN:  I'm sorry, Judge.  I did

15   not hear that answer.

16            THE COURT:  Miss Reporter, repeat the

17   answer.

18                      (WHEREUPON, the record was

19                      read as requested.)

20            MS. BORMANN:  Thank you.

21   BY MR. FRANKS:

22        Q.   You talked to a Detective Bradley on June

23   3rd of 1997, did you not?

24        A.   Yes, I did.

1        Q.    And where were you when you talked to

2    Detective Bradley on that day?

3        A.    Well, I talked to him several occasions.

4    At least about two or three times.  And every

5    time that -- each time that I was talking to them,

6    I don't recall exactly dates that I was talking

7    to him.  I don't know which one you're talking

8    about.

9        Q.    Well, on June 3rd of 1997 at about 2210

10   police time, which would be 10:10 civilian time,

11   you were at the police station involved in the

12   investigation of Mr. Hillard, were you not?

13       A.    Oh, yes.

14       Q.    Okay.  And when you were involved in the

15   identification of Mr. Hillard, the detective

16   talked to you at 10:10 in the evening on June 3rd;

17   is that correct?

18       A.    Yes.

19       Q.    Yes?

20       A.    Yes.

21       Q.    And did you tell Detective Bradley that

22   they, meaning the offenders, wanted money, and

23   they wanted drugs?  Did you tell Detective Bradley

24   that?

1          A.    That is not -- that's not what I said.

2          Q.    You never told that?  And that never

3     happened?

4          A.    It never happened.

5          Q.    Did you tell Detective Bradley that they

6     wanted your Lexus?

7          A.    Yes.  I --

8                MR. RODDY:  Objection, Judge.  It's not

9     impeaching.

10               THE COURT:  Overruled.

11    BY MR. FRANKS:

12         Q.    Is that right?

13         A.    Yes.

14         Q.    And you told Detective Bradley that they

15    wanted your company checks?

16         A.    Yes.

17         Q.    So the only thing you don't recall is if

18    they wanted your drugs?

19               MR. RODDY:  Objection.

20               THE COURT:  Objection sustained.

21    BY MR. FRANKS:

22         Q.    When -- if I understand what happened to

23    you in this bathroom now, you were in the bathtub

24    for a period of time; is that right?

1        A.    Yes.

2        Q.    And -- well, let me ask you this first.

3    When you got hit in the eye area with this chisel,

4    what room were you in, the bathroom or the living

5    room?

6        A.    Living room.

7        Q.    Did you ever tell any detectives that you

8    were in the bathroom when you were struck in the

9    eye?

10       A.    What do you mean by "struck"?

11       Q.    Hit with the chisel?

12       A.    I got hit two times in the eye.   The

13   first one was in the living room.

14       Q.    The first one was in the living room?

15       A.    Yes.

16       Q.    But that was not by Mr. Walls, you said?

17       A.    The first one?  No.

18       Q.    All right.  But it was with the same

19   chisel both times; right?

20       A.    Yes, yes.

21       Q.    But they changed?  Different people

22   used the chisel on you?  Is that what you're

23   saying?

24       A.    Two different people used the chisel on

D-208

1    me, yes.

2         Q.   And when you were hit by Mr. Walls, he

3    hit you supposedly in the bathroom; right?

4         A.   Yes.

5         Q.   And is that the time when your eye was

6    hurt, or was your eye hurt the first time?

7         A.   My eye has been hurt for the first time,

8    but I can see.  For the first time, I can still

9    see with that eye.

10        Q.   All right.  You misunderstood.

11                  When -- the man with the bat is

12   the one that used the chisel on you first;

13   right?

14        A.   Yeah.

15        Q.   And where did he hit you with the chisel?

16        A.   Right here (indicating.)

17        Q.   So he hit you on your eye --

18        A.   On top of my eyebrow.

19        Q.   And Mr. Walls supposedly hit you where?

20        A.   Continuously hit me right here on my face

21   where it broke my bone here (indicating.)

22        Q.   All right.  Around the same eye?

23        A.   Yeah.  It's not one time.

24        Q.   Now, if I understand now, you said you

1      were able to jump out of the bathtub; is that
2      correct?
3            A.    To roll down, not jump.
4            Q.    What?
5            A.    Roll, to roll.
6            Q.    You rolled down?
7            A.    Yeah, I rolled down.
8            Q.    At that time, you were still tied with
9      electrical cord and tape and all kinds of things
10     around your legs?
11           A.    Yes.
12           Q.    And you were handcuffed behind you?
13           A.    Yes.
14           Q.    And did you roll, or did you kind of hop
15     to the door?
16           A.    Like, you know, like you can scrub.  I
17     scrubbed to the door by my back.
18                 MS. BORMANN:  I'm sorry.  I didn't
19     understand that.
20                 THE COURT:  Miss Reporter, repeat it,
21     please.
22                             (WHEREUPON, the record was read
23                              as requested.)
24

1    BY MR. FRANKS:

2        Q.    So were you on your back --

3        A.    Yeah.

4        Q.    -- as you moved to the door?

5        A.    Yeah.

6            MR. FRANKS:    May I have a moment,

7    Judge?

8            THE COURT:    Yes.

9                    (Brief pause.)

10   BY MR. FRANKS:

11       Q.    Directing your attention to your

12   grand jury testimony again on September 29th of

13   1997, you again, sir, recall testifying in the

14   grand jury under oath; is that correct?

15       A.    Yeah.

16       Q.    Is that a yes?

17       A.    You mean I testified on that day?  Yeah.

18       Q.    Yeah.  Do you remember that you testified

19   in front of the grand jury on September 29th,

20   1997?

21       A.    Yes, I remember.

22       Q.    Directing counsel's attention to Page

23   8 -- excuse me -- Page 21, line 18.

24                    "Question:    Then after you had

```
 1           been in the bathroom for a couple of hours

 2           and had not seen any of the men from that

 3           period of time, what did you do,

 4           Mr. Jinadu?

 5                   "Answer:  I managed myself -- I

 6           managed myself to get out from the

 7           bathtub.  I got out on the floor.  I can

 8           still stand up from the way they tied me

 9           up.  Then I stood up.  I walked slowly to

10           the bathroom door."

11               MR. RODDY:  Objection.

12               MR. FRANKS:  Question --

13               MR. RODDY:  I'm sorry.

14      BY MR. FRANKS:

15          Q.  "Question:  How were you walking?

16                   "Answer:  I was moving to the

17           left and right like this because my legs

18           had been tied."

19               MR. RODDY:  Objection.

20               THE COURT:  Overruled.

21      BY MR. FRANKS:

22          Q.  Did you give those answers to those

23      questions in front of the grand jury?

24          A.  Yes, I did.
```

```
 1          Q.    And if I understand what you're saying is
 2     when you got to this door, there was nobody in the
 3     apartment?
 4          A.    Un-uhn, yeah, no.
 5          Q.    That's correct?
 6          A.    Yes, that's correct.
 7          Q.    And you then managed to get yourself to
 8     the front door?
 9          A.    Yeah.
10          Q.    And there was -- still you saw nobody?
11          A.    Yeah.
12          Q.    Is that a yes?
13          A.    Yes.  That's what I said, yes.
14          Q.    So you had been over a period of hours up
15     to then beaten all over your body; is that
16     correct?
17          A.    Yes.
18          Q.    Men had threatened you, and men had
19     pointed guns at you; is that right?
20          A.    Yes.
21          Q.    And you are now at the front door of this
22     apartment; is that correct?
23          A.    Yeah, that's correct.
24          Q.    Do you leave the front door?
```

1          A.   No.

2          Q.   Do you try to escape at that moment?

3          A.   No, I don't.

4          Q.   Did you tell the officers that first

5    talked to you that you escaped out the back door?

6          A.   Will you repeat the question for me?

7          Q.   Did you tell the detectives -- strike

8    that.

9                    The first police officers you

10   talked to in the Winthrop apartment --

11         A.   Mm-hmm.

12         Q.   -- did you tell them you left out the

13   back door?

14         A.   Back door?

15         Q.   There is a back door to this studio,

16   isn't there?

17         A.   There's no back door in the studio on the

18   fourth floor.

19         Q.   There's no back door to this apartment?

20         A.   In that apartment?

21         Q.   Yes.

22         A.   No, there's no back door.  Only one door,

23   only front door.

24         Q.   Did you go out the front door or the back

1    door of the building?

2         A.    I go to the front door of the building.

3         Q.    When you left in the end?

4         A.    When I left the premises, yeah.

5         Q.    You went out the front?

6         A.    Yeah, in front.

7         Q.    Did you tell the police you went out the

8    back?

9         A.    No.

10        Q.    Okay.  Well, let me ask you this.  When

11   you're standing there at the front door, at that

12   point, you're still handcuffed; is that right?

13        A.    When I was standing in the front door?

14        Q.    I'll withdraw the question because I'm

15   now confused.

16              You're inside the apartment?

17        A.    Okay.

18        Q.    All right.  You have managed to somehow

19   wiggle your way to the front door; is that

20   correct?

21        A.    Mm-hmm.

22        Q.    And your hands are still bound?  You're

23   handcuffed --

24        A.    (Nodding.)

```
 1        Q.   -- in front of you now?

 2        A.   Yes.

 3             MR. RODDY:  Objection, Judge.  This has

 4   all been gone into.

 5             THE COURT:  Well, no.  Overruled.

 6   BY MR. FRANKS:

 7        Q.   What was the condition of your feet when

 8   you were standing at the front door?

 9        A.   Okay.  I went to the front door two

10   times.

11        Q.   I'm asking you the first time.

12        A.   The first time?

13        Q.   Yes.

14        A.   Yeah, I was still tied.

15        Q.   You were tied up?

16        A.   My leg was tied.

17        Q.   Your legs were tied, and you were

18   handcuffed?

19        A.   Yeah.

20        Q.   Okay.  And you -- did you attempt at that

21   moment to get out the front door?

22        A.   I couldn't walk.

23        Q.   Well, you got all the way to the front

24   door, didn't you, from the bathroom?
```

D-216

1          A.   Yes.

2               MR. RODDY:   Objection.

3               THE COURT:   Overruled.

4     BY MR. FRANKS:

5          Q.   Is that right?

6          A.   Yes.

7          Q.   And you found out that for whatever

8     reason these people that had tormented you were

9     gone?

10         A.   Yes.

11         Q.   And you're standing at the front door?

12         A.   Because --

13         Q.   Just answer my question.

14         A.   Okay.

15         Q.   Were you standing at the front door?

16         A.   No, I did not.

17         Q.   Well, what did you do, sir, after you

18    were standing at the front door?  What did you

19    do?

20         A.   I tried to see if there's somebody in

21    front of that door waiting.

22         Q.   And there were four people with guns

23    there, were there?

24               MR. RODDY:   Objection.   I'd ask the

1    witness be allowed to answer his question.

2                    THE COURT:  Yes.

3                        Did you finish your answer, sir?

4                    THE WITNESS:  Yes, I finished.

5    BY MR. FRANKS:

6        Q.    When you peeped out the front door, were

7    there four people standing there with guns?

8        A.    No.

9        Q.    Was there anybody there?

10       A.    Nobody.

11       Q.    Did you open the door?

12       A.    No, I don't.  I couldn't open the door.

13       Q.    You opened the bathroom door, didn't

14   you?

15       A.    By my back.

16       Q.    So you managed to open the bathroom door,

17   but you couldn't open the front door?

18                   MR. RODDY:  Objection, asked and

19   answered.

20                   THE COURT:  Sustained.

21   BY MR. FRANKS:

22       Q.    You were able to get handcuffs from

23   behind your back somehow to the front of you, but

24   you couldn't figure out a way to open the front

1       door; is that correct?

2                  MR. RODDY:   Same objection.

3                  THE COURT:   Sustained.

4       BY MR. FRANKS:

5           Q.   Did you yell out the door?

6           A.   Yeah.

7           Q.   You did?

8           A.   Yeah.

9           Q.   You yelled for help?

10          A.   Yeah.  I didn't yell.

11          Q.   What did you say?

12          A.   I went to call the police.

13          Q.   You went to call the police inside the

14      apartment?

15          A.   Outside -- you just mixing up the

16      question.

17          Q.   You're saying you went to the police

18      after you got outside?

19          A.   When I got outside.

20          Q.   Well, I'm not asking you about that,

21      sir.  I want you to just understand I'm asking you

22      about what you did when you were standing at the

23      front door the first time you went there.  Do you

24      understand my question now?

1          A.    Yes, I understand.

2          Q.    Did you call for help at that moment?

3          A.    No, I don't.

4          Q.    Is the next thing you did to work your

5     way all the way back to the bathroom --

6          A.    Repeat it again?

7          Q.    -- from the front door?

8          A.    Mm-hmm.

9          Q.    Did you take yourself in the condition

10    you were in back all the way to the bathroom?

11         A.    Yes, I did.

12         Q.    And you sat on the toilet to figure out

13    what you were going to do; is that right?

14         A.    I sat on the toilet, started loosening my

15    rope, not figuring out what I wanted to do.  I

16    already know what I wanted to do.  I already know.

17         Q.    You know?

18         A.    Yes.

19         Q.    Were you ever shown a gun that Mr. Walls

20    supposedly had in his hand?

21         A.    Yes, today.

22         Q.    Today?

23         A.    Yes.

24         Q.    So one of the guns you were shown here

D-220

1       you're now saying was in Mr. Walls' hand?

2           A.   Yes.

3           Q.   Which one?  Describe it.

4           A.   The one with the little white stuff on

5       it.

6           Q.   The little white stuff on it.  Well,

7       there's little white stuff on -- what white stuff

8       are we talking about?

9           A.   That little -- that right there, the one

10      you're holding.

11          Q.   You're talking about this stuff here, the

12      white stuff?

13          A.   Yeah.

14              MR. RODDY:  Just for the record, counsel

15      has in his hand People's Exhibit Number 9.

16              THE COURT:  All right.

17              MR. FRANKS:  Yes, I do, People's Exhibit

18      Number 9.

19      BY MR. FRANKS:

20          Q.   The white stuff you're talking about is

21      where?

22          A.   Right there that you're showing me right

23      there.

24          Q.   What part of the gun is the white stuff?

1         A.    It's a gun, revolver.  What you mean?

2         Q.    Where is the white stuff located on the

3    gun?

4         A.    Where you can hold the gun.

5         Q.    So what do you call this part?

6         A.    What I call what?

7         Q.    All right.  This is the barrel, is it

8    not?

9         A.    I just know this is the gun.

10        Q.    Do you want to call it the handle of the

11   gun?

12        A.    Yes, the handle of the gun.

13        Q.    And it's got black tape all the way

14   around the handle; is that right?

15        A.    Right now, yeah.

16        Q.    Did it have -- was it all white?  Was the

17   handle all white when you saw it on the 10th?

18        A.    I could only see the white stuff on the

19   bottom by your fingertip.

20        Q.    Please listen to the question.  When you

21   saw this gun in Mr. Walls' hand, was he pointing

22   it at you?

23        A.    Yes.

24        Q.    Was he holding the gun like I'm showing

1    it now?

2        A.   No.

3             MR. RODDY:   Judge, objection.

4             THE COURT:   He's trying to explain that

5    it's on the bottom of the handle there, which he's

6    done three times.

7    BY MR. FRANKS:

8        Q.   The only place you see any white stuff is

9    on the bottom of the handle; is that correct?

10       A.   Yes.

11       Q.   And there's black tape wound all the way

12   around; is that right?

13       A.   How am I supposed to know?  I don't pay

14   attention.  I just see it's a gun.

15       Q.   You paid attention enough to see there

16   was white stuff on the bottom of the handle?

17       A.   Yes.

18            MR. RODDY:   Objection.  Counsel is

19   arguing with the witness.

20            THE COURT:   Sustained.

21   BY MR. FRANKS:

22       Q.   Did you see the black tape on the handle?

23       A.   I don't pay attention to that.

24       Q.   You paid attention to the bottom of the

1    handle, but not the handle, itself?

2        A.    Yes.

3            MR. RODDY:  Objection.

4            THE COURT:  It's been asked and answered

5    about four times, Mr. Franks.  Go on to something

6    else.

7    BY MR. FRANKS:

8        Q.    Who is the first police officer you ever

9    told that Erven Walls was someone you had seen

10   before?

11       A.    I tell the officers.  Like I said,

12   there's a lot of officers the day the incident

13   happened to me.  I don't even know which one is

14   talking to me.  They was talking to me.  I told

15   the first person who showed me the ID.

16       Q.    So the same officers who showed you the

17   ID are the people that you first told that Walls

18   was someone you knew?

19       A.    Yeah.

20       Q.    All right.

21       A.    I said I knew --

22       Q.    And did you tell Detective Bradley the

23   first time you saw him that Erven Walls was

24   someone you knew?

1          MR. RODDY:  Objection.

2          THE COURT:  Sustained.

3     BY MR. FRANKS:

4          Q.   When did you first tell, if at all,

5     Detective Bradley that Erven Walls was someone you

6     knew?

7          MR. RODDY:  Objection.

8          THE COURT:  Sustained.

9     BY MR. FRANKS:

10         Q.   Well, did you tell Detective Jackson or

11    Detective Bradley when they interviewed you at

12    Illinois Masonic on approximately the 12th of May

13    of '97 that Erven Walls was someone you knew?

14         MR. RODDY:  Objection.

15         THE COURT:  Sustained.

16         MR. FRANKS:  Judge, I'm just trying to

17    lay a foundation here.  Is that the reason why

18    it's being sustained?

19         THE COURT:  He's already indicated who

20    he told it to first.

21         MR. FRANKS:  I'm asking now because he

22    never told those things to Detective Bradley or

23    Detective Jackson on the 12th, and I want to bring

24    that out.

D-225

```
 1                 THE COURT:  The objection is sustained.

 2      BY MR. FRANKS:

 3           Q.   Are you known on the street as Afize

 4      (phonetic)?

 5           A.   I'm sorry?  What you mean?

 6           Q.   Afize?  Is that your name?

 7           A.   That's my middle name.

 8                MR. FRANKS:  May I have a moment,

 9      Judge?

10                THE COURT:  Yes.

11                          (Brief pause.)

12      BY MR. FRANKS:

13           Q.   When you left --

14                THE COURT:  Just a minute.  There's a

15      juror missing.

16                MR. FRANKS:  Oh, excuse me, your Honor.

17                          (Brief pause.)

18                THE COURT:  You may continue.

19                MR. FRANKS:  Thank you.

20      BY MR. FRANKS:

21           Q.   When you finally managed to get outside

22      of the building on Winthrop, you're saying you saw

23      two of the people that had been in the apartment;

24      is that correct?
```

1        A.    Yes, I said that.

2        Q.    Did you see Erven Walls outside of the

3    apartment?

4        A.    No.

5        Q.    You said you had seen Mr. Walls two times

6    before this had happened; is that correct?

7        A.    Yes, sir.

8        Q.    Did Mr. Walls owe you money?

9        A.    Did he owe me money?

10       Q.    Yes.

11       A.    No.

12       Q.    You had seen him, though, in the area of

13    your business, though; is that correct?

14       A.    Dropping her off.

15       Q.    When?

16       A.    When?

17       Q.    Yes.

18       A.    Sometime in April when she just started

19    working for me, when she just started working in

20    my office.

21       Q.    Do you remember the circumstances that

22    you saw her?

23       A.    In the morning, around 9:00 o'clock.

24       Q.    Did Mr. Walls walk into the office with

1    her?

2         A.    No.    He drop her off.    She was in the

3    car.    When she -- I mean, she's supposed to be

4    working that day.    She come to my office.    As soon

5    as she come upstairs, I see a car parked in front

6    of my office.    She told me that's her boyfriend.

7         Q.    She walked up some stairs to get to your

8    office?

9         A.    He dropped Delores off.

10        Q.    He dropped her off, and did he pull away

11   right away?

12        A.    He didn't pull away right away.    That's

13   how I see.    I saw through the window because --

14        Q.    What was he doing?

15        A.    He just dropped her off, and she come to

16   the upstairs.

17        Q.    She came to the office.    She came through

18   the door.    Did she have to go up some stairs?

19        A.    Who?

20        Q.    I thought you said she had some stairs

21   she had to walk up?

22        A.    Yeah.

23        Q.    Maybe I misheard you.

24        A.    Yeah.

D-228

1        Q.    She came up some stairs, came into your

2    office?

3        A.    Yes.

4        Q.    She had a conversation with you?

5        A.    She don't have no conversation with me.

6        Q.    Did she tell you the man is her

7    boyfriend?

8        A.    I was the one asked her. I said, who was

9    that in the car.

10       Q.    Okay. So you had seen the car from

11   where?

12       A.    Through my window.

13       Q.    Did you tell the state's attorney

14   that you had seen my client, Erven Walls, two

15   times?

16             MR. RODDY:  Objection.

17             THE COURT:  Overruled.

18   BY MR. FRANKS:

19       Q.    Did you tell him about this?

20       A.    Yes, I believe so.

21       Q.    Did you tell Mr. Roddy, the

22   state's attorney in this case, that you had only

23   seen my client one time before May 10th?

24       A.    Before May 10th? Yeah, one time before

1    May 10th.

2         Q.   Did you see Mr. Walls inside Delores'

3    Winthrop apartment?

4         A.   Yes.

5         Q.   Did you see him in Delores' Winthrop

6    apartment before May 10th of 1997?

7         A.   Yeah.  That's what I mean.  In her

8    apartment, yeah, I saw him before.

9         Q.   That's not your office, though, is it?

10   The Winthrop apartment?

11        A.   The first time in my office.

12        Q.   The first time was in your office?

13        A.   Yes.

14        Q.   So that had to be at least in April of

15   '97; is that correct?

16             MR. RODDY:  Objection, Judge.  He

17   testified to that.

18             THE COURT:  Sustained.

19   BY MR. FRANKS:

20        Q.   When is the next time you saw Mr. Walls

21   after you saw him in the car outside of your

22   trucking company?

23        A.   The day I went to Delores' house one

24   day.  I don't recall what day was that.

```
 1          Q.   Well, how long before you were hurt in
 2     that same apartment did you go in there and see
 3     Mr. Walls?
 4          A.   Repeat that question?  I'm sorry.
 5          Q.   How many days, weeks, months before May
 6     10th had you seen Mr. Walls in that same
 7     apartment?
 8          A.   Probably a week after, a week after he
 9     dropped her off.  It could be that time.
10          Q.   A week after he dropped her off?
11          A.   Yeah.
12          Q.   And when you went into the apartment, did
13     you go in with Mr. Walls and Delores?
14               MR. RODDY:  Judge, I'm going to object.
15     I don't know what he's speaking of.  The testimony
16     of Mr. Jinadu was that he saw him outside the
17     Winthrop apartment.  There's no testimony he ever
18     went inside on this second occasion.
19               THE COURT:  That's what he's trying to
20     find out.  Overruled.
21     BY MR. FRANKS:
22          Q.   You understand what I'm talking about?
23          A.   No, I don't.  You can repeat it.
24          Q.   I'll repeat it as many times as we need
```

D-231

1    to.  I'm not talking about May 10th of '97 when

2    you were hurt.  I'm talking about when you claim

3    you saw Mr. Walls in the area of the Winthrop

4    apartment before you were hurt.

5              Do you understand what I'm asking?

6         A.   Yes, I do.

7         Q.   All right.  When you saw Mr. Walls on

8    that occasion, he was inside Delores' apartment;

9    is that correct?

10        A.   He's not in -- I didn't say inside.  He

11   was not inside.  It's in the building.  I went to

12   see Delores that day, and I saw him.  I saw them

13   together in that building.

14        Q.   Were they in her apartment, or where were

15   they?

16        A.   They was coming outside.  I used to call

17   her because she has a phone.  Before the phone was

18   disconnected, I used to call Delores and say, come

19   downstairs, I'm around.

20              Then when she was coming down, and

21   I saw them together, and I said, who's this, and

22   she just told me, that's my boyfriend.

23        Q.   Did she introduce you?

24        A.   No, she don't.

D-232

1        Q.   Were you standing all together?

2        A.   I never allow this man to get into my

3   car.  Anytime I visit Delores, Delores come to my

4   car.

5        Q.   So Delores came to your car, but without

6   Erven?

7        A.   Yeah.  He was standing in front of the

8   building.  I'm in the car.

9        Q.   How many feet away was he?

10       A.   I don't know feet.

11       Q.   Was he as far as the door in the back of

12  the courtroom?

13       A.   I'm on the street in front of the

14  building.  This man was standing in front of the

15  building, and my wife come to me in the car.

16       Q.   How many feet away was he in terms of --

17  you can use something in this courtroom.  Was he

18  farther than the door of the outside of the

19  courtroom?

20       A.   I can give you a distance, but the feet,

21  I don't know the distance.

22       Q.   Give me a distance?

23       A.   From where Walls is to the back door.

24            THE COURT REPORTER:  I'm sorry.  Can you

D-233

1    repeat that?

2              THE WITNESS:   He was standing in front

3    of the door entry, the building entry, and I was

4    in the car.  And Delores came to me, and I say,

5    who was that, who was that guy, and she told me,

6    that's the guy I'm seeing.

7    BY MR. FRANKS:

8         Q.   Did she give you a name?

9         A.   Who?

10        Q.   Did she give you a name?

11        A.   No, she didn't give me a name.  I don't

12   ask a name.

13        Q.   Were you angry?

14        A.   Yes.

15             MR. FRANKS:   I have nothing further.

16             THE COURT:   You may inquire.

17             MS. BORMANN:   Shall I start?

18             THE COURT:   You may inquire.

19             MS. BORMANN:   Thank you, Judge.

20                  Bear with me, please.   I have a

21   lot of notes.

22                  CROSS EXAMINATION

23                  BY MS. BORMANN:

24        Q.   Good afternoon, Mr. Jinadu.

D-234

```
 1        A.    Hello.  How are you?

 2        Q.    I'm going to try to make this as brief as

 3   possible.

 4                    You are a Nigerian citizen and not

 5   a U.S. citizen; is that right?

 6        A.    Yes.

 7        Q.    Are you a registered alien here in the

 8   United States?

 9        A.    Yes, I am.

10        Q.    Now, back when this occurred, you said

11   you were the owner of a trucking company called

12   Yinka Freight and Hauling, Incorporated;

13   correct?

14        A.    That's correct.

15        Q.    And your testimony here today is that

16   you're currently working in that business?

17        A.    Yeah.

18        Q.    Yes?  You're currently actually the

19   president of the company; right?

20        A.    I beg your pardon?

21        Q.    You're actually currently the president

22   of the company?

23        A.    Yes.

24        Q.    It's still called Yinka Freight and
```

1     Hauling, Incorporated?

2         A.   Yes.

3         Q.   And it's a company in good standing here

4     in the State of Illinois; right?

5         A.   Yes.

6         Q.   Sir, isn't it true that Yinka Freight and

7     Hauling was involuntarily dissolved by the State

8     of Illinois in April of this year?

9              MR. RODDY:  Objection, Judge, to the

10    relevance of this.

11             THE COURT:  Overruled.

12    BY MS. BORMANN:

13        Q.   Isn't that true?

14        A.   Yes.

15        Q.   So your company was dissolved by the

16    State of Illinois?

17             MR. RODDY:  Objection.  He just said,

18    "yes."

19    BY THE WITNESS:

20        A.   Not no more.  At that time.

21    BY MS. BORMANN:

22        Q.   Now, sir, you said that the address of

23    the company was what?

24        A.   3827 West Harrison Street.

1       Q.  Sir, isn't it true that with the State of

2  Illinois, prior to your company being dissolved,

3  you had listed its address at 4753 North Broadway,

4  Suite Number 716?

5       A.  I beg your pardon?

6       Q.  4753 North Broadway, Suite Number 716,

7  Chicago, Illinois, 60640?

8       A.  I'm sorry.  I don't have no clue about

9  that.

10      Q.  So the answer is no?

11      A.  Yeah.

12      Q.  Sir, are you the incorporator?

13         MR. RODDY:  Judge, I'm going to ask to

14  be heard at sidebar briefly.

15         THE COURT:  All right.

16              (WHEREUPON, the following was

17              had outside the

18              hearing of the juries:)

19         MR. RODDY:  Judge, I see counsel has

20  numerous documents that we've never been given.

21         MS. BORMANN:  Actually --

22         MR. RODDY:  Can I finish?

23         I have never seen these.  We're in

24  the middle of trial.  Discovery is a two-way

1    street.

2            MS. BORMANN:  Your Honor, I tried to get

3    these documents yesterday and was unable to do

4    so.  I contacted the Secretary of State, and they

5    indicated to me down in Springfield that they

6    could not do this.

7            Our law clerk was able to

8    ascertain from them yesterday that maybe they

9    could do it, and they were able to pick them up

10   today.  I just got them.

11           THE COURT:  Well, why didn't you show it

12   to them?

13           MS. BORMANN:  Over the lunch period?

14   Because I honestly didn't believe he was going to

15   deny any of this.

16           MS. CURTIS:  It's also collateral and

17   irrelevant.

18           THE COURT:  You're not going to be able

19   to prove this up in any way.  It's certainly

20   collateral.

21           MR. RODDY:  Judge, we were down here at

22   20 minutes after 2:00.

23           THE COURT:  It's collateral in any

24   event.  You'll be bound by the answers he gave.

D-238

1    It's as simple as that.  It's totally collateral.

2    So proceed as you wish.

3                         (WHEREUPON, the following was

4                         had in open court, in the

5                         presence of the Erven Walls

6                         jury and Tony Hillard jury:)

7    BY MS. BORMANN:

8        Q.   Sir, isn't it true that the existence of

9    that company that you have told us about was

10   terminated in 1998?

11       A.   Terminated?

12       Q.   Terminated?  Do you know what terminated

13   means?

14       A.   No, I don't.

15       Q.   Ended?

16       A.   No.

17       Q.   Now, sir, during the time that -- in 1997

18   when you were working and you said you had your

19   ex-wife -- actually, she was your wife at that

20   time; right?

21       A.   Yes.

22       Q.   You were married?

23       A.   Separated.

24       Q.   But separated; correct?

1        A.    Yes.

2        Q.    But still legally married?

3        A.    Yes.

4        Q.    And during this time, you are operating

5    this trucking company; right?

6        A.    Yes.

7        Q.    And you were able to support yourself

8    based on that?

9        A.    Say that again?

10       Q.    You were able to support yourself?

11       A.    Oh, yeah.

12       Q.    And you were living on the south side of

13   Chicago?

14       A.    Yes.

15       Q.    In the 1600 block of 56th Street or 65th

16   Street, 1600 east; right?

17       A.    Yes.

18       Q.    And you were living there at that time

19   with your fiance; correct?

20            MS. CURTIS:  Objection, relevance.

21            THE COURT:  Sustained.

22   BY MS. BORMANN:

23       Q.    Well, you were paying the bills in that

24   residence; is that right?

D-240

1          A.    Yes, that's right.

2          Q.    Now, you have told us you were also

3     paying your wife's rent at that time; is that

4     right?

5          A.    No.   I'm supporting her paying the rent.

6     I'm not paying the full rent.

7          Q.    Okay.

8          A.    Yeah.

9          Q.    Well, when Mr. Roddy asked you earlier,

10    didn't you tell us that you were supporting your

11    wife?

12         A.    Yeah, but --

13         Q.    So now you're telling us you paid the

14    rent for Mrs. Jinadu, for your wife, in May of

15    1997, April of 1997, March of 1997?

16              MS. CURTIS:   Objection, form of the

17    question.

18              THE COURT:   Sustained.

19    BY MS. BORMANN:

20         Q.    Prior to May of 1997, were you paying the

21    rent at --

22         A.    No, I'm not paying the rent.   I'm

23    supporting her to pay the rent.   She pay it.   She

24    pay half; sometimes I pay half.

```
 1          Q.    So you were giving her money?

 2          A.    Yes, I was giving her money.

 3          Q.    And you were giving her money every

 4    month?

 5          A.    Yes.

 6          Q.    And you were giving her money every month

 7    to help pay her bills?

 8          A.    Yes.

 9          Q.    Okay.  And at that time, you also owned a

10    Lexus; correct?

11          A.    Yes.

12          Q.    But you did not own any other car?

13          A.    No.

14          Q.    The Lexus is the only car you owned at

15    that time?

16                MS. CURTIS:  Objection, asked and

17    answered.

18                THE COURT:  Objection sustained.

19    BY MS. BORMANN:

20          Q.    Did your business own a car?

21          A.    Yes.

22          Q.    What car did your business own?

23          A.    Well, a 1980 Mack truck, truck, Mack,

24    yeah.
```

File Date: _7-1-2008_

Case No: _08cv1775_

ATTACHMENT # _____

EXHIBIT _7-part6_

TAB (DESCRIPTION)

_____

1      Q.    Okay.  Anything else besides -- any cars?

2      A.    Yeah.  Toyota Land Cruiser.

3      Q.    I'm sorry?

4      A.    Toyota Land Cruiser.

5      Q.    A Toyota Land Cruiser?

6      A.    Yes.

7      Q.    And that was owned by the business at

8    that time?

9      A.    No, before the business.  Because before

10   the trucking business, like I said in the

11   beginning, I was doing -- buying used cars and

12   selling cars.

13     Q.    I understand.

14     A.    Okay.

15     Q.    My question to you is, did the business

16   own the Land Cruiser in May of 1997, or did you

17   personally own the Land Cruiser in May of 1997?

18               MS. CURTIS:  Objection.

19               THE COURT:  Objection sustained.

20   BY MS. BORMANN:

21     Q.    Sir, did the business own the

22   Land Cruiser in 1997?

23               MS. CURTIS:  Objection.

24               THE COURT:  Sustained.

D-243

1      BY MS. BORMANN:

2          Q.   All right.  Now, sir, during the time

3      period we're talking about, specifically May 10th

4      of 1997, you were able to pay all of your bills;

5      correct?

6          A.   To be able to pay my bills or to pay --

7          Q.   Yes.  Were you able to pay your bills?

8          A.   Yes.

9          Q.   But you did not carry health insurance at

10     all?

11         A.   I do carry health insurance.

12         Q.   In May of 1997, did you carry health

13     insurance, sir?

14             MS. CURTIS:  Objection, relevance.

15             THE COURT:  Sustained.

16     BY MS. BORMANN:

17         Q.   Well, sir, you have told us that you

18     spent seven days at Illinois Masonic Hospital; is

19     that right?

20         A.   Yes.

21         Q.   Sir, you were admitted the evening of May

22     10, 1997; isn't that right?

23         A.   Yes.

24             MS. BORMANN:  May I approach, Judge?

```
 1                    THE COURT:  Yes.
 2                    MS. BORMANN:  Thank you.
 3                         (WHEREUPON, Defendant Hillard
 4                         Exhibit Number 1 was marked for
 5                         identification.)
 6        BY MS. BORMANN:
 7             Q.   Sir, I'm going to show you what I have
 8        marked as Hillard Exhibit Number 1 for
 9        identification purposes.
10                    This is a discharge form from
11        Illinois Masonic Hospital; right?
12             A.   Yes.
13             Q.   And, in fact, your signature appears in
14        the bottom, right-hand corner of that, doesn't
15        it?
16             A.   Yes.
17             Q.   Along with the date that you were
18        discharged, doesn't it?
19             A.   Yes, it was.
20             Q.   In fact, you were discharged on May 13th,
21        three days after you were admitted; is that right?
22             A.   No.  It say May 15th.
23             Q.   I'm sorry?
24             A.   Not 13th.  May 15th.
```

1    Q.   Where?

2    A.   Right here.  Are you talking about here?

3    Q.   Sir, that is your next scheduled

4    appointment, isn't it?

5    A.   Oh, yeah.

6    Q.   Yeah.  May 15th would be -- that was your

7    followup appointment, wasn't it?

8    A.   Yeah.  That's what I mean.

9    Q.   And that would have been on an outpatient

10   basis on the 15th?

11   A.   Yes.

12   Q.   And that's because you were discharged on

13   the 13th of May, weren't you?

14   A.   Yeah.  But I don't recall that at that

15   time.  Yeah, I was discharged on the 13th.  I

16   don't know -- even know.  But I don't see this.  I

17   never see this.

18   Q.   You never saw this paper?

19   A.   Yeah, I never see this paper.

20   Q.   So that's not your signature there by the

21   X?

22   A.   I mean, I never have it.  I sign it, and

23   they have it.  They don't give it to me.

24   Q.   This paper is the instructions for you to

D-246

1    go home; right?

2         A.    Yeah.

3         Q.    It lists the medications you're supposed

4    to take and how you're supposed to take them;

5    correct?

6         A.    I have a prescription separate.

7         Q.    Correct?

8         A.    Yes.

9         Q.    It also gives you special instructions

10   for self-care and where you should follow up for

11   your outpatient appointments, doesn't it?

12        A.    Yes.  Yes.

13        Q.    In fact, it indicates that you're

14   supposed to follow up with Trauma Outpatient

15   Center, call tomorrow and make appointment for May

16   16th, Friday?

17        A.    Yes.

18        Q.    Follow up with Eye Center with

19   Dr. Heis (phonetic) Thursday, 5-15, at 10:55.

20   Follow up with ENT, with Dr. Allegretti (phonetic)

21   Thursday, 5-15, at 1:30 p.m.?

22             MS. CURTIS:  Objection, move to strike,

23   relevance.

24             THE COURT:  Overruled.

D-247

1     BY MS. BORMANN:

2          Q.    Is that right?

3          A.    Yes.

4          Q.    And those are the instructions as you

5     were given this document that you were supposed to

6     follow as you were discharged on May 13th; is that

7     correct?

8          A.    Yes.

9          Q.    And, in fact, that's your signature down

10    there by the date, isn't it?

11         A.    Yes.

12         Q.    Thank you.

13         A.    You're welcome.

14         Q.    Now, you weren't transferred from one

15    hospital to another?  You went home on May 13th;

16    right?

17         A.    Yes.

18         Q.    And you went home --

19         A.    I thought it was on the 15th, but, yeah,

20    now that I see that, it's on the 13th.

21         Q.    So you went home that afternoon, so less

22    than 72 hours after you had been admitted?

23         A.    Afternoon?

24         Q.    Yes.  You were actually released at 4:40

D-248

1        in the afternoon on May 13th, weren't you?

2            A.    I don't believe so.   I'm sorry.   They may

3        write that down.   I got to my house in the

4        evening, because I know -- about 9:00 o'clock.

5            Q.    And when you were discharged, you were

6        told to make appointments with Cook County

7        Hospital; correct?

8            A.    No, no.   Not at that time.   They asked me

9        to come back there for two more days.

10           Q.    You were then referred to Cook County

11       Hospital?

12           A.    After that two days, yeah.

13           Q.    So you didn't spend from the 13th -- you

14       were out of the hospital for a week before you

15       went back to Cook County Hospital; right?

16           A.    That's correct, yes.

17           Q.    And you went back to Cook County Hospital

18       for plastic surgery; right?

19           A.    Yes.

20           Q.    Okay.   You saw a plastic -- you were

21       referred to Cook County Hospital because you could

22       not afford to pay for -- you could not afford to

23       pay to have the work done at Illinois Masonic; is

24       that right?

1          A.    That's correct.

2          Q.    So you could have it done free at

3     Cook County; right?

4          A.    Yes.

5          Q.    Okay.  So you did -- you saw a plastic

6     surgeon at Cook County Hospital?

7          A.    Yeah.

8          Q.    And that was on the 20th?

9          A.    I don't recall no more.

10         Q.    Sir, you were released from Cook County

11    Hospital on the 27th after the plastic surgery had

12    been done; is that right?

13         A.    Yes.  Yes.

14         Q.    And you were given a prescription for

15    Tylenol when you left?

16              MS. CURTIS:  Objection, relevance.

17              THE COURT:  Overruled.

18    BY MS. BORMANN:

19         Q.    When you left Cook County Hospital; is

20    that right?

21         A.    No, I wasn't given a prescription for

22    Tylenol.

23              MS. BORMANN:  May I approach, Judge?

24              THE COURT:  Yes.

D-250

```
 1                              (WHEREUPON, Defendant Hillard's
 2                              Exhibit Number 2 was marked for
 3                              identification.)
 4     BY MS. BORMANN:
 5          Q.   Sir, I'm going to hand you a document I
 6     have marked as Hillard Exhibit Number 2 for
 7     identification and ask you to look at the bottom,
 8     Xeroxed prescription there.
 9                    Do you recognize that prescription
10     as being given to you when you were discharged
11     from Cook County Hospital?
12          A.   Which one?  This one right here?
13          Q.   Yeah, that one right there.
14          A.   Yes.
15          Q.   And you were prescribed Tylenol, 650
16     milligrams, when you were discharged from
17     Cook County Hospital; is that right?
18          A.   This is Tylenol?  This is not Tylenol.
19          Q.   Sir, can you read the first one right
20     here?  What is that?
21          A.   This one right here?  It look like the
22     antibiotic ointment.
23          Q.   There is an antibiotic ointment, that's
24     correct.  The one above that.
```

1          A.    The one in the tube?

2          Q.    No, no.  Sir, read the letters.  Can you

3     read?

4          A.    I can read.  T-u --

5          Q.    T-y-l --

6          A.    It don't look like Y to me.

7                MS. CURTIS:  Objection.  He's answered

8     the question.

9                THE COURT:  Objection sustained.

10    BY MS. BORMANN:

11         Q.    Now, sir, the apartment at 5851 north on

12    Winthrop, were you the actual leaseholder on that,

13    or was Delores?

14         A.    Delores.

15         Q.    Delores?

16         A.    Yes.

17         Q.    And how long had Delores lived in that

18    apartment?

19         A.    Probably maybe six months.

20         Q.    Okay.  And so she had moved into that

21    apartment some time toward the end of 1996, around

22    maybe Halloween or so?  October, fall of 1996?

23         A.    No.  She moved into that apartment in

24    '97.

1        Q.    In '97.  So sometime after January of

2    '97?

3        A.    Yes.

4        Q.    And from January of 1997 until this

5    happened in May of 1997, how many times had you

6    been in the apartment?

7        A.    In the apartment or in the building?

8        Q.    In the apartment?

9        A.    I been to that apartment in the building

10   about two times.

11       Q.    Only two times?

12       A.    Only two times.

13       Q.    And how many times had you been to the

14   building?

15       A.    Plus the day the incident happened, three

16   times.

17       Q.    So the total now have you been in the

18   building, does that include the two times that you

19   were in the apartment?

20       A.    Including everything together, five

21   times.

22       Q.    Five times total?

23       A.    Yes.

24       Q.    So three times where you never went in

D-253

1       the apartment and two times where you did?

2           A.   Yes.

3           Q.   And, sir, during all of this time when

4       Delores lived -- now, this place at 5851 North

5       Winthrop is in Rogers Park; right?

6           A.   No.

7           Q.   Well, it's north of Foster Avenue;

8       correct?

9           A.   Yes.

10          Q.   It's north of Bryn Mawr; correct?

11          A.   Yes.

12          Q.   And it's just south of Hollywood; right?

13          A.   South of Hollywood, yes.

14          Q.   And Winthrop is right off the Lake?  It's

15      about -- from there, two blocks west of the Lake?

16      Would that be right?

17          A.   That's not right.  The place was called

18      Uptown.

19          Q.   I'm sorry.

20          A.   The place was called Uptown.

21          Q.   All right.  That's fine.  So 5800 north,

22      and you lived 1600 east and 65th Street?

23          A.   Yes.

24          Q.   Now, your business, you told us, was out

1      on the west side on Harrison near Pulaski; right?

2          A.   Yes.

3          Q.   Okay.  And you didn't have any friends

4      that lived in Delores' building besides Delores,

5      did you?

6          A.   No.  In that building, no.

7          Q.   So when you came to see -- those five

8      times that you were there to see Delores, you were

9      there just to see her; right?

10         A.   Yeah.  You know, we were separated.  We

11     still sleeping together.

12         Q.   So you were still sleeping with Delores

13     during all of this time?

14         A.   Yes.

15         Q.   Now, when you would go to sleep with

16     Delores, that would be in her apartment; right?

17         A.   No.

18         Q.   It would be in the building, but not in

19     her apartment?

20         A.   No.  I come to pick her up, take her to

21     my house.

22         Q.   Okay.  When you were in her apartment,

23     you noticed it was a studio apartment; correct?

24         A.   Mm-hmm, yes.

D-255

1        Q.    It's a small place, isn't it?

2        A.    Yes.

3        Q.    It was a one room that has the living

4    quarters?

5        A.    Mm-hmm.

6        Q.    And then there's just a bathroom;

7    correct?

8        A.    Yes.

9        Q.    And the one room that has the living

10   quarters is very small, isn't it?  It's room

11   enough for --

12       A.    You mean -- you say -- you mean another

13   room in that apartment?

14       Q.    No.  The living area of the studio

15   apartment that you have talked about, what you

16   have talked about as the living room, it's very

17   small?

18       A.    Not very.  It contain a bed, and it

19   contain two chairs, two sitting chairs.

20       Q.    Two chairs?

21       A.    Yes.

22       A.    And a coffee table.

23       Q.    And a table?

24       A.    Mm-hmm.

D-256

1      Q.   Now, on that day now, you also -- it

2    contained some stereo equipment; right?

3      A.   What?

4      Q.   Stereo equipment?  Stereo, music, the

5    thing you use to play music.  Did Delores have a

6    stereo?

7      A.   No.  She got a TV.

8      Q.   She has a TV?

9      A.   Yes.

10     Q.   And you had seen that TV on those times

11   that you had been there before?

12     A.   Yeah.  Like I say, I been there two

13   times.

14     Q.   At this time, Delores didn't have a phone

15   in her apartment, did she?

16     A.   What time?

17     Q.   May of 1997?

18     A.   Yes.  There was a phone then -- oh,

19   you're talking about the day of the incident?

20     Q.   Yes.

21     A.   Yeah, no phone.

22     Q.   There was no phone in her apartment?

23     A.   At all.

24     Q.   That's right.

1          A.    Mm-hmm.

2          Q.    Now, sir, Mr. Franks talked to you

3     about -- quite a bit about talking to the police.

4     I don't want to spend a lot of time on it, but I

5     do want to go over a few things.

6                     When you first got out of the

7     building after these offenders had done this to

8     you, you at that point had not been hit for a

9     little while; right?  Because you had been left

10    alone for a little while before you escaped;

11    correct?

12         A.    Yes.

13         Q.    So when you saw the police, you wanted to

14    make sure that the guys and the woman who did this

15    did not get away; is that right?

16         A.    Exactly.

17         Q.    So you wanted to cooperate with the

18    police?

19         A.    Yes.

20         Q.    Right?

21         A.    Yes.

22         Q.    You wanted to be honest with them?

23         A.    Cooperate and honest is the same, yes.

24         Q.    And you wanted to give them every bit of

1    information you had about who did this; is that

2    right?

3        A.   Yes, exactly.

4        Q.   Now, sir, isn't it true that you

5    described five offenders in this case; right?

6        A.   Yes.

7        Q.   You described one of them as Delores

8    Jinadu; is that right?

9        A.   Yes.

10       Q.   And Delores, you told them, lived there

11   at 5851 North Winthrop; right?

12       A.   Say that again.

13       Q.   You told the police that Delores lived

14   there at 5851 North Winthrop?

15       A.   Oh, yes.  Yes, I told them.

16       Q.   And you told them, the police, these

17   first police -- this is Officer Schmidt or

18   Ramirez.  Remember them?  They're the guys that

19   first talked to you?

20       A.   No, I don't.

21       Q.   You remember the blond guy?  He's kind of

22   a tall, blond guy, youngish looking white guy?

23       A.   There's a lot of officers, so I don't

24   pay attention to none of them.  I was talking to

```
 1    them.

 2        Q.   Well, do you remember that guy, tall,

 3    blond guy that you talked to --

 4             MS. CURTIS:  Objection, asked and

 5    answered.

 6    BY THE WITNESS:

 7        A.   I was not talking to one officer.  I was

 8    talking to a whole bunch of them.

 9             THE COURT:  Overruled.

10    BY MS. BORMANN:

11        Q.   Do you remember a Hispanic officer, a

12    little older, maybe in his late 40s, slightly

13    graying?

14        A.   Ma'am, I do not recall the faces of the

15    police.  At that time, I was in serious hurt.

16        Q.   I understand that.

17        A.   Yeah.  I don't recall.

18        Q.   So you don't remember what they look

19    like --

20        A.   Yeah.

21        Q.   -- those police officers?

22             Now, you also told those police

23    officers that she was a female; right?

24        A.   Yes.
```

1      Q.    That she was black; right?

2      A.    Yes.

3      Q.    That she was 24 years of age?

4      A.    Yes.

5      Q.    That she was five foot eight?

6      A.    Yes.

7      Q.    And she weighed 150 pounds; right?

8      A.    I don't know about the pounds.  I didn't

9  describe her to them.  I just told them that she

10  used to be my wife.

11      Q.    So you didn't give them a weight?

12      A.    No.

13      Q.    Now, you also told them she has brown

14  eyes; right?

15      A.    I didn't describe them to that point.

16      Q.    Did you tell them she had black hair?

17      A.    Yeah.

18      Q.    Yes.

19              Did you tell them that she had a

20  dark complexion?

21      A.    Yeah, I tell them that.

22      Q.    Now, you also, sir, named somebody named

23  Jermaine Craine, didn't you?

24      A.    If I named somebody Jermaine?

1      Q.   Jermaine Craine as one of the offenders?

2      A.   If I do -- you mean if I say that?

3      Q.   I'm asking you whether or not you told

4  those police officers who you don't remember

5  what they look like, whether or not you told them

6  that one of the offenders was named Jermaine

7  Craine?

8      A.   That is not correct, no.

9      Q.   All right.  Did you tell them that that

10  person was wearing -- that a person was wearing

11  blue jeans and a red jacket?

12      A.   Yes.

13      Q.   Did you tell them that that person was

14  male?

15      A.   Who is that?

16      Q.   The person wearing the blue jeans and the

17  red jacket?

18      A.   Yes.

19      Q.   Okay.  Did you tell them that that person

20  was black?

21      A.   Yes, I did.  African American.  Is that

22  what you mean?

23      Q.   That's what I mean.

24      A.   Yeah.

1      Q.   Did you tell them that person was in his

2   20s?

3      A.   Yes.

4      Q.   Did you tell them you didn't know that

5   person's height?

6      A.   Yeah.  I tell them that, that I don't

7   know the height.

8      Q.   Did you tell them that that person

9   weighed 160 pounds?

10      A.   I describe to you the tall one, the huge

11   one out of them.  They ask me the best way they

12   can be able to try to locate them, if I could

13   describe them a little bit.

14                    And I said, the guy is huge like

15   me.  He's taller than me a little bit.

16      Q.   What I'm asking you, though, sir, is the

17   guy with the blue jeans and the red jacket, did

18   you describe that guy, the guy whose height you

19   didn't know, as being 160 pounds?

20      A.   At that time, I don't recall everything

21   they asked about description and something.  I'm

22   sorry.  I don't recall all of that.

23      Q.   So your answer is, no, you don't remember

24   telling them how much the person weighed?

D-263

1      A.    Yeah.   I don't remember telling them how
2    much the person weighed.

3      Q.    Did you tell them that that person had
4    brown eyes?

5      A.    Yes.

6      Q.    Did you tell them that that person had
7    black hair?

8      A.    Yes.

9      Q.    Did you tell them that that person had a
10    medium complexion?

11      A.    Medium?

12      Q.    Medium?

13      A.    What does medium mean?   I don't say that.

14      Q.    Well, you just told us that you told
15    those officers that Delores, your wife, has a dark
16    complexion; right?

17      A.    Yes.

18      Q.    And my question to you is whether or not
19    you told them that this person wearing the blue
20    jeans and the red jacket had a medium complexion?

21      A.    To be honest with you, I don't even know
22    what is medium complexion.   I mean, I can say
23    maybe light skinned or a little bit deep.

24      Q.    So you know light skinned and you know

D-264

1    deeper?

2        A.   Yeah.

3        Q.   But you don't know medium?

4        A.   I don't know what medium means.

5        Q.   So the answer is, no, you did not tell

6    them this person had a medium skin tone?

7        A.   No, I don't say that.

8        Q.   No, you didn't say that to those

9    officers?

10       A.   I didn't, yeah.

11       Q.   Now, you described a third person as --

12   by their name of Erven Walls, your wife's

13   boyfriend; correct?

14       A.   If I tell the police his name?

15       Q.   Yes.

16       A.   No, I don't.

17       Q.   Well, you told us earlier -- you told us

18   it was her boyfriend?

19       A.   I didn't say that.  I said after they

20   show me the ID, they had a picture that showed

21   this guy's face.  I said, that right there, that's

22   him.

23       Q.   So you didn't give them the name, Erven

24   Walls?

```
1          A.    Because I didn't know the name.

2          Q.    Did you describe somebody who lived with

3     your wife at 5851 North Winthrop?

4          A.    Yeah.  Excuse me.  I'm sorry.  Lived?

5          Q.    Stayed with your wife?

6          A.    No, I never said nobody stayed with her.

7          Q.    So you didn't give an address for this

8     person?

9          A.    No.

10         Q.    Did you describe this person as a male

11    black?

12         A.    What man?

13         Q.    Well, the guy you said you didn't know as

14    Erven Walls, but you identified him by his

15    picture?

16         A.    Oh, yes, of course.

17         Q.    Did you describe him as five foot eleven

18    inches tall?

19         A.    Yes.

20         Q.    Did you describe him as weighing 165

21    pounds?

22         A.    I probably did.  I don't recall that.  I

23    don't remember if I tell them about the pounds

24    because, you see, the pound stuff, I don't know.
```

1    I can't even tell how many pounds people weigh.

2        Q.   So you don't know whether or not you told

3    the police officers that?

4        A.   I don't recall that.  I don't remember.

5        Q.   Did you tell them that he had brown eyes?

6        A.   Yeah.  They asked me the color of the

7    eyes, yeah.

8        Q.   Did you tell them that he had black hair?

9        A.   Yes.

10       Q.   Now, let's go on to offender number

11   four.  Did you describe that person as a male

12   black?

13       A.   Yes.

14       Q.   Okay.  Did you describe that person as

15   five foot ten?

16       A.   Yes.

17       Q.   Did you describe that person as weighing

18   200 pounds?

19       A.   Yes.

20       Q.   Did you describe that person as wearing

21   black jeans with a red pullover?

22       A.   The 200 pounds?

23       Q.   The 200 pound guy?

24       A.   No, no.  Red pullover, no.  Like a brown,

1      like the color of that chair.

2          Q.   So you didn't tell the police officers

3      that he -- the 200 pound guy was wearing black

4      jeans with a red pullover?

5          A.   I say he was in black jeans.  I'm talking

6      about the jacket color.  I didn't say it was red.

7          Q.   So black jeans is yes.  You did tell them

8      that, but not --

9          A.   Yes.

10         Q.   -- but not that he was in a red pullover?

11         A.   I thought you said jacket.

12         Q.   No, pullover.

13         A.   Yeah.

14         Q.   You did say he was in a red pullover?

15         A.   Yes, pullover.

16         Q.   And you told them you didn't have any

17     further information on this person?  You knew

18     nothing else about this person; right?

19         A.   Oh, yes, of course.

20         Q.   Now, offender number five was the last

21     male black?

22         A.   Was the last what?

23         Q.   Was the last male black?  That person was

24     also a male black?

1        A.    Mm-hmm.

2        Q.    And that person you described as being

3    five foot five inches tall; right?

4        A.    You could say that.

5        Q.    And that person you described as

6    weighing 140 pounds?  He was a much smaller

7    person; right?

8        A.    Mm-hmm.

9        Q.    And that person, you said, was wearing a

10   blue jacket; right?

11       A.    Yeah.

12       Q.    And that person, you said, was wearing

13   gray jeans; right?

14       A.    Yes.

15       Q.    That person -- you gave those police

16   officers a name for this person?  That name was

17   Dormaine Walls, wasn't it?  D-o-r-m-a-i-n-e

18   Walls?

19       A.    I never give any name to any officers.

20       Q.    So your answer is no?

21       A.    Yes.

22       Q.    Thank you.

23       A.    You're welcome.

24       Q.    Now, sir, when the police arrived, you

1    were with them when they went back to the

2    apartment?  In fact, you showed them the apartment

3    where this had happened; right?

4         A.    They don't let me into the apartment.

5         Q.    Well, were you there when they searched

6    it?  Could you see when they searched the place?

7         A.    What do you mean if I'm there?  I don't

8    understand what you mean by I'm there.

9         Q.    My question is -- I should phrase it more

10   artfully for you.

11                   Did you see the police search the

12   apartment?

13        A.    They went to the apartment, yeah.

14        Q.    Okay.  Did you see them search it?

15        A.    No, I didn't.  I know they were

16   searching.  I didn't see them because I --

17        Q.    Okay.  Did they bring things out to you

18   to show you?

19        A.    Yes, they do.

20             MS. BORMANN:  Judge, may I approach?

21             THE COURT:  Yes.

22             MS. BORMANN:  Thank you.

23

24

D-270

1                              (WHEREUPON, Defendant Hillard's

2                              Exhibit Number 3 was marked for

3                              identification.)

4    BY MS. BORMANN:

5         Q.    Let me see if I can read my own writing

6    now.  I'm going to hand you what I have marked as

7    Hillard Exhibit Number 3 for identification

8    purposes and show that to you.

9                    Is that one of the things -- what

10   is that, first of all?

11        A.    This is a social security card.

12        Q.    And whose name is it in?

13        A.    Dormaine Jerome Walls.

14        Q.    Dormaine Jerome Walls?

15        A.    Yes.

16        Q.    Is that one of the pieces of things that

17   the police officers showed you when they searched

18   the apartment?

19        A.    Never.  They never showed me something

20   like this.

21                             (WHEREUPON, Defendant Hillard's

22                             Exhibit Number 4 was marked for

23                             identification.)

24

1    BY MS. BORMANN:

2        Q.   I'm going to show you what I have marked

3    as Hillard Number 4 for identification.  Can you

4    tell us what that is?

5        A.   Yeah.  It look like a social security

6    card.

7        Q.   And this one is in the name of Zachary T.

8    Walls; correct?

9        A.   Yeah.

10       Q.   With a different social security number

11   than the one from Dormaine Walls?

12       A.   Yes.

13       Q.   Is this one of the pieces of

14   identification that the police officer showed you

15   when they searched the apartment?

16       A.   No.

17                    (WHEREUPON, Defendant Hillard's

18                     Exhibit Number 5 was marked for

19                     identification.)

20   BY MS. BORMANN:

21       Q.   I have what I have marked as Hillard

22   Number 5 for identification.  Can you tell us what

23   that is?

24       A.   Certificate for return to school or work.

D-272

1    Q.   And whose name is that in?

2    A.   I think this is E-h --

3    Q.   E-r-v-e-n?

4    A.   Yes.

5    Q.   Erven Walls?

6    A.   Yes, this is Walls.

7    Q.   Yes?

8    A.   Yes.

9    Q.   Did they ever show that to you?

10   A.   No, they don't.  They never showed me

11   that.

12                      (WHEREUPON, Defendant Hillard's

13                      Exhibit Number 6 was marked for

14                      identification.)

15   BY MS. BORMANN:

16   Q.   I have what I have marked as Number 6,

17   and I don't want it to fall apart here, but it

18   looks like it's going to, so we'll try not to make

19   it.

20                      Can you tell us what that is?

21   A.   This look like an American birth

22   certificate.

23   Q.   It's a birth certificate; right?

24   A.   Mm-hmm.

D-273

1          Q.    And who is that for?   Is that for Erven

2    Walls?

3          A.    Mm-hmm.

4                            (WHEREUPON, Defendant Hillard's

5                            Exhibit Number 7 was marked for

6                            identification.)

7    BY MR. FRANKS:

8          Q.    And I'm going to show you what I have

9    marked as Group Exhibit Number 7, showing you

10   three documents.   Can you tell me what those are?

11                Oh, I'm sorry.   On Number 6, that

12   birth certificate, did the police officers ever

13   show you that?

14         A.    No, they never showed me.

15         Q.    And the group exhibit that I just showed

16   you, those are three tickets, aren't they?

17         A.    No.

18         Q.    They're not tickets?

19         A.    No, they're not tickets at all.   I

20   mean --

21         Q.    Did you ever see these three documents?

22   Did the police ever show you these?

23         A.    I never see any of this document before.

24         Q.    Now, before you testified here today,

D-274

1      sir, you talked with these state's attorneys

2      about what you were going to testify to, didn't

3      you?

4          A.   Yes, I do.

5          Q.   And, in fact, they're not the first

6      state's attorneys that you talked to; right?

7          A.   Mm-hmm.

8          Q.   They're not the first state's attorneys

9      you talked to?

10         A.   Who?

11         Q.   These two people here, Mr. Roddy and

12     Miss Curtis?

13         A.   Yeah.

14         Q.   They are the first state's attorneys you

15     have talked to?

16         A.   No, no.  They're not the first persons.

17         Q.   In fact, you talked to a Mary Pat

18     Devereaux before when you testified in front of

19     the grand jury; right?

20              MS. CURTIS:  Objection, relevance to how

21     many state's attorneys he's spoken to.

22              THE COURT:  Overruled.

23     BY THE WITNESS:

24         A.   I don't recall.  Maybe.  Yeah, I talked

1      to somebody who is -- besides the two people

2      here.  I don't know.  I don't recall the name.

3      BY MS. BORMANN:

4           Q.   All right.  And how many other state's

5      attorneys have you talked to?

6           A.   How many?

7           Q.   Mm-hmm.

8           A.   Yeah.  Three, three or four.

9           Q.   Including these two people here?

10          A.   Yeah.

11          Q.   And when you talked to these two people

12     here, they talked to you about what you were going

13     to testify here to today; right?

14          A.   If they what?

15          Q.   They talked with you about what your

16     testimony was going to be here today; correct?

17          A.   Yes.

18          Q.   Okay.  And they told you you'd be

19     cross-examined; right?  You'd be asked questions

20     by defense attorneys; right?

21          A.   They told me they -- they didn't tell me

22     anything.  They just made me a letter, a subpoena

23     letter.  Then they asked me to come here.

24          Q.   So you didn't talk with these state's

```
 1    attorneys about what your testimony was going to
 2    be today?
 3         A.   Yeah.   They told me what time it's going
 4    to be.
 5         Q.   Did you tell them about what you were
 6    going to testify to?
 7         A.   No, I don't tell them what I'm going to
 8    say.
 9         Q.   You have never talked to the
10    state's attorneys about what you're going to say?
11    Is that your testimony?
12         A.   Yes.
13         Q.   So you never were in the State's
14    Attorney's Office in this building prior to
15    today's date to discuss your testimony?
16         A.   Yes, I was.   Yeah.
17         Q.   When were you in this building prior to
18    today's date to discuss your testimony?
19              MR. RODDY:   Judge, I'll object to the
20    relevance of this.
21              THE COURT:   Overruled.
22    BY THE WITNESS:
23         A.   Today.
24
```

1    BY MS. BORMANN:

2        Q.    Before today?

3        A.    The last subpoena, the last subpoena

4    before this date.  It was on April -- I think

5    April 30th I came.

6        Q.    Have you been in the building between

7    April 30th and today?

8        A.    No.

9        Q.    On April 30th, did you speak with these

10   state's attorneys or different state's attorneys?

11       A.    April 30th?

12       Q.    Yes.

13       A.    Yeah.  I spoke to him.

14       Q.    These state's attorneys?  Did you speak

15   to somebody by the name of Gina Savini?

16       A.    That's -- yeah, that's the person that's

17   familiar.  She called me on the phone that I have

18   to come to the Court.  I didn't talk to her in

19   person.

20       Q.    When you came to court on the 30th,

21   you didn't see these two state's attorneys, did

22   you?

23       A.    I think I see Joe and Gina Savini.

24       Q.    You talked to Miss Savini then?

D-278

1        A.    Yes.

2        Q.    And you talked about what you were going

3    to testify to, didn't you?

4        A.    They told me when the court date is going

5    to be.

6        Q.    But you never talked to anyone from the

7    State's Attorney's Office about what you were

8    going to testify to?

9        A.    I really don't understand exactly what

10   you mean.

11            THE COURT:   You're using a word that is

12   throwing this man, testify, testify.   Ask if he

13   talked about what happened to him.

14   BY MS. BORMANN:

15       Q.    Did you talk to the state's attorneys

16   about what you're telling us here today about what

17   happened to you?

18       A.    Yes, I did.

19       Q.    When did you talk to the state's

20   attorneys?

21       A.    I talked to them April 26th.   I call

22   because they leave a message, and Gina Savini left

23   a message, and I talked to her.

24       Q.    Okay.   Before you testified here today --

D-279

```
 1          A.    Mm-hmm.
 2          Q.    -- meaning yesterday or sometime last
 3     week, did you ever sit down with either of these
 4     people and talk with them about what you were
 5     going to say here today?
 6          A.    No.   The answer is no.
 7                            (WHEREUPON, Defendant Hillard's
 8                            Exhibit Number 8 was marked for
 9                            identification.)
10     BY MS. BORMANN:
11          Q.    Sir, I'm going to approach.
12                     May I, Judge?  I'm sorry.
13                     And show what I have marked as
14     Hillard's Number 8 for identification.  Can you
15     tell us what that is?
16          A.    ID card.
17          Q.    And that's in the name of Jermaine --
18                     THE COURT:  Before you do this, these
19     are not in evidence.  They haven't been
20     identified.  If you ask him if he's seen them
21     before, that's one thing.  Every piece you have
22     shown him, he's never seen before.  If he says
23     he's seen it before, you can inquire on it.
24     There's no foundation for those exhibits.
```

1    BY MS. BORMANN:

2         Q.   Have you seen that before?

3         A.   Yes.

4         Q.   When did you see that?

5         A.   The police showed me.  They show me ID.

6         Q.   And that ID is in the name of Jermaine

7    Craine; is that correct?

8         A.   I don't read the name.  They just show me

9    the picture.  This (indicating.)

10        Q.   Is this in the same condition it was when

11   they showed it to you other than the fact that

12   there's a white sticker on the back?

13        A.   Ma'am, they show me the face of the

14   person --

15        Q.   I understand.  Is the card in the same --

16        A.   That's what they showed me.

17                         (WHEREUPON, Defendant Hillard's

18                         Exhibit Number 9 was marked for

19                         identification.)

20   BY MS. BORMANN:

21        Q.   Okay.  I'm showing you what I have marked

22   as Hillard Exhibit Number 9 for identification

23   purposes.  Have you seen that before?

24        A.   This one?

D-281

1      Q.   Yes.

2      A.   Yes.

3      Q.   What is it?

4      A.   That's my wife's driver's license, my

5      ex-wife.

6      Q.   It's a driver's license?

7      A.   Yes.

8      Q.   And that's for Delores Jinadu?

9      A.   Yes.

10     Q.   And the police showed you that on the

11     day -- or did the police show you that the day of

12     the incident?

13     A.   They didn't show me.  That's why they

14     have a description of her.  They didn't show me a

15     driver's license.

16     Q.   Okay.  Thank you.

17          Sir, when you talked to those

18     police officers that day -- today -- first of all,

19     was any cash ever taken from you during this

20     incident?

21     A.   Cash?

22     Q.   Yes.  Cash money?

23     A.   Not even one dollar.

24     Q.   Not even one dollar?

D-282

1          A.    Yes.

2          Q.    And that's because you didn't have your

3     wallet with you?

4          A.    Probably.

5          Q.    Okay.  Your wallet was, you said, I

6     think, back in your office?

7          A.    Repeat that question?

8          Q.    Your wallet was back in your office;

9     right?

10         A.    Yeah, it was on here in my office.

11         Q.    Didn't you tell the original officers in

12    the case, Officer Schmidt and Ramirez, that the

13    offenders in this case took 60 dollars in money

14    from you?

15         A.    I don't recall that I say that.  I'm

16    sorry.

17         Q.    Sir, did you tell these officers that the

18    offenders in this case took a TV from the

19    apartment?

20         A.    They took a TV?

21         Q.    They took a TV?

22         A.    Apartment?  It's not my apartment.  Why

23    would I say my TV is there?  I didn't say that.

24         Q.    Did you tell those officers that they

1    took a radio?

2         A.   No, I don't.

3         Q.   Did you tell those officers that they

4    took a stereo?

5         A.   No, I don't.

6         Q.   Now, sir, you told us that the reason you

7    went to 5851 this day was because you were going

8    to pick up your wife to bring her to work?

9         A.   That's right.

10        Q.   Is that right?

11        A.   That's correct.

12        Q.   When you talked to her earlier that

13   morning --

14        A.   Yes.

15        Q.   -- didn't you tell her take a cab?

16        A.   Yes -- no.  I told her to take the 22

17   downtown.  It would be very easy for her.  Yeah, I

18   did.

19        Q.   And she wouldn't?

20        A.   She say, you going to be complaining.

21   You always complain.  I mean, you out there now.

22   You got a car.  Why don't you come and get me?

23   She say something.

24        Q.   Now, Saturday, you said, is -- your

D-284

1    office is open; right?

2        A.    Yeah.

3        Q.    Okay.  And you and your wife on that day

4    were supposed to be in the office?

5        A.    Yes.

6        Q.    Working?

7        A.    Yeah.

8        Q.    Nobody else was in the office?

9        A.    Nobody else.

10        Q.    Okay.  And customers come into the

11    office, you have said; right?

12        A.    Supposed to -- no, not come in.  They

13    supposed to call.

14        Q.    Oh, customers call the office?

15        A.    Yes.

16        Q.    Because they expect you to be open on

17    Saturdays?

18        A.    Me?

19        Q.    Yeah, your office?

20        A.    Who expected me?  My customers?

21        Q.    Your customers?

22        A.    No.

23        Q.    Well, nevertheless, sir, you picked up

24    and drove from the west side of Chicago --

1        A.    That's right.

2        Q.    -- to Uptown on the north side of Chicago

3    that morning?

4        A.    Yes.

5        Q.    And you left your office, which is

6    supposed to be open, not open; correct?

7        A.    Mm-hmm.

8        Q.    Now, sir, didn't you tell the original

9    responding police officers the reason you went to

10   5851 North Winthrop that day was to discuss

11   business with your wife?

12       A.    That's not -- no, no.

13       Q.    Sir, didn't you tell those same

14   officers -- first of all, when you had the

15   conversation with the officers, this is right

16   after this had happened; right?

17       A.    Right, yeah.

18       Q.    Okay.  So it's obviously very fresh in

19   your mind?

20       A.    Yes.

21       Q.    It had just happened?

22       A.    Yes, you can say that.

23       Q.    All right.  Now, didn't you tell the

24   officers when you were explaining what happened

1    that day that somebody by the name of Jermaine
2    Craine -- strike that -- somebody described as
3    wearing blue jeans and a red jacket, male black in
4    their 20s, pulled you -- with an unknown height,
5    brown eyes, and black hair, pulled you into that
6    apartment?

7        A.   No, I did not say that.

8        Q.   And didn't you tell those officers that
9    after that person pulled you into the apartment,
10   that's when the person hit you over the head with
11   a baseball bat?

12       A.   That's not correct.

13       Q.   Now, sir, you told us today that when you
14   woke up in the living room, you -- your feet were
15   bound with electrical cord, I think you said;
16   right?

17       A.   Yes.

18       Q.   And the rest of you was free; right?

19       A.   What do you mean by "the rest?"

20       Q.   Well, your hands were free?  They weren't
21   bound in any way at that point?

22       A.   Mm-hmm.

23       Q.   And your mouth was not bound?

24       A.   No.

1          Q.   And none of the other parts of your body
2     were bound?

3          A.   Besides my legs, my two legs.

4          Q.   Just your ankles; right?

5          A.   Yeah.

6          Q.   Sir, didn't you tell those original
7     officers that you were handcuffed and bound in
8     the -- strike that.

9               Now, your testimony -- we're
10    getting ahead of ourselves here.

11              Your testimony here today is that
12    once you were brought into the bathroom, that's
13    when you were handcuffed and tied up; right?

14         A.   Did you say when I was running?

15         Q.   No, no, no.  You said when you woke up,
16    just your ankles were bound; right?

17         A.   Yes.

18         Q.   You were then carried to the bathroom at
19    some point; right?

20         A.   Yes, at some point.

21         Q.   Okay.  And then you were handcuffed in
22    the bathroom --

23         A.   Yes.

24         Q.   -- right?

1          A.    (Nodding.)

2          Q.    And you were taped up in the bathroom?

3          A.    Yes.

4          Q.    And were you gagged with tape in the

5     bathroom?

6          A.    Yes.

7          Q.    Sir, didn't you tell the original

8     responding officers that you were handcuffed, and

9     your legs were tied with duct -- with tape and

10    electric cords and placed duct tape and a bandana

11    over your mouth right after the men -- strike

12    that.

13                Didn't you tell them that right

14    after they removed your clothing, the offenders,

15    they handcuffed you, tied your legs with duct tape

16    and electrical cords, and placed duct tape and a

17    blue bandana over your mouth?

18                MS. CURTIS:   Objection.   How is that

19    impeaching?

20                THE COURT:   Sustained.

21    BY MS. BORMANN:

22         Q.    Well, didn't you then tell them that

23    then they took you to the bathroom and threw you

24    down?

```
 1                    MS. CURTIS:  Objection, form of the
 2       question.
 3                    THE COURT:  Sustained.
 4       BY MS. BORMANN:
 5           Q.   Sir, didn't you tell those police
 6       officers that you were bound and cuffed before you
 7       were taken to the bathroom?
 8           A.   No, I didn't tell them that.
 9           Q.   Sir, didn't you tell those same officers
10       that when the offenders in this case were trying
11       to collect ransom for you, they were calling your
12       friends to get the ransom?
13                    MS. CURTIS:  Objection, asked and
14       answered.
15                    THE COURT:  Sustained.
16                    MS. BORMANN:  I'm sorry.
17                    THE COURT:  Both juries have heard that
18       question asked and answered on cross-examination
19       by Mr. Franks.  I don't see any reason to repeat
20       it again.
21       BY MS. BORMANN:
22           Q.   Sir, didn't you tell them that they
23       were -- the offenders were demanding drugs in
24       exchange for your release?
```

D-290

1                    MS. CURTIS:  Objection.

2                    THE COURT:  Overruled.

3        BY THE WITNESS:

4             A.   No, I didn't tell them that.

5        BY MS. BORMANN:

6             Q.   Sir, in this small apartment that we've

7        described, you have some time in the bathroom;

8        correct?  And some time in the living room there;

9        is that fair?

10            A.   Yes, that's fair.

11            Q.   Okay.  And when you were able to escape,

12       you spent some time in the living room because you

13       were actually at the front door, and then you went

14       back to the bathroom; right?

15            A.   I didn't spend no time in the living

16       room.

17            Q.   Okay.  But certainly, you saw that living

18       room area?

19            A.   Empty, nobody.

20            Q.   Nobody was there?

21            A.   Yes.

22            Q.   I'm going to ask you about some of the

23       furniture.  Did you see a worktable in there with

24       drug paraphernalia on it?

1           MS. CURTIS:  Objection, asked and

2      answered.

3           THE COURT:  Sustained.

4      BY MS. BORMANN:

5           Q.   Sir, I want to go on to -- besides

6      talking to the original police officers in this

7      case, you also testified once before in this case;

8      is that right?

9           A.   If I testified when?

10          Q.   Do you know what the word "testify"

11     means?

12          A.   I know what is testify mean.

13          Q.   Okay.  You testified once before in this

14     case under oath; right?

15          A.   Before the grand jury, yeah.

16          Q.   Yes.

17          A.   Yes.

18          Q.   Okay.  And that happened on September

19     29th of 1997?

20          A.   That's correct, yes.

21          Q.   And you did like you did today?  You

22     swore to tell the truth, the whole truth, and

23     nothing but the truth so help you God; right?

24          A.   Yes.

1        Q.    And you sat in a witness chair similar to

2    where you are today?

3        A.    Yes.

4        Q.    And there were ladies and gentlemen of

5    the grand jury there to listen to your testimony;

6    right?

7        A.    That's correct.

8        Q.    And there was a state's attorney, a woman

9    by the name of Mary Pat Devereaux, asking you

10    questions; right?

11        A.    Mm-hmm, yes.

12        Q.    And you were giving your honest answers

13    at that time; is that right?

14        A.    That's correct.

15        Q.    Now, sir, isn't it true today you told us

16    that before you were taken to the bathroom, a

17    couple of things happened; right?  You were first

18    hit with -- when you woke up -- after you woke up,

19    but before you were taken to the bathroom, you

20    told us today, that you were hit in the face with

21    a chisel by the guy who was originally having a

22    baseball bat; right?

23        A.    Yes.  Yes.

24        Q.    All right.  I'm going to refer to that

D-293

```
 1        person as the bat man or the bat guy.  Let's call
 2        him the bat guy so that we can differentiate.
 3                        In fact, when you testified in
 4        front of the grand jury, that's what you called
 5        him was the man with the baseball bat?
 6        A.    Yes.
 7        Q.    So we'll call him the bat guy.  You have
 8        testified the bat guy is not any of the people
 9        here; right?
10        A.    I'm sorry.  I don't want to say the bad
11        guy is not here.  All of them is a bad guy.
12        Q.    The baseball bat, the guy who had the
13        baseball bat?
14        A.    Yeah, he's not here.
15        Q.    Okay.  That guy isn't here.
16                        Now, there's another offender in
17        the case, somebody who doesn't ever say anything
18        to you; is that right?
19        A.    Correct, yes.
20        Q.    He never says anything to you, and he
21        never touches you; right?
22        A.    But points a gun.
23        Q.    Right.  He never touches you?
24        A.    Mm-hmm, yes.
```

1       Q.   All right.  I'm going to call him the do

2    nothing guy; okay?

3       A.   Okay.

4       Q.   Then there's a guy who you have described

5    who never wears a mask; right?  He's never -- he

6    doesn't have a mask on at all during the entire

7    time; right?

8       A.   Can you repeat that question?

9       Q.   Sure.  There's one guy -- one of the

10   offenders in this case who never had a mask on;

11   right?

12      A.   Yes.

13      Q.   That person you have identified today as

14   Erven Walls; right?

15      A.   Oh, yes.

16      Q.   All right.  I'm going to call that person

17   no mask.  Do you understand?

18      A.   Okay.

19      Q.   Pardon?

20      A.   I said, okay.

21      Q.   And then there's a guy who is light

22   skinned; right?

23      A.   Yes.

24      Q.   In fact, when you testified in front of

1    the grand jury, that's what you referred to him as

2    is light skinned?

3        A.   Yes.

4        Q.   And that person -- that's the person

5    you're now saying is Tony Hillard?

6        A.   Tony Hillard, yes.

7        Q.   Okay.  When we're going through this,

8    stop me if you don't understand something;

9    okay?

10        A.   I will.

11        Q.   Okay.  Today you have testified that the

12    guy with the bat was the first person to hit you

13    with the chisel in your face; right?

14        A.   Yes.

15        Q.   And that happened in the living room?

16        A.   Yes.

17        Q.   And then you said that on direct

18    examination that Erven Walls, no mask, then hit

19    you with the chisel; is that right?

20        A.   Yes.

21        Q.   Okay.  And that happened in the living

22    room?

23        A.   No.

24        Q.   That happened in the bathroom?

1    A.   Thank you.  Yes.

2    Q.   So that didn't happen right after the bat

3  guy hit you with the chisel?

4    A.   Right.  You mean just immediately?

5    Q.   Right.

6    A.   No.

7    Q.   Now, after the bat guy hits you with the

8  chisel --

9    A.   Mm-hmm.

10   Q.   -- does anybody else hit you while you're

11  in the living room?

12   A.   Nobody hit me when I was in the living

13  room.

14   Q.   Okay.  So no one hit you with a bat while

15  you were in the living room other than when you

16  first came in?

17   A.   Thank you.  Yes.

18   Q.   And no one -- did anybody put a gun in

19  your face or anything while you were in the living

20  room?

21   A.   Yes, somebody did.

22   Q.   Who?

23   A.   The guy right there (indicating.)

24   Q.   Which guy?

1          A.    Tony Hillard.

2          Q.    Okay.   The light-skinned guy?

3          A.    The light-skinned guy.

4          Q.    Okay.   Now, earlier today, you testified

5     that Mr. Walls put a gun in your mouth; correct?

6          A.    No, I didn't say that.   Tony Hillard put

7     a gun in my mouth.

8          Q.    Oh, I'm sorry.   Tony Hillard put a gun in

9     your mouth.

10              Sir, when you were asked -- when

11    you say that the light-skinned guy put the gun to

12    your forehead, did he ask you anything?

13         A.    The light-skinned guy put a gun in my

14    mouth --

15         Q.    No, no, no.   The light-skinned guy, while

16    you were in the living room, you said he put a gun

17    to your head; right?

18         A.    Yes.

19         Q.    Did he ask you anything?

20         A.    Yeah.

21         Q.    What did he ask you?

22         A.    He asked me if I didn't tell them where

23    all my money at or where my car at, they're going

24    to knock me out.

1       Q.    And did you tell him that your car was

2    parked at your house?

3       A.    Yes.

4       Q.    On 65th Street?

5       A.    Yes, 56th.

6       Q.    56th Street?

7       A.    Yes.

8       Q.    Sir, how did you get from your business

9    to Miss Jinadu's house?

10      A.    Miss Jinadu?

11      Q.    Your wife?

12      A.    By my different car, the Toyota Tercel.

13      Q.    The Toyota Taser (sic)?

14      A.    Yeah.

15      Q.    That's another car that you owned?

16      A.    No, I didn't own.  I told you that's my

17   girlfriend's car.  That's my girlfriend's car.

18      Q.    Now, today, you have told us that no

19   mask, the guy you have identified as Erven Walls,

20   is the person who pulled you into the bathroom; is

21   that right?

22      A.    He couldn't do it alone.

23      Q.    Well, didn't you tell us a little earlier

24   that Erven Walls pulled you into the bathroom by

1    your legs, I think?

2         A.   That's what I'm saying.  He did pull me

3    by the bathroom supported by the guy with the

4    baseball bat.  The other guy joined him to do

5    that.

6         Q.   The baseball bat guy joined him?

7         A.   Yes.

8         Q.   So two of them pulled you into the

9    bathroom together?

10        A.   Yes.

11        Q.   Now, while you're in the bathroom, that's

12   when you say that the light-skinned guy, Tony

13   Hillard, you say he put a gun inside your mouth;

14   right?

15        A.   Yes.

16        Q.   Okay.  Sir, when you testified in front

17   of the grand jury -- Page 11, Page 29.

18                    (Brief pause.)

19             THE COURT:  You may proceed.

20             MS. BORMANN:  Thank you.

21             "Question --" I'm going to ask

22   you whether or not you were asked these questions

23   and whether or not you gave this series of

24   answers.

1               "Question:  Then what happened?
2        Is that when the man without the mask
3        grabbed the rope by your legs?
4               "Answer:  Yes.  He dragged me
5        into the bathroom because I was in the
6        living room, and it was after he asked me
7        the question, the guy who doesn't have the
8        mask on, he pulled me.  He pulled my legs
9        in the bathroom.
10              "Question:  Did the guy that was
11       holding the baseball bat, did he help shove
12       you into the bathroom?
13              "Answer:  Yes, he did.
14              "Question:  Once they got you
15       into the bathroom, did the guy that had
16       pulled your legs, did he put you up against
17       the bathroom wall?
18              "Answer:  Yes, he did.
19              "Question:  Did he handcuff your
20       hands behind your back?
21              "Answer:  He did, yes.
22              "Question:  Once you were
23       handcuffed in the bathroom and your legs
24       were bound, what did the guy without the

1         mask do then?

2                "Answer:  Then he pulled his gun

3         out and put it -- I'm sorry -- then he

4         pulled his gun out and put it in my mouth.

5                "Question:  Once he put the gun

6         inside your mouth, did he say anything to

7         you?

8                "Answer:  Yes.

9                "Question:  What did he say?

10              "Answer:  He said, look, this is

11        not a joke.  You have to give -- you'd

12        better give up all your -- tell us where

13        all your money is at, tell your car at.

14        This is not a joke.  That's what he said.

15        If you don't tell us where your money at,

16        we're going to knock you out."

17              Did you say that?

18    A.   That's correct, yes.

19        THE COURT:  There's nothing -- there's

20  nothing inconsistent about that.

21  BY MS. BORMANN:

22    Q.   Sir, who was the man without the mask?

23    A.   I keep on saying that's the guy without

24  the mask.  He's the only one that doesn't have

1    nothing on, no mask on.

2        Q.    So this series of questions when the

3    state's attorney is asking you about what -- the

4    man with the mask, that's what you're talking

5    about?

6        A.    The man without mask on?

7        Q.    Mask, correct?

8        A.    Yes.

9        Q.    Sir, Page 29, very end.

10              "Question:  Did you recognize the

11          man who had never worn the mask and had put

12          the gun in your mouth in that lineup?  Did

13          you recognize him?

14              "Answer:  Yes, I did.

15              "Question:  Do you now know him

16          to be Erven Walls?

17              "Answer:  Yes."

18        A.    Yes.

19        Q.    Sir, you never told anybody in this

20    entire case, the first police officers that

21    responded on the scene, the detectives in the

22    case, the state's attorneys that you talked to nor

23    the state's attorney when you testified in front

24    of the grand jury, that my client, Mr. Hillard,

1    ever put a gun in your mouth, did you?

2               MS. CURTIS:  Objection.

3               THE COURT:  Overruled.

4    BY THE WITNESS:

5         A.   Yes, I did.

6    BY MS. BORMANN:

7         Q.   You did?

8         A.   Yes.

9         Q.   When you testified in front of the

10   grand jury, you told that grand jury that it was

11   Erven Walls that did it, didn't you?

12        A.   Erven Walls put the gun -- all these guys

13   had a gun.  He put a gun in my mouth and tell me,

14   we had to rent this gun.  He did that, too.  He

15   did the same, too.

16        Q.   So they both put guns in your mouth?

17        A.   Not at the same time.

18        Q.   At different times?

19        A.   Yes.

20        Q.   Sir, there is not one single time that

21   you have ever told any police officer, be it the

22   responding officers on the 10th, the detectives

23   you talked to on May 12th, any Assistant State's

24   Attorney, or any grand jury, that two people put

1    guns in your mouth that day?

2         A.   Yes.  I give the answer to the question.

3    They asked me.  I tell them what -- I said what

4    happened to me about these guys.

5         Q.   Did you tell any police officer --

6         A.   That --

7         Q.   -- that two people put guns in your mouth

8    that day?

9         A.   I believe I give that, yes.  I give,

10   yeah.

11        Q.   Which officers?

12        A.   All the officers that asked me questions

13   about them.

14        Q.   Every officer you have talked to?

15        A.   Yes.

16        Q.   Sir, what state's attorney did you

17   tell that two people put guns in your mouth that

18   day?

19             MS. CURTIS:  Objection, asked and

20   answered.

21             THE COURT:  Sustained.

22   BY MS. BORMANN:

23        Q.   Now, when you're in the bathroom -- well,

24   since -- well, let's follow that up.

1                    Now, you have testified here now

2      after I asked you about your grand jury testimony

3      that Erven Walls also put a gun in your mouth that

4      day; right?

5           A.    Yeah.

6           Q.    Okay.  Did that happen in the bathroom or

7      in the living room?

8           A.    I don't recall exactly where he was.  It

9      happened, but I remember he put a gun on my head

10     and put it in my mouth, too.

11          Q.    But you don't know where it happened?

12          A.    Either one of those two places that I

13     have been, either the living room or the bathroom.

14          Q.    And the person that you have now told us

15     is the light-skinned guy, Mr. Hillard, that

16     happened in the bathroom?

17          A.    Yes.

18          Q.    Sir, did you testify -- Page 12.

19                    Were you asked this question at

20     the same hearing, and did you give this answer?

21     This is after -- this is in response to what the

22     guy with no mask did.

23          A.    Mm-hmm.

24          Q.    "After he threatened you in that way,

1           what happened?

2                   "Answer:  Say that again?

3                   "After he had made those threats

4           to you about knocking you out, did he say

5           anything else, or what was the next thing

6           he did?

7                   "Answer:  The next thing he did,

8           he went back out.  He went back out and

9           talked to Delores.  I don't know what he

10          was talking about.  He pulled the gun back

11          out and went back outside and went and

12          talked to Delores.

13                  "Question:  After he talked with

14          Delores, did he come back in the bathroom?

15                  "Answer:  Yeah, he came back in

16          the bathroom.

17                  "Question:  When he came back in

18          the bathroom, did he have anything in his

19          hands?

20                  "Answer:  Yes.

21                  "Question:  What was that?

22                  "Answer:  He had a chisel.  He

23          had a very good iron, short iron, but it

24          looked like a chisel.

```
 1                    "Question:  Like a chisel?
 2                    "Answer:  Yes, like a chisel
 3           iron."
 4                    Did you give that series of
 5      answers to those series of questions?
 6           A.   Yes, I did.
 7                MS. CURTIS:  Objection, objection.
 8                THE COURT:  Overruled.
 9      BY MS. BORMANN:
10           Q.   And we're talking about Erven Walls here;
11      correct?
12           A.   Yeah.
13           Q.   Now, today, you have told us -- actually,
14      you didn't tell us.
15                    When you were hit with a chisel,
16      you said you were hit by the guy with the bat;
17      right?
18           A.   For the first time?
19           Q.   For the first time?
20           A.   Yeah.
21           Q.   And then you were hit by Mr. Walls
22      sometime later?
23           A.   Yeah.
24           Q.   And the time you were hit by Mr. Walls
```

1    sometime later was in the bathroom; correct?

2        A.   Yes.

3        Q.   Now, did Mr. -- did the guy with the bat

4    say anything to you before he hit you with the

5    chisel?

6        A.   Yes.

7        Q.   What did he say?

8        A.   He said, shut up -- he said, don't look

9    at me, bitch.

10       Q.   And this was the bat guy?

11       A.   Bat, yeah.

12       Q.   The guy who is wearing the bat?  The guy

13    who had the bat originally?

14       A.   Yes, yes, yes.

15       Q.   Mr. Walls didn't say that to you?

16       A.   Yeah, no.

17       Q.   No, he didn't say, close your eyes,

18    bitch; right?

19       A.   No.

20       Q.   Sir, did you give this series of answers

21    to this series of questions?  Again, continuing

22    from where I left off, talking about the man with

23    no mask.

24                     "Question:  What did he do with

1          the chisel?

2                    "Answer:  He looked into my face

3          like this.  He told me, close your eyes,

4          bitch.  He called me bitch.  Excuse me.

5          Then he kept hitting me with the iron on my

6          right eye until I cannot see no more.

7                    "Question:  After he repeatedly

8          hit you in your head and your right eye,

9          you could no longer see out of your right

10         eye?

11                   "Answer:  No, I couldn't."

12                   Did you give that series of

13   answers to that series of questions?

14      A.   I said that, but if -- maybe that was a

15   misunderstanding right there.  I'm still talking

16   about the same person.

17      Q.   So we're talking about -- in your

18   testimony in front of the grand jury, we're

19   talking about an incident that happens in the

20   bathroom --

21      A.   Mm-hmm.

22      Q.   -- with Erven Walls and a chisel?

23      A.   Yeah.

24      Q.   And your testimony in front of the

1    grand jury was that a chisel -- that Erven Walls
2    said, close your eyes, bitch, and hit you with a
3    chisel in the face?

4         A.    The baseball bat, he say, close your
5    eyes, bitch, when I wake up for the first time.

6         Q.    I understand that's what you're saying
7    now.  What you said today is you were hit by the
8    guy who was holding the bat with a chisel in the
9    living room; right?

10        A.    Yeah.

11        Q.    And that that's the guy who said, close
12   your eyes, bitch?

13        A.    The one with the baseball bat?

14        Q.    Yeah.

15        A.    Yeah.

16        Q.    Not Mr. Walls?

17        A.    No.

18        Q.    While you're in the bathroom, sir, does
19   the light-skinned guy ever come in and menace you
20   and put a gun to your head?

21        A.    Yeah.

22        Q.    When?

23        A.    When I was in the bathroom.

24        Q.    When after -- before or after you were

1     hit with the chisel?

2         A.    After I was already hit with the chisel.

3         Q.    And when he does that, does he say

4     anything to you?

5         A.    Yes.

6         Q.    What does he say?

7         A.    He say the same question he already say

8     when he put the gun in my mouth.  He say, this is

9     no joke.  If you do not tell us where all your

10    money at, we're going to knock you out.

11        Q.    Were you asked this question and did you

12    give this answer to the grand jury?

13               MR. RODDY:  What page?

14               MS. BORMANN:  Page 14, Counsel.  I'm

15    sorry.

16    BY MS. BORMANN:

17        Q.    Actually, it starts on the bottom of Page

18    13.

19                    "Question:  When the three men

20          were in the bathroom, what did they do to

21          you then?

22                    "Answer:  The three men in the

23          bathroom?

24                    "Question:  Yes.

1                        "Answer:  The same -- the
2           light-skinned one, he had put a gun to my
3           forehead the first time.  He put it back
4           and told me, we renting the guns, and we
5           have to pay for it.  Tell us where all your
6           money is.
7                        "Question:  So he told you that
8           we are renting these guns, and we have to
9           pay for them?
10                       "Answer:  Yes."
11          A.    Yes.
12          Q.    Were you asked those questions, and did
13     you give those answers?
14          A.    Oh, yes.
15          Q.    Sir, today, you told us that your wife --
16     you overheard your wife talking about getting the
17     key from you to your office; isn't that right?
18          A.    No.  I heard her say, has anybody seen
19     the key, where the key at.
20          Q.    Has anybody seen the key?
21          A.    Yeah.  That's what she said.  That's what
22     I thought she said.
23          Q.    And your wife actually had a key to the
24     office; right?

1          A.    Yeah.

2          Q.    So none of the offenders in this case

3     took a key from you, did they?

4          A.    How would I know?  I don't know.

5          Q.    Sir -- and you didn't go through this on

6     direct examination with Mr. Roddy, and Mr. Franks

7     didn't touch on it, but at the end of when

8     Mr. Roddy was asking you questions, when you were

9     talking about your hospital stay, you said that

10    you had injured your knees?

11         A.    Yeah.

12         Q.    When did that happen?

13         A.    In the bathroom.  When I was -- when they

14    put me down into the bathroom.

15         Q.    Where in the bathroom were you when that

16    happened?

17         A.    The same location where I was.

18         Q.    On the floor or in the tub?

19         A.    No, before the tub.  In the tub, nobody

20    hit me no more.  They just poured water on me.

21         Q.    And that happened in the bathroom?

22         A.    Yes.

23         Q.    When that person did that, that's the

24    baseball bat guy that did that; right?

1          A.    Hit me, yeah, in my legs.

2          Q.    When the bat guy did that, was he alone

3    or with others?

4          A.    I don't recall that.  I just know that he

5    hit me in the legs.  I don't recall that.

6          Q.    So you don't recall whether or not --

7    when you were being hit in the knees, whether or

8    not anybody else was there?

9               MS. CURTIS:  Objection, asked and

10   answered.

11              THE COURT:  Sustained.

12   BY MS. BORMANN:

13         Q.    Well, how long did that process take

14   where you were actually hit in the knees?

15         A.    After -- after he took the gun out of my

16   mouth.  After the light-skinned one took the gun

17   out of my mouth and went into the living room,

18   then the guy came back and hit me in the legs.

19         Q.    After the last one took the gun out of

20   your mouth?  Which is the last one?

21         A.    I said, light-skinned one.

22         Q.    The guy that you didn't tell any of the

23   police about; is that right?

24              MS. CURTIS:  Objection.

D-315

1                    THE COURT:  Objection sustained.

2       BY MS. BORMANN:

3            Q.    Now, sir, today you told us that the

4       light-skinned guy, the guy you identify as Tony

5       Hillard, is the guy who turned the shower on and

6       put the towels on you; right?

7            A.    Tony Hillard, yeah.

8            Q.    Right.  And at that time, he was alone?

9            A.    No, he was not alone.

10           Q.    He wasn't alone?

11           A.    No.

12           Q.    Who was he with?

13           A.    Do you want me to tell you?  He's not

14      alone because when he came back before they do

15      the shower stuff, he come with the gun and the

16      pillow.

17           Q.    I'm talking about when the shower got

18      turned on.

19           A.    That was the last thing.

20           Q.    I understand.  Listen to me carefully.

21      When the shower got done and you were covered with

22      towels --

23           A.    Yeah.

24           Q.    -- was the light-skinned person alone or

D-316

1      with somebody else?

2            A.    I do not see nothing no more.  They put

3      my face into the wall and pump water on me.  I

4      can't see anything.

5            Q.    So you don't know.  The last thing you

6      saw before that happened, was the light-skinned

7      person alone or with somebody else?

8            A.    I don't know.  I don't know.  The answer

9      to that question, I don't see anybody.  I saw him

10     pull the water on me.

11           Q.    Now, today, you said that there was one

12     guy, the guy we talked about as do nothing, he

13     actually came into the bathroom at some point;

14     isn't that right?

15           A.    At some point, yeah.

16           Q.    Okay.  When?

17           A.    After they -- after they handcuffed me.

18     After he handcuffed me and the two of them taped

19     me, they left.  The guy who doesn't do nothing,

20     he's just like a security for them, he just tell

21     me, don't move.  He just pointed the gun.

22           Q.    So he did come into the bathroom?

23           A.    Yeah, he came to the bathroom.

24           Q.    And you specifically remember that?

1            A.    Oh, yes.  I can remember that.

2            Q.    And that happened sometime after

3    Mr. Walls handcuffed you?

4            A.    Oh, yeah.

5            Q.    Okay.  Now, I'm going to direct your

6    attention -- Page 20 -- to your grand jury

7    testimony, and ask you whether or not you gave

8    these answers to this set of questions.

9                       "Question:  One of the men with

10            the handgun, did he ever come into the

11            bathroom, or did he always remain in the

12            living room?

13                       "Answer:  There was one -- when

14            this first happened, this one, he doesn't

15            say nothing at all.  He pointed the gun to

16            me like this.  He didn't say nothing.  He

17            just stand on his feet facing me.  He

18            didn't say nothing at all.

19                       "Question:  And that man that

20            held the gun pointed at your body and never

21            said anything, had he remained in the

22            living room while you were in the bathroom,

23            and was he facing the bathroom while the

24            door was open?

D-318

1                      "Answer:  You're talking about
2  ·            during the time when the door was open?
3                      "Question:  Yes.
4                      "Answer:  Yes."
5       A.    Mm-hmm.
6       Q.    So this person did remain in the living
7    room as the state's attorney asked you and you
8    answered?
9       A.    Oh, yes, of course.  I didn't deny that.
10   Yeah.
11      Q.    Sir, I'm going to show you what's been
12   marked as People's Exhibit Number 6 for
13   identification purposes.  These are the handcuffs
14   that we're talking about; right?
15      A.    Yes.
16      Q.    And the chain on these handcuffs -- these
17   are the ones the police had to break off; right?
18   Oops.
19      A.    I don't know if that was the police that
20   broke it off.
21      Q.    They broke it off --
22      A.    In the hospital.
23      Q.    Okay.  Somebody broke it off, and they
24   broke it by cutting the actual band, didn't they?

D-319

1       Is that right?

2           A.    I don't know.

3           Q.    Well, were you there when they took the

4       handcuffs off?

5           A.    No, I was not there.  I was dead.  I was

6       dead in the hospital.  I didn't know what was

7       going on.  They already dead me because they want

8       to put stitches in my head.  I don't know what's

9       going on no more.

10          Q.    These are the same handcuffs that you

11      said were placed on you; right?

12          A.    Yes.

13          Q.    And there's one, two, three links that

14      attach these handcuffs; right?  Can you see

15      that?

16          A.    Yes.

17          Q.    And it's about maybe two inches between

18      the two handcuffs; right?

19          A.    (Nodding.)

20          Q.    Okay.  Now, you have testified -- and if

21      I may have the witness stand for just a moment?

22                THE COURT:  Stand up, sir.

23      BY MS. BORMANN:

24          Q.    Thank you.

1                        You have testified that you had

2     them behind your back?  That you were cuffed

3     behind your back?

4          A.   Yes.

5          Q.   Can you show the ladies and gentlemen of

6     the jury -- just turn for a second -- exactly

7     how --

8          A.   Yes.

9          Q.   Sir, your hands need to be a little

10    closer than that.  Your wrists need to be apart.

11         A.   Water already release me.

12         Q.   Well, the water didn't stretch the metal,

13    did it?

14         A.   No.

15         Q.   Show the ladies and gentlemen of the jury

16    exactly how it is that you moved your hands from

17    the back while they're cuffed, and I'll just put

18    my fingers like this, and I'll follow you.  You

19    just move your hands to the front like you did

20    that day?

21         A.   See, when you have a dress on, you can't

22    do it.  You've got to be naked.  You can possibly

23    do your hands like this.

24         Q.   You can do that if you pull it apart?

D-321

1        A.    Instead of separate, the chain is already

2    holding back tight.  So your hand is not going to

3    separate, so then you can possibly do that.

4                    If you don't believe it, they can

5    handcuff me.  I'll take off my shirt over here.  I

6    will turn my hand from the back to the front.

7                    MS. BORMANN:  Judge, may I ask them to

8    do that?  I think the sheriff probably has a pair

9    with a key.

10                   THE COURT:  You want him to take his

11   shirt off?

12                   MS. BORMANN:  I don't have any objection

13   to it.

14                   MR. RODDY:  Judge, I'm going to object.

15                   THE COURT:  Sustained.

16                   MR. RODDY:  Your Honor, he's explained

17   it, and this is ridiculous.

18                   MS. BORMANN:  Judge, I'm going to

19   object.

20                   THE COURT:  There's no need to argue.  I

21   have sustained the objection.

22   BY MS. BORMANN:

23        Q.    Sir, never at any time when you say you

24   moved these handcuffs to -- from the back to the

D-322

1    front of you, did your hands come out of them, did

2    they?

3        A.   Could you repeat that?

4        Q.   When you moved the handcuffs from the

5    back to the front like you said you did when they

6    were only two inches apart the entire time, your

7    hands never came out of the cuffs, did they?

8        A.   My hands?  My hands never come out.

9        Q.   They stayed in the entire time?

10       A.   Until I get to the hospital.

11       Q.   Right, and they cut them off?

12       A.   Yes, in the front.

13       Q.   Sir, today, you told us that when you got

14    outside, you saw two guys in front of the

15    building; right?

16       A.   Yes.

17       Q.   And you're sure of who they are; right?

18       A.   I'm sure.

19       Q.   And they're the baseball bat guy; right?

20       A.   Yes.

21       Q.   And the light-skinned guy?

22       A.   Tony Hillard right here (indicating.)

23       Q.   And not a single other person; right?

24       A.   Un-uhn, no.

1          Q.   I'll direct your attention -- Page 25 of

2     the transcript.

3                    Sir, while you were under oath in

4     front of that jury that listened to you on January

5     29, 1997 --

6               MS. MC BETH:   September 29th.

7     BY MS. BORMANN:

8          Q.   I'm sorry.  September 29, 1997, were you

9     asked these questions, and did you give these

10    answers?

11                    "Question:  Then what did you do?

12                    "Answer:  I went to the front

13         door.  When I get to the front of the

14         building, I can see the three guys that I

15         see -- they come in the bathroom before.  I

16         saw them sitting down.  There was a

17         school.  There was a school in front of the

18         building, a kindergarten school.

19                    "Is this across the street from

20         the building?

21                    "Answer:  Opposite of the street,

22         of the building, like they --

23                    "Question:  So it's across from

24         the building you saw the three of them?

D-324

```
 1                    "Answer:  They sat down on

 2           something there.  When they see me, they

 3           jumped down, and I was on their way, and I

 4           was just running down the street shouting

 5           to people to help me, call the police."

 6                    Did you give that answer to those

 7      questions?

 8      A.   I didn't say three.  I say two.  They

 9      probably misunderstand my English.

10      Q.   Well, sir, did you testify -- if this is

11      Page 29 that that was a mistake there, on Page

12      25 --

13      A.   It could be a mistake.  I know what I

14      said.  Two.

15      Q.   Were you asked these questions?  The same

16      exact transcript, same hearing in front of the

17      same jury under oath.  Make it Page 28.

18                    "Question:  And, Mr. Jinadu, when

19           you first came outside the apartment

20           building, you saw the three men across the

21           street.  The three men you saw, was it the

22           man that had the baseball bat?

23                    "Answer:  Yes."

24                    Was that a question you were
```

1    asked, and was that an answer you gave?

2         A.   Yes, that's a question I answered, the

3    baseball bat guy, the one with the baseball bat in

4    his hand.

5         Q.   Were you asked these set of questions

6    about these three guys after about the guy with

7    the baseball bat?

8                   "Was it also the light-skinned

9              man?

10                  "Answer:  Yes.

11                  "And was it also the man that

12             had never said anything but held the gun on

13             you in the living room?

14                  "Answer:  Yes."

15        A.   I probably said that.  I wasn't -- I

16   don't -- I wasn't dead yet.  I was running out of

17   the building looking for somebody, looking for

18   help.  I don't know what was going on at that

19   time.  I just saw two of them.

20        Q.   My question is, when you testified in

21   front of the grand jury, did you tell them it was

22   three guys, the guy with the baseball bat, the guy

23   who never said anything, and the light-skinned

24   guy?

```
1          A.    I just said the light-skinned guy.

2          Q.    I'm just asking, did you testify to that?

3          A.    If I did, I probably don't remember did I

4     say that.

5          Q.    Sir, besides talking to the original

6     officers, Schmidt and Ramirez, and besides talking

7     to the grand jury, as we've gone through, you also

8     talked to the detectives in this case?  Their

9     names are Vernon Bradley and Alonzo Jackson.  Do

10    you remember them?

11         A.    That's correct, yes.

12         Q.    Okay.  Two African American men;

13    correct?

14               And you talked to them on a number

15    of occasions; right?

16         A.    (Nodding.)

17         Q.    You talked to them on May 12th while you

18    were at Illinois Masonic Hospital the day before

19    you were released?

20         A.    Yes.

21         Q.    And then you talked to them in your home

22    at some point between May 12th and June 3rd;

23    correct?

24         A.    I talked to one person.
```

1        Q.    I'm sorry?

2        A.    Not them.  One.

3        Q.    Just one?

4        A.    One officer.

5        Q.    And that was Detective Bradley; right?

6        A.    That's right.

7        Q.    And you talked to him in your home?

8        A.    Yes.

9        Q.    And then you talked to -- and his partner

10   wasn't there?

11       A.    You mean that day?

12       Q.    Yeah, in your home?

13             MS. CURTIS:  Objection, asked and

14   answered.

15             THE COURT:  Overruled.

16   BY MS. BORMANN:

17       Q.    Was Detective Jackson there?

18       A.    I only talked to Detective Bradley that

19   day.

20       Q.    I'm asking you, okay, on May 12th at

21   Illinois Masonic Hospital, you were interviewed by

22   both Detective Bradley and Detective Jackson --

23       A.    Yes.

24       Q.    -- together; right?

1      A.   Yes.

2      Q.   And then sometime between May 12th and

3   June 3rd, you were interviewed in your home;

4   correct?

5      A.   Yes.

6      Q.   And that was by Detective Bradley; right?

7      A.   Yes.

8      Q.   Was Detective Jackson also there?

9      A.   No, he's not there.

10      Q.   Then you were interviewed in Cook County

11   Hospital; correct?

12      A.   Mm-hmm, yeah.

13      Q.   And that was also --

14      A.   Excuse me.  I'm sorry.  Interviewed, no.

15   I wasn't interviewed.  They visit me.

16      Q.   They visited you?

17      A.   Yeah.

18      Q.   Did they talk about the facts of the case

19   with you?

20      A.   They just asked me if I'm feeling better.

21      Q.   So they didn't talk about what had

22   happened to you?

23      A.   We already talked about that before.

24      Q.   I understand.

1          A.    Yeah.

2          Q.    I'm asking if in Cook County Hospital,

3     the detectives asked you about what had occurred

4     on May 10th of 1997?

5          A.    I don't recall that, because I already

6     talked to them about that before.

7          Q.    Was both Detective Bradley and Detective

8     Jackson there?

9          A.    Yes, yeah.

10          Q.    And then you were interviewed again by

11     Detectives Bradley and Jackson on the evening of

12     June 3rd; is that right?

13          A.    Where?  You got to tell me where.

14          Q.    At Area 3 Violent Crimes in the police

15     station?

16          A.    Yes, yeah.

17          Q.    And that occurred at approximately

18     10:00 o'clock in the evening; right?

19          A.    Yes.

20          Q.    Okay.  Now, when you were interviewed by

21     those detectives, didn't you tell those detectives

22     on your May 12th interview, the one in the

23     hospital, that when you woke up in the apartment

24     in the living room, you were bound with electrical

1    tape, your body, ankles, and your mouth at that

2    point in the living room?

3         A.   Repeat that question?

4         Q.   Sure.  Didn't you tell those detectives

5    that when you woke up in the living room, at that

6    point, you were bound with electrical tape around

7    your body, your ankles, and your mouth?

8         A.   I didn't say electrical tape.  Electric

9    cable.  That's what I mean.  Not tape.

10        Q.   So your answer is, you did not tell the

11   detectives that?

12        A.   I told the detectives that I was tied on

13   my ankles.

14        Q.   Not your mouth and not the rest of your

15   body?

16        A.   When I wake up?

17        Q.   Yes.

18        A.   Yeah, just my ankles.

19        Q.   Now, didn't you also tell them that from

20   the identification -- and I'm going to show you

21   this again, what I showed to you earlier.  I have

22   marked these as Defendant's Exhibit Number 3

23   through 9.  Remember?  The paper identification I

24   showed you earlier and the two IDs I showed you.

1                          Now, I know you testified earlier

2      you hadn't seen any of the paper identification?

3           A.   No.

4           Q.   But you had seen these two pieces.

5                          Okay.  Didn't you tell Detective

6      Bradley that when you -- after this had occurred

7      and those original police officers showed up --

8           A.   When what?

9           Q.   -- didn't you tell Detective Bradley

10     that right after this occurred when the original

11     police officers showed up, they showed you that

12     ID, and you identified three people from that

13     series of identification?

14          A.   No, I did not say that.

15          Q.   Thank you.

16                         Didn't you tell Detective

17     Bradley that you could identify those three people

18     from separate identification from those three

19     people?

20          A.   I told him that I identified the five of

21     them, five.

22          Q.   I'm talking about by name?

23          A.   No, I never said that.

24          Q.   Didn't you tell Detective Bradley --

1    strike that.

2                    Today, we're talking about masks;

3    right?  And you said three of the male blacks

4    involved wore masks.  I guess you had them taking

5    them off at some point, but they wore masks;

6    right?  These things that go around the face and

7    cover the lower part of the face; right?

8        A.   Yes.

9        Q.   Okay.  Didn't you tell Detective Bradley

10   when you -- those you first saw when you woke up;

11   right?  Those masks?

12       A.   Yeah.

13       Q.   That's when you first noticed them?

14       A.   First what?

15       Q.   That's when you first noticed the masks

16   is when you woke up?

17       A.   Yes.

18       Q.   Because you didn't see anybody before you

19   got hit on the head?

20       A.   That's correct, yes.

21       Q.   Didn't you tell Detective Bradley that

22   when you woke up, no one was wearing masks?

23       A.   When I woke up?  No, I never made --

24       Q.   I'm sorry?

D-333

1        A.    The answer is no.

2        Q.    Thank you.

3              Now, sir, now, today, you have

4    told us that two people were outside when you got

5    out, and you described them as a light-skinned

6    person and a baseball bat guy.

7              MS. CURTIS:  Objection, asked and

8    answered.

9              THE COURT:  Sustained.

10             MS. BORMANN:  Judge, it's another --

11   well, never mind.

12   BY MS. BORMANN:

13       Q.    Now, sir, last but not least, you went to

14   a lineup in this case on June 3rd; right?

15       A.    Yes.

16       Q.    Well, when you did the lineup, sir, were

17   the people sitting or standing?

18       A.    They was standing.

19       Q.    Okay.  Did they turn at all?

20             MS. CURTIS:  Objection.

21             THE COURT:  Overruled.

22   BY MS. BORMANN:

23       Q.    Were they asked to turn at all?

24       A.    Yes.

D-334

1        Q.   Were they asked to say anything?

2        A.   No.

3        Q.   Sir, when you viewed this lineup, you

4    could only see out of one eye; isn't that

5    right?

6        A.   I could only what?

7        Q.   When you viewed this lineup, you could

8    only see out of one eye?

9        A.   With one eye?

10       Q.   Out of one eye?

11                Sir, when you were hit in the face

12   that day, it caused you not to be able to see in

13   your right eye; is that right?

14       A.   That day.

15       Q.   Correct.

16       A.   That day that the incident happened.  Not

17   after that.  I left the hospital.

18       Q.   Your vision was impaired until a final

19   surgery in December of 1997; isn't that right?

20       A.   December?

21       Q.   Yes.  Didn't you have your vision

22   corrected in December of last year?

23       A.   No.  Ever since I come back from the

24   Cook County, I have been okay.  I can just, you

1    know, focus something for five minutes.  When I'm

2    reading something in the paper, that's the only

3    problem that I have.

4        Q.    Is your vision now back to normal?

5        A.    It's back to normal now, but I have the

6    same problem.  I can't focus with some things.  It

7    be watery.

8        Q.    When you viewed the lineup in this case,

9    it was some five days after you had been released

10   after the plastic surgery; isn't that right?

11       A.    Five days?  I believe it's more than

12   that.

13       Q.    Sir, you were released from the hospital

14   on May 27th; right?

15       A.    Yeah.

16       Q.    And you viewed the lineup on June 3rd,

17   less than a week later?

18       A.    Okay.

19       Q.    Is that right?

20       A.    Yeah, that's correct.

21       Q.    Okay.  And when you were released from

22   the hospital, you had a patch over your eye?

23       A.    What?

24       Q.    You had a patch a patch over your eye?

1   A. A patch?

2   Q. A patch?

3   A. No, I don't have anything on my face.

4   Q. Okay.  So when you were released from the

5 hospital, they didn't cover your eye?

6   A. They don't.

7   Q. After you had plastic surgery?

8   A. Yes.  When I have the plastic surgery, I

9 stayed in the hospital.  When I leave that place,

10 nothing on my eye.

11   Q. And your vision was perfect when you

12 left?

13     MS. CURTIS:  Objection, asked and

14 answered.

15     THE COURT:  Sustained.

16 BY MS. BORMANN:

17   Q. Sir, I'm going to can ask you to take a

18 look at People's Exhibit Number 2 for

19 identification.  This is a photograph of five guys

20 sitting; right?

21   A. Yes.

22   Q. So that's not actually the lineup that

23 you saw, because when you saw it, they were

24 standing?

1          A.   Yes, that was actually the one that I

2     saw.

3          Q.   Okay.  Those are the guys, but when you

4     saw it, they were standing?

5          A.   They asked them to sit down, standing,

6     and turn around and everything, yeah.

7          Q.   And you identified the light-skinned guy

8     in the lineup, didn't you?

9          A.   Yes, I did.

10         Q.   And the light-skinned guy is the guy that

11    you put the X over his head, isn't it?

12         A.   Say that again?

13         Q.   The light-skinned guy is the guy you put

14    the X over his head?  There's an X there that you

15    marked; right?

16         A.   Oh, yeah, yeah.  Okay.

17         Q.   That's over the light-skinned guy's head,

18    isn't it?

19         A.   Yes.

20         Q.   Okay.  He's the only light-skinned guy in

21    that entire lineup, isn't he?

22         A.   No.

23              MS. CURTIS:  Objection.

24              THE COURT:  Overruled.

1    BY THE WITNESS:

2         A.    I'm sorry.  No, it's not.

3    BY MS. BORMANN:

4         Q.    One last question.  Sir, this is marked

5    as People's Number 8, and this is the first gun

6    that Mr. Roddy showed you when he came up to you

7    earlier during direct examination; okay?  Do you

8    remember this gun?

9         A.    No, he didn't show me this.

10        Q.    Yeah, it was --

11        A.    You talking about Joe?

12        Q.    Yes.

13        A.    Oh, okay.  I don't know that's his name.

14        Q.    Yeah.  Mr. Roddy showed you two guns;

15   right?

16        A.    Yes, that's correct.

17        Q.    The first one was People's Number 8.

18   This one; right?

19        A.    That's correct.

20        Q.    And the second one was People's 9?

21        A.    Mm-hmm.

22        Q.    The first one when Mr. Roddy asked you

23   the question, you told the ladies and gentlemen of

24   both of these juries that this one, People's 8,

1    was the one that Mr. Walls had?

2         A.   Who is Mr. Walls?

3         Q.   Mr. Walls, Erven Walls, the no mask guy?

4         A.   No, I said the one with the white.

5         Q.   I'm talking about when Mr. Roddy asked

6    you.

7         A.   Yeah.

8         Q.   People's Number 8, this is the one

9    Mr. Walls had; right?

10        A.   Right.

11        Q.   And when Mr. Roddy asked you, People's

12   Number 9, the one with the tape, you said this is

13   the one that the light-skinned guy had; right?

14        A.   No.  He was asking me that's the one

15   what's his name have, the guy --

16        Q.   I'm not talking about what Mr. Franks

17   said.  I'm asking, when Mr. Roddy showed you these

18   two guns, People's Number 8 you identified as

19   coming from Erven Walls.  That's the first gun.

20                  You were told -- in fact, I

21   remember you looking around the jury at me, and

22   you said this one was held by my client,

23   Mr. Hillard?

24        A.   Here today, I never made a mistake on the

D-340

1     identification of the gun. I said this gun right

2     here, this is the one his client had. He's asking

3     me about his client.

4             MS. BORMANN: Judge, I would ask that

5     the court reporter at some point read back the

6     testimony regarding the identification -- earlier

7     identification of the guns.

8             MR. RODDY: Judge, we'll object.

9             THE COURT: No. That objection is

10   sustained.

11            MS. BORMANN: Judge, I have nothing

12   further.

13           THE COURT: Any redirect?

14           MR. RODDY: Briefly, Judge.

15           THE COURT: Go ahead.

16           REDIRECT EXAMINATION

17           BY MR. RODDY:

18     Q. Sir, I'm going to show you what is marked

19   as Defendant's Exhibit Number 10 for

20   identification. Do you remember when that was

21   shown to you?

22     A. Right.

23     Q. And there's a picture in there; correct?

24     A. Yes.

1          Q.   Do you recognize the person in this
2     courtroom that's shown in that picture?
3          A.   Yes, I recall.
4          Q.   Do you see him here?
5          A.   Yes.
6          Q.   Point him out, please?
7          A.   That's him right there, over there
8     (indicating.)
9          Q.   That's the guy you know as Mr. Walls?
10         A.   Yes.
11              THE COURT:   That's Defendant's 10?
12              MR. RODDY:   That's what it's marked on
13    here.
14              MS. BORMANN:   Yes.
15              MR. FRANKS:   I think it's 8.
16              MS. MC BETH:   We didn't get that far.
17              THE COURT:   8 was Jermaine --
18              MS. BORMANN:   I'm sorry.   It was 8.
19              MR. RODDY:   I apologize.   Number 10 was
20    written on here.
21    BY MR. RODDY:
22         Q.   Showing you again the same thing,
23    Defendant's Number 8, that Miss Bormann showed
24    you, you saw that; right?

```
1          A.   Yes.

2          Q.   In fact, it was the only thing she

3     showed you that you had ever seen by the police;

4     correct?

5          A.   Yes.

6          Q.   The person whose picture on there you

7     identified as Erven Walls?

8          A.   Yes.

9          Q.   And the person you identified as being

10    Delores' boyfriend; right?

11         A.   Yes.

12         Q.   And you didn't know his name on May 10th?

13         A.   No, I never know the name.

14         Q.   How many times have you been arrested for

15    drugs, Yinka?

16              MR. FRANKS:  Objection.

17              MS. BORMANN:  Objection.

18              THE COURT:  Sustained.

19    BY MR. RODDY:

20         Q.   Have you ever been involved in drug

21    dealing?

22         A.   No.

23              MR. RODDY:  Nothing further.

24              THE COURT:  Anything else from the two
```

D-343

1    of you?

2                    RECROSS EXAMINATION

3                    BY MR. FRANKS:

4        Q.    Mr. Jinadu, when they showed you this

5    photo ID, was that the only object that was shown

6    to you in the apartment?

7        A.    Yeah.

8        Q.    Did they show you any other objects,

9    such as social security cards or anything else at

10   all?

11                   MR. RODDY:   Objection, asked and

12   answered already.

13                   THE COURT:   It was on Miss Bormann's

14   examination.   If you feel you have to repeat it,

15   go ahead.

16                   MR. FRANKS:   Judge, it's in relation to

17   this ID.

18                   THE COURT:   This has been shown.   He was

19   shown a bunch of exhibits that were marked by

20   Miss Bormann, Defendant's 3 through 9.   He said he

21   had seen one there, Number 8.   Now, if you want to

22   go through all the rest, be my guest.

23                   MR. FRANKS:   Judge, I will take a moment

24   of the Court's time.   I realize how late it is.

1      BY MR. FRANKS:

2          Q.   Was anything else shown to you other than

3      this ID?

4          A.   No.

5          Q.   Were you out in the hall, or did you go

6      into the apartment?

7          A.   I was on the hall, on the hallway.

8          Q.   Did you help the police look around the

9      apartment at all inside of the apartment?

10         A.   No.

11         Q.   Did you tell Detective Bradley that you

12     were the one that found the IDs and showed it to

13     the police?

14         A.   No, that's not correct.

15         Q.   That is not correct?

16         A.   Yes.

17         Q.   Now, the state's attorney saw fit to ask

18     you the last question about drug dealing.  Do you

19     on a regular basis send money back to the country

20     of Nigeria through Western Union?

21         A.   No, I never do that.

22         Q.   You have never done that in your life?

23              MR. RODDY:  Objection.  He just answered

24     the question.

```
 1                    THE COURT:  Sustained.
 2    BY MR. FRANKS:
 3         Q.   Do you send money back to Nigeria in any
 4    form?
 5                    MR. RODDY:  Objection.
 6                    THE COURT:  Sustained.
 7    BY MR. FRANKS:
 8         Q.   Is it your testimony that all these Land
 9    Cruisers, Lexus cars, apartments that you have are
10    all from legitimate funds?
11                    MR. RODDY:  Objection, beyond the scope.
12                    THE COURT:  Overruled.
13    BY THE WITNESS:
14         A.   Yes, it is.
15    BY MR. FRANKS:
16         Q.   Have you dealt with Delores or anybody
17    else involving narcotics?
18         A.   What?
19         Q.   Have you ever dealt with her involving
20    narcotics?
21         A.   In my car?
22         Q.   Do you know what narcotics are, sir?
23         A.   Cars?  I don't know what cotics mean.
24    You can repeat the question.
```

1          Q.    You're saying you don't know what the

2      word "narcotics" means?

3          A.    Cotics?

4          Q.    Do you understand the word "drugs"?

5          A.    Yeah, drugs.

6          Q.    Yeah?   You know drugs?

7          A.    Yes.

8          Q.    Have you ever dealt or known that Delores

9      has ever dealt with drugs?

10               MS. CURTIS:  Objection.

11               THE COURT:  Objection sustained.

12     BY MR. FRANKS:

13         Q.    All of the paraphernalia that was in

14     Delores' house, you're saying, in her apartment,

15     you know nothing about?

16               MR. RODDY:  Objection, asked and

17     answered.

18               THE COURT:  Overruled.

19     BY THE WITNESS:

20         A.    Nothing, no, I don't.

21     BY MR. FRANKS:

22         Q.    Who is the leaseholder of Delores'

23     apartment?

24               MR. RODDY:  Objection.

1                    THE COURT:  Sustained.

2      BY MR. FRANKS:

3          Q.   Was there a person by the name of Harold

4      that you knew lived in that apartment building?

5                    MR. RODDY:  Objection.

6                    THE COURT:  Sustained.

7      BY MR. FRANKS:

8          Q.   Did anyone by the name of Harold to your

9      knowledge make any kind of a report indicating

10     that items were stolen out of that Winthrop

11     apartment?

12                   MR. RODDY:  Objection.

13                   THE COURT:  Sustained.  Mr. Franks, this

14     is clearly so far outside the scope of the

15     redirect examination.

16                   MR. FRANKS:  My last question.

17     BY MR. FRANKS:

18         Q.   Do you and Harold have anything to do

19     with drugs together?

20         A.   No.

21                   MR. FRANKS:  Nothing further.

22                   THE COURT:  Let me see counsel for a

23     minute.  I don't need the reporter.

24

1                           (WHEREUPON, a discussion was

2                           had off the record outside the

3                           hearing of the juries.)

4           THE COURT:  Ladies and gentlemen, that's

5      going to conclude the evidence for today.  I'm

6      going to ask that you come back at 10:00 o'clock

7      tomorrow morning.  Report to the same courtrooms

8      that you did earlier; that is, the Hillard jury

9      will go to Judge Himel's chambers or jury room

10     over in 404, and the Walls jury will come here.

11                     We will begin as soon as everybody

12     is assembled and I have completed the routine call

13     that I have in the morning, which should be fairly

14     brief tomorrow morning.

15                     Do not discuss the case amongst

16     yourselves over the recess, and we're hoping to

17     finish the case tomorrow.  Have a pleasant

18     evening.  See you back here tomorrow.

19                           (WHEREUPON, a recess was had in

20                           the above matter.)

21                           (WHEREUPON, the following was

22                           had in open court, outside the

23                           presence of the juries:)

24           THE COURT:  Okay.  You have one more

D-349

1    lawyer to ask questions of you.

2             MR. DOSCH:  Judge, I'm not going to

3    repeat all the impeachment if I don't have to.

4             THE COURT:  I would hope not.  You don't

5    have to.

6                      CROSS EXAMINATION

7                      BY MR. DOSCH:

8        Q.   Mr. Jinadu, you have been married -- how

9    long had you been married to Delores?

10       A.   Three years now.  Three years.

11       Q.   So you're still legally married to her?

12       A.   Yes.

13       Q.   And at the time that this had happened in

14   May of '97, how long had you been married to her?

15       A.   '95.  Two years, two years.

16       Q.   Two years?

17       A.   Yes.

18       Q.   And when you got married, where were you

19   living?

20       A.   1711 West Jarvis.

21       Q.   Which is the address on her

22   identification?

23       A.   Can I see that one second?

24             MR. DOSCH:  Yes.  It will be

**File Date:** _7-1-2008_

**Case No:** _08cv1775_

**ATTACHMENT #** _____

**EXHIBIT** _T-part 7_____

**TAB (DESCRIPTION)**

_____

```
1     Defendant's -- are you marking this?  Are you
2     going to mark this, the ID?
3               THE COURT:  It was already marked.
4               MS. CURTIS:  It's previously marked as
5     Defendant's 9.
6     BY MR. DOSCH:
7         Q.   I'll show you Bormann's Number 9.
8               THE COURT:  Actually, Hillard's Number
9     9.
10    BY MR. DOSCH:
11        Q.   That's her identification?
12        A.   Yes.
13        Q.   And the address on there was your
14    address?
15        A.   Yes.
16        Q.   It wasn't her address?
17        A.   It was both of us.
18        Q.   You both lived there?
19        A.   Yeah.
20        Q.   Did you tell her to get a new license to
21    show your address?
22        A.   Pardon me?
23        Q.   Did you tell her to get this license with
24    your address on it?
```

1              MS. CURTIS:  Objection.

2    BY MR. DOSCH:

3         Q.   To show to INS?

4              THE COURT:  Overruled.

5    BY THE WITNESS:

6         A.   No, I didn't.

7    BY MR. DOSCH:

8         Q.   And how long did you live on the Jarvis

9    address?  When did you move out of there?

10        A.   From '95 to -- I think it's August '96.

11   Middle of '96.  I moved out of there from the

12   middle of '96.  I don't recall the particular

13   month that I moved out from there.  Jarvis, I

14   lived there for a year.

15        Q.   Okay.  And then did you separate at that

16   time, or did you --

17        A.   No, we didn't separate.  No, we didn't

18   separate at that time.  We stayed together.

19        Q.   And where did you move then?

20        A.   When did I move out?

21        Q.   When you moved from the Jarvis address,

22   where did you go to?

23        A.   I went to 1642 West 56th Street.

24        Q.   And you lived there together with

D-352

1      Delores?

2          A.    Yeah.

3          Q.    How long did you live there with her?

4          A.    Just about two months.

5          Q.    And then she moved out?

6          A.    I told her we have to separate.  Yeah,

7      she moved out.

8          Q.    You told her she had to leave?

9          A.    Yes.

10         Q.    Okay.  And that's when she went to the

11     Winthrop address?

12         A.    Yes.

13         Q.    Now, when you first married Delores, were

14     you still selling used cars?

15         A.    Yes.

16         Q.    How long did you sell used cars?

17         A.    I sell it until the time that -- 1996,

18     that I opened this business.

19         Q.    It was in 1996 --

20         A.    Until 1996.

21         Q.    When did you open the Yinka Freight and

22     Hauling?

23         A.    October '96.

24         Q.    And when you opened that up in October of

D-353

1    '96, did you have three trucks?

2        A.   Yes.

3        Q.   And you got the funds for those three

4    trucks from selling used cars; is that right?

5            MR. RODDY:  Objection, relevance.

6    BY THE WITNESS:

7        A.   Yeah.

8            THE COURT:  I don't know the relevance.

9    BY MR. DOSCH:

10       Q.   When you were selling used cars, were you

11   doing that for yourself, or were you working for a

12   car lot?

13           MS. CURTIS:  Objection.

14           THE COURT:  Sustained.

15   BY MR. DOSCH:

16       Q.   Now, on May 10, 1997, at 9:30, you paged

17   Delores; is that correct?

18       A.   Yes.

19       Q.   Why didn't you just call her?

20       A.   She don't have no phones.

21       Q.   And that was at 9:30 you paged her;

22   right?

23       A.   Yeah.  I believe during that time,

24   yes.

D-354

1        Q.   And how long did you have to wait for a

2   call back?

3        A.   Probably ten minutes.  It was not long.

4        Q.   And she told you her car was broken down;

5   is that right?

6        A.   Yes.

7        Q.   You had no knowledge of her car having

8   been in an accident?

9        A.   No, no.

10        Q.   Now, when you got buzzed in, you went

11   upstairs, she opened the door, smiled at you, and

12   you stepped in and got hit.  You saw a hand with a

13   bat on it come from behind the door; is that

14   right?

15        A.   Yes.  On the corner of the door, yeah.

16        Q.   And hit you on the head, and you blacked

17   out?  You don't remember anything?

18        A.   Yes.

19        Q.   And a couple of hours later, you wake up?

20        A.   Yes.

21        Q.   The first thing you see is a guy with a

22   baseball bat; right?

23        A.   Yes.

24        Q.   And he's got an automatic in his hand;

1     right?

2          A.   Yes.

3          Q.   And a mask?

4          A.   Yes.

5          Q.   That's the first thing you see?

6          A.   That's the first thing I saw.

7          Q.   Are you sitting down?  Laying down?

8     Where are you?

9          A.   I was -- you know, when you -- how you --

10    where you lay down on the floor, and they make you

11    sit.  You sit up, like, sit up.

12         Q.   Were you leaning against something?

13         A.   No.  On the middle of the -- on the

14    center -- on the center of the living room.

15         Q.   You were sitting up or laying down?

16         A.   I was sitting up like this.  I was not on

17    a seat, on a chair.  On the floor.

18         Q.   You were sitting on the floor when you

19    woke up?

20         A.   Yes.

21         Q.   Before that, you were laying down?

22         A.   When I wake up.  I was still laying down

23    when I wake up.

24         Q.   And you saw the guy with the bat standing

D-356

1    over you?

2         A.    Yeah, when I sit up.

3         Q.    When you sit up, you see him?

4         A.    Yeah.

5         Q.    And you see three other guys in there?

6         A.    I saw them.

7         Q.    Were they all standing, or were they

8    sitting?

9         A.    They all standing.

10        Q.    And was Delores laying on the floor, too?

11        A.    No.  She sat on the bed.

12        Q.    She was laying on the bed?

13        A.    She sat.  She sat down on the bed.

14        Q.    How large is this -- this living room is

15   the whole apartment; right?

16        A.    Yeah.

17        Q.    Could you give us in -- are you familiar

18   with feet or meters?  Could you measure in feet,

19   or do you measure in meters?

20        A.    How many feet was the measurement of the

21   living room?

22        Q.    What were the dimensions of this living

23   room?

24        A.    A little bit wide living room.  Like you

1    can say 12 feet wide here.  I'm talking about the

2    length.  And so it is square.  It would probably

3    be the same, too.  It's a little bit big studio.

4    It's a big studio.

5         Q.   So it's 12 by 12 foot?

6         A.   I'm going to put it like this.  The

7    apartment contains queen-sized bed and about two

8    chairs and one coffee table and a little space you

9    can put the TV on, and that's it.  Like that.

10        Q.   But you couldn't have ballroom dancing in

11   this studio apartment?

12        A.   No, no, I don't think --

13             MS. CURTIS:  Objection.

14             THE COURT:  Overruled.

15   BY MR. DOSCH:

16        Q.   And when you woke up, it was just your

17   feet that were tied; is that right?

18        A.   That's correct.

19        Q.   Is that right?

20        A.   Yes.

21        Q.   When you woke up?

22        A.   Yes.

23        Q.   No one hit you in the legs with a

24   baseball bat when you woke up?

D-358

1           A.    Un-uhn, no.

2           Q.    You weren't hit with a baseball bat until

3      you were in the bathroom; isn't that right?

4           A.    I beg your pardon?

5           Q.    You weren't hit in with a baseball bat in

6      the knees until you were in the bathroom; is that

7      right?

8           A.    Yes, yes.

9           Q.    Was that before or after you were in the

10     tub?

11          A.    Before.

12                MS. CURTIS:  Objection, asked and

13     answered.

14                THE COURT:  All of this has been gone

15     into twice, Mr. Dosch.  I wish you would confine

16     yourself to what's relevant to your defense.

17                MR. DOSCH:  Okay.  So this impeachment

18     was put in that he was hit in the knees --

19                THE COURT:  I'm considering it, you

20     know, for all three defendants.

21                MR. DOSCH:  I understand.  I'm not sure

22     if this was put in or not.

23                THE COURT:  If there's a question, go

24     ahead and do it.  I don't know.

D-359

1    BY MR. DOSCH:

2         Q.   Do you remember telling Detective Bradley

3    on May 12th that when you woke up, you were now in

4    handcuffs, and they were placed behind your back.

5    The male black who struck him on the head with the

6    baseball bat began striking both of the victim's

7    knees with the baseball bat.

8                   Do you remember telling Detective

9    Bradley that?

10                  MS. CURTIS:   Objection, asked and

11   answered.

12                  THE COURT:   Overruled.

13   BY THE WITNESS:

14        A.   I remember.

15   BY MR. DOSCH:

16        Q.   You did tell him that?

17        A.   Yes.

18        Q.   Now, you indicated on direct and during

19   one of the crosses that you heard -- the one thing

20   you heard Delores say was, did you get the keys;

21   is that right?

22        A.   Yes.

23        Q.   And you also indicated she had keys to

24   your office?

D-360

1         A.   Pardon me?

2         Q.   You also indicated she had keys to your

3    office?

4         A.   She does.

5              THE COURT:  I don't think that's what he

6    said.  He said what he heard was he heard her say,

7    did anybody see the key.

8              THE WITNESS:  Yes.

9    BY MR. DOSCH:

10        Q.   Okay.  That's the only thing you heard

11   Delores say; is that right?

12        A.   Yes.

13        Q.   And when you're in the bathroom, did you

14   see Delores?

15        A.   No, I didn't see her.

16        Q.   How long were you in the living room

17   before you were put in the bathroom?

18        A.   I don't recall.  I don't recall, but it's

19   awhile, a couple -- awhile.  I don't know.  I

20   looking at the wall clock.  That's what I

21   monitor.  I can say about 3:00 o'clock or --

22        Q.   I don't think you understood me.

23             Before they dragged you into the

24   bathroom, you were in the living room; right?

1          A.    Yeah.

2          Q.    How long were you in the living room

3     before they dragged you into the bathroom?

4          A.    Probably 30 minutes, 45 minutes, you

5     could say that.  I'm not sure about the time.

6          Q.    And that whole time, Delores was on the

7     bed?

8          A.    Yeah, she was sitting down on the bed.

9          Q.    Thanks.

10               And when you were sitting up in

11    the middle of the living room floor, did you see

12    Ervan Raimy with the gun in his hand at that time,

13    the guy without the mask?

14         A.    What's the name?

15         Q.    I'm sorry.  Different case.

16               Erven Walls?  I'm sorry.  The man

17    without the mask, did you see him with a gun in

18    the living room?

19         A.    Yeah, yes.

20         Q.    Did he have the gun in his hand when he

21    dragged you into the bathroom?

22               MR. RODDY:  Object.  It's been asked and

23    answered on two or three occasions.

24               THE COURT:  Sustained.

1    BY MR. DOSCH:

2        Q.   Did you tell -- strike that.

3             Okay.  You indicated that both

4    Hillard and the guy with the baseball bat came in

5    and threatened you with guns; right?  Into the

6    bathroom --

7        A.   Yes.

8        Q.   -- at one point in time?

9             Did you tell them at this time, I

10   don't have any money with me, the only money that

11   I have is 800 dollars that is in my office in my

12   drawer, and my wife knows where my office is,

13   she's got the duplicate key?  Did you ever say

14   that?

15       A.   Yes, I say that.

16            THE COURT:  Pardon me?

17            THE WITNESS:  I say that.

18            THE COURT:  You did say that?

19            THE WITNESS:  Yes.

20   BY MR. DOSCH:

21       Q.   Was any money taken from you?

22       A.   I don't recall that at that time, no.  I

23   don't remember no money taken from me.

24       Q.   Did anyone take your wallet?

D-363

1        A.    My wallet?

2        Q.    Wallet, yes?

3        A.    No, they didn't take my wallet.  My

4    wallet was in my office.

5        Q.    So when you came to -- you didn't bring

6    your wallet, I take it, to Delores' apartment; is

7    that correct?

8        A.    No, I didn't.  I just left it on the

9    table.

10            MR. DOSCH:  That's all I have,

11    Judge.

12            THE COURT:  Is that it?

13            MR. DOSCH:  Yes.

14            MR. RODDY:  No redirect.

15            THE COURT:  Okay.  Thank you,

16    Mr. Jinadu.  You may step down, sir.

17                (Witness excused.)

18            THE COURT:  We'll reconvene at about

19    10:15.

20            MR. RODDY:  Thank you, Judge.

21            THE COURT:  Court's in recess.

22            MS. BORMANN:  Judge, if I may for just a

23    moment.  I'm trying to determine the evidentiary

24    things, issues.

D-364

1                         There's some impeachment we need
2        to perfect on the grand jury transcript.  The
3        court reporter is a reporter for the
4        State's Attorney's Office.
5                         Will you guys stipulate to the
6        grand jury transcript?
7                  THE COURT:  Well, I assume there can be
8        a stipulation that that's what's in the
9        transcript.
10                 MR. RODDY:  What's typed down on the
11       paper, we'll stipulate that's what the
12       court reporter --
13                 MS. CURTIS:  -- heard and typed down,
14       but not necessarily that's what he said.
15                 MS. BORMANN:  That she took it to the
16       best of her ability, and that's what she took
17       down.
18                 MR. RODDY:  Yes.
19                 MS. BORMANN:  Fine.
20                 THE COURT:  Are you going to go with the
21       transcript?
22                 MS. BORMANN:  Yes.
23                 THE COURT:  Okay.  Anything else we want
24       to do with Mr. Hillard?

1          MS. BORMANN:  No, Judge.

2                    (WHEREUPON, the above matter

3                    was continued to

4                    July 15, 1998.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS  )

2                    ) SS:

3    COUNTY OF C O O K  )

4           I, JO ANN KROLICKI, an Official Shorthand

5    Reporter for the Circuit Court of Cook County,

6    County Department, Criminal Division, do hereby

7    certify that I reported in shorthand the

8    proceedings had in the above-entitled cause, and

9    that the foregoing is a true and correct

10   transcript of my shorthand notes so taken before

11   Judge Michael P. Toomin on July 14, 1998.

12

13

14   JO ANN KROLICKI, CSR, RPR
OFFICIAL COURT REPORTER

15   ILLINOIS LICENSE NO. 084-002215

16

17

18

19

20

21

22

23

24

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME . . . 4 . . . . OF . . 7 . . . VOLUME . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED . PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE . COURT NO. 99–0152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois . . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and . . . . . . . . . . . . . . . . . . . . . . . . TONY HILLARD . . . . . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness: AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . APRIL 23, . . . . . . . . . . . , 19 . 99 .

Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

```
 1  STATE OF ILLINOIS   )
                         )      SS.
 2  COUNTY OF C O O K    )

 3              IN THE CIRCUIT COURT OF COOK COUNTY
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
    THE PEOPLE OF THE    )
 5  STATE OF ILLINOIS    )
                         )      Case No. 97-30453
 6       VS              )
                         )      Before JUDGE MICHAEL TOOMIN
 7  ERVEN WALLS,         )                (And Two Juries)
    TONY HILLARD, and    )
 8  DELORES JINADU       )      JULY 15, 1998

 9

10       Court convened pursuant to adjournment.

11       Present:

12              HONORABLE RICHARD DEVINE,
                     State's Attorney of Cook County, by
13              MR. JOSEPH RODDY, and
                MS. ANN CURTISS,
14                   Assistant State's Attorneys,
                     appeared for the People;
15
                MS. RITA FRY,
16                   Public Defender of Cook County, by
                MS. CHERYL BORMANN, and
17              MS. RUTH MC BETH,
                     Assistant Public Defenders,
18                   appeared for the defendant Hillard,

19              MR. BRIAN DOSCH,
                     appeared for defendant Jinadu,

20
                MR. DANIEL FRANKS,
21                   appeared for defendant Walls.

22
    Paul P. Marzano, CSR, RPR
23  Official Court Reporter
    2650 S. California, Room 4C02
24  Chicago, IL  60608
    License #84-001789
```

FILED

APR 2 2 1999

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

1                          (The following proceedings

2                          were had out of the

3                          hearing of the jury:)

4       THE COURT:   Erven Walls, Tony Hillard, and

5  Delores Jinadu.

6       THE COURT:   State ready to proceed?

7       MR. RODDY:   Yes, Judge.

8       THE COURT:   Defense.

9       MS. BORMANN:   Your Honor, I have a quick motion

10  in limine based upon a conversation I had with Mr.

11  Franks today.

12            I'm asking your Honor to not have my jury

13  present, have Mr. Hillard's jury--

14       THE COURT:   Not to what?

15       MS. BORMANN:   Have Mr. Hillard's jury present

16  when Mr. Franks cross examines the detectives in this

17  case.

18            He's indicated to me that he is going to

19  attempt to prove through cross-examination of the

20  detective that Erven Walls is the same person as

21  Germaine Craine, is the same person as Zachary

22  Taylor, is the same person as all of those different

23  identifications.

24            He has a good faith basis to do so because

E-3

1 if his client testifies, he'll prove that up.

2          That is not relevant in my case, and in
3 fact it goes exactly inconsistent with my theory of
4 the Defense.

5      THE COURT:    How is that inconsistent with your
6 theory?  Your theory of defense is that your guy
7 wasn't there.

8      MS. BORMANN:    My theory of defense is my guy
9 wasn't there, and those people whose identification
10 was received were, and that they're not the same
11 people.

12     THE COURT:    Well, that's a question for the
13 jury to decide.  We know that Mr. Walls is Mr.
14 Dormaine Craine.  He's got two separate files before
15 this Court.  He is on probation on one.  He has a
16 substantive case here.  I'm not going to fool the
17 jury into thinking that he's two different people.

18     MS. BORMANN:    I'm not asking--

19     THE COURT:    I'm not going to allow you.

20     MS. BORMANN:    I'm not asking you to fool the
21 jury, your Honor.

22          There may be another Germaine Craine out
23 there.  I don't know if there is or there isn't.

24     THE COURT:    That's a question for the jury to

E-4

1 decide.

2         I can understand the inference that you're
3 attempting to create, but I don't think it's a fair
4 inference, and I think the jury is entitled -- both
5 juries are entitled to hear all of what relates to
6 this case, what was collected in the apartment, and
7 they can draw whatever conclusions they have to draw
8 from that.

9      MS. BORMANN:    So, my motion is denied?

10     THE COURT:    Yes.

11     MS. BORMANN:    Thank you.

12     THE COURT:    Okay.  Anything else?

13     MS. BORMANN:    No, your Honor.

14     MR. FRANKS:    Judge, do you have --
15 Judge Wadas was using my charging document, the
16 indictment, my copy of the indictment.

17        Is that in the file because it was never
18 returned to me?

19     THE COURT:    I don't know.

20     MR. FRANKS:    I'll find it.

21     THE COURT:    Do you have an extra copy of the
22 charging instrument for Mr. Franks?

23     THE CLERK:    This was copied off of the original.

24     MR. FRANKS:    That's mine.

1      THE COURT:   All right.

2          Ready for the juries then?  State, ready

3 for the juries?

4      MR. RODDY:   Yes, your Honor.

5      THE COURT:   Let's bring over--

6      THE SHERIFF:  Both of them?

7      THE COURT:   Right.

8      THE SHERIFF:  They're on their way.

9              (The following proceedings were

10             had in the hearing and the

11             presence of the juries:)

12     THE COURT:   Good morning, ladies and

13 gentlemen.

14         Please be seated.  We're prepared to move

15 forward with additional evidence in the case.  I

16 understand the State has another witness available?

17     MS. CURTISS:    Yes.  We ask leave to call

18 Officer Ramirez.

19     THE COURT:   Very well.

20         Step up, please, Officer.  Face this way

21 and raise your right hand.

22                 (Witness is sworn.)

23

24


E-6

1                          MARIO RAMIREZ,

2 called as a witness on behalf of the People of the

3 State of Illinois, being first duly sworn, was

4 examined and testified as follows:

5                      DIRECT EXAMINATION

6                      BY MS. CURTISS:

7       THE CLERK:  Please be seated, Officer.

8       MS. CURTISS:

9       Q.   Officer, I'm going to ask you to keep your

10 voice up so everyone can hear.  This is a large

11 courtroom, and sometimes sound doesn't travel so

12 well.

13           Sir, would you, please, state your name?

14      A.   My full name is Mario Ramirez,

15 R-a-m-i-r-e-z.

16      Q.   Who are you currently employed by?

17      A.   I am employed by the Chicago Police

18 Department.

19      Q.   How long have you been a Chicago police

20 officer?

21      A.   Sixteen years.

22      Q.   In May of 1997, specifically May 10 of

23 1997, in which district were you working for the

24 Chicago Police Department?

E-7

1       A.    At that time, I was employed in the 20th
2  District.

3       Q.    And what are the perimeters of the 20th
4  District?

5       A.    If I remember correctly, on the north, it
6  would be bound by Thorndale.  On the south, it would
7  be down to Lawrence.  On the east, the lake, and on
8  the west along the river.

9       Q.    On May 10, were you working alone or were
10 you working with a partner?

11      A.    I was working with a partner by the name of
12 Officer Schmidt.

13      Q.    And on May 10, were you in your police
14 clothes as you are here today in court?

15      A.    Yes, ma'am.

16      Q.    Specifically, I want to direct your
17 attention to about 7:00 or so on the evening of May
18 10 of 1997.

19            Where were you and your partner at about
20 that time?

21      A.    At that time, we were on the north side of
22 the district, approximately Thorndale and Winthrop.

23      Q.    And were you out on the street, or were you
24 in your police car?

E-8

1    A.    We were in a marked vehicle.

2    Q.    And were you driving that car?

3    A.    I believe I was, ma'am.

4    Q.    At about 7:00, did anything unusual

5 happen?

6    A.    Yes.

7          At the intersection of Winthrop and

8 Thorndale, we were traveling eastbound when we were

9 hailed over by a young boy.        .

10   Q.    And once you stopped your police car, did

11 you talk to the young boy?

12   A.    Yes.

13   Q.    Where did this young boy direct you to?

14   A.    He -- pardon me?

15   Q.    Where did this young boy direct you to?

16   A.    He directed us over one block east to a

17 street by the name of Kenmore.

18   Q.    When you were on Kenmore, what did you see

19 at the location there?

20   A.    On Kenmore, north of Winthrop, we saw a

21 male black on the west side of the street.  He was --  .

22 the only clothes he had on was a pair of Jockey

23 underwear.

24          The man was handcuffed, bleeding profusely

E-9

1 from the head.  He had open wounds on his head, and

2 he had gray duct tape hanging from his mouth, chin.

3 He was also partially bound by electrical wire.

4     Q.   Where was he bound with the electrical

5 wire?

6     A.   At that time, he had managed to get some of

7 it off, but it was around his neck.

8     Q.   So, you approached this person?

9     A.   Yes.

10     Q.   Did you learn this person's name to be

11 Yinka Jinadu?

12     A.   Yes.

13     Q.   Was this the same Yinka Jinadu that

14 testified here yesterday?

15     A.   That's correct.

16     Q.   And once you approached him in your squad

17 car, what happened next?

18     A.   We tried to calm him down because he was

19 very excited.

20          He was also extremely nervous, and at first

21 I could not understand him because of his heavy

22 accent.  Once we managed to calm him down, I was able

23 to understand what had happened to him.

24     Q.   Where did he direct you to?

E-10

1       A.      He directed us to -- back to the block of
2  Winthrop, about the 59 hundred block, east side of
3  the street.

4       Q.      I'm sorry.

5               What was the distance between where you had
6  picked up Yenka to where he directed you on to
7  Winthrop?

8       A.      That would be one block west, half a block
9  south.

10      Q.      Approximately, how much time did it take
11 you to get from where you picked up Yinka to get back
12 to 5831 North Winthrop?

13      A.      My best estimation would be three to five
14 minutes.

15      Q.      And during that time, did Mr. Jinadu tell
16 you what had happened to him that day?

17      A.      Yes.

18      Q.      When you got to the location of 5831 North
19 Winthrop, where did you go in that building?

20      A.      We went up to one of the apartments.  I
21 don't remember the exact floor, but we brought him
22 along to show us which apartment it was.

23      Q.      Did he point out an apartment to you?

24      A.      Yes, ma'am.

E-11

1    Q.    Did you enter that apartment?

2    A.    Yes.

3    Q.    Could you, please, describe what that

4 apartment looked like when you walked through the

5 door?

6    A.    Once inside the apartment, it was a small

7 apartment.

8         To me, it was a studio type of apartment

9 where the living room also served as a bedroom.

10        Upon entering the room, directly in front

11 of us was a bed, a night stand.  This was on our

12 right.

13        On the southeast corner was a black

14 television and immediately to our left was a table.

15        Upon this table were hundreds of plastic

16 bags, a scale, white powder, spoons, and as you

17 continued, there was -- to your left a small kitchen,

18 refrigerator, stove, and a counter.  And between that

19 kitchen and the small table was a small -- yes, a

20 very small hallway which contained a closet to its

21 left and then the bathroom.

22    Q.    Did you proceed into the bathroom?

23    A.    Yes.

24    Q.    What did the bathroom look like?

E-12

1      A.    The bathroom was in disarray.  There were a
2 lot of clothes on the floor, wet, and tangled up.

3            As I entered the bathroom, on our left I
4 remember there was blood smeared on the Walls.

5            Pulling what was left of the curtain open,
6 the entire tub was covered in blood and bloody water,
7 numerous wet cotton towels soaked with water and
8 blood.

9      Q.    Could you describe the condition of the bed
10 area where the bed was located?

11      A.    The bed was not made.  The majority of the
12 blankets were at the foot of the bed, one or two
13 pillows in the center of the bed, and some at the
14 head, by the -- at the head of the -- at the head of
15 the bed.

16      Q.    Okay.

17      A.    There were a lot of also plastic bags that
18 had fallen off of the bed onto the floor near the
19 foot of the bed.

20      Q.    Okay.

21      A.    In my estimation, it was maybe a queen size
22 bed.

23      Q.    Okay.

24      MS. CURTISS:    May I approach, your Honor?

E-13

1       THE COURT:    You may.

2       MS. CURTISS:

3       Q.    Officer Ramirez, I'm going to show you what
4  has been marked as People's Exhibit Number 1.   It's a
5  photograph.

6             Do you recognize what's depicted in
7  People's Exhibit 1?

8       A.    Yes, this is a view of the washroom and the
9  closet to the left.

10      Q.    And you indicated earlier when you
11 testified that there was blood smeared on the wall is
12 that depicted, too, in that photo?

13      A.    Yes, it is.

14      Q.    What side of the photo is that on?

15      A.    Looking directly at the photo it would be
16 on the left-hand side.

17      Q.    Okay.

18            I'm going to show you what's been marked as
19 People's Exhibit 10.

20            Do you recognize the photo, or pardon me,
21 the scene depicted in the photo of People's Exhibit
22 Number 10?

23      A.    Yes, this is a picture of the bedroom,
24 showing the bed, the television, and what little

E-14

1  furniture there is in the apartment.

2      Q.    Is that a true and accurate depiction of

3  how that bedroom looked when you entered the

4  apartment on May 10 of 1997?

5      A.    Yes.

6      Q.    Let me just back up as to People's Exhibit

7  Number 1.

8            Is that a true and accurate photograph of

9  how the bathroom view looked to you when you entered

10 the bathroom on May 10 of 1997?

11     A.    Yes, ma'am.

12     Q.    I'm going to show you what's been marked as

13 People's Exhibit Number 11, 12, and 13.

14           Those also are photographs.  Do you

15 recognize the person depicted in the photographs?

16     A.    Yes, he is the gentleman you identified

17 earlier.

18     Q.    That's Yenka Jinadu?

19     A.    Yes, that is correct.

20     Q.    Does the photograph there depict accurately

21 how Yenka appeared to you when you found him on the

22 street on May 10 of 1997?

23     A.    Yes.

24     Q.    And is he in all of the photographs there?

1       A.    Yes, he is.

2       Q.    And the things around his neck, that's what
3 you had described as tape?

4       A.    Yes, ma'am.

5       Q.    And the handcuffs there, he's still in the
6 handcuffs?

7       A.    Yes, he is.

8       Q.    I'm showing you what's been marked as
9 People's Exhibit Number 14.

10            Do you recognize People's Exhibit Number
11 14?

12      A.    Yes, it is a picture of the washroom
13 itself.

14      Q.    Okay.

15            And does this photograph truly and
16 accurately depict how the washroom looked when you
17 entered it on May 10 of 1997?

18      A.    Yes, ma'am.

19      Q.    And again on the left side, is that the
20 blood that you indicated you had seen on the scene on
21 May 10?

22      A.    Yes.

23      Q.    Was there anything on the bed of this
24 apartment that you recovered?

1     A.   Yes.

2     Q.   What was that?

3     A.   On top of the bed in the center, I
4  recovered two revolvers, one a 22 and another a 357
5  magnum.

6     Q.   Were these guns loaded or unloaded when you
7  recovered them?

8     A.   If I remember correctly, they were loaded.

9     Q.   I'm going to show you what's been
10 previously marked as People's Exhibit 8.

11         Do you recognize People's Exhibit 8?

12    A.   Yes, this is one of the revolvers found on
13 the bed, a Smith and Wesson 357 magnum.

14    Q.   And this is the same gun that you
15 recovered?

16    A.   Yes, it is.

17    Q.   Is it in similar or substantially similar
18 condition today as when you recovered in May 10,
19 1997?

20    A.   Yes, in addition to the initials I put on
21 the gun.

22    Q.   There are some initials on the gun?

23    A.   Yes, ma'am.

24    Q.   When did you put those on that gun?

E-17

1    A.    At the time of inventory.

2    Q.    Why do you do?

3    A.    Just to make sure it's the same gun
4 inventoried that I get back in the courtroom.

5    Q.    And is there a serial number on that gun?

6    A.    Yes.

7    Q.    Where is that?

8    A.    That's found on the butt of the gun on the
9 bottom.

10    Q.    What is the serial number to that gun?

11    A.    Here, this is K King 261713.

12    Q.    Okay.

13          You indicated that when this gun was
14 recovered it was loaded?

15    A.    Yes.

16    Q.    I'm going to show you what's been marked as
17 People's Exhibit 8B and 8C.  These have not been
18 opened.  If you wouldn't mind opening that?

19          What are the contents of Exhibit 8C?

20    A.    These are five Federal live 357 magnum
21 cartridges.

22    Q.    And did you recover those items on May 10
23 of 1997?

24    A.    Yes.

1    Q.   Where did you find those?

2    A.   They were inside the cylinder of that
3 specific gun.

4    Q.   Are they today in substantially the same
5 condition today as they with were when you found them
6 on May 10 of 97?

7    A.   Yes.

8    Q.   I am showing you what's been marked as 8B.

9         What are the contents of 8B?

10   A.   These are two spent cartridges.

11   Q.   Where were they recovered from?

12   A.   From the scene.

13   Q.   Which gun or from where did you find those
14 on the scene?

15   A.   I don't recall exactly where these came
16 from.

17   Q.   Okay.

18        But they were not in Exhibit 8, the gun
19 here?

20   A.   No, but that gun will fire these type of
21 shells also.

22   Q.   All right.

23        These are in substantially the same
24 condition today as they were when you recovered them

1 on May 10?

2    A.   That's correct.

3    Q.   I'm going to show you what's been

4 previously marked as People's Exhibit Number 9.

5          Do you recognize that, People's Exhibit

6 Number 9?

7    A.   Yes, this is the secondary gun that we

8 found on the scene.

9    Q.   That, too, is a revolver?

10    A.   Yes, it is.

11    Q.   You recovered that gun from the bed?

12    A.   That's correct.

13    Q.   Is this gun in substantially the same

14 condition today as it was when you recovered it from

15 the bed?

16    A.   Yes, it is.

17    Q.   How can you tell that this is the same gun?

18    A.   Again, this gun also has my initials

19 engraved on it or scratched on it.

20    Q.   I'm going to show you what's been marked as

21 People's Exhibit Number 9B.  Would you open that?

22    MR. FRANKS:   What number is that?

23    MS. CURTISS:   9B.

24    MR. FRANKS:   B as in boy.

E-20

1  THE COURT: Yes.

2  MS. CURTISS: Yes.

3  MR. FRANKS: Okay.

4  MS. CURTISS:

5  Q. Okay.

6  A. Okay. These are six live 22 magnum rounds.

7  Q. Where were they recovered from?

8  A. Also from the cylinder of this revolver.

9  Q. Are they today in substantially the same

10 condition as they were when you recovered them on May

11 10 of 97?

12  A. Yes, they are, ma'am.

13  Q. Did you recover anything else from the main

14 room, the bedroom living room area?

15  A. Yes, we did.

16  Q. What was that?

17  A. Looking at the bed from the east to the

18 west on the right would have been a small night

19 stand, on top of which there were numerous

20 identifications.

21  Q. Officer, I'm going to show you what's

22 previously been marked as defendant Hillard's Exhibit

23 3. Do you recognize what that is?

24  A. Yes, that's a Social Security card.

1      Q.    Whose name is on that?

2      A.    On this card is the name of Jerome Walls
3   with a number of 356842762.

4      Q.    Is this one of the pieces of identification
5   that you recovered from that table in the living
6   room?

7      A.    Yes, ma'am.

8      Q.    Is it today in substantially the same
9   condition as it was the day that you recovered it?

10     A.    Yes.

11     Q.    I'm going to show you what's previously
12  been marked as Hillard Exhibit 4 do you recognize
13  what that is?

14     A.    Yes.

15     Q.    What is that?

16     A.    This is also another Social Security card.

17     Q.    Whose name appears on that?

18     A.    On this one its labeled as Zachary T. Walls
19  with a Social Security number of 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.

20     Q.    You recovered that from the same side
21  table?

22     A.    Yes.

23     Q.    Is it today in substantially the same
24  condition as it was the day you recovered it?

1     A.    Yes, it is.

2     Q.    I am showing what's been marked as

3 Defendant Hillard 5.  Do you recognize that?

4     A.    Yes.

5     Q.    What is that?

6     A.    This is a certificate of returning to

7 work.

8     Q.    Whose name appears on it?

9     A.    On here also is Erven Walls.

10     Q.    This piece of -- this certificate that you

11 recovered was from the same table?

12     A.    Yes, it is.

13     Q.    Is it today in substantially the same

14 condition as it was on the day you recovered it?

15     A.    Yes.

16     Q.    I'm going to show you what's been marked

17 previously as Defendant's 6?  This is a fragile

18 exhibit.

19          Do you recognize what's been marked as

20 Defendant's Exhibit 6?

21     A.    Yes, before me I have a certified copy of a

22 birth certificate.

23     Q.    For whom?

24     A.    For a Mr. Erven Zachary Taylor Walls.

1      Q.   Where -- did you recover that?

2      A.   Yes, I did.

3      Q.   Did you recover it from the same side of
4  the table that the rest of the identification was
5  recovered from?

6      A.   Yes, it is.

7      Q.   Is it today in substantially the same
8  condition as it was on the day that you recovered it
9  on May 10?

10     A.   Yes, ma'am.

11     Q.   I am showing you what's been marked as
12  Group Exhibit 7.  What is Group Exhibit 7?

13     A.   Seven consists of three traffic tickets
14  issued out of the 18th District to a Mr. Erven Walls.

15     Q.   What address is listed on the tickets?

16     A.   This address is the address of 5851 north
17  Winthrop.

18     Q.   That appears on each of the traffic
19  tickets?

20     A.   That's correct.

21     Q.   You recovered these traffic tickets from
22  the apartment at 5851 North Winthrop on May 10?

23     A.   Yes.

24     Q.   Are they today in the same condition as

E-24

1 they were on May 10 of 97?

2    A.   Yes.

3    Q.   I am now showing you what's been previously

4 been marked as Defendant's Exhibit Number 8.

5         Do you recognize what that is?

6    A.   A photo ID.

7    Q.   And did you recover that photo ID from the

8 apartment on May 10?

9    A.   Yes.

10    Q.   From the same side table?

11    A.   Yes, I did.

12    Q.   Is there a name on that card?

13    A.   Yeah, it's Mr. Germaine Craine.

14    Q.   All right.

15    THE COURT:   Germaine or Dormaine?

16    A.   Germaine.

17    THE COURT:   Germaine?

18    A.   Yes.

19    MS. CURTISS:

20    Q.   Is it in substantially the same condition

21 as it was on the day you recovered it on May 10?

22    A.   Yes.

23    Q.   Finally, I'm showing you what's been marked

24 as People's Exhibit -- pardon me -- Defendant's

1  Exhibit Number 9 for identification.  Do you

2  recognize what that is?

3        A.    Yes, this is an Illinois driver's license

4  of a young lady.

5        Q.    Whose name is on that?

6        A.    The name on here is to whom the license was

7  issued to, and that's a Delores D. Jinadu.

8        Q.    All right.

9              Did you recover that from the same table

10 that the rest of these identifications were recovered

11 from?

12       A.    Yes, ma'am.

13       Q.    Is it today in the same condition as it was

14 on the day you recovered it?

15       A.    Yes.

16       Q.    After you recovered these identifications,

17 these pieces of identification, what did you do with

18 them on May 10?

19       A.    I handed them over to my partner, Officer

20 Schmidt, to hold on to.

21       Q.    Where was your -- where was your partner;

22 was he outside or inside of the apartment?

23       A.    He was in the apartment.

24       Q.    Officer, you indicated the dimensions of

E-26

1 the apartment.

2          What was the -- what was the temperature
3 like when you went into the apartment at about 7:00
4 or in the evening on May 10?

5     A.   Upon immediately opening the door, the
6 place felt like a sauna, all of the windows were
7 closed and a large volume of humidity in the
8 apartment.

9     Q.   After you recovered the items that you've
10 just talked about, where did you go next?

11     A.   After that, we went to Illinois Masonic, if
12 I remember correctly, to get the condition of the
13 victim and also to retrieve some of the items that
14 were taken off of him, those being the items that
15 were used to restrain him because we did not have a
16 key to unlock that type of set of handcuffs.

17          I believe that the hospital cut them off,
18 if I'm correct.

19     Q.   Did you receive anything else from the
20 hospital personnel when you went to Illinois Masonic
21 beside the handcuffs?

22     A.   I believe they gave us the duct tape which
23 was the tape used or still around the individual's
24 neck and some electrical cords maybe and a few

1 portions of clothing.

2    Q.    Would it be fair to say that they gave you

3 the items that were around Mr. Jinadu's neck when you

4 phoned them?

5    A.    Yes.

6    Q.    I'm going to show you what's been

7 previously marked as People's Exhibit Number 6.

8          Do you recognize People's Exhibit

9 Number 6?

10   A.    Yes, I do.

11   Q.    What is People's Exhibit Number 6?

12   A.    These are the handcuffs that were on the

13 subject.

14   Q.    And when they were on him, I imagine they

15 weren't broken as they are today?

16   A.    These are not broken.  They've been cut,

17 probably cut with a large set of bolt cutters.

18   Q.    And are these handcuffs today in

19 substantially the same condition as they were when

20 you received them from the personnel at Illinois

21 Masonic?

22   A.    Yes, ma'am.

23   Q.    I'm going to show you what's been marked as

24 People's Group 7.  Do you recognize the contents of

1 People's 7?

2     A.   Yes.

3     Q.   What is in People's 7?

4     A.   These are the other items that were on the
5 subject.

6          They include basically the electrical tape
7 both, in black and white, a large number of strands
8 of duct tape, gray in color, and a few items of
9 clothing covered in dried blood.

10    Q.   Are these items in substantially the same
11 condition today as they were when you received them
12 from the personnel at Illinois Masonic Hospital?

13    A.   Yes, ma'am.

14    Q.   During the time that you recovered the guns
15 and the identification from the inside of the
16 apartment, where was Mr. Jinadu?

17    A.   At that time, he was seated outside in the
18 hallway.  He was waiting for the ambulance.

19    MS. CURTISS:   Thank you, Officer Ramirez.  I
20 have no further questions.

21    THE COURT:   Mr. Franks, you may inquire.

22    MR. FRANKS:   Thank you.

23              CROSS EXAMINATION

24              BY MR. FRANKS:

1      MR. FRANKS:

2      Q.   Officer, when you first saw Mr. Jinadu, he
3  was handcuffed, is that correct?

4      A.   Yes.

5      Q.   And how was he handcuffed?

6      A.   Handcuffed in front.

7      Q.   Now, you say handcuffed in front.

8           The handcuffs were on both of his wrists,
9  is that correct?

10     A.   That is correct, sir.

11     Q.   And they were in the front of him basically
12  the way that I'm standing in front of you, is that
13  correct?

14     A.   More or less, yes.

15     Q.   With his wrists almost touching, is that
16  correct?

17     A.   You could say that.

18     Q.   And after you were able to calm him down,
19  you indicated that he then told you and your partner
20  what had happened to him, is that correct?

21     A.   Yes.

22     Q.   And you had discussions with him about what
23  had occurred to him during the time that you were
24  with him,, is that correct?

E-30

1    A.    That's correct.

2    Q.    All right.

3          You talked to him before you got to the
4 apartment, is that correct?

5    A.    That's correct.

6    Q.    You talked to him after you got to the
7 apartment and gathered more information, is that
8 correct?

9    A.    No, that's incorrect.  I never said that.

10   Q.    Well, I'm just asking you.

11         Did you continue your interviewing of him
12 after you got to the apartment?

13   A.    No, he was taken away in the ambulance.

14   Q.    All right.

15         Did you question him again or get more
16 information from him when you saw him at Illinois
17 Masonic Hospital?

18   A.    No.

19   Q.    All right.

20         So, you and your partner did write up a
21 case report regarding this matter, is that correct?

22   A.    Yes, sir.

23   Q.    All right.

24         And the information that you put in your

1 case report then is the information that he gave you
2 before you got to the Winthrop apartment, is that
3 correct?

4     A.   The information on the report -- on the
5 reports is the information taken from him in the
6 vehicle and I believe from whatever my partner was
7 able to speak to him about in the hallway.

8     Q.   Okay.

9          When you say the hallway, there were
10 further discussions then between Mr. Jinadu and your
11 partner in the hallway while you were in the process
12 of -- of visiting the -- the crime scene, is that
13 correct?

14    A.   No, we were not visiting it.  We were
15 searching it.

16    Q.   Certainly, you were.

17         And you were gathering information and then
18 talking to Mr. Jinadu about what you found, is that
19 correct?

20    A.   That's correct.

21    Q.   All right.

22         Now, when you were inside of the apartment
23 on Winthrop, you found two separate guns both on the
24 bed, is that correct?

E-32

1      A.    Yes.

2      Q.    Did you find anywhere inside of that

3 apartment a baseball bat?

4      A.    No, I did not.

5      Q.    Did you find anywhere in that scene any

6 type of a tire iron or chisel or any other metal type

7 object that could be used as a weapon?

8      A.    No, sir.

9      Q.    Now, sir, did you notice anywhere in the

10 apartment any type of a heavy crystal vase?

11     A.    To the best of my recollection, no.

12     Q.    You did not see any heavy type crystal vase

13 that was broken on the floor near the front door, did

14 you?

15     A.    I don't recall.

16     Q.    All right.

17           You looked around the front door of that

18 studio apartment, is that correct?

19     A.    I did what, sir?

20     Q.    You looked around the front entrance way

21 inside of the studio apartment, is that correct?

22     A.    Yes.

23     Q.    And there was -- was there anything broken

24 or lying right at the doorway area?

E-33

1      A.    I don't recall.

2      Q.    All right.

3            And if there had been some broken vase or a
4 baseball bat or any other item that could have been
5 used as a weapon, that is something that would have
6 attracted your attention, is that correct?

7      MR. RODDY:    Objection.

8      THE COURT:    Sustained.

9      MR. FRANKS:

10     Q.    When you went into that apartment, you were
11 looking for evidence of the crime that had been
12 committed here, is that correct?

13     A.    No, that's incorrect.

14     Q.    All right.

15           Well, you indicated that one of the things
16 that you noticed upon your entry was like a work
17 table, is that correct?

18     A.    Yes.

19     Q.    All right.

20           Where was that work table located?

21     A.    Upon entering the apartment, it was to my
22 immediate left.

23     Q.    And how far away from the doorway would
24 that be?

E-34

1      A.    A couple of feet, two, three.

2      Q.    Just a couple of feet?

3      A.    Two or three feet.

4      Q.    So almost right at the front entrance?

5      A.    Yes.

6      Q.    Okay.

7            And on this bench, you indicated that there
8 were numerous items, is that correct?

9      A.    Yes.

10     Q.    And if I'm not -- well, strike that.

11           What did you see on the bench?

12     A.    As I stated earlier, there were hundreds of
13 clear plastic bags.

14     Q.    Now, how were these bags on the table?
15 Were they in a -- in boxes or were they just loose?

16     A.    They were just thrown all over the table
17 and a lot of them were also on the -- on the floor.

18     Q.    All right.

19           How big was this table?

20     A.    A small table of the size of maybe two by
21 four, or two by three.

22     Q.    And there were hundreds of these -- these
23 were all just clear bags or that -- there was nothing
24 inside of them, is that correct?

1      MR. RODDY:    Objection?

2      A.    That's correct.

3      THE COURT:    Sustained.

4      MR. FRANKS:

5      Q.    What else besides these bags were on the

6 table?

7      MR. RODDY:    Objection.

8      A.    Could you repeat the question, please?

9      THE COURT:    Pardon me?

10     MR. RODDY:    Objection.  He already answered

11 that question once.

12     THE COURT:    You asked the question.

13     MR. FRANKS:    This is cross.

14     THE COURT:    Well, he has a right to ask him,

15 too.  Overruled.  If he wants to repeat it, he can

16 repeat it.

17     MR. FRANKS:

18     Q.    What else was on the table?

19     A.    A scale.

20     Q.    What kind of scale?

21     A.    Measuring scale.

22     Q.    Measuring?

23     A.    Weight.

24     Q.    Weight.  Which could often be used in--

E-36

1       MR. RODDY:    Objection.

2       MR. FRANKS:    -- for narcotics?

3       MR. RODDY:    Objection.

4       THE COURT:    Overruled.

5       A.    Could be -- it could be used for cooking.

6       MR. FRANKS:

7       Q.    Well, did you think that this particular

8 scale was used for cooking?

9       MR. RODDY:    Objection.

10      THE COURT:    Sustained.    How would he know?

11      MR. FRANKS:

12      Q.    Well -- you describe in your case report

13 that this was part of a drug lab?

14      A.    I don't recall if that was in there.

15      Q.    All right.

16          I show you what will be considered as

17 Defendant Walls--

18      MR. RODDY:    I object to the relevance of the

19 question.

20      THE COURT:    Sustained.

21      MR. FRANKS:

22      Q.    Did the items that you found on the table

23 indicate to you that there was a drug lab in this

24 apartment?

1       MR. RODDY:    Objection.

2       THE COURT:    Sustained.

3       MR. FRANKS:

4       Q.   All right.

5            Well, besides -- how big was this scale?

6       A.   Oh, a scale that could measure up to maybe

7  500 grams.

8       Q.   It could also measure weights of less than

9  a gram, could it not?

10      A.   It had that capability.

11      MR. RODDY:    Objection to the relevancy.

12      THE COURT:    Overruled.

13      MR. FRANKS:

14      Q.   I am not sure if the jury could hear your

15 answer.

16      THE COURT:    You may answer, sir.

17      A.   It had that capability.

18      MR. FRANKS:

19      Q.   And have you in your 16 years as a police

20 officer seen one of those hundreds of bags used in

21 drug trafficking in the City of Chicago?

22      MR. RODDY:    Objection.

23      THE COURT:    Sustained.

24      MR. FRANKS:

E-38

1       Q.    All right.

2             Well, besides these hundreds of clear bags

3  and this scale, what else was on the table?

4       A.    Jars of white powder.

5       Q.    What did you believe was inside of those

6  jars of white powder?  What was that white powder?

7       MR. RODDY:    Objection.

8       THE COURT:    Sustained.

9       MR. FRANKS:

10      Q.    Did you send that white powder to the crime

11 lab?

12      MR. RODDY:    Objection.

13      THE COURT:    Sustained.

14      MR. FRANKS:

15      Q.    Did you inventory the jars of white

16 powder?

17      MR. RODDY:    Objection.

18      THE COURT:    Overruled.

19      A.    No.

20      MR. FRANKS:

21      Q.    So, you did not believe that those jars of

22 white powder were contraband, did you?

23      MR. RODDY:    Objection.

24      THE COURT:    Sustained.

1      MR. FRANKS:

2      Q.   Did you believe that the jars of white

3 powder were mix?

4      MR. RODDY:   Objection.

5      THE COURT:   Sustained.

6      MR. FRANKS:

7      Q.   Well, what is super latex -- lactose,

8 excuse me.

9      A.   I don't know.  I'm not a chemist.

10     Q.   Well, did you put in your -- in your report

11 that there were numerous bottles of super lactose?

12     A.   Yes, it's possible.

13     Q.   Would your report refresh your recollection

14 that that is inside of your report and that that is

15 what you recovered?

16     A.   Yes, it would.

17     Q.   All right.

18          I'll show you at this time what I

19 previously marked as Defendant Walls's Exhibit

20 Number 1.

21          I'll direct your attention to the second to

22 the last line of your narrative on that page.

23          First of all, is that a copy of your police

24 report that you and your partner prepared regarding

1 this incident?

2     A.    Yes.

3     Q.    Does that report bear your signature?

4     A.    On the front, yes.

5     Q.    Does that signature attest to the

6 authenticity and the information in that report being

7 true and accurate?

8     A.    Yes, sir.

9     Q.    And do you see the portion of the report

10 that I directed your attention to?

11     A.    Yes.

12     Q.    Does that now in fact refresh your

13 recollection that you did find jars of what you put

14 in quotes as super lactose?

15     A.    Yes.

16     Q.    What is super lactose?

17     MR. RODDY:    Objection.

18     THE COURT:    Sustained.

19     MR. FRANKS:

20     Q.    How many jars or bottles of super lactose

21 did you recover?  .

22     A.    I don't recall.  There were several.

23     Q.    More than three?

24     MR. RODDY:    Objection, Judge.  He answered the

1 question.

2       THE COURT:    Overruled.

3       A.    I don't recall the exact number, sir.

4       MR. FRANKS:

5       Q.    Just a range, sir.

6       A.    Three, five, I'm not certain.

7       Q.    And all of these jars or bottles were on --
8 were on top of this particular workbench or table, is
9 that correct?

10      MR. RODDY:    Objection, asked and answered.

11      THE COURT:    Sustained.

12      MR. FRANKS:

13      Q.    Now, besides the items that you mentioned,
14 were there also breathing masks that you recovered on
15 that bench?

16      A.    Yes.

17      Q.    And can you describe these breathing
18 masks?

19      A.    Basically paper masks that painters use.

20      Q.    Or drug dealers.

21      MR. RODDY:    Objection, Judge.

22      THE COURT:    Sustained.

23      MR. FRANKS:

24      Q.    Now, as far as you know, did the evidence

1 technicians come into this apartment at any time
2 while you were present?

3    A.    Yes, he did.

4    Q.    And did this evidence technician look for
5 fingerprints inside of the premises?

6    A.    I don't know.

7    Q.    But a trained evidence technician from the
8 Chicago Police Department was present while you were
9 conducting your own investigation, is that correct?

10    MR. RODDY:    Objection, asked and answered.

11    THE COURT:    Sustained.

12    MR. FRANKS:

13    Q.    Well, is this an evidence technician from
14 the Chicago Police Department that you know to be
15 trained in the art of taking fingerprints from
16 premises?

17    MR. RODDY:    Objection.

18    THE COURT:    Sustained.

19    MR. FRANKS:

20    Q.    How many evidence technicians were in the
21 apartment while you were there?

22    A.    Only one.

23    Q.    And do you know what unit he came from?

24    A.    You have to speak up.  I couldn't hear

E-43

1 you.

2    Q.   I am sorry; I was looking down.

3         What unit was this evidence technician

4 from?

5    A.   He was from the 24th District.

6    Q.   And who had sent for him to come to that

7 location?

8    A.   I don't recall if it was myself or the

9 supervisor on the scene.

10   Q.   Do you know the purpose that this evidence

11 technician was brought to the scene for?

12   MR. RODDY:    Objection.

13   THE COURT:    Sustained.

14   MR. FRANKS:

15   Q.   Well, as far as you know, were any

16 fingerprints found at the scene of Mr. Walls?

17   MR. RODDY:    Objection.

18   THE COURT:    Overruled.

19   A.   No, I do not.

20   MR. FRANKS:

21   Q.   Now, the gun or guns that you found at the

22 scene, People's Exhibit 8 and 9, did the evidence

23 technician look at those guns before you touched

24 them?

1   A.   No, he did not.

2   Q.   You picked up the guns yourself?

3   A.   Yes, I did.

4   Q.   How did you pick them up?

5   A.   I picked them up by the handle.

6   Q.   I mean, you didn't put like a pen or a

7 pencil inside of the trigger mechanism and carry them

8 like this this, did you?

9   A.   No, sir.

10   Q.   Did you give the guns to the evidence

11 technician that was at the scene?

12   A.   No, I did not.

13   Q.   Do you know if the evidence technician ever

14 printed those guns?

15   MR. RODDY:   Objection.

16   THE COURT:   When you ask a question that starts

17 out with did you know, it always calls for a hearsay

18 answer, and I think you know that, Mr. Franks.

19        So, kindly refrain from posing questions

20 that way.  Ask a proper question, and you'll get a

21 proper answer.

22   MR. FRANKS:

23   Q.   Did you see if the evidence technicians

24 ever examined or touched these weapons, Exhibits 8

E-45

1 and 9?

2     A.    No, sir.

3     Q.    Did you give any of the items that you

4 recovered in People's Exhibit Number 7 to any

5 evidence technician?

6     A.    No.

7     Q.    You personally recovered from Illinois

8 Masonic the metallic handcuffs, is that correct?

9     A.    Yes, my partner and I.

10    Q.    And do you know what kind of metal People's

11 Exhibit Number 6 is, the handcuffs?

12    MR. RODDY:    Objection.

13    THE COURT:    Sustained.

14    MR. FRANKS:

15    Q.    Well, is it a shiny and smooth surface on

16 People's Exhibit Number 6?

17    MR. RODDY:    Objection.

18    THE COURT:    Overruled.

19    A.    Yes.

20    MR. FRANKS:

21    Q.    Can you easily see fingerprints or

22 fingerprint smudges on such an item?

23    MR. RODDY:    Objection.

24    THE COURT:    Overruled.

1      A.    Sometimes.

2      MR. FRANKS:

3      Q.    Certainly People's Exhibit Number 6 you

4 gave to an evidence technician to examine, isn't that

5 correct?

6      A.    I am sorry; I didn't hear your question.

7      Q.    Did you give Number 6 to the evidence

8 technician?

9      A.    No, sir.

10     Q.    It was your information that one of the

11 offenders had placed those handcuffs on Mr. Jinadu,

12 is that correct?

13     A.    That's correct.

14     Q.    He didn't put them on himself, did he?

15     A.    Not according to him.

16     Q.    Did you send People's Exhibit Number 6, the

17 handcuffs, to the crime lab for examination?

18     A.    No, because they were contaminated.

19     Q.    Did you contaminate them?

20     A.    No, the fire department contaminated them.

21 The hospital personnel contaminated them in order to

22 remove them.  It's just very logical.

23     Q.    Well, their prints might have been on it,

24 but the offenders' prints might have been on it also,

E-47

1 isn't that correct?

2          MR. RODDY:     Objection.

3          THE COURT:     Argumentative, sustained.

4          MR. FRANKS:

5          Q.    So, you're saying it was likely that there

6 there were some fingerprints on that item, is that

7 correct?

8          MR. RODDY:     Objection.

9          THE COURT:     Sustained.

10          MR. FRANKS:

11          Q.    Now, Mr. Jinadu told you that this incident

12 occurred at approximately 10:30, is that correct?

13          A.    Yes.

14          Q.    And that would be 10:30 in the morning, is

15 that correct?

16          A.    Yes.

17          Q.    And you only found him outside in the

18 condition that you described him in just minutes

19 after 7:00 p.m. in the evening, is that correct?

20          A.    That's correct.

21          Q.    Now, you indicated that there were two

22 spent shells.

23          I believe they were 8B if I'm not mistaken,

24 is that correct?

E-48

```
1        MS. CURTISS:    8C?

2    A.   Yes.

3        MR. FRANKS:     Excuse me, 8C.

4    Q.   Is that correct?

5    A.   Yes.

6    Q.   Okay.

7        Where did you recover these two spent

8 shells from?

9    A.   I'm not certain exactly what location they

10 came from in the apartment.

11   Q.   But they were inside of the apartment?

12   A.   I did not -- I did not recover them myself

13 personally.

14   Q.   Who did?

15   A.   One of the other officers.  I don't recall

16 which one.

17   Q.   Okay.

18        Who inventoried 8C?

19   A.   I would have to look at the inventory sheet

20 to refresh my memory.

21        MR. FRANKS:    If I may have a moment, Judge?

22   Q.   Officer, I'll show you a series of

23 inventories.

24        If we can consider this as Group Exhibit
```

1 Number 2 for Walls.  The last two pages seem to

2 relate to handguns.

3          If you want to review those and see if

4 there's any indication related to these two spent

5 shells; I'm not sure what you'll find.

6     A.   I don't see them on here.

7     Q.   All right.

8          Officer, what I handed to you, to your

9 recollection, in that Group Exhibit Number 2, are

10 those all of the inventories that you prepared

11 relating to this case, or is there a possibility that

12 there are others?

13    A.   These are the only ones that I remember or

14 recall making.

15    Q.   All right.

16         So, this exhibit that was shown to you, 8C,

17 is a mystery item, is that correct?

18    MR. RODDY:    Objection.

19    THE COURT:    Sustained.

20    MR. FRANKS:

21    Q.   Is there any mention of that, those spent

22 cartridges, in any of those inventories that you have

23 in front of you?

24    MR. RODDY:    Object to the relevance.

1       THE COURT:   Sustained.

2       MR. FRANKS:

3       Q.   Well, there's nothing then on any of the
4  inventories that you prepared or your partner
5  prepared that refreshes your recollection as to where
6  this, People's Exhibit Number 8C, came from, is that
7  correct?

8       MR. RODDY:   Objection.  Asked and answered.

9       THE COURT:   Sustained.

10      MR. FRANKS:

11      Q.   Well, sir, you're sure that this 8C is from
12  this case, are you not?

13      MR. RODDY:   Objection.

14      THE COURT:   Overruled.

15      A.   What's that, sir?

16      MR. FRANKS:

17      Q.   What I showed you before, 8C, the spent
18  cartridges, are from this particular case, are they
19  not?

20      A.   They appear to be.

21      Q.   And why do you say they appear to be?

22      A.   Well, they're with the rest of the group of
23  items shown to me.

24      Q.   All right.

1    A.    But I don't recall inventorying them.

2    Q.    All right.

3          And as far as you know, they were found

4 inside of the apartment at 5851 West Winthrop,

5 apartment 403, is that correct?

6    MR. RODDY:    Objection.

7    THE COURT:    Sustained.

8    MR. FRANKS:

9    Q.    Do you have any idea if they were in the

10 bathroom or in the frontroom of that apartment where

11 they were recovered?

12    MR. RODDY:    Objection.

13    THE COURT:    Sustained.

14    MR. FRANKS:

15    Q.    Did you receive any information during the

16 course of your investigation of this matter that any

17 shots were fired during the course of this incident?

18    A.    Not to my recollection.

19    Q.    This workbench, as you walk in the front

20 door, would it be your left or to your right?

21    MR. RODDY:    Objection, asked and answered.

22    THE COURT:    ·Sustained.

23    MR. FRANKS:

24    Q.    Now, you indicated that there was some

1 identifications that were found inside of the

2 apartment, is that correct?

3     A.   Yes.

4     Q.   Were these identifications inside of

5 anything, or were they out in the open?

6     A.   Well, as I stated earlier, they were out in

7 the open on top of a night stand.

8     Q.   Were each one of these items that were

9 shown to you, the Social Security cards and the other

10 items, were they in a pile, or were they individually

11 out in the open?

12     A.   They were just thrown on top of the night

13 stand, not necessarily in a pile, just scattered on

14 top of it.

15     Q.   All right.

16          So, the driver's license of Delores Jinadu

17 was on the same night stand as these -- as the other

18 items that you saw, is that correct?

19     MR. RODDY:   Objection, asked and answered.

20     THE COURT:   Overruled.

21     A.   That's what I stated, yes.

22     MR. FRANKS:

23     Q.   All right.

24          Well, was there a wallet inside of that

1 apartment that you saw?

2     A.   If there had been a wallet, it would have

3 been inventoried.

4     Q.   Well, my question is, Officer, did you find

5 or see a wallet inside of that apartment?

6     A.   No.

7     Q.   You did not inventory everything in the

8 apartment, did you?

9     A.   No.

10     MR. RODDY:   Objection.

11     THE COURT:   The answer may stand.

12     MR. FRANKS:

13     Q.   You did not inventory all of the bags and

14 the lactose and the breathing mask, did you?

15     MR. RODDY:   Objection.

16     THE COURT:   Sustained.

17     MR. FRANKS:

18     Q.   The item number 6, Hillard Number 6, that's

19 the birth certificate of an Erven Walls, is it not?

20     A.   Yes.

21     Q.   And it appears to be folded up, is that

22 correct?

23     A.   Yes.

24     Q.   And it's folded and in such an old

1 condition that it's falling apart, is that correct?

2      A.    That is correct.

3      Q.    All right.

4            Officer, you carry a wallet, don't you?

5      A.    Yes, but I don't carry my birth certificate

6 in it.

7      Q.    All right.

8            Do you carry sometimes other papers in it?

9      A.    No.

10     MR. RODDY:    Objection.

11     THE COURT:    Objection sustained.

12           Officer, don't answer until I can hear the

13 objection and rule on it, if you will.

14     MR. FRANKS:

15     Q.    Does this piece of paper, the birth

16 certificate, appear to be folded one, two, three --

17 over three ways in one direction, is that correct?

18     A.    Yes.

19     Q.    And one, two, three ways in the other

20 direction, is that correct?

21     A.    Yes.

22     Q.    And it appears to then be folded into about

23 one inch by one-and-a-half inch square or rectangle

24 then, is that correct?

1    A.   Yes.

2    Q.   Would this item easily fit into a wallet?

3    MR. RODDY:    Objection.

4    THE COURT:   Sustained.

5    MR. FRANKS:

6    Q.   So, it's your testimony, Officer, that this
7  birth certificate, was it out open fully on the night
8  stand in this condition as I'm holding it out?

9    A.   No, I never said that.

10   Q.   All right.

11        What I'm asking you how was it sitting on
12 the night stand?

13   A.   It was sitting on the night stand folded.

14   Q.   Folded.

15        And the certificate for return to school or
16 work in the name of Erven Walls, was that also folded
17 on the night stand?

18   A.   No.

19   Q.   This was open?

20   A.   Yes.

21   Q.   All right.

22        Does it appear to have a fold in the middle
23 of it?

24   A.   Now that you made one, yes.

E-56

1    Q.    I made one, is that what you are

2 suggesting, Officer?

3    A.    You are folding it.  It could be folded

4 anyway.

5    Q.    You are suggesting that I made the fold.

6         Do you want to look at it, Officer, to see

7 if that fold appears to have been there for a rather

8 long time?

9    MR. RODDY:    Objection, Judge.

10   THE COURT:    Sustained.

11   MR. FRANKS:

12   Q.    Describe the fold, Officer.

13   MR. RODDY:    Objection.

14   THE COURT:    Sustained.

15   MR. FRANKS:

16   Q.    All right.

17        The two Social Security cards, three and

18 four, I believe it's Number 4 in the same of Zachary

19 T. Walls, that appears to be quite discolored --

20 discolored, does it not?

21   A.    Yes, sir, it's due to age.

22   Q.    Due to age.

23        And it's not even complete on the right

24 side, is that correct?

1    A.   Yes, sir.

2    Q.   And the one in the name of Dormaine Jerome

3 Walls also appears to be discolored with age, does it

4 not?

5    A.   No, not necessarily.

6    Q.   That one you don't think might be as old as

7 the other card, is that correct?

8    A.   That's correct.

9    MR. RODDY:    Objection.

10   THE COURT:   Sustained.

11   MR. FRANKS:

12   Q.   All right.

13        Now, you testified about these tickets that

14 are -- they're not marked -- Number 7, Hillard 7.

15        That involved a vehicle that is a Honda, is

16 that correct?

17   A.   Yes.

18   Q.   And in the -- on the -- the date of these

19 tickets are for April 1 of 1997, is that correct?

20   A.   No, I don't know.

21   Q.   All right.

22        I'll again show you the exhibit and see if

23 that refreshes your recollection as to the date of

24 the tickets.

1    A.   April 1, 97.

2    Q.   Thank you.

3         And these tickets also appear to have a
4  fold in them, don't they?

5    A.   Yes, they do.

6    Q.   Officer, did you prepare the case report in
7  this matter?

8    A.   No.

9    Q.   Are you familiar with the contents of the
10 case report?

11   A.   Most of it.

12   Q.   All right.

13        Were you present during the conversation
14 with Mr. Jinadu for the information that is contained
15 in the case report?

16   A.   Some of it.

17   Q.   As far as you know, is all of the
18 information in the case report true to the extent
19 that you know it?

20   A.   Yes.

21   MR. RODDY:   Object to the form of that
22 question, Judge.

23   THE COURT:   Overruled.

24   MR. FRANKS:

1    Q.   Did Mr. Jinadu tell you that the morning
2 this incident occurred that his ex-wife called him
3 that morning and asked him to come to her apartment
4 to discuss business?

5         Did Mr. Jinadu tell you that?

6    A.   Yes, I do recall something along those
7 lines.

8    Q.   And that is what is in your report, is that
9 correct?

10   MR. RODDY:   Objection.

11   THE COURT:   Sustained.

12   MR. FRANKS:

13   Q.   Is the word business--

14   MR. RODDY:   Objection.

15   MR. FRANKS:   The word that he used?

16   THE COURT:   Overruled.

17   A.   No, I don't recall if it was put in the
18 case report in that manner.

19   MR. FRANKS:

20   Q.   All right.

21        Would again seeing your case report refresh
22 your recollection?

23   MR. RODDY:   I'm going to object.  That's
24 already been sustained.

1      THE COURT:   Sustained.

2      MR. FRANKS:   Judge, he just said he is not

3  sure if it's in the case report.

4      THE COURT:   What's in the case report is not

5  important.

6      MR. FRANKS:

7      Q.   Would your case report refresh your

8  recollection that he used the word discussed

9  business?

10      MR. RODDY:   Objection.  It's already been

11  answered.  He said yes.

12      THE COURT:   Sustained.

13      MR. FRANKS:   If the State says he said yes,

14  then I'll move on.

15      Q.   Did the complaining witness in this case,

16  Mr. Jinadu, tell you that one of the offenders pulled

17  him inside the apartment?

18      A.   Yes, he did.

19      Q.   And you indicated in the case report that

20  the offender that did this was numbered 2, is that

21  correct?

22      MR. RODDY:   Objection.

23      THE COURT:   Sustained.

24      MR. FRANKS:

1      Q.    All right.

2            Well, which -- how did Mr. Jinadu describe
3  to you the individual that pulled him into the
4  apartment?

5      A.    I believe he gave us a physical description
6  and subsequently he -- he identified the individual
7  to my partner who put his name in the report.  You
8  would have to ask my partner on that one.

9      Q.    Well, the physical description then if you
10 recall, I certainly can ask your partner, if
11 necessary, was the physical description he gave you
12 that he had blue jeans and a red jacket?

13     A.    At this point, I don't recall.  If it's on
14 the case report, that's what he said.

15     Q.    All right.

16           Was the individual that he said had pulled
17 him into the apartment, did he give the name or did
18 you determine the name to be a Germaine Craine?

19     MR. RODDY:     Objection.

20     THE COURT:     Determined to be, sustained.

21     MR. FRANKS:

22     Q.    Well, you indicated that there was a photo
23 ID shown, is that correct?

24     A.    I said that right now?

E-62

1      Q.   Well, I'll withdraw the question.

2           I'll show you what has been previously

3 marked as Hillard Number 8.

4           Is that the photo ID that you've identified

5 in court?

6      A.   Yes, sir.

7      Q.   All right.

8           And that is in the name of -- I'm not clear

9 what the first letter is; either Germaine or Dormaine

10 Craine, is that correct?

11     A.   Yes.

12     Q.   And in your presence or to your partner,

13 did Mr. Jinadu identify the photograph in this

14 exhibit?

15     A.   I believe he did.

16     Q.   And that wasn't to you; that was to your

17 partner?

18     A.   Yes.

19     Q.   And in the case report is Germaine Craine,

20 C-r-a-i-n-e.

21          Is that the individual in the case report

22 listed as offender number two?

23     MR. RODDY:    Objection.

24     THE COURT:    Sustained.

E-63

1      MR. FRANKS:

2      Q.   Well, did Mr. Jinadu say that the person

3 whose -- who's in the photograph is the person that

4 pulled him into the apartment?

5      A.   I don't know.

6      Q.   Did Mr. Jinadu tell you that the person

7 that pulled him into the apartment hit him with a

8 baseball bat?

9      A.   When I spoke to him alone in the car before

10 my partner got in, he said he got hit either with a

11 baseball bat or a blunt instrument.

12     Q.   Okay.

13          Did you put information regarding that in

14 your case report?

15     A.   Something was put in there.

16     Q.   Would looking at your case report refresh

17 your recollection as to what he said?

18     A.   Yes, sir.

19     Q.   I show you again your case report which has

20 been previously marked and direct your attention to

21 the first column, about midway down the page.

22          Just indicate to me when you've had an

23 opportunity to look at that.

24     A.   Okay.

E-64

1      Q.    Does that -- after reviewing your case
2 report, does that refresh your recollection that, in
3 fact, he told you that the person who pulled him into
4 the apartment then hit him in the head with a
5 baseball bat?

6      MR. RODDY:    Object to the form of the
7 question.

8      THE COURT:   Overruled.

9      A.    Yes.

10      THE COURT:   Continue your examination, please,
11 Mr. Franks.

12      MR. FRANKS:

13      Q.    Did Mr. Jinadu tell you that any of the men
14 that he saw in the apartment were wearing masks?

15      A.    I don't recall.

16      Q.    Did Mr. Jinadu tell you that the offenders
17 called Mr. Jinadu's friend and associates demanding
18 money or drugs for his release?

19      A.    I believe he did say that they called him,
20 but I don't recall him saying anything about drugs.

21      Q.    Again, would your case report refresh your
22 recollection that you used the word drugs in your
23 report?

24      A.    Yes, it would.

E-65

1      Q.    Showing you again this exhibit, looking at
2 the second column, the third line.

3      A.    Yes.

4      Q.    All right.

5            It does, in fact, say the offenders then
6 called victim's friend and associates demanding money
7 or drugs for his release, is that correct?

8      MR. RODDY:    Objection.

9      THE COURT:    Objection sustained.

10     MR. FRANKS:

11     Q.    Does that refresh your recollection that
12 Mr. Jinadu used the word drugs when he was describing
13 what happened to him that particular day?

14     MR. RODDY:    Object to the form of the
15 question.

16     THE COURT:    Overruled.

17     A.    Yes, that word was used.

18     MR. FRANKS:

19     Q.    All right.

20           Was Mr. Jinadu ever inside the apartment in
21 your presence?

22     A.    Not that I can recall.

23     Q.    You left him then just in the hallway
24 outside of the apartment, is that correct?

E-66

1     A.    That is correct.  He was too weak to walk
2 anymore.

3     MR. FRANKS:    I have nothing further.

4     MS. MC BETH:   Your Honor, may I inquire?  Thank
5 you.

6                    CROSS EXAMINATION

7                    BY MS. MC BETH:

8     MS. MC BETH:

9     Q.    Good morning, Officer Ramirez.  How are you
10 today?

11    A.    Okay.  How are you?

12    Q.    Good.

13          Now, you told us you've been a Chicago
14 police officer for 16 years, is that correct?

15    A.    Yes, ma'am.

16    Q.    It sounds like your beat is no longer the
17 beat that it was back in March of 97, is that right?

18    A.    That is correct.

19    Q.    You are in a new district now, is that
20 correct?

21    A.    Yes, ma'am.

22    Q.    Always as a patrol officer or ever as a
23 tactical officer?

24    A.    I work tact, prostitution, public housing.

E-67

1    Q.   Okay.

2         You worked a number of assignments?

3    A.   Yes, ma'am.

4    Q.   Is that correct?

5    A.   Yes.

6    Q.   Prior to your time of actually going out on

7 the street as a police officer, you were trained in

8 the Chicago Police Department Academy, is that

9 correct?

10   A.   Yes, ma'am.

11   Q.   That's mandatory training for all new

12 police officers, is that right?

13   A.   That is correct.

14   Q.   And that's training in the classroom, is

15 that right?

16   A.   Yes.

17   Q.   As well as ride-alongs with other

18 experienced police officers, is that right?

19   A.   Yes.

20   Q.   And from time to time, police officers can

21 go back to the academy and get updated training, is

22 that right, or go elsewhere to get more training?

23   A.   It depends on what you mean.

24   Q.   Okay.

1          What I mean is in your situation, have you

2 had any training since you've been in the academy?

3     A.   You mean, have I gone back since I

4 graduated from the academy?

5     Q.   Exactly.

6     A.   Yes, I have.

7     Q.   Okay.

8          And how many times have you done that?

9     A.   I believe once -- twice, ma'am.

10    Q.   Okay.

11         When was the most recent time?

12    A.   About six years ago.

13    Q.   Okay.

14         Your training as a Chicago police officer

15 consists of the initial training when you first

16 became a police officer and two other times that you

17 got additional training, is that right?

18    A.   Yes, ma'am.

19    Q.   Okay.

20         One of the things that you learned when you

21 become a police officer when you go back for training

22 is of course how to investigate crimes, is that

23 right?

24    A.   Yes.

E-69

1    Q.    You learn how to apprehend people or arrest
2 people for crimes, is that right?

3    A.    Yes.

4    Q.    You learn that part of your job may be
5 testifying about what happens out there on the
6 street, is that right?

7    A.    I don't understand the question.

8    Q.    Okay.

9          You were told in the academy that after you
10 investigate crimes and make arrests you may have to
11 come to court and testify like you're doing today, is
12 that right?

13    A.    Yes.

14    Q.    Okay.

15          So, you were prepared for that when you
16 graduated from the academy and went out on the
17 street?

18    A.    No, not necessarily.

19          You have to -- you graduate to that after
20 years of experience, through numerous cases.  Some
21 police officers work the streets; some don't.  They
22 go into offices.

23    Q.    You're one of those that works the street,
24 is that correct?

1      A.   Yes.

2      Q.   Consequently, that brings you into court to
3 tell ladies and gentlemen like these two juries about
4 what you -- about what you saw out there, is that
5 right?

6      A.   Yes.

7      Q.   What you need to do is often you're
8 testifying a year or more after the actual incidents
9 that you're testifying about, is that right?

10     A.   Yes, sometimes.

11     Q.   Just like in this case, it's been more than
12 a year since you met Mr. Jinadu, is that right?

13     A.   That's correct.

14     Q.   Okay.

15          You need to rely on the reports that you
16 and other officers have prepared in refreshing your
17 memory in order to testify, is that correct?

18     A.   Sometimes.

19     Q.   Okay.

20          You need to talk to the state's attorneys
21 to find out what questions they're going to be asking
22 you about on the stand, is that right?

23     A.   Sometimes.

24     Q.   Okay.

1          In this particular case, you did talk to

2 the state's attorneys in this case about what you

3 would be testifying about, is that right?

4      A.   Yes, I did.

5      Q.   You came to court on Monday, is that

6 right?

7      A.   Yes.

8      Q.   Because the case started on Monday, is that

9 right?

10     A.   That's correct.

11     Q.   Officer Schmidt was here as well, is that

12 right?

13     A.   What was that?

14     Q.   Officer Schmidt was here on Monday as well,

15 is that right?

16     A.   Yes, he was.  I believe he was subpoenaed

17 by the Defense.

18     Q.   Okay.

19          You and he sat down on the bench in the

20 back there with one of the state's attorneys, is that

21 right?

22     A.   That's correct.

23     Q.   Okay.

24          And one of the things you did was go over

E-72

1 some of the reports, is that right?

2      A.   I don't believe I did.  I was reading the

3 newspaper.

4      Q.   Okay.

5           And one of the things that you did was you

6 talked to Miss Curtiss, the assistant state's

7 attorney here, is that right?

8      A.   Yes, I did speak to the lady.

9      Q.   When you were talking to her, you put the

10 newspaper down.

11           You weren't reading the paper at the same

12 time you talked to her, were you?

13      A.   That's correct.

14      Q.   To your knowledge, was Officer Schmidt

15 appearing to read the reports in this case?

16      A.   He was speaking to the--

17      MS. CURTISS:   Objection.

18      THE COURT:   Overruled.  Go ahead.

19      A.   He was speaking to the state's attorney.

20      MS. MC BETH:

21      Q.   Okay.

22           My question is to your knowledge was he

23 reading or appearing to read those police reports in

24 this case?

1       A.    You know, I don't know if he did or not.

2       Q.    Okay.

3             Now, there are a lot of different types of

4  police reports, is that right?

5       A.    Yes, there's about one for every type of

6  incident.

7       Q.    Okay.

8             In fact, the police department provides you

9  with different types of forms, is that right?

10      A.    Yes.

11      Q.    There are arrest reports where you have to

12 note the details of an arrest, is that right?

13      A.    That's correct.

14      MS. CURTISS:    Objection.

15      THE COURT:    Sustained.

16      MS. MC BETH:

17      Q.    In this particular case, you and your

18 partner prepared and signed the general offense case

19 report, is that correct?

20      A.    Yes.

21      Q.    That's two pages front and back for a total

22 of four sides, is that right?

23      A.    Four sides?

24      Q.    Yes, sir.

E-74

1    A.    I believe it's two sides, isn't it?

2    Q.    Two sides on the first page and then two
3 sides on the second page, isn't it?

4    A.    Two sides, one front page and one back
5 page.

6    Q.    Your testimony today is the general offense
7 case report that you and your partner prepared on May
8 10 of 1997 in this case is only two pages?

9    A.    That's what I call -- that's what I would
10 call it.

11    Q.    Okay.

12          You mean two separate pieces of paper or
13 two sides of one piece of paper?

14    A.    Two sides of one.

15    Q.    Okay.  I think I already marked this one.

16    MR. FRANKS:    Walls 1.

17    MS. MC BETH:

18    Q.    We will -- just a minute, please.

19          Officer Ramirez, I'm showing you what I
20 marked for identification purposes as Hillard
21 Defendant's Exhibit Number 10 and showing this to Mr.
22 Roddy for the State.

23          This is a photocopy of four different
24 pages, is that correct?

E-75

1      A.    Yes.

2      Q.    Okay.

3      MR. FRANKS:    If I can indicate, Hillard 10 is
4 the same as Walls 1.

5      THE COURT:    I understand that.  She had to mark
6 her's herself.  That's all right.

7      MS. MC BETH:

8      Q.    All right.

9            The first page -- I would ask you to take a
10 look at it?

11     A.    I looked at it.

12     Q.    It's a photocopy of the report that you and
13 your partner prepared on May 10, is that right?

14     A.    Yes.

15     Q.    Okay.

16           It is -- it comprises four different pieces
17 of paper, is that correct?

18     A.    Yes.  Now that you explained it and showed
19 it to me, yes, I understand what you are saying.

20     Q.    What it means is somebody photocopied the
21 front of your page one and back of your page 1?

22     A.    Just so the jury understands, on the
23 original case report, it is just one sheet.

24     Q.    Yes.

E-76

1     A.    I mean, it's not like one page and then
2  another page behind it.

3     Q.    Right.

4           On the original one, there is writing and
5  printing on both sides, is that right?

6     A.    That's correct.

7     Q.    What someone has done here instead of
8  making a two-sided copy, they used one page for the
9  front and one page for the back?

10    A.    That's what they've done.

11    Q.    The second page, one page for the front and
12 one page for the back?

13    A.    Right.

14    Q.    Thank you.

15          Now, when you saw Mr. Jinadu on the street,
16 you realized he had been the victim of a violent
17 crime, is that correct?

18    A.    Well, when we first saw him, we knew that
19 something had happened to him.  We didn't know what.

20    Q.    Right.

21          After talking to him, you wanted to return
22 to the place that this happened, is that correct?

23    A.    Yes.

24    Q.    You wanted him to take you to where these

1 things happened to him, is that right?

2    A.    Yes.

3    Q.    And that was because that you wanted to try

4 to apprehend the people that had done this if they

5 were still there, is that correct?

6    A.    That's correct.

7    Q.    And you wanted to find out if there was

8 anyone else in there who knew anything about it, is

9 that correct?

10    A.    Yes.

11    Q.    Certainly, you wanted to make sure there

12 was no one else who had been injured, is that

13 correct?

14    A.    That's correct.

15    Q.    You wanted to recover physical evidence of

16 this crime, is that right?

17    A.    Yes.

18    Q.    Okay.

19        You told us it's a very small apartment, is

20 that right?

21    A.    Yes, I did.

22    Q.    I am sorry; what did you say?

23    A.    Yes, I did.

24    Q.    Okay.

1          You were able to search it thoroughly and
2 determine that there was no one else in that
3 apartment, is that right?

4     A.   Yes.

5     Q.   No one hiding under the bed or behind the
6 shower curtain, is that right?

7     MS. CURTISS:   Objection, asked and answered.

8     THE COURT:   Well, it has been through two
9 separate examinations.

10          Are you adopting the examination, or do you
11 want to do this all over again?

12     MS. MC BETH:   I don't want to do it all over
13 again.

14     THE COURT:   Let's do something different then.
15 Let's hear something new.

16     MS. MC BETH:

17     Q.   I'd like to ask you about the specific
18 names that are on some of these exhibits.

19          Hillard Exhibit Number 3 is the Social
20 Security card, is that right?

21     A.   It doesn't say what number it is.

22     Q.   There is Number 3 in the corner?

23     A.   Oh, I see, okay.  Yes, it is a Social
24 Security card.

1    Q.    And that card, the name of the person on
2 that card is Dormaine Jerome Walls, is that correct?

3    A.    It appears to be that.

4    Q.    That first letter appears to be a D?

5    A.    It could be a D or a G.

6    Q.    A G and then an O, is that correct?

7    A.    Yes.

8    Q.    R-m-a-i-n-e, is that correct?

9    A.    Correct.   It has a number also issued to
10 it, which is 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.

11   Q.    Thank you.

12         Showing you Hillard Exhibit Number 6, the
13 birth certificate.

14         This is a certificate of life birth, is
15 that correct?

16   A.    Yes.

17   Q.    The child is Erven, E-e-r -- excuse me,
18 E-r-v-e-n, is that right?

19   A.    Yes.

20   Q.    Zachary Taylor Walls, is that right?

21   A.    Yes.

22   Q.    Thank you.

23         Now, you told us that Mr. Jinadu was seated
24 in the hallway while you were waiting for the

1 ambulance to arrive, is that right?

2      A.   Yes.

3      Q.   He remained there until after the evidence

4 technician arrived.

5      A.   Yes, he did.

6      Q.   And the evidence technician that arrived

7 was Officer Hutspet, is that right?

8      A.   I don't recall his name, but if you say

9 that was his name, that's who he was.

10     Q.   And he prepared reports, too, is that

11 correct?

12     A.   They generally do.

13     Q.   And he took pictures of Mr. Jinadu there at

14 the scene before he was taken to the hospital, is

15 that right?

16     A.   That's correct.

17     Q.   And the evidence technician completed his

18 work about 9:30, is that correct?

19      MS. CURTISS:    Objection.

20      THE COURT:   Sustained.

21      MS. MC BETH:

22     Q.   Mr. Jinadu told you that there were four

23 men and one women involved in this crime, is that

24 right?

1    A.    I believe that's the number that he used.

2    Q.    And the woman that he told you was his

3 wife, is that right?

4    A.    Yes.

5    Q.    He never told you that one of the men was

6 his wife's boyfriend, did he?

7    A.    I don't recall if he did.

8    Q.    Would it refresh your recollection to look

9 at the general offense case report that you had

10 prepared?

11    A.    Sure, it would.  It would help.

12    Q.    I ask you to look at Defendant's Exhibit

13 Number 10.  See if it refreshes your recollection.

14    A.    You have to show it here.  I don't see it.

15 I see that he stated his wife was his ex-wife, but I

16 don't see any reference made to a boyfriend at this

17 point.

18    Q.    Okay.

19          You've had a chance to review all four

20 pages, sir?

21    A.    The first two.

22    Q.    All right.

23          Well, look at page 3 and 4 and tell me if

24 it refreshes your recollection as to whether he ever

E-82

1 told you that one of the men was his ex-wife's

2 boyfriend.

3       A.    I don't see it.

4       Q.    Okay.

5             He never told you that he had lost

6 consciousness for two hours, did he?

7       A.    Yes, he did tell me that.

8       Q.    Okay.

9             Did you make any note of that in your

10 four-page report, sir?

11      A.    No, I didn't.  See, you have to understand

12 these reports are nothing more than a brief summary.

13 If you were to put everything in there, it would be

14 like a book.

15      Q.    Sure.

16            The detectives are going to do a follow-up

17 on these types of cases, is that correct?

18      A.    They are they are supposed to, yes.

19      Q.    So, you leave some of the -- I shouldn't

20 say you leave -- you know there are going to be

21 officers following up and getting more information,

22 is that right?

23      A.    That's correct.

24      Q.    Okay.

**File Date:** ___7-1-2008___

**Case No:** ___08cv1775___

**ATTACHMENT #** _____

**EXHIBIT** ___T- part 8___

**TAB (DESCRIPTION)**

_____

1            What the information you were trying to get
2 was enough information that you could -- you or other
3 officers could locate and apprehend the offenders, is
4 that right?

5     A.    That's correct.

6     Q.    Okay.

7            You need to list the evidence that's
8 observed and recovered there, is that right?

9     A.    Yes.

10    Q.    And you need to provide a summary you say
11 of what happened, is that right?

12    A.    A brief summary, ma'am.

13    Q.    Okay.

14            In this case, that took two pages, front
15 and back, is that right?

16    MS. CURTISS:    Objection.

17    THE COURT:    Sustained.

18    MS. MC BETH:

19    Q.    Now, Mr. Jinadu did tell you that after he
20 got hit in the head then four male blacks approached
21 him pointing guns at him, correct?

22    MS. CURTISS:    Objection, asked and answered.

23    THE COURT:    Pardon me?

24    MS. CURTISS:    Asked and answered.

1    THE COURT:   Overruled.

2    A.   He stated a couple of them pointed guns at
3 him.  I don't recall how many.

4    MS. MC BETH:

5    Q.   Okay.

6         I ask you to look at the back of page 1 of
7 your report.

8         You note in your report offender number two
9 pulled victim inside.

10   MS. CURTISS:   Objection to her reading from
11 report.

12   THE COURT:   Sustained.

13   MS. MC BETH:

14   Q.   All right.

15        You did note in your report how many people
16 pointed guns at him after he had been hit in the
17 head, is that correct?

18   MS. CURTISS:   Objection, not impeaching.

19   THE COURT:   I don't know whether it is or it
20 isn't.  You may answer.

21   MS. MC BETH:

22   Q.   Is that correct?

23   A.   There is a statement in there about that,
24 yes.

1    Q.    Yes.

2         And in your report, you note that after he

3 was pulled--

4    MS. CURTISS:    Objection.

5    THE COURT:    Objection sustained.

6         I take it you are using this to refresh his

7 recollection?

8    MS. MC BETH:    No, sir, to impeach him.

9    THE COURT:    Well, then direct him to a specific

10 point.

11   MS. MC BETH:

12   Q.    Yes.

13        At this point in the report here, you note

14 that after offender number two pulled him inside of

15 the apartment and hit him in the head--

16   MS. CURTISS:    Objection.

17   THE COURT:    Objection sustained.

18   THE COURT:    Can't you concentrate on what you

19 are attempting to do?

20   MS. MC BETH:    Yes, Judge.

21   THE COURT:    It has nothing to do with being

22 pulled anywhere.

23   MS. MC BETH:

24   Q.    Okay.

1          The next line of the reports notes what
2 happened after that, is that correct?

3     A.   Yes.

4     Q.   It notes that offender two, three, four,
5 and five approached, each pointing handguns at the
6 victim?

7     MS. CURTISS:   Objection.

8     THE COURT:   Overruled.

9     MS. MC BETH:

10    Q.   Is that correct?

11    A.   That's what that statement says, yes.

12    Q.   That's the statement in your report, is
13 that correct?

14    A.   Yes.

15    Q.   And that's the statement that you got from
16 Mr. Jinadu, is that correct?

17    A.   I didn't get that statement from him.

18    Q.   Mr. Jinadu told you that he was bound and
19 handcuffed before he was taken to the bathroom.

20    A.   I don't know at what point he was bound or
21 handcuffed.

22    Q.   I ask you to look at the second page here,
23 the back of the first page of your report reading
24 from here up to here, and see if it refreshes your

E-87

1 recollection that Mr. Jinadu told you that he was

2 bound and handcuffed?

3      MS. CURTISS:    Objection.

4      THE COURT:    Can you wait a minute?

5      MS. CURTISS:    He didn't say that.   He didn't

6 remember.   He said he didn't know.

7      THE COURT:   Sustained.

8      MS. CURTISS:    Thank you.

9      MS. MC BETH:

10     Q.   You don't know if he told you that.

11     A.   He didn't tell me.

12     Q.   He did not tell you that he was bound and

13 cuffed before he was taken to the bathroom?

14     A.   No.

15     Q.   Okay.

16          Officer, I would like to ask you about your

17 course of investigation.

18          The offenders that you were looking for

19 after you talked to Mr. Jinadu, do you remember

20 those, sir?

21     MS. CURTISS:    Objection, assumes facts not in

22 evidence.

23     THE COURT:   Sustained.

24     MS. MC BETH:

1    Q.    Mr. Jinadu gave you the description of five
2 offenders, is that right?

3    A.    Yes, he gave my partner a description of
4 five offenders, yes.

5    Q.    In your presence, is that correct?

6    A.    Not that I recall.

7    Q.    Is there anything that would refresh your
8 recollection as to whether he gave your partner the
9 description in your presence?

10    A.    I can tell you what he did tell me if
11 that's what you would like.

12    Q.    Okay.

13          My question to you, sir, is there anything
14 that you could look at that would help you remember
15 whether he gave the descriptions to your partner when
16 you were actually there.

17    A.    No.

18    Q.    Were any of the descriptions that you put
19 in your report given to you?

20    A.    The only one I recall was the one where he
21 gave me the information about his wife or ex-wife.

22    Q.    Okay.

23          Would your report refresh your recollection
24 about any other descriptions that he gave you?

E-89

1      MS. CURTISS:    Objection, asked and answered.

2      THE COURT:    Sustained.

3      MS. MC BETH:    Judge, I have no further

4 questions of Officer Ramirez.

5      THE COURT:    Mr. Dosch?

6      MR. DOSCH:    May I, Judge?

7                    CROSS EXAMINATION

8                    BY MR. DOSCH:

9      MR. DOSCH:

10     Q.    Officer Ramirez, it was about 7:00 you were

11 waved down by this boy--

12     A.    Yes.

13     Q.    -- when you got to the scene.

14            You went and you saw Mr. Jinadu, and he was

15 pretty excited?

16     A.    Yes.

17     Q.    Nervous.

18            You calmed him down.    Were you able to calm

19 him down enough so that you could talk to him?

20     A.    Yes.

21     Q.    You understood him?

22            Did you understand what he was saying?

23     A.    After he calmed down, sir.

24     Q.    Was that in your squad?

E-90

1    A.    No, it -- outside of the squad.

2    Q.    Outside of the squad.

3          Did you eventually put him inside of your
4  squad?

5    A.    Yes.

6    Q.    Did you finally calm him down enough to get
7  a coherent account out of him as to what had happened
8  to him?

9    A.    Yes.

10   Q.    You had no problems understanding what he
11 said once he calmed down, is that right?

12       MR. RODDY:    Objection, asked and answered.

13       THE COURT:    Sustained.

14       MR. DOSCH:

15   Q.    At that time, did he tell you -- isn't it
16 true that he told you that his wife, his ex-wife
17 called him this morning and asked him to come to her
18 apartment to discuss business.

19       When he arrived at the apartment, offender
20 two pulled victim inside the apartment and hit him in
21 the head with a baseball bat.

22       Offenders two, three, four, five
23 approached, each pointing a handgun at the victim.

24       MR. RODDY:    I object to him reading.

E-91

1     MR. DOSCH:     Offenders then removed victim's
2 clothing and property, handcuffed him, tied his legs
3 with duct tape and electric cords and placed duct
4 tape and a blue bandanna over his mouth.

5           Offenders then took him to the bathroom and
6 then threw him -- threw him down.

7           Offenders then called victim's friend and
8 associates demanding money or drugs for his release.

9           After awhile, offenders left apartment and
10 victim managed to free his legs and escape the
11 apartment and use the back door.  Isn't that what Mr.
12 Jinadu told you?

13     A.   That's what's on the report.

14     Q.   Is that what he told you?

15     A.   That's what he told my partner.

16     Q.   Thank you.

17           Now, when you went upstairs, did you
18 take -- was the apartment on the fourth floor?

19     A.   I don't recall the floor it was on, but it
20 was in the upper levels.

21     Q.   How many apartments were on the floor, the
22 apartment he directed you to?

23     A.   I would -- I would have to guess.

24     Q.   Could you guess for us, please?

E-92

1    A.    Maybe 8 to 12 apartments.

2    Q.    On his floor?  It was a rather large
3 apartment building, is that correct?

4    A.    That's correct.

5    Q.    Was there an elevator in this building?

6    A.    Yes, there is.

7    Q.    Did you take the elevator up or did you
8 walk up?

9    A.    I believe I took the staircase and whatever
10 officers fit in the elevator went up in the elevator.

11    Q.    How about Mr. Jinadu, did he walk upstairs
12 with you or did he go up in the elevator?

13    A.    I don't recall that.

14    Q.    Did you have to carry him up?

15    A.    No.  At that time, he was still able to
16 move under his own power.

17    Q.    He was able to walk.

18          He was able to walk to the apartment door
19 at least, is that correct?

20    A.    Not to the door.  He just pointed to the
21 door.

22    Q.    Pointed to the door.

23          Well, this photo that you identified as
24 Exhibit Number 13 -- 11, 12, and 13, was this of Mr.

1 Jinadu all wrapped up?  Was that outside of the

2 apartment?

3      A.   Yes, that's the hallway.

4      Q.   That was taken, this photo was taken,

5 Exhibits 12 through 14 -- strike that -- 11 through

6 13, they were taken by the evidence technician, is

7 that correct?

8      A.   That's correct.

9      Q.   Did you call for the evidence technician?

10      MR. RODDY:   Objection, Judge.  It's already

11 been answered on a prior cross.

12      THE COURT:   Sustained.

13      MR. DOSCH:

14      Q.   Okay.

15           After you first ran into Mr. Jinadu, how

16 long was it before the evidence technician showed

17 up?

18      A.   I don't know.  I was busy.

19      Q.   Well, was it right away, or did you have to

20 wait awhile?

21      A.   Waited a little while.

22      Q.   Say a half hour?

23      A.   No, I don't know.  I couldn't honestly tell

24 you how long.

E-94

1      Q.    Did you call for an ambulance for Mr.

2 Jinadu?

3      A.    Yes, I did.

4      Q.    What time did you do that?

5      A.    I believe that was right after finding

6 him.

7      Q.    Okay.

8            And how long did it take for the ambulance

9 to appear?

10     A.    The ambulance took maybe ten -- ten

11 minutes, 10, 15 minutes.

12     Q.    Okay.

13           Did the ambulance have to wait for the

14 evidence technician to appear?

15     MR. RODDY:    Objection, Judge.

16     THE COURT:    Sustained.

17     MR. DOSCH:

18     Q.    Did the evidence technician appear after

19 the ambulance?

20     MR. RODDY:    Objection.

21     THE COURT:    Sustained.

22     MR. DOSCH:

23     Q.    Well, when you were looking around inside

24 of this apartment, did you find Mr. Jinadu's

1 clothes?

2    A.   No, I don't recall looking for them.

3    Q.   You didn't look for his clothes?

4    A.   No, I was looking for his assailants.

5    Q.   Okay.

6       Did you find any pagers in there or

7 beepers?

8    A.   I don't remember seeing any.  If there were

9 any, I didn't see them.

10    Q.   Okay.

11       How about a phone?  Did you find any phones

12 in there?

13    A.   I believe there was a portable phone, but

14 I'm not certain.

15    Q.   Did you inventory any portable phones?

16    MR. RODDY:   Objection.

17    THE COURT:   Overruled.  You may answer.

18    A.   No, I don't believe I did.

19    MR. DOSCH:

20    Q.   Did you find any crowbars or a crowbar?

21    MR. RODDY:   Objection, asked and answered.

22    THE COURT:   Sustained.

23    MR. DOSCH:   I don't believe it was asked.  He

24 asked about a chisel.

1      THE COURT:   Well, it was a tire iron.

2          If you want to ask about a crowbar, ask

3  about a crowbar.

4      MR. DOSCH:   I am sorry.  It was asked, Judge?

5  I don't recall.

6      Q.   Did you find any tire irons?

7      A.   No.

8      Q.   Did you find any automatic weapons in this

9  apartment?

10     A.   No, sir.

11     Q.   Did you find any keys in this apartment?

12     A.   I don't recall if there were keys in

13 there.

14     Q.   Did you find any money in this apartment?

15     A.   No.

16     MR. DOSCH:   I have nothing further.

17     THE COURT:   Any redirect?

18     MS. CURTISS:   No, thank you.

19     THE COURT:   Well, I have a question.

20         The case reports that you were shown, you

21 indicated that they reflect things that were said to

22 you or your partner by Mr. Jinadu, some of the

23 things?

24     A.   Yes, sir.

1    THE COURT:   Everything he said to you is not on
2 there, is that correct?

3    A.   That's correct.

4    THE COURT:   When Mr. Dosch read the synopsis of
5 what was told to you, he read it things that were
6 said -- things that happened in a certain sequence as
7 recorded in the report.  Do you recall that?

8    A.   Yes, sir.

9         Usually, we try and piece it together and
10 then in an orderly fashion.  Sometimes, it doesn't
11 come out that way.

12    THE COURT:   That's what I was getting at.

13         Is that -- the way it's recorded there,
14 does that necessarily mean that those things happened
15 in sequence at the scene or just -- these things that
16 were told to you by the victim that you recorded in a
17 manner that you sought to record them?

18    A.   That would be a fair statement.

19    THE COURT:   All right.

20    A.   Fair explanation.

21    THE COURT:   You may step down.

22    MR. DOSCH:   Can I ask a question, Judge?

23         May I ask a question, a follow-up question,
24 your Honor?

1       THE COURT:    Yeah.

2       MR. DOSCH:

3       Q.   Well, you don't go out of your way to mix
4  up the order of what he tells you, do you?

5       A.   No, that would -- that sounds like it would
6  have some intent to hide something.

7       MR. DOSCH:    Nothing further.

8       MS. MC BETH:    May I ask a question, please?

9       THE COURT:    If you feel it's necessary, go
10 ahead.

11      MS. MC BETH:

12      Q.   Officer, one line of this report indicates
13 offenders then took him to the bathroom and threw him
14 down so that does indicate a sequence, right?

15      A.   It appears that way.

16      Q.   Right.

17           They took him to the bathroom and threw him
18 down.   That happened after something else, right?

19      A.   You could say that, yes.

20      Q.   Okay.

21           That's a fair reading of it, is that
22 right?

23      A.   In your interpretation, yes.

24      Q.   Do you think I'm being fair?

E-99

1     MS. CURTISS:   Objection.

2     THE COURT:   Sustained.

3          Is that necessarily the order that he told
4 you and your partner that things happened?

5     A.   It's not necessarily the way it happened
6 sometimes, sir.

7     THE COURT:   All right.  You may step down,
8 thank you.

9               (Witness is excused.)

10    MS. CURTISS:   At this time, we would call
11 Officer Schmidt.

12    THE COURT:   Very well.

13    MS. BORMANN:   Can we have a sidebar?

14    THE COURT:   Excuse us, folks.

15    MS. BORMANN:   I don't need the court reporter.

16          (Whereupon, there was a sidebar

17          discussion had out of the hearing of the

18          court reporter and juries, after which the

19          following proceedings were had:)

20    THE COURT:   Just stand to the side for a
21 minute, Officer.  All right.  Step up, please.  Face
22 this way to be sworn.

23    THE CLERK:   Raise your right hand.

24                    (Witness is sworn.)

E-100

1                    ROBERT SCHMIDT,

2 called as a witness on behalf of the People of the

3 State of Illinois, being first duly sworn, was

4 examined and testified as follows:

5                DIRECT EXAMINATION

6                BY MS. CURTISS:

7      THE CLERK:   Please be seated, Officer.

8      MS. CURTISS:

9      Q.   Officer, I'm going to ask you keep your

10 voice up.  It's a large room, and it's difficult to

11 hear sometimes.  What's your name?

12     A.   Robert Schmidt.

13     Q.   How are you employed?

14     A.   Chicago Police Department.

15     Q.   How long have you been employed by the

16 Chicago Police Department?

17     A.   Three-and-a-half years.

18     Q.   Three-and-a-half years.

19          Were you working as a Chicago police

20 officer on May 10 of 1997?

21     A.   Yes, I was.

22     Q.   On that date, were you working with a

23 partner?

24     A.   Yes, I was.

1      Q.   Was that Officer Ramirez?

2      A.   Yes, it was.

3      Q.   Sir, on that date, were you dressed as you

4 are today in your full uniform?

5      A.   Yes, ma'am.

6      Q.   I want to direct your attention to about

7 7:00, 7:05 in the evening of May 10 of 1997.

8           At that juncture, were you approached by a

9 civilian?

10     A.   Yes, I was.

11     Q.   And did this civilian direct you to

12 Thorndale, the street of Thorndale or Kenmore?

13     A.   We were on Thorndale.

14     Q.   Where did this civilian direct you to?

15     A.   Kenmore.

16     Q.   Once you got to that location, what did you

17 see?

18     A.   I saw the victim in a doorway bleeding,

19 screaming.

20     Q.   What did he look like what was he wearing?

21     A.   He only had a pair of white underwear on.

22 He was handcuffed in front.  There was electrical

23 tape or duct tape around his neck area.  He was

24 bleeding from the head.

E-102

1         THE COURT:    Take the gum out of your mouth.

2         A.    Sorry.

3         MS. CURTISS:

4         Q.    I want to show you what's been previously

5    marked as People's Exhibit Number 11, 12, and 13.

6              These are photographs.  Do you recognize

7    the person who is depicted in the photographs, 11,

8    12, and 13?

9         A.    Yes, I do.

10        Q.    Is that the gentleman that you saw out on

11   the street that you just described?

12        A.    Yes.

13        Q.    Is he in the same condition in the

14   photographs as he was when you saw him on the street?

15        A.    Yes.

16        Q.    After you saw him on the street, did you

17   talk with him?

18        A.    Yes.

19        Q.    Can could you describe his demeanor?

20        A.    Was very frantic, jumpy, hysterical.  He

21   was crying if I remember correctly.  He was talking

22   very fast, just very emotional.

23        Q.    Was it difficult to understand him?

24        A.    At first it was.

E-103

1               We were trying to calm him down to -- to
2  see what happened and what kind of injuries he had
3  because just by looking at him, we couldn't tell what
4  had been done to him. I mean, he was bleeding
5  profusely from the head, and we tried to calm him
6  down.

7        Q.   Did you first talk to him outside of your
8  squad car?

9        A.   Yeah.

10       Q.   About how long did that conversation take,
11 just the one outside of the squad car?

12       A.   Maybe two minutes, three minutes, something
13 like that. I mean --

14       Q.   After that conversation, did you place him
15 in your squad car?

16       A.   Yes, we did.

17       Q.   And pursuant to your discussion with him,
18 did you then proceed to 5851 North Winthrop?

19       A.   Yes, we did.

20       Q.   And about how much time did it take for you
21 to drive from where you picked up the victim, Yinka,
22 to 5851 North Winthrop?

23       A.   Well, as I remember, we -- we waited a
24 couple of minutes -- once we got him in the squad car

E-104

1 to try to talk to him again, but the drive took no
2 more than a minute.

3    Q.   Was there anything besides his hysterical
4 condition that made it difficult for you to
5 understand him?

6    A.   He had an accent.

7    Q.   Okay.

8         During the time that you drove from where
9 you picked up Mr. Jinadu to 5851 North Winthrop, did
10 he tell you about what had happened to him that day?

11   A.   Hmm, hmm.

12   Q.   Is that a yes?

13   A.   Yes.

14   Q.   Once you got to the location of 5851 North
15 Winthrop, did you and your partner as well as Yinka
16 go up to apartment 403?

17   A.   Yes, we did.

18   Q.   Did, in fact, Mr. Jinadu point out that
19 apartment as the one that he had been held in all
20 that day?

21   A.   Yes, he did.

22   Q.   Now, did you go into the apartment when you
23 got there?

24   A.   Yeah.  Yes, we did.

E-105

1    Q.    How long were you in the apartment?

2    A.    No more than 30 seconds.

3    Q.    After you were in the apartment, did you
4 then remain outside in the hallway?

5    A.    Yes, I did.

6    Q.    Where was Mr. Jinadu?

7    A.    He was with me in the hallway.

8    Q.    During the time that Mr. Jinadu was with
9 you in the hallway, did you again talk with him and
10 get descriptions from him about the offenders?

11   A.    Yes, I did.

12    Q.    What was his demeanor at that point?

13   A.    He had calmed down somewhat, but he was
14 still very frantic, and he would be calm for a little
15 while, and then he would get hysterical again and
16 then calm, and I tried to work with that.

17   Q.    Were you the only police officer talking
18 with him then?

19   A.    There was a couple of other officers on the
20 scene.  I don't really recall anybody talking or
21 interviewing him like I was.

22         The evidence technician that was there to
23 take pictures, he may have asked him brief questions
24 but--

E-106

1      Q.   Any hospital personnel there?

2      A.   There was two Chicago Fire Department
3 paramedics there.

4      Q.   At some point did your partner, Officer
5 Ramirez, bring to you some identification that he had
6 found inside of the apartment?

7      A.   Yes, he did.

8      Q.   Showing you what's been marked as Hillard
9 Exhibit Number 8 specifically, did Officer Ramirez
10 give you that piece of photo ID?

11     A.   Yes.

12     Q.   What did you do with that ID?

13     A.   I showed it to the victim.

14     Q.   When the victim looked at that, was he able
15 to identify that person?

16     A.   Yes, he was.

17     Q.   Who did he tell you that person was?

18     A.   He said that's one of the guys that held
19 him captive for the day and beat him and held a gun
20 to him and numerous other things.

21     MR. FRANKS:   Judge, he spoke very softly.  I
22 couldn't hear the answer.

23     THE COURT:   Mr. Reporter, repeat that, would
24 you please.

1                          (Whereupon, the court reporter

2                          read back from the record as

3                          requested.)

4       MS. CURTISS:

5       Q.   And the name on that photo ID is what?

6       A.   Germaine Craine.

7       Q.   Did your partner also give to you what has

8 been marked as Hillard's Number 3?

9       A.   Yes, he did.

10      Q.   And what is that?

11      A.   A Social Security card.

12      Q.   In the name of?

13      A.   Dormaine Jerome Walls.

14      Q.   Did your partner also give you what is

15 marked as Hillard's Number 6?

16      A.   Yes, he did.

17      Q.   What's that?

18      A.   That's a -- that's a birth certificate.

19      Q.   Okay.

20           Whose name is that in?

21      A.   Erven Taylor or Walls -- yeah, Erven.

22      THE COURT:    I can't hear you.

23      A.   Erven Taylor Walls.

24      MS. CURTISS:

E-108

1    Q.   I'm showing you what's been marked as
2 Hillard's 4.

3         Is that one of the pieces of identification
4 that your partner gave you on May 10?

5    A.   Yes.

6    Q.   What is that?

7    A.   Social Security card.

8    Q.   Whose name is on that?

9    A.   Zachary T. Walls.

10   Q.   Did he also -- did your partner also give
11 you what's been marked as Defense Group 7?

12   A.   Yes, he did.

13   Q.   What is Defense Group 7?

14   A.   They are State of Illinois traffic
15 citations.

16   Q.   And who's being issued the ticket in those
17 tickets?

18   A.   Erven Walls.

19   Q.   And did he also give you what's been marked
20 Hillard Number 5 for identification?

21   A.   Yes, he did.

22   Q.   What's that?

23   A.   It looks like a return to work note.

24   Q.   Okay.

1       A.      From a doctor.

2       Q.      Did he also give you what's been marked as

3  Hillard's Number 9?

4       A.      Yes.

5       Q.      What is that?

6       A.      Illinois State driver's license.

7       Q.      Did you keep possession of these

8  identifications?

9       A.      All of them, yes.

10      Q.      Okay.

11              And after -- during the conversation with

12  Mr. Jinadu, when he was there in the hallway, when

13  you got the description of the offenders, was it

14  clear to you at all times the distinction between

15  each offender that Mr. Jinadu was describing to you?

16      A.      It was hard to get the physical

17  descriptions from him.

18      Q.      Why do you say it was hard?

19      A.      Because he was still frantic, and there was

20  a lot going on around him.

21              There were police officers walking back and

22  forth, and the evidence technician was trying to take

23  his pictures.  I was able to get, I believe, three

24  descriptions from him.

1    Q.    At any time, did he ever--

2         MR. FRANKS:    I'm having a great deal of

3 trouble hearing him.  I couldn't hear the number.  I

4 thought he said three, but I'm not sure.

5         THE COURT:    Mr. Reporter, would you read that

6 back for Mr. Franks?

7                        (Whereupon, the court reporter

8                        read back from the record as

9                        requested.)

10        MS. CURTISS:

11        Q.    At any time, did he ever name by name any

12 of his offenders?

13        A.    He named Delores Jinadu.

14        Q.    Did he name any -- did he name any of the

15 male offenders?

16        A.    No, he didn't.

17        Q.    About how long in minutes did you talk with

18 Mr. Jinadu when he was seated outside of the

19 apartment in the hallway?

20        A.    At the most, five.

21        Q.    At the most five minutes.

22             After that conversation, did Mr. Jinadu go

23 to the hospital?

24        A.    Yes, he did.

1    Q.    Did you, too, go to the hospital?

2    A.    Yes, we did.

3    Q.    Following your trip to the hospital, did
4 you return to the 20th District?

5    A.    Yes, we did -- or yes.

6    Q.    I'm going to show you what's been marked as
7 People's Exhibit 8.  Do you recognize People's
8 Exhibit 8?

9    A.    Yes, I do.

10    Q.    What is People's Exhibit 8?

11    A.    It is a weapon my partner recovered from
12 the apartment.

13    Q.    And what is the serial number on that?  The
14 bottom?

15    A.    It's K261713.

16    Q.    When you returned to the 20th District, did
17 you run a registration check on this firearm?

18    A.    Yes, I did.

19    Q.    Did you learn who this firearm was
20 registered to?

21    A.    Yes, I did.

22    Q.    Who was that?

23    A.    I don't have the case report.  I don't --

24    Q.    Would looking at your case report refresh

1 your memory?

2      A.   Yes, please.

3      Q.   I'm showing you what's been marked, I

4 guess, Walls 1 as well as Hillard's 10 I believe.

5      THE COURT:   All right.

6      MS. CURTISS:

7      Q.   Tell me when your memory has been

8 refreshed.  Is it refreshed?

9      A.   Yeah.

10     Q.   Who was that gun registered to?

11     A.   Laretha Hillard.

12     Q.   In addition to running the gun as far as

13 registration, did you also then prepare a case report

14 regarding the incident that had occurred on May 10?

15     A.   Yes, I did.

16     Q.   And in preparing that case report, there's

17 a general summary of what Mr. Jinadu told you, is

18 that correct?

19     A.   Yes.

20     Q.   That again is a summary of what he told

21 you?

22     A.   Yes.

23     Q.   Furthermore, you've marked down names of

24 offenders and descriptions of offenders.

1    A.   Yes, I did.

2    Q.   The names that you documented on this case
3 report, where did you get those names from?

4    A.   From the identification that my partner
5 recovered from the scene.

6    Q.   And where did you get the address of where
7 the offenders lived?

8    A.   From their identification.

9    Q.   And the description on there as far as
10 height and weight and clothing, where did you get
11 that information from?

12    A.   From the identification and from what he
13 said.

14    Q.   In some instances, did you put a
15 description given by the victim along with the name
16 found on the identification?

17    A.   I believe in one of the ID's I did.

18    Q.   You combined the two?

19    A.   Yeah.

20    Q.   And as far as the summary of the offense,
21 the way that you wrote it, is that the order that Mr.
22 Jinadu told you it happened?

23    A.   Yes.

24    Q.   And the content that is in this report,

1 that is from the approximately ten minutes of

2 conversation that you had with Mr. Jinadu, is that

3 correct?

4     A.   Yes, it is.

5     Q.   Mr. Jinadu indicated to you that the events

6 of May 10th were over a span of many hours, seven to

7 nine hours, right?

8     A.   Yes, ma'am.

9     Q.   And the way that you documented was not

10 hour by hour what happened, is it?

11    MR. FRANKS:   Objection at this point.

12    THE COURT:   Overruled.

13    A.   No, it was a summary.

14    MS. CURTISS:

15    Q.   It's not verbatim, it's not word for word

16 what Mr. Jinadu told you?

17    A.   No.

18    MR. FRANKS:   Objection.

19    THE COURT:   Overruled.

20    A.   No, it is not.

21    MS. CURTISS:   Thank you, Officer Schmidt.  I

22 have no further questions.

23    THE COURT:   Mr. Franks.

24

1                    CROSS EXAMINATION

2                    BY MR. FRANKS:

3        MR. FRANKS:

4        Q.   Officer Schmidt, your partner was Officer

5   Ramirez, is that correct?

6        A.   Yes, it is.

7        Q.   And Officer Ramirez just testified before

8   you, is that correct?

9        A.   Yes, it is.

10       Q.   All right.

11            I will try not to ask you questions that

12   have already been asked of Officer Ramirez.

13            It's my understanding, Officer Schmidt, you

14   are the one that actually wrote the case report, is

15   that right?

16       A.   Yes, it is.

17       Q.   And Officer Ramirez was not present for all

18   of the conversations that you had with Mr. Jinadu, is

19   that correct?

20       A.   Correct.

21       Q.   Now, one of the things as I understand it,

22   you received the photo ID that is in the name of what

23   appears to be Dormaine Craine from your partner, is

24   that correct?

E-116

1     A.    Yes.

2     Q.    And you showed that exhibit which I believe

3 is Number 8 to Mr. Jinadu in the area of the

4 apartment, is that correct?

5     A.    Yes.

6     Q.    All right.

7           And then as -- using that identification,

8 you incorporated that information into your case

9 report, is that correct?

10    A.    Yes.

11    Q.    And the individual that you listed as

12 Germaine or Dormaine Craine was considered in your

13 report as offender number two, is that correct?

14    A.    Correct.

15    MR. RODDY:    Objection.

16    THE COURT:    Objection sustained.    When there is

17 an objection, don't answer the question.

18    A.    I didn't hear it.

19    THE COURT:    Well, listen for it.

20    THE COURT:    I'll strike the answer and instruct

21 the jury to disregard.

22    MR. FRANKS:

23    Q.    Well, you received information that a

24 Delores Jinadu was an offender in this case from the

1 complaining witness, is that correct?

2    A.   Yes.

3    Q.   And in your case report, did you list her
4 as offender number one?

5    MR. RODDY:   Objection.

6    THE COURT:   Sustained.

7    MR. FRANKS:

8    Q.   Okay.

9         Officer, did you indicate after your
10 conversation for Mr. Jinadu, did Mr. Jinadu tell you
11 that when he arrived in the apartment, an offender
12 pulled him inside of the apartment?

13    A.   Yes.

14    Q.   And did Mr. Jinadu indicate to you that the
15 offender that did that was depicted in the photograph
16 you had seen in Hillard Number 8, this ID card?

17    A.   Yes.

18    Q.   Okay.

19         And did Mr. Jinadu then tell you that the
20 person that is on this ID card, Number 8, is the
21 person that hit him then with a baseball bat?

22    A.   Yes.

23    Q.   And in your report -- strike that.  Did Mr.
24 Jinadu -- strike that.

E-118

1          Did Mr. Jinadu tell you that 60 dollars was

2 taken from his person or presence?

3     A.   Yes, he did.

4     Q.   When you saw Mr. Jinadu, he was handcuffed

5 in front of him, is that correct?

6     A.   Yes.

7     MR. FRANKS:    I have nothing further.

8     THE COURT:    Miss McBeth.

9              CROSS EXAMINATION

10             BY MS. MC BETH:

11    MS. MC BETH:

12    Q.   Officer Schmidt, Mr. Jinadu told you that

13 the people in the photo ID's and the paper ID's were

14 the offenders that were known to him, is that

15 correct?

16    A.   No.

17    Q.   When you showed him those photo ID's and

18 paper ID's, he positively identified them as the

19 offenders who were known to him.

20    A.   No, he identified the people in the picture

21 ID's only.

22    Q.   Okay.

23         Showing you what I've marked as Defendant's

24 Exhibit Number 10, Defendant Hillard's Exhibit Number

E-119

1  10, this is a photocopy.

2          It's four pages, is that right?

3      A.   Yes.

4      Q.   It's four -- it is a photocopy of your

5  general offense case report in this case, is that

6  correct?

7      A.   Correct.

8      Q.   You prepared that on May 10 of 1997, is

9  that right?

10     A.   Yes, I did.

11     Q.   Okay.

12          I'd ask you to look at the part that I've

13 underlined in orange right here, on this page.

14          Have you had a chance to read that, sir?

15     A.   Hmm, hmm.

16     Q.   You wrote in your report that the victim

17 positively identified the photo ID and paper ID as

18 those of the offenders are known to him, is that

19 correct?

20     A.   Yes.

21     Q.   You signed this report, is that correct,

22 sir?

23     A.   Yes, I did.

24     Q.   Okay.

1          Now, he gave you descriptions of five of
2 the offenders, is that right?  Five offenders?

3     A.   I believe so, yes.

4     Q.   You said that he gave the name Delores
5 Jinadu by name, right?

6     A.   Yes, he did.

7     Q.   All right.

8          He gave a height and weight description of
9 her, is that right?

10    A.   I got that off of her driver's license.

11    Q.   Okay.

12         The second offender was someone in blue
13 jeans and a red jacket, is that right?

14    A.   Yes.

15    Q.   All right.

16         And you compared that with the photo ID of
17 Germaine Craine, is that right?

18    A.   Yes.

19    Q.   So, he told you that that person was the
20 same one in the photo ID of Germaine Craine?

21    A.   Yes.

22    Q.   Okay.

23         He told you that that person was a male
24 black in his twenties, is that right?

E-121

1    A.    Hmm, hmm; yes.

2    Q.    With an unknown height?  Is that right?

3    A.    Yes.

4    Q.    Who weighed 160 pounds, is that right?

5    A.    Yes.

6    Q.    Brown eyes, black hair, is that right?

7    A.    Yes.

8    Q.    And a medium complexion?

9    A.    Yes.

10    Q.    Now, this photo ID of Germaine Craine,
11 Hillard's Exhibit Number 8, although it has a
12 photograph on it, it doesn't have height and weight
13 listed on it, is that right?

14    A.    Correct.

15    Q.    So, you got the height and weight of
16 Germaine Craine from Mr. Jinadu?

17    A.    Correct.

18    Q.    Okay.

19          And the third offender was Erven Walls, is
20 that right?

21    A.    I did not -- the descriptions I got from
22 the photo ID I got from the identification.  I got
23 it, and I put everything in the case report.

24    Q.    Right.  Okay.

1          One offender was 5 foot 11, is that right?

2     A.   Hmm, hmm.

3     Q.   That's the third offender, is that right?

4     A.   Hmm, hmm.

5     Q.   That's the one that you listed as Erven

6 Walls, is that right?

7     A.   Yes.

8     Q.   You noted his address, is that right?

9     A.   Yes.

10    Q.   5851 North Winthrop?

11    A.   Yes.

12    Q.   That he was a male black, 5'11", right?

13    A.   Yes.

14    Q.   165 pounds, is that right?

15    A.   Yes.

16    Q.   The fourth offender was a male black 5'10"

17 and 200 pounds, right?

18    A.   Yes.

19    Q.   You didn't have a name for him, is that

20 right?

21    A.   If it's not on the case report, I don't.

22    Q.   Okay.

23         He had on black jeans a red pullover, is

24 that right, and you had no further information about

E-123

1 him?

2     A.   Correct.

3     Q.   The last offender was a male black who was
4 five foot five, is that correct?

5     A.   Yes.

6     Q.   You listed his name as Dormaine Walls, is
7 that right?

8     A.   No, Dormaine was an add-on to the case
9 report.  It was an ID found, and I put it on the case
10 report.

11    Q.   And you put it on the case report where you
12 listed the information about offender number five, is
13 that right?

14    A.   If it's on there as his name, it's a
15 mistake.  I listed all of the names that I recovered
16 or my partner recovered, or tried to.

17    Q.   I ask you to look at Defendant's Exhibit
18 Number 10 and the first page, second line, beginning
19 with offender number five.

20    A.   Hmm, hmm.

21    Q.   To the end of the sentence there.

22    A.   Right.

23    Q.   That lists the fifth offender as Dormaine
24 Walls, is that right?

E-124

1      A.    If you'll look for all of the offenders, I

2 have marked their name first, then address, then a

3 physical description for offender number five.   I

4 wrote physical description and all of that.

5      Q.    And then the name?

6      A.    And then the name.

7      Q.    Okay.

8      A.    That does not mean that that is his name.

9      Q.    Okay.

10          You didn't know who that name belonged to,

11 is that right?

12      A.    Right.

13      Q.    So, really on your report, you list male

14 black, five-five, 140 pounds, blue jacket, gray

15 jeans, and then you put the name, is that right?

16      A.    Correct.

17      Q.    Okay.

18      MS. CURTISS:    I object to writing the name up

19 there.

20          The police officer indicated why it was

21 there.  This doesn't indicate that he demonstrated

22 that he was there.  It's just putting a name.

23      THE COURT:    She can write whatever she wants to

24 write.

1      MS. MC BETH:

2      Q.   Okay.

3           And it was very important to get as much

4  information as you could about the offenders because

5  at the time you talked to Mr. Jinadu, they were still

6  at large, is that right?

7      A.   Yes, we believed they were still in the

8  area.

9      MS. MC BETH:   May I have a moment?

10     Q.   You also got information from Mr. Jinadu

11 about the report that was taken from him, is that

12 right?

13     A.   Yes.

14     Q.   He told you that 60 dollars in United

15 States currency was taken from him, is that right?

16     MS. CURTISS:    Objection, asked and answered.

17     THE COURT:   Sustained.

18     MS. MC BETH:

19     Q.   Okay.

20          And also a TV radio or stereo of unknown

21 value, is that right?

22     A.   If it's in the report, yes.

23     Q.   I ask you to look at Defendant's Exhibit

24 Number 10, first page, in the box for TV, radio, or

1 stereo, and see if that refreshes your recollection

2 as to whether he told you TV, radio, or stereo was

3 taken.

4          Look at the box on the first page.

5     A.   Right.  What's your question?

6     Q.   Now, do you remember if he told you TV or

7 radio or stereo was taken?

8     A.   No, I don't.  If it's on the back page.

9     Q.   Okay.

10    MS. MC BETH:   I have no further questions of

11 Officer Schmidt.

12         THE COURT:   Mr. Dosch.

13              CROSS-EXAMINATION

14              BY MR. DOSCH:

15    MR. DOSCH:

16    Q.   Was there a wallet recovered on the scene?

17    A.   Not to my knowledge.

18    Q.   Did he tell you a wallet was taken from

19 him?

20    A.   I don't recall if it's on the report.

21    Q.   Just to clarify.  I'm talking about Mr.

22 Jinadu?

23    A.   Hmm, hmm.

24    Q.   I show you your report and see if that

1 refreshes your recollection, the last page.

2          Did you list in that report what was taken,

3 what he claimed was taken from him?

4     A.    A wallet, a Motorola cell phone, a beeper,

5 and 60 dollars USC.

6     Q.    He told you that he had a wallet taken from

7 him?

8     A.    Yes.

9     MR. DOSCH:    Nothing further.

10    THE COURT:    Anything else?

11    MS. CURTISS:    Briefly.

12                 REDIRECT EXAMINATION

13                 BY MS. CURTISS:

14    MS. CURTISS:

15    Q.    When you showed Defendant's Number 8, which

16 is this photo ID to Mr. Jinadu, he said that that was

17 one of the offenders, right?

18    A.    Correct.

19    Q.    He gave you a description of that offender,

20 right?

21    A.    Yes.

22    Q.    You indicated that you marked down on your

23 property some information regarding an Erven Walls at

24 5851 North Winthrop.

1          Where did you obtain that information

2 from?

3     A.    Off the tickets.

4     Q.    The tickets in my hand because that's

5 what's listed there, is that correct?

6     A.    Correct.

7     Q.    And when Mr. Jinadu was describing the

8 other offenders, he gave you the description of a

9 male black, 5'11, 165 pounds, and you just put it

10 together with Erven Walls, didn't you?

11     A.    Correct.

12     MS. CURTISS:    Thank you, Officer Schmidt.   No

13 further questions.

14     A.    Can I be excused?

15     THE COURT:    Let me make sure I understand what

16 you've testified to here.

17          You got some -- a photo identification with

18 Mr. Craine on it?

19     A.    Yes, sir.

20     THE COURT:    Correct?

21          You have some other identification of a

22 Zachary Walls, Erven Walls, and a Dormaine Craine, is

23 that right?

24     A.    Correct.

E-129

1        THE COURT:   Or Dormaine Walls.  I'm sorry.

2            When you were writing up your report, did

3 you assume from having those pieces of paper that

4 those were the names of the people who were involved

5 in this?

6      A.    My partner and I inventoried all of the

7 pieces of paper for the detectives to follow up on.

8            I tried to -- we were -- we thought they

9 were still in the neighborhood and at large, and I

10 was trying to work on sending a flash message out so

11 I worked as hard as I could in the short amount of

12 time to try to put a name to the descriptions.

13       THE COURT:   You didn't know at the time that

14 you compiled your report whether all of those names

15 pertained to one person, two persons, or four

16 persons, did you?

17      A.    Correct.

18       THE COURT:   Anything else?  You may stand down,

19 sir.

20               (Witness is excused.)

21      MR. RODDY:    At this time, we call Detective

22 Bradley.

23       THE COURT:   Does anybody else need a break

24 before we start?  Let's take a recess.


                        E-130

1      MR. FRANKS:   We need a break.

2      THE COURT:   Okay.  Take the jury back.

3           This jury is here, the Walls jury in the

4 jury room.  How about you folks in the Hillard jury?

5 We'll take a few minutes then.

6                         (The following proceedings

7                          were had out of the

8                          hearing of the juries:)

9      THE COURT:   There will be a brief recess.  Let

10 me see counsel in chambers for a minute.

11                        (Whereupon, there was a recess

12                         had in the above-entitled

13                         cause, after which the

14                         following proceedings were had:)

15     THE SHERIFF:   Court is back in session.

16     MR. FRANKS:   I talked to my potential

17 witnesses.  They start work at 2:00.

18          Do you anticipate that the Defense case

19 will be reached this afternoon?  I'll tell them to

20 stay.

21     THE COURT:   Yes.

22     MR. FRANKS:   Okay.

23     THE COURT:   We are ready to go with Detective

24 Bradley?

E-131

1      MR. RODDY:   I'll get him.

2      THE COURT:   Let's bring in the -- bring in the

3 Walls jury first.  Where's Miss Jinadu?

4      MR. DOSCH:   She's here.

5      THE COURT:   Okay.

6      THE SHERIFF:   We're waiting on the jury in 404.

7      THE COURT:   Okay.

8      THE SHERIFF:   They're coming, now.  I guess they

9 were using the washroom.

10     THE COURT:   Okay.

11                    (The following proceedings were

12                    had in the hearing and the

13                    presence of the juries:)

14     THE COURT:   Be seated, ladies and gentlemen.

15          We're going to proceed with the testimony

16 of Detective Bradley before lunch, but simply the

17 direct examination.

18          The cross-examinations will follow after

19 lunch, and I think we will be able to complete the

20 direct in time to get you over to the dining areas.

21          Detective do you want to step forward,

22 please.  Raise your right hand.

23                    (Witness is sworn.)

24

1                   VERNON BRADLEY,

2 called as a witness on behalf of the People of the

3 State of Illinois, being first duly sworn, was

4 examined and testified as follows:

5                 DIRECT EXAMINATION

6                 BY MR. RODDY:

7       THE CLERK:  Please be seated, Detective.

8       MR. RODDY:

9       Q.   Detective, introduce yourself to the ladies

10 and gentlemen of the jury.

11      A.   My name is Vernon Bradley, B-r-a-d-l-e-y.

12      Q.   How are you employed, sir?

13      A.   I'm employed by the Chicago Police

14 Department as a Violent Crimes detective.

15      Q.   How long have you been a Violent Crimes

16 detective?

17      A.   One year-and-a-half.

18      Q.   Prior to that, were you a Chicago police

19 officer and not a detective?

20      A.   Yes.

21      Q.   For how long have you been a Chicago police

22 officer?

23      A.   21 years.

24      Q.   Now, what is your -- you said your present

E-133

1 assignment is Area 3 Violent Crimes, Detective?

2     A.    Yes.

3     Q.    First off, where is Area 3?

4     A.    Area 3 is bounded by the Chicago River,
5 north to Evanston. It is east to the lakefront and
6 west approximately to California.

7     Q.    Do you have a general office that you work
8 out of?

9     A.    Belmont and Western.

10    Q.    And what do you do as a detective assigned
11 to Violent Crimes in Area 3?

12    A.    Violent Crimes deals with violence against
13 persons, battery, armed robbery, kidnapping, murder.

14    Q.    How is it that you get assignments to go
15 investigate these crimes?

16    A.    You are assigned through the Violent Crimes
17 sergeant, handouts.

18    Q.    What is it you do when you get such a
19 handout or assignment to check out one of these
20 crimes?

21    A.    You investigate by speaking to the victim
22 usually first.

23    Q.    I'd like to ask you about May of 1997.

24          Were you an Area 3 Violent Crimes detective

E-134

1 then?

2     A.   Yes.

3     Q.   Were you familiar with an incident that

4 happened on May 10 of 1997 at 5851 North Winthrop?

5     A.   Yes.

6     Q.   Were you familiar with that case from the

7 reports that had been generated by prior officers?

8     A.   Yes.

9     Q.   Did you know the name of the victim then?

10    A.   Yes.

11    Q.   What was that person's name?

12    A.   Yinka Jinadu.

13    Q.   You had an understanding of what happened

14 to Mr. Jinadu?

15    A.   Yes.

16    Q.   What was that?

17    A.   That he had been--

18    MR. FRANKS:   Objection.

19    THE COURT:   Sustained.

20    MR. RODDY:

21    Q.   You were aware of the nature and

22 circumstances of what had happened to him, weren't

23 you?

24    MR. FRANKS:   Objection.

1       THE COURT:   Overruled.

2       A.   I was familiar with them, yes.

3       MR. RODDY:

4       Q.   Eventually after May 10 of 1997 did you get

5  assigned to handle that investigation?

6       A.   Yes.

7       Q.   When did you get that assignment?

8       A.   The 12th of May.

9       Q.   What did you do after receiving that

10 assignment?

11      A.   I interviewed the victim.  He was admitted

12 to Illinois Masonic Hospital.

13      Q.   Did you ask him about what had happened to

14 him and what caused him to end up at Illinois Masonic

15 Hospital?

16      A.   Yes.

17      Q.   After speaking to him, were you looking for

18 offenders in this incident?

19      A.   Yes.

20      Q.   How many?

21      A.   A total of five.

22      Q.   Do you know -- did you have any names?

23      A.   Yes.

24      Q.   What were the names?

1    A.    Delores Jinadu, Erven Walls, a Germaine

2 Craine.

3    Q.    And did you begin looking for those people?

4    A.    Yes.

5    Q.    Did you also begin looking for two other

6 people?

7    A.    Yes.

8    Q.    You did not have their names?

9    A.    No.

10    Q.    Did you learn anything in the course of

11 your investigation about anything specifically being

12 recovered from inside of the apartment where this

13 happened, 5851 North Winthrop?

14    A.    Yes, I discovered the two handguns were

15 recovered.

16    Q.    Did you learn that one of them was a 357

17 revolver?

18    A.    Yes.

19    Q.    Did you further learn information with

20 regards to that gun that it had been registered at

21 the time of the incident?

22    A.    Yes, it was.

23    Q.    Did you find out who that gun was

24 registered to?

1    A.    It was registered to Laretha Hillard.

2    Q.    Sometime in the course of your

3 investigation, did you continue in your efforts to

4 locate these offenders and conduct further

5 investigations?

6    A.    Yes.

7    Q.    Did you find out that a person by the name

8 of Laretha Hillard lived at 1230 North Laramie here

9 in Chicago?

10   A.    Yes.

11   Q.    Did you speak with her?

12   A.    Yes.

13   Q.    After speaking with her, did you then go

14 somewhere several days later?

15   A.    Yes.

16   Q.    After speaking with Laretha Hillard, do you

17 remember on June 3 going to another area on the north

18 side of Chicago?

19   A.    Yes, 714 West Division.

20   Q.    What's located there?

21   A.    That's part of the Cabrini Green Public

22 Housing.

23   Q.    After speaking with Miss Hillard, did you

24 go to that address and a specific apartment?

E-138

1    A.    Yes, apartment 1003.

2    Q.    Pardon me.

3          Tell us what happened -- well, strike

4 that.

5          Who did you go there with on June 3?

6    A.    Detective Jackson and other officers from

7 the Cabrini Green tactical unit.

8    Q.    Tell the ladies and gentlemen what happened

9 when you arrived at that apartment on June 3.

10    A.    When we arrived at that apartment, we

11 knocked at the door.  The door was opened.

12          An individual, a male subject was in the

13 room in the frontroom, and he matched the description

14 of one of the offenders in this case.

15    Q.    How many people were inside of that

16 apartment when that door was opened?

17    A.    Two, a male and a female.

18    Q.    Who opened the door?

19    A.    The female opened the door.

20    Q.    I ask you to look around the courtroom and

21 see if you see -- and ask you to look around and see

22 if you see the person that you saw in that apartment

23 on June 3 of 1997?

24    A.    Yes.

1      Q.    Please point him out for the record.

2      A.    Tony Hillard, black suit.

3      Q.    Indicating, for the record, the defendant,

4  Tony Hillard.

5      THE COURT:    The record may reflect the

6  identification of the defendant Hillard in open

7  court.

8      MR. RODDY:

9      Q.    What did you do when you saw Hillard in

10 that apartment?

11     A.    I asked him what his name was.

12     Q.    What did he respond to you?

13     A.    He gave a bogus name.  I don't remember

14 what it is at this point.

15     Q.    Did you then take the defendant, Tony

16 Hillard, anywhere?

17     A.    We took him to Area 3.

18     Q.    For what purpose?

19     A.    For the purpose of a lineup.

20     Q.    Tell the ladies and gentlemen what a lineup

21 is.

22     A.    A lineup consists of -- well, we have a

23 room that has a very large glass window and you put

24 participants in the lineup -- pardon me -- inside of

1 the room, and the victim will come up to the room, to

2 the glass, and he will view the participants or the

3 persons inside of the room.

4     Q.   Did you come back to Area 3 Violent Crimes?

5     A.   Yes.

6     Q.   Did you contact Mr. Mr. Yinka Jinadu for

7 the purpose of him coming down and looking at this

8 lineup?

9     A.   Yes.

10     Q.   Did he come down?

11     A.   Yes, he did.

12     Q.   Approximately 9:00 p.m. that night, was Mr.

13 Jinadu in Area 3 Violent Crimes?

14     A.   Yes, he was.

15     Q.   Did you and your partner then put together

16 this lineup that you just explained to the ladies and

17 gentlemen?

18     A.   Yes.

19     Q.   And was the defendant, Tony Hillard, in the

20 lineup?

21     A.   Yes, he was.

22     Q.   Did he have the chance to pick what spot he

23 wanted to stand?

24     A.   Yes, he chose his position in the lineup.

1       Q.    How many people were in the lineup?

2       A.    Total of five.

3       Q.    Where were you at when the lineup was

4  conducted, Detective?

5       A.    I was outside of the room with the victim.

6       Q.    And was any other -- anybody inside other

7  than the five people in the lineup?

8       A.    Detective Jackson.

9       Q.    Did the victim then look at that lineup?

10      A.    Yes, he did.

11      Q.    Did he identify anyone?

12      A.    He positively identified Tony Hillard.

13      Q.    Do you see that person in court that he

14  positively identified?

15      A.    Yes.

16      Q.    Would you, please, point to him?

17      A.    Black suit, at the table.

18      MR. RODDY:    Indicating, for the record, the

19  defendant, Tony Hillard.

20      Q.    What did he identify him as?

21      A.    As one of the offenders in the incident.

22      Q.    Did he tell you anything specifically what

23  the defendant Hillard did?

24      A.    He said -- he said that Tony Hillard while

E-142

1 armed with a firearm threatened him, requested money.

2      Q.   Did you then make efforts to have a photo

3 of that lineup taken?

4      A.   Yes.

5      Q.   Was a photo actually taken?

6      A.   Yes, it was.

7      Q.   Detective, I'd like to show you People's

8 Exhibit Number 2 which which we've previously

9 marked.

10           I ask you if you recognize what's shown in

11 that photo.

12      A.   Yes.

13      Q.   What is that a picture of?

14      A.   This depicts the lineup that we conducted

15 on that date.

16      Q.   Does that picture truly and accurately

17 depict the way that that lineup looked when Yinka

18 Jinadu looked at it?

19      A.   Yes.

20      Q.   Would you, please, point to the person that

21 he identified as the person who had a gun and robbed

22 him and threatened him?

23      A.   The person with the X over their head.

24      Q.   What seat is he in in that lineup?

E-143

1      A.   From left to right, number two.

2      Q.   Do you see that person here in court today?

3      A.   Yes.

4      Q.   Please point to him.

5      A.   Tony Hillard in the black suit.

6      Q.   Indicating, for the record, the defendant,
7 Tony Hillard.

8           Detective, after June 3, 1997, did your
9 investigation into what had happened to Yinka Jinadu
10 continue?

11     A.   Yes.

12     Q.   Did it take you into the month of September
13 of 1997?

14     A.   Yes.

15     Q.   Sometime either on or before September 17th
16 of 1997, did you develop any information where a
17 possible offender might be located?

18     A.   Yes.

19     Q.   Tell the ladies and gentlemen what
20 information you obtained.

21     A.   We discovered information that Erven Walls
22 would be at 1121 South State.

23     Q.   What date did you go -- did you go to 1121
24 South State?

1      A.    Yes.

2      Q.    Did you go there on September 17, 1997?

3      A.    Yes.

4      Q.    Did you go there with anyone?

5      A.    With Detective Jackson.

6      Q.    Tell us what happened when you arrived
7 there.

8      A.    When we arrived there, we observed Erven
9 Walls, and he was in the company of Delores Jinadu,
10 and we took them into custody.

11     Q.    You said you saw the person named Erven
12 Walls.

13           Do you see that person in court today?  If
14 so, please point to him.

15     A.    Yes, Erven Walls in the tan shirt.

16     Q.    Indicating, for the record, the defendant
17 who's standing.

18     THE COURT:    Very well.

19     MR. RODDY:

20     Q.    Do you see the woman you called Delores
21 Jinadu in court here today that was with her and
22 Walls when you saw them at 11th and State?

23     A.    Yes.

24     Q.    Please identify her.

1      A.    Delores is wearing the brown striped
2  sweater.

3      Q.    Indicating, for the record, the defendant,
4  Delores Jinadu.

5            Tell us what happened when you saw Walls
6  and Jinadu coming out of where they were at.

7      A.    Well, they were together, and we placed
8  them in custody.

9      Q.    Did you take them anywhere?

10     A.    Yes, we took them to Area 3, Violent
11 Crimes.

12     Q.    Is that where your office is located?

13     A.    Yes.

14     Q.    Did you make any efforts at that time to do
15 anything in continuance of your investigation into
16 what happened to Mr. Jinadu?

17     A.    Yes.

18           Again, we notified Mr. Jinadu that we
19 needed him to come into Area 3, and we would conduct
20 another lineup.

21     Q.    The same kind of lineup you described to
22 the ladies and gentlemen of these two juries?

23     A.    Yes.

24     Q.    Did Mr. Jinadu come down to Area 3 that

1 evening about 7:00 or 7:15?

2      A.    Yes, he did.

3      Q.    Was a lineup put together?

4      A.    Yes.

5      Q.    How many people were present in that

6 lineup?

7      A.    A total of five.

8      Q.    Was the defendant, Erven Walls, placed in

9 that lineup?

10      A.    Yes.

11      Q.    Was he allowed to choose his position in

12 that lineup?

13      A.    Yes, he was.

14      Q.    Did Mr. Jinadu then look at those five

15 people in that lineup?

16      A.    Yes, he did.

17      Q.    Where were you at, Detective, when this

18 happened?

19      A.    I was on the inside at this particular

20 lineup, and Detective Jackson was on the outside.

21      Q.    Did you learn in the course of your

22 investigation if Mr. Jinadu identified anyone in that

23 lineup?

24      MR. FRANKS:    Objection.

E-147

1    THE COURT:   Overruled.

2    A.   Yes.

3    MR. RODDY:

4    Q.   Who did he identify?

5    A.   Erven Walls.

6    Q.   What did he identify him as?

7    MR. FRANKS:   Objection.

8    THE COURT:   Overruled.

9    A.   As one of the offenders who participated in
10 the incident on the date.

11   MR. RODDY:

12   Q.   Did you learn what Erven Walls did than?

13   MR. FRANKS:   Judge, objection.  This wasn't
14 part of the investigation.  He was on the inside.

15   THE COURT:   Pardon?

16   MR. FRANKS:   He was on the inside with the --
17 with the people that were in the lineup.  He was not
18 with the complaining witness in this case.

19   THE COURT:   Sustained.

20   MR. RODDY:

21   Q.   After Mr. Jinadu identified Erven Walls as
22 being one of the participants to what happened to him
23 on May 10 of 1997, is that the end of your
24 investigation, Detective?

E-148

1     A.    No.

2     Q.    Isn't it true today that you are still
3 continuing to look for the two other people who
4 participated in that?

5     A.    Yes, this is an open case.

6     Q.    I show you what I've already marked as
7 People's Exhibit Number 4 for identification.

8           I ask you if you recognize what's shown in
9 that photo.

10    A.    Yes, this depicts the lineup conducted on
11 that day.

12    Q.    Does it truly and accurately show the way
13 that the lineup was put together when Mr. Jinadu
14 identified Erven Walls?

15    A.    Yes.

16    Q.    And do you see the person in that photo
17 that Yenka Jinadu identified as Erven Walls?

18    MR. FRANKS:    Same objection, Judge.  He wasn't
19 present for the interview.

20    THE COURT:    Okay, fine.  Bring in Detective
21 Jackson.  We'll bring him in.  End it with him.

22    MR. FRANKS:    Judge?

23    THE COURT:    It's already been testified to by
24 Mr. Jinadu.

1              If you want to bring in the other detective

2 for it, that's fine.  I'll sustain your objection.

3      MR. FRANKS:    Judge, I withdraw it.

4      THE COURT:    Fine.  Pardon me?

5      MR. FRANKS:    I withdraw the objection.

6      THE COURT:    All right.  Proceed then.

7      MR. RODDY:    Thank you.

8      Q.   Did you learn in the course of your

9 investigation from your partner which person that

10 Yenka Jinadu picked out as the one who was involved

11 in the incident.

12      A.   Yes, I did.

13      Q.   Which one was it?

14      A.   Second from the left, with the X over their

15 head.

16      Q.   Do you see that person here in court today?

17      A.   Yes, Erven Walls in the brown shirt.

18      Q.   The same person that's pictured in this

19 picture right here?

20      A.   Yes.

21      MR. RODDY:    If I might have one second,

22 Judge?  Nothing further.  Thank you.

23      THE COURT:    All right.

24              Ladies and gentlemen, at this time, we're

E-150

1 going to break for our lunch recess.

2          When you come back, I'm going to have
3 the -- I'm going to have you change rooms and have
4 the Hillard jury report to our jury room here, and
5 then we will be proceeding solely with that jury for
6 the next witness, and then we'll be back to the Walls
7 jury.

8          So, we'll give you a little longer time for
9 lunch, and then we'll be planning to end both cases
10 today.  That's my timetable.

11          So, we will probably end the Hillard case
12 first and then work with the Walls case.  Just
13 relax.

14          You know what is happening, and we're
15 trying to finish within the timetable that I
16 indicated to you, although I did not with the Walls
17 jury because I did not select you, but that's the
18 timetable, folks.

19          So, let's take the juries out separately
20 and return the Hillard jury here.

21                         (The following proceedings
22                          were had out of the
23                          hearing of the jury:)
24      THE COURT:  All right.  Let's resume at 2:30

1 here to finish up with the Hillard case.

2          Mr. Dosch, I don't know if you want to stay
3 here for this.  You are welcome to.

4     MR. DOSCH:   I don't know -- if you just want
5 me to do separate cross on Detective Bradley, I can
6 do that.

7     THE COURT:   Yeah, probably.

8     MR. DOSCH:   All right.

9     THE COURT:   You should be here for Miss
10 Bormann.

11     MR. FRANKS:   What time do you want me want me
12 back?

13     THE COURT:   You?

14     MR. FRANKS:   Yeah.

15     THE COURT:   I would say by 4:00.

16                      (Whereupon, there was a recess
17                      had in the above-entitled
18                      cause, after which the
19                      following proceedings were had:)

20

21

22

23

24

(Rev. 2/18/93) CCCR-56

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME . . . 5 . . . OF . . 7 . . . . VOLUME . . . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED . . . PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE . . COURT NO. 99-0152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The People of the State of Illinois . . . . . . . WERE . . . . . . . . . . . . . . pending in said Court, between . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and . . . . . . . . . . . . . . . . . . TONY HILLARD . . . . . . . . . . WAS . . . . . . . . . . . . . . ., Defendant . . . .

Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . APRIL 23, . . . . . . . . . . . . . . , 19 . 99 .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

1

2   STATE OF ILLINOIS    )
                         )   SS.
3   COUNTY OF C O O K    )

4           IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
5
    THE PEOPLE OF THE    )
6   STATE OF ILLINOIS    )
                         )   Case No. 97-30453
7       VS               )
                         )   Before JUDGE MICHAEL P. TOOMIN
8   ERVEN WALLS,         )          (And Two Juries)
    TONY HILLARD,        )
9   DELORES JINADU       )   JULY 15, 1998

10                           2:30 P.M.

11      Court convened pursuant to recess.

12      Present:

13          HONORABLE RICHARD DEVINE,
                State's Attorney of Cook County, by
14          MR. JOSEPH RODDY, and
            MS. ANN CURTISS,
15              Assistant State's Attorneys,
                appeared for the People;
16
            MS. RITA FRY,
17              Public Defender of Cook County, by
            MS. CHERYL BORMANN, and
18          MS. RUTH MC BETH,
                Assistant Public Defenders,
19              appeared for the defendant Hillard,

20          MR. BRIAN DOSCH,
                appeared for defendant Jinadu,
21
            MR. DAN FRANKS,
22              appeared for defendant Walls.

23

24

E-153

1

2                          (The following proceedings

3                          were had out of the

4                          hearing of the juries:)

5     THE COURT:   Okay.

6         Number 1, I.P.I. 1.01.  Any objection?

7     MS. MC BETH:   No objection.

8     THE COURT:   That's going to be given with the

9 punishment as well.

10    MS. CURTISS:   Right.

11    THE COURT:   People's 2 is 1.02, credibility

12 without the defendant testifying.

13    MS. MC BETH:   No objection.

14    THE COURT:   Given.

15        Three, 1.03, opening statements, closing

16 arguments.

17    MS. MC BETH:   No objection.

18    THE COURT:   Four, 1 point 05, note taking.

19    MS. MC BETH:   No objection.

20    THE COURT:   Five, 2.01, charges.

21    MS. MC BETH:   We would object based upon our

22 prior motion in limine to find the armed violence

23 unconstitutional disproportionate as to attempt first

24 degree murder.

1        THE COURT:   Given over objection.

2             Six, 2.02, nature of the indictment.

3        MS. MC BETH:   No objection.

4        THE COURT:   Given.  7, 2 point 03, burden of

5 proof.

6        MS. MC BETH:   No objection.

7        THE COURT:   8, 302, circumstantial evidence.

8        MS. MC BETH:    No objection.

9        THE COURT:   Given.

10            Nine.  Now we have this 3.11, 9 and 9A.

11 What do you want to do.

12       MS. CURTISS:   Wait, Judge.

13       THE COURT:   3.11.

14       MS. CURTISS:   Did you do 2.04?  I have 8 as

15 being 2.04.

16       MS. MC BETH:   Is it the State's?

17       THE COURT:   That's not a Defense instruction.

18       MS. CURTISS:   All right.

19       THE COURT:   Number 9 has four contingencies.

20 9A has three.

21       MS. BORMANN:   We're asking for the one with

22 four contingencies.

23            The reason we're asking for that is that in

24 this case, we had a police officer, the gentleman who

E-156

1 just testified, Officer Schmidt, testify

2 inconsistently with his report.

3        He testified that, in fact, he did not show

4 the victim identification and the victim -- paper

5 identification, and in fact the victim did not

6 positively identify from the photo ID and paper ID at

7 those identifications as those of the offenders who

8 are known to him.

9        And that is exactly how it's worded in the

10 police report which was signed by the officer, and

11 it's something that the officer had personal

12 knowledge of.

13     THE COURT:    Let me see it.

14     MS. BORMANN:    Sure.

15     THE COURT:    When he did the report?

16     MS. BORMANN:    Sure, because it would be

17 involving something that he had shown the victim.

18 That squarely fits within the rule that indicates

19 that something can be used as substantive evidence.

20        It is not merely impeachment.  It is a

21 prior inconsistent statement which there is testimony

22 here before your Honor on the two juries and there

23 clearly is, and it narrates or describes something

24 that he had personal knowledge of which is the

E-157

1 interview with the victim, and it's signed by the

2 officer involved, Officer Schmidt.

3      MS. CURTISS:    I completely disagree.

4           The police report is not an earlier

5 statement by the officer.

6           It is a document recording events of

7 another party.  It is not the statement of the

8 officer.

9           It is different from what the officer

10 testified to today, but again it is not a prior

11 inconsistent statement by Officer Schmidt.

12      MS. MC BETH:    It is directly contradictory to

13 what he said today.  Today he said he didn't show him

14 paper ID.

15      MS. CURTISS:    He did not say anything in that

16 report.  He's documenting something that a third

17 party did.

18      THE COURT:    He's documenting what another

19 person did.

20      MS. BORMANN:    He didn't testify to that, your

21 Honor.

22           He testified that he interviewed the victim

23 and so did Officer Ramirez.  He was with the victim

24 at the -- at the apartment, outside of the apartment,

1 and Officer Ramirez was with him during the time that

2 they interviewed him in the car.

3          This is his signed statement, narrating

4 something that he had personal knowledge of, and he

5 denied it on the stand.  If that's not a prior

6 inconsistent statement, I don't know what is.

7       MS. CURTISS:    That's not a signed statement.

8 That's a report signed by a police officer

9 documenting things that were told to him by a third

10 party.  That's not a statement.

11      MS. BORMANN:    Actually, it doesn't just talk

12 about things that were told to him by a third party.

13          This says victim positively identified the

14 photo ID and paper ID as those of the offenders who

15 are known to him, signed by this -- signed by this

16 officer.

17          We had both officers who signed this report

18 on the stand.  The other officer indicated he was not

19 present outside in the hall.

20          Officer Schmidt indicated that he was at

21 all times during the interview of the victim.  That

22 is something that he was there for.

23          He placed it in his report because he was

24 there for it.  And now when he hit the stand here, he

1 denied that that's what happened.

2     MR. RODDY:     In actuality, that report is true
3 because if the argument is all of those ID's belong
4 to two people, Delores Jinadu and Erven Walls, then
5 he does know those two people.

6     MS. BORMANN:     Well, actually the different
7 Social Security numbers all don't belong to Erven
8 Walls.

9     THE COURT:     I don't think that this fits within
10 the category, 115-10 point 1. I don't think it's his
11 prior statement. It's a statement that he's
12 reporting of Mr. Jinadu.

13     MS. BORMANN:     Your Honor, the report -- no,
14 no. His words, in his handwriting exactly, victim
15 positively identified the photo ID and paper ID as
16 those of the offenders known to him.

17          It's something he did in the course of his
18 investigation.

19          How can it can be somebody else's words?
20 It's not somebody else's words. It's his words. He
21 testified to that course of investigation when the
22 State asked him on direct to something directly
23 contrary to his narration of the course of his
24 investigation reported in his own police report in

1 his own handwriting and signed by him.

2          THE COURT:   No, I don't see it.

3              You know, there's a limitation upon 115 10
4 point 1 that deals with a person's -- for instance, a
5 person's being a witness, a witness to an event, and
6 giving an inconsistent statement as being the witness
7 to that event.

8              There are cases which limit the thrust of
9 that section to where it's being used for impeachment
10 that say what somebody may have heard somebody else
11 say and things of that nature.

12             There are cases that have come, you know,
13 off of the bright line of that section in the last
14 four or five years, and I think that's what Miss   .
15 Curtiss is suggesting here.  This is not the prior
16 statement of this witness.  It is the prior statement
17 attributed to Jinadu.

18        MS. BORMANN:   Judge, the prior statement
19 attributed to this officer is that he showed him the
20 identification, photo and picture.  The officer
21 denied that -- I mean, the photo and paper.

22             He denied that on the stand.  That's not
23 something that Mr. Jinadu did.  Mr. Jinadu is sitting .
24 in the hallway.

1      THE COURT:   Any reply?

2      MS. CURTISS:   Again, my position is that the
3 police report of the officer is documenting events
4 relayed to him by Jinadu, things that he learned.

5           There's also an indication in the report
6 regarding Laretha Hillard and registration.  This is
7 information he obtained from third party.  It is not
8 his statement.

9      MS. BORMANN:   Your Honor?

10     MS. CURTISS:   He's not a witness to anything.

11     MS. BORMANN:   They also indicate in there --
12 well, he is.

13          They also indicate the condition of the
14 victim which he also -- which he sees.

15          He also indicates what he sees inside of
16 the apartment.

17          He also indicates what he recovers inside
18 of the apartment.

19          I mean, there is a large portion of this
20 report that has absolutely nothing to do with
21 interviews with anybody.  It has to do with what they
22 did in the course of the investigation and they did.

23     THE COURT:   Fine.

24          I'm going to deny nine.  I'll give 9A.

1 People's 10, 3 point 15.  Identification testimony?

2       MS. MC BETH:   No objection.

3       THE COURT:   Given.  11 is 5.03.  Now, we have--

4       MS. CURTISS:    Two versions.

5       MS. MC BETH:   Which one do you have?

6       THE COURT:   I just have the one with an

7 offense.

8       MS. MC BETH:   Okay.

9       MR. RODDY:   That's what we are proposing.

10 They asked us to prepare that.

11       MS. MC BETH:   I also asked them to delete the

12 second paragraph.

13           My objection to 11 as tendered by State is

14 it reads the person responsible, and the first

15 paragraph refers to the commission of an offense and

16 then has the second paragraph, the word conduct

17 including any criminal act done in furtherance of the

18 planned and intended act.

19           The committee comments to I.P.I. 5.03

20 indicate that the bracketed material in the first

21 paragraph and the second paragraph should be used

22 only when the offense charged is different from the

23 planned and intended act, but done in furtherance of

24 it.

1          Otherwise, it is supposed to read the
2 offense and have one paragraph, not the second
3 paragraph, and that's -- that would be my objection
4 because we have no evidence here that the planned and
5 intended act was different from the offense charged,
6 but done in furtherance of it.

7          We don't have a statement by the
8 defendant.  We just have actors, no indication that
9 something went haywire or they took advantage of the
10 situation and committed different offenses.

11     MR. RODDY:     Judge, there is no explicit plan
12 stated because we don't know what's in the minds of
13 these people, and if they don't say anything, we
14 don't know, but clearly there was a plan to go and do
15 something to Mr. Jinadu, most likely to rob him and
16 to obtain property from him and money.

17          Now, I think that it refers to people,
18 planning, let's go and kill someone, and they go
19 there, and they accomplish that goal.  And if they go
20 there with just one goal in mind and accomplish that
21 one goal, then that might be the appropriate case.

22          In the case where they say let's go and
23 commit a robbery with guns and in the course of it
24 someone is killed, then it becomes an offense.

1          Clearly, I don't think that any of the
2 defendants planned specifically when they got
3 together to commit attempt first degree murder, armed
4 violence, aggravated kidnapping, armed robbery.

5     MS. CURTISS:    Aggravated battery.

6     MR. RODDY:    Aggravated battery, all of those.

7          What they planned, they planned to go do
8 some kind of criminal activity.  And when they did
9 that, you can't get into their subjective minds.  It
10 should be an offense.

11    MS. MC BETH:    If I may?

12         I was agreeing with Mr. Roddy up until the
13 end where they didn't clearly intend to do all of
14 those things.

15         I think the facts though -- first of all,
16 we are speculating about intent, and nobody's arguing
17 on either side that he was there for the planned --
18 that he was there for the planning but not the
19 commission.  We don't have a situation like that.

20         But the acts that the victim described
21 are as soon as the door opens, Delores smiles at him,
22 and he's hit with a baseball bat.

23         That sounds like part of the plan was to do
24 great bodily harm to him with the baseball bat, and

1 they want money when he wakes up.

2          It sounds like part of the plan was to do
3 the armed robbery, and he's tied up when he wakes
4 up.

5          So, it sounds like part of the plan was to
6 do the kidnapping.  This is not a case where the
7 planned and intended act is different from the
8 offense charged.

9     MR. RODDY:    I have this case, People versus
10 Terry.  They cite the Kessler case.

11          We believe the statute as it reads means
12 that where one aids another in the planning or
13 commission of an offense, he is legally accountable
14 for the conduct of the person he aids, and that the
15 word conduct encompasses any criminal act done in
16 furtherance of the planned and intended act.  That's
17 the Supreme Court of Illinois.  That was a battery
18 that ended up being a murder.

19     THE COURT:   I think that it should be given in
20 the way that's set forth in the first version of an
21 offense because you have a multiplicity of offenses
22 here.

23          You don't know -- I mean, it really is a
24 question for the trier of fact to determine whether

1 all of these offenses were planned at the same time

2 or were not.

3          There is some evidence of a ransom

4 situation where phone calls were allegedly made.

5     MR. RODDY:   That's the clean copy of 1.  It

6 should take over 101.

7     THE COURT:   Yeah.

8     MS. MC BETH:   Where is the punishment?  How far

9 down is it?

10     MR. RODDY:   Fourth paragraph.

11     THE COURT:   Fourth paragraph.

12     MS. MC BETH:   Okay, fine.

13     THE COURT:   I'm going to give the first

14 version.

15     MS. MC BETH:   That would be over our

16 objection.

17     THE COURT:   Okay.  12 is 6 point 05X.

18     MS. MC BETH:   No objection.

19     THE COURT:   Given.

20          13 is 6 point 07X.

21     MS. MC BETH:   No objection.

22     THE COURT:   Given.  14, 8 point 01, definition

23 of kidnapping.

24     MS. MC BETH:   No objection.

1      THE COURT:   Given.   15, 8 point 04, aggravated

2  kidnapping.

3      MS. MC BETH:   No objection.

4      THE COURT:   Given.   16, issues of aggravated

5  kidnapping.

6      MS. MC BETH:   I don't have that, I don't

7  think.   Oh, yes, I do.   I am sorry.   I don't have

8  that.   I am sorry, Judge.   15 was--

9      THE COURT:   8 point 04, definition of

10 aggravated kidnapping.

11     MS. MC BETH:   I don't have that.   Can I read

12 over your shoulder?

13     MR. RODDY:   It should be in there.

14     MS. MC BETH:   Let me check.   No, I don't have

15 it.

16     MS. CURTISS:   I have an extra set.

17     MR. RODDY:   You have the definition of

18 kidnapping, but not aggravated kidnapping?

19     MS. MC BETH:   Right.

20     MR. RODDY:   Okay.

21     MS. MC BETH:   No objection.   And 16 is 8 point

22 05, Judge.

23     THE COURT:   Just a second.

24     MS. MC BETH:   All right.

E-168

1        THE COURT:   15 is 8 point 04.

2        MS. MC BETH:   No objection.

3        THE COURT:   16 is 8 point 05.

4        MS. MC BETH:   No objection.

5        THE COURT:   Given.  17 is 11 point 13.

6        MS. MC BETH:   No objection.

7        THE COURT:   18 is 11 point 14.

8        MS. MC BETH:   No objection.

9        THE COURT:   Given.  19, 11 point 51.

10       MS. MC BETH:   We would object.  Based on our

11 motion, it should be dismissed.

12       THE COURT:   Given over objection.  20, 11 point

13 52.   You'll object on the same basis.

14       MS. MC BETH:   Yes.

15       THE COURT:   Given.  21 is 1405, definition of

16 armed robbery.

17       MS. MC BETH:   No objection.

18       THE COURT:   22, issues on armed robbery.

19       MS. MC BETH:   No objection.

20       THE COURT:   That's 14 point 06.  Given.  23 is

21 26.01.

22       MS. MC BETH:   Only with respect to armed

23 violence, we are objecting.

24       THE COURT:   All right.  Given over objection.

E-169

1          24 and 25, not guilty, guilty of attempt

2 first degree murder.

3      MS. MC BETH:   No objection.

4      THE COURT:   26 and 27, not guilty, guilty of

5 armed violence.

6      MS. MC BETH:   No objection.

7      THE COURT:   That's given.

8          28 and 29, not guilty, guilty of armed

9 robbery.

10      MS. MC BETH:.  No objection.

11      THE COURT:   Given.

12          30 and 31, not guilty, guilty of aggravated

13 kidnapping.

14      MS. MC BETH:   No objection.

15      THE COURT:   32, 33, not guilty, guilty of

16 aggravated battery.

17      MS. MC BETH:   No objection.

18      THE COURT:   Given.

19      MS. MC BETH:   We would ask that you give 22

20 point 04, and we'll make that Defendant's Exhibit

21 (sic) Number 1, the defendant did not testify and

22 must not be considered by you.

23      THE COURT:   That will be given.

24      THE COURT:   Okay.

1         Anything else?  Do you have any objection

2 to the People's Exhibits that have been marked and

3 identified?

4         MS. MC BETH:    The spent casings, he couldn't

5 remember where they came from, so we would object to

6 those.

7         MR. RODDY:    We are not going to move -- we'll

8 move them all in, but we don't move the spents in.

9         MS. CURTISS:    No.

10         THE COURT:    Okay.  What number was that?

11         MR. RODDY:    9C, I believe.  It's either 8C or

12 9C.

13         THE COURT:    8C.

14         MR. RODDY:    8C.

15         THE COURT:    Or is it B?

16         MR. RODDY:    I believe the spents were C.

17         THE COURT:    C.

18         MR. RODDY:    Yes.

19         MS. CURTISS:    The certified copy of the

20 registration of Laretha Hillard's gun I assume is

21 coming as another exhibit.

22         MR. RODDY:    Yes.

23         MS. MC BETH:    We would have the same objection.

24         THE COURT:    It will be admitted.  It will be

1 overruled.

2       MS. MC BETH:   You're moving in some of

3 Hillard's, too, right, the identifications?

4       MR. RODDY:   Yes.

5       THE COURT:   Second question.

6            We're going to go out, do your cross,

7 finish up.  You have no witnesses?

8       MS. MC BETH:   I believe that's correct.

9       THE COURT:   Okay.

10            I want to admonish him before we bring the

11 jury out then.

12       MS. MC BETH:   Okay.

13       MR. RODDY:   Then we will do the cross of

14 Detective Bradley after the Hillard is out

15 deliberating, or the cross of -- is the cross of

16 Detective Bradley going to be in front of both

17 juries?

18       THE COURT:   No.

19       MS. MC BETH:   No.

20       THE COURT:   The cross is going to be right now

21 in front of the Hillard jury.  We're going to argue

22 and send them out.

23       MR. RODDY:   And then the cross.

24       THE COURT:   And then the cross in front of

1 Walls.

2     MR. RODDY:    Okay.

3     MS. MC BETH:    We have one piece of evidence in
4 our case which is the stipulation as to the grand
5 jury, what the court reporter at the grand jury said.

6     THE COURT:    Fine, okay.

7           Well, any reason why we shouldn't get
8 started then?

9     MR. RODDY:    Do you want to deal with what's
10 going to be published to the jury?

11     MS. MC BETH:    Can I get my list?  Do you want
12 to deal with that?

13     THE COURT:    Yeah, mine as well do it all now so
14 we can just go right through.

15           How about if I tell them we're going to
16 send the exhibits back, and it's possible that we may
17 need them or some of them when we start to argue with
18 that second jury?

19     MS. CURTISS:    Yeah.

20     MR. RODDY:    There will be a two-minute recess
21 between the close of the evidence and closing
22 arguments so we can go and ask them can we borrow
23 some of these exhibits now?  Is that fair?

24     THE COURT:    You mean have the sheriff go into

1 the Hillard jury?

2      MR. RODDY:   Right.

3      THE COURT:   That's why I want them here.

4      MR. RODDY:   That's fine with us.

5      MS. MC BETH:   She said depending upon what
6 Officer Bradley does on cross, we may have a
7 witness.

8      So, I don't know.  We don't know what he's
9 going to do on cross yet.

10     THE COURT:   What about the exhibits going
11 back?

12     MS. MC BETH:   Okay.

13     One is a picture of the bathroom.  Two is a
14 picture of the lineup.  No objection.  You know, I
15 have no objection to 1 through 9 of the State's
16 Exhibits.

17     Did you make 10 another copy of the general
18 offense case report or was that our's?

19     MR. RODDY:   That's yours.

20     MS. MC BETH:   10 through 13 are photos.  14 is
21 a photo, no objection.  I do object to -- is it 8B,
22 the spent casings?

23     THE COURT:   They're not -- they don't want the
24 spent casing to go back.

1       MS. MC BETH:    Okay.

2            No objection to the live rounds or the live
3 rounds from the 22 caliber.

4       THE COURT:    I assume you're going to want all
5 of the stuff that you marked?

6       MS. MC BETH:    Right, the Social Security card.
7 Social -- the certificate of ability to return to
8 work, birth certificate, the group exhibit of
9 tickets, driver license, Hillard Defense Exhibits 3
10 through 9, I believe.

11      THE COURT:    Anything but your police reports
12 will be fine.

13      MS. MC BETH:    Okay.

14      THE COURT:    Okay.  I think we can start then.

15      MR. RODDY:    The last exhibit we have will be
16 certified.

17      MS. CURTISS:    Will they be able to take back
18 the demonstrative exhibit?

19      THE COURT:    Their chart?

20      MS. CURTISS:    Yes.

21      THE COURT:    No.

22      THE COURT:    State ready?

23      MR. RODDY:    Just a minute, Judge, my partner
24 just stepped out.

1      THE COURT:   Okay.

2           Ready on cross-examination?  Ready for

3 cross-examination of Detective Bradley?  Bring in the

4 jury, please.  Bring in the jury, please.

5                (The following proceedings were

6                had in the hearing and the

7                presence of the Hillard jury:)

8      THE COURT:   You may be seated, ladies and

9 gentlemen.

10                CROSS-EXAMINATION

11                BY MS. BORMANN:

12     MS. BORMANN:

13     Q.   Good afternoon, Detective.  How are you?

14     A.   Fine, thank you.

15     Q.   Good.

16          Let me get my paperwork straight.  If

17 you'll bear with me?

18     A.   Sure.

19     Q.   Thank you.

20          Now, Detective, you told us that you have

21 been a police officer for 21 years, right?

22     A.   Yes.

23     Q.   And during the majority of that time, 19

24 and a half, you were a patrolmen, is that right?

1    A.   Yes.

2    Q.   You worked the streets?

3    A.   Yes.

4    Q.   And, sir, as part of your training, you
5 learned how to prepare police reports, right?

6    A.   Yes.

7    Q.   And in this specific case, you prepared
8 one, two, three -- five reports, right?

9    A.   Yes.

10    Q.   All right.

11         You prepared something called supplementary
12 reports, right?

13    A.   Yes.

14    Q.   There are four of those, of the five
15 reports that I'm talking about, right?

16    A.   Yes.

17    Q.   Okay.

18         Supplementary reports are meant to
19 supplement the original case report, is that right?

20    A.   Yes.

21    Q.   Okay.

22         The original case report is taken by the
23 original responding officers?

24    A.   Yes.

1      Q.    In this case Officer Schmidt and Ramirez,

2 right?

3      A.    Yes.

4      Q.    Okay.

5            Now, you also did an arrest report in this

6 case, is that right?

7      A.    Yes.

8      Q.    And one other thing that you did is

9 something called a general progress report, is that

10 correct?

11     A.    Yes.

12     Q.    What's a general progress report?

13     A.    That's -- those are notes that you may take

14 that you can refer to later on to complete your

15 supplementary.

16     Q.    Okay.

17           They're notes that you take when you're

18 interviewing witnesses, for instance, right?

19     A.    Yes.

20     Q.    There's actually a form that the Chicago

21 Police Department provides that you can do that on,

22 right?

23     A.    Interview form?

24     Q.    Yeah, a GPR.

1          It's titled general progress report, right?

2     A.   Right.

3     Q.   It is a lined piece of paper?

4     A.   Yes.

5     Q.   And it's intended for you to jot down

6 things as they're happening?

7     A.   Yes.

8     Q.   And then you rely on those later when you

9 do your supplementary reports?

10    A.   Yes.

11    Q.   Okay.

12         Because the supplementary report is a typed

13 report?

14    A.   Yes.

15    Q.   That has to be submitted to a supervisor

16 and approved?

17    A.   Yes.

18    Q.   Thank you.

19         Now, in this case, you did an interview of

20 Mr. Jinadu on May 12 of 1997, is that right?

21    A.   Yes.

22    Q.   And that's the day that you were assigned

23 the case by one of your superiors?

24    A.   Yes.

1     Q.   Now, when you did that interview of Mr.

2 Jinadu, that was at Illinois Masonic Hospital,

3 right?

4     A.   Yes.

5     Q.   That was in a hospital room?

6     A.   Yes.

7     Q.   And you were there with your partner?

8     A.   Yes.

9     Q.   That's Detective Jackson?

10    A.   Yes.

11    Q.   Now, on that -- you two were the only ones

12 there besides Mr. Jinadu?

13    A.   Yes.

14    Q.   And Mr. Jinadu, you asked Mr. Jinadu a

15 series of questions and he responded, right?

16    A.   Yes.

17    Q.   Okay.

18         Now, on that date, you didn't take any

19 notes?

20    A.   That day, I took notes on the back of a

21 case report.

22    Q.   Okay.

23         Do you have those notes with you?

24    A.   No, I don't.

1      Q.   Have you ever given them to the state's
2 attorney?

3      A.   I think the original case report is turned
4 over, a copy of it.   There might be notes on the back
5 of that one, yes.

6      Q.   Okay.

7           Do you know where that is?

8      A.   It should be in your file, the original
9 case report.

10     Q.   Officer, you testified at a prior
11 proceeding in this case, is that correct?

12     A.   Right.

13     Q.   Is that right?

14     A.   Yes.

15     Q.   You were asked a series of questions by an
16 assistant state's attorney Savini?

17     MR. RODDY:    What page?

18     MS. BORMANN:

19     Q.   I'll get to the page.   I have to find it
20 first.   Bear with me.

21          Officer, today you're saying you took notes
22 on the back of a case report that you think I should
23 have?

24     A.   There are a few notes on the back of the

E-181

1 case report, yes.

2      Q.   Okay.

3           That was taken on the 12th of May?

4      A.   Yes.

5      Q.   Do you remember testifying at a proceeding

6 here under oath before Judge Toomin?

7      A.   Yes.

8      Q.   Page 28.

9           Do you remember being--

10     MR. RODDY:    Which motion, counsel?

11     MS. BORMANN:

12     Q.   That would be the hearing that happened on

13 the 5th day of March of 1998 before His Honor, Judge

14 Toomin.

15     MR. RODDY:    Thank you.

16     MS. BORMANN:

17     Q.   You remember actually being questioned by

18 Miss Savini, the state's attorney?

19     A.   Yes.

20     Q.   And myself?

21     A.   Yes.

22     Q.   You were under oath at that time?

23     A.   Yes.

24     Q.   Do you remember being asked this question,

File Date: _____7- 1- 2 0 0 8_____

Case No: _____O 8 c v 1 7 7 5_____

ATTACHMENT # _____

EXHIBIT ___T- par t 9_____

TAB (DESCRIPTION)

_____

1 this series of questions and giving this answer.

2          Question:  Now, during the conversation you

3 and Detective Jackson were eliciting from Mr. Jinadu

4 exactly what happened on the date of May 10, right?

5          Answer:  Yes.

6          Question:  You wanted to ascertain if he

7 had any knowledge about the offenders in the case,

8 correct?

9          Answer:  Yes.

10          Question:  Did you take any notes during

11 that interview?

12          Answer:  No, I went along with the case

13 report that I had, and it was so close I'm not sure

14 if I took notes or not.

15          Question:  Do you have an independent

16 recollection of whether or not you took notes?

17          Answer:  No.

18          What you are telling us today, some four

19 months after your testimony here, is that now you

20 have an independent recollection?

21     A.    I believe that there are a few notes on the

22 back of that original case report.

23     MS. CURTISS:    I object, your Honor.  This is

24 not impeaching.

E-183

1       THE COURT:  Sustained.

2       MS. BORMANN:

3       Q.   Are we talking about -- when we're talking

4 about the general offense case report, we're talking

5 about not a back that's blank.

6            We're talking about because each page of

7 the general offense case report is two-sided.

8            We're talking about what you actually

9 marked on the general offense case report itself.

10      MS. CURTISS:   Objection.

11      THE COURT:   Overruled.

12      A.   Yes.

13      MS. BORMANN:   Great.  Thank you.  I am sorry.

14 I didn't understand what you were saying.  Thank

15 you.

16      Q.   Now, you -- that's my next question to

17 you.

18            You -- you -- when you had that interview

19 with Mr. Jinadu on May 12, you had this general

20 offense case report with you, right?

21      A.   Yes.

22      Q.   Okay.

23            That's a two-page report, two sides of each

24 page, is that correct?

1        A.     Yes.

2        Q.     It's Xeroxed a total of four pages if you
3 don't put one on the back of the other, right?

4        A.     Yes.

5        Q.     Okay.

6               You had read that report prior to your
7 interview of Mr. Jinadu that day in the hospital,
8 right?

9        A.     Yes.

10       Q.     Okay.

11              In fact, you -- you used that report, you
12 read along with it as you interviewed Mr. Jinadu, is
13 that right?

14       A.     Yes.

15       Q.     Okay.

16              And the interview that you had with Mr.
17 Jinadu on that date was substantially the same as
18 what was in the general offense case report, is that
19 right?

20       A.     Yes.

21       Q.     Okay.

22              In fact, that's why you didn't take any
23 notes that day, is that right?

24       A.     Yes.

1    Q.   Okay.

2         You would have taken notes that day, had he

3 said something different from what was in the

4 original case report?

5    MS. CURTISS:   Objection.

6    THE COURT:   Sustained.

7    MS. BORMANN:

8    Q.   Sir, he gave you a series of descriptions

9 that day, didn't he?

10   A.   Yes.

11   Q.   Okay.

12        And he described five offenders that were

13 involved in this incident, isn't that right?

14   A.   Yes.

15   Q.   Okay.

16        And he described one of them as Delores

17 Jinadu, is that right?

18   A.   Yes.

19   Q.   And she would have resided at 5851 North

20 Winthrop, the actual address of the incident?

21   A.   Yes.

22   Q.   She was a female black, right?

23   A.   Yes.

24   Q.   24 years of age?

E-186

1     A.   Yes.

2     Q.   5 foot 8?

3     A.   Yes.

4     Q.   150 pounds, is that right?

5     A.   Yes.

6     Q.   Now, he also described somebody who was

7 wearing blue jeans, right?

8     A.   Yes.

9     Q.   A red jacket?

10    A.   Yes.

11    Q.   Male black?

12    A.   Yes.

13    MS. CURTISS:   Objection.  This is not

14 impeaching.

15    THE COURT:   It doesn't appear to be.

16    MS. BORMANN:   No, Judge, we'll get to that.

17 It's not impeaching.  I'm not trying to impeach.

18 This is the course of investigation, how this

19 happened.

20    THE COURT:   No, no.

21         The statements that you are attempting to

22 bring out of Mr. Jinadu will be admissible through

23 this officer only if they're inconsistent.  Otherwise

24 they're hearsay.

E-187

1      MS. BORMANN:    They are not inconsistent with

2 the general offense case report.

3      THE COURT:    Then go onto something else then.

4      MS. BORMANN:

5      Q.    All right.

6            Now, sir, that day Mr. Jinadu told you that

7 after the incident happened, the police arrived, is

8 that correct?

9      A.    Yes.

10     Q.    He said -- he told you that he did speak to

11 those police officers, right?

12     A.    Yes.

13     Q.    And he told you that at that time he

14 identified three of the offenders from identification

15 that was shown to him, is that right?

16   . A.    No, I don't believe that's what he said,

17 no.

18     Q.    Page 36 of the transcript.

19           Remember that hearing that I talked about

20 earlier?

21     A.    Yes.

22     Q.    Where you testified here?

23     A.    Yes.

24     Q.    All right.

1           That was under oath, right?

2      A.   Yes.

3      Q.   Right?

4      A.   Yes.

5      Q.   Okay.

6           Do you remember being asked this question
7 and giving these answers?

8           Question:  And he told you that from that
9 identification, he could identify three of the
10 offenders as being Delores Jinadu, Germaine Craine,
11 and Erven Walls, is that right?

12          Your answer:  That's correct.

13          Do you remember being asked that question
14 and giving that that answer?

15     A.   I thought -- I thought that the answer I
16 gave on that day was that he only knew one offender.
17 He was shown a photograph of another offender.

18     Q.   Sir, I don't mean to cut you off, but my
19 question is did you testify to that?  Were you asked
20 that question?

21     A.   Yes.

22     Q.   Did you give that answer?

23     A.   Yes.

24     Q.   Thank you.

1     A.    You're welcome.

2     Q.    All right.

3           Now, those are as you were going along in

4  your report the offenders that were listed as one,

5  two, and three on the general offense case report, is

6  that correct?

7     A.    Yes.

8     Q.    Okay.

9           Now, offenders four and five were not named

10 by Mr. Jinadu, is that right?

11    A.    Right.

12    Q.    Okay.

13    MR. RODDY:    Objection, Judge.

14    THE COURT:    Say that again.  Repeat that.

15    MS. BORMANN:    Offenders four and five were not

16 named by Mr. Jinadu.

17    THE COURT:    Overruled.

18    MS. BORMANN:

19    Q.    Were they?

20    A.    Yes, they were not.

21    Q.    They were named I said.

22          Were they named?

23    A.    No, they were not.

24    Q.    I am sorry; I didn't understand your

1 answer.

2        He described them though?

3   A.   Yes.

4   Q.   Okay.

5        He never gave you the name of Tony Hillard,

6 did he?

7   A.   No.

8   Q.   Now, I want to jump ahead to June 3, some

9 three weeks after this, to the date that you went to

10 my client's home at 714 West Division.

11       That day, you and your partner did not go

12 alone, is that right?

13   A.   That's right.

14   Q.   You took Chicago Housing North police

15 officers with you, right?

16   A.   Yes.

17   Q.   In fact, those are Officers Bryant and

18 Patterson?

19   A.   Yes.

20   Q.   They are assigned to the Cabrini Green

21 area?

22   A.   Yes.

23   Q.   Because that's where you had to go to,

24 right?

E-191

1     A.    Yes.

2     Q.    You didn't know Tony Hillard, did you?

3     A.    No.

4     Q.    Okay.

5           You wanted to bring these police officers

6 with you to assist in identifying Mr. Hillard, is

7 that right?

8     A.    Yes, they were familiar with the area,

9 yes.

10    Q.    Okay.

11          Now, on that day, you told us that when you

12 went to the door, a young woman opened it?

13    A.    Yes.

14    Q.    And there was a man standing behind her?

15    A.    Yes.

16    Q.    And you said that you asked him his name,

17 right?

18    A.    Yes.

19    Q.    And you said that he gave you a bogus

20 name?

21    A.    Yes.

22    Q.    A fictitious name?

23    A.    Yes.

24    Q.    An alias?

1     A.   Yes.

2     Q.   Okay.

3          Now, Officer, you filled out an arrest

4 report in this case after you arrested Mr. Hillard,

5 right?

6     A.   Yes.

7     Q.   And in an arrest -- and you signed it?

8     A.   Yes.

9     Q.   It was complete and accurate?

10    A.   Yes.

11    Q.   Now, an arrest report, there's a spot for

12 the defendant -- the arrestee's name, right?

13    A.   Yes.

14    Q.   And in that case, you put down Tony

15 Hillard, right?

16    A.   Yes.

17    Q.   And there was also a spot right underneath

18 that, a box, for an alias or nickname, isn't there?

19    A.   Yes.

20    Q.   And in this case, you didn't put down any

21 alias or nickname, did you?

22    A.   I didn't remember what he told me.

23    Q.   Sir, you signed your police report, your

24 arrest report, the day that you actually arrested my

1 client on June 3, is that right?

2   A.   Yes.

3   Q.   Okay.

4        Now, when you arrested Mr. Hillard, he

5 looked much the same that he does today, right?

6   A.   Yes.

7   Q.   Okay.

8        He was 5 foot 10 inches tall?

9   A.   Yes.

10   Q.   170 pounds?

11   A.   Yes.

12   Q.   He had short brown hair?

13   A.   Yes.

14   Q.   He also had a tattoo on his hand, is that

15 right?

16   A.   Is that in the arrest report?

17   MS. BORMANN:   Judge, may I?

18   THE COURT:   Well--

19   MS. BORMANN:   -- approach?

20   MS. CURTISS:   I object to the relevance at

21 this point.

22   THE COURT:   I don't think that you've laid the

23 foundation for showing him the arrest report.

24   MS. BORMANN:

1    Q.   Okay.

2         Would anything refresh your recollection

3  regarding whether or not Mr. Hillard had a tattoo on

4  his hand that day?

5    A.   Yes.

6    Q.   What would?

7    A.   The arrest report.

8    Q.   Okay.  Thank you.

9         May I, Judge?

10   THE COURT:   Yeah.

11   MS. BORMANN:

12   Q.   Thank you.

13        I'm going to hand you what I previously

14  actually marked as Hillard Number 13, Judge.  Take a

15  look at that.  Directing your attention to this

16  part.

17        Does that refresh your recollection,

18  Detective?

19   A.   Yes.

20   Q.   All right.

21        Did Mr. Hillard have a tattoo on his hand?

22   A.   If it's in the report.  I don't remember

23  seeing one, but if it's there, I guess that's it.

24   MS. BORMANN:   May I have the detective step

1 down for a minute, your Honor?

2      THE COURT:   For what?

3      MS. BORMANN:

4      Q.   Detective, would actually seeing the actual

5 tattoo that you noted in your report--

6      A.   I concede--

7      Q.   Would that--

8      A.   I'll concede if it's in the report, that

9 it's there.

10     Q.   I am not asking for concession, Judge.   I'm

11 asking--

12     THE COURT:   The question is does that refresh

13 your recollection?

14     A.   It would, yes.

15     THE COURT:   That refreshes your recollection?

16     A.   Yes.

17     THE COURT:   That there was a tattoo?

18     A.   Yes.

19     THE COURT:   Fine.

20     MS. BORMANN:

21     Q.   Okay.

22          It is on his hand right here, right, on the

23 top of his right hand?

24     A.   Yes.

1    Q.    Okay.

2          It actually says in big letters l-o-v-e,

3 love, right?

4    A.    Yes.

5    Q.    Love?

6    A.    Yes.

7    Q.    Thank you.

8          Now, on that day when you took Mr. Hillard

9 into custody, you actually entered his apartment,

10 right?

11   A.    Yes.

12   Q.    Okay.

13         You entered his bedroom with him while he

14 got dressed?

15   A.    Yes.

16   Q.    Okay.

17         He didn't resist you?

18   MS. CURTISS:    Objection.

19   THE COURT:    Overruled.

20   A.    No.

21   MS. BORMANN:

22   Q.    Okay.

23         He went with you to Area 3 Violent Crimes

24 voluntarily, didn't he?

1      A.    Yes.

2      Q.    Okay.

3            And now you told us earlier that the reason
4  that you took him into custody is that he matched a
5  description of one of the offenders in the case,
6  correct?

7      A.    Yes.

8      Q.    Okay.

9            And those are the descriptions that are
10 consistent with what was in the general offense case
11 report that we talked about, correct?

12     A.    Yes.

13     Q.    And you believed at that time that he
14 matched the description of somebody who had been
15 described as Germaine Craine, is that right?

16     A.    There are -- yes.

17     Q.    Thank you.

18     A.    You're welcome.

19     Q.    Okay.

20           Now, after you arrested my client, you then
21 went back to Area 3, right?

22     A.    Yes.

23     Q.    And eventually, after the lineup had been
24 done, you completed your supplementary report, is

1 that correct?

2    A.   I am not familiar if it was done that day

3 or not.

4    Q.   Okay.

5        Would looking at a copy of your

6 supplementary report refresh your recollection about

7 when it was prepared?

8    A.   Yes.

9    Q.   Thank you.

10       I'm going to hand the officer what I marked

11 as Hillard Number 14 for identification purposes,

12 Judge.

13    THE COURT:  Very well.

14    MS. BORMANN:

15    Q.   Does looking at that report refresh your

16 recollection as to when you prepared it?

17    A.   I -- June 6, okay.

18    Q.   It was submitted on the 6th of June, wasn't

19 it?

20    A.   Yes.

21    Q.   Okay.

22       And you prepared it sometime between the

23 3rd and the 6th?

24    A.   Yes.

1     Q.   Sometime after Mr. Hillard had been

2 arrested and in custody?

3     A.   Yes.

4     Q.   Okay.

5          Now, nobody else on the case were in

6 custody at that time, were they?

7     A.   No.

8     Q.   Okay.

9          So, because of that as Mr. Roddy asked you

10 during direct, the investigation was still pending?

11    A.   Yes.

12    Q.   Right?

13    A.   Yes.

14    Q.   There were still wanted offenders?

15    A.   Yes.

16    Q.   Okay.

17         And you -- and the wanted offenders were

18 still -- oops, sorry about that -- Erven Walls,

19 right?

20    A.   Yes.

21    Q.   At that point, you had the address of 5851

22 North on Winthrop, right?

23    A.   Yes.

24    Q.   And the description of him was the same.

1         That was in the general offense case

2 report, is that correct?

3     A.   Yes.

4     Q.   All right.

5         And the second offender that was still

6 wanted after Mr. Hillard was arrested -- Ruth, can

7 you help me out?

8     MS. MC BETH:   Sure.

9     MS. BORMANN:

10    Q.   Was Delores Jinadu, right?

11    A.   Yes.

12    Q.   All right.

13        That was the then wife.

14    THE COURT:   Is there any reason to write all of

15 these down again?  You have them on the sheet before

16 you.

17    MS. BORMANN:   Actually, I don't, Judge, and

18 we're going to be getting to that, if you'll bear

19 with me.

20    THE COURT:   It's repetitive with what's on the

21 previous sheet.

22    MS. BORMANN:   I am sorry, Judge.  It won't be

23 repetitive.  That's what I'm getting to.

24    Q.   The third offender that was still wanted,

1 at that time, was a male black in his twenties,

2 right?

3     A.   Yes.

4     Q.   That was the guy who was described as

5 five-ten, right?

6     A.   Yes.

7     Q.   And 200 pounds, right?

8     A.   Yes.

9     Q.   Okay.

10       And that person is described as wearing

11 black jeans, right?

12     A.   Yes.

13     Q.   And a red pullover, correct?

14     A.   Yes.

15     Q.   And the final offender that was still

16 wanted at this time was a male black in his twenties?

17     A.   Yes.

18     Q.   Five foot five, right?

19     A.   Yes.

20     Q.   My writing is terrible.  And 140 pounds?

21     A.   Yes.

22     Q.   With a clothing description of a blue

23 jacket and gray jeans, right?

24     A.   Yes.

1    Q.    Thank you.

2    A.    You're welcome.

3    Q.    Okay.

4          Thank you, Ruth.  Thank you, Officer.

5    A.    You're welcome.

6    Q.    Okay.

7          Now, you -- we talked earlier about the

8  conversation that you had with Mr. Jinadu on May 12.

9          You actually had two other interviews with

10 him prior to June 3, right?

11   A.    Yes.

12   Q.    One was at his home?

13   A.    Yes.

14   Q.    That was with Detective Jackson?

15   A.    I was corrected on that.  I made a

16 mistake.  I was by myself.

17   Q.    Okay.

18         And the other one was at Cook County

19 Hospital?

20   A.    Yes.

21   Q.    You don't have notes from either of those?

22   A.    No.

23   Q.    That's because they were substantially the

24 same in content as the first interview which followed

1 along with the general offense case report?

2     A.    Yes.

3     Q.    You had a final interview with him in Area
4 3 on June 3 of 1997, right?

5     A.    Yes.

6     Q.    And that's not documented in a
7 supplementary report, right?

8     A.    No, it's on the GPR.

9     Q.    It's on a GPR, the notes we were talking
10 about earlier.

11          Now, I'm going to ask you specifically what
12 Mr. Jinadu told you.

13          On -- when you interviewed him on May 12th
14 of 1997, Mr. Jinadu told you that he was aware of the
15 fact that Delores' car had been in an accident -- let
16 me get the exact words for you here -- that Delores
17 had an automobile accident in her vehicle, and that
18 it might be undrivable on the day of the incident, is
19 that right?

20    A.    Yes.

21    Q.    And at -- on that day, Mr. Jinadu also told
22 you -- I am sorry -- actually on June 3 of 1997, at
23 that time, during that interview, Mr. Jinadu told you
24 that when these people were demanding things from

1 him, they were demanding drugs from him, is that
2 right?

3    A.    Yes.

4    Q.    And Mr. Jinadu also told you that when he
5 was beaten in the knees with the baseball bat and hit
6 in the face with the chisel, that that all happened
7 in the living room prior to going to the bathroom,
8 isn't that right?

9    A.    Yes.

10   Q.    Mr. Jinadu also told you that then he was
11 taken to the bathroom, right, after that?

12   A.    Yes.

13   Q.    He told you while he was in the living
14 room, he was cuffed, is that right?

15   A.    He was what?

16   Q.    Handcuffed.  He was cuffed in the living
17 room.

18   A.    Yes.

19   Q.    In fact, he told you when he woke up, he
20 had already been cuffed and bound, and what I mean by
21 bound was around the mouth, the body, and the ankles,
22 is that right?

23   A.    Yes.

24   Q.    Okay.

E-205

1          He also told you that when he was hit by
2 the tire iron, that was by Erven Walls, and that was
3 before he was taken to the bathroom, is that right?

4      A.    Yes.

5      Q.    Okay.

6          He never told you that he was hit by two
7 people with a tire iron, did he?

8      A.    I don't believe so, no.

9      Q.    Okay.

10         He did say that that -- that the male black
11 that hit him with the iron, that happened in the
12 living room, is that correct?

13     A.    Yes.

14     Q.    Now, he also told you regarding the wearing
15 of masks, that when he woke up, there was nobody that
16 had a mask on in that apartment, is that right?

17     A.    That could be unclear.  That's what I
18 wrote.

19     Q.    Well, actually, sir, it's not what you
20 wrote.  Page 47.

21         That testimony that you gave prior here
22 under oath, where you asked this question; did you
23 give this answer?

24         Question:  Did he tell you whether or not

E-206

1 any of the male blacks or his wife -- you know what,

2 I need to start a little bit ahead of that.

3          Question:  And he told you -- Mr. Jinadu

4 told you that when he woke up he saw his wife with

5 four male blacks, is that right?

6          Answer:  Yes.

7          Question:  Did he tell you whether or not

8 any of the male blacks or his wife were wearing masks

9 at that time?

10          Answer:  At that time, they were not

11 wearing masks.

12          Were you asked that question and did you

13 give that answer?

14    A.    Correct.

15    Q.    Thank you.

16          Now, Mr. Jinadu never told you some other

17 stuff.

18          He never told you during any interview that

19 anyone put a gun in his mouth, did he?

20    A.    He said that, but it might not be written.

21    Q.    Well, Officer, not only is it not written,

22 I'm going to hand you your -- there are a total of

23 three reports -- actually, two reports in this case

24 and a general progress report that indicate the

1 variety of interviews that you had with Mr. Jinadu,

2 is that right?

3     A.   Right.

4     Q.   One is a supplementary report that was

5 submitted sometime between June 3 and June 6?

6     A.   Right.

7     Q.   Another one is a supplementary report done

8 on October 5, right?

9     A.   Right.

10     Q.   An the other one is general progress report

11 notes actually in your handwriting taken during the

12 interview of Mr. Jinadu on June 3 at Area 3?

13     A.   Right.

14     Nowhere in there is it written that he put

15 a gun in his mouth.  You're right, absolutely.

16     Q.   It's not there anywhere, is that right?

17     A.   Absolutely right, you're right.

18     Q.   Okay.

19     Now, certainly he never told you that two

20 people during this incident had the nerve to put guns

21 in his mouth, did he?

22     A.   No.

23     Q.   Okay.

24     And last but not least, this was when

1 you -- I am sorry, it's actually not last, close to
2 it, though.

3          When you took over this case, obviously
4 you're a Violent Crimes detective, is that correct?

5     A.   Yes.

6     Q.   And so any acts of violence are things
7 that -- that are very important to you, any of the
8 acts that occur during a crime that are of a violent
9 nature, is that right?

10    A.   Yes.

11    Q.   Okay.

12         Any threats made to the victim are also
13 incredibly important, aren't they?

14    A.   Yes.

15    Q.   Okay.

16         Mr. Jinadu never told you that anyone said
17 to him it's time for you to die, did he?

18    A.   No.

19    Q.   Officer, in a wrap up, I asked you earlier
20 it's clear that Mr. Jinadu never knew Tony Hillard,
21 right?

22    A.   Right.

23    Q.   He never gave you the name of Tony
24 Hillard?

E-209

1     A.   Right.

2     Q.   But during your direct examination,

3 Detective, when Mr. Roddy asked you what the victim

4 told you during the lineup, you said he told you that

5 Tony Hillard while armed with a weapon threatened and

6 robbed him.

7          He didn't use the name Tony Hillard, did

8 he?

9     A.   No.

10    Q.   You told him the name of the suspect Tony

11 Hillard, is that right?

12    A.   Yes, after he was arrested, sure.

13    MS. BORMANN:   If I may have a moment, Judge?   I

14 have nothing further of the detective.   Thank you.

15    THE COURT:   Any redirect?

16    MR. RODDY:   Briefly, Judge.

17              REDIRECT EXAMINATION

18              BY MR. RODDY:

19    MR. RODDY:

20    Q.   Detective, all of the descriptions that you

21 had throughout this case, the four males, is it fair

22 to say their height size is of a general height size

23 of most males around?

24    A.   Yes.

E-210

1      Q.    And that their weight size is also the same

2 as most general characteristics?

3      A.    Yes.

4      Q.    As you sit here today and as you saw him on

5 June 3, do you think Tony Hillard is of general

6 height and general weight?

7      A.    I would say so, yes.

8      Q.    Was he at that time?

9      A.    Yes.

10     MR. RODDY:     If I can have one second?

11     Q.    All of the reports that you generated, the

12 GPR and sups, are those summaries of your reports?

13     A.    Yes.

14     Q.    When you spoke with Mr. Jinadu on several

15 occasions, did you ever have difficulty in conversing

16 with him and getting straight everything that

17 happened to him?

18     A.    Yes.

19     Q.    And do your reports all speak in a time

20 from what began in the morning until the end, or are

21 they jumbled up and trying to get an idea of what

22 happened throughout that whole nine hours?

23     A.    Yes.

24     MR. RODDY:     Nothing further.

1      MS. BORMANN:   Judge, I just have a couple of

2  questions based upon what Mr. Roddy asked.

3                   RECROSS EXAMINATION

4                   BY MS. BORMANN:

5      MS. BORMANN:

6      Q.   You told us, sir, that -- that -- that you

7  had some difficulty understanding him?  Is that

8  right?

9      A.   Yes.

10      Q.   Bear with me, Officer, while I look through

11  my notes, please.  Page 29 of the transcript.

12            Officer, during that same time period that

13  we were talking about where you testified here in the

14  same courtroom, were you asked these series of

15  questions, and did you give these series of answers?

16            Question:  How long did you spend speaking

17  to Mr. Jinadu?

18            Answer:  I'm not sure, maybe a half hour or

19  so.

20            Question:  Was he awake?

21            Answer:  Yes.

22            Question:  He was -- seemed like he was

23  oriented, in other words he seemed like he understood

24  what you were saying?

E-212

1          Answer:  Yes.

2          Question:  Was he able to answer clearly?

3          Answer:  Yes.

4          Were you asked those questions, and did you

5 give those answers?

6     A.   Yes.

7     MR. RODDY:   I'll object.  I'll withdraw that.

8     THE COURT:   Overruled.

9     MS. BORMANN:   Nothing else.

10    THE COURT:   I've got a couple of questions,

11 Detective.

12         Clear up something.  When Miss Bormann was

13 asking you questions about the identification and the

14 charts she had there, I believe that you indicated

15 that you thought that Mr. Hillard matched the

16 description of the person who you had seen named in

17 the reports as Germaine Craine.

18    A.   Yes.

19    THE COURT:   You had a name of Germaine Craine.

20 You had a name of Erven Walls.

21    A.   Yes.

22    THE COURT:   At some point in the investigation,

23 did you learn that they were the same persons?

24    A.   Yes, but not at that time.

E-213

1      THE COURT:    So, this was well before the arrest

2 of Mr. Walls in September.

3      A.    Yes.

4      THE COURT:    And up to that point, you assumed

5 from the identification found in the premises that

6 there was an Erven Walls, there was also a Germaine

7 Craine, and some other variations of those names?

8      A.    Yes, it was very unclear because I never

9 really saw the identification.    That was just what

10 was listed in the reports.    I never personally

11 examined that information, I mean the

12 identification.

13      THE COURT:    Well, going onto September, when

14 you arrested Miss Jinadu and Erven Walls, was it at

15 that point that you determined that Erven Walls was

16 indeed Germaine Craine?

17      A.    We did determine that, but it was a little

18 bit before the arrest that we realized that he was

19 the same.

20      THE COURT:    So, that accounted for a good deal

21 of the identification, photo and non-photo

22 identification that was found at the crime scene?

23      A.    Yes.

24      THE COURT:    I have nothing further.

E-214

1      MS. BORMANN:   I have nothing further.

2      MR. RODDY:   Nothing further.

3      THE COURT:   Thank you.  You may step down.

4      A.   Thank you.

5                  (Witness is excused.)

6      MS. BORMANN:   Judge, may we have a sidebar with

7 the reporter?

8      THE COURT:   You want the reporter?

9      MS. BORMANN:   Please.

10                  (The following proceedings were

11                   had in the hearing and the

12                   presence of the jury:)

13      MS. BORMANN:   Judge, I have an objection to the

14 Court's questioning.  I have an objection to the

15 Court's questioning.

16      THE COURT:   Why?

17      MS. BORMANN:   Because you elicited hearsay from

18 the detective, the information that Germaine Craine

19 and Erven Walls was addressed in the motion in

20 limine, and you granted that motion because that

21 information will be based on hearsay.

22          So, I'm asking that you strike the answers

23 to that and that the jury be told to disregard it.

24      THE COURT:   No, because I think you opened it

1 up on your cross-examination, that he made this

2 assumption, and I was -- I thought that there was

3 some confusion as to why he was making that

4 assumption.

5          He did clear it up that when he made it --

6 when he figured it out later the arrest of Mr. Walls,

7 but I don't see how that affects Mr. Hillard at all.

8      MS. BORMANN:   Judge, Mr. -- Detective Bradley

9 testified here today and has testified at a previous

10 proceeding that when he interviewed the victim in

11 this case at the hospital, the victim told him he

12 identified three of the offenders and named them from

13 three pieces of identification.  They were Erven

14 Walls, Germaine Craine, and Delores Jinadu.

15          That was elicited on my cross-examination

16 and in fact I had to remind the officer of his prior

17 testimony, and he agreed to it.

18          So, the Court clearing that up is -- there

19 are three people out there.

20          I don't know if one is named Germaine

21 Craine, but one certainly looks like Erven Walls, and

22 whether or not that person name is actually Germaine

23 Craine or not, I don't know.  But the bottom line is

24 that the jury was not entitled to hear the hearsay

1 evidence that your Honor elicited, and I'm again
2 renewing my request.

3      MR. RODDY:     This jury has already heard
4 through Yinka who identified the photo stating
5 Germaine Craine that it's Erven Walls.  He identified
6 that person.

7      THE COURT:     And in your cross-examination, he
8 said that on the basis of the information that he
9 had, the number two man of the second man who was
10 Germaine Craine, that he assumed that description was
11 the one that fit Tony Hillard.  That's what he
12 testified to when you asked him.

13     MS. BORMANN:     That's correct, but I didn't
14 elicit hearsay from him, your Honor.

15     THE COURT:     Well, I'm not going to strike it.

16     MS. BORMANN:     Thank you.

17     THE COURT:     Are you prepared to do your
18 stipulation now?

19     MR. RODDY:     We will with the certified copy,
20 yeah.

21     THE COURT:     Okay.

22          And then do you have witnesses?

23     MS. BORMANN:     No, I don't believe we do.   We
24 just have some stipulations and the transcript.

E-217

1    THE COURT:    Okay.

2                  (The following proceedings were

3                  had in the hearing and the

4                  presence of the Hillard jury:)

5    THE COURT:    You may proceed.

6    MR. RODDY:    At this time, ladies and gentlemen

7 of the jury, we're going to be proceeding by way of a

8 certified copy of a gun registration,

9 self-authenticating document.

10            I would like to mark this as People's

11 Exhibit Number 15 and present it to the jury at this

12 time.

13    THE COURT:    Yes.

14    MR. RODDY:    People's Exhibit Number 15 is an

15 exact reproduction of a document on file in the

16 Chicago Police Department as certified by Mr. James

17 Piper, the director of the records division, of the

18 Chicago Police Department, and People's Exhibit

19 Number 15 states that it is a Chicago -- City of

20 Chicago firearms registration for a weapon, that

21 being People's Exhibit Number 8, a 357 caliber

22 revolver with the serial number being K, as in King,

23 261713.

24            That it was registered on November 14,

E-218

1 1996. That it was good for one year from the date of

2 that time, and it was registered in the name of Miss

3 Laretha Hillard, H-i-l-l-a-r-d, with a home address

4 of 1230 North Larabee. That will be it.

5 THE COURT: Pardon me?

6 MR. RODDY: That would be it as to that.

7 THE COURT: Are you offering any exhibits?

8 MR. RODDY: Judge, at this time, we would be

9 seeking to have the identification marks stricken as

10 to People's 1 through 15 and also on the -- what was

11 earlier noted as Defendant's 3 through 9 and have

12 them admitted into evidence.

13 THE COURT: They will be received.

14 MS. CURTISS: We are not.

15 MR. RODDY: Not 8C at this time.

16 THE COURT: All right.

17 They may be received, and the

18 identification marks may be stricken. Anything

19 else?

20 MR. RODDY: At this time, the People would

21 rest their case against Tony Hillard.

22 THE COURT: Yes.

23 MS. BORMANN: Your Honor, we do have evidence

24 by way of stipulation.

E-219

1          THE COURT:    You may proceed.

2          MS. BORMANN:    I don't know if the jury was

3  instructed on what a stipulation is.

4          THE COURT:    I'm not sure, but I will.

5          MS. BORMANN:    Thank you.

6          THE COURT:    Ladies and gentlemen, you are about

7  to hear evidence presented by stipulation.  I'm not

8  sure that I did alert you to this type of evidence,

9  but I may have.

10          In any event, the evidence that's presented

11  by stipulation is evidence for which there is no

12  disagreement or any contest as to its veracity or

13  admissibility.

14          And, therefore, the parties have agreed

15  that if a given witness were called, he or she would

16  testify in the manner reflected in the stipulation.

17  You may proceed.

18          MS. MC BETH:    Thank you, your Honor.

19          It is stipulated between the following

20  parties, Tony Hillard, through his attorneys, Ruth

21  McBeth and Cheryl Bormann, and the People of the

22  State of Illinois through their attorneys, Joseph

23  Roddy and Ann Curtiss, that if the following witness

24  were called to testify, this would be her testimony:

E-220

1          She would state that her name is Janet K.
2 Lupa, L-u-p-a.

3          She is a certified shorthand reporter
4 licensed to practice in the State of Illinois, and
5 that she was so employed on the day of September 29,
6 1997.

7          On that day, she was employed and took
8 transcripts -- took shorthand of the proceedings in
9 front of the Cook County grand jury here in this
10 building.

11         She heard testimony from Yenka Jinadu.   She
12 would identify him as the same Yinka Jinadu who
13 testified before you today.

14         Miss Lupa would testify that she is
15 certified her report of the -- she took those
16 proceedings in shorthand and, thereafter, caused them
17 to be transcribed into typewriting and certified that
18 she made a true and accurate transcript of the
19 proceedings before the grand jury.

20         She would testify that Mr. Yenka Jinadu was
21 sworn to tell the truth, raised his right hand, swore
22 to tell the truth, the whole truth, and nothing but
23 the truth, and was asked questions by an assistant
24 state's attorney.   Her name is Mary Pat Devereaux.

E-221

1           And Miss Lupa would testify that Mr. Jinadu
2 was asked the following questions by Miss Devereaux
3 and gave the following answers:

4           Question by Miss Devereaux:  And what did
5 she say to you and what did you say to her?

6           Answer:  I got the money.  I was expecting
7 her.  She was supposed to be in my office working
8 that Saturday morning.  She was supposed to be there
9 by 9:30, and I didn't see her.

10          Another question by Miss Devereaux.  Then
11 what did you do?

12          Answer:  I went to the front door.  When I
13 get to the front of the building, I can see the three
14 guys.  I see they come in the bathroom before.  I see
15 them sitting down.  There is a school.  There was a
16 school in front of the building, kindergarten
17 school.

18          Question by Miss Devereaux.  Is this across
19 the street from the building?

20          Answer by Mr. Jinadu:  Opposite the street
21 of the building like this.

22          Question by Miss Devereaux:  So it's across
23 from the building you saw three of the men?

24          Answer by Mr. Jinadu:  They sat down on

1 something there.  When they see me, they jumped

2 down.  They were on their way and I was just running

3 down the street shouting to people to help me call

4 the police.

5          Question by Miss Devereaux:  And, Mr.

6 Jinadu, when you first came outside of the apartment

7 building, you saw the three men across the street.

8 The three men that you saw, was it the man that had

9 the baseball bat?

10          Answer by Mr. Jinadu:  Yes.

11          Question:  Was it the light skinned man?

12          Answer:  Yes.

13          Question:  And was it the man that had

14 never said anything, but held the gun on you in the

15 living room?

16          Answer:  Yes.  So stipulated?

17     MR. RODDY:    Stipulate those are the words that

18 she typed down at the grand jury proceeding.

19     MS. BORMANN:   Your Honor, at this time, we

20 would ask to strike the identification marks and move

21 into evidence Hillard Exhibits 1 through 9

22 inclusive.

23     THE COURT:   They may be received.  The

24 identification marks will be stricken.

1      MS. BORMANN:   Your Honor, with that, the

2 Defense would rest.

3      THE COURT:   All right.

4          Does the State have any rebuttal evidence?

5      MR. RODDY:   No.

6      THE COURT:   We're about to move into the final

7 phase of the trial, the closing arguments and the

8 instructions of the law.

9          Before we do that, I'm going to ask that

10 you step out just for a couple of minutes.  I have

11 some housekeeping matters before we move into the

12 final stage of the trial.

13          Just stretch your legs for a couple of

14 minutes.  You'll be right back in here.

15                              (The following proceedings

16                              were had out of the

17                              hearing of the jury:)

18      MS. MC BETH:   At the close of all of the

19 evidence, we would more for a directed verdict of

20 acquittal as to each of the charges.

21      THE COURT:   That will be denied.  Mr. Hillard?

22      DEFENDANT HILLARD:   Yes.

23      THE COURT:   Listen carefully.

24          You've heard your lawyers indicate that

1 they have finished or completed their presentation of

2 the evidence, correct?

3       DEFENDANT HILLARD:   Yes, sir.

4       THE COURT:   And from that, I've ascertained

5 that you have elected not to testify?

6       DEFENDANT HILLARD:   No, sir.

7       THE COURT:   That's correct.

8       DEFENDANT HILLARD:   Yes.

9       THE COURT:   You understand that you do have the

10 right under our law to take the witness stand and

11 tell your side of the story?

12      DEFENDANT HILLARD:   Yes.

13      THE COURT:   You would be cross-examined

14 presumably by the state's attorney as well.  You

15 understand that?

16      DEFENDANT HILLARD:   Yes, sir.

17      THE COURT:   You have decided after consultation

18 with your lawyers not to testify, is that right?

19      DEFENDANT HILLARD:   Yes.

20      THE COURT:   Has anybody promised you anything

21 to cause you to do that?

22      DEFENDANT HILLARD:   No, sir.

23      THE COURT:   Anybody threaten you or make you do

24 that?

1      DEFENDANT HILLARD:   No.

2      THE COURT:   And you've heard your lawyers
3 present some evidence here by stipulation.

4           Is there any evidence that was not
5 presented that you were desirous of having
6 presented?

7      DEFENDANT HILLARD:   No, sir.

8      THE COURT:   You are satisfied with your
9 representation of what your lawyers have done in the
10 way of defending you?

11     DEFENDANT HILLARD:   Yes.

12     THE COURT:   Very well.  All right.

13          Then I think we're ready to proceed with
14 the arguments.  Okay.  Bring the jury back in.

15               (The following proceedings were
16                had in the hearing and the
17                presence of the Hillard jury:)

18     THE COURT:   Please be seated, folks.  I said it
19 would be brief, and this time I was correct.

20          We are moving into the last stage of the
21 trial now, the final arguments and the instructions
22 of law.

23          The arguments will be presented to you in
24 this manner.

1           The State has the opportunity to address

2 you first, followed by defense counsel, and the State

3 has the opportunity to speak to you last, inasmuch as

4 they do have the burden of proof in all criminal

5 cases.

6           After the closing arguments, I will be

7 reading to you the instructions of law.

8           The State may proceed.

9                CLOSING ARGUMENT

10               BY MR. RODDY:

11     MR. RODDY:    Thank you.

12          We spoke a lot about May 10, 1997, ladies

13 and gentlemen.  I wasn't there, Ann wasn't there, you

14 weren't there, but he was there.

15          We know that because of what Yinka Jinadu

16 told you from that witness stand and everything that

17 you've heard there.

18          You know that Tony Hillard was there armed

19 with this gun when he put it in the mouth of Yinka

20 Jinadu and proceeded to assist with his partners in

21 beating, robbing, kidnapping, and holding him so that

22 they could get what they wanted because it's all

23 about what he wants and what his partners want.  And

24 what they wanted, they accomplished.

1           This is what they accomplished.  This is
2 Yinka Jinadu as he appeared in his underwear,
3 bleeding, handcuffed, manacled, tied down, sitting
4 with no dignity, left except for his own memory of
5 what happened to him on that night when he was
6 tortured by Tony Hillard, Delores Jinadu, Erven Walls
7 and their two other partners.

8           When you came into this courtroom, ladies
9 and gentlemen, you walked in here and some of you
10 might have said I've been here before, I've never
11 been here, I don't know what to expect.  That's an
12 understandable feeling.  Some of the things that you
13 can expect we can give to you.

14          The first thing that you need to do to be a
15 juror is to get the law.  The law is given to you by
16 Judge Toomin.

17          There's going to be many forms of paper
18 that you get back there.  It will tell you what the
19 law is in this case, and it's with that law and the
20 oath that you took that you are going to read the law
21 and you are going to apply it to what you heard
22 because that's another tool, a tool that we can give
23 to you.

24          We give you evidence.  We give you physical

E-228

1 evidence. You are going to have both of these guns,
2 Tony Hillard's gun, Erven Walls' gun.

3           You are going to get to see the handcuffs
4 that were put on Yinka Jinadu.

5           You are going to get these pictures. You
6 will be able to look at them and try to resolve what
7 happened then.

8           You are going to get this evidence back
9 there, too, what was used to bind Yinka Jinadu as he
10 stayed in that bathroom, in that room for 12 hours.

11          Lastly, you are going to get the most
12 important thing, that's your own common sense because
13 that's what this case is really about, common sense.

14          You walk through these doors. You come
15 into this building. Your life and everything that
16 you experience out there, whether you come from the
17 north side, south side, west side, whether you are
18 from Indiana or Colorado or whatever, those things
19 are not left outside on the curb at 26th and
20 California.

21          Those things are brought here, and they're
22 put in every seat right there, and they're brought
23 with you into that jury room when you deliberate what
24 happened on May 10 of 1997.

1       I'm going to come back to your common sense
2 because that's what it's all about.

3       This first bit that I'm going to talk to
4 you about, and Ann is going to talk to you last, I'm
5 going to tell you about some of the law that you are
6 going to hear and read to you what they actually are
7 is the first one, most important one back there for
8 this case.

9       MS. BORMANN:   Objection.

10      THE COURT:   What's the objection?

11      MS. BORMANN:   That one is more important than
12 the other?

13      THE COURT:   That's his opinion.  Overruled.

14      MR. RODDY:   The first one is called
15 accountability or legal responsibility.  We don't
16 have any titles on them, just phrases of what the law
17 is.

18      What it is is the law of responsibility.
19 It's recognizing that there is strength in numbers.

20      We're not going to reward a person just
21 because he doesn't inflict the fatal blow or doesn't
22 do something that a whole group joined together could
23 do.

24      This is how it reads:  A person is legally

1 responsible for the conduct of another person when
2 either before or during the commission of an offense
3 and with the intent to promote or facilitate the
4 commission of an offense, he knowingly solicits,
5 aids, abets, agrees to aid, or attempts to aid the
6 other person in the planning or commission of an
7 offense.

8          The word conduct includes any criminal act
9 done in the furtherance of the planned and intended
10 act.

11          Keep this one with you at all times.  Read
12 that in conjunction with all of the things that we
13 have to prove to you.  That might sound like a lot of
14 legalese, and that's what it is because it's written
15 by lawyers, and it's written by legislators, but what
16 it really is that it recognizes you might be two
17 separate people who might get together to do
18 something.

19          The best example of that is two people or
20 three or four get into a car.

21          They decide that they're going to go to a
22 bank and do a bank robbery.

23          Only one of those people has a gun.  But
24 I'm in the back seat, and I know that that person has

1 a gun.

2          You might be in the back seat and know that
3 that person has a gun.  You might be in the front
4 seat and know that that person has a gun.  That is
5 the driver who has that gun, and he gets out of that
6 car, and he goes into the bank to commit that
7 robbery, and all three of us just think he's going to
8 rob that bank and inside that person shoots and kills
9 someone.

10          This law, the law of responsibility, the
11 law about strength in numbers says wait a minute.
12 You knew he had a gun.  You knew he was going to
13 commit a bank robbery.  You went along for the ride.

14          Well, you know what?  You're going along
15 for the ride the whole way because if you're in for a
16 penny; you're in for a pound.  There's a lot of
17 phrasing we use.

18          If you are going to run with the pack,
19 you're going to share with the kill.  They're all
20 true.  They are all easier ways of putting together
21 what the law of accountability is.

22          So, when you sit here and you remember what
23 was told, what Tony Hillard did about how he came in,
24 put that gun in his mouth and how he took his gun and

E-232

1 had that with him over a long period of time and that
2 gun maintained in his hands, and this barrel went
3 into Yenka's mouth and went into his head and said
4 where is the money, we're going to take you out.

5          You heard all about that.  Those were his
6 actions.  The law of accountability puts this same
7 gun that Erven Walls had right in his hands.

8          It puts the baseball bat that his other
9 partner had to split over the head of Yinka Jinadu
10 right in his hands, and it puts everything that
11 Delores Jinadu thought about and planned right in his
12 hands and mine, and it puts that other fourth
13 person's gun right in the hands of Tony Hillard
14 because all five of those people stand in the same
15 shoes and are guilty of everything that every one of
16 them did.

17          Now, I've read you the law of
18 accountability.  I've given some themes that I've
19 used before and the judge has probably heard eons of
20 times to explain it, but remember one thing about
21 accountability.  It came out from Yinka.

22          He said in a question from Miss Bormann,
23 well, you don't see the bat man here, do you?
24          And you know he couldn't understand

E-233

1 specifically when she said bat man, thought she said
2 bad man. And he said to her, no, no, they're all bad
3 here.

4        Remember that? Everyone heard those
5 words. They're all bad here. That's the best
6 explanation of accountability you can get because he
7 was so right when he said they're all bad here
8 because everything that he did is attributable to his
9 partners, and everything that they did is
10 attributable to him.

11       So, think about that, that gun, all four of
12 them, that baseball bat, certain people might have
13 had it, but under the law, he's got it all. And with
14 that comes the responsibility for this because when
15 you take these actions and you set out to do
16 something, and something like this results from them,
17 you, ladies and gentlemen, are responsible because
18 that's what our law says, and that's why it was
19 created that way.

20       Take that instruction and keep it with you
21 when you read through what we have to prove to you.

22       Attempt first degree murder. We need to
23 show you that the defendant, Tony Hillard, here is
24 where the accountability comes in, or one for whose

E-234

1 conduct he's legally responsible for it.  You are
2 going to see that in these instructions throughout
3 every proposition, performed an act which constituted
4 a substantial step towards the killing of an
5 individual.

6           He and his partner took a baseball bat and
7 they split open Yenka's head, and he and his partner
8 took a tire iron or chisel or metal rod or whatever
9 it was they used, and they opened up his face with
10 it, and they created such damage that he had to have
11 a plate inside of his face that caused injury to his
12 eye.

13          When you take a baseball bat and crack
14 somebody over the head and you put a tire iron to
15 their face, you don't need to have someone yelling
16 out, I'm killing you, I want to kill you, you know
17 what they're trying to do.  Use your common sense,
18 ladies and gentlemen.

19          And that the defendant or one for whose
20 conduct he is legally responsible did so with the
21 intent to kill an individual.  You know what their
22 goal was when they put a bat to his head and opened
23 it up, when they put a tire iron to his head and
24 opened it up, their intent is not the spoken words of

E-235

1 them, it is the actions of him and his partners and
2 the cruelty and the inhumanity that was suffered by
3 Yinka Jinadu on that night for those nine hours.

4        We have proved each and every element of
5 that offense, ladies and gentlemen.

6        The defendant is charged with aggravated
7 kidnapping.

8        We need to show that Tony Hillard or one
9 for whose conduct he is legally responsible secretly
10 confined Yinka Jinadu against his will.

11       Well, here's the confines.  Show me a
12 better type of confines anywhere, and they weren't
13 bragging about it and calling all of their friends
14 and calling the police and saying it's no secret.

15       They put these handcuffs on him, but that's
16 not enough because now it's time to really take care
17 of matters and put electrical cords and tape and to
18 put all kinds of things we can find from Delores
19 Jinadu's house and come together, and Tony Hillard
20 and Erven Walls, and let's get them together and cuff
21 them and put all of this on him so we can do what we
22 want to do and get what we want from him.

23       It's all about we because they're a group
24 and what one does, the other does and what one does,

E-236

1 the other pays for in responsibility.

2          That the defendant or one for whose conduct
3 he is legally responsible acted knowingly.

4          Clearly, they knew what was going on.  They
5 controlled the whole situation.  And that Tony
6 Hillard or one for whose conduct he's legally
7 responsible had a dangerous weapon and was armed with
8 it.

9          You know that this is the gun that he had
10 on him.  Yenka told you that he had this gun on him.
11 Even if he didn't have this gun on him, you know that
12 someone else in this apartment had this gun and this
13 gun.

14          And no matter which gun you take, they all
15 point right there because whether it's in someone
16 else's hand or his hand, he gets them all, and he
17 gets the two guns that are still out on the street,
18 and he gets the baseball bat that his partner used to
19 split open his head.

20          He's charged with aggravated battery.  We
21 need to show you Tony Hillard or one for whose
22 conduct he is legally responsible knowingly caused
23 great bodily harm to Yinka.

24          Do I need to say anything on this, ladies

1 and gentlemen?

2 He's charged with armed robbery. We must
3 show that the defendant, Tony Hillard, or one for
4 whose conduct he is legally responsible knowingly
5 took property from Yinka.

6 You know that. Yinka told you he had a
7 pager and cellular phone in there. You know at that
8 point in time, when he left there and went to
9 Illinois Masonic, those were gone. That property was
10 taken from him, done so by the use of force or
11 threatening the imminent use of force.

12 Look at the pictures. Was there force
13 there?

14 Someone didn't fall down the stairs here.
15 This was a torture for nine hours and whatever one of
16 them did, the other one did.

17 Lastly, the defendant or one for whose
18 conduct he's legally responsible had on his person a
19 dangerous weapon or was otherwise armed with a
20 dangerous weapon. It's the same thing. He's got the
21 357, the one that's registered to Laretha Hillard on
22 him at that time, and his partners all had guns. We
23 got one of them, but there's two other guns still out
24 there.

1          And lastly, to prove that the defendant
2 convicted of armed violence which states that Tony
3 Hillard or one for whose conduct he's legally
4 responsible committed aggravated battery.  They speak
5 for themselves.  That's aggravated battery.  That
6 should be next to it in a dictionary.

7          This is aggravated battery just as it is an
8 attempt to kill.  And that when he did that, he
9 committed that aggravated battery upon Yinka Jinadu,
10 he had on him that weapon.  This is that weapon.  And
11 this plus this is armed violence.

12         And this plus this is armed violence for
13 all of them, and so are the other two guns, and so is
14 the baseball bat, and so are all of the dangerous
15 weapons they had with them on that day.

16         That is the law coupled with the evidence,
17 ladies and gentlemen.  That's what the judge is going
18 to give to you.  That's what Ann and I have tried to
19 present to you, and we've put our case forward.

20         Yinka Jinadu stood there and told you what
21 he saw and what he experienced.  Think in your hearts
22 and in your minds.

23         Do you think that maybe after he was
24 tortured for nine hours by Hillard and his buddies,

E-239

1 do you think that maybe after he had been beaten and
2 a hole put in his head and eye fractured and couldn't
3 see and he had difficulty seeing, do you think maybe
4 he is forced to run out in handcuffs in his underwear
5 in the middle of the streets of your city?

6          Do you think that maybe he might be a
7 little upset?

8          Do you think, couple that with his accent,
9 he might have a little trouble in communicating
10 exactly what happened to him and laying it out step
11 by step by step?

12          Do you think that that might happen?  Well,
13 that's common sense.  That's the common sense that
14 none of us can give to you.  It's the common sense
15 that you have through every lifetime experience you
16 have, and it's the common sense that tells everyone
17 in this courtroom, specifically that man right there,
18 Tony Hillard, that we know what you did that night.

19          We know what you and your partners were
20 bent on doing, and we listened to Mr. Jinadu, and we
21 heard what he had to say, and we know what happened
22 that night because we heard Yinka and we saw the
23 evidence.

24          We know that on that night, he was beaten,

E-240

1 and he was tortured, and common sense will tell you
2 that after the police continued their investigation
3 and interestingly enough, a woman by the name of
4 Laretha Hillard just happened to own, to have that
5 gun registered at the time of this offense.  And it
6 just so happened that this gun was in the apartment
7 when the police went there, and that after speaking
8 with Laretha, they found Tony Hillard.

9          Your common sense tells you that he was
10 there, and we know that he was there.  We know that
11 he was there with all of his partners when they set
12 out to commit these crimes.

13          Ladies and gentlemen, what common sense
14 tells you is it's time right now to stop all of
15 this.  That the responsibility must be placed
16 somewhere, and your job as jurors and the oaths that
17 you took on Monday is to follow the law, to follow
18 what you told Judge Toomin that you would do.

19          You said that if you have that law that you
20 would find the defendant guilty if we proved each and
21 every element of that offense.

22          You know what?  When you look through all
23 of those instructions, you are not going to find
24 anything in there that says well if a man might come

E-241

1 to this country and might do something and might
2 obtain worldly possession and might have a car, you
3 don't have to believe that person because he's a drug
4 dealer.

5         You are not going to find anything in there
6 at all.  You are not going to find anything in there
7 that will say we are not going to believe you just
8 because of who you are.

9         You are going to follow the law, and you
10 are going to take responsibility and put it where it
11 solely belongs because it belongs on the partner
12 here.  It is one working with two working with three,
13 working with four, working with five, and everyone
14 knows the damage that you can do with a fist versus a
15 finger and, ladies and gentlemen, that responsibility
16 should be placed right here on Tony Hillard.

17         When you go back there, take a look at
18 those instructions.  You remember the law.  You look
19 at all of this evidence, and you remember the
20 testimony.

21         I'm confident you'll come back and tell us
22 that's where the responsibility lays, that he is
23 guilty as charged of each and every one of those
24 crimes.  That when he ran with the pack, it's time to

1 share in the kill. And that when he put his penny
2 in, here comes the pound.

3        And reaffirm what Yenka told all of us,
4 that they're all bad, right there. They're all bad,
5 right there. That is badness right there, and that
6 is guilt.

7                CLOSING ARGUMENT
8                BY MS. BORMANN:

9    MS. BORMANN:   Thank you, Judge.

10        Good afternoon. I'm sorry, ladies and
11 gentlemen; I always seem to be a bit behind.

12        You know, what happened in this case is a
13 terrible thing. And as Mr. Roddy said, we agree on
14 this.

15        It doesn't matter whether this guy's a drug
16 dealer or whether he's not.

17        Nobody deserves to have what happened to
18 this guy happen to him. That's not the issue in this
19 case.

20        If Mr. Roddy or Miss Curtiss thinks it is,
21 then they've made a mistake. They have been
22 listening to Mr. Franks' cross-examination and not
23 mine.

24        We don't think it matters. The only thing

1 that matters here, the only issue before you is

2 whether or not the State has proven beyond a

3 reasonable doubt that my client, Mr. Hillard, was

4 there and in order to prove that, they have to put

5 before you credible, believable evidence.

6         Mr. Roddy told you during his part of the

7 opening and Miss Curtiss is going to have another

8 chance to address you when I'm done because the State

9 does have a burden of proof beyond a reasonable

10 doubt.

11         They are going to try to answer questions

12 she's going to bring up before she gets there, and

13 I'm going to try and talk a little bit about what Mr.

14 Roddy said, but Mr. Roddy said that the most

15 important instruction is the accountability

16 instruction.

17         Well, I disagree with him. They are in

18 fact one of the instructions that you are going to

19 receive in this case.

20         You must not single out certain

21 instructions and disregard others.

22         You must use all of the instructions in

23 this case, every single one of them.

24         And in this case -- and I have to bring it

1 up because I had this happen before with juries.  You

2 understand that you don't have to believe a witness.

3          You don't have to take what somebody says

4 up there as the God's truth just because they said

5 it.

6          In fact, Judge Toomin told you that earlier

7 when you were all being picked.  Just because Yinka

8 Jinadu says it's a fact doesn't mean it's a fact.

9 You have to apply common sense.  I agree with Mr.

10 Roddy on that one.

11          Now, it was a terrible thing that happened

12 to Mr. Jinadu.  Nobody is disagreeing with that.

13          And the only worse thing in this case would

14 be is if you convicted an innocent man, and my client

15 is innocent.

16          That would be a worse thing because Mr.

17 Jinadu now can go home.

18          If you convict Mr. Hillard, an innocent

19 man, he's not in that situation.

20          Each of these charges in this case is

21 incredibly serious.  Judge Toomin told you that --

22 each of them.

23          When you go back there to deliberate and

24 you're determining whether or not the State has

1 proven any one of the charges, remember that.  They
2 are all very, very serious charges.

3          Let's talk a little bit about Yinka
4 Jinadu.  Who is he?

5          We know a little bit of information.  We
6 know that he was married to a woman named Delores
7 Jinadu.  I think they were married in 1995 for
8 approximately two years, and they were separated at
9 this time.

10          We also know he was paying her rent,
11 although he told Mr. Roddy he was paying the rent.
12 And then when Mr. Franks asked the question, he said
13 that he was supporting her.  And then when I asked
14 the question, he said, no, I wasn't supporting her, I
15 was paying the rent.  But at any rate, we know he was
16 paying at least part of the rent.

17          We also know that he was still sleeping
18 with his wife at that time although he had a fiance,
19 and that -- that he had been to that apartment at
20 least five times I think he said at least to the
21 building five times in the past.

22          We know that that apartment was a drug lab,
23 and how we know that is because of the evidence that
24 was found there.

1          I mean, nobody here -- who's fooling who?
2  Who's fooling who?  Bottles of white powder called
3  super lactose, breathing masks, scales that measure
4  less than a gram, hundreds of plastic baggies.

5          What does that sound like to you?  Does it
6  sound like a drug lab?  It is.

7          Mr. Jinadu also strikes you as the kind of
8  person who likes to be in control.

9          Do you think for a moment that Mr. Jinadu
10 would pay any part of his wife's rent without knowing
11 exactly what went on in that apartment?  Of course
12 not.

13         He strikes -- well, we know that he's a --
14 he strikes me as a precise man.  Remember -- I found
15 it very interesting because in the ten years that
16 I've been a criminal defense lawyer, I've not ever
17 seen somebody testify after they've been beaten so
18 badly that they looked at their watch.

19         This is a man who is borderline anal
20 retentative.  I mean, he looks at his watch when he
21 first wakes up so he knows exactly what time it is.

22         This is a man who is precise, and that is
23 incredibly important.

24         Why is that important?  Because when he's

1 not precise like he was yesterday on the stand,

2 there's a reason for it, and it has nothing to do

3 with language barriers.

4         Now, we know he is a Nigerian citizen

5 living legally in the United States.

6         We also know that he owns three cars, a

7 Lexus, a Toyota, and a Land Cruiser.

8         He says that he is actively involved with a

9 business.  He also says that he has no insurance, or

10 at least in May, he didn't have any health insurance,

11 May of 1997.

12         We also know that he's a large man.  He's

13 very, very bulky, and I got a direct view of that

14 when we were doing the direct examination regarding

15 handcuffs.  He's a very large man.

16         We also know that in this case he is the

17 only witness -- the only witness.  Everything else

18 the state's attorney put on in this case is window

19 dressing.

20    MR. RODDY:    Objection, Judge.

21    THE COURT:    Sustained.

22    MS. BORMANN:    Well, in order to convict in this

23 case, there's only one witness that matters.

24         And in order to convict, in order for each

1 of you to agree that there is proof beyond a

2 reasonable doubt in this case, you have to believe

3 Mr. Jinadu.

4         The law is that one credible witness is

5 enough to convict.  Credible, an important word.

6 It's important because one of the instructions that

7 you are going to receive is this.

8         The believability -- oops, wrong one.  Only

9 you are the judges of the believability of the

10 witnesses and of the weight to be given to the

11 testimony of each of them.

12         In considering the testimony of any

13 witness, you may take into account his ability and

14 opportunity to observe, his memory, his manner while

15 testifying, any interest, bias, or prejudice he may

16 have, and the reasonableness of his testimony

17 considered in the light of all of the evidence in the

18 case.

19         Now, what that tells you, ladies and

20 gentlemen, is just because somebody says it's a fact

21 doesn't mean that it's a fact.

22         You have to determine that from all of

23 those things, all right?

24         Now, let's talk about why there's a problem

1 with Mr. Jinadu's testimony in this case, all right?

2          I've never personally met Mr. Jinadu. He's

3 a State witness, okay? I don't know what's going on

4 inside of his head. I don't know whether he is

5 mistaken in this case or whether he is not being

6 truthful.

7          We don't know. You will never know. It

8 just won't happen, but we have certain indicia --

9 certain indications of one of those two things, and I

10 want to go through them.

11          Now, I'm going to miss some of them, and I

12 want you to bear with me because I know that you paid

13 all attention to this, so you caught a lot of them,

14 but I'm going to go through some of the

15 inconsistencies just to highlight them, okay?

16          First of all, he told you that he never

17 told the police that he was aware on May 10 of 1997

18 that his wife's car had been in an automobile

19 accident, and that it might be inoperable.

20          Well, we know that's a lie because when I

21 asked Detective Bradley just a few moments ago about

22 that, he said, yeah, he said that to me.

23          He also denied adamantly on the stand ever

24 telling anyone that these people that held him had

1 demanded drugs from him.

2        Now, why is that?  We know it's not true.
3 We know that the people who are holding him demanded
4 drugs from him.

5        How do we know that?  Because on two prior
6 occasions, once to -- well, actually to a detective
7 in the case and also to the original officers in the
8 case, to Schmidt and Ramirez, and also to Detective
9 Bradley, two separate occasions, he said the same
10 thing.

11        One was they demanded drugs of his friends
12 and associates in order for his return.  The other
13 one was they demanded drugs from him in order to let
14 him go.

15        So, some inconsistency there, but still
16 involving drugs.  Why is it that Mr. Jinadu wouldn't
17 want to be truthful about that where things happen.

18        Now, I wish we had a layout of the room
19 because this man when he talks to people -- I
20 understand that he's got -- he's got an accent, but
21 it isn't that heavy.

22        I understood him, unless he was too soft,
23 and then I had to ask if he spoke louder, and I'm
24 guessing he did, and I hope you did.

1        He has different things happening all over
2 the place. At one point, you know he's being hit
3 with an iron in the living room. I am sorry. No, he
4 testifies today or yesterday that he was hit with the
5 iron in the bathroom, but we know that he told the
6 detective in the case that he was hit by the iron in
7 the living room.

8        We also know from the testimony yesterday
9 that he said that he was hit by two people with a
10 tire iron, but we know that he told the detective
11 that he was only hit by one person with the tire
12 iron.

13        Did the facts change between May 12 when
14 the detective talked to him and yesterday? No, they
15 didn't. I'm going to skip on where things happened.
16 There's a bunch of them. What people were doing at
17 the various times.

18        Okay. Big deal, right? He says that he
19 walks out -- this is an identification case, all
20 right?

21        Is Tony Hillard one of the guys who was
22 there?

23        So, in order for the State to have a strong
24 case, they have to have the opportunity to observe,

E-252

1 and we're going to talk about that instruction in

2 just a moment, all right?

3        So, the more opportunity that this guy has

4 to observe in his mind, the greater the this case is,

5 okay?

6        Does he just see him in the apartment with

7 a mask on?  No.  He says that he sees him outside in

8 front, except that he testifies that he sees two guys

9 out in front and on prior testimony, ladies and

10 gentlemen, in front of a jury, much like yourselves.

11     MR. RODDY:    Objection, Judge.

12     THE COURT:    Objection sustained.  It's not like

13 themselves.

14     MS. BORMANN:    It's a grand jury.  There is no

15 defense attorney.  There is no defendant there.

16        A grand jury, when only a state's attorney

17 was questioning him, he told the grand jury that

18 there were three people out there, and when Miss

19 Devereaux asked him who were the three people, he

20 said a black guy, light guy, and the do nothing guy,

21 the guy that never said anything.

22        Now, did it go from three to two?  Did the

23 facts change?  No, they didn't change.  Mr. Jinadu

24 couldn't keep it straight.

1           There are many more things that were
2 inconsistent in terms of what people were doing
3 between what he said yesterday on the stand and what
4 he told the detectives and what he testified to
5 earlier in front of the grand jury and what he told
6 the original officers, and we went through all of
7 that, and I know that you paid attention so I'm not
8 going to talk about it. I want to bring up a couple
9 of things, though.

10          I want to bring up when he became
11 inconsistent during the same testimony. This man
12 testified during one day.

13          Between direct and cross-examination, this
14 man could not remain consistent, and I want to direct
15 your attention to those things.

16          Do you remember when the state's attorney
17 was asking him -- and it was Mr. Roddy -- asking him
18 about the guns in the mouth? And he said that -- he
19 made a big -- I don't blame him.

20          If somebody put a gun in my mouth, it's a
21 horrible thing. It's a horrible, horrible, horrible
22 thing, something that would stick with you until the
23 day that you died. It would be burned in your
24 memory, a person's hand -- hand -- hand right up in

1 your mouth with a gun barrel shoved down it. It
2 would be memorable.

3          You would never forget the circumstances,
4 except in this case, this man testified on direct
5 examination that my client, Mr. Hillard, did that.

6          And then on cross-examination, I brought up
7 the fact that at a prior proceeding in front of the
8 grand jury under oath, he had testified differently,
9 that he had testified that Erven Walls had done this
10 act to him, putting the gun in his mouth.

11         Did you notice something interesting
12 happened?  What you should have noticed is all of a
13 sudden, his story changed.  Oops.  I mean, well, it
14 wasn't just one guy that did it.  Now, it's two guys
15 that did it.

16         Now, nowhere, anywhere in this entire case
17 and we -- we talked about the police officers who
18 interviewed this guy.

19         You heard them testify.  Nowhere did this
20 man ever tell anybody that someone put a gun in his
21 mouth, let alone two people put guns in his mouth.

22         Why is that important that he never said
23 those things?

24         It's important for the same reason that I

E-255

1 just told you. This would be such a memorable
2 incident. It would be one of the first things that
3 you would tell somebody -- one of the first things.
4        Now, there's another -- so, that was some
5 testimony that changed from direct to cross.
6        The other thing that changed which is
7 really interesting and -- let's see if I can find it
8 here. Bear with me while I look for it in the
9 transcript because I want to quote it. All right.
10       Mr. Roddy during direct examination of Mr.
11 Jinadu. Sir, I'll show you what's been marked as
12 People's Exhibit Number 8 for identification, this
13 gun, without the tape around it.
14       Do you recognize this, sir? Mr. Jinadu's
15 answer: Yes, I do.
16       Question: What do you recognize this as?
17 Answer: As the revolver that Walls, that's the gun
18 he -- that's the gun he used to point to my head.
19 And you recognize this -- Mr. Roddy asking and you
20 recognize this how, sir? Answer: As a revolver.
21       MR. RODDY:   I object to her characterization
22 of the questions. The jury can remember how the
23 questions were asked.
24       THE COURT:   Sustained.

E-256

1      MS. BORMANN:   You recognize this how, sir?   As

2 a revolver, as a handgun.

3          Was this one of the guns used against you

4 that night?  Answer:   Yes.

5          That's the gun that guy right there

6 pulled.   Indicating.   Mr. Roddy speaking.

7 Indicating, for the record, who are you pointing to?

8 Answer:   Walls.   Question:   Indicating Mr. Walls?

9 Answer:   Yes.

10          Now, the reason that this is so important

11 is this.

12          This is the gun they're saying is

13 registered to somebody named Laretha Hillard who

14 knows who she is.   I don't know.   You don't know.

15 Nobody here knows, okay?

16          But they're saying that this gun is

17 registered to somebody named Laretha Hillard.

18          Now, I suppose they're going to get up and

19 argue, boy, they have the same last name.   Boy,

20 that's sure a coincidence, isn't it?   This is the

21 gun, this one without the tape that's registered to

22 person with the same last name as my client, by the

23 way, also with the same last name as the

24 Superintendent of Police of Chicago, Terry Hillard,

1 and it's not pronounced Hillard. It's pronounced

2 Hillard, H-i-l-l-a-r-d.

3       Now, this gun stuck out, and I'm going to

4 comment on the demeanor of the witness up there.

5       This was an interesting little thing that

6 was happening here because it was very apparent if

7 you were watching that Mr. Roddy did not -- was

8 surprised by the answer.

9     MR. RODDY:   Objection.

10     THE COURT:   Sustained.

11     MR. RODDY:   I ask her to refrain from this type

12 of argument because it's not relevant. It's

13 improper.

14     THE COURT:   Continue.

15     MS. BORMANN:   Thank you.

16       This gun -- this gun is now put in the

17 hands of Erven Walls by Mr. Jinadu, this gun, this

18 one with the tape around it and the white on the

19 bottom. This one then according to Mr. Jinadu during

20 the same group of testimony is then attributed to my

21 client, okay?

22       Now, this is a problem for the State

23 because this gun that now we have in Mr. Walls' hand

24 is the one registered to Laretha Hillard, and what

1 good is that to the State's case?  It doesn't help

2 them at all.

3           Now, Mr. Roddy commented on it.  In fact,

4 when he made his argument and he said it doesn't

5 matter who held what gun because they are all

6 accountable.

7           Well, I guess that's one way of addressing

8 it.  But if a guy isn't there, then it does matter,

9 doesn't it?

10          You remember something in this case --

11 well, after all of this, after Mr. Jinadu said Mr.

12 Walls is holding Number 8 and -- and -- and that Mr.

13 Hillard was doing Number 9, Mr. Jinadu changed his

14 testimony, and it was during the time that Mr.

15 Franks, the attorney for Mr. Walls, was questioning

16 him, and then he changed it all around again.

17          And that's why I addressed it when I got up

18 there and I asked him, which is which, and then they

19 stayed this way, I think.

20          So, at any rate, he changed his testimony

21 from one to the other because the truth is he

22 probably doesn't know.  This was a horrible thing

23 that happened to him.

24          Now, he also interestingly enough and -- is

1 the photo over here?  You'll have a chance to see
2 this.

3          This is the lineup photo.  This is the one
4 that Mr. Jinadu said that they were sitting down, but
5 it was similar to the lineup he saw because when he
6 saw it, they were standing, okay?

7          Now, Mr. Jinadu, I asked Mr. Jinadu, is Mr.
8 Hillard the only light-skinned black there?  He said
9 no.

10          Now, you will all have a chance to take a
11 look at this, and Mr. Hillard's complexion sticks out
12 like a sore thumb in this photograph.

13          It's not a difficult question.  It wasn't a
14 difficult question.  I didn't intend it to be a
15 difficult question.  It just happens to be the
16 truth.

17          He is the only light-skinned guy in this --
18 in this lineup.  And when Mr. Jinadu gave me a hard
19 time, answered no about that, that told you something
20 about him.  Think about that, very simple question.

21          He also testified that he doesn't know --
22 well, actually he testified that he never described
23 the person, offender number two, as having a medium
24 complexion.  Remember, I didn't fill it in because he

1 didn't say that.

2         He told me that he knows light, and he
3 knows dark, but he doesn't know medium.

4         Now, we heard from the officers that, in
5 fact, Mr. Jinadu described this offender as having a
6 medium complexion.

7         Does Mr. Jinadu know what medium is?  I
8 suggest to you, ladies and gentlemen, that he does.

9         Now, there is some inconsistencies in his
10 testimony in one day.  I want to talk a little bit
11 about impossibilities because there were a couple of
12 those, too.

13         He testified unlike every other witness
14 here that he had never been prepared to testify by
15 the state's attorney.

16         Do you think for a moment that experienced
17 prosecutors such as Miss -- Mr. Roddy and Miss
18 Curtiss would put a witness on the stand without
19 knowing what he's going to say?  Of course not.  It's
20 Law 101.

21         So, why would Mr. Jinadu -- I mean, every
22 other -- yeah, you were prepared to testify?  Yeah,
23 we looked at my reports.  I talked to Miss Curtiss.
24 Why would Mr. Jinadu deny that?  Why?

1          Big impossibility, these two instances of
2 chain, okay, behind the back.  This is what he
3 testified to.

4          He testifies -- now, when the police find
5 him and when they photograph him, he's -- he's
6 clearly handcuffed.

7          There is no doubt that this happened to
8 this man, but I want to talk a little bit about --
9 you know what the problems are here, why it is that
10 they're -- that there's some problems.

11          He testified that when -- he's in front
12 here, and this is a horrible picture, and this is a
13 horrible thing, and no one deserves this.

14          It's shocking you guys haven't seen it
15 yet.  You will have plenty of time to see if it's
16 shocking, but you'll notice that he's handcuffed in
17 the front, and you'll notice -- it looks like he is
18 trying to pull his hands apart there, but you can
19 see -- you can't get your hands very apart in those,
20 right?  It's really hard to do because it's
21 handcuffs.

22          And he tells you that -- I'm having a hard
23 time putting my hands back like that.  His hands are
24 like this, two inches apart, and he somehow manages

1 to get them without uncuffing them over his head and
2 in the front.

3          Police handcuff people behind their back so
4 that can't happen.

5          There are torture methods.  Those of you I
6 hope -- maybe, some of you have served in the wars.
7 There are torture methods that involve pulling back
8 people's arms when they're cuffed together because
9 it's incredibly painful.  The arms don't go over the
10 head.  Even Houdini had to have secret tricks to do
11 things.  Mr. Jinadu is not Houdini.  Mr. Jinadu is a
12 person who is at this point aggrandizing his own
13 powers.

14          Now, again, do we as the Defense, know
15 why?  I don't know why.  We don't know why.

16          Ladies and gentlemen, there's just stuff
17 that is plain wrong on this, just wrong.

18          Hillard Exhibits Number 1 and 2.  Number 1
19 is a patient discharge instructions given to a
20 patient when they're going to leave the hospital, and
21 then it has all of the follow-up treatment and
22 stuff.

23          Mr. Jinadu testified that when Mr. Roddy
24 asked him, that he spent seven days at Illinois

1 Masonic Hospital, but we know that's not true.

2        We know he was discharged on May 13.  He
3 spent three days which is bad.  Don't get me wrong.
4 Nobody wants to spend even one day inside of a
5 hospital.  I was in a horrible car accident five
6 years ago and had to spend--

7      MS. CURTISS:    Objection.

8      THE COURT:    Mere argument.

9      MS. BORMANN:  · -- two weeks in the hospital.  I
10 can tell you exactly what day I was admitted and
11 exactly what day I was released because it is a
12 horrible experience.

13       Mr. Jinadu told you that he was in the
14 hospital for seven days, more than twice the number
15 of days that he actually spent at Illinois Masonic
16 Hospital.

17       And when I tried to confront him with this,
18 when I showed him his signature and the date next to
19 it, do you remember that?  I mean, I couldn't get a
20 straight answer.  It's 5-13, sir.  No, it's 5-15.
21 Sir, it's 5-13.  And then I would point to it oh,
22 well, I don't remember getting this.

23       Then I said, sir, these are your
24 instructions.  These are your follow-up cares,

1 right? It says you're supposed to go to out patient
2 on the 16th and on the 15th somebody else, right?
3 Oh, yeah. Oh, yeah.

4 Why would Mr. Jinadu give me such a hard
5 time about that? And then -- and then the
6 prescription from Cook County for Tylenol and an
7 antibiotic issued upon his discharge, seven days
8 after he was admitted for plastic surgery when he
9 testified that it was nine. Why would he give me a
10 hard time?

11 The instruction that I told you about
12 earlier tells you that you may consider the demeanor
13 of a witness while testifying.

14 Actually, I think the exact word is a
15 manner while testifying, and that's an important
16 thing that we have as human beings in determining
17 whether or not somebody is credible or whether or not
18 somebody is mistaken for that matter.

19 The state's attorney, I'm going to
20 anticipate when Miss Curtiss gets up here, she's
21 going to tell you what Mr. Roddy did already. There
22 is a huge language barrier. That's the reason why
23 everyone is misunderstanding this man.

24 No, no. Mary Pat Devereaux during the

E-265

1 grand jury testimony, and you heard the transcript of
2 that heard him say three, and she repeated three.
3 She said and the three people you saw and he said,
4 yes, the three people I saw, and she said the three
5 people you saw were A, B, and C, and he said, yes,
6 the three people I saw were A, B, and C.

7         That's a language barrier?  For whom?  Mary
8 Pat Devereaux, an assistant state's attorney.

9         This man did not have a language barrier
10 when Mr. Roddy was questioning him.  Not once did he
11 stop Mr. Roddy and say, I don't understand -- not
12 once.

13         Yet, when I got up to cross-examine him and
14 I think I speak English, you know, I'm kind of nice;
15 everything became an issue.

16         I remember at one time Judge Toomin saying
17 maybe he doesn't understand the word testify.  So, I
18 asked him -- remember he gave me a hard time about
19 some question.

20         I had to ask it three or four times.  And
21 then a little later on, I asked him, you know what
22 testify means?  He said, oh, yeah, that means like
23 under oath.  He didn't have a language barrier.  He
24 understood.  He just didn't like to have to give the

1 answers that he had to give, but there was no huge

2 language barrier.  Yes, he speaks with an accent.  My

3 grandmother spoke with an accent.  It didn't mean I

4 couldn't understand what she said.

5         He also, as you heard from Detective

6 Bradley from his prior transcript, was able to speak

7 clearly during their interview, and this was in a

8 hospital three days after this -- two days after this

9 had occurred.

10        He also did something that is -- and I mean

11 maybe I deserved it, I don't know, but he rolled his

12 eyes at me.  He laughed during various parts of my

13 cross-examination.

14        Now, I represent a guy whose liberty is at

15 stake, an innocent guy.  This man is laughing,

16 pretending like he couldn't read.

17        I have the prescription in front of me, a

18 prescription that was given to him when he got

19 discharged from the hospital.  Do you remember that?

20 Pretending like he couldn't tell what a T looked

21 like.  Why?  Why?

22        Enough.  Let's talk about the evidence.

23 The evidence is Mr. Jinadu's testimony.  The evidence

24 also is the testimony of all of the other witnesses

1 combined with some of the physical evidence which
2 you'll get back in the jury room.

3       Now, in order to determine whether evidence
4 is reliable, there are a lot of things we look at.

5       For instance, in the identification
6 testimony -- I don't have that instruction.  The
7 judge will instruct you that one of the things that
8 you are to consider in determining whether -- here we
9 go.

10      When you weigh the identification testimony
11 of a witness -- and remember you are the only judges
12 of the weight to be given to any testimony, all
13 right?

14      We already talked about that.  So, when you
15 weigh -- in other words, when you determine whether
16 or not an identification must be made in in case you
17 should consider all of the facts and circumstances in
18 evidence, including but not limited to the
19 following:  One of them is the witness's earlier
20 description of the offender.

21      That's why this is so important.  This man
22 had a horrible thing happen to him.  And when he was
23 finally able to escape and he got the attention of
24 the police, they calmed him down, remember, so they

E-268

1 could discuss with him what had occurred.

2          And they got a version of the events from
3 him that included descriptions, okay?

4          And the descriptions were of a -- of a
5 woman, Delores Jinadu, a Germaine Craine, and Erven
6 Walls, no name, and then later we find out this
7 Germaine doesn't actually belong to this.  So, just
8 two -- two regular descriptions, okay?

9          Now, the state's attorney, Mr. Roddy, asked
10 the detective, well, doesn't Tony Hillard just like
11 have an average -- isn't he just an average person?
12 Excuse me.

13          This is an identification case.  There has
14 to be something more than he's just an average guy.
15 There has to be something more than that.  Let's talk
16 about this for a moment, okay?

17          My client has brown hair is 5 foot 10 and
18 170 pounds, obviously not this guy.  The guy that the
19 detective said after they arrested my guy, Germaine
20 Craine we know now the name is not Germaine Craine
21 but this guy, defendant number two.  They think this
22 is the guy, okay?

23          This is the guy who is described by Mr.
24 Jinadu as a guy with an unknown height.

1          Now, according to Mr. Jinadu, my client
2 accosted him in several places, all right, the living
3 room, the bathroom, and did a bunch of horrible
4 things to him.

5          Do you think for a moment that the offender
6 who did that, whomever it is, would have a height
7 that was unknown to the victim?  No, especially in
8 light of the fact that he can give the height of
9 everybody else.  That doesn't make any sense.

10          Mr. Jinadu -- this person probably only saw
11 the clothing description.  This person also has black
12 hair and a medium complexion.  We know that my client
13 is light-skinned, and we know that my client has
14 brown hair.

15          This person was also wearing blue jeans and
16 a red jacket.  In fact, we have clothing descriptions
17 on everybody, except for Erven Walls and Delores
18 Jinadu.

19          So, the three supposedly unknown offenders
20 at this point, one was wearing blue jeans and a red
21 jacket.  One was wearing black jeans and a red
22 pullover, and one was wearing a blue jacket and gray
23 jeans.

24          Interesting thing to note.  Not once did

E-270

1 Mr. Jinadu during his examination in this case ever

2 describe what my client was wearing that day.

3         Now, if he's supposed to be one of these

4 three guys, the guy wearing the blue jeans and the

5 red jacket or the guy with the black jeans and red

6 pullover or the guy with the blue jacket and the gray

7 jeans, don't you think we would have heard about it

8 just once?  That would be -- that would be some

9 corroboration.  It doesn't exist.

10        Now, the reason that those prior

11 descriptions are important is not just because the

12 jury instructions says they are.  The reason they are

13 is our common sense.

14        When -- do you remember that telephone game

15 that you used to play when you were a kid?  You have

16 a string and you have two cans at the end and then

17 one person says something and you can hear the other

18 one.  And then you would pass it down.  And then

19 there would be another group of kids.  And by the end

20 of the whole line, what started out as John Smith was

21 a patriot became Donna Jones wears red underwear.

22 Remember that game?

23        Well, that's -- the thing that starts out

24 is the most reliable, okay?  That's kind of just a

1 basic rule of how this thing works out.

2          And it gets changed over time because
3 people make mistakes or because people are
4 suggestable.  We all know that.  That's why
5 advertising works, right?  If we weren't suggestable,
6 why would McDonald's bother having commercials,
7 right?

8          We see McDonald's commercials and see fries
9 and we want.  Well, people react like that.  It's
10 human nature, and we want to, and I'm sure Mr. Jinadu
11 in this case wants to help the police.

12          So, the police put a light-skinned guy in a
13 lineup, and the only one, and that's the guy who gets
14 identified.  That's what happened in this case.  Mr.
15 Jinadu told you that.

16          I want to talk about something that
17 actually happened -- well, we'll get to that with the
18 physical evidence.

19          The gun involved.  Remember I said that's
20 the gun, and whether it's this gun or this gun, as
21 Mr. Roddy said in the State's position, it doesn't
22 really matter and their position has to be that
23 because the victim changed his testimony.

24          But let's assume for a moment that it's

1 this gun, and he has it in his mouth, and he is

2 holding it in his right hand and his hand is right

3 there, okay?

4        He's got the top of the hand right there.

5 My client has a tattoo that says love in big dark

6 letters on the top of his right hand, something that

7 the police noticed when they arrested him, something

8 that Mr. Jinadu never described to anybody.

9        Do you think that if you had somebody

10 holding a gun to your mouth like that with that close

11 that you might notice that?

12        Of course you did.  That's because the

13 person, the offenders that did this in this case were

14 not my client -- were not my client.

15        It's an interesting little thing because

16 actually one of the questions that Mr. Roddy asked of

17 Mr. Jinadu during direct examination when he wasn't

18 having a problem understanding was did you notice --

19 talking about Tony Hillard, did you notice anything

20 about his hand exact words.

21        Did you notice anything about his hand?

22 And do you know whether Jinadu said yeah there was a

23 gun in it -- not, yeah, the hand -- not -- Mr. Roddy

24 didn't ask what was in his hand.

E-273

1         Did you notice anything about his hand?
2 Yeah, it had a gun in it.  Nothing about a big tattoo
3 that says love right across the top of his hand.

4         Okay.  Here we go.  Physical evidence.
5 This identification.  There are, I believe, a total
6 of eight pieces that are recovered -- this is an
7 inventory slip, this is not in evidence.

8         There's a total of eight pieces of evidence
9 recovered in the apartment where Mr. Jinadu was
10 held.  They are -- we've been through them, okay?
11 But now you are going to have a chance to see them.

12        There's only one of these pieces of
13 identification that has -- there's only one -- do you
14 have the driver's license?  Do you have the driver's
15 license, Delores Jinadu's license?  Thank you.

16        These are paper identification and photo
17 identification, okay?  Paper, photo.

18        Delores Jinadu's driver's license is the
19 only piece of evidence in this entire case that has a
20 height and a weight on it.  None of the rest of this
21 does.

22        This photograph, that's Germaine Craine.
23 And the guy said -- Mr. Jinadu told us that one of
24 the other offenders looked like Erven Walls, but

1 whether this is Erven Walls or somebody named

2 Germaine Craine, who knows?  It doesn't have a height

3 and a weight on it, okay?

4           And the two Social Security cards are just

5 your basic Social Security cards which is two

6 different people with two different numbers, no

7 heights and weights, birth certificate which I guess

8 probably has the height and weight of Erven Walls

9 when he was born, but I don't think that that really

10 matters now, and the driver's ticket which doesn't

11 have any height and weight on it either, okay?

12          So, there is no height and weight on any of

13 this identification.

14          So, it is interesting that Mr. Jinadu would

15 deny giving heights and weights on all of these

16 people.

17          Are we expected to believe that the police

18 made it up?  After all, there's only one witness in

19 this case, right?

20.          It's Mr. Jinadu.  Of course, the police

21 didn't make it up.

22          Of course, Mr. Jinadu provided that

23 information.  Use your common sense.  Now, one more

24 thing, one interesting thing, and Miss McBeth did the

1 cross-examination of -- of Officer Schmidt.

2          Now, Officer Schmidt had been prepared to
3 testify by the State and on direct, he testified that
4 he did not show the paper and photo identification to
5 the victim and that -- and that the victim did not
6 positively identify offenders that are known to him
7 from this identification, okay?

8          Except that in his police report are
9 written these exact words signed by Detective -- or
10 Officer Schmidt and also Officer Ramirez.  The victim
11 positively identified the photo ID and the paper ID
12 as those of the offenders who are known to him.
13 Where did that come from?  We know the officer didn't
14 make it up.  Paper ID, photo ID.

15          Okay.  The registration.  You are going to
16 get this in the back.  It's actually posted on a
17 piece of blue construction paper.  It says that --
18 this is a document kept in the police department, and
19 it has a picture of a black woman, sort of a mug
20 shot -- you can't see it -- named Laretha Hillard.
21 That person lives at 1230 North Larabee or at least
22 did at this point in Chicago and had a gun registered
23 which turned out to be this gun here, the one that
24 Mr. Jinadu originally said was Erven Walls.

1          Now, you heard the detective testify that
2 he spoke with someone named Laretha Hillard and we
3 didn't get a date or anything like that, and --
4 okay.

5          So, he spoke to Laretha Hillard and I guess
6 the State is going to get up here and tell you that
7 you should infer from this because it's the same last
8 name that it's something that has to do with Tony
9 Hillard except, ladies and gentlemen, the country
10 doesn't work like that.

11         We demand evidence, proof -- proof -- proof
12 beyond a reasonable doubt, not innuendo, not the
13 person in this picture had the same last name,
14 therefore, it must be the guy.  Yeah, it's why
15 they -- I guess that's why they arrested Tony
16 Hillard.  Does the same name match?

17         I mean, the officers, Patterson and Bryant,
18 knew the area, knew Mr. Hillard, okay?  So, I guess,
19 you know, that's why the detectives brought them with
20 them.  You know, they probably did this thing where
21 they're like, anybody know any Hillards in the area?
22         My client lives at 714 West Division, not
23 1240 North Larabee.  And if the State wants you to
24 rely on this evidence to show that there's like some

E-277

1 connection between this Hillard and my client, why
2 don't they bring in this person?

3          Who is Laretha Hillard?  Who is she?  No.
4 Instead, they like to have you speculate, speculate.

5          We're going to convict an innocent man
6 based upon speculation?

7          If you do, then you're not doing your job,
8 doing your job and doing what you promised me that
9 you would do earlier, which is hold the State to
10 their burden of beyond a reasonable doubt.

11          Now, it's not always a popular thing to
12 do.  But if you don't hold them to the burden of
13 beyond a reasonable doubt, then we can forget the
14 Magna Carta that sits above the judge here, and we
15 can forget our Constitution.

16          Back in England, a long, long time ago,
17 what happened was like somebody would be tried, they
18 would have one person come in and just get up and
19 say, okay, Tony Hillard did this, that's right.  Tony
20 Hillard did this.  Put him to death, send him to jail
21 for 50 years, whatever, and then that would be it,
22 and the person would be sentenced to death or
23 sentenced to 50 years or whatever.

24          Our system of government works differently

1 than that.   Thank God.   That's why we have
2 cross-examination.

3          It's not designed to trick anybody.   It's
4 designed to get at the truth.   That's why we have
5 juries.   That's why we have proof beyond a reasonable
6 doubt, and that's why we require something more than
7 a same last name, not even a name like Koniewicz.

8          We're talking about a name that is so
9 common that the Superintendent of the Chicago Police
10 Department shares the same last name as Laretha.

11          Is Laretha Hillard married to Terry
12 Hillard, the chief of police?  I don't know, maybe.
13 We don't have any evidence of it, but we don't have
14 any evidence to the contrary either because the State
15 who is required to put on the evidence in this case
16 chose not to.   They want you not to use your
17 God-given brains and to be freaked out, excuse my
18 vernacular, here by these pictures and be so upset by
19 what happened to Mr. Jinadu that you just overlook
20 the fact that they didn't bring in any evidence to
21 connect this with Mr. Hillard.

22          Don't you think that if the evidence
23 existed to connect it with Mr. Hillard, you would
24 have heard about it?  Yes, yes, yes.

1         If there were any evidence besides the

2 testimony of Mr. Jinadu in this case to connect Mr.

3 Hillard to this case, you would have heard about it

4 because Mr. Jinadu's testimony was impeached.

5         So, if there was any corroboration out

6 there to connect Mr. Hillard with this crime, the

7 State would have put it in front of you.  The reason

8 that they didn't is because it doesn't exist.

9         The reason that it doesn't exist is very

10 simple.  It's the logical next step.  Why doesn't any

11 corroboration exist?  Well, might it be because my

12 client's innocent?

13        That moves me onto the next point.  Oh,

14 yes, one more little thing.

15        Do you remember -- it's a little thing

16 about the gun.  Do you remember -- the State didn't

17 bring this out on the direct of -- of Mr. Jinadu, but

18 I did.

19        Mr. Jinadu told you that the light-skinned

20 man who was holding the gun on him said we are

21 renting these guns, give us the money.  We are

22 renting these guns, give us the money.

23        So, I guess one of the State's alternative

24 theories might be besides the alternative theory that

E-280

1 he either had this gun or he had this gun, but one of
2 the alternative theories might be that, let's
3 see, Mr. Hillard who has the same name as the person
4 who is on this document, who actually owned the gun,
5 okay, who doesn't have any connection to Mr. Hillard,
6 all right, that person like rented a gun to somebody
7 with the same last name? Boy, now that's a
8 coincidence. That's just -- that's really a
9 coincidence. This person with the same last name
10 rented a gun to somebody else with the same last
11 name.

12          Well, let's talk about the lack of
13 corroboration in this case because it's important in
14 an identification case.

15          Identifications can be mistaken. They can
16 also be not truthful, okay? We don't know in this
17 case. It's just wrong. It doesn't matter which one
18 it is.

19          So, in an identification case, it is often
20 important to have corroboration. Like in rape cases,
21 a lot of times they have DNA evidence. It's been a
22 Godsend because all of those people that were
23 wrongfully convicted on their identification
24 testimony--

File Date:  7-1-2008

Case No:  08cv1775

ATTACHMENT # _____

EXHIBIT  J - part 10 _____

TAB (DESCRIPTION)

_____

1      MR. RODDY:    Objection.

2      THE COURT:    Objection sustained.    That has no
3 bearing on this case.    I'll instruct the jury to
4 disregard it.

5      MS. BORMANN:    Well, there is no corroboration
6 in this case.

7           Fingerprints.    We know that an evidence
8 technician was there, okay?    An evidence technician
9 takes pictures, collects evidence.    We know that.

10           No fingerprints that match Mr. Hillard --
11 none in an entire apartment where these guys were
12 supposed to be for nine hours.

13           If they would have had fingerprints, you
14 would have seen them.    They don't.

15           How about evidence of a relationship, any
16 relationship between Tony, my client, and these two
17 people?    Delores Jinadu and Erven Walls?

18           How about that?    How about anyone that's
19 ever seen them together?    Anyone?

20           My client lives 714 West on Division.
21 These people live, whether you call it uptown or
22 Rogers Parkway, north along the lake.

23           Any corroboration, anybody that's ever seen
24 them together, ever seen Tony Hillard in the

E-282

1 neighborhood.

2         After all, according to the victim, my
3 client's standing outside right outside at the time
4 that it happens on a beautiful May day, when it's
5 gorgeous outside, on a sidewalk in front of a
6 school.

7         Any witness, any witness that can place him
8 there besides Mr. Jinadu?  No, because he wasn't
9 there.

10         How about any relationship between Tony and
11 this person, this person that you're supposed to jump
12 to that conclusion about?  You know our mother always
13 said don't jump to conclusions, but you're supposed
14 to.  That's what the State wants you to do.

15         How about any evidence of a relationship
16 between those two people?  No, of course not because
17 there is none.

18         How about other witnesses that might have
19 been outside?  No.  That saw Tony Hillard?  Nope,
20 because there are none.

21         How about -- now, we know that this place
22 is a drug lab, and there is all sorts of drug
23 paraphernalia in there, and there is all sorts of
24 weapons.

1              How about this?  The detective goes to
2 arrest my client, Tony Hillard, some two weeks after
3 this occurs, and he testifies he actually goes into
4 Mr. Hillard's house, and he goes into the bedroom.

5              As he's in house -- and Mr. Hillard has to
6 get dressed.  How about any evidence of a weapon or
7 drugs either in Mr. Hillard's house or on his person,
8 something that would indicate to you like this isn't
9 just a guy living with his girlfriend in an apartment
10 on the north side.

11             How about that?  Anything?  No, no, no,
12 no.  Because it doesn't exist.

13             I anticipate that the State's going to get
14 up -- and I've been doing this for awhile -- so
15 there's a couple of things that happen and Mr. Roddy
16 did at first, the pointing.  You know, there's this.
17 There's this, you know.

18             We can scream at Mr. Hillard, and we can
19 watch his reaction, and we can pretend like he's not
20 a human being.

21     MR. RODDY:     Objection, Judge.

22     THE COURT:    Overruled.

23     MS. BORMANN:   And we can pretend he is an
24 animal.  He's not.

E-284

1             We can say he's the unluckiest man in the

2 world.  That's right, the unluckiest man in the world

3 because -- because -- because somebody with the same

4 last name as his name, with the same last name as the

5 superintendent of police, had a gun found in this

6 apartment, and guy identified him, that guy, that

7 guy, Jinadu. Yeah, that guy, the guy that testified

8 that he could lift the cuffs over his head while they

9 were still cuffed. That guy, we are supposed to rely

10 on that. Okay. Unluckiest man in the world, okay.

11          How about -- I'm doing this because I'm not

12 going to have a chance to address you again. So, I

13 want to like anticipate what the State's going to

14 argue.

15          How about make him take responsibility?

16 You might hear that.

17    THE COURT:  Wind up your argument. You have

18 been talking for more than an hour now.

19    MS. BORMANN:  I am sorry.

20          But the truth is that the hysterics, the

21 inflammation, all of that stuff doesn't make a case.

22          You can point all you want, and you can

23 scream all you want. I'm asking you to reason, to

24 think about this, to hold the State to their burden,

1 like you promised us that you would do.  And if you

2 do that, if you do your duty in this case, you will

3 find Mr. Hillard not guilty because despite screaming

4 and despite pointing, it's impossible for a

5 prosecutor to point an innocent man to guilt.

6          Ladies and gentlemen, thanks for listening

7 to me.

8               REBUTTAL ARGUMENT

9               BY MS. CURTISS:

10     MS. CURTISS:    Without hearing a word in

11 language that we can all understand, the appearance

12 of Yinka Jinadu on May 10 of 1997, the handcuffs say

13 Hillard and his partners were here.

14          The electrical tape around his neck says

15 Hillard and his partners were here.

16          The tape around his neck says Hillard and

17 his partners were here.

18          The blood on his face says Hillard and HIS

19 partners were here.

20          The swelling shut of that eye says Hillard

21 and his partners were here.

22          The broken bones on his face say Hillard

23 and his partners were here.

24          These are torture methods.  Hillard's

1 attorney referred to the stay that Yinka Jinadu had

2 at Cook County Hospital as plastic surgery. Getting

3 a plate put in your face is plastic surgery.

4         Having a broken orbital bone repaired is

5 plastic surgery, like women on the north shore are

6 doing this left and right. That's not plastic

7 surgery. That's great bodily harm.

8     MS. BORMANN:   Objection, your Honor.

9     THE COURT:   Overruled.

10    MS. CURTISS:   Much has been made about Mr.

11 Jinadu's ability to describe his offenders, describe

12 their height, describe their weight, describe their

13 complexion.

14         There's a huge difference between

15 description and recognition. Poets describe; the

16 rest of us recognize.

17         You all had the opportunity to meet Yinka

18 Jinadu. I would venture to guess if I asked you to

19 describe Mr. Jinadu in terms of height and weight and

20 complexion, I would get 12 to 14 different

21 descriptions.

22         However, if you saw Mr. Jinadu on the

23 street right now, you'd recognize him. Try

24 describing the taste of an apple, but you recognize

E-287

1 it when you see it.

2          We had a long, long time to also observe
3 Mr. Jinadu's demeanor in court, his ability to speak
4 and communicate, his ability to understand
5 questions.

6          When he was asked do you see the bat guy
7 seated at the table, he didn't understand the
8 question, but he answered it truthfully.  He said,
9 yeah, the bad guy is seated over there.  They're all
10 bad guys.

11          Does his inability to describe 5'11", 160
12 pounds means that he doesn't recognize the person
13 here in court?

14          Why on earth would Yinka Jinadu lie about
15 Mr. Hillard being one of the people, one of the
16 people, and his partners who tortured him on May 10?
17          Why would he do that?  There is no reason
18 to.

19          After the hours and hours of
20 cross-examination of Mr. Jinadu, the most that's come
21 out of it is there were three people on the street
22 instead of two, that Delores' car had been in an
23 accident.  That's why it wasn't working.

24          Did Mr. Jinadu ever waiver in his

1 affirmation that Tony Hillard was there with his

2 partners on May 10 of 1997?

3          Did he ever waiver that Mr. Hillard had a

4 gun?

5          Did he ever waiver that Hillard put the gun

6 to his head?

7          Did he ever waiver in that Mr. Hillard

8 demanded money?

9          Did he ever waiver in that Mr. Hillard was

10 one of the men out on the corner?  No, never.

11          We must prove our case beyond a reasonable

12 doubt.  It's not no doubt.  It's not any doubt.

13 That's reasonable doubt.

14          We take that burden proudly, and we make

15 that burden every single day in this courtroom, and

16 the jail is filled with people in instances where

17 people have met that burden.

18          Was Hillard there?  Was he there on May

19 10?  Hillard's lawyer says this is an identification

20 case.  It's whether or not you believe that Yenka

21 knows that this is the guy that was there on May 10

22 this.

23          The judge is going to instruct you on

24 identification.  It goes to -- it says the

E-289

1 following:

2        When you weigh the identification testimony
3 of a witness, you should consider all of the facts
4 and circumstances in evidence, including but not
5 limited to the following:

6        The opportunity the witness -- the witness
7 had to view the offender at the time of the offense.

8        This is a small room that they were in.
9 This is a room smaller than the jury room that you
10 will deliberate in, and he was in that room for nine
11 hours.  Opportunity to see Hillard?  Absolutely.

12        The witness's degree of attention at the
13 time of the offense.

14        Mr. Jinadu did not pass Mr. Hillard at the
15 checkout line at the Jewel.  Mr. Jinadu had the
16 opportunity to see Mr. -- pardon me.

17        Mr. Jinadu had the opportunity to see Mr.
18 Hillard when he put the gun to his head.  He felt his
19 breath when Hillard demanded money.  He felt his
20 sweat when in the bathtub he said it's time for you
21 to die.  He looked into his eyes at a distance no
22 farther than I am from you and heard him ask for
23 money, maybe heard him ask for drugs.

24        Opportunity to see?  Was Yenka at

E-290

1 attention?  You bet he was.

2          The witness's earlier description of the
3 offender.  We've gone into that.  Five-ten,
4 five-eleven, 170 pounds.  He's right on the money
5 with this guy.

6          The level of certainty shown by the witness
7 when confronting the defendant.

8          Not once did he waiver that this guy was
9 the guy with the gun.  Not once did he waiver when he
10 said this is the guy that put the gun in my mouth.

11         Not once did he waiver when he said
12 Hillard's the guy that demanded money.  Not once did
13 he waiver when he said Hillard came up with a pillow
14 and said you're going to die.  Level of certainty?
15 One hundred percent.

16         The length of time between the offense and
17 the identification confrontation.  I told you about
18 the confrontation that took place yesterday in
19 court.

20         However, on June 3, a little over three
21 weeks after this crime, this torture had occurred,
22 Yenka identified Hillard in a lineup.

23         He looked at five different people.
24 Hillard, the only reason he stuck out like a sore

E-291

1 thumb is because that face, those eyes, those lips,
2 everything about him is burned in Yinka Jinadu's
3 heart.  It's emblazened on his body.  He sees this
4 face and his partners in his sleeping hours.  He
5 exists in his conscience.  This man and his partners
6 are Yenka Jinadu's nightmare.

7          There's more than what Yenka says.  There's
8 more to this case than just his words.  There's
9 corroboration.  There's corroboration at the scene.

10          When the police went to this small
11 apartment, there's Yenka's blood.  You can see there
12 are things down here that were used that Yenka
13 described that were used to bind him.  The guns were
14 there.

15          This gun, registered to Laretha Hillard,
16 not Terry Hillard.  After talking to Laretha Hillard,
17 the next place that the detective went to was to
18 where he was.

19     MS. BORMANN:   Objection.  That wasn't the
20 testimony.

21     THE COURT:   The jury's heard the evidence.
22 Overruled.

23     MS. CURTISS:   Link between Laretha and this
24 man and this gun?  I'm not asking you to make a rash

1 conclusion. I'm asking you to make a reasonable
2 inference.

3           At the crime scene, there's a gun
4 registered to Laretha Hillard and after talking to
5 Laretha Hillard, this man is arrested.

6           Some of the things brought up by Hillard's
7 attorney as far as Yenka's explanation or recitation
8 as to what happened there when Hillard said we're
9 renting the guns, the fact that there's drug
10 paraphernalia there.

11           I'm not here to vouch for the smarts or the
12 common sense of the defendants.

13           I'm not here to say they were the smartest
14 defendants. Who would have this crime -- it was in
15 Delores's home.

16           Erven Walls left every piece of
17 identification he owns. A gun registered to Laretha
18 Hillard is left there by him. There's a drug lab.

19           I'm not saying these defendants were
20 smart. But what I am saying is that all of that, all
21 that's there, it says something about the defendants,
22 and it says something about Yenka.

23           I told you at the beginning of this that
24 there's a difference -- there's a collision on May

E-293

1 10, that lust for life and that lust for money.

2         When they asked him where his money was,
3 when they asked Yenka where his car was, he told
4 them.  He told them absolutely where it was.

5         Now to someone like this guy, someone like
6 this guy, who only lusts for money, he had that love
7 on his hand and by the way, when a man has a gun in
8 your mouth or in your temple, that's what was
9 significant about his hand, was the gun in it, not
10 the love that was written on it.

11         The love that this man has is for money,
12 just like the rest of his partners.  That's all they
13 wanted, was money.

14         So sure, to a guy like this guy, it doesn't
15 make sense that a guy -- that someone like Yinka
16 would hyperextend his shoulder in order to get free,
17 in order to live.

18         This is a man who thinks nothing of ripping
19 apart a man's face for money, for drugs, for cars.

20         I'm not going to point at this man and say
21 that he's an animal because his actions tell you that
22 he is an animal.

23         Hillard and his partners put a gun to
24 Yenka's head.  They beat him with a baseball bat.

1 They beat him with a chisel.  They bound him like an

2 animal.  They bound him in cord and in tape.  They

3 treated him like garbage.  His actions tell you an

4 animal.  I need not tell you that.

5          My partner, Joe, said that when they left

6 the victim like this, that he had no dignity, and I

7 disagree.

8          Everything that Yenka did that day was

9 kind.

10          He came over to give his ex-wife a ride to

11 work.  He walked into the door, and they wanted

12 money.  They wanted his gun.  He said take it, take

13 it.  Let me live.  I want to live.

14          This man, as the judge told you at the

15 beginning of the trial, he has this cloak, this

16 presumption of innocence.

17          Everything that this man did on May 10th of

18 1997 says that that cloak doesn't fit.  And even as

19 he sits here today in this suit--

20     MS. BORMANN:    We have an objection to that.

21     THE COURT:    Overruled.

22     MS. CURTISS:    -- his actions and his partner's

23 actions on May 10th of 1997 remove that cloak and in

24 this suit he is not half -- he has not half the

E-295

1 dignity of Yenka.

2          You can now see him for what he truly is.
3 He tried to kill Yenka.  He is an attempt murderer.
4 He kidnapped Yenka.  He robbed Yenka, and he beat
5 Yenka severely.

6          Your oath tells you to do justice.  The
7 evidence directs you to one place in doing justice.
8 Find Mr. Hillard guilty.  Find him guilty of the
9 crimes he committed against Yenka.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      THE COURT:   Members of the jury, the evidence
2 and arguments in this case have been completed, and I
3 now will instruct you as to the law.

4           The law that applies to this case is stated
5 in these instructions, and it is your duty to follow
6 all of them.

7           You must not single out certain
8 instructions and disregard others.

9           When I use the word he in these
10 instructions, I mean a male or a female.

11          It is your duty to determine the facts and
12 to determine them only from the evidence in this
13 case.

14          You are to apply the law to the facts and
15 in this way decide the case.

16          You are not to concern yourselves with
17 possible punishment or sentence for the offenses
18 charged during your deliberations.

19          It is the function of the trial judge to
20 determine the sentence should there be a verdict of
21 guilty.

22          Neither sympathy nor prejudice should
23 influence you.

24          You should not be influenced by any

E-297

1 person's race, color, religion or national ancestry.

2　　　　From time to time, it has been the duty of
3 the Court to rule upon the admissibility of the
4 evidence.

5　　　　You should not concern yourselves with the
6 reasons for these rulings and you should disregard
7 questions and exhibits which were withdrawn or to
8 which objections were sustained.

9　　　　Any evidence which was received for a
10 limited purpose should not be considered by you for
11 any other purpose.

12　　　　You should also disregard testimony and
13 exhibits which the Court has refused or stricken.

14　　　　The evidence which you should consider
15 consists only of the testimony of the witnesses and
16 the exhibits which the Court has received.

17　　　　You should consider all of the evidence in
18 the light of your own observations and experiences in
19 life.

20　　　　Neither by these instructions nor by any
21 ruling or remark which I have made do I mean to
22 indicate any opinion that I may have as to the facts
23 or as to what your verdicts should be.

24

E-298

1           Faithful performance by you of your duties

2 as jurors is vital to the administration of justice.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1           Those of you who took notes during trial

2 may use your notes to refresh your memory during jury

3 deliberations.

4           Each juror, however, should rely upon his

5 or her recollection of the evidence.

6           Just because a juror has taken notes does

7 not necessarily mean that his or her recollection of

8 the evidence is any better or more accurate than the

9 recollection of a juror who did not take notes.

10          When you are discharged from further

11 service in this case, your notes will be collected by

12 the deputy and destroyed.

13          Throughout this process, your notes will

14 remain confidential, and no one will be allowed to

15 see them.

16

17

18

19

20

21

22

23

24

1        Opening statements are made by the

2 attorneys to acquaint you with the facts they expect

3 to prove.

4        Closing arguments are made by the attorneys

5 to discuss the facts and circumstances in the case

6 and should be confined to the evidence and to

7 reasonable inferences to be drawn from the evidence.

8        Neither opening statements nor closing

9 arguments are evidence, and any statement or argument

10 made by the attorneys which is not based on the

11 evidence should be disregarded.

12       The defendant is charged with the offenses

13 of attempt first degree murder, armed violence, armed

14 robbery, aggravated kidnapping, and aggravated

15 battery.  The defendant has pleaded not guilty.

16

17

18

19

20

21

22

23

24

1            The charges against the defendant in this
2 case are contained in a document called the
3 indictment.  This document is the formal method of
4 charging the defendant and placing him on trial.  It
5 is not any evidence against the defendant.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1            The defendant is presumed to be innocent of

2 the charges against him, and this presumption remains

3 with him throughout every stage of the trial and

4 during your deliberations on the verdict.

5            It is not overcome unless from all of the

6 evidence in the case, you are convinced beyond a

7 reasonable doubt that he is guilty.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1.      The State has the burden of proving the

2 guilt of the defendant beyond a reasonable doubt and

3 this burden remains on the State throughout the

4 case.  The defendant is not required to prove his

5 innocence.

6       The fact that the defendant did not testify

7 must not be considered by you in any way in arriving

8 at your verdict or verdicts.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          Only you are the judges of the

2 believability of the witnesses and of the weight to

3 be given to the testimony of each of them.

4          In considering the testimony of any

5 witness, you may take into account their ability and

6 opportunity to observe, their memory, their manner

7 while testifying, any interest, bias, or prejudice

8 they may have, and the reasonableness of their

9 testimony considered in the light of all of the

10 evidence in the case.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          The believability of a witness may be
2 challenged by evidence that on some former occasion,
3 he made a statement that was not consistent with his
4 testimony in this case.

5          Evidence of this kind ordinarily may be
6 considered by you only for the limited purpose of
7 deciding the weight to be given the testimony you
8 heard from the witness in this courtroom.  However,
9 you may consider a witness's earlier inconsistent
10 statement as evidence without this limitation when
11 the statement was made under oath at a proceeding or
12 the statement narrates, describes, or explains an
13 event or condition the witness had personal knowledge
14 of, or the witness acknowledged under oath that he
15 made the statement.

16          It is for you to determine what weight
17 should be given to that statement.

18          In determining the weight to be given to a
19 statement, an earlier statement, you should consider
20 all of the circumstances under which it was made.

21

22

23

24

1          When you weigh the identification testimony

2 of a witness, you should consider all of the facts

3 and circumstances in evidence including but not

4 limited to the following:

5          The opportunity the witness had to view the

6 offender at the time of the offense, or the witness's

7 degree of attention at the time of the offense, or

8 the witness's earlier description of the offender, or

9 the level of certainty shown by the witness when

10 confronting the defendant, or the length of time

11 between the offense and the identification

12 confrontation.

13

14

15

16

17

18

19

20

21

22

23

24

1          Circumstantial evidence is the proof of

2 facts or circumstances which give rise to a

3 reasonable inference of other facts which tend to

4 show the guilt or innocence of the defendant.

5          Circumstantial evidence should be

6 considered by you together with all of the other

7 evidence in the case in arriving at your verdicts.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          A person is legally responsible for the

2 conduct of another person when either before or

3 during the commission of an offense and with the

4 intent to promote or facilitate the commission of an

5 offense, he knowingly solicits, aids, abets, agrees

6 to aid, or attempts to aid the other person in the

7 planning or commission of an offense.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1            The word conduct includes any criminal act

2 done in furtherance of the planned and intended act.

3            A person commits the offense of attempt

4 first degree murder when he with the intent to kill

5 an individual does any act which constitutes a

6 substantial step toward the killing of an

7 individual.  The killing attempted need not have been

8 accomplished.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          To sustain the charge of attempt first
2 degree murder, the State must prove the following
3 propositions:

4          First:  That the defendant or one for whose
5 conduct he is legally responsible performed an act
6 which constituted a substantial step toward the
7 killing of an individual, and second:  That the
8 defendant or one for whose conduct he is legally
9 responsible did so with the intent to kill an
10 individual.

11         If you find from your consideration of all
12 of the evidence that each one of these two
13 propositions has been proved beyond a reasonable
14 doubt, you should find the defendant guilty.

15         If, however, you find from your
16 consideration of all of the evidence that any one of
17 these propositions has not been proved beyond a
18 reasonable doubt, you should find the defendant not
19 guilty.

20

21

22

23

24

1          A person commits the offense of aggravated

2 battery when he knowingly and by any means causes

3 great bodily harm to another person.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          To sustain the charge of aggravated

2 battery, the State must prove the following

3 propositions or proposition:

4          That the defendant or one for whose conduct

5 he is legally responsible knowingly caused great

6 bodily harm to Yenka Jinadu.

7          If you find from your consideration of all

8 of the evidence that this proposition has been proved

9 beyond a reasonable doubt, you should find the

10 defendant guilty.

11          If, however, you find from your

12 consideration of all of the evidence that this

13 proposition has not been proved beyond a reasonable

14 doubt, you should find the defendant not guilty.

15

16

17

18

19

20

21

22

23

24

E-313

1          A person commits armed violence when he

2 commits the offense of aggravated battery while armed

3 with a dangerous weapon.

4          A person is considered armed with a

5 dangerous weapon when he carries on or about his

6 person or is otherwise armed with a handgun.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          To sustain the charge of armed violence,
2 the State must prove the following propositions:

3          First:  That the defendant or one for whose
4 conduct he is legally responsible committed the
5 offense of aggravated battery, and

6          Second:  That that when the defendant or
7 one for whose conduct he is legally responsible
8 committed the offense of aggravated battery, he was
9 armed with a draining dangerous weapon.

10          If you find from your consideration of all
11 of the evidence that each one of two propositions has
12 been proved beyond a reasonable doubt, you should
13 find the defendant guilty.

14          If, however, you find from your
15 consideration of all of the evidence that any one of
16 these propositions has not been proved beyond a
17 reasonable doubt, you should find the defendant not
18 guilty.

19

20

21

22

23

24

1         A person commits the offense of armed

2 robbery when he while carrying on or about his person

3 or while otherwise armed with a dangerous weapon

4 knowingly takes property from the person or presence

5 of another by the use of force or by threatening the

6 imminent use of force.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1           To sustain the charge of armed robbery, the
2 State must prove the following propositions:

3           First:  That the defendant or one for whose
4 conduct he is legally responsible knowingly took
5 property from the person or presence of Yinka Jinadu,
6 and

7           Second:  That the defendant or one for
8 whose conduct he is legally responsible did so by the
9 use of force or by threatening the imminent use of
10 force, and

11           Third:  That the defendant or one for whose
12 conduct he is legally responsible carried on or about
13 his person a dangerous weapon or was otherwise armed
14 with a dangerous weapon at the time of the taking.

15           If you find from your consideration of all
16 of the evidence that each one of these three
17 propositions has been proved beyond a reasonable
18 doubt, you should find the defendant guilty.

19           If, however, you find from your
20 consideration of all of the evidence that any one of
21 these propositions has not been proved beyond a
22 reasonable doubt, you should find the defendant not
23 guilty.

24

E-317

1          Finally, a person commits the offense of

2 aggravated kidnapping when he knowingly and secretly

3 confines another person against his will.

4          A person who kidnaps -- kidnaps another

5 commits the offense of aggravated kidnapping when he

6 does so while armed with a dangerous weapon.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          To sustain the charge of aggravated
2 kidnapping, the State must prove the following
3 propositions:

4          First:  That the defendant or one for whose
5 conduct he is legally responsible secretly confined
6 Yinka Jinadu against his will, and

7          Second:  That the defendant or one for
8 whose conduct he is legally responsible acted
9 knowingly, and

10          Third:  That the defendant or one for whose
11 conduct he is legally responsible was armed with a
12 dangerous weapon.

13          If you find from your consideration of all
14 of the evidence that each one of these three
15 propositions has been proved beyond a reasonable
16 doubt, you should find the defendant guilty.

17          If, however, you find from your
18 consideration of all of the evidence that any one of
19 these propositions has not been proved beyond a
20 reasonable doubt, you should find the defendant not
21 guilty.

22

23

24

1         When you retire to the jury room, you will
2 first elect one or select one of your members to
3 serve as your foreperson.

4         He or she will preside during your
5 deliberations upon your verdicts.

6         Your agreement upon a verdict must be
7 unanimous.

8         Your verdicts must be in writing and signed
9 by all of you, including your foreperson.

10         As I have noted, the defendant is charged
11 with the offenses of attempted first degree murder,
12 armed violence, armed robbery, aggravated kidnapping,
13 and aggravated battery.   Therefore, you will receive
14 ten forms of verdict.

15         As to each charge, you will be provided
16 with both, a not guilty and a guilty form of
17 verdict.   They are in this format.

18

19

20

21

22

23

24

E-320

1          As to the charge of attempt first degree

2 murder, we, the jury, find the defendant, Tony

3 Hillard, not guilty of attempt first degree murder, a

4 line for the signature of the foreperson followed by

5 the other 11 other members of the jury.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1           And the alternative form, we, the jury,

2 find the defendant, Tony Hillard, guilty of attempt

3 first degree murder, again with the requisite lines

4 for the signature of the foreperson and the other 11

5 members of the jury.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          And the alternative form, we, the jury,

2 find the defendant, Tony Hillard, guilty of attempt

3 first degree murder, again with the requisite lines

4 for the signature of the foreperson and the other 11

5 members of the jury.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          Similarly with the crime of armed violence,

2 we have a not guilty form and a guilty form.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          And with the crime of armed robbery, not

2 guilty and guilty form.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1           The crime of aggravated battery --
 2 aggravated kidnapping, not guilty form, guilty form.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1           And finally with the crime of aggravated

2 battery, the not guilty form and the guilty form.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          From these two verdict forms with respect

2 to each particular charge, you should select the one

3 form or verdict that reflects your decision or

4 verdict on that charge and sign it as I have stated.

5          Do not write on the other verdict form for

6 that particular charge.  That is sign only one

7 verdict form, guilty or not guilty, for each of the

8 charges that are before you.

9          And I might add, attach no significance to

10 the order that I read or displayed the verdict forms

11 to you.  There is none.  That's simply how they

12 appear in the packet of the instructions.

13

14

15

16

17

18

19

20

21

22

23

24

1    THE COURT:   When you retire, ladies and

2 gentlemen, you will have the instructions.  You will

3 have the evidence that the Court -- the physical

4 evidence that the Court has admitted for your perusal

5 and inspection with several caveats I will note at

6 this time.

7          There has been evidence and there is

8 physical evidence here of two weapons, two handguns

9 and live ammunition that was identified in court.

10          My policy simply is while you are free to

11 see the guns and the ammunition, I will not have them

12 both back in the jury room at the same time.  That

13 just will not be a prudent course of action.

14 Accidents can happen.

15          If I'm going to send the guns back to you,

16 we are not going to send the live bullets back

17 there.

18          If you want to see the bullets, we'll

19 exchange the guns for the bullets so you can see

20 those, if you choose to.

21          Secondly:  We're going to be moving ahead

22 hopefully with the other jury while you're

23 deliberating, and we may reach the point this evening

24 in final arguments where we may need some of that

1 evidence back to -- for final argument before the
2 other jury.

3          It will be awhile before we do that, but I
4 caution you that since there is the other jury here,
5 that we will be going on with as you deliberate, and
6 we may need to borrow that from you, and perhaps you
7 can take that into consideration during your
8 deliberations.

9          And I don't want to tell you how to do your
10 deliberations obviously, but I may want to look at
11 some of the physical evidence early on so that we can
12 have it back if we need it, but we'll accommodate
13 you.  You have first call on the evidence.

14          At this time, I'll going to ask the clerk
15 to swear in the deputies who will be tending to the
16 jury during the deliberations.

17          THE CLERK:   Do you and each of you solemnly
18 swear by the ever-living God that you will take this
19 jury to a safe and convenient place provided by the
20 Sheriff of Cook County, and there keep them together
21 and permit no person to speak to them, nor speak to
22 them yourself about this cause and when they have
23 agreed upon their verdict, you will return them into
24 open court?

1      THE SHERIFFS:   I do.

2      THE COURT:   Very well.

3           At this point, Mr. Hubbard and Mrs. Johns,

4  could you step out of the back of the jury box,

5  please.

6           Come right up here, folks.  Do you have

7  anything back in the jury room?  I guess you wouldn't

8  have coats or hats, but any newspaper or books or

9  anything?

10     A.   No.

11     THE COURT:   Have a seat there then, please.

12 The jury may retire to deliberate.

13     THE SHERIFF:  All rise for the jury.

14                          (The following proceedings

15                          were had out of the

16                          hearing of the juries:)

17     THE COURT:   Folks, do you want to step forward,

18 please, right up here.

19          Mr. Hubbard and Miss Johns, with the jury

20 being in tact at this time, hopefully ready, willing,

21 and able to decide the case, this will complete your

22 service as alternates and your service as jurors on

23 this stint of jury duty.

24          While you will not be deciding the case,

E-330

1 your contribution nonetheless has been significant.

2          It's obviously very important to us that we
3 have alternates available up to this point who can
4 pick up the cause as need be.

5          I want to express our appreciation to you
6 by tendering to you the certificates of jury service
7 and telling you at this time that you are no longer
8 bounds by the bonds of not discussing the case.

9          You are free to discuss it with whomever
10 you choose.  By the same token, you are just as free
11 not to.  That's up to you.

12          If you wish to remain, we are going to
13 proceed -- be proceeding with the rest of the case
14 for Mr. Walls.

15          If not, you can call back tomorrow, and I'm
16 sure we will have a verdict to tell you about.  I
17 don't know how long it will be, whether it will be
18 soon.  But in any event, thank you very much for your
19 service.

20     A.   Can we leave now?

21     THE COURT:   Pardon me?

22     A.   Can we leave?

23     THE COURT:   Yes.

24     A.   Thanks very much, your Honor.

1    THE COURT:    Thank you.

2    A.    Thank you.

3    A.    It's been a pleasure.

4    THE COURT:   We'll take about five minutes.

5                        (Whereupon, there was a recess

6                        had in the above-entitled

7                        cause, after which the

8                        following proceedings were had:)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS
COUNTY OF COOK  } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME . 6 . . . OF . 7 . . . . VOLUME . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS.  NO PRAECIPE HAVING BEEN FILED . PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE . COURT NO. 99-0152

In a certain cause . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . TONY HILLARD . . . . . . . . . . WAS . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . APRIL 23, . . . . . . . . . . . . . ., 19 99 .

Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

1

2  STATE OF ILLINOIS  )
                      )  SS.
3  COUNTY OF C O O K  )

4           IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
5
   THE PEOPLE OF THE  )
6  STATE OF ILLINOIS  )
                      )  Case No. 97-30453
7      VS             )
                      )  Before JUDGE MICHAEL P. TOOMIN
8  ERVEN WALLS,       )        (And Two Juries)
   TONY HILLARD,      )
9  DELORES JINADU     )  JULY 15, 1998

10                       6:00 P.M.

11      Court convened pursuant to recess.

12      Present:

13          HONORABLE RICHARD DEVINE,
                State's Attorney of Cook County, by
14          MR. JOSEPH RODDY, and
            MS. ANN CURTISS,
15              Assistant State's Attorneys,
                appeared for the People;
16
            MS. RITA FRY,
17              Public Defender of Cook County, by
            MS. CHERYL BORMANN, and
18          MS. RUTH MC BETH,
                Assistant Public Defenders,
19              appeared for the defendant Hillard,

20          MR. BRIAN DOSCH,
                appeared for defendant Jinadu,
21
            MR. DAN FRANKS,
22              appeared for defendant Walls.

23

24

                        E-333

1

2                              (The following proceedings

3                              were had out of the

4                              hearing of the juries:)

5       THE SHERIFF:   Court's back in session.

6       MR. DOSCH:    Can I finish tomorrow?

7       THE COURT:    Yeah.  Detective Bradley said he'll

8 come back tomorrow.  I would rather go with the jury

9 anyway, if you want to come back tomorrow.

10      MR. RODDY:    Let me make sure to tell Detective

11 Bradley that he needs to be cross-examined tonight,

12 right?

13      THE COURT:   Yeah, by Walls; yeah.

14          All right, not by Jinadu.  I would rather

15 work with Walls and get them close to going out, if

16 we can.

17          We may leave it up to them if they want to

18 go out tonight or go out in the morning.

19      MR. DOSCH:    What time do you want me back?

20      THE COURT:   Well, I'll tell you what.  If we

21 don't get the Walls jury out tonight, I have a long

22 call tomorrow.  What I would like to do is just have

23 you come back and get the jury out.  That would mean

24 that give us a call at 11:00 or something.

1        MR. DOSCH:    All right.

2        THE COURT:    Regardless of what happens.

3        MR. DOSCH:    Thank you.  I appreciate that.  We

4   can send Delores back.

5        THE COURT:    Yes, we can.  Are you ready to

6   start?

7        MS. CURTISS:    Judge, these people want to talk

8   to you.

9        THE COURT:    Okay.  We'll take a five minute

10  recess.

11                            (Whereupon, there was a recess

12                            had in the above-entitled

13                            cause, after which the

14                            following proceedings were had:)

15       MS. CURTISS:    Mr. Franks wanted some of the

16  exhibits.

17       THE COURT:    For what, for cross-examination?

18       MS. CURTISS:    What is the question?

19       THE COURT:    For his cross-examination of the

20  detective?

21       MS. CURTISS:    That I'm not sure.  He was

22  talking about things he needed.  I don't know if it

23  was right now or for ASA O'Malley.

24       THE COURT:    Mr. Franks, did I understand that

1 you need some of the physical evidence?

2     MR. FRANKS:   Judge, I think I will.  My other
3 problem is is that I do have civilian witnesses that
4 have children and homes, and can I tell them to come
5 back in the morning or--

6     THE COURT:   No, no.

7     MR. FRANKS:   You really want to?

8     THE COURT:   I want -- I want to send the jury
9 out tonight.  I don't know what I'm going to do.

10          What evidence do you need from the jury
11 that we have to take from them?

12     MR. FRANKS:   What I was going to use would be
13 the lineup picture of my client and the -- and those
14 items that were involved in the identification, the
15 tickets and so forth, the Hillard exhibits.

16     THE COURT:   Well, do you know the numbers of
17 those exhibits?

18     MR. FRANKS:   Exhibits 3 through 9.

19     THE COURT:   That's Defense Exhibits?

20     MR. FRANKS:   Correct.

21     MR. RODDY:   The lineup photo is?

22     THE COURT:   Not of Hillard, of Walls.

23     MR. FRANKS:   Of Walls.

24     MR. RODDY:   Four and five relating to Walls.

1    THE COURT:    Put it on piece of paper, and the

2 sheriff can take it back and tell them we need to

3 borrow them.  One of them is in an envelope I

4 believe.

5    MR. RODDY:    I took them out and kept them

6 separate.

7    THE COURT:    You took them out.

8    MR. RODDY:    He wants all of the stuff found at

9 the apartment.

10    MR. FRANKS:    Four and five, which is People's

11 Exhibits, and Defendant's 3 through 9.

12    MR. FRANKS:    Three through -- I don't need

13 nine, just 8, 3 through 8.

14    THE COURT:    We'll get that.

15        In the meantime, let's bring out Mr. Walls

16 and send for the other jury.

17    THE SHERIFF:    Okay.  They're here.

18    THE COURT:    They're here?

19    THE SHERIFF:    Yes, they are ready to go now.

20    MR. RODDY:    The only thing we need after Mr.

21 O'Malley is done testifying is to get the certified

22 gun registration to put it in front of this jury and

23 bring it back.

24    MR. FRANKS:    You are going to put the

1 certified gun registration in my case?

2        MR. RODDY:     Sure.

3        MR. FRANKS:     I would object as to relevance.

4        THE COURT:     With O'Malley you want to do it?

5        MR. RODDY:     After he's done.

6        THE COURT:     That's fine.

7        THE SHERIFF:   All rise for the jury.

8                       (The following proceedings were

9                       had in the hearing and the

10                      presence of the Walls jury:)

11       THE COURT:     Please be seated, ladies and

12 gentlemen.

13              I thank you for your patience.   We are

14 trying to move ahead on this case.   We've completed

15 the other case.

16              The jury is deliberating, and there are

17 aspects of this case that we have to tend to at this

18 time.

19              You may take your place in the witness

20 chair, Detective Bradley.

21              Mr. Franks, you may proceed with your

22 examination.

23

24

1                    CROSS-EXAMINATION

2                    BY MR. FRANKS:

3      MR. FRANKS:    Thank you, your Honor.

4      Q.   Ladies and gentlemen I am aware of how late

5 it is.  I'll do my best to do this as quickly as

6 possible.

7           Detective Bradley, you indicated that you

8 only became a detective recently, is that correct?

9      A.   Yes.

10     Q.   And in May -- on May 10th of 97, how long

11 had you been a detective?

12     A.   Since November of 96.

13     Q.   Now, when you became involved in this case

14 on the 12th of May of 97, you had at your disposal

15 the case report, is that correct?

16     A.   Yes.

17     Q.   And you read that report, is that correct?

18     A.   Yes.

19     Q.   And during the entire course of the

20 investigation, you learned that there was no

21 fingerprints that were found at the scene, is that

22 correct?

23     A.   Yes.

24     Q.   And there were certain pieces of evidence

E-340

1 that were recovered at the scene, such as Social

2 Security cards and identifications, is that correct?

3     A.   Yes.

4     Q.   And those items you determined from looking

5 at the case reports and inventory slips had been, in

6 fact, inventoried, is that correct?

7     A.   Yes.

8     Q.   Did you pull those items from inventory to

9 look at them personally for any evidentiary value?

10    A.   No.

11    Q.   So, the items -- we'll get those in a few

12 minutes, but those -- have you seen those Social

13 Security cards and so forth in court so far?

14    A.   No.

15    Q.   All right.

16         If I can proceed by asking you this then,

17 Detective?

18         Detective, you talked to Mr. Jinadu on more

19 than one occasion, is that correct?

20    A.   Yes.

21    Q.   You talked to him first on the 12th of May,

22 is that right?

23    A.   Yes.

24    Q.   And at that time you had the case report to

1 review, is that correct?

2     A.   Yes.

3     Q.   And did you walk him through his story, at

4 that time?

5     MR. RODDY:   Objection to the characterization.

6     THE COURT:   Sustained.

7     MR. FRANKS:

8     Q.   Well, you asked him what happened and he

9 told you, is that correct?

10     A.   Yes.

11     Q.   All right.

12          Did you take any notes on that occasion?

13     A.   A few on the back of the case report.

14     Q.   Okay.

15          All right.  Did you put those in a formal

16 supplementary report later on?

17     A.   No.

18     Q.   All right.

19          How many visits altogether did you have

20 with Mr. Jinadu?

21     A.   Three before the first arrest.

22     Q.   So, three before the first arrest, meaning

23 the one on May 12, at Illinois Masonic you visited

24 him in his home, is that correct?

1      A.    Right.

2      Q.    And you know the dates that that occurred?

3      A.    No, I'm not familiar -- I can't remember

4 that date, but I visited him in Cook County Hospital

5 when he was having eye surgery.  That was the second

6 visit.

7      Q.    That was the second visit?

8      A.    Yes.

9      Q.    Did you take any notes at that time?

10     A.    No.

11     Q.    Did you take any notes the third visit was

12 at his house?

13     A.    No.

14     Q.    Where was the third visit?

15     A.    I don't remember.

16     Q.    Well, where did you see him on the third

17 visit?

18     A.    At his home.

19     Q.    All right.

20           That's what I thought I asked you.

21           All right.  Do you know the date of that

22 home visit?

23     A.    No.

24     Q.    Did you take any notes of the home visit?

1    A.    No.

2    Q.    All right.

3         Now, Detective, when you talked to Mr.
4 Jinadu, he did tell you, did he not, that when
5 Delores called him before this incident occurred, she
6 told him that there had been an automobile accident
7 involving her car and that her car was undrivable, is
8 that correct?

9    A.    Yes.

10   Q.    And that was part of her conversation with
11 him on May the 10th of 1997, in the morning, is that
12 correct?

13   A.    Yes.

14   Q.    Okay.

15        Now also, sir, when you talked to him
16 during these interviews, he told you that none of the
17 offenders had masks on when he woke up inside the
18 Winthrop apartment, is that correct?

19   A.    Yes.

20   Q.    And you indicated that you spoke to him
21 then on the date that Mr. Hillard was arrested, is
22 that correct?

23   A.    Yes.

24   Q.    You talked to Mr. Jinadu, is that correct?

E-344

1     A.   Yes.

2     Q.   All right.

3          And that conversation then -- that you had

4  with Mr. Jinadu was memorialized in what's called a

5  general progress report, is that correct?

6     A.   Yes.

7     Q.   Which are handwritten notes, is that

8  correct?

9     A.   Yes.

10    Q.   And that interview that you had with Mr.

11  Jinadu was on June the 3rd, 1997, at 2210 hours,

12  civilian time, 10:10 p.m., is that correct?

13    A.   Yes.

14    Q.   All right.

15         And did Mr. Jinadu during that conversation

16  tell you that the offenders wanted money and they

17  wanted drugs?

18    A.   Yes.

19    Q.   All right.

20         Did Mr. Jinadu during that same

21  conversation on the third of June tell you that when

22  he woke up in the Winthrop apartment, he was naked in

23  the bathtub?

24    A.   No.

1    Q.    I'm sorry?

2    A.    No.

3    Q.    Well, have you had an opportunity to review

4 your GPR from June 3?

5    A.    Yes.

6    Q.    All right.

7         Is that -- is that -- are those -- are

8 those words and handwriting on your report?

9         If I may show you what can be considered, I

10 believe, I believe it's Defendant's Exhibit Number 3

11 for identification purposes only.

12         Is this, in fact, your GPR from June 3 of

13 1997?

14    A.    Yes.

15    Q.    And do you see -- I think it's about a

16 quarter of the way down the page in bold handwriting,

17 the sentence I read to you?

18    A.    That's not a complete sentence, but it's

19 written naked in bathtub.

20    Q.    Woke up first, is that correct?

21    A.    Right.

22    Q.    And then right after that?

23    A.    Naked in bathtub, yes.

24    Q.    All right.

1      A.   That's not a sentence.

2      Q.   So woke up, and then it says naked in
3  bathtub?

4      A.   Yes.

5      Q.   All right.

6           Sir, on that June 3 interview, did Mr.
7  Jinadu tell you that he was struck with a heavy metal
8  pipe or chisel, and that it was the same person that
9  struck with the heavy metal pipe or chisel that hit
10 him with the baseball bat?

11     A.   No, there were two separate people.

12     Q.   There were two separate people?

13     A.   Yes.

14     Q.   All right.

15          Sir, when you first saw -- excuse me,
16 Judge.  Are those exhibits there?  Thank you very
17 much.

18     THE COURT:   There's one there that you didn't
19 ask for that came out.

20     MR. FRANKS:   Thank you very much.  I'll try to
21 get these back to the jury as quickly as possible.

22     Q.   Sir, you may have -- well, I'm sorry.

23          Sir, I asked you before if you were aware
24 that certain items were -- were inventoried.

1          You were using those -- this case report to
2 try to find certain offenders, is that correct?

3     A.    Yes.

4     Q.    And you were looking for a Germaine Craine,
5 is that correct?

6     A.    Yes.

7     Q.    And you were aware from the beat officers'
8 case report that there was a photo ID, is that
9 correct?

10    A.    Yes.

11    Q.    But you never pulled it out of inventory to
12 see if you or anyone else could recognize the person
13 in that photograph?

14    A.    No.

15    Q.    You were aware, sir, that the inventories
16 had a ticket or tickets that were part of that
17 inventory, is that correct?

18    A.    Yes.

19    Q.    And on the inventory, it even had the
20 ticket number, is that correct?

21    A.    Yes.

22    Q.    But on the actual tickets, there is a
23 wealth of information for any investigator, is that
24 correct, identifiers?

E-348

1    A.   Yes.

2    Q.   But you did not pull those tickets, is that

3 correct?

4    A.   No.

5    Q.   Did you learn the -- when you booked Mr.

6 Erven Walls, the defendant in this case, what did he

7 say his full name was, if you recall?

8    A.   Erven Walls.  At this point, I don't

9 remember his middle name.

10   Q.   Did he have a middle name?

11   A.   I think he did.

12   Q.   Do you remember what it is?

13   A.   No.

14   Q.   Could it have been Zachary?

15   A.   Could have been.

16   Q.   There is a Social Security card, an old

17 Social Security card, with the name of Zachary

18 Walls?  Did you ever determine whose this was?

19   A.   No.

20   Q.   It wasn't of interest.

21        Dormaine Jerome Walls do you have any idea

22 who that is?

23   A.   No.

24   Q.   All right.

1           In the case report, it indicated that there

2 were five different offenders, is that correct?

3     A.   Yes.

4     Q.   And four men, one woman, is that correct?

5     A.   Yes.

6     Q.   And in the case report, you're talking

7 about separate men under the name of Germaine Craine,

8 Erven Walls, and then there's the name Dormaine Walls

9 also mentioned as a potential offender, is that

10 correct?

11    A.   Yes.

12    Q.   And those may all have been the same

13 person, is that correct?

14    A.   Yes.

15    Q.   So, you had four out of four chances of

16 eventually coming up with Erven Walls then, is that

17 correct?

18    MR. RODDY:    Objection, Judge.

19    THE COURT:    Sustained.

20    MR. FRANKS:

21    Q.   All right.

22         When you arrested Mr. Walls, he was

23 arrested at what time at 11th and State?

24    A.   He was arrested after the lineup.

1      Q.    Well, all right.

2            When you first took him into your control,

3 what time was it?

4      A.    Approximately 12:00.

5      Q.    And you transported him to your

6 headquarters at Belmont and Western, is that

7 correct?

8      A.    Yes.

9      Q.    And did you give him his Miranda rights at

10 11th and State?

11     A.    No.

12     Q.    Did you give him Miranda rights before you

13 put him in your police car?

14     MR. RODDY:    Objection to the relevance.

15     THE COURT:    It's not relevant at this point.

16 Sustained.

17     MR. FRANKS:

18     Q.    All right.

19           Did you speak to Mr. Erven Walls about why

20 you were taking him to Belmont and Western before he

21 got in the car?

22     A.    Yes.

23     Q.    Did you talk to him about the facts of this

24 case at 11th and State?

E-351

1      MR. RODDY:    Objection.

2      THE COURT:    Sustained.

3      MR. FRANKS:

4      Q.    Did you have any conversation with Erven

5  Walls inside of your police car?

6      MR. RODDY:    Objection.

7      THE COURT:    Well, he can answer yes or no

8  whether he did.   Overruled.

9      A.    We spoke about nothing pertaining to the

10  case.

11      MR. FRANKS:

12      Q.    Well, when is the first time that you

13  talked to him about something pertaining to the

14  case?

15      A.    That was after he was picked out of a

16  lineup.

17      Q.    So, if I understand correctly, you took him

18  to Belmont and Western and arrived there at what

19  time?

20      A.    Approximately 12:45 or 1:00 in the

21  afternoon.

22      Q.    And you're saying that Mr. Walls wasn't

23  under arrest at that time, is that right?

24      MR. RODDY:    Objection.

1      THE COURT:    Sustained.

2      MR. FRANKS:

3      Q.   All right.

4           Well, did Mr. Walls -- Belmont and Western

5  has some courtrooms in it, and it has a section

6  that's the police station, is that correct?

7      A.   Yes.

8      Q.   All right.

9           And the Area 3 Violent Crimes Headquarters

10 is up on the second floor, is that correct?

11     A.   Yes.

12     Q.   All right.

13          Did you have Mr. Walls wait down in the

14 lobby area downstairs?

15     A.   No.

16     Q.   Did you take him upstairs to the second

17 floor?

18     A.   Yes.

19     Q.   Did he remain then out in the open area

20 where the general public can mingle with the police

21 officers there up on the second floor?

22     MR. RODDY:     Objection.

23     THE COURT:    Sustained.

24     MR. FRANKS:

E-353

1  Q. Well, there is an open kind of general room

2 on the second floor in the Violent Crimes

3 Headquarters area, is that correct?

4  MR. RODDY: Object to the relevance.

5  THE COURT: Sustained.

6  MR. FRANKS:

7  Q. Where was Mr. Walls taken by you?

8  MR. RODDY: Objection, asked and answered.

9  THE COURT: Overruled.

10  MR. RODDY: Not relevant.

11  MR. FRANKS:

12  Q. I am talking about on the second floor.

13 Where was he taken?

14  THE COURT: You may answer.

15  A. He was taken to an interview room.

16  MR. FRANKS:

17  Q. All right.

18  And where -- you have no recollection as to

19 which number interview room, do you?

20  A. They don't have numbers.

21  Q. They don't have numbers?  They used to.

22  MR. RODDY: Ask to strike the comments.

23  THE COURT: I'll strike it.

24  MR. FRANKS:

1      Q.    When you took him in there, was there

2 anybody else in that interview room?

3      A.    No.

4      MR. RODDY:    Object to the relevance.

5      THE COURT:    Well, I'm not aware of relevance

6 here, Mr. Franks.  You better go onto something

7 else.

8      MR. FRANKS:

9      Q.    Well, at some point, a photograph was taken

10 of Mr. Walls, was there not?

11     A.    Yes.

12     Q.    And that photograph showed injuries to the

13 person of Mr. Walls, does it not?

14     A.    Yes.

15     Q.    And that photograph was taken after the

16 lineup was conducted, does it not?

17     A.    Yes.

18     Q.    What time was the photograph taken?

19     A.    I would have to have something to refresh

20 my memory the photographs.

21     Q.    Would the lineup of Mr. Walls refresh your

22 recollection?

23     A.    Yes.

24     Q.    Does it indicate that the lineup occurred

E-355

1 at civilian time 9:15 in the evening on September

2 17th?

3    A.    Yes.

4    Q.    And who would have taken the photograph?

5    A.    The evidence technician took the

6 photograph.

7    Q.    Are you done?

8    A.    Yes.

9    Q.    All right.

10         And he certainly would have taken that

11 photograph after the lineup had already been

12 conducted, is that correct?

13    MR. RODDY:    Objection, asked and answered.

14    THE COURT:    Yes, it's asked and answered.

15 Sustained.

16    MR. FRANKS:

17    Q.    What time did the evidence technician take

18 the photograph, if your report refreshes your

19 recollection?

20    MR. RODDY:    Objection.

21    THE COURT:    Overruled.

22    A.    Sometime after 9:00, 9:10.

23    MR. FRANKS:

24    Q.    All right.

E-356

1           And Mr. Walls had been now at Belmont and

2 Western at that point how long?

3       MR. RODDY:    Objection.

4       THE COURT:    Overruled.

5       A.    From 1:00 until 9:00 at night.

6       MR. FRANKS:

7       Q.    All right.

8           And this is the photograph, People's

9 Exhibit Number 5, that was taken, is that correct?

10      A.    Yes.

11      MR. FRANKS:    Judge, I have no more further use

12 for those other exhibits if you wish them to go back

13 to the jury.

14      THE COURT:    How about the lineup -- the photo?

15      MR. FRANKS:    This one I would like out here.

16      THE COURT:    Yeah.

17      MR. FRANKS:    These might be more relevant to

18 the jury.

19      THE COURT:    Why don't you give them to the

20 deputy back there and she can send them back in.

21      MR. FRANKS:    If I may be excused, your Honor?

22      Q.    All right.

23           People's Exhibit Number 5 again is Mr.

24 Walls after the lineup, is that correct?

E-357

1    A.    Yes.

2    Q.    And do you see his left eye in that

3 photograph?

4    A.    Yes.

5    Q.    What is the condition of his left eye?

6    A.    It's red.

7    Q.    And do you see any bruising or marks on his

8 forehead area?

9    A.    I see some bruising, yes.

10    Q.    Where is that located?

11    A.    Right above his eye.

12    Q.    Was there also some bruising on his left

13 cheek as well?

14    A.    Yes.

15    Q.    After you interviewed -- well, strike

16 that.

17         What time was the first interview you had

18 with Mr. Walls?

19    MR. RODDY:    Objection, Judge.

20    THE COURT:    Repeat that, Paul.

21                      (Whereupon, the court reporter

22                      read back from the record as

23                      requested.)

24    MR. RODDY:    Objection.

E-358

1      THE COURT:   Sustained.

2      MR. FRANKS:

3      Q.   Well, when did you give Mr. Walls Miranda

4  rights if at all?

5      MR. RODDY:   Objection.

6      THE COURT:   Sustained.

7      MR. FRANKS:

8      Q.   All right.

9           Did Mr. Walls stay in a room with a -- with

10 a door?

11     A.   Yes.

12     Q.   Was that door opened or closed?

13     A.   It was closed.

14     Q.   And he was in that closed room before the

15 lineup as well, is that correct?

16     A.   Yes.

17     MR. RODDY:   Objection, asked and answered.

18     THE COURT:   The answer may stand.  Don't answer

19 until I have a chance to rule.

20     A.   Sorry, your Honor.

21     THE COURT:   I know it's late.

22     MR. FRANKS:

23     Q.   Detective, who, if anyone else, talked to

24 Mr. Walls on the 17th of September, the date that he

1 was arrested?

2       MR. RODDY:    Objection.

3       THE COURT:    Sustained.

4       MR. RODDY:    Judge may I be heard at sidebar on

5 this?

6       THE COURT:    Sure.

7                           (The following proceedings

8                           were had out of the

9                           hearing of the jury:)

10      THE COURT:    Yes.

11      MR. RODDY:    This is specifically why we filed

12 motions in limine.

13            Counsel is trying to get into the fact that

14 people were there, that he was spoken to, and that

15 statements were obtained from him.

16            I did this so this would not happen in

17 front of the jury, and it's in direct violation of

18 your Honor's ruling.

19      MR. FRANKS:    Well, Judge, you know, there is a

20 course of investigation concept that the State uses

21 in every single case, and here I think it is

22 incredibly relevant whether my client was in custody

23 from noon on the 17th until the evening of the 18th,

24 and I think that the jury has the right to know what

1 his condition was, where he was, and who had contact
2 with him.

3       THE COURT:   I don't see any relevance about
4 it.

5             What you are trying to do is to have the
6 State object to a series of questions that you know
7 are the subject of the motion in limine.

8             I think that's highly improper. I'm going
9 to direct you not to because you're planting seeds
10 that something happened that is not going to be
11 evidence in this case.

12            Whether he was interviewed and talked to by
13 16 different people is not going to be relevant to
14 this proceeding.

15      MR. FRANKS:   May I inquire as to where he was
16 and how -- you know, how he was treated during the
17 time from this point of the lineup until he
18 supposedly spoke to the assistant state's attorney 24
19 hours later?

20      THE COURT:   It's not relevant.  If he wants to
21 introduce evidence on his side of the case, I suppose
22 that he can do what he wants to do.

23            But there's not going to be any -- any
24 suggestions of any statements until O'Malley

E-361

1 testifies, and that's why this witness is not the
2 witness. That's why it's outside of the scope of the
3 direct examination, and he's not the proper witness
4 to be talking to about statements or admissions or
5 whatever you want to call them. It's as simple as
6 that.

7      MR. FRANKS: Just so it's clear again on the
8 record, I think we did discuss it before.

9          I don't know what assistant state's
10 attorney O'Malley is going to say exactly, but it may
11 become necessary for me to call Detective Bradley
12 then in my case or whatever.

13     THE COURT: Well, he's got to come back for Mr.
14 Dosch anyway.

15     MR. FRANKS: Very well.

16              (The following proceedings were
17              had in the hearing and the
18              presence of the jury:)

19     MR. FRANKS:

20     Q.   Detective Bradley, you were present when
21 Mr. -- when Mr. Walls was interviewed by assistant
22 state's attorney O'Malley on September 18th, is that
23 correct?

24     MR. RODDY: Objection.

1      THE COURT:    I thought we just covered this.

2           This is outside of the scope of the direct

3  examination.  It's not proper cross-examination.  If

4  it becomes relevant later, then you may inquire on it

5  later.

6      MR. FRANKS:     Very well.

7      THE COURT:    Stay within the boundaries of what

8  was elicited on direct examination.  That's a very

9  basic rule here.

10     MR. FRANKS:    All right, Judge.

11     Q.    When the lineup was conducted, were the men

12 in the lineup for Mr. Walls sitting or standing?

13     A.    Sitting.

14     Q.    And why was that, sir?

15     A.    That's just the fair way to do it.

16     Q.    Because the people you had in the lineup

17 were all different sizes, is that correct?

18     A.    Yes.

19     Q.    And were they sitting pretty much like

20 they're sitting in the photograph that was taken of

21 the lineup, People's Exhibit Number 4 in evidence or

22 for identification at this point?

23     A.    Exactly that way.

24     Q.    Exactly.

1          When you first talked to Yenka Jinadu, he

2 never told you during that initial interview that you

3 had with him on the 12th of May, 1997, he never told

4 you that one of the offenders was the boyfriend of

5 the Delores Jinadu, did he?

6      MR. RODDY:    Objection.

7      THE COURT:    Overruled.

8      A.   No.

9      MR. FRANKS:    Nothing further.

10     MR. RODDY:    Briefly.

11              REDIRECT EXAMINATION

12              BY MR. RODDY:

13     MR. RODDY:

14     Q.   Showing you People's Number 5, the picture

15 of Erven Walls taken right after the lineup, that's

16 what that is, isn't it?

17     A.   Yes.

18     Q.   That's the same person that's sitting here?

19     A.   Yes.

20     Q.   Now, that picture shows he has got a red

21 line and a little bruise around his eye?

22     A.   Yes.

23     Q.   Does this show the same way he looked when

24 you saw him at 11th and State right before you

1 grabbed him and Delores coming out of the courtroom?

2      A.    Yes.

3      Q.    Now, you also said, Detective, that there

4 were some names on identification cards, Germaine

5 Craine and Erven Walls?

6      A.    Yes.

7      Q.    Prior to arresting the defendant on

8 September 17th of 1997, isn't it true that you

9 learned that actually Germaine Craine and Erven Walls

10 were the same person?

11     A.    Yes.

12     MR. RODDY:    Nothing, Judge.

13            RECROSS EXAMINATION

14            BY MR. FRANKS:

15     MR. FRANKS:

16     Q.    Sir, 11th and State is police headquarters,

17 is it not?

18     A.    Yes.

19     Q.    You were taking a man into custody that you

20 believe may have been an offender in a very serious

21 crime, is that correct?

22     A.    Yes.

23     Q.    And when you first saw him, you realized

24 that he had bruising on or about his face, is that

E-365

1 correct?

2    A.    Yes.

3    Q.    And you were aware that at that time you

4 may hold this man at Belmont and Western for a period

5 of hours or days, is that correct?

6    MR. RODDY:    Objection.  Objection.

7    THE COURT:    Sustained.

8    MR. FRANKS:

9    Q.    All right.

10        You were bringing Mr. Walls into Belmont

11 and Western, Area 3 Headquarters, to do an

12 investigation and interview, is that correct?

13    MR. RODDY:    Objection.

14    THE COURT:    Overruled.

15    A.    Yes.

16    MR. FRANKS:

17    Q.    And sometimes those investigations take

18 time, do they not?

19    A.    Yes.

20    Q.    All right.

21        They can take even overnight, is that

22 true?

23    A.    Yes.

24    Q.    All right.

1           Now, when you were at 11th and State and
2 you first saw this man had injuries to his face, eye,
3 and so forth, did you go downstairs into the police
4 station at 11th and State and have any other officer
5 look at Mr. Walls to act as a prover to his
6 condition?

7      MR. RODDY:   Objection.

8      THE COURT:   Overruled.

9      A.   No.

10     MR. FRANKS:

11     Q.   Did you utilize any of the camera equipment
12 at 11th and State to take a picture of the way Erven
13 Walls looked when you stopped him right there in the
14 building which is police headquarters?

15     A.   No.

16     Q.   Did you -- strike that.

17          Did you make out any memorandum or report
18 as soon as you brought Mr. Walls to Belmont and
19 Western indicating what his condition was so there
20 would be no question that these injuries had come to
21 you -- strike that -- had been on the person of Mr.
22 Walls when you brought him in?

23     A.   No.

24     MR. FRANKS:   Nothing further.

E-367

1     MR. RODDY:   Nothing, Judge.

2     THE COURT:  Thank you, Detective.

3              (Witness is excused.)

4     THE COURT:  I understand you have another

5 witness here, Mr. Roddy?

6     MR. RODDY:  Yes, Judge.

7     THE COURT:  Step up, please, sir.  Raise your

8 right hand.  Face this way.

9              (Witness is sworn.)

10           MICHAEL O'MALLEY,

11 called as a witness on behalf of the People of the

12 State of Illinois, being first duly sworn, was

13 examined and testified as follows:

14           DIRECT EXAMINATION

15           BY MS. CURTISS:

16     THE CLERK:  Please be seated sir.

17     MS. CURTISS:

18     Q.  Sir, I am going to ask that you keep your

19 voice up.  It's a large courtroom, and sometime it's

20 difficult to hear.

21         Would you, please, state and spell your

22 name?

23     A.  Michael O'Malley, O apostrophe

24 M-a-l-l-e-y.

1    Q.    Mr. O'Malley, who are you current employed
2  by?

3    A.    Cook County State's Attorney's Office.

4    Q.    And how long have you been a Cook County
5  State's Attorney?

6    A.    Five years.

7    Q.    And in that regard, are you also licensed
8  to practice law in the State of Illinois?

9    A.    Yes, Illinois and California.

10   Q.    Prior to coming to the employ of the
11 State's Attorney's Office, what did you do?

12   A.    I was a school teacher for about 24 years.
13 I taught in various public schools in Chicago, in
14 Catholic schools in Chicago.

15          I was dean of students at Gordon Technical
16 High School for a few years, and I was in the Peace
17 Corps in Ethiopia where I taught, and I taught for
18 the Jesuits in Peru.  I also taught in California.

19   Q.    What was that?

20   A.    I also taught in California.

21   Q.    Okay.

22          Where are you currently working in the
23 State's Attorney's Office?

24   A.    I'm presently assigned to the preliminary

E-369

1 hearing unit.

2      Q.    Okay.

3            In September of 1997, where were you
4 assigned in the office?

5      A.    I was assigned to the felony review unit of
6 the State's Attorney's Office.

7      Q.    Could you, please, describe what are the
8 functions of felony review unit?

9      A.    Felony review is a kind of strange job.
10 You work three days on and three days off.  You work
11 12 hour shifts.

12           The office is upstairs, the 14th floor.
13 You can be assigned to 26th Street or one of the five
14 police areas in the city.

15           And if a crime has been committed, the
16 police will call the dispatcher and the felony review
17 unit.

18           They will assign the case to you and you go
19 out, and you investigate it.

20           You talk to victims, witnesses, and
21 defendants if they're willing to talk to you, and you
22 try to determine what the situation is.

23      Q.    On September 18th of 1997, you indicated --
24 let me back up.

1           You indicated there are 12 hour shifts.   On

2  September 18 of 97, were you working the morning

3  shift or the afternoon shift?

4       A.    I was working the afternoon shift.

5       Q.    And were you dispatched to Area 3, Violent

6  Crimes?

7       A.    I was.

8       Q.    And did you have the opportunity to talk

9  with the defendant named Erven Walls?

10      A.    I did have that opportunity.

11      Q.    Do you see the Erven Walls that you spoke

12 with that evening here today in court?

13      A.    Yes, he is.

14      Q.    Could you point to him and describe what

15 he's wearing?

16      A.    The gentleman who just stood up.  He is

17 wearing looks like a green and tan shirt with light

18 colored slacks.

19      MS. CURTISS:   Your Honor, may the record

20 reflect the witness has identified the defendant,

21 Erven Walls?

22      THE COURT:   The record may so reflect.

23      MS. CURTISS:

24      Q.    Prior to speaking with Mr. Walls did you

E-371

1 talk with any detectives that were also at Area 3?

2       A.    Yes, I did.

3       Q.    Whom did you speak with?

4       A.    Bradley and Jackson.

5       Q.    And when you went into talk with Mr. Walls,

6 were you by yourself or were you in the company of

7 one of these detectives?

8       A.    I was -- most of the time I was with

9 Detective Bradley.

10      Q.    And what is the first thing that you did

11 when you met Mr. Walls?

12      A.    I introduced myself.

13      MR. FRANKS:    What date are we talking about?

14      THE COURT:   He said September 18.

15      MR. FRANKS:    Thank you.

16      A.    I introduced myself.

17            I told him my name is Michael O'Malley,

18 that I was an assistant state's attorney.  I was a

19 prosecutor and a lawyer, but not his lawyer.  I asked

20 if he understood that and he said that he did.

21            I then read him his Miranda rights.  I

22 related them from memory.

23      MS. CURTISS:

24      Q.    Could you, please, tell the ladies and

E-372

**File Date:** _7 - 1 - 2 0 0 8_

**Case No:** _08 c v 1775_

**ATTACHMENT #** _____

**EXHIBIT** _I - part II_

**TAB (DESCRIPTION)**

_____

1 gentlemen of the jury how exactly you explained the
2 Miranda rights to Mr. Walls?

3      A.    Yes.

4            I said you have the right to remain
5 silent.

6            Anything you say can be used in a court of
7 law against you.

8            You have a right to have an opportunity and
9 have him present with you during questioning.

10           If you cannot afford an attorney, one will
11 be provided by the courts.

12           I asked him if he understood each one of
13 those rights. He said that he did, and that he was
14 willing to talk to me.

15     Q.    And just in case I forgot this, was this at
16 approximately 11:00 -- or pardon me, 10:40 p.m.?

17     A.    Yes, around 10:30, something like that.

18     Q.    You indicated that the defendant agreed to
19 speak with you?

20     A.    Yes, ma'am.

21     Q.    Did he give you -- did he talk to you about
22 the attempt murder, armed robbery, and aggravated
23 kidnapping of Yinka Jinadu?

24     MR. FRANKS:    Objection to the form of the

E-373

1 question.

2     THE COURT:   Sustained.   Rephrase.

3     MS. CURTISS:

4     Q.   What did -- what did he tell you if

5 anything about Yinka Jinadu?

6     A.   Well, he told me that he was a friend of

7 Delores.

8     Delores was Yenka's -- I don't know if he

9 said ex-wife or former wife or estranged wife or

10 wife, but that there was a plan.   His Uncle Lavelle

11 had a plan to rob Yenka.

12     And he told him that -- he said that he was

13 threatened by his uncle to cooperate, but also he was

14 promised a reward for his cooperation, which would be

15 ten grams of heroin worth seven hundred dollars on

16 the street if he cooperated with him.

17     The plan was to have Delores call Yenka and

18 have him come over.

19     And Yenka did come over, and when he came

20 over -- when he came over, he was there with Delores

21 and Lavelle and somebody named Montrell Trico Harris,

22 I believe, and a Tony Hillard.

23     And he said when he walked in, I think he

24 said Harris hit him in the head with an object,

1 rendering him unconscious.

2          And he said then he and Delores dropped

3 him -- he and Delores left, and Delores dropped him

4 at his sister.  I believe it was on South Federal

5 Street.

6     Q.   Did he indicate whether any of the people

7 that were present had guns?

8     A.   Yes, he told me that Lavelle had a gun.

9     Q.   Was that then the substance of the

10 conversation you had with Mr. Walls?

11     A.   Yes.

12     MS. CURTISS:    Thank you Mr. O'Malley.  No

13 further questions.

14     THE COURT:   You may inquire, Mr. Franks, if you

15 choose.

16               CROSS EXAMINATION

17               BY MR. FRANKS:

18     MR. FRANKS:

19     Q.   Mr. O'Malley, did Erven Walls sign a

20 document with this statement on it?

21     A.   No, sir.

22     Q.   Had you met Mr. Walls before you had this

23 conversation?

24     A.   Yes, sir.

```
 1      MS. CURTISS:    Objection.

 2      THE COURT:    Overruled.   The answer may stand.

 3      MR. FRANKS:

 4      Q.   When?

 5      A.   The day before.

 6      Q.   Where?

 7      A.   Area 3, police headquarters.

 8      Q.   Same interview room that you talked to him

 9 on the 18th?

10      A.   I'm not positive if it was the same

11 interview room.

12      Q.   But it was in an interview room?

13      A.   Yes, sir.

14      Q.   What time did you see him on the 17th?

15      MR. RODDY:    Objection.

16      THE COURT:    Sustained.

17      MR. FRANKS:

18      Q.   Was it, approximately, 24 hours before you

19 took the interview on the 18th?

20      MS. CURTISS:    Objection.

21      THE COURT:    Sustained.

22      MR. FRANKS:

23      Q.   Was it one hour or closer to 24 hours?

24      MR. RODDY:    Objection.
```

1      MS. CURTISS:   Objection.

2      THE COURT:   Sustained.

3      MR. FRANKS:   Can I be heard at sidebar please?

4      THE COURT:   That's not necessary. This has

5 been covered in a motion, Mr. Franks. Go onto

6 something else.

7      MR. FRANKS:

8      Q.   Well, Mr. O'Malley, you said that the

9 State's Attorney's Office is -- or the felony review

10 unit of State's Attorney's Office is a strange job,

11 is that correct?

12     A.   Yes, I did.

13     Q.   You were not assigned to this case as an

14 investigator, were you?

15     A.   I was assigned as a state's attorney

16 attorney, sir.

17     Q.   And a state's attorney in Cook County makes

18 determinations of whether or not a person will be

19 charged with crimes, is that correct?

20     A.   Sometimes. That's part of our job, yes,

21 sir.

22     Q.   Well, that's the main job of a felony

23 review assistant state's attorney, is that correct?

24     A.   It's one of the jobs, sir.

E-377

1    Q.  Detectives call you any time of the day or

2 night, and then you come out to the various areas to

3 investigate a case to see whether or not a charge

4 will be filed, is that correct?

5    A.  Yes, sir.

6    Q.  All right.

7    And you were called out by Detective

8 Bradley to make such a determination, is that

9 correct?

10    A.  Yes, sir.

11    Q.  And you were asked to make such a

12 determination after a lineup identification of Mr.

13 Walls on the 17th of September, is that correct?

14    A.  Yes, it is.

15    Q.  That is when you first became involved in

16 this case, is that correct?

17    A.  That's correct.

18    Q.  All right.

19    And you temporarily rejected approval of

20 charges on this case, is that correct?

21    A.  No, sir, that's not correct.

22    MR. RODDY:   Objection.

23    THE COURT:  Objection sustained.

24    MR. FRANKS:

E-378

1    Q.    All right.

2          Did you take any notes of your conversation

3  with Mr. Walls on the 18th of September?

4    A.    Yes, I did.

5    Q.    And how did you take those notes?

6    A.    There is a felony review folder, and there

7  is a part for the defendant's testimony or statement,

8  and I wrote down what he said to me.

9    Q.    All right.

10   A.    You know, not word for word, but a synopsis

11 of what he said to me.

12   Q.    All right.

13         And information on that portion of the

14 felony review folder regarding the statement of Erven

15 Walls was what he said to you on the 18th of

16 September, is that correct?

17   A.    Yes, sir.

18   Q.    Now, I mean, I have kind of a yellow legal

19 pad in front of me here.

20         Were you using at first like a yellow legal

21 pad and writing down what he said and then later you

22 transposed that over to your felony review folder, or

23 did you write directly onto the felony review folder?

24   A.    I'm not sure, sir.

1    Q.   So you may have taken other notes?

2    A.   I may have.  I'm not sure.

3    Q.   And as an assistant state's attorney, you

4 know that you were supposed to keep those notes, is

5 that correct?

6    A.   No, sir.

7    Q.   You don't know that?

8         Well, you knew that as a felony review

9 assistant, you may end up testifying in court

10 regarding a statement, is that correct?

11   A.   Yes, sir.

12   Q.   And you know that even the scribbles of a

13 detective on a GPR, a general progress note, are

14 supposed to be kept.  You know that, don't you?

15        MS. CURTISS:   Objection to relevance.

16        THE COURT:   Overruled.

17        MR. FRANKS:

18   Q.   You know that, don't you?

19   A.   I don't know if I know that scribbles had

20 to be kept, no, sir.

21   Q.   Well, maybe not the scribbles -- even the

22 scribbles.  Everything on a general progress report

23 regarding a case is supposed to be kept.  Is that

24 right?

1      A.    Yes, sir.

2      Q.    But somehow you are exempt from that rule,
3 sir?

4      MS. CURTISS:    Objection.

5      THE COURT:    Sustained.

6      MR. FRANKS:

7      Q.    Didn't you make -- did you make any other
8 notes on any other pieces of paper regarding the
9 statement of Mr. Walls?

10     MS. CURTISS:    Objection.

11     THE COURT:    Overruled.

12     A.    I believe that I answered that I wasn't
13 sure that I -- if I did or I didn't.

14     MR. FRANKS:

15     Q.    All right.

16           If you did, you destroyed those notes?

17     A.    I didn't say that.    What I have is the
18 felony review notes.    That's all that I'm sure of
19 that I took.

20     Q.    Well, those notes then are in handwriting,
21 is that correct?

22     A.    Yes, sir.

23     Q.    You never wrote out any kind of a report
24 that was typewritten solely for the State's

1 Attorney's Office, is that correct?

2      A.   No, sir.

3      Q.   The first thing on your felony review

4 folder says that--

5      MR. RODDY:    Objection, Judge.

6      THE COURT:   Sustained.

7      MR. FRANKS:

8      Q.   Well, who were the witnesses for the

9 statement on the 18th of September?

10     A.   Detective Bradley and I.

11     Q.   And was Detective Bradley present when you

12 talked to Erven Walls the day before?

13     MS. CURTISS:    Objection.

14     THE COURT:   Sustained.

15     MR. FRANKS:

16     Q.   Did you write down a time that this

17 interview occurred?

18     A.   Yes, sir.

19     Q.   What time was that?

20     A.   I think it's 10:40 -- my folder probably

21 says.  I write in military time.  It probably says

22 2240.

23     Q.   All right.

24          Assistant state's attorney O'Malley, you've

1 had all day to look at your notes, is that correct?

2     A.   No, sir.

3     Q.   When did you first look at your notes

4 regarding testifying in this case?

5     MS. CURTISS:   Objection, relevance.

6     THE COURT:   Overruled.

7     A.   Probably around 5:00 tonight.

8     MR. FRANKS:

9     Q.   All right.

10       You said that somebody hit Yenka Jinadu

11 with an object, is that right?

12     A.   Yes, sir.

13     Q.   Do you recall what that object was that he

14 said was used to hit Mr. Jinadu?

15     A.   I think he said it was a crystal vase.

16     Q.   Do you need to refresh your recollection by

17 looking at your notes?

18     A.   If I'm wrong, then -- if it's not crystal

19 vase, then my memory would have to be refreshed, yes,

20 sir.

21     Q.   I'm asking you if you needed to refresh if

22 you're sure that you put down -- or you put down a

23 heavy crystal vase.

24       Is that the words that you put in your

1 notes?

2    A.    I don't know if it was heavy crystal vase
3 or crystal vase.

4    Q.    All right.

5          If I may just show you your notes, People's
6 Exhibit Number 4 for identification purposes only.

7          I show you actually which is a series of
8 pages.  I think the only ones relevant at this moment
9 are one, two, three.

10          Are those in fact a copy I guess of your
11 felony review notes?

12    A.    Yes, sir.

13    Q.    From September 18 interview?

14    A.    Yes, sir.

15    Q.    All right.

16    A.    It says a heavy crystal vase, that's
17 correct.

18    Q.    Thank you.

19          Have you learned during the course of your
20 communications with the state's attorneys in this
21 courtroom that there was a bat that was actually used
22 supposedly initially when Mr. Jinadu entered the
23 apartment?

24    MS. CURTISS:    Objection.

1     A.   No.

2     MS. CURTISS:    Relevance.

3     THE COURT:   The answer may stand.  You might be

4 well advised to wait to answer until I rule on the

5 objection.

6     A.   Yes, Judge.

7     MR. FRANKS:

8     Q.   Well, looking at your notes, sir -- strike

9 that.

10         The first thing Mr. Walls said to you on

11 the 18th of September was he denied--

12     MR. RODDY:    Objection, Judge.

13     MR. FRANKS:    -- any knowledge--

14     THE COURT:   Objection sustained.  Are you

15 talking -- come up here.

16         (Whereupon, there was a sidebar

17         discussion had out of the hearing of the

18         court reporter and jury, after which the

19         following proceedings were had:)

20     MR. FRANKS:

21     Q.   Assistant state's attorney O'Malley, when

22 the conversation began on September 18th, 1997, you

23 gave him Miranda rights all over again, is that

24 correct?

1    A.    Yes, sir.

2    Q.    And then he told you that he had nothing to

3 do with this incident, is that correct?

4    A.    No, I don't believe it is.

5    Q.    Well, on your notes, you indicate -- well,

6 let me say this.

7          How many individuals have you interviewed

8 in felony review that were potential defendants that

9 you eventually approved charges on?

10   A.    I wouldn't know the exact number, sir.

11   Q.    Would it be in the hundreds?

12   A.    I would imagine it would be in the

13 hundreds, yes.

14   Q.    All right.

15         And many of those same people gave you

16 statements, is that correct?

17   A.    That's correct, sir.

18   Q.    Voluntary statements?

19   A.    That's correct, sir.

20   Q.    And it's not unusual for defendants or

21 people you interview to say one thing in the

22 beginning of an interview and change their stories

23 over time?

24   MS. CURTISS:    Objection.

1    MR. FRANKS:    Is that true?

2    MS. CURTISS:    Relevance.

3    THE COURT:   Overruled.

4    A.    That sometimes happens, yes, sir.

5    MR. FRANKS:

6    Q.    Now, in this case, on the 18th of

7 September, when you interviewed Mr. Walls, he said

8 different things to you, did he not?

9    A.    I don't believe so on the 18th.  I think he

10 told one story.

11    Q.    Well, sir, your own -- did you not write in

12 your notes at the very top right after you indicate

13 that the defendant waived his Miranda rights,

14 defendant tells several versions of the incident.

15    A.    Yes, I wrote that.

16    Q.    And that was regarding your interview of

17 the 18th?

18    A.    No, sir.

19    Q.    Well, you put down with a number one and

20 then a parenthesis, that the defendant denies any

21 knowledge, is that correct?

22    A.    Yes, sir.

23    Q.    And at some point, he denied any knowledge

24 to you, is that correct?

1      MR. RODDY:    Objection.

2      MS. CURTISS:    Objection.

3      A.   No, that's not correct.

4      THE COURT:   Wait a minute.

5      A.   I am sorry, Judge.

6      THE COURT:   The objection is overruled.

7      MR. FRANKS:

8      Q.   Did the defendant deny knowledge in the

9  incident to you?

10      A.   No, sir.

11      THE COURT:   Are you talking about on September

12  18?

13      MR. FRANKS:    I'm trying to, Judge.

14      THE COURT:   All right.   The answer may stand

15  then.

16      MR. FRANKS:

17      Q.   Did you write down in your summary of the

18  interview of September 18th a D or delta for

19  defendant denies any knowledge.

20           Are those words in your handwriting on that

21  memorandum?

22      A.   Yes, sir, they are.

23      Q.   They are?

24           On the next -- well, strike that.

1         Did the defendant, Mr. Walls, tell you then

2 about a Barbara Sparkman on the 18th of September

3 during that interview?

4    A.   No, he did not.

5    Q.   Did he ever talk to you about a Barbara

6 Sparkman?

7    MS. CURTISS:   Objection.

8    THE COURT:   Overruled.

9    A.   Yes, he did.

10    MR. FRANKS:

11    Q.   And when did he do that?

12    A.   On the 17th.

13    Q.   And did he give you an address and a phone

14 number of Barbara Sparkman?

15    MS. CURTISS:   Objection.

16    THE COURT:   Sustained.

17    MR. FRANKS:

18    Q.   On the 18th of September, did he ever

19 mention the name Barbara Sparkman?

20    MS. CURTISS:   Objection, asked and answered.

21    THE COURT:   Sustained.

22    MR. FRANKS:

23    Q.   Did you write down in your handwriting

24 after a two and a parenthesis, -- Judge, in this

1 light, I'm having trouble reading.  I am sorry.

2 Delta, defendant, stated he left before victim

3 arrived and Barbara Sparkman picked him up?

4        Did -- do those words appear on your memo,

5 and if I've misread them, please indicate that to me

6 because it's very hard to read your handwriting?

7    A.   Could I take a look at it?

8    Q.   Of course you can.

9    A.   I am sorry, yes, he did -- I did write that

10 down about Barbara Sparkman.

11    Q.   Okay.

12        That he was picked up before the incident

13 occurred.

14    A.   Yes.

15    Q.   All right.

16        He told you that on the 18th of September?

17    MR. RODDY:   Objection, asked and answered.

18    THE COURT:   I believe he said the 17th.

19    MR. FRANKS:

20    Q.   Did he tell you also on the 18th?

21    A.   No, sir.

22    Q.   No?  But on the 17th, he told you that?

23    A.   Yes.

24    MS. CURTISS:   Objection.

1       THE COURT:   Objection sustained.   I'll strike

2  that and instruct the jury to disregard it.

3       MR. FRANKS:

4       Q.   All right.

5            Well, do you know where the defendant had

6  been between the 17th when you talked to him and the

7  18th of September when you talked to him?

8       A.   Not exactly, no.

9       Q.   Well, he was still in the custody of the

10 Chicago Police Department, was he not?

11      A.   Yes, sir.

12      Q.   Do you know if he had stayed in an

13 interview room at Belmont and Western on the second

14 floor the entire time?

15      MS. CURTISS:   Objection, asked and answered.

16 He said he doesn't know where he was.

17      THE COURT:   Sustained.

18      MR. FRANKS:

19      Q.   All right.

20           All right.   So, now you reintroduce

21 yourself to Mr. Walls on the 18th, and you start a

22 new interview, is that correct?

23      MR. RODDY:   Objection.

24      THE COURT:   Overruled.

1      A.   I don't know if you would call it a new
2 interview, or if you would call it picking up from
3 the day before.

4      MR. FRANKS:

5      Q.   All right.

6           Well, picking up from the day before, he
7 didn't tell you any of the same things that he had
8 told you the day before.

9      MS. CURTISS:   Objection.

10     THE COURT:   Sustained.

11     MR. FRANKS:

12     Q.   All right.

13          Did he tell you right away that there was a
14 plan to rob the victim when you first started talking
15 to him on the 18th?

16     A.   Yes, I believe he did.

17     Q.   You're not sure?

18     A.   To my recollection, yes, he told me that
19 when I talked to him, yes.

20     Q.   Is it possible he denied at first and then
21 he kind of leads into this new story?

22     MR. RODDY:   Objection.

23     THE COURT:   Sustained.

24     MR. FRANKS:

E-392

1    Q.   All right.

2         Well, he told you -- you used the word

3    that -- that the plan was to rob the victim, is that

4    right?

5    A.   If that's what I wrote down, yes, sir.

6    Q.   It wasn't his plan, was it?

7    A.   I said it was his Uncle Lavelle's plan.

8    Q.   Do you have any idea if there exists an

9    Uncle Lavelle?

10   A.   I just -- sir, I'm telling you what he told

11   me.

12   Q.   I understand.

13        In your investigation -- you said that you

14   are doing an investigation here, is that correct?  Is

15   that right?

16   A.   Partially, yes.

17   Q.   Yes.

18        You're trying to decide whether there's

19   enough evidence to charge a man, is that correct?

20   A.   Yes, sir.

21   Q.   All right.

22        Did you find out in your investigation if

23   there is an Uncle Lavelle?

24        MR. RODDY:    Objection.

1      THE COURT:   Sustained.

2      MR. FRANKS:

3      Q.   Do you know if the defendant even has an
4  uncle?

5      MR. RODDY:    Objection.

6      THE COURT:   Sustained.

7      MR. FRANKS:

8      Q.   Now, what's the next thing that Mr. Walls
9  said to you after he said that Lavelle had this plan
10  to go after the victim?  Did he name the victim by
11  name?

12     A.   I don't know if I would have named the
13  victim, or if he named the victim.

14     Q.   That's kind of important, isn't it?

15     MR. RODDY:    Objection.

16     THE COURT:   Sustained.

17     MR. FRANKS:

18     Q.   I mean, if -- if this offender knows the
19  name of the victim, that would indicate they have
20  some sort of relationship, isn't that right?

21     MR. RODDY:    Objection.

22     THE COURT:   Sustained.

23     MR. FRANKS:

24     Q.   All right.

1           Did Mr. Walls use the name Yenka?

2      A.   I don't know if he used that name, or if he

3 used his last name, or if he just said Delores's

4 ex-husband or former husband.

5      Q.   How about Aphizi, would he have used that

6 name?

7      A.   Pardon me?

8      Q.   Afeez, did you ever hear that name in this

9 investigation?

10     A.   Would you spell that for me, sir?

11     Q.   I will do my best.  I think it's

12 A-f-e-e-z.

13     A.   I don't remember hearing that name.

14     Q.   All right.

15          All right.  So, you just used kind of

16 shorthand felony review, V for victim, is that

17 right?

18     A.   Yes, sir.

19     Q.   Okay.

20          After he said there was this plan to rob

21 the victim, what's the next thing that he said?

22     A.   I would have to -- I don't remember

23 exactly.  If you want to show me my notes, I'd be

24 able to read it to you.

1    Q.    Well, counsel, you testified in summary
2 what he said just a few moments ago, is that
3 correct?

4    A.    Yes, sir.

5    Q.    All right.

6          What's the next thing that you remember
7 that he said to you?

8    A.    I don't remember, sir.

9    Q.    You don't remember anything about what he
10 said to you right now?

11   A.    I can remember almost everything he said to
12 me.

13   Q.    Then tell me again in summary what he told
14 you without being in sequence.

15   A.    Sure.

16         He told me that the plan was to rob the
17 victim, Delores's husband. And the plan was his
18 Uncle Lavelle's.

19   Q.    We got that far already. Go ahead.

20   MS. CURTISS:    Objection. Can you let him
21 answer?

22   THE COURT:    Let him answer.

23   A.    Uncle Lavelle had a gun, and that Lavelle
24 threatened him to cooperate.

1              But he also said that he was promised, he
2  and Delores were promised ten grams of heroin which
3  was worth about seven hundred dollars on the street
4  if they cooperated.

5              He told me that Delores called the victim
6  on the telephone and asked him to come over and pick
7  her up.

8              And that when he walked in, he and Delores
9  were there, along with Lavelle, Montrell Trico
10 Harris, and Tony Hillard and that when he walked in,
11 I think it was Montrell hit him in the head with a
12 heavy object, a crystal vase, and then he told me
13 that Delores and he left together, and she dropped
14 him off at his sister's house.

15             I don't remember the exact address on South
16 Federal.  I think that it was -- he even gave an
17 apartment number.  That's the gist and I think most
18 of what he said to me.

19        MR. FRANKS:

20        Q.   All right.

21             Well, did he tell you the nationality of
22 Delores's husband or ex-husband?

23        A.   Yes, he did.  He mentioned that he was
24 Nigerian.

E-397

1      Q.    Nigerian?

2            Did he say anything else to identify who

3 this Nigerian ex-husband was?

4      A.    He mentioned that it was Delores' husband.

5      Q.    Did he say if he was a truck driver or what

6 profession he was in?

7      A.    Let me see.

8            His uncle asked him -- could I see my

9 statement again, please?  I'm not positive.

10     Q.    You're almost there.  The uncle asked him

11 about what?

12     A.    Could I please see my statement, sir?

13     Q.    Well, let me ask you this.

14           Was there any discussion about drugs?

15     A.    I can tell you absolutely if I look at my

16 statement.

17     Q.    What -- all right.

18           Showing you Defendant's Exhibit Number 4

19 again.

20     A.    Thank you.

21     Q.    Certainly.

22     A.    Yes.  He said his uncle wanted to know who

23 the defendant's supplier was.

24     Q.    Supplier of tires or supplier of what?

1    A.    It doesn't say, sir.

2    Q.    What do you think he was talking about?

3    A.    I thought--

4    MS. CURTISS:    Objection.

5    THE COURT:    Objection sustained.

6    MR. FRANKS:

7    Q.    He was supposed to get grams of heroin for

8 his cooperation?

9    A.    Heroin.

10    MS. CURTISS:    Objection, asked and answered.

11    THE COURT:    Overruled.    The answer may stand.

12    MR. FRANKS:

13    Q.    All right.

14        So, are you indicating that you don't know

15 what Mr. Walls meant when he said that there was

16 discussion about the defendant's supplier who was

17 this Nigerian?

18    MS. CURTISS:    Objection, relevance as to what

19 Mr. O'Malley thought about that.

20    THE COURT:    Overruled.

21    A.    No, I thought it meant drugs.

22    MR. FRANKS:

23    Q.    Certainly.

24        So, did Walls tell you when Lavelle had

E-399

1 asked him the information about this supplier?

2     A.   I don't believe so.

3     Q.   All right.

4          It was before May 10 of 97, wasn't it?

5     A.   Well, I don't really -- I don't know that.

6     Q.   Didn't you ask him?  You didn't think of

7 it?

8     A.   I didn't say that, sir.

9     Q.   Well, did you ask him?

10    A.   I don't know if I asked him when the plan

11 was.

12    Q.   So, you don't know if Uncle Lavelle wanted

13 to know about the defendant's supplier in a

14 conversation that happened before May 10th?

15    A.   It could have been on May 10th.

16    MS. CURTISS:   Objection.

17    THE COURT:   Overruled.

18    A.   I don't know.

19    MR. FRANKS:

20    Q.   So, Walls told you after being in the

21 police station now for a day-and-a-half that there

22 was this guy, Uncle Lavelle, that wanted to know who

23 my supplier was.  So, I told him it was Delores'

24 ex-husband, the Nigerian, is that right?  Is that a

1 fair statement of the facts?

2    A.   Yes, sir.

3    Q.   Okay.

4         Now, Tony Hillard had already been

5 arrested, isn't that right?

6    A.   I believe so, but I'm not positive.

7    Q.   And Detective Bradley was the arresting

8 officer of Tony Hillard, was he not?

9    MS. CURTISS:   Objection.

10   THE COURT:   Overruled.

11   A.   I don't know.

12   MR. FRANKS:

13   Q.   Okay.

14        Well, Detective Bradley was one of the

15 interviewers of Walls during the course of this

16 investigation, was he not?

17   A.   Yes, sir.

18   Q.   And Detective Bradley would have had

19 information regarding the arrest of Tony Hillard,

20 would he not?

21   MS. CURTISS:   Objection, relevance.

22   THE COURT:   Sustained.

23   MR. FRANKS:

24   Q.   Walls never told you -- strike that.

1          Did Walls tell you that he was in the
2 apartment when Montrell, I believe is the name you
3 used, hit the victim with a heavy crystal vase, or is
4 this information he had just learned?

5     A.   No, they were there when this happened.

6     Q.   Who is they?

7     A.   He and Delores and Lavelle and Trico -- and
8 Montrell Trico Harris and Tony were there when the
9 victim walked in is what he told me.

10    Q.   Okay.

11         And had you told him that we don't know if
12 you did it or not, but if you give us some
13 information, we can go out and get the bad guys?

14         Did you talk to him like that?  It's a long
15 pause, Judge.

16    A.   I don't believe that I did, sir, no.

17    Q.   You may have?

18    A.   I don't believe.

19    Q.   You kind of cajoled him, didn't you?

20    MR. RODDY:   Objection to this whole line.

21    THE COURT:   Overruled.

22    A.   No, I don't think so.

23    MR. FRANKS:

24    Q.   You kind of laughed, like you laughed just

E-402

1 now, and you said, you know, Erven, you know, there

2 is some bad people out there that are ripping off

3 drug suppliers, and we know that you and Delores

4 didn't have much to do with this, you know, but we

5 got to get these guys because they're hurting people

6 like you.

7        Boy, I haven't done that in awhile.  Did

8 you talk to him like that?

9        A.   No, sir.

10       Q.   Well, he came up with this, yeah, I was

11 there, and I saw Montrell hit this man with a heavy

12 crystal vase on the top of his head, right?

13       A.   Yes, sir.

14       Q.   And that's not true, is it?

15       MS. CURTISS:   Objection.

16       THE COURT:   Sustained.

17       MR. FRANKS:

18       Q.   From your investigation of this case and

19 every police report that you have ever seen, Yinka

20 Jinadu was not hit with a heavy crystal vase, was

21 he?

22       MS. CURTISS:   Objection.  This is not whether

23 it happened or what this man said.  It's irrelevant.

24       THE COURT:   Overruled.

E-403

1    A.    He was hit with a heavy object.  Whether it

2 was a vase or you say a bat or if it was a lead pipe,

3 he was hit.

4    MR. FRANKS:

5    Q.    But every police report you must have read

6 said it was a baseball bat, isn't that right?

7    A.    I don't believe that I read any police

8 reports, sir.

9    Q.    Well, at the time you had, hadn't you,

10 O'Malley?

11         That's your job to read the case report,

12 and there was detective reports all over the place

13 already.  You had an offender already charged?

14    A.    I would have had some police reports

15 available to me, at that time, yes, sir, but not all

16 of them.

17    Q.    All right.

18         And every one that you had, the beat

19 report, the June supplementary report of Bradley,

20 every one of them said the man as he walked in the

21 door was hit with a baseball bat?

22         Do you need to review all of the case

23 reports and reports?  I would like to avoid that

24 considering it's 8:00 at night.

E-404

1      MS. CURTISS:    Objection to the form of that
2  question.

3      THE COURT:    Sustained.

4      MR. FRANKS:

5      Q.    Did you see in the reports that Mr. Jinadu
6  as he walked into the apartment was hit with a
7  baseball bat?

8      A.    I don't remember that, no, sir.

9      Q.    All right.  We'll move on.

10          Was Mr. Walls just trying to tell you what
11  you wanted to hear when he talked about the heavy
12  crystal vase?

13      MS. CURTISS:    Objection.

14      THE COURT:    Sustained.

15      MR. FRANKS:

16      Q.    How many people did he say had guns?

17      A.    Repeat that, please.

18      Q.    How many people did Walls tell you had guns
19  during the incident?

20      A.    He just mentioned Lavelle.

21      Q.    You know, again it's a problem with just
22  looking at handwriting and copies of copies, but is
23  that seven hundred dollars worth of heroin or two
24  thousand dollars worth of heroin?

E-405

1      A.    Seven hundred dollars.

2      Q.    Okay.

3            It likes look three zeroes to me.  Why
4  don't you look at it, O'Malley?

5      A.    Sure.

6      THE COURT:   His name is Mr. O'Malley.

7      MR. FRANKS:    Thank you, Judge.

8      A.    It does look like seven thousand here, yes,
9  sir.

10     MR. FRANKS:

11     Q.    Now, it's not seven hundred, it's not two
12 thousand; it's seven thousand?

13     A.    I think it was seven hundred dollars or --
14 seven hundred dollars was what I said originally.

15     Q.    Wait.

16           How many zeroes are in the number?

17     A.    It looks like three right here, but it's
18 hard to tell.

19     Q.    You know, was there a typewriter at Belmont
20 and Western?

21     MS. CURTISS:    Objection.

22     THE COURT:   Overruled.

23     A.    Thank you.  I'm sure there were, sir.

24     MR. FRANKS:

1      Q.   Now, you know there's another way that
2 felony review assistants take statements, is there
3 not?

4      A.   Yes, sir.

5      Q.   And what is often occurring -- well, strike
6 that.

7           You could have taken a court-reported
8 statement, couldn't you?  Could you not have?

9      A.   I guess I could have, yes, sir.

10     Q.   Paul here is a court reporter in front of
11 you, is that correct?

12     A.   Yes, sir.

13     Q.   All right.

14          He has a machine, and felony review has a
15 special group of court reporters that take down
16 verbatim every word a potential defendant says, is
17 that correct?

18     A.   Yes, that's correct.

19     Q.   They are on 24-hour notice, is that
20 correct?

21     A.   Yes, sir.

22     Q.   And they go literally everyday to all of
23 the area headquarters, including Belmont and Western,
24 is that correct?

E-407

1    A.    No, sir.

2    Q.    They don't go there?

3    A.    Not everyday; no, sir.

4    Q.    Well, they're somewhere everyday.

5    A.    I don't know, not in felony review, not

6 necessarily, no, sir.

7    Q.    Felony review has their own stable of court

8 reporters that are assigned only to them, is that

9 correct?

10    MR. RODDY:    Object to the characterization.

11    THE COURT:    Sustained.

12    MR. FRANKS:

13    Q.    To stable?    Excuse me.

14        How many court reporters are assigned to

15 felony review, if you know?

16    A.    I don't know.

17    Q.    All right.

18        If you were to call as a felony review

19 assistant and say I need a court reporter at Belmont

20 and Western "stat", could you get one?

21    MR. RODDY:    Objection, Judge.  He already told

22 this jury that he could have taken a court reported.

23    THE COURT:    Yes.  All right.  Sustained.

24    MR. FRANKS:

1      Q.    Okay.

2            Short of taking a court-reported statement,
3 there's a handwritten statement that is often taken
4 by felony review assistants, is that correct?

5      A.    Yes, that's correct.

6      Q.    Describe what that is.

7      A.    Well, it is a statement that the defendant
8 when he gives a statement, I write it down.    There's
9 a first page that has the Miranda rights included,
10 and it says statement of so and so taken at this
11 place, taken at this time, regarding the crime which
12 occurred at this place, and it's the Miranda rights,
13 and the defendant would sign that, and then it would
14 start out with the preface saying after being
15 advised -- after being advised of his Constitutional
16 rights, et cetera, after introducing myself, he
17 agreed to talk to me, and then we would go into short
18 biographical information about the defendant, and
19 then we would go into the heart of the matter, the
20 crime, and he would tell me what had occurred.

21            And then everybody signs it and proofreads
22 it together, and that's the handwritten statement.

23      MR. FRANKS:

24      Q.    All right.

E-409

1          Where -- where the potential defendant

2 actually signs off on, that is written down?

3     A.   Yes, sir.

4     Q.   Okay.

5          Now, as you said, the first page of that

6 starts out with the Miranda rights, is that correct?

7     A.   Yes.

8     Q.   And the defendant has a little spot there

9 where -- right under the Miranda rights he signs it,

10 is that correct?

11    A.   Yes, sir.

12    Q.   All right.

13         Did -- in this case, did Mr. Walls sign any

14 document indicating that he understood or was waiving

15 his Miranda rights?

16    A.   No, sir, it was an oral statement.

17    Q.   Totally oral?

18    A.   Yes, sir.

19    Q.   All right.

20         Now, on the document that you just

21 described where you would write out the facts as you

22 know them, you would literally read to the potential

23 defendant the words that you wrote down so there's no

24 misunderstanding and we don't worry about if it's two

1 thousand or seven hundred dollars, all right, you

2 read it to the man and then when he is satisfied that

3 every word is correct, he signs it, is that correct?

4     A.   Well, given my handwriting, there could

5 still be that misunderstanding.

6     Q.   Well, you read it to him.  That's how you

7 can avoid those misunderstandings?

8     A.   Yes.

9     Q.   And if there are mistakes, and there often

10 are, is that correct?

11     A.   Yes, sir.

12     Q.   You literally cross out words and you add

13 words, and he signs on the side like a legal

14 document, and he initials every change, isn't that

15 right?

16     A.   In the handwritten statement, that's

17 correct, yes.

18     Q.   Yeah.

19          At the bottom of each page, he signs it or

20 initials it, is that right?

21     A.   In the handwritten statement, that's

22 correct.

23     Q.   And at the end, he signs his full name, is

24 that right?

E-411

1    A.   Yes, sir, in the handwritten statement.

2    Q.   You usually -- as an assistant state's

3 attorney from felony review, you sign off on it, is

4 that correct?

5    A.   Yes, I do.

6    Q.   You usually have one of the investigating

7 detectives sign off on it?

8    A.   That's the procedure in the handwritten

9 statement, yes.

10    Q.   That was not done here?

11    A.   This is an oral statement, sir.

12    Q.   You make the decision whether it's oral or

13 written, isn't that right?

14    A.   Sometimes.

15    Q.   You got the pen in your hand, don't you,

16 sir?

17    Is that right?  You had the pen in your

18 hand, not Mr. Walls.  He didn't have the pen in his

19 hand?

20    A.   That's correct.

21    Q.   Did Mr. Walls in this statement say that

22 the victim in this case was handcuffed?

23    A.   No, sir.

24    Q.   Did he say that this man was taken into a

1 bathtub and beaten inside of the bathroom?

2    A.   No, Mr. Walls didn't tell me that.

3    Q.   Did Mr. Walls ever tell you that he hit

4 this victim at any time?

5    A.   No, Mr. Walls did not admit that, no.

6    Q.   All right.

7         The farthest you could get Mr. Walls was to

8 say that he was there and as soon as he was hit with

9 the vase, this victim was hit with the vase, he

10 left?

11    MR. RODDY:   Objection.

12    THE COURT:   Objection sustained as to the

13 farthest he could get him to do.

14    MR. FRANKS:

15    Q.   Well, did he say that he left right after

16 the man was hit with the vase?

17    A.   I don't think he said right after, but he

18 said that he and Delores left and Delores took him.

19    Q.   Did he say that he saw anything else happen

20 to the victim after he was hit with the vase?

21    A.   No, he did not admit that to me.

22    Q.   All right.

23         Did he say how he left with Delores?

24    A.   What do you mean, sir?

E-413

1      Q.   In terms of transportation.

2      A.   She dropped him off in a car, I guess.

3      Q.   Well, what kind of car did he say that she

4  had?

5      A.   I don't think he said.

6      Q.   All right.

7           Well, did you read in the supplementary

8  report of Detective Bradley that was from June, well

9  before the arrest in September of 97--

10          MR. RODDY:    I'm going to object.

11  Understanding what the question is going to be, it's

12  not relevant.

13          MR. FRANKS:    It's not irrelevant?

14          THE COURT:   Finish the question.

15          MR. FRANKS:   Did you -- all right.

16      Q.   Did you read in the supplementary report,

17  that you would have had access to, that Delores

18  Jinadu's car had been in an accident and was

19  undrivable?

20          MR. RODDY:    Same objection.

21          THE COURT:   Objection sustained.   There's no

22  proof of that.

23          MR. FRANKS:   .

24      Q.   Well, did you -- were you told -- strike

1 that.

2         Now, he told you that Delores and him were

3 boyfriend and girlfriend, didn't he?

4    A.   I don't know if he said it in that many

5 words.

6    Q.   All right.

7         Well, you had the right to ask him any

8 question that you wanted, isn't that right?

9    A.   Yes, sir.

10   Q.   You -- you didn't have to guess at

11 anything, did you?

12   A.   No, sir.

13   Q.   All right.

14        I mean, if you wanted to know about their

15 relationship, you could ask him, couldn't you?

16   A.   Yes, sir.

17   Q.   All right.

18        Did he tell you what his relationship

19 with -- was with Delores?

20   MS. CURTISS:   Objection, asked and answered.

21   THE COURT:   Sustained.

22   MR. FRANKS:

23   Q.   All right.

24        Well, he did tell you exactly where he went

E-415

1 next, did he not?

2     MR. RODDY:    Objection, asked and answered.

3     THE COURT:    Sustained.

4     MR. FRANKS:

5     Q.    All right.

6          Did he tell you that he went to an address

7 on Federal Street?

8     MR. RODDY:    Same objection.

9     THE COURT:    Sustained.

10    MR. FRANKS:    I haven't asked him anything

11 about that.    That was done on direct.

12    THE COURT:    All right.    Overruled.

13    MR. FRANKS:    Thank you.

14    Q.    Did he tell you that he had gone to an

15 address on Federal?

16    A.    Yes, he said that Delores dropped him off

17 there.

18    Q.    And did he tell you whose address that

19 was?

20    A.    I believe he said it was his sister's.

21    Q.    And he gave you a specific address of 3517

22 South Federal, apartment 506, did he not?

23    A.    If that's what my handwriting says, yes,

24 sir.

1      Q.   Okay.

2           And did he tell you what time he got to

3 that address?

4      A.   I don't recall.

5      Q.   Well, this incident as you knew from the

6 case report went on until 7:00 at night, is that

7 correct?

8      MS. CURTISS:   Objection.

9      THE COURT:   Overruled.

10     A.   I would have to look at something to

11 refresh my memory.

12     MR. FRANKS:

13     Q.   Showing you what has been previously marked

14 Walls' 1 -- I think it's Number 10 for Mr. Hillard.

15 Is that the case report in this case?

16     A.   Yes, it is.

17     Q.   Does it indicate the times of the

18 occurrence?

19     MS. CURTISS:   Objection, not proper refreshing

20 recollection.

21     THE COURT:   Sustained.

22     MR. FRANKS:

23     Q.   Did you have an opportunity to see that

24 case report while you were investigating this matter

1 on the 17th and 18th of September, 1997?

2    A.   I'm sure I did, yes.

3    Q.   Yes.

4         And would you have noted then the time of

5 occurrence?

6    A.   Yes, the 10th of May of 1997, from 10:30 in

7 the morning until military time 1904 which would be

8 7:04 that evening.

9    Q.   Okay.

10        What time did Mr. Walls tell you, if you

11 asked at all, did he say that the victim was hit over

12 the head with a heavy crystal vase?

13    A.   I don't think he discussed times.

14    Q.   Okay.

15        Well, he didn't volunteer it, did he?

16    MS. CURTISS:   Objection, asked and answered.

17    THE COURT:   Sustained.

18    MR. FRANKS:

19    Q.   You know, you were the investigator.  Did

20 you ask him what time this happened?

21    A.   Well, the exact time, I don't know if I

22 did, sir.  I talked about the date.

23    Q.   How about--

24    A.   The 10th of May.

E-418

1    Q.   How about in a five hour span?  What time

2 did he say that this went down?

3    MS. CURTISS:   Objection.

4    THE COURT:  Sustained.

5    MR. FRANKS:

6    Q.   Did you ask him what time it happened?

7    MS. CURTISS:   Objection.

8    THE COURT:  Sustained.

9    MR. FRANKS:

10    Q.   Did you ask him how long he was in the

11 apartment with Yenka?

12    A.   I don't know if I did ask him that, sir.

13    Q.   Did you put it in your notes?

14    A.   Could I see my notes, sir?

15    Q.   Just to save time, is there any time frames

16 mentioned in your notes at all?

17    A.   I don't believe so.  That's why I asked to

18 see them.

19    Q.   Very well.

20    A.   Give me a second.  I have the time where I

21 started taking the statement.

22    Q.   Well, that's the time that you were with

23 the man, is that right?

24    A.   Yes, sir.

1      Q.    All right.

2      A.    That's what I'm saying.  That's the only
3  time I see down here.

4      Q.    Did you even ask him what date the incident
5  happened?

6      A.    Well, I would have -- I would have said
7  about this, you know, this incident last May 10.

8      Q.    Well, you knew it happened then because you
9  had a crime you were investigating.

10           What I'm interested in is what Mr. Walls
11  told you and what information he had.

12           Did he even know the date that Yenka Jinadu
13  was hurt?

14      MR. RODDY:    Objection.

15      THE COURT:    Overruled.

16      A.    Well, as I say, I was talking to him about
17  the incident of May 10.  So, of course he knew that,
18  sir.

19      MR. FRANKS:

20      Q.    All right.

21           Did he ever tell you in his own words the
22  date of occurrence?

23      A.    I doubt it because I would have.

24      Q.    You doubt it?

1    A.   I would have said to him about May 10, and
2 he would have gone on to discuss this.

3    Q.   You would put the words in his mouth that
4 it was May 10?

5    A.   Sir, I didn't say he came out with the
6 date, May 10. So, no one is is putting words in his
7 mouth.

8    Q.   Did he tell you if it happened in the
9 morning, noon, the middle of the night?

10        When did he say that this happened?

11    MS. CURTISS:   Objection.

12    THE COURT:   Sustained.

13    MR. FRANKS:

14    Q.   Did he ever tell you anything having to do
15 with time at all?

16    MS. CURTISS:   Objection.

17    THE COURT:   Sustained.

18    MR. FRANKS:

19    Q.   All right.

20        Had he told you that Barbara Sparkman drove
21 him to that address on Federal to apartment 506 at
22 3517 South Federal?

23    MS. CURTISS:   Objection.

24    THE COURT:   Sustained.

E-421

1       MR. FRANKS:    Judge, may I have just a moment?

2 Judge, I have nothing further.

3       THE COURT:    Anything else?

4       MS. CURTISS:    No, your Honor.

5       THE COURT:    Thank you.  You may step down.

6       A.    Thank you, Judge.

7                   (Witness is excused.)

8       MR. RODDY:    May we approach for one second?

9       THE COURT:    Yes.  Do you need the reporter?

10      MR. RODDY:    No.

11                  (Whereupon, there was a sidebar

12                  discussion had out of the hearing of the

13                  court reporter and jury, after which the

14                  following proceedings were had:)

15      MR. FRANKS:    May I leave the courtroom for a

16 moment?

17      THE COURT:    Yes.  Can you get from the jury

18 People's Exhibit Number 15?  It's got a blue back on

19 it that says stipulation or certified copy.

20      THE SHERIFF:    Sure.

21      THE COURT:    Give that to Mr. Roddy, please.

22      MR. RODDY:    Thank you.

23      THE SHERIFF:    Sure.

24      MR. RODDY:    May I proceed?

1    THE COURT:    Yes.

2    MR. RODDY:    At this time, I have in my hand
3 what I marked as People's Exhibit Number 15, and what
4 that is, ladies and gentlemen, is proceeding by way
5 of certified copy of gun registration.

6           This document, People's Exhibit Number 15,
7 is an exact reproduction of a document on file in the
8 Chicago Police Department, and it is certified by Mr.
9 James Piper who is the director of the records
10 division of the Chicago Police Department.

11          What it states is that on November 14th of
12 1996, a 357 magnum firearm with serial number K as in
13 King 261713 was the gun that was testified to and
14 identified here earlier in court was registered in
15 the City of Chicago to woman by the name of Laretha
16 Hillard at 1230 North Larabee here in Chicago.

17          It was a valid registration from one year
18 from the date of November 14th, 1996 to November 14th
19 of 1997.

20          Judge, at this time, the State would be
21 moving to strike the identification marks on People's
22 Exhibits 1 through 15 with the exception of 8C and
23 also Defendant Hillard's 3 through 9 and ask that
24 those be moved into evidence at this time.

E-423

1      THE COURT:    Those exhibits may be received, and
2 the identification marks may be stricken.

3      MR. RODDY:    At this time, the People would
4 rest their case against Erven Walls.

5      THE COURT:    Very well.

6          Ladies and gentlemen, the State has
7 completed its case-in-chief.  Mr. Franks, do you have
8 any evidence to present?

9      MR. FRANKS:    Yes, I do, Judge.

10      THE COURT:    May I see counsel for a moment?    I
11 don't need the reporter.

12          (Whereupon, there was a sidebar
13          discussion had out of the hearing of the
14          court reporter and jury, after which the
15          following proceedings were had:)

16      MR. FRANKS:    Judge, may I approach for a
17 moment?

18      THE COURT:    Yes.  Miss Curtiss, do you want to
19 come over?

20      MS. CURTISS:    Sure.

21          (Whereupon, there was a sidebar
22          discussion had out of the hearing of the
23          court reporter and jury, after which the
24          following proceedings were had:)

1        THE COURT:    Ladies and gentlemen, we are
2  endeavoring to locate a couple of witnesses that were
3  in the building, and we will endeavor to finish up
4  with the evidence tonight.

5            As to whether we're going to argue tonight,
6  I haven't made that decision.  I may leave that up to
7  you yourselves.

8            You've been here a long time.  If we do not
9  argue tonight, we are going to come back at about
10 9:00 tomorrow, and I will start at 9:00.

11           I'll delay whatever business that I have,
12 and we'll finish up with this jury at this time, but
13 I do want to finish the evidence tonight so that at
14 least we will get that far and complete the arguments
15 tomorrow if that is the case.

16           So, I'm going to ask that you go back to
17 the jury room just for a few minutes rather than sit
18 here, and you might want to let the sheriff know if
19 you prefer to wind up the case tonight.  I'll stay as
20 long as you want to.

21           If you would be more comfortable hearing
22 the arguments tomorrow, alert us to that.  So, step
23 back in the jury room, and we'll call you shortly.
24                          (The following proceedings

E-425

1                        were had out of the

2                        hearing of the jury:)

3       THE COURT:   Mr. Roddy and Miss Curtiss?   I

4  would like to see you and the lawyers for Mr.

5  Hillard.

6                        (Whereupon, there was a recess

7                        had in the above-entitled

8                        cause, after which the

9                        following proceedings were had:)

10      THE COURT:   Okay.

11          We have a note from the jury that came in

12  about what, five of eight or so?

13      MR. RODDY:   Approximately that time.

14      THE COURT:   It says quote if we think that the

15  witness is lying sometimes does this make him

16  uncredible and his testimony null and void?   The

17  jury.

18          The proposed answer is with counsel being

19  present, the defendant Hillard's presence is being

20  waived I assume?

21      MS. BORMANN:   Yes.

22      THE COURT:   Jurors:  The fact that you may

23  determine that a witness is untruthful as to certain

24  aspects of his testimony does not necessarily make

1 that witness uncredible and his testimony null and
2 void.

3　　　　You are the sole judges of the
4 believability of the witnesses and the weight to be
5 given to their testimony in its entirety.  Is that
6 it?

7　　MR. RODDY:　That's fine.

8　　MS. BORMANN:　That's fine.

9　　MR. FRANKS:　Judge, can I show Joe real quick
10 and--

11　　THE COURT:　7 to 5 is pretty much an even
12 split.  I don't consider that unanimity.  We will
13 argue tomorrow.

14　　　　We will have them come back to our jury
15 room.  Hopefully, we will have a verdict in the other
16 case.

17　　　　I've got a fairly substantial call so we
18 are going to -- I don't want to get that call started
19 because once we do--

20　　MR. FRANKS:　I have a 9:00 case.  I just have
21 to run in there and tell them to continue it.

22　　THE COURT:　Where?

23　　MR. FRANKS:　In the branch courts in the
24 building.  I have things all over the county.

E-427

1      MR. RODDY:   Can we argue at 9:30?

2      THE COURT:   That's what I would do because once

3 people start coming in, it's going to be hard to get

4 started.

5      MR. FRANKS:   9:30?

6      THE COURT:   Have the jury here at 9:15 and

7 argue at 9:30.  How's that?  Okay.

8      THE COURT:   We will go over instructions after

9 you rest.

10     MR. FRANKS:   Okay.

11     THE COURT:   Okay.  Let's go out and do it.

12                        (Whereupon, there was a recess

13                        had in the above-entitled

14                        cause, after which the

15                        following proceedings were had:)

16     THE COURT:   Bring out Mr. Walls.

17     THE SHERIFF:   Coming out.

18     THE COURT:   Mr. Franks?  The jury will be

19 coming in in just a minute.

20          There is a couple of things that should be

21 handled.  The State had rested.  Do you have a motion

22 to make?

23     MR. FRANKS:   Yes, Judge.

24          I do have a motion at the end of the

E-428

1 State's case for a directed finding of not guilty,

2 not withstanding the position we're in at this

3 point.

4       THE COURT:    Motion for directed verdict is

5 denied.    I want to admonish Mr. Walls.

6       MR. FRANKS:    Certainly.

7       THE COURT:    Mr. Walls, step up here, please.

8             Your attorney has indicated to me that he's

9 prepared to rest his presentation of evidence after

10 he presents some stipulations dealing with I believe

11 the grand jury transcript.    Correct, Mr. Franks?

12      MR. FRANKS:    Yes.

13      THE COURT:    And he has indicated also that you

14 have elected not to testify in the case, is that

15 correct?

16      DEFENDANT WALLS:    Yes, sir.

17      THE COURT:    Do you understand that you have

18 that right?

19      DEFENDANT WALLS:    Yes, sir.

20      THE COURT:    You have a right to take the

21 witness stand and tell your side of the story.

22      DEFENDANT WALLS:    Yes.

23      THE COURT:    Your lawyer would ask you questions

24 and the state's attorneys could cross-examine.    You

1 see how it's done?

2      DEFENDANT WALLS:   Yes, sir.

3      THE COURT:   You've talked to Mr. Franks about

4 this, about testifying?

5      DEFENDANT WALLS:   I don't want to testify.

6      THE COURT:   But you consulted with your

7 lawyer?

8      DEFENDANT WALLS:   Right, right.

9      THE COURT:   You talked to your folks about it,

10 your family?

11      DEFENDANT WALLS:   Right.

12      THE COURT:   You made the decision not to

13 testify?

14      DEFENDANT WALLS:   Yes.

15      THE COURT:   You're comfortable with that

16 decision?

17      DEFENDANT WALLS:   Yes.

18      THE COURT:   Nobody has promised you anything to

19 make that decision?

20      DEFENDANT WALLS:   No, sir.

21      THE COURT:   Nobody threatened you?

22      DEFENDANT WALLS:   No, sir.

23      THE COURT:   Also, Mr. Franks as I indicated has

24 represented to us that after he presents the

1 stipulations, that would complete his case.  Do you

2 understand that?

3       DEFENDANT WALLS:   Yes, sir.

4       THE COURT:   Are you in agreement with that?

5       DEFENDANT WALLS:   Yes, sir.

6       THE COURT:   Is there anyone that you would have

7 called as a witness that he has decided not to call?

8       DEFENDANT WALLS:   No, sir.

9       THE COURT:   You're comfortable with the

10 position to put on the stipulation, and that will be

11 your evidence, and then we will go into the arguments

12 tomorrow, right?

13       DEFENDANT WALLS:   Yes, sir.

14       THE COURT:   That's fine.

15       MR. FRANKS:   Thank you.

16       THE COURT:   Have a seat.

17       MR. FRANKS:   Judge, are you going to explain--

18       THE COURT:   Pardon me?

19       MR. FRANKS:   Are you going to explain what a

20 stipulation is?

21       THE COURT:   Yeah, sure.

22            Are they coming in?  Are they coming in,

23 the jury?

24       THE SHERIFF:   Yes.  All rise for the jury.

E-431

1              (The following proceedings were

2              had in the hearing and the

3              presence of the jury;)

4     THE COURT:    Please be seated.

5          Ladies and gentlemen, the next piece of

6  evidence that will be presented will be by the

7  Defense, and that will be by the way of stipulation.

8          A stipulation is a word we use here for

9  agreement which means that there is no contest as to

10 the evidence that Mr. Franks is going to deliver to

11 you at this point.

12         Basically, a stipulation is given in the

13 manner and form of if a given witness were called, he

14 or she would testify in the manner reflected in the

15 stipulation.  This is a timesaving device where there

16 is no contest as to what the witness would say, and

17 both sides are in agreement that if the witness were

18 in court, he or she would testify accordingly.  You

19 may proceed.

20    MR. FRANKS:    Thank you, Judge.

21         Ladies and gentlemen, there will be an

22 agreement between the parties representing the

23 state's attorney, Joe Roddy and Ann Carson (sic), for

24 the Defense, Daniel Franks representing Erven Walls,

1 and we would agree that if called to testify, a court

2 reporter by the name of Janet Lupa, L-u-p-a, would

3 testify that she is a certified court reporter, and

4 that she was present in the grand jury proceeding of

5 September 29th, 1997, and took notes of that grand

6 jury proceeding, and then had them typewritten and a

7 certified copy of that transcript was prepared.

8          As part of that transcript, she would

9 testify if called that she was present when one,

10 Yinka Jinadu, J-i-n-a-d-u, testified on the 29th of

11 September of 1997 and answered certain questions in

12 the following manner:

13          Question by the assistant state's attorney

14 that questioned Mr. Jinadu.  The name of the state's

15 attorney was Mary Pat Devereaux and she asked this

16 question:

17          Calling your attention to May 10, 1997,

18 were you at your office at 38 West Addison in

19 Chicago, Cook County, Illinois at about 10:30 in the

20 morning?

21          Answer:  Yes.

22          Question:  Did you receive a phone call

23 from Delores Jinadu?

24          Answer:  Yes, ma'am.

E-433

1          And what did she say to you, and what did

2 you say to her?  His answer was I got the money.  I

3 was expecting her.  She was supposed to be in my

4 office working that Saturday morning.  She supposed

5 to be there by 9:30, and I didn't see her.  She

6 called me, and she told me a problem with her car.

7 Her car wouldn't start.  She asked me to come and

8 pick her up.  I said, okay, I'm on my way.

9          The following question was asked and the

10 following answer was given later in that grand jury

11 appearance.

12          Question:  And then what did you do?

13          Answer:  I went to the front door.  When I

14 get to the front door of the building, I can see the

15 three guys that I see.

16          They come in the bathroom before.  I saw

17 them sitting down.  There is a school.  There was a

18 school in front of the building, a kindergarten

19 school, and then a couple of pages later question and

20 Mr. Jinadu, when you first came outside of the

21 apartment building, you saw the three men across the

22 street, the three men that you saw, was it the man

23 that had the baseball bat?

24          Answer:  Yes.

E-434

1          Was it the light-skinned man?

2          Answer:  Yes.

3          And was it the man that had never said

4 anything, but held the gun on you in the living

5 room?

6          Answer:  Yes.

7      MR. RODDY:    We would stipulate if the court

8 reporter were to testify, she would say that's what

9 what she typed down.

10     THE COURT:  Very well.

11     MR. FRANKS:   With that stipulation, the

12 Defense would rest.

13     THE COURT:  All right.

14          Ladies and gentlemen, both sides have

15 completed their presentation of the evidence and

16 given that the hour is now 9:25, I don't think that

17 it would be fair to the parties or to yourself to

18 subject you to final arguments at this late in the

19 evening.

20          It will probably take -- it will probably

21 take an hour and a half at least to get the arguments

22 and instructios of law to you.  It would then be

23 11:00, and I think that we would have you in a hotel

24 very shortly after that.

E-435

1        So, in any event, I'm going to have you
2 back here to this courtroom at 9:15 tomorrow.

3        What I propose to do is move right into the
4 final arguments.

5        I have a fairly long status call tomorrow,
6 but it doesn't start until ten, and we'll have
7 somebody at the door to keep the lawyers and parties
8 out of here, so that we'll get you on your way to
9 your deliberations before I do the routine business
10 of this courtroom.

11        So, it is important that you be here at
12 9:15 so that we can start just as soon as everybody
13 else is assembled and get you off early enough to
14 start your deliberations.

15        Have a pleasant evening.  Do not discuss
16 the case.  We will see you back here tomorrow morning
17 at courtroom 400.  Thank you.

18        THE SHERIFF:  All rise for the jury.

19        A.    This courtroom?

20        THE COURT:    This courtroom, yes.

21        A.    Thank you.

22                            (The following proceedings
23                             were had out of the
24                             hearing of the jury:)

1     THE COURT:  This case will stand in recess

2  until tomorrow at the time indicated.

3          May I see counsel in chambers and the

4  reporter on the jury instruction conference?

5                          (Whereupon, there was a recess

6                          had in the above-entitled

7                          cause, after which the

8                          following proceedings were had:)

9     THE COURT:  Off the record, Paul.

10                         (A discussion was had off

11                         the record, after which

12                         the following proceedings

13                         were had:)

14    THE COURT:  Let's go on the record.

15         This is the jury instruction conference in

16 chambers on Erven Walls.  Mr. Franks, do you want Mr.

17 Walls present?

18    MR. FRANKS:   No.

19    THE COURT:  You have waived his presence?

20    MR. FRANKS:   Yes.

21    THE COURT:  I have People's instructions before

22 me which I've numbered in the order received.

23         People's 1 is I.P.I. 1 point 01.  Any

24 objection?

1      MR. FRANKS:    No.

2      THE COURT:    Given.

3          2, I.P.I. 1.02, any objection?

4      MR. FRANKS:    No.

5      THE COURT:    Given.    Three, 1.03, any

6  objection?

7      MR. FRANKS:    No.

8      THE COURT:    Given.

9          Four, 1 point 05, any objection?

10     MR. FRANKS:    No.

11     THE COURT:    Given.

12     MR. FRANKS:    What's five?

13     THE COURT:    Five, 2.01.    Any objection?

14     MR. FRANKS:    No.

15     THE COURT:    Given.    Six, 2.02.

16     MR. FRANKS:    No objection.

17     THE COURT:    Given.

18         Seven, 2.03.

19     MR. FRANKS:    No objection.

20     THE COURT:    Given.

21         Eight, 3.02.

22     MR. FRANKS:    I would request this instruction.

23     THE COURT:    Huh?

24     MR. FRANKS:    I'm requesting this instruction.

1      THE COURT:   I am sorry.   That's going to be

2  number -- Defense 1.

3      MR. FRANKS:   Okay.

4      THE COURT:   We'll hold that off for a minute.

5  Eight is -- did I say 3.02, circumstantial evidence?

6      MR. FRANKS:   No objection.

7      THE COURT:   Given.

8          Nine is 3.06-07, defendant's statement.

9      MR. FRANKS:   No objection.

10     THE COURT:   Is this proper?

11     MR. FRANKS:   Which one?

12     THE COURT:   It is for you to determine whether

13 the defendant made the statement.

14         Isn't there language in I.P.I. that's to be

15 given only if he denies making the statement?

16     MR. RODDY:   I would have to check, but I

17 assume that's going to be the Defense's argument.

18     THE COURT:   Well, argument and the evidence are

19 two different things.

20         The bracketed phrase in the second sentence

21 should be deleted only when the defendant admits

22 making all of the material statements attributed to

23 him.

24     MR. FRANKS:   He didn't testify, Judge.

E-439

1     MS. CURTISS:   He would have to say I said it,

2 and then we can delete that, right?

3     MR. FRANKS:  Hmm, hmm.

4     MS. CURTISS:  Okay.

5     THE COURT:  It should be deleted only when he

6 admits.

7     MR. RODDY:  It stays like this.

8     THE COURT:  Yeah.  Does that make sense?

9     MR. FRANKS:  Yeah, even at this hour, at 9:00

10 at night.

11    MR. RODDY:  There is no evidence to the

12 contrary that he didn't make the statement.

13    THE COURT:  I suppose, okay.  That will be

14 given.  10 is 3.11, prior inconsistent statements?

15    MR. FRANKS:  Okay.

16    MR. RODDY:  It should just be the first one.

17 I prepared it because the other side wanted it.  It

18 should be the first one.

19    THE COURT:  Any objection?

20    MR. FRANKS:  The top one is the one that the

21 judge has.

22    MR. RODDY:  Yes.

23    MR. FRANKS:  The top one is fine.

24    THE COURT:  11 is 3 point 15, identification

1 testimony.

2      MR. FRANKS:    No objection.

3      THE COURT:    Given.

4           12, 5.03, accountability.

5      MR. FRANKS:    No objection.

6      THE COURT:    Given.  13, 6 point 05X, attempt
7 murder definition.

8      MR. FRANKS:    No objection.

9      THE COURT:    Given.  14, 6 point 07 X, issues of
10 attempt murder.

11     MR. FRANKS:    No objection.

12     THE COURT:    Given.  15, 8 point 01, definition
13 of kidnapping.

14     MR. FRANKS:    No objection.

15     THE COURT:    Given.

16          16, 8 point 04, definition of aggravated
17 kidnapping.

18     MR. FRANKS:    No objection.

19     THE COURT:    Given.

20          17, 8 point 05, issues of aggravated
21 kidnapping.

22     MR. FRANKS:    No objection.

23     THE COURT:    Given.

24          18, 11 point 13, definition of aggravated

1 battery.

2      MR. FRANKS:   No objection.

3      THE COURT:  Given.

4        19, 11 point 14, issues of aggravated

5 battery.

6      MR. FRANKS:   No objection.

7      THE COURT:  Given.

8      THE COURT:  Twenty, definition of armed

9 violence.

10     MR. FRANKS:   No objection.

11     THE COURT:  Given.  21, issues of armed

12 violence, 1152.

13     MR. FRANKS:   No objection.

14     THE COURT:  Given.  22, 14 point 05, definition

15 of armed robbery.

16     MR. FRANKS:   No objection.

17     THE COURT:  Given.  23, 14 point 06, issues on

18 armed robbery.

19     MR. FRANKS:   No objection.

20     THE COURT:  Given.

21     THE COURT:  24 is 26 point 01, the general

22 housekeeping instruction.

23     MR. FRANKS:   No objection.

24     THE COURT:  Given.

1          The verdict forms are 25 and 26, not

2 guilty, guilty of attempt murder.  Any objection?

3     MR. FRANKS:   No.

4     THE COURT:   27 and 28, not guilty and guilty of

5 armed violence.

6     MR. FRANKS:   No objection.

7     THE COURT:   Given.

8          29 and 30, not guilty and guilty of armed

9 robbery.

10    MR. FRANKS:   No objection.

11    THE COURT:   Given.

12         31 and 32, not guilty and guilty of

13 aggravated kidnapping.

14    MR. FRANKS:   No objection.

15    THE COURT:   33 and 34, not guilty and guilty of

16 battery.

17    MR. FRANKS:   No objection.

18    THE COURT:   You have Defense Number 1.

19    MR. FRANKS:   Yes.

20    THE COURT:   That will be given.

21    MR. RODDY:   No objection.

22    THE COURT:   Well, you all get a good night's

23 sleep.  Maybe, you won't.

24    MR. FRANKS:   Thank you, Judge.  See you in the

E-443

1 morning.

2      THE COURT:    We will.

3                          (Whereupon, there was a recess

4                          had in the above-entitled

5                          cause, after which the

6                          following proceedings were had:)

7      THE SHERIFF:   Court is back in session.   Court

8 is back in session.   Please be seated and quiet.

9      THE COURT:    Okay.

10          We were notified the jury had reached a

11 verdict at roughly 10:00.   The Court is assembled.

12 We will have the jury come in at this time.

13      THE SHERIFF:   Coming out, jury.

14                          (The following proceedings were

15                          had in the hearing and the

16                          presence of the Hillard jury:)

17      THE COURT:    Be seated, ladies and gentlemen.

18          Mr. Thompson?

19      THE FOREPERSON:    Yeah.

20      THE COURT:    You are the foreperson, sir?

21      THE FOREPERSON:    Yes, sir.

22      THE COURT:    I understand you reached verdicts?

23      THE FOREPERSON:    Yes, sir.

24      THE COURT:    Would you give the papers to the

1 sheriff, please?

2 THE FOREPERSON: Yes, sir.

3 THE COURT: Thank you.

4 Let the record reflect the Court has

5 examined the verdict forms and finds them to be in

6 proper order.

7 I'll tender them to the clerk to read to

8 the courtroom as assembled.

9 THE CLERK: We, the jury, find the defendant,

10 Tony Hillard, not guilty of attempted first degree

11 murder.

12 We, the jury, find the defendant, Tony

13 Hillard, guilty of armed robbery.

14 We, the jury, find the defendant, Tony

15 Hillard, guilty of aggravated kidnapping.

16 We, the jury, find the defendant, Tony

17 Hillard, guilty of aggravated battery.

18 We, the jury, find the defendant, Tony

19 Hillard, guilty of armed violence.

20 THE COURT: Anything further?

21 MS. BORMANN: I would ask that you poll the

22 jury, please.

23 THE COURT: Ladies and gentlemen, the Defense

24 has requested that the jury be polled.

1          This is a routine procedure employed at the
2 end of deliberations.

3          The clerk will be asking you individually
4 essentially this question.  Was this and is this now
5 your verdict?

6     THE CLERK:

7     Q.   Katherine Lease, was this then and is this
8 now your verdict?

9     A.   Yes, it is.

10     Q.   Norma Miller, was this then and is this now
11 your verdict?

12     A.   Yes.

13     Q.   Dean Maiben, was this then and is this now
14 your verdict?

15     A.   Yes.

16     Q.   Evangeline Kurtzer, was this then and is
17 this now your verdict?

18     A.   Yes.

19     Q.   Stephen Hinds, was this then and is this
20 now your verdict?

21     A.   Yes.

22     Q.   Carl Wendell, was this then and is this now
23 your verdict?

24     A.   Yes.

E-446

1    Q.   William Swanigan, was this then and is this
2 now your verdict?

3    A.   Yes.

4    Q.   Frederick Pannoke, was this then and is
5 this now your verdict?

6    A.   Yes, it is.

7    Q.   Malika Cooper, was this then and is this
8 now your verdict?

9    A.   Yes.

10   Q.   Rogers Thompson, was this then and is this
11 now your verdict?

12   A.   Yes.

13   Q.   Jopseh Koniewicz, was this then and is --
14 was this then and is this now your verdict?

15   A.   Yes.

16   Q.   Kelly Lukes, was this then and is this now
17 your verdict?

18   A.   Yes.

19   THE COURT:   Very well.

20        The jury having been polled, the clerk will
21 be directed to enter judgment upon the verdicts of
22 the jury as returned in open court.

23        Ladies and gentlemen, with the return of
24 your verdict here, your verdicts, I should say, this

1 will complete the trial and your jury service.

2          On behalf of the participants and myself, I

3 wish to extend to you our appreciation for the

4 service that you have rendered here.

5          I say that without regard to what your

6 decision is or would be.

7          We recognize that folks such as yourselves

8 who come down here and agree to sit as jurors are

9 performing a very sobering and responsible task, one

10 that I over the years recognized as being second only

11 insofar as the ingredients of citizenship are

12 concerned to service in the military in the defense

13 of this country.

14          I routinely spend a few minutes with the

15 jurors before we send you on your way for a couple of

16 reasons, and one is to make myself available to

17 answer any questions you may have about your jury

18 service or about the case.

19          So, if you'll step back into the jury room,

20 I'll be with you just very briefly.

21     THE SHERIFF:  Come on, folks.  All rise for the

22 jury.

23                         (The following proceedings

24                          were had out of the

1                          hearing of the jury:)

2       MS. CURTISS:    At this time, the People would

3 move the defendant's bond be revoked.

4       THE COURT:    Bonds will be revoked.  We'll set

5 this down for presentence return and post-trial

6 motions.  I want to go past the 30 days.

7       MS. BORMANN:    As long as the State agrees to

8 waive it in terms of the motion for new trial.

9       THE COURT:    Well, I can waive it.

10      MS. BORMANN:    Thank you, yes.  If the Court

11 will allow that.

12      THE COURT:    What week will you be back now?

13      MS. BORMANN:    I will be back on -- do you want

14 to do it the week of the 17th?

15      MS. BORMANN:    That's fine.  The 19th, if that's

16 convenient.

17      THE COURT:    Yeah, that's fine.  August 19.

18 Make sure that the PSI request is completed.  We'll

19 stand in recess until tomorrow at 9:30.

20      MS. CURTISS:    I am sorry, your Honor.  I will

21 not be here on the 19th.  I'm on vacation the 14th

22 through the 24th.

23      THE COURT:    You won't be here.

24      MS. CURTISS:    I'm on vacation the 14th through

E-449

1 the 24th.

2      THE COURT:   The 14th through the 24th.

3      MS. CURTISS:   Yes.

4      THE COURT:   Well, let's make it for the 26th.

5 How's that?

6      MS. BORMANN:   That's fine.

7      THE COURT:   August 26.

8      MS. BORMANN:   Thank you.

9      MS. CURTISS:   Thank you.

10      THE COURT:   Court's in recess then until

11 tomorrow morning.

12                              (A continuance

13                              was taken to 7-16-98.)

14

15

16

17

18

19

20

21

22

23

24

1

2 STATE OF ILLINOIS )
                    )  SS.
3 COUNTY OF C O O K )

4

5

6      I, PAUL P. MARZANO, CSR, RPR, Official Court

7 Reporter for the Circuit Court of Cook County,

8 Illinois Judicial Circuit of Illinois, do hereby

9 certify that I reported in shorthand the proceedings

10 had in the above-entitled cause; that I thereafter

11 caused the foregoing to be transcribed, which I

12 hereby certify to be a true and accurate transcript

13 of the report of proceedings had before the Honorable

14 MICHAEL TOOMIN, Judge of said court.

15

16

17                     Official Court Reporter,
                          License #84-001789
18

19

20

21 Dated this ____21st__ day

22 of _____January _, 1999.

23

24

E-451

1    STATE OF ILLINOIS  )
                          ) SS:
2    COUNTY OF C O O K  )

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - CRIMINAL DIVISION

4

    THE PEOPLE OF THE     )
5    STATE OF ILLINOIS    )
                       )
6          vs.         ) No. 97 CR 30453
                       )
7    TONY HILLARD       )

8

9               REPORT OF PROCEEDINGS at the hearing

10   of the above-entitled cause, had before the

11   HONORABLE MICHAEL P. TOOMIN on the 26th day of

12   October 1998.

13

    A P P E A R A N C E S:
14        HON. RICHARD A. DEVINE
           State's Attorney of Cook County
15        BY:   MS. ANN CURTIS
             Assistant State's Attorney
16            Appeared on behalf of the People;

17        MS. RITA FRY
           Cook County Public Defender
18        BY:   MS. CHERYL BORMANN
             Assistant Public Defender
19            Appeared on behalf of the Defendant.

20

21

22

23   JO ANN KROLICKI, CSR
    Official Court Reporter
24   Illinois License No. 084-002215

F-1

1          THE CLERK:  Tony Hillard.

2          MS. BORMANN:  Your Honor, this is Tony

3     Hillard.  I'm asking on today's date to file an

4     Amended Motion for a New Trial.  I believe it's

5     actually already in the court file.

6                    The only difference between the

7     amended motion and the motion I filed previously

8     is the last paragraph, which alleges that the

9     sentencing scheme of the current armed violence

10    statute is unconstitutional as it violates the

11    single subject rule.

12         MS. CURTIS:  Your Honor, on the last

13    court date, counsel provided a 2nd District

14    opinion regarding that matter.  On today's date, I

15    have supplied both to the Court and to counsel the

16    First District's ruling on the same matter wherein

17    it found that, in fact, the single subject rule

18    was not violating.  In fact, that the

19    armed violence is constitutional.

20         MS. BORMANN:  That's correct.  In fact,

21    I believe I informed the Court on the last court

22    date that there was a First District case because

23    it was mentioned in the Danety (phonetic) opinion,

24    so there is currently a split among the circuits

F-3

```
 1    regarding that issue.

 2              THE COURT:  Well, in the Lortell Wiggins

 3    (phonetic) case, Miss Curtis, was that

 4    armed violence that was at issue there or unlawful

 5    use of weapons?

 6              MS. CURTIS:  Yes.  Actually, I think it

 7    was the WIC.  It wasn't even --

 8              THE COURT:  The WIC?

 9              MS. CURTIS:  Yes.  I believe that was

10    the issue that brought it to the Court.  However,

11    in ruling upon it, it held that all of the matters

12    that were taken up in that bill were appropriately

13    in the bill and that there was no violation of the

14    single subject rule.

15              MS. BORMANN:  That's correct.  And the

16    2nd Circuit came to exactly the opposing opinion

17    based upon the inclusion of the WIC Act as it was

18    included in the Safe Neighborhood Act.  It

19    regulated things like who could sell WIC, who

20    could buy WIC, how they did the voucher system,

21    and it had nothing to do with criminal activities,

22    and they found that violative of the single

23    subject rule in the 2nd District.

24              THE COURT:  Anything else you want to
```

1    say about the motion?

2          MS. BORMANN:  No, your Honor.  We'd rest

3    on the motion as filed.  It's pretty extensive.

4          THE COURT:  Yes.  I have had occasion

5    earlier before the amendment was filed to study

6    the motion for a new trial.

7          Does the state have any comment on

8    it?

9          MS. CURTIS:  Your Honor, we believe you

10    ruled appropriately throughout the trial, and the

11    only comment is we are in the First District, and

12    we'd ask this Court follow the ruling of the First

13    District opinion.

14          THE COURT:  Well, I believe that I am

15    obliged to follow the ruling of the First District

16    in the Wiggins case, so I do not believe there's a

17    violation of the single subject rule here based

18    upon that holding.

19          The other matters that have been

20    urged here, many of them were presented to the

21    Court for pretrial rulings, also for evidentiary

22    rulings, rulings relating to offers of evidence as

23    well as the motions to dismiss various counts of

24    the indictment.

1          I do not find the rulings of the

2     Court to be in error at this time, and I will deny

3     the Motion for a New Trial.  The motion is hearby

4     denied.

5          MS. BORMANN:  Thank you, your Honor.  I

6     believe we're ready to proceed to sentencing.

7          THE COURT:  Very well.  Does the state

8     have any live witnesses today?

9          MS. CURTIS:  No, your Honor.

10         THE COURT:  Defense?

11         MS. BORMANN:  Yes, your Honor.

12         THE COURT:  Why don't I hear from your

13    witnesses first?

14         MS. BORMANN:  Thank you.  I'd ask to

15    call Mr. Parnell.

16         THE COURT:  Raise your right hand,

17    please.

18              (Witness sworn.)

19

20

21

22

23

24

```
1     WHEREUPON,

2                    WARREN PARNELL,

3     called as a witness on behalf of the Defendant,

4     having been first duly sworn, under oath was

5     examined and testified as follows:

6                    DIRECT EXAMINATION

7                    BY MS. BORMANN:

8         Q.   Can you please tell the judge your name?

9         A.   First name is Warren Parnell,

10    P-a-r-n-e-l-l.

11        Q.   Mr. Parnell, are you employed?

12        A.   Yes, I am.

13        Q.   By whom are you employed?

14        A.   I'm employed by Scott Wesler Service

15    (phonetic).

16        Q.   What do you do for them?

17        A.   I'm a claims adjustor.

18        Q.   Do you also have a vocation that does not

19    pay you?

20        A.   Yes, I do.

21        Q.   What is that vocation?

22        A.   I'm a minister at the New Covenant Life

23    Church.  I also am a participant in prison

24    ministry.
```

```
 1          Q.   Part of your duties as a minister of the
 2     church is also being part of your prison ministry
 3     here at the Cook County Jail; correct?
 4          A.   Correct.
 5          Q.   Do you know the gentleman standing to
 6     your right, Mr. Tony Hillard?
 7          A.   Yes, I do.
 8          Q.   Can you tell us something he's wearing
 9     and point to him, please?
10          A.   Mr. Hillard standing right to my right
11     (indicating.)
12               MS. BORMANN:   Your Honor, may the record
13     indicate that he's pointed to Mr. Hill?
14               THE COURT:   Yes.
15     BY MS. BORMANN:
16          Q.   How long have you known Mr. Hillard?
17          A.   Almost 15-to-20 years.
18          Q.   And how is it that you know Mr. Hillard
19     originally?
20          A.   Originally, I know Mr. Hillard from the
21     old community that I used to stay in, which is --
22          Q.   Which community is that?
23          A.   Cabrini Green.
24          Q.   Did you grow up in Cabrini Green?
```

1       A.   Yes, I did.

2       Q.   At what point in your life did you leave

3  Cabrini Green?

4       A.   I left Cabrini Green in '84 or '85.  I

5  moved to the west side.

6       Q.   Is that now currently where you reside?

7       A.   No.  I currently reside at 1238 West

8  101st Place.

9       Q.   On the south side?

10       A.   Yes.

11       Q.   Now, you have said you have known

12  Mr. Hillard 15 or 20 years.  How is it that you

13  actually met him other than living in the same

14  neighborhood?

15       A.   I used to engage in fellowship with his

16  older brother, Jerome Hillard, and through he and

17  I being buddies in the old community, I met

18  Mr. Hillard.

19       Q.   Okay.  And how old was Mr. Hillard when

20  you first met him?

21       A.   Mr. Hillard was quite young at that

22  time.  I believe no more than seven, eight,

23  somewhere around there.  I was kind of young

24  myself at that time.

1        Q.   Have you had a chance over the years --
2   since 1985, have you had regular contact with Tony
3   Hillard or not?

4        A.   Yes.  I would frequently go over to
5   Cabrini Green and just visit the old neighborhood,
6   see how people are doing, just to talk and get an
7   update of what's going on.

8        Q.   Since Mr. Hillard has been incarcerated
9   on this case, have you had occasion to see him
10  during the pendency of this matter?

11       A.   Yes, I have.

12       Q.   Where has that been?

13       A.   That's been in Division 1 of Cook County
14  Jail.

15       Q.   And how often are you in Division 1 of
16  Cook County Jail?

17       A.   Every Saturday.

18       Q.   And what is your purpose for being in
19  Division 1 every Saturday?

20       A.   To go and minister to the men that's
21  locked up.

22       Q.   And would you minister to those men
23  whether or not Tony Hillard was there?

24       A.   Yes.

F-10

1          Q.    And did you, in fact, prior to

2    Mr. Hillard being incarcerated on this case, go to

3    Division 1 every Saturday?

4          A.    Yes.

5          Q.    Since you have been ministering at Cook

6    County Jail, has Mr. Hillard been actively

7    involved in your ministry at Division 1?

8          A.    Yes, he is.

9          Q.    Can you explain that to us?

10         A.    When I first started going to Division 1,

11   I had occasion to meet Mr. Hillard.   I did not

12   know he was there, but since then, I have been

13   going, and since he's been there, he's been a

14   fellow participant in our ministry.

15                   When I first started coming, he

16   was kind of, you know, back, but the last six,

17   seven months, he's been right there up front in

18   organizing the ministry get-together, getting

19   people to calm down.   When I come in, he asks the

20   brothers to turn the TV down and kind of bring the

21   noise to a level where those who want to hear me

22   preach can come up close and hear me.

23                   So he's been a leader in helping

24   me out to organize the meetings.   Even when I'm

F-11

1    not there, he's leading a prayer group.  He's

2    leading a service even while we're not there.

3         Q.    Now, you know that Mr. Hillard has

4    previously been convicted of two drug offenses in

5    his background?

6         A.    Yes.

7         Q.    In 1992 and 1994; correct?

8         A.    Yes.

9         Q.    You knew him back in those days; correct?

10        A.    Yes, I did.

11        Q.    Have you seen a change in him between

12   those days of 1992 until the present time, which

13   is October of 1998?

14        A.    Yes, I have.  I have seen a change.

15        Q.    Can you tell the judge what that change

16   is?

17        A.    There's a demonstration in his character

18   where -- you can tell anybody from their

19   character.  I seen a demonstration of his

20   character not only by how he's acting around when

21   I'm there, but also when I'm not there.  To me,

22   that's the key.

23        Q.    What do you mean about when you're not

24   there since you're not there?

F-12

1      A.   He doesn't know, but I have asked fellow

2   individuals and guards to keep an eye on

3   Mr. Hillard to let me know how he's doing.

4   Sometimes they can portray one way while you're

5   there, and when you're not, there's a different

6   character.

7                    I have asked individuals to keep

8   an eye on him and give me a report, and there's

9   always a good report.  Mr. Hillard is doing good.

10  He's keeping low key.  He's reading his Bible.

11  He's keeping the guys together.  He try to talk to

12  guys, and there's always a positive aroma about

13  himself.

14      Q.   As a result of that positive -- his

15  positive actions, has he recently been transferred

16  in Division 1?

17      A.   Yes, he has.

18      Q.   And where was he transferred from and

19  where to?

20      A.   He was transferred, I believe, from E-1

21  to G-2, and G-2 they have a cell block where

22  christians can interact, and that's only done when

23  persons show good behavior, good attitude, and

24  they saw that in Mr. Hillard, and they allowed him

1      to go to G-2.

2          Q.    You have obviously known the family for

3      quite awhile?

4          A.    Yes.

5          Q.    Do you still keep in contact with

6      Mr. Hillard's older brother?

7          A.    When I have an opportunity to visit the

8      neighborhood.

9          Q.    Is Miss Hillard in court today, Tony's

10     mom?

11         A.    Yes.

12         Q.    Is she employed?

13         A.    Yes.  She's a nurse.

14         Q.    Is there anything else that I failed to

15     ask you that you wish to tell Judge Toomin about

16     Mr. Hillard?

17         A.    No.  There's nothing you failed to ask,

18     but I just stand on his behalf.  I know

19     Mr. Hillard from his beginning, and even now.  And

20     if Mr. Hillard was not demonstrating a character

21     where I thought he would be safe to the community,

22     I would be the first and foremost to go against

23     anything that would not be correct, because

24     not only do I have a family, I have other members

F-14

1    who have family, and I believe and have strong

2    faith that Mr. Hillard has done a change for the

3    better.

4                    MS. BORMANN:  Thank you.

5                    THE WITNESS:  Thank you.

6                    MS. BORMANN:  Your Honor, we have no

7    other witnesses to call in mitigation.

8                    THE COURT:  All right.  I'll hear from

9    the state first.

10                   MS. CURTIS:  Thank you, your Honor.

11                   Throughout the course of the jury

12   trials and the bench trial, your Honor learned of

13   the occurrences in 1997 which Mr. Hillard was a

14   part of, and, your Honor, I submit to you this

15   morning that this man out of all that were on

16   trial is the most dangerous.

17                   The two others that were on trial,

18   Miss Jinadu and Mr. Walls, they had a connection

19   to Yinka.  One was his wife.  One was now the

20   boyfriend of his wife.  But there's no connection

21   with Mr. Hillard and Mr. Jinadu.  He didn't know

22   him.

23                   He joined this conspiracy to

24   commit torture without knowing the victim, without

F-15

1   any personal grudge that's foreseeable, without
2   any bias that this Court could :ee, and when he
3   joined that conspiracy, his actions, different
4   than the others, really indicated that he did --
5   he did want to kill him.

6               You may recall from the trial it's
7   this defendant that puts the gun in the victim's
8   mouth and says, no joke, tell me where the money
9   is, tell me where the car is.  He's the one that
10  bound the victim.  He's the one that went back in
11  with the gun and pillow and said, it's time for
12  you to die, and at that juncture, it was another
13  co-offender who pulled this defendant back.

14              His actions indicate one of two
15  things, either he clearly did intend to kill him,
16  or his intention was simply to psychologically
17  torture the victim while he was there bound and
18  beaten.

19              The defendant's background
20  indicates a corroboration for these character  .
21  traits, these character traits that indicate that
22  it's easy for him to pick on the weak.  It's easy
23  for him to be cruel.  He has a conviction for
24  possession of controlled substance with intent to

F-16

1     deliver, a crime wherein it preys on weak and
2     dependent people.  It preys on drug addicts for
3     profit.  That's in his background.
4                    In looking at factors of
5     mitigation, I look at, is the defendant's criminal
6     conduct the result of circumstances unlikely to
7     occur.  What we have are circumstances that will
8     occur again and again, because without
9     provocation, this defendant will eagerly join a
10    criminal conspiracy.
11                   And what's important when the
12    Reverend spoke and what's important in reviewing
13    the defendant's presentence investigation, there
14    is nothing in this presentence investigation but
15    fabulous people to look to for conduct that he
16    should have aspired to.  His mother, who is here
17    today in court, has supported him all of his
18    life.  She has worked for the past ten years as a
19    nurse.
20                   The defendant has never held a
21    job.  The defendant has children, but does not
22    support them.  He indicates that he was not drug
23    dependent, alcohol dependent.  He has not been
24    part of a gang.

1               He has been surrounded and

2    nurtured in a community that, really, his conduct

3    is the exception.  He has seen good conduct, good

4    character traits, and opted not to follow them.

5    There is something inside of him that prevents him

6    from taking the good road.

7               He always takes the bad road, and

8    for that reason, for this willingness to violate

9    the law despite good example, the likelihood that

10   this defendant's criminality will recur in the

11   future, I believe, is great.

12              And I know this Court does not

13   have a crystal ball; however, because of his past

14   track record and because of the facts and

15   circumstances of this case -- this is wanton

16   cruelty.  This was clearly exercised without any

17   provocation of the victim.

18              Because of this, I submit that

19   this defendant is the most dangerous because every

20   person walking out there in society is a likely

21   victim.  He need have no connection to them, no

22   bias toward them, no grudge.  Everybody out there

23   is a potential victim when this man is on the

24   streets, and for that reason, your Honor, I ask

F-18

1    that he be sentenced to significant years in the

2    penitentiary.

3              THE COURT:  Miss Bormann?

4              MS. BORMANN:  Mr. Hillard is going to be

5    23 at the end of this year.  Mr. Hillard has two

6    prior convictions, the last of which was from four

7    years ago for narcotics cases.  There's absolutely

8    no indication of violence in his background

9    whatsoever.

10             I want you to remember the facts

11   of this case, because with respect to Mr. Hillard,

12   it was by far the weakest case for the state.  It

13   was, in the vernacular of this building, a single

14   finger ID with no prior description that matches

15   Mr. Hillard and no former knowledge between the

16   two that would boost an identification and, in

17   fact, conflicting testimony from the victim in

18   this case, all of which was decided in the state's

19   favor by the jury, but you can consider that in

20   mitigation.

21             The victim testified, as

22   Miss Curtis indicated, that at some point

23   Mr. Hillard had a gun.  However, you'll remember,

24   your Honor, that that gun was identified as a

F-19

1    different gun when Mr. Roddy asked the question

2    than when I asked the question and then cleared up

3    by co-counsel, Mr. Franks, in his own

4    cross-examination.

5                    Mr. Jinadu further testified that

6    my client -- at one point, my client was one of

7    the people to bring him into the bathroom with one

8    other individual, and then at another point during

9    his testimony, indicated that there were three

10   people, and my client wasn't one of the people who

11   was there.

12                   There were, to put it mildly, a

13   number of inconsistencies in that person's

14   testimony.  This is a true identification case,

15   and Mr. Jinadu got up and identified Tony Hillard,

16   but it's the defense's belief, your Honor, in this

17   case that there's been no showing -- Miss Curtis

18   is right.  If you believe Mr. Hillard did this, I

19   suppose there's absolutely no indication as to

20   why.

21                   There's simply no evidence in the

22   record other than the testimony by Mr. Jinadu that

23   even indicates that there is a relationship

24   between Mr. Hillard, Miss Jinadu, and Mr. Walls.

F-20

1    I can tell you that the defense's position in this

2    case is that there wasn't, and that Mr. Hillard

3    was wrongly identified.  You know how weak

4    identification testimony can be, and that's what

5    this case was about.

6         THE COURT:  There was, was there not,

7    some indication of a gun that was --

8         MS. BORMANN:  Registered to a Loretha

9    Hillard, correct, and absolutely no testimony

10   linking Loretha Hillard with Tony Hillard other

11   than a last name in common.  That's correct.

12            Your Honor allowed the state to

13   introduce a certified copy of gun registration of

14   one of the guns that was retrieved from the room

15   where Mr. Jinadu had been held.  That gun clearly

16   was registered to, I believe, a woman, indicated

17   female, a Loretha Hillard.

18            There was no other evidence

19   connecting Mr. Hillard to this alleged Loretha

20   Hillard other than having the same last name.  But

21   you're right about that.  That was part of the

22   evidence in this case.

23            Your Honor, in light of what

24   Mr. Parnell got up here and told you, he knew

F-21

1    about Mr. Hillard's prior convictions.  He's had
2    significant contact with Mr. Hillard, both when
3    Mr. Hillard was growing up and now since --
4    because of his ministry in the jail.
5                   He got up here and he told you he
6    has seen a change in Mr. Hillard, and, in fact,
7    the jail has seen a change in Mr. Hillard, which
8    is why Mr. Hillard was transferred from a tier in
9    the jail that had more security to one that had
10   less, and we're asking your Honor to take those
11   mitigation factors into consideration when
12   sentencing Mr. Hillard.
13                   I understand that this is a
14   consecutive sentencing scheme here, but I'm asking
15   for the minimum.  This was by far the weakest case
16   the state had in this case, and Mr. Hillard has
17   never presented a violent past to anybody in his
18   past, and with the testimony of Minister Parnell,
19   Reverend Parnell, we're asking you to allow
20   Mr. Hillard to become a productive member of
21   society.
22                   It's interesting to note, your
23   Honor, that when we talk about the social history,
24   it's a rather brief presentence investigation, but

F-22

1    under the education, the defendant reported that

2    his future education goal is to obtain his high

3    school diploma.  This is something kind of out of

4    the blue.  He wants to do the right thing, and

5    we're asking your Honor to give him a chance to do

6    that.

7           THE COURT:  Mr. Hillard, the law gives

8    you this opportunity to speak on your own behalf.

9    Do you have anything to say at this time?

10           THE DEFENDANT:  No, sir.

11           THE COURT:  You do not?

12           THE DEFENDANT:  No, sir.

13           THE COURT:  The Court has studied and

14    familiarized itself with the presentence report

15    containing the background, social investigation of

16    the defendant, employment, family history,

17    criminal background as well as education.

18           I have listened to the mitigation

19    evidence today and the comments of both counsel,

20    both in aggravation and in mitigation, all within

21    the context of the mandate of the legislature

22    which tells me factors that I am supposed to look

23    at and consider both in aggravation and mitigation

24    in passing sentence in cases such as these.

1              In aggravation, it is apparent, it

2      is significant from this case that the facts of

3      the case are paramount, in my opinion, for they

4      reflect an unprovoked, senseless beating, more

5      than beating, torture of Mr. Jinadu, possibly drug

6      related, a group assault.  Mr. Jinadu was severely

7      beaten.  His orbital bone was fractured.  He was

8      hospitalized.

9              And we have the added component

10     that not only was this a beating, a gang beating,

11     group beating, and torture, but there were

12     individuals, and more specifically Mr. Walls, who

13     was identified as being -- excuse me --

14     Mr. Hillard being identified as having a gun as

15     was Mr. Walls.

16              Deterrence is another factor that

17     the Court must consider both for Mr. Hillard as

18     well as others who might be similarly situated and

19     inclined to emulate or follow this behavior.

20              Mr. Hillard is not a stranger to

21     the criminal justice system.  He was given the

22     lenity of the court in 1992, probationary

23     sentence.  He was entitled to probation; he got

24     it.  Apparently, he may have completed it

F-24

File Date: _7-1-2008_

Case No: _08cv1775_

ATTACHMENT # _____

EXHIBIT _T-part 12_____

TAB (DESCRIPTION)

_____

1    satisfactorily.

2              But nonetheless, he came back two

3    years later with an even more serious offense,

4    possession with intent to deliver within a

5    thousand feet of a school, and he received three

6    years in the penitentiary.  His background is

7    much like that of Erven Walls, prior drug

8    convictions.

9              The presentence report does not

10   demonstrate any logical reason of why Mr. Hillard

11   finds himself in this position today.  He comes

12   from a supportive family, a mother and a father

13   who live together; albeit, not married, but

14   nonetheless, received their support.  He was able

15   to attend high school.  He attended high school at

16   Near North Metro at least up to two years and then

17   dropped out.  He is unmarried.  He has not himself

18   enjoyed any employment opportunities, but

19   nonetheless, has fathered three children; albeit,

20   children that are not being supported by himself.

21             It is true, as Miss Curtis

22   observes, that the Court does not have a crystal

23   ball, and yet, there is no reasonable assurance

24   that I have that this type of conduct would not

1    recur in the future were Mr. Hillard again placed

2    among civilized people within the community.

3                    There was no provocation here, no

4    justification, no excuse, no reasonable

5    explanation.  The only explanation was one that

6    was unreasonable, greed, and the idea that one is

7    entitled to the property or wealth of another and

8    can take it when they choose to.

9                    Considering all of these factors

10   in aggravation and in mitigation, it will be the

11   judgment of the Court that the defendant, Tony

12   Hillard, will be sentenced as follows:

13                    On Count 4, the charge of

14   armed violence, you will be sentenced to 25 years

15   in the Illinois Department of Corrections.  On

16   Count 3, armed robbery, the Court will impose a

17   sentence of 15 years.  As to Count 12, aggravated

18   kidnapping, the Court will impose a sentence of 10

19   years.  All sentences will run consecutive; that

20   is, the sentence in Count 3 will run consecutive

21   to the sentence in Count 4.  The sentence on Count

22   12 will run consecutive to the sentence in Count

23   3.

24                    The finding of guilty returned by

F-26

1    the jury on Count 17; that is, the verdict finding

2    the defendant guilty of aggravated battery, will

3    merge into the sentence that I have imposed in

4    Count 4, armed violence.

5                    You do, Mr. Hillard, have a right

6    to appeal from the judgments and sentences that I

7    have just imposed.  To do that, however, you must

8    within 30 days come back into court and file a

9    Notice of Appeal with the clerk of the court.

10                    If you were indigent, counsel

11   could be appointed to assist you in that effort

12   and a transcript of the proceedings heard today

13   prior to trial and at trial could be made

14   available to aid your lawyer in that regard.

15                    Have you prepared appeal papers?

16             MS. BORMANN:  I have not, Judge, because

17   I intend to file a motion to reduce sentence.  Can

18   we hold this on and stay the mit to make sure that

19   Mr. Hillard doesn't get shipped?

20             MS. CURTIS:  I believe Mr. Walls is

21   coming back on November 9th.  Am I correct in

22   that?

23             THE COURT:  I won't be here the 9th.

24   I'll be back the 16th or I'll be here next week

F-27

1    probably up to the 4th.

2            MS. BORMANN:  Why don't we do it when

3    you get back?  How about the 17th?

4            THE COURT:  The 17th is fine.  11-17.

5    I'll stay the mit to that date for your motion.

6            MS. BORMANN:  Thank you, Judge, and I

7    will file it in the meantime.

8                            (WHEREUPON, the above matter

9                            was continued to

10                           November 17, 1998.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS   )

2                        ) SS:

3    COUNTY OF C O O K   )

4            I, JO ANN KROLICKI, an Official Shorthand

5    Reporter for the Circuit Court of Cook County,

6    County Department, Criminal Division, do hereby

7    certify that I reported in shorthand the

8    proceedings had in the above-entitled cause, and

9    that the foregoing is a true and correct

10   transcript of my shorthand notes so taken before

11   Judge Michael P. Toomin on October 26, 1998.

12

13   _____

             JO ANN KROLICKI, CSR, RPR
14           OFFICIAL COURT REPORTER
             ILLINOIS LICENSE NO. 084-002215

15

16

17

18

19

20

21

22

23

24

F-29

1    STATE OF ILLINOIS  )
                        ) SS:
2    COUNTY OF C O O K  )

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT-CRIMINAL DIVISION
4

5    THE PEOPLE OF THE       )
    STATE OF ILLINOIS       )
6                           )
       vs.             )  No. 97-CR-30453
7                          )
    TONY HILLARD          )
8

9                       CONTINUANCE

10             REPORT OF PROCEEDINGS at the

11    hearing of the above-entitled cause, before the

12    Honorable MICHAEL P. TOOMIN, on the 17th day of

13    November 1998.

14       APPEARANCES:

15            HON. RICHARD A. DEVINE,
            State's Attorney of Cook County, by
16             MR. LOREN SEIDNER,
            Assistant State's Attorney,
17               appeared on behalf of the People
               of the State of Illinois;
18
            HON. RITA A. FRY,
19            Public Defender of Cook County, by
            MS. CHERYL BORMANN,
20            Assistant Public Defender,
               appeared on behalf of the Defendant
21               Tony Hillard.

22
    Annette M. Golab, CSR
23    Official Court Reporter
    2650 South California Avenue
24    Chicago, Illinois 60608

1      THE CLERK:  Tony Hillard, Sheet 7.

2      MS. BORMANN:  Cheryl Bormann, Assistant Public

3  Defender.  I represent Tony Hillard.  The matter was

4  continued after sentencing for today's date.

5  Mr. Hillard is not in back today.  I cannot tell you

6  if he has been shipped or not, which is a possibility

7  since he was sentenced to an aggregate of 50 years in

8  the Illinois Department of Corrections.

9      What I ask to do is continue the case for

10  hearing on the motion.  I would like Mr. Hillard to

11  be here.  I am tendering a copy to the State.  What I

12  ask to do is to continue the case so that I can

13  ascertain the whereabouts of Mr. Hillard.  And if

14  need be, I will notify the State and maybe we can

15  writ him in from DOC.

16      THE COURT:  Wouldn't it be better --

17      THE DEFENSE ATTORNEY:  Today I have a number of

18  matters.

19      THE COURT:  If we know he is here, it is easy to

20  bring him back over here.  So let's do a house check.

21      MS. BORMANN:  We could continue it.  The motion

22  is on file.  The case has been disposed of.  So we

23  could just continue it for eleven days, and I can let

24  the State know today.  I can call and find out if he

1    is there and continue the matter to the second week

2    of December if that's convenient with the Court, or

3    we can pass the case and I can try and call today and

4    find out if he is here.  And if he is here, we can

5    give it that date.  If he is not here --

6        THE COURT:  You tell me what you want to do.

7        MS. BORMANN:  I suggest we give it a date in the

8    second week of December.  I can notify the State if

9    we need to writ him in from DOC.

10        THE COURT:  December 9th?

11        MS. BORMANN:  That's fine.

12        THE COURT:  December 9th by agreement.

13        MS. BORMANN:  Thank you, Judge.

14

15            (The above cause was continued to

16            10:00 a.m., December 9, 1998.)

17

18

19

20

21

22

23

24

```
1    STATE OF ILLINOIS   )
                         ) SS:
2    COUNTY OF C O O K   )

3

4

5              I, ANNETTE M. GOLAB, an Official Court

6    Reporter in the Circuit Court of Cook County, County

7    Department, Criminal Division, do hereby certify

8    that I reported in shorthand the proceedings had at

9    the hearing of the aforementioned cause; that I

10   thereafter caused the foregoing to be transcribed,

11   which I hereby certify to be a true and accurate

12   transcript of the proceedings had before the

13   Honorable MICHAEL P. TOOMIN, Judge of said Court.

14

15

16

17

18                            _____
                              Official Court Reporter
19

20

21   Dated this 20th day
     of April 1999.
22

23

24
```

G-5

1  STATE OF ILLINOIS )      Off. #727
                         )
2  COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
4
   THE PEOPLE OF THE      )
5  STATE OF ILLINOIS      )
                          )
6        -VS-             )   No. 97-30453
                          )
7  TONY HILLARD           )

8          REPORT OF PROCEEDINGS in the above-entitled

9  cause taken before the Hon. MICHAEL TOOMIN,

10 Judge of said court, on December 31, 1999.

11     PRESENT:

12            HON. RICHARD A. DEVINE,
                  State's Attorney of Cook County, by
13            MR. PATRICK McGUIRE,
                  Assistant State's Attorney,
14                representing the People;

15            MS. RITA FRY,
                  Public Defender of Cook County, by
16            MS. CHERYL BORMANN,
                  Assistant Public Defender,
17                representing the Defendant.

18
   Victoria A. Ondriska
19 Official Court Reporter
   #084-001457
20

21

22

23

24

1

2          THE CLERK:  Tony Hillard.

3          MS. BORMANN:  Good morning, your Honor.

4          The matter is set today for ruling on a motion

5    to reduce sentence which I previously filed on November

6    17, 1998.  Mr. Hillard was sentenced on October 26,

7    1998, and then for a variety reasons, most notably the

8    fact that he was not brought over from the jail and then

9    shipped to the Department of Corrections although there

10   was outstanding mitt for him here, the case was

11   continued from time to time.

12         At this time we stand on the motion as

13   written.

14         THE COURT:  The Court had the opportunity to

15   review this motion some weeks ago.  These matters

16   essentially were brought to the attention of the Court

17   at the time of the sentence, either expressly or

18   impliedly.  I do not find there is any merit in the

19   motion.

20         The motion to reduce will be denied.

21         MS. BORMANN:  Thank you, your Honor.

22         At this time, your Honor, I'm seeking leave to

23   file a notice of appeal.  Mr. Hillard himself has

24   actually signed it on today's date, and we're asking for

1   the appointment of the Public Defender.

2           THE COURT:   The State Appellate Defender?

3           MS. BORMANN:   Actually, no.   Our own Public

4   Defender.

5           THE COURT:   The Public Defender will be

6   appointed.

7           MS. BORMANN:   Thank you, Judge.

8                           (Which were all the proceedings

9                            had in the above-entitled cause

10                           on said date.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  STATE OF ILLINOIS )
                     ) SS.
2  COUNTY OF COOK    )

3

4        I, VICTORIA A. ONDRISKA, Official Court

5  Reporter, do hereby certify that the foregoing Report of

6  Proceedings was reported by me, and is a true and

7  accurate transcript of my shorthand notes so taken.

8

9                    *Victoria A. Ondriska*

10                   Victoria A. Ondriska

11

12

13

14

15

16

17

18

19

20

21

22

23

24

H  -    5

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

Office # 727

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) ) ) ) | |
| vs. | ) ) | No. |
| Tony Hillard | ) ) ) | 97-30453 |

FILED

APR 2 2 1999

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

## REPORT OF COMPLIANCE

I, Thomas G. McEnery, Supervisor of the Official Court Reporters of the Circuit Court of Cook County, County Department-Criminal Division, do hereby state that on the _22_ day of _April_ A.D. 199_9_, the original Report of Proceedings was filed with the Clerk of the Criminal Division. PD

_____
Thomas G. McEnery
Supervisor

Received by _____
Deputy Clerk, Criminal Division

vol 7 of 7

1263 pages

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME . . . . 7 . . . . OF . . 7 . . . VOLUME . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED . PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE . COURT NO. 99-0152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois . . . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and . . . . . . . . . . . . . . . . . . . . . TONY HILLARD . . . . . . . . . . . WAS . . . . . . . . . . . . . . . ., Defendant. . . .

Witness: AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . APRIL 23, . . . . . . . . . . . . ., 19 99 .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**