*HHN*

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex rel.    )
 TONY HILLARD,    )
    )
        Petitioner,    )
    )
    v.    )    No. 08 C 1775
    )
KEITH ANGLIN, Warden,    )
 Danville Correctional Center,[1]    )    The Honorable
    )    Robert W. Gettleman,
        Respondent.    )    Judge Presiding.

**FILED**

7-1-2008
JUL 0 1 2008    YM

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

In compliance with Rule 5 of the Rules Governing Section 2254 Cases in the

United States District Courts, the attached Exhibits to respondent's Answer to

petitioner's Petition for Writ of Habeas Corpus are hereby filed with this Court:

Exhibit A:    Court Hearing and Ruling on Petitioner's Motion to Quash Arrest and
    Suppress Evidence, Circuit Court of Cook County (Mar. 4 and 5, 1998);

Exhibit B:    Petitioner's Opening Brief on Direct Appeal, *People v. Hillard*, No. 1-
    99-0152 (Ill.App.);

Exhibit C:    State's Brief on Direct Appeal, *People v. Hillard*, No. 1-99-0152
    (Ill.App.);

Exhibit D:    Petitioner's Supplemental Brief on Direct Appeal, *People v. Hillard*,

---

[1] Keith Anglin is currently the warden at Danville Correctional Center where
petitioner is presently imprisoned and therefore should be substituted in place of
the named respondent Joseph Loftus. *See* Rule 2(a) of the Rules Governing Section
2254 cases in the United States District Courts; Fed. R. Civ. P. 25(d)(1); *Rumsfeld v.
Padilla*, 542 U.S. 426, 435 (2004) (citing *Hogan v. Hanks*, 97 F.3d 189, 190 (7th Cir.
1996)); *Bridges v. Chambers*, 425 F.3d 1048, 1049-50 (7th Cir. 2005)

No. 1-99-0152 (Ill.App.);

Exhibit E:   Rule 23 Order, *People v. Hillard*, No. 1-99-0152 (Ill.App. June 11, 2001);

Exhibit F:   PLA to the Supreme Court of Illinois, *People v. Hillard*, No. 91958;

Exhibit G:   Order Denying PLA, *People v. Hillard*, No. 91958 (Ill. Oct. 3, 2001);

Exhibit H:   Petitioner's Pro Se Postconviction Petition, No. 97 CR 30453, Circuit Court of Cook County (Aug. 18, 2001);

Exhibit I:   Petitioner's Supplemental Postconviction Petition, No. 97 CR 30453, Circuit Court of Cook County (Nov. 25, 2003);

Exhibit J:   State's Motion to Dismiss Petitioner's Pro Se and Supplemental Postconviction Petitions, No. 97 CR 30453, Circuit Court of Cook County (Jan. 27, 2004);

Exhibit K:   Petitioner's Second Supplemental Postconviction Petition, No. 97 CR 30453, Circuit Court of Cook County (Feb. 4, 2004);

Exhibit L:   State's Amended Motion to Dismiss Postconviction Petitions, No. 97 CR 30453, Circuit Court of Cook County (Feb. 19, 2004);

Exhibit M:   Court Hearing and Ruling from the Bench Denying Petitioner's Postconviction Petition, No. 97 CR 30453, Circuit Court of Cook County (Apr. 28, 2004);

Exhibit N:   Petitioner's Opening Brief on Postconviction Appeal, *People v. Hillard*, No. 1-04-3365 (Ill.App.);

Exhibit O:   State's Brief on Postconviction Appeal, *People v. Hillard*, No. 1-04-3365 (Ill.App.);

Exhibit P:   Petitioner's Reply Brief on Postconviction Appeal, *People v. Hillard*, No. 1-04-3365 (Ill.App.);

Exhibit Q:   Rule 23 Order, *People v. Hillard*, No. 1-04-3365 (Ill.App. June 15, 2007);

Exhibit R:   PLA to the Supreme Court of Illinois, *People v. Hillard*, No. 105011;

Exhibit S:    Order Denying PLA, *People v. Hillard*, No. 105011 (Ill. Nov. 29, 2007); and

July 1, 2008                                        Respectfully submitted,

                                                   LISA MADIGAN
                                                   Attorney General of Illinois


                               By:    _____
                                      CHARLES REDFERN, Bar No. 6283811
                                      Assistant Attorney General
                                      100 W. Randolph Street, 12th Floor
                                      Chicago, IL 60601-3218
                                      PHONE: (312) 814-3565
                                      FAX: (312) 814-2253
                                      EMAIL: credfern@atg.state.il.us

FILED

APR 2 2 1999

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

| | |
|---|---|
| STATE OF ILLINOIS ) | |
| ) SS: | |
| COUNTY OF C O O K ) | |

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT–CRIMINAL DIVISION

TONY HILLARD,        )
      Petitioner,)
              )
    -vs-         )   Case No. 97-CR-30453
              )
THE PEOPLE OF THE  )   Charge: Attempt Murder
STATE OF ILLINOIS,  )
      Respondent.)

### MOTION TO QUASH ARREST
### AND
### SUPPRESS EVIDENCE

REPORT OF PROCEEDINGS of the hearing

before the Honorable MICHAEL TOOMIN, on March 4,

1998.

APPEARANCES:

      MS. RITA FRY,
          Public Defender of Cook County, by
      MS. CHERYL BORMANN,
          Assistant Public Defender
          appeared for the Petitioner;

      HONORABLE RICHARD DEVINE,
          State's Attorney of Cook County, by
      MS. GINA SAVINI,
          Assistant State's Attorney,
          appeared for the Respondent.

EXHIBIT A

A-1

1

## INDEX

2

3     Date of Hearing: 3/4/98
      Page Numbers: A-1 to A-31

4

### PROCEEDINGS

5

| LIST OF WITNESSES | DX | CX | RDX | RCX | RDX |
|-------------------|-----|-----|-----|-----|-----|
6
| BENICIA EBERHARDT | 7 | 14 | | | |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  THE CLERK:  Walls, Jinadu and Hillard.

2  MR. DOSCH:  For the record, Brian Dosch,

3 Assistant Public Defender for Delores Jinadu.

4    Present is Delores Jinadu.

5  MS. BORMANN:  Your Honor, my name is Cheryl

6 Bormann, I am an Assistant Public Defender; I

7 represent Tony Hillard who is standing directly

8 behind me.

9  THE COURT:  With the other defendant.

10  MS. BORMANN:  Erven Walls is in custody.

11  THE COURT:  All right.  We have the three

12 defendants before the court.

13  MS. BORMANN:  Correct, your Honor.

14    With respect to Tony Hillard, matter is

15 set for motion to quash arrest, suppress out of

16 court identification, and then if we can pass that.

17    Then there is the issue of the in-court

18 identification.  We are ready.

19  THE COURT:  Okay.  The other defendants are here

20 I guess for a regular status date.

21  MR. DOSCH:  Yes.

22  MS. WOODBURY:  Yes.

23  THE COURT:  Well, do you want to get dates or do

24 you want to stay here for the motion?

1    MR. DOSCH: No, dates.

2    MS. BORMANN:  We anticipate being ready to set

3    the matter for trial regardless of the ruling on the

4    motion today.

5    THE COURT:  That's fine.

6    MR. DOSCH:  That's fine with me.

7         Bench indicated.

8    MS. BORMANN:  Bench is indicated.

9    MS. WOODBURY:  Bench.

10    THE COURT:  Well, we will give it an earlier

11    date.

12         How about setting this for Thursday, that

13    week of-- the 23rd?

14    MR. DOSCH:  That's fine.

15    MS. WOODBURY:  That's fine.

16    MS. BORMANN:  Fine.

17    MS. WOODBURY:  I have a bench trial in Judge

18    Morrissey's courtroom that has been set several

19    times.  I should-- but that's the only other thing I

20    have.

21    THE COURT:  How is the 30th?

22    MS. SAVINI:  April 30th we are wide open.

23    MS. WOODBURY:  That's fine.

24    THE COURT:  April 30, bench indicated.  We will

1    resolve Mr. Hillard's motion.

2              That's by agreement?

3         MS. WOODBURY:   Yes.

4         MS. BORMANN:   Yes.

5         MS. SAVINI:   Only other thing I need to advise

6    the Court, I had put a call out to my detectives

7    early this morning; I hadn't heard back from them.

8              Miss Bormann didn't think she was going

9    to be ready.   The detective called back, told me

10   they are in the middle of a robbery investigation.

11   He is at the hospital.

12             He gave me a pager, I will see if I can

13   get him back in for this afternoon if we can do her

14   witness in the morning.

15        MS. BORMANN:   That's fine.

16        THE COURT:   We will pass it.

17                       (The case was passed and later

18                        recalled, after which the

19                        following proceedings were had:)

20        THE CLERK:   Tony Hillard.

21        MS. BORMANN:   Your Honor, the Tony Hillard

22   matter is set for a motion to quash arrest, suppress

23   evidence, ready to begin.

24             Just by way of typographical error in the

1    motion, I move to amend paragraph one, alleges that

2    Mr. Hillard was arrested in his home on June 3rd,

3    1997 approximately 6:00 p.m. He was arrested in his

4    home on June 3rd.  It wasn't at 6:00 p.m., it was

5    approximately 10:30 in the morning, 10:30 a.m.

6        THE COURT:  Instead of 6:00 p.m.

7        MS. BORMANN:  Right.  I'd move to strike-- that

8    was my error move-- to strike 6:00 p.m. and--

9        THE COURT:  10:30 p.m.?

10        MS. BORMANN:  A.m., Judge, in the morning.

11        THE COURT:  I'm sorry.  Okay.

12            It's your motion, you may proceed.

13        MS. BORMANN:  Thank you.  We'd ask to call

14    Benicia Eberhardt, please.

15        THE COURT:  Very well.

16        MS. SAVINI:  Judge, I would make a motion to

17    exclude witnesses.

18        THE COURT:  That will be reciprocal.

19                (Witness sworn.)

20                BENICIA EBERHARDT,

21    called as a witness on behalf of the Petitioner,

22    having been first duly sworn, was examined and

23    testified as follows:

24                DIRECT EXAMINATION

A-6

BY MS. BORMANN:

1     Q.  In a nice loud voice, could you state your
name and spell your last name for the court
reporter.

    A.  Benicia, B-E-N-I-C-I-A, Eberhardt,
E-B-E-R-H-A-R-D-T.

    Q.  Miss Eberhardt, where do you currently live?

    A.  714 West Division, apartment 1003.

    Q.  And how old are you?

    A.  Twenty-two.

    Q.  Do you know Tony Hillard?

    A.  Yes.

    Q.  How do you know him?

    A.  We are friends.

    Q.  Back in June of 1997, what was your
relationship with Mr. Hillard?

    A.  He was my boyfriend.

    Q.  Back on June 3rd of 1997, where did Mr.
Hillard live?

    A.  714 West Division, apartment 1003.

    Q.  Was that with you?

    A.  Um-hum.

    Q.  Did-- you have to say yes or no, ma'am.

    A.  Yes.

1          Q.   Did anybody else live in that apartment with

2     the two of you?

3          A.   No.

4          Q.   Miss Eberhardt, how old are you?

5          A.   Twenty-two.

6          Q.   Miss Eberhardt, are your currently on

7     probation for aggravated battery?

8          A.   Yes.

9          Q.   Now directing your attention back to June

10    3rd of 1997 in the morning hours sometime around

11    10:30 in the morning, can you tell us where you

12    were?

13         A.   At my home, 714 West Division.

14         Q.   And where in your home were you?

15         A.   In my bedroom.

16         Q.   How many bedrooms are there in your

17    apartment?

18         A.   Two.

19         Q.   Which bedroom were you in?

20         A.   The first one, my bedroom.

21         Q.   Was anybody else in the bedroom with you at

22    that time?

23         A.   Yes.

24         Q.   Who?

1    A.  Tony Hillard.

2    Q.  You do see Tony Hillard sitting in court

3  here today?

4    A.  Yes.

5    Q.  Could you point to him, tell us what he is

6  wearing?

7    A.  DOC suit.

8    MS. BORMANN:  Your Honor, may the record reflect

9  the in-court identification of Mr. Hillard.

10    THE COURT:  It may.

11    MS. SAVINI:  Thank you.

12    Q.  Where specifically in your bedroom were you

13  at that time?

14    A.  In the bed.

15    Q.  Where was Mr. Hillard?

16    A.  In the bed.

17    Q.  Did something get you out of bed that

18  morning?

19    A.  Yes.

20    Q.  What was the first thing that got you out of

21  bed?

22    A.  A knock on the door.

23    Q.  After you heard the knock on the door, what

24  did you do?

1      A.  Got up.

2      Q.  After you got-- when you got up after you

3  heard the knock on the door, where was Mr. Hillard?

4      A.  Still in the bed.

5      Q.  Did Mr. Hillard eventually get up?

6      A.  Yes.

7      Q.  After had Mr. Hillard got up, where did you

8  go?

9      A.  I went to the door.

10      Q.  What did you do when you got to the door?

11      A.  Opened the door.

12      Q.  When you opened the door, did you see

13  anybody standing outside your apartment door?

14      A.  Yes.

15      Q.  Who?

16      A.  Police.

17      Q.  How many police officers did you see

18  standing outside your apartment door?

19      A.  About three or four.

20      Q.  Now at that time where was Mr. Hillard?

21      A.  Standing like in the hallway.

22      Q.  Approximately how far from where you were

23  standing in the door was Mr. Hillard at this time?

24      A.  Like a little further-- like from where she

1    is sitting just a little further back.

2         Q.   This far?

3         A.   Yeah.

4         Q.   Approximately, your Honor, ten feet or so.

5         THE COURT:   Ten feet, yes.

6         MS. BORMANN: Q.   How were you dressed at that

7    time?

8         A.   I think I had on some boxers and a t-shirt.

9         Q.   And how was Mr. Hillard dressed at that

10   time?

11        A.   He had on some boxers.

12        Q.   Was he wearing a shirt?

13        A.   No.

14        Q.   After you opened the door and realized they

15   were police officers, what happened-- well, strike

16   that.

17             How did you know they were police

18   officers?

19        A.   One of them had a badge hanging on the chain

20   off his neck.

21        Q.   Were they dressed in uniform or were they

22   dressed in regular street clothes?

23        A.   Street clothes.

24        Q.   What happened after you opened the door and

1    noticed they were police?

2       A.   They came in.

3       Q.   And when you say they came in, how many of

4    the police officers came in?

5       A.   All of them.

6       Q.   Where did they go when they came in?

7       A.   Looked through my house, came right in,

8    looked through my house and then they grabbed Tony.

9       Q.   Prior to them grabbing Tony, did they say

10   anything?

11      A.   No.

12      Q.   Where was Tony when they grabbed Tony?

13      A.   He was like in the hallway like going back

14   to the room, I guess to get dressed, you know.

15      Q.   Did-- after they grabbed Tony, did you hear

16   Tony say anything?

17      A.   No, not really because I was in the front.

18      Q.   After they grabbed Tony, did Tony go

19   anywhere with the police officers?

20      A.   Yeah, they took him to jail.

21      Q.   Before they took-- before they left the

22   house, ma'am, did Tony get dressed?

23      A.   Yes.

24      Q.   How did he get dressed?

1      A.   How?

2      Q.   Did he go back by himself to the bedroom

3  where--

4      A.   Oh, no, they went with him in the bedroom

5  when he put on his clothes.

6      Q.   And do you remember what he put on that day?

7      A.   Black jacket, a blue shirt; I think some

8  blue jeans.

9      Q.   Now after the police officers let him put on

10  his clothes, did you see them leave the apartment?

11      A.   Yes.

12      Q.   When you saw them leave the apartment, was

13  Mr. Hillard handcuffed or not?

14      A.   Yes, he was handcuffed.

15      Q.   And can you show the Judge where he was

16  handcuffed, in front or in back?

17      A.   In the back like this ( Indicating).

18      MS. BORMANN:   Indicating, your Honor, for the

19  record, behind his back.

20      THE COURT:   Very well.

21      MS. BORMANN: Q. At that time or any time prior

22  to this, did those police officers ever show you a

23  warrant to search your apartment?

24      A.   No, they didn't.   They just came right in my

1    house.

2        Q.  Did they ever show you a warrant for Mr.

3    Hillard's arrest?

4        A.  No.

5        Q.  Did they tell you where he was being taken?

6        A.  Yes, they said to the 18th District.

7        MS. BORMANN:  I don't have anything further.

8                    CROSS EXAMINATION

9                    BY MS. SAVINI:

10       Q.  Ma'am, when you heard the knock at the door,

11   did you look out your peephole to see who was there?

12       A.  No, just opened the door.

13       Q.  Did you ask who was there before you opened

14   the door?

15       A.  No.

16       Q.  When you opened the door, that's when you

17   saw three or four officers standing in your doorway?

18       A.  Yes.

19       Q.  Did you ask them what they wanted at that

20   time?

21       A.  I didn't have a chance to.

22       Q.  Well, did they tell you that they were the

23   police or is it just the badge that you saw?

24       A.  Yes, the badge.

1       Q.  When you opened the door, is it your

2  testimony that they just walked right in your

3  apartment?

4      A.  Yes.

5      Q.  They just pushed you out of the way?

6      A.  Yes.

7      Q.  And it's your testimony that the defendant

8  was about ten feet behind you in the hallway?

9      A.  Yes.

10      Q.  A place where the police would be able to

11  see him from the door?

12      A.  Yes.

13      Q.  And when they walked right past you, did

14  they go right to your boyfriend?

15      A.  They searched my house first.

16      Q.  So they didn't go to the defendant first,

17  first they searched your house?

18      A.  Yes.

19      Q.  And what were you doing while they searched

20  your house?

21      A.  I was in the front because one of them

22  wouldn't let me back in the back.

23      Q.  I don't understand that.  You were in the

24  front--

1        A.   The front of my house, in my living room.

2        Q.   Because one of them had you in the back?

3        A.   No, they wouldn't let me in the back of my

4    house.

5        Q.   When you say the front, when you enter your

6    apartment you are in the living room, right?

7        A.   Yes.

8        Q.   And in the back of your apartment is a

9    kitchen, right?

10       A.   Yes, the bathroom and bedrooms.

11       Q.   Both bedrooms are in the back?

12       A.   Um-hum.

13       Q.   Is that a yes?

14       A.   Yes.

15       Q.   And that's the hallway that leads to the

16   back that the defendant was standing in, right?

17       A.   Yes.

18       Q.   How many officers stayed with you in the

19   living room?

20       A.   One.

21       Q.   And two or three went into your apartment in

22   other rooms?

23       A.   Yes, three or four.

24       Q.   You couldn't see where they went, could you?

A-16

1       A.   No.

2       Q.   So you don't know that they searched your

3  apartment, do you?

4       A.   I know they searched my apartment.

5       Q.   Did you see them?

6       A.   Yeah, because after he went in the back, the

7  one that had me the front, I went back there to see

8  what is-- why was they in my apartment, they didn't

9  have no right to be.

10      Q.   They didn't make you stay in the living

11  room?

12      A.   Yes.   Then I went back there on my own.

13      Q.   So they let you go back into your kitchen,

14  right?

15      A.   Yes.

16      Q.   And they didn't make you stay in the living

17  room?

18      A.   They made me stay in the living room at

19  first.

20      Q.   And then you got to walk around your

21  apartment anywhere you wanted?

22      A.   Right.

23      Q.   And you never actually saw any officers

24  search though, did you?

1  A. Yes.

2  Q. What officer did you see search?

3  A. One that had the badge hang off his neck.

4  Q. What did he look like?

5  A. He was kind of thick, like a brown skinned--

6  Q. A man?

7  A. Yes.

8  Q. He was black?

9  A. Um-hum.

10  Q. And do you remember about how old he was?

11  A. Probably in his 30's.

12  Q. What room did he search?

13  A. The empty room, the last room.

14  Q. And that would have been a bedroom?

15  A. Um-hum.

16  Q. Nobody stays in that room?

17  A. Huh-uh, but it was--

18  Q. Was that a no?

19  A. No.

20  Q. You have to answer yes or no.

21  A. No.

22  Q. There is a bed in there?

23  A. Yeah.

24  Q. What did you see him do when he was in that

1  room?

2     A.  He raised up the mattress.

3     Q.  Did you see them look--

4     A.  Look up under the bed; that's all.

5     Q.  Were you in the bedroom when they were doing

6  that?

7     A.  I was watching him.

8     Q.  You were in the bedroom watching him?

9     A.  Um-hum.  Yes.

10    Q.  And your boyfriend, the defendant, where was

11 he?

12    A.  In our room.

13    Q.  You didn't see that though?

14    A.  See what?

15    Q.  Well if you were in one bedroom, you

16 couldn't see him in the other bedroom, could you?

17    A.  No.

18    Q.  You are just guessing that he was in the

19 other room?

20    A.  I knew he was in that room, where else would

21 he be?

22    Q.  Well, you have a kitchen and a living room

23 and bathroom, don't you?

24    A.  Yeah.  But that's where he was.

1      Q.   And he was in there as far as you know

2  getting dressed, is that right?

3      A.   Yes.

4      Q.   And you are telling me at no time did the

5  police ever say that they were taking him to the

6  station until they were walking out with him?

7      A.   That's-- I asked them that, where is he

8  going, where are you taking him.  They said 18th

9  District.

10      Q.   And they told you he was under arrest, too,

11  didn't they?

12      A.   No.

13      Q.   They never told you that?

14      A.   No.

15      Q.   Did you ask why he was going there?

16      A.   No.

17      Q.   Well when the police officers came in and

18  searched, how long did they search before they went

19  over to your boyfriend, the defendant?

20      A.   All of them didn't search.

21      Q.   How long did they search before an officer

22  searched-- went over to your boyfriend, the

23  defendant?

24      MS. BORMANN: Objection, asked and answered.

1          THE COURT:  Overruled.

2          MS. SAVINI: Q. You can answer.

3          A.   They came in, some of them went to him and

4     some of them searched my house.

5          Q.   Well, you have told us that you actually saw

6     one in the empty room that has a mattress

7     searching.  Did you see any other officers search

8     anything?

9          A.   Yes.

10          Q.   What other officers did you see search?

11          A.   The ones-- the other ones that was with the

12     one that was searching the bedroom.

13          Q.   How many officers was it that you saw

14     searching?

15          A.   It was like three or four of them.  It was

16     like all of them except for the one that didn't

17     search at first when they first came in.

18          Q.   I thought there were only three or four

19     officers that even came to your door?

20          A.   Yes.

21          Q.   And if one of them stayed with you, how were

22     three or four of them searching?

23          A.   The rest of them was searching.

24          Q.   You only saw one searching though, is that

1    right?

2        A.   No.

3        Q.   You saw two searching?

4        A.   After he got through searching the bedroom,

5    that's, you know, that don't nobody be in, and I

6    left out that bedroom, I went all through my house.

7    I wanted to know what is you all doin'.  They was

8    all in my cabinets, my kitchen, everything.

9        Q.   Did you ever see an officer approach your

10   boyfriend, the defendant?

11       A.   Yes, he was in the room with him getting

12   dressed.

13       Q.   When?  How soon after they entered your

14   house did you see an officer approach your

15   boyfriend?

16       A.   After he got-- me asking why you searching

17   my house and stuff, what you all doin', that's when

18   he went in the bedroom.  He was getting dressed.

19       Q.   So it wasn't until after they searched your

20   house that you finally asked them-- that you finally

21   saw them go over to your boyfriend, is that right?

22       A.   I don't understand what you said.

23       Q.   Well, I am asking you, how soon after the

24   police came through your front door did they go over

1  to your boyfriend, the defendant?

2       A.  As soon as they came in.

3       Q.  How many officers went over to your

4  boyfriend?

5       A.  I don't know.

6       Q.  Did they handcuff him then?

7       A.  No.

8       Q.  Did you see where your boyfriend, the

9  defendant, was at that point?

10      A.  He was in my bedroom.

11      Q.  And which room were you in?

12      A.  I was in the living room when they first

13  came in my house, then they walked past me, went in

14  the bedroom, went all through my house.

15          The one officer had me in the front room,

16  would not let me back.  Then I went in the back;

17  that's when one of them searching the back room, I

18  got to go past my bedroom to get to the next room.

19  That's how I know Tony was in our bedroom.

20      Q.  When you went past your bedroom, is that

21  when you saw him getting dresses?

22      A.  No, he wasn't getting dressed yet.  He was

23  sitting on the bed.

24      Q.  Was he talking to one of the officers?

1        A.   I guess so.

2        Q.   And one of the officers was in the room with

3    him?

4        A.   Yes.

5        Q.   When you came back past your bedroom, is

6    that when you saw him getting dressed?

7        A.   No, he wasn't getting dressed either, that's

8    when I went to my kitchen and saw they was looking

9    all through my cabinets and stuff.

10       Q.   When did you see him getting dressed?

11       A.   Like after they got through like going

12   through my house and stuff, then start putting on

13   his clothes.

14       Q.   Let me get something straight.  There is one

15   officer that stayed with your boyfriend, is that

16   right, that wasn't searching?

17       A.   Um-hum.

18       Q.   Is that a yes?

19       A.   Yes.

20       Q.   And is that the officer that-- from what you

21   could tell was talking to your boyfriend, the

22   defendant?

23       A.   Yes.

24       Q.   And when your boyfriend, the defendant, was

1    getting dressed and you saw this, was that the

2    officer that was in the bedroom with him?

3        A.   All of them was like up in there then.

4        Q.   Because no one was searching anymore?

5        A.   No.

6        Q.   And at that point your boyfriend left the

7    apartment with the police officers, didn't he?

8        A.   Yes.

9        Q.   He didn't fight with them, did he?

10       A.   No.

11       Q.   He didn't argue with them, did he?

12       A.   No.

13       Q.   And when-- did you see him get handcuffed?

14       A.   Yes.

15       Q.   He didn't give them a hard time when he was

16   handcuffed, did he?

17       A.   No.

18       Q.   And he went with them when they took him

19   out, is that right?

20       A.   Yes.

21       Q.   And it's at that point that you asked where

22   they were taking him?

23       A.   Yes.

24       Q.   And they told you?

1       A.   Yes.

2       Q.   Had you ever seen any of these officers

3   before?

4       A.   No.

5       Q.   It's your testimony that you didn't want the

6   police officers to enter your house?

7       A.   No.

8       Q.   You weren't going to cooperate with them or

9   listen to what they had to say?

10      MS. BORMANN:   Objection.

11      THE COURT:   Sustained.

12      MS. SAVINI: Q.   You didn't say anything to them

13   before they came in, is that right?

14      A.   No, I didn't have a chance, they walked

15   right in my house.

16      Q.   And did you say anything to them when you

17   saw them?

18      A.   They walked past me.

19      Q.   You saw them search your kitchen?

20      A.   They just walked in my house.   That's when I

21   start saying something.

22      MS. SAVINI:   One moment, Judge.

23      Q.   The officer that was holding you in the

24   living room asking you to stay in the living room,

1    you never said anything to him?

2         A.   Yeah.  Yes.

3         Q.   You did talk to him?

4         A.   Um-hum, yes.

5         Q.   What did you talk to him about?

6         A.   I asked him why they coming in my house.

7    What you all want.

8         Q.   And did he tell you that they were looking

9    for your boyfriend, Tony Hillard?

10        A.   No, told me to shut up.

11        Q.   They didn't take anything other than your

12   boyfriend from the house, did they?

13        A.   No.

14        Q.   The case that your boyfriend's lawyer asked

15   you about, your aggravated battery, that was from

16   October of '93, is that right?

17        A.   Yes.

18        Q.   And you got probation and four months in the

19   Cook County Jail from Judge Singer?

20        A.   Yes.

21        Q.   And you violated that in July of 1997,

22   right?

23        MS. BORMANN:  Objection.

24        THE WITNESS:  Yes.

1    THE COURT:  Sustained.

2        MS. SAVINI: Nothing further, Judge.

3        MS. BORMANN:  I have nothing further of this

4    witness, Judge.

5        THE COURT:  Thank you.  You may step down.

6                    (Witness excused.)

7        MS. BORMANN:  Judge, we rest.

8        THE COURT:  Petitioner rests.

9        MS. BORMANN:  Oh, no, I'm sorry, Judge, we

10    don't, we actually have a stipulation.

11                It would be stipulated between the

12    parties in this case, the petitioner and the

13    respondent, that after Mr. Hillard was taken out of

14    his home, he was taken to the police station where

15    eventually in the evening at approximately--.

16        THE COURT:  That is the 18th District or Area

17    3?

18        MS. BORMANN:  He was actually taken to Area 3,

19    not the 18th District, taken to Area 3, where he was

20    placed in a lineup at approximately 9:00 o'clock in

21    the evening on June 3rd, 1997.

22                During that lineup where Detective Alonzo

23    Jackson was present, he was identified as an

24    offender in this case by the alleged victim, Yinka,

1    Y-i-n-k-a, Jinadu.

2                    So stipulated?

3        MS. SAVINI:  I will stipulate to that, Judge.

4        THE COURT:  Okay.  With that petitioner rests?

5        MS. BORMANN:  Yes.

6        THE COURT:  Okay.  Any word on these

7    detectives?

8        MS. SAVINI:  Judge, last time I called them they

9    were on Lake Shore Drive.  I asked them if they

10   could be here for the 2:30 call and they said that's

11   what they planned on doing.

12       THE COURT:  Oh good, okay.  Well, we still

13   have-- we can recess this case until 2:30.  We still

14   have Mr. Guerraro, is that correct?

15       THE COURT:  I put a call out to his lawyer.  I

16   know the defendant is here, she has not seen the

17   attorney, I left a voice mail to call us

18   immediately.

19       THE COURT:  Did you have the officer in that

20   case?

21       MS. SAVINI:  Yes.  Four officer here.

22                    And incidentally, Judge, if the Court is

23   concerned, those officers have to execute a search

24   warrant this afternoon when they go on duty.  They

1    don't want it to get stale.  So I just want to alert

2    the Court of their position.

3                              (The case was passed and later

4                                   recalled, after which the

5                                   following proceedings were had:)

6         THE COURT:  Tony Hillard will be by agreement,

7    hold on call to tomorrow to continue for the

8    motion.

9                         (The matter was continued to March 5,

10                                   1998.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

COOK COUNTY, ILLINOIS

I, NOREEN SULLIVAN ERICKSON, an Official
Court Reporter for the Circuit Court of Cook County,
Cook Judicial Circuit of Illinois, do hereby certify
that I reported in shorthand the proceedings had on
the hearing in the above-entitled cause; that I
thereafter caused the foregoing to be transcribed
into typewriting, which I hereby certify to be a
true and accurate transcript of the proceedings had
before the Honorable MICHAEL TOOMIN, Judge of said
court.

OFFICIAL COURT REPORTER

License No. 84-1527

85

```
 1   STATE OF ILLINOIS   )
                         )    SS:
 2   COUNTY OF COOK      )

 3          IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
     THE PEOPLE OF THE   )
 5   STATE OF ILLINOIS   )
                         )
 6                       )    Indictment No. 97 30453
              VS         )
 7                       )    Charge:   Attempted Murder
                         )
 8   TONY HILLARD        )

 9                  REPORT OF PROCEEDINGS

10          BE IT REMEMBERED that on the 5th day of March

11   A.D., 1998, this cause came on for hearing before the

12   Honorable MICHAEL P. TOOMIN, Judge of said court.

13          APPEARANCES:

14                  HON. RICHARD DEVINE,
                    State's Attorney of Cook County, by
15                  MS. GINA SAVINI,
                    Assistant State's Attorney,
16                     appeared for the People;

17                  HON. RITA A. FRY,
                    Public Defender of Cook County, by
18                  MS. CHERYL BORMANN,
                    Assistant Public Defender,
19                     appeared for the Defendant.

20

21

22

     Brenda D. Hayes, CSR
23   Official Court Reporter
     2650 S. California
24   Chicago, Illinois  60608
```

1                          I N D E X

2

3      Date of Hearing:  3-5-98

4      Page Numbers:  B-1 - B-114

5                        PROCEEDINGS

6                          Page    DX      CX      RDX      RCX

7      Vernon Bradley            B-3     B-28    B-85

8      <u>Arguments</u>
       State          B-87
9      Defense        B-96

10     Ruling         B-109

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1              THE CLERK:  Tony Hillard.

2              THE COURT:  This is Mr. Hillard.  This is a

3    continuation from yesterday.  I believe we were

4    waiting for one officer to come in and you have the

5    officer?

6              MS. SAVINI:  Yes, judge, he's here.

7              THE COURT:  Have Mr. Hillard seated at

8    counsel table.

9                        (Witness sworn.)

10                       VERNON BRADLEY,

11   called as a witness on behalf of the People of the

12   State of Illinois, having been first duly sworn, was

13   examined and testified as follows:

14                    DIRECT EXAMINATION

15                    BY MS. SAVINI:

16        Q    Officer, in a loud and clear voice please

17   state and spell your name.

18        A    My name is Vernon Bradley, B-r-a-d-l-e-y,

19   star number 21179, Area Three, Violent Crimes.

20        Q    Are you assigned there as a detective?

21        A    Yes.

22        Q    How long have you been a Chicago police

23   officer?

24        A    Twenty years.

1        Q    Of those years how long have you been a

2    detective?

3        A    One year.

4        Q    Have you been assigned to Area Three that

5    entire time?

6        A    Yes.

7        Q    I'd like to direct your attention to May 12th

8    of 1997, were you working as a detective at Area Three

9    on that day?

10       A    Yes.

11       Q    On that date did you receive an assignment to

12   investigate an armed robbery and aggravated battery of

13   an individual by the name of Yinka Jinadu?

14       A    Yes.

15       Q    That occurred at 5851 North Winthrop in

16   Chicago.

17       A    Yes.

18            THE COURT:   Where was that?

19            MS. SAVINI:   5851 North Winthrop.

20   BY MS. SAVINI:

21       Q    After receiving -- Well, how many days after

22   the incident did you receive that assignment?

23       A    The incident happened on the 10th, I received

24   it on the 12th.

1      Q      So two days after?

2      A      Two days after.

3      Q      After receiving that assignment did you

4    locate the victim, Mr. Jinadu?

5      A      Yes.

6      Q      Where did you locate him?

7      A      He was at Illinois Masonic Hospital.

8      Q      Why was he in Illinois Masonic Hospital?

9      A      He was there being treated for various

10   injuries, a broken orbital bone, skull fracture.

11     Q      When you went to Illinois Masonic Hospital

12   did you interview the victim there?

13     A      Yes.

14     Q      Other than yourself who was present for that

15   interview?

16     A      My partner, Detective Jackson.

17     Q      And at that time what did the victim tell

18   you?

19     A      The victim stated that on the day of 10 May

20   he received a phone call from his wife, who is an

21   employee -- his ex-wife or estranged wife who is an

22   employee of his at his trucking company and she asked

23   him to come and give her a ride to work because she

24   had trouble with her vehicle.

1            He proceeded from his home to 5851 North
2    Winthrop and when he arrived there he exited the
3    vehicle and rang the doorbell for his wife to come
4    down to get the ride to work.  She told him to come
5    upstairs, so she buzzed the door, he went up to the
6    fourth floor, Apartment 403, and when he reached the
7    apartment the door opened and he saw an individual's
8    clothing and he felt a blow to his head.
9        Q    Did he tell you what happened after he saw
10   clothing and felt a blow to the head?
11       A    He was unconscious and he woke up in the
12   living room of the studio apartment and in the living
13   room was his ex-wife, his estranged wife, and four
14   male black subjects.
15       Q    Was he able to estimate for you approximately
16   how long he was unconscious for?
17       A    I think he said he was about two hours
18   unconscious.
19       Q    In addition to waking up and seeing his
20   ex-wife and four other people in the living room did
21   he tell you what condition he was in when he woke up?
22       A    When he woke up he was bound, he was
23   handcuffed and bound with electrical tape.
24       Q    What parts of his body were bound?

1          A     His body, his ankles, I think also his mouth.

2          Q     And did he tell you how he was dressed at

3     that point?

4          A     He was in his underwear at that point.  He

5     was stripped of his clothing.

6          Q     What happened after he came to and found

7     himself in this condition?

8          A     The male black subjects were pointing

9     handguns at him and they were asking him for money,

10    the keys to his vehicle and anything -- money and keys

11    to his vehicle.

12         Q     Did they request of him anything from his

13    business?

14         A     Also they wanted the keys to his business so

15    they could go and take his checks, his business

16    checks, and he told them in addition to that he had

17    eight hundred dollars at work, that they could have

18    that also.

19         Q     Did he give them in fact the keys?

20         A     Right.  They took his keys.

21         Q     What else did you learn was taken from him?

22         A     They took his keys, a cell phone and a pager

23    I think.

24         Q     Now, after he told them that he -- they could

1   have the keys to his office where there was eight

2   hundred dollars did he tell you whether or not

3   anything was sent back to him?

4       A    Well, there was one individual there who

5   threatened him further with a handgun and said that

6   the eight hundred dollars was not enough money, that

7   they wanted more, and at that point he was carried to

8   the washroom in the apartment.

9       Q    Before being carried to the washroom did he

10  tell you whether or not he was struck with anything?

11      A    Yes.  He was struck with a metal object that

12  he thought was a tire iron about the head and he was

13  struck -- in addition he was struck with a baseball

14  bat from the individual who first struck him when he

15  walked in the door.

16      Q    You said he was then carried to a bathroom?

17      A    Right.

18      Q    Did he tell you what occurred once he was

19  brought into the bathroom?

20      A    He was drug to the washroom and threatened

21  again with a handgun by two male blacks.  I think they

22  again put some more tape around him.  They turned the

23  water on in the shower and soaked him and covered him

24  with towels and they left the washroom leaving him by

1    himself.

2        Q    What happened when he was in the bathroom?

3        A    He stated that he was in the washroom for a

4    length of time and he could hear people talking

5    outside.  He heard his wife discuss taking the keys to

6    his business and retrieving the money and his company

7    checks and maybe even taking his new car, he had a new

8    car.  And after a while he didn't hear anyone in the

9    apartment anymore.

10       Q    So what did he do?

11       A    While he was sitting in the water he loosened

12   the tape that he was bound with and he jumped out of

13   the bathtub and he didn't hear anyone in the apartment

14   anymore because he heard the door closed so he exited

15   the washroom, he looked in the apartment, he saw no

16   one there, he opened the door to the apartment and he

17   ran down the stairs to the street.

18       Q    And when he got down the stairs did he tell

19   you what he saw outside of the apartment?

20       A    When he exited the building he saw some

21   individuals standing across the street from the

22   building that he had seen in the apartment.

23       Q    Some of the offenders?

24       A    Two of the offenders.

B-9

1      Q    And what happened when he saw the offenders,

2    where did he go?

3      A    When the offenders saw him they ran, you

4    know, they fled.

5      Q    Did Mr. Jinadu tell you how he was dressed at

6    this time?

7      A    I think he was still in his underwear and he

8    was handcuffed and he still had some of the binding,

9    the tape was still wrapped around his body or

10   something.

11     Q    What did he tell you was the next thing that

12   happened?

13     A    Well, he started screaming for help and the

14   police arrived and he explained what happened to the

15   responding officers.

16     Q    After explaining what happened to the

17   officers did he take the officers anywhere?

18     A    He took the officers back up to the

19   apartment, 403.

20     Q    And once inside the apartment did he tell you

21   what happened?

22     A    He told the responding officers the same

23   story, that he came to pick up his wife for work, she

24   opened the door, he was struck with an object, bound

1    and escaped.

2         Q    Did he tell you whether or not he saw the

3    officers recover anything inside the apartment?

4         A    Right.  He observed the officers recover two

5    handguns, one was a .38 caliber Smith & Wesson.

6         Q    And did he tell you whether or not he was

7    shown any pictures by the officers once inside the

8    apartment?

9         A    He was shown a photo identification and he

10   identified that photo as one of the fellas in the

11   apartment, one of the offenders, and it was indeed the

12   offender who struck him with an iron pipe.

13        Q    He identified that photo as a person that

14   struck him when he initially came through the door?

15        A    No.  When he was bound on the floor.

16        THE COURT:  This is up in the apartment he

17   made a photo identification?

18        MS. SAVINI:  Yes.  I'll clear that up in one

19   moment, judge.

20   BY MS. SAVINI:

21        Q    Now, the identification that he made, what

22   type of picture was that identification made from?

23        A    I believe it was a driver's license.

24        Q    And where was that driver's license found?

1       A    Inside the apartment, 403.

2       Q    Now, officer, in addition to talking to the

3    victim did you also review the facts of the case

4    report that were completed by Officers Schmidt and

5    Ramirez, the officers that responded to this incident?

6       A    Yes.

7       Q    And in addition to what you learned from the

8    victim did you in fact learn that a photo ID was found

9    in the apartment?

10      A    Right.  Yes.

11      Q    And did you learn that a .38 caliber weapon

12   was recovered from that apartment?

13      A    Yes.

14      Q    I want to back you up again to your

15   conversation with the victim, obviously he was able to

16   give you the name of his estranged wife?

17      A    Yes.

18      Q    And you testified that he made an

19   identification from a license which contained a name

20   of one of the offenders; is that right?

21      A    Yes.

22      Q    Was he able to give you any name or physical

23   description of the other three male black offenders?

24      A    Yes.

1      Q     What were those descriptions that he gave

2  you?

3      A     He described them as being in there twenties,

4  one individual -- male blacks, one individual he had

5  no height for but the weight was one sixty with brown

6  eyes and black hair.

7            The second individual was five foot ten

8  inches tall and he weighed -- No.  Five foot eleven

9  inches tall and he weighed two hundred pounds, black

10  and brown eyes -- brown eyes and back hair.

11            The third offender was five foot eleven,

12  one sixty-five, brown eyes, black hair.  And another

13  individual was five foot five, one forty-five, brown

14  eyes, black hair.

15      Q     Now, detective, after you had learned this

16  information both from the initial case scene report

17  officers and from the victim did you do any follow-up

18  as to this .38 caliber weapon that was recovered in

19  the house?

20      A     Yes.  The officers that recovered the weapon

21  also ran a check to see who the weapon was registered

22  to.

23      Q     And did you receive that information?

24      A     Yes.

1      Q      What did you learn?

2             MS. BORMANN:  Objection.  Foundation.

3             THE COURT:  Pardon me?

4             MS. BORMANN:  Foundation.  When and who.

5             THE COURT:  Well, sustained.

6    BY MS. SAVINI:

7      Q      This .38 caliber Smith & Wesson, you're

8    stating that that gun was run to see who it was

9    registered from -- or to?

10     A      Yes.

11     Q      How was that information obtained?

12     A      It was obtained off the original case report.

13     Q      This was information that was already in the

14   case report provided by the original scene officers?

15     A      Right.

16     Q      Did you learn from the initial case report

17   who in fact the gun was registered to?

18     A      Yes.

19     Q      Who did you learn it was registered to?

20            MS. BORMANN:  Objection.

21            THE COURT:  What's the objection?

22            MS. BORMANN:  Foundation.  It's unclear to me

23   at least, judge.  Is he saying that it's from the

24   original offense case report that he learned who it

1    was registered to or from the officers themselves?

2              THE COURT:   Well, sustained.   I don't know.

3    BY MS. SAVINI:

4         Q    Officer, did you learn who the gun was

5    register to from reading the case report or from

6    speaking to the officers?

7         A    From reading the case report.

8         Q    And after you read the case report that's how

9    you determined who the gun was register to; is that

10   right?

11        A    Yes.

12        Q    And in addition to the name of that person

13   there was other information about the registered owner

14   of the gun; is that right?

15        A    Yes.

16        Q    Did you follow up on that information?

17        A    Yes.

18        Q    How did you follow up on that information?

19        A    I made a phone call to the registered owner

20   of the handgun.

21        Q    Who was that person?

22        A    Loretha Hillard.

23             THE COURT:   What was the name?

24             THE WITNESS:   Loretha.

1              THE COURT:  Last name?

2              THE WITNESS:  Hillard.

3              MS. SAVINI:  Hillard, H-i-l-l-a-r-d.

4              THE COURT:  Okay.

5    BY MS. SAVINI:

6         Q    Your conversation with Miss Hillard was over

7    the phone?

8         A    Yes.

9         Q    And when you spoke to her did you ask her

10   about the weapon that had been recovered?

11        A    Yes, I did.

12        Q    Can you tell me what your conversation with

13   her consisted of, what did you say to her and what did

14   she say to you?

15             MS. BORMANN:  Objection.  Foundation.  When

16   did this conversation take place?

17             THE COURT:  Sustained.

18   BY MS. SAVINI:

19        Q    Officer, do you recall the exact date that

20   you had this conversation with her?

21        A    No, I don't remember exactly.

22        Q    Can you approximate what date you had this

23   phone conversation with Loretha Hillard?

24        A    I can approximate it was before the 19th of

1    May.

2          Q    What day was the defendant arrested on?

3          A    He was -- The 3rd of June.

4          Q    And why is May 19th a significant day in your

5    mind?

6          A    It's significant because that's when she had

7    reported the handgun stolen.

8          Q    And you believe that you spoke with her

9    before or after May 19th?

10          A    Before May 19th.

11          Q    And the day that you got assigned to this

12    case was on May 12th?

13          A    The 12th, yes.

14          Q    So sometime after May 12th but you believe

15    before May 19th you had the phone conversation with

16    her?

17          A    I believe so.

18          Q    Did you make that call from the area or from

19    another phone?

20          A    Yes, from the area.

21          Q    When you called her is she the person that

22    answered the phone?

23          A    Yes.

24          Q    So you asked for Loretha Hillard and she

1    represented to you over the phone she was Loretha

2    Hillard?

3        A    Yes.

4        Q    What did you say to her at that point and

5    what did she say to you?

6        A    I asked her if she knew where her gun was and

7    she said that --

8        Q    Before you asked for the specifics of the gun

9    did you learn what her occupation was?

10        A    Yes.

11        Q    What did she tell you her occupation was?

12        A    She was a ex-security guard for the Chicago

13    Housing Authority at the building where she lived,

14    1230 North Larrabee.

15        Q    After learning what her occupation was did

16    you in fact ask her if she had ever owned a .38

17    caliber Smith & Wesson?

18        A    Yes.

19        Q    What did she tell you?

20        A    She said yes.

21        Q    What else did she tell you about the

22    whereabouts of that gun?

23        A    She said that the gun had been taken and that

24    if anyone took the gun it would be her brother, Tony

1    Hillard.

2         Q    Did she tell you when her gun had been taken?

3         A    I don't think she was sure about when it was

4    missing.

5         Q    Did she tell you whether or not she had

6    reported her gun stolen?

7         A    She said she did report it stolen.

8         Q    Did you do anything to confirm that

9    information?

10        A    Right.  I ascertained the report number that

11   the gun was reported stolen under.

12        Q    And in fact had she reported her gun stolen?

13        A    Yes.

14        Q    And the gun that she reported stolen it

15   matched the serial numbers and a description of the

16   gun that you -- that the beat officers had recovered

17   at the scene of the crime; is that right?

18        A    Yes.

19        Q    Now, after she told you the only person that

20   could have taken her gun was her brother --

21             MS. BORMANN:  Objection.  That's not the

22   testimony.

23

24

BY MS. SAVINI:

Q    Well, officer -- Detective, I'm sorry, what did she tell you about the circumstances of her gun being missing?

A    She said if her gun was stolen the only person who could have stolen it would have been her brother, Tony Hillard.

Q    She gave you his name?

A    Right.

Q    Did she give you any other information about Tony Hillard?

A    Right.  She also stated that he lived with his girlfriend at 714 Division.  His girlfriend's name was Pookie and she lived in Apartment 1003.

Q    After she gave you that information sometime subsequent to talking with her did you act upon that information?

A    Yes.

Q    Now, I want to draw your attention to June 3rd of 1997, on that day where did you go?

A    We went to the apartment at 714 Division and we knocked on the door.

Q    When you went to that apartment did anybody -- and knocked on the door had you announced

B-20

1  your office in any way?

2      A   Yes.

3      Q   Other than yourself was anybody else at that

4  location?

5      A   I was accompanied with the public housing

6  Tactical Unit from Cabrini Green.

7      Q   How many officers did that include?

8      A   Two.

9      Q   And other than yourself was there any other

10  detectives?

11      A   And my partner, Detective Jackson.

12      Q   So a total of seven officers went to the

13  714 Division address?

14      A   Yes.

15      Q   Now, after you knocked on the door and

16  announced your office did anyone ever open the door?

17      A   Yes.

18      Q   Who open the door?

19      A   A female black.

20      Q   Once the female black opened the door did you

21  have any conversation with her?

22      A   Yes.  We told her we wanted to speak to Tony.

23      Q   And other than the female black did you see

24  anyone else present in the apartment from where you

1    were standing?

2        A   Yes.   There was a male black standing a

3    couple feet behind her.

4        Q   Did you notice anything about the physical

5    characteristics of that person?

6        A   He matched the description given by the

7    victim as one of the robbery offenders.

8        Q   Now, after you told the woman that opened the

9    door that you were looking for Tony and noticed that

10   there was a male black that fit the description of one

11   of the offenders what's the next thing that you did or

12   said?

13       A   We asked him his name, the male black in the

14   apartment his name, and he gave us some fictitious

15   name, I don't remember what it was right now, but he

16   didn't say he was Tony Hillard.

17       Q   Now, when you asked his name were you inside

18   or outside of the apartment at that point?

19       A   At the threshold.

20       Q   Did you enter the apartment?

21       A   Yes.

22       Q   When you entered the apartment had the female

23   at the door told you you could enter the apartment?

24       A   She didn't say anything.

1    Q    Now, when you entered the apartment did you

2    go past the female and to the male individual?

3    A    Yes.

4    Q    And when you spoke with him you said

5    initially he gave you a bogus name?

6    A    Yes.

7    Q    What's the next thing you said to him after

8    he gave you a name?

9    A    I asked him why did he steal his sister's

10   gun.

11   Q    What did he say?

12   A    His reply was he didn't take his sister's

13   gun.

14   Q    What happened after that?

15   A    I asked him would he come to Area Three and

16   discuss the theft of her -- of his sister's gun.

17   Q    What did he say?

18   A    He said he would and he had to go put on his

19   shirt and his shoes.  He was just wearing a pair of

20   pants.

21   Q    When he went to go put his clothes on which

22   room did he go into?

23   A    He went into one of the bedrooms.

24   Q    Where did you go?

1      A    I followed him into the bedroom.

2      Q    Other than yourself did any of the other

3    three officers follow him into the bedroom?

4      A    No.

5      Q    Did you see where the other three officers

6    were?

7      A    They were standing by the front door.

8      Q    Where was the female that answered the door?

9      A    She was still standing by the front door.

10     Q    Once inside the bedroom with the defendant

11   while he was dressing did he say anything to you?

12     A    He then told me that he was Tony Hillard and

13   he still didn't know anything about the theft of his

14   sister's gun.

15     Q    At that time had you mentioned anything to

16   him about the armed robbery or the aggravated battery?

17     A    No.

18     Q    You had only discussed the gun with him?

19     A    That's all.

20     Q    And he was denying that to you?

21     A    Yes.

22     Q    After he was dressed did you take him out of

23   the apartment?

24     A    Yes.

1      Q    Did you take him out in handcuffs or not?

2      A    No, I don't think so.

3      Q    Do you remember if handcuffs were placed on

4  him?

5      A    I think he was placed in handcuffs before he

6  entered the police vehicle.

7      Q    So he was cuffed before he got into the car,

8  you just don't remember if it was inside or outside of

9  the apartment?

10     A    Right.  Yes.

11     Q    While you were inside of the apartment could

12  you estimate for us about how much time you spent in

13  there speaking with the defendant from the moment that

14  this woman opened the door until the moment you took

15  him out of the apartment?

16     A    I would say maybe four or five minutes maybe.

17     Q    At any time did you or any of the officers

18  search the apartment?

19     A    No.

20     Q    I'm sorry.  I didn't hear that?

21     A    No.

22     Q    At any time did you or any of the officers go

23  through all the kitchen cabinets of the apartment?

24     A    No.

1      Q    Other than the female and the person that you

2    arrested did you see anybody else in the apartment?

3      A    No.

4      Q    Do you see the person that represented

5    himself to be Tony Hillard to you in court today?

6      A    Yes.

7      Q    Can you please identify him by something he's

8    wearing?

9      A    The khaki outfit.

10          MS. SAVINI:  May the record reflect the

11   in-court identification of the defendant, judge?

12          THE COURT:  It may.

13   BY MS. SAVINI:

14     Q    Now, after the defendant was taken out of the

15   apartment did you bring him to Area Three

16   Headquarters?

17     A    Yes.

18     Q    And some time later on that evening you

19   placed him in a lineup; is that right?

20     A    Yes.

21     Q    He was identified by the victim in this case

22   as one of the offenders?

23     A    Yes, he was.

24          MS. SAVINI:  Just a moment, judge.

1    BY MS. SAVINI:

2        Q    Officer, other than taking the defendant from

3    that apartment at 714 Division did you take anything

4    else from that apartment?

5        A    No.

6        Q    And other than the defendant making a denial

7    that he didn't know anything about stealing his

8    sister's gun did he make any other statement to you in

9    that apartment?

10       A    No.

11       Q    And no lineup was conducted of the defendant

12   inside the apartment, was it?

13       A    No.

14       Q    No show-up was conducted of the defendant

15   inside the apartment?

16       A    No.

17            MS. SAVINI:    I have nothing further, judge.

18            MS. BORMANN:    May I, judge?

19            THE COURT:    Yes.

20

21

22

23

24

1                    CROSS-EXAMINATION

2                    BY MS. BORMANN:

3          Q     Detective, you testified that on May 12th of

4     1998 you received the case and that's the day you went

5     to Illinois Masonic Hospital, right?

6          A     Yes.

7          Q     And that's where you talked to the person we

8     now know as Yinka Jinadu?

9          A     Yes.

10         Q     Did you talk to him in a hospital room?

11         A     Yes.

12         Q     Who was present for that conversation?

13         A     My partner, Detective Jackson.

14         Q     Now, during that conversation you and

15    Detective Jackson were eliciting from Mr. Jinadu

16    exactly what happened the day of May 10th, right?

17         A     Yes.

18         Q     And you wanted to ascertain if he had any

19    knowledge about the offenders in the case, correct?

20         A     Yes.

21         Q     Did you take any notes during that interview?

22         A     You know, I went along with the case report

23    that I had and it was so close that I'm not sure if I

24    took notes or not.

B-28

1     Q   Do you have an independent recollection of

2  whether or not you took notes?

3     A   No.

4     Q   Do you remember whether or not your partner,

5  Detective Jackson, took notes?

6     A   No.

7     Q   Do you have either your notes or Detective

8  Jackson's notes from that interview?

9     A   No.

10     Q   Now, you've testified that the results -- How

11  long did you spend speaking to Mr. Jinadu?

12     A   I'm not sure.  Maybe a half hour or so.

13     Q   And he was awake?

14     A   Yes.

15     Q   He was -- seemed like he was oriented, in

16  other words he seemed like he understood what you were

17  saying?

18     A   Yes.

19     Q   Was he able to answer clearly?

20     A   Yes.

21     Q   And you've testified that it followed a long

22  with the case report, right?

23     A   I'm sorry?

24     Q   What he told you followed along with what the

1    case report said?

2         A    Yes.

3         Q    Now, you had read the case report prior to

4    your interview with Mr. Jinadu, right?

5         A    Yes.

6         Q    And you had the case report with you, right?

7         A    Yes.

8         Q    So you were able to look at that case report

9    and you would have noted if there were any differences

10   between what he said to you and what was in the case

11   report, right?

12        A    Yes.

13        Q    The case report is four sides of paper, a

14   total of four pages, correct, two pages each side, two

15   sides of each page; is that right?

16        A    Yes.

17        Q    Now, what Mr. Jinadu told you was that there

18   were five offenders involved with this case; is that

19   right?

20        A    Yes.

21        Q    And he told you that after he had escaped

22   from the apartment that day the police arrived and he

23   went back with the police to the apartment in

24   question, right?

1          A     Yes.

2          Q     He went back in with the police, he told you

3    he went back in with the police to the apartment at

4    5851 West Winthrop, number 403?

5          A     North Winthrop.

6          Q     North Winthrop, number 403?

7          A     Yes.

8          Q     And he said he went with the police and he

9    was there when they searched the apartment and they

10   found certain objects, right?

11         A     Yes.

12         Q     And he told you that one of the -- two of the

13   objects were weapons, right?

14         A     Yes.

15         Q     And he told you that they found some

16   identification, right?

17         A     Yes.

18         Q     The police officers found some

19   identification?

20         A     Yes.

21         Q     He told you that the police officers showed

22   him that identification on May 10th; is that right?

23         A     Yes.

24         Q     Now, you know that they found a total of --

1    When you were talking to Mr. Jinadu on the date of

2    May 12th you at that point know that they found a

3    total of eight pieces of identification in that

4    apartment on May 10th, right?

5        A    He didn't count out how many pieces of

6    identification they found.

7        Q    Officer, you were aware at that point that

8    there had been a total of eight pieces of

9    identification inventoried in this case, right?

10       A    If it's on the case report I did, yes.

11       Q    Okay.  And some of that -- Now, he told you

12   that he was showed how many pieces of identification

13   that contain photographs?

14       A    He didn't specify how many pieces of

15   identification that he identified or was shown.

16       Q    He told you what is consistent with the

17   general offense case, correct?

18       A    Pretty much, yes.

19       Q    So he told you when you interviewed him on

20   May 12th that he -- he named three offenders in this

21   case; is that right?

22       A     He only named one offender in the case,

23   hisself.

24       Q    Now, officer -- I'm sorry?

B-32

1       A       He only named one offender.

2       Q       Which offender did he tell you he named?

3       A       His wife.

4       Q       And what is her name?

5       A       Delores.

6       Q       Now, officer -- May I approach, judge?

7               THE COURT:  Uh-huh.

8    BY MS. BORMANN:

9       Q       I'm going to hand you what I've marked as

10   Petitioner's No. 1 for identification, this is a copy

11   of the four pages of the general offense case report.

12   I want you to take a look at that.  Is that the same

13   general offense case report that you had with you when

14   you interviewed Mr. Jinadu on May 12th in the

15   hospital?

16      A       Yes, it is.

17      Q       Now, there are a total -- In the section

18   where it says -- there are a number of offenders, it

19   says five, correct?

20      A       Yes.

21      Q       And there are three names, three actual

22   names, offender number one is named, offender number

23   two is named and offender number three is named,

24   correct?

1          A      Yes.

2          Q      And then the other two remaining persons are

3     not named; is that right?

4          A      Yes.

5          Q      Now, this is consistent with what he told you

6     on May 12th while you were in the hospital with him,

7     isn't it?

8          A      He stated that he could only identify one

9     person, his wife.

10         Q      I'm sorry.  So it isn't -- What he told you

11    that day in the hospital is not consistent with what's

12    on this police report?

13         A      Not in the box of offenders.

14         Q      Now, I want to direct your attention to page

15    three of the general offense case report -- I'm sorry.

16    Actually mark page two of two on the top but it's in

17    the way that they're listed it would be page three.

18    In the narrative section there the reporting officers

19    state the following:  Reporting officers observed

20    several ID cards and ID papers which had been left in

21    haste by offs, o-f-f-s, meaning offenders.  Victim

22    positively identified the photo ID and paper ID as

23    those of the offenders who are known to him.  Does it

24    state that?

1        A        Sure does.

2            MS. SAVINI:   Judge, I'm going to object to

3    the reading of the police report for purposes of

4    impeachment.   I don't think this is impeachment.   If

5    it's not offered for that I'm not sure why.

6            THE COURT:   Well, initially as I recall in

7    the Cross-Examination the detective indicated that

8    the -- he didn't take notes because what the victim

9    told him was basically consistent with what was in the

10   case report, so I think it's proper in that regard.

11   Overruled.

12   BY MS. BORMANN:

13       Q    Now, those pieces of identification that the

14   victim was shown, according to the general offense

15   case report, are the pieces of identification that

16   were inventoried in the case, right?

17       A    Yes.

18       Q    And in fact that's what Mr. Jinadu told you

19   when you interviewed him on May 12th, isn't it?

20           MS. SAVINI:   Objection, judge.   Again it's

21   one thing to say -- First of all I'm not sure who

22   we're impeaching, the victim with this case report or

23   the detective, and how would the victim know what

24   police inventoried?   So I understand that he stated he

1       followed along with this to confirm the things that

2       were being said to him by the victim but this was

3       inclusive of many more things than the victim would be

4       aware of, what was inventoried and specifics of police

5       procedure, how things were recovered. So I don't know

6       how that is impeaching specifically to this officer.

7               MS. BORMANN: I'm not attempting to impeach

8       the officer. I'm attempting to elicit information

9       about what he heard in comparison to what's in the

10      general offense case report, which the officer says he

11      went through as he interviewed Mr. Jinadu, all of it

12      having to do with whether or not there's probable

13      cause for my client's arrest.

14              THE COURT: Objection overruled.

15      BY MS. BORMANN:

16          Q   Detective, the -- Mr. Jinadu on May 12th when

17      you interviewed him told you that he was shown the

18      various pieces of identification that were retrieved

19      by the original officers in this case; is that right?

20          A   That's right.

21          Q   And he told you that from that identification

22      he could identify three of the offenders as being

23      Delores Jinadu, Jermaine Crane, C-r-a-n-e, and a

24      Erven Walls; is that right?

```
1         A    That's correct.

2         Q    Those individuals are listed in the general

3    offense case report that you had with you that day as

4    offenders number one, two and three; is that right?

5         A    Yes.

6         Q    And those pieces of identification from those

7    three separate individuals were found at the scene

8    5851 North Winthrop on May 10, 1997?

9         A    Yes.

10        Q    Did you attempt to have --

11             THE COURT:  Wait a minute.  Wait.  You said

12   that he could name his wife, Jermaine Crane and Erven

13   Walls?

14             MS. BORMANN:  Correct.

15             THE COURT:  Aren't they the same person?

16             MS. BORMANN:  There you go, judge.

17             THE COURT:  It's two people, not three

18   people?

19             MS. BORMANN:  Well, your Honor, no.  The

20   victim on May 10th and as we're hearing right now on

21   May 12th identifies three different people, he names

22   them, they're Delores Jinadu, Jermaine Crane and Erven

23   Walls.

24             THE COURT:  All right.
```

1    BY MS. BORMANN:

2       Q    There are two remaining offenders, detective,

3    who are not named in the general offense case report;

4    is that right?

5       A    Right.

6       Q    One of the -- The description that Mr. Jinadu

7    gave you on May 12th for those other two offenders is

8    consistent with what's in the general offense case

9    report; is that right?

10      A    Yes.

11      Q    The descriptions for the remaining two

12   unnamed offenders, we'll start with what's listed in

13   the general offense case report as offender number

14   four, you still have it in front of you, don't you?

15      A    Yes.

16      Q    -- that person is described as a male black,

17   five foot ten, two hundred pounds, black jeans, red

18   pullover, no further information; is that right?

19      A    Yes.

20      Q    And that's consistent with what Mr. Walls

21   told you during your interview of May 12th?

22      A    Yes.

23      Q    The fifth and final offender is described as

24   a male black, five foot five, a hundred and forty

1    pounds, blue jacket, gray jeans, Walls, Dormaine,

2    D-o-r-m-a-i-n-e; is that correct?

3        A    That's correct.

4        Q    Now, Mr. Hillard is not noted in the general

5    offense -- is not named in the general offense case

6    report; is that right?

7        A    That's correct.

8        Q    And in fact Mr. Jinadu during your interview

9    of him on May 12th in the hospital never named Tony

10   Hillard, did he?

11       A    No, he didn't.

12       Q    Now, what you've told us thus far then is

13   that Mr. Jinadu named several offenders and on the

14   unnamed offenders he gave you those descriptions that

15   I've just read; is that right?

16       A    That's correct.  He never named these people.

17   He only named his wife.  He was shown photographs of a

18   fella that he identified and the reporting officers

19   put that fella's name off the ID on the case report.

20       Q    So the fella that -- Let's talk about that

21   for a moment.  There are actually two pieces of

22   identification recovered in that home that day that

23   contain photographs, don't they?

24       A    I'm not sure about that.  I know one for

1    sure.

2        Q    Would a copy of the inventory report in this

3    case refresh your recollection?

4        A    Yes.

5            MS. BORMANN:  Judge, may I?

6            THE COURT:  Yes.

7            MS. BORMANN:  I'll mark it as Petitioner's

8    No. 2.

9    BY MS. BORMANN:

10       Q    I'm handing you a copy of the inventory sheet

11   containing the pieces of identification retrieved on

12   May 10th from that apartment.  Have you had a chance

13   to look at that and refresh your recollection?

14       A    Yes.

15       Q    One of the pieces that was found was a

16   driver's license belonging to Delores Jinadu and that

17   contains a photograph, correct?

18       A    Right.

19       Q    There's another photographic piece of

20   evidence and that is a SWAP identification card issued

21   to a Jermaine Crane; is that right?

22       A    Right.

23       Q    And that contains a photo as well; is that

24   right?

1        A     Right.

2        Q     So Mr. Jinadu was shown both of those pieces

3    of identification and identified those persons from

4    those photographs; is that right?

5.       A     Right.

6              MS. SAVINI:  Objection to the knowledge on

7    that one, judge.

8              THE COURT:  Yes.  Sustained.

9    BY MS. BORMANN:

10       Q     When you interviewed Mr. Jinadu on May 12th

11   you asked him whether or not he was shown those pieces

12   of identification and whether or not he identified

13   those people, didn't you?

14       A     Right.

15       Q     And he said, yes, he was shown those pieces

16   of identification on May 10th and he identified those

17   individuals; is that right?

18       A     That's right.

19       Q     Now, there was paper identification, further

20   identification belonging to a person named Erven Walls

21   that was inventoried as well; is that right?

22       A     Right.

23       Q     What types of identification were those?

24       A     An Illinois driver's license, a ticket, a

1    certificate of something returned for Walls and a

2    birth certificate.

3        Q    Did you ask Mr. Jinadu if he was shown that

4    information and whether or not he made an

5    identification of offender number three as Erven Walls

6    in this case based on that identification?

7        A    The only thing I asked him about were the

8    photo ID's, that was it.

9        Q    Now, after you had your interview with

10    Mr. Jinadu on that date did you again interview

11    Mr. Jinadu before June 3rd, before arresting my client

12    at his home?

13        A    Yes.

14        Q    When did that occur?

15        A    We interviewed him at -- Well, we interviewed

16    him at his home once and we interviewed him at the

17    Cook County Hospital when he was -- he had to have an

18    operation on his eye, we interviewed him there.

19        Q    When did you interview him at Cook County

20    Hospital following the interview of May 12th?

21        A    The date I'm not sure of.

22        Q    Sometime between May 12th and June 3rd?

23        A    Yes.

24        Q    Do you have notes from that interview?

```
 1          A     No, I don't.

 2          Q     Does your partner have any notes from that

 3     interview?

 4          A     I don't think so.

 5          Q     When did you interview him at his home?

 6          A     The exact date I'm not sure.

 7          Q     Would that have been between May 12th and

 8     June 3, 1997?

 9          A     Yes.

10          Q     And who was present for that interview?

11          A     Myself and my --

12                MS. SAVINI:  Judge, I'm going to object to

13     the relevance.  It's all beyond the scope.  I've only

14     gone into one conversation at the hospital.  I don't

15     know how any other conversations are relevant.

16                THE COURT:  I don't know.

17                MS. BORMANN:  I don't either because none of

18     this is indicated in any report.  What I'm trying to

19     ascertain is whether or not any further description

20     was ever given on any other date.

21                THE COURT:  All right.  Overruled.

22

23

24
```

1    BY MS. BORMANN:

2         Q    The interview that you had in Mr. Jinadu's

3    home was your partner, Detective Bradley -- I'm sorry.

4    -- Detective Jackson present for that?

5         A    Yes.

6         Q    Were you two the only ones there besides

7    Mr. Jinadu?

8         A    Yes.

9         Q    And how long did that interview in his home

10   take?

11        A    Maybe fifteen, twenty minutes maybe.

12        Q    Did you make any notes from that interview?

13        A    No.

14        Q    Did your partner?

15        A    No.

16        Q    Those two interviews, are those the only two

17   interviews you had with Mr. Jinadu between the date of

18   May 12th and June 3rd?

19        A    Yes, probably.

20        Q    Those two interviews were substantially the

21   same in nature as your first interview of May 12th?

22        A    Everything is pretty much consistent, yes.

23        Q    Now, you said that you went through on

24   May 12th and you interviewed Mr. Jinadu, you went

1    through precisely what happened on the day of

2    May 10th; is that right?

3        A    Yes.

4        Q    And you told us that according to Mr. Jinadu,

5    what Mr. Jinadu told you was that when he went up to

6    Apartment 403 the door opened; is that right?

7        A    Yes.

8        Q    And then he said he saw some clothing; is

9    that right?

10        A    Yes.  He saw a person.

11        Q    Did he tell you what kind of clothing he saw

12    at the door?

13        A    I'm sure he did but I can't recall at this

14    point.

15        Q    And then he said he got hit on the head; is

16    that right?

17        A    Yes.

18        Q    Did he, during your interview, identify to

19    you who it was or give a description of the person who

20    hit him on the head and whose clothing he saw?

21        A    Yes.

22        Q    What description or what name did he give you

23    during your May 12th interview?

24        A    He described the fellow as being the bigger

1    of the group.

2         Q    The bigger of the group?

3         A    Yes.

4         Q    Did he describe the person as a male?

5         A    A male.

6         Q    Now, at this point you had the descriptions

7    of the five offenders, three names and two further

8    descriptions; is that right?

9         A    Yes.

10        Q    And the biggest of the group would be the

11   person who is described as whom?

12        A    Two hundred pounds I would imagine.

13        Q    Five foot ten and two hundred pounds?

14        A    Five foot eleven or five foot ten.

15             MS. SAVINI:  I'm going to object to the

16   detective's conclusion as to what the victim's thought

17   process was.

18             MS. BORMANN:  Judge, I'll get to that.

19             THE COURT:  Overruled.

20   BY MS. BORMANN:

21        Q    In your knowledge that was the biggest

22   person, the five foot ten, two hundred pound person as

23   described and given no name; is that right?

24        A    I would presume so, yes.

1      Q    Okay.  Did you ask Mr. Jinadu whether or not

2   the person he had originally described as offender

3   number four, five foot ten, two hundred pounds, was

4   the person that hit him on the head with the baseball

5   bat?

6      A    No.

7      Q    Did he tell you whether or not the person who

8   was originally described as offender number four, five

9   foot ten, two hundred pounds, dressed in black jeans

10  and a red pullover, was the person who hit him over

11  the head with a baseball bat?

12     A    No.

13     Q    Now, he then told you that he was unconscious

14  for approximately two hours, correct?

15     A    Yes.

16     Q    And when he woke up he was in the living

17  room; is that right?

18     A    It was a studio apartment so it's basically

19  one room I guess.

20     Q    And he told you, Mr. Jinadu told you that

21  when he woke up he saw his wife with four male blacks;

22  is that right?

23     A    Yes.

24     Q    Did he tell you whether or not any of the

1      male blacks or his wife were wearing masks at that

2      time?

3          A      At that time they were not wearing masks.

4          Q      He told you -- I want to get this correct.

5      What did Mr. Jinadu specifically tell you regarding

6      what he saw when he woke up in that room?

7          A      I believe he said they were not wearing

8      masks.

9          Q      Who was not wearing masks, officer?

10         A      The individuals in the room.

11         Q      Any of them?

12         A      Any of them.

13         Q      And he said when he woke up he noticed those

14     four people -- five people and that he was bound; is

15     that right?

16         A      Yes.

17         Q      He told you that he was bound on his ankles

18     and his mouth?

19         A      He was bound around his body and his ankles

20     at that point, I believe, and he was handcuffed.

21         Q      And he was handcuffed?

22         A      Yes.

23         Q      Did he tell you what he was handcuffed with?

24         A      A pair of handcuffs I think.

1        Q    Did he tell you whether or not he noticed any

2    weapons in the room?

3        A    He stated that all the male blacks had

4    handguns.

5        Q    Did he give at this point a description any

6    different from what's in the general offense case

7    report regarding those four male blacks who were

8    holding weapons?

9        A    No, I don't think so.

10       Q    So at this point his description is

11   consistent with what you had in the general offense

12   case report?

13       A    Yes.

14       Q    You then told us at some point one

15   individual -- Strike that.

16                   Mr. Jinadu told you during your

17   interview of May 12th that after this occurred one

18   individual in particular threatened him further with a

19   handgun, is that what Mr. Jinadu told you?

20       A    Yes.

21       Q    Did he give you a description of the one

22   individual who threatened him further with a handgun

23   at that point?

24       A    I think his description was that he was one

1      of the bright ones.

2          Q    I'm sorry?

3          A    Bright, complexion, bright.

4          Q    Bright ones, b-r-i-g-h-t?

5          A    Yes.

6          Q    Did you ask -- Were those Mr. Jinadu's words,

7      bright?

8          A    I think those were his words.

9          Q    Did you ask Mr. Jinadu what bright meant,

10     what he meant by bright?

11         A    Right.

12         Q    What did he say?

13         A    Light colored skin.

14         Q    Did you ask him the height or the weight or

15     which one of the offenders listed on the general

16     offense case report that would have been?

17         A    No.

18         Q    He then told you on May 12th that what

19     happened to him on May 10th was he was then brought to

20     the bathroom and while he was being brought to the

21     bathroom he was struck with a tire iron; is that

22     right?

23         A    I believe he was struck with the tire iron

24     while he was still in the living room.

1      Q     I'm sorry.  So Mr. Jinadu told you that

2    before he got taken to the bathroom while he was in

3    the living room he was struck with a tire iron?

4      A     Right.

5      Q     Did he tell you whether or not that person

6    was wearing a mask who struck him with the tire iron?

7      A     No.

8      Q     Did you ask -- No, meaning he didn't tell you

9    or, no, the person wasn't wearing a mask?

10     A     When he regained consciousness it was my

11   impression that no one had a mask.

12     Q     Okay.  That's your impression because that's

13   what Mr. Jinadu told you; is that right?

14     A     Yes, I believe so.

15     Q     Now, did he describe to you the person who

16   hit him with the tire iron?

17     A     Yes.

18     Q     And how did he describe that person?

19     A     He was dark skinned and he was his wife's

20   boyfriend, he had seen him prior.

21     Q     So this was -- Was this the first time that

22   during your interview with Mr. Jinadu that Mr. Jinadu

23   had told you that one of the offenders was a man he

24   had seen before known to him as his wife's boyfriend?

1      A    This is in one of the later interviews, yes.

2      Q    Which interview did this take place at?

3      A    I'm not sure which one but it wasn't in the

4   hospital or the initial one.

5      Q    So during the hospital interview on May 12th

6   Mr. Jinadu never told you that he knew one of the

7   offenders because one of the offenders was his wife's

8   boyfriend?

9      A    He didn't know his name or anything, he just

10   knew that it was her boyfriend, yes.

11      Q    And did he tell you that he had seen that

12   person before?

13      A    Yes.

14      Q    When did Mr. Jinadu tell you that?

15      A    When he had seen him or when did he tell me?

16      Q    When did he tell you?

17      A    This is in one of the interviews.  I'm not

18   sure.  It's not the first one.

19      Q    Some subsequent one?

20      A    Yes.

21      Q    When you were interviewing Mr. Jinadu on the

22   12th, on May 12th in the hospital, did you ask

23   Mr. Jinadu or did Mr. Jinadu tell you -- Strike that.

24              Did you ask Mr. Jinadu if he knew any of

1  the offenders beyond his wife?

2      A   I'm not sure if I asked him that or not.

3      Q   Okay.  You had three names in front of you on

4  a general offense case report.  Did you ask Mr. Jinadu

5  whether or not he knew any of the three named

6  offenders?

7      A   He knew only one named offender, his wife.

8      Q   So the answer is you did ask him?

9      A   About the names on the case report, yes.

10      Q   When -- After Mr. Jinadu -- Strike that.

11           On May 12th did Mr. Jinadu give you a

12  description of the person who hit him with the tire

13  iron?

14      A   Yes, he did.

15      Q   And what was that description --

16           MS. SAVINI:  Objection.  Asked and answered.

17  BY MS. BORMANN:

18      Q   -- besides being bright?

19           THE COURT:  Sustained.

20  BY MS. BORMANN:

21      Q   Was there any further description besides the

22  bright?

23      A   That was a darker individual.

24      Q   I'm sorry.  That was the darker individual?

1          A     Yes.

2          Q     Okay.   Did he give any further description

3     besides darker?

4                MS. SAVINI:  Objection, judge.  Asked and

5     answered.

6                THE COURT:  Sustained.

7     BY MS. BORMANN:

8          Q     Now you also told us that on May 12th

9     Mr. Jinadu told you that he was then hit by the person

10    who was wielding the baseball bat again; is that

11    right?

12         A     Yes.

13         Q     When -- During your conversation with

14    Mr. Jinadu did Mr. Jinadu tell you when he was struck

15    again by the person with the baseball bat?

16               MS. SAVINI:  Objection, judge, to the

17    relevance.

18               THE COURT:  What is the relevance of all of

19    this?  It seems to me it's like a deposition.

20               MS. BORMANN:  It's the ID, judge.

21               THE COURT:  It doesn't go to probable cause.

22               MS. BORMANN:  It does because it goes to the

23    identification in this case.  What we're getting to,

24    your Honor, is that nowhere during this time period

1    where all of this occurs does a description even

2    remotely like Tony Hillard pop out.  So the fact this

3    man, the victim in this case, had ample opportunity

4    during this attack to view the offenders means that

5    there should be an accurate description.

6            THE COURT:  You're getting way ahead of

7    things, way ahead of things.  You know, if you're

8    successful on your motion you may go into these, this

9    area that you're going into, and probably with the

10   victim himself but I don't think this goes to probable

11   cause.  Sustained.

12   BY MS. BORMANN:

13       Q    Detective, did he give you a name of anybody

14   who hit him with the baseball bat?

15       A    No.

16       Q    Now, you told us originally he went

17   outside -- he told you that he went outside and he saw

18   two offenders across the street; is that right?

19       A    Yes, I believe there were two.

20       Q    Did he give you any names of any person he

21   saw across the street?

22       A    No, he didn't.

23            MS. SAVINI:  Objection.

24            THE COURT:  He's never given any names.  He

1    doesn't know names except for his ex-wife.

2    BY MS. BORMANN:

3         Q     After your interview with Mr. Jinadu on

4    May 12th you continued the investigation you said by

5    making a phone call to a person named Loretha,

6    L-o-r-e-t-h-a, Hillard, H-i-l-l-a-r-d; is that right?

7         A     Yes.

8         Q     And you told us that that phone call happened

9    sometime between May 12th and May 19th?

10        A     Yes.

11        Q     And the reason you know that the phone call

12   happened between May 12th and May 19th is because the

13   gun was not reported stolen until May 19th; is that

14   right?

15        A     Yes.

16        Q     Now, the gun -- When you talked to Loretha

17   Hillard she already knew the gun had been missing,

18   right?

19        A     Yes.

20        Q     And did she tell you when she discovered the

21   gun had been missing?

22             MS. SAVINI:  Objection to the relevance.

23             THE COURT:  Overruled.

24             THE WITNESS:  I'm not sure when she said

1   exactly she realized the gun was missing.

2   BY MS. BORMANN:

3        Q    Did she tell you how it is that she

4   discovered that her gun was missing?

5        A    I believe she said she was looking for it and

6   she couldn't find it.

7        Q    Did she tell you where she kept her gun?

8             MS. SAVINI:  Objection.

9             THE COURT:  Sustained.

10  BY MS. BORMANN:

11       Q    Now, what she did tell you -- How long did

12  your conversation go with Miss Hillard?

13       A    Not very long.

14       Q    You had not ever met Miss Hillard before this

15  date that you talked with her?

16       A    No.

17       Q    And you could not recognize her voice; is

18  that right?

19       A    I only spoke to her once.

20       Q    You had not heard her voice prior to this

21  time?

22       A    Sure didn't.

23       Q    And you suspected that you were talking to

24  Miss Hillard because the person on the other end of

1    the phone identified themself as such, right?

2        A    Yes.

3        Q    You asked a series of questions regarding

4    whether or not she had a weapon registered to her,

5    right?

6        A    Yes.

7        Q    And whether or not she knew it was missing?

8        A    Yes.

9        Q    And when you asked her whether or not she

10   knew it was missing what did she say to you?

11       A    She said if my gun is missing my brother

12   probably took it.

13       Q    She said if my gun is missing my brother

14   probably took it?

15       A    Right.

16       Q    Did you ask her, officer, if she lived with

17   anybody?

18            MS. SAVINI:  Objection.

19            THE COURT:  Sustained.

20   BY MS. BORMANN:

21       Q    Well, did you ask her why she believed that?

22            MS. SAVINI:  Objection.

23            THE COURT:  Overruled.

24            THE WITNESS:  She believed that because her

1    brother -- she said he's always stealing something.

2    BY MS. BORMANN:

3        Q    That's what she said?

4        A    Yes.

5        Q    And did she say anything else?

6        A    She told me where I could find him.

7        Q    Did she say anything else about Tony Hillard

8    besides if my gun is missing my brother must have

9    taken it and he's always stealing something?

10       A    That's pretty a summation of what she said.

11       Q    I'm not interested in a summation, detective,

12   that's what I'm trying to get to you here.  Did you

13   make any notes of the conversation you had with

14   Loretha Hillard?

15       A    I don't believe so.

16       Q    Do you have an independent recollection at

17   this point of what that conversation was that took

18   place that day?

19       A    That's all I could tell you is what I just

20   told you.

21       Q    Was there anything else said?

22       A    In regards to what?

23       Q    In regards to the missing gun and Tony

24   Hillard?

1          A     She told me that if the gun is missing he

2     stole it because he's always stealing things and I

3     asked her if she knew where he was and she told me he

4     lives with his girlfriend and she gave me her address.

5          Q     And that's it?

6          A     That was probably the extent of the

7     conversation.  I said I would get back to her.

8          Q     Did you?

9          A     No, I never did.

10         Q     Now, you've seen the general offense case

11    report filed in the missing gun case, haven't you?

12         A     No.

13         Q     Do you remember -- Strike that.

14               MS. BORMANN:  Judge, may I approach?

15               THE COURT:  Yes.

16    BY MS. BORMANN:

17         Q     I'm going to mark this -- At the time you

18    talked to Miss Hillard, detective, had she reported

19    the gun stolen, yet?

20         A     That I'm not sure.

21         Q     Did you ask her?

22         A     I asked her about the gun and I don't

23    remember if I asked her if she reported it stolen, no,

24    to be honest.

1          THE COURT:  I'm getting confused now because

2      at first I thought he said on Direct Examination that

3      she said she owned it but if anyone took it it would

4      have been her brother.  Did she know it was taken or

5      didn't she know it was taken?

6          THE WITNESS:  I felt that she knew it was

7      taken but she didn't come out and say that it was

8      taken at that point.

9          THE COURT:  Well, you also testified that you

10     verified she had reported it stolen, is that some

11     later point in time?

12         THE WITNESS:  Right.

13         THE COURT:  So she had reported it stolen

14     then on the same day you talked to her?

15         THE WITNESS:  Because I don't have notes I'm

16     not sure exactly what day I talked to her, that's the

17     problem, but I found out that the gun had been

18     reported stolen on the 19th.

19     BY MS. BORMANN:

20         Q    When did you find out the gun had been

21     reported stolen on the 19th?

22         A    After I spoke to her.

23         MS. BORMANN:  Judge if I may approach?

24

B-61

1    BY MS. BORMANN:

2         Q    I'll hand you what I've marked as

3    Petitioner's No. 4.  This is a copy of the

4    supplementary report you've prepared in this case that

5    was submitted on June 6, 1997; is that right?

6         A    Yes.

7         Q    And that general offense case report has an

8    indication of some -- some indication of your

9    conversation with Miss Hillard; is that right?

10        A    Yes.

11        Q    And in your -- That's your supplementary

12   report, isn't it?

13        A    Right.

14        Q    And in your supplementary report you indicate

15   that the gun was reported stolen on May 19th; is that

16   right?

17        A    Yes.

18        Q    And you indicate that it was reported stolen

19   understood RD number B-303395; is that right?

20        A    Yes.

21        Q    Where did you receive that RD number from,

22   officer?

23             MS. SAVINI:  Objection.

24             THE COURT:  Overruled.

1          THE WITNESS:  Where did I receive that?  I

2     think I received it from her.  As a matter of fact

3     this refreshes my memory.  She told me that this is

4     the number it was under.

5     BY MS. BORMANN:

6          Q     So she gave you that number when you spoke

7     with her before May 19th?

8          A     I believe so but I didn't speak to her before

9     May 19th apparently.  I spoke to her after the 19th of

10    May.

11         Q     So what you're telling us now is you spoke

12    with Loretha Hillard after May 19th?

13         A     This refreshes my memory I had to because she

14    gave me the police report number.

15         Q     Now, I'm going to hand you what I've

16    previously marked as Petitioner's No. 3, it's a little

17    out of order but this is the general offense case

18    report under RD number B-303395, is that what it is?

19         A     Yes.

20         Q     That's a general offense case report for a

21    gun reported missing by Loretha Hillard on May 19th of

22    1997, isn't it?

23         A     Yes.

24         Q     Is that the general offense case report that

1    you referred to in your supplementary report?

2        A    Yes.

3        Q    Nowhere in that report, officer, does it

4    indicate that there is any suspect whatsoever with

5    respect to the theft of that gun; is that right?

6            MS. SAVINI:  Objection.

7            THE COURT:  What is that?

8    BY MS. BORMANN:

9        Q    Nowhere in that general offense case report

10   does it indicate that there is any suspect with

11   respect to that missing gun?

12           MS. SAVINI:  Objection.

13           THE COURT:  Overruled.

14   BY MS. BORMANN:

15       Q    Does it?

16       A    No.

17       Q    And this general offense case report you've

18   just told us was made prior to your conversation with

19   Miss Hillard?

20       A    Right.

21       Q    Now, you said based upon that information

22   that you had from Miss Hillard you went to the home of

23   Tony Hillard, right?

24       A    Yes.

1          Q    And you went there on June 3rd of 1997?

2          A    Right.

3          Q    What time did you arrive at Mr. Hillard's

4     home on June 3, 1997?

5          A    It was in the early afternoon.  I'm not sure

6     exactly what time.

7          Q    Do you know what time?

8          A    I'm not sure exactly what time, no.

9          Q    Noon?

10         A    I think it was after noon.

11         Q    At 2:00?

12         A    Probably before 2:00.

13         Q    1:00?

14         A    Could have been 1:00 o'clock.  Between 1:00

15    and 2:00 I'd say.

16         Q    You don't know is the bottom line?

17         A    I don't know.  That's what I said at first, I

18    don't know.

19         Q    You went there with your partner, Detective

20    Jackson; is that right?

21         A    Right.

22         Q    And two Chicago Housing Authority police

23    officers?

24         A    Yes.

1          Q     They were Housing-North?

2          A     Yes.  Cabrini Green, right.

3          Q     Do you know those officers?

4          A     Yes.

5          Q     Who are they?

6          A     Patterson and Bryant.

7          Q     And you took those officers with you to

8     assist in the arrest of Mr. Hillard?

9          A     Yes.

10         Q     And to assist again in identifying him?

11         A     Yes.

12         Q     Now, when you arrived at the door you said

13    that a woman answered the door, right?

14         A     Yes.

15         Q     And you saw a gentleman standing a few feet

16    behind her?

17         A     Yes.

18         Q     At that time, officer, isn't it true that the

19    CHA officers -- I'm sorry.  Strike that.  The housing

20    officers, Patterson and Bryant, are the ones who

21    identified Mr. Hillard to you?

22              MS. SAVINI:  Objection to the relevance.

23              THE COURT:  Overruled.

24              THE WITNESS:  At that time they didn't

1    identify him to me, no.

2    BY MS. BORMANN:

3        Q    Officer, I'm going to hand you what has

4    already been marked as Petitioner's Exhibit No. 4 for

5    identification.  I want to direct your attention to

6    the fifth page of your supplementary report we

7    referred to earlier and direct your attention to

8    specifically the second to the last full paragraph in

9    there where it reads, officer:

10                    "The reporting detective on 3 June, 1997

11    went to the apartment at 714 West Division, number

12    1003, with Chicago Police Department Public Housing

13    Tactical Unit.  Pookie, opened the apartment door and

14    asked the police what did they want.  Standing behind

15    her was a male black subject.  The public housing

16    tactical officers identified the male black subject as

17    Hillard, Tony."

18                    Isn't that what it indicates in your

19    supplementary report?

20        A    Yes.

21        Q.   Isn't that in fact what happened?

22        A    That's not in fact what happened, no.

23        Q    So your supplementary report is incorrect?

24        A    It's incorrect because I didn't understand

1    until later after I had already talked to him that

2    they said that, yes, that was Tony Hillard, that's why

3    it's in there.  They didn't say that at first.  After

4    the interview with him they said, yes, that is Tony

5    Hillard.

6         Q    Now, officer, you also indicated to us that

7    when you asked Mr. Hillard his name he gave you a

8    fictitious name, correct?

9         A    Yes.

10        Q    What fictitious name did he give you?

11        A    I don't recall what name it was.

12        Q    Do you have any notes of that fictitious

13   name?

14        A    No.

15        Q    In fact, officer, in your supplementary

16   report that gives a narrative of his arrest you never

17   indicate that Mr. Hillard had ever given you a

18   fictitious name, do you?

19        A    No.

20        Q    And on the arrest report, which you signed in

21   this case and filled out, you never indicate in that

22   arrest report that Mr. Hillard ever gave you a

23   fictitious name, do you?

24        A    No.

File Date: _7-1-2008_

Case No: _08 cv 1775_

ATTACHMENT # _____

EXHIBIT _A to B_____

TAB (DESCRIPTION)

_____

1      Q    Officer, when you went into that home you

2    said you asked Mr. Hillard about the theft of his

3    sister's gun, right?

4      A    Yes.

5      Q    And she -- that was based on the fact that

6    she had told you if my gun was taken Tony Hillard must

7    have done it; is that right?

8      A    Yes.

9      Q    And he denied any knowledge of that incident,

10    didn't he?

11      A    Yes.

12      Q    And at that point you told him to get

13    dressed, right?

14      A    I asked him to come down to the station and

15    straighten it out, yes, the area and straighten it

16    out, yes.

17      Q    You told him to get dressed because he was in

18    boxer shorts wasn't he?

19      A    I thought he was in a pair of pants.

20      Q    You had him get dressed certainly, right?

21      A    He put on a shirt and shoes, yes.

22      Q    And you took him to Area Three; is that

23    right?

24      A    Yes.

1    Q    In handcuffs?

2    A    Yes.

3    Q    And he was put in a lineup at 9:30 in the

4    evening that evening?

5    A    Yes.

6    Q    Mr. Hillard was not free to leave Area Three

7    Police Station, was he?

8    A    Not at that point, no.

9    Q    Mr. Hillard was not free to leave after you

10    entered his apartment, was he?

11    A    He could have been free to leave.  He said he

12    wanted to come along with us, straighten the gun out.

13    Q    So he told you he wanted to come with you to

14    Area Three?

15    A    I asked him would he come to Area Three to

16    discuss and straighten out the theft of his sister's

17    gun.

18    Q    So he voluntarily went with you to Area

19    Three, Violent Crimes; is that your testimony?

20    A    Yes.

21    Q    And you handcuffed him?

22    A    I don't think we handcuffed him until we got

23    downstairs and when he rides in the squad car he has

24    to be handcuffed.

1              THE COURT:  Anybody who rides in a squad car

2     has to be handcuffed?

3              THE WITNESS:  Anyone who is suspected of a

4     theft.

5     BY MS. BORMANN:

6         Q    You never -- While he was at the police

7     station you never received -- What time did you get to

8     Area Three with Mr. Hillard?

9         A    We took him directly there.

10        Q    So sometime in the early afternoon hours?

11        A    Yes.

12        Q    You never received from the time that you

13    arrived there at say 2:00, 2:30 in the afternoon until

14    he was placed in a lineup at 9:30 at night you never

15    received any more information regarding the theft of

16    this gun, did you?

17        A    No.

18        Q    And you never received any more information

19    regarding his involvement in anything that occurred on

20    May 10th at 5851 North Winthrop, did you?

21        A    I called the victim to come and view him in a

22    lineup because he matched the description of one of

23    the offenders he named at the incident.

24        Q    Let's talk about that actually, officer.

1    Which description in the general offense case report

2    that you indicate is consistent with your interview of

3    Mr. Jinadu did, in your mind, Mr. Hillard match?

4        A    It could have been Crane, Jermaine listed.

5        Q    The person, the named offender of Jermaine

6    Crane is who you say he matched the description of?

7        A    His description is similar to all of them

8    just about really.

9        Q    Well, let's go through the description of

10    Jermaine Crane, that description is a male black,

11    twenties, unknown height, one sixty, brown eyes, black

12    hair, medium complexion; is that right?

13        A    Yes.

14        Q    And there is a name of Jermaine Crane, right?

15        A    Yes.

16        Q    Now, you're telling us -- You told us earlier

17    when the State asked you that he matched the

18    description when you saw him in the doorway at his

19    apartment, right?

20        A    Yes.

21        Q    And so you were thinking of this person when

22    you said he matched the description you were thinking

23    the person listed as offender number two named

24    Jermaine Crane, right?

1          MS. SAVINI:  Objection.  He already stated he

2     fits the physical description of all the people

3     described.

4          THE COURT:  Overruled.

5     BY MS. BORMANN:

6          Q    Is that right, detective?

7          A    He matches the description of all of them.  I

8     could pick any one of these.

9          Q    Okay.  So the person -- Let's back up though.

10    Offender number two, that description has a name

11    attached to it of Jermaine Crane, right?

12         A    Yes.

13         Q    And in the police possession in this case is

14    a photograph of Jermaine Crane that's part of a

15    Sheriff's Work Alternative Program, SWAP,

16    identification card, right?

17         A    Yes.

18         Q    Did you ever look at that identification card

19    during the time you had Mr. Hillard at Area Three from

20    2:30 in the afternoon to 9:30 to see whether or not he

21    matched it?

22         MS. SAVINI:  Objection.

23         THE COURT:  Overruled.

24         THE WITNESS:  It's inventoried at 26th and

1    California in the basement somewhere.  I've never seen

2    that photograph.

3    BY MS. BORMANN:

4        Q    So it's your testimony you can't get evidence

5    from the Evidence and Recovered Property Section at

6    26th Street?

7              MS. SAVINI:  Objection.  Argumentative.

8              THE COURT:  Sustained.

9    BY MS. BORMANN:

10       Q    Can you, detective?

11       A    Yes.

12       Q    Did you?

13       A    No.

14       Q    Now, you said he could match any of the

15   descriptions.  Let's go on to the person described as

16   Erven Walls, offender number three, living at 5851

17   North Winthrop, male black, five-eleven, one

18   sixty-five pounds, brown eyes, black hair.  Did

19   Mr. Hillard live at 5851 North Winthrop?

20             MS. SAVINI:  Objection.

21             THE COURT:  Sustained.

22

23

24

1   BY MS. BORMANN:

2       Q    Well, the description of offender number

3   three, detective, is exactly what I've just said,

4   isn't it, gives a name and address and a height,

5   weight, hair color, eye color description, right?

6       A    Yes.

7       Q    Okay.  And you've told us that Mr. Hillard

8   could have fit any of those descriptions, right?

9       A    Yes.

10      Q    Did Mr. Hillard -- How did Mr. Hillard fit a

11  description of Erven Walls living at 5851 North

12  Winthrop?

13              MS. SAVINI:  Objection.

14              THE COURT:  Overruled.

15              THE WITNESS:  His physical description, apart

16  from his address, you could have numerous addresses,

17  his physical description is the same.

18  BY MS. BORMANN:

19      Q    Well, did you run a rap sheet, a B of I

20  sheet, on Mr. Hillard before going to pick him up?

21      A    Yes.

22              MS. SAVINI:  Objection.

23              THE COURT:  The answer may stand.

24

1       BY MS. BORMANN:

2           Q    And you looked at that rap sheet, right?

3           A    Yes.

4           Q    Did it ever have a listing of an address of

5       5851 North Winthrop?

6           A    No.

7           Q    Did it ever have an alias name of Erven

8       Walls?

9           A    No.

10          Q    Did it ever have an alias name of Jermaine

11      Crane?

12          A    No.

13          Q    Let's go on to offender number four who is

14      described, male black, five ten, two hundred pounds,

15      black jeans, red pullover, no further information.

16      How does Mr. Hillard match that description in your

17      mind, detective?

18          A    He's that tall and he could weigh that much.

19          Q    Mr. Hillard weighs a hundred and sixty-five

20      pounds, doesn't he?

21              MS. SAVINI:   Objection.

22              THE COURT:   Overruled.

23              THE WITNESS:   That's what his arrest report

24      says, yes.

1      BY MS. BORMANN:

2            Q      You filled out his arrest report, didn't you?

3            A      Sure did.

4            Q      It's accurate, isn't it?

5            A      If he tells me --

6                   MS. SAVINI:  Objection.

7                   THE COURT:  Overruled.

8      BY MS. BORMANN:

9            Q      Let's go on with --

10                  THE COURT:  We're going to have to recess

11     this motion, it's getting to the point where it's a

12     little bit late.  We'll recess until 2:30, come back

13     at that time and finish it up.

14                               (A luncheon recess was taken.)

15                  THE CLERK:  Tony Hillard.

16                  THE COURT:  You may proceed, Miss Bormann.

17                  MS. BORMANN:  Thank you, judge.

18     BY MS. BORMANN:

19           Q      Officer, I want to talk a little bit about --

20     I want to go back to what you said earlier about

21     Mr. Hillard matching any of the descriptions of any of

22     the offenders.  We were on offender number four when

23     we broke for lunch I believe, so I want to go back to

24     that.  Strike that.

1          With respect to offender number four the

2    person described as five foot ten and two hundred

3    pounds wearing black jeans and a red pullover,

4    Mr. Jinadu never gave you any further information

5    regarding that offender; is that right?

6         A    No.

7         Q    Pardon?

8         A    No.

9         Q    No, he didn't or, yes, he did give you more

10   information?

11        A    No.

12        Q    No, he did not give you more information?

13        A    He did not.

14        Q    He didn't give you a hair color?

15        A    No.

16        Q    An eye color?

17        A    No.

18        Q    Thank you.  Or any description of any facial

19   hair or anything like that?

20        A    No.

21        Q    With respect to offender number five, that

22   person was described to you by Mr. Jinadu as a male

23   black who was five foot five inches tall; is that

24   right?

1      A    Yes.

2      Q    And that male black was five foot five inches

3  tall was described to you by Mr. Jinadu as weighing

4  approximately a hundred and forty pounds; is that

5  right?

6      A    Yes.

7      Q    Wearing a blue jacket and gray jeans; is that

8  right?

9      A    Yes.  I don't have the report in front of me

10  but I believe you're correct.

11      Q    Now, officer, after you took Mr. Hillard out

12  of his home and put him in the police car handcuffed

13  you took him to Area Three; is that right?

14      A    Yes.

15      Q    And eventually at some point that evening at

16  approximately 9:30 you placed him in a lineup; is that

17  right?

18      MS. SAVINI:  Objection, judge.  That's all

19  been asked and answered.

20      THE COURT:  This has been asked and answered.

21  BY MS. BORMANN:

22      Q    Prior to placing him in a lineup you

23  interviewed Mr. Hillard, right?

24      A    Well, yeah, I interviewed him at the

1    apartment and on the way in and he said he didn't know

2    anything about anything.

3            MS. SAVINI:  Objection.

4            THE COURT:  Sustained.

5    BY MS. BORMANN:

6        Q    Officer, when you interviewed Mr. Hillard

7    prior to the lineup you interviewed him not only about

8    the lost gun but you also interviewed him about the

9    facts of this case involving Yinka Jinadu?

10           MS. SAVINI:  Objection.

11           THE COURT:  What's the basis?

12           MS. SAVINI:  What's the relevance of

13    something that happened after the arrest in the home?

14           MS. BORMANN:  Judge, I don't know that the

15    State is going to argue that the arrest came in the

16    home.

17           MS. SAVINI:  That's our argument, that he's

18    arrested in the home.  I'll concede that right now he

19    was under arrest.

20           THE COURT:  Okay.  I'll sustain the objection

21    then.

22           MS. BORMANN:  Thank you.

23

24

1    BY MS. BORMANN:

2        Q    Officer, when you -- You conducted the lineup

3    or did your partner?

4            MS. SAVINI:  Objection.  What's the relevance

5    of who conducted the lineup?

6            MS. BORMANN:  The lineup is part of the

7    evidence which we seek to suppress.

8            THE COURT:  It's already been stipulated by

9    your side, it's been testified by her side.

10           MS. BORMANN:  Correct.  And the State --

11           THE COURT:  He's under arrest now so what's

12   the difference?

13           MS. BORMANN:  I agree with you, judge,

14   however the State went into it on Direct Examination.

15   I believe that I'm entitled to cross-examine based on

16   their questioning on Direct.

17           THE COURT:  Well, they did, they didn't need

18   to but they did.  Go ahead.

19           MS. BORMANN:  Thank you.

20   BY MS. BORMANN:

21       Q    That lineup, how many persons were placed in

22   that lineup?

23       A    I believe five.  I'd have to have the report

24   to give you the exact.

1      Q    I'll mark that as Petitioner's No. 6 and give

2    that to you.  That lineup was conducted in a sitting

3    position, wasn't it, officer?

4          MS. SAVINI:  Judge, I going to object again.

5    The only question I asked this detective was a lineup

6    conducted subsequent to going to Area Three that's

7    because that was the basis of what the defendant is

8    asking to be suppressed.  I didn't go into any of the

9    facts of it, I just went into the fact that it

10   happened.

11         I'm conceding the arrest happens in the

12   apartment.  I don't know how this is anything more

13   than a deposition if we're going to go into all the

14   facts of a lineup.  It may be relevant for a second

15   motion Miss Bormann is going to file on this case but

16   it's not relevant now.

17         THE COURT:  What about it?

18         MS. BORMANN:  Judge, it's relevant because

19   this is the evidence sought to be suppressed.  The

20   officer testified that after a lineup my client was

21   indicated to be one of the offenders in the case.

22   What I want to go into here is how that occurred and

23   what that offender supposedly did, all of that goes

24   to -- in determining whether or not -- actually

1    determining what should be suppressed.

2              I'm going to ask you to suppress the

3    statements from that.  I'm going to ask you to

4    suppress the entire lineup, all of the information

5    regarding the lineup.  So I believe I'm entitled to go

6    into the information I'm seeking to have suppressed.

7    Not only was there a finger pointed at my client but

8    at the same time this officer talked to the individual

9    known as Yinka Jinadu and elicited information which

10   would normally be admissible under the criminal court

11   rules dealing with lineups and I'm seeking to have all

12   of that suppressed.

13             THE COURT:  That's not what you asked to do

14   though.

15             MS. BORMANN:  I'm asking to suppress the

16   lineup identification.

17             THE COURT:  You basically said he was

18   illegally arrested, taken to Area Three, put in a

19   lineup, identified by Yinka Jinadu and they intend to

20   use that against him, the results of an out-of-court

21   lineup identification and an in-court identification.

22             MS. BORMANN:  Correct.  The out-of-court

23   identification, your Honor, as your Honor well knows

24   is not simply pointing a finger, it's the actual words

B-83

1    spoken by Mr. Jinadu when he points the finger and

2    that's what I'm getting at.

3            THE COURT:  Objection sustained.

4    BY MS. BORMANN:

5        Q    Officer, with respect to this case you

6    already indicated to us that you did not take notes

7    during several of the interviews you talked about.

8    With respect to the interview you had on the telephone

9    with Miss Loretha Hillard did you ever take notes of

10   that interview?

11           MS. SAVINI:  Objection.  Asked and answered.

12           THE COURT:  Sustained.

13   BY MS. BORMANN:

14       Q    Officer, with respect to your investigation

15   in this matter prior to your arrest of Mr. Hillard how

16   many general progress notes or notes, how many pages

17   did you take regarding this case?

18           MS. SAVINI:  Objection.

19           THE COURT:  Sustained.

20   BY MS. BORMANN:

21       Q    Officer, was Mr. Hillard ever charged with

22   the theft of the weapon in this matter?

23           MS. SAVINI:  Objection.

24           THE COURT:  Overruled.

1              THE WITNESS:  No.

2    BY MS. BORMANN:

3        Q    That case is still open, isn't it?

4             MS. SAVINI:  Objection.

5             THE COURT:  Sustained.

6             MS. BORMANN:  I have nothing else.

7             THE COURT:  Anything else, Miss Savini?

8             MS. SAVINI:  Yes, judge.

9                     REDIRECT EXAMINATION

10                    BY MS. SAVINI:

11       Q    Detective, you were asked about an arrest

12   report that you prepared in this case, you did prepare

13   one?

14       A    Yes.

15       Q    In preparing that arrest report you included

16   several biographical and physical descriptive things

17   about the defendant; is that right?

18       A    Yes.

19       Q    You included his sex and race, didn't you?

20       A    Yes.

21       Q    And what were his sex and race?

22       A    Male black.

23       Q    Do you recall what his age was at the time of

24   the arrest?

1          A      Twenty-one years old.

2          Q      Do you recall what his height was at the time

3     of the arrest?

4          A      Five foot eleven.

5          Q      Are you sure about that?

6          A      I'd have to look to make sure.  I think it

7     was about five foot eleven, five foot ten.

8          Q      What would refresh your recollection?

9          A      The arrest report.

10             MS. SAVINI:  Judge, I'll mark the arrest

11    report as Respondent's Exhibit No. 1.

12             THE COURT:  Yes.

13    BY MS. SAVINI:

14         Q      Take a look at that and tell me when your

15    recollection is refreshed as to his physical

16    description?

17         A      He's five foot ten, yes.

18         Q      He's five foot ten?

19         A      Yes.

20         Q      What was the weight you indicated on your

21    arrest report?

22         A      One seven zero.

23         Q      Now, the information in here is information

24    that you got from the defendant?

1        A     Yes.

2        Q     He's the one that told you his height?

3        A     Yes.

4        Q     And he's the one that told you his weight?

5        A     Yes.

6        Q     You didn't pull out a scale and weigh him?

7        A     No.

8        Q     And didn't take out a tape measure and

9     measure his height, did you?

10       A     No.

11             MS. SAVINI:  Nothing further, judge.

12             MS. BORMANN:  I have nothing based on that.

13             THE COURT:  Thank you, detective.  You may

14    step down.

15                        (Witness excused.)

16             THE COURT:  State have anything else?

17             MS. SAVINI:  No, judge.  I'd rest.

18             THE COURT:  Both sides rest?

19             MS. BORMANN:  Yes, judge.

20             THE COURT:  Any argument?

21             MS. BORMANN:  Judge, I would waive the

22    opening and reserve rebuttal.

23             MS. SAVINI:  Judge, the motion that's in

24    front of you is a motion that's asking you to suppress

1    an identification based on whether or not there was

2    probable cause and the circumstances of the arrest of

3    this defendant.

4        One of the first things that I would

5    concede is that the time of the arrest was at the

6    apartment and at best what the defense I imagine could

7    argue is the State has a Payton violation here, a

8    warrantless arrest inside a home, and I think that

9    brings us to the so what issue.

10       Even if you found there was a Payton

11   violation in this case, so what.  There's nothing that

12   was recovered from the home by way of evidence.  There

13   was no statement made inside the home other than a

14   denial by the defendant to any type of gun case

15   involving his sister, so there really is no evidence

16   inside the home.

17       What the case law says is that anything

18   that's obtained after that outside of the home is

19   still going to be admissible even though there may

20   have been a warrantless arrest inside the home, and

21   that's New York versus Harris.  In New York versus

22   Harris anything that happened outside of the home,

23   even though assuming there was probable cause, was

24   still admissible evidence and it was not suppressed by

1    the court.

2              And the case of People versus Alexander

3    extended that from statements in New York versus

4    Harris to lineup identifications like we have in this

5    case. So even if the court finds that there is some

6    type of Payton violation, and I'm not arguing this was

7    a consensual entry, if anything it was iffy. The

8    detective told you that I didn't ask her if I could go

9    in, she didn't tell me I couldn't go in. When I saw

10   the guy that met the description I walked past her and

11   went in. So even if the court finds there was a

12   Payton violation there is nothing to be suppressed.

13              I think the bigger issue is whether or

14   not there was probable cause and there was probable

15   cause to arrest this defendant. In order for there to

16   be probable cause the State has to show that a crime

17   has been committed and that this person could have

18   been the person that committed the crime and it's

19   based on the mental state of the officer.

20              In this case we certainly know a serious

21   crime had been committed and we know that the victim

22   was Yinka Jinadu. In this case we know that when the

23   crime was committed a weapon was left at the crime

24   scene. We know that that weapon belonged or was

1    registered to an individual by the name of Loretha

2    Hillard and before we even know that, judge, we know

3    that the victim can give physical descriptions of all

4    of the people in the apartment and he can name one by

5    name because that's his wife of whom he was separated

6    from.

7                       He knows that the others are four male

8    blacks and the detective gave you the various height

9    and weight descriptions of those other four people.

10   Now, those varied slightly but they weren't all that

11   different and I think there's got to be at least two,

12   if not three, that the victim does fit.

13                      One of the descriptions was a male back

14   in his twenties with an unknown height, weight of a

15   hundred and sixty.  This defendant was five ten and

16   one seventy, according to the information that he gave

17   to the detectives.  And the court can take notice of

18   it and the detective has testified that he is a male

19   black.

20                      One of the other physical descriptions

21   he was given was five eleven and one sixty-five, that

22   would be an inch and five pounds off from what the

23   defendant stated to the police was his height and

24   weight.  Another would be five ten, his height, and

1    two hundred pounds.  That would be slightly heavier

2    than what the officer knew.

3              The other would be five five and one

4    forty, probably the most distinct of all but still

5    five inches off and approximately thirty pounds short,

6    probably the farthest off as I've stated, judge.

7    Based on that physical description that's only one of

8    the things that the officers used in order to arrest

9    him as far as probable cause.

10             We knew that he was a male black and he

11   fit roughly at least three of the height and weight

12   descriptions.  But there's more than that in this

13   case, judge, because of the police work that was done.

14   When the gun was recovered at the scene, and let me

15   just back up for one minute, judge, because a lot was

16   made of this issue as to who he could name.

17             The only person that the detective ever

18   said the victim could name, even though there are

19   names in the case report, which is evidence I objected

20   to and it was allowed in, what is the relevance

21   because a police officer, not this detective, wrote it

22   in his case report, he put names into this report.

23   This detective said the victim couldn't give me

24   anybody's name other than his wife.

1      Now, whether or not he could identify

2  someone from a photo, that's a different story, judge,

3  but the only person that he could give a name to was

4  Delores Jinadu, his wife.  So the fact that there are

5  names in this case report really are irrelevant, it's

6  what the victim knew and what he could articulate to

7  the detective so that we can look at what was in the

8  detective's mind at the time of the arrest.

9      He had four physical descriptions of

10  four men and one female who was definitely a known

11  offender because of her relationship with the victim.

12      Now, getting back to the gun, the gun

13  that's used at the crime scene or found at the crime

14  scene registers to the defendant's sister.  The police

15  are able to learn that information and they interview

16  over the phone the defendant's sister.  And what does

17  she say?  My brother -- Well, first of all she says

18  she's a CHA officer or used to be and that she had

19  reported her gun stolen.

20      And the officer was quite truthful he

21  couldn't remember when he had the phone conversation

22  with her and Miss Bormann was able to refresh his

23  recollection with his report and once he looked at his

24  report and realized that his sister, the defendant's

1    sister, was able to give him the RD under which she

2    reported the gun stolen, which was done on May 19th,

3    at that point he realizes I did speak with her after

4    May 19th because she already had that information

5    available to me.

6            The detective took that a step further

7    and in fact checked to see if an RD did exist, and it

8    did, for a stolen gun that was the same type of gun,

9    the same gun used in this case and verified that in

10    fact the defendant's sister had made a report on

11    May 19th that her gun was missing.

12            When asked who do you think could have

13    taken your gun, what does the sister say?  The only

14    person that could have taken it was Tony.  Why?

15    Because he steals from me all the time.

16            MS. BORMANN:  Objection.  That's not the

17    testimony.

18            THE COURT:  Pardon me?

19            MS. BORMANN:  That wasn't the testimony.

20            THE COURT:  That wasn't the testimony?

21            MS. BORMANN:  No.  The testimony was --

22            THE COURT:  He's always stealing something.

23            MS. BORMANN:  He's always stealing something.

24            THE COURT:  That's pretty close.

1          MS. SAVINI:  I'm sorry, judge.  He's always

2     stealing something.  And at this time I'm going to

3     argue to you it was the gun that was found at the

4     crime scene that he stole from his sister.  What does

5     the detective do?  Who is your brother and how can I

6     find him?  My brother is Tony Hillard and he stays up

7     the road with Pookie over at 714 West Division, that's

8     where you can find him and the detective acts on that

9     information.

10          He knows to go to that address because

11    the defendant's sister gives him that address.  He

12    knows the apartment number to go to, which was 1003.

13    When he gets there he knocks on the door.  He's

14    greeted by someone who we now know is Pookie because

15    she's testified in this courtroom that she's the one

16    that opened the door and standing behind her is the

17    defendant, someone that meets the physical

18    description, he's the only other man in the apartment.

19          And the detective quite honestly says I

20    walked in and went right up to him because I had

21    already asked -- I already told them I was looking for

22    Tony and they told me there was no Tony, so I

23    confronted this man and I asked him about stealing his

24    sister's gun and right away he told them he didn't

1     steal any gun.

2                 Well, maybe the defendant's state of

3     mind at that point is he thought he could clear that

4     small matter up. He didn't know what the

5     detectives -- what else the detectives also were

6     looking at at that point, so he says, no, I didn't

7     steal my sister's gun. Well, let's talk about it.

8     Get your clothes on. We're going to go down to the

9     station. And I'll concede, judge, he was going down

10     to the station whether he wanted to or whether he

11     didn't want to because the police had every right to

12     take him in at that point.

13                 At that point he not only fits a

14     physical description, he is linked to the crime scene

15     by the weapon and by his sister, the information

16     obtained through his sister. Not to mention, judge,

17     just as an aside, that they could have arrested him at

18     that point for the possession of the stolen gun based

19     on information that they had received from his sister.

20     They could have at least investigated that a little

21     further, they had enough at that point to arrest him

22     for that.

23                 Whether or not they could ever prove

24     that, that's not the standard. The standard is

1    whether or not he could arrest him but they certainly

2    could have arrested him for the crimes in this case

3    and that's because of the physical description that he

4    met and the fact that the gun found at the crime scene

5    was tied to him through an investigation, that's

6    clearly enough evidence to bring him in and at least

7    start an investigation to detain him so that he could

8    be put in a lineup.

9                Judge, based on all the evidence you

10   heard from the detective I think it's clear the State

11   has established probable cause at this point.  I would

12   ask that you deny the motion.

13               MS. BORMANN:  Let's talk about the word

14   detain.  It's not a detention, it's an arrest.  What

15   the State is telling you is they're conceding he was

16   under arrest when he left his apartment that day.

17   They had to have probable cause for that arrest.  And

18   I respectfully disagree with Miss Savini.  It isn't

19   just whether or not a person thinks a crime has been

20   committed, it's also whether or not a reasonable

21   person believes that this person committed the crime,

22   that's probable cause, not if he could have done it

23   because you know what anybody who is a male black in

24   the City of Chicago on May 10th of 1997 could have

1    done this.  So that's not the standard.

2              What do we have?  What objective facts

3    do we have?  Not many.  We have a phone call to a

4    woman named Loretha Hillard by this officer who cannot

5    tell you when he made the phone call.  At one point

6    it's at one time, at another point it's at another

7    time.  The bottom line is according to the officer the

8    woman says if my gun was taken my brother would have

9    been the only one that could have taken it.

10             THE COURT:  She already knows it was taken.

11             MS. BORMANN:  Well, does she?  Because every

12   time that detective was asked that question he

13   repeated the same sentence, which was if my gun was

14   taken my brother would have been the only one to take

15   it.

16             THE COURT:  Well, I'm not so sure because it

17   seems to me that was the way you couched the questions

18   and he just went along with it.  When he originally

19   testified on Direct Examination he said that she said

20   that she owned it, it was taken, and if anyone took it

21   it would have been her brother.

22             MS. BORMANN:  It was taken and if anyone took

23   it --

24             THE COURT:  That's what he said she said on

1 his Direct Examination.  Then there was some confusion

2 as to whether she actually had reported it then or not

3 because he next testified he verified she had indeed

4 reported it stolen.  Then later on on

5 Cross-Examination he came back and he agreed that he

6 must have talked to her after the 19th because the

7 report was dated the 19th and that it had been

8 reported stolen as of the time that he had talked to

9 her initially.

10    MS. BORMANN:  Actually, judge --

11    THE COURT:  There was some confusion, I agree

12 with you.

13    MS. BORMANN:  There was.  My recollection of

14 the testimony on each and every occasion was what she

15 said was if the gun was taken my brother was the only

16 one that had taken it.  Now, let's talk about that.

17 He said that conversation occurred after May 19th,

18 that's what he eventually said.  Earlier on he said

19 something different.

20    THE COURT:  Yeah, he said that.

21    MS. BORMANN:  After May 19th an RD had been

22 filed on the case, right?

23    THE COURT:  Uh-huh.

24    MS. BORMANN:  -- an RD filed by Miss Hillard,

1    that we heard from this detective, which Miss Savini

2    argued the detective looked at, which the detective

3    denies looking at, but at any rate it doesn't matter

4    because the bottom line is when Miss Hillard reported

5    her gun missing there was no suspect mentioned at all

6    and that was information available to the police

7    before they went out to my client's house that day.

8    They chose not to look at it.

9         Let's look at some more information they

10   had, the gun aside, the gun aside.  If the gun was

11   taken he's the only one that could have taken it.  The

12   police don't investigate further, they don't say why

13   is that?  Don't you live with somebody else?  Nothing

14   is done to corroborate that statement.  Does it make

15   sense?  Of course it doesn't make sense.  It doesn't

16   make sense at all.  They don't try to corroborate it

17   at all.

18        THE COURT:  Why did they go to Tony Hillard

19   then in the first place?  If she didn't relate this to

20   Detective Bradley why did he invent Tony Hillard?  It

21   had to come from the sister.  Absolutely.  There is no

22   doubt in my mind that Miss Hillard told the police

23   officers about her brother named Tony Hillard,

24   absolutely no doubt in my mind, absolutely no doubt.

1    Whether Miss Hillard said it's the only person that

2    could have taken my gun, if it was taken, I have some

3    doubts about that because it just doesn't make sense.

4              This is a woman who reported her gun

5    missing on May 19th and didn't report any suspected

6    offender in it.  So when the officer talked to her how

7    did that all of a sudden know it's Tony Hillard?  I

8    don't know.

9              But at any rate let's move on to the

10   next thing the State said that they had, which is a

11   description of an offender.  Miss Savini says it

12   doesn't matter whether there's names attached to the

13   descriptions?  Of course it matters.  The police

14   didn't pull up those names out of nowhere, they didn't

15   just make them up.  These names were taken from

16   identification that was shown to the victim and the

17   victim identified the photos on the identification as

18   the persons who were involved in the incident

19   involving the victim.  Those persons were, according

20   to the victim, Delores Jinadu, Jermaine Crane, Erven

21   Walls and then two other unnamed persons.  Now --

22             MS. SAVINI:  Judge, I'm going to object to

23   that because that is not evidence.

24             THE COURT:  I don't think that that's a

1    correct characterization because we know ourselves

2    that Erven Walls and Jermaine Crane are the same

3    person, so if they had one with his picture and he's

4    working -- We know he's on probation because I've

5    inherited his probation. Mr. Crane keeps talking

6    about it every time he comes out here, when is my

7    probation going to be up.

8            He has a SWAP ID, obviously part of his

9    probation. He's also Erven Walls. There's only one

10   person, and we don't know what other identification

11   with pictures on it were of Walls and Jermaine Crane.

12   It could have been just one picture on the SWAP photo

13   and other identification of Erven Walls because he is

14   the same guy.

15           MS. BORMANN: Judge, I'm going to agree with

16   you completely. Erven Walls and Jermaine Crane are

17   exactly the same guy and we know that now. But when

18   the victim identified that identification on May 10th

19   to those police officers they didn't know that which

20   is why Jermaine Crane is listed as a separate offender

21   from Erven Walls. Jermaine Crane is listed as

22   offender number two wearing blue jeans, a red shirt, a

23   male black in his twenties, height unknown, weight of

24   one sixty, brown eyes, black hair, medium complexion.

1          Offender number three is listed as Erven

2    Walls at 5851 North Winthrop, male black, five eleven,

3    one sixty-five, brown eyes, black hair.

4          THE COURT:  But that's obviously because the

5    police did not know the two were the same.  They had

6    identification from one and a photo ID from somebody

7    else.

8          MS. BORMANN:  Obviously the police didn't

9    know it's the same, but the descriptions are

10    different.

11          THE COURT:  And that's corroborated by

12    another factor here and that is on Cross-Examination

13    the detective told you that in looking at the case

14    report there are five offenders, three names are set

15    out, which we know, the ex-wife, Jermaine and Erven

16    and two are not identified by name.  He also indicated

17    that the case report did give descriptions as to the

18    four male blacks so it's entirely consistent.  There

19    are not -- The only people who are named there are the

20    ex-wife and Walls-Crane who is the same individual.

21          MS. BORMANN:  We know now, judge, that Walls

22    and Crane are the same individual but the reports

23    don't indicate --

24          THE COURT:  The police didn't know and

B-102

1    neither did the victim.  How would he know what their

2    names were?

3        MS. BORMANN:  Well, there's a good question.

4    Then when he gave those descriptions to the police

5    that are listed as separate offenders having separate

6    heights and weight under the same name how -- under

7    those two different names, now we know they're the

8    same person, how did that happen?

9        MS. SAVINI:  I'm going to object to what the

10   police report says because I don't think what the

11   police report says is evidence and something isn't

12   clear here --

13       THE COURT:  Because they could certainly be

14   the same person.  We have number one was a male black,

15   a hundred and sixty pounds, black hair, brown eyes.

16   Number three is a male black, five eleven, a hundred

17   and sixty-five pounds.  There could have been that

18   distinction.  I mean he could have fit either one of

19   them.  Crane could have or Walls.

20       MS. BORMANN:  Except that they have different

21   clothing descriptions.  One is wearing blue jeans and

22   a red jacket and the other one actually has no

23   clothing description whatsoever but a full eye, hair

24   and other measurement and color.  So they're clearly

1    as the victim describes them going to be two different

2    people.

3                Now, I don't know how they ended up with

4    a name of Jermaine Crane on one and Erven Walls on

5    another and I think your Honor is probably right but

6    let's talk about that because what that means then is

7    that the descriptions are worthless, right?  If what

8    we have are descriptions of the same guy as two

9    different offenders on this case does that make any

10   sense to you?  Of course not.

11               A person describing who was the offender

12   in the case would say this guy was this size, this guy

13   was this size and they can't be the same person,

14   right?

15          THE COURT:  They can't be but he said that

16   there were four male blacks.

17          MS. BORMANN:  Correct.

18          THE COURT:  And if you look at it this way

19   and say that three people have been identified by name

20   because there is two sets of identification there --

21          MS. BORMANN:  Three sets.

22          THE COURT:  -- and one women, so three people

23   have been identified by name, which would be one woman

24   and two men, okay, and that there are two other

1    individuals who are not identified in any way in the

2    case report.

3              MS. BORMANN:   Correct.

4              THE COURT:   That doesn't -- You can't

5    attribute that to the victim here.  He's not calling

6    them by name anyway.

7              MS. BORMANN:   But we can because what the

8    detective indicated to your Honor was that on page

9    three of that general offense case report, the

10   officer, and this is the one he relied upon, this is

11   the one that was accurate which is why he didn't take

12   any notes, he indicated that those officers said they

13   showed the paper and photo ID's to the victim and

14   that's how the victim identified those people.

15             THE COURT:   He didn't know what kind of

16   photo, what kind of paper ID there was.  He knew that

17   there was one SWAP ID with a picture on it, that was

18   something that the individual could identify.  If you

19   had another set of ID with no photo identification on

20   there it's obvious that the victim could not have made

21   a photo identification from that but by process of

22   elimination the police concluded that that was two

23   separate people up there.

24             MS. BORMANN:   And did the police then, before

1    they went out to arrest my client, determine whether

2    or not Mr. Hillard -- whether or not the picture on

3    that photo ID matched Mr. Hillard?  No.

4           THE COURT:  Why would it have to match him?

5           MS. BORMANN:  Well, that would be one

6    offender, wouldn't it?  If it matched him we would

7    certainly have probable cause here and I wouldn't be

8    doing a motion.

9           THE COURT:  Well, that's true but I mean

10   you're eliminating a lot of other things, a lot of

11   other bases here.  They didn't have a gun that was

12   traceable to the sister in turn who put the finger on

13   Mr. Hillard.

14          MS. BORMANN:  The sister who said, your

15   Honor, if my gun was taken Tony Hillard is the only

16   one that could have taken it.  If my gun was taken.

17   The gun was missing.  That in and of itself would not

18   give probable cause for the arrest on the gun.

19          THE COURT:  You're putting a gloss on it that

20   I don't think that's what she said according to the

21   detective.  And when you analyze the statement, if

22   anyone took it, it would be my brother.

23          MS. BORMANN:  Right.

24          THE COURT:  That doesn't necessarily mean if

1    it was taken but if anyone took it, it would have been

2    him.   That's pretty much saying I think he's the guy

3    who took it.

4          MS. BORMANN:   If anyone took it.   But at this

5    point, your Honor, in the time sequence involved that

6    according to the detective on Cross she would have

7    already reported the gun stolen.

8          THE COURT:   She did.

9          MS. BORMANN:   She did.   So she would have

10   already reported the gun missing and -- So it wouldn't

11   make any sense for her to say if anyone took the gun

12   then it was Tony Hillard because at this point,

13   according to the detective, she's already reported it

14   stolen so presumably she would have known that.

15          THE COURT:   I can't examine her motives of

16   why she didn't include it on the 19th of May.   I don't

17   know why she didn't say if anyone took it it would

18   have been my brother.   There's no evidence of what she

19   said at that time.

20          MS. BORMANN:   We can't examine her motives

21   but we can examine what the officer said she said in

22   light of common sense and so that's what I'm asking

23   your Honor to do.   That coupled with the fact that we

24   have descriptions that are not very distinct in this

1    case.

2              The five five, one forty, that's

3    relatively distinct, five ten, two hundred is a

4    heavier set guy, a much bigger guy.  The other two

5    offenders are described as five eleven and one

6    sixty-five and an unknown height and one sixty and the

7    only thing they all have in common is that they're

8    male blacks.  These are not very specific with

9    respect -- very specific descriptions except for the

10   one with respect to their clothing.

11             There is no indicia of facial hair, lack

12   of facial hair or anything else that would lead

13   somebody to believe -- And in fact the detective said

14   it could have been any of them.  Well, exactly.  It

15   probably could have been any male black in the City of

16   Chicago.  That's not enough for probable cause.  And

17   the situation with the sister with the gun is also not

18   enough for probable cause.  Would that be enough

19   probable cause to arrest Tony Hillard for the theft of

20   a gun?  Miss Hillard didn't even know whether or not

21   her gun was stolen.  Her gun was missing.

22             THE COURT:  She reported it stolen.

23             MS. BORMANN:  She reported it missing.  So,

24   your Honor, what I'm asking you to do is grant the

1    motion.  There is not probable cause for this arrest.

2    They came into his home, they arrested him, they took

3    him to a police station where they kept him for

4    something like seven hours before they put him in a

5    lineup and I'm asking you to suppress the out-of-court

6    lineup.

7              THE COURT:  All right.  The court has heard

8    the evidence on the motion to quash arrest and

9    suppress evidence and I'll make the following findings

10   and conclusions mandated by Section 114-12 of The Code

11   of Criminal Procedure:  It is the defendant's position

12   as stated in this motion that he was arrested on

13   June 3, 1997 at his lawful residence, 714 West

14   Division in the City of Chicago without benefit of

15   arrest warrant, search warrant or any other lawful

16   process and was not violating any laws at the time of

17   his arrest or prior thereto.

18             The issue presented is whether there was

19   probable cause to effect the arrest that took place

20   there, the State having conceded in argument and the

21   detective as well that he did arrest the defendant at

22   that location.

23             A subsidiary issue is whether there was

24   an unlawful warrantless entry into the premises to

1    effect the arrest of Mr. Hillard, what affect that

2    would have.  According to the defendant's evidence

3    Benica Eberhardt, his roommate or lady friend,

4    testified on the time in question there was a knock on

5    the door, she answered the door, the police were

6    there, the defendant was a short distance behind her

7    in the hallway, the police entered and grabbed the

8    defendant after searching the apartment, he was

9    thereafter taken away.  Factually not very

10   inconsistent with the testimony of Detective Bradley,

11   which I will summarize at this point.

12              The detective testified that he was the

13   investigating officer on the armed robbery and beating

14   of Yinka Jinadu on May 10, 1997 at 5851 North

15   Winthrop.  In interviewing the victim several days

16   later at Illinois Masonic Hospital Detective Bradley

17   related the victim was still recovering from a

18   fractured skull and I believe a fractured orbital bone

19   and at that time at the hospital told him that on the

20   date of the robbery his ex-wife or estranged wife had

21   called him, asked him to pick her up at the Winthrop

22   address, he went there, she wanted him to come

23   upstairs to her apartment, he was buzzed in, he came

24   up and he was struck as he was about to enter the

1   apartment.

2              He awakened two hours later.  Four male

3   blacks were in the apartment, as was his ex-wife.  He

4   was bound and handcuffed and taped and keys and other

5   property were demanded.  He was struck with a tire

6   iron, he was beaten additionally with a bat, he was

7   placed in a bathroom shower and soaked in water.  When

8   he ceased to hear any further conversation in the room

9   he came out, found that the occupants had left and was

10  able to get free, ran down to the front of the

11  building and saw two of the male offenders across the

12  street who then fled.

13             Police were called, they came to the

14  scene, they went back upstairs, recovered weapons, and

15  the victim made a photo identification of one of the

16  offenders who we know from the evidence is a

17  co-offender of Mr. Hillard, Jermaine Crane, also known

18  as Erven Walls.  In addition to that gentleman, the

19  two names they had for that person, obviously the

20  identity of the ex-wife or estranged wife was known at

21  that time.

22             One of the guns was traced to the

23  defendant's sister.  The sister had filed a report of

24  a gun missing or stolen earlier, that report being

1   dated May 19, 1997.  When Detective Bradley

2   interviewed her by phone she told him if anyone took

3   it it would have been her brother, Tony Hillard.

4              Armed with that information they

5   proceeded to the residence of Mr. Hillard and

6   Miss Eberhardt at 714 West Division.  They knocked on

7   the door, saw a male black after the door was answered

8   by the young lady, saw a male black fitting the

9   general description of one of the offenders and asked

10  his name upon which -- to which he gave a phony name.

11  The detective then accused the defendant of taking the

12  gun of the sister, which Mr. Hillard denied, and then

13  agreed to come to the station to clear up the matter.

14              He also admitted that he was Tony

15  Hillard in the apartment of his lady friend.  The

16  central issue obviously to be resolved is whether this

17  adds up to probable cause to arrest Mr. Hillard.  What

18  we have basically is a gun used in an armed robbery

19  and a beating, recovered at the scene, linked to the

20  sister of the defendant and then to Mr. Hillard.  We

21  have the defendant in a place where the sister

22  indicated he would be, fitting the general description

23  of one of the offenders and the defendant initially

24  giving a phony name to the police.  This adds up to

1    reasonable grounds to believe that the defendant had

2    committed an offense and probable cause to arrest him.

3              The motion to quash arrest and suppress

4    evidence shall be denied.

5         MS. BORMANN:  Judge, the matter is just

6    continued for trial to April 30th I believe.

7         MS. SAVINI:  April 30th.

8         THE COURT:  April 30th for trial.  It is a

9    bench trial, isn't it?

10        MS. BORMANN:  Yes.

11        THE COURT:  All right.

12

13                        (The above entitled matter

14                         was continued to

15                         April 30, 1998.)

16

17

18

19

20

21

22

23

24

```
1    STATE OF ILLINOIS)
                      )          SS:
2    COUNTY OF C O O K)

3              IN THE CIRCUIT COURT OF COOK COUNTY
                 COUNTY DEPARTMENT-CRIMINAL DIVISION
4

5              I, BRENDA D. HAYES, Official Court

6    Reporter for the Circuit Court of Cook County, Cook

7    Judicial Circuit of Illinois, do hereby certify that

8    I reported stenographically the proceedings had on

9    the hearing in the above entitled cause; that I

10   thereafter transcribed said hearing into

11   typewriting, which I hereby certify to be a

12   true and accurate transcript of the proceedings

13   had before the Honorable MICHAEL P. TOOMIN, Judge of

14   said court.

15

16

17

18

19   _____

20         OFFICIAL COURT REPORTER

21

22

23

24
```

B-114

No. 99-0152

In The

# Appellate Court Of Illinois

First Judicial District

PEOPLE OF THE STATE OF ILLINOIS,

*Plaintiff-Appellee,*

vs.

TONY HILLARD,

*Defendant-Appellant,*

Appeal from the Circuit Court of Cook County, Illinois
Criminal Division
The Honorable Michael Toomin, *Judge Presiding*

## BRIEF AND ARGUMENT FOR APPELLANT

Rita A. Fry,
Public Defender of Cook County,
69 W. Washington Street, 15th Flr,
Chicago, IL 60602,
(312) 603-0600

*Counsel for Appellant.*

**R.H.R. SILVERTRUST**
ASSISTANT PUBLIC DEFENDER

*Of Counsel*

EXHIBIT B

ORAL ARGUMENT REQUESTED

POINTS AND AUTHORITIES

I.

**THE POLICE LACKED PROBABLE CAUSE TO MAKE A WARRANTLESS ARREST OF DEFENDANT AND AS SUCH, DEFENDANT'S MOTION TO QUASH HIS ARREST AND ALL EVIDENCE WHICH STEMMED THEREFROM SHOULD HAVE BEEN GRANTED.**

*Illinois v. Gates* (1983) 46 U.S. 213,
        76 L.Ed 2d 527 ............................................................................... 12

*People v. Dilworth* (1996) 169 Ill.2d 195,
        661 N.E.2d 310 ............................................................................... 12

*Dunaway v. New York* (1979) 442 U.S. 200,
        60 L.Ed.2d 824 ............................................................................... 12

*People v. Peak* (1963) 29 Ill. 2d 343,
        194 N.E.2d 322 ............................................................................... 13

*People v. Creach* (1979) 79 Ill. 2d 96,
        402 N.E.2d 228 ............................................................................... 13

*People v. Exline* (1983) 98 Ill. 2d 150,
        456 N.E. 2d 112 ............................................................................... 15

*People v. Johnson* (1983) 94 Ill. 2d 148,
        445 N.E. 2d 777 ............................................................................... 15

*People v. Wilson* (1994) 260 Ill. App.3d 364,
        632 N.E.2d 114 ............................................................................... 16

II.

**IT WAS REVERSIBLE ERROR TO ALLOW DEFENDANT'S JURY HEAR THE CROSS EXAMINATION OF CO-DEFENDANT'S COUNSEL WHERE THIS WAS ANTAGONISTIC TO DEFENDANT'S DEFENSE.**

*People v. Bean* (1985) 109 Ill.2d 80
        485 N.E.2d 349 ............................................................................... 20

*People v. Murphy & Bell* (1981) 93 Ill.App.3d,

417 N.E.2d 759 ............................................................20

In *People v. Rodriguez* (1997) 289 Ill.App.3d 223,
680 N.E. 2d 757 ...........................................................20

III.

**DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHERE THE TRIAL JUDGE ACTED ON PRIVATE KNOWLEDGE AND ABANDONED HIS ROLE OF IMPARTIAL ARBITER AND ASSUMED THE MANTLE OF A PROSECUTOR.**

*People v. Moriarty* (1966) 33 Ill.2d 606,
213 N.E.2d 516 ................................................................24

*People v Franceschini* (1960) 20 Ill.2d 126,
169 N.E.2d 244. ............................................................24

*People v. Nelson* (1974) 58 Ill.2d 61,
317 N.E.2d 71 .................................................................25

## NATURE OF THE CASE

Tony Hillard charged by Indictment No.97 CR 30453 with the offenses of attempt murder, armed robbery, armed violence, aggravated kidnapping, aggravated battery, and unlawful use of weapon by a felon. After a jury before the Honorable Michael Toomint, he was convicted and sentenced to fifty years imprisonment in the Illinois Department of Corrections. No question is raised on the Indictment.

## ISSUES RAISED FOR APPEAL

1. Did the police have probable cause to make a warrantless arrest of defendant in his apartment based solely on an anonymous telephone tip that the defendant may have stolen the gun which was found at the scene of the offense committed some weeks before?

2. Was it proper from defendant's jury to hear cross examination by his co-defendant's counsel which destroyed defendant's alibi and placed him at the scene and alleged he was a perpetrator?

3. Was it proper for the trial judge to take upon himself, based on his private knowledge, the duty of informing the jury by means of cross-examination of police offices that defendant's theory as to which assailants committed the crime was false?

## JURISDICTIONAL STATEMENT

Jurisdiction is had pursuant to Illinois Supreme Court Rule 603 and Article VI., Section 6 of the Illinois Constitution of 1970. Judgment was entered on July 15, 1998 (CR2), Notice of Appeal was timely filed on December 31, 1998. [CR.4]

## STATEMENT OF FACTS

At the hearing on defendant's motion to suppress his arrest, Officer Bradley testified that on May 12, 1997, he was assigned to investigate the robbery of Yinka Jinadu which had occurred two days before. Bradley went to interview Jinadu at the hospital. According to Bradley, Jinadu told him that on the morning of May 10, 1997, he had received a call from his estranged wife, Doris Jinadu, who was an employee at his trucking firm. She asked him to come and give her a ride to work because she was having trouble with her vehicle. (B.5) Jinadu then went to pick up his wife and went up to her apartment located at 5851 N. Winthrop in Chicago. (B.3,6)

Upon entering his wife's apartment, Jinadu was hit over the head and knocked unconscious for about two hours. (B.6) When he came to, he found that he was in his underwear, handcuffed and bound with electrical tape. He saw his wife and four black men. Jinadu told Officer Bradley that the male blacks pointed guns at him and asked him for money, the keys to his business, and the keys to his vehicle. (B.7). One of the male blacks who pointed a gun at him was characterized as light-skinned by Jinadu. (B.49-50) After giving the men what they wanted, Jinadu was taken to a washroom where he was beaten with a tire iron and baseball bat. Jinadu described the man who hit him with the tire iron as being dark-skinned and his wife's

6

boyfriend. (B.51) Two male blacks threatened him, threw him in the shower, soaked him and then covered him with towels leaving him by himself. (B.8) After hearing his wife and the others leave the apartment, he worked his way loose and ran out of the apartment building where he saw two of his assailants across the street. (B.9) He screamed for help and eventually the police arrived.

The police took him back into the apartment where they recovered two guns a driver's license with a photograph of one of the assailants. (B.10-11) From the license, the police had learned the name of one of the assailants as well as his appearance. According to Bradley, Jinadu was able to give the police a description of his four assailants. They were all male blacks in their 20's. He described one as being 160 lbs. with black hair and brown eyes. A second was 5 feet 11 inches and weighed 200 lbs. with black hair and brown eyes. The third assailant was 5 feet 11 inches and weighed 165 lbs. with black hair and brown eyes. The fourth assailant was 5 feet 5 inches and weighed 145 lbs. (B.13)

Bradley learned that three of the five offenders had been named (B.33) These were: Jinadu's wife, Dolores, Jermaine Crane and Erven Walls, who were listed as Offender No.1, Offender No.2 and Offender No.3 respectively. (B.36-

7



38) Jinadu was able to identify them from pictures of drivers licenses and other photo identification he had been show of these individuals. (B.40-42)

The unnamed offenders, Nos. 4 and 5 were described as follows: No.4 was 5 feet 10 inches and 200 lbs. and No.5 was described as 5 feet 5 inches and 145 lbs. (B.38)

Bradley determined that a .38 caliber handgun had been recovered from the apartment and learned from a police report that it was registered to one Loretha Hillard. (B.15) On or about May 19, 1997, Bradley claimed he had a telephone conversation with a person who purported to be Loretha Hillard. (B.16-17) Bradley admitted he had never met and did not the personally know the voice of Loretha Hillard.(B.57)

He stated he was told by this person that she was an ex-security guard for the CHA at 1240 N. Laramie, the building in which she lived. He then asked her if she knew where her gun was and she responded that it had been taken, "and that if anyone took the gun, it would be her brother, Tony Hillard." (B.18-19) Although Bradley initially claimed that when he asked her if she had reported the gun stolen she had told him yes, later, he admitted he did not know if he ever asked her or if she ever told him she had reported her

8



gun stolen. (B.60) When shown the date of the stolen gun report (May 19, 1997), he then changed his testimony and said he must of have spoken to the person claiming to be Loretha Hillard after May 19th. (B.63)

Bradley also claimed the person purporting to be Loretha Hillard told him that her brother Tony lived with his girlfriend at 714 Division in Apartment 1003. However she gave Bradley no description of her brother whatsoever. (B.20) Two weeks later, on June 3, 1997, Bradley went to this apartment and knocked on the door. It was answered by a female black. (Benicia Eberhardt). Bradley saw a male black standing a few feet behind her. (Tony Hillard) (A.11, B.21-22) According to Bradley this male black matched the description given by Jinadu of one of the assailants. (B.22) Bradley asked the man his name. The man gave him some name but it was not 'Tony Hillard.' He then asked the man if he had stolen his sister's gun to which the man replied that he had not. (B.23) Bradley then entered the apartment and without further ado placed Mr. Hillard under arrest. (A.12, B.25, B.80)

Bradley first said he arrested Mr. Hillard because he matched the description of Jermaine Crane, but then changed this and said Mr. Hillard matched the description of all of the offenders. (B.72) Bradley admitted that he had run a check on Tony Hillard before he went to arrest him and knew that he was not

9

Jermaine Crane or Erven Walls. They were known as Offender No.2 and No.3 (B.76) Finally Bradley admitted that Offender No.4 was described as weighing 200 lbs. and that Mr. Hillard weighed only 165 lbs. (B.76-78) He also admitted that Jinadu had described Offender No.5 as 5 feet 5 inches in height and 140 lbs. But Bradley clearly knew that Mr. Hillard was 5 feet 10 inches and weighed either 165 or 170. (CR.122)

Later that evening (June 3, 1997), Mr. Hillard was placed in a line-up at the police station and was identified by Mr. Jinadu as one of the assailants. (B.26)

Prior to the state presenting its main witness, Jinadu, the trial judge was put on notice that defendant's defense would be that he had not been at the scene of the crime, that four of the five offenders, including co-defendant Erven Walls, had been named, all five had been described and that defendant had not been named by the victim and did not match the description of the one remaining unnamed offender. Counsel for Walls told the judge that he would present evidence that defendant was there and had attacked the victim. (D.22-24) The judge himself acknowledged that he could easily remove defendant's jury but said it was not a question of ease or judicial economy but of necessity and that he did not see the necessity. (D.24) The trial judge

said he did not believe that co-defendant Walls' lawyer would "point the finger at the defendant." He did not think Walls needed to do it, but said he would remove the jury if this occurred. (D.25)

On cross-examination of Jinadu, defense counsel for Walls elicited from him that Mr. Hillard was in fact at the scene of the crime and had participated. (D.204-5)

Also prior to trial, defense counsel for Mr. Hillard made a motion in limine to prevent any of the state's witnesses from testifying that Erven Walls was the same person as Jermaine Crane, Dormane Walls or Zachary Taylor. Granting this motion, the judge stated that this was a conclusion that the police officers should not be allowed to make. (D.52-53)

During the trial, just before the state planned to put on the police officers in the case, defense counsel learned from Erven Walls' attorney that he was going to try and establish through cross examination of the officers that Erven Walls, Dormaine Craine and Jermane Crane were the same person. (E.3) She therefore asked that Mr. Hillard's jury be removed during this cross-examination. The judge refused stating that he knew for a fact that Erven Walls and Dormaine Craine were the same person because he had two

11

other cases in front of him which proved this. (E.4) He said he was not going to try and fool the jury.

As it turned out, counsel for Mr. Walls did not bring out through cross-examination of Officer Schmidt that Walls and Craine were the same person. However the judge, through his questions of this witness did. At the end of cross examination of Officer Schmidt, the judge suggested to him that the identification papers belonging to Walls, the Craines and Taylor could have belonged to only one or two people and not four. (E.129-130)

Then, at the end of cross examination of Officer Bradley the judge did more that suggest that Walls and Jermaine Craine were one and the same person. He asked the question point blank. After getting an affirmative answer from Bradley. The judge then asked Bradley if all of the identification papers under different names were really just that of one person, Erven Walls, and again elicited a positive answer. (E.213-214)

ARGUMENT

I.

## THE POLICE LACKED PROBABLE CAUSE TO MAKE A WARRANTLESS ARREST OF DEFENDANT IN HIS APARTMENT AND AS SUCH, DEFENDANT'S MOTION TO QUASH HIS ARREST AND ALL EVIDENCE WHICH STEMMED THEREFROM SHOULD HAVE BEEN GRANTED.

In determining whether the police had probable cause to arrest an individual, Courts look to the totality of the circumstances. *Illinois v. Gates* (1983) 46 U.S. 213, 76 L.Ed 2d 527. Common sense considerations, rather than technical rules guide the consideration of whether probable cause to arrest existed.

Whether probable cause exists is normally a mixed question of law or fact and as such the ruling of a trial court will not ordinarily be overturned unless it is manifestly erroneous. See: *People v. Dilworth* (1996) 169 Ill.2d 195, 661 N.E.2d 310. This case, as the record on appeal clearly indicates, is unquestionably an example of such error.

An arrest requires that the arresting officers have probable cause. *Dunaway v. New York* (1979) 442 U.S. 200, 60 L.Ed. 824. Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge, and of which he had reasonable and *trustworthy information* are

sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty. *People v. Peak* (1963) 29 Ill. 2d 343, 194 N.E.2d 322. Probable cause must be particularized with respect to the person arrested. *People v. Creach* (1979) 79 Ill. 2d 96, 402 N.E.2d 228.

Where the basis of an arrest is informer information, the totality of the circumstances must be considered in determining whether or not the arresting officer had probable cause. *Illinois v. Gates* (1983) 462 U.S. 213, 76 L.Ed.2d 527. To be considered is the veracity and basis of knowledge of the persons supplying the hearsay information.

So, what did Officer Bradley know when he arrested Mr. Hillard in his own home without a warrant on June 3, 1997? First, he not even know the man he was arresting was Tony Hillard. The man he saw standing behind the woman who answered the door denied that he was Tony Hillard. Bradley did not learn until much later that the man was Hillard. (B.67-69) But Bradley placed him under arrest immediately anyway. He did it because he said Mr. Hillard matched the descriptions of four of the five offenders. This is correct if you count that Mr. Hillard was male and black with black hair and brown eyes because this is the only way that he matches the description of "all of the

14

offenders." Jinadu had described men who were as short as 5 feet 5 inches and as tall as 5 feet 11 inches, men who weighed as little as 140 lbs. and as much as 200 lbs. Clearly it was impossible for Mr. Hillard to have matched the description of all of the offenders and just as clearly Officer Bradley had no idea what Mr. Hillard looked like.

Next, he did not know that Tony Hillard was involved in the crime. Jinadu had never given Bradley Hillard's name. The officer knew that a gun registered to one Loretha Hillard had been recovered at the scene. He spoke to a person on the phone who claimed she was Loretha Hillard but Officer Bradley had no way of knowing because he had never met Loretha Hillard and had never spoken with her. This person told him that her brother Tony Hillard was the only person she could think of who could possibly have taken her gun. (B.18-19) This person also told Bradley where 'her brother Tony' lived. So Officer Bradley went to this address. In reality, at the time, he did not know if he really had spoken with Loretha Hillard. He did not know if this Loretha Hillard was in fact the sister of Tony Hillard. For all he knew, this voice could have been anyone. It could have been Tony Hillard's angry estranged or ex-wife who wanted to get even with him for cheating on her. It could have been an ex-girl friend. It could also have been Tony's sister who for whatever reason wanted to get even with him. All that Officer Bradley had

at the time he stood looking at a man in the doorway---a man who denied he was Tony Hillard---was a series of possibilities.

So, Officer Bradley did not know, first and most importantly, if Tony Hillard was involved in the crime since he was never named. Nor did he know if Tony Hillard had in fact stolen the gun which was found at the scene. Even if it had been stolen by him from his sister, this did not mean that he kept it and went to Jinadu's apartment. There was no evidence whatsoever that Mr. Hillard's prints were found any gun recovered from the scene of the crime. And finally, Bradley did not know at whom he was looking when he asked a strange man, lawfully in his apartment, if he were Tony Hillard and had he taken his sister's gun. In short, Officer Bradley had no reason to believe the man he was looking at was Tony Hillard, but he arrested him anyway. This was lazy and sloppy police work which Officer Bradley tried to back up by saying Mr. Hillard matched the description of all of the offenders. And so he did----if being black and having brown eyes and black hair is a good enough description to give a policeman probable cause. No, the fact is, Officer Bradley had no reason to arrest Mr. Hillard.

In the final analysis, all Bradley had was some person whom he did not know saying that her brother had taken her gun and this is where you can find

him. This person, this voice, cannot and should not even be dignified with the title 'informant.' In *People v. Exline* (1983) 98 Ill. 2d 150, 456 N.E. 2d 112, the Illinois Supreme Court in finding probable cause and in reversing the lower courts' ruling of no probable cause found it crucial that the informer had established his credibility with the police. Furthermore, the informer had made actual drug buys from the defendant. Additionally, the arresting officer had personal knowledge of the facts in the informant's allegations.

In *People v. Johnson* (1983) 94 Ill. 2d 148, 445 N.E. 2d 777, an informer told the police that two men had committed a certain murder. The informer furnished a description of the suspects, including the fact that one of them was known as "Stan". The informant gave the police the suspects' address. The police went to the address. As they entered the premises, two men fled climbing out a window. They were immediately arrested by officers standing outside. One of the men matched the informer's description. The Court ruled that the police did not have probable cause to arrest defendant because the informant's information was merely a "tip" and did not "contain any facts from which it could be concluded that defendant was responsible for the murder." The state argued that there was sufficient corroboration of the tip so as to provide probable cause. The Court rejected this argument noting that for such an arrest to be valid any corroboration must not only support the

informant's tip but must also support the conclusion that the arrestee and no one else committed the crime. Here, there is no corroboration, there is no description, there is no telling the police that defendant was involved in the crime by anyone, and there were no prints of the suspect found on the gun. Obviously, the information given to Officer Bradley by the voice to whom he spoke did not amount to probable cause to arrest.

In *People v. Wilson* (1994) 260 Ill. App.3d 364, 632 N.E.2d 114, This Court held that a tip on the identity of the assailant from the victim's daughter, whom the police knew, did not provide rhe officers with probable cause to arrest absent any effort by the officers to determine the daughter's veracity or the factual basis for the knowledge. In the case at bar, Officer Bradley had no idea with whom he was speaking. He did not verify the fact that he was actually speaking to or had spoken with Loretha Hillard and, of course, there was no effort made to determine if the information he received had any basis in fact or the veracity of the person with whom he spoke.

Therefore, for all of these reasons, defendant's motion to quash his arrest and all the evidence which stemmed therefrom should have been granted.

II.

## IT WAS REVERSIBLE ERROR TO ALLOW DEFENANDANT'S JURY HEAR THE CROSS EXAMINATION OF CO-DEFENDANT'S COUNSEL WHERE THIS WAS ANTAGONISTIC TO DEFENDANT'S DEFENSE.

It is important to note that at the outset of this case, the trial judge recognized that the co-defendants would be presenting antagonistic defenses. This conclusion cannot be gainsaid in that he allowed separate juries to be used for each defendant. As the question before This Court is one of law alone, the standard of review is *de novo.*

The trial judge was put on notice well before the trial began that defendant's defense would be that he had not been at the scene of the crime, that four of the five offenders, including co-defendant Erven Walls, had been named, that all five had been described and that defendant had not been named by the victim and did not match the description of the one remaining unnamed offender. Counsel for Walls told the judge that he would present evidence that defendant was there and had attacked the victim. (D.22-24) The judge himself acknowledged that he could easily remove defendant's jury but said it was not a question of ease or judicial economy but of necessity and that he did not see the necessity. (D.24) The trial judge said he did not believe that co-defendant Walls' lawyer would "point the finger at the defendant." He did not think Walls needed to do it, but said he would remove the jury if this

19

occurred. (D.25) Just as warned, defense counsel for Walls elicited from Jinadu, the victim, that Mr. Hillard was in fact at the scene of the crime and had participated. (D.204-5)

It has long been the case that where co-defendants plan to present defenses which implicate their co-defendant or defenses which are so antagonistic to each other that they cannot receive a fair trial, they must be granted a severance. *People v. Bean* (1985) 109 Ill.2d 80, 485 N.E. 349.

Mr. Hillard's defense was that he simply was not there. This was his alibi. By placing Mr. Hillard there and discussing what he did to the victim, counsel for co-defendant was attacking defendant's alibi and his defense. Where defendants are initially tried together, This Court has recognized such action ought to necessitate a severance and at the very least that defendant's jury should not have been allowed to hear the testimony of a co-defendant which was antagonistic to defendant's alibi, *People v. Murphy & Bell* (1981) 93 Ill.App.3d, 417 N.E.2d 759.

In *People v. Rodriguez* (1997) 289 Ill.App.3d 223, 680 N.E. 2d 757, This Court noted that co-defendants do not directly have to implicate each other to create prejudicial error. It is enough for a defendant's jury to hear cross-

examination from co-defendant's counsel which bolsters the state's case. That is what happened here. Counsel for co-defendant accepted Jinadu's assertion that defendant was present when the offense was committed and questioned him further about defendant's part in it.

This error was especially reprehensible under circumstances where the judge recognized the error, stated on the record that he could easily remove defendant's jury during this cross examination, said it wasn't necessary because he did not foresee co-defendant's counsel proceeding in this way, but the judge promised if it became necessary he would act. His failure to protect defendant from this prejudice was a blow to the heart of Mr. Hillard's defense. It could not have harmed defendant any more fundamentally than it did. As such it constituted reversible error.

III.

# DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHERE THE TRIAL JUDGE ACTED ON PRIVATE KNOWLEDGE AND ABANDONED HIS ROLE OF IMPARTIAL ARBITER AND ASSUMED THE MANTLE OF A PROSECUTOR.

Prior to trial, defense counsel for Mr. Hillard made a motion in limine to prevent any of the state's witnesses from testifying that Erven Walls was the same person as Jermaine Crane, Dormaine Walls or Zachary Taylor. Granting this motion, the judge stated that this was a conclusion that the jury, and not police officers, should be allowed to make. (D.52-53)

During the trial, just before the state planned to put on the police officers in the case, defense counsel learned from Erven Walls' attorney that he was going to try and establish through cross examination of the officers that Erven Walls, Dormaine Craine and Jermane Crane were the same person. (E.3) Defense counsel for Mr. Hillard therefore asked that his jury be removed during this cross-examination. The judge refused stating that he knew for a fact Erven Walls and Dormaine Craine were the same person because he had two other cases in front of him which proved this. (E.4) He said he was not going to try and fool the jury. He was going to take judicial notice that they were one and the same person.

As it turned out, counsel for Mr. Walls did not bring out through cross-examination of Officer Schmidt that Walls and Craine were the same person. However the judge, through his questions of this witness did. At the end of cross examination of Officer Schmidt, the judge suggested to him that the identification papers belonging to Walls, the Craines and Taylor could have belonged to only one or two people and not four. (E.129-130)

At the end of cross examination of Officer Bradley the judge did more that suggest that Walls and Jermaine Craine were one and the same person. He asked the question point blank. After getting an affirmative answer from Bradley, the judge then asked him if all of the identification under different names were really just that of one person, Erven Walls. Again Bradley answered yes. (E.213-214)

A reading of these two pages makes it very clear that the judge was literally acting like a prosecutor, trying to clean up the case and make the points they had failed to do. He directly attacked the point that Erven Walls and Craine were different individuals and he undermined the fact that all of the identification with different names on it supported the premise that they had belonged to different individuals. He even ended his questioning in a prosecutorial manner stating, "I have nothing further." (E.214)

Counsel for Mr. Hillard immediately objected and privately pointed out to the judge that he had violated the motion in limine he had granted and that he had further introduced hearsay testimony which was conclusive in nature and extremely harmful to defendant's case. She asked the judge to strike the answers and to instruct the jury to disregard them, but he refused, "No, because I think you opened it up on cross-examination." (E.215-16) This is a peculiar response which further supports that the judge was acting as a prosecutor. If defense counsel "opened something up" it was not for the judge to go into it, but for the prosecutor on redirect. It is clear from the judge's prior comments i.e: that he "wasn't going to let the jury be fooled" and that he knew that Walls and Craine were one and the same, that the judge was intent on making the state's case for them if they did not.

While a judge has the right to question witnesses to clarify or fill in gaps in testimony, *People v. Hopkins* (1963) 29 Ill.2d 260, 194 N.E.2d 213, he must not abandon his role as impartial arbiter and assume the mantle of the prosecutor by asking questions which the prosecution could but failed to ask, *People v. Moriarty* (1966) 33 Ill.2d 606, 213 N.E.2d 516, *People v Franceschini* (1960) 20 Ill.2d 126, 169 N.E.2d 244. The standard of review as to whether a trial judge has abused his discretion is *de novo.*

24

The judge's decision to question Officer Bradley was based on his private knowledge that Walls and Craine and Taylor were the same person. (E.4) Bute rule has long been that it is a denial of due process for a trial judge to rely on his private knowledge. He is limited to the record made during trial. Failure to confine himself to the record at trial is also reversible error. *People v. Nelson* (1974) 58 Ill.2d 61, 317 N.E.2d 71.

CONCLUSION

For these reasons, appellant respectfully requests this Honorable Court to reverse his conviction and vacate his sentence.

Respectfully submitted,

Rita A. Fry,
Public Defender of Cook County

200 W. Adams Street, 4th Floor
Chicago, IL 60606
312-609-2040

R.H.R. SILVERTRUST
ASSISTANT PUBLIC DEFENDER

Of Counsel.

1a

APPENDIX
———————

NOTICE OF APPEAL

TO THE APPELLATE COURT OF ILLINOIS
IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL DIVISION

F THE STATE OF ILLINOIS )    No. __97-CR-30453__
                        )    Trial Judge: __TOOMIN__
        -vs-            )    Attorney: __CHERYL BORMANN__
                        )
,LARD                   )

## NOTICE OF APPEAL

l is taken from the order of judgment described below:
JT'S NAME: **TONY HILLARD**
3376                           D.O.B.  **DECEMBER 10, 19975**
JT'S ADDRESS: **ILLINOIS DEPARTMENT OF CORRECTIONS**
JT'S ATTORNEY: **PUBLIC DEFENDER OF COOK COUNTY.**
JT'S ADDRESS: **69 WEST WASHINGTON, CHICAGO, IL 60602**
:  **ARMED VIOLENCE, ARMED ROBBERY, AGGRAVATED KIDNAPPING**
?:  **GUILTY**
OCTOBER 26, 1998 *DECEMBER 31, 1998*
3:  **25 YEARS IDOC CONSECUTIVE TO 15 YEARS IDOC CONSECUTIVE TO 10 YEARS**
AGGREGATE OF 50

_____
APPELLANT

### VERIFIED PETITION FOR REPORT OF PROCEEDINGS
### COMMON LAW RECORD AND FOR APPOINTMENT OF COUNSEL ON APPEAL

ipreme Court Rules 605-608, appellant asks the Court to order the
l Court Reporter to transcribe an original and copy of the proceedings,
e original with the Clerk and deliver a copy to the appellant; order the
> prepare the Record on Appeal and to Appoint Counsel on Appeal.
nt, being duly sworn, says that at the time of his conviction he was and
le to pay for the Record or an appeal lawyer.

_____
APPELLANT ~~& ATTORNEY~~

BED and SWORN TO this _____ day of _____, 1998

_____
NOTARY PUBLIC

## O R D E R

IRDERED the State Appellate Defender/Public Defender of Cook County be
ed as counsel on appeal and the Record and Report of Proceedings be
ed appellant without cost. Dates to be transcribed:

AL MOTION DATE(S): 3-4-98; 3-5-98  OTHER:
.IVER DATE:N/A
)ATE(S):   7-13-98; 7-14-98
:ING DATE(S):  10-26-98; 11-

**ENTERED**

*December 31, 1998* PU DEC ENTERED _____
J U D G E

CLERK OF CIRCUIT COURT
CRIMINAL DIVISION

2a

## TABLE OF CONTENTS OF THE RECORD ON APPEAL

### [A] The Common Law Record

Memorandum of Orders, the Half Sheets ................................................................. 1
Arrest Report ........................................................................................................ 122
Complaint .................................................................................................................
Jury Waiver ..............................................................................................................
Indictment ............................................................................................................ na
Motion to Suppress Arrest & Evidence ................................................................. 6
People's Motion For Discovery ............................................................................ 49
Defense Motion for Discovery ............................................................................. 35
People's Answer to Discovery ...............................................................................
Defense Answer to Discovery ............................................................................... 37
Motion in Limine .....................................................................................................
Instructions .............................................................................................................
Verdict .................................................................................................................. 62
Social Investigation Report ................................................................................ 115
Motion for New Trial ........................................................................................... 141
Committing Orders .............................................................................................. 148
Motion to Reduce Sentence ................................................................................ 146
Notice of Appeal ................................................................................................. 149

### [B] Report of Proceedings

**MOTION TO QUASH ARREST**

| Witnesses: | Direct | Cross | R/Dir | R/Cross |
|---|---|---|---|---|
| Benicia Eberhardt | A7 | A14 | | |
| Officer Bradley | B3 | B28 | B85 | |

**TRIAL**

| | Direct | Cross | R/Dir | R/Cross |
|---|---|---|---|---|
| Yinka Jinadu | D103 | D155/234/350 | D341 | D344 |
| Mario Ramirez | E7 | E29/67/90 | | |
| Officer Schmidt | E101 | E116/119/127 | E128 | |
| Officer | E133 | E176 | E210 | E212 |
| Closing State | E227 | | | |
| Closing Defense | E243 | | | |
| Rebuttal State | E286 | | | |
| Verdict | E445 | | | |
| Sentencing Hearing | F7 et. seq. | | | |

28

File Date: _____7-1-2008_____

Case No: _____08CV1775_____

ATTACHMENT # _____

EXHIBIT _____C through F_____

TAB (DESCRIPTION)

_____



2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 1

For Opinion See 752 N.E.2d 456, 798 N.E.2d 424

Appellate Court of Illinois, First District.
PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
Erven WALLS & Tony Hillard, Defendants-Appellants.
Nos. 1-99-0065, 1-99-0152.
July 14, 2000.

Appeal from the Circuit Court of Cook County, Criminal Division. Honorable Michael P. Toomin, Judge Presiding.

Brief and Argument for Plaintiff-Appellee
Richard A. Devine, State's Attorney, County of Cook, Room 309 – Richard J. Daley Center, Chicago, Illinois 60602, Attorney for Plaintiff-AppelleeRenee Goldfarb, Linda D. Woloshin, Mary L. Boland, Assistant State's Attorneys, Of Counsel.

**\*1 POINTS AND AUTHORITIES**

I.

**(Responding to Walls Issue I.)**

**WHERE THE PEOPLE DID NOT HAVE ANY MATERIAL TO TENDER REGARDING THE VICTIM'S IMMIGRATION STATUS, THERE WAS NO BRADY VIOLATION AND CONSEQUENTLY THERE WAS NO DUE PROCESS VIOLATION ... 16**

*People v. Steidl*, 142 Ill. 2d 204, 568 N.E.2d 837 (1991 ... 16-37

*People v. Robinson,* 167 Ill. 2d 397, 657 N.E.2d 1020 (1995) ... 17

*People v. Enoch*, 122 Ill.2d 176, 522 N.E.2d 1124 (1988) ... 17-19

*People v. Tenner*, 157 Ill.2d 341, 626 N.E.2d 138 (1993) ... 17

*People v. Matthews*, 299 Ill. App. 3d 914, 702 N.E.2d 291 (1st Dist. 1998) ... 17

*People v. Weaver*, 92 Ill. 2d 545, 442 N.E.2d 255 (1982) ... 17

**\*2** *People v. Blount*, 220 Ill. App. 3d 732, 580 N.E.2d 1381 (1st Dist. 1991) ... 18

*People v. Pecoraro*, 175 Ill. 2d 294, 677 N.E.2d 875 (1997) ... 19

*People v. House*, 141 Ill. 2d 323, 566 N.E. 2d 259 (1990) ... 19

*People v. Guest*, 115 Ill. 2d 72, 503 N.E. 2d 255 (1986) ... 19

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 2

*People v. Robinson*, 157 Ill. 2d 68, 623 N.E.2d 352, (1993) ... 19,20,23

*People v. Tripp*, 271 Ill. App.3d 194, 648 N.E.2d 241 (1995) ... 19

*People v. Secor*, 279 Ill. App. 3d 389, 664 N.E.2d 1054 (1996) ... 20

*People v. Young* (1978), 59 Ill. App. 3d 254, 375N.E.2d 442, 16 Ill. Dec. 569 ... 23

*United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985) ... 24

*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) ... 24

412 (134 Ill. 2d R. 412) ... 18

134 Ill. 2d R.412(a)(ii). ... 18

## II.

**(Responding to Walls Issue II.)**

**DEFENDANT'S COUNSEL WAS NOT INEFFECTIVE WHERE THERE IS NO REASONABLE PROBABILITY THAT THE VICTIM'S IMMIGRATION STATUS WOULD HAVE AFFECTED THE OUTCOME OF THE TRIAL ... 25**

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, (1984) ... 25,26

*3 People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984) ... 25

*People v. Gacy*, 125 Ill.2d 117, 530 N.E.2d 1340 (1988) ... 26

*People v. Eddmonds*, 143 Ill. 2d 501, 578 N.E.2d 952 (1991 ... 26

*People v. Bennett*, 222 Ill. App. 3d 188, 582 N.E.2d 1370 (2nd Dist. 1992) ... 26

*People v. Davis*, 236 Ill.App.3d 233, 603 N.E.2d 635 (1st Dist. 1992) ... 27

## III.

**(Responding to Hillard Issue I.)**

**POLICE HAD PROBABLE CAUSE TO ARREST DEFENDANT HILLARD WHERE THE DEFENDANT WAS LINKED TO THE CRIME BY DESCRIPTION OF THE VICTIM, BY A GUN RECOVERED AT THE SCENE AND BY INFORMATION LEADING TO DEFENDANT'S APARTMENT AT WHICH DEFENDANT WAS PRESENT AND ADMITTED HIS IDENTITY. THEREFORE THE DENIAL OF DEFENDANT'S MOTION TO QUASH WAS PROPER ... 28**

*Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 1663 (1996) ... 28

*People v. Montgomery*, 112 Ill.2d 517, 494 N.E.2d 475 (1986) ... 28

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*People v. Westbrook*, 262 Ill.App.3d 836, 635 N.E.2d 398 (1st Dist. 1992) ... 28

*People v. Adams*, 131 Ill.2d 387, 546 N.E.2d 561 (1989) ... 28

*People v. Johnson*, 187 Ill.App.3d 756, 544 N.E.2d 392 (1st Dist. 1989) ... 28

*People v. Johnson*, 94 Ill.2d 148, 445 N.E.2d 777 (1983) ... 30

**\*4** *People v. Wilson,* 260 Ill.App.3d 364,  632 N.E.2d 114 (1st Dist. 1994) ... 30

**IV.**

**(Responding to Hillard Issue II.)**

**WHERE THERE WERE NO ANTAGONISTIC DEFENSES, IT WAS PROPER TO PERMIT BOTH JURIES TO HEAR THE CROSS EXAMINATION OF THE VICTIM ... 31**

*People v. Lee*, 87 Ill. 2d 182, 429 N.E.2d 461 (1981 ... 31,33

*People v. Weston*, 271 Ill. App. 3d 604, 648 N.E.2d 1068 (1995) ... 31

*People v. Bean*, 109 Ill. 2d 80, 85 N.E.2d 349 (1985) ... 32,33

*People v. Daugherty*, 102 Ill. 2d 533, 468 N.E.2d 969 (1984) ... 32

*People v. Marts*, 266 Ill. App. 3d 531, 639 N.E.2d 1360 (1st Dist. 1994) ... 32

*Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968) ... 33

*People v. Mischke*, 278 Ill. App. 3d 252, 662 N.E.2d 442 (1st Dist. 1995) ... 33

*People v. Lovelady*, 221 Ill. App. 3d 829, 582 N.E.2d 1217 (1st Dist. 1991) ... 33

*People v. Adams*, 176 Ill. App. 3d 19, 530 N.E.2d 1155 (1st Dist. 1988) ... 34

*People v. Coleman*, 223 Ill.App. 3d 975, 586 N.E.2d 270 (1st Dist. 1991) ... 34

*People v. Williams*, 196 Ill. App. 3d 851, 554 N.E.2d 1040, (1st Dist. 1990) ... 35

*People v. Jackson*, 223 Ill. App. 3d 1045; 586 N.E.2d 341 (1st Dist. 1991) ... 35

**\*5** *People v. Rice*, 286 Ill. App. 3d 394, 675 N.E.2d 944 (1st Dist. 1996) ... 35

*People v. Murphy*, 93 Ill.App.3d 606, 417 N.E.2d 759 (1st Dist. 1981) ... 35

*People v. Rodriguez*, 289 Ill.App.3d 223, 680 N.E.2d 757 (2nd Dist. 1997) ... 35

*People v. Johnson*, 202 Ill. App. 3d 417, 559 N.E.2d 1041 (1st Dist. 1990) ... 35

725 ILCS 5/111--4(a), 114--7 (West 2000) ... 31

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

## V.

**(Responding to Hillard Issue III.)**

**DEFENDANT HAS WAIVED THIS ISSUE WHERE THE BASIS FOR HIS LATE-MADE OBJECTION AT TRIAL WAS HEARSAY WHILE ON APPEAL HE CLAIMS JUDICIAL ERROR. ALTERNATIVELY, THE JUDGE PROPERLY CLARIFIED AN AMBIGUITY AND DID NOT ASSUME THE ROLE OF A PROSECUTOR IN THIS CASE ... 37**

*People v. Steidl*, 142 Ill. 2d 204, 568 N.E.2d 837 (1991) ... 37

*People v. Robinson,* 167 Ill. 2d 397, 657 N.E.2d 1020 (1995) ... 37

*People v. Enoch*, 122 Ill.2d 176, 522 N.E.2d 1124 (1988) ... 37

*People v. Tenner*, 157 Ill.2d 341, 626 N.E.2d 138 (1993) ... 38

*People v. Hopkins*, 29 Ill. 2d 260, 1 94 N.E.2d 213 (1963) ... 38

*People v. Williams*, 173 Ill. 2d 48, 670 N.E.2d 638 (1996) ... 38

*People v. Falaster*, 173 Ill. 2d 220, 670 N.E.2d 624 (1996) ... 38

*People v. Wesley*, 18 Ill. 2d 138, 163 N.E.2d 500 (1959) ... 38,41

**\*6** *People v. Franceschini*, 20 Ill. 2d 126, 169 N.E.2d 244 (1960) ... 38

*People v. Lurie*, 276 Ill. 630, 115 N.E. 130 (1917) ... 38

*People v. Hopkins*, 29 Ill. 2d 260, 194 N.E.2d 213 (1963) ... 38

*People v. Nelson*, 58 Ill.2d 61, 317 N.E.2d 31 (1974) ... 40

*People v. Hooper*, 133 Ill. 2d 469, 552 N.E.2d 684 (1989) ... 41

*People v. Cobbins*, 162 Ill. App. 3d 1010, 516 N.E.2d 382 (1st Dist. 1987) ... 41

*People v. Nevitt*, 135 Ill. 2d 423, 553 N.E.2d 368 (1990) ... 41

**ISSUES PRESENTED FOR REVIEW**

Whether where the people did not have any material to tender regarding the victim's immigration status, there was no *Brady* violation and consequently there was no due process violation.

Whether defendant's counsel was not ineffective where there is no reasonable probability that the victim's immigration status would have affected the outcome of the trial.

Whether police had probable cause to arrest defendant Hillard where the defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)                                                    Page 5

was linked to the crime by description of the victim, by a gun recovered at the
scene and by information leading to defendant's apartment at which defendant was
present and admitted his identity.

Whether where there were no antagonistic defenses, it was proper to permit both
juries to hear the cross examination of the victim.

Whether defendant has waived this issue where the basis for his late-made objec-
tion at trial was hearsay while on appeal he claims judicial error. Alternatively,
whether the judge properly clarified an ambiguity and did not assume the role of a
prosecutor in this case.

## STATEMENT OF FACTS

Defendants Erven Walls[FN1] and Tony Hillard[FN2] were charged by indictment with
attempt murder (720 ILCS 5/9-1), armed robbery (720 ILCS 5/18-2), armed violence
(*8720 ILCS 5/33A-2), aggravated kidnapping (720 ILCS 5/10-2), aggravated battery
(720 ILCS 5/12-4) and unlawful use of firearms by a felon (720 ILCS 5/24-1 ).[FN3]

> FN1. Defendant Walls' one volume Common Law Record will be referred to as
> (W:CL ____ ) and the nine volume Report of Proceedings will be referred to as
> (W:R. ____ ). The one volume Supplemental Record will be referred to as
> (W:R.Supp. ____ ).

> FN2. Defendant Hillard's one volume Common Law Record will be referred to as
> (H:CL ____ ) and the seven volume Report of Proceedings will be referred to
> as (H:R. ____ ).

> FN3. In a simultaneous bench trial, codefendant Delores Jinadu was convicted
> of armed violence, armed robbery and aggravated kidnapping and sentenced to
> consecutive respective terms of 15 years, 6 years and 4 years. Her convic-
> tions were affirmed on appeal, and in light of People v. Cervantes, (No
> 87229, Dec.2, 1999), her sentence for armed violence was vacated and the
> matter remanded for resentencing. (Cons. Nos. 1-98-3148 & 1-99-0587, decided
> pursuant to S.Ct.R. 23, March 20, 2000). Her case is not at issue in this
> appeal.

In simultaneous partly-severed jury trials before the Honorable Michael P. Toomin,
defendants Walls and Hillard were found guilty of armed robbery (court 3), armed
violence (count 4), and aggravated kidnapping (count 12). (W:CL171; H:CL148[FN4])
Defendants Walls and Hillard were each sentenced to an aggregate term of 50 years
(consecutive sentences of 25 years, armed violence; 15 years, armed robbery; and
10 years, aggravated kidnapping) (W:CL.171; H:CL.148)

> FN4. The amended mittimus reflects that defendant Hillard was also found
> guilty of Count 10 (H:CL15). This is in error, since it was Count 17
> (aggravated battery) that the trial court merged into Count Four. (H:CL.148)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)                                                                          Page 6
(Cite as: 2000 WL 34201566)

Count 10 had been nolle pressed prior to trial. (H:R.C23, 25).

Prior to trial, defendant Hillard filed a motion to quash his arrest which was denied after a hearing. (H:R.B) The following evidence was introduced at defendants' trials: In August 1994, the victim, Jinka Jinadu, 30 at the time of trial, came to the United States from Nigeria. He initially worked at a car dealership and eventually started a trucking company. (W:R.J103-104; H:R.D103-104) He met and married co-defendant Delores Jinadu (Dolores) in February 1995. They separated in 1996, but kept in contact. Delores moved to an apartment, and the victim provided her "a little bit of assistance to pay her rent." (W:R.J106; H:R.D106) For approximately one month, beginning around April 1997, Delores worked as a secretary for the victim's business. (W:R.J107; H:R.D107)

*9 On May 10, 1997, Delores did not arrive at work as scheduled, so the victim paged her. She returned the page, and explained that her car was broken down; she asked him to pick her up. (W:R.J108-09; H:R.D108-109) The victim drove to Delores' apartment at 5851 North Winthrop. He arrived around 10:15 a.m., but she was not ready. The victim did not have any money on him, but he did have his cell phone, pager and keys to his car. (W:R.J109-110; H:R.D109-110) Delores invited the victim up to the apartment to wait while she finished getting ready. (W:R.J110-11; H:R.D110-11)

As soon as the victim walked in, he was hit on the head with a baseball bat. The victim lost consciousness for two hours. When he awoke it was after noon; blood was seeping from a head wound. (W:R. J112-13; H:R.D112-113) The victim's clothes had been removed; he was clad in his underwear. His legs were tied with electrical cord. The man with the bat was there, still with the bat in one hand and a gun in the other; he had a scarf over the lower half of his face. (W:R.J115-16; H:R.D115-116)

There were 3-4 other males present with Delores in the room, including co-defendants Anthony Hillard and Erven Walls. The victim met Walls twice before; Walls was with Delores both times. Walls was Delores' boyfriend. Hillard had a gun in his hand, and a scarf over his face, like the baseball bat man. Walls, had no mask, but he did have a gun. There was another unidentified man present, who looked like Walls. (W:R.J116-19; H:R.D116-19)

When the victim awoke, he opened his eyes and saw the man with the bat who came over to him and said, "close your eyes, bitch," then hit the victim on the head with an iron, which looked like a chisel. Walls also took the iron "chisel" and came over to the victim and hit him repeatedly in the eye area, until he could no longer see. (W:R.J120-22; H:R.D120-122)

*10 Walls, assisted by baseball bat man, then pulled the victim by the leg into the bathroom. Hillard came in and put his gun into the victim's mouth, and demanded the victim tell them where the money and the car was. Hillard went out of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

bathroom. (W.R.J122-23; H:R.D122-123) Walls returned to the bathroom with hand-cuffs, and put the victim's hands behind his back, then cuffed him and taped the victim's legs and hands with Hillard's help. (W.R.J124-25; H:R.D124-125) Hillard returned to the bathroom a few minutes later with a gun in one hand and a pillow in the other. He put the pillow to the victim's face and said, "it's time for you to die. You think it's a joke." (W:R.J126; H:R.D126) Baseball bat man came in quickly and stopped Hillard, saying "don't kill him yet. Wait until they come back." (W:R.J126;H:R.D126) The unidentified male came into the bathroom holding a gun on the victim. (W:R.J127; H:R.D127)

The victim could hear Delores asking if "anybody saw the key," which the victim believed was Delores' copy of the key to the victim's office and house. (W:R.J127; H:R.D127)

The men came in and out of the bathroom for a period of about five hours. At one point, Walls put a gun to the victim's head and threatened to kill him if the victim did not tell them where all his money was. (W:R.J128; H:R.D128) Baseball bat man hit the victim in the legs while he was lying in the tub. (W:R.J136; H:R.D136) At some point, the men stopped wearing masks. (W:R.J134-35; H:R.D134-135) Eventually, Hillard put a towel over the victim who was in the bathtub and turned the water on to make it look like the victim fell in the tub. Then the men turned the light off and left. (W:R.J129, H:R.D129) Around 7 p.m., the victim was able to escape the tape which had loosened from the water; he still had the cuffs on, but after some maneuvering was able to bring his arms under his legs to his front. He opened the bathroom door; No one was in the apartment with him. (W:R.J130-132; H:R.D130-132) The victim was able to get outside the *11 apartment; he saw base-ball bat man and Hillard outside. When they saw him, they ran, (W:R.J132-33; H:R.D132-33)

On May 10, 1997, shortly after 7 p.m., Chicago Police Officer Mario Ramirez was with his partner, Robert Schmidt, in his marked patrol car when he was hailed by a young boy at the intersection of Winthrop and Thorndale. (W:R.K9-10; H:R.E9-10) The boy directed the officers over to Kenmore about a block east where they saw the victim standing on the street in his underwear, handcuffed, bleeding profusely, and partially bound. (W:R.K10-11; H:R.E10-11) The victim directed police to Delores' apartment. Inside, there were hundreds of plastic bags, a scale, white powder, and spoons. The bathroom was in disarray and full of blood. (W:R.K12-13; H:R.E12-13) In addition to the drugs, police recovered two loaded handguns. (W:R.K17-20; H:R.E17-20) There were also documents of identification for Jerome Walls, Zachary T. Walls, Erven Walls, Germaine Craine, and Delores Jinadu in the apartment. (W:R.K21-26; H:R.E21-26)

Officer Robert Schmidt briefly interviewed the victim who was "hysterical" and difficult to understand. (W:R.K103; H:R.E103) While Ramirez was in the apartment, Schmidt obtained descriptions of the offenders from the victim. He talked to the victim about five minutes at most, before the victim went to the hospital.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)                                    Page 8
(Cite as: 2000 WL 34201566)

(W:R.K111; H:R.E111) Ramirez brought out identifications that he found in the apartment. (R.G104-110) The victim named Delores Jinadu, but not any of the males. (W:R.K111; H:R.E111) But the victim did identify a photo of "Germaine Craine" (later identified as Walls).

The victim said that the person identified as Germaine or Dormaine Crane hit him with the baseball bat. (W:R.K117-118; H:R.E117-118) Although it was hard to get the physical descriptions from the frantic victim (W:R.K105-110; H:R.E105-110), the victim did describe the height, weight and clothing of one offender that Schmidt found the photo identification for as Germaine Crane. Erven Walls was listed as 5'8 and 160 lbs. with **12** an address of 5851 N. Winthrop. (W:R.K121-122; H:R.E121-122) Dormaine Walls was an add-on whose name was added because of the identification found in the apartment. The information on Erven Walls came from the tickets that were found at the scene. When the victim described one offender as male black, 5'11 , 165 lbs, Officer Schmidt put it together and identified, that person as Erven Walls. (W:R.K129; H:R.E129) However, Schmidt explained that the officers did not know at the time whether the names pertained to one or more persons. (W:R.K124-25,130; H:R.E124-25,130)

The victim said $60 was taken from him. (W:R.K119; H:R.E119) Schmidt listed in the report that the victim said offenders took a wallet, cell phone, beeper and $60. (W:R.K120; H:R.E120)

The victim was taken to Illinois Masonic by ambulance for treatment, stitches and a fracture. (W:R.J134,K27; H:R.D134,E27) Police could not get the cuffs off, so they had to be cut off by hospital personnel. (W:R.J144; H:R.D144) The victim eventually had eye surgery at Cook County where he was hospitalized for several days. (W: R. J135-36; H:R.D135-36)

Detective Vernon Bradley was assigned to do follow up on the case on May 12, 1997. (W:R.K135-36; H:R.E135-36) He testified consistently at defendant Hillard's motion to quash and at defendants' trial that he interviewed the victim in Illinois Masonic Hospital. (W:R.K136; H:R.E136; H:R.B) He looked for offenders Delores Jinadu, Erven Walls and Germaine Craine, as well as for two other unidentified males. (W:R.K137; H:R.E137) He tracked down the registration for one of the handguns found in the apartment. It was registered to Laretha Hillard. The detective spoke with her and then went to a specific apartment in Cabrini Green and identified co-defendant Hillard who initially gave police a false name and then admitted that he was Tony Hillard. Detective Bradley arrested Tony Hillard who was put into a lineup and identified by the victim as **13** one of the offenders. (W:R.K138-42; H:R.E138-42) Detective Bradley also developed information on the whereabouts of Erven Walls and Delores Jinadu. They were arrested at 1121 S. State on September 17,1997. Walls was put into a lineup and identified by the victim. (W:R.K145,147-48; H:R.E145, 147-48)

Because Walls had given a statement to police, the court severed the cross examin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

ation of Detective Bradley, and counsel for Hillard and Walls each separately cross examined Detective Bradley outside the presence of the other co-defendant's jury. In Hillard's case, on cross examination, Bradley agreed that the victim's statement was substantially the same when he interviewed him on May 12 as what was in the general case report. (H:R.E185) The victim identified five offenders, one of whom was Delores Jinadu. (H:R.E186) The victim did not name Hillard, but did describe him. (H:R.E191) Hillard matched the description of one of the offenders who Detective Bradley thought at the time was Germaine Craine. (H:R.E198)

The court then asked Detective Bradley to explain a question asked by defense counsel that Hillard matched the description of Germaine Crane. Detective Bradley explained that he had names of Germaine Craine and Erven Walls but Hillard also generally matched those descriptions. Because the detective was working off of information in the reports and had never actually seen the identifications, it was only after the arrest of Walls that it was determined that Walls was the same person as Craine. (H.R.E213-14) After the witness was excused, the defense made a hearsay objection to the court's questions, and after argument, it was overruled. (H:R.E214-17)

Laretha Hillard's gun was admitted by stipulation in Hillard's case. (H:R.E218-19) The People then rested against Hillard. (H:R.E218) Defendant Hillard's case-in-chief consisted of a stipulation as to the testimony of Janet K. Lupa, a court reporter who recorded the victim's testimony before the grand jury, which showed certain *14 inconsistencies with the victim's trial testimony. ( H:R.E220-222) Defendant Hillard's motion for directed verdict was heard and denied. (H:R.E224) Thereafter the Hillard defense rested.

In Walls' case, Detective Bradley was also cross examined and admitted that there were no fingerprints at scene. (W:R.K340) On redirect in Walls' case, Bradley confirmed that Germaine Craine and Erven Walls are the same person. (W:R.K365) The People then introduced the testimony of ASA Michael O'Malley who spoke to Walls. (W:R.K371) Walls told ASA O'Malley that Walls' uncle had a plan to rob the victim. They were promised 10 grams of heroin ($700) for their cooperation. (W:R.K374) The plan was to have Delores call the victim and have him come over. When the victim came, Harris hit the victim in the head. Then Delores took Walls and dropped him at his sister's at 3517 South Federal Street. (W:R.K374-75, 397, 416) ASA O'Malley testified that Walls did not admit to hitting the victim. (W:R.K413)

Laretha Hillard's gun was also admitted by stipulation in Walls' case. (W:R.K218-19) The People then rested their case against Walls. Walls' motion for a directed verdict was denied. (W:R.K429) Defendant Walls' case-in-chief consisted of a stipulation as to the testimony of Janet K. Lupa, a court reporter who recorded the victim's testimony before the grand jury in which there were certain inconsistencies with the victim's trial testimony. (W:R.K433-35) Defendant Walls' motion for directed verdict was heard and denied. (W:R.L3) Thereafter the Walls defense rested. (W:R.K435)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

After separate closing arguments, each jury deliberated. Separately, the juries found each defendant guilty of all counts except attempt first degree murder (H:R.E444; W:R.L107-108)

Walls' and Hillard's motions for new trials were heard and denied. (W:R.P3-12; H:R.F6) In Walls' case, the victim's reference to the Immigration and Naturalization *15 Service became an issue at the motion for a new trial, and the court permitted Walls' defense counsel to examine the victim on this issue. The victim clarified that, during trial, he wanted to visit his father in Africa, but immigration told him to stay for trial. (W:R.P15) The court denied Walls' motion. (W:R.P28) Thereafter, defendant Walls at sentencing introduced two certificates of achievement, arguments were heard and the court heard from defendant who stated: "Well, I just, you know, I want a week's stay, and the armed violence is unconstitutional." Defendant Walls also represented that he had been coerced and that the police were lying, but then, after a discussion with his counsel, simply asked for leniency and a week's stay. (W:R.P35) The court noted that aggravation was very high, and that defendant Walls was on probation for another matter. Defendant Walls was sentenced to an aggregate of 50 years (15 years armed robbery, 25 years armed violence and 10 years aggravated kidnaping, all consecutive).

At his sentencing hearing, defendant Hillard introduced the testimony of Warren Parnell a minister at New Covenant Life Church and a participant in prison ministry in which he ministers to those in Cook County jail including Hillard. (H:R.F7-8) Parnell testified that he had known Hillard for 15-20 years and that Hillard had changed so that he read the bible and became actively involved in the ministry as a fellow participant. (H:R.F11) Hillard declined to speak to the court. (H:R.F23) Defendant Hillard was sentenced to an aggregate of 50 years (15 years armed robbery, 25 years armed violence and 10 years aggravated kidnaping, all consecutive). (H:R.F26-30)

Defendant Walls' motion for reconsideration of denial of new trial and for reconsideration of sentence was denied. (W:R.R3) Defendant Hillard's motion for reconsideration of sentence was also denied (H:R.H3)

This appeal followed.

### *16 ARGUMENT

#### I.

#### (Responding to Walls Issue I.)

**WHERE THE PEOPLE DID NOT HAVE ANY MATERIAL TO TENDER REGARDING THE VICTIM'S IMMIGRATION STATUS, THERE WAS NO BRADY VIOLATION AND CONSEQUENTLY THERE WAS NO DUE PROCESS VIOLATION.**

In this argument, defendant Walls contends that he was denied due process where

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

the People "failed to provide defendant with information concerning the victim's INS status despite numerous requests." (W: Deft.Br.14) The People maintain that the defendant has waived any issue with respect to the victim's INS status. Alternatively, the People maintain that since the People did not have INS material to tender regarding the victim's immigration status prior to, or during trial, there was no *Brady* violation and consequently no due process violation. Moreover, the People timely tendered the information they obtained regarding the victim's immigration status promptly.

Initially, it must be noted that defendant has waived this issue. Defendant's contention on appeal is a *discovery violation* and is directed at the People. However, in his motion for a new trial, defendant complained that the *court denied cross examination* of the victim on his INS status. (W:CL165) An objection to evidence on specified grounds waives on appeal any alternative objections not specified. *People v. Steidl*, 142 Ill. 2d 204, 230, 568 N.E.2d 837 (1991).

After the victim impact statement was received by defendant Walls on August 26, 1998 in which the victim refers to the INS, there was no request to amend defendant's written motion fora new trial. However, defense counsel did argue this issue before the court and was given a continuance to determine the foundation of the reference by the victim. (W:R.N3-12) On September 29, 1998 defendant Walls *17 represented that the INS did have a file and again requested a continuance which was granted. (W:R.P9) On October 13, 1998 defendant was granted permission to cross examine the victim on the basis for the reference. Although defense counsel orally requested that this issue be part of the motion (W:R.P10) [FN5], he failed to file any written amendment or supplemental motion incorporating this issue, and therefore has waived it for review. Moreover, in his Motion to reconsider the motion for a new trial filed on November 9, 1998 (W:CL167), defendant Walls sought again to obtain relief on the failure to permit questioning of the victim as to his INS status. However, no *Brady* complaint is made in that written motion. (W:CL167)

> FN5. There are two report of proceedings in Walls' record marked "P." Both occur in volume nine. This reference is to the second "P" date of October 13, 1998.

It is clear that a written post-trial motion raising an issue is required to preserve alleged errors that may have occurred during the trial. *People v. Robinson*, 167 Ill. 2d 397, 404, 657 N.E.2d 1020 (1995) (a defendant waives an issue for purposes of appeal when he fails to raise it through both an objection and a post-trial motion); *People v. Enoch*, 122 Ill.2d 176, 186, 522 N.E.2d 1124 (1988). It is well-settled that if not so preserved, errors are deemed waived on appeal. *People v. Tenner*, 157 Ill.2d 341, 370, 626 N.E.2d 138 (1993). Therefore, defendant has waived this issue raised in his brief.

Alternatively, should this Court choose to review defendant's arguments, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 12

People maintain that there has been no due process violation.

The standard of review for an alleged discovery violation is whether the trial court abused its discretion. *People v. Matthews*, 299 Ill. App. 3d 914, 918, 702 N.E.2d 291 (1st Dist. 1998)(citing *People v. Weaver*, 92 Ill. 2d 545, 559, 442 N.E.2d 255 (1982). Moreover, on appeal, all reasonable presumptions are in favor of the action of the trial court and the burden is upon the defendant to overcome such a presumption by **18** affirmatively showing the errors charged. *People v. Blount*, 220 Ill. App. 3d 732, 745, 580 N.E.2d 1381 (1st Dist. 1991).

Disclosure to the accused in criminal cases is governed by Supreme Court Rule 412 (134 Ill. 2d R. 412). In relevant part, Rule 412 provides:
(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:
\*\*\*
(i) The names and last known addresses of persons whom the State intends to call as witnesses together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements.
\*\*\*
(iii) A transcript of those portions of grand jury minutes containing testimony of the accused and relevant testimony of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial;
\*\*\*
(vi) Any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at the hearing or trial.
\*\*\*
(c) Except as is otherwise provided in these rules as to protective orders, the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor.

134 Ill. 2d R.412(a)(ii).

Thus, Rule 412 on its face permits the defendant to make a written motion for certain information pertaining to the People's witnesses, namely, their names, addresses, statements, prior grand jury testimony, and criminal records, if any. Defendant Walls did file a motion for discovery in the instant case. (W:CL66) However, in that written motion, with respect to the victim, defendant Walls requested: the victim's last known address; **19** the victim's criminal history and any outstanding warrants; and law enforcement reports relating to the victim that the People had access to. (W:CL66) While in his brief, defendant claims to have requested information concerning the victim's INS status "numerous" times (W:Deft.Br.14), defendant provides no record sites in support, and the common law

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 13

record shows only the single written motion which does not make a request for such information. The failure to make such a written request in discovery operates to waive the issue for this court's review under *Enoch.*

Defendant, nonetheless, argues that the People have "an affirmative duty to disclose to the defense evidence that is favorable to the defendant where the evidence is material to either guilt or punishment." (W:Deft.Br.14) While the People agree that it is true that the suppression of material evidence favorable to the accused by the People would violate the constitutional guarantee of due process of law, regardless of the good faith or bad faith of the prosecution (*see People v. Pecoraro*, 175 Ill. 2d 294, 305, 677 N.E.2d 875 (1997)), the defendant must establish that he requested the evidence in question and that the People possessed the evidence yet failed to disclose it. *People v. House*, 141 Ill. 2d 323, 387, 566 N.E. 2d 259 (1990)(State under no duty to discover and disclose nurse's notes).) Failure to make this showing ends the analysis, and there is no need to consider the favorability or materiality of the undisclosed evidence. *People v. Guest*, 115 Ill. 2d 72, 87, 503 N.E. 2d 255 (1986).

Even if such material were exculpatory and material, a failure to meet the constitutional command of cases such as *Bagley* and *Brady* and our Supreme Court Rule 412 does not require a reversal absent a showing of undue prejudice. *People v. Robinson*, 157 Ill. 2d 68, 78-79, 623 N.E.2d 352, 357 (1993). A new trial should be granted if the defendant is prejudiced by the discovery violation and the trial court fails to eliminate the prejudice. *20People v. Tripp*, 271 Ill. App.3d 194, 203, 648 N.E.2d 241 (1995). Illinois courts have relied on the following factors to determine whether a defendant is entitled to a new trial as a result of a discovery violation: the closeness of the evidence, the strength of the undisclosed evidence, the likelihood that prior notice would have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose the new evidence. *People v. Secor*, 279 Ill. App. 3d 389, 664 N.E.2d 1054 (1996); *Robinson*, 157 Ill. 2d at 82.

Here, defendant Walls did raise the victim's INS status before the jury, which the court ultimately found to be irrelevant. In his cross examination of the victim, the following questions were asked by Attorney Franks:
Q: Now, in what year did you get married to Delores?
A: February '95.
Q: And you were not an American citizen at that time, were you?
A: No, I'm not.
Q: And you're trying to become an American citizen, are you not?
A: Yes.
Q: And there is currently an investigation with the INS regarding your citizenship; is that correct?
ASA: OBJECTION
COURT: Sustained.
A: No.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COURT: Do not answer before I rule.
WITNESS: Okay.
COURT: I'll strike the answer and instruct the jury to disregard it. The objection
was sustained on the grounds of relevance.

W:R.J159-160.

Later, after trial, upon receipt of the victim's impact statement (VIS), in which
the victim states that "because of this incident I am not able to visit my family
in Africa due to INS" (W:CL164), Attorney Franks sought a continuance regarding
the "pending" investigation referred to in the victim's statement. (W:R.N5) Coun-
sel then represented that the victim admitted in a telephone call with him prior
to trial that "the INS had an **21 investigation regarding this matter." (W:R.N5)
Defense counsel then argued that the People should have "tendered any and all doc-
uments regarding INS." (W:R.N5) Next, counsel renewed his request that the People
"look into this matter to see if there is such materials that were discoverable."
(W:R.N5) The ASA responded that, prior to trial the People conducted exhaustive
searches regarding any local, state or federal involvement of the victim and found
none. (W:R.N6) The ASA also stated that they inquired of the INS as to whether the
victim "was the focus of the investigation and found no information at all."
(W:R.N6) The People argued that the reference in the VIS did not acknowledge any
investigation, and that the People were told there were no reports and were not in
possession of any reports. (W:R.N6-7, 9, 11) Finally, the defendant asked for a
continuance to inquire directly with INS to determine whether there was any in-
vestigation. (W:R.N10) The court asked for the relevance of such a matter and de-
fense counsel represented that, because "this incident is involved in an INS in-
vestigation" and was keeping the victim from leaving the country, it was relevant.
(W:R.N10) The court was not so sure it was relevant, but gave defense counsel 30
days time to investigate the statement. (W:R.N11)

When the matter reconvened on September 29, 1998, defense counsel represented that
the People tendered a file number "based on information we received from his civil
lawyers and an investigator" showing that INS does have a file number on him. The
People responded that the victim did receive a subpoena, but that nothing had been
subpoenaed from INS. (W:R.P3-4) Defense counsel claimed he did not have the file
number until the People provided one. The court noted that the ASA indicated that
they opened the file because there was an inquiry. (W:R.P5) Defense counsel
claimed that he had talked to a supervisor at INS who told him that the applica-
tion was closed and indicated that the victim "may be an illegal alien." (W:R.P5)
The People responded that **22 it still was not relevant and that the sentencing
issues remained the same. The court announced it was ready to proceed with senten-
cing. (W:R.P6) Defense counsel asked for more time to subpoena an INS district
director for the file, since he had already subpoenaed the victim. The court
offered to have defense counsel cross examine the victim (who was present in
court) on the statement. (W:R.P7) Counsel did so. He learned that the victim had
filed an application with his wife (co-defendant) Delores to be resident of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States, but he did not withdraw his application; the victim showed counsel his INS card. Regarding the VIS, the victim explained that although he wanted to visit his father in Nigeria during the time of trial, an immigration officer alerted him that the State would need his testimony for trial and asked him not to leave. (W:R.P10-15) The judge then sustained further objections to this testimony explaining that the victim clarified that he was married to Delores and was legally present at the time of trial. Defense counsel argued that the victim could have been an illegal alien even if he was not aware of it. (W:R.P18) The court ended the questioning and the matter proceeded to sentencing.

On this record, the defendant has failed to show that the People ever possessed the INS status information prior to defendant's subpoena. In fact, defendant has failed to show any probability of the existence of an INS investigation. All that defendant could show was that the victim was told by the INS to stay for trial and therefore he missed visiting his father in Nigeria. Moreover, the defendant has failed to demonstrate that any immigration material was either exculpatory or material.

Defendant, however, claims that the People had a duty to procure this evidence from "another government agency." (W:Deft.Br.15) However, SCR412(g) only requires the People to exercise due diligence in attempting to get such material, and the People certainly did make efforts at defendant's oral request to check into the victim's *23 immigration status. Moreover, the Rule is clear that if the People's efforts are unsuccessful, that defendant can obtain suitable subpoenas or orders to procure such material. The defendant, despite several continuances, failed to subpoena the INS.

Even in cases where information is within the investigative chain, the Supreme Court has directed inquiry into whether the failure to transmit such knowledge up the informational chain was inadvertent or intentional and whether any real prejudice to defendant occurred. For example, in *People v. Robinson*, 157 Ill. 2d 68, 80, 623 N.E.2d 352 (1993), a murder case, the Court refused to impute the knowledge of police to the prosecution where the prosecution did not learn of the existence of a correctional officer witness until the eve of trial. In so doing, the Court took note that while Supreme Court Rule 412 provides for the disclosure of materials and information within the State's possession (134 Ill. 2d R. 412) and Rule 412(f) imposes upon the prosecution the duty to ensure that a flow of information is maintained between various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused, nonetheless the Court found it relevant that the prosecution did not learn of the officer's involvement until the eve of the trial. In so doing, the Court specifically rejected defendant's claim that the officer's knowledge was imputed to the State since investigative personnel must fully participate in providing evidence to the State's Attorney in order that discovery can be accomplished. The Court noted:
If this court were to conclude that the knowledge of every State employee who is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

involved in a criminal case is imputed to the prosecution, the control over crim-
inal cases would be placed in the hands, and at the mercy of every employee who
touches the case. While the knowledge of police officers under certain circum-
stances has been held to be imputed to the prosecution (**24** *People v. Young*
(1978), 59 Ill. App. 3d 254, 375 N.E.2d 442, 16 Ill. Dec. 569), we decline to ex-
tend this line of reasoning in a per se manner. Rather, we believe that the im-
putation of such knowledge to the prosecution requires an individualized focus on
the factual circumstances. Among the factors to be considered would be the reason-
ableness of such imputation, whether the failure to transmit such knowledge up the
informational chain was inadvertent or intentional and whether any real prejudice
occurred.

157 Ill.2d at 80.

Here, the People clearly made attempts to obtain, but were provided no such in-
formation regarding the victim and therefore had nothing to provide to defendant.
Moreover, the evidence of an INS application was neither exculpatory nor material
in the sense that there was a reasonable probability that the outcome of the trial
would have been different had the evidence been presented to the jury, therefore
the defendant cannot show a violation of due process. *See United States v. Bagley*,
473 U.S. 667,105 S. Ct. 3375 (1985); *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct.
1194 (1963).

Defendant's convictions should be affirmed.

## *25 II.

### (Responding to Walls Issue II.)

**DEFENDANT'S COUNSEL WAS NOT INEFFECTIVE WHERE THERE IS NO REASONABLE PROBABILITY
THAT THE VICTIM'S IMMIGRATION STATUS WOULD HAVE AFFECTED THE OUTCOME OF THE TRIAL.**

To avoid the consequences of failing to preserve this issue (see People's Issue
I.), defendant contends that his convictions should be reversed since he was den-
ted the effective assistance of counsel. (W: Deft.Br.16) However, defendant's con-
tention still fails.

To prevail on a claim of ineffective assistance of counsel, a convicted defendant
must show, first, that counsel's performance was deficient and, second, that the
deficient performance so prejudiced the defense that defendant was deprived of a
fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064,
(1984), *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984)(adopting
*Strickland* standard). In *Albanese*, our Supreme Court explained that:
First, the defendant must show that counsel's performance was deficient. This re-
quires showing that counsel made errors so serious that counsel was not function-
ing as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the
defendant must show that the deficient performance prejudiced the defense. This

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. (Citation and quotation marks omitted)

As to the first element of the *Strickland* test, a defendant must show that counsel's representation fell below an objective standard of reasonableness. **\*26**\*Strickland*, 466 U.S. at 688. A reviewing court must indulge in a strong presumption that counsel's conduct is within the wide range of reasonable professional assistance and make its determination in light of all the circumstances. *Strickland*, 466 U.S. at 689. Counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. Strong deference is given to counsel's judgments. Id.

As to the second element, a defendant must show that there exists a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 692. Thus, the *Strickland* test also requires "a reasonable probability of a different result, not merely a possibility" of a different result. *People v. Gacy*, 125 Ill.2d 117, 129-30, 530 N.E.2d 1340 (1988). If a reviewing court can resolve an ineffective assistance of counsel claim because the defendant did not suffer sufficient prejudice, the reviewing court need not determine whether defense counsel's errors constituted less than effective assistance. *People v. Eddmonds*, 143 Ill. 2d 501, 511-512, 578 N.E.2d 952 (1991).

Both prongs of the *Strickland* test must be established by the defendant. *People v. Bennett*, 222 Ill. App. 3d 188, 201, 582 N.E.2d 1370 (2nd Dist. 1992). The People maintain that defendant has not established that counsel's performance was so deficient that he was not functioning as counsel and that defendant was prejudiced by counsel's performance in this case.

Defendant, in this case, has also failed to meet the second prong of the *Strickland* test. There is no evidence present in the record to suggest that the probability is that the outcome would have been different had defendant sought the information on the victim's residency status. As the People have argued at Issue I., *supra*, defense counsel did raise the victim's INS status before the jury, which the court ultimately found **\*27** to be irrelevant. In his cross examination of the victim, Attorney Franks asked the year of the victim's marriage and elicited that the victim was not an American citizen in February, 1995. The victim also admitted that he was trying to become an American citizen at the time of trial. (W:R.J159-160.)

Defendant's argument – that if defense counsel had subpoenaed the victim's residency status from the INS it would somehow have "dampened the appeal to the jury's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)
                                                                                    Page 18

emotion of the State's opening argument" - is based on the faulty premise that somehow defendant was convicted solely because he engaged in armed violence, armed robbery "and aggravated kidnaping of an immigrant whose petition was still pending. There is no merit to this argument. Defendant was convicted because of his acts not on the basis of the pendency of a residency petition. The trial judge was correct. It was irrelevant.

Defendant's argument regarding motive fails where defendant was connected to the crime by the victim's identification and by his photo identification left in the apartment. Moreover, the fact that the victim was not an American citizen was admitted by the victim at trial.

Therefore, because defendant has failed to meet the two prong Strickland test, he was not denied effective assistance of counsel. *People v. Davis*, 236 Ill.App.3d 233, 241-42, 603 N.E.2d 635 (1st Dist. 1992).

Defendant's convictions should be affirmed.

                            **\*28 III.**

                  **(Responding to Hillard Issue I.)**

**POLICE HAD PROBABLE CAUSE TO ARREST DEFENDANT HILLARD WHERE THE DEFENDANT WAS LINKED TO THE CRIME BY DESCRIPTION OF THE VICTIM, BY A GUN RECOVERED AT THE SCENE AND BY INFORMATION LEADING TO DEFENDANT'S APARTMENT AT WHICH DEFENDANT WAS PRESENT AND ADMITTED HIS IDENTITY. THEREFORE THE DENIAL OF DEFENDANT'S MOTION TO QUASH WAS PROPER.**

Defendant Hillard challenges the existence of probable cause to arrest him in this case. (H: Deft.Br. 13) The defendant herein did file a motion for a new trial on October 26, 1998, and included a boilerplate reference regarding the motion to quash. (H:CL142,#10) The People maintain that police had probable cause to arrest and so the court's denial of defendant's motion to quash was proper.

In reviewing whether there was probable cause to arrest, a reviewing court will accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence. However, an appellate court will review de novo the ultimate question of whether there was probable cause. See *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996).

Probable cause exists when the totality of the circumstances known to the arresting officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. *People v. Montgomery*, 112 Ill.2d 517, 525, 494 N.E.2d 475 (1986); *People v. Westbrook*, 262 Ill.App.3d 836, 847, 635 N.E.2d 398 (1st Dist. 1992). When determining whether probable cause existed at the time of a defendant's arrest, the question is whether a reasonable person in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 19

the police officer's position would have believed that the defendant committed a crime. *29 *People v. Adams*, 131 Ill.2d 387, 398, 546 N.E.2d 561 (1989). Evidence which would not be admissible at trial, and which may not establish a defendant's guilt beyond a reasonable doubt, could nonetheless constitute probable cause for his arrest. *See People v. Johnson*, 187 Ill.App.3d 756, 771, 544 N.E.2d 392 (1st Dist. 1989).

Defendant argues that Officer Bradley did not know at the apartment that the man he was arresting was defendant Hillard. (H:Deft.Br.14) Yet, defendant ignores the evidence that the victim described an offender, later shown to be Hillard, at the crime scene. (H:R.B12) Detective Bradley testified that he learned that one of the guns recovered from the crime scene was registered to Laretha Hillard, and when he spoke to her by telephone, she named her brother, the defendant, as the only one who would have stolen it. (H:R.B20) Laretha then gave Detective Bradley her brother's address. (H:R.B20) On June 3, when officers went to Hillard's apartment, they were acting on information they received from Laretha Hillard, defendant's sister. Officer Bradley was accompanied by his partner and two officers from the Tactical Unit at Cabrini Green. (H:R.B21) The Cabrini Green officers were present to assist in identifying defendant Hillard. (H:R.B66) When the woman answered the door to police, they identified themselves and asked to speak to Tony. A male was standing just behind her who matched the description given by the victim as one of the offenders. (H:R.B21-22) Although defendant gave police a fictitious name, when Detective Bradley asked defendant why he stole his sister's gun, defendant replied he did not take his sister's gun. (H:R.B23) Defendant then admitted he was Tony Hillard and restated his denial of the allegation that he took his sister's gun. Defendant was then arrested. (H:R.B24)

Police certainly had probable cause to arrest defendant who was linked to the crime scene by a gun found there, his sister's information, and the fact that he fit the description of one of the offenders given by the victim. As the trial court found in denying *30 defendant's motion to quash his arrest, the evidence "adds up to reasonable grounds to believe that the defendant had committed an offense and probable cause to arrest him." (H:R.B113)

Defendant's argument that *People v. Johnson*, 94 Ill.2d 148, 445 N.E.2d 777 (1983) or *People v. Wilson*, 260 Ill.App.3d 364, 632 N.E.2d 114 (1st Dist. 1994) preclude a finding of probable cause simply has no merit.

In citing *Johnson*, defendant analogizes the instant case to one involving an "informant" who tips police off that two men have committed a murder and gives a description. 94 Ill.2d at 156-57. In *Johnson*, no probable cause was found. Here, it was the victim of the crimes that described the offender after a several hour ordeal of torture, a gun found at the crime scene was registered to defendant's sister who promptly named defendant as the person who likely stole the gun, and defendant was found at the address the sister provided. *Johnson* has little to offer this case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 20

Similarly in *Wilson*, it was the daughter of the robbery victim who was not present at the scene who provided the victim with descriptive information on defendant. It was the victim that then passed that information along to police who never talked with the daughter. 260 Ill.App.3d at 366. This case does not rest on a single "informant" and therefore *Wilson* does not assist the defendant. For all the above reasons defendant's motion to quash was properly granted and defendant's convictions should be affirmed.

**\*31 IV.**

**(Responding to Hillard Issue II.)**

**WHERE THERE WERE NO ANTAGONISTIC DEFENSES, IT WAS PROPER TO PERMIT BOTH JURIES TO HEAR THE CROSS EXAMINATION OF THE VICTIM.**

In this argument, defendant Hillard contends that it was error for Walls' defense counsel to cross examine the victim in front of Hillard's jury, on the basis of antagonistic defenses. (H:Deft.Br. 19-20) The People maintain that where the defendant's defenses were not antagonistic, a severance was not required. Moreover, in this case, the trial judge carefully considered the impact on the juries of joint testimony and properly ruled that certain testimony was to be heard solely by an individual jury while certain testimony, including the cross examination of the victim complained-of here would be heard by both juries. The court properly severed the portions of defendant Walls' simultaneous jury trial that were potentially antagonistic to defendant Hillard. The victim's cross-examination was not one of the antagonistic portions. Therefore, the court was not required to sever the defendants' cross examination of the victim.

A trial court may join two or more charges or defendants when the offenses charged are based on two or more acts which are part of the same comprehensive transaction. See 725 ILCS 5/111--4(a), 114--7 (West 2000). In fact, the general rule is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. *People v. Lee*, 87 Ill. 2d 182, 187, 429 N.E.2d 461 (1981). Thus, joinder is appropriate where the offenses were part of a single occurrence or common scheme. *People v. Weston*, 271 Ill. App. 3d 604, 612, 648 N.E.2d 1068(1995).

**\*32** The decision to grant a severance is within the sound discretion of the circuit court. *People v. Bean*, 109 Ill. 2d 80, 93, 85 N.E.2d 349 (1985); *People v. Daugherty*, 102 Ill. 2d 533, 541, 468 N.E.2d 969 (1984).) An appellate court will not reverse a trial court's ruling on a motion for joinder absent an abuse of discretion. *People v. Marts*, 266 Ill. App. 3d 531, 542, 639 N.E.2d 1360 (1st Dist. 1994).

Prior to trial, defendant Hillard filed a "motion for severance of UUW by a felon charges" which was granted without objection, (H:C4-5) While defense counsel makes a reference to having "earlier moved for a severance," (H:R.C5) there is no record

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

support for such statement and the court corrected that impression and clarified that no severances had been granted, but recognized that there was one witness who required separate cross examination based on *Bruton*. (H:R.C19-20) Immediately before trial, the issue was again orally raised. (H:R.D21-24) The court noted that if the defenses became antagonistic, he would move the jury out, but that defendant's argument was anticipatory, and the court would consider severance if the need for it arose. (H:R.D25-26, 29) Defense counsel for Hillard did not register an objection to this procedure. (H:R.D29)

Defendants' Walls and Hillard were tried simultaneously before separate juries, and the victim's testimony was heard jointly by both juries. The court did sever the cross examination of Detective Bradley. Defendant's basis for his claim of error is that "defense counsel for Walls elicited from Jinadu, the victim, that Mr. Hillard was in fact at the scene of the crime and had participated." (H:Deft.Br.20) However, defendant ignores the fact that in the victim's direct examination, the victim identified Tony Hillard as being one of his offenders, and described how Hillard looked at the time of the crime. (H:R.D116,118) He also described how Hillard had a revolver and how he put the revolver in the victim's mouth and ordered the victim to tell the offenders where his *33 money was or Hillard would "knock" the victim out. (H:D118, 123,148) The victim also testified on direct that Hillard assisted Walls in taping the victim's hands and legs together. (H:R.D125,146) He also testified that Hillard held a pillow case to his face and said "it's time for you to die" before being pulled off the victim by another offender. (H:R.D126) The victim identified Hillard as the person who put towels on him and turned the water on in the bathtub as the victim lie there bound with tape and handcuffed. (H:R.D129) On direct examination, the victim identified Hillard as one of the offenders whom he saw when he escaped from the apartment. (H:R.D133) The victim also testified that he identified Hillard from a lineup (H:R.D136-137, 139-41)

Illinois courts have recognized two independent sources of prejudice which necessitate separate trials. *Bean*, 109 Ill. 2d at 93. The first involves an interference with the constitutionally guaranteed right of confrontation. See *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968). The second, upon which defendant's contention is based, includes situations "when codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others." *Bean*, 109 Ill. 2d at 93; *Daugherty*, 102 Ill. 2d at 541-42. In other words, such prejudice exists where "a codefendant takes the stand to point a finger at the defendant as the real perpetrator of the offense." *People v. Lee*, 87 Ill. 2d 182,187, 429 N.E.2d 461 (1981).

*Bean* instructs, however, that the mere apprehension of prejudice is not enough to conduct separate trials. 109 Ill. 2d at 92. There must be actual hostility between the defendants in order to necessitate separate trials. *People v. Mischke*, 278 Ill. App. 3d 252, 264, 662 N.E.2d 442 (1st Dist. 1995). Actual hostility occurs when there is "true conflict, such that each defendant professes his own innocence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and condemns the other." *34*People v. Lovelady*, 221 Ill. App. 3d 829, 836, 582
N.E.2d 1217 (1st Dist.1991)(citing *People v. Adams*, 176 Ml App. 3d 197, 200, 530
N.E.2d 1155 (1st Dist. 1988)). It is not sufficient to require a severance where a
codefendant's theory is inconsistent or contradictory to the defendant's theory.
*People v. Coleman*, 223 Ill. App. 3d 975, 994, 586 N.E.2d 270 (1st Dist.
1991)(reversed, in part, for a *Batson* hearing).

Defendant's sole record cite for his complaint is D.204-5. (H:Deft.Br.20) At that
point, 50 pages into Walls' cross examination, the victim testified as follows:
Q: Did all four men - were they all pointing guns at you at the same time when you
woke up?
A: Not all of them at the same time.
Q: I can't hear you.
A: Not all of them at the same time.
Q: Well, how many of them?
A: How many of them point a gun on me?
Q: Yeah.
A: Two.
Q: And which two were they?
A: One is not here today, and one is here today.
Q: And which is the one that's here today?
A: Tony Hillard.
Q: Okay.
A: Yeah.

(H:R.D204) The cross examination continued on then for another 30 pages, but there
were no more references by the victim to defendant Hillard. (H:R.D204-34)

Clearly, defendant's attempt to transform the victim's single answer confirmation
of his direct testimony on Walls' cross examination into a defense which is "so
antagonistic" to him that he could not receive a fair trial falls far short of the
requisite showing. Merely because Hillard claimed alibi does not show actual hos-
tility where defendant Walls claimed reasonable doubt. This Court has already in-
structed that, for *35 example, where one defendant claims an alibi defense and
the other defendant asserts a reasonable doubt, but at no time do the defendants
become rivals or accuse each other, there is no showing of actual hostility.
*People v. Williams*, 196 Ill. App. 3d 851, 860, 554 N.E.2d 1040, (1st Dist. 1990);
see also *People v. Rice*, 286 Ill. App. 3d 394, 675 N.E.2d 944 (1st Dist. 1996);
*People v. Jackson*, 223 Ill. App. 3d 1045; 586 N.E.2d 341 (1st Dist. 1991).

Moreover, while the defendant cites *People v. Murphy*, 93 Ill.App.3d 606, 417
N.E.2d 759 (1st Dist. 1981) in support of his argument, he admits in his brief
that *Murphy* involves a *co-defendant's antagonistic testimony*. (H:Deft.Br.20, em-
phasis added) He then cites to *People v. Rodriguez*, 289 Ill.App.3d 223, 680 N.E.2d
757 (2nd Dist. 1997) for the proposition that the "co-defendants do not directly
have to implicate each other to create prejudicial error," but without any author-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 23

ity he leaps to the conclusion that the victim's answer rises to that level. However, in *Rodriguez*, for example, one defendant attacked several occurrence witnesses' initial statements in which they implicated him and not his co-defendant as being coerced and unreliable. The co-defendant, in direct contrast, maintained that those same statements were true and that the occurrence witnesses' trial testimony, in which they implicated him and not his co-defendant, was untruthful. 289 Ill.App.3d at 226. Nothing remotely close exists in the instant case where Walls' theory of defense was to attack the victim's entire story and cast doubt on whether the victim could be believed at all, while Hillard maintained an alibi defense.

At most, the victim's answer was cumulative because he had already identified Hillard as one of the offenders on direct. Thus, even if erroneous, it was harmless. *See People v. Johnson*, 202 Ill. App. 3d 417, 426, 559 N.E.2d 1041 (1st Dist. 1990)(where identification testimony is merely cumulative, it constitutes harmless **\*36** error.) Defendant cannot show prejudice on this record. His convictions must be affirmed.

### **\*37 V.**

### (Responding to Hillard Issue III.)

**DEFENDANT HAS WAIVED THIS ISSUE WHERE THE BASIS FOR HIS LATE-MADE OBJECTION AT TRIAL WAS HEARSAY WHILE ON APPEAL HE CLAIMS JUDICIAL ERROR. ALTERNATIVELY, THE JUDGE PROPERLY CLARIFIED AN AMBIGUITY AND DID NOT ASSUME THE ROLE OF A PROSECUTOR IN THIS CASE.**

In this argument, defendant Hillard contends that the trial judge impermissibly acted as an advocate for the People where he clarified the fact that identification papers found at the crime scene which identified Erven Walls, Jermaine Craine, and Dormaine Walls all related to codefendant Walls. The People maintain that defendant has waived this objection. Alternatively, the court rightfully clarified the ambiguity left by Detective Brad ley's testimony. Moreover, whether *codefendant Walls* used aliases does not prejudice *defendant Hillard* where Hillard's defense was alibi. Therefore, the defendant has failed to sustain his claimed errors.

Initially, it must be pointed out that defendant, at trial, complained after the witness had been excused that the detective's testimony was hearsay. (H:R.E214-15) But in his post trial motion, he claimed, as he does herein, that there was judicial error. An objection to evidence on specified grounds waives on appeal any alternative objections not specified. *People v. Steidl*, 142 Ill. 2d 204, 230, 568 N.E.2d 837 (1991). Moreover, both a trial objection and a written post trial motion are required to preserve such an error. Defendant has failed to properly preserve this issue for review. *People v. Robinson*, 167 Ill. 2d 397.404. 657 N.E.2d 1020 (1995) (a defendant waives an issue for purposes of appeal when he fails to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)
(Cite as: 2000 WL 34201566)

Page 24

raise it through both an objection and a post-trial motion): *People v. Enoch*, 122
Ill.2d 176,186, 522 N.E.2d 1124 (1988). It is well-settled **38** that if not so pre-
served, errors are deemed waived on appeal. *People v. Tenner*, 157 Ill.2d 341, 370,
626 N.E.2d 138 (1993).

Alternatively, the trial court properly clarified an ambiguity left by the detect-
ive's testimony. The propriety of judicial examination of a witness is determined
by the circumstances in each case and rests largely in the discretion of the trial
court. *People v. Hopkins*, 29 Ill. 2d 260,194 N.E.2d 213 (1963). The appropriate
scope of questioning by the court depends on the facts and circumstances of the
case and lies largely within the trial judge's discretion. *People v. Williams*, 173
Ill. 2d 48, 93, 670 N.E.2d 638 (1996). Indeed, the trial judge may question wit-
nesses in order to elicit the truth or clarify material issues which seem obscure.
*People v. Falaster*, 173 Ill. 2d 220, 670 N.E.2d 624 (1996)(citing *People v.
Wesley*, 18 Ill. 2d 138, 155, 163 N.E.2d 500 (1959). As our Supreme Court has
noted, "[i]t is the judge's duty to see that justice is done, and where justice is
liable to fail because a certain fact has not been developed or a certain line of
inquiry has not been pursued it is his duty to interpose and either by suggestions
to counsel or an examination conducted by himself avoid the miscarriage of
justice. . ." People v. Franceschini. 20 Ill. 2d 126.132.169 N.E.2d
244(1960)(citing *People v. Lurie*, 276 Ill. 630, 641, 115 N.E. 130 (1917).)

Defendant concedes that the trial judge has discretion to question witnesses "to
clarify or fill in gaps in testimony." (H:Deft.Br.24) And, while it is true, as
defendant argues citing to *People v. Hopkins*, 29 Ill. 2d 260, 265, 194 N.E.2d 213
(1963), that a judge may not assume the role of an advocate, that is not what
happened here. In this case, during cross examination, Detective Bradley explained
that the victim described five offenders, but disagreed with counsel that the vic-
tim identified three offenders from identification as counsel intimated.
(H:R.E188) The detective further explained that he thought the victim only knew
one offender, but was shown a picture of another. However, **39** defense counsel at-
tempted to impeach the detective with his prior testimony to the effect that the
victim could identify three offenders "from that identification" as Erven Walls,
Germaine Craine and Delores Jinadu. (H:R.E189) The detective also agreed that de-
fendant never named offenders 4 and 5, and never named an offender as Tony Hil-
lard. (H:R.E188-89; 90-91)

Later in the cross examination, defense counsel asked about defendant Hillard's
description and the detective agreed that Hillard's description generally matched
the person known as Germaine Craine. (H:R.E198) The People elicited on redirect
that "the four male offenders all shared a general height and weight, including
defendant Hillard. (H:R.E210-211)

Thus, defense counsel clearly introduced confusion regarding the name and descrip-
tion of Germaine Craine, and the court rightly asked Detective Bradley to clarify
the resolution of that name found on one of the identifications in the apartment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)                                                    Page 25
(Cite as: 2000 WL 34201566)

as belonging to Erven Walls:
Court: I've got a couple of questions, Detective.
Clear up something. When Miss Bormann was asking you questions about the identi-
fication and the charts she had there, I believe that you indicated that you
thought that Mr. Hillard matched the description of the person who you had seen
named in the reports as Germaine Craine.
A: Yes.
Court: You had a name of Germaine Craine. You had a name of Erven Walls.
A: Yes.
Court: At some point in the investigation, did you learn that they were the same
person?
A: Yes, but not at that time.
Court: So, this was well before the arrest of Mr. Walls in September.
A: Yes.
Court: And up to that point, you assumed from the identification found in the
premises that there was an Erven *40 Walls, there was also a Germaine Craine, and
some other variations of those names?
A: Yes, it was very unclear because I never really saw the identification. That
was just what was listed in the reports. I never personally examined that informa-
tion, I mean the identification.
Court: Well, going onto September, when you arrested Miss Jinadu and Erven Walls,
was it at that point that you determined that Erven Walls was indeed Germaine
Craine?
A: We did determine that, but it was a little bit before the arrest that we real-
ized that he was the same.
Court: So that accounted for a good deal of the identification, photo and non-
photo identification that was found at the crime scene?
A: Yes.

(H:R.E213-215). Defense counsel made no objection to the above questions or an-
swers, and the parties rested. After the witness was excused, defense counsel for
Hillard asked for a sidebar at which counsel made a late hearsay objection.
(H:R.E214-15) Counsel requested the answers be stricken and that the jury be told
to disregard. The court refused, stating that counsel had opened the door to this
on cross examination and the court found some confusion as to why the detective
made the assumption about defendant Walls. The court also questioned how this ex-
planation harmed defendant Hillard. Counsel responded that the victim "named"
three offenders from "three pieces of identification" as Erven Walls, Germaine
Craine and Delores Jinadu and that she reminded the detective of the victim's pri-
or statements to this effect. (H:R.E216) However, as the above references to the
record show, contrary to defense counsel's argument, the detective did not agree
that the victim named three offenders from the identification. In fact, defense
counsel, by her argument, demonstrated the confusion caused by the detective's
testimony on this issue.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34201566 (Ill.App. 1 Dist.)                                                          Page 26
(Cite as: 2000 WL 34201566)

Moreover, defendant complains that the judge relied on his private knowledge in questioning the detective, and cites **41**People v. Nelson, 58 Ill.2d 61, 317 N.E.2d 31 (1974) in support. (H:Deft.Brf.25) However, defendant's citation to Nelson does not assist him where, unlike the judge in Nelson, the instant trial court did not undertake a private examination of defendant's culpability in the crime, but merely sought to clarify the confusion surrounding the name of Germaine Craine as it related to the co-defendant Erven Walls. This was not a matter of the judge's private knowledge of the defendant, but instead one of public record. As our Supreme Court has noted, "it is never improper for a judge to aid in bringing out the truth in a fair and impartial manner." Franceschini, 20 Ill. 2d at 132.

Even if this court considers the matter to have been raised in error, where a defendant complains of such questions or comments by the court, prejudice "must appear to be the probable result of the trial court's remarks or they must have been a material factor in the defendant's conviction to constitute reversible error." People v. Cobbins, 162 Ill. App. 3d 1010, 1028, 516 N.E.2d 382 (1st Dist. 1987). See People v. Nevitt, 135 Ill. 2d 423, 456, 553 N.E.2d 368 (1990)(citing People v. Wesley, 18 Ill. 2d 138, 155, 163 N.E.2d 500 (1959). Even if the evidence was hearsay, it was harmless error. People v. Hooper, 133 Ill. 2d 469, 495, 552 N.E.2d 684 (1989)(Even if they elicited hearsay, the court's questions did not prejudice defendant). On this record there was simply no prejudice to defendant Hillard, who asserted an alibi defense, on the clarification of the identity of Germaine Craine as Erven Walls.

Defendant's convictions should be affirmed.

### *42 CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendants' convictions and sentences for armed violence, armed robbery and aggravated kidnapping.

Pursuant to People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(1992); 725 ILCS 130/13 (1992); 55 ILCS 5/4-2002.1 (1992), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee "of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill, 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (1992), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. Erven WALLS & Tony Hillard, Defendants-Appellants.
2000 WL 34201566 (Ill.App. 1 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

No. 99-0152

In The

# Appellate Court Of Illinois

CRIMINAL APPEALS

OCT 1 6 2000

and RICHARD J. DALvv ... CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

First Judicial District

PEOPLE OF THE STATE OF ILLINOIS,

*Plaintiff-Appellee,*

vs.

TONY HILLARD,

*Defendant-Appellant,*

Appeal from the Circuit Court of Cook County, Illinois
Criminal Division
The Honorable Michael Toomin, *Judge Presiding*

# SUPPLEMENTAL BRIEF AND ARGUMENT FOR APPELLANT

Rita A. Fry,
Public Defender of Cook County,
69 W. Washington Street, 15th Flr,
Chicago, IL 60602,
(312) 603-0600

*Counsel for Appellant.*

**R.H.R. SILVERTRUST**
ASSISTANT PUBLIC DEFENDER

*Of Counsel.*  

EXHIBIT D

## ORAL ARGUMENT REQUESTED

# SUPPLEMENTAL BRIEF

## POINTS AND AUTHORITIES

### SUPPLEMENTAL I.
### THE IMPOSITION OF CONSECUTIVE SENTENCES, BASED ON THE TRIAL JUDGE'S FINDING THAT DEFENDANT INFLICTED SEVERE BODILY HARM UPON THE VICTIM, WAS UNCONSTITUTIONAL.

*Apprendi v. New Jersey* \_\_U.S.\_\_,
          120 S.Ct. 2348 .................................................................... 4

*People v. Clifton* \_\_Ill.App.3d\_\_,
        Docket No.98-2126, Decision of September 29, 2000 ....................................... 5

## SUPPLEMENTAL ISSUE RAISED FOR APPEAL

1. Was the imposition of consecutive sentences based on trial judge's finding of severe bodily harm constitutional?

## SUPPLEMENTAL STATEMENT OF FACTS

Defendant was convicted of armed violence, armed robbery and aggravated kidnapping. These offenses all occurred during a single course of action during which the victim was seized, robbed and beaten. The trial judge stated that after considering all factors in aggravation and mitigation as well as statutory factors, he was sentencing defendant to 25 years imprisonment for armed violence, 15 years for armed robbery and 10 years for aggravated kidnapping, all sentences to run consecutive to each other. (F.23-26) Hence defendant was to serve 50 years imprisonment.

SUPPLEMENTAL ARGUMENT

I.

THE IMPOSITION OF CONSECTIVE SENTENCES, BASED UPON THE TRIAL JUDGE'S FINDING THAT DEFENDANT INFLICTED SEVERE BODILY HARM UPON THE VICTIM, WAS UNCONSTITUTIONAL.

Under Illinois law, consecutive sentences may not be imposed for offenses committed during a single course of conduct except where:

1. The trial court finds defendant inflicted severe bodily harm
2. Defendant was convicted of §§12-13, 12-14 or 12-14.1 of the Criminal Code of 1961
3. Defendant was convicted of armed violence based on predicate offense of solicitation of murder
4. The trial court is of the opinion that consecutive sentences are necessary to protect the public.

See: 730 ILCS 5/5-8-4.

An examination of the record indicates that the trial judge made the ruling that defendant inflicted severe bodily harm upon the victim although he spoke in general terms without specifically using the words "severe bodily harm." He nonetheless spoke of torture, gang torture and the victim's need to be hospitalized. (F.23-25). There was no other factor mentioned by the judge which could have been used to impose consecutive sentences,

The U.S. Supreme Court's ruling in *Apprendi v. New Jersey* ___U.S.___, 120 S.Ct. 2348 requires that:

> "Other than the fact of a prior conviction,...any fact that increases the penalty for a crime beyond the presecribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."

4

In *People v. Clifton* ___Ill.App.3d___, Docket No.98-2126, Decision of September 29, 2000, This Court found that the section of 730 ILCS 5/5-8-4 which allows a sentencing judge to impose consecutive sentences based on his own finding that defendant inflicted severe bodily harm upon the victim was unconstitutional and required the vacation of consecutive sentences and the imposition of current sentences.

Because this is exactly what occurred in the case at bar, defendant's consecutive sentences must be vacated.

*R. Silvertrust / Buck*

## APPENDIX B

FIRST DIVISION
June 11, 2001

RECEIVED

'01  JUN 11  P1:33

APPEAL DIVISION

NOTICE

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

IN THE APPELLATE COURT ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | No. 97 CR 30453 |
| v. | ) | |
| | ) | Honorable |
| TONY HILLARD, | ) | Michael Toomin, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |
| | ) | |

### ORDER

Defendant Tony Hillard was convicted in a jury trial of armed robbery, armed violence, aggravated kidnaping, and aggravated battery. He was sentenced to 50 years' imprisonment. On appeal, defendant raises four issues. He contends that: (1) the trial court erred in failing to grant his motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly sentenced defendant to a consecutive sentence. We affirm.

## APPENDIX B

## EXHIBIT E

1-99-0152

## BACKGROUND

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed and hit him on the head again with an iron object. Codefendant then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Codefendant and the man with the bat then pulled Jinadu into the bathroom, handcuffed him and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the bathroom and came back holding a pillow and the gun. Codefendant also returned to the bathroom carrying handcuffs. He and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street

-2-

1-99-0152

where he saw the man with the baseball bat and codefendant standing across the street. Upon seeing him, both men fled down the street.

Defendant and codefendant Walls were tried simultaneously before two juries. Prior to trial, defendant moved for a motion to quash his arrest and suppress evidence. The trial court denied the motion to quash finding that Detective Brady had reasonable grounds to believe that defendant had committed the offense and that probable cause to arrest him existed. Prior to trial, the trial court noted that both juries would be present during the cross-examination of the victim. At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership and eventually started his own trucking company. He met and married Delores in 1995 and they separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10, 1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him, Delores explained that her car was broken and asked Jinadu to pick her up at her apartment. Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the door he was hit on the head with a baseball bat and lost consciousness. After regaining consciousness, Jinadu was placed in a bathtub and repeatedly beaten and threatened by the men in the apartment. After the men left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw

-3-

1-99-0152

hundreds of plastic bags, a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Jinadu also described the height, weight and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Crane. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven and Delores at 1121 South State Street. Codefendant Erven Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha Hillard. He called Laretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address. He went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and

-4-

1-99-0153

defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police station and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years' imprisonment.

## ANALYSIS

Defendant first challenges the trial court's finding in denying defendant's motion to quash arrest and suppress evidence. In denying defendant's motion, the trial court noted some of the facts known to the police at the time of the arrest. We will summarize some of those facts in order to illustrate why under the totality of the circumstances known to the police officers at the time of the arrest there was sufficient information to warrant a reasonably prudent person to believe that defendant had committed a crime.

Benicia Eberhardt testified on behalf of defendant. She stated that she was in her bedroom with defendant when there was a knock on the door. She opened the door and saw three or four police officers standing in the hallway. At the time, defendant was standing a few feet behind her. She stated that the police officers pushed her out of the way, walked into the apartment and

-5-

1-99-0152

grabbed defendant. Defendant was taken into his room to put on some clothes while two officers searched the apartment. Defendant was then handcuffed and taken to the police station.

Detective Bradley testified that he spoke to the victim two days after the incident. Jinadu immediately identified his wife, Delores. He also identified codefendant Erven Walls from a drivers license which was found in the apartment on the day of the incident. He identified Walls as his wife's boyfriend who he had seen on previous occasions. Jinadu also gave Detective Bradley the physical description of the other three offenders. He described them as being in their twenties. One offender was 5'11" and weighed 200 lbs with black hair and brown eyes. Another offender was 5'11", 165 lbs. Finally, the last offender was approximately 5'5", 145 lbs with brown eyes and black hair. Detective Bradley testified that one of the guns found in the apartment was registered to Loretha Hillard. He called Ms. Hillard and spoke to her on the telephone. Ms. Hillard informed Detective Bradley that she was an ex-security guard for the Chicago Housing Authority. She further told Detective Bradley that her gun had been taken and that the only person who would have taken it was her brother, Tony Hillard. Ms. Hillard told Detective Bradley the address and apartment number of where defendant and his girlfriend lived. Detective Bradley, along with other police officers, went to the address given to him by Ms. Hillard. They knocked on the door and it was opened by Benicia Eberhardt. Detective Bradley stated that he told the woman that he wanted to speak to defendant. Standing behind her was a man who fit the general description of one of the offenders which Jinadu had given to the officers.

When asked to identify himself, defendant gave Detective Bradley a fictitious name. Detective Bradley then asked him why he stole his sister's gun. Defendant replied that he did not

-6-

1-99-0132

take his sister's gun. He was then asked to accompany the police officer's to the police station to discuss the theft of his sister's gun. Defendant said that he would go but that he had to put on his shirt and shoes. Detective Bradley followed defendant into one of the bedrooms where he told detective Bradley that his name was Tony Hillard. Defendant was taken to the police station where he was later identified by Jinadu as one of the offenders. Detective Bradley further testified that at the time of the arrest defendant was 21 years old with black hair, brown eyes, was 5'11" and weighed 170 lbs.

We note that defendant's reliance on *People v Johnson*, 94 Ill. 2d 148 (1983) and *People v. Wilson*, 260 Ill. App. 3d 364 (1994), is not applicable to the factual scenario in this case. Both *Wilson* and *Johnson* stand for the proposition that a warrantless arrest based on an informant's tip must be sufficiently reliable and corroborated so as to provide probable cause. However, the situation in this case is not governed by that principle. Here, the basis for the probable cause did not center around an informants tip but rather was based on the information from Ms. Hillard which provided a link between the stolen gun and defendant and helped the police to locate defendant. That link, however, was not the sole basis of the arrest. In addition to that information once the police were at the specific location provided by Ms. Hillard, defendant fit the description given to them by the victim.

Both the United States and the Illinois Constitutions govern the conduct of police officers in performing warrantless arrests. U.S. Const., amends. IV, XIV; Ill. Const. 1970 art. 1, §6; *People v. Buss*, 187 Ill. 2d 144 (1999). These constitutional provisions allow the police to make a warrantless arrest but only if the police have knowledge "which would lead a reasonable man to

-7-

1-99-0152

believe that a crime has occurred and that it has been committed by the defendant." *People v. Robinson*, 167 Ill. 2d 397, 405 (1995). In reviewing a probable cause challenge, the court does not apply bright-line legal rules but evaluates the police conduct in accordance with practical, every-day principles. *People v. Kidd*, 175 Ill. 2d 1, 22 (1996).

Probable cause for an arrest exists when the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. *People v. Lumpp*, 113 Ill. App. 3d 694 (1983). The court determines under the totality of the circumstances whether the evidence available to the arresting officer at the time of the arrest provides a reasonable basis for the officer to believe that the suspect committed an offense. *People v. Dizon*, 297 Ill. App. 3d 880, 885 (1998). The question is whether a reasonable person in the police officer's position would have believed that the defendant committed a crime. *People v. Adams*, 131 Ill. 2d 387, 398 (1989). Moreover, although the standard for determining whether probable cause existed for a warrantless arrest requires more than a mere suspicion on the part of the police officers, it does not require arresting officers to have in their hands evidence sufficient to convict the defendant. *Dizon*, 297 Ill. App. 3d at 885. A general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. *People v. Robinson*, 299 Ill. App. 3d 426, 431 (1998).

When defendant solely challenges the trial court's legal conclusions for denying a motion to quash arrest and suppress evidence, as in this case, our review is *de novo*. *People v. Wright*, 183 Ill. 2d 16, 21 (1998).

-8-

1-99-0152

In applying the above principles to the present case we conclude that based on the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. The police officers were there as part of their investigation of a vicious beating and armed robbery. They had recovered a .38 caliber gun from the apartment which led them to defendant's apartment based on information which was provided by his sister. She reported that the gun was stolen from her home and informed the officers that she believed the person who stole it was defendant. She also provided the officers with defendant's name, address and apartment number. Thus, the gun found at the scene of the crime was linked to defendant. Armed with Jinadu's descriptions of the offenders and Ms. Hillard's information, the police were able to locate defendant at the exact address provided to them. Moreover, upon seeing defendant the officers realized that he fit the general description of one of the offenders. Jinadu had described one of the offenders as a black man that was 5'11" and weighed 165 lbs. He further stated that all of the offenders were in their twenties. At the time of the arrest defendant was 21 years old, was 5'11" and weighed 170 lbs. These characteristics where similar to those described by the victim. Further, when asked whether he was Tony Hillard, defendant lied and gave the officers a fictitious name. He later admitted that he was Tony Hillard. The general description of the offenders, coupled with other specific facts and circumstances provided by Ms. Hillard as well as defendant's behavior in the apartment, was sufficient to lead a reasonably prudent person to conclude that there was a reasonable probability that defendant was one of the offenders.

Defendant's second point of contention revolves around the fact that the trial court

-9-

1-99-0152

allowed codefendant Walls' counsel to cross-examine Jinadu in front of defendant's jury.
Defendant maintains that because the defenses were antagonistic the cross-examination prejudiced
defendant's jury. Here, both defendant and codefendant were tried simultaneously before
separate juries. Prior to trial, both defense attorneys filed a motion for severance on the unlawful
use of a weapon by a felon count which the trial court granted. During the trial, the trial court
severed the cross-examination of Detective Bradley. Defendant argues that the trial court should
have also severed the cross-examination of Jinadu. Defendant argues that during the cross-
examination of the victim by codefendant's attorney, the victim named defendant as one of the
offenders thus prejudicing defendant. Specifically, Jinadu stated that one of the offenders that
pointed a gun at him was defendant.

As a general principle of law, defendants who are jointly indicted are jointly tried unless
fairness to one of the defendant's requires a separate trial to avoid prejudice. *People v. Lee*, 87
Ill. 2d 182, 187 (1981). Prejudice exists where "a co-defendant takes the stand to point a finger
at the defendant as the real perpetrator of the offense." *Lee*, 87 Ill. 2d at 187. Furthermore, the
mere apprehension of prejudice is not enough to conduct separate trials; there must be actual
hostility between the defendants in order to necessitate separate trials. *People v Bean*, 109 Ill. 2d
80, 92 (1985). Severance is not required when codefendants' defenses are merely contradictory.
*People v. Rice*, 286 Ill. App. 3d 394 (1996), citing *People v. Lovelady*, 221 Ill. App. 3d 829, 836
(1991). The decision to grant a severance is within the sound discretion of the trial court and an
appellate court will not reverse a trial court's ruling absent an abuse of discretion. *People v.
Fornear*, 283 Ill. App. 3d 171 (1996).

-10-

1-99-0152

In this case, defendant and codefendant did not implicate each other as the perpetrators of the crime. Defendant presented an alibi defense. As defendant points out in his brief his defense was simply that he was not present at the time of the incident. Codefendant Walls' defense, on the other hand, was one of reasonable doubt. The trial court stated, in replying to defense counsel's assertion that codefendant would implicate defendant through cross-examination of the victim:

> "How does that help Mr. Wall's to point the finger at Mr. Hillard. I will wait and see if you do it  Then I'll move the jury out. I don't know why somebody who says their client wasn't there has to point the finger at another defendant and say he was there. That doesn't establish that your guy wasn't there.

                              ***

> We'll have to wait and see if it happens. If it happens, I'll move the jury out to protect whatever defendant's right have to be protected. To me, this is nonsense. It's a lot of fiction that one has to point the finger to make a separate cross-examination and represent to me, I'm going to pin it on this guy in front of his jury, when it doesn't make any sense or rhyme, reason or rationale why she would do that if her client wasn't there. But, I'll hear it when I hear it."

The record in this case indicates that during the cross-examination of Jinadu by codefendant Walls' attorney there is one isolated instance in which Jinadu stated that defendant was one of the offenders who pointed a gun at him. This single reference, however, was a repetition of Jinadu's testimony on direct examination where Jinadu testified that defendant pointed a gun at him, placed the gun in Jinadu's mouth, ordered him to reveal where he kept his money, helped codefendant Walls bind Jinadu's legs and hands, placed a pillow on Jinadu's face and filled the bathtub with water. As the trial court correctly noted, the necessity of removing the

-11-

1-99-0152

jury due to an antagonistic defense did not arise in this case. Jinadu's testimony on cross-examination did not create an antagonistic defense but was cumulative of his direct testimony.

Moreover, the record indicates that the remainder of the cross-examination by counsel for codefendant Walls consisted of a series of questions designed to create a reasonable doubt that Walls was not one of the perpetrators. It did not revolve around implicating defendant as the main perpetrator. In addition, during closing arguments, codefendant's counsel argued reasonable doubt as opposed to placing the blame on defendant. In fact, defense counsel stated, "I don't know if Mr. Hillard was involved in that, in this case or not ***." Defense counsel then proceeded to attack the credibility of Jinadu and the inconsistencies in his testimony.

This court has clearly stated in *Rice* that the requirement for actual hostility which necessitates severance "is not met where, for example, one defendant claims an alibi defense and the other defendant asserts a reasonable doubt, but at no time do the defendants become rivals or accuse each other." *Rice*, 286 Ill. App. 3d at 402. Such is the situation in the present case. Given that the defenses were not antagonistic to each other and that defendant has failed to show any prejudice which resulted from Jinadu's single reference to defendant during cross-examination, the trial court correctly ruled in denying severance.

Defendant's final contention is one which he does not have standing to raise. Standing is met when: (1) the proponent of a particular legal right alleges an injury in fact; and (2) the proponent asserts his own legal rights and interests, rather than basing his claim for relief upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *People v. Bond*, 205 Ill. App. 3d 515 (1990). Here, defendant argues that it was judicial error for

-12-

1-99-0152

the trial court to question Detective Bradley as to whether codefendant Walls and Jermaine Craine were the same person. Defense counsel objected to the court's questioning to which the trial court replied, "[I] don't see how that affects Mr. Hillard at all." We agree with the trial court that the trial court's questions regarding identification of Walls and Craine as the same person, did not impact defendant Hillard or any of Hillard's legal rights. Defendant has failed to articulate how the trial court's actions caused defendant an injury in fact. As such, defendant's claim lacks standing for purposes of this appeal.

In a supplemental argument, defendant contends that the trial court erred in sentencing him to a consecutive sentence pursuant to section 5-8-4(a) where the sentence violated his constitutional right to due process and trial by jury according to the recent holding in the Supreme Court case *Apprendi v. New Jersey*, 530 U.S. 466, 490,147 L. Ed. 2d 435, 455,120 S. Ct. 2348, 2363-67, (2000). In *Apprendi*, the U.S. Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The trial court determined that the crime was motivated by bias based on race and therefore increased the defendant's sentence. The *Apprendi* Court concluded that it is unconstitutional, and a violation of a defendant's due process rights, for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In this case the trial judge sentenced defendant under 730 ILCS 5/5-8-4(a), which calls for the imposition of consecutive sentences in cases of

-13-

1-99-0152

multiple convictions arising out of a single course of conduct if one of the offenses is either a

Class 1 or Class X felony and the court finds that the defendant inflicted severe bodily injury.

Section 5-8-4(a) states in pertinent part:

> "The court shall not impose consecutive sentences for offenses
> which were committed as part of a single course of conduct during
> which there was no substantial change in the nature of the criminal
> objective, unless, one of the offenses for which defendant was
> convicted was a Class X or Class 1 felony and the defendant
> inflicted severe bodily injury ***." 730 ILCS 5/5-8-4(a) (West
> 1998).

Recently, in *People v. Wagener*, our supreme court held that *Apprendi* concerns are not

implicated by consecutive sentencing. *People v. Wagener*, No. 88843, slip op. at 14 (June 1,

2000). Noting that consecutive sentences remain discrete and do not transmute into a single

sentence, the *Wagener* court determined that consecutive sentences cannot run afoul of *Apprendi*,

as that case only addresses sentences for individual crimes. *Wagener*, slip op. at 14-15.

Accordingly, the *Wagener* court concluded that section 5-8-4(b), which allows the imposition of

consecutive sentences where the sentencing court is of the opinion that such a term is necessary to

protect the public from further criminal conduct by the defendant, passes constitutional muster.

*Wagener*, slip op. at 15. Following the reasoning of *Wagener*, we conclude that section 5-8-4(a),

under which defendant was sentenced, also passes constitutional muster. Thus, we affirm the trial

court's order imposing consecutive sentences.

For the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, J., with McNULTY, P.J., and TULLY, J., concurring.

-14-

ORIGINAL

**91958**

NO.

| | | |
|---|---|---|
| People State of Illinois, | ) | Appellate Court, |
| | ) | First District |
| Respondent | ) | No. 1-99-0152 |
| | ) | |
| v. | ) | Circuit Court, |
| | ) | Cook County |
| Tony Hillard, | ) | No. 97CR30453 |
| | ) | |
| Petitioner | ) | Hon. Michael Toomin, |
| | ) | Judge Presiding |

PETITION FOR LEAVE TO APPEAL

**FILED**

JUL 1 7 2001

SUPREME COURT CLERK

Tony Hillard
Reg. No. B-58149
P. O. Box 711
Menard, IL 62259

35 - 0 71691

R - 061101
No RH

EXHIBIT F

No. _____

IN THE
SUPREME COURT OF THE STATE OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | Petition for leave to appeal from the Appellate Court of Illinois, First Judicial Circuit. |
| Plaintiff-Appellee, | |
| ) | |
| vs. | |
| ) | No. 1-99-0152 |
| TONY HILLARD, | |
| ) | There heard on appeal from the Circuit court of Cook County, Illinois. |
| Defendant-Appellant, | |
| ) | |
| | Honorable Michael Toomin |

## PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE

STATE OF ILLINOIS:

May it please the Court:

1.

## PRAYER FOR LEAVE TO APPEAL

Your Petitioner, Tony Hillard, pro se., respectfully petitions this Honorable Court for Leave to Appeal pursuant to Supreme Court Rule 315, from the judgment of the Appellate Court of Illinois, First Judicial District, which affirmed the judgment of conviction entered by the Circuit Court of Cook County, Illinois upon the jury verdict finding the Petitioner guilty of armed robbery, aggravated kidnaping, armed violence and aggravated battery.

## II.

## OPINION AND PROCEEDINGS BELOW

On ___7-15-98___, Petitioner was found guilty of armed robbery, aggravated kidnaping, armed violence and aggravated battery.

1.

Petitioner was subsequently sentenced to a fifty (50) year prison term upon his conviction. He appealed this conviction to the Illinois Appellate Court, First Judicial District. On **June 11, 2001,** the Court delivered its opinion in said appeal, affirming the judgment of conviction and sentence. No petition for rehearing was filed.

## III.

### POINTS RELIED UPON FOR REVERSAL

THE TRIAL COURT AS WELL AS THE APPELLATE COURT ERRED IN FAILING TO GRANT THE MOTION TO QUASH ARREST WHERE THERE WAS A LACK OF PROBABLE CAUSE.

(2)

IT WAS ERROR FOR CODEFENDANT'S COUNSEL TO CROSS-EXAMINE THE VICTIM IN FRONT OF DEFENDANT'S JURY WHERE DEFENDANT AND CODEFENDANT HAD ANTAGONISTIC DEFENSES.

(3)

THE TRIAL COURT IMPERMISSIBLY ACTED AS AN ADVOCATE WHERE HE QUESTIONED A WITNESS AND CLARIFIED CODEFENDANT'S ALIAS NAMES.

## IV.

### STATEMENT OF FACTS

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrial tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf coving the lower portion of his face. Jinadu also saw codefendant,

Erven Walls, with a gun in his hand. The man with the base-
ball bat walked over to Jinadu, told him to keep his eyes closed
and hit him on the head again with an iron object. Codefendant
then walked over to Jinadu and hit him repeatedly on the head and
around the eyes. Codefendant and the man with the bat then pull-
ed Jinadu into the bathroom, handcuffed him and placed him in the
bathtub.

Defendant Hillard came into the bathroom and put a gun into
Jinadu's mouth, demanding that JJinadu tell him where the car and
money were kept. Defendant then walked out of the bathroom and
came back holding a pillow and a gun. Codefendant also returned
to the bathroom carrying handcuffs. He and defendant put Jinadu's
hands behind his back, cuffed him, and further taped his legs and
hands together. Defendant then began to place the pillow on Jinadu's
face but was stopped by the man holding the bat. Five hours elap-
sed during which time Jinadu was threatened at gunpoint to tell
the men where he kept his money. Eventually, defendant placed a
towel over Jinadu and turned the faucet in the tub and left. Arou-
nd 7 p.m. Jinadu extricated himself from the electrial tape
binding his feet and climbed out of the tub. He was unable, how-
ever, to release the handcuffs binding his hands. He opened the
bathroom door and saw that he was alone in the apartment. He
walked out of the apartment and onto the street where he saw the
man with the baseball bat and codefendant standing across the
street. Upon seeing him, both men fled down the street.

Defendant and codefendant Walls were tried simultaneously
before two juries. Prior to trial, defendant moved for a motion

3.

to quash his arrest and suppress evidence. The trial court denied
the motion to quash finding Detective Brady had reasonable grou-
nds to believe that defendant had committed the offense and that
probable cause to arrest him existed. Prior to trial, the trial
court noted that both juries would be present during the cross-
examination of the victim, at trial, Jinadu testified that he
came to the United States in 1994, worked for a car dealership
and eventually started his own trucking company. He met and mar-
ried Delores in 1995 and they seperated in 1996. In April 1997,
Delores began to work as Jinadu's secretary. On May 10, 1997,
Delores did not arrive at work as scheduled and Jinadu paged her
After callING him, Delores explained that her car was broken and
asked Jinadu to pick her up at her apartment. Jinadu drove to
her apartment and arrived at 10:15 a.m. Delores invited Jinadu up
to the apartment to wait while she finished getting ready. As
Jinadu walked through the threhold of the door he was hit on the
head with a baseball bat and lost consciousness. After regaining
consciousness, Jinadu was placed in a bathtub and repeatedly
beaten and threatened by the men in the apartment. After the men
left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10,1997,
when he was stopped by a young boy who directed him to Jinadu. At
the time Jinadu was on the street and had an open head wound,
gray duct tape on his mouth and chin and his hands were bound in
handcuffs. Jinadu showed Officer Ramirez, Delores' apartment. As
Officer Ramirez entered the apartment he saw hundreds of plastic
bags, a scale, white powder, spoons and breathing masks. Officer

4.

Ramirez also saw ⬤at there was blood in the b⬤htub. From the a-
partment he recovered two loaded revolvers and documents of ident-
ification for defendant, Sachary T.Walls, Jerome Walls, Germaine
Craine and Delores Jinadu.

Officer Schmidt testified that while officer Ramirez was in
the apartment, he waited with Jinadu outside of the apartment. He
stated that Jinadu identified Delores by name but was unable to
name any of the other offenders (even though he knew at the time
that one of the offenders was now the boyfriend of his ex-wife).
Jinadu also described the height, weight and clothing of one of
the offenders that fit the discription and the photo identifi-
cation of one of the offenders named Germaine Crane. Officer Sch-
midt further explained that at the time the officers did not know
whether the names retrieved from the apartment all pertained to
one person or to multiple people.

Detective Bradley testified that he was assigned to follow
up on the case. After talking to Jinadu, Detective Bradley had the
names of Delores, and Germaine Craine. Jinadu told the detective
that the offenders wanted money and drugs. On September 17,1997,
Detective Bradley arrested codefendant Erven and Delores at 1121
South State Street. Codefendant Erven Walls was placed in a line-
up and was identified by Jinadu as one of the offenders. Detective
Bradley also learned that one of the recovered guns was register-
ed to Laretha Hillard. He called Laretha and spoke to her on the
phone. She told him that the only person who would have taken her
gun was her brother, Tony Hillard. (this was later proven untrue
as the attached affidavit will attest to). She also gave Detect-
ive Bradley her brother's address. He went to the address with

5.

other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany officers to the police station to discuss the XXXX theft of his sister's gun, defendant said that he would. Defendant then told the detective his name and again denied any knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police station and placed in a lineup. He was later identified by Jinadu as one of the offenders.

## V.

## A R G U M E N T

**THE TRIAL COURT AS WELL AS THE APPELLATE COURT ERRED IN FAILING TO GRANT DEFENDANT'S MOTION TO QUASH ARREST AND SUPPRESS THE EVIDENCE WHERE THERE WAS A LACK OF PROBABLE CAUSE.**

The arrest of the defendant in this case is a demonstration of the power of the police within our criminal justice system. The hearing on the motion to quash the arrest and suppress the evidence was a complete farce and a travesty of justice.(the attached AFFIDAVIT will prove that Detective Bradley lied, yet no one called the sister to testify at the motion hearing).Since this is the first time that the affidavit was presented to a Court the Petitioner prays that this Honorable Court will review this plain error de novo.

The rule of seizure is such an important allegation grounded into our criminal justice system that it can never be viewed as a passive or meek issue. The heart of our system rest upon whether the proper procedures were followed in bringing the criminal suspect before a tribunal to face the charges lodged against him. If there is a glitch in the seizure of the individual and the arrest isn't proper; that person must be returned to the community with his full citizenship restored. Overzealous police work should overshadow the dictates of the constitutional mandate of our jurisprudence.

It is a well developed fact that arrest occurs when the individual movement is impaired. An arrest must be based upon the information known by the arresting officer executing the arrest. In the case before the Court, the arresting officer only had enough information to warrant a investigation and not an arrest. The arresting Officer (Bradley) received information that a hand gun had been recovered from the scene of an aggravated battery and armed robbery. He later found out that this hand gun was registered to Ms. Loretha Hillard, the sister of the defendant. Armed with this knowledge the Officer allegedly contacted Ms. Hillard and she in turn told him the following. " if my gun is missing my brother probably took it." (see T.R. B-58) (Affidavit attached). With merely a blanket statement from Ms. Hillard, Officer Bradley, alone with other officers goes to the defendant home and arrest him for stealing his sisters gun. The gun in question was never proven to have been used in the crime against the victim to the aggravated battery and armed robbery. The gun was never processed for fingerprints or blood or saliva because it was alleged to have been placed in Mr. Jinadu's mouth. If proper police work is the hallmark of bringing a suspect before the court, this case must certainly fail or fall short of a good arrest. The information of

Ms. Hillard was never enough to warrant an arrest of the defend-
ant in this case. It is evident that where the crime took place
was a drug house from all the paraphernalia ovserved by the first
officer at the scene of the crime. Furthermore, even the victim
intimated that the individuals involved requested drugd as well
as money, and since his ex-wife was a party to this crime, it
stands to reason that she knew that Jinadu had access to drugs.
The prosecutor being aware of these facts, and the defense coun-
sel, should have brought out this information to the trial court
so as to assess whether the gun in question was a product of a
past drug buy or was it in fact involved in the crime??? Thereby,
informing the court that the gun charge was not in and of itself
solid enough to remove this defendant from his home on the pre-
texts of stealing his sister's gun. It was merely a means of
getting the defendant to an environment which the police control.
Once in that station no citizen can stand the test of challenging
his involvement in a crime due in part to the victim's need for
revenge. The general discription given to the officers was so
far out that know reasonable police could have used it as a means
of executing an arrest.

A Circuit Court's ruling on a motion to quash arrest and
suppress evidence generally involves the determination of facts
and assessment of the credibility of the witness. A ruling pre-
mised on these determinations is subject to reversal on appeal
only where manifestly erroneous. **People v. Saechao,** 129 Ill.2d 522,
534, 136 Ill.Dec. 59, 544 N.E.2d 745(1989). Since this leave to
appeal involves purely a question of law accordingly review by
this Honorable Court is de novo. **People v. Krueger,** 175 Ill.2d 60.

Though in the instant case there was no warrant for the defendant's arrest; there existed no exigent circumstances, and there was no need to worry about danger or the destruction of evidence. These officers had several options: 1) to obtain a warrant; 2) simply question the defendant before arresting him; and arrest the known offenders whereby to get information to see if in fact this defendant was a part of the criminal plan. By not utilizing these options or any of the proper means of arresting a person, the arresting officers here efforts was far less then proper and the Circuit Court and/or the Appellate Court should have dismissed this case and the charges against this defendant.

In Wilson v. Arkansas, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed. 2d 976(1995), (183 Ill.2d 22) the United States Supreme Court held that the reasonable inquiry required by the Fourth Amendment includes whether the police knock and announce their office prior to gaining entry pursuant to a search warrant. Surely, without a search warrant or a warrant for the arrest of an individual, places a far greater restraint on our law enforcement officers??? Here, the police knocked and the door was opened by the defendant's girl friend; but she never gave them permission to enter the dwelling. (T.R,B-22)  Officer Bradley stated while on the witness stand that he enterred the dwelling because of the Black male standing behind the female. (T.R. B-22)

Again in Wilson, (supra) the Court found that failure of the police to knock and announce their office prior to executing a warrant is presumptively unreasonable. However, the Court regoginzed that an announcement is not constitutionally required in every case and certain circumstances may justify an unannounced entry.  The Court declined to catalogue all such circumstances,

9.

but noted that an unannounced entry may be reasonable where officers have reason to believe there exists a threat of violence or that evidence would likely be destroyed upon an unannounced entry. In the present case procuring a warrant would have satified all of this.

Even given the reasoning of Officer Bradley as to why they enterred the defendant's home was not in and of itself enough to arrest the defendant for the gun theft, nor hold him and place him in a line up without him knowing the reason why. However, when the state conceded that the arrest took place in the apartment (T.R.B-80) that was an admission to the fact that the arrest was not proper and should have been quashed. Where is the very reason that the state did not charge him with the theft of the gun in the first place but merely used it as a means to obtain a suspect and step on every right he might have to be free from seizure without probable cause.

To add injury to insult the state goes on to argue the relevancy of the aftermath of the illegal arrest as proper police procedure. None of the action that followed the illegal arrest can be deemed correct and the conviction must be reversed. Without charging the defendant with the gun the police abused it authority by detaining him in their custody. Placing him in a line up and charging himwhere there was such a limited discription that it could fit every other black man in the city of Chicago.

[187 Ill.2d 204] Both the United States Constitution and the Illinois Constitution protect individuals from unreasonable searches and seizures. People v. Williams,164 Ill2d 1,11, 206 Ill. Dec. 592, 645 N.E.2d 844(1994); U.S. Const. amends. IV,X IV;Ill.

Const.1970, art.1,§6. In order for a warrantless arrest to be law-
ful under these constitutional provisions, police must have " '
"knowledge of facts which would lead a reasonable man to believe
that a crime has occured and that it has been committed by the
defendant." ' " People v. Jones,156 Ill.2d 225,237,189 Ill.Dec.
357,620 N.E.2d 325(1993); quoting People v Wright, 111 Ill.2d 128
145, 95 Ill.Dec. 787, 490 N.E.2d 640(1985); quoting People v.
Eddmonds, 101 Ill.2d 44,60,77 Ill.Dec 724, 461 N.E.2d 347(1984);
People v. Kidd,175 Ill.2d 1, 22, 221 Ill. Dec. 486, 675 N.E.2d 910
(1996). " ' " In dealing with probable cause, * * * the Court deal
with probabilities. These are technical; they are factual and
practical considerations of everyday life on which reasonable and
prudent men, not legal technicians act." [citation].' " Kidd,
175 Ill.2d at 24,221 Ill.Dec. 486, 675 N.E.2d 910, quoting Peo-
ple v. Wright, 111 Ill.2d*35 128,146,95 Ill.Dec.787, 490 N.E.2d
640(1985). [240 Ill.Dec. 554] In determining whether police had
probable cause to make an arrest, courts examine facts known to
police at the time the arrest was made. People v. Robinson 167
Ill2d 397, 405,212 Ill.Dec.675, 657 N.E.2d 1020(1995). It has been
shown that the only information known by any officer was that the
gunon the crime scene belone to a Ms. Hillard, who stated that her
brother probably stole it. There was no fingerprints, blood or
any other evidence to warrant the arrest. " When officers are
working in concert, probable cause can be established from all
the information collectively received by the officers even if
that information is not specifically known to the officer who
makes the arrest." People v. Bascom, 286 Ill.App.3d 124, 127, 221
Ill.Dec. 629, 675 N.E.2d 1359(1997).

A defendant has the burden of demonstrating illegal search or seizure. **Kidd**, 175 Ill.2d at 22, 221 Ill.Dec. 486,675 N.E.2d 910. In reviewing a ruling on a motion to supress, a reviewing court may consider evidence presented at trial as well as evidence presented at the suppression hearing. **People v. Sims,** 167 Ill.2d 483, 500, 212 Ill.Dec.931, 658 N.E.2d 413(1995). When the circuit court's ruling on such a motion involves factual determinations and credibility assessments, it will be reversed on appeal only when manifestly erroneous. **People v. Wright** 183 Ill.2d 16,21, 231 Ill.Dec. 908,697 N.E.2d 693(1998). De novo review is appropriate,[187 Ill.2d 205] however, when there are no factual or credibility disputes, the reviewing court must look at all available evidence and information.

Even given the totality of the information the arrest and detention fall far short of established law. There must be some indicia of reliability in order to establish probable cause. In Illinois, information received by the police from third parties must be justified by some indicia of relibility in order to establish probable cause. **People v. Morris,** 229 Ill.App.3d 144, 158, 171 Ill.Dec. 112, 593 N.E.2d 932(1992). Probable cause is defined as facts and circumstances that would prompt a reasonable person to believe that an offense has been committed and that the accused committed the offense. **Morris,** 229 Ill.App.3d at 158,171 Ill.Dec.112, 593 N.E.2d 932. <u>It should be duly noted that none of this was present in the case before the court,the only facts that the officers had were minimal at best.</u> Probable cause may be determines by the totality of the circumstances. **Illinois v. Gates,** 462 U.S. 213,234,103 S.Ct.2317,2329,76 L.Ed2d 527,545(1983). The action taken in this case can only be discribed as a complete miscarriage of justice, and it is up to this Honorable Court to set right the wrong committed against this defendant.

The defendant here ask that this Court view this action as a plain error. (Affidavit attached)"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This rule delineating the plain error exception is, however, used "sparingly." See United States v. Frady, 456 U.S. 152,163 n.14, 102 S.Ct.1584,71 L.Ed.2d 1(1985), the Supreme Court authorized the court's of appeals to correct "only particularly egregious errors," those that "seriously affect the fairness, integrity or public reputation of judicial proceedings." Id, at 15 (quoting United States v. Atkinson,297 U.S. 157,160,56 S.Ct.391, 80 L.Ed. 555(1936)).

When reviewing for plain error a court should consider on a case-by-case basis, "the obviousness of the error, the significance of the interest protected by the rule that was violated, the seriousness of the error in the particular case, and the reputation of the judicial proceedings if the error stands uncorrected..." United States v. Thame,846 F.2d 200,205(3d Cir.1988). The definitive goal is the prevention of manifest injustice. Government of the Virgin Islands v.Smith,949 F2d 677,681(3dCir.1991).

13.

IT WAS ERROR FOR CODEFENDANT'S COUNCEL
TO CROSS EXAMINE THE VICTIM IN FRONT OF
DEFENDANT'S JURY WHERE DEFENDANT AND CO-
DEFENDANT HAD ANTAGONISTIC DEFENSE...

Our Appellate Court seem to have misunderstood the gist of the defendant's argument concerning this issue. Mr. Jinadu, would state that he was rob, but the problem with questioning him in front of the defendant's jury was due to the fact that he knew that his ex-wife was the main planner alone with her boyfriend. So when the Codefendant's counsel questions him in front of the defendants jury there is a probability that they could equate his answers as relating to every individual involved. Especially, where the victim could not in no wise actually see the defendant as being one of the individual involved where he states that he was hit on the head upon entering the house. He saw his ex-wife and her boyfriend. Here as well as the evidence is where a little bit of common sense must prevail. Any reference to the defendant while cross examination of the victim in front of his jury is prejudicial where the defendant is claiming that he do not know these people and had no association with them. The fact of the matter is that not one of the codefendant ever mentioned that the defendant here was involved.

When a trial court has severed the defendants, it is the duty of that court to use every precaution not to prejudice the other's jury against him. For the trial court to allow the cross examination of the victim in front of this defendant's jury was a very bad act. Where the judge is not the jury it should not be his determination as to what will influence the virdict and therefore, can not imphatically assess the outcome of information obsorbed by them. In all actuality the trial court should have removed the defendant's jury, if only to protect the integrity of the trial itself.

THE TRIAL COURT IMPERMISSIBLY ACTED AS AN ADVOCATE
WHERE HE QUESTIONED A WITNESS IN ORDER TO CLARIFY
CODEFENDANT'S ALIAS NAMES.

" A trial judge has the right to question witnesses in order
to elicit the truth or to bring enlightenment on material issues
which seem onscure." People v. Wesley,18 Ill.2d 138,154-155,163 N.E.
2d 500(1959). In the case at bar the trial judge's asking for clarity
as to the many names of the codefendant was innocent enough, but when
but when the court made the statement such as "I don't see how that
affects Mr. Hillard at all." There was no enlightenment in that state-
ment at all, as a matter of fact it could have prejudiced the defend-
ant, by giving the impression that the court has decided that the
evidence was so overwhelmimg as to the defendant there was in no wise
any harm in making the statement. The jury may have preceived such
from the statement and did not listen to any of the evidence which
was in favor of the defendant.

This is a plain error and the burden rest upon this Court to
protect a criminal defendant from any miscarriage of justice by a
remark made by a lower court. It is improper for a judge to assume
the role of an advocate.People v.Hopkins,29 Ill.2d 260,265(1963);
People v. Bernstein, 250 Ill. 63,67,(1911); or to suggest through
comments or questions an opinion regarding the facts of the case or
credibility of witnesses(People v. Marino,414 Ill.445,450(1953)).The
appropriate scope of questioning by the court dependa on the facts
and circumstances of the case and lies largely within the trial
judge's discretion. People v.Williams,173 Ill.2d 48,79(1996);People
v. Nevitt, 135 Ill.2d423,456(1990);People v. Trefonas,9Ill.2d 92,100
(1956). In this situation before the Court the trial judge went be-
yond the scope of judge and chose the role of an advocte because
the alias names of the codefendant was of no material value.

15

Nothing in the course of this trial warranted the commet from the judge and the comment went beyond mere questioning to infer the court's opinion.

## CONCLUSION

For the reasons stated herein the petitioner, <u>Tony Hillard,</u> prays that this Honorable Court allow him Leave to Appeal and reverse the decision of the lower courts as a matter of an issue of grave miscarriage of justice.

Respectfully submitted,

_____

Tony Hillard

16.

File Date: _____ 7-1-2008 _____

Case No: _____ 08 cv 1775 _____

ATTACHMENT # _____

EXHIBIT _____ G to J _____

TAB (DESCRIPTION)

_____

## STATE OF ILLINOIS
## SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday, the tenth day of September, 2001.

Present: Moses W. Harrison II, Chief Justice
Justice Charles E. Freeman          Justice Mary Ann G. McMorrow
Justice Thomas R. Fitzgerald        Justice Robert R. Thomas
Justice Thomas L. Kilbride          Justice Rita B. Garman

On the third day of October, 2001, the Supreme Court entered the following judgment:

No. 91958

People State of Illinois,

    Respondent

    v.

Tony Hillard,

    Petitioner

Petition for Leave
to Appeal from
Appellate Court
First District
1-99-0152
97CR30453

The Court having considered the Petition for leave to appeal and being fully advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the records, files and Seal thereof, I certify that the foregoing is a true copy of the final order entered in this case.

IN WITNESS WHEREOF, I have hereunto
subscribed my name and affixed the Seal
of said Court, this twenty-fifth day
of October, 2001.

Clerk,
Supreme Court of the State of Illinois

EXHIBIT G

IN THE

CIRCUIT COURT OF COOK COUNTY

COUNTY DEPARTMENT-CRIMINAL DIVISION

**RECEIVED**

AUG 2 3 2001

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,) | | |
| Respondent, ) | PETITION FOR POST-CONVICTION RELIEF | |
| vs. ) | | |
| ) | Case No. <u>97-CR-30453</u> | |
| TONY HILLARD, ) | | |
| Petitioner. ) | Honorable <u>Michael Toomin</u> | |
| | Judge presiding | |
| ) | | |

### NOTICE OF FILING

To: Dorothy Brown, Clerk                    Richard Devine
    2650 So. California Ave.              2650 So. California Ave.
    Chicago, Illinois                    Chicago, Illinois
            60608                                60608

I, <u>Tony Hillard,</u> will have caused the attached Petition
For Post-Conviction Relief to be filed in the Clerk's Office
of the Cook County Circuit Court on <u>3- 18</u> ,2001.

Signed: _____

### PROOF OF SERVICE

PLEASE BE ADVISED that I will have caused an accurate copy
of the attached Petition For Post-Conviction Relief to be served
upon both parties mentioned aboved. This was accomplished by pla-
cing the same in the hand of a correctional officer at the Men-
ard Correctional Center, P.O. Box 711, Menard, Ill. 62259,on
August _15_, 2001, with postage being prepaid at the same.

Signed: _____

**Subscribed and sworn to before**

**me this /8 day of August, 2001**

_____
Notary public

"OFFICIAL SEAL"
PATRICIA LUERS
Notary Public, State of Illinois
My Commission Exp. 12/15/2004

**FILED**

AUG 27 2001

DOROTHY BROWN
CLERK OF CIRCUIT COURT

EXHIBIT H

IN THE

CIRCUIT COURT OF COOK COUNTY

COUNTY DEPARTMENT-CRIMINAL DIVISION

**RECEIVED**

AUG 2 3 2001

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, )

        Respondent,         )

vs.                      )

TONY HILLARD,

        Petitioner.        )

                        )

PETITION FOR POST-CONVICTION

Case No. <u>97-CR-30453</u>

Honorable <u>Michael Toomin</u>
               Judge presiding

## MOTION FOR LEAVE TO FILE AND PROCEED IN FORMA PAUPERIS

Now comes the petitioner, <u>Tony Hillard,</u> pro se., and pursuant 725 ILCS 5/122, and moves this Honorable Court to allow him to proceed on this cause In Forma Pauperis.

In support of this request the petitioner states:

1.) That he is in custody of the State of Illinois, Department of Corrections, at the Menard Correctional Center, P.O. Box 711, Menard, Illinois, 62259.

2.) That the petitioner is without funds, assets, both personal or real property to defray the cost of the proceedings on the attached Petition For Post-Conviction Relief.

3.) The petitioner has no viable means of income to pay said cost.

WHEREFORE, the petitioner, **TONY HILLARD**, prays that this Honorable Court will enter an order granting him the opportunity to proceed In Forma Pauperis.

Signed: _Tony Hillard_

**FILED**

AUG 2 7 2001

**DOROTHY BROWN**
CLERK OF CIRCUIT COURT

C000 3

IN THE
CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

**RECEIVED**

AUG 2 3 2001

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| Respondent, ) | PETITION FOR POST-CONVICTION |
| vs. ) | |
| TONY HILLARD, ) | Case No. <u>97-CR-30453</u> |
| Petitioner. ) | Honorable <u>Michael Toomin</u> |
| | Judge presiding |
| ) | |

---

## MOTION FOR APPOINTMENT OF COUNSEL

NOW comes the petitioner,<u>Tony Hillard,</u> pro se., requesting this Honorable Court to enter an order appointing counsel to represent him in this cause.

In support of this request the petitioner states:

1.) That he is incarcerated at the Menard Correctional Center, P.O. Box 711, Menard, Ill. 62259.

2.) That I am without funds or assets to defray the cost of hiring my own attorney to represent me in these proceedings.

3.) I realize that it is important to have representation in a matter such as this and believe I have a meritorious claim.

WHEREFORE, the petitioner, **Tony Hillard,** prays that this Honorable Court issue an order to appoint counsel to represent him in this cause.

Respectfully submitted,

_Tony Hillard_
Tony Hillard

**FILED**

AUG 2 7 2001

DOROTHY BROWN
CLERK OF CIRCUIT COURT

C00014

IN THE

CIRCUIT COURT OF COOK COUNTY

COUNTY DEPARTMENT-CRIMINAL DIVISION

**RECEIVED**

AUG 2 3 2001

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Respondent, | ) | PETITION FOR POST-CONVICTION |
| vs. | ) | |
| | ) | Case No. 97-CR-30453 |
| TONY HILLARD, | ) | Honorable Michael Toomin |
| Petitioner. | ) | Judge presiding |
| | ) | |

## PETITION FOR POST-CONVICTION RELIEF

NOW COMES, the petitioner, TONY HILLARD, pro se., and pur-
suant to the Illinois Post-Conviction Act, **725 ILCS 5/122-1** and
moves this Honorable Court to vacate the judgment entered at the
time of sentencing _Oct. 26, 1998_, in the Circuit Court of
Cook County, on the jury verdict of guilty to the charges of,
armed robbery, aggravated kidnaping, armed violence and aggra-
vated battery, in connection with the indictment number listed
above 97-CR-30453, and grant petitioner a new trial.

IN **SUPPORT THEREOF**, petitioner states as follows:

1.) That petitioner's current address is: Reg. No. B-58149, at
the Menard Correctional Ceneter, P.O. Box 711, Menard, Ill. 62259.

2.) That petitioner was sentenced to fifty (50) years in the
Illinois Department of Corrections by judge Michael Toomin, on
_Oct. 26, 1998_.

3.) That petitioners rights were violated under the United States
Constitution and the Illinois Constitution in the following man-
ner:

**FILED**

AUG 2 7 2001

DOROTHY BROWN
CLERK OF CIRCUIT COURT

A.) Petitioner's constitutional rights to the effective assistance of counsel was violated where trial counsel did not investigate the evidence presented against the petitioner during a motion hearing to suppress or quash the assrest.

RECEIVED
AUG 2 8 2001
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

The United States Supreme Court, in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052(1984) established that the Sixth Amendment principles have a place in collaterial petitions for ineffective assistance of counsel purposes. The Court fashioned a two-prong test to ascertain whether counsel representation fell below the require standard of reasonableness. The first prong rests on the Sixth Amendment's requirement for effective assistance of counsel. The Court defineds this as the "reasonableness test under the prevailing professional norms." The Court declined to be more specific with this definition because:

> "In any case presenting an ineffectiveness claim the performance inquiry must be whether counsel's assistance was unreasonable considering all the circumstances."

In the case at bar the issue being presented is whether the trial counsel's failure to investigate deprived the petitioner of a fair trial: " The principle [the duty to investigate] is so fundamental that the failure to conduct a reasonable pre-trial investigation may in itself amount to ineffective assistance of counsel." The duty to investigate is part of a defendant's right to reasonably competent counsel.

The reason why counsel failure to investigate is so inherently egregious that counsel's performance fell below the required standards of competent representation. The defendant's sister was mentioned as the catalyst by which this petitioner was implicated. However, if counsel had did his investigations he would have found

C000 6

that <u>Loretha Hillard</u>, (see attached) the defendant's sister did N🗸t

say that her brother(the defendant) was the one who took the gun

nor did she even suggest that he had took it.

The test for ineffective assistance of counsel is not whe-
ther the adversarial process was undermined by defense counsel's
chosen strategy but whether the process was so undermined by coun-
sel's conduct such that trial could not be relied upon as hav-
ing produced a just, i.e., reliable result. Had trial counsel
produced the defendant's sister at the hearing to quash the arrest,
in all probabilities the defendant would not have even stood
the test of trial because there was no probable cause to arrest.
The arresting officer made his choice to arrest the defendant due
in part to the alleged information he received from the defend-
ant's sister. Furthermore, he [the arresting officer] did not have
an accurate description of the  defendant to warrant an arrest. A
simple general discription that fits over one thousand individ-
uals could not be the basis for arresting an individual.

Stated another way, the defendant must establish that there
is a reasonable probability that, but for counsel's conduct, the
result of the proceeding would have been different. As stated
above the defendant believes that the results would have been
different.   Courts have repeatedly stressed the importance of..
adequate investigations of potential defenses. Without an ade-
quate investigation, it follows that the trial record will not
contain all the available evidence. For example, this court can-
not review the testimony of witnesses favorable to the defendant
who were never called. It would be hard to assess if the State's
witnesses would have been forced to tell the truth had they been
confronted with their prior inconsistent statements.

C00017

The failure by trial counsel to investigate a critical source of potentially exculpatory evidence was held to be ineffective assistance of counsel. Oftentimes, the failure by counsel to call a witness is a tactical decision, which courts will as a rule not second guess. When the decision is made not to call a witness because that witness's testimony would tend to incriminate the defendant, ineffective assistance of counsel will not be found. However, the United States Court Of Appeals for the Seventh Circuit in dealing with similar case stated that such a finding of ineffectiveness for a failure to call witnesses; noted this:

> " Once a court finds that a trial counsel's performance was constitutionally inadequate, and counsel's acts or omissions may have impaired the defense, the burden of proof is on the government/state to prove beyond a reasonable doubt that the trial counsel's ineffective assistance did not affect the verdict."

The State cannot make such a finding where the only evidence that linked this defendant to the gun or the case came from his sister, which she states in an affidavit that she did not make such a statement. If the Chicago Police who arrested this defendant would have waited to receive more information, the defendant is positive that he would not have been placed in a position where a mistake of identification would exist. The victim in this case only picked the defendant out because he (the victim) wanted someone to pay for his injuries. As is the case in many situations, a poor citizen cannot come up with an alibi as to his whereabouts, so the poor man are at the mercy of the court or a thankless and unconscious jury. Such a violation of the right to representation of trial counsel is so fundamental that a mistake of this magnitude could not be brushed off as trial strategy. Even if the court was to recognize that trial counsel has superior training it was unconscionable and this Court should hold an evidentiary hearing to reach the merits of this claim.          C0008

B.)  The petitioner was denied his Fourteenth Amendment right to
equal protection and due process where the State's Attorney used
or allowed false information to enter into the trial without try-
ing to correct it at all. The defendant here has reason to believe
that the prosecutor withheld exculpatory evidence from the defense
counsel pertaining to the ownership of the gun recovered at the
scene of the crime. It was determined that the gun was registered
to the defendant's sister. Once the officers was armed with this
information about the registration of the gun, the arresting of-
ficer(Vernon Bradley), allegedly phoned LORETHA HILLARD,and she
stated: "she said that the gun had been taken and that if anyone
took the gun it would be her brother, Tony Hillard."
In all actuality this would have been a very good state witness,
because she could put the gun in the hand of her brother. But for
reasons unknown the prosecutor never called her as a witness and
in all probabilities the defense never knew about this or if he
did, he allowed it to go uncontested. The affidavit attached is
proof positive that the officer lied on the witness stand and that
the prosecutor suborned that lie. There is no way to tell if the
prosecutor had her on their list of witnesses.

     The defendant believes that he should have been informed
about the contents of the alleged phone call long before it was
produced at the hearing to quash arrest. This information is so
important that the defendant is reasonably sure that if the attached
affidavit was disclosed the arrest itself would have been quashed.
The only evidence that linked the defendant to this case is that
of the gun and the alleged statement to the police by his sister.
It necessarily follows that if the omitted evidence creates a
reasonable doubt that did not otherwise exist, constitutional
error has been committed. This means that the omission must be

C000'9

evaluated in the context of the entire record. If there is no

reasonable doubt about guilt whether or not the additional evi-

dence is considered, there is no justification for a new trial.

On the other hand, if the verdict is already of questionable

validity, additional evidence of relatively minor importance

might be sufficient to create a reasonable doubt. Our Supreme

Court in dealing with whether a defendant received a fair trial

mandated by the Due Process Clause of the Fifth Amendment to the

Constitution. Our construction of that clause in the Fourteenth

Amendment applicable to trials in state courts.

There are a few problems which the defendant concede to.

First, in advance of trial, and perhaps during the course of a

trial as well, the prosecutor must decide what, if anything, he

should voluntarily submit to the defense counsel. Second, after

trial a judge may be required to decide whether a nondisclosure

deprived the defendant of his right to due process. Logically the

same standard must apply at both times. For unless the omission

deprived the defendant of a fair trial, there was no constitut-

ional violation requiring that the verdict be set aside; and ab-

sent a constitutional violation, there was no breach of the pro-

secutor's constitutional duty to disclose. In the case before the

bar the defendant was denied a fair trial where the information

held by the prosecutor could have brought about a different ver-

dict. Furthermore, the prosecutor had Ms. Hillard, as a state

witness, but never utilized as such. The best and most important

evidence at trial was the testimony of the arresting office as

he related to the trier of fact, that the defendant's sister said

FILED

AUG 27 2001

DOROTHY BROWN
CLERK OF CIRCUIT COURT

6.

RECEIVED

AUG 2 9 2001

CLERK OF THE CIRCUIT
CRIMINAL DIVISION

that "if any one stole her gun it was her brother." This being
the most damaging piece of information/evidence it is incumbent
upon this court to proceed to an evidentiary hearing to ascertain
the truth. The gun was never finger printed to see if in fact the
defendant's prints were on it. Afterall, if the defendant was so
lacks as to leave his sister's stolen gun at the scene of a rob-
bery, surely he would not wiped the fingerprints off the gun to
make it easier to arrest and convict him.

Where the standard of review under the Post-Conviction Act
are well pleaded facts in the petition and supporting affidavits
are to be taken as true, then this Petition should at least go
beyond the summarial dismissal stage and proceed to an evidentiary
hearing.

WHEREFORE, the defendant **Tony Hillard**, prays that this
Honorable Court will grant him the opportunity to proceed with
this Post-Conviction Petition to bring about the truth as to
the commission of the charged offense.

Respectfully submitted,

Tony Hillard

STATE OF ILLINOIS )
                  )SS:
COUNTY OF RANDOLPH )

**F I L E D**

AUG 2 7 2001

**A F F I D A V I T**

**DOROTHY BROWN**
CLERK OF CIRCUIT COURT

I, **Tony Hillard,** being first duly sworn upon my oath that I
have read and understood the above Petition For Post-Conviction
Relief. All of the facts presented in this Petition are true and
correct to the best of my recollection.

**RECEIVED**

Affiant
Tony Hillard

AUG 2 3 2001  7.

**CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION**

C 00021

STATE OF ILLINOIS    )
                     )  SS
COUNTY OF  Cook      )

## A F F I D A V I T

I, _Loretha Hillard_ being first duly sworn
upon my oath depose and state that the following matters are both true
and correctly made upon my personal knowledge and belief, and if called
as a witness, I am competent to testify thereto: I Loretha Hillard
believe my weapon had been stolen out of my apt.
by an unknown person. I then lived at 1530 N.
Larrabee #408. On the day in question, around (may
be early June) 1997 I reported my weapon stolen
to the 18th district police station, which was located on
Chicago Avenue, now located on Division and Larrabee.
I went to the police station and told a police officer
my airm't weapon had been stolen a 38 Smith/Wesson
caliber, police wrote out a report on my weapon
and I received a copy. Two weeks later or so, I
received a phone call from a police officer asking
various questions about my weapon. The police officer
asked me did I have any idea who could have
stolen my weapon. I replied No, I didn't know
who could have taken my weapon. The police officer
then asked did I have any relatives that lived
in the area, I then replied, I had a number of
relatives that live in the area. The officer then
implied did I think any of my family members
would take my weapon. I replied no I know
my family would not put me in jeopardy. He then
said are I sure, I then replied, I'm positively
sure, and the conversation ended, then thank you Ms. Hillard
for your time, he will be getting back in touch with me
which he didn't. I never spoke to the [scratch] the police officer.

Subscribed and Sworn to
before me on the 26th day
of _June_ ,2001.

_Sandra Elizabeth Martell_
NOTARY PUBLIC

Respectfully submitted,

_Loretha Hillard_
AFFIANT #B85-0067-649 H

"OFFICIAL SEAL"
Sandra Elizabeth Martell
Notary Public, State of Illinois
My Commission Exp. 03/26/2005

C 00022



Clerk's Office
Appellate Court First District
State of Illinois
160 N. LaSalle
Suite 1400
Chicago, IL  60601

11/06/01

Honorable Dorothy Brown
Richard J. Daley Center
Room 1001
Chicago, IL  60602

**RECEIVED**

NOV 0 8 2001

Re: People v. Hillard, Tony
    Appellate Court No. 1-99-0152
    Trial Court No. 97CR30453

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

Dear Honorable Brown:

     Attached is the Mandate of the Appellate Court in the above entitled cause.

     We are sending the attorneys of record a copy of this letter to inform them that the mandate of the Appellate Court has been filed with you.

                              Steven M. Ravid
                              Clerk of the Appellate Court
                              First District, Illinois

**FILED**

NOV 0 9 2001

DOROTHY BROWN
CLERK OF CIRCUIT COURT

Attachment

cc: All attorneys of record

C 00023

IN THE APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

MARGARET J. O'MARA FROSSARD, Justice

Jill K. McNulty, Justice

John P. Tully, Justice

Steven M. Ravid                                    Michael F. Sheahan, Sheriff

---

On the Eleventh day of June, 2001, the Appellate Court, First District, issued the following judgment:

No. 1-99-0152
PEOPLE OF THE STATE OF ILLINOIS,                Appeal from Cook County
    Plaintiff-Appellee,                        Circuit Court No. 97CR30453
    v.
TONY HILLARD,
    Defendant-Appellant.

As Clerk of the Appellate Court, in and for the First District of the State of Illinois, and the keeper of the Records, Files and Seal thereof, I certify that the foregoing is a true copy of the final order of said Appellate Court in the above entitled cause of record in my office.



IN TESTIMONY WHEREOF, I have set my hand and affixed the seal of said Appellate Court, at this Sixth day of November, 2001.

Clerk of the Appellate Court
First District, Illinois

# RECEIVED

NOV 0 8 2001

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

C00024

FIRST DIVISION
June 11, 2001



NOTICE

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

No. 1-99-0152

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, RECEIVED | ) | |
| v. | ) NOV 0 8 2001 | No. 97 CR 30453 |
| | ) | |
| TONY HILLARD, CLERK OF THE CIRCUIT COURT CRIMINAL DIVISION | ) | Honorable Michael Toomin, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

### ORDER

Defendant Tony Hillard was convicted in a jury trial of armed robbery, armed violence, aggravated kidnaping, and aggravated battery. He was sentenced to 50 years' imprisonment. On appeal, defendant raises four issues. He contends that: (1) the trial court erred in failing to grant his motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly sentenced defendant to a consecutive sentence. We affirm.

1-99-0152

## BACKGROUND

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed and hit him on the head again with an iron object. Codefendant then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Codefendant and the man with the bat then pulled Jinadu into the bathroom, handcuffed him and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the bathroom and came back holding a pillow and the gun. Codefendant also returned to the bathroom carrying handcuffs. He and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street

-2-

C 00026

1-99-0152

where he saw the man with the baseball bat and codefendant standing across the street. Upon

seeing him, both men fled down the street.

Defendant and codefendant Walls were tried simultaneously before two juries. Prior to

trial, defendant moved for a motion to quash his arrest and suppress evidence. The trial court

denied the motion to quash finding that Detective Brady had reasonable grounds to believe that

defendant had committed the offense and that probable cause to arrest him existed. Prior to trial,

the trial court noted that both juries would be present during the cross-examination of the victim.

At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership

and eventually started his own trucking company. He met and married Delores in 1995 and they

separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10,

1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him,

Delores explained that her car was broken and asked Jinadu to pick her up at her apartment.

Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the

apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the

door he was hit on the head with a baseball bat and lost consciousness. After regaining

consciousness, Jinadu was placed in a bathtub and repeatedly beaten and threatened by the men in

the apartment. After the men left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by

a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open

head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu

showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw

-3-

C 00027

1-99-0152

hundreds of plastic bags, a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Jinadu also described the height, weight and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Crane. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven and Delores at 1121 South State Street. Codefendant Erven Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha Hillard. He called Laretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address. He went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and

-4-

C 00028

1-99-0152

defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police station and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years' imprisonment.

## ANALYSIS

Defendant first challenges the trial court's finding in denying defendant's motion to quash arrest and suppress evidence. In denying defendant's motion, the trial court noted some of the facts known to the police at the time of the arrest. We will summarize some of those facts in order to illustrate why under the totality of the circumstances known to the police officers at the time of the arrest there was sufficient information to warrant a reasonably prudent person to believe that defendant had committed a crime.

Benicia Eberhardt testified on behalf of defendant. She stated that she was in her bedroom with defendant when there was a knock on the door. She opened the door and saw three or four police officers standing in the hallway. At the time, defendant was standing a few feet behind her. She stated that the police officers pushed her out of the way, walked into the apartment and

-5-

1-99-0152

grabbed defendant. Defendant was taken into his room to put on some clothes while two officers searched the apartment. Defendant was then handcuffed and taken to the police station.

Detective Bradley testified that he spoke to the victim two days after the incident. Jinadu immediately identified his wife, Delores. He also identified codefendant Erven Walls from a drivers license which was found in the apartment on the day of the incident. He identified Walls as his wife's boyfriend who he had seen on previous occasions. Jinadu also gave Detective Bradley the physical description of the other three offenders. He described them as being in their twenties. One offender was 5'11" and weighed 200 lbs with black hair and brown eyes. Another offender was 5'11", 165 lbs. Finally, the last offender was approximately 5'5", 145 lbs with brown eyes and black hair. Detective Bradley testified that one of the guns found in the apartment was registered to Loretha Hillard. He called Ms. Hillard and spoke to her on the telephone. Ms. Hillard informed Detective Bradley that she was an ex-security guard for the Chicago Housing Authority. She further told Detective Bradley that her gun had been taken and that the only person who would have taken it was her brother, Tony Hillard. Ms. Hillard told Detective Bradley the address and apartment number of where defendant and his girlfriend lived. Detective Bradley, along with other police officers, went to the address given to him by Ms. Hillard. They knocked on the door and it was opened by Benicia Eberhardt. Detective Bradley stated that he told the woman that he wanted to speak to defendant. Standing behind her was a man who fit the general description of one of the offenders which Jinadu had given to the officers.

When asked to identify himself, defendant gave Detective Bradley a fictitious name. Detective Bradley then asked him why he stole his sister's gun. Defendant replied that he did not

-6-

C 00030

1-99-0152

take his sister's gun. He was then asked to accompany the police officer's to the police station to discuss the theft of his sister's gun. Defendant said that he would go but that he had to put on his shirt and shoes. Detective Bradley followed defendant into one of the bedrooms where he told detective Bradley that his name was Tony Hillard. Defendant was taken to the police station where he was later identified by Jinadu as one of the offenders. Detective Bradley further testified that at the time of the arrest defendant was 21 years old with black hair, brown eyes, was 5'11" and weighed 170 lbs.

We note that defendant's reliance on *People v Johnson*, 94 Ill. 2d 148 (1983) and *People v. Wilson*, 260 Ill. App. 3d 364 (1994), is not applicable to the factual scenario in this case. Both *Wilson* and *Johnson* stand for the proposition that a warrantless arrest based on an informant's tip must be sufficiently reliable and corroborated so as to provide probable cause. However, the situation in this case is not governed by that principle. Here, the basis for the probable cause did not center around an informants tip but rather was based on the information from Ms. Hillard which provided a link between the stolen gun and defendant and helped the police to locate defendant. That link, however, was not the sole basis of the arrest. In addition to that information once the police were at the specific location provided by Ms. Hillard, defendant fit the description given to them by the victim.

Both the United States and the Illinois Constitutions govern the conduct of police officers in performing warrantless arrests. U.S. Const., amends. IV, XIV; Ill. Const. 1970 art. I, §6; *People v. Buss*, 187 Ill. 2d 144 (1999). These constitutional provisions allow the police to make a warrantless arrest but only if the police have knowledge "which would lead a reasonable man to

-7-

C 00031

1-99-0152

believe that a crime has occurred and that it has been committed by the defendant." *People v. Robinson*, 167 Ill. 2d 397, 405 (1995). In reviewing a probable cause challenge, the court does not apply bright-line legal rules but evaluates the police conduct in accordance with practical, every-day principles. *People v. Kidd*, 175 Ill. 2d 1, 22 (1996).

Probable cause for an arrest exists when the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. *People v. Lumpp*, 113 Ill. App. 3d 694 (1983). The court determines under the totality of the circumstances whether the evidence available to the arresting officer at the time of the arrest provides a reasonable basis for the officer to believe that the suspect committed an offense. *People v. Dizon*, 297 Ill. App. 3d 880, 885 (1998). The question is whether a reasonable person in the police officer's position would have believed that the defendant committed a crime. *People v. Adams*, 131 Ill. 2d 387, 398 (1989). Moreover, although the standard for determining whether probable cause existed for a warrantless arrest requires more than a mere suspicion on the part of the police officers, it does not require arresting officers to have in their hands evidence sufficient to convict the defendant. *Dizon*, 297 Ill. App. 3d at 885. A general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. *People v. Robinson*, 299 Ill. App. 3d 426, 431 (1998).

When defendant solely challenges the trial court's legal conclusions for denying a motion to quash arrest and suppress evidence, as in this case, our review is *de novo*. *People v. Wright*, 183 Ill. 2d 16, 21 (1998).

-8-

C 00032

1-99-0152

In applying the above principles to the present case we conclude that based on the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. The police officers were there as part of their investigation of a vicious beating and armed robbery. They had recovered a .38 caliber gun from the apartment which led them to defendant's apartment based on information which was provided by his sister. She reported that the gun was stolen from her home and informed the officers that she believed the person who stole it was defendant. She also provided the officers with defendant's name, address and apartment number. Thus, the gun found at the scene of the crime was linked to defendant. Armed with Jinadu's descriptions of the offenders and Ms. Hillard's information, the police were able to locate defendant at the exact address provided to them. Moreover, upon seeing defendant the officers realized that he fit the general description of one of the offenders. Jinadu had described one of the offenders as a black man that was 5'11" and weighed 165 lbs. He further stated that all of the offenders were in their twenties. At the time of the arrest defendant was 21 years old, was 5'11" and weighed 170 lbs. These characteristics where similar to those described by the victim. Further, when asked whether he was Tony Hillard, defendant lied and gave the officers a fictitious name. He later admitted that he was Tony Hillard. The general description of the offenders, coupled with other specific facts and circumstances provided by Ms. Hillard as well as defendant's behavior in the apartment, was sufficient to lead a reasonably prudent person to conclude that there was a reasonable probability that defendant was one of the offenders.

Defendant's second point of contention revolves around the fact that the trial court

-9-

1-99-0152

allowed codefendant Walls' counsel to cross-examine Jinadu in front of defendant's jury. Defendant maintains that because the defenses were antagonistic the cross-examination prejudiced defendant's jury. Here, both defendant and codefendant were tried simultaneously before separate juries. Prior to trial, both defense attorneys filed a motion for severance on the unlawful use of a weapon by a felon count which the trial court granted. During the trial, the trial court severed the cross-examination of Detective Bradley. Defendant argues that the trial court should have also severed the cross-examination of Jinadu. Defendant argues that during the cross-examination of the victim by codefendant's attorney, the victim named defendant as one of the offenders thus prejudicing defendant. Specifically, Jinadu stated that one of the offenders that pointed a gun at him was defendant.

As a general principle of law, defendants who are jointly indicted are jointly tried unless fairness to one of the defendant's requires a separate trial to avoid prejudice. *People v. Lee*, 87 Ill. 2d 182, 187 (1981). Prejudice exists where "a co-defendant takes the stand to point a finger at the defendant as the real perpetrator of the offense." *Lee*, 87 Ill. 2d at 187. Furthermore, the mere apprehension of prejudice is not enough to conduct separate trials; there must be actual hostility between the defendants in order to necessitate separate trials. *People v Bean*, 109 Ill. 2d 80, 92 (1985). Severance is not required when codefendants' defenses are merely contradictory. *People v. Rice*, 286 Ill. App. 3d 394 (1996), citing *People v. Lovelady*, 221 Ill. App. 3d 829, 836 (1991). The decision to grant a severance is within the sound discretion of the trial court and an appellate court will not reverse a trial court's ruling absent an abuse of discretion. *People v. Fornear*, 283 Ill. App. 3d 171 (1996).

-10-

C 00034

1-99-0152

In this case, defendant and codefendant did not implicate each other as the perpetrators of the crime. Defendant presented an alibi defense. As defendant points out in his brief his defense was simply that he was not present at the time of the incident. Codefendant Walls' defense, on the other hand, was one of reasonable doubt. The trial court stated, in replying to defense counsel's assertion that codefendant would implicate defendant through cross-examination of the victim:

> "How does that help Mr. Wall's to point the finger at Mr. Hillard. I will wait and see if you do it. Then I'll move the jury out. I don't know why somebody who says their client wasn't there has to point the finger at another defendant and say he was there. That doesn't establish that your guy wasn't there.

> ***

> We'll have to wait and see if it happens. If it happens, I'll move the jury out to protect whatever defendant's right have to be protected. To me, this is nonsense. It's a lot of fiction that one has to point the finger to make a separate cross-examination and represent to me, I'm going to pin it on this guy in front of his jury, when it doesn't make any sense or rhyme, reason or rationale why she would do that if her client wasn't there. But, I'll hear it when I hear it."

The record in this case indicates that during the cross-examination of Jinadu by codefendant Walls' attorney there is one isolated instance in which Jinadu stated that defendant was one of the offenders who pointed a gun at him. This single reference, however, was a repetition of Jinadu's testimony on direct examination where Jinadu testified that defendant pointed a gun at him, placed the gun in Jinadu's mouth, ordered him to reveal where he kept his money, helped codefendant Walls bind Jinadu's legs and hands, placed a pillow on Jinadu's face and filled the bathtub with water. As the trial court correctly noted, the necessity of removing the

-11-

C00035

1-99-0152

jury due to an antagonistic defense did not arise in this case. Jinadu's testimony on cross-examination did not create an antagonistic defense but was cumulative of his direct testimony.

Moreover, the record indicates that the remainder of the cross-examination by counsel for codefendant Walls consisted of a series of questions designed to create a reasonable doubt that Walls was not one of the perpetrators. It did not revolve around implicating defendant as the main perpetrator. In addition, during closing arguments, codefendant's counsel argued reasonable doubt as opposed to placing the blame on defendant. In fact, defense counsel stated, "I don't know if Mr. Hillard was involved in that, in this case or not ***." Defense counsel then proceeded to attack the credibility of Jinadu and the inconsistencies in his testimony.

This court has clearly stated in *Rice* that the requirement for actual hostility which necessitates severance "is not met where, for example, one defendant claims an alibi defense and the other defendant asserts a reasonable doubt, but at no time do the defendants become rivals or accuse each other." *Rice*, 286 Ill. App. 3d at 402. Such is the situation in the present case. Given that the defenses were not antagonistic to each other and that defendant has failed to show any prejudice which resulted from Jinadu's single reference to defendant during cross-examination, the trial court correctly ruled in denying severance.

Defendant's final contention is one which he does not have standing to raise. Standing is met when: (1) the proponent of a particular legal right alleges an injury in fact; and (2) the proponent asserts his own legal rights and interests, rather than basing his claim for relief upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *People v. Bond*, 205 Ill. App. 3d 515 (1990). Here, defendant argues that it was judicial error for

-12-

C 00036

1-99-0152

the trial court to question Detective Bradley as to whether codefendant Walls and Jermaine Craine
were the same person. Defense counsel objected to the court's questioning to which the trial
court replied, "[I] don't see how that affects Mr. Hillard at all." We agree with the trial court that
the trial court's questions regarding identification of Walls and Craine as the same person, did not
impact defendant Hillard or any of Hillard's legal rights. Defendant has failed to articulate how
the trial court's actions caused defendant an injury in fact. As such, defendant's claim lacks
standing for purposes of this appeal.

In a supplemental argument, defendant contends that the trial court erred in sentencing
him to a consecutive sentence pursuant to section 5-8-4(a) where the sentence violated his
constitutional right to due process and trial by jury according to the recent holding in the Supreme
Court case *Apprendi v. New Jersey*, 530 U.S. 466, 490,147 L. Ed. 2d 435, 455,120 S. Ct. 2348,
2363-67, (2000) In *Apprendi*, the U.S. Supreme Court held that "[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530
U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The trial court determined that the
crime was motivated by bias based on race and therefore increased the defendant's sentence. The
*Apprendi* Court concluded that it is unconstitutional, and a violation of a defendant's due process
rights, for a legislature to remove from the jury the assessment of facts that increase the
prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at
490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In this case the trial judge sentenced defendant
under 730 ILCS 5/5-8-4(a), which calls for the imposition of consecutive sentences in cases of

-13-

1-99-0152

multiple convictions arising out of a single course of conduct if one of the offenses is either a

Class 1 or Class X felony and the court finds that the defendant inflicted severe bodily injury.

Section 5-8-4(a) states in pertinent part:

> "The court shall not impose consecutive sentences for offenses
> which were committed as part of a single course of conduct during
> which there was no substantial change in the nature of the criminal
> objective, unless, one of the offenses for which defendant was
> convicted was a Class X or Class 1 felony and the defendant
> inflicted severe bodily injury ***." 730 ILCS 5/5-8-4(a) (West
> 1998).

Recently, in *People v. Wagener*, our supreme court held that *Apprendi* concerns are not

implicated by consecutive sentencing. *People v. Wagener*, No. 88843, slip op. at 14 (June 1,

2000). Noting that consecutive sentences remain discrete and do not transmute into a single

sentence, the *Wagener* court determined that consecutive sentences cannot run afoul of *Apprendi*,

as that case only addresses sentences for individual crimes. *Wagener*, slip op. at 14-15.

Accordingly, the *Wagener* court concluded that section 5-8-4(b), which allows the imposition of

consecutive sentences where the sentencing court is of the opinion that such a term is necessary to

protect the public from further criminal conduct by the defendant, passes constitutional muster.

*Wagener*, slip op. at 15. Following the reasoning of *Wagener*, we conclude that section 5-8-4(a),

under which defendant was sentenced, also passes constitutional muster. Thus, we affirm the trial

court's order imposing consecutive sentences.

For the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, J., with McNULTY, P.J., and TULLY, J., concurring.

-14-

ASA

STATE OF ILLINOIS          )
                           )
COUNTY OF COOK             )

IN THE CIRCUIT COURT OF COOK COUNTY
ILLINOIS COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,     )
                                     )
               Respondent.           )
                                     )    No. 97-CR-30453
        vs.                          )    Judge: Michael Toomin
                                     )
TONY HILLARD,                        )
                                     )
               Petitioner.           )

## PETITIONER TONY HILLARD'S SUPPLEMENTAL PETITION

**NOW COMES,** Petitioner, **TONY HILLARD**, by his attorney, **EDWIN A.**

**BURNETTE**, Cook County Public Defender, through **ELYSE KRUG MILLER**, Assistant

Public Defender and presents this Supplemental Petition which supplements but does not

supercede Petitioner's original *pro se* petition filed. In support of this Petition, Petitioner

submits the following:

1. Petitioner Hillard was convicted of armed robbery, aggravated kidnaping, armed

violence and aggravated battery following a jury trial.

2. At the sentencing hearing on October 26, 1998, Petitioner was sentenced to 25 years

for armed violence, 15 years for armed robbery and 10 years for aggravated kidnapping. All

sentences were ordered to run consecutively. (Vol. 7, F26)

3. Petitioner filed a timely post-conviction petition on or about August 18, 2001. He

1

EXHIBIT I

C 00039

alleged his trial counsel was ineffective for failing to call Petitioner's sister at the motion to suppress hearing as she would have testified that she never told the police that Petitioner must have taken her gun. In his original petition, Petitioner did not raise any issue regarding his armed violence sentence.

## COUNT I

Petitioner's 25 year sentence for armed violence must be vacated under the Illinois Supreme Court decision in *People v. Cervantes*, 189 Ill.2d 80 (1999)

### MEMORANDUM OF LAW

At the time of Petitioner's sentencing hearing, in 1998, the armed violence statute required a minimum sentence of 15 years. Petitioner was sentenced to 25 years. On December 2, 1999 our supreme court held, in *People v. Cervantes*, 189 Ill.2d 80, that the public act, 88-680, under which this minimum sentence was enacted violated the single-subject rule of the Illinois constitution. The minimum sentence for armed violence should be 6 years. Therefore, Petitioner's 25 year sentence for armed violence must be vacated. Petitioner is entitled to a new sentencing hearing.

## COUNT II

Petitioner was denied effective assistance of counsel when his attorney failed to call a crucial witness at his suppression hearing who would have testified that she never told the police that Petitioner took her gun.

2

C00040

## MEMORANDUM OF LAW

Petitioner filed a motion to quash arrest and suppress an out of court identification. (Vol. I, A3)

At the hearing, Officer Vernon Bradley testified that he was assigned to investigate an armed robbery and aggravated battery of Yinka Jinadu. (Vol. I, B4) Inside the apartment where the complainant was attacked, the police found two guns, one of which was a .38 caliber Smith and Wesson. (Vol. I, B11) The police discovered that the gun was registered to a Loretha Hillard. (Vol. I, B15) Loretha had reported her gun as stolen. (Vol. I, B19) Bradley testified that Loretha told him that if her gun was stolen the only person who could have stolen it was her brother, Tony. (Vol. I, B20) Loretha also told him that Petitioner lived with his girlfriend, Pookie, at 714 Division in Chicago. (Vol. I, B20)   Loretha told Bradley where she could find Petitioner. (Vol. I, B59, 62-63).

Defense counsel never called Loretha at the suppression hearing. Attached to this petition is the affidavit of Loretha Hillard, signed and notarized on June 26, 2001, in which she denies ever telling the police that her brother took her gun. In fact, when asked whether she thought any family members would take her weapon, Loretha replied no. (Affidavit of Loretha Hillard)

Petitioner was denied effective assistance of trial counsel when his attorney failed to call Loretha Hillard at the suppression hearing to rebut Officer Bradley's testimony. In *Strickland v. Washington,* 466 U.S. 668 (1984), the defedant must show that counsel's representation fell below an objective standard of reasonableness and the defendant was prejudiced; that is, but for counsel's errors, the results of the proceedings would have been different.   Whether counsel

3

C 00041

was ineffective for failure to investigate (as Petitioner alleges in his *pro se* petition) is

determined by the value of the evidence that was not presented. *People v. Dillard,* 204

Ill.App.3d 7, 10, 561 N.E.2d 1219 (1990) Attorneys have an obligation to explore all readily

available sources of evidence that could possibly benefit their clients. *People v. Morris,* 335

Ill.App.3d 70, 79,779 N.E.504 (1st Dist. 2002) Relying mainly on the information that the police

claimed Loretha Hillard gave them, the court ruled that the police had probable cause to arrest

Petitioner and denied the motion to quash and suppress. (Vol. I, B111-113)

In order to rebut the police testimony defense counsel should have called Loretha Hillard

since she had an obligation to present evidence beneficial to Petitioner. Her failure to do so

constituted a constitutional claim of ineffective assistance of counsel. At this stage, with

Loretha's affidavit, a substantial showing of a constitutional violation has been demonstrated.

Therefore, Petitioner asks this Court to set this case for an evidentiary hearing. *People v.*

*Morris,,* 335 Ill.App.3d 70, 76,  779 N.E.2d 504, 510 (1st Dist. 2002)

Respectfully submitted,

Elyse Krug/Miller
Assistant Public Defender

EDWIN A. BURNETTE
PUBLIC DEFENDER OF COOK COUNTY
ATTORNEY NO. 30295
2650 S. CALIFORNIA AVE.
CHICAGO, ILLINOIS   60608
(773) 869-3217

4

C 00042

# APPENDIX

88MC3#1

STATE OF ILLINOIS )
) SS
COUNTY OF Cook )

# AFFIDAVIT

I, Loretha Hillard being first duly sworn upon my oath depose and state that the following matters are both true and correctly made upon my personal knowledge and belief, and if called as a witness, I am competent to testify thereto: I Loretha Hillard believed my weapon had been stolen out of my apt. by an unknown person. I then lived at 1230 N. Larrabee #408. On the day in question, around (May or early June) 1997, I reported my weapon stolen to the 18th district police station which was located on Chicago Avenue, now located on Division and Larrabee. I went into police station and told a police officer my (gun) weapon had been stolen a 38 Smith Wesson caliber. police wrote out a report on my weapon and I received a copy. Two weeks later or so, I received a phone call from a police officer asking me several Questions about my weapon. The police officer asked me did I have any idea who could have stolen my weapon, I replied No I don't know who could have taken my weapon. The police officer then asked did I have any relatives that live in the area. I then replied I had a number of relatives that live in the area. The officer then implied did I think any of my family members would take my weapon. I replied No, I know my family would not put me in jeopardy. He then said Am I sure. I then replied I'm positively sure! and the conversation ended when thank you Ms. Hillard for your time, he will be getting back in touch with me, which he did not, I never spoke to th the police officer.

Subscribed and Sworn to before me on the 26th day of June, 2001.

Sandra Elizabeth Martell
NOTARY PUBLIC

Respectfully submitted,

Loretha Hillard
AFFIANT H635-2067-6549 #

"OFFICIAL SEAL"
Sandra Elizabeth Martell
Notary Public, State of Illinois
My Commission Exp. 03/26/2005

C00044

1    and escaped.

2        Q    Did he tell you whether or not he saw the

3    officers recover anything inside the apartment?

4        A    Right.  He observed the officers recover two

5    handguns, one was a .38 caliber Smith & Wesson.

6        Q    And did he tell you whether or not he was

7    shown any pictures by the officers once inside the

8    apartment?

9        A    He was shown a photo identification and he

10   identified that photo as one of the fellas in the

11   apartment, one of the offenders, and it was indeed the

12   offender who struck him with an iron pipe.

13       Q    He identified that photo as a person that

14   struck him when he initially came through the door?

15       A    No.  When he was bound on the floor.

16       THE COURT:  This is up in the apartment he

17   made a photo identification?

18       MS. SAVINI:  Yes.  I'll clear that up in one

19   moment, judge.

20   BY MS. SAVINI:

21       Q    Now, the identification that he made, what

22   type of picture was that identification made from?

23       A    I believe it was a driver's license.

24       Q    And where was that driver's license found?

C00045

1    was registered to or from the officers themselves?

2          THE COURT:  Well, sustained.  I don't know.

3    BY MS. SAVINI:

4      Q    Officer, did you learn who the gun was

5    register to from reading the case report or from

6    speaking to the officers?

7      A    From reading the case report.

8      Q    And after you read the case report that's how

9    you determined who the gun was register to; is that

10    right?

11      A    Yes.

12      Q    And in addition to the name of that person

13    there was other information about the registered owner

14    of the gun; is that right?

15      A    Yes.

16      Q    Did you follow up on that information?

17      A    Yes.

18      Q    How did you follow up on that information?

19      A    I made a phone call to the registered owner

20    of the handgun.

21      Q    Who was that person?

22      A    Loretha Hillard.

23          THE COURT:  What was the name?

24          THE WITNESS:  Loretha.

1    Hillard.

2         Q    Did she tell you when her gun had been taken?

3         A    I don't think she was sure about when it was

4    missing.

5         Q    Did she tell you whether or not she had

6    reported her gun stolen?

7         A    She said she did report it stolen.

8         Q    Did you do anything to confirm that

9    information?

10        A    Right.  I ascertained the report number that

11   the gun was reported stolen under.

12        Q    And in fact had she reported her gun stolen?

13        A    Yes.

14        Q    And the gun that she reported stolen it

15   matched the serial numbers and a description of the

16   gun that you -- that the beat officers had recovered

17   at the scene of the crime; is that right?

18        A    Yes.

19        Q    Now, after she told you the only person that

20   could have taken her gun was her brother --

21        MS. BORMANN:  Objection.  That's not the

22   testimony.

23

24

C 00047

BY MS. SAVINI:

    Q    Well, officer -- Detective, I'm sorry, what did she tell you about the circumstances of her gun being missing?

    A    She said if her gun was stolen the only person who could have stolen it would have been her brother, Tony Hillard.

    Q    She gave you his name?

    A    Right.

    Q    Did she give you any other information about Tony Hillard?

    A    Right.  She also stated that he lived with his girlfriend at 714 Division.  His girlfriend's name was Pookie and she lived in Apartment 1003.

    Q    After she gave you that information sometime subsequent to talking with her did you act upon that information?

    A    Yes.

    Q    Now, I want to draw your attention to June 3rd of 1997, on that day where did you go?

    A    We went to the apartment at 714 Division and we knocked on the door.

    Q    When you went to that apartment did anybody -- and knocked on the door had you announced

C00048

motion.   There is not probable cause for this arrest.
They came into his home, they arrested him, they took
him to a police station where they kept him for
something like seven hours before they put him in a
lineup and I'm asking you to suppress the out-of-court
lineup.

THE COURT:  All right.  The court has heard
the evidence on the motion to quash arrest and
suppress evidence and I'll make the following findings
and conclusions mandated by Section 114-12 of The Code
of Criminal Procedure:  It is the defendant's position
as stated in this motion that he was arrested on
June 3, 1997 at his lawful residence, 714 West
Division in the City of Chicago without benefit of
arrest warrant, search warrant or any other lawful
process and was not violating any laws at the time of
his arrest or prior thereto.

The issue presented is whether there was
probable cause to effect the arrest that took place
there, the State having conceded in argument and the
detective as well that he did arrest the defendant at
that location.

A subsidiary issue is whether there was
an unlawful warrantless entry into the premises to

C 00049

effect the arrest of Mr. Hillard, what affect that
would have.  According to the defendant's evidence
Benica Eberhardt, his roommate or lady friend,
testified on the time in question there was a knock on
the door, she answered the door, the police were
there, the defendant was a short distance behind her
in the hallway, the police entered and grabbed the
defendant after searching the apartment, he was
thereafter taken away.  Factually not very
inconsistent with the testimony of Detective Bradley,
which I will summarize at this point.

The detective testified that he was the
investigating officer on the armed robbery and beating
of Yinka Jinadu on May 10, 1997 at 5851 North
Winthrop.  In interviewing the victim several days
later at Illinois Masonic Hospital Detective Bradley
related the victim was still recovering from a
fractured skull and I believe a fractured orbital bone
and at that time at the hospital told him that on the
date of the robbery his ex-wife or estranged wife had
called him, asked him to pick her up at the Winthrop
address, he went there, she wanted him to come
upstairs to her apartment, he was buzzed in, he came
up and he was struck as he was about to enter the

C00050

1    apartment.

2              He awakened two hours later.  Four male

3    blacks were in the apartment, as was his ex-wife.  He

4    was bound and handcuffed and taped and keys and other

5    property were demanded.  He was struck with a tire

6    iron, he was beaten additionally with a bat, he was

7    placed in a bathroom shower and soaked in water.  When

8    he ceased to hear any further conversation in the room

9    he came out, found that the occupants had left and was

10   able to get free, ran down to the front of the

11   building and saw two of the male offenders across the

12   street who then fled.

13             Police were called, they came to the

14   scene, they went back upstairs, recovered weapons, and

15   the victim made a photo identification of one of the

16   offenders who we know from the evidence is a

17   co-offender of Mr. Hillard, Jermaine Crane, also known

18   as Erven Walls.  In addition to that gentleman, the

19   two names they had for that person, obviously the

20   identity of the ex-wife or estranged wife was known at

21   that time.

22             One of the guns was traced to the

23   defendant's sister.  The sister had filed a report of

24   a gun missing or stolen earlier, that report being

C00051

reasonable grounds to believe that the defendant had committed an offense and probable cause to arrest him.

The motion to quash arrest and suppress evidence shall be denied.

MS. BORMANN: Judge, the matter is just continued for trial to April 30th I believe.

MS. SAVINI: April 30th.

THE COURT: April 30th for trial. It is a bench trial, isn't it?

MS. BORMANN: Yes.

THE COURT: All right.

(The above entitled matter
was continued to
April 30, 1998.)

B-113

dated May 19, 1997. When Detective Bradley interviewed her by phone she told him if anyone took it it would have been her brother, Tony Hillard.

Armed with that information they proceeded to the residence of Mr. Hillard and Miss Eberhardt at 714 West Division. They knocked on the door, saw a male black after the door was answered by the young lady, saw a male black fitting the general description of one of the offenders and asked his name upon which -- to which he gave a phony name. The detective then accused the defendant of taking the gun of the sister, which Mr. Hillard denied, and then agreed to come to the station to clear up the matter. He also admitted that he was Tony Hillard in the apartment of his lady friend. The central issue obviously to be resolved is whether this adds up to probable cause to arrest Mr. Hillard. What we have basically is a gun used in an armed robbery and a beating, recovered at the scene, linked to the sister of the defendant and then to Mr. Hillard. We have the defendant in a place where the sister indicated he would be, fitting the general description of one of the offenders and the defendant initially giving a phony name to the police. This adds up to

C 00052

STATE OF ILLINOIS    )
                            )    SS
COUNTY OF COOK    )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

| | |
|---|---|
| TONY HILLARD | ) |
| | ) |
| Petitioner | ) |
| | ) |
| v. | )   PC No. 97CR30453 |
| | ) |
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
| | ) |
| Respondent. | ) |

### 651 CERTIFICATE

I, Elyse Krug Miller, Assistant Public Defender, certify that in accordance with Rule 651(c) of the Illinois Supreme Court I have communicated with Petitioner by telephone and by letter in order to ascertain his claim of a constitutional deprivation of his civil rights. I have read the pertinent portions of his trial proceedings and have reviewed the common law record. I have examined Petitioner's *pro se* post-conviction petition. A supplemental post-conviction petition is being filed on Petitioner's behalf.

ELYSE KRUG MILLER
Assistant Public Defender

C 00053

STATE OF ILLINOIS          )
                           )SS.
COUNTY OF COOK             )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT      -      CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS     )
            Plaintiff-Respondent    )
                                    )   CASE NO. 97CR30453
            vs.                     )   THE HONORABLE MICHAEL TOOMIN
                                    )   Judge Presiding
TONY HILLARD                        )
            Defendant-Petitioner    )

## MOTION TO DISMISS

Now come the People of the State of Illinois, by and through their attorney, Richard A. Devine, State's Attorney of Cook County, through his assistant, Christine Stephens, and respectfully moves this Honorable Court to strike the *pro se* and supplemental petitions for post-conviction relief and to dismiss the proceedings for the following reasons:

### STATEMENT OF FACTS

In May of 1997, Yinka Jinadu was hit over the head with a baseball bat as he entered the apartment of his estranged wife Delores. When he awoke, he discovered that he was stripped of his clothing and his feet were bound with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other, and a scarf covering the lower portion of his face. Erven Walls also displayed a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed, and hit

1

C 00054

him on the head again with an iron object. Walls then walked over to Jinadu and repeatedly hit him on the head and around the eyes. Walls and the man with the bat then pulled Jinadu into the bathroom, handcuffed him, and placed him in the bathtub.

Petitioner Tony Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Petitioner then walked out of the bathroom and came back holding a pillow and the gun. Walls also returned to the bathroom carrying handcuffs. He and petitioner put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Petitioner then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jinadu was threatened at gunpoint to tell the men where he kept his money. Petitioner placed a towel over Jinadu, turned on the faucet in the tub, and left. Eventually, Jinadu was able to free himself from the electrical tape. Upon opening the bathroom door, he saw that he was alone in the apartment. After exiting the apartment and walking out onto the street, he saw the man with the baseball bat and Walls outside. They both fled upon seeing Jinadu.

Police arrived and spoke to Jinadu. They then entered the apartment where they recovered several items including two loaded revolvers. Detective Bradley learned that one of the recovered guns was registered to Loretha Hillard. He called her on the phone, at which time she told him that the only person who would have taken her gun was her brother, petitioner. In addition to his name, she also gave Detective Bradley petitioner's address.

Detective Bradley went to that address with other officers. Benicia Eberhardt answered the door and petitioner was standing behind her. Detective Bradley observed that petitioner matched the description given by Jinadu as one of the offenders. Petitioner initially provided

2

him with a fictitious name and denied stealing his sister's gun.  Petitioner agreed to accompany

the officers to the police station for investigation.  Thereafter, he told Detective Bradley that his

name was Tony Hillard.  Petitioner was arrested, placed in a lineup, and later identified by Jinadu

as one of the offenders.

## PROCEDURAL POSTURE

Following a pre-trial hearing, this Honorable Court denied petitioner's motion to quash

arrest and suppress evidence.  On July 15, 1998, a jury convicted him of armed robbery, armed

violence, aggravated kidnapping and aggravated battery.  Later, on October 26, 1998, this court

sentenced petitioner to a total of fifty years in the Illinois Department of Corrections.  On June

11, 2001, his conviction and sentence were affirmed on direct appeal.  (Exhibit A attached)

Thereafter, on August 27, 2001, petitioner filed the instant *pro se* petition for post-conviction

relief.  He filed a supplemental post-conviction petition through his assistant public defender on

November 25, 2003.

## PETITIONER IS NOT ENTITLED TO POST-CONVICTION RELIEF WHERE HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM IS BOTH WAIVED AND ENTIRELY WITHOUT MERIT.

Petitioner now complains that he received ineffective assistance of counsel because his trial

attorney allegedly did not "investigate the evidence presented against the petitioner during a motion

hearing to suppress or quash the arrest." (P.C. Pet. p. 2)  Specifically, he claims that at that hearing

his trial attorney should have called petitioner's sister, Loretha Hillard, who allegedly would have

3

C 00056

testified that she never told the police that she believed petitioner took her gun, which petitioner insists would have resulted in a finding of no probable cause. (P.C. Pet. p. 2-4) Yet because petitioner failed to raise any allegations of ineffective assistance of trial counsel in his direct appeal, they are now waived. It is well-established law in Illinois that the scope of post-conviction review is limited by the doctrines of *res judicata* and waiver. Where the petitioner has appealed his convictions, all issues actually adjudicated on direct appeal are *res judicata*, and all issues which petitioner could have raised in his direct appeal but failed to raise are deemed waived. People v. Stewart, 123 Ill.2d 368, 528 N.E.2d 631 (1988); People v. Gaines, 105 Ill.2d 79, 473 N.E.2d 868 (1984); People v. Derengowski, 44 Ill.2d 476, 256 N.E.2d 455 (1970). Because petitioner raised not one complaint about his trial counsel in his direct appeal, his untimely efforts to do so now are waived.

Even assuming *arguendo* that this allegation of ineffective assistance of trial counsel survives waiver, it still fails because it is entirely without merit.

According to the United States Supreme Court in Strickland v. Washington, to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show, "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2055 (1984).

In judging an ineffective assistance of counsel claim, the benchmark is whether the attorney's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. The Strickland analysis involves a two-step inquiry. The defendant must show that his attorney's specific

4

acts or omissions to act fell below the standard of reasonable professional judgment. Id.; People v. Albanese, 104 Ill.2d 504, 525, 473 N.E.2d 1246, 1255 (1984), cert denied sub nom., Albanese v. Illinois, 471 U.S. 1044, 105 S.Ct. 1061 (1985). The reasonableness of an attorney's action is determined in light of the facts of the particular case, viewed not in hindsight, but as of the time of the conduct. Strickland, 466 U.S. at 690, 104 S.Ct. at 2066; People v. Spicer, 163 Ill. App. 3d 81, 93, 516 N.E.2d 491, 500 (1987), appeal denied, 119 Ill.2d 571, 522 N.E.2d 1254 (1988). There is a presumption that counsel has provided adequate assistance and has exercised reasonable professional judgment. Strickland, 466 U.S. at 690, 104 S.Ct. at 2066; Spicer, 163 Ill. App. 3d at 93, 516 N.E.2d at 499.

Even if a defendant can show that his attorney acted below the standard of reasonableness, he cannot succeed in an ineffective assistance of counsel claim unless he can prove to a reasonable probability that, but for his attorney's errors, the outcome of his case would have been different. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068; Albanese, 104 Ill.2d at 525, 473 N.E.2d at 1255. Because petitioner in the instant case fails to satisfy either prong, his petition must be dismissed.

Here, petitioner fails to show that his attorney's performance was deficient since he alleges no facts demonstrating that he ever informed trial counsel of Loretha Hillard's purported testimony. On the contrary, the evidence showed that Ms. Hillard would have been a beneficial witness to the prosecution, but harmful to the defense. Where the circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation. People v. Orange, 168 Ill.2d 138, 150 (1995). Not once in Ms. Hillard's affidavit does she assert that trial counsel was aware of her current allegations, allegations which are in stark contrast to the testimony presented at the motion to quash

5

arrest and suppress evidence. Nor does she assert that she attempted to make counsel aware of the instant allegations. Absent such facts, petitioner cannot establish that his attorney's representation fell below an objective standard of reasonableness. Satisfying neither prong of Strickland, petitioner's argument fails.

Furthermore, it is important to recognize that the mere fact that a witness did not testify does not allow the inference that counsel did not investigate the witness. People v. Kluppelberg, 257 Ill.App.3d 516, 628 N.E.2d 908 (1993). Illinois cases provide that the decision whether to call a particular witness is generally a matter of trial strategy or tactics and will not support a claim of ineffective assistance of counsel. People v. Flores, 128 Ill.2d 66, 538 N.E.2d 481, 488 (1989); People v. Ashford, 121 Ill.2d 55, 520 N.E.2d 632, 636 (1988). This petition must be dismissed.

### PETITIONER'S ARGUMENT FAILS WHERE HE REFUTES HIS OWN CLAIM THAT THE PROSECUTION WITHHELD EXCULPATORY EVIDENCE FROM THE DEFENSE.

In another attempt at post-conviction relief, petitioner claims that the "prosecutor withheld exculpatory evidence from the defense counsel pertaining to the ownership of the gun recovered at the scene of the crime." (P.C. pet. 5) The argument that follows contradicts this allegation, since he then admits that "it was determined that the gun was registered to [petitioner's] sister," a fact that was also brought out at the motion to quash arrest and suppress evidence, at trial, and in Ms. Hillard's recent affidavit. (P.C. pet. 5) Petitioner's argument fails.

Petitioner adds that Ms. Hillard's affidavit is "proof positive that the officer lied on the witness stand and that the prosecutor suborned that lie." (P.C. 5) Petitioner forgets that this affidavit

6

C 00059

wasn't signed until June 26, 2001, over three years after petitioner's trial. Again, petitioner offers

zero evidence to show that Ms. Hillard's current story was the same in 1998. Rather, the evidence

back then showed quite the contrary. Furthermore, Ms. Hillard is petitioner's sister. Clearly

petitioner, not trial counsel, had a better idea as to whether her testimony would have been beneficial

to the defense. Petitioner could have called her as a witness had he wished. Yet not once does

petitioner claim that he ever asked his attorney to do so. Given these facts, his argument must be

rejected.

> **PETITIONER'S DEMAND FOR POST-CONVICTION RELIEF
> IS UNWARRANTED WHERE HIS SENTENCE WAS
> ALREADY UPHELD ON DIRECT APPEAL AND WHERE HE
> FAILED TO CHALLENGE HIS ARMED VIOLENCE
> SENTENCE IN THAT APPEAL, WAIVING THIS ISSUE.**

Finally, petitioner complains that his armed violence sentence must be vacated under

People v. Cervantes, 189 Ill.2d 80, 723 N.E.2d 265 (1999). In an unsuccessful challenge to his

consecutive terms of imprisonment, the First District Illinois Appellate Court already reviewed

and upheld his sentence on direct appeal. (Exhibit A) As such, further challenges to his sentence

are now *res judicata*. Moreover, because he did not specifically challenge his sentence for armed

violence in his direct appeal, it is also waived. Stewart, Gaines, Derengowski, *supra*.

Furthermore, if it was deemed necessary, the appellate court was free to reverse petitioner's

armed violence sentence on its own. It chose not to do so. This petition must be dismissed.

WHEREFORE, the respondent prays that an order be entered by this Honorable Court,

7

C 00060

striking the petitions for post-conviction relief of the petitioner Tony Hillard, and dismissing the proceedings.

Respectfully submitted

RICHARD A. DEVINE

States Attorney of
Cook County, Illinois

By:

Christine Stephens
Assistant States Attorney

8




FIRST DIVISION
June 11, 2001

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

No. 1-99-0152

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, RECEIVED | ) | Cook County |
| | ) | |
| v.                    NOV 0 8 2001 | ) | No. 97 CR 30453 |
| | ) | |
| TONY HILLARD,    CLERK OF THE CIRCUIT COURT | ) | Honorable |
| CRIMINAL DIVISION | ) | Michael Toomin, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

## ORDER

Defendant Tony Hillard was convicted in a jury trial of armed robbery, armed violence, aggravated kidnaping, and aggravated battery. He was sentenced to 50 years' imprisonment. On appeal, defendant raises four issues. He contends that: (1) the trial court erred in failing to grant his motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly sentenced defendant to a consecutive sentence. We affirm.

C 00062

1-99-0152

## BACKGROUND

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed and hit him on the head again with an iron object. Codefendant then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Codefendant and the man with the bat then pulled Jinadu into the bathroom, handcuffed him and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the bathroom and came back holding a pillow and the gun. Codefendant also returned to the bathroom carrying handcuffs. He and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street

-2-

C 00063

1-99-0152

where he saw the man with the baseball bat and codefendant standing across the street. Upon

seeing him, both men fled down the street.

Defendant and codefendant Walls were tried simultaneously before two juries. Prior to

trial, defendant moved for a motion to quash his arrest and suppress evidence. The trial court

denied the motion to quash finding that Detective Brady had reasonable grounds to believe that

defendant had committed the offense and that probable cause to arrest him existed. Prior to trial,

the trial court noted that both juries would be present during the cross-examination of the victim.

At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership

and eventually started his own trucking company. He met and married Delores in 1995 and they

separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10,

1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him,

Delores explained that her car was broken and asked Jinadu to pick her up at her apartment.

Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the

apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the

door he was hit on the head with a baseball bat and lost consciousness. After regaining

consciousness, Jinadu was placed in a bathtub and repeatedly beaten and threatened by the men in

the apartment. After the men left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by

a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open

head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu

showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw

-3-

C 00064

1-99-0152

hundreds of plastic bags, a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Jinadu also described the height, weight and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Crane. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven and Delores at 1121 South State Street. Codefendant Erven Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha Hillard. He called Laretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address. He went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and

-4-

1-99-0152

defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police station and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years' imprisonment.

## ANALYSIS

Defendant first challenges the trial court's finding in denying defendant's motion to quash arrest and suppress evidence. In denying defendant's motion, the trial court noted some of the facts known to the police at the time of the arrest. We will summarize some of those facts in order to illustrate why under the totality of the circumstances known to the police officers at the time of the arrest there was sufficient information to warrant a reasonably prudent person to believe that defendant had committed a crime.

Benicia Eberhardt testified on behalf of defendant. She stated that she was in her bedroom with defendant when there was a knock on the door. She opened the door and saw three or four police officers standing in the hallway. At the time, defendant was standing a few feet behind her. She stated that the police officers pushed her out of the way, walked into the apartment and

-5-

C 00066

1-99-0152

grabbed defendant. Defendant was taken into his room to put on some clothes while two officers searched the apartment. Defendant was then handcuffed and taken to the police station.

Detective Bradley testified that he spoke to the victim two days after the incident. Jinadu immediately identified his wife, Delores. He also identified codefendant Erven Walls from a drivers license which was found in the apartment on the day of the incident. He identified Walls as his wife's boyfriend who he had seen on previous occasions. Jinadu also gave Detective Bradley the physical description of the other three offenders. He described them as being in their twenties. One offender was 5'11" and weighed 200 lbs with black hair and brown eyes. Another offender was 5'11", 165 lbs. Finally, the last offender was approximately 5'5", 145 lbs with brown eyes and black hair. Detective Bradley testified that one of the guns found in the apartment was registered to Loretha Hillard. He called Ms. Hillard and spoke to her on the telephone. Ms. Hillard informed Detective Bradley that she was an ex-security guard for the Chicago Housing Authority. She further told Detective Bradley that her gun had been taken and that the only person who would have taken it was her brother, Tony Hillard. Ms. Hillard told Detective Bradley the address and apartment number of where defendant and his girlfriend lived. Detective Bradley, along with other police officers, went to the address given to him by Ms. Hillard. They knocked on the door and it was opened by Benicia Eberhardt. Detective Bradley stated that he told the woman that he wanted to speak to defendant. Standing behind her was a man who fit the general description of one of the offenders which Jinadu had given to the officers.

When asked to identify himself, defendant gave Detective Bradley a fictitious name. Detective Bradley then asked him why he stole his sister's gun. Defendant replied that he did not

-6-

C 00067

1-99-0152

take his sister's gun. He was then asked to accompany the police officer's to the police station to discuss the theft of his sister's gun. Defendant said that he would go but that he had to put on his shirt and shoes. Detective Bradley followed defendant into one of the bedrooms where he told detective Bradley that his name was Tony Hillard. Defendant was taken to the police station where he was later identified by Jinadu as one of the offenders. Detective Bradley further testified that at the time of the arrest defendant was 21 years old with black hair, brown eyes, was 5'11" and weighed 170 lbs.

We note that defendant's reliance on *People v Johnson*, 94 Ill. 2d 148 (1983) and *People v. Wilson*, 260 Ill. App. 3d 364 (1994), is not applicable to the factual scenario in this case. Both *Wilson* and *Johnson* stand for the proposition that a warrantless arrest based on an informant's tip must be sufficiently reliable and corroborated so as to provide probable cause. However, the situation in this case is not governed by that principle. Here, the basis for the probable cause did not center around an informants tip but rather was based on the information from Ms. Hillard which provided a link between the stolen gun and defendant and helped the police to locate defendant. That link, however, was not the sole basis of the arrest. In addition to that information once the police were at the specific location provided by Ms. Hillard, defendant fit the description given to them by the victim.

Both the United States and the Illinois Constitutions govern the conduct of police officers in performing warrantless arrests. U.S. Const., amends. IV, XIV; Ill. Const. 1970 art. I, §6; *People v. Buss*, 187 Ill. 2d 144 (1999). These constitutional provisions allow the police to make a warrantless arrest but only if the police have knowledge "which would lead a reasonable man to

-7-

C 00063

1-99-0152

believe that a crime has occurred and that it has been committed by the defendant." *People v. Robinson*, 167 Ill. 2d 397, 405 (1995). In reviewing a probable cause challenge, the court does not apply bright-line legal rules but evaluates the police conduct in accordance with practical, every-day principles. *People v. Kidd*, 175 Ill. 2d 1, 22 (1996).

Probable cause for an arrest exists when the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. *People v. Lumpp*, 113 Ill. App. 3d 694 (1983). The court determines under the totality of the circumstances whether the evidence available to the arresting officer at the time of the arrest provides a reasonable basis for the officer to believe that the suspect committed an offense. *People v. Dizon*, 297 Ill. App. 3d 880, 885 (1998). The question is whether a reasonable person in the police officer's position would have believed that the defendant committed a crime. *People v. Adams*, 131 Ill. 2d 387, 398 (1989). Moreover, although the standard for determining whether probable cause existed for a warrantless arrest requires more than a mere suspicion on the part of the police officers, it does not require arresting officers to have in their hands evidence sufficient to convict the defendant. *Dizon*, 297 Ill. App. 3d at 885. A general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. *People v. Robinson*, 299 Ill. App. 3d 426, 431 (1998).

When defendant solely challenges the trial court's legal conclusions for denying a motion to quash arrest and suppress evidence, as in this case, our review is *de novo*. *People v. Wright*, 183 Ill. 2d 16, 21 (1998).

-8-

C 00069

1-99-0152

In applying the above principles to the present case we conclude that based on the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. The police officers were there as part of their investigation of a vicious beating and armed robbery. They had recovered a .38 caliber gun from the apartment which led them to defendant's apartment based on information which was provided by his sister. She reported that the gun was stolen from her home and informed the officers that she believed the person who stole it was defendant. She also provided the officers with defendant's name, address and apartment number. Thus, the gun found at the scene of the crime was linked to defendant. Armed with Jinadu's descriptions of the offenders and Ms. Hillard's information, the police were able to locate defendant at the exact address provided to them. Moreover, upon seeing defendant the officers realized that he fit the general description of one of the offenders. Jinadu had described one of the offenders as a black man that was 5'11" and weighed 165 lbs. He further stated that all of the offenders were in their twenties. At the time of the arrest defendant was 21 years old, was 5'11" and weighed 170 lbs. These characteristics where similar to those described by the victim. Further, when asked whether he was Tony Hillard, defendant lied and gave the officers a fictitious name. He later admitted that he was Tony Hillard. The general description of the offenders, coupled with other specific facts and circumstances provided by Ms. Hillard as well as defendant's behavior in the apartment, was sufficient to lead a reasonably prudent person to conclude that there was a reasonable probability that defendant was one of the offenders.

Defendant's second point of contention revolves around the fact that the trial court

C 00070

1-99-0152

allowed codefendant Walls' counsel to cross-examine Jinadu in front of defendant's jury. Defendant maintains that because the defenses were antagonistic the cross-examination prejudiced defendant's jury. Here, both defendant and codefendant were tried simultaneously before separate juries. Prior to trial, both defense attorneys filed a motion for severance on the unlawful use of a weapon by a felon count which the trial court granted. During the trial, the trial court severed the cross-examination of Detective Bradley. Defendant argues that the trial court should have also severed the cross-examination of Jinadu. Defendant argues that during the cross-examination of the victim by codefendant's attorney, the victim named defendant as one of the offenders thus prejudicing defendant. Specifically, Jinadu stated that one of the offenders that pointed a gun at him was defendant.

     As a general principle of law, defendants who are jointly indicted are jointly tried unless fairness to one of the defendant's requires a separate trial to avoid prejudice. *People v. Lee*, 87 Ill. 2d 182, 187 (1981). Prejudice exists where "a co-defendant takes the stand to point a finger at the defendant as the real perpetrator of the offense." *Lee*, 87 Ill. 2d at 187. Furthermore, the mere apprehension of prejudice is not enough to conduct separate trials; there must be actual hostility between the defendants in order to necessitate separate trials. *People v. Bean*, 109 Ill. 2d 80, 92 (1985). Severance is not required when codefendants' defenses are merely contradictory. *People v. Rice*, 286 Ill. App. 3d 394 (1996), citing *People v. Lovelady*, 221 Ill. App. 3d 829, 836 (1991). The decision to grant a severance is within the sound discretion of the trial court and an appellate court will not reverse a trial court's ruling absent an abuse of discretion. *People v. Fornear*, 283 Ill. App. 3d 171 (1996).

C 00071

1-99-0152

In this case, defendant and codefendant did not implicate each other as the perpetrators of the crime. Defendant presented an alibi defense. As defendant points out in his brief his defense was simply that he was not present at the time of the incident. Codefendant Walls' defense, on the other hand, was one of reasonable doubt. The trial court stated, in replying to defense counsel's assertion that codefendant would implicate defendant through cross-examination of the victim:

> "How does that help Mr. Wall's to point the finger at Mr. Hillard. I will wait and see if you do it. Then I'll move the jury out. I don't know why somebody who says their client wasn't there has to point the finger at another defendant and say he was there. That doesn't establish that your guy wasn't there.

\*\*\*

> We'll have to wait and see if it happens. If it happens, I'll move the jury out to protect whatever defendant's right have to be protected. To me, this is nonsense. It's a lot of fiction that one has to point the finger to make a separate cross-examination and represent to me, I'm going to pin it on this guy in front of his jury, when it doesn't make any sense or rhyme, reason or rationale why she would do that if her client wasn't there. But, I'll hear it when I hear it."

The record in this case indicates that during the cross-examination of Jinadu by codefendant Walls' attorney there is one isolated instance in which Jinadu stated that defendant was one of the offenders who pointed a gun at him. This single reference, however, was a repetition of Jinadu's testimony on direct examination where Jinadu testified that defendant pointed a gun at him, placed the gun in Jinadu's mouth, ordered him to reveal where he kept his money, helped codefendant Walls bind Jinadu's legs and hands, placed a pillow on Jinadu's face and filled the bathtub with water. As the trial court correctly noted, the necessity of removing the

-11-

C 00072

1-99-0152

jury due to an antagonistic defense did not arise in this case. Jinadu's testimony on cross-examination did not create an antagonistic defense but was cumulative of his direct testimony.

Moreover, the record indicates that the remainder of the cross-examination by counsel for codefendant Walls consisted of a series of questions designed to create a reasonable doubt that Walls was not one of the perpetrators. It did not revolve around implicating defendant as the main perpetrator. In addition, during closing arguments, codefendant's counsel argued reasonable doubt as opposed to placing the blame on defendant. In fact, defense counsel stated, "I don't know if Mr. Hillard was involved in that, in this case or not ***." Defense counsel then proceeded to attack the credibility of Jinadu and the inconsistencies in his testimony.

This court has clearly stated in *Rice* that the requirement for actual hostility which necessitates severance "is not met where, for example, one defendant claims an alibi defense and the other defendant asserts a reasonable doubt, but at no time do the defendants become rivals or accuse each other." *Rice*, 286 Ill. App. 3d at 402. Such is the situation in the present case. Given that the defenses were not antagonistic to each other and that defendant has failed to show any prejudice which resulted from Jinadu's single reference to defendant during cross-examination, the trial court correctly ruled in denying severance.

Defendant's final contention is one which he does not have standing to raise. Standing is met when: (1) the proponent of a particular legal right alleges an injury in fact; and (2) the proponent asserts his own legal rights and interests, rather than basing his claim for relief upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *People v. Bond*, 205 Ill. App. 3d 515 (1990). Here, defendant argues that it was judicial error for

-12-

1-99-0152

the trial court to question Detective Bradley as to whether codefendant Walls and Jermaine Craine
were the same person. Defense counsel objected to the court's questioning to which the trial
court replied, "[I] don't see how that affects Mr. Hillard at all." We agree with the trial court that
the trial court's questions regarding identification of Walls and Craine as the same person, did not
impact defendant Hillard or any of Hillard's legal rights. Defendant has failed to articulate how
the trial court's actions caused defendant an injury in fact. As such, defendant's claim lacks
standing for purposes of this appeal.

In a supplemental argument, defendant contends that the trial court erred in sentencing
him to a consecutive sentence pursuant to section 5-8-4(a) where the sentence violated his
constitutional right to due process and trial by jury according to the recent holding in the Supreme
Court case *Apprendi v. New Jersey*, 530 U.S. 466, 490,147 L. Ed. 2d 435, 455,120 S. Ct. 2348,
2363-67, (2000). In *Apprendi*, the U.S. Supreme Court held that "[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530
U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The trial court determined that the
crime was motivated by bias based on race and therefore increased the defendant's sentence. The
*Apprendi* Court concluded that it is unconstitutional, and a violation of a defendant's due process
rights, for a legislature to remove from the jury the assessment of facts that increase the
prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at
490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In this case the trial judge sentenced defendant
under 730 ILCS 5/5-8-4(a), which calls for the imposition of consecutive sentences in cases of

-13-

1-99-0152

multiple convictions arising out of a single course of conduct if one of the offenses is either a

Class 1 or Class X felony and the court finds that the defendant inflicted severe bodily injury.

Section 5-8-4(a) states in pertinent part:

> "The court shall not impose consecutive sentences for offenses
> which were committed as part of a single course of conduct during
> which there was no substantial change in the nature of the criminal
> objective, unless, one of the offenses for which defendant was
> convicted was a Class X or Class 1 felony and the defendant
> inflicted severe bodily injury ***." 730 ILCS 5/5-8-4(a) (West
> 1998).

Recently, in *People v. Wagener*, our supreme court held that *Apprendi* concerns are not

implicated by consecutive sentencing. *People v. Wagener*, No. 88843, slip op. at 14 (June 1,

2000). Noting that consecutive sentences remain discrete and do not transmute into a single

sentence, the *Wagener* court determined that consecutive sentences cannot run afoul of *Apprendi*,

as that case only addresses sentences for individual crimes. *Wagener*, slip op. at 14-15.

Accordingly, the *Wagener* court concluded that section 5-8-4(b), which allows the imposition of

consecutive sentences where the sentencing court is of the opinion that such a term is necessary to

protect the public from further criminal conduct by the defendant, passes constitutional muster.

*Wagener*, slip op. at 15. Following the reasoning of *Wagener*, we conclude that section 5-8-4(a),

under which defendant was sentenced, also passes constitutional muster. Thus, we affirm the trial

court's order imposing consecutive sentences.

For the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, J., with McNULTY, P.J., and TULLY, J., concurring.

-14-

C 30075

**File Date:** _7-1-2008_

**Case No:** _08cv1775_

**ATTACHMENT #** _____

**EXHIBIT** _K to M_

**TAB (DESCRIPTION)**

_____

STATE OF ILLINOIS    )
                       )
COUNTY OF COOK    )

## IN THE CIRCUIT COURT OF COOK COUNTY
## ILLINOIS COUNTY DEPARTMENT - CRIMINAL DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, )<br><br>Respondent. )<br>              )<br>vs.              )<br>              )<br>TONY HILLARD,    )<br>              )<br>Petitioner.    ) | No. 97-CR-30453<br>Judge: Michael Toomin |

### PETITIONER'S SECOND SUPPLEMENTAL PETITION

**NOW COMES,** Petitioner, **TONY HILLARD**, by his attorney, **EDWIN A.**

**BURNETTE**, Cook County Public Defender, through **ELYSE KRUG MILLER**, Assistant

Public Defender and presents this Supplemental Petition which supplements but does not

supercede Petitioner's original *pro se* petition filed. In support of this Petition, Petitioner

submits the following:

1. Petitioner Hillard was convicted of armed robbery, aggravated kidnaping, armed

violence and aggravated battery following a jury trial.

2. At the sentencing hearing on October 26, 1998, Petitioner was sentenced to 25 years

for armed violence, 15 years for armed robbery and 10 years for aggravated kidnapping. All

sentences were ordered to run consecutively. (Vol. 7, F26)

1

3. Petitioner filed a timely post-conviction petition on or about August 18, 2001. He alleged his trial counsel was ineffective for failing to call Petitioner's sister at the motion to suppress hearing as she would have testified that she never told the police that Petitioner must have taken her gun. In his original petition, Petitioner did not raise any issue regarding his armed violence sentence.

### COUNT I

Petitioner's 25 year sentence for armed violence must be vacated under the Illinois Supreme Court decision in *People v. Cervantes*, 189 Ill.2d 80 (1999)

### MEMORANDUM OF LAW

At the time of Petitioner's sentencing hearing, in 1998, the armed violence statute required a minimum sentence of 15 years. Petitioner was sentenced to 25 years. On December 2, 1999 our supreme court held, in *People v. Cervantes*, 189 Ill.2d 80, that the public act, 88-680, under which this minimum sentence was enacted violated the single-subject rule of the Illinois constitution. The minimum sentence for armed violence should be 6 years. Petitioner filed a direct appeal of his conviction and sentence. The appeal number was 99-0152. He was appointed counsel on appeal. Appellate counsel filed Petitioner's opening brief on March 10, 2000, 3 months after *Cervantes* was decided. However, appellate counsel failed to raise *Cervantes* on appeal, and, therefore, provided ineffective assistance to Petitioner on direct appeal.. The two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984) applies to claims of ineffective assistance of appellate counsel. *People v. Simpson*, 204 Ill.2d 536, 566 (2001) Although issues not raised on direct appeal are waived, no waiver exists when a petitioner, as in

2

C 00077

the case at bar, alleges his appellate attorney was ineffective for failing to raise the issue on direct

appeal. *People v. Flores,* 153 Ill.2d 264, 278 (1992) A post-conviction petition is an appropriate

method for a defendant to claim that his appellate attorney was ineffective for failing to present

an argument during the Petitioner's direct appeal. *People v. Salazar,* 162 Ill.2d 513, 519-520

(1994) Appellate counsel's failure to raise the meritorious issue under *Cervantes* was

"objectively unreasonable" and had it been raised the appellate court would have vacated his

armed violence sentence and remanded the case back to the trial court for a new sentencing

hearing.

## COUNT II

Petitioner was denied effective assistance of counsel when his attorney failed to call a

crucial witness at his suppression hearing who would have testified that she never told the police

that Petitioner took her gun.

## MEMORANDUM OF LAW

Petitioner filed a motion to quash arrest and suppress an out of court identification. (Vol.

I, A3) At the hearing, Officer Vernon Bradley testified that he was assigned to investigate an

armed robbery and aggravated battery of Yinka Jinadu. (Vol. I, B4) Inside the apartment where

the complainant was attacked, the police found two guns, one of which was a .38 caliber Smith

and Wesson. (Vol. I, B11) The police discovered that the gun was registered to a Loretha

Hillard. (Vol. I, B15) Loretha had reported her gun as stolen. (Vol. I, B19) Bradley testified that

Loretha told him that if her gun was stolen the only person who could have stolen it was her

brother, Tony. (Vol. I, B20) Loretha also told him that Petitioner lived with his girlfriend,

3

C 00078

Pookie, at 714 Division in Chicago. (Vol. I, B20)   Loretha told Bradley where she could find Petitioner. (Vol. I, B59, 62-63)

Defense counsel never called Loretha at the suppression hearing. Attached to this petition is the affidavit of Loretha Hillard, signed and notarized on June 26, 2001, in which she denies ever telling the police that her brother took her gun. In fact, when asked whether she thought any family members would take her weapon, Loretha replied no. (Affidavit of Loretha Hillard)

Petitioner was denied effective assistance of trial counsel when his attorney failed to call Loretha Hillard at the suppression hearing to rebut Officer Bradley's testimony. In *Strickland v. Washington,* 466 U.S. 668 (1984), the defedant must show that counsel's representation fell below an objetive standard of reasonableness and the defendant was prejudiced; that is, but for counsel's errors, the results of the proceedings would have been different.   Whether counsel was ineffective for failure to investigate (as Petitioner alleges in his *pro se* petition) is determined by the value of the evidence that was not presented. *People v. Dillard,* 204 Ill.App.3d 7, 10, 561 N.E.2d 1219 (1990) Attorneys have an obligation to explore all readily available sources of evidence that could possibly benefit their clients. *People v. Morris,* 335 Ill.App.3d 70, 79,779 N.E.504 (1st Dist. 2002) Relying mainly on the information that the police claimed Loretha Hillard gave them, the court ruled that the police had probable cause to arrest Petitioner and denied the motion to quash and suppress. (Vol. I, B111-113)

In order to rebut the police testimony defense counsel should have called Loretha Hillard since she had an obligation to present evidence beneficial to Petitioner. Her failure to do so constituted a constitutional claim of ineffective assistance of counsel. At this stage, with

4

C 00079

Loretha's affidavit, a substantial showing of a constitutional violation has been demonstrated.

Therefore, Petitioner asks this Court to set this case for an evidentiary hearing. *People v.*

*Morris,,* 335 Ill.App.3d 70, 76, 779 N.E.2d 504, 510 (1st Dist. 2002)

Respectfully submitted,

Elyse Krug Miller
Assistant Public Defender

EDWIN A. BURNETTE
PUBLIC DEFENDER OF COOK COUNTY
ATTORNEY NO. 30295
2650 S. CALIFORNIA AVE.
CHICAGO, ILLINOIS   60608
(773) 869-3217

5

C 00000

STATE OF ILLINOIS    )
                       ) SS
COUNTY OF COOK     )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

TONY HILLARD                   )
                               )
      Petitioner,          )
                               ) INDICTMENT NUMBER 79 CR 30453
   -vs-                    )
                               )
PEOPLE OF THE STATE OF ILLINOIS, )
                               )
      Respondent.        )

## C E R T I F I C A T E

I, ELYSE KRUG MILLER, Assistant Public Defender of Cook County, certify in accordance with Rule 651 (c) of the Illinois Supreme Court that:

1. I have consulted with petitioner, TONY HILLARD, by telephone and by letter, to ascertain his contentions of deprivations of his constitutional rights.

2. I have obtained and examined the Report of Proceedings of the trial and sentencing concerning Indictment Number 97 CR 30453.

3. I prepared a Second Supplemental Petition for Post Conviction Relief, augmenting petitioner's previously filed *pro se* Petition the attorney-drafted First Petition, the latter having been filed on November 26, 2003.

                                **ELYSE KRUG MILLER**
                                Assistant Public Defender

Date: *February 4, 2004*

C 00091

STATE OF ILLINOIS        )
                         )SS.
COUNTY OF COOK           )

400 **FILED**

TIME_____ AM
           PM

FEB 1 9 2004

Dorothy Brown
Clerk of the Circuit Court
Criminal Division

Deputy Clerk Signature

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT      -      CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS   )
                Plaintiff-Respondent   )
                                       )
                                       )   CASE NO. 97CR30453
                vs.                    )   THE HONORABLE MICHAEL TOOMIN
                                       )   Judge Presiding
TONY HILLARD                           )
                Defendant-Petitioner   )

## AMENDED MOTION TO DISMISS

Now come the People of the State of Illinois, by and through their attorney, Richard A.

Devine, State's Attorney of Cook County, through his assistant, Christine Stephens, and respectfully

moves this Honorable Court to strike the *pro se*, original supplemental and second supplemental

petitions for post-conviction relief and to dismiss the proceedings for the following reasons:

### STATEMENT OF FACTS

In May of 1997, Yinka Jinadu was hit over the head with a baseball bat as he entered the

apartment of his estranged wife Delores. When he awoke, he discovered that he was stripped of

his clothing and his feet were bound with electrical tape. He also saw his wife and three or four

other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other,

and a scarf covering the lower portion of his face. Erven Walls also displayed a gun in his hand.

The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed, and hit

1

EXHIBIT L

him on the head again with an iron object. Walls then walked over to Jinadu and repeatedly hit him on the head and around the eyes. Walls and the man with the bat then pulled Jinadu into the bathroom, handcuffed him, and placed him in the bathtub.

Petitioner Tony Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Petitioner then walked out of the bathroom and came back holding a pillow and the gun. Walls also returned to the bathroom carrying handcuffs. He and petitioner put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Petitioner then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jinadu was threatened at gunpoint to tell the men where he kept his money. Petitioner placed a towel over Jinadu, turned on the faucet in the tub, and left. Eventually, Jinadu was able to free himself from the electrical tape. Upon opening the bathroom door, he saw that he was alone in the apartment. After exiting the apartment and walking out onto the street, he saw the man with the baseball bat and Walls outside. They both fled upon seeing Jinadu.

Police arrived and spoke to Jinadu. They then entered the apartment where they recovered several items including two loaded revolvers. Detective Bradley learned that one of the recovered guns was registered to Loretha Hillard. He called her on the phone, at which time she told him that the only person who would have taken her gun was her brother, petitioner. In addition to his name, she also gave Detective Bradley petitioner's address.

Detective Bradley went to that address with other officers. Benicia Eberhardt answered the door and petitioner was standing behind her. Detective Bradley observed that petitioner matched the description given by Jinadu as one of the offenders. Petitioner initially provided

2

C 00085

him with a fictitious name and denied stealing his sister's gun.  Petitioner agreed to accompany

the officers to the police station for investigation.  Thereafter, he told Detective Bradley that his

name was Tony Hillard.  Petitioner was arrested, placed in a lineup, and later identified by Jinadu

as one of the offenders.

## PROCEDURAL POSTURE

Following a pre-trial hearing, this Honorable Court denied petitioner's motion to quash

arrest and suppress evidence.  On July 15, 1998, a jury convicted him of armed robbery, armed

violence, aggravated kidnapping and aggravated battery.  Later, on October 26, 1998, this court

sentenced petitioner to a total of fifty years in the Illinois Department of Corrections.  On June

11, 2001, his conviction and sentence were affirmed on direct appeal.  (Exhibit A attached)

Thereafter, on August 27, 2001, petitioner filed the instant *pro se* petition for post-conviction

relief.  He filed a supplemental post-conviction petition through his assistant public defender on

November 25, 2003.

## PETITIONER IS NOT ENTITLED TO POST-CONVICTION RELIEF WHERE HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM IS BOTH WAIVED AND ENTIRELY WITHOUT MERIT.

Petitioner now complains that he received ineffective assistance of counsel because his trial

attorney allegedly did not "investigate the evidence presented against the petitioner during a motion

hearing to suppress or quash the arrest." (P.C. Pet. p. 2)  Specifically, he claims that at that hearing

his trial attorney should have called petitioner's sister, Loretha Hillard, who allegedly would have

3

C 00084

testified that she never told the police that she believed petitioner took her gun, which petitioner insists would have resulted in a finding of no probable cause. (P.C. Pet. p. 2-4) Yet because petitioner failed to raise any allegations of ineffective assistance of trial counsel in his direct appeal, they are now waived. It is well-established law in Illinois that the scope of post-conviction review is limited by the doctrines of *res judicata* and waiver. Where the petitioner has appealed his convictions, all issues actually adjudicated on direct appeal are *res judicata*, and all issues which petitioner could have raised in his direct appeal but failed to raise are deemed waived. People v. Stewart, 123 Ill.2d 368, 528 N.E.2d 631 (1988); People v. Gaines, 105 Ill.2d 79, 473 N.E.2d 868 (1984); People v. Derengowski, 44 Ill.2d 476, 256 N.E.2d 455 (1970). Because petitioner raised not one complaint about his trial counsel in his direct appeal, his untimely efforts to do so now are waived.

Even a ssuming *a rguendo* t hat t his a llegation o f i neffective a ssistance o f t rial c ounsel survives waiver, it still fails because it is entirely without merit.

According to the United States Supreme Court in Strickland v. Washington, to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show, "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2055 (1984).

In judging an ineffective assistance of counsel claim, the benchmark is whether the attorney's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. The Strickland analysis involves a two-step inquiry. The defendant must show that his attorney's specific

4

C 30085

acts or omissions to act fell below the standard of reasonable professional judgment. Id.; People v. Albanese, 104 Ill.2d 504, 525, 473 N.E.2d 1246, 1255 (1984), cert denied sub nom., Albanese v. Illinois, 471 U.S. 1044, 105 S.Ct. 1061 (1985). The reasonableness of an attorney's action is determined in light of the facts of the particular case, viewed not in hindsight, but as of the time of the conduct. Strickland, 466 U.S. at 690, 104 S.Ct. at 2066; People v. Spicer, 163 Ill. App. 3d 81, 93, 516 N.E.2d 491, 500 (1987), appeal denied, 119 Ill.2d 571, 522 N.E.2d 1254 (1988). There is a presumption that counsel has provided adequate assistance and has exercised reasonable professional judgment. Strickland, 466 U.S. at 690, 104 S.Ct. at 2066; Spicer, 163 Ill. App. 3d at 93, 516 N.E.2d at 499.

Even if a defendant can show that his attorney acted below the standard of reasonableness, he cannot succeed in an ineffective assistance of counsel claim unless he can prove to a reasonable probability that, but for his attorney's errors, the outcome of his case would have been different. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068; Albanese, 104 Ill.2d at 525, 473 N.E.2d at 1255. Because petitioner in the instant case fails to satisfy either prong, his petition must be dismissed.

Here, petitioner fails to show that his attorney's performance was deficient since he alleges no facts demonstrating that he ever informed trial counsel of Loretha Hillard's purported testimony. On the contrary, the evidence showed that Ms. Hillard would have been a beneficial witness to the prosecution, but harmful to the defense. Where the circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation. People v. Orange, 168 Ill.2d 138, 150 (1995). Not once in Ms. Hillard's affidavit does she assert that trial counsel was aware of her current allegations, allegations which are in stark contrast to the testimony presented at the motion to quash

5

arrest and suppress evidence. Nor does she assert that she attempted to make counsel aware of the instant allegations. Absent such facts, petitioner cannot establish that his attorney's representation fell below an objective standard of reasonableness. Satisfying neither prong of Strickland, petitioner's argument fails.

Furthermore, it is important to recognize that the mere fact that a witness did not testify does not allow the inference that counsel did not investigate the witness. People v. Kluppelberg, 257 Ill.App.3d 516, 628 N.E.2d 908 (1993). Illinois cases provide that the decision whether to call a particular witness is generally a matter of trial strategy or tactics and will not support a claim of ineffective assistance of counsel. People v. Flores, 128 Ill.2d 66, 538 N.E.2d 481, 488 (1989); People v. Ashford, 121 Ill.2d 55, 520 N.E.2d 632, 636 (1988). This petition must be dismissed.

### PETITIONER'S ARGUMENT FAILS WHERE HE REFUTES HIS OWN CLAIM THAT THE PROSECUTION WITHHELD EXCULPATORY EVIDENCE FROM THE DEFENSE.

In another attempt at post-conviction relief, petitioner claims that the "prosecutor withheld exculpatory evidence from the defense counsel pertaining to the ownership of the gun recovered at the scene of the crime." (P.C. pet. 5) The argument that follows contradicts this allegation, since he then admits that "it was determined that the gun was registered to [petitioner's] sister," a fact that was also brought out at the motion to quash arrest and suppress evidence, at trial, and in Ms. Hillard's recent affidavit. (P.C. pet. 5) Petitioner's argument fails.

Petitioner adds that Ms. Hillard's affidavit is "proof positive that the officer lied on the witness stand and that the prosecutor suborned that lie." (P.C. 5) Petitioner forgets that this affidavit

6

C 00087

wasn't signed until June 26, 2001, over three years after petitioner's trial. Again, petitioner offers

zero evidence to show that Ms. Hillard's current story was the same in 1998. Rather, the evidence

back then showed quite the contrary. Furthermore, Ms. Hillard is petitioner's sister. Clearly

petitioner, not trial counsel, had a better idea as to whether her testimony would have been beneficial

to the defense. Petitioner could have called her as a witness had he wished. Yet not once does

petitioner claim that he ever asked his attorney to do so. Given these facts, his argument must be

rejected.

### PETITIONER'S DEMAND FOR POST-CONVICTION RELIEF IS UNWARRANTED WHERE HIS SENTENCE WAS ALREADY UPHELD ON DIRECT APPEAL AND WHERE HE FAILED TO CHALLENGE HIS ARMED VIOLENCE SENTENCE IN THAT APPEAL, WAIVING THIS ISSUE.

Petitioner complains that his armed violence sentence must be vacated under People v.

Cervantes, 189 Ill.2d 80, 723 N.E.2d 265 (1999). In an unsuccessful challenge to his consecutive

terms of imprisonment, the First District Illinois Appellate Court already reviewed and upheld

his sentence on direct appeal. (Exhibit A) As such, further challenges to his sentence are now

res judicata. Moreover, because he did not specifically challenge his sentence for armed

violence in his direct appeal, it is also waived. Stewart, Gaines, Derengowski, supra.

Furthermore, if it was deemed necessary, the appellate court was free to reverse petitioner's

armed violence sentence on its own. It chose not to do so. This petition must be dismissed.

7

C 00088

## APPELLATE COUNSEL WAS NOT INEFFECTIVE FOR DECIDING NOT TO CHALLENGE HIS ARMED VIOLENCE SENTENCE ON DIRECT APPEAL.

In his second supplemental petition, petitioner adds that appellate counsel was ineffective for failing to challenge his armed violence sentence under Cervantes, *supra* on direct appeal. (2nd Supp. p. 2-3) Because petitioner fails to demonstrate he was prejudiced by that decision, this argument is without merit.

The two-prong Strickland test applies to claims of ineffective appellate counsel. People v. Caballero, 126 Ill.2d 248, 269-70, 533 N.E.2d 1089 (1989). A defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating such a failure was objectively unreasonable and that counsel's decision prejudiced defendant. People v. Enis, 194 Ill.2d 361, 377, 743 N.E.2d 1 (2000). Normally, appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. People v. Mack, 167 Ill.2d 525, 532-33, 658 N.E.2d 437 (1995).

Here, petitioner received a sentence of twenty-five years in the Illinois Department of Corrections on his armed violence conviction. That sentence falls within the legal sentencing range of six to thirty years' imprisonment. Petitioner's sentence was based not only on his active participation in the torture of the victim, it was also based on his criminal and personal background. (Exhibit B attached) As such, this sentence was in no way excessive. Furthermore, the appellate court did not find it excessive. Because petitioner cannot establish prejudice, his complaint about appellate counsel fails under Strickland.

8

C 00089

WHEREFORE, the respondent prays that an order be entered by this Honorable Court, striking the petitions for post-conviction relief of the petitioner Tony Hillard, and dismissing the proceedings.

Respectfully submitted

RICHARD A. DEVINE

States Attorney of
Cook County, Illinois

By:  Christine Stephens
Assistant States Attorney

9

C 00020



FIRST DIVISION
June 11, 2001

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

No. 1-99-0152

### IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 97 CR 30453 |
| | ) | |
| TONY HILLARD, | ) | Honorable Michael Toomin, Judge Presiding. |
| Defendant-Appellant. | ) | |

**RECEIVED**

**NOV 0 8 2001**

**CLERK OF THE CIRCUIT COURT**
**CRIMINAL DIVISION**

### ORDER

Defendant Tony Hillard was convicted in a jury trial of armed robbery, armed violence, aggravated kidnaping, and aggravated battery. He was sentenced to 50 years' imprisonment. On appeal, defendant raises four issues. He contends that: (1) the trial court erred in failing to grant his motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly sentenced defendant to a consecutive sentence. We affirm.

1-99-0152

## BACKGROUND

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed and hit him on the head again with an iron object. Codefendant then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Codefendant and the man with the bat then pulled Jinadu into the bathroom, handcuffed him and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the bathroom and came back holding a pillow and the gun. Codefendant also returned to the bathroom carrying handcuffs. He and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street

-2-

C 00092

1-99-0152

where he saw the man with the baseball bat and codefendant standing across the street. Upon

seeing him, both men fled down the street.

Defendant and codefendant Walls were tried simultaneously before two juries. Prior to

trial, defendant moved for a motion to quash his arrest and suppress evidence. The trial court

denied the motion to quash finding that Detective Brady had reasonable grounds to believe that

defendant had committed the offense and that probable cause to arrest him existed. Prior to trial,

the trial court noted that both juries would be present during the cross-examination of the victim.

At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership

and eventually started his own trucking company. He met and married Delores in 1995 and they

separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10,

1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him,

Delores explained that her car was broken and asked Jinadu to pick her up at her apartment.

Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the

apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the

door he was hit on the head with a baseball bat and lost consciousness. After regaining

consciousness, Jinadu was placed in a bathtub and repeatedly beaten and threatened by the men in

the apartment. After the men left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by

a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open

head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu

showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw

-3-

C 00093

1-99-0152

hundreds of plastic bags, a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Jinadu also described the height, weight and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Crane. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven and Delores at 1121 South State Street. Codefendant Erven Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha Hillard. He called Laretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address. He went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and

-4-

C 00094

1-99-0152

defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he

had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked

if he would accompany officers to the police station to discuss the theft of his sister's gun,

defendant said that he would. Defendant then told the detectives his name and again denied any

knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police

station and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's

testimony before the grand jury. Defendant was found guilty by the jury of armed robbery,

aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years'

imprisonment.

## ANALYSIS

Defendant first challenges the trial court's finding in denying defendant's motion to quash

arrest and suppress evidence. In denying defendant's motion, the trial court noted some of the

facts known to the police at the time of the arrest. We will summarize some of those facts in

order to illustrate why under the totality of the circumstances known to the police officers at the

time of the arrest there was sufficient information to warrant a reasonably prudent person to

believe that defendant had committed a crime.

Benicia Eberhardt testified on behalf of defendant. She stated that she was in her bedroom

with defendant when there was a knock on the door. She opened the door and saw three or four

police officers standing in the hallway. At the time, defendant was standing a few feet behind her.

She stated that the police officers pushed her out of the way, walked into the apartment and

-5-

C 00095

1-99-0152

grabbed defendant. Defendant was taken into his room to put on some clothes while two officers searched the apartment. Defendant was then handcuffed and taken to the police station.

Detective Bradley testified that he spoke to the victim two days after the incident. Jinadu immediately identified his wife, Delores. He also identified codefendant Erven Walls from a drivers license which was found in the apartment on the day of the incident. He identified Walls as his wife's boyfriend who he had seen on previous occasions. Jinadu also gave Detective Bradley the physical description of the other three offenders. He described them as being in their twenties. One offender was 5'11" and weighed 200 lbs with black hair and brown eyes. Another offender was 5'11", 165 lbs. Finally, the last offender was approximately 5'5", 145 lbs with brown eyes and black hair. Detective Bradley testified that one of the guns found in the apartment was registered to Loretha Hillard. He called Ms. Hillard and spoke to her on the telephone. Ms. Hillard informed Detective Bradley that she was an ex-security guard for the Chicago Housing Authority. She further told Detective Bradley that her gun had been taken and that the only person who would have taken it was her brother, Tony Hillard. Ms. Hillard told Detective Bradley the address and apartment number of where defendant and his girlfriend lived. Detective Bradley, along with other police officers, went to the address given to him by Ms. Hillard. They knocked on the door and it was opened by Benicia Eberhardt. Detective Bradley stated that he told the woman that he wanted to speak to defendant. Standing behind her was a man who fit the general description of one of the offenders which Jinadu had given to the officers.

When asked to identify himself, defendant gave Detective Bradley a fictitious name. Detective Bradley then asked him why he stole his sister's gun. Defendant replied that he did not

-6-

C 00096

1-99-0152

take his sister's gun. He was then asked to accompany the police officer's to the police station to discuss the theft of his sister's gun. Defendant said that he would go but that he had to put on his shirt and shoes. Detective Bradley followed defendant into one of the bedrooms where he told detective Bradley that his name was Tony Hillard. Defendant was taken to the police station where he was later identified by Jinadu as one of the offenders. Detective Bradley further testified that at the time of the arrest defendant was 21 years old with black hair, brown eyes, was 5'11" and weighed 170 lbs.

We note that defendant's reliance on *People v Johnson*, 94 Ill. 2d 148 (1983) and *People v. Wilson*, 260 Ill. App. 3d 364 (1994), is not applicable to the factual scenario in this case. Both *Wilson* and *Johnson* stand for the proposition that a warrantless arrest based on an informant's tip must be sufficiently reliable and corroborated so as to provide probable cause. However, the situation in this case is not governed by that principle. Here, the basis for the probable cause did not center around an informants tip but rather was based on the information from Ms. Hillard which provided a link between the stolen gun and defendant and helped the police to locate defendant. That link, however, was not the sole basis of the arrest. In addition to that information once the police were at the specific location provided by Ms. Hillard, defendant fit the description given to them by the victim.

Both the United States and the Illinois Constitutions govern the conduct of police officers in performing warrantless arrests. U.S. Const., amends. IV, XIV; Ill. Const. 1970 art. I, §6; *People v. Buss*, 187 Ill. 2d 144 (1999). These constitutional provisions allow the police to make a warrantless arrest but only if the police have knowledge "which would lead a reasonable man to

C 00097

1-99-0152

believe that a crime has occurred and that it has been committed by the defendant." *People v. Robinson*, 167 Ill. 2d 397, 405 (1995). In reviewing a probable cause challenge, the court does not apply bright-line legal rules but evaluates the police conduct in accordance with practical, every-day principles. *People v. Kidd*, 175 Ill. 2d 1, 22 (1996).

Probable cause for an arrest exists when the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. *People v. Lumpp*, 113 Ill. App. 3d 694 (1983). The court determines under the totality of the circumstances whether the evidence available to the arresting officer at the time of the arrest provides a reasonable basis for the officer to believe that the suspect committed an offense. *People v. Dizon*, 297 Ill. App. 3d 880, 885 (1998). The question is whether a reasonable person in the police officer's position would have believed that the defendant committed a crime. *People v. Adams*, 131 Ill. 2d 387, 398 (1989). Moreover, although the standard for determining whether probable cause existed for a warrantless arrest requires more than a mere suspicion on the part of the police officers, it does not require arresting officers to have in their hands evidence sufficient to convict the defendant. *Dizon*, 297 Ill. App. 3d at 885. A general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. *People v. Robinson*, 299 Ill. App. 3d 426, 431 (1998).

When defendant solely challenges the trial court's legal conclusions for denying a motion to quash arrest and suppress evidence, as in this case, our review is *de novo*. *People v. Wright*, 183 Ill. 2d 16, 21 (1998).

C 00098

1-99-0152

In applying the above principles to the present case we conclude that based on the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. The police officers were there as part of their investigation of a vicious beating and armed robbery. They had recovered a .38 caliber gun from the apartment which led them to defendant's apartment based on information which was provided by his sister. She reported that the gun was stolen from her home and informed the officers that she believed the person who stole it was defendant. She also provided the officers with defendant's name, address and apartment number. Thus, the gun found at the scene of the crime was linked to defendant. Armed with Jinadu's descriptions of the offenders and Ms. Hillard's information, the police were able to locate defendant at the exact address provided to them. Moreover, upon seeing defendant the officers realized that he fit the general description of one of the offenders. Jinadu had described one of the offenders as a black man that was 5'11" and weighed 165 lbs. He further stated that all of the offenders were in their twenties. At the time of the arrest defendant was 21 years old, was 5'11" and weighed 170 lbs. These characteristics where similar to those described by the victim. Further, when asked whether he was Tony Hillard, defendant lied and gave the officers a fictitious name. He later admitted that he was Tony Hillard. The general description of the offenders, coupled with other specific facts and circumstances provided by Ms. Hillard as well as defendant's behavior in the apartment, was sufficient to lead a reasonably prudent person to conclude that there was a reasonable probability that defendant was one of the offenders.

Defendant's second point of contention revolves around the fact that the trial court

-9-

C 00099

1-99-0152

allowed codefendant Walls' counsel to cross-examine Jinadu in front of defendant's jury.

Defendant maintains that because the defenses were antagonistic the cross-examination prejudiced

defendant's jury. Here, both defendant and codefendant were tried simultaneously before

separate juries. Prior to trial, both defense attorneys filed a motion for severance on the unlawful

use of a weapon by a felon count which the trial court granted. During the trial, the trial court

severed the cross-examination of Detective Bradley. Defendant argues that the trial court should

have also severed the cross-examination of Jinadu. Defendant argues that during the cross-

examination of the victim by codefendant's attorney, the victim named defendant as one of the

offenders thus prejudicing defendant. Specifically, Jinadu stated that one of the offenders that

pointed a gun at him was defendant.

　　　　As a general principle of law, defendants who are jointly indicted are jointly tried unless

fairness to one of the defendant's requires a separate trial to avoid prejudice. *People v. Lee*, 87

Ill. 2d 182, 187 (1981). Prejudice exists where "a co-defendant takes the stand to point a finger

at the defendant as the real perpetrator of the offense." *Lee*, 87 Ill. 2d at 187. Furthermore, the

mere apprehension of prejudice is not enough to conduct separate trials; there must be actual

hostility between the defendants in order to necessitate separate trials. *People v. Bean*, 109 Ill. 2d

80, 92 (1985). Severance is not required when codefendants' defenses are merely contradictory.

*People v. Rice*, 286 Ill. App. 3d 394 (1996), citing *People v. Lovelady*, 221 Ill. App. 3d 829, 836

(1991). The decision to grant a severance is within the sound discretion of the trial court and an

appellate court will not reverse a trial court's ruling absent an abuse of discretion. *People v.*

*Fornear*, 283 Ill. App. 3d 171 (1996).

C 00　00

1-99-0152

In this case, defendant and codefendant did not implicate each other as the perpetrators of the crime. Defendant presented an alibi defense. As defendant points out in his brief his defense was simply that he was not present at the time of the incident. Codefendant Walls' defense, on the other hand, was one of reasonable doubt. The trial court stated, in replying to defense counsel's assertion that codefendant would implicate defendant through cross-examination of the victim:

> "How does that help Mr. Wall's to point the finger at Mr. Hillard. I will wait and see if you do it. Then I'll move the jury out. I don't know why somebody who says their client wasn't there has to point the finger at another defendant and say he was there. That doesn't establish that your guy wasn't there.

> \*\*\*

> We'll have to wait and see if it happens. If it happens, I'll move the jury out to protect whatever defendant's right have to be protected. To me, this is nonsense. It's a lot of fiction that one has to point the finger to make a separate cross-examination and represent to me, I'm going to pin it on this guy in front of his jury, when it doesn't make any sense or rhyme, reason or rationale why she would do that if her client wasn't there. But, I'll hear it when I hear it."

The record in this case indicates that during the cross-examination of Jinadu by codefendant Walls' attorney there is one isolated instance in which Jinadu stated that defendant was one of the offenders who pointed a gun at him. This single reference, however, was a repetition of Jinadu's testimony on direct examination where Jinadu testified that defendant pointed a gun at him, placed the gun in Jinadu's mouth, ordered him to reveal where he kept his money, helped codefendant Walls bind Jinadu's legs and hands, placed a pillow on Jinadu's face and filled the bathtub with water. As the trial court correctly noted, the necessity of removing the

-11-

1-99-0152

jury due to an antagonistic defense did not arise in this case. Jinadu's testimony on cross-examination did not create an antagonistic defense but was cumulative of his direct testimony.

Moreover, the record indicates that the remainder of the cross-examination by counsel for codefendant Walls consisted of a series of questions designed to create a reasonable doubt that Walls was not one of the perpetrators. It did not revolve around implicating defendant as the main perpetrator. In addition, during closing arguments, codefendant's counsel argued reasonable doubt as opposed to placing the blame on defendant. In fact, defense counsel stated, "I don't know if Mr. Hillard was involved in that, in this case or not ***." Defense counsel then proceeded to attack the credibility of Jinadu and the inconsistencies in his testimony.

This court has clearly stated in *Rice* that the requirement for actual hostility which necessitates severance "is not met where, for example, one defendant claims an alibi defense and the other defendant asserts a reasonable doubt, but at no time do the defendants become rivals or accuse each other." *Rice*, 286 Ill. App. 3d at 402. Such is the situation in the present case. Given that the defenses were not antagonistic to each other and that defendant has failed to show any prejudice which resulted from Jinadu's single reference to defendant during cross-examination, the trial court correctly ruled in denying severance.

Defendant's final contention is one which he does not have standing to raise. Standing is met when: (1) the proponent of a particular legal right alleges an injury in fact; and (2) the proponent asserts his own legal rights and interests, rather than basing his claim for relief upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *People v. Bond*, 205 Ill. App. 3d 515 (1990). Here, defendant argues that it was judicial error for

-12-

C 00 02

1-99-0152

the trial court to question Detective Bradley as to whether codefendant Walls and Jermaine Craine were the same person. Defense counsel objected to the court's questioning to which the trial court replied, "[I] don't see how that affects Mr. Hillard at all." We agree with the trial court that the trial court's questions regarding identification of Walls and Craine as the same person, did not impact defendant Hillard or any of Hillard's legal rights. Defendant has failed to articulate how the trial court's actions caused defendant an injury in fact. As such, defendant's claim lacks standing for purposes of this appeal.

In a supplemental argument, defendant contends that the trial court erred in sentencing him to a consecutive sentence pursuant to section 5-8-4(a) where the sentence violated his constitutional right to due process and trial by jury according to the recent holding in the Supreme Court case *Apprendi v. New Jersey*, 530 U.S. 466, 490,147 L. Ed. 2d 435, 455,120 S. Ct. 2348, 2363-67, (2000). In *Apprendi*, the U.S. Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The trial court determined that the crime was motivated by bias based on race and therefore increased the defendant's sentence. The *Apprendi* Court concluded that it is unconstitutional, and a violation of a defendant's due process rights, for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In this case the trial judge sentenced defendant under 730 ILCS 5/5-8-4(a), which calls for the imposition of consecutive sentences in cases of

-13-

1-99-0152

multiple convictions arising out of a single course of conduct if one of the offenses is either a

Class 1 or Class X felony and the court finds that the defendant inflicted severe bodily injury.

Section 5-8-4(a) states in pertinent part:

> "The court shall not impose consecutive sentences for offenses
> which were committed as part of a single course of conduct during
> which there was no substantial change in the nature of the criminal
> objective, unless, one of the offenses for which defendant was
> convicted was a Class X or Class 1 felony and the defendant
> inflicted severe bodily injury ***." 730 ILCS 5/5-8-4(a) (West
> 1998).

Recently, in *People v. Wagener*, our supreme court held that *Apprendi* concerns are not

implicated by consecutive sentencing. *People v. Wagener*, No. 88843, slip op. at 14 (June 1,

2000). Noting that consecutive sentences remain discrete and do not transmute into a single

sentence, the *Wagener* court determined that consecutive sentences cannot run afoul of *Apprendi*,

as that case only addresses sentences for individual crimes. *Wagener*, slip op. at 14-15.

Accordingly, the *Wagener* court concluded that section 5-8-4(b), which allows the imposition of

consecutive sentences where the sentencing court is of the opinion that such a term is necessary to

protect the public from further criminal conduct by the defendant, passes constitutional muster.

*Wagener*, slip op. at 15. Following the reasoning of *Wagener*, we conclude that section 5-8-4(a),

under which defendant was sentenced, also passes constitutional muster. Thus, we affirm the trial

court's order imposing consecutive sentences.

For the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, J., with McNULTY, P.J., and TULLY, J., concurring.

-14-

C 02 04

1    STATE OF ILLINOIS   )
                         )  SS:

2    COUNTY OF C O O K  )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT - CRIMINAL DIVISION

4
    THE PEOPLE OF THE        )

5    STATE OF ILLINOIS      )
                        )

6          vs.           ) No. 97 CR 30453
                        )

7    TONY HILLARD         )

8             REPORT OF PROCEEDINGS at the hearing of

9    the above-entitled cause, had before the HONORABLE

10   MICHAEL P. TOOMIN on the 26th day of October 1998.

11

12   A P P E A R A N C E S:
             HON. RICHARD A. DEVINE
             State's Attorney of Cook County

13           BY:  MS. ANN CURTIS
                 Assistant State's Attorney

14                Appeared on behalf of the People;

15           MS. RITA FRY
             Cook County Public Defender

16           BY:  MS. CHERYL BORMANN
                 Assistant Public Defender

17                Appeared on behalf of the Defendant.

18

19

20

21

22

23   JO ANN KROLICKI, CSR
     Official Court Reporter

24   Illinois License No. 084-002215

1

1                          I N D E X

2

3      People vs. Tony Hillard

4      Date of Hearing:  10-26-98

5      Page Numbers:  1 through 29

6

7                        PROCEEDINGS

8                                                      PAGE

9      POST-TRIAL MOTIONS                                3

10     SENTENCING HEARING                                6
       WITNESSES:                    DX   CX   RDX   RCX
11     WARREN PARNELL                 7

12     SENTENCING                                        23

13

14
                         EXHIBITS
15                                    ID         REC.
       None
16

17

18

19

20

21

22

23

24

C09 06

1                    THE CLERK:  Tony Hillard.

2                    MS. BORMANN:  Your Honor, this is Tony

3       Hillard.  I'm asking on today's date to file an

4       Amended Motion for a New Trial.  I believe it's

5       actually already in the court file.

6                    The only difference between the

7       amended motion and the motion I filed previously is

8       the last paragraph, which alleges that the sentencing

9       scheme of the current armed violence statute is

10      unconstitutional as it violates the single subject

11      rule.

12                   MS. CURTIS:  Your Honor, on the last court

13      date, counsel provided a 2nd District opinion

14      regarding that matter.  On today's date, I have

15      supplied both to the Court and to counsel the First

16      District's ruling on the same matter wherein it found

17      that, in fact, the single subject rule was not

18      violating.  In fact, that the

19      armed violence is constitutional.

20                   MS. BORMANN:  That's correct.  In fact, I

21      believe I informed the Court on the last court date

22      that there was a First District case because it was

23      mentioned in the Danety (phonetic) opinion, so there

24      is currently a split among the circuits regarding

3

1    that issue.

2           THE COURT:  Well, in the Lortell Wiggins

3    (phonetic) case, Miss Curtis, was that

4    armed violence that was at issue there or unlawful

5    use of weapons?

6           MS. CURTIS:  Yes.  Actually, I think it was

7    the WIC.  It wasn't even --

8           THE COURT:  The WIC?

9           MS. CURTIS:  Yes.  I believe that was the

10   issue that brought it to the Court.  However, in

11   ruling upon it, it held that all of the matters that

12   were taken up in that bill were appropriately in the

13   bill and that there was no violation of the single

14   subject rule.

15          MS. BORMANN:  That's correct.  And the 2nd

16   Circuit came to exactly the opposing opinion based

17   upon the inclusion of the WIC Act as it was included

18   in the Safe Neighborhood Act.  It regulated things

19   like who could sell WIC, who could buy WIC, how they

20   did the voucher system, and it had nothing to do with

21   criminal activities, and they found that violative of

22   the single subject rule in the 2nd District.

23          THE COURT:  Anything else you want to say

24   about the motion?

4

1          MS. BORMANN:  No, your Honor.  We'd rest on

2     the motion as filed.  It's pretty extensive.

3          THE COURT:  Yes.  I have had occasion

4     earlier before the amendment was filed to study the

5     motion for a new trial.

6               Does the state have any comment on

7     it?

8          MS. CURTIS:  Your Honor, we believe you

9     ruled appropriately throughout the trial, and the

10    only comment is we are in the First District, and

11    we'd ask this Court follow the ruling of the First

12    District opinion.

13         THE COURT:  Well, I believe that I am

14    obliged to follow the ruling of the First District in

15    the Wiggins case, so I do not believe there's a

16    violation of the single subject rule here based upon

17    that holding.

18              The other matters that have been

19    urged here, many of them were presented to the Court

20    for pretrial rulings, also for evidentiary rulings,

21    rulings relating to offers of evidence as well as

22    the motions to dismiss various counts of the

23    indictment.

24              I do not find the rulings of the

CCO 09

1    Court to be in error at this time, and I will deny

2    the Motion for a New Trial.  The motion is hearby

3    denied.

4         MS. BORMANN:  Thank you, your Honor.  I

5    believe we're ready to proceed to sentencing.

6         THE COURT:  Very well.  Does the state have

7    any live witnesses today?

8         MS. CURTIS:  No, your Honor.

9         THE COURT:  Defense?

10         MS. BORMANN:  Yes, your Honor.

11         THE COURT:  Why don't I hear from your

12    witnesses first?

13         MS. BORMANN:  Thank you.  I'd ask to call

14    Mr. Parnell.

15         THE COURT:  Raise your right hand, please.

16              (Witness sworn.)

17    WHEREUPON,

18              WARREN PARNELL,

19    called as a witness on behalf of the Defendant,

20    having been first duly sworn, under oath was examined

21    and testified as follows:

22              DIRECT EXAMINATION

23              BY MS. BORMANN:

24         Q.   Can you please tell the judge your

6

1   name?

2        A.   First name is Warren Parnell,

3   P-a-r-n-e-l-l.

4        Q.   Mr. Parnell, are you employed?

5        A.   Yes, I am.

6        Q.   By whom are you employed?

7        A.   I'm employed by Scott Wesler Service

8   (phonetic).

9        Q.   What do you do for them?

10       A.   I'm a claims adjustor.

11       Q.   Do you also have a vocation that does not

12   pay you?

13       A.   Yes, I do.

14       Q.   What is that vocation?

15       A.   I'm a minister at the New Covenant Life

16   Church.  I also am a participant in prison

17   ministry.

18       Q.   Part of your duties as a minister of the

19   church is also being part of your prison ministry

20   here at the Cook County Jail; correct?

21       A.   Correct.

22       Q.   Do you know the gentleman standing to your

23   right, Mr. Tony Hillard?

24       A.   Yes, I do.

7

1       Q.   Can you tell us something he's wearing and

2   point to him, please?

3       A.   Mr. Hillard standing right to my right

4   (indicating.)

5            MS. BORMANN:  Your Honor, may the record

6   indicate that he's pointed to Mr. Hill?

7            THE COURT:  Yes.

8   BY MS. BORMANN:

9       Q.   How long have you known Mr. Hillard?

10      A.   Almost 15-to-20 years.

11      Q.   And how is it that you know Mr. Hillard

12  originally?

13      A.   Originally, I know Mr. Hillard from the old

14  community that I used to stay in, which is --

15      Q.   Which community is that?

16      A.   Cabrini Green.

17      Q.   Did you grow up in Cabrini Green?

18      A.   Yes, I did.

19      Q.   At what point in your life did you leave

20  Cabrini Green?

21      A.   I left Cabrini Green in '84 or '85.  I

22  moved to the west side.

23      Q.   Is that now currently where you reside?

24      A.   No.  I currently reside at 1238 West 101st

8

C00012

1    Place.

2         Q.    On the south side?

3         A.    Yes.

4         Q.    Now, you have said you have known

5    Mr. Hillard 15 or 20 years.  How is it that you

6    actually met him other than living in the same

7    neighborhood?

8         A.    I used to engage in fellowship with his

9    older brother, Jerome Hillard, and through he and I

10   being buddies in the old community, I met

11   Mr. Hillard.

12        Q.    Okay.  And how old was Mr. Hillard when you

13   first met him?

14        A.    Mr. Hillard was quite young at that time.

15   I believe no more than seven, eight, somewhere

16   around there.  I was kind of young myself at that

17   time.

18        Q.    Have you had a chance over the years --

19   since 1985, have you had regular contact with Tony

20   Hillard or not?

21        A.    Yes.  I would frequently go over to Cabrini

22   Green and just visit the old neighborhood, see how

23   people are doing, just to talk and get an update of

24   what's going on.

9

C 0 0 ' ' 3

1           Q.    Since Mr. Hillard has been incarcerated on

2     this case, have you had occasion to see him during

3     the pendency of this matter?

4           A.    Yes, I have.

5           Q.    Where has that been?

6           A.    That's been in Division 1 of Cook County

7     Jail.

8           Q.    And how often are you in Division 1 of

9     Cook County Jail?

10          A.    Every Saturday.

11          Q.    And what is your purpose for being in

12    Division 1 every Saturday?

13          A.    To go and minister to the men that's locked

14    up.

15          Q.    And would you minister to those men whether

16    or not Tony Hillard was there?

17          A.    Yes.

18          Q.    And did you, in fact, prior to Mr. Hillard

19    being incarcerated on this case, go to Division 1

20    every Saturday?

21          A.    Yes.

22          Q.    Since you have been ministering at Cook

23    County Jail, has Mr. Hillard been actively involved

24    in your ministry at Division 1?

10

C 0 0 1 ´ 4

1          A.    Yes, he is.

2          Q.    Can you explain that to us?

3          A.    When I first started going to Division 1, I

4    had occasion to meet Mr. Hillard.  I did not know he

5    was there, but since then, I have been going, and

6    since he's been there, he's been a fellow participant

7    in our ministry.

8                When I first started coming, he was

9    kind of, you know, back, but the last six, seven

10   months, he's been right there up front in organizing

11   the ministry get-together, getting people to calm

12   down.  When I come in, he asks the brothers to turn

13   the TV down and kind of bring the noise to a level

14   where those who want to hear me preach can come up

15   close and hear me.

16               So he's been a leader in helping me

17   out to organize the meetings.  Even when I'm not

18   there, he's leading a prayer group.  He's leading a

19   service even while we're not there.

20         Q.    Now, you know that Mr. Hillard has

21   previously been convicted of two drug offenses in his

22   background?

23         A.    Yes.

24         Q.    In 1992 and 1994; correct?

C00  ˊ5

1          A.    Yes.

2          Q.    You knew him back in those days; correct?

3          A.    Yes, I did.

4          Q.    Have you seen a change in him between those

5     days of 1992 until the present time, which is October

6     of 1998?

7          A.    Yes, I have.   I have seen a change.

8          Q.    Can you tell the judge what that change

9     is?

10         A.    There's a demonstration in his character

11    where -- you can tell anybody from their character.

12    I seen a demonstration of his character not only by

13    how he's acting around when I'm there, but also when

14    I'm not there.   To me, that's the key.

15         Q.    What do you mean about when you're not

16    there since you're not there?

17         A.    He doesn't know, but I have asked fellow

18    individuals and guards to keep an eye on

19    Mr. Hillard to let me know how he's doing.   Sometimes

20    they can portray one way while you're there, and when

21    you're not, there's a different character.

22                    I have asked individuals to keep an

23    eye on him and give me a report, and there's always a

24    good report.   Mr. Hillard is doing good.   He's

C00116

1     keeping low key.  He's reading his Bible.  He's

2     keeping the guys together.  He try to talk to guys,

3     and there's always a positive aroma about himself.

4          Q.   As a result of that positive -- his

5     positive actions, has he recently been transferred in

6     Division 1?

7          A.   Yes, he has.

8          Q.   And where was he transferred from and where

9     to?

10         A.   He was transferred, I believe, from E-1

11    to G-2, and G-2 they have a cell block where

12    christians can interact, and that's only done when

13    persons show good behavior, good attitude, and they

14    saw that in Mr. Hillard, and they allowed him to go

15    to G-2.

16         Q.   You have obviously known the family for

17    quite awhile?

18         A.   Yes.

19         Q.   Do you still keep in contact with

20    Mr. Hillard's older brother?

21         A.   When I have an opportunity to visit the

22    neighborhood.

23         Q.   Is Miss Hillard in court today, Tony's mom?

24         A.   Yes.

13

1          Q.    Is she employed?

2          A.    Yes.  She's a nurse.

3          Q.    Is there anything else that I failed to ask

4     you that you wish to tell Judge Toomin about Mr.

5     Hillard?

6          A.    No.  There's nothing you failed to ask, but

7     I just stand on his behalf.  I know

8     Mr. Hillard from his beginning, and even now.  And if

9     Mr. Hillard was not demonstrating a character where I

10    thought he would be safe to the community, I would be

11    the first and foremost to go against anything that

12    would not be correct, because not only do I have a

13    family, I have other members who have family, and I

14    believe and have strong faith that Mr. Hillard has

15    done a change for the better.

16                MS. BORMANN:  Thank you.

17                THE WITNESS:  Thank you.

18                MS. BORMANN:  Your Honor, we have no other

19    witnesses to call in mitigation.

20                THE COURT:  All right.  I'll hear from the

21    state first.

22                MS. CURTIS:  Thank you, your Honor.

23                      Throughout the course of the jury

24    trials and the bench trial, your Honor learned of the

14

CC9 ´8

1      occurrences in 1997 which Mr. Hillard was a part of,

2      and, your Honor, I submit to you this morning that

3      this man out of all that were on trial is the most

4      dangerous.

5                        The two others that were on trial,

6      Miss Jinadu and Mr. Walls, they had a connection to

7      Yinka.  One was his wife.  One was now the boyfriend

8      of his wife.  But there's no connection with

9      Mr. Hillard and Mr. Jinadu.  He didn't know him.

10                       He joined this conspiracy to commit

11     torture without knowing the victim, without any

12     personal grudge that's foreseeable, without any bias

13     that this Court could see, and when he joined that

14     conspiracy, his actions, different than the others,

15     really indicated that he did -- he did want to kill

16     him.

17                       You may recall from the trial it's

18     this defendant that puts the gun in the victim's

19     mouth and says, no joke, tell me where the money is,

20     tell me where the car is.  He's the one that bound

21     the victim.  He's the one that went back in with the

22     gun and pillow and said, it's time for you to die,

23     and at that juncture, it was another co-offender who

24     pulled this defendant back.

15

C00  9

1                        His actions indicate one of two
2    things, either he clearly did intend to kill him, or
3    his intention was simply to psychologically torture
4    the victim while he was there bound and beaten.
5                        The defendant's background indicates
6    a corroboration for these character traits, these
7    character traits that indicate that it's easy for him
8    to pick on the weak.  It's easy for him to be cruel.
9    He has a conviction for possession of controlled
10   substance with intent to deliver, a crime wherein it
11   preys on weak and dependent people.  It preys on drug
12   addicts for profit.  That's in his background.
13                       In looking at factors of mitigation,
14   I look at, is the defendant's criminal conduct the
15   result of circumstances unlikely to occur.  What we
16   have are circumstances that will occur again and
17   again, because without provocation, this defendant
18   will eagerly join a criminal conspiracy.
19                       And what's important when the
20   Reverend spoke and what's important in reviewing the
21   defendant's presentence investigation, there is
22   nothing in this presentence investigation but
23   fabulous people to look to for conduct that he should
24   have aspired to.  His mother, who is here today in

1     court, has supported him all of his life.  She has

2     worked for the past ten years as a nurse.

3                          The defendant has never held a job.

4     The defendant has children, but does not support

5     them.  He indicates that he was not drug dependent,

6     alcohol dependent.  He has not been part of a gang.

7                          He has been surrounded and nurtured

8     in a community that, really, his conduct is the

9     exception.  He has seen good conduct, good character

10    traits, and opted not to follow them.  There is

11    something inside of him that prevents him from taking

12    the good road.

13                         He always takes the bad road, and for

14    that reason, for this willingness to violate the law

15    despite good example, the likelihood that this

16    defendant's criminality will recur in the future, I

17    believe, is great.

18                         And I know this Court does not have a

19    crystal ball; however, because of his past track

20    record and because of the facts and circumstances of

21    this case -- this is wanton cruelty.  This was

22    clearly exercised without any provocation of the

23    victim.

24                         Because of this, I submit that this

17

1    defendant is the most dangerous because every person

2    walking out there in society is a likely victim. He

3    need have no connection to them, no bias toward them,

4    no grudge. Everybody out there is a potential victim

5    when this man is on the streets, and for that reason,

6    your Honor, I ask that he be sentenced to significant

7    years in the penitentiary.

8                    THE COURT: Miss Bormann?

9                    MS. BORMANN: Mr. Hillard is going to be

10   23 at the end of this year. Mr. Hillard has two

11   prior convictions, the last of which was from four

12   years ago for narcotics cases. There's absolutely

13   no indication of violence in his background

14   whatsoever.

15                    I want you to remember the facts of

16   this case, because with respect to Mr. Hillard, it

17   was by far the weakest case for the state. It was,

18   in the vernacular of this building, a single finger

19   ID with no prior description that matches Mr. Hillard

20   and no former knowledge between the two that would

21   boost an identification and, in fact, conflicting

22   testimony from the victim in this case, all of which

23   was decided in the state's favor by the jury, but you

24   can consider that in mitigation.

18

C 0 0  22

1          The victim testified, as Miss Curtis

2    indicated, that at some point Mr. Hillard had a gun.

3    However, you'll remember, your Honor, that that gun

4    was identified as a different gun when Mr. Roddy

5    asked the question than when I asked the question and

6    then cleared up by co-counsel, Mr. Franks, in his own

7    cross-examination.

8          Mr. Jinadu further testified that my

9    client -- at one point, my client was one of the

10   people to bring him into the bathroom with one other

11   individual, and then at another point during his

12   testimony, indicated that there were three people,

13   and my client wasn't one of the people who was

14   there.

15          There were, to put it mildly, a

16   number of inconsistencies in that person's testimony.

17   This is a true identification case, and Mr. Jinadu

18   got up and identified Tony Hillard, but it's the

19   defense's belief, your Honor, in this case that

20   there's been no showing -- Miss Curtis is right.  If

21   you believe Mr. Hillard did this, I suppose there's

22   absolutely no indication as to why.

23          There's simply no evidence in the

24   record other than the testimony by Mr. Jinadu that

1    even indicates that there is a relationship between

2    Mr. Hillard, Miss Jinadu, and Mr. Walls.  I can tell

3    you that the defense's position in this case is that

4    there wasn't, and that Mr. Hillard was wrongly

5    identified.  You know how weak identification

6    testimony can be, and that's what this case was

7    about.

8                    THE COURT:  There was, was there not, some

9    indication of a gun that was --

10                   MS. BORMANN:  Registered to a Loretha

11   Hillard, correct, and absolutely no testimony linking

12   Loretha Hillard with Tony Hillard other than a last

13   name in common.  That's correct.

14                   Your Honor allowed the state to

15   introduce a certified copy of gun registration of one

16   of the guns that was retrieved from the room where

17   Mr. Jinadu had been held.  That gun clearly was

18   registered to, I believe, a woman, indicated female,

19   a Loretha Hillard.

20                   There was no other evidence

21   connecting Mr. Hillard to this alleged Loretha

22   Hillard other than having the same last name.  But

23   you're right about that.  That was part of the

24   evidence in this case.

1              Your Honor, in light of what

2     Mr. Parnell got up here and told you, he knew about

3     Mr. Hillard's prior convictions.  He's had

4     significant contact with Mr. Hillard, both when Mr.

5     Hillard was growing up and now since .-- because of

6     his ministry in the jail.

7              He got up here and he told you he has

8     seen a change in Mr. Hillard, and, in fact, the jail

9     has seen a change in Mr. Hillard, which is why

10    Mr. Hillard was transferred from a tier in the jail

11    that had more security to one that had less, and

12    we're asking your Honor to take those mitigation

13    factors into consideration when sentencing Mr.

14    Hillard.

15              I understand that this is a

16    consecutive sentencing scheme here, but I'm asking

17    for the minimum.  This was by far the weakest case

18    the state had in this case, and Mr. Hillard has never

19    presented a violent past to anybody in his past, and

20    with the testimony of Minister Parnell, Reverend

21    Parnell, we're asking you to allow Mr. Hillard to

22    become a productive member of society.

23              It's interesting to note, your Honor,

24    that when we talk about the social history, it's a

C 00 25

1    rather brief presentence investigation, but under the

2    education, the defendant reported that his future

3    education goal is to obtain his high school diploma.

4    This is something kind of out of the blue.  He wants

5    to do the right thing, and we're asking your Honor to

6    give him a chance to do that.

7              THE COURT:  Mr. Hillard, the law gives you

8    this opportunity to speak on your own behalf.  Do you

9    have anything to say at this time?

10              THE DEFENDANT:  No, sir.

11              THE COURT:  You do not?

12              THE DEFENDANT:  No, sir.

13              THE COURT:  The Court has studied and

14    familiarized itself with the presentence report

15    containing the background, social investigation of

16    the defendant, employment, family history, criminal

17    background as well as education.

18                        I have listened to the mitigation

19    evidence today and the comments of both counsel, both

20    in aggravation and in mitigation, all within the

21    context of the mandate of the legislature which tells

22    me factors that I am supposed to look at and consider

23    both in aggravation and mitigation in passing

24    sentence in cases such as these.

22

1            In aggravation, it is apparent,

2     it is significant from this case that the facts of

3     the case are paramount, in my opinion, for they

4     reflect an unprovoked, senseless beating, more than

5     beating, torture of Mr. Jinadu, possibly drug

6     related, a group assault.  Mr. Jinadu was severely

7     beaten.  His orbital bone was fractured.  He was

8     hospitalized.

9            And we have the added component that

10    not only was this a beating, a gang beating, group

11    beating, and torture, but there were individuals, and

12    more specifically Mr. Walls, who was identified as

13    being -- excuse me -- Mr. Hillard being identified as

14    having a gun as was Mr. Walls.

15            Deterrence is another factor that the

16    Court must consider both for Mr. Hillard as well as

17    others who might be similarly situated and inclined

18    to emulate or follow this behavior.

19            Mr. Hillard is not a stranger to the

20    criminal justice system.  He was given the lenity of

21    the court in 1992, probationary sentence.  He was

22    entitled to probation; he got it.  Apparently, he may

23    have completed it satisfactorily.

24            But nonetheless, he came back two

23

1    years later with an even more serious offense,

2    possession with intent to deliver within a thousand

3    feet of a school, and he received three years in the

4    penitentiary.  His background is much like that of

5    Erven Walls, prior drug convictions.

6                      The presentence report does not

7    demonstrate any logical reason of why Mr. Hillard

8    finds himself in this position today.  He comes from

9    a supportive family, a mother and a father who live

10   together; albeit, not married, but nonetheless,

11   received their support.  He was able to attend high

12   school.  He attended high school at Near North Metro

13   at least up to two years and then dropped out.  He is

14   unmarried.  He has not himself enjoyed any employment

15   opportunities, but nonetheless, has fathered three

16   children; albeit, children that are not being

17   supported by himself.

18                      It is true, as Miss Curtis observes,

19   that the Court does not have a crystal ball, and yet,

20   there is no reasonable assurance that I have that

21   this type of conduct would not recur in the future

22   were Mr. Hillard again placed among civilized people

23   within the community.

24                      There was no provocation here, no

1    justification, no excuse, no reasonable explanation.

2    The only explanation was one that was unreasonable,

3    greed, and the idea that one is entitled to the

4    property or wealth of another and can take it when

5    they choose to.

6                    Considering all of these factors in

7    aggravation and in mitigation, it will be the

8    judgment of the Court that the defendant, Tony

9    Hillard, will be sentenced as follows:

10                   On Count 4, the charge of

11   armed violence, you will be sentenced to 25 years in

12   the Illinois Department of Corrections.  On Count 3,

13   armed robbery, the Court will impose a sentence of 15

14   years.  As to Count 12, aggravated kidnapping, the

15   Court will impose a sentence of 10 years.  All

16   sentences will run consecutive; that is, the sentence

17   in Count 3 will run consecutive to the sentence in

18   Count 4.  The sentence on Count 12 will run

19   consecutive to the sentence in Count 3.

20                   The finding of guilty returned by the

21   jury on Count 17; that is, the verdict finding the

22   defendant guilty of aggravated battery, will merge

23   into the sentence that I have imposed in Count 4,

24   armed violence.

25

1           You do, Mr. Hillard, have a right to

2    appeal from the judgments and sentences that I have

3    just imposed.  To do that, however, you must within

4    30 days come back into court and file a Notice of

5    Appeal with the clerk of the court.

6           If you were indigent, counsel could

7    be appointed to assist you in that effort and a

8    transcript of the proceedings heard today prior to

9    trial and at trial could be made available to aid

10   your lawyer in that regard.

11          Have you prepared appeal papers?

12          MS. BORMANN:  I have not, Judge, because I

13   intend to file a motion to reduce sentence.  Can we

14   hold this on and stay the mit to make sure that

15   Mr. Hillard doesn't get shipped?

16          MS. CURTIS:  I believe Mr. Walls is coming

17   back on November 9th.  Am I correct in that?

18          THE COURT:  I won't be here the 9th.  I'll

19   be back the 16th or I'll be here next week probably

20   up to the 4th.

21          MS. BORMANN:  Why don't we do it when you

22   get back?  How about the 17th?

23          THE COURT:  The 17th is fine.  11-17.  I'll

24   stay the mit to that date for your motion.

C00 30

1              MS. BORMANN:  Thank you, Judge, and I will

2      file it in the meantime.

3                              (WHEREUPON, the above matter

4                              was continued to

5                              November 17, 1998.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

C09 31

1     STATE OF ILLINOIS    )

2                          )  SS:

3     COUNTY OF C O O K    )

4              I, JO ANN KROLICKI, an Official Shorthand

5     Reporter for the Circuit Court of Cook County, County

6     Department, Criminal Division, do hereby certify that

7     I reported in shorthand the proceedings had in the

8     above-entitled cause, and that the foregoing is a

9     true and correct transcript of my shorthand notes so

10    taken before Judge Michael P. Toomin on October 26,

11    1998.

12

13

                        JO ANN KROLICKI, CSR, RPR
14                      OFFICIAL COURT REPORTER
                        ILLINOIS LICENSE NO. 084-002215
15

16

17

18

19

20

21

22

23

24

28

1    STATE OF ILLINOIS )
                        )SS
2    COUNTY OF COOK    )

3
     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
4    CRIMINAL DEPARTMENT/CRIMINAL DIVISION

5         THE PEOPLE OF THE          )
          STATE OF ILLINOIS,         )
6                                     )
          PLAINTIFF,                  )
7                                     )
               VS.                    ) 97CR30458-03
8                                     )
                                      )
9         TONY HILLARD,               )
                                      )
10        DEFENDANT,                  )

11             REPORT OF PROCEEDINGS had at the

12   hearing of the above-entitled cause, before the

13   HONORABLE MICHAEL P. TOOMIN, on the 28th day of

14   April, A.D., 2004.

15             PRESENT:

16             HON. RICHARD A. DEVINE,
               State's Attorney of Cook
17             County, by
               JOHN BRASSIL & CHRISTINE STEPHENS,
18             Assistant State's Attorneys,
               appeared on behalf of the People;
19
               MR. EDWIN A. BURNETTE,
20             Public Defender of Cook County,
               by CHERYL MILLER, GEORGE DYKES, &
21             MARGE SANDERS,
               Assistant Public Defenders,
22             appeared on behalf of the
               Defendant.
23

24

1F

EXHIBIT M

```
 1        GAIL DUFF, C.S.R./R.P.R.,
          Official Court Reporter
 2        Circuit Court of Cook County
          Criminal Division
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1     Transcribed by:  GAIL DUFF

2     In re:    TONY HILLARD

3     Case No:  97CR30453-03

4     Date:    4-28-04

5     Page No:  1F-119F

6                              I N D E X

7                        DX    CX    RDX   RCX

8     MS. HILLARD

9         BY MS. MILLER        6           35

10        BY MS. STEPHENS            26

11    MS. BORMANN

12        BY MS. STEPHENS      42          77

13        BY MS. MILLER             54          83

14    REBUTTAL WITNESS:

15        MS. HILLARD

16          BY MS. MILLER    86

17

18

19

20

21

22

23

24

                              3F

```
1              THE CLERK:  Tony Hillard.
2              THE COURT:  Mr. Hillard is here today on his
3    hearing on a supplemental petition I believe for post
4    conviction.
5              MS. MILLER:  Yes.
6              THE COURT:  Would you identify yourselves for
7    the record.
8              MS. MILLER:  My name is Cheryl Miller, I'm
9    assistant Public Defender, on behalf of Tony Hillard.
10             MS. STEPHENS:  Christian Stephens, assistant
11   State's Attorney.
12             MS. MILLER:  I also have co-counsel George
13   Dykes and  Mark Sanders.
14             THE COURT:  Why don't you step up here all of
15   you.  We have Ms. Miller and whose with you, Ms.
16   Miller?
17             MS. MILLER:  George Dykes, D-y-k-e-s.
18             MS. SANDERS:  Marge Sanders, S-a-n-d-e-r-s.
19             THE COURT:  Okay.
20             MS. STEPHENS:  Christine Stephens and John
21   Brassil on behalf of the People.
22             THE COURT:  Okay.  It's your burden to
23   proceed.  What do you have today?
24             MS. MILLER:  We have Loretha Hillard as our
```

4F

1    witness, and she is outside and we have a motion to

2    exclude witnesses.  We just have one witness, Your

3    Honor.

4              THE COURT:  That will be reciprocal.  Each

5    side can police their own witnesses.

6              MS. STEPHENS:  And as a preliminary matter,

7    and I discussed this with counsel, I would adopt our

8    motion to dismiss -- our amended motion to dismiss our

9    answer.

10             THE COURT:  Okay.  Any other preliminary

11   matters you need to address?

12             MS. STEPHENS:  I don't think so, Judge.

13             THE COURT:  What about the State, how many

14   witnesses do you have?

15             MS. STEPHENS:  We have two witnesses,

16   Ms. Bormann and Detective Bradley.

17             THE COURT:  Petitioner have any opening

18   statement?

19             MS. MILLER:  No.  We will waive opening

20   statement.

21             THE COURT:  Respondent?

22             MS. STEPHENS:  We will waive.

23             THE COURT:  Call your first witness.

24             MS. MILLER:  We are going to call Loretha

1    Hillard.

2              THE COURT:  Very well.

3                    **MS. LORETHA HILLARD,**

4         called as a witness, having been first duly

5         sworn,  was examined and testified as follows:

6                    **DIRECT EXAMINATION**

7    BY MS. MILLER:

8         Q    State your name for the record please and

9    spell your last name?

10        A    Loretha Hillard, H-i-l-l-a-r-d.

11        Q    How old are you?

12        A    37.

13        Q    Do you mind if I call you Loretha?

14        A    Yes.  I don't know mind no.

15        Q    Are you presently living at 963 West

16   Cullerton Street?

17        A    Yes.

18        Q    Is this a house or an apartment?

19        A    Apartment.

20        Q    What kind of building do you live in?

21        A    It's a three flat.

22        Q    With whom do you presently live?

23        A    Me, my two children, and my mother.

24        Q    Do you have any siblings?

1     A    Yes.

2     Q    Could you name them for us?

3     A    Cassandra.

4     Q    How old is Cassandra?

5     A    29.

6     Q    Okay.

7     A    Tony.

8     Q    How would is Tony?

9     A    28; Annette, 31; Aaron, 33; Sheretta,32.

10    Q    And Tony is —

11    A    I have one more.

12    Q    Go ahead.

13    A    Jerome, he's 38.

14    Q    And Tony is Tony Hillard the petitioner in

15  this case?

16    A    Yes.

17    Q    Are you a high school graduate?

18    A    Yes.

19    Q    When did you graduate?

20    A    I obtained my high school certificate

21  through GED.

22         THE COURT:  I can't hear you.

23       BY THE WITNESS:

24    A    2002, May.

7F

1      BY MS. MILLER:

2      Q    You received a GED?

3      A    Yes.

4      Q    Are you presently in school now?

5      A    No.

6      Q    Are you presently employed?

7      A    Yes.

8      Q    Whom do you work for?

9      A    I work for Artie's (phonetic) Security

10   Symptoms.

11     Q    How long have you worked for Artie's

12   (phonetic) Security Symptoms?

13     A    It would be 2 years next month in June.

14     Q    You work for them full time?

15     A    Yes.

16     Q    What days of the week do you work?

17          MR. BRASSIL:  Objection, relevance.

18          THE COURT:  Sustained.

19     BY MS. MILLER:

20     Q    Where are you employed?

21     A    I work at Prudential Plaza.

22     Q    What are your duties at Prudential Plaza?

23     A    I'm a security officer.

24     Q    Could you explain what you do as a

1    security officer at Prudential Plaza?

2        A    I provide customer service for guests and

3    tenants, check the building out, perimeter check.

4        Q    What kind of building is Prudential Plaza?

5            MS. STEPHENS:  Objection.

6            THE COURT:  Sustained.

7            MS. MILLER:  Can I be heard.  I think the

8    questions are important to establish her credibility.

9            THE COURT:  It has nothing to do with her

10   credibility.

11       BY MS. MILLER:

12       Q    Do you carry a gun on your job?

13       A    No.

14       Q    Do you need specialized training to be a

15   security job?

16           MS. STEPHENS:    Objection, relevance.

17           THE COURT:  Sustained.

18       BY MS. MILLER:

19       Q    Do you have any criminal convictions?

20           MR. BRASSIL:  Objection.

21           MS. MILLER:  Judge, I think this is very

22   relevant.  We are asking you to accept her testimony

23   because she is a credible witness.  I need to establish

24   that she is a credible witness, a good citizen, someone

1  to be believed and the only way I can do that is to

2  give you information about her background.

3          THE COURT:  Overruled.

4          MS. MILLER:  Thank you.

5  BY MS. MILLER:

6      Q   Do you have any criminal convictions?

7      A   No.

8      Q   Were you tested for drugs when you became

9  a security officer?

10     A   Yes.

11     Q   Did you test negative for drug?

12     A   Yes.

13         MR. BRASSIL:  Objection.

14         THE COURT:  Sustained.

15  BY MS. MILLER:

16     Q   Did they do a background check on you?

17     A   Yes.

18     Q   Did you ever have a job in which you were

19  required to carry a gun?

20     A   Yes.

21     Q   Can you tell when that was?

22     A   That was in 1993 of July.  I was a

23  security officer for Public Housing Development.

24     Q   Do you have a blue card?

10F

1      A    Yes.

2      Q    Can you tell the Court what a blue card

3    is?

4      A    It's a permit, employee registration card.

5    I had to have that in order to work security.

6      Q    I'm sorry?

7      A    I have to have that blue card in order to

8    work security.

9      Q    Do you need the blue card in order to

10   carry a gun?

11     A    No.

12     Q    Do you have a blue card now?

13     A    Yes.

14     Q    How long did you carry a gun for on your

15   job?

16     A    Almost 3 years.

17     Q    Can you tell us  the year that you did

18   carry a gun on your job?

19     A    July '93 up until '97.  I don't recall the

20   date -- '96, I'm sorry.

21     Q    I'm calling your attention to May of 1997

22   can you tell us where you lived in May of 1997?

23     A    Yes.  I lived 1230 North Larrabee,

24   apartment 408.

11F

```
 1              THE COURT:  What Larrabee?
 2              THE WITNESS:  Yes.
 3          BY MS. MILLER:
 4       Q    Is that commonly known at Cabrini Green?
 5       A    Yes.
 6       Q    Can you tell us where you were employed in
 7  May of 1997?
 8       A    Yes.
 9       Q    Where were you employed?
10       A    I was employed by Residents Management
11  Corporation.  I worked as a janitor.
12       Q    Where did you work as a janitor?
13       A    In my building, 1230 Larrabee.
14       Q    Did you carry a gun as part of your
15  duties?
16       A    No.
17       Q    Did you own a gun in May of 1997?
18       A    Yes.
19       Q    Was the gun registered?
20       A    Yes.
21              MS. MILLER:  May I approach, Your Honor?
22              THE COURT:  Yes.
23          BY MS. MILLER:
24       Q    I'm going to show you what I've marked as
```

1    Petitioner Exhibit Number 1.  Do you recognize this

2    document?

3          A    Yes.

4          Q    Can you tell the Court what it is?

5          A    It's registration a copy of the

6    registration card.

7          Q    For what?

8          A    For a 357 Smith and Wesson.

9          Q    Whose gun is it?

10         A    Mine.

11         Q    And you were called in to sign this

12    registration?

13         A    Yes.

14         Q    What date did you sign it?

15         A    '95 or '96.

16         Q    And how long was the gun registration good

17    for?

18         A    I think a year.

19         Q    Can you tell the Court again what kind  of

20    gun were you registered to own?

21         A    It was a 357 Smith and Wesson.

22         Q    Now, I want to take you back to where you

23    lived in May of 1997.  Who did you live with?

24         A    I lived with my 2 children, myself, my 2

1    children and my sister.

2         Q    And your sister was?

3         A    Cassandra.

4         Q    Did Tony live with you in 1997?

5         A    No.

6         Q    Other than when you were children, did he

7    ever live with you?

8         A    No.

9         Q    Did you keep your gun in your house in

10   1997?

11        A    Yes.

12        Q    Where did you keep your gun?

13        A    Under my mattress.

14        Q    Was it loaded?

15        A    No.

16        Q    Where did you keep the bullets?

17        A    I kept it separate.  I kept it in my

18   sister's room.

19        Q    How many people knew, how many — did I

20   ask you where you kept your gun?

21        A    Yes.

22        Q    How many people knew were you kept your

23   gun?

24        A    Only my sister.

1  Q Your sister Cassandra?

2  A Yes.

3  Q Did you have family that lived nearby in

4 Cabrini Green?

5  A Yes.

6  Q How many family members lived near you?

7  A Maybe over 50 or more.

8  Q Fifty family members?

9  A Yes.

10  Q Did you socialize with these 50 family

11 members?

12  A Yes.

13  Q Did they come to your house a lot?

14  A Yes.

15  Q How often would you say your family

16 members came over to your house on a regular basis?

17  A Back then maybe 3 to 4 times out of a

18 week.

19  Q Did Tony come over to your house on a

20 regular basis?

21  A Maybe once a week or so.

22  Q Did your siblings come over to your house

23 on a regular basis?

24  A Yes.

1    Q    What about their friends?

2    A    Yes.

3    Q    What about cousins, did you have cousins

4    that live nearby?

5    A    Yes.

6    Q    How many cousins would you say lived near

7    you in Cabrini Green?

8    A    Maybe over, it was a lot.  I had a lot of

9    cousins.  I can't estimate but maybe over 50.

10    Q    Did your cousins come over to your house

11    on a regular basis?

12    A    Yes.

13    Q    Did you keep your doors locked?

14    A    Inside the house or outside?

15    Q    Well, outside the doors to your house?

16    A    Okay.

17    Q    Did you live in an apartment?

18    A    Yes.

19    Q    So I'm asking the doors to your house?

20    A    Yes, yes, but sometimes I would forget to

21    lock it because I worked in the building.

22    Q    So sometimes the doors to your house were

23    unlocked?

24    A    Yes.

16F

1    Q    Did any of these numerous people number of

2    people come over to your house when you weren't

3    home?

4    A    Yes.

5    Q    How did you know that?

6    A    Because they would be there when I get

7    home.

8    Q    Did visitors to your house have free

9    access to all rooms in your house?

10    A    They could have always accessed, the doors

11    were always open.

12    Q    So how many people would you estimate in

13    May of 1997 or a month before were coming over to

14    your house on a regular basis?

15    A    Maybe 10 to 12.

16    Q    And was this normal?

17    A    Yes.  I had a lot of company.

18    Q    It wasn't just in May?

19    A    No.

20    Q    But it was a normal way of life for you?

21    A    Yes.

22    Q    To entertain a lot of friends and family?

23    A    Yes.

24    Q    Now, did you discover one day that your

17F

1    gun was missing?

2         A    Yes.

3         Q    How did you discover that?

4         A    Well, I was going to look for some

5    important papers under my mattress and I discovered

6    it wasn't there.

7         Q    Do you recall the date you made that

8    discovery?

9         A    I think it was May 17.

10        Q    Of?

11        A    '97.

12        Q    And what did you do when you discovered

13   your gun was missing?

14        A    I went to the police station and reported

15   it.

16        Q    I'm going to show you what I've marked as

17   Petitioner Exhibit Number 2.  Take a look at it and

18   tell the Court what this is?

19        A    It's a police report.

20        Q    And what did you tell the police?

21             MR. BRASSIL:  Objection.

22             THE COURT:  Sustained.

23        BY MS. MILLER:

24        Q    Did you report the gun stolen?

1      A     Actually, I said it was missing.

2      Q     On this police report, did you tell the

3   police that Tony stole your gun?

4            MS. STEPHENS:  Objection.

5            THE COURT:  Sustained.  Strike it.

6        BY MS. MILLER:

7      Q     Did you ever tell the police that Tony

8   stole your gun?

9      A     No.

10     Q     Did the police give you a copy of this

11   report?

12     A     No, at the police station.

13     Q     They gave you a copy of the report at the

14   police station?

15     A     Yes.

16     Q     Okay.  Do you recall what -- strike that.

17           Sometime after you made this stolen police

18   report, did  talk to another police officer?

19     A     Yes.

20     Q     Do you recall his name?

21     A     Officer Bradley.

22     Q     Did you talk to him in person or on the

23   telephone?

24     A     On the phone.

```
 1        Q      Do you recall how many times you talked to
 2    him on the phone?
 3        A      Once.
 4        Q      Do you recall where this conversation took
 5    place?
 6        A      At my house.
 7        Q      Do you recall when the conversation took
 8    place?
 9        A      No.
10        Q      Do you recall if it took place after you
11    made the report that your gun was stolen?
12        A      Yes, it was after.
13        Q      So when you had the conversation with
14    Officer Bradley, you already knew your gun was
15    missing?
16        A      Yes.
17        Q      Do you recall what the police officer
18    asked you?
19        A      Yes.
20        Q      What did he ask you?
21        A      He called, and he asked me about my gun,
22    and who could have tooken it.  He asked me about my
23    weapon and who could have tooken the gun.
24        Q      What did you tell him?
```

1      A    I told him I had no idea who took it.

2      Q    Did you ever tell Officer Bradley if your

3    gun was stolen that Tony was the only person who

4    could have taken it?

5      A    No.

6      Q    Did you ever tell Officer Bradley I

7    thought it was Tony because he was always stealing

8    something?

9      A    No.

10     Q    Had Tony ever stolen anything from you

11   before?

12     A    No.

13     Q    Had Tony ever stolen anything from any

14   family members?

15     A    No.

16     Q    Do you know where Tony was living at the

17   time?

18     A    Yes.

19     Q    Did you give the police officer Tony's

20   home address?

21     A    No.

22     Q    Did you tell the police officer anywhere

23   that they could possibly find Tony?

24     A    No.

1    Q    Do you recall signing an affidavit in this

2  case?

3    A    Yes.

4    Q    I'm going to show you what I've marked as

5  Petitioner Exhibit 2, could you look at this

6  document and tell the Court what it is?

7    A    It's an affidavit.

8    Q    What date did you sign it after?

9    A    June 26, 2001.

10    Q    Thank you.

11        I want to ask a you couple of questions

12  about your affidavit.  In your affidavit, did you

13  respond when the police officer asked you if you

14  have relatives in the area?

15    A    Yes.

16        MS. STEPHENS:  Objection.

17        MS. MILLER:  It's her affidavit.

18        MS. STEPHENS:  She could ask her the question

19  without having her refer to her affidavit.

20        THE COURT:  The affidavit is simply a means

21  to get to a hearing.  She could testify as she has been

22  whatever she put in the affidavit is hearsay.

23    BY MS. MILLER:

24    Q    Well, did you draft the affidavit

1    yourself?

2        A    Yes.

3        Q    Did you tell -- strike that.

4             Did you tell Officer Bradley that you were

5    positive that no family members had taken your gun?

6             MS. STEPHENS:  Objection to leading.

7             THE COURT:  Sustained.

8        BY MS. MILLER:

9        Q    What did you tell Officer Bradley?

10       A    I did tell him that I know that my family

11   members wouldn't possibly steal my gun because it

12   was registered in my name and I know they wouldn't

13   do that.

14       Q    Why are you so sure that no family members

15   would steal your gun?

16       A    Because we are close.  I know this.  I

17   trust them.  I know they wouldn't do that.

18       Q    Do you know a lawyer by the name of Cheryl

19   Bormann?

20       A    Yes.

21       Q    Who is she?

22       A    She was Tony's ex-public defender.

23       Q    Did Ms. Bormann ever contact you regarding

24   Tony's case?

23F

1       A      Yes.

2       Q      How many times did you talk to her?

3       A      I can't recall, maybe 4 times.

4       Q      Did you talk to her in person or on the

5   phone?

6       A      On the phone.

7       Q      Did you ever talk to her in person?

8       A      Only when he had a court.

9       Q      Do you recall who was present when you

10  spoke to her on the phone?

11      A      No, I don't.

12      Q      Do you recall when you talked to her on

13  the phone?

14      A      No.

15      Q      If you recall if Ms. Bormann ever asked

16  you what you told the police about your missing gun?

17      A      Yes, she did ask me.  She said that.  She

18  asked me who could have tooken my gun.  I told her I

19  didn't know, I simply didn't know.

20      Q      Did Ms. Bormann ask if you you told the

21  police that only Tony could have stolen your gun if

22  it was stolen?

23      A      Yes, she did tell me that.

24      Q      When did you tell her about that?

1      A    I told her no.

2      Q    So you told Ms. Bormann you never said

3   that?

4      A    Right, exactly yes.

5      Q    Did Ms. Bormann ever tell you she wanted

6   you to testify at this motion to suppress hearing?

7      A    I don't recall no.

8      Q    Were you willing and ready to testify at

9   the motion to suppress hearing?

10     A    Yes.

11          MS. MILLER:  I have no further questions —

12   One moment.

13          May I approach, Your Honor?

14          THE COURT:  Yes.

15   BY MS. MILLER:

16     Q    I'm just going to show you Petitioner

17   Exhibit Number 2.  Can you tell me where in that

18   report it says that Tony stole your gun?

19          MR. BRASSIL:  Objection.

20          THE COURT:  Sustained.

21          MS. MILLER:  Thank you.  We have no further

22   questions of this witness.  I will ask that she remain

23   outside in case I need her in rebuttal.

24          THE COURT:  Can the State ask some questions

1   first.

2            MS. MILLER:  Oh, yes.

3            THE COURT:  State may inquire.

4                    **CROSS-EXAMINATION**

5      BY MS. STEPHENS:

6      Q    It petitioner, Tony Hillard, is your

7   brother, is that correct?

8      A    Yes.

9      Q    You summarized your story today in an

10  affidavit, is that correct?

11           MS. MILLER:  Objection to the term story,

12  Your Honor.

13           THE COURT:  Overruled.

14      BY THE WITNESS:

15      A    Yes.

16      BY MS. STEPHENS:

17      Q    And did the petitioner, your brother, give

18  you the paperwork to complete that affidavit?

19      A    No, no.

20      Q    You completed that affidavit on June 26,

21  2001, is that right?

22      A    Yes.

23      Q    That's almost 3 years after your brother

24  was convicted of the armed robbery in this case, is

1    that correct?

2        A    Yes.

3        Q    And, in fact, you completed this affidavit

4    actually 15 days after your brother's appeal failed

5    in the Appellate Court, is that correct?

6        A    Yes, I guess.

7        Q    Now, you said in May of 1997, you were a

8    janitor, is that right?

9        A    Yes.

10        Q    And you still had a gun in your house, is

11    that correct?

12        A    Yes.

13        Q    So that's because you were an ex-security

14    guard, is that right?

15        A    Yes.

16        Q    And had you previously been a security

17    guard for the CHA, the Chicago Housing Authority?

18        A    Yes.

19        Q    Back in May of 1997 you were living at

20    1230 North Larrabee, correct?

21        A    Yes.

22        Q    And you say that month actually on May 1,

23    you discovered that your gun was missing from your

24    apartment, is that correct?

1      A    That is correct.

2      Q    You reported missing gun to the police,

3    correct?

4      A    Yes.

5      Q    Is it fair — do you recall filing that

6    report on May 19, 1997?

7      A    It could have been.

8      Q    Would anything help refresh your

9    recollection to when you filed your report?

10     A    May 17 or the 19th, I don't know.  It's

11   around that time.

12     Q    Would looking at the actual report refresh

13   your recollection to when you filed your report?

14     A    Yes.

15          MS. STEPHENS:  May I approach the witness?

16          THE COURT:  Yes.

17     BY MS. STEPHENS:

18     Q    I'm showing what's previously been marked

19   as Defense Exhibit 1.  I ask you do you recognize

20   that?

21     A    Yes, I do.

22          THE COURT:  What is it you call that?

23          MS. STEPHENS:  I believe it's previously been

24   called defense.

1            THE COURT:   Petitioner 2?

2            MS. MILLER:   Number 2.

3        BY THE WITNESS:

4        A    I would say May 19.

5        BY MS. STEPHENS:

6        Q    Having reviewed that report, you now

7    recall that you reported your gun missing on May 19,

8    1997, is that correct?

9        A    Yes.

10       Q    Sometime thereafter, Detective Bradley

11   called you about that gun, correct?

12       A    Yes.

13       Q    You just had one phone conversation with

14   him, right?

15       A    Yes.

16       Q    You've never spoken to him before is that

17   fair to say?

18       A    No, I haven't.

19       Q    And you've never met him before, correct?

20       A    No, I haven't.

21       Q    To your knowledge, your brother Tony

22   Hillard had never met Detective Bradley before, is

23   that correct?

24       A    Not to my knowledge no.

29F

1      Q    You told Detective Bradley that you owned
2   a Smith and Wesson gun, is that correct?

3      A    Yes.

4      Q    And you also told him that you had been an
5   ex-security guard for the Chicago Housing Authority?

6      A    I don't recall.

7      Q    Did you tell Detective Bradley during that
8   conversation that you lived at 1230 North Larrabee?

9      A    I don't recall.

10     Q    You now say that during that conversation
11  you did not tell Detective Bradley that if anyone
12  had told stolen your gun it would have been Tony, is
13  that what you are telling us?

14     A    That is correct.

15     Q    Did you tell Detective Bradley that Tony
16  had a girlfriend?

17     A    I don't recall.

18     Q    Did you tell Detective Bradley that Tony's
19  girlfriend name was Pookie?

20     A    I did yes.

21     Q    You did tell him that Tony —

22     A    Yes, he did have a girlfriend yes at the
23  time.

24     Q    And you told Detective Bradley that Tony's

30F

1    girlfriend was name Pookie, is that correct?

2         A    Yes.

3         Q    So you also gave Detective Bradley the

4    name of your brother, is that correct, your brother

5    being Tony Hillard?

6         A    He already seemed to know him.

7         Q    Why did you say that?

8         A    Prior conviction or whatever but he knew

9    him.

10        Q    Did you say Detective Bradley, did you

11   give Detective Bradley the name of Tony Hillard?

12        A    I remember that.

13        Q    But you gave him the name of his

14   girlfriend, Pookie?

15        A    I don't recall.

16        Q    I thought you just said you did give him

17   the name of his girlfriend?

18        A    His girlfriend yes.

19        Q    You don't recall if you gave him Tony

20   Hillard's name?

21        A    I think he said something to me about

22   I'm — I didn't give him the name.  He gave me the

23   name.

24        Q    Did you tell Detective Bradley that Tony

1    and Pookie lived together at 714 West Division in

2    Chicago?

3         A    No.

4         Q    Now, eventually your brother was arrested

5    for the armed robbery involved this gun that was

6    taken out of your apartment, correct?

7         A    Yes.

8         Q    And he was represented before during a

9    trial by APD Cheryl Bormann, is that right?

10        A    Yes.

11        Q    You had several, you said you had several

12   phone conversations with her about this case, is

13   that correct?

14        A    Yes.

15        Q    But you're telling us you never met with

16   her in person?

17        A    No, ma'am.  I only met her in court once.

18        Q    But outside of court you never met with

19   her face-to-face, is that what you are saying?

20        A    Yes, that's what I'm saying.

21        Q    Do you remember Bormann coming to your

22   home at any time?

23        A    No, I don't recall her coming to my home.

24        Q    Do you remember you eventually --- strike

1    that.

2                After you lived at 1230 North Larrabee,

3    you eventually move to 963 West Fullerton where you

4    reside today, is that correct?

5        A    Yes.

6        Q    You live in apartment 308, is that fair to

7    say?

8        A    Yes.

9        Q    That's where you've always lived since

10   moved to that address, is that correct?

11       A    Yes.

12       Q    Do you recall Ms. Bormann and a female law

13   clerk coming to your home on Cullerton in February

14   of 1998?

15       A    No, I don't.

16       Q    Do you remember them coming to your home

17   specifically February 25 of 19989?

18       A    No.

19       Q    You don't remember them coming to your

20   home in the evening on that date?

21       A    No, I do not.

22       Q    Nonetheless, you say that you had phone

23   conversation in which Ms. Bormann asked you about

24   the gun that was taken from your home, is that

1    correct?

2        A    Yes.

3        Q    You told Ms. Bormann that when the gun was

4    stolen, you were living at 1230 North Larrabee?

5        A    Yes.

6        Q    You also told her that during the time

7    just before your gun was taken your front door was

8    left unlocked half the time, is that correct?

9        A    No.  I never told her that.

10        Q    You told Ms. Bormann that you were living

11    in that home on Larrabee with your sister Cassandra,

12    is that correct?

13        A    Yes.

14        Q    Did you tell Ms. Bormann that because your

15    door was unlocked half the time Tony Hillard or

16    other family members could have taken your gun?

17        A    No, I never told her that.

18        Q    Ms. Bormann, do you recall Bormann asking

19    you about your phone conversation with Detective

20    Bradley?

21        A    Yes.

22        Q    You never told Ms. Bormann that when

23    Detective Bradley asked you if any of your family

24    members had taken your weapon, you replied no.  I

1    know my family would not put me in jeopardy, you did

2    not tell Bormann that, is that correct?

3          A    I did tell her that yes.

4          Q    Did you tell Bormann that you told the

5    police that you weren't sure who took your gun but

6    you thought that Tony Hillard might have stolen it

7    because he had access to your home?

8          A    No.

9          Q    Just a couple more questions.

10              Did you tell Detective Bradley, did you

11   give him the name of other, any other relative that

12   might have taken your gun?

13         A    No.

14         Q    Did you tell give him the names of any

15   friends that might have taken your gun?

16         A    No.

17              MS. STEPHENS:   I have nothing further.

18              MS. MILLER:   I have some redirect, Your

19   Honor.

20              THE COURT:   Okay.

21                    **REDIRECT EXAMINATION**

22         BY MS. MILLER:

23         Q    I'm going as to ask you some questions

24   about Petitioner Exhibit 2 which the State also

1    brought out.

2              MS. MILLER:  Can I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MS. MILLER:

5         Q    This is a stolen gun report.  Can you look

6    at this and tell us what date you reported in box 6,

7    what date you  had reported your gun missing?

8         A    Date of arrival time 19th May 1997.

9         Q    Box 6 date of occurrence?

10        A    May 17.

11             MS. STEPHENS:  Objection -- Withdrawn.

12             THE COURT:  Okay.

13             MS. MILLER:  Thank you.

14   BY MS. MILLER:

15        Q    You reported your gun missing on what

16   date?

17        A    It says dates of occurrence May 17, 1997.

18        Q    On direct, you testified you were willing

19   and able to testify at the motion to suppress

20   hearing?

21        A    Yes.

22        Q    Were you subpoenaed for the motion to

23   suppress hearing?

24             MS. STEPHENS:  Objection, beyond the scope.

1           THE COURT:  Overruled.

2           MS. MILLER:  It goes to the fact that she

3    was, it's within scope.  She was cross-examined by the

4    fact she did not find the affidavit until 2 years

5    later.  I want to bring out she was subpoenaed and

6    ready to testify on March 5, 1998.

7           THE COURT:  Overruled.  Go ahead.

8       BY MS. MILLER:

9       Q    Were you subpoenaed to testify?

10      A    No.

11      Q    Would anything refresh your recollection?

12           MS. STEPHENS:  Objection.

13      BY THE WITNESS:

14      A    I know I was never subpoenaed by

15   Ms. Bormann.

16      BY MS. MILLER:

17      Q    Would subpoena refresh your recollection?

18      A    Yes, it would.

19           THE COURT:  Wait a minute.  She said she

20   wasn't so how could it be refreshed?

21           MS. MILLER:  I'll withdraw it, Your Honor.

22      BY MS. MILLER:

23      Q    So you were ready to testify in March 5,

24   1998 the date of suppression hearing?

                        37F

1      A     Yes.

2      Q     You were not called to testify?

3      A     Exactly.

4      Q     Had you been called to testify, you would

5   have said that you never accused your brother of

6   stealing your gun?

7               MR. BRASSIL:  Objection.

8               THE COURT:  Sustained.

9      BY MS. MILLER:

10     Q     When you talked to Officer Bradley --

11  strike that.

12              Your brother, Tony, before 1997 had some

13  prior dealings with the police?

14     A     Yes.

15     Q     So when you talked to Officer Bradley, he

16  knew all about Tony?

17              MS. STEPHENS:  Objection, foundation.

18              THE COURT:  Sustained.

19     BY MS. MILLER:

20     Q     You talked to Officer Bradley on what date

21  do you recall?

22     A     No, I don't recall what date.

23     Q     Would conversation phone call you talked

24  about on direct examination you had telephone

38F

1    conversation with Officer Bradley?

2        A    Yes.

3        Q    This telephone conversation, when did it

4    occur approximately?

5        A    I don't know the date.  I don't recall.

6        Q    Did the conversation occur after you

7    reported your gun stolen?

8        A    Yes.

9        Q    And did it occur, where did the

10    conversation occur?

11        A    At my home.

12        Q    And did Officer Bradley, during this

13    conversation, tell you he knew Tony?

14            MS. STEPHENS:  Objection, leading.

15            THE COURT:  Sustained.

16        BY MS. MILLER:

17        Q    Did Officer Bradley say anything about

18    your brother?

19        A    Yes.

20        Q    Did he say the first?

21        A    Yes.

22        Q    Did he mention your brother's name first?

23        A    Yes.

24            MS. STEPHENS:  Objection, leading.

1             THE COURT:  Sustained.

2        BY MS. MILLER:

3        Q    What did Officer Bradley say in this phone

4    conversation?

5        A    Well.  He knew that my brother Tony had

6    prior convictions before.  And maybe trying to, he

7    knew about my whole family actually.

8        Q    Okay.

9             MR. BRASSIL:  Objection, that was conclusory.

10   It says nothing about what the detective said.

11            THE COURT:  Sustained.  I'll strike it.

12       BY MS. MILLER:

13       Q    When you interviewed with Ms. Bormann, did

14   you tell her that Tony could have taken your gun?

15       A    I never interviewed with her.

16       Q    When you talked to her on the phone, did

17   you tell her that Tony could have taken your gun?

18       A    No, I never told her that.

19            MS. MILLER:  Thank you.  No further

20   questions.

21            MS. STEPHENS:  Nothing further.

22            THE COURT:  All right.  Thank you.  You may

23   step down.

24            MS. MILLER:  Your Honor, we don't have any

1    further witnesses.  We would like to have documents

2    admitted into evidence, Petitioner Exhibit Number 1,

3    which is the gun registration; and the Petitioner

4    Exhibit Number 2, the stolen gun report; and the

5    Petitioner Exhibit Number 3 affidavit, I would ask that

6    Exhibit Number be stricken and documents in evidence.

7              THE COURT:  State, have any objection?

8              MS. STEPHENS:  We would object to petitioner

9    numbers 2 and 3.  They are both hearsay documents and

10   petitioner, their witness has already testified as to

11   the sum and substance as to the contents of both

12   documents because both documents contain hearsay.  We

13   object.

14             THE COURT:  Well, it seems to me that

15   People's Exhibit No. 2 is a police report is simply to

16   establish notice and date, substance of what is in the

17   report would be hearsay and affidavit is attached to

18   the petition.

19             Simply to put the allegations of the

20   petitioner in the motion, she's testified basically

21   to what's in the affidavit.  I think it's hearsay as

22   well.  I'll admit 1, 2; and 3 will be refused.

23   Petition rest.

24             State have evidence?

41F

```
 1              MS. STEPHENS:  Yes.  We would call Cheryl
 2     Bormann.
 3                    MS. CHERYL L. BORMANN,
 4         called as a witness, having been first duly
 5         sworn, was examined and testified as follows:
 6                      DIRECT EXAMINATION
 7     BY MS. STEPHENS:
 8         Q    In a loud, clear voice, could you please
 9     state your name?
10         A    Cheryl L. Bormann, C-h-e-r-y-l L.
11     B-o-r-m-a-n-n.
12         Q    What is your occupation?
13         A    I'm an attorney.
14         Q    And for whom are you employed?
15         A    I'm an attorney supervisor in the Cook
16     County Public Defender Office currently.
17         Q    And how long have you been a assistant
18     Public Defender?
19         A    I was an assistant Public defender from
20     198 — January of 1989 until the end of 1998.  I
21     reassigned most of my time was spent here in this
22     building then I went into private practice.  I began
23     my own criminal practice.  I was in this building
24     for 5 years and recently was rehired by the office
```

42F

1    as a supervisor.

2        Q    How long have you been licensed to
3    practice law in Illinois?

4        A    Since November of 1989 so 16 years almost.

5        Q    Bringing you black to summer of 1997
6    through 1998, do you remember where you were
7    assigned then is a Public Defender?

8        A    I was an assistant Public Defender
9    assigned to this particular courtroom, Judge Toomin.

10       Q    In the summer of 1997, did you, were you
11   assigned to this armed robbery case, 97CR30453?

12       A    Actually, the first case under a different
13   number and then she consolidated all contain.  I was
14   appointed to represent Tony Hillard.

15       Q    Do you see Tony Hillard in court?

16       A    Yes.

17       Q    Please point to something he is wearing?

18       A    Wearing the jumpsuit sitting next to Ms.
19   Miller.

20            MS. STEPHENS:  May the record reflect
21   in-Court identification of the petitioner?

22            THE COURT:  It would.

23       BY MS. STEPHENS:

24       Q    Do you recall approximately when you first

43F

1   met with petitioner with regards to this case?

2        A    Gosh.   The case came in in the summer of

3   1997 so it would have been in the summer months.   I

4   don't recall exactly.

5        Q    Who else were you working with in

6   connection with this case in February?

7        A    My partner was Ruth McBeth who is not

8   assistant public defender assigned to the task

9   force.   At that time we had two 711 clerks, Supreme

10  Court 711 third year law student at Kent College of

11  Law, one by the name of Stephanie Schlegel, now

12  currently an assistant Public Defender, I believe

13  assigned to this building.   And Alyssa Mogul,

14  M-o-g-u-l, now partner in the firm of Ron, Dunn, and

15  Levi.

16       Q    After you received this case, you

17  investigated it, is that fair to say?

18       A    Yes.

19       Q    As part of your investigation, did you

20  become acquainted with the name of Loretha Hillard?

21       A    Loretha Hillard was the sister of

22  Mr. Hillard and was referred to some discovery

23  tendered to me by the State in that summer month of

24  1998?

44F

1      Q    Did you learn that she was a possible

2   witness?

3      A    Yes.   She was referred to in supplementary

4   report as somebody who has been interviewed prior to

5   the arrest of Mr. Hillard?

6      Q    What efforts, if any, did you make to

7   contact Loretha Hillard?

8      A    Well, I sent out an investigator.   My

9   investigator at the time was Mike Smith.   I think he

10  is now a supervisor in the Office Investigator

11  Division.   But I submitted a request for an

12  investigation, Mr. Smith, that was I believe in

13  September of 1997 to try and locate Ms. Hillard and

14  I attached all the relevant reports to that request

15  and sent Mr. Smith to try to find her.

16     Q    Was he able to find her?

17     A    He located her I believe spoke to her by

18  telephone, but she was no longer living at the

19  address that had been referred to in the police

20  reports.

21     Q    Was that address 1230 North Larrabee?

22     A    Yes,   since I'm relying upon memory

23  something that happened many years ago, I believe he

24  was able to locate her at her job.   She was a

45F

1    security guard at CHA in the same complex that she

2    had been living in.

3         We were given a phone number, eventually,

4    I believe by Mr. Hillard.

5    Q    And after you were given that phone

6    number, did you have phone conversations with Mrs.

7    Hillard?

8    A    Yes, numerous.

9    Q    Approximately, how many phone

10   conversations did you have with Ms. Hillard prior to

11   that time?

12   A    Well, between myself and Ms. Mogul, who

13   was my 711 clerk at the time, it would have been

14   upwards, I had one conversation with her that I

15   distinctly remember.  I know Ms. Mogul had one.  We

16   probably had many more.  I would say somewhere

17   between 2 and 6.

18   Q    Phone conversations?

19   A    Phone conversations.

20   Q    Now, on January 23rd of 1998, did you file

21   a motion to quash arrest and suppress evidence for

22   Mr. Hillard?

23   A    I did.

24   Q    And at that time did you contemplate upon

**File Date:** _7-1-2008_

**Case No:** _08 cv 1775_

**ATTACHMENT #** _____

**EXHIBIT** _M cont'd - N_

**TAB (DESCRIPTION)**

_____

1    calling Loretha at that hearing?

2         A    Yes, I did.

3         Q    Was that before or after -- strike that.

4              Did you thereafter meet with Ms. Hillard

5    in person?

6         A    I spoke with her before filing the motion

7    then I met with her after filing the motion.

8         Q    Do you have an independent recollection of

9    when that face-to-face meeting took place?

10        A    No.

11        Q    Would anything help refresh your

12   recollection to when that meeting took place?

13        A    Yes.

14        Q    What would that be?

15        A    That would be the date book from 1997,

16   1998 that read Kent College of Law because my law

17   clerk's notebook, she is being another that kept

18   track of my appointment.

19              MS. MILLER:  Objection hearsay.

20              THE COURT:  Objection, as to what?

21              MS. MILLER:  To the hearsay that she is going

22   to testify as to the content of the date book.

23              THE COURT:  It refreshes her recollection?

24              MS. STEPHENS:  That is correct.

47F

```
1               THE COURT:  Overruled.
2               MS. STEPHENS:  May I approach the witness?
3               THE COURT:  Yes.
4          BY MS. STEPHENS:
5          Q    I'm showing you People's Exhibit 1.  Do
6     you recognize that?
7          A    Yes.
8          Q    What is that?
9          A    This is a date book 1997, 1998 weekly
10    Academy Planner, Chicago Kent College of Law, it was
11    given.
12              MS. MILLER:  I renew my objection.  It's not
13    her date book.
14              THE COURT:  Overruled.
15         BY THE WITNESS:
16         A    It was given to me by Alicia Mogul, my
17    former 711 in preparation for this hearing.
18         BY MS. STEPHENS:
19         Q    And I would ask you to review that book
20    and hand it back.  When your memory has been
21    refreshed as to when you met with Ms. Hillard in
22    person the first time you met?
23         A    That would have been 25th of
24    February 1998.
```

48F

1      Q     And where did you meet with Ms. Hillard at

2    that time?

3      A     At her address, at her home which is on

4    Cullerton.  I can not give you exact number although

5    it's referred to in Ms. Mogul's note from that day.

6      Q     Would you like to --

7      A     It would refresh my recollection if I can

8    see the notes.

9      Q     I'm handing you Petitioner-respondent

10   number 1 again.  Is your memory freshed to the

11   address of the face-to-face meeting on February 25,

12   1998 with Ms. Hillard?

13     A     Yes.

14     Q     What was that address?

15     A     963 West Cullerton, K-u-l-l-e-r-t-o-n,

16   apartment 308.

17     Q     And when you met with Ms. Hillard at that

18   time who else was present, if anyone?

19     A     My law clerk, Ms. Mogul.

20     Q     What time of day did that conversation

21   take place?

22     A     We had a six o'clock appointment, six

23   o'clock in the evening.

24     Q     At that time, how long did you meet with

1    her in person?

2         A    Approximately an hour.

3         Q    At that time did you ask her questions

4    about the gun that was taken from her home at 1230

5    North Larrabee?

6         A    Yes, I did.

7         Q    In summary what did she tell you at that

8    time?

9         A    She told me that at the time she was

10   living on Larrabee in Cabrini, that she was living

11   with her sister whose name is the tip -- I don't

12   remember -- that she owned a gun that she had

13   legally because she was a security guard at the

14   time, that when she was not armed, she stored it

15   under her mattress in her home; that everybody in

16   her family and her friends knew that she had the

17   gun; that between she and her sister, they left

18   their front door unlocked about half the time and

19   that anybody who knew where her gun was located,

20   knew that she had a gun and knew that the apartment

21   was open could obtain the gun.

22        Q    Did you ask her about whether Tony Hillard

23   could have access to that gun?

24        A    I specifically ask that question because

50F

1    that was the issue and she told me that yes Tony,

2    like all of her other family members and friends,

3    would have known where the gun was and could have

4    had he wanted to make himself -- could have availed

5    himself of the gun.

6        Q    Did you also talk to her about a phone

7    conversation she had with the police about that gun?

8        A    I did.

9        Q    And what did she tell you relative to that

10   conversation?

11       A    I asked her whether or not she had said to

12   a police officer regarding the theft of the gun that

13   the only person who could have stolen the gun was

14   Tony Hillard.

15           I asked that specific question because

16   that statement is contained in the police report in

17   this case.  She denied making that statement to a

18   police officer.

19           She indicated instead that she told police

20   officer exactly what they told me, Mogul and I, that

21   Mr. Hillard along with many of her other

22   acquaintances and family members could have access

23   to the gun.

24       Q    Did she tell you that she gave the police



1   Tony Hillard's name?

2       A    I don't recall whether or not she said

3   they brought up the name or whether or not she

4   brought up the name that I don't remember.

5       Q    Do you remember asking her if she told the

6   police where Tony Hillard was living at the time?

7       A    I don't remember whether I asked her that,

8   I probably did based upon what I would do in a

9   situation like this, but I don't remember her

10  response.

11      Q    Do you remember asking her if she also

12  gave the police the name of Tony's girlfriend?

13      A    I don't remember asking that and I don't

14  remember if she responded.

15      Q    Did she tell you that during this

16  conversation an officer asked her -- I'm sorry --

17  that during this phone conversation with the police

18  the officer asked her if any of her family members

19  would take her weapon to which she replied, no, I

20  know my family would not put me in jeopardy?

21      A    She never said that to me.

22      Q    After this face-to-face conversation you

23  had with Ms. Hillard, the motion to quash arrest and

24  suppress evidence was eventually heard on March 4th

1    and 5th of 1998 in this courtroom for Tony Hillard,

2    is that correct?

3        A    Yes.

4        Q    Now, at that hearing you did call a

5    witness, is that correct?

6        A    I called the detective.

7             THE COURT:  Who?

8             THE WITNESS:  I don't remember.

9             MS. MILLER:  I didn't hear the question.

10       BY MS. STEPHENS:

11       Q    Did you call Loretha Hillard at the motion

12   to quash arrest and suppress hearing?

13       A    No.

14       Q    Why not?

15       A    Because Ms. Hillard, under oath made it

16   very clear that she would deny having that

17   conversation with the officer on the phone, placed a

18   link between Ms. Hillard on the gun in question.  At

19   that point no such link other than hearsay was going

20   to be made at trial and I wanted to keep it that

21   way.

22       Q    Were there any other reasons you chose not

23   to call Loretha at that hearing?

24       A    The reason I met with her in person was to

53F

1     access her credibility as a witness, although I had
2     talked to her on the phone, it's difficult to make
3     that assessment without meeting somebody in person
4     and I wanted to get a sense of that; it was my
5     opinion after meeting with Ms. Hillard and
6     discussing this issue for close to an hour that she
7     would — her credibility was not going to outweigh
8     the police officer's credibility so the purpose of
9     the motion, we were not going to win that
10    credibility argument.

11          I would then have had to put her on the
12    stand under oath for a motion that I didn't think
13    Judge Toomin was going to grant and have her
14    basically give the State evidence under oath that
15    they can then use against Mr. Hillard at the trial
16    in this matter.  I chose not to do that.

17    Q     Did you think — strike that.

18          MS. STEPHENS:  I have nothing further.

19          THE COURT:  Defense may inquire.

20                    **CROSS-EXAMINATION**

21    BY MS. MILLER:

22    Q     Good afternoon?

23    A     Good afternoon.

24    Q     So your title in March of 1999 you were an

1   assistant Public Defender?

2        A    Correct.

3        Q    You were not yet a supervisor?

4        A    No.

5        Q    You got assigned to Tony's case around

6   1997?

7        A    Sometime in the summer months of 1977

8   yes.

9        Q    And the motion to suppress hearing took

10  place March 5, 1998?

11       A    I believe it was actually set for the 4th.

12  I don't know what happened but I know it went on to

13  the 5th.

14       Q    So that was almost about a year later,

15  about 10 months later?

16       A    Several months certainly.

17       Q    In between that time, did you receive

18  discovery document?

19       A    Of course.

20       Q    Did you receive a supplementary police

21  report dated June 6th of 1997?

22       A    I couldn't tell right now.

23       Q    Could something refresh your memory?

24       A    If you had a report that was contained in

55F

1   my file that I filed during the representation of

2   Ms. Hillard.

3       Q    Let me show you what I've marked at

4   Petitioner 4.  Would you look at this document and

5   tell the Court; tell the Court whether this was one

6   of the discovery materials you received from the

7   State?

8       A    I'm certain that it is because it contains

9   the substance of the conversation I interviewed

10  Ms. Hillard about.

11      Q    Okay.  Thank you.  Was another discovery

12  document you received copy of the grand jury

13  testimony dated June 16, 1997?

14      A    It may very well have been.  I can't tell

15  you that right now.  If it was in my trial file that

16  you obtained, Ms. Miller, then it was.

17      Q    Showing you what I've marked as Petitioner

18  Exhibit Number 5.  Would you look at this document

19  and tell the Court whether or not you received that

20  document, it's the grand jury testimony in

21  discovery?

22      A    I can't tell for certain that I did

23  because I don't remember.  I may have.  It would be

24  my practice to obtain testimony that would be there

56F

1    like the actual indictment.  It would be my

2    practice.  I don't have any independent recollection

3    no.

4         Q    Is it normally your practice to review

5    discovery document before conducting a motion to

6    suppress hearing?

7         A    Of course.

8         Q    Would you have normally reviewed the grand

9    jury testimony of the police officer before a motion

10   to suppress hearing?

11        A    Normally I would have had that and

12   normally, of course,  I would.

13        Q    And do you recall on January 23, 1998

14   filing a motion to quash and suppress evidence?

15        A    I can't give exact date but I filed it

16   sometime before March yes.

17        Q    Would something refresh your recollection?

18        A    Sure probably the file stamp on the actual

19   motion.

20             MS. STEPHENS:  Your Honor, I'll stipulate

21   that she filed motion to quash arrest in January 28,

22   1998.

23        BY MS. MILLER:

24        Q    And the basis for your motion to quash and

57F

1    suppress was that the police lacked probable cause

2    --

3            MS. STEPHENS:  January 23, 1998 she filed it.

4        BY MS. MILLER:

5        Q    And the basis for your motion to quash and

6    suppress is that the police lacked probable cause to

7    arrest Tony?

8        A    Basis for my probable cause and basis for

9    the motion was that police lacked probable cause to

10   arrest Mr. Hillard for theft of weapon, that's what

11   she said.  They based their arrest so yes that was

12   the basis.

13       Q    So you filed a motion to suppress, quash

14   arrested and suppress evidence in order to try to

15   convince the Court there was no probable cause?

16       A    Well, I alleged there was no probable

17   cause from the arrest and attempted to suppress

18   things from the arrest.

19       Q    So your answer is yes?

20       A    Yes.

21       Q    Okay.  Did you review motion to suppress

22   supplementary report that you just identified?

23           MR. BRASSIL:  Objection, relevance.

24           THE COURT:  Overruled.  Go ahead.

1

2          BY THE WITNESS:

3          A     Well, most certainly since I used it to

4    interview Ms. Hillard approximately a week before

5    the motion.

6          BY MS. MILLER:

7          Q     Then your answer is yes?

8          A     Yes.

9          Q     You knew what Loretha allegedly told

10   Bradley from the supplementary report, is that

11   correct?

12         A     Yes.

13         Q     You knew that the report said Loretha told

14   police that Tony only Tony could have stolen her

15   gun?

16         A     I know that was alleged in the police

17   report yes.

18         Q     Did you review Bradley's testimony before

19   the grand jury before the motion to suppress

20   hearing?

21         A     I don't have any independent recollection

22   of that.

23         Q     You knew Loretha was Tony's sister?

24         A     Certainly.

1      Q    You met with her several times or you

2   talked to her on the phone several times?

3      A    I met with her once.

4      Q    You met with her once and you talked with

5   her on the phone several times?

6      A    Yes, either myself or Ms. Mogul talked to

7   her on the phone several times.

8      Q    And you asked her if she told the police

9   that only Tony could have stolen her gun?

10     A    I simply remember --

11     Q    All I know it's a yes or no answer.  Did

12  ask you her if she told the police that only Tony

13  could have stolen her gun?

14     A    What are we talking about --

15     Q    When you talked, when you say you talked

16  to her face-to-face?

17     A    Yes, I did definitely.

18     Q    And she denied saying that to the police?

19     A    Yes.

20     Q    And Loretha told you where she lived in

21  1997, correct?

22     A    During the face-to-face interview are we

23  talking about?

24     Q    Did Loretha tell you where she lived in

1   1997?

2           MR. BRASSIL:  Objection.

3           THE COURT:  Sustained.

4       BY MS. MILLER:

5       Q   After that meeting, Ms. Bormann, you

6   talked about they're talking about the same meeting?

7           MS. STEPHENS:  What meeting?

8           MS. MILLER:  The meeting she claimed she had

9   with Loretha.

10          MR. BRASSIL:  Objection to the foundation.

11  I'm not arguing, Counsel, the witness clearly didn't

12  know what conversation we are talking about.

13          THE COURT:  Sustained, she has several

14  conversations.

15      BY MS. MILLER:

16      Q   You claimed that you met with Loretha in

17  her house in February of 1998?

18      A   On February 25th yes.

19      Q   And had you face-to-face interview with

20  her?

21      A   Yes.

22      Q   She told you at that time where she was

23  living in 1997?

24      A   I'm sure she did.  We discussed it.

61F

1  Q And she told you that she testified on

2 direct lots of people had access to her house?

3  A I don't know if she used the word lots.

4 She told me that friends and relatives had access to

5 the house.

6  Q And told you that Tony had access to her

7 house?

8  A Yes, he was real --

9  Q She told you lots of other people had

10 access to her house in addition to Tony?

11  A That is correct.

12  Q And you subpoenaed Loretha to testify at

13 the motion to suppress hearing, did you not?

14  A I don't recall that I did.

15  Q Would anything refresh your recollection?

16  A Sure.

17  Q I'm showing you what I've marked as

18 Petitioner Number 6.  Could look at this document

19 and tell the Court what it is?

20  A That is a subpoena with my name on the

21 bottom of it that, oh yes, certificate by Alicia

22 Mogul on the 25th of February 1998 when we are at

23 her home.

24  Q You subpoenaed her?

1       A    Yes.  Ms. Mogul served her during our

2    face-to-face meeting at her home on the 25th of

3    February.

4       Q    So you subpoenaed her to testify at the

5    motion to suppress hearing?

6       A    We gave her a subpoena yes.

7       Q    But you didn't call her, did you?

8       A    No.

9       Q    At the hearing Bradley testified that

10   Loretha told him that only Tony could have taken her

11   gun, is that correct?

12      A    Yes, I believe --

13      Q    And Loretha would have testified because

14   you interviewed her that she never told Bradley that

15   only Tony could have taken her gun?

16           MS. STEPHENS:  Objection.  You can't

17   anticipate how the witness would have testified on that

18   date.

19           THE COURT:  Sustained.

20       BY MS. MILLER:

21      Q    Did you interviewed her in her home?

22      A    Yes.

23      Q    Did you ask her whether she ever told

24   Bradley that only Tony could have taken her gun?

1      A      Yes.

2      Q      And she denied ever telling Bradley that?

3      A      She denied that to me.

4      Q      So as a attorney you probably figure

5   because you subpoenaed her that if she was called to

6   testify, she had testified consistent with what she

7   told you in the house?

8      A      Actually, Ms. Miller also told you when

9   you interviewed  me she did not make a good

10  witness.  The reason I interviewed her in person

11  after having telephone conversation with her --

12          MS. STEPHENS:  Ask that she be allowed to

13  finish her answer and not interrupt the witness in the

14  middle of her answer.

15          MS. MILLER:  They could only -- I'm only

16  asking yes or no answers.

17          THE COURT:  Some questions don't just call

18  for a yes or no answer.

19          MS. MILLER:  I think this question did call

20  for a yes or no answer.  She testified that she

21  interviewed Loretha and Loretha said I didn't tell the

22  police officer that.  I subpoenaed Loretha.  I asked

23  her you subpoenaed her.

24          MS. STEPHENS:  We are still in the middle of

1   objection that the witness should be allowed to answer

2   her question.

3            THE COURT:  You still have a question

4   pending?

5            MS. MILLER:  Yes.

6            THE COURT:  What's your question?

7       BY MS. MILLER:

8       Q    My question is you subpoenaed Loretha to

9   testify at the motion to suppress here?

10      A    She was given a subpoena.

11      Q    She told you at the face-to-face meeting

12  that Bradley never, that she never told Bradley that

13  only Tony could have stolen her gun?

14      A    That is correct.

15      Q    She also told you at this meeting that

16  other people besides Tony had access to her home?

17      A    Yes.

18      Q    But you didn't subpoena her?

19           MS. STEPHENS:  Objection.

20      BY MS. MILLER:

21      Q    You didn't call her to testify?

22      A    No, I did not.

23      Q    You didn't call her to testify because you

24  thought she was not credible?

1    A    That was one of the reasons.

2    Q    Is that correct?

3    A    In part it's correct.

4    Q    You didn't call her because you thought

5  her testimony would hurt Tony?

6    A    I knew her testimony would hurt Tony.

7    Q    You didn't call her because you thought it

8  would created a link between  Tony and the gun, is

9  that correct?

10   A    In part.

11   Q    But you knew that the police already knew

12  about the gun, is that correct?

13   A    You knew the police --

14   Q    You knew that the police already knew?

15       THE COURT:  Let her answer the question.

16  Don't put another question to her.  She was answering

17  the question and you interrupted her.

18       MS. MILLER:  I just asked her did you know

19  the police already knew about the gun, is that correct

20  that's all I asked her.

21   BY THE WITNESS:

22   A    I guess I don't understand your question.

23   BY MS. MILLER:

24   Q    You reviewed supplemental report?

66F

1        A     Yes.

2        Q     And you knew that there was a gun found at
3    the scene of the crime?

4        A     Yes, I did.

5        Q     And you knew that the gun was registered
6    to Loretha Hillard?

7        A     That's what the police report said yes.

8        Q     You knew that the police knew about the
9    gun registered to Loretha?

10       A     I assumed they did based on the reports.

11       Q     And you knew that Loretha was Tony
12   Hillard's sister?

13       A     Are we talking about when I first got the
14   report or when I interviewed Ms. Hillard?

15   Eventually, I discovered that yes.

16       Q     You knew that Bradley had talked to
17   Loretha?

18       A     Actually I didn't know it was Bradley
19   because Miss Hillard didn't remember whether or not
20   it was Bradley but according to the police report it
21   was Bradley.

22       Q     Because the supplementary report was
23   written by Officer Bradley?

24       A     Correct.

67F

1       Q    And in the supplementary report Bradley

2   said Loretha told him that only Tony could have

3   stolen the gun?

4       A    In part that's what the report read.

5       Q    You didn't think that was a link between

6   the gun and Tony at the time of the motion to

7   suppress hearing?

8       A    For the purpose of the motion it was

9   clearly a link.

10      Q    Now, you didn't call Officer Bradley as

11  your witness, did you?

12      A    No.  What I don't remember, I don't

13  remember.  I don't remember who called whom.  I

14  remember cross-examining Detective Bradley so I

15  probably did call him but I can't tell you that for

16  sure.

17           A transcript of the motion would certainly

18  help refresh my memory with respect to that.

19      BY MS. MILLER:

20      Q    Showing you what I've marked as Petitioner

21  Exhibit Number — can you look at this document and

22  advise the Court what it is?

23      A    Looks like a copy of a transcript titled

24  motion to suppress arrest and myself and Ms. Hillard

1     and Mr. Savina (phonetic) appearing for the state.

2         Q    Could you tell us if that refresh your

3     recollection to whether or not you called Officer

4     Bradley as your own witness?

5         A    This isn't the whole transcript.  I

6     started midway through so I can tell -- This appears

7     to be another copy of a transcript.  And it appears

8     that I called his girlfriend, and that the State

9     called Detective Bradley.

10        Q    Thank you.

11             At this motion to suppress, you argued

12    that Bradley's testimony that Loretha told him that

13    only Tony could have taken the gun, did not

14    establish probable cause, is that correct?

15        A    I can't tell you that.  I have not

16    reviewed my argument from that transcript.

17        Q    Okay.  When you met face-to-face with

18    Loretha, you testified that Loretha told you that

19    Tony knew where the gun was kept, is that your

20    testimony?

21        A    Loretha told me that Tony along with all

22    of her other family members would have known that

23    she had the gun in her apartment.  I don't recall if

24    she said that Mr. Hillard knew exactly where this

1   was under the mattress, that I don't recall.

2        Q    At the motion to suppress do you recall

3   that Bradley testified Loretha told him where to

4   find Tony?

5        A    I don't recall Detective Bradley's

6   testimony.

7        Q    Would anything refresh your recollection?

8        A    Sure, the transcript.

9        Q    Turn to page B59.

10       A    I see a question.  Did she say anything

11   else.  Answer:  She told me where I could find her.

12       Q    Would you turn to page B60?

13            MR. BRASSIL:  I believe the transcript speaks

14   for itself.  I don't see the relevance of these

15   questions.

16            MS. MILLER:  She doesn't recall.

17            MS. STEPHENS:  Transcript speaks for itself,

18   to ask a person what she said previously if she is not

19   impeached.

20            THE COURT:  She is asking to refresh your

21   recollection.  Overruled.

22       BY MS. MILLER:

23       Q    Could you read the answer?

24       A    To which?

1        Q       Page B60.  Did Bradley testify that

2    Loretha gave him Tony's address?

3        A       Can you direct me where on the page?

4        Q       At the very top.  She told me that?

5        A       I'm trying to find the question.

6        Q       It's B60.  Well, the question would be on

7    B59?

8        A       In that regard to the gun in (inaudible)

9    Tony Hillard I asked an open-ended question was

10   there anything else said and then there was an

11   answer given by the detective.

12       Q       Right in that answer the detective

13   testified that Loretha told him where Tony lived and

14   what his address was?

15       A       Yes, that is what the detective testified

16   to.

17       Q       And Bradley also testified in motion to

18   suppress that he arrested Tony on June 3?

19       A       I don't recall the date.  I know he

20   testified that he arrested Mr. Hillard because that

21   was the basis of the motion but I can't give you the

22   date.

23       Q       Do you recall the officer testifying that

24   he talked to Loretha sometime between May 12 and May

71F

1    19?

2         A    I don't remember the date, no, ma'am.

3         Q    Do you want to turn to page 56, would that

4    refresh your recollection?

5         A    I asked the question:  And you told us the

6    phone call happened sometime between May 12 and May

7    19 and his answer was yes.

8         Q    So you recall now that he testified that

9    he talked to her between May 12 and May 19?

10        A    I'm relying upon transcript.  I have no

11   independent memory of it.

12             MS. STEPHENS:  Objection to this line of

13   questioning.  She's attempting, I believe, to impeach

14   or call Ms. Bormann's trial tactic into question based

15   on transcript from motion to quash arrest and suppress

16   evidence.  The issue at this hearing why didn't she

17   called Loretha Hillard at that hearing and the answers

18   that are relative to that question all pertain to what

19   happened before the hearing, not to what Detective

20   Bradley stated at the hearing.

21             MR. BRASSIL:  May I add something.  It's also

22   my understanding regarding post conviction proceeding

23   all the transcripts, all the prior hearings, all the

24   prior testimony are admissible automatically maybe

1   considered by the Court, as such all of these

2   questioning have no relevance to her witness the way

3   the transcript could be admitted.  She isn't refreshing

4   her recollection.  She is asking her to parse out

5   sentences in her testimony.

6           THE COURT:  Seems that way.

7           MS. MILLER:  My purpose, Your Honor, is to

8   impeach the witness with her motion to quash arrest and

9   suppress evidence and her failure to discredit

10  Bradley's testimony which dealt with why she did not

11  call Loretha and I only have one more question and I'm

12  done and I can wrap it all up.

13          THE COURT:  I don't see that this is the way

14  to impeach her.  This is what a witness testified.  She

15  has given you the reason why she didn't call Loretha to

16  testify and Mr. Brassil is correct.  The entire record

17  is part of these --

18          MS. MILLER:  Your Honor, it goes to Bradley's

19  testimony that Loretha told him where she could find

20  Tony.  That goes to his testimony that Ms. Bormann, we

21  are alleging did not attempt to discredit so I have one

22  more question and we can with respect it suppressed.

23          THE COURT:  About something that is in the

24  transcript?

73F

1          MS. MILLER:  No.  The question, one question
2     is in the transcript the date that he went to arrest
3     Tony, and I would just ask her if she recalls the date
4     that he testified he went to arrest Tony.
5          THE COURT:  And then go to the transcript.
6          MS. MILLER:  No then I'm done.
7          THE COURT:  Go ahead.  Ask her the question.
8          MS. MILLER:  Thank you.
9     BY MS. MILLER:
10         Q    Do you recall that Officer Bradley
11    testified that he arrested Tony on June 3?
12         A    As I said to you earlier, I don't recall
13    the date.
14         Q    Would it refresh your recollection if you
15    went to page B20 line 19?
16         A    I'm going to be able to tell you what the
17    transcript says.  It would not refresh my
18    recollection because this happened years ago so I
19    don't have an independent recollection of the
20    testimony.  But if the officer testified to it and
21    it's consistent to the police report, it's the date.
22         Q    So the officer testified that he talked
23    Loretha on May 19 and he arrested Tony on June 3rd
24    and he testified, do you recall that?

74F

1　　　A　　I don't recall but it's in the transcript.

2　　It's clearly there.

3　　　Q　　And he testified that Loretha told him

4　　Tony's address?

5　　　A　　Yes, he did.　It's in the transcript.

6　　　Q　　But you never cross-examined the officer

7　　on the fact that he waited two weeks after he got

8　　this information to go arrest Tony?

9　　　A　　No.

10　　　　MS. STEPHENS:　Objection.

11　　　　THE COURT:　What's your objection?

12　　　　MS. STEPHENS:　Same objection, that question

13　　has nothing to do with the issue at this hearing.　The

14　　issue isn't what kind of job she did cross-examining

15　　Detective Bradley.

16　　　　The issue is why didn't she call Loretha

17　　Hillard at the hearing, that's the sole hearing

18　　issue that the petitioner is raised in his pro se

19　　petition, that's the sole issue that was raised in

20　　the supplementary petition.

21　　　　MS. MILLER:　I submit this all goes to

22　　Loretha's testimony which is what Bradley's testifying.

23　　He testified she gave me the address.

24　　　　THE COURT:　You're asking her ──

1          MS. MILLER:  I'm questioning her on why she

2     didn't cross-examine him on what Loretha told him.

3          THE COURT:  What's that got to do with the

4     issue in the petition.  The petition relates to her not

5     calling Loretha.

6          The fact that Bradley waited a week, a

7     month, a year to go out and arrest Mr. Hillard

8     really has no relevance to what's before the Court

9     nor to her competence as a lawyer.

10          MS. MILLER:  I'll withdraw the question,

11     that's fine.

12     BY MS. MILLER:

13     Q    So Officer Bradley testified that Loretha

14     told him only Tony could have stolen her gun and you

15     never called, is that correct?

16     A    Yes.

17     Q    And you never called anyone at the hearing

18     to try to contradict Officer Bradley's testimony, is

19     that correct?

20          MS. STEPHENS:  Objection.

21          THE COURT:  Just a minute.  What's your

22     basis?

23          MS. STEPHENS:  The issue whether she called

24     her or anyone else.

76F

1     MS. MILLER:  You didn't ---

2     THE COURT:  Sustained.

3  BY MS. MILLER:

4   Q You didn't called Loretha Hillard to

5 contradict Officer Bradley's testimony?

6   A I chose not to call Loretha Hillard yes.

7   Q Even though Loretha Hillard told you that

8 she had never made that statement to Officer

9 Bradley?

10   A Yes.

11     MS. MILLER:  Thank you.  I have no further

12 questions.

13       **REDIRECT EXAMINATION**

14  BY MS. STEPHENS:

15   Q Counsel showed you a subpoena for

16 Ms. Hillard.  You did subpoena her for the motion to

17 quash arrest and suppress evidence?

18   A My law clerk actually hand delivered it to

19 her the night that we interviewed her at her home.

20   Q So she got that subpoena from you or at

21 the same time that you heard her story face-to-face,

22 is that correct?

23   A Yes.

24   Q But you chose not to call her at the

1    motion to quash arrest and suppress evidence, is

2    that correct?

3        A    Yes.

4        Q    You said that's because she would not have

5    made a good witness to Tony, is that correct?

6        A    Yes.

7        Q    Can you give all the reasons why she would

8    not have given, why she would have made a good

9    witness for the petitioner?

10       A    We issued her a subpoena on the off chance

11   that we might need her because you can never predict

12   what's going to happen or whose going to testify to

13   what's in a motion.  I have been practicing for

14   years.  I had a general idea but we weren't sure so

15   we issued a subpoena anyway because she said if she

16   needed to take off work, she needed something to

17   show them.  We gave her that.

18            I didn't call Loretha Hillard for a

19   variety of reasons, one was I didn't think she was

20   going to make a credible witness.  And I didn't

21   think that Judge Toomin, who was going to be the

22   trier of facts for the purposes of the motion was

23   going to consider Ms. Hillard's testimony more

24   credible that the officer's testimony; that was the

1    issue for the purposes of the motion.

2              ' Now the downside to calling Ms. Hillard at

3    the motion was my biggest concern because if I

4    called Ms. Hillard at the motion what would have

5    happened she would have been put under oath, sworn

6    to testify and then testified prior to the trial in

7    this case.

8              At the trial, which I knew was going to be

9    a jury at that point, I anticipated a couple of

10   things:  One was a single finger ID by the

11   complainant in the case and then the possibility

12   that gun records registering the gun to Ms. Hillard

13   would be attempted to be introduced.

14             I thought that I had a decent chance at

15   that motion in limine to prevent the State from

16   doing that very thing if they couldn't — the name

17   Loretha Hillard, Tony Hillard because then the jury

18   would be left to speculation to any sorts of

19   relationship.  I didn't want to put Mr. Hillard

20   under oath saying that Mr. Hillard, defendant, had

21   an opportunity and access to steal the gun because

22   that was given evidence to the State they didn't

23   have. '

24             Ms. Hillard knew that she did not have to

79F

1    talk to the State's attorney if they attempted to

2    interview her.

3           She knew she would have to appear. She

4    was subpoenaed and we were hoping that that wasn't

5    going to happen and, in fact, it didn't.

6           The State never called Ms. Hillard to

7    testify because she didn't know what she would say

8    on the stand, and I did so for all of those reasons

9    I chose not to put her on at the motion because I

10    thought we had a much better chance of winning the

11    trial without her previous testimony.

12           THE COURT: Let me make sure I understand

13    what you are saying. The downside to that motion to

14    quash and suppress, the State would have established

15    through Detective Bradley that he talked to the

16    defendant's sister and she said what she said?

17    A    That is correct.

18           THE COURT: You knew that was going to

19    happen?

20           THE WITNESS: Yes.

21           THE COURT: But she wasn't called at the

22    motion and you didn't call her at the trial, it would

23    have been a gap as to whether that gun record to

24    Loretha Hillard actually meant anything as far as Tony

1   is concerned?

2          THE WITNESS:  That is correct, that was no

3   link.

4          THE COURT:  She was the sister and he had

5   access to her home?

6          THE WITNESS:  That is correct.

7          THE COURT:  That's what you viewed as

8   downside?

9          THE WITNESS:  It's viewed as a downside that

10   I would have put the witness under oath, provided the

11   State with evidence that linked my client to a gun that

12   they didn't have without hearsay testimony of an

13   officer.

14          THE COURT:  So all they had from the police

15   report was the hearsay of Bradley talking to Ms.

16   Hillard?

17          THE WITNESS:  Over the phone yes.

18          THE COURT:  I understand.  Go ahead, Ms.

19   Stephens.

20     BY MS. STEPHENS:

21     Q   So if you had put Loretha on the stand at

22   the motion to quash arrest and suppress evidence,

23   you would have established for the State the

24   relationship between a relationship between

1   petitioner and Loretha Hillard, is that correct?

2       A    I would have established, the words would

3   have come out of Ms. Hillard's mouth under oath yes.

4       Q    And you would have established Loretha's

5   ownership of the gun, is that correct?

6       A    Well, it would have come out of her mouth

7   yes.

8       Q    And she would have said she possessed the

9   gun, is that correct?

10      A    She would have said that I thought.

11      Q    And she would have told you that the

12  petitioner had access to the gun, is that correct?

13      A    She would have testified to that I believe

14  yes.

15      Q    And you believe that she would have

16  established that the gun was missing at the time of

17  the crime?

18      A    Yes.

19      Q    And you would have also established that

20  she did not report the gun stolen until May 19 of

21  1997, is that correct?

22      A    I don't recall whether the gun was

23  reported stolen.

24      Q    Are there any other things that you

82F

1   believe you would have established if the State had

2   you put Loretha Hillard on the stand?

3       A    I think pretty much between you and Judge

4   Toomin pretty much covered it.

5           MS. STEPHENS:  I have nothing further.

6           MS. MILLER:  Your Honor, I have follow up

7   questions.

8           THE COURT:  Go ahead.

9           MS. MILLER:  Thank you.

10                  **RECROSS-EXAMINATION**

11   BY MS. MILLER:

12       Q    Did the trial, the gun registration did

13   that show Loretha owned the gun was introduced to at

14   the trial?

15       A    Over my objection yes.

16       Q    Before the motion to suppress, the police

17   already knew that Loretha was the owner of the gun,

18   is that correct?

19       A    Well, the report indicated that she was

20   yes.

21       Q    And Bradley testified that he knew that

22   Loretha said Tony, her brother, took the gun, is

23   that correct?

24       A    Yes.

1      Q    So when you filed motion to suppress, you

2   want to win, right?

3      A    Not always.  It would have been nice to

4   win but that, actually a case like this is not the

5   sole purpose for filing a pretrial motion.

6      Q    When you filed a motion to suppress, you

7   asked for the out of court line up to be suppressed?

8      A    That's the remedy I have.

9      Q    And you asked for in court line up to be

10  suppressed, as a result it was taken by out of

11  court?

12     A    Right.

13     Q    If the Judge had granted the motion to

14  suppress the out of court line up would have been

15  suppressed,  is that correct?

16     A    Well, had the Judge found there was no

17  probable cause the initial legal ruling would have

18  been to suppress the line up.

19     Q    And more than likely would have

20  continuation hearing to decide whether in-Court

21  identification?

22     A    That is correct.

23     Q    If you had won in-Court identification,

24  this probably wouldn't have been case to trial?

1       A    If it wasn't in-Court identification, I

2    would have only in terms I know in practice who

3    actually would be one of those that that would have

4    been --

5       Q    Have you had a trial with just an in-Court

6    identification?

7       A    That is correct.

8       Q    And as it turned out, the gun was still

9    introduced into trial?

10      A    Over my objection that is correct.

11           MS. MILLER:  I have nothing further.

12           MS. STEPHENS:  I have nothing further.  At

13   this time we would seek leave to admit Respondent

14   Exhibit Number 2 which would be the transcript from

15   March 5, 1998 pertaining to Detective Bradley's

16   testimony from that day.

17           MS. MILLER:  That's motion to suppress?

18           MS. STEPHENS:  Motion to quash arrest and

19   suppress evidence.

20           MS. MILLER:  No objection.

21           MS. STEPHENS:  With the admission of that

22   transcript, we would rest at this time.

23           THE COURT:  All right.  Both sides rests?

24           MS. MILLER:  No.  We would like to call

85F

1   Loretha as a rebuttal witness.

2   THE COURT:  Fine,  call her.  Ms. Hillard,

3   you understand you're still under oath?

4   THE WITNESS:  Yes.

5   REBUTTAL WITNESS:

6   BY MS. MILLER:

7   Q   Do you recall when you testified on direct

8   examination that you talked to Ms. Bormann several

9   times by telephone?

10   A   Yes.

11   Q   Did you ever call meeting her in person?

12   A   No, I don't.

13   Q   Is it possible you just forgot about that

14   meeting?

15   A   Perhaps, maybe.  I just don't remember

16   meeting her.

17   Q   During your conversation did you ever tell

18   Ms. Bormann that Tony knew where you kept your gun

19   hidden?

20   A   No.

21   MS. MILLER:  I have no further questions.  I

22   tendered the witness.  Thank you.

23   MS. STEPHENS:  I have nothing further.

24   THE COURT:  Just a minute.  I see Petitioner

86F

1    Number 6.  May I see Petitioner Number 6?  No, it would

2    be subpoena.

3            Showing you Petition Number 6,

4    Ms. Hillard, have you ever been seen that before?

5            THE WITNESS:  Yes.

6            THE COURT:  Do you know what that is?

7            THE WITNESS:  A subpoena.

8            THE COURT:  Do you see your signature?

9            THE WITNESS:  Don't look like, I see a

10   signature.

11           THE COURT:  You didn't sign this?

12           THE WITNESS:  I don't recall signing this.

13           THE COURT:  You don't recall anybody being in

14   your home and giving you that subpoena before the

15   motion was heard?

16           THE WITNESS:  I don't recall this at all.

17           THE COURT:  Are you saying you were never

18   subpoenaed to testify on March 4, 1998 in this

19   courtroom?

20           THE WITNESS:  I'm not saying that.  I'm

21   saying I don't recall signing it.

22           THE COURT:  Were you subpoenaed to testify

23   here?

24           THE WITNESS:  I don't recall, Judge.

87F

1          THE COURT:  You don't recall that either?

2          THE WITNESS:  No.

3          THE COURT:  Anything else?

4          MS. STEPHENS:  Is that your signature on the

5    subpoena?

6          THE WITNESS:  Doesn't look like my signature.

7          MS. STEPHENS:  I have nothing else.

8          THE COURT:  Doesn't look like your signature?

9          THE WITNESS:  No.  I don't write like that.

10         MS. MILLER:  Your Honor, may I ask a follow

11   up question?

12         THE COURT:  Sure.

13         MS. MILLER:  Loretha, regarding Petitioner

14   Number  6, is that handwriting at the bottom of this

15   subpoena?

16         THE WITNESS:  Doesn't look like my

17   handwriting.

18         MS. MILLER:  Is that your signature?

19         THE WITNESS:  No.

20         MS. MILLER:  Do you recall whether you were

21   present in court on March 4, 1998 the day the motion to

22   suppress hearing begin?

23         THE WITNESS:  No, I don't recall.

24         MS. MILLER:  You just don't remember?

1          THE WITNESS:  No.

2          MS. STEPHENS:  I have nothing further.

3          THE COURT:  You may step down.

4          MS. MILLER:  Petitioner rests.  We would ask

5    Your Honor to admit into evidence the entire record on

6    appeal in addition to the motion.

7          THE COURT:  I think it's before me the entire

8    record is before me in any event.

9          MS. MILLER:  That's true and normally but I

10   am just asking sometimes if there's an appeal, the

11   Clerk's office does not make it part of the record

12   until you order.

13         THE COURT:  It may be received.

14         MS. MILLER:  Thank you.

15         THE COURT:  Both sides rest?

16         MS. STEPHENS:  Yes.

17         THE COURT:  Any argument?

18         MS. MILLER:  Yes, Your Honor.  Thank you.

19            CLOSING ARGUMENT BY MS. MILLER:

20         Your Honor, we submit that following

21   evidentiary hearing we have provided the Court with

22   a preponderance of the evidence that trial counsel

23   was ineffective for failing to call Loretha to

24   impeach Officer Bradley's testimony.

1          A preponderance of the evidence is a
2   standard here under People v. Stovall (phonetic) 47
3   Ill.2nd 42 264 NE 2d 174 1970; and People v. Rovito
4   327 Ill. App.3d. 164, 762 NE 2d 641 First District,
5   2001.  We believe we have met that standard.

6          Under Strickland v. Washington trial
7   counsel was ineffective because the petitioner must
8   show that counsel representation failed below the
9   objective standard of reasonableness and that
10  counsel's insufficiency there was a reasonable
11  probability that counsel's performance was
12  prejudicial to the defense.  And prejudice exists
13  when there's reasonable probability that but for
14  counsel's unprofessional errors the result of the
15  proceeding would be different.

16         So I'd like to look at the first prong,
17  Your Honor has acknowledged that Tony's arrest was
18  based on the information that Loretha reportedly
19  gave to Officer Bradley.

20         And Loretha came here and she is an
21  upstanding citizen and she testified credibly and
22  she testified that she was more than willing to
23  testify at the motion to suppress, but she never
24  told Officer Bradley that Tony stole her gun.  And

1   she recalls talking to Ms. Bormann on the telephone
2   and being interviewed with here.

3         She doesn't recall the face-to-face
4   interview but I don't think that's neither here nor
5   there whether she remembers the face-to-face.  She
6   only remembers the telephone call.

7         She is a young woman with a high school
8   diploma.  She has no criminal conviction.  She has
9   been gainfully employed.  And she said no family
10  member of mine would ever take my gun.  I certainly
11  would never believe any family member of mine would
12  ever take my gun, and she would have testified and
13  she would have impeached or contradicted Officer
14  Bradley's testimony.

15        And she told Ms. Bormann that I never said
16  that I told the officer that only Tony took my gun.
17  And her testimony is corroborated by the stolen
18  police report because no she never told police
19  officer when she reported her gun missing.  If she
20  thought her brother had stolen the gun she would
21  have told the police that.  She never --

22        MS. STEPHENS:  Objection.

23        THE COURT:  That's not the evidence.  You
24  tried to bring in the contents of the police report

91F

1   that was objected to and I refused to allow it.

2          MS. MILLER:  I agree.  All I'm saying --

3          THE COURT:  Only argue the evidence then

4   don't argue non-evidence here.

5          MS. MILLER:  But she did testify that she

6   never told the police that Tony stole her gun when she

7   reported it missing.

8          THE COURT:  She testified as to her

9   conversation with the Detective Bradley and what she

10  told him and what she didn't tell him.  What was put in

11  the police report or the report of the weapon being

12  missing is non-evidence.

13         MS. MILLER:  But her testimony is

14  corroborated by that fact.  And trial counsel admits

15  that she talked to Loretha.  She admits she heard

16  Loretha denying of excusing Tony.  She testified that

17  she heard Loretha say that lots of people had access to

18  her home and she even subpoenaed Loretha to testify at

19  the motion to suppress.

20         And the law is clear that trial counsel is

21  obligated to present all evidence that's favorable

22  to her client so her failure to call Loretha clearly

23  falls below objective standard of reasonableness.

24         As to the second prong prejudice, let me

                          92F

1   read something to your Honor that you yourself

2   wrote.

3          In this case police report obviously

4   identified Ms. Hillard as a source of information

5   establishing probable cause for her brother's arrest

6   assuming the voracity of the recent way describe the

7   cycles [sic] the outcome on petitioner's motion to

8   quash could well have been different.

9          So trial counsel knew that the only way

10   she could probably win the motion to suppress was to

11   discredit Officer Bradley's testimony.

12          THE COURT:  When you quote from what I said

13   in the motion to dismiss the order, that obviously is

14   taken from a vantage point that doesn't exist today

15   because we hadn't heard from Ms. Bormann.  We don't

16   know any reasons that she had for not doing what you

17   think she should have done.  I certainly wouldn't have

18   known when I wrote that.

19          MS. MILLER:  That's true.  But we have an

20   officer here who gets on the stand and who testified

21   that he talked to Loretha and she said only Tony could

22   have stolen my gun; and his testimony stood unimpeached

23   and uncontradicted and trial counsel knew after talking

24   to Loretha that Officer Bradley's testimony could be

1    impeached.

2          Loretha testified that Tony and lots of
3    people had access to her home.  They all had access
4    to all rooms in her house and sometimes her doors
5    were unlocked and people were present when she
6    wasn't home; and she testified that Tony, her
7    brother, also has access to her home.

8          There was evidence that many people
9    besides Tony Hillard had access to Loretha's home
10   and could have taken her gun and had she presented
11   that testimony she could have argued that lots of
12   people or many people had access to the home and
13   that does not make a case for probable cause against
14   one Tony Hillard.

15         I would like to just take a moment, Your
16   Honor, during this closing argument to review
17   Ms. Bormann's closing argument at the motion to
18   suppress because her closing argument in and of
19   itself begs for Loretha to have been called.

20         On page 599 of the argument, Ms. Bormann
21   says, well, let's look at some more information.
22   They have the gun aside.  If the gun was taken, he's
23   the only one who could have taken it.  The police
24   don't investigate further.  They don't say why that

1   is don't you live with somebody else.  Nothing is

2   done to corroborate that statement.

3         And Your Honor replies.  Well, there's no

4   doubt in my mind that Ms. Hillard told the police

5   officers about her brother named Tony Hillard,

6   absolutely no doubt in my mind.

7         And then on page B 106, Ms. Bormann again

8   in arguing her motion to suppress says.  The sister

9   who said Your Honor my gun was taken.  Tony Hillard

10   is the only one who could have taken it if my gun

11   was taken, the gun was missing that in and of itself

12   would not give probable cause for the arrest of the

13   gun; and Your Honor replies well that's pretty much

14   saying I think he is the guy who took it and

15   Ms. Bormann goes on and said on page B107, line 9,

16   so she would have reported the gun missing but it

17   wouldn't make any sense for her to say if anyone

18   took the gun then it was Tony Hillard because at

19   this point, according to the detective, she's

20   already reported it stolen so presumably she would

21   have known that.  And your Honor replies on page

22   B107 but there's no evidence of what she said at

23   that time.

24         Her entire closing argument simply begs

1    for Loretha to have been called because there was no

2    evidence of what actually was said and was not said

3    and that was absolutely essential to this motion to

4    suppress because Bradley's testimony standing alone,

5    Your Honor, had no choice but to find probable

6    cause.

7         With Loretha's testimony, as a credible

8    witness as she is, despite the fact she might not

9    remember face-to-face, there was at least the

10   possibility that the motion to suppress would have

11   been granted.

12        Therefore, trial counsel's conduct fell

13   below a reasonable level for not calling Loretha and

14   Mr. Hillard was clearly prejudiced by trial

15   counsel's failure to call Loretha to impeach

16   Bradley.

17        And in conclusion we would ask that

18   Mr. Hillard's petition be granted, that his

19   conviction is vacated, and that this Court order

20   that the out of court line up was the fruit of

21   illegal arrest and remand this case for a new trial.

22        THE COURT:   Thank you.

23

24        CLOSING ARGUMENT BY MS. STEPHENS:

1           As you know we are at the 3rd stage

2    of the post conviction proceeding.   The evidentiary

3    hearing we know longer have to accept what the

4    defendant has alleged as fact in this post

5    conviction petition is true.

6           At this stage the defendant has a high

7    burden.   The defendant, the petitioner must show a

8    substantial violation of his constitutional rights.

9           Here as you know from reading his pro se

10   and supplemental petition he is alleging ineffective

11   assistance of counsel on the part of Ms. Bormann

12   based on his pro se petition on the fact that she

13   allegedly did not investigate Loretha Hillard at

14   all; and in the supplemental petition they further

15   argued that she was ineffective because she should

16   have called Loretha Hillard at the motion to quash

17   arrest and suppress evidence.

18          Your Honor, to prove that claim of

19   ineffective assistance of counsel, the defense has a

20   very high burden to establish.   They must show one

21   that Ms. Bormann's performance was deficient and

22   under Strickland v. Washington number 2 they must

23   show that that deficiency in her performance would

24   have changed the outcome at trial.

1          Your Honor, I would submit to you in no

2     way has defense established either prong in

3     Strickland v. Washington.

4          Let's talk about the defendant's ---

5     petitioner's allegation in this pro se petition that

6     Ms. Hillard --- that Ms. Bormann never investigated

7     at all Loretha Hillard.

8          Well, that claim is rebutted by the

9     defense's own witness Loretha Hillard.

10         Loretha Hillard, at the very minimum,

11    admitted that Ms. Bormann had several phone

12    conversations with her and had conversations with

13    her about the gun that was recovered from the scene

14    of the crime.

15         So number 1 that knocks out petitioner's

16    allegation in it's pro se petition.

17         Let's talk about the question in the

18    supplemental petition, why didn't Ms. Bormann called

19    Loretha Hillard at trial.

20         Your Honor, Ms. Bormann answered that

21    question far better than I can summarize to you

22    right now, but in a nutshell Ms. Bormann told you

23    that calling Ms. Hillard would have caused far more

24    harm to Tony Hillard than good.

1           As she told you there was, had she called

2    Ms. Hillard at this hearing at the motion to quash

3    arrest and suppress evidence, she would have

4    established a link on the part, a link for the State

5    linking the gun that was recovered from the crime

6    scene to the defendant because the defendant

7    petitioner had access to that gun inside Loretha's

8    home.  That is what Loretha told Ms. Hillard during

9    her face-to-face conversation with her prior to

10   motion to quash arrest and suppress evidence.

11          Ms. Bormann gave you several other reasons

12   why she did not call Loretha Hillard at that motion.

13   She told you that she did not believe Loretha

14   Hillard would have made a credible witness.

15          We know that not only from the fact as

16   related to you from Ms. Bormann, we know just based

17   on Loretha's own testimony, today's testimony that

18   was far from credible, testimony that's been

19   impeached not only by the police but by Ms. Bormann

20   herself.

21          Let's talk about that testimony you heard

22   from Loretha.  She tells you she was never, she told

23   you on district examination when she was called in

24   defense's case-in-chief that she was never

1   subpoenaed for the motion by Ms. Bormann.   Suddenly,

2   the defense actually shows Ms. Bormann a subpoena.

3   Ms. Bormann confirms yes, she did subpoena

4   Ms. Hillard for the motion.

5          But yet again when Ms. Hillard is shown

6   that subpoena now on rebuttal suddenly she goes from

7   saying she for sure wasn't subpoenaed for the motion

8   saying she doesn't remember.

9          Loretha told you also that she never met

10  with Cheryl Bormann in person on direct examination

11  she was clear.   I asked her several times, did you

12  meet with her face-to-face.   No.   Then after

13  Ms. Bormann testified suddenly it's possible that I

14  could have met with her.

15         Your Honor, that is not credible

16  testimony.   She told you on direct examination that

17  she never told Ms. Bormann that she left the front

18  door to her home at 1230 North Larrabee open half

19  the time.

20         Ms. Bormann contradicted that.   Said

21  that's exactly what she told her when she

22  interviewed her in February of 1998.

23         Loretha told you that she never told

24  Ms. Bormann, that Tony Hillard had access to her

1   home and could have taken the gun but yet that's

2   exactly what Ms. Bormann told you she told her in

3   February of 1998.

4        She also said that she never, Loretha also

5   said she never told the police that her family

6   members would have taken her gun.  I asked

7   Ms. Bormann that exact question, is that what she

8   tells the police.  Ms. Bormann denied the fact,

9   denied Ms. Hillard ever made that statement the

10  statement being that she never told the police that

11  her family members would have taken her gun.

12       And, Your Honor, as you know from review

13  of Detective Bradley's testimony, her statement

14  today Loretha Hillard's statement are flatly

15  contradicted by the statement you heard with regards

16  to that same conversation over the phone with

17  Detective Bradley.

18       Your Honor, so based on all that not only

19  did Ms. Bormann investigate Loretha Hillard, she

20  made a strategic decision and proper decision not to

21  call Loretha Hillard at trial.

22       Your Honor, as I noted in my written

23  motion to dismiss cases of Flores and Ashford, both

24  held that the decision as to whether to call a

1  particular witness is general a matter of trial

2  strategy or tactic which would not support claim of

3  ineffective assistance of counsel yet that is

4  exactly what the petitioner is asking, basing his

5  claim of ineffective assistance of counsel today.

6          Well, we got that strategy with

7  Ms. Bormann and she told you all the strategic

8  reasons why and proper reason why she did not want

9  to call Ms. Hillard who was not a credible witness.

10          Your Honor, based on the credible

11  testimony you heard from Ms. Bormann as suppose to

12  bias, incredible, inconsistent, impeached testimony

13  that you heard from Lonetha Hillard, we would submit

14  that not only that, I'm sorry, we would submit that

15  petitioner has in no way satisfied either prong of

16  Strickland v. Washington.

17          What you have is a petitioner who filed

18  and a witness who filed this affidavit 15 days after

19  his, the petitioner's appeal failed in the appellate

20  court.

21          Prior to that there was no mention, no

22  complaints about Ms. Bormann.  This petitioner,

23  there's no evidence that this petitioner ever asked

24  for another attorney, ever complained to you about

102F

1    Ms. Bormann, never raised ineffective assistance of

2    counsel in the Appellate Court, no claim about that

3    whatsoever until his appeal failed.

4         What you have is a story that's been

5    conjured up in the last minute now in the 11th hour.

6    Ms. Hillard is trying to help her brother.  Her

7    testimony was not credible.

8         For all of those reasons, we would ask

9    that you deny post conviction relief.

10                    REBUTTAL BY MS. MILLER:

11        I would submit, Your Honor, that you can't

12   be possible by trial standing when and the attorney

13   filed a motion to suppress and the police officer

14   testifies to what is clearly probable cause, what

15   this Court found to be clearly probable cause and

16   had the witness impeached that officer and doesn't

17   put that witness on the stand, that doesn't amount

18   to trial strategy, that amounts to ineffective

19   assistance of counsel.

20        And if Loretha had conjured up this

21   testimony, she probably could have done a better

22   job.  She could have said sure I remember the

23   face-to-face meeting with Ms. Bormann.  She could

24   have said, sure I remember being subpoenaed,

1    She testified to what she remembered.  She

2    remembered several telephone calls with Ms. Bormann.

3    She remembers talking to Ms. Bormann.  She simply

4    did not remember the face-to-face meeting and she

5    did not remember being subpoenaed.

6    Her testimony was very credible.  And on

7    direct examination, Ms. Stevens asked Loretha did

8    you ever tell Ms. Bormann that Tony could have taken

9    your gun and she said no.

10    And interestingly enough Ms. Bormann never

11    testified that Loretha said that at no time that

12    Loretha said to her yes Tony could have taken my

13    gun.

14    She testified Tony had access to her

15    house, that lots of other people had access to her

16    house and that she never told the police officer

17    that Tony took her gun.

18    But she never even, Ms. Bormann never

19    testified that Loretha told her, well, yes Tony

20    could have taken her gun.  Had she called Loretha to

21    impeach Officer Bradley, there was a strong

22    possibility that the motion to suppress would have

23    been granted and People v. Brinson, 399 NE. 2d 1010

24    1014, page 1014 2nd District 1980 have held as to

1    many other cases that claims of ineffective

2    assistance of counsel have been sustained where a

3    motion to suppress have a strong probability of

4    success.

5         I would submit without Loretha's testimony

6    there was absolutely no possibility of success.

7    With this testimony, there was a probability that

8    the results would have been different.

9         Therefore, we ask to find under Strickland

10   and Washington that the standard has been met.

11        Thank you.

12                   COURT'S RULING:

13        The Court has heard the evidence and the

14   contentions of the parties as expressed here at the

15   conclusion of these proceedings and will make the

16   following findings and conclusions, which I believe

17   were mandated under the Post Conviction Hearing Act.

18        We are as the parties recognize at the

19   final and 3rd stage of the evidentiary hearing, in

20   the post conviction proceeding, and I think it's

21   fairly evident that both sides understand that the

22   burden is on the petitioner to establish a

23   substantial violation of his constitutional rights.

24        The contention here is that trial counsel,

1    Cheryl Bormann, was ineffective when she failed to

2    call Loretha Hillard at the suppression hearing to

3    rebut the testimony of Detective Bradley.

4            And we've heard from Ms. Bormann.   We have

5    heard from Loretha Hillard.   And we have heard from

6    Detective Bradley in as much as his trial testimony

7    is before the Court, and the Court is familiar with

8    it.

9            When we look at allegations of

10   ineffectiveness, obviously, we are bound by the

11   single case of Strickland v. Washington was

12   specifically or expressly adapted in Illinois in

13   People v. Albanese, as I recall, whether it had to

14   be or something else, but in any event, it is the

15   controlling standard and simply refined it speaks to

16   two prongs that must be established, what we will

17   call performance prong and the prejudice prong; that

18   is performance prong that counsel was deficient in

19   her representation of the petitioner.

20           And the prejudice prong which simply

21   states but for that deficiency the prejudice would

22   not have accrued to the defendant, that is a

23   reasonable probability that a different result would

24   have obtained, in this case a success on the motion

1    to quash arrest and suppress evidence.

2            In reviewing the testimony of Ms. Bormann,

3    who I suppose we can say is the major actor here, it

4    is evidence that she, during the course of the

5    proceeding received discovery as normally the case.

6            That discovery from the evidence today and

7    the entire record would reflect there was, at least

8    in the eyes of the prosecution, a basis for probable

9    cause to arrest Mr. Hillard.

10            A gun was found at the scene of the

11    assault upon Mr. Genadue (phonetic), gun was traced

12    to Toretha Hillard through a report that she had

13    filed with the Chicago Police Department.

14            The detective, Detective Bradley,

15    contacted this woman, Ms. Hillard, according to the

16    discovery, she told them that the, she told him if

17    her gun was stolen, that the only person who could

18    have taken it was her brother Tony; and she gave

19    more detail as to where Tony could be located, who

20    he was living with.  From the address, as I recall

21    700 block on Division, just around the block from

22    Larrabee from her own residence.

23            And the police in turn went to that

24    residence and low and behold observed Mr. Hillard

1    along with the young lady who opened the door.

2              He fit the description of one of the

3    offenders.  He was arrested and in turn was

4    identified on several occasions and at trial.

5              We know also that Ms. Bormann prepared a

6    motion to quash arrest and suppress evidence, that

7    motion was docketed.  It was set down for a hearing,

8    preparations were made for a hearing, one of the

9    them being an effort to contact Loretha Hillard to

10   ascertain the voracity of the recitals in the

11   discovery of what indeed she had told to Detective

12   Bradley.

13             There were phone conversations that

14   Ms. Hillard testified to here today.  She did not

15   recall being interviewed.  She recalls coming to

16   court and that was the only time she had any

17   face-to-face contact with Ms. Bormann.

18             Ms. Bormann obviously recalls otherwise.

19   Ms. Bormann testified that she went to the home of

20   Ms. Hillard, a different location than it had been

21   earlier than when she lived on Larrabee, I believe

22   900 block of Cullerton now where Ms. Hillard

23   testified she is still living.

24             Ms. Bormann went with a 711, a young lady

1    who worked in this courtroom, was working on the

2    case with her, interviewed her and noted some of the

3    things that she said, one perhaps that would be very

4    helpful to Mr. Hillard, that is that Loretha denied

5    that she told Officer Bradley that what the report

6    reflected that if the gun was stolen, the only

7    person who could have taken it was her brother.  But

8    she told her more.

9         One of the things that she told to

10   Ms. Bormann was that she told her that she had told

11   Bradley, just as she had told Ms. Bormann, that

12   friends and family members knew she had a gun and

13   could have availed themselves of the gun, that her

14   doors were often open.  People could have easily

15   removed the gun.

16        Ms. Bormann had an occasion during the

17   course of this interview to observe this witness,

18   potential witness, her demeanor, reason of what she

19   had to say, and she left a subpoena for her.

20        Ms. Hillard does not recall that, she

21   doesn't even recall Ms. Bormann being there, and I

22   have no reason to doubt that Ms. Bormann was indeed

23   there.  She certainly would have not testified to it

24   had it not been so and I would believe her

1    recollection of that over Ms. Hillard.

2          In any event the subpoena was left with

3    the idea that it might be necessary to call this

4    lady during the course of the motion.

5          The motion indeed did go forward.   Ms.

6    Bormann made the decision not to call Ms. Hillard.

7    She made it on the basis of several reasons she

8    articulated here in her testimony.

9          She believed that Ms. Hillard was not a

10   credible witness, especially vis-a-vis Detective

11   Bradley that she would be pitting the testimony of a

12   person with considerably interest in the case i.e.

13   her brother against that of a detective, a sworn

14   police officer, who very likely would have been

15   viewed as having certainly no personal interest in

16   this case, perhaps some professional interest, but

17   this was a decision that she made and moreover she

18   envisioned a downside if she called Ms. Hillard, and

19   she explained that here in her testimony today and

20   that was why I queried on it because I was a little

21   concerned as to what she was saying and I wanted to

22   clarify that.

23         And what she was saying, as I understand

24   it, and I think counsel do today that if Ms. Hillard

1   had testified at the motion, the State would have
2   been left with something that she did not have at
3   the inception of the motion.  What they had at the
4   inception was the testimony of Detective Bradley as
5   to what a person purporting to be the sister of the
6   defendant told him.
7          It was hearsay.  It would not have been
8   admissible in the case in the trial of this case.
9   Had Ms. Hillard testified, however, she would have
10  given sworn testimony from her own lips establishing
11  a clear and substantial link with the defendant,
12  that being her brother.
13         And if she testified in accordance to what
14  she had told Ms. Bormann that both the defendants,
15  that all family members and friends, a substantial
16  number knew she had the gun and could avail
17  themselves of that gun.  Those would have been links
18  from the defense side that could circumstantially be
19  used by the State at trial as the evidence, strong
20  evidence against Mr. Hillard.  So she made a
21  decision not to call the sister of the defendant.
22         When we look at the mandate of Strickland
23  and it's progeny and one of the things that sticks
24  out in Strickland that I can recall, I can't tell

1  you the page number, but one of the admonitions of

2  the U.S. Supreme Court of course is that we are not

3  to engage in Monday morning quarterbacking, and we

4  are not to ruminate over what might have been done

5  or what other counsel might have been doing or might

6  do in a given case.

7          We are to look to tell whether there was

8  deficient performance and whether prejudice emerged

9  from that performance to the extent that had that

10  performance been different a different result would

11  have flowed.

12          This is not a situation where that

13  Ms. Bormann did not make an adequate investigation.

14  She knew of the witness.  She attempted to contact

15  her.  And indeed did.  She met with her.  She

16  observed her demeanor.  She left a subpoena to keep

17  her options open.  She was not required to call her.

18          As a matter of fact, I think it could be

19  argued that under Strickland she was not even

20  required to present the motion, that is a call for a

21  lawyer to make.  She did present the motion.  But

22  she did not call Ms. Hillard, and that was within

23  the scope of her engagement as counsel to make that

24  call.

1          She gave here in court a reasonable

2    explanation of why she did not call Ms. Bormann

3    [sic] and the Court can accept that.

4          The inquiry could well end here, but I

5    won't.  I will go on to the 2nd prong, although I

6    needn't, and explore with you would the result have

7    been different had Ms. Hillard testified here.

8          Her testimony would have been, as

9    Ms. Bormann opined, her testimony as the sister of

10   the defendant, vis-a-vis Detective Bradley, she's

11   now testified and she said things that I think

12   detract from her credibility.

13         She testified here in court that she only

14   met Ms. Bormann here in the courtroom, that has been

15   contradicted.  She does not recall being subpoenaed,

16   that has been contradicted.

17         She is contradicted by both Ms. Bormann

18   and Detective Bradley, as to what Bradley did say at

19   the trial or at the motions and there's some other

20   details as well.  When you look at the relationship

21   of these parties, Detective Bradley, a stranger to

22   this lady, coming upon her only on the basis of her

23   name according to a stolen gun reports and yet from

24   his testimony garnering details that he testified to

1   beyond the simple explanations attributed to Ms.

2   Hillard that her brother, Tony, was the only one who

3   could have taken the gun, but not only that where

4   Tony was, who his girlfriend was, where they lived

5   information that the detective acted upon and proved

6   to be truthful, proved to be accurate which

7   certainly goes a long way of crediting Detective

8   Bradley and detracting from the testimony of

9   Ms. Hillard here today.   How would he have gotten

10   that information if, in fact, indeed it did not come

11   from Ms. Hillard.

12        And so the Court's conclusion is had she

13   testified with these discrepancies and with these

14   inconsistencies and without being accused of Monday

15   morning quarterbacking, I can not perceive that a

16   different result would have been obtained had Ms.

17   Bormann called her and given the downside there was

18   a reasonable explanation for it.

19        Based upon these observations, findings,

20   the Court concludes that the petitioner has failed

21   to establish any credible basis for this court to

22   warrant that he was denied affective assistance of

23   counsel by Ms. Bormann's failure to call Lorenne

24   Hillard as a witness at the suppression hearing and

1    that will be the finding of this Court.

2            What remains is I recall is a different

3    aspect of the case dealing with the sentence of the

4    defendant and the result that flowed from the appeal

5    of a co-defendant, Erving Walls, where the Appellate

6    Court on its own sent the case back for a

7    resentencing -- I can't recall exactly now -- I know

8    what it is, it was the armed violence statute was

9    declared unconstitutional and so the inquiry was

10   since the perimeters of the sentence changed when

11   the crime reverted back to its original sentencing

12   guidelines whether this Court in the case of Walls

13   would have given the same sentence, and I think the

14   sentences of both defendants were the same in that

15   regards, although that's just my recollection, so we

16   are at that juncture where we must proceed to a

17   resentencing hearing.

18           I think the State had some problem about

19   that but I believe I covered that in the motion that

20   the reason why I felt that we should have this if

21   the other relief was not granted.

22           Now, I think the question arises as to the

23   need for a presentence report, and my understanding

24   has always been that absent an agreed sentence we

1   need a presentence report, even if it's waived, I

2   think that's where we are at.

3        We did have a presentence report,

4   obviously, back in 1998. I would be, I don't know

5   whether I would be within the realm of competent

6   judging to think that we could use that, but I don't

7   think we would be wise in any event to do that and

8   we should have a new one prepared so that the Court

9   can learn all it is to learn about Mr. Hillard since

10   he was previously sentenced in 1998.

11        I don't know if both parties share that

12   observation or not. Ms. Miller, what about you?

13        MS. MILLER: Yes, Your Honor, I would like a

14   presentence report so much has changed.

15        THE COURT: Do you think it's necessary. I do

16   too.

17        MS. MILLER: Yes.

18        THE COURT: State.

19        MR. BRASSIL: I have no objection, Judge. I

20   did do a check of the statute, I thought maybe there

21   was something in the statute after certain time, it's

22   not in there, but I have no objection to doing another

23   PSI.

24

1        THE COURT:  We need 30 to 35 days to prepare

2    that.  And I think he's going to have to be up here to

3    be interviewed by the probation department.  I know

4    there's a problem with the jail as far as shipping

5    people out even though we send them over there.  But

6    maybe we can put on the report that he should remain

7    because he need to be resentenced, that might do it.

8        Prepare an order to go with the mittimus

9    to keep him here maybe they will listen to it.  If

10   you would fill out the report, the request for the

11   PSI, we'll turn that over to the courtroom people

12   and hopefully they can interview him in the next

13   couple of days.

14       So today is the 28th, I would say we are

15   looking at the week of May 24th whatever is

16   convenient for counsel here.

17       MS. MILLER:  I'm having to 2nd chair on the

18   24th. Would it be possible to move it over until next

19   week?

20       THE COURT:  The 1st week of June?

21       MS. MILLER:  Yes, Judge, I'm second chair —

22       THE COURT:  I have no problem with that.  May

23   31 is a Holiday day so are you here in the building on

24   a certain date?  Let's make it the 1st of June.

117F

1          MS. MILLER:  That's fine, 6-1.

2          MS. STEPHENS:  State anticipate issuing a

3    subpoena to the Illinois Department of Corrections for

4    any and all disciplinary records of the defendant.

5    Would the Court sign an order prior to sentencing it?

6          THE COURT:  Yes.

7          MS. MILLER:  Actually, I would ask permission

8    to subpoena all the documents, all documents, his GED,

9    high school diploma, and history too before the

10   sentence to.  I'd like to issue a subpoena (inaudible)

11   on his work history.

12         THE COURT:  That's fine.

13         Court's in recess until tomorrow.

14                        (WHEREUPON, the

15                        above-entitled cause was

16                        concluded.)

17

18

19

20

21

22

23

24

1          STATE OF ILLINOIS  )
                              ) SS

2          COUNTY OF COOK     )

3

4      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

5        CRIMINAL DEPARTMENT/CRIMINAL DIVISION

6

7          I, Gail Duff, an Official Court

8  Reporter for the Circuit Court of Cook County,

9  Criminal Department, do hereby certify that I

10  reported in shorthand the proceedings had at the

11  hearing of the above-entitled cause; that I

12  thereafter caused the foregoing to be transcribed

13  into typewriting, which I hereby certify to be a

14  true and correct transcript of the proceedings.

15

16

17                Official Court Reporter

18                  083-003875

19  Dated this 31st

20  of May, 2005.

21

22

23

24

No. 04-3365

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

vs.

TONY HILLARD,

Defendant-Appellant.

Appeal from the Circuit Court of Cook County, Illinois
County Department, Criminal Division
No. 97-CR-30453

Honorable Michael P. Toomin, Presiding.

APPELLANT'S BRIEF

FREDERICK F. COHN
35 E. Wacker Drive
Suite 595
Chicago, Illinois  60601
(312) 641-0692

Attorney for Appellant

RECEIVED
CRIMINAL APPEALS

AUG - 7 2006

309 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

ORAL ARGUMENT REQUESTED

EXHIBIT N

## POINTS AND AUTHORITIES

Page

1.  The decision of the trial court denying defendant
a new trial in a post-conviction hearing must be
overruled because the Assistant Public Defender, Ms.
Bormann, defendant's original trial counsel, who was
accused of ineffective assistance of counsel in
representing defendant, was a supervisor in the Public
Defender's Office at the time of the post-conviction
hearings, where defendant was represented by an
Assistant Public Defender.                                    9

People v. Harden, 217 Ill.2d 289, 840 N.E.2d 1205        9, 10

People v. Banks, 121 Ill.2d 36, 520 N.E.2d 617    9, 10, 11, 12

People v. Smith, 37 Ill.2d 622, 230 N.E.2d 169          9, 12

State v. Florida, 617 So.2d 781 (State of Florida, 1993)    11

Ryan v. Thoms, 261 Ga. 661, 409 S.E.2d 507 (Ga. 1991)      11

Ware v. State, 267 Ga. 510, 480 S.E. 999 (Ga. 1997)        11

District Court for the Twenty First Judicial
District v. Buss, 783 P.2d 1223, Cal. Supreme Court         11

Angarano v. United States, 329 A.2d 453 (D.C. App. 1974)    12

Tot v. United States, 319 U.S. 463, 87 L.Ed. 1514           12


2.  Counsel at the original proceedings that resulted in
defendant's conviction rendered ineffective assistance of
counsel by failing to do necessary research as to
controlling law and failing to present controlling law,
and hence, defendant was denied his Sixth Amendment
(United States Constitution) rights. Counsel who
represented defendant on appeal and at the post-
conviction proceedings also provided ineffective
assistance of counsel.                                       13

United Stats v. Crews, 445 U.S. 463, 63 L.Ed.2d 537         13

People v. Talley, 34 Ill.App.3d 506, 340 N.E.2d 167         13

People v. Robinson, 299 Ill.App.3d 426, 701 N.E.2d 231   15, 16

Search and Seizure, Fourth Edition, LaFave,
Section 3.4(c), p. 253                                   16, 17

                                                        Page

Com v. Richards, 458 Pa. 455, 327 A.2d 63                 17

People v. Wright, 111 Ill.2d 18, 488 N.E.2d 973        18, 21

Dixon v. Snyder, 266 F.3d 693 (7 Cir. 2001)              18

Workman v. Tate, 957 F.2d 1339                         18, 21

People v. Truly, 230 Ill.App.3d 948, 595 N.E.2d 1230   18, 21

People v. McPhee, 256 Ill.App.3d 102, 628 N.E.2d 523   18, 21

People v. Stewart, 217 Ill.App.3d 373, 577 N.E.2d 177  18, 21

People v. Sommerville, 193 Ill.App.3d 161,
549 N.E.2d 1315                                        18, 21

People v. Butler, 23 Ill.App.3d 108, 318 N.E.2d 680    18, 21

People v. Karraker, 261 Ill.App.3d 942,
633 N.E.2d 1250                                       18, 21-22


3.  This case must be reversed because post-conviction
appointed counsel for indigent defendant at the post-
conviction hearing failed to comply with Supreme Court
Rule 651(c).                                              23

People v. Bashaw, ___ Ill.App.3d ___, ___ N.E.2d ___
(Second District), No. 2-03-1330                         23

## NATURE OF THE CASE

Tony Hillard, defendant-appellant (hereafter, defendant), was tried and convicted of armed robbery, aggravated kidnapping, armed violence and aggravated battery and was sentenced to 50 years. Defendant's appeal was affirmed, Illinois Appellate Court, First District, No. 1-99-0152, on June 11, 2001. A Post-Conviction Petition was timely filed. The court denied in part and granted in part the State's Motion to Dismiss.

After an evidentiary hearing, the Post-Conviction Petition was denied.

No questions are raised on the pleadings.

## STATEMENT OF THE ISSUES

1. The issue is whether the decision of the trial court denying defendant a new trial in a post-conviction hearing must be overruled because the Assistant Public Defender, defendant's original trial counsel, who was accused of ineffective assistance of counsel in representing defendant, was a supervisor in the Public Defender's Office at the time of the post-conviction hearings, where defendant was represented by an Assistant Public Defender.

2. The issue is whether counsel at the original proceedings that resulted in defendant's conviction rendered ineffective assistance of counsel by failing to do necessary

3

research as to controlling law and failing to present controlling law, and hence, defendant was denied his Sixth Amendment (United States Constitution) rights. Counsel who represented defendant on appeal and at the post-conviction proceedings also provided ineffective assistance of counsel.

3.    The issue is whether this case must be reversed because post-conviction appointed counsel for indigent defendant at the post-conviction hearing failed to comply with Supreme Court Rule 651(c).

### JURISDICTION

This cause is here as an appeal from denial of a Post-Conviction Petition after an evidentiary hearing pursuant to Illinois Supreme Court Rule 603.

4

## STATEMENT OF FACTS[1]

On May 10, 1997, Yinka Jinadu entered the apartment of
his estranged wife. He was there set upon, beaten and
kidnapped by a number of men.

He testified to a general description. His testimony was:

"Q: Was he able to give you any name or physical
description of the other three male black offenders?

A: Yes.

Q: What were those descriptions that he gave you?

A: He described them as being in there twenties,
one individual -- male blacks, one individual he had no
height but for the weight was one sixty with brown eyes
and black hair.

The second individual was five foot ten inches tall
and he weighed -- No. Five foot eleven inches tall and he
weighed two hundred pounds, black and brown eyes -- brown
eyes and back hair.

The third offender was five foot eleven, one sixty-
five, brown eyes, black hair. And another individual was
five foot five, one forty-five, brown eyes, black hair."
(B-12-B-13)

During the investigation, it was determined that a gun
found at the apartment was registered to Loretha Hillard,
defendant's sister. She reported the gun missing on May 19,
1997.

At the Motion to Suppress, Det. Bradley testified that
defendant's sister stated the gun had been taken and that if

---

[1] This Statement of Facts is created both from facts presented
in the original Motion to Suppress and original trial, which
were reviewed by the trial court in making its conclusion
after hearing evidence in the post-conviction hearing and
evidence presented in the post-conviction hearing.

5

anyone took the gun, it would be her brother Tony. (Tr. B-18)

She advised the police where defendant lived. On June 3, 24 days after the information was received, the police went to the address given by the sister, that defendant at first did not admit to the name of Tony Hillard; defendant denied he took the gun; admitted his name and was arrested. He was identified at a line-up.

The trial judge, in denying the Motion to Suppress, stated:

> "The central issue obviously to be resolved is whether this adds up to probable cause to arrest Mr. Hillard. What we have basically is a gun used in an armed robbery and a beating, recovered at the scene, linked to the sister of the defendant and then to Mr. Hillard. We have the defendant in a place where the sister indicated he would be, fitting the general description of one of the offenders and the defendant initially giving a phony name to the police. This adds up to reasonable grounds to believe that the defendant had committed an offense and probable cause to arrest him.
>
> The motion to quash arrest and suppress evidence shall be denied." (B-112-113)

In a Supplemental Post-Conviction Petition, it was alleged in part that trial counsel was ineffective because counsel failed to present evidence, testimony of defendant's sister, refuting the assertion by Officer Bradley as to what defendant's sister is alleged to have told him.

The State's Motion to Dismiss was denied. At the hearing on the Post-Conviction Petition, defendant's sister testified she never told Det. Bradley that defendant could and/or would have stolen the gun.

She testified only her sister knew where she kept her gun (Tr. 14F); that many relatives and friends would come to her apartment (Tr. 16F); people would be in her apartment when she was not home. (Tr. 17F) She testified she told Police Officer Bradley that she had no idea who took the gun (Tr. 21F); that she never told the police where Tony lived. (Tr. 21F) She testified she spoke to defendant's Public Defender, Ms. Bormann, a few times on the phone (Tr. 24F) and once in person in court. (Tr. 24F) She told Ms. Bormann that she never said to police that only defendant could have stolen the gun. (Tr. 24F)

She told Ms. Bormann prior to the Motion to Suppress that she was ready and willing to testify. (Tr. 24F-25F)

She testified she did not recall Ms. Bormann coming to her house.

Ms. Cheryl Bormann, the Assistant Public Defender who represented defendant at trial, testified at the post-conviction hearing. (Tr. 42F) At the time of her testimony, she was a supervisor in the Public Defender's Office.

In the post-conviction hearing, defendant was represented by an Assistant Public Defender.

Ms. Bormann testified she and her 711 assistant met in person with defendant's sister at the sister's apartment (Tr. 49F, 50F, 51F) and the sister told her, Ms. Bormann:

"Q:   Did you ask her about whether Tony Hillard could have access to that gun?

7

A:  I specifically ask that question because that was the issue and she told me that yes Tony, like all of her other family members and friends, would have known where the gun was and could have had he wanted to make himself -- could have availed himself of the gun.

Q:  Did you also talk to her about a phone conversation she had with the police about that gun?

A:  I did.

Q:  And what did she tell you relative to that conversation?

A:  I asked her whether or not she had said to a police officer regarding the theft of the gun that the only person who could have stolen the gun was Tony Hillard.

I asked that specific question because that statement is contained in the police report in this case. She denied making that statement to a police officer.

She indicated instead that she told police officer exactly what they told me, Mogul and I, that Mr. Hillard along with many of her other acquaintances and family members could have access to the gun." (Tr. 50F-51F)

She also testified it was her tactical choice not to call Ms. Hillard.

The trial court rejected Ms. Hillard's version and accepted that Ms. Bormann made a tactical decision not to call Ms. Hillard. (Tr. 114F)

At the post-conviction proceeding, defendant was represented by an Assistant Public Defender. Ms. Bormann who originally represented defendant at trial was at the time of the post-conviction proceedings a supervisor in the Public Defender's Office.

8

**ARGUMENT**

1.

**The decision of the trial court denying defendant a new trial in a post-conviction hearing must be overruled because the Assistant Public Defender, Ms. Bormann, defendant's original trial counsel, who was accused of ineffective assistance of counsel in representing defendant, was a supervisor in the Public Defender's Office at the time of the post-conviction hearings, where defendant was represented by an Assistant Public Defender.**

Defendant at a post-conviction hearing is not guaranteed effective assistance of counsel under the Sixth Amendment to the United States Constitution, People v. Harden, 217 Ill.2d 289, 840 N.E.2d 1205, and is only guaranteed the level of assistance of counsel guaranteed by the Post-Conviction Hearing Act, Harden, supra, i.e., "reasonable assistance."

Here, at the time of the post-conviction hearing, defendant's prior trial counsel, Ms. Bormann, who was accused of providing ineffective assistance of counsel, was now a supervisor in the Public Defender's Office. (Tr. 42F-43F) In People v. Banks, 121 Ill.2d 36, 520 N.E.2d 617, the court overruled its prior decision of People v. Smith, 37 Ill.2d 622, 230 N.E.2d 169. In People v. Smith, supra, the court held a per se conflict existed when one Public Defender must question the effectiveness of another Public Defender. In People v. Banks, supra, the court held that where such situation exists "a case by case inquiry should be conducted to determine if there is the presence of an actual conflict...." Banks, 121 Ill.2d at 44, 520 N.E.2d 617.

9

The court in Harden, supra, interpreting when a hearing should be held, stated:

> "In the context of a potential conflict between two public defenders,... Relevant factors include whether the two public defenders were trial partners in the defendant's case (see *People v. Claybourn*, 221 Ill.App.3d 1071, 164 Ill.Dec. 403, 582 N.E.2d 1347 (1991); *People v. Vaughn*, 200 Ill.App.3d 765, 146 Ill.Dec. 516, 558 N.E.2d 479 (1990)); whether they were in hierarchical positions where one supervised or was supervised by the other (see ***780**1215 *People v. Munson*, 265 Ill.App.3d 765, 203 Ill.Dec. 81, 638 N.E.2d 1207 (1994); *People v. Levesque*, 256 Ill.App.3d 639, 194 Ill.Dec. 775, 628 N.E.2d 272 (1993))." (Emphasis added.)

Here, Ms. Bormann was a supervisor. This should have required a hearing as to the relationship of Bormann and Public Defender, Elyse Krug Miller.

In Banks, supra, the court held it is permissible for one Public Defender to raise the ineffectiveness of another Public Defender. The court stated:

> "Our subsequent cases, however, evidence our understanding of the special nature of public defender's offices where conflict of interest are concerned. Public defender's offices, we have recognized, are unlike private law firms for purposes of conflicts of interest. While a conflict of interest among any member of a private law firm will disqualify the entire firm (*People v. Stoval* (1968), 40 Ill.2d 109, 239 N.E.2d 441), the disqualification of an assistant public defender will not necessarily disqualify all members of that office (*People v. Robinson* (1979), 79 Ill.2d 147, 37 Ill.Dec. 267, 402 N.E.2d 157). In *Robinson* it was urged that where an assistant public defender is disqualified by reason of a conflict of interest then all other assistants in that office should be *per se* disqualified since these other assistants' loyalty to their office would conflict with their loyalty to their clients. The court rejected this contention, reasoning that any such loyalty to one's office was too remote to justify a *per se* conflict of interest rule." (Emphasis added.)

The court's reasoning does not apply where one Public Defender alleged to be incompetent is a supervisor, i.e., in a superior position in the Public Defender's Office. An Assistant Public Defender may not want to jeopardize his job or his job assignment or other intangible benefits by too strenuously attacking a supervisor in the Public Defender's Office. The Assistant Public Defender making the attack may have a <u>subliminal</u> <u>fear</u> of "self-harm" by attacking a person with greater power--a supervisor in the Public Defender's Office.

Here, there should have been a hearing.

Because there was no such hearing held here, the judgment below must be reversed.

The rule of <u>People v. Banks</u>, <u>supra</u>, is contrary to the holding of other sister States. See <u>State v. Florida</u>, 617 So.2d 781 (State of Florida, 1993); <u>Ryan v. Thoms</u>, 261 Ga. 661, 409 S.E.2d 507 (Ga. 1991), cited with approval in <u>Ware v. State</u>, 267 Ga. 510, 480 S.E. 999 (Ga. 1997); <u>District Court for the Twenty First Judicial District v. Buss</u>, 783 P.2d 1223, Cal. Supreme Court. There, the court rejected the Illinois Rule and stated:

> "The Mesa County District Court urges us to adopt the approach favored by the Illinois courts, applying a case-by-case rule for all types of conflicts of interest faced by public defenders, *see People v. Banks*, 121 Ill.2d 36, 117 Ill.Dec. 266, 269, 520 N.E.2d 617, 620 (1987) (prescribing 'a case-by-case inquiry designed to determine whether the facts of a particular case indicate an actual conflict and therefore preclude representation'); *see also Richards v. Clow*, 103 N.M. 14,

11

16, 702 P.2d 4, 6 (1985) (same); *cf. Thompson v. State,*
254 Ga. 393, 330 S.E.2d 348 (1985) (adopting case-by-case
rule for conflicts of interest involving part-time state
court solicitors). We conclude instead, for the reasons
articulated in this opinion, that a per se rule is
appropriate for the particular type of conflict of
interest involved in the present case."

See Angarano v. United States, 329 A.2d 453 (D.C. App.
1974) rejecting People v. Banks, supra rule and adopting
People v. Smith, 37 Ill.2d 622, 230 N.E.2d 169 (1967) rule.

The position above was based on United States Supreme
Court precedent.

The Illinois Supreme Court in People v. Banks, supra,
rejected the well-reasoned opinion in People v. Smith, supra,
by distinguishing the loyalty of lawyers in a Public
Defender's Office to the Public Defender's Office and to the
other members of the Public Defender's Office, from the
loyalty of private attorneys to their firms and other members
of their firms.

This is an irrational distinction. It is unsupported by
any data from any survey. It is based on an irrational
presumption. Hence, it is unconstitutional. Tot v. United
States, 319 U.S. 463, 87 L.Ed. 1514.

There is no real difference between how lawyers function
in a private law firm and in a Public Defender's Office. The
decision in Banks must be reconsidered.

12

2.

**Counsel at the original proceedings that resulted in defendant's conviction rendered ineffective assistance of counsel by failing to do necessary research as to controlling law and failing to present controlling law, and hence, defendant was denied his Sixth Amendment (United States Constitution) rights. Counsel who represented defendant on appeal and at the post-conviction proceedings also provided ineffective assistance of counsel.**

If defendant's Motion to Suppress his arrest had been granted, his out-of-court identification at the line-up must be suppressed. United Stats v. Crews, 445 U.S. 463, 63 L.Ed.2d 537, and the State could only present an in-court identification if it could prove independent origin. United States v. Crews, supra. If the out-of-court or the in-court identifications had been suppressed, defendant would have probably been acquitted.

The State had conceded that on June 3 at defendant's house, defendant was arrested. Since the police had no warrant and did not observe defendant committing a crime, the State had the burden to prove there existed at the time of defendant's seizure probable cause to arrest defendant. People v. Talley, 34 Ill.App.3d 506, 340 N.E.2d 167.

The arrest of defendant was based primarily on a general description. The victim testified:

"Q: Was he able to give you any name or physical description of the other three male black offenders?

A: Yes.

Q: What were those descriptions that he gave you?

A: He described them as being in there twenties,

13

one individual -- male blacks, one individual he had no
height but for the weight was one sixty with brown eyes
and black hair.

The second individual was five foot ten inches tall
and he weighed -- No. Five foot eleven inches tall and he
weighed two hundred pounds, black and brown eyes -- brown
eyes and back hair.

The third offender was five foot eleven, one sixty-
five, brown eyes, black hair. And another individual was
five foot five, one forty-five, brown eyes, black hair."
(B-12-B-13)

If trial counsel had provided effective assistance of
counsel, no court could find under controlling law the
existence of probable cause.

In finding the existence of probable cause, the trial
court (later adopted by the Appellate Court) found three facts
when combined provided probable cause. They were:

(a) Defendant fit a general description of a person
involved in a crime.[2]

(b) The alleged statement of Loretha Hillard "That the
only person who would have taken her gun was her brother Tony
Hillard." (00028)

(c) Defendant at first did not admit to his name.

The fact that defendant fit the general description was
considered by the trial court and the Appellate Court as the
most important fact in finding the existence of probable

---

[2] The crime occurred on May 10 and defendant was arrested on
June 3. He was not arrested in close proximity to the location
of the crime.

14

cause. Ruling of trial court. (Original Trial, Tr. B-112-B-113) There, the trial court stated:

> "We have the defendant in a place where the sister indicated he would be, fitting the general description of one of the offenders and the defendant initially giving a phony name to the police. This adds up to reasonable grounds to believe that the defendant had committed an offense and probable cause to arrest him." (B-112-B-113)

The Appellate Court agreed. (Order of Affirmance, Appendix B, p. 8)

Officer Brady testified defendant fit the general description of all the people described by the victim. (B-73) The Public Defender failed to effectively handle the facts referred to in paragraphs (a) and (b).

Here, the general description relied on was a black man, 5'11", 165 pounds in his twenties. Defendant as 5'11", 170 pounds and 21. Although a general description may be a basis for an arrest under certain circumstances it cannot be, not under the circumstances here where there was a substantial time and location difference between the crime and the observation of defendant. The crime occurred on May 10. Defendant was arrested on June 3. Defendant was not arrested in the vicinity of the crime. For a general description to provide a basis for arrest, defendant must be seen shortly after the crime and in the vicinity of the crime.

People v. Robinson, 299 Ill.App.3d 426, 701 N.E.2d 231, relied on by the Appellate Court, and the other cases relied on in Robinson were factually very different than here. In

15

those cases, the police saw defendant shortly after the crime in the general area of where the crime occurred. Here, where the police saw defendant 20 or more days after the crime and not in the vicinity of the crime and where the description was very general, the general description, even when joined by the other facts, cannot demonstrate probable cause.

In *Robinson*, supra, the court stated "Police stopped defendant shortly after the incident occurred and in close proximity to the scene of the crime." The other cases relied on by the court in *Robinson* all related to incidents where the time and place were in close proximity.

The court in *Robinson* stated:

"In *People v. Wilson*, 141 Ill.App.3d 156, 95 Ill.Dec. 848, 490 N.E.2d 701 (1986), police received a description of a man with a gun walking north wearing a gray hat, maroon and gray striped sweater, black pants and a black coat.... The court noted that police saw defendant in the area described, his clothing matched the description given, and he was walking in the direction noted in the description....

Likewise, in *People v. Starks*, 190 Ill.App.3d 503, 137 Ill.Dec. 447, 546 N.E.2d 71 (1989), a defendant convicted of attempted murder and armed robbery argued that he was improperly stopped and arrested by police. The description of the robbery suspect included his race, approximate height and weight, and color and type of clothing. The defendant was stopped and arrested in a vehicle approximately 20 minutes after the robbery and a block and a half from the scene of the crime." (Emphasis added.)

In Search and Seizure, Fourth Edition, LaFave, Section 3.4(c), p. 253, in a summary of the case law, it is concluded where there is a most general description and the defendant is seized long after the crime and not in the general vicinity,

16

there is no probable cause. (See Appendix C, pages 252-269 from LaFave.)

A review of the cases that deal with arrest based on general suspicion would have advised defense counsel at trial, defense counsel on appeal and defense counsel at post-conviction hearing that the arrest in this case could not be based on the general description. See in LaFave, supra, p. 254, case of Com v. Richards, 458 Pa. 455, 327 A.2d 63.

In the instant case, the description was very general and did not contain the uniqueness of the description where arrests have been upheld. (See LaFave, supra, p. 256.)

Here, the crime occurred on May 10 and defendant was arrested on June 3. Also he was not seen in the general area of the crime.

Defense counsel at the Motion to Suppress failed to argue this very important distinction and failed to support the argument with case law. (Original Trial, Tr. B-96-B-109)

The law as set out in LaFave is so persuasive that only total lack of effectiveness can explain the failure to cite these cases.

If trial defense counsel would have researched the issue, i.e., general description as basis for arrest, he would have found that such general description, as here, would not support an arrest when defendant is not seen shortly after the crime and in the general area of the crime.

The failure of a lawyer to research for controlling case

17

law is ineffective assistance of counsel. See People v. Wright, 111 Ill.2d 18, 488 N.E.2d 973. In Dixon v. Snyder, 266 F.3d 693 (7 Cir. 2001), the United States Court of Appeals for the Seventh Circuit held that failure of counsel to know the law is ineffective assistance of counsel that cannot be excused by labeling counsel's action strategy. The court stated:

> "If counsel was unaware of the statute, then his decision not to cross-examine Carlisle cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions because it was not based on strategy but rather on a 'startling ignorance of the law.' Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)." (Emphasis added.)

The failure of counsel to investigate the law is equivalent to failure to investigate and find important exculpatory facts. Workman v. Tate, 957 F.2d 1339; People v. Truly, 230 Ill.App.3d 948, 595 N.E.2d 1230; People v. McPhee, 256 Ill.App.3d 102, 628 N.E.2d 523; People v. Stewart, 217 Ill.App.3d 373, 577 N.E.2d 177; People v. Sommerville, 193 Ill.App.3d 161, 549 N.E.2d 1315; People v. Butler, 23 Ill.App.3d 108, 318 N.E.2d 680; People v. Karraker, 261 Ill.App.3d 942, 633 N.E.2d 1250.

Hence, here, at every stage, defendant was denied effective assistance of counsel by the Office of the Public Defender.

The trial Public Defender rendered ineffective assistance of counsel by failure to research and present controlling law.

The appellate counsel[3] and post-conviction counsel failed to render effective assistance of counsel by failing to research and present controlling law.

Defense counsel also failed to properly demonstrate that any alleged statement concerning who could steal the gun has no real value in proving existence of probable cause.

This statement could not rise to the level of probable cause. It is not a statement that she saw defendant take the gun, or she saw defendant with the gun, or she heard defendant admit that he took the gun.

The other fact relied on by the court is not probable cause. The mere fact that a person refuses to provide cooperation with police investigation is not evidence of guilt. Refusing to provide a name is not flight or physical resistance. It is not probable cause.

This statement, "That the only person who would have taken her gun was her brother Tony Hillard." (C00028, Opinion of Appellate Court), or as Det. Bradley testified, "If her gun was stolen the only person who could have stolen it would have been her brother." (Motion to Suppress, Original Trial, March 5, 1998, Tr. B-20) are mere speculations. It is surmise. Such

---

[3] Attached as Appendix D is part of the Brief of the Public Defender in the Appellate Court that relates to no probable cause for arrest.

speculation or surmise cannot rise to the level of probable cause.

The other ineffective act of defense counsel is failure to call Ms. Hillard to testify she never told Police Officer Bradley that the only person who could steal the gun was her brother. Ms. Bormann testified she interviewed Miss Hillard and was told she never stated that. (Tr. 51) Ms. Bormann testified:

"Q: Did you ask her about whether Tony Hillard could have access to that gun?

A: I specifically ask that question because that was the issue and she told me that yes Tony, like all of her other family members and friends, would have known where the gun was and could have had he wanted to make himself -- could have availed himself of the gun.

Q: Did you also talk to her about a phone conversation she had with the police about that gun?

A: I did." (Tr. 50F-51F)

She testified she made a strategic decision not to call Miss Hillard because of credibility concerns. (Tr. 54F, 79F)

She testified she was concerned that if she called Ms. Hillard, evidence from her would be similar to that provided by Det. Bradley. (Tr. 53F) She testified:

"Q: Did you call Loretha Hillard at the motion to quash arrest and suppress hearing?

A: No.

Q: Why not?

A: Because Ms. Hillard, under oath made it very clear that she would deny having that conversation with the officer on the phone, placed a link between Ms. Hillard on the gun in question. At that point no such

20

link other than hearsay was going to be made at trial and I wanted to keep it that way." (Tr. 53F)

She could have made a determination if such evidence would have been admitted by making a pre-trial Motion in Limine.

Her decision was flawed by her failure to make a Motion in Limine before the hearing on the Motion to Suppress. If she had, she would have known if the court would have admitted (as it ultimately did) Ms. Hillard's alleged statement to Officer Bradley. If the court was to admit this evidence, no harm would occur from providing the State with additional evidence of defendant's possible connection to the gun. Surely, no harm would have been done where Ms. Hillard would have testified that many others also had availability to steal the gun.

Hence, an additional major defect in counsel's action was making a strategic decision without conducting proper investigation as to what evidence would be admitted. This is the equivalent of not properly researching the proper law or not investigating relevant facts. This is ineffective assistance. See People v. Wright, 111 Ill.2d 18, 488 N.E.2d 973; Workman v. Tate, 957 F.2d 1339; People v. Truly, 230 Ill.App.3d 948, 595 N.E.2d 1230; People v. McPhee, 256 Ill.App.3d 102, 628 N.E.2d 523; People v. Stewart, 217 Ill.App.3d 373, 577 N.E.2d 177; People v. Sommerville, 193 Ill.App.3d 161, 549 N.E.2d 1315; People v. Butler, 23 Ill.App.3d 108, 318 N.E.2d 680; People v. Karraker, 261

21

Ill.App.3d 942, 633 N.E.2d 1250.

Here, because of ineffective assistance of counsel as described above, defendant was prejudiced by defendant's illegal arrest and by the out-of-court identification not being suppressed, and possibly the in-court identification not being suppressed.

3.

**This case must be reversed because post-conviction appointed counsel for indigent defendant at the post-conviction hearing failed to comply with Supreme Court Rule 651(c).**

Supreme Court Rule 651(c) reads:

"The record filed in that court shall contain a showing, which may be made by the certificate of petitioners' attorney, that the attorney has consulted with petitioner either by mail or in person to ascertain his contentions of deprivation of constitutional right, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed ... that are necessary for an adequate presentation of petitioner's contentions."

No such petition has been filed in this case. Under authority of People v. Bashaw, ___ Ill.App.3d ___, ___ N.E.2d ___ (Second District), No. 2-03-1330, the denial of post-conviction relief must be reversed.

## CONCLUSION

Defendant requests that the dismissal of his Post-Conviction Petition be reversed.

Respectfully submitted,

FREDERICK F. COHN
Attorney for Appellant

23

APPENDIX A

**People v. Tony Hillard**
No. 04-3365

<u>INDEX</u>

<u>COMMON LAW RECORD</u>                                                Page

Placita                                                                C1

Half-sheets                                                            C2

Notice of Filing                                                       C12

Motion for Leave to File and Proceed in Forma Pauperis                 C13

Motion for Appointment of Counsel                                      C14

Petition for Post-Conviction Relief                                    C15

Affidavit of Loretha Hillard                                           C22

Letter to Honorable Dorothy Brown from Steven M. Ravid,
Clerk of the Appellate Court                                           C23

Certification of Clerk                                                 C24

Order of Appellate Court of Illinois                                   C25

Petitioner Tony Hillard's Supplemental Petition                       C39

Appendix                                                               C43

Affidavit of Loretha Hillard                                           C44

Transcript - page B-11                                                 C45

Transcript - page B-15                                                 C46

Transcript - page B-19                                                 C47

Transcript - page B-20                                                 C48

Transcript - page B-109                                                C49

Transcript - page B-110                                                C50

Transcript - page B-111                                                C51

APPENDIX A

i

Page

Transcript - page B-113

Transcript - page B-112                                        C52

651 Certificate                                                C53

Motion to Dismiss                                              C54

Order of Appellate Court of Illinois                           C62

Petitioner's Second Supplemental Petition                      C76

Certificate                                                    C81

Amended Motion to Dismiss                                      C82

Order of Appellate Court of Illinois                           C91

Report of Proceedings - October 26, 1998                       C105
Page Numbers 1 through 29
  Post-trial Motions                                           C107
  Sentencing Hearing                                           C110
  Witnesses:
  Warren Parnell
    Direct                                                     C111
  Sentencing                                                   C127

Certificate of Official Court Reporter                         C132

Adult Probation Department Investigative Report                C133

Order of Commitment and Sentence to Illinois Department
Of Corrections                                                 C156

Notice of Appeal                                               C157

Notice of Notice of Appeal                                     C158

Notice of Appeal                                               C159

Certificate of Clerk                                           C160

File Date: _____7- 1- 2 0 0 8_____

Case No: _____0 8 c v 1 7 7 5_____

ATTACHMENT # _____

EXHIBIT _N t o O_____

TAB (DESCRIPTION)

_____

Page

REPORT OF PROCEEDINGS

Date:  November 25, 2003
Pages:  A1 through A5
Continuance

Date:  February 19, 2004
Pages:  B-1 through B-18
Arguments

Date:  February 26, 2004
Pages:  C-1 through C-7
Court's Decision on Respondent's Motion to Dismiss          C-3

Case Continued to 3-18-04                                   C-6

Date:  March 18, 2004
Pages:  D-1 through D-6
Continuance

Date:  April 22, 2004
Pages:  E-1 through E-3
On Call in Error

Date:  April 28, 2004
Pages:  1F through 119F

Witnesses:

Ms. Hillard

        Direct Examination                                  6
        Cross Examination                                  26
        Redirect Examination                               35

Ms. Bormann

        Direct Examination                                 42
        Cross Examination                                  54
        Redirect Examination                               77
        Recross Examination                                83

Rebuttal Witness:

Ms. Hillard

        Direct Examination                                 86

Page

Date:   June 1, 2004
Pages:   G-1 through G-11
Continuance                                                    G-10

Date:   June 28, 2004
Pages:   H-1 through H-20
Resentencing

Report of Compliance

Certificate of Clerk

IN THE CIRCUIT COURT OF COOK COUNTY

PLE OF THE STATE OF ILLINOIS )   CASE NUMBER    97CR3045303
             V.        )   DATE OF BIRTH   12/10/75
NY     HILLARD      )   DATE OF ARREST  06/03/97
endant              IR NUMBER 0988376   SID NUMBER 031106560

## ORDER OF COMMITMENT AND SENTENCE TO
## ILLINOIS DEPARTMENT OF CORRECTIONS
====================================

The above named defendant having been adjudged guilty of the offense(s) enumerated below
hereby sentenced to the Illinois Department of Corrections as follows:

| Statutory Citation | Offense | Sentence | | Class |
|---|---|---|---|---|
| 720-5/18-2(A) | ARMED ROBBERY | YRS. 015 | MOS.00 | X |

and said sentence shall run concurrent with count(s) ___ ___ ___ ___

| 720-5/33A-2 | ARMED VIO/CATEGORY I WEAP | YRS. 020 | MOS.00 | X |

and said sentence shall run consecutive to count(s)  003  ___ ___ ___

| 720-5/10-2(A)(5) | AGGRAVATED KIDNAPING/ARME | YRS. 010 | MOS.00 | 1 |

and said sentence shall run consecutive to count(s)  003  004  ___ ___

YRS. _____   MOS. _____

and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

YRS. _____   MOS. _____

and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

On Count ___  defendant having been convicted of a class ___ offense is sentenced as
a class x offender pursuant TO 730 ILCS 5/5-5-3(C)(8).

On Count ___  defendant is sentenced to an extended term pursuant to 730 ILCS 5/5-8-2.

The Court finds that the defendant is entitled to receive credit for time actually served
custody for a total credit of _____ days as of the date of this order.

IT IS FURTHER ORDERED that the above sentence(s) be concurrent with
sentence imposed in case number(s) _____
consecutive to the sentence imposed under case number(s)

IT IS FURTHER ORDERED THAT CREDIT FOR ALL TIME SERVED IN CUSTODY

IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff
the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take
her into custody and confine him/her in a manner provided by law until the above sentence is fulfilled.

DATED _____ JUNE 28, 2004

ENTER: 06/28/04

CERTIFIED BY ( (L)ANNERINO
           DEPUTY CLERK

JUDGE: TOOMIN, MICHAEL P.    0501

GCPJ 06/28/04 11:48:37

V

FILED

JUN 2 8 2004

04-3365

TO THE APPELLATE COURT OF ILLINOIS   DOROTHY BROWN
IN THE CIRCUIT COURT OF COOK COUNTY CLERK OF CIRCUIT COURT
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
                                )
              vs                ) Indictment No. 97 CR 30453
                                ) Judge Michael Toomin
TONY HILLARD                    )

FILED
APPELLATE COURT 1st DIST.
STEVEN M. RAVID
CLERK
NOV 1 7 2004

## NOTICE OF APPEAL

An Appeal is taken from the order of judgment described below:
APPELLANT'S NAME: TONY HILLARD
IR#     D.O.B.
APPELLANT'S ADDRESS: Illinois Department of Corrections
APPELLANT'S ATTORNEY: Public Defender of Cook County
ADDRESS: 69 West Washington, 15th Fl., Chicago, IL 60602
OFFENSE:    Murder
JUDGEMENT: Denial of PC petition  & Resentencing
DATE:  June 28, 2004

_____ atty for
APPELLANT               Tony Hillard

## VERIFIED PETITION FOR REPORT OF PROCEEDINGS
## COMMON LAW RECORD AND FOR APPOINTMENT OF COUNSEL ON APPEAL

Under Supreme Court Rules 605-608, appellant asks the Court to order the Official Court Reporter to transcribe an original and copy of the proceedings, file the original with the Clerk and deliver a copy to the appellant; order the Clerk to prepare the Record on Appeal and to Appoint State Appellate Defender on Appeal. Appellant, being duly sworn, says that at the time of his conviction he was and is unable to pay for the Record or an appeal lawyer.

_____
APPELLANT

SUBSCRIBED and SWORN TO THIS _____ DAY OF _____,2004.

_____
NOTARY PUBLIC

## ORDER

IT IS ORDERED the State Appellate Defender be appointed as counsel on appeal and the Record and Report of Proceedings be furnished appellant without cost. Dates to be transcribed: November 25, 2003; February 19, February 26, March 18, April 28, June 1 and June 28, 2004.

DATE: 6/28/04

ENTER: _____
JUDGE

vi

*R. Silvertrust / Buck*

RECEIVED

'01  JUN 11  P1 33

APPEAL DIVISION



FIRST DIVISION
June 11, 2001

NOTICE

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 97 CR 30453 |
| | ) | |
| TONY HILLARD, | ) | Honorable |
| | ) | Michael Toomin, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

## ORDER

Defendant Tony Hillard  was convicted in a  jury trial of armed robbery, armed violence,

aggravated kidnaping, and aggravated battery.  He was sentenced to 50 years' imprisonment.  On

appeal, defendant raises four issues.  He contends that: (1) the trial court erred in failing to grant his

motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for

codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and

codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where

he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly

sentenced defendant to a consecutive sentence.  We affirm.

**APPENDIX B**

1-99-0152

## BACKGROUND

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed and hit him on the head again with an iron object. Codefendant then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Codefendant and the man with the bat then pulled Jinadu into the bathroom, handcuffed him and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the bathroom and came back holding a pillow and the gun. Codefendant also returned to the bathroom carrying handcuffs. He and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street

-2-

1-99-0152

where he saw the man with the baseball bat and codefendant standing across the street. Upon seeing him, both men fled down the street.

Defendant and codefendant Walls were tried simultaneously before two juries. Prior to trial, defendant moved for a motion to quash his arrest and suppress evidence. The trial court denied the motion to quash finding that Detective Brady had reasonable grounds to believe that defendant had committed the offense and that probable cause to arrest him existed. Prior to trial, the trial court noted that both juries would be present during the cross-examination of the victim. At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership and eventually started his own trucking company. He met and married Delores in 1995 and they separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10, 1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him, Delores explained that her car was broken and asked Jinadu to pick her up at her apartment. Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the door he was hit on the head with a baseball bat and lost consciousness. After regaining consciousness, Jinadu was placed in a bathtub and repeatedly beaten and threatened by the men in the apartment. After the men left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw

-3-

1-99-0152

hundreds of plastic bags, a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Jinadu also described the height, weight and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Crane. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven and Delores at 1121 South State Street. Codefendant Erven Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha Hillard. He called Laretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address. He went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and

-4-

1-99-0152

defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police station and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years' imprisonment.

## ANALYSIS

Defendant first challenges the trial court's finding in denying defendant's motion to quash arrest and suppress evidence. In denying defendant's motion, the trial court noted some of the facts known to the police at the time of the arrest. We will summarize some of those facts in order to illustrate why under the totality of the circumstances known to the police officers at the time of the arrest there was sufficient information to warrant a reasonably prudent person to believe that defendant had committed a crime.

Benicia Eberhardt testified on behalf of defendant. She stated that she was in her bedroom with defendant when there was a knock on the door. She opened the door and saw three or four police officers standing in the hallway. At the time, defendant was standing a few feet behind her. She stated that the police officers pushed her out of the way, walked into the apartment and

-5-

1-99-0152

grabbed defendant. Defendant was taken into his room to put on some clothes while two officers searched the apartment. Defendant was then handcuffed and taken to the police station.

Detective Bradley testified that he spoke to the victim two days after the incident. Jinadu immediately identified his wife, Delores. He also identified codefendant Erven Walls from a drivers license which was found in the apartment on the day of the incident. He identified Walls as his wife's boyfriend who he had seen on previous occasions. Jinadu also gave Detective Bradley the physical description of the other three offenders. He described them as being in their twenties. One offender was 5'11" and weighed 200 lbs with black hair and brown eyes. Another offender was 5'11", 165 lbs. Finally, the last offender was approximately 5'5", 145 lbs with brown eyes and black hair. Detective Bradley testified that one of the guns found in the apartment was registered to Loretha Hillard. He called Ms. Hillard and spoke to her on the telephone. Ms. Hillard informed Detective Bradley that she was an ex-security guard for the Chicago Housing Authority. She further told Detective Bradley that her gun had been taken and that the only person who would have taken it was her brother, Tony Hillard. Ms. Hillard told Detective Bradley the address and apartment number of where defendant and his girlfriend lived. Detective Bradley, along with other police officers, went to the address given to him by Ms. Hillard. They knocked on the door and it was opened by Benicia Eberhardt. Detective Bradley stated that he told the woman that he wanted to speak to defendant. Standing behind her was a man who fit the general description of one of the offenders which Jinadu had given to the officers.

When asked to identify himself, defendant gave Detective Bradley a fictitious name. Detective Bradley then asked him why he stole his sister's gun. Defendant replied that he did not

1-99-0152

take his sister's gun. He was then asked to accompany the police officer's to the police station to discuss the theft of his sister's gun. Defendant said that he would go but that he had to put on his shirt and shoes. Detective Bradley followed defendant into one of the bedrooms where he told detective Bradley that his name was Tony Hillard. Defendant was taken to the police station where he was later identified by Jinadu as one of the offenders. Detective Bradley further testified that at the time of the arrest defendant was 21 years old with black hair, brown eyes, was 5'11" and weighed 170 lbs.

We note that defendant's reliance on *People v Johnson*, 94 Ill. 2d 148 (1983) and *People v. Wilson*, 260 Ill. App. 3d 364 (1994), is not applicable to the factual scenario in this case. Both *Wilson* and *Johnson* stand for the proposition that a warrantless arrest based on an informant's tip must be sufficiently reliable and corroborated so as to provide probable cause. However, the situation in this case is not governed by that principle. Here, the basis for the probable cause did not center around an informants tip but rather was based on the information from Ms. Hillard which provided a link between the stolen gun and defendant and helped the police to locate defendant. That link, however, was not the sole basis of the arrest. In addition to that information once the police were at the specific location provided by Ms. Hillard, defendant fit the description given to them by the victim.

Both the United States and the Illinois Constitutions govern the conduct of police officers in performing warrantless arrests. U.S. Const., amends. IV, XIV; Ill. Const. 1970 art. 1, §6; *People v. Buss*, 187 Ill. 2d 144 (1999). These constitutional provisions allow the police to make a warrantless arrest but only if the police have knowledge "which would lead a reasonable man to

-7-

1-99-0152

believe that a crime has occurred and that it has been committed by the defendant." *People v. Robinson,* 167 Ill. 2d 397, 405 (1995). In reviewing a probable cause challenge, the court does not apply bright-line legal rules but evaluates the police conduct in accordance with practical, every-day principles. *People v. Kidd,* 175 Ill. 2d 1, 22 (1996).

Probable cause for an arrest exists when the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. *People v. Lumpp,* 113 Ill. App. 3d 694 (1983). The court determines under the totality of the circumstances whether the evidence available to the arresting officer at the time of the arrest provides a reasonable basis for the officer to believe that the suspect committed an offense. *People v. Dizon,* 297 Ill. App. 3d 880, 885 (1998). The question is whether a reasonable person in the police officer's position would have believed that the defendant committed a crime. *People v. Adams,* 131 Ill. 2d 387, 398 (1989). Moreover, although the standard for determining whether probable cause existed for a warrantless arrest requires more than a mere suspicion on the part of the police officers, it does not require arresting officers to have in their hands evidence sufficient to convict the defendant. *Dizon,* 297 Ill. App. 3d at 885. A general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. *People v. Robinson,* 299 Ill. App. 3d 426, 431 (1998).

When defendant solely challenges the trial court's legal conclusions for denying a motion to quash arrest and suppress evidence, as in this case, our review is *de novo. People v. Wright,* 183 Ill. 2d 16, 21 (1998).

-8-

1-99-0152

    In applying the above principles to the present case we conclude that based on the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. The police officers were there as part of their investigation of a vicious beating and armed robbery. They had recovered a .38 caliber gun from the apartment which led them to defendant's apartment based on information which was provided by his sister. She reported that the gun was stolen from her home and informed the officers that she believed the person who stole it was defendant. She also provided the officers with defendant's name, address and apartment number. Thus, the gun found at the scene of the crime was linked to defendant. Armed with Jinadu's descriptions of the offenders and Ms. Hillard's information, the police were able to locate defendant at the exact address provided to them. Moreover, upon seeing defendant the officers realized that he fit the general description of one of the offenders. Jinadu had described one of the offenders as a black man that was 5'11" and weighed 165 lbs. He further stated that all of the offenders were in their twenties. At the time of the arrest defendant was 21 years old, was 5'11" and weighed 170 lbs. These characteristics where similar to those described by the victim. Further, when asked whether he was Tony Hillard, defendant lied and gave the officers a fictitious name. He later admitted that he was Tony Hillard. The general description of the offenders, coupled with other specific facts and circumstances provided by Ms. Hillard as well as defendant's behavior in the apartment, was sufficient to lead a reasonably prudent person to conclude that there was a reasonable probability that defendant was one of the offenders.

    Defendant's second point of contention revolves around the fact that the trial court

1-99-0152

In this case, defendant and codefendant did not implicate each other as the perpetrators of the crime. Defendant presented an alibi defense. As defendant points out in his brief his defense was simply that he was not present at the time of the incident. Codefendant Walls' defense, on the other hand, was one of reasonable doubt. The trial court stated, in replying to defense counsel's assertion that codefendant would implicate defendant through cross-examination of the victim:

> "How does that help Mr. Wall's to point the finger at Mr. Hillard. I will wait and see if you do it. Then I'll move the jury out. I don't know why somebody who says their client wasn't there has to point the finger at another defendant and say he was there. That doesn't establish that your guy wasn't there.

\*\*\*

> We'll have to wait and see if it happens. If it happens, I'll move the jury out to protect whatever defendant's right have to be protected. To me, this is nonsense. It's a lot of fiction that one has to point the finger to make a separate cross-examination and represent to me, I'm going to pin it on this guy in front of his jury, when it doesn't make any sense or rhyme, reason or rationale why she would do that if her client wasn't there. But, I'll hear it when I hear it."

The record in this case indicates that during the cross-examination of Jinadu by codefendant Walls' attorney there is one isolated instance in which Jinadu stated that defendant was one of the offenders who pointed a gun at him. This single reference, however, was a repetition of Jinadu's testimony on direct examination where Jinadu testified that defendant pointed a gun at him, placed the gun in Jinadu's mouth, ordered him to reveal where he kept his money, helped codefendant Walls bind Jinadu's legs and hands, placed a pillow on Jinadu's face and filled the bathtub with water. As the trial court correctly noted, the necessity of removing the

-11-

1-99-0152

jury due to an antagonistic defense did not arise in this case. Jinadu's testimony on cross-examination did not create an antagonistic defense but was cumulative of his direct testimony.

Moreover, the record indicates that the remainder of the cross-examination by counsel for codefendant Walls consisted of a series of questions designed to create a reasonable doubt that Walls was not one of the perpetrators. It did not revolve around implicating defendant as the main perpetrator. In addition, during closing arguments, codefendant's counsel argued reasonable doubt as opposed to placing the blame on defendant. In fact, defense counsel stated, "I don't know if Mr. Hillard was involved in that, in this case or not ***." Defense counsel then proceeded to attack the credibility of Jinadu and the inconsistencies in his testimony.

This court has clearly stated in *Rice* that the requirement for actual hostility which necessitates severance "is not met where, for example, one defendant claims an alibi defense and the other defendant asserts a reasonable doubt, but at no time do the defendants become rivals or accuse each other." *Rice*, 286 Ill. App. 3d at 402. Such is the situation in the present case. Given that the defenses were not antagonistic to each other and that defendant has failed to show any prejudice which resulted from Jinadu's single reference to defendant during cross-examination, the trial court correctly ruled in denying severance.

Defendant's final contention is one which he does not have standing to raise. Standing is met when: (1) the proponent of a particular legal right alleges an injury in fact; and (2) the proponent asserts his own legal rights and interests, rather than basing his claim for relief upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *People v. Bond*, 205 Ill. App. 3d 515 (1990). Here, defendant argues that it was judicial error for

-12-

1-99-0152

the trial court to question Detective Bradley as to whether codefendant Walls and Jermaine Craine were the same person. Defense counsel objected to the court's questioning to which the trial court replied, "[I] don't see how that affects Mr. Hillard at all." We agree with the trial court that the trial court's questions regarding identification of Walls and Craine as the same person, did not impact defendant Hillard or any of Hillard's legal rights. Defendant has failed to articulate how the trial court's actions caused defendant an injury in fact. As such, defendant's claim lacks standing for purposes of this appeal.

In a supplemental argument, defendant contends that the trial court erred in sentencing him to a consecutive sentence pursuant to section 5-8-4(a) where the sentence violated his constitutional right to due process and trial by jury according to the recent holding in the Supreme Court case *Apprendi v. New Jersey*, 530 U.S. 466, 490,147 L. Ed. 2d 435, 455,120 S. Ct. 2348, 2363-67, (2000). In *Apprendi*, the U.S. Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The trial court determined that the crime was motivated by bias based on race and therefore increased the defendant's sentence. The *Apprendi* Court concluded that it is unconstitutional, and a violation of a defendant's due process rights, for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In this case the trial judge sentenced defendant under 730 ILCS 5/5-8-4(a), which calls for the imposition of consecutive sentences in cases of

-13-

1-99-0152

multiple convictions arising out of a single course of conduct if one of the offenses is either a

Class 1 or Class X felony and the court finds that the defendant inflicted severe bodily injury.

Section 5-8-4(a) states in pertinent part:

> "The court shall not impose consecutive sentences for offenses
> which were committed as part of a single course of conduct during
> which there was no substantial change in the nature of the criminal
> objective, unless, one of the offenses for which defendant was
> convicted was a Class X or Class 1 felony and the defendant
> inflicted severe bodily injury ***." 730 ILCS 5/5-8-4(a) (West
> 1998).

Recently, in *People v. Wagener*, our supreme court held that *Apprendi* concerns are not

implicated by consecutive sentencing. *People v. Wagener*, No. 88843, slip op. at 14 (June 1,

2000). Noting that consecutive sentences remain discrete and do not transmute into a single

sentence, the *Wagener* court determined that consecutive sentences cannot run afoul of *Apprendi*,

as that case only addresses sentences for individual crimes. *Wagener*, slip op. at 14-15.

Accordingly, the *Wagener* court concluded that section 5-8-4(b), which allows the imposition of

consecutive sentences where the sentencing court is of the opinion that such a term is necessary to

protect the public from further criminal conduct by the defendant, passes constitutional muster.

*Wagener*, slip op. at 15. Following the reasoning of *Wagener*, we conclude that section 5-8-4(a),

under which defendant was sentenced, also passes constitutional muster. Thus, we affirm the trial

court's order imposing consecutive sentences.

For the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, J., with McNULTY, P.J., and TULLY, J., concurring.

-14-

and also before it has been possible to identify the perpetrator in some other very reliable way, such as by fingerprints uncovered at the crime scene being matched with those of a specific person.[142] When the police receive a report of a crime which has just been committed, it is standard practice to obtain such a description of the perpetrator as can be quickly gathered and then attempt to find the person in the area before he has had an opportunity to complete his escape. Such procedures are essential, for experience has shown that when the victim or witness cannot name the offender his apprehension is unlikely unless he is promptly located in the area.[143] And certainly this fundamental fact must enter into a determination of what degree of specificity is needed to establish probable cause in this context. As noted in *Commonwealth v. Brown*,[144] upholding the arrest of a man seen on the street near the scene of a mid-afternoon robbery, which occurred a half hour earlier, because he fit the description given the police (black male, 5′10″ in height, 160 pounds, gold rim glasses, full length brown coat):

> If the description provided by the eyewitnesses in the instant case were insufficient to establish probable cause to arrest the appellant, we dare say that police would rarely be able to gather sufficient information to make an arrest based on an eyewitness' account of the crime and description of the perpetrator. Such an imbalance in the interests of society and the individual would be wholly out of place in an area of constitutional law where maintaining that balance is the very aim of the courts and legislatures.

However, this point should not be pushed too far. It is true that the practical demands of law enforcement must be taken into account in determining what the Fourth Amendment requires in this type of situation. But it must be remembered that arrest is not the only possible police response. The brief-stopping-for-investigation device is frequently and fruitfully employed in this context,[145] and this must enter into any evaluation of when the police must be allowed to arrest persons found near a crime scene.[146]

Analysis of the instant problem is further complicated by the fact that courts and commentators are not in agreement as to the degree of probability which is required to satisfy the probable cause test. That

142. As stated in Haynes v. State, 314 Ark. 354, 862 S.W.2d 275 (1993): "Such compelling evidence as fingerprints offers ample support for the finding of probable cause."

143. President's Comm'n on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 97 (1967).

144. 230 Pa.Super. 214, 326 A.2d 906 (1974).

145. See § 9.5(g).

146. This is not to suggest that the stopping-for-investigation device will alone

suffice as a sufficient law enforcement response in such cases. While "it would be good practice to pursue the less drastic alternative * * *, in some cases, only by a more prolonged exercise of custody may the inquiry go forward." Model Code of Pre-Arraignment Procedure 295 (1975). Consequently, it is *not* so that arrest, as compared with a brief stopping for investigation, is never permissible until the victim or witness has made a positive identification of a detained suspect. Hill v. United States, 627 A.2d 975 (D C.App.1993).

question has been considered earlier in this Treatise,[147] and will not be canvassed again here. Suffice it to note that this fundamental question is of particular significance in this context, for if a more-probable-than not-standard applies this will limit to an appreciable extent the situations in which such an arrest may be made. "The description which a victim gives of an assailant will very rarely justify an officer in believing that a person who appears to correspond to that description is more probably than not guilty of the assault."[148]

But even if something less than a more-probable-than-not standard is applicable, it is clear that the description given and the other relevant circumstances must be such that the police will be very selective in determining whom to arrest. This point is very well illustrated by *Commonwealth v. Jackson*.[149] After a man was shot on the street at 9:30 p.m., a police broadcast described the assailants as two black males in dark clothing, 5'6" to 5'8" in height with medium builds, medium to dark complexions, and semi-bush haircuts. One hour later and one block from the crime, an officer arrested a black youth who fit the physical description except that he wore light-colored trousers and had no shirt on. Shortly thereafter this same officer arrested four other youths who fit the description; in all, the police apprehended 15 to 20 youths matching the description within a few hours after the slaying. The court held:

> We find the arrest here to be clearly without probable cause. The arresting officer had only a very sketchy description consisting of height, general build, hair length and complexion shade. That the description was equally applicable to a great many individuals in the area is demonstrated by the fact that moments later the same officer arrested four additional suspects in the same block in which appellant was seized. * * *

> We have consistently held that descriptions equally applicable to large numbers of people will not support a finding of probable cause. * * * This is especially so where the arrest occurs some time after the crime. Here, the identification of the appellant as a possible culprit was made at least 40 minutes after the slaying. The very general nature of the description applicable to five individuals in a single residential block, to at least ten additional suspects actually arrested, and to a large proportion of the neighborhood residents cannot legally support an arrest made some time after the crime. Hence, the arrest here was improper.

Though the multiple arrests in *Jackson* dramatically illustrate the fact that the police did not have probable cause, it should not be

---

147. See § 3.2(e).

148. Model Code of Pre–Arraignment Procedure 294 (1975).

149. 459 Pa. 669, 331 A.2d 189 (1975). See also United States v. Fisher, 702 F.2d 372 (2d Cir.1983) (no probable cause where the identification the officer had re the perpetrator of robbery "was equally applicable to a number of individuals likely to be in the area," and if probable cause existed for defendant's arrest then "it would have existed for the arrest of virtually any Black male who, at lunchtime in a predominantly Black neighborhood, happened to come" along at that time); United States v. Short, 570 F.2d 1051 (D.C.Cir.1978) (reaching the same result as *Jackson* on similar facts).

assumed that the arrest of the first youth was unlawful only because the others followed. The result would be the same had the police for some reason stopped with the first arrest, for it would still be true that the police acted upon a too general description which could fit many persons in the area where the offenders might then be. Such is the teaching of another Pennsylvania case, *Commonwealth v. Richards*,[150] holding unlawful the arrest of a man residing at a hotel because he fit the general description given by the victim of a rape which occurred a few days before and about a block away. The *Richards* court explained:

> The identification given to the police by the victim was general in nature and would have applied to a large segment of the community. A description of a white male with blondish thinning hair, medium height, "real skinny", approximately 30 years of age, fails to have that conclusive quality which would necessarily draw attention to a particular individual. We are not faced here with a situation where a description is coupled with circumstances that together combine to satisfy the requirement of probable cause. The instant appellant was not apprehended at or near the scene shortly after the incident wearing the clothing described, but rather several days later.

There is no verbal formula which can effectively communicate precisely what kind of description by a victim or witness together with what kind of attendant circumstances adds up to probable cause. It is possible, however, to identify several relevant factors—some of which are mentioned in *Jackson* and *Richards*—which must be taken into account in making this particular type of probable cause determination: (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in the area; (4) the known or probable direction of the offender's flight; (5) observed activity by or condition of the particular person arrested; and (6) knowledge that the person arrested or his vehicle have been involved in other criminality of the type for which the instant arrest was made. These will be discussed seriatim.

(1) Particularity of description. Where an offense such as robbery, involving direct confrontation between the offender and others, has occurred, the police are usually able to obtain some sort of description of the person or persons committing the crime.[151] The quality of this description, of course, will depend upon the opportunity victims and witnesses had to view the perpetrator, their skills of recall and reporting,

---

150. 458 Pa. 455, 327 A.2d 63 (1974).

151. Sometimes no description of the perpetrators is available, but a description is given of persons seen in the area at about the time of the crime. Even if it is probable that these same persons have been located by the police soon thereafter, chances are there is not probable cause to arrest but only reasonable suspicion justifying a stop.

See, e.g., Burnham v. State, 265 Ga. 129, 453 S.E.2d 449 (1995) (3 young males, one wearing tan jacket, seen running from area of crime, same persons seen entering theater were arrested when they left at end of movie; held, arrest unlawful, though there were grounds for a stop).

and the time the police are able to spend assembling a description before undertaking the search for the criminal. The description will except in extraordinary circumstances provide the sex[152] and race[153] of the offender, and typically will include some other information as well. Often certain of his physical features will be described, such as approximate age,[154] height[155] and weight,[156] build,[157] complexion,[158] hair color or style,[159] and presence of a beard[160] or moustache.[161] In addition, it is common for at least some items of apparel to be described, such as particular colors or kinds of hats,[162] coats,[163] shirts,[164] pants[165] or

152.  E.g., United States v. Nash, 946 F.2d 679 (9th Cir.1991); United States v. Hurt, 476 F.2d 1164 (D.C.Cir.1973); State v. Maxwell, 502 S.W.2d 382 (Mo.App.1973); Commonwealth v. Brown, 230 Pa.Super. 214, 326 A.2d 906 (1974).

153.  E.g., United States v. Oakley, 153 F.3d 696 (8th Cir.1998); United States v. Harvey, 3 F.3d 1294 (9th Cir.1993) (black); United States v. Nash, 946 F.2d 679 (9th Cir.1991) (black); McDonald v. Arkansas, 501 F.2d 385 (8th Cir.1974) (white); State v. Dixon, 153 Ariz. 151, 735 P.2d 761 (1987) (Indian); State v. Schoffner, 248 Mont. 260, 811 P.2d 548 (1991) (black) State v. Guzman, 752 A.2d 1 (R.I.2000) (black).

154.  E.g., United States v. Nash, 946 F.2d 679 (9th Cir.1991); People v. Miller, 31 Ill.App.3d 436, 334 N.E.2d 421 (1975); Commonwealth v. Claiborne, 423 Mass. 275, 667 N.E.2d 873 (1996); Commonwealth v. Jones, 457 Pa. 423, 322 A.2d 119 (1974).

155.  E.g., United States v. Oakley, 153 F.3d 696 (8th Cir.1998); United States v. Nash, 946 F.2d 679 (9th Cir.1991); United States v. Hurt, 476 F.2d 1164 (D.C.Cir. 1973); State v. Schwartz, 239 Neb. 84, 474 N.W.2d 461 (1991); Commonwealth v. Brown, 230 Pa.Super. 214, 326 A.2d 906 (1974).

156.  E.g., United States v. Oakley, 153 F.3d 696 (8th Cir.1998); United States v. Nash, 946 F.2d 679 (9th Cir.1991); United States v. Hurt, 476 F.2d 1164 (D.C.Cir. 1973); Mears v. Commonwealth, 499 S.W.2d 75 (Ky.App.1973); State v. Schwartz, 239 Neb. 84, 474 N.W.2d 461 (1991).

157.  E.g., People v. Barksdale, 24 Ill. App.3d 489, 321 N.E.2d 489 (1974).

158.  E.g., Mears v. Commonwealth, 499 S.W.2d 75 (Ky.App.1973); Commonwealth v. Claiborne, 423 Mass. 275, 667 N.E.2d 873 (1996).

159.  E.g., United States v. Nash, 946 F.2d 679 (9th Cir.1991); People v. Barksdale, 24 Ill.App.3d 489, 321 N.E.2d 489 (1974); State v. Schwartz, 239 Neb. 84, 474 N.W.2d 461 (1991); State v. Baldic, 131

N.H. 225, 551 A.2d 977 (1988); Guzman v. State, 521 S.W.2d 267 (Tex.Crim.App.1975).

160.  E.g., Cole v. State, 701 So.2d 845 (Fla.1997); State v. Turner, 193 Neb. 261, 207 N.W.2d 382 (1973).

161.  E.g., People v. Barksdale, 24 Ill. App.3d 489, 321 N.E.2d 489 (1974); Mears v. Commonwealth, 499 S.W.2d 75 (Ky.App. 1973); Commonwealth v. Claiborne, 423 Mass. 275, 667 N.E.2d 873 (1996); State v. Schwartz, 239 Neb. 84, 474 N.W.2d 461 (1991); State v. Chaloux, 130 N.H. 809, 546 A.2d 1081 (1988).

162.  E.g., United States v. Oakley, 153 F.3d 696 (8th Cir.1998); Hill v. United States, 627 A.2d 975 (D.C.App.1993); People v. Miller, 31 Ill.App.3d 436, 334 N.E.2d 421 (1975); Commonwealth v. Tookes, 236 Pa.Super. 386, 344 A.2d 576 (1975); State v. Guzman, 752 A.2d 1 (R.I.2000); Washington v. State, 518 S.W.2d 240 (Tex.Crim.App. 1975).

163.  E.g., United States v. Diggs, 522 F.2d 1310 (D.C.Cir 1975); Matter of E.G., 482 A.2d 1243 (D.C.App.1984); State v. York, 324 A.2d 758 (Me.1974); State v. Schoffner, 248 Mont. 260, 811 P.2d 548 (1991); State v. Guzman, 752 A.2d 1 (R.I. 2000).

164.  E.g., United States v. Harvey, 3 F.3d 1294 (9th Cir.1993); Charles v. Smith, 894 F.2d 718 (5th Cir 1990); United States v. Hurt, 476 F.2d 1164 (D.C.Cir.1973); Hill v. United States, 627 A.2d 975 (D.C.App. 1993); Cole v. State, 701 So.2d 845 (Fla. 1997); State v. Buti, 131 Idaho 793, 964 P.2d 660 (1998); Mears v. Commonwealth, 499 S.W.2d 75 (Ky.App.1973).

165.  E.g., Charles v. Smith, 894 F.2d 718 (5th Cir.1990); McDonald v. Arkansas, 501 F.2d 385 (8th Cir.1974); United States v. Hurt, 476 F.2d 1164 (D.C.Cir.1973); Hill v. United States, 627 A.2d 975 (D.C.App. 1993); State v. Schoffner, 248 Mont. 260, 811 P.2d 548 (1991); State v. Schwartz, 239 Neb. 84, 474 N.W.2d 461 (1991).

shoes.[166] It may be noted that the wanted individual was wearing glasses[167] or that he was carrying some object.[168]

As a general proposition, it may be said that the greater the number of these identifying characteristics which are available, the more likely it is that there will be grounds to arrest a person found with all or most of those characteristics. But obviously there is more to it than the number of points of comparison, for otherwise it would be possible to conclude that some number of points (say, five) would suffice for probable cause. The fundamental question, as stated in *Jackson*, is whether the description is so detailed that it is not "equally applicable to a great many individuals in the area."[169] Thus, consideration must be given to the uniqueness of particular points of identification. The clothing description in *Jackson* as being dark obviously is not as helpful as, for example, reference to a rust-colored hat with buckles on it.[170] And of course the uniqueness of a particular point of identification cannot be determined in the abstract. A description of the offender as a black male might

**166.** E.g., United States v. Hebert, 131 F.3d 514 (5th Cir.1997); Cole v. State, 701 So.2d 845 (Fla.1997); McDonald v. Arkansas, 501 F.2d 385 (8th Cir.1974); Matter of E.G., 482 A.2d 1243 (D.C.App.1984).

**167.** E.g., Matter of E.G., 482 A.2d 1243 (D.C.App.1984); People v. Barksdale, 24 Ill. App.3d 489, 321 N.E.2d 489 (1974); Commonwealth v. Brown, 230 Pa.Super. 214, 326 A.2d 906 (1974).

**168.** E.g., United States v. Diggs, 522 F.2d 1510 (D.C.Cir.1975); Commonwealth v. Tookes, 236 Pa.Super. 386, 344 A.2d 576 (1975).

**169.** See also Hill v. United States, 627 A.2d 975 (D.C.App.1993) (probable cause here, as description "not so general as to be applicable to large numbers of people").

**170.** As in People v. Miller, 31 Ill. App.3d 436, 334 N.E.2d 421 (1975). See also United States v. Shavers, 524 F.2d 1094 (8th Cir.1975) (noting limited utility of description of bank robber as black male 5'8" in community where population 50% black); People v. Lewis, 975 P.2d 160 (Colo.1999) (clerks at 7–Eleven described robber as black male 6'1"–6'3" with athletic build wearing Colorado Rockies hat and black coat and pants; when officer soon thereafter found 4 black males, all fairly tall with athletic builds and wearing dark clothing, no probable cause to arrest one of them; court stresses "description was so general as to fit three others persons in this one motel room alone" and that "the man was missing the most distinctive element of the description, i.e., the Rockies hat"); State v. Federici, 179 Conn. 46, 425 A.2d 916 (1979) (no probable cause where "the two perpetrators were described only by sex and race" and as wearing "outer-wear-type garments"); People v. Ward, 73 Ill.App.3d

1001, 29 Ill.Dec. 922, 392 N.E.2d 619 (1979) (stressing uniqueness of certain aspects of descriptions of two robbers, namely, that one was a blue-eyed Negro and the other had a scar near left eye, in holding there were grounds to arrest the pair when they appeared together in court on another charge over two weeks later); People v. Henderson, 36 Ill.App.3d 355, 344 N.E.2d 239 (1976) (stressing the uniqueness of the description, namely, a man with a cast on his leg in a car of a certain make and year with license plates from a distant state); Johnson v. State, 455 N.E.2d 897 (Ind. 1983) (probable cause where defendant found in vicinity within minutes of crime at 1:30 a.m. and fit description of 5'6" and smell build, medium Afro, white tank top shirt, cut off blue jeans, white tennis shoes); State v. Barnes, 220 Kan. 25, 551 P.2d 815 (1976) (stressing uniqueness of description, including that robber had gold tooth and tattooed cheeks); State v. Lee, 524 So.2d 1176 (La.1987) (description of murderer as black, about 5'7" and 130–145 lbs., reeking of alcohol, wearing wave net cap, black shirt, blue jean cut offs and tennis shoes with black stripes, all known to fit defendant on that night, sufficient where defendant known to have been in general area); Commonwealth v. Sams, 465 Pa. 323, 350 A.2d 788 (1976) (description only of black male of very limited utility).

It ultimately is for the court, rather than the police officer, to decide if the description was sufficient in light of all the circumstances. Thus, an arrest cannot be upheld on the conclusory testimony of an officer that he arrested defendant and his companion because they "fitted the description" of two persons who had invaded a nearby home three days earlier. People v. Talley, 34 Ill.App.3d 506, 340 N.E.2d 167 (1975).

sometimes be very helpful, but it was not in *Jackson* because of the number of black males in the vicinity.[171] If two or more offenders were involved and some sort of description of each of them is obtained, it is much more likely that there will be grounds to arrest that group if later found together than if a person found fitting one of the descriptions is later found alone.[172] This is because the probabilities of there being another group of persons together on the same occasion with the same combination of physical and clothing characteristics are very slight.

If a victim or witness is also able to give some description of the vehicle in which the offender or offenders escaped, this substantially increases the chances that probable cause will exist. This is because vehicles may usually be more precisely described than people. The clearest case, of course, is when the license number of the vehicle is provided; when such occurs, there will almost inevitably be probable cause without regard to the other circumstances of the case.[173] Even if there is some degree of uncertainty about the exact license number[174] or

**171.** See also United States v. Fisher, described in note 149 supra; Branam v. State, 277 Ark. 204, 640 S.W.2d 445 (1982) (no probable cause, as the "physical description could have fit any number of black males in the area").

**172.** United States v. Carpenter, 342 F.3d 812 (7th Cir.2003) (where bank robbers were 3 black men between 19 and 20, one 5'8" and 130 lbs. with black leather jacket and black skull cap, second 5'4" and 140 lbs. with grey jacket and pants and red baseball cap, and third 5'9" with very distinctive clothing, and officer saw these 3 men together 6 hours after robbery and again 2 days later, one wearing the distinctive clothing and other two fitting general descriptions but wearing different clothes, probable cause to arrest all three); United States v. Hurt, 476 F.2d 1164 (D.C.Cir. 1973); Carey v. United States, 377 A.2d 40 (D.C.App.1977); Cole v. State, 701 So.2d 845 (Fla.1997); People v. Ward, 73 Ill. App.3d 1001, 29 Ill.Dec. 922, 392 N.E.2d 619 (1979); State v. Anthony, 776 So.2d 376 (La.2000); State v. York, 324 A.2d 758 (Me. 1974); Mobley v. State, 270 Md. 76, 310 A.2d 803 (1973); State v. Pettis, 522 S.W.2d 12 (Mo.App.1975); Commonwealth v. Powers, 484 Pa. 198, 398 A.2d 1013 (1979).

**173.** United States v. Quinn, 18 F.3d 1461 (9th Cir.1994) (probable cause where bank robbers escaped by car and license number check indicated defendant, a suspect in a similar robbery, owned the car, which then seen two hours after robbery parked at premises where defendant located); People v. Edwards, 836 P.2d 468 (Colo. 1992) (clear probable cause where license number and one occupant of car "matched the description of the suspect who had used a gun during the burglary" 40 minutes

earlier); State v. Dennis, 189 Conn. 429, 456 A.2d 333 (1983) (2 robbers described and license number of vehicle given, can arrest described persons exiting that car an hour later); People v. Robinson, 62 Ill. App.3d 900, 20 Ill.Dec. 196, 379 N.E.2d 1264 (1978); State v. Thompson, 3 Kan. App.2d 426, 596 P.2d 174 (1979); State v. Elais, 416 A.2d 1253 (Me.1980); People v. Esters, 417 Mich. 34, 331 N.W.2d 211 (1982) (probable cause to search car of description and license number of that used in robbery shortly before); Stephens v. State, 503 P.2d 1309 (Okl.Crim.App.1972); Commonwealth v. Payton, 253 Pa.Super. 422, 385 A.2d 410 (1978); Webb v. State, 760 S.W.2d 263 (Tex.Crim.App.1988) (citizen gave license number of robber's car and said it ahead on that street); McCary v. Commonwealth, 228 Va. 219, 321 S.E.2d 637 (1984) (2 hours after robbery, parked vehicle discovered which fit description of getaway car and had one of two license numbers reported); Hills v. State, 93 Wis.2d 139, 286 N.W.2d 356 (1980).

Also very relevant, but of lesser force, is evidence that defendant's vehicle was parked in the area at the time of the crime. See, e.g., United States v. Martin, 28 F.3d 742 (8th Cir.1994) (probable cause here, as defendant fit general description of onstreet robber, and witness noted license number of van idling unattended nearby, and it defendant's van).

**174.** United States v. Jones, 84 F.3d 1206 (9th Cir.1996) (where bank manager said robber escaped in yellow cab number 557 or 577 and officer saw cab number 557 "where one would expect the robber's getaway car to be," with passenger "crouched down in back seat consistent with an at-

§ 3.4(c)    PROBABLE CAUSE    Ch. 3

only part of the number is recalled,[175] that information plus other descriptive information concerning the car may nonetheless make it sufficiently unlikely that there is more than one such car so that this description will provide probable cause. So too, if a highly detailed description of both the exterior and interior of the car is given, as may occur when a crime victim has been transported in the vehicle, this is likely to support a finding of probable cause even if a substantial period of time passes before a vehicle fitting this description is located.[176] When the description of the car is more general and thus not sufficient under the circumstances to alone establish probable cause,[177] that description may nonetheless contribute to a finding of probable cause.[178] This is

tempt to avoid detection," and "cab turned on its code blue lights indicating a problem," and occupant "fit general description of the bank robber," probable cause to arrest); United States v. Williams, 10 F.3d 1070 (4th Cir.1993) (probable cause where vehicle described as white jeep-like vehicle with four black male occupants and 7-digit license number different only as to one number); State v. Mills, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992) (probable cause because "the vehicle's license plate number and physical description matched or nearly matched that of the robber's vehicle"; defendant's car a black Camaro with license 253 RQJ, while bystander's note re fleeing car read "253 QJR"); Commonwealth v. Jones, 233 Pa.Super. 461, 335 A.2d 789 (1975) (car identified as having red bottom and black top, first three digits of license 86G, last three either 662 or 226; probable cause re red and black car six blocks away with license 86G 226).

175. State v. Strickland, 87 S.D. 522, 211 N.W.2d 575 (1973) (car identified as older model Chevrolet, blue with white top, 1971 Iowa license with prefix 77; probable cause re such a car seen in the area). Compare Luckett v. State, 259 Ind. 174, 284 N.E.2d 738 (1972) (description of car as green Chevrolet with license prefix 82J permitted stopping of car for investigation, and contributed to probable cause when police saw in car objects similar to those reported stolen).

176. Davis v. United States, 367 A.2d 1254 (D.C.App.1976) (car used in several kidnappings and rapes described by victims as green Chevrolet Vega with black interior, bucket seats, two doors, stick shift, clear plastic seat covers, blue and white license plates); People v. Barksdale, 24 Ill.App.3d 489, 321 N.E.2d 489 (1974) (car used in several kidnappings and rapes described by the victims as a 1968 black Chevrolet, black vinyl top, damage to left rear and right front of vehicle, nonfactory air conditioning, bench-type seats, small portable radio and

tape player, small hole in carpet in front); Commonwealth v. A Juvenile (No. 2), 411 Mass. 157, 580 N.E.2d 1014 (1991) (though witness described hit-and-run vehicle as only a small black car, another witness said defendant seen driving such a car in vicinity, probable cause then developed when, upon observing defendant's car, police learned that the damage, paint chips, fibers, etc., "were consistent with the kind of damage likely to result from the accident under investigation"); Seales v. State, 495 So.2d 475 (Miss.1986) (witness identified getaway car as dark green Ford LTD without license plate and with bright chrome where plate should be, and then viewed and identified such a car when it parked on street a few days later; this amounts to probable cause).

177. There may be circumstances in which the mere general description of the vehicle will itself suffice to establish probable cause. Illustrative is Prince v. United States, 825 A.2d 928 (D.C.App.2003), where the witness was another police officer who only provided the description "a red Saturn," deemed sufficient where 30–60 second later such a vehicle found in "the exact location" officer-witness said it would be, and "there were no other red Saturns in the immediate vicinity."

178. See, e.g., United States v. Parks, 285 F.3d 1133 (9th Cir.2002) (where bank robbers seen escaping in white car, and another witness saw 3 men transfer from a white car to a blue car, probable cause to search blue car seen to contain bulletproof vest where car parked at apartment complex where police tracked signals from beeper in money taken in bank robbery and found money taken); State v. McClain, 258 Kan. 176, 899 P.2d 993 (1995) (description of "small black pickup truck" accompanied by two black males sufficient where 10 minutes after robbery that vehicle seen driving away from crime scene with occupants acting suspiciously); State v. Travis, 568 A.2d 316 (R.I.1990) (description of Chevrolet

particularly true when that description is sufficient to justify a brief stopping of the vehicle, after which the police also match the occupants with the descriptions of the offenders,[179] see apparently incriminating evidence in the car,[180] or find that the occupants give unconvincing or inconsistent explanations concerning their travels.[181]

One question which sometimes causes the courts difficulties is whether probable cause is present when the police match up some but not all of the description with the person arrested. It is fair to say that the fact that part of the description given the police does not fit is "a negative factor in [the] assessment of the existence of probable cause,"[182] but yet it would be inappropriate to assume probable cause cannot exist absent a full match-up of all parts of the description. The arresting officer must be allowed to take account of the possibility that the victim or witness has been in error with respect to part of the tendered description.[183] The same is true of the failure of a victim or witness to mention some identifying characteristic.[184]

In assessing the likelihood that this is the reason for the discrepancy, what must be taken into account is the strength of the points of comparison which do match up and also whether the nature of those which did not match are such that an error could readily occur. On the last point, for example, it is rather hard to explain why a witness would describe an assailant as being dressed in dark clothing if he was actually wearing light-colored trousers,[185] and thus it should not readily be assumed that such an error was made and that consequently a suspect in light trousers may be arrested. By contrast, estimation of heights and weights is rather difficult, and thus it is proper to conclude that some

Monte Carlo of dark color with light top, older car headed north with male operator, as escape vehicle of person who attempted murder, sufficient where such car seen headed north less than hour later, and defendant standing by it bleeding, which "would support an inference that he had recently been involved in a violent encounter"). See also the *Harple* case, note 191 infra.

**179.** United States v. Tilmon, 19 F.3d 1221 (7th Cir.1994); State v. Buti, 131 Idaho 793, 964 P.2d 660 (1998); Mobley v. State, 270 Md. 76, 310 A.2d 803 (1973); State v. Schwartz, 239 Neb. 84, 474 N.W.2d 461 (1991); Washington v. State, 94 Nev. 181, 576 P.2d 1126 (1978).

**180.** Luckett v. State, 259 Ind. 174, 284 N.E.2d 738 (1972); State v. Wellman, 128 N.H. 340, 513 A.2d 944 (1986).

**181.** Commonwealth v. Riggins, 366 Mass. 81, 315 N.E.2d 525 (1974).

**182.** Mobley v. State, 270 Md. 76, 310 A.2d 803 (1973).

**183.** State v. Nelson, 129 Ariz. 582, 633 P.2d 391 (1981) (witnesses referred to light-

colored Toyota or Datsun pickup truck with license 2NT-837, probable cause to seize truck of that type with only one letter of license different); People v. Frierson, 25 Cal.3d 142, 158 Cal.Rptr. 281, 599 P.2d 587 (1979).

**184.** United States v. Martin, 28 F.3d 742 (8th Cir.1994) (probable cause though elderly victim described defendant as "clean cut" and did not mention his ponytail, as "a ponytail pulled back behind the head is a feature that a robbery victim might well overlook").

**185.** Recall that in the *Jackson* case, discussed in the text at note 149 supra, the defendant wearing light-colored trousers was arrested though the witness said the assailant was dressed in dark clothing.

See also McFerguson v. United States, 770 A.2d 66 (D.C.App.2001) (where report of burglary by two black men, one wearing white shirt and red pants and other one tall, and two black men seen running 20 minutes later over a mile away, no probable cause, as neither man "was wearing red pants—the sole distinctive feature of the description").



error as to them has occurred when a suspect is found who matches up in several other respects.[186] Similarly, it is rather easy to confuse similar models of cars, and thus the fact a different kind of car was named should not be deemed to defeat the probable cause showing when several other descriptive factors concerning the car and its occupants match up.[187]

It is also appropriate to consider conditions at the time of the crimes that bear upon the possibility of error, as illustrated by *State v. Turner*.[188] There, the lookout broadcast was for two individuals in their late teens or early twenties, one with a beard, who escaped from a robbery in a silver-blue or silver-gray Pontiac, one headlight on high beam and one on low, no tail lights, damage to right rear, possible license 1–L400. Defendant, bearded and 22 years of age, was arrested about 45 minutes later while riding in a turquoise-colored Plymouth, license 1–L488, with

---

**186.** In United States v. Hurt, 476 F.2d 1164 (D.C.Cir.1973), for example, the court concluded: "The fact is that the radio 'lookout' was for two suspects, and since the two were arrested together we must view the presence of probable cause in light of all the evidence as it related to both defendants. Huff was arrested five blocks from the murder scene approximately an hour after the stabbing wearing a red T-shirt and brown pants, both described in the radio 'lookout' * * *, in the presence of a suspect who not only fit the 'lookout' description quite accurately but answered to the name given and had visible blood on his clothes and shoes. Under these circumstances a discrepancy of six inches in height and 40 to 50 pounds in weight between the 'lookout' description and Huff's actual description cannot negate all of the other indicia of probable cause."

See also Burns v. State, 270 Ind. 512, 387 N.E.2d 442 (1979) (arrest of two persons loitering in grocery a few blocks from where persons of similar description held up store recently, where car outside had license very close to partial number reported by witnesses of robbery, lawful notwithstanding fact witnesses said robbers were two black males but one defendant here actually female, as she wore loose-fitting clothing and kept hair under knit cap).

Compare with *Hurt* Maxwell v. City of Indianapolis, 998 F.2d 431 (7th Cir.1993) (part of description of wanted person was that he weighed 175 lbs., while arrestee—plaintiff here—weighed 270 lbs.; "while weight is a mutable characteristic, the size of the difference here should have given the police officers pause").

**187.** Brinnon v. State, 376 So.2d 769 (Ala.Crim.App.1979) (dispatch said getaway car Chevrolet, but occupants of Ford arrested; probable cause in light of other matching factors and close proximity to robbery

in time and distance); Mobley v. State, 270 Md. 76, 310 A.2d 803 (1973) (robbery by two black males in their 20's, one wearing green army-type fatigue jacket, other wearing three-quarter length suede coat, thought to have fled in yellow and black Duster; probable cause to arrest persons fitting that description found in yellow and black Dodge Coronet); State v. Morgan, 593 S.W.2d 256 (Mo.App.1980) (car was '68 rather than '72 model, this not fatal where basic silhouette of the two models essentially the same and several other points of description matched); Commonwealth v. Allen, 287 Pa.Super. 88, 429 A.2d 1113 (1981) (probable cause though car brown 1969 Olds and not green '69 Buick, as car found near robbery within hour of crime, and matching of other descriptive factors: cracked windshield, first 3 digits of license were 797, occupied by 3 males, one of them wearing a checkered shirt).

Compare United States v. Kithcart, 134 F.3d 529 (3d Cir.1998) (where description of robbers was of 2 black males fleeing in a black sports car, "possible Z–28, possible Camara," no probable cause to arrest black driving black Nissan 300ZX, as "there was no evidence offered at the suppression hearing that the shapes of the two cars were sufficiently similar so as to warrant an inference that a 300ZX could be mistaken for a Z–28").

**188.** 190 Neb. 261, 207 N.W.2d 382 (1973) See also People v. Washington, 89 Ill.App.3d 734, 44 Ill.Dec. 925, 412 N.E.2d 1 (1980) (where witnesses said getaway car a green 1972 Chevrolet while defendant's car a 1972 silver Chevrolet, given fact their "observations occurred in the early hours of the morning under artificial lighting conditions, a mistaken belief in the color of the automobile is understandable").

one low beam headlight out and moderate damage to the rear. In holding that there was probable cause, the court emphasized that "the robbery occurred after two o'clock in the morning," a time when "it is not too difficult to mistake two figure eights for two zeros."

It is likewise proper to consider opportunities the suspect has had to alter certain descriptive characteristics, especially when other facts make that person a prime suspect. Illustrative is *State v. Olsen*,[189] holding there was probable cause to arrest defendant for a robbery where he matched that part of the description which referred to a white male in his 20's about 6 feet tall with a stocking cap, but he had a beard not mentioned in the description given, he was wearing a brown leather jacket and not the described green parka, and he was driving a blue Cadillac rather than the described yellow Olds or Chevrolet. The court deemed it "reasonable for the officers to assume the suspect had changed cars and coats," an assertion which is meaningful only in light of the other facts then known by the police: defendant was travelling away from the city of the robbery and admitted he had come from there; he had a bundle of several hundred dollar bills in his pocket and other bundles of cash totalling several thousand dollars were in his glove compartment, and his explanation was that the money came from a friend whose name he did not know.[190]

(2) Size of the area. Whether or not probable cause requires that an arrestee be more probably than not the person wanted, it is clear that the probability must be quite high. As noted earlier, a description which would fit many people will not suffice. But the chances of a certain description fitting several persons in turn depends upon the number of persons in the relevant universe. This means that the time which has elapsed between the crime and the arrest is an important consideration,[191] for it shows what distance the perpetrator of the crime could have traveled[192]—the radius of the area within which the perpetrator might then be. If the elapsed time is short, such as five or ten minutes,

---

189.   315 N.W.2d 1 (Iowa 1982).

190.   See also United States v. Tilmon, 19 F.3d 1221 (7th Cir.1994) (where defendant lawfully stopped 50 miles from and 2 hours after bank robbery, probable cause to arrest given fact "he matched the description given on the police radio" accompanied by "identification of the distinctively marked car" the robber escaped in, and this so though defendant "wore different clothes from those described by the robbery eyewitnesses" in light of fact "two hours had passed since the robbery"); State v. Gomes, 764 A.2d 125 (R.I.2001) (probable cause existed where defendant fit description of perpetrator of recent nearby crime except that he did not now have on black leather jacket).

191.   And thus an absence of sufficiently precise information as to the time and/or place of the crime will be fatal to a probable cause showing where only a general descrip-

tion is available. United States v. Kithcart, 134 F.3d 529 (3d Cir.1998) (since officer didn't know when the robbery occurred on a certain evening or where in a certain township it occurred, no probable cause on description of black males driving black sports car).

*Kithcart* was distinguished in United States v. Harple, 202 F.3d 194 (3d Cir. 1999), as while in the instant case the arsonists were rather generally described as "a young group of white males driving a blue or white automobile," in addition such group and car found near another fire at location where they could see fire trucks arrive and members of group had hand-held scanners tuned to police and fire department frequencies.

192.   The police are not required to assume that the perpetrators have put as much distance between them and the crime scene as is possible. In People v. Lippert,, 89

§ 3.4(c)  PROBABLE CAUSE  Ch. 3

then this area is fairly small, and a matching up of a person in the area with a rather general description which might not otherwise suffice will be adequate for probable cause.[193]

This is not to say, however, that there is some time span which is so long that an arrest upon the description of a victim or witness may not lawfully be made. Rather, the point is that as more time passes the potential area (and thus the number of persons who might fit the

Ill.2d 171, 69 Ill.Dec. 819, 432 N.E.2d 605 (1982), the court stated: "Defendant was also in the area of the robbery within a short time after its occurrence. Although defendant argues that this fact cuts against the existence of probable cause, in that robbers would be expected to be far away 30 minutes later, such a holding would require that searches for suspects take place only at the fringes of the area. Since there was no indication that the robbers were nonresidents of the area, it seems to us not illogical to expect that they might still be in the vicinity."

But the fact that a perpetrator fleeing the scene would be at a particular point at a particular time is especially significant re a person so observed who fits even a somewhat general description of the perpetrator. See, e.g., State v. Buti, 131 Idaho 793, 964 P.2d 660 (1998) (probable cause where car, passenger and item of clothing within car matched victim's description and in addition car seen 87 miles from burglary about an hour after it committed, so it "at a distance from the Deeg house consistent with the time between the break-in and the stop"); Commonwealth v. Claiborne, 423 Mass. 275, 667 N.E.2d 873 (1996) (defendant "was located at a place and time consistent with having left the scene of that night's reported robbery").

193. United States v. Harvey, 3 F.3d 1294 (9th Cir.1993) (black man in turquoise shirt sufficient where arrest two blocks from and 3–5 minutes after bank robbery); Charles v. Smith, 894 F.2d 718 (5th Cir. 1990) (police encountered woman on road who had just been raped, probable cause to arrest defendant, who officer had seen in area earlier and who then later found less than mile away hitchhiking, as victim had stated "the assailant was wearing dark pants and a dark sweater or shirt with white stripes, and the direction in which the rapist had gone on foot after the attack"); Matter of E.G., 482 A.2d 1243 (D.C.App.1984) (robbery had occurred only minutes before 3–4 blocks away); State v. McClain, 258 Kan. 176, 899 P.2d 993 (1995) (2 black males in small black pickup sufficient where same seen 10 minutes after crime headed away from crime scene and

occupants acted suspiciously); State v. Shea, 421 So.2d 200 (La.1982), judgment rev'd on unrelated grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985) (stressing persons matching descriptions mainly of clothing worn arrested within minutes and 3 blocks of robbery); State v. Willis, 269 N.W.2d 355 (Minn.1978) (description of black man in 20's, about 5'4", bushy hair, short mustache, wearing leather jacket and green pants sufficient where cab driver picked up such person 3 blocks from rape immediately after its occurrence); State v. Baldic, 131 N.H. 225, 551 A.2d 977 (1988) (police on scene of robbery within minutes, description of man with bushy hair and green jacket sufficed as to person walking rapidly and who did not respond in any way to police shining spotlight on him); State v. Guzman, 752 A.2d 1 (R.I.2000) (black man in red baseball cap and black hooded jacket sufficient where such person found within 20 minutes of crime 10–12 blocks away in direction of perpetrator's flight and that person manifested nervousness).

But a general description will certainly not suffice after the passage of considerable time. See, e.g., Grant v. City of Long Beach, 315 F.3d 1081 (9th Cir.2002) ("Grant's resemblance to general physical descriptions provided by earlier victims" of rape over past 18 months did not establish probable cause). And sometimes the description will be so general that there will be no probable cause even after a short time span. See, e.g., State v. Federici, 179 Conn. 46, 425 A.2d 916 (1979) (2 defendants described only as white males wearing coats who left in 1965 or 1966 gray Chevrolet; no probable cause to arrest such persons in brown car two and a half miles away shortly after robbery).

More time will be allowed if the police have control of the area. In Commonwealth v. Hill, 237 Pa.Super. 543, 353 A.2d 870 (1975), the court stated: "The one hour gap between the robbery and the apprehension of appellants was not fatal to this finding, because the area where appellants were arrested was cordoned off by the police so that no one could enter or leave it, and appellants matched the [general] description of the robbers given [arresting officer]

description) also increases, giving rise to the need for greater particularity in the description. Thus, when a rape victim was able to give so many particulars that a highly detailed composite sketch of the offender could be prepared, an officer who matched up a person he saw on the street with every detail in the sketch, which he then had before him, could arrest that person even though over a week had passed since the crime.[194] Similarly, where several rape-kidnapping victims were able to give a rather detailed description of their assailant and also to describe highly unique characteristics of the interior of his car, a person fitting that description and driving such a car could be arrested though a substantial amount of time had passed since those crimes.[195]

(3) Number of persons in the area. When a matchup of a description with a person seen by the police occurs in reasonable temporal proximity to the crime, it is also necessary to take account of the number of persons who are then about in the relevant area. The fewer the number of persons about, the less chance there is that a description of a given particularity would fit persons other than the individual at hand. In the

Allenbach by the other officers at the scene. This combination of factors was sufficient to establish probable cause."

194. People v. Barksdale, 24 Ill.App.3d 489, 321 N.E.2d 489 (1974). See also State v. Dixon, 153 Ariz. 151, 735 P.2d 761 (1987) (probable cause to arrest defendant for rape though hour and a half had passed; court stresses many identifying characteristics given, virtually all of which matched); Cole v. State, 701 So.2d 845 (Fla.1997) (probable cause notwithstanding passage of 3 days where .2 men matched "detailed physical description" given by rape victim of 2 perpetrators and their clothing, and they now located in area where car stolen to make their escape was found); State v. Purnell, 621 S.W.2d 277 (Mo.1981) (probable cause to arrest for earlier rape, as defendant matched composite drawing); Carr v. State, 96 Nev. 936, 620 P.2d 869 (1980) (probable cause to arrest defendant, stopped 3–4 blocks from burglaries in area and prior victim and witness had given detailed description, down to hairy mole on face, all of which fit defendant); State v. Williams, 314 N.C. 337, 333 S.E.2d 708 (1985) (probable cause for arrest based largely upon magistrate's comparison of defendant's photo with composite prepared with help of rape victim).

Compare Branam v. State, 277 Ark. 204, 640 S.W.2d 445 (1982) (where witnesses to robbery gave conflicting and general descriptions of person which caused police to look for a thin, darkskinned black male 5'5" to 5'7" with curly hair and loud mouth, no probable cause to arrest defendant, lightskinned and 5'3" over 10 days later).

195. People v. Jenkins, 31 Ill.App.3d 910, 335 N.E.2d 87 (1975). See also Burgeson v. State, 267 Ga. 102, 475 S.E.2d 580 (1996) (nationwide lookout for Ga. murder victim's car with description of persons she last seen with, Tenn. officer stopped that car and described persons fled; this probable cause); State v. Gathercole, 553 N.W.2d 569 (Iowa 1996) (probable cause G was robber where witness gave description of a man resembling one police knew as G, and license number of car parked nearby at time of robbery established it owned by G's wife); State v. Thompson, 3 Kan.App.2d 426, 596 P.2d 174 (1979) (arrest of driver lawful where police had identified car by license number as being used in robbery two days earlier); State v. Square, 433 So.2d 104 (La.1983) (grounds to arrest for bank robbery several hours earlier on basis of description of late model 2-door yellow Chrysler Cordoba with yellow vinyl top, license with a B in it and 75 first numbers and last numbers possibly 407; all fit except license was 754B907); State v. Olds, 603 S.W.2d 501 (Mo.1980) (probable cause 24 hours after kidnapping murder on basis of bulletin where "common to the bulletin and the arrest scene were: a six foot one inch black male, heavy set, with sideburns and a short beard, driving a dirty station wagon with a whip antenna, wire screening on the side windows, a curtain on the back, and a bed in the rear section"); State v. Valentine, 584 S.W.2d 92 (Mo.1979) (defendant stopped because of suspicious conduct suggesting he was planning to rob store, officer then noticed he matched composite photo from descriptions given by witnesses to recent robberies).

previously-discussed *Jackson* case,[196] the offense occurred at about 9:30 p.m. in a densely populated area, which accounts for the ease with which the police found several persons fitting the general description they had received. Though the court there correctly held there was not probable cause for the defendant's arrest,[197] rather general descriptions have been found sufficient when the time or place was such that few persons were on the streets.[198]

Where the offender has fled in a car, it is similarly proper to take account of the number of vehicles then on the streets. A rather general description of vehicle and occupant, otherwise insufficient to show probable cause, might well suffice if police patrolling the area in search of the offender had seen no other cars.[199] Thus, in *State v. York*,[200] where the car was simply described as a Ford with an unusual taillight configuration, the court found it most relevant that the police "from the time of the alert had seen no other moving vehicles at that hour of this October night in the sparsely populated village." In the case of a somewhat stronger basis of identification, it is significant that there was "little traffic," meaning "it was unlikely that a large number of vehicles matching the description would be present."[201]

**196.** See discussion in text at note 149 supra.

**197.** See also United States v. Shavers, 524 F.2d 1094 (8th Cir.1975) (holding a description of a bank robber as a black man about 5'8" tall insufficient under the circumstances to support at arrest a block from and 10 minutes following the crime, the court noted: "At 9 o'clock on any weekday morning, many individuals answering to the broadcast description could be found in a business district such as the one where Shavers was arrested"); United States v. Lewis, 486 A.2d 729 (D.C.App.1985) (general description of person who assaulted woman in park insufficient as to defendant, seen running in park shortly thereafter, as park large and several other people including joggers in the park then).

**198.** State v. Leslie, 147 Ariz. 38, 708 P.2d 719 (1985) (description of Mexican male in blue clothes sufficient in "area of sparse population" where it "highly unlikely that there was another similarly dressed fitting defendant's description in the vicinity"); People v. Brake, 191 Colo. 390, 553 P.2d 763 (1976); People v. Lippert, 89 Ill.2d 171, 59 Ill.Dec. 819, 432 N.E.2d 605 (1982) (though descriptions were "rather general," probable cause existed, as "the rural area surrounding the small community of Liverpool was sparsely populated (Deputy Dugan referred to it as 'desolate'), the Liverpool road was lightly traveled (defendant's car was the only one seen by Dugan on the road), and it was late at night"); Mears v. Commonwealth, 499 S.W.2d 75 (Ky.App.

1973); State v. Tate, 658 S.W.2d 940 (Mo. App.1983) (description of rapist as black male sufficed as to such person arrested close in time and place to crime, given that this occurred early Sunday morning in desolate industrial riverfront area where no pedestrians ordinarily would be found); State v. Schoffner, 248 Mont. 260, 811 P.2d 548 (1991) (description of black man in white coat and red pants sufficient at 5 a.m. where person fitting description was "the only person in the area"); State v. Baldic, 131 N.H. 225, 551 A.2d 977 (1988) (description of bushy hair and green jacket sufficed where only minutes had passed on an "otherwise deserted street" about 10 p.m. in a small town); State v. Young, 27 N.C.App. 308, 219 S.E.2d 261 (1975); Guzman v. State, 521 S.W.2d 267 (Tex.Crim.App.1975).

**199.** Hooper v. State, 516 S.W.2d 941 (Tex.Crim.App.1974). See also State v. Nolan, 93 N.M. 472, 601 P.2d 442 (App.1979) (robber described as white male with dark hair, full beard and mustache, about 5'10" and 180–200 lbs., wearing dark hat and bluejeans; grounds to arrest person fitting that description driving car 37 miles away shortly after robbery "at an early morning hour and on a road leading from the town where the robbery occurred"; court stresses this was the only car seen coming from that community).

**200.** 324 A.2d 758 (Me.1974).

**201.** State v. Buti, 131 Idaho 793, 964 P.2d 660 (1998).

(4) *Direction of flight.* In the course of holding that the police had probable cause for the arrest at issue, courts frequently take note of the fact that the police had been advised of the direction in which the offender was fleeing on foot[202] or by vehicle.[203] This is quite correct, for the likely direction of flight also bears upon the sufficiency of a given description.[204] When this direction is known, it then may be said that of the total relevant area (again, measured by a radius the length of possible flight since the time of the crime), a particular slice is more likely than the rest to contain the individual or vehicle sought. This means that when a person or car matching up is found in that particular segment of the area, a finding of probable cause is not jeopardized by the fact that the description might fit others not on the path of probable flight. This is especially apparent when the "slice" is very small, as where the perpetrator has been tracked to a specific location[205] or is later

**202.** United States v. Harvey, 3 F.3d 1294 (9th Cir.1993); Charles v. Smith, 894 F.2d 718 (5th Cir.1990); Prophet v. United States, 602 A.2d 1087 (D.C.App.1992); State v. Melear, 63 Haw. 488, 630 P.2d 619 (1981); People v. Miller, 81 Ill.App.3d 436, 334 N.E.2d 421 (1975); Commonwealth v. Jones, 457 Pa. 423, 322 A.2d 119 (1974); State v. Guzman, 752 A.2d 1 (R.I.2000); Guzman v. State, 521 S.W.2d 267 (Tex. Crim.App.1975).

Cf. State v. Dixon, 153 Ariz. 151, 735 P.2d 761 (1987) (though arrest for rape committed hour and a half earlier, detailed description and perpetrator had said he leaving the area immediately and defendant, fitting the description, found hitchhiking on interstate); State v. Kolinsky, 182 Conn. 533, 438 A.2d 762 (1980) (probable cause to search car on grounds it car which dropped off robber at crime scene, as it fit general description and "the robber ran in the exact direction where the car was parked").

**203.** State v. Buti, 131 Idaho 793, 964 P.2d 660 (998) (burglary victim reported car headed south on Highway 37, car matching description seen heading south on Highway 38 just past the junction with Highway 37); State v. Curry, 400 So.2d 614 (La.1981) (arrests lawful though made in another community than where cab driver robbed, as his cab located near place where arrests thereafter made); Commonwealth v. Riggins, 366 Mass. 81, 315 N.E.2d 525 (1974); Washington v. State, 94 Nev. 181, 576 P.2d 1126 (1978); State v. Wellman, 128 N.H. 340, 513 A.2d 944 (1986); Commonwealth v. Harris, 297 Pa.Super. 305, 443 A.2d 851 (1982) (it known cab driver had taken 3 men from robbery scene to locality where defendant and 2 others arrested); State v. Travis, 568 A.2d 316 (R.I.1990); Hooper v. State, 516 S.W.2d 941 (Tex.Crim.App.1974).

If the person described and/or the *modus operandi* of the offense fit other recent crimes in the same area, it is likewise proper to take into account the known or suspected direction of flight on any of those previous occasions. See, e.g., Commonwealth v. Claiborne, 423 Mass. 275, 667 N.E.2d 873 (1996) ("the direction he was heading was consistent with the route taken by the suspect in one of the previous robberies").

**204.** But direction of flight without some description is unlikely to suffice. See, e.g., People v. Schafer, 946 P.2d 938 (Colo. 1997) (no probable cause where "only link between the convenience store robbery and the tent was a statement by the victim that the robber had headed east on foot, combined with a statement by her friend that a 'transient' was camping behind a local restaurant east of the convenience store" by about half a mile).

**205.** United States v. Sawyer, 144 F.3d 191 (1st Cir.1998) (probable cause for search warrant where witness reported seeing defendant's 16-year-old son in area about time of burglary and distinctive footprints found at burglary scene were tracked to within 10 yards of defendant's residence); United States v. Morgan, 799 F.2d 467 (9th Cir.1986) (bank robber followed by witnesses to hobo camp area, and cab driver later reported taking passenger matching description from that area to certain motel; thus probable cause to arrest person fitting description found at motel); State v. Naujoks, 637 N.W.2d 101 (Iowa 2001) (where victim of burglary saw perpetrators repeatedly enter neighboring apartment building with loot, and police saw goods of general kind stolen within one apartment and persons answering door were untruthful, probable cause); Thomas v. State, 645

seen by the victim or witness at another location.[205]

The direction-of-flight ingredient takes on special importance when it can be continuously pinpointed by an electronic tracking device, as in *United States v. Levine*.[207] Tellers gave the robber two packets of "bait money," each planted with an electronic transmitter, part of an electronic tracking system, a joint effort of local police and financial institutions. The tracking system was alerted when the bait money was taken from the teller's drawer, at which 30 police vehicles equipped with a tracking unit were dispatched to various locations in an effort to pick up the signal. Each tracking unit which picks up a signal indicates what direction the transmitter is and also indicates when the patrol car is getting closer to it. One officer's car picked up a signal that became stronger as he headed north and which moved to the right when two vehicles turned right off the freeway. One of the two vehicles turned again, but the direction indicator did not change, but when the other vehicle turned into a parking lot the tracking unit showed the transmitter had made such a shift in direction and that it was very close. The court understandably concluded that the "electronic tracking device in use during the particular robbery was at least as reliable as a dog's nose," and that consequently "the electronic tracking device constitutes a sufficient basis for probable cause" to arrest the driver and search the car.[208]

(5) Actions by or condition of person arrested. Conduct by the individual which suggests he is attempting to flee from a crime may also be taken into account with the available description. Illustrative is *Commonwealth v. Jones*,[209] where officers searching for the perpetrators of a midafternoon robbery-murder had nothing more than a description of young black men in dark clothing. In upholding defendant's arrest several blocks away in the direction of flight, the court noted that he "fit

So.2d 1345 (Miss.1994) (bloodhounds tracked scent from rape scene to defendant's house; probable cause to arrest defendant when he seen wearing shoes matching print at crime scene); State v. Dow, 256 Mont. 126, 844 P.2d 780 (1992) (immediately after Christmas rape in alley police followed distinct footprints in snow to specific motel room several blocks away, which clerk said was rented by a male, and person who answered door fit victim's description; probable cause to arrest).

206. Hill v. United States, 627 A.2d 975 (D.C.App.1993) (officers unable to find person fitting description, but about 10 minutes later witness to crime—actually an undercover officer—spotted defendant on a particular corner and so advised police; the two broadcasts collectively established probable cause).

207. 80 F.3d 129 (5th Cir.1996).

208. There was testimony that the system had been in effect for 8 years, that its

success rate in locating stolen money was between 95–97%, that it only failed when the robber located or accidentally discarded the transmitter, that the system has a built-in self-test to inform the officers it is operating correctly, and that the arresting officer had experience using the system both in practice runs and in tracking other robbery suspects.

209. 457 Pa. 423, 322 A.2d 119 (1974). See also United States v. Fouche, 776 F.2d 1398 (9th Cir.1985) (bank robber had fled on foot; defendant, though now driving nearby, was very nervous and sweating profusely); State v. Wilson, 178 Conn. 427, 423 A.2d 72 (1979) (officer told that 2 black men had attempted robbery, that one shorter than other and that they fled on foot into woods had probable cause to arrest two black men walking 2 miles away one hour later where one man was taller than the other and they had burrs and twigs on lower trousers and were sweating and breathing heavily on cool night).

the description given, was walking extremely quickly, breathing heavily, perspiring profusely and furtively looking over his shoulder." Similarly, other courts have stressed that the arrestee apparently was trying to conceal himself or objects from the police[210] or took flight when approached by police,[211] or that when the arrestee was first seen he was running in a direction away from where the crime had occurred,[212] or was hurriedly driving away from that area.[213] Also relevant is the fact the arrestee reacted in an unusual way to police presence or police investigative activity short of a detention.[214] Especially when the arrest occurs some time after the offense, it is relevant that the suspect was engaged in suspicious activity suggesting preparation to commit another such offense.[215]

Of particular significance in those cases in which the available description is alone sufficient for a stopping for investigation, is the possibility that it may develop into probable cause for arrest as a consequence of what the police see or hear during the detention. Thus, it may be useful to the probable cause determination that the suspect has blood[216] or dye[217] on his clothing, is carrying goods of the type believed to

**210.** United States v. Jones, 84 F.3d 1206 (9th Cir.1996) (bank robber had fled in cab, and when officer pulled up along side cab of possible number given he "saw a passenger crouching down in the back seat," conduct "consistent with an attempt to avoid detection," that contributed to the probable cause determination); United States v. Snow, 82 F.3d 935 (10th Cir.1996) (probable cause where defendant, who fit description of man who stole shotgun from store, was observed by police to "take an object from a black satchel, hide it in the waistband of his pants and begin to run toward the door to a children's home").

**211.** People v. Williams, 147 Ill.2d 173, 167 Ill.Dec. 853, 588 N.E.2d 983 (1991) (contributing to probable cause was "observable actions of the defendant, i.e., his 'brisk' emergence from the crowd, his quickly walking away from approaching police * * * and looking over his shoulder"); State v. Smith, 328 N.C. 99, 400 S.E.2d 712 (1991) ("a black male wearing blue jeans and a blue shirt" sufficient notwithstanding distance of 2 miles and passage of 2 hours considering other facts, including flight upon seeing uniformed office in patrol car).

**212.** McDonald v. Arkansas, 501 F.2d 385 (8th Cir.1974); Matter of E.G., 482 A.2d 1243 (D.C.App.1984) ("appellant had been running in the general direction away from the scene"); State v. Shea, 421 So.2d 200 (La.1982), judgment rev'd on unrelated grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985) (defendants "were heading away from the scene of the crime at a brisk pace"); State v. Pettis, 522 S.W.2d 12 (Mo.App.1975).

**213.** United States v. Maguire, 918 F.2d 254 (1st Cir.1990) (defendant made a brief attempt to flee in car when officer "revealed his identity by holding up his police radio"); United States v. Fouche, 776 F.2d 1398 (9th Cir 1985) (defendant quickly exited driveway near robbed bank); State v. Pierce, 126 N.H. 84, 489 A.2d 109 (1985) (described car approached from direction of robbery and sped through stop sign).

**214.** State v. McClain, 258 Kan. 176, 899 P.2d 993 (1995) ("the passenger intermittently disappeared from the trooper's view, and the driver continuously checked the sideview mirrors"); State v. Baldic, 131 N.H. 225, 551 A.2d 977 (1988) ("while the rain might have induced his rapid gait, it did nothing to explain away his highly suspicious behavior in taking no ostensible notice of a bright spotlight suddenly shining upon him").

**215.** United States v. Williams, 10 F.3d 1070 (4th Cir.1993) (where description of Jan. 7 bank robbers as four black males in white jeep-like vehicle with certain license number, probable cause to arrest such persons in such vehicle on Jan. 16, though license plate number wrong as to one digit, as that vehicle drove slowly by two banks).

**216.** United States v. Hurt, 476 F.2d 1164 (D.C.Cir.1973). See also State v. Travis, 568 A.2d 316 (R.I.1990) (probable cause to arrest person by car generally described as used to flee scene of attempted murder, as "fact that the suspect was bleeding would support an inference that he had recently been involved in a violent encounter").

Case 1:08-cv-01775   Document 16-7   Filed 07/01/2008   Page 36 of 111

have been involved in the crime,[218] is very nervous,[219] or has given an implausible explanation for his presence[220] or some other dubious statement.[221] Also, if the officer attempts a lawful stop but the suspect "refused to stop when initially ordered to do so," this may also be taken into account.[222]

(6) Knowledge that the person or vehicle has been involved in other similar criminality on a prior occasion. As discussed earlier,[223] a person's past criminal record and other similar facts may be taken into account in making a probable cause determination. This being so it seems clear that a description which might otherwise be questioned may past muster if it is found to fit a person or vehicle the police know has been involved in past criminality similar to that presently under investigation. Illustrative is *United States v. Diggs*,[224] where it seems that both the initial stop of the car and the later arrest of the occupants for bank robbery were aided by the fact that the distinctive car was recognized as having been used to

**217.** United States v. Hebert, 131 F.3d 514 (5th Cir 1997) (defendant and interior of his car marked with red paint-like substance after bank robbery and officer knew robber had been exposed to red dye packet).

**218.** Luckett v. State, 259 Ind. 174, 284 N.E.2d 738 (1972); State v. Schoffner, 248 Mont. 260, 811 P.2d 548 (1991) (on patdown of laundromat burglary suspect, large quantity of change discovered); Commonwealth v. Tookes, 236 Pa.Super. 386, 344 A.2d 576 (1975).

**219.** State v. Gomes, 764 A.2d 125 (R.I. 2001) (relevant that defendant "grew very nervous and began to stutter and mumble in response to his questions").

**220.** United States v. Young, 512 F.2d 321 (4th Cir.1975) (man robbed was at National Airport by two black men, grounds to arrest two such men leaving airport in car as hitchhikers, given fact their "story about being at the airport without means of transportation and seeking work at 11:00 p.m. at night sounded unlikely"); Commonwealth v. Riggins, 366 Mass. 81, 315 N.E.2d 525 (1974) (two men in car stopped because vehicle fit general description of car in which two bank robbers were making their escape; grounds to arrest where neither had any identification, passenger said he did not know where they had been, and driver said they were coming from Boston, unlikely given direction car then headed).

**221.** Muniz v. State, 672 S.W.2d 804 (Tex.Crim.App.1984) (2 defendants matching description of burglars stopped, when asked for identification both claimed to have lost their billfolds). See also People v. Sims, 192 Ill.2d 592, 249 Ill.Dec. 610, 736 N.E.2d 1048 (2000) (defendant, seen in vicinity of murder, located a few blocks away

hours later, gave false name to police); State v. Smith, 328 N.C. 99, 400 S.E.2d 712 (1991) ("a black male wearing blue jeans and a blue shirt" sufficient notwithstanding distance of 2 miles from and passage of 2 hours since shooting, as when defendant asked his name he said "I haven't shot anybody").

**222.** Matter of E.G., 482 A.2d 1243 (D.C.App.1984). See also United States v. Chapman, 954 F.2d 1352 (7th Cir.1992) (probable cause where reasonable suspicion because car fit general description of bank robbery getaway car, and driver then refused to stop when officer signalled him to pull over); United States v. Nash, 946 F.2d 679 (9th Cir.1991) (stressing that when police "approached the cab in which Nash was sitting, he exited the cab and attempted to leave the scene").

**223.** See § 3.2(d).

**224.** 522 F.2d 1310 (D.C.Cir.1975). See also State v. Jones, 208 Neb. 641, 305 N.W.2d 355 (1981) (probable cause to arrest defendant for sexual assault on child, notwithstanding child's inability to identify defendant from picture of him, as defendant had similar build, clothing and name as assailant and defendant had been involved in sexual assaults in the past); Derr v. Commonwealth, 242 Va. 413, 410 S.E.2d 662 (1991) (general description by burglary/rape victim, plus fact defendant's car seen parked nearby just before offense, defendant "had been charged with several offenses since 1976 including abduction, rape and burglary," and "method of operation in those offenses was similar to that employed in these offenses" established probable cause).

transport the fruits of an earlier robbery and one of the occupants was recognized as a person involved in that prior robbery.

**Library References**

C.J.S. Arrest §§ 27–36; Searches and Seizures §§ 10–11, 48–53, 56–57, 61, 102, 159.

West's Key No. Digests, Arrest ⇐63.4(7)–63.4(16); Searches and Seizures ⇐38, 39, 40, 115.1–119.

## § 3.5  Information From or Held by Other Police

### *Analysis*

Subsec.
(a) The police officer as a reliable source.
(b) Directive or request without underlying facts.
(c) No directive or request, other police have probable cause.
(d) Police records and the problem of updating.
(e) Police investigations and conclusory assertions.

———

The nature of modern law enforcement is such that not infrequently the particular officer who makes an arrest or search is not the only policeman involved in some way in the investigation of the offense concerning which the arrest or search was made. Information about certain criminal conduct or certain offenders is often communicated broadly within a particular police department by way of a daily bulletin or similar written communication or by broadcast over the police radio. Teletype and telephone are used to communicate such information to other police agencies at the local, state or national level. Directives or requests for action, frequently unaccompanied by a complete elaboration of the underlying circumstances, are also communicated within and between law enforcement agencies on a regular basis.

The information which is communicated or which is the basis for a directive or request for action usually has as its source an informant[1] or a victim or witness[2] or the direct observations of an officer.[3] The question of when information directly obtained from these various sources amounts to probable cause is discussed in other sections in this Chapter. The concern here, by contrast, is with those special problems which arise by virtue of the fact that certain information or a directive or request was or could have been communicated through police channels.

(a) **The police officer as a reliable source.** As we have already seen, an "informer," in the narrow sense of that word, is by no means presumed to be a credible person. This means that it is generally necessary, as a prerequisite to establishing probable cause on the basis of

§ 3.5

1. See § 3.3.

2. See § 3.4.

3. See § 3.6.

No. 99-0152

In The

# Appellate Court Of Illinois

First Judicial District

PEOPLE OF THE STATE OF ILLINOIS,

*Plaintiff-Appellee,*

vs.

TONY HILLARD,

*Defendant-Appellant,*

Appeal from the Circuit Court of Cook County, Illinois
Criminal Division
The Honorable Michael Toomin, *Judge Presiding*

## BRIEF AND ARGUMENT FOR APPELLANT

Rita A. Fry,
Public Defender of Cook County,
69 W. Washington Street, 15th Flr,
Chicago, IL 60602,
(312) 603-0600

*Counsel for Appellant.*

R.H.R. SILVERTRUST
ASSISTANT PUBLIC DEFENDER

*Of Counsel.*

ORAL ARGUMENT REQUESTED

APPENDIX D

POINTS AND AUTHORITIES

I.

THE POLICE LACKED PROBABLE CAUSE TO MAKE A WARRANTLESS ARREST OF DEFENDANT AND AS SUCH, DEFENDANT'S MOTION TO QUASH HIS ARREST AND ALL EVIDENCE WHICH STEMMED THEREFROM SHOULD HAVE BEEN GRANTED.

*Illinois v. Gates* (1983) 46 U.S. 213,
76 L.Ed 2d 527 ................................................................12

*People v. Dilworth* (1996) 169 Ill.2d 195,
661 N.E.2d 310 ................................................................12

*Dunaway v. New York* (1979) 442 U.S. 200,
60 L.Ed.2d 824 ................................................................12

*People v. Peak* (1963) 29 Ill. 2d 343,
194 N.E.2d 322 ................................................................13

*People v. Creach* (1979) 79 Ill. 2d 96,
402 N.E.2d 228 ................................................................13

*People v. Exline* (1983) 98 Ill. 2d 150,
456 N.E. 2d 112 ................................................................15

*People v. Johnson* (1983) 94 Ill. 2d 148,
445 N.E. 2d 777 ................................................................15

*People v. Wilson* (1994) 260 Ill. App.3d 364,
632 N.E.2d 114 ................................................................16

II.

IT WAS REVERSIBLE ERROR TO ALLOW DEFENANDANT'S JURY HEAR THE CROSS EXAMINATION OF CO-DEFENDANT'S COUNSEL WHERE THIS WAS ANTAGONISTIC TO DEFENDANT'S DEFENSE.

*People v. Bean* (1985) 109 Ill.2d 80
485 N.E.2d 349 ................................................................20

*People v. Murphy & Bell* (1981) 93 Ill.App.3d,

417 N.E.2d 759 ................................................................20

In *People v. Rodriguez* (1997) 289 Ill.App.3d 223,
            680 N.E. 2d 757 ................................................................20

III.

DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHERE THE TRIAL JUDGE ACTED ON PRIVATE KNOWLEDGE AND ABANDONED HIS ROLE OF IMPARTIAL ARBITER AND ASSUMED THE MANTLE OF A PROSECUTOR.

*People v. Moriarty* (1966) 33 Ill.2d 606,
            213 N.E.2d 516 ................................................................24

*People v Franceschini* (1960) 20 Ill.2d 126,
            169 N.E.2d 244. ................................................................24

*People v. Nelson* (1974) 58 Ill.2d 61,
            317 N.E.2d 71 ................................................................25

## NATURE OF THE CASE

Tony Hillard charged by Indictment No.97 CR 30453 with the offenses of attempt murder, armed robbery, armed violence, aggravated kidnapping, aggravated battery, and unlawful use of weapon by a felon. After a jury before the Honorable Michael Toomint, he was convicted and sentenced to fifty years imprisonment in the Illinois Department of Corrections. No question is raised on the Indictment.

ISSUES RAISED FOR APPEAL

1. Did the police have probable cause to make a warrantless arrest of defendant in his apartment based solely on an anonymous telephone tip that the defendant may have stolen the gun which was found at the scene of the offense committed some weeks before?

2. Was it proper from defendant's jury to hear cross examination by his co-defendant's counsel which destroyed defendant's alibi and placed him at the scene and alleged he was a perpetrator?

3. Was it proper for the trial judge to take upon himself, based on his private knowledge, the duty of informing the jury by means of cross-examination of police offices that defendant's theory as to which assailants committed the crime was false?

## JURISDICTIONAL STATEMENT

Jurisdiction is had pursuant to Illinois Supreme Court Rule 603 and Article VI, Section 6 of the Illinois Constitution of 1970. Judgment was entered on July 15, 1998 (CR2), Notice of Appeal was timely filed on December 31, 1998. [CR.4].

## STATEMENT OF FACTS

At the hearing on defendant's motion to suppress his arrest, Officer Bradley testified that on May 12, 1997, he was assigned to investigate the robbery of Yinka Jinadu which had occurred two days before. Bradley went to interview Jinadu at the hospital. According to Bradley, Jinadu told him that on the morning of May 10, 1997, he had received a call from his estranged wife, Doris Jinadu, who was an employee at his trucking firm. She asked him to come and give her a ride to work because she was having trouble with her vehicle. (B.5) Jinadu then went to pick up his wife and went up to her apartment located at 5851 N. Winthrop in Chicago. (B.3,6)

Upon entering his wife's apartment, Jinadu was hit over the head and knocked unconscious for about two hours. (B.6) When he came to, he found that he was in his underwear, handcuffed and bound with electrical tape. He saw his wife and four black men. Jinadu told Officer Bradley that the male blacks pointed guns at him and asked him for money, the keys to his business, and the keys to his vehicle. (B.7). One of the male blacks who pointed a gun at him was characterized as light-skinned by Jinadu. (B.49-50) After giving the men what they wanted, Jinadu was taken to a washroom where he was beaten with a tire iron and baseball bat. Jinadu described the man who hit him with the tire iron as being dark-skinned and his wife's

boyfriend. (B.51) Two male blacks threatened him, threw him in the shower, soaked him and then covered him with towels leaving him by himself. (B.8) After hearing his wife and the others leave the apartment, he worked his way loose and ran out of the apartment building where he saw two of his assailants across the street. (B.9) He screamed for help and eventually the police arrived.

The police took him back into the apartment where they recovered two guns a driver's license with a photograph of one of the assailants. (B.10-11) From the license, the police had learned the name of one of the assailants as well as his appearance. According to Bradley, Jinadu was able to give the police a description of his four assailants. They were all male blacks in their 20's. He described one as being 160 lbs. with black hair and brown eyes. A second was 5 feet 11 inches and weighed 200 lbs. with black hair and brown eyes. The third assailant was 5 feet 11 inches and weighed 165 lbs. with black hair and brown eyes. The fourth assailant was 5 feet 5 inches and weighed 145 lbs. (B.13)

Bradley learned that three of the five offenders had been named (B.33) These were: Jinadu's wife, Dolores, Jermaine Crane and Erven Walls, who were listed as Offender No.1, Offender No.2 and Offender No.3 respectively. (B.36-

7

38) Jinadu was able to identify them from pictures of drivers licenses and other photo identification he had been show of these individuals. (B.40-42)

The unnamed offenders, Nos. 4 and 5 were described as follows: No.4 was 5 feet 10 inches and 200 lbs. and No.5 was described as 5 feet 5 inches and 145 lbs. (B.38)

Bradley determined that a .38 caliber handgun had been recovered from the apartment and learned from a police report that it was registered to one Loretha Hillard. (B.15) On or about May 19, 1997, Bradley claimed he had a telephone conversation with a person who purported to be Loretha Hillard. (B.16-17) Bradley admitted he had never met and did not the personally know the voice of Loretha Hillard. (B.57)

He stated he was told by this person that she was an ex-security guard for the CHA at 1240 N. Laramie, the building in which she lived. He then asked her if she knew where her gun was and she responded that it had been taken, "and that if anyone took the gun, it would be her brother, Tony Hillard." (B.18-19) Although Bradley initially claimed that when he asked her if she had reported the gun stolen she had told him yes, later, he admitted he did not know if he ever asked her or if she ever told him she had reported her

8

gun stolen. (B.60) When shown the date of the stolen gun report (May 19, 1997), he then changed his testimony and said he must of have spoken to the person claiming to be Loretha Hillard after May 19th. (B.63)

Bradley also claimed the person purporting to be Loretha Hillard told him that her brother Tony lived with his girlfriend at 714 Division in Apartment 1003. However she gave Bradley no description of her brother whatsoever. (B.20) Two weeks later, on June 3, 1997, Bradley went to this apartment and knocked on the door. It was answered by a female black. (Benicia Eberhardt). Bradley saw a male black standing a few feet behind her. (Tony Hillard) (A.11, B.21-22) According to Bradley this male black matched the description given by Jinadu of one of the assailants. (B.22) Bradley asked the man his name. The man gave him some name but it was not 'Tony Hillard.' He then asked the man if he had stolen his sister's gun to which the man replied that he had not. (B.23) Bradley then entered the apartment and without further ado placed Mr. Hillard under arrest. (A.12, B.25, B.80)

Bradley first said he arrested Mr. Hillard because he matched the description of Jermaine Crane, but then changed this and said Mr. Hillard matched the description of all of the offenders. (B.72) Bradley admitted that he had run a check on Tony Hillard before he went to arrest him and knew that he was not

9

Jermaine Crane or Erven Walls. They were known as Offender No.2 and No.3 (B.76) Finally Bradley admitted that Offender No.4 was described as weighing 200 lbs. and that Mr. Hillard weighed only 165 lbs. (B.76-78) He also admitted that Jinadu had described Offender No.5 as 5 feet 5 inches in height and 140 lbs. But Bradley clearly knew that Mr. Hillard was 5 feet 10 inches and weighed either 165 or 170. (CR.122)

Later that evening (June 3, 1997), Mr. Hillard was placed in a line-up at the police station and was identified by Mr. Jinadu as one of the assailants. (B.26)

Prior to the state presenting its main witness, Jinadu, the trial judge was put on notice that defendant's defense would be that he had not been at the scene of the crime, that four of the five offenders, including co-defendant Erven Walls, had been named, all five had been described and that defendant had not been named by the victim and did not match the description of the one remaining unnamed offender. Counsel for Walls told the judge that he would present evidence that defendant was there and had attacked the victim. (D.22-24) The judge himself acknowledged that he could easily remove defendant's jury but said it was not a question of ease or judicial economy but of necessity and that he did not see the necessity. (D.24) The trial judge

said he did not believe that co-defendant Walls' lawyer would "point the finger at the defendant." He did not think Walls needed to do it, but said he would remove the jury if this occurred. (D.25)

On cross-examination of Jinadu, defense counsel for Walls elicited from him that Mr. Hillard was in fact at the scene of the crime and had participated. (D.204-5)

Also prior to trial, defense counsel for Mr. Hillard made a motion in limine to prevent any of the state's witnesses from testifying that Erven Walls was the same person as Jermaine Crane, Dormane Walls or Zachary Taylor. Granting this motion, the judge stated that this was a conclusion that the police officers should not be allowed to make. (D.52-53)

During the trial, just before the state planned to put on the police officers in the case, defense counsel learned from Erven Walls' attorney that he was going to try and establish through cross examination of the officers that Erven Walls, Dormaine Craine and Jermane Crane were the same person. (E.3) She therefore asked that Mr. Hillard's jury be removed during this cross-examination. The judge refused stating that he knew for a fact that Erven Walls and Dormaine Craine were the same person because he had two

11

other cases in front of him which proved this. (E.4) He said he was not going to try and fool the jury.

As it turned out, counsel for Mr. Walls did not bring out through cross-examination of Officer Schmidt that Walls and Craine were the same person. However the judge, through his questions of this witness did. At the end of cross examination of Officer Schmidt, the judge suggested to him that the identification papers belonging to Walls, the Craines and Taylor could have belonged to only one or two people and not four. (E.129-130)

Then, at the end of cross examination of Officer Bradley the judge did more that suggest that Walls and Jermaine Craine were one and the same person. He asked the question point blank. After getting an affirmative answer from Bradley. The judge then asked Bradley if all of the identification papers under different names were really just that of one person, Erven Walls, and again elicited a positive answer. (E.213-214)

12

ARGUMENT

I.

THE POLICE LACKED PROBABLE CAUSE TO MAKE A WARRANTLESS ARREST OF DEFENDANT IN HIS APARTMENT AND AS SUCH, DEFENDANT'S MOTION TO QUASH HIS ARREST AND ALL EVIDENCE WHICH STEMMED THEREFROM SHOULD HAVE BEEN GRANTED.

In determining whether the police had probable cause to arrest an individual, Courts look to the totality of the circumstances. *Illinois v. Gates* (1983) 46 U.S. 213, 76 L.Ed 2d 527. Common sense considerations, rather than technical rules guide the consideration of whether probable cause to arrest existed.

Whether probable cause exists is normally a mixed question of law or fact and as such the ruling of a trial court will not ordinarily be overturned unless it is manifestly erroneous. See: *People v. Dilworth* (1996) 169 Ill.2d 195, 661 N.E.2d 310. This case, as the record on appeal clearly indicates, is unquestionably an example of such error.

An arrest requires that the arresting officers have probable cause. *Dunaway v. New York* (1979) 442 U.S. 200, 60 L.Ed. 824. Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge, and of which he had reasonable and *trustworthy information* are

13

sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty. *People v. Peak* (1963) 29 Ill. 2d 343, 194 N.E.2d 322. Probable cause must be particularized with respect to the person arrested. *People v. Creach* (1979) 79 Ill. 2d 96, 402 N.E.2d 228.

Where the basis of an arrest is informer information, the totality of the circumstances must be considered in determining whether or not the arresting officer had probable cause. *Illinois v. Gates* (1983) 462 U.S. 213, 76 L.Ed.2d 527. To be considered is the veracity and basis of knowledge of the persons supplying the hearsay information.

So, what did Officer Bradley know when he arrested Mr. Hillard in his own home without a warrant on June 3, 1997? First, he not even know the man he was arresting was Tony Hillard. The man he saw standing behind the woman who answered the door denied that he was Tony Hillard. Bradley did not learn until much later that the man was Hillard. (B.67-69) But Bradley placed him under arrest immediately anyway. He did it because he said Mr. Hillard matched the descriptions of four of the five offenders. This is correct if you count that Mr. Hillard was male and black with black hair and brown eyes because this is the only way that he matches the description of "all of the

14

offenders." Jinadu had described men who were as short as 5 feet 5 inches and as tall as 5 feet 11 inches, men who weighed as little as 140 lbs. and as much as 200 lbs. Clearly it was impossible for Mr. Hillard to have matched the description of all of the offenders and just as clearly Officer Bradley had no idea what Mr. Hillard looked like.

Next, he did not know that Tony Hillard was involved in the crime. Jinadu had never given Bradley Hillard's name. The officer knew that a gun registered to one Loretha Hillard had been recovered at the scene. He spoke to a person on the phone who claimed she was Loretha Hillard but Officer Bradley had no way of knowing because he had never met Loretha Hillard and had never spoken with her. This person told him that her brother Tony Hillard was the only person she could think of who could possibly have taken her gun. (B.18-19) This person also told Bradley where 'her brother Tony' lived. So Officer Bradley went to this address. In reality, at the time, he did not know if he really had spoken with Loretha Hillard. He did not know if this Loretha Hillard was in fact the sister of Tony Hillard. For all he knew, this voice could have been anyone. It could have been Tony Hillard's angry estranged or ex-wife who wanted to get even with him for cheating on her. It could have been an ex-girl friend. It could also have been Tony's sister who for whatever reason wanted to get even with him. All that Officer Bradley had

15

at the time he stood looking at a man in the doorway---a man who denied he was Tony Hillard---was a series of possibilities.

So, Officer Bradley did not know, first and most importantly, if Tony Hillard was involved in the crime since he was never named. Nor did he know if Tony Hillard had in fact stolen the gun which was found at the scene. Even if it had been stolen by him from his sister, this did not mean that he kept it and went to Jinadu's apartment. There was no evidence whatsoever that Mr. Hillard's prints were found any gun recovered from the scene of the crime. And finally, Bradley did not know at whom he was looking when he asked a strange man, lawfully in his apartment, if he were Tony Hillard and had he taken his sister's gun. In short, Officer Bradley had no reason to believe the man he was looking at was Tony Hillard, but he arrested him anyway. This was lazy and sloppy police work which Officer Bradley tried to back up by saying Mr. Hillard matched the description of all of the offenders. And so he did----if being black and having brown eyes and black hair is a good enough description to give a policeman probable cause. No, the fact is, Officer Bradley had no reason to arrest Mr. Hillard.

In the final analysis, all Bradley had was some person whom he did not know saying that her brother had taken her gun and this is where you can find

16

him. This person, this voice, cannot and should not even be dignified with the title 'informant.' In *People v. Exline* (1983) 98 Ill. 2d 150, 456 N.E. 2d 112, the Illinois Supreme Court in finding probable cause and in reversing the lower courts' ruling of no probable cause found it crucial that the informer had established his credibility with the police. Furthermore, the informer had made actual drug buys from the defendant. Additionally, the arresting officer had personal knowledge of the facts in the informant's allegations.

In *People v. Johnson* (1983) 94 Ill. 2d 148, 445 N.E. 2d 777, an informer told the police that two men had committed a certain murder. The informer furnished a description of the suspects, including the fact that one of them was known as "Stan". The informant gave the police the suspects' address. The police went to the address. As they entered the premises, two men fled climbing out a window. They were immediately arrested by officers standing outside. One of the men matched the informer's description. The Court ruled that the police did not have probable cause to arrest defendant because the informant's information was merely a "tip" and did not "contain any facts from which it could be concluded that defendant was responsible for the murder." The state argued that there was sufficient corroboration of the tip so as to provide probable cause. The Court rejected this argument noting that for such an arrest to be valid any corroboration must not only support the

17

informant's tip but must also support the conclusion that the arrestee and no one else committed the crime. Here, there is no corroboration, there is no description, there is no telling the police that defendant was involved in the crime by anyone, and there were no prints of the suspect found on the gun. Obviously, the information given to Officer Bradley by the voice to whom he spoke did not amount to probable cause to arrest.

In *People v. Wilson* (1994) 260 Ill. App.3d 364, 632 N.E.2d 114, This Court held that a tip on the identity of the assailant from the victim's daughter, whom the police knew, did not provide the officers with probable cause to arrest absent any effort by the officers to determine the daughter's veracity or the factual basis for the knowledge. In the case at bar, Officer Bradley had no idea with whom he was speaking. He did not verify the fact that he was actually speaking to or had spoken with Loretha Hillard and, of course, there was no effort made to determine if the information he received had any basis in fact or the veracity of the person with whom he spoke.

Therefore, for all of these reasons, defendant's motion to quash his arrest and all the evidence which stemmed therefrom should have been granted.

18

II.

## IT WAS REVERSIBLE ERROR TO ALLOW DEFENANDANT'S JURY HEAR THE CROSS EXAMINATION OF CO-DEFENDANT'S COUNSEL WHERE THIS WAS ANTAGONISTIC TO DEFENDANT'S DEFENSE.

It is important to note that at the outset of this case, the trial judge recognized that the co-defendants would be presenting antagonistic defenses. This conclusion cannot be gainsaid in that he allowed separate juries to be used for each defendant. As the question before This Court is one of law alone, the standard of review is *de novo*.

The trial judge was put on notice well before the trial began that defendant's defense would be that he had not been at the scene of the crime, that four of the five offenders, including co-defendant Erven Walls, had been named, that all five had been described and that defendant had not been named by the victim and did not match the description of the one remaining unnamed offender. Counsel for Walls told the judge that he would present evidence that defendant was there and had attacked the victim. (D.22-24) The judge himself acknowledged that he could easily remove defendant's jury but said it was not a question of ease or judicial economy but of necessity and that he did not see the necessity. (D.24) The trial judge said he did not believe that co-defendant Walls' lawyer would "point the finger at the defendant." He did not think Walls needed to do it, but said he would remove the jury if this

19

occurred. (D.25) Just as warned, defense counsel for Walls elicited from Jinadu, the victim, that Mr. Hillard was in fact at the scene of the crime and had participated. (D.204-5)

It has long been the case that where co-defendants plan to present defenses which implicate their co-defendant or defenses which are so antagonistic to each other that they cannot receive a fair trial, they must be granted a severance. *People v. Bean* (1985) 109 Ill.2d 80, 485 N.E. 349.

Mr. Hillard's defense was that he simply was not there. This was his alibi. By placing Mr. Hillard there and discussing what he did to the victim, counsel for co-defendant was attacking defendant's alibi and his defense. Where defendants are initially tried together, This Court has recognized such action ought to necessitate a severance and at the very least that defendant's jury should not have been allowed to hear the testimony of a co-defendant which was antagonistic to defendant's alibi, *People v. Murphy & Bell* (1981) 93 Ill.App.3d, 417 N.E.2d 759.

In *People v. Rodriguez* (1997) 289 Ill.App.3d 223, 680 N.E. 2d 757, This Court noted that co-defendants do not directly have to implicate each other to create prejudicial error. It is enough for a defendant's jury to hear cross-

examination from co-defendant's counsel which bolsters the state's case. That is what happened here. Counsel for co-defendant accepted Jinadu's assertion that defendant was present when the offense was committed and questioned him further about defendant's part in it.

This error was especially reprehensible under circumstances where the judge recognized the error, stated on the record that he could easily remove defendant's jury during this cross examination, said it wasn't necessary because he did not foresee co-defendant's counsel proceeding in this way, but the judge promised if it became necessary he would act. His failure to protect defendant from this prejudice was a blow to the heart of Mr. Hillard's defense. It could not have harmed defendant any more fundamentally than it did. As such it constituted reversible error.

NO. 1-04-3365

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Respondent-Appellee,

vs.

TONY HILLARD,

Petitioner-Appellant.

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable Michael P. Toomin, Judge Presiding.

BRIEF AND ARGUMENT FOR
RESPONDENT-APPELLEE

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Respondent-Appellee

JAMES E. FITZGERALD,
MARY L. BOLAND,
BOBBIE N. SENGUPTA,
Assistant State's Attorneys,
Of Counsel.

EXHIBIT O

LE234

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Respondent-Appellee,

vs.

TONY HILLARD,

Petitioner-Appellant.

**POINTS AND AUTHORITIES**

**I.**

**WHERE DEFENDANT FAILED TO ESTABLISH THAT ANY CONFLICT OF INTEREST EXISTED BETWEEN HIS TRIAL COUNSEL AND POST CONVICTION COUNSEL, DEFENDANT RECEIVED REASONABLE ASSISTANCE OF POST CONVICTION COUNSEL**............................................... **25**

People v. Banks, 121 Ill. 2d 36 (1987)............................................. 25

People v. Palmer, 141 Ill. App. 3d 234 (1st Dist. 1986)................................ 25

People v. Hardin, 217 Ill. 2d 289 (2005) ......................................... 26, 27

People v. Spreitzer, 123 Ill. 2d 1 (1988) .......................................... 26, 27

People v. Munson, 265 Ill. App. 3d 765 (3d Dist. 1994)................................ 28

People v. Levesque, 256 Ill. App. 3d 639 (1st Dist. 1993)............................ 28

1

People v. Vaughn, 200 Ill. App. 3d 765 (1st Dist. 1990).............................    29

## II.

**WHERE DEFENDANT ON DIRECT APPEAL RAISED THE ISSUE OF PROBABLE CAUSE TO ARREST AND WHERE THIS COURT HAS ALREADY DECIDED THE MATTER, HIS COMPLAINTS AS TO TRIAL COUNSEL'S STRATEGY SHOULD HAVE BEEN RES JUDICATA. FURTHER, AS THERE WAS NO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, THERE WAS NO INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. FINALLY, DEFENDANT RECEIVED REASONABLE ASSISTANCE OF POST CONVICTION COUNSEL......**    **30**

### A.

**Standard of Review.......................................**    **30**

People v. Rovito, 327 Ill. App. 3d 164 (1st Dist. 2001) ................................    31

People v. Morgan, 212 Ill. 2d 148 (2004)........................................................    31

### B.

**Where Defendant Failed to Establish That Trial Counsel Was Ineffective, The Trial Court Properly Denied Defendant's Post-Conviction Petition ..........................................................**    **31**

People v. Hillard, 1-99-0152, (unpublished pursuant to Rule 23, June 11, 2001)    31, 32, 39

People v. Britz, 174 Ill. 2d 163 (1996)..............................................    32, 41

Strickland v. Washington, 466 U.S. 668 (1994)............................................    *passim*

People v. Albanese, 104 Ill.2d 504 (1984)......................................................    34

People v. Lundy, 334 Ill. App. 3d 819 (1st Dist. 2002).................................    34

People v. Smith, 177 Ill. 2d 53 (1997).............................................................    35

People v. Ward, 187 Ill. 2d 249 (1999)................................................. 35

People v. Ashford, 121 Ill. 2d 55 (1988) .............................................. 35

People v. Evans, 209 Ill. 2d 194 (2004)............................................... 36

People v. Sims, 192 Ill. 2d 592 (2000) ................................................ 37

## C.

### Defendant's claim here on appeal that a general description is insufficient to establish probable clause is barred by res judicata and waiver ................................................. 37

People v. Beacham, 336 Ill. App. 3d 688 (1st Dist. 2002) ........................... 37

People v. Britz, 174 Ill. 2d 163 (1996)............................................... 38

Altaf v. Hanover Square Condominium Association No. 1,
    188 Ill. App. 3d 533 (1st Dist. 1989) .................................... 39

People v. Blair, 215 Ill. 2d 427 (2005)............................................... 40

725 ILCS 5/122-3................................................................... 37, 38

## D.

### Defendant's claims that counsel was ineffective for failing to investigate what evidence would be admitted and that Ms. Hillard's statement to Detective Bradley did not establish probable cause are waived for defendant's failure to raise them in his post conviction petition............................................. 40

People v. Beronich, 334 Ill. App. 3d 536 (1st Dist. 2002)........................... 40, 41, 42

People v. Love, 199 Ill. 2d 269 (2002) ............................................. 42

725 ILCS 5/122-2................................................................... 40, 42

### E.

**As there was no ineffective assistance of trial counsel, defendant received effective assistance of appellate counsel. Moreover, defendant received reasonable assistance of post conviction counsel** ................................................................... **42**

People v. Flores, 153 Ill. 2d 264 (1992)......................................................... 43

People v. Rials, 345 Ill. App. 3d 636 (1st Dist. 2003)................................... 44

Ill. Sup. Ct. R. 341(h)(7) ................................................................................ 43

### III.

**WHERE DEFENDANT'S COUNSEL FILED TWO CERTIFICATES IN COMPLIANCE WITH ILLINOIS SUPREME COURT RULE 651(C), IT IS IRRELEVANT THAT THE ATTORNEY WHO ARGUED AT THE EVIDENTIARY HEARING FAILED TO FILE A RULE 651(C) CERTIFICATE** ........................................................ **45**

People v. Guest, 166 Ill. 2d 381 (1995) ............................................. 45

People v. Porter, 122 Ill. 2d 64 (1988)............................................... 45

People v. Flores, 153 Ill. 2d 264 (1992).............................................. 45

The language of Rule 651(c)................................................................ 46

People v. Lilly, 291 Ill. App. 3d 662 (5th Dist. 1997) ...................... 46, 47, 48

People v. Suarez, 2007 Ill. LEXIS 5, (Ill. Jan. 19, 2007)................. 47

People v. Slaughter, 39 Ill. 2d 278 (1968) ......................................... 47

Ill. Sup. Ct. Rule 651(c) ..................................................................... 47

## ISSUES PRESENTED FOR REVIEW

Whether the trial court's denial of post conviction relief was proper where no *per se* conflict existed; where defendant failed to raise the issue of a potential conflict in the trial court; and where defendant alleges no defect in post conviction counsel's performance.

Whether defendant received effective assistance of trial and appellate counsel where counsel's performance was objectively reasonable, and where counsel's actions did not prejudice defendant.

Whether defendant received reasonable assistance from post conviction counsel where counsel reviewed defendant's *pro se* post conviction petition; reviewed the record of proceedings; filed two supplemental petitions; and successfully argued that defendant receive an evidentiary hearing.

Whether the trial court's denial of post conviction relief after the evidentiary hearing should be affirmed where counsel that reviewed defendant's petition filed two Rule 651(c) certificates

5

## STATEMENT OF FACTS[1]

Defendant convicted in a jury trial before the Honorable Michael P. Toomin of armed robbery, aggravated kidnaping, aggravated battery, and armed violence and sentenced to a total of 50 years' imprisonment. (C. 4) Defendant filed a direct appeal which was denied by this Court on June 11, 2001. (People v. Hillard, No. 1-99-0152, unpublished pursuant to Rule 23). Defendant filed a *pro se* petition for post conviction relief and, after being appointed counsel, filed two supplemental petitions. (C. 15, 39, 76) After an evidentiary hearing, Judge Toomin denied further post conviction relief on defendant's claim of ineffective assistance of trial counsel. (R. 115F) Defendant now appeals the denial of post conviction relief after the evidentiary hearing.

Factual Background

This court summarized the facts of this case in the direct appeal as follows:

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw

---

[1] The record on appeal consists of a single Common Law Record (referred to as C.___) and a single volume Report of Proceedings (R.___).

codefendant, Erven Walls, with a gun in his hand. The man with the baseball
bat walked over to Jinadu, told him to keep his eyes closed and hit him on the
head again with an iron object. Codefendant then walked over to Jinadu and
hit him repeatedly on the head and around the eyes. Codefendant and the man
with the bat then pulled Jinadu into the bathroom, handcuffed him and placed
him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's
mouth, demanding that Jinadu tell him where his car and money were kept.
Defendant then walked out of the bathroom and came back holding a pillow
and the gun. Codefendant also returned to the bathroom carrying handcuffs.
He and defendant put Jinadu's hands behind his back, cuffed him, and further
taped his legs and hands together. Defendant then began to place the pillow
on Jinadu's face but was stopped by the man holding the bat. Five hours
elapsed during which time Jinadu was threatened at gunpoint to tell the men
where he kept his money. Eventually, defendant placed a towel over Jinadu
and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated
himself from the electrical tape binding his feet and climbed out of the tub.
He was unable, however, to release the handcuffs binding his hands. He
opened the bathroom door and saw that he was alone in the apartment. He
walked out of the apartment and onto the street where he saw the man with
the baseball bat and codefendant standing across the street. Upon seeing him,

7

both men fled down the street.

Defendant and codefendant Walls were tried simultaneously before two juries. Prior to trial, defendant moved for a motion to quash his arrest and suppress evidence.

People v. Hillard, 1-99-0152, Slip Op. 2-3 (unpublished order pursuant to Supreme Court Rule 23, June 11, 2001). At the motion to suppress, the following testimony was elicited:

Benicia Eberhardt testified on behalf of defendant. She stated that she was in her bedroom with defendant when there was a knock on the door. She opened the door and saw three or four police officers standing in the hallway. At the time, defendant was standing a few feet behind her. She stated that the police officer pushed her out of the way, walked into the apartment and grabbed defendant. Defendant was taken into his room to put on some clothes while two officers searched the apartment. Defendant was then handcuffed and taken to the police station.

Detective Bradley testified that he spoke to the victim two days after the incident. Jinadu immediately identified his wife, Delores. He also identified codefendant Erven Walls from a drivers license which was found in the apartment on the day of the incident. Jinadu also gave Detective Bradley the physical description of the other three offenders. He described them as being in their twenties. One offender was 5'11" and weighed 200 lbs with black hair and brown eyes. Another offender was 5'11", 165 lbs. Finally,

8

the last offender was approximately 5'5", 145 lbs with brown eyes and black hair. Detective Bradley testified that one of the guns found in the apartment was registered to Loretha Hillard. He called Ms. Hillard and spoke to her on the telephone. Ms. Hillard informed Detective Bradley that she was an ex-security guard for the Chicago Housing Authority. She further told Detective Bradley that her gun had been taken and that the only person who would have taken it was her brother, Tony Hillard. Ms. Hillard told Detective Bradley the address and apartment number of where defendant and his girlfriend lived. Detective Bradley, along with other police officers, went to the address given to him by Ms. Hillard. They knocked on the door and it was opened by Benicia Eberhardt. Detective Bradley stated that he told the woman that he wanted to speak to defendant. Standing behind her was a man who fit the general description of one of the offenders which Jinadu had given to the officers.

When asked to identify himself, defendant gave Detective Bradley a fictitious name. Detective Bradley then asked him why he stole his sister's gun. Defendant replied that he did not take his sister's gun. He was then asked to accompany the police officer's [sic] to the police station to discuss the theft of his sister's gun. Defendant then said he would go but that he had to put on his shirt and shoes. Detective Bradley followed defendant into one of the bedrooms where he told detective Bradley that his name was Tony

9

Hillard. Defendant was taken to the police station where he was later identified by Jinadu as one of the offenders. Detective Bradley further testified that at the time of the arrest defendant was 21 years old with black hair, brown eyes, was 5'11" and weighed 170 lbs.

People v. Hillard, 1-99-0152, Slip Op. 5-7 (unpublished order pursuant to Supreme Court Rule 23, June 11, 2001).

This Court further stated:

The trial court denied the motion to quash finding that Detective Brady [sic] had reasonable grounds to believe that defendant had committed the offense and that probable cause to arrest him existed. Prior to trial, the trial court noted that both juries would be present during the cross-examination of the victim. At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership and eventually started his own trucking company. He met and married Delores in 1995 and they separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10, 1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him, Delores explained that her car was broken and asked Jinadu to pick her up at her apartment. Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the door he was hit on the head with a baseball bat and lost consciousness. After

10

regaining consciousness, Jinadu was placed in a bathtub and repeatedly beaten and threatened by the men in the apartment. After the men left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw hundreds of plastic bags, a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Jinadu also described the height, weight and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Crane. Officer Schmidt further explained that at the time the officers did not know whether the names retrieved from the apartment all pertained to one person or multiple people.

11

Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven and Delores at 1121 South State Street. Codefendant Erven Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha [sic] Hillard. He called Laretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address. He went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police station and placed in a lineup. He was later identified by Jinadu as one

12

of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years' imprisonment.

People v. Hillard, 1-99-0152, Slip. Op. 3-5 (unpublished order pursuant to Supreme Court Rule 23, June 11, 2001).

Procedural History

Defendant appealed his conviction, alleging that police did not have probable cause to arrest him, and thus the trial court improperly denied his motion to quash arrest; that the cross-examination of the victim by codefendant's counsel in front of defendant's jury was improper where defendant and codefendant had antagonistic defenses; that where the trial court questioned a witness and clarified codefendant's alias names, the trial court was improperly acting as an advocate; and that the trial court improperly sentenced defendant to a consecutive sentence. People v. Hillard, 1-99-0152, Slip. Op. 1 (unpublished pursuant to Rule 23, June 11, 2001). This Court affirmed defendant's conviction on June 11, 2001. People v. Hillard, 1-99-0152, Slip. Op. 14 (unpublished pursuant to Rule 23, June 11, 2001).

On August 27, 2001, defendant filed a motion for leave to file and proceed in forma pauperis, a motion for appointment of counsel, and a *pro se* petition for post-conviction relief. (C. 12-15) Defendant's *pro se* petition for post conviction relief alleged that he had received ineffective assistance of counsel because counsel failed to investigate whether

13

Loretha Hillard stated or suggested that defendant took her gun. (C. 16-17)

Defendant's petition also claimed that counsel was ineffective for failing to call Loretha Hillard to testify at the motion to quash arrest. (C. 17) According to defendant's petition, Loretha's testimony would have shown that officers did not have probable cause to arrest defendant, for the basis of the arrest was the information Loretha gave the officers and a general description "that fits over one thousand individuals." (C. 17) Defendant also stated that "[t]he victim in this case only picked the defendant out because he (the victim) wanted someone to pay for his injuries." (C. 18)

Defendant also claimed in his petition that the prosecution "withheld exculpatory evidence from the defense counsel." (C. 19) Among the evidence defendant asserted was withheld was information regarding "the ownership of the gun recovered at the scene of the crime" as well as "the contents of the alleged phone call long before it was produced at the hearing to quash arrest." (C. 19)

Defendant attached an affidavit from Loretha Hillard, his sister, where Loretha stated that she had reported her gun stolen on May 18, 1997. (C. 22) She also stated in her affidavit that she told a police officer over the telephone that she did not know who had stolen her weapon and that she knew that none of her family members would steal the gun from her. (C. 22) Loretha signed the affidavit on June 26, 2001.

On November 25, 2003, defendant's post-conviction counsel, Elyse Krug Miller, filed a supplemental petition to defendant's *pro se* petition. (C. 39, R. A-3) In the supplemental petition, a new issue was raised, that defendant's 25 year sentence be vacated.

14

(C. 40) It also alleged that trial counsel was ineffective for failing to call Loretha Hillard to testify at the hearing on the motion to quash arrest to rebut Officer Bradley's testimony. (C. 41) Ms. Krug Miller also filed a 651 certificate, which stated:

> I, Elyse Krug Miller, Assistant Public Defender, certify that in accordance with Rule 651(c) of the Illinois Supreme Court I have communicated with Petitioner by telephone and by letter in order to ascertain his claim of a constitutional deprivation of his civil rights. I have read the pertinent portions of his trial proceedings and have reviewed the common law record. I have examined Petitioner's *pro se* post-conviction petition. A supplemental petition is being filed on Petitioner's behalf.

(C. 53, R. A-3) Ms. Krug Miller signed the certificate. (C. 53)

The People filed a motion to dismiss, asking the trial court to strike defendant's *pro se* and supplemental petitions and dismiss the proceedings. (C. 54) The People argued that defendant's ineffective assistance claim was waived and without merit (C. 56); that defendant's claim that exculpatory evidence was withheld was rebutted by his own petition (C. 59); and that his claim for relief based on his sentence was waived and unwarranted. (C. 60)

Elyse Krug Miller filed a second supplemental petition on defendant's behalf, again alleging that defendant's 25 year sentence had to be vacated and that defendant was denied effective assistance of counsel when trial counsel failed to call Loretha Hillard as a witness at the motion to quash. (C. 76-80) Defendant also alleged that appellate counsel was ineffective

15

for failing to raise the sentencing issue under People v. Cervantes, 189 Ill. 2d 80, on direct appeal. (C. 77-78) Ms. Miller filed another 651(c) certificate with the second supplemental petition. (C. 81) The People filed an amended motion to dismiss in response to defendant's claims. (C. 82-90)

On February 19, 2004, the trial court heard argument on the motion to dismiss defendant's post-conviction proceedings and continued the case for a ruling. (R. B1-B17)

On February 26, 2004, the court ruled on the motion to dismiss. (R. C1-C6) The court granted an evidentiary hearing on the ineffective assistance of counsel claim, for trial counsel's failure to call Loretha Hillard as a witness at the hearing on the motion to quash arrest. (R. C3) The court dismissed defendant's Brady claim (R. C3) and granted a new sentencing hearing on Cervantes issue. (R. C4)

On April 28, 2004, the trial court held an evidentiary hearing on the ineffective assistance of counsel claim. (R. 1F-118F) Defendant was represented by assistant public defender Cheryl Miller and her partners, George Dykes and Marge Sanders. (R. 4F)

Loretha Hillard testified on behalf of defendant that she was defendant's sister. (R. 7F) She received her GED in May 2002 and testified that she had no criminal background. (R. 7F, 10F) From 1993 to 1996 she worked as a security officer for a public housing development. (R. 10F-11F)

In May of 1997, Ms. Hillard lived at the Cabrini Green housing project and worked there as a janitor. (R. 12F) She owned a 357 Smith and Wesson gun, which was registered to her. (R. 12F-13F) At the time, Ms. Hillard lived with her 2 children and her sister, Cassandra.

16

(R. 13F-14F) She kept her unloaded gun under her mattress, and kept the bullets in her sister's room. (R. 14F) According to Ms. Hillard, only Cassandra knew where she kept the gun. (R. 14F)

Ms. Hillard testified that "maybe over 50 or more" family members lived near her. (R. 15F) These family members visited her 3 to 4 times a week. (R. 15F) Defendant came to her home "maybe once a week or so." (R. 15F) Her other siblings also visited regularly, as well as their friends. (R. 15F-16F) Because she worked in the building, she sometimes forgot to lock the door to her apartment. (R. 16F) Visitors would come to her home while she wasn't there, and once inside the apartment, they had free access to all of the rooms in the apartment. (R. 17F) Ms. Hillard estimated that 10 to 12 people regularly visited her in May of 1997. (R. 17F)

On May 17, 1997, Ms. Hillard discovered that her gun was missing, for it was no longer under her mattress. (R. 18F) She went to the police station to report the gun missing. (R. 18F-19F) Ms. Hillard denied telling the police that defendant stole her gun. (R. 19F)

Sometime after reporting the gun stolen, Ms. Hillard spoke to Officer Bradley over the telephone. (R. 19F) She did not recall when the conversation took place, but knew it was after she had reported the gun stolen. (R. 20F) According to Ms. Hillard, when the officer asked who could have taken the gun, she "told him I had no idea who took it." (R. 21F) She denied telling Officer Bradley that if her gun was stolen, defendant was the only person who could have taken it. (R. 21F) Ms. Hillard stated she knew where defendant lived at the time but did not give the officer defendant's address or tell him where to find defendant. (R. 21F)

17

Ms. Hillard further testified that she told Officer Bradley "I know that my family members wouldn't possibly steal my gun because it was registered in my name and I know they wouldn't do that." (R. 23F) She testified that she was close to her family members and trusted them. (R. 23F)

Ms. Hillard knew defendant's trial counsel, Assistant Public Defender Cheryl Bormann. (R. 23F) According to Ms. Hillard, Ms. Bormann contacted her "maybe 4 times" by telephone. (R. 24F) Ms. Hillard testified that the only time she spoke to Ms. Bormann was in court. (R. 24F) She did not recall when she spoke to Ms. Bormann on the telephone. (R. 24F) Ms. Bormann asked Ms. Hillard who could have taken the gun, and Ms. Hillard replied that she did not know. (R. 24F)

Ms. Bormann also asked Ms. Hillard whether Ms. Hillard told the police that only defendant could have stolen her gun, to which Ms. Hillard replied no. (R. 25F) Ms. Hillard testified that she did not recall whether Ms. Bormann had told her she wanted her to testify at the hearing on the motion to suppress, but Ms. Hillard was ready and willing to do so. (R. 25F)

On cross examination, Ms. Hillard denied that defendant gave her the paperwork to complete the affidavit. (R. 26F) She admitted that she completed the affidavit almost 3 years after defendant was convicted of armed robbery and 15 days after defendant's direct appeal was denied. (R. 27F-28F) Ms. Hillard believed that defendant had never met Detective Bradley before. (R. 29F)

Ms. Hillard admitted telling Detective Bradley that defendant's girlfriend's name was

18

Pookie. (R. 30F) Ms. Hillard denied telling the officer where defendant and Pookie lived. (R. 32F) She stated that Detective Bradley gave Ms. Hillard defendant's name. (R. 31F)

Ms. Hillard admitted to speaking with Ms. Bormann, defendant's trial attorney, several times on the telephone. (R. 32F) However, Ms. Hillard stated she only met with Ms. Bormann once, in court. (R. 32F) She did not recall Ms. Bormann visiting her at her home. (R. 33F)

Ms. Hillard denied telling Ms. Bormann that the door to her home was unlocked often and that defendant or other family members could have taken the gun. (R. 34F) Ms. Hillard testified that she told Ms. Bormann that when Detective Bradley asked her if any family members had taken the gun, she replied no, she knew her family would not put her in jeopardy. (R. 34F-35F)

On redirect examination, Ms. Hillard testified that she was not subpoenaed to testify, but was ready to do so at the suppression hearing. (R. 37F-38F) She stated she never interviewed with Ms. Bormann and that she had never told her that defendant could have taken her gun. (R. 40F)

Following Ms. Hillard's testimony, the court allowed defendant to enter a gun registration report and the police report Ms. Hillard had filed about her stolen gun into evidence. (R. 41F)

The People then called Cheryl Bormann to the stand. (R. 42F) Ms. Bormann testified that she had been an assistant public defender from January of 1989 until the end of 1998. (R. 42F) She then spent five years in private practice and had recently returned to the public

19

defender's office as an attorney supervisor. (R. 42F-43F)

Ms. Bormann represented defendant, whom she identified in court, during trial. (R. 43F) She was working with a partner and two Rule 711 law clerks. (R. 44F) She conducted investigation after receiving the case and learned that Loretha Hillard was a possible witness. (R. 44F-45F) She sent out an investigator to locate Ms. Hillard. (R. 45F) The investigator located Ms. Hillard at her job, which was as a security guard in the Chicago Housing Authority complex in which she had lived. (R. 46F)

Eventually, Ms. Bormann received a phone number by which to reach Ms. Hillard. (R. 46F) Between Ms. Bormann and one of her law clerks, they spoke to Ms. Hillard between 2 and 6 times. (R. 46F) On February 25, 1998, Ms. Bormann and her law clerk met with Ms. Hillard in person at Ms. Hillard's home for about an hour. (R. 49F-50F) During this meeting, Ms. Hillard told Ms. Bormann that she had been living in Cabrini with her sister and that she legally owned a gun. (R. 50F) Ms. Hillard further told Ms. Bormann that she kept her gun under her mattress at home, and that her friends and family knew she had a gun. (R. 50F) Ms. Hillard revealed to Ms. Bormann that she and her sister left their door unlocked "about half the time and that anybody who knew where her gun was located, knew that she had a gun and knew that the apartment was open could obtain the gun." (R. 50F) Ms. Bormann asked Ms. Hillard whether defendant had access to the gun and Ms. Hillard replied that defendant, like her other family members and friends, "would have known where the gun was and could have had he wanted to make himself – could have availed himself of the gun." (R. 51F)

When Ms. Bormann asked Ms. Hillard whether she had told police that defendant

20

was the only person who could have stolen the gun, Ms. Hillard indicated that she had told police that defendant and many other relatives and acquaintances could have taken the gun. (R. 51F) Ms. Hillard never told Ms. Bormann that in her conversation with the police, she had told them that she knew her family would not take her weapon because they would not put her in jeopardy. (R. 52F)

On March 4 and 5, 1998, defendant's motion to quash arrest was heard. (R. 52F-53F) Ms. Bormann called a detective to testify, but did not call Ms. Hillard to testify. (R. 53F) According to Ms. Bormann, she did not call Ms. Hillard because she did not want any evidence admitted linking defendant to the gun other than the link that the officer would establish by hearsay. (R. 53F) Ms. Bormann had also determined that Ms. Hillard's credibility, had she testified, would not outweigh the officer's credibility. (R. 54F)

On cross examination, Ms. Bormann testified that the basis of the motion to quash was that the police lacked probable cause to arrest defendant for theft of Ms. Hillard's weapon. (R. 58F) Ms. Bormann knew that Ms. Hillard was defendant's sister. (R. 59F) Ms. Bormann had subpoenaed Ms. Hillard's presence at the hearing on the motion to quash arrest but did not call her to testify. (R. 62F-63F) Ms. Bormann testified she did not call Ms. Hillard because she was not credible and believed her testimony would hurt defendant's case by creating a link between him and the gun. (R. 66F) Ms. Bormann agreed that at the hearing on the motion, Officer Bradley testified that Ms. Hillard told him that only defendant could have stolen her gun. (R. 76F)

On redirect examination, Ms. Bormann stated that when she and her law clerk met

21

with Ms. Hillard at her home, the law clerk hand delivered the subpoena to Ms. Hillard. (R. 77F) Ms. Bormann explained that she subpoenaed Ms. Hillard "because you can never predict what's going to happen or whose [sic] going to testify to what's in a motion." (R. 78F) Ms. Bormann went on to explain:

> I didn't call Loretha Hillard for a variety of reasons, one was I didn't think she was going to make a credible witness. And I didn't think that Judge Toomin, who was going to be the trier of facts for the purposes of the motion was going to consider Ms. Hillard's testimony more credible that [sic] the officer's testimony; that was the issue for the purposes of the motion.

> Now the downside to calling Ms. Hillard at the motion was my biggest concern because if I called Ms. Hillard at the motion what would have happened she would have been put under oath, sworn to testify and then testified prior to the trial in this case.

> At the trial, which I knew was going to be a jury at that point, I anticipated a couple of things: One was a single finger ID by the complainant in the case and then the possibility that gun records registered the gun to Ms. Hillard would be attempted to be introduced.

> I thought that I had a decent chance at that motion in limine to prevent the State from doing that very thing if they couldn't – the name Loretha Hillard, Tony Hillard because then the jury would be left to speculation to any sorts of relationship. I didn't want to put Mr. [sic] Hillard under oath

<div align="center">22</div>

saying that Mr. Hillard, defendant, had an opportunity and access to steal the

gun because that was given [sic] evidence to the State they didn't have.

(R. 78F-79F)

During defendant's recross examination, Ms. Bormann testified that the gun

registration showing Ms. Hillard to be the owner of the gun was introduced at trial over her

objection. (R. 83F)

Defendant then called Ms. Hillard in rebuttal. Ms. Hillard admitted it was possible

that she had met in person with Ms. Bormann but did not remember. (R. 86F) Ms. Hillard

testified she never told Ms. Bormann that defendant knew where she kept her gun. (R. 86F)

The court asked Ms. Hillard whether she signed a subpoena, and Ms. Hillard replied that she

did not recall signing the subpoena and that the signature on the subpoena did not look like

her signature. (R. 87F) She did not recall if she was subpoenaed for the motion to quash

arrest. (R. 87F) She did not recall whether she was present in court for the motion to suppress

hearing. (R. 88F)

After closing arguments, the court found that defendant had "failed to establish any

credible basis for this court to warrant that he was denied effective assistance of counsel by

Ms. Bormann's failure to call Loretha Hillard as a witness at the suppression hearing." (R.

114F)

At a separate sentencing hearing on June 28, 2004, the court reduced defendant's

sentence for armed violence from 25 to 20 years' imprisonment. (R. H18)

23

Defendant now appeals the denial of post conviction relief following the evidentiary hearing.

## ARGUMENT

### I.

**WHERE DEFENDANT FAILED TO ESTABLISH THAT ANY CONFLICT OF INTEREST EXISTED BETWEEN HIS TRIAL COUNSEL AND POST CONVICTION COUNSEL, DEFENDANT RECEIVED REASONABLE ASSISTANCE OF POST CONVICTION COUNSEL.**

Defendant claims that a conflict of interest existed between his trial counsel and his post conviction counsel and, therefore, the trial court should have conducted a hearing to inquire on the conflict. (Def. Br. 11) Specifically, defendant asserts that a conflict existed between post-conviction and trial counsel because at the time of the evidentiary hearing, his former trial counsel was a supervisor in the public defender's officer. (Def. Br. 9) Defendant recognizes that the Illinois Supreme Court's decision in People v. Banks, 121 Ill. 2d 36 (1987) entirely rejected the claim that a *per se* conflict of interest exists where one assistant public defender challenges the effectiveness of another assistant public defender. (Def. Br. 10) However, defendant contends that the decision in Banks is unconstitutional and should be reconsidered. (Def. Br. 12) Because only the Illinois Supreme Court may overrule or modify its own decisions, this Court is bound by the Banks decision. See People v. Palmer, 141 Ill. App. 3d 234, 238 (1st Dist. 1986) (stating that where the Illinois "supreme court has declared Illinois law on any point, that court alone can overrule and modify its previous opinion; such a decision binds all other judicial tribunals in this State, and it is the duty of those tribunals to follow such a decision in similar cases."). Therefore, defendant's requests that this Court reverse the trial court's denial of further post conviction relief and reconsider

25

the Illinois Supreme Court's decision in <u>Banks</u> should be dismissed. Moreover, where no *per se* conflict of interest existed between defendant's trial and post conviction counsel; where defendant never indicated any potential conflict to the trial court; and where defendant neither claims nor can demonstrate any harm, defendant's argument here is without merit.

A defendant is entitled to reasonable, not effective, assistance of counsel in post-conviction proceedings. However, "[t]he right to reasonable assistance of post conviction counsel includes the correlative right to conflict-free representation" when post-conviction counsel is called upon to challenge the effectiveness of a defendant's trial attorney. <u>People v. Hardin</u>, 217 Ill. 2d 289, 300 (2005). *Per se* conflicts of interest exist where defense counsel has a "prior or contemporaneous association with either the prosecution or the victim" or "a tie to a person or entity -- either counsel's client, employer, or own previous commitments -- which would benefit from an unfavorable verdict for the defendant." <u>People v. Spreitzer</u>, 123 Ill. 2d 1, 14-17 (1988). Where a *per se* conflict exists, a defendant need not show prejudice to warrant a reversal of proceedings against him. <u>Id</u>. at 15.

However, it is well settled that in Illinois, no *per se* conflict of interest exists where an assistant public defender alleges the ineffectiveness of another assistant public defender. <u>People v. Banks</u>, 121 Ill. 2d 36, 43 (1987). Rather, where a potential conflict from one assistant public defender alleging the ineffectiveness of another assistant public defender is brought to a court's attention, normally by the defendant, the court "must take adequate steps – *i.e.*, conduct a 'case-by-case inquiry' per <u>Banks</u> – to determine whether the risk of a conflict colored the defendant's representation." <u>Hardin</u>, 217 Ill. 2d at 302. Mere speculation

26

or bare allegations of conflict are not enough; a defendant must present facts presenting the gist of a conflict. Id. at 302-303. Moreover, trial courts are not required to conduct *sua sponte* investigations into possible conflicts. Id. at 301. Where the trial court is not informed of a potential conflict, "the defendant must point to some specific defect in his counsel's strategy." Id. at 302, quoting Spreitzer, 123 Ill. 2d at 18-19 (1988).

Here, at no point does the record reveal that defendant gave any indication to the trial court that he would claim a conflict of interest existed between trial and post-conviction counsel. Accordingly, the trial court was under no duty to conduct a hearing to inquire as to the alleged conflict. See Hardin, 217 Ill. 2d at 301.

Furthermore, defendant makes no allegation that post conviction counsel was deficient in any way as a result of Bormann's status as a supervisor in the public defender's office. Defendant instead generally alleges that "an assistant public defender may not want to jeopardize his job or his job assignment or other intangible benefits by too strenuously attacking a supervisor in the public defender's office" and that an assistant may have a "subliminal fear" of arguing a supervisor's ineffectiveness. (Def. Br. 11) As such general language points to no "specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict," defendant has made no showing to warrant relief. See Hardin., 217 Ill. 2d at 302 (quoting Spreitzer, 123 Ill. 2d at 17-18). Moreover, the record reveals that post-conviction counsel consulted with defendant, reviewed the record, and amended his post-conviction petition. (C. 53, 81) Counsel at the evidentiary hearing presented Loretha Hillard for direct examination, cross examined witnesses put on by the People, and argued

27

zealously for a new trial. (R. 1F-118F)

Defendant's reliance on <u>People v. Hardin</u> for the proposition that trial counsel's status as a supervisor in the public defender's officer definitively created a conflict between post-conviction and trial counsel is misplaced. (Def. Br. 10) First, the language defendant quotes from <u>Hardin</u> was in the context of the Court discussing relevant factors to assess whether a potential conflict exists once a defendant raises an issue of a conflict of interest. (Def. Br. 10) In this case, defendant did not bring any potential conflict to the trial court's attention. Second, the Court in <u>Hardin</u> stated that whether public defenders "were in hierarchical positions where *one supervised or was supervised by the other*" (emphasis added) is a relevant factor to consider. 217 Ill. 2d at 303. Thus, the Court did not make the general assertion that any supervisor in a public defender's office, even if not a direct supervisor of an attorney bringing an ineffective assistance claim against the supervisor, is in conflict with any person in a lower position in the public defender's office. Rather, the Court anticipated circumstances like those in the cases it cited, such as <u>People v. Munson</u>, 265 Ill. App. 3d 765 (3d Dist. 1994), where an assistant public defender challenged the effectiveness of the county public defender. The court declined to adopt a *per se* rule that a conflict exists whenever a subordinate challenges the effectiveness of the assistance of a superior; rather, the court stated "the magnitude of such a potential conflict depends largely upon the level of control and supervision exercised by the public defender over the subordinate." <u>Id</u>. at 771. Similarly, in <u>People v. Levesque</u>, 256 Ill. App. 3d 639 (1st Dist. 1993), the other case cited by the Court, the defendant challenged the trial court's failure to inquire of the defendant's counsel

28

at post-trial motions whether counsel could "overcome his natural loyalty to an attorney under his supervision," against whom the defendant had filed an ARDC complaint. Id. at 649-650. The court remanded the case for such an inquiry. Id. at 650.

Thus, in neither of the cases cited by the Court in Hardin was a *per se* rule established that a conflict exists when an assistant public defender challenges another assistant public defender with a supervisory role in the office. Unlike Levesque, there is no indication that Bormann, defendant's trial counsel, was personally supervising defendant's post-conviction counsel. Rather, at the evidentiary hearing, Bormann testified that she had recently become a supervisor in the public defender's office. (R. 42F-43F)

Additionally, even if defendant had made a showing of a potential conflict, defendant's relief would consist of remand to the trial court to inquire as to whether a conflict of interest existed, not a reversal of the court's decision. See People v. Vaughn, 200 Ill. App. 3d 765, 770 (1st Dist. 1990) (where the trial court failed to consider the defendant's contention that a conflict of interest existed between assistant public defenders with a working relationship, the reviewing court remanded the case for a determination of the conflict of interest question). Here, however, it is clear that defendant did not even reach a minimum threshold for relief. Accordingly, defendant's claim should be dismissed.

## II.

**WHERE DEFENDANT ON DIRECT APPEAL RAISED THE ISSUE OF PROBABLE CAUSE TO ARREST AND WHERE THIS COURT HAS ALREADY DECIDED THE MATTER, HIS COMPLAINTS AS TO TRIAL COUNSEL'S STRATEGY SHOULD HAVE BEEN RES JUDICATA. FURTHER, AS THERE WAS NO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, THERE WAS NO INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. FINALLY, DEFENDANT RECEIVED REASONABLE ASSISTANCE OF POST CONVICTION COUNSEL.**

Defendant claims that the trial court's denial of his post-conviction petition should be reversed because he received ineffective assistance of trial counsel, appellate counsel, and post-conviction counsel. However, defendant in his direct appeal raised the issue of probable cause to arrest and the matter was decided by this Court. Therefore, the issue here should have been barred by *res judicata*. To circumvent this bar, defendant complained that trial counsel was ineffective for failure to call Loretha Hillard as a witness at the motion to quash. However, defendant failed to satisfy either prong of <u>Strickland</u>. Moreover, although he complains that his counsel in the post conviction proceedings below was "ineffective," he concedes that he was only entitled to reasonable assistance, something the record shows he obtained. Therefore, defendant's claims were properly dismissed and the trial court's denial of his post conviction petition should be affirmed.

### A.
### Standard of Review.

In this case, defendant was granted a third stage evidentiary hearing on his post conviction petition, after which the trial court dismissed defendant's claim of ineffective

30

assistance of trial counsel. (R. 114F) "Post-conviction relief at the third stage of the post-conviction process is justified only where a defendant demonstrates by a preponderance of the evidence that his conviction or sentence resulted from a substantial deprivation of federal or state constitutional rights." People v. Rovito, 327 Ill. App. 3d 164, 167-168 (1st Dist. 2001). A trial court's determination following an evidentiary hearing on a post conviction petition will not be disturbed on review unless it is manifestly erroneous. People v. Morgan, 212 Ill. 2d 148, 155 (2004). "Manifest error is error which is clearly evident, plain, and indisputable." Id. (internal citations omitted). Here, the decision below was proper, for there was no showing or error, much less manifest error.

## B.

### Where Defendant Failed to Establish That Trial Counsel Was Ineffective, The Trial Court Properly Denied Defendant's Post-Conviction Petition.

On direct appeal, defendant alleged that police did not have probable cause to arrest him, and thus the trial court improperly denied his motion to quash arrest; that the cross-examination of the victim by codefendant's counsel in front of defendant's jury was improper where defendant and codefendant had antagonistic defenses; that where the trial court questioned a witness and clarified codefendant's alias names, the trial court was improperly acting as an advocate; and that the trial court improperly sentenced defendant to a consecutive sentence. People v. Hillard, 1-99-0152, Slip. Op. 1 (unpublished pursuant to Rule 23, June 11, 2001).

31

This Court affirmed defendant's conviction on June 11, 2001. People v. Hillard, 1-99-0152, Slip. Op. 14 (unpublished pursuant to Rule 23, June 11, 2001). In so doing, this Court found "that based on the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders." People v. Hillard, 1-99-0152, Slip. Op. 14 (unpublished pursuant to Rule 23, June 11, 2001). Therefore, the issue of probable cause to arrest was *res judicata* in this post conviction proceeding. See People v. Britz, 174 Ill. 2d 163, 177 (1996).

To circumvent the doctrine of *res judicata*, defendant argued in his post conviction petition that trial counsel was ineffective for failing to call Loretha Hillard to testify at the motion to suppress. (C. 17, 40, 78) The trial court granted an evidentiary hearing on the issue of counsel's failure to call Ms. Hillard to testify at the motion to quash and a separate hearing for resentencing. (R. C3)

At the evidentiary hearing, Loretha Hillard, defendant's sister, and Cheryl Bormann, defendant's trial counsel, testified. Loretha Hillard testified that she was defendant's sister and that in May of 1997, the gun she kept in her home under her mattress was stolen. (R. 7F, 14F, 18F) She reported the gun missing on May 17, 1997. (R. 19F) According to Ms. Hillard, only her sister, with whom she lived, knew that she kept a gun. (R. 14F) She testified that "maybe 50 or more" relatives lived near her and visited her three to four times a week. (R. 15F) Ms. Hillard stated that defendant visited her once a week. (R. 15F) She admitted that she kept her apartment unlocked sometimes, that visitors entered her home when she wasn't

32

there, and that visitors in her home had access to every room in the home. (R. 16F-17F) She admitted speaking to Officer Bradley over the phone after her gun was stolen, but denied telling him that defendant was the only person who could have taken it and denied telling him defendant's address. (R. 20-21F) Ms. Hillard admitted that she spoke with Cheryl Bormann several times on the phone, but stated she only saw her in person when she came to court. (R. 23-24F) She later stated that it was possible that she met with Ms. Bormann in person, but could not remember it. (R. 86F)

Cheryl Bormann, defendant's trial attorney, testified that between Ms. Bormann and her law clerk, they had spoken to Ms. Hillard over the telephone between two and six times. (R. 46F) Ms. Bormann also testified that she and her law clerk interviewed Ms. Hillard at Ms. Hillard's home for about an hour on February 25, 1998. (R. 49F-50F) Ms. Bormann testified that she did not call Ms. Hillard as a witness on the motion to quash arrest because she did not believe Ms. Hillard would make a credible witness and did not want Ms. Hillard's testimony to establish a direct link between defendant and the recovered gun. (R. 78F-79F)

After the evidentiary hearing, the trial court found that defendant had not shown that trial counsel was ineffective under Strickland v. Washington, 466 U.S. 668 (1994). (R. 112F-114F) The trial court concluded that Ms. Hillard's testimony "detract[ed] from her credibility." (R. 113F) The court also found that "[t]his is not a situation where that Ms. Bormann did not make an adequate investigation." (R. 112F) The court found that Ms.

33

Bormann had contacted Ms. Hillard, met with her, observed her demeanor, and issued a subpoena, but was not required to call her as a witness. (R. 112F)

The trial court's finding that defendant's trial counsel was effective was proper. In order to establish a violation of the constitutional right to effective assistance of counsel, a criminal defendant must show first, that counsel's performance was deficient in that it was objectively unreasonable and second, that the deficient performance so prejudiced the defense that defendant was deprived of a fair trial. Strickland, 466 U.S. at 687; People v. Albanese, 104 Ill.2d 504 (1984). In People v. Albanese, the Illinois Supreme Court adopted the Strickland rule, stating that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 104 Ill. 2d at 525-526.

A defendant has the burden of demonstrating that he has received ineffective assistance of counsel. People v. Lundy, 334 Ill. App. 3d 819, 829 (1st Dist. 2002). A defendant's failure to make a requisite showing of either deficient performance or sufficient prejudice defeats an ineffective assistance of counsel claim. Strickland, 466 U.S, at 697, 700. Moreover, "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant. If it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice . . . that course should be followed." Albanese, 104 Ill. 2d at 527.

Under the first prong of the Strickland test, there is a strong presumption that

34

counsel's performance falls within "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Generally, trial strategy will not support a finding of ineffective assistance of counsel. People v. Smith, 177 Ill. 2d 53, 92 (1997). The decision of whether to call a particular witness is typically a matter of trial strategy, and does not support a claim of ineffective assistance of counsel, particularly where the witness's testimony would have been harmful to a defendant. Strickland, 466 U.S. 668 (1984); People v. Ward, 187 Ill. 2d 249, 261-262 (1999); People v. Ashford, 121 Ill. 2d 55, 74-75 (1988).

Here, Ms. Bormann's decision not to call Ms. Hillard to testify at the motion to quash arrest was clearly a matter of trial strategy. Ms. Bormann testified that she interviewed Ms. Hillard and determined that her credibility would not outweigh Detective Bradley's credibility. (R. 78F) Additionally, Ms. Bormann did not want to establish a direct link between defendant and the gun through Ms. Hillard's testimony. (R. 79F) Ms. Hillard's testimony would clearly have established such a link, where she testified that defendant was her brother (R. 7F), that defendant visited her home once a week (R. 15F), and that visitors entered her home while she was away because she sometimes kept her apartment door unlocked. (R. 16F-17F) Thus, Ms. Bormann's decision not to call Ms. Hillard, then, clearly amounts to trial strategy, which she reached after speaking with Ms. Hillard several times and meeting with her in person at Ms. Hillard's home.

Moreover, defendant cannot satisfy the second prong of the Strickland analysis, for defendant cannot establish prejudice. To show actual prejudice, defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

35

proceeding would have been different. Strickland, 466 U.S. at 694. "A reasonable probability of a different result is not merely a possibility of a different result." People v. Evans, 209 Ill. 2d 194, 220 (2004).

In the case at bar, defendant has failed to establish that he was prejudiced by counsel's decision not to call Ms. Hillard at the motion to quash arrest. Instead, defendant in his brief merely speculates that no harm would have resulted if Ms. Hillard had testified. (Def. Br. 21) However, the standard under Strickland is not whether "no harm" would have resulted had counsel made a different strategic decision, but whether a defendant was prejudiced by counsel's action. Strickland, 466 U.S. at 687. In fact, the Court in Strickland cautioned that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence," and that, as a result, a court reviewing an ineffective assistance of counsel claim should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.

Here, defendant has not even argued that he was prejudiced by Ms. Bormann's. Accordingly, defendant has not met the second prong of the Strickland test, thus defeating defendant's claim of ineffective assistance of counsel. See Strickland, 466 U.S. at 700. Nor could defendant show prejudice from Ms. Bormann's decision not to call Ms. Hillard to testify. On the contrary, Ms. Hillard's testimony would have provided a direct link between defendant and the gun. Thus, her testimony would have aided the prosecution. The trial judge himself, in ruling on the evidentiary hearing, noted: "I can not perceive that a different result

36

would have been obtained had Ms. Bormann called her." (R. 114F) Moreover, because Ms. Hillard is defendant's sister her testimony would have been less credible than Detective Bradley's testimony, where the detective had no such potential bias for any of the parties involved. See People v. Sims, 192 Ill. 2d 592, 635 (2000) (counsel's failure to call a witness whose testimony had "clear risks" was not ineffective assistance).

## C.
### Defendant's claim here on appeal that a general description is insufficient to establish probable clause is barred by res judicata and waiver.

Defendant also asserts that trial counsel was ineffective for failing to research and argue at the motion to suppress that "the arrest in this case could not be based on the general description" of the defendant that the victim gave to police. (Def. Br. 17) However, defendant failed to allege this claim in his *pro se* or supplemental petitions for post-conviction relief. Defendant merely stated in his *pro se* petition: "Furthermore, he [the arresting officer] did not have an accurate description of the defendant to warrant an arrest. A simple general description that fits over one thousand individuals could not be the basis for arresting an individual." (C. 17)

Claims of substantial denial of constitutional rights that are not raised in a defendant's original or amended post-conviction petition are deemed waived. 725 ILCS 5/122-3. Accordingly, a reviewing court need not consider on the appeal of the dismissal of a post conviction petition any issues not raised in the petition. See People v. Beacham, 336 Ill. App. 3d 688, 691 (1st Dist. 2002). Here, defendant's petition did not allege that counsel was

37

ineffective for failing to argue at the motion to quash that the police officer relied on a general description. Rather, the petition attacked the basis of defendant's arrest. Thus, this ineffective assistance claim is waived. See 725 ILCS 5/122-3.

Assuming, *arguendo,* that this Court finds that defendant's statement regarding the description given to police by the victim amounts to a claim of ineffective assistance of counsel for failing to argue the description at the motion to suppress, defendant's claim is barred under the waiver doctrine. "It is well established that determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided *and issues that could have been presented on the direct appeal, but were not, are deemed waived.*" People v. Britz, 174 Ill. 2d 163, 177 (1996) (emphasis added).

It is true that the waiver rule is relaxed where facts relating to the claim did not appear in the original appellate record and thus the reviewing court was unable to consider such evidence outside the record. Id. Here, however, defendant's allegation that counsel was ineffective for failing to argue that the description of him was general at the motion to quash arrest could have been raised on direct appeal. In fact, on direct appeal, appellate counsel challenged the finding of probable cause at the motion to quash. (Defendant's Brief on Appeal, 13-18) Thus, the claim that trial counsel was ineffective for not arguing this claim could similarly have been brought on direct appeal, and is accordingly barred from consideration in the post-conviction petition for relief. See Britz, 174 Ill. 2d at 177.

Moreover, defendant failed to include in the record on review the complete motion to quash arrest and suppress evidence; mere excerpts from the motion appear in the appendix to

38

defendant's first supplemental post conviction petition. (C. 39-52) An appellant has the burden to present a sufficiently complete record of proceedings to support a claim of error on review. Altaf v. Hanover Square Condominium Association No. 1, 188 Ill. App. 3d 533, 539 (1st Dist. 1989). Doubts that may arise from the incompleteness of a record on review are resolved against the appellant, and a reviewing court will make reasonable presumptions in favor of the judgment, order, or ruling from which an appeal is taken. Id. Thus, taking into consideration defense counsel's testimony at the evidentiary hearing as to her trial strategy, as well as presumptions that defense counsel otherwise competently conducted the motion to quash, defendant cannot establish that counsel was ineffective for failing to argue that the description the arresting officer had of defendant was general at the motion to quash.

Related to his claim that counsel was ineffective for failing to argue that the description given by the victim was general, defendant also challenges the findings of this Court in his direct appeal, stating that the Court made "mere speculations" and engaged in "surmise" in finding that probable cause to arrest defendant existed. (Def. Br. 19) Defendant asserts that this Court, in affirming the denial of defendant's motion to quash arrest and suppress evidence, erroneously relied on defendant's initial refusal to give his proper name to police officers before he was arrested. (Def. Br. 19) According to defendant, this fact did not, on its own, amount to probable cause. (Def. Br. 19) However, the record reveals that this Court analyzed probable cause under a totality of the circumstances, not on any one factor alone. People v. Hillard, 1-99-0152 (unpublished pursuant to Supreme Court Rule 23, June 11, 2001). Moreover, defendant may not, on appeal of the dismissal of a post-conviction

39

petition, mount an attack on the direct appeal, for issues decided on direct appeal are now *res judicata.* See People v. Blair, 215 Ill. 2d 427, 443 (2005).

**D.**

**Defendant's claims that counsel was ineffective for failing to investigate what evidence would be admitted and that Ms. Hillard's statement to Detective Bradley did not establish probable cause are waived for defendant's failure to raise them in his post conviction petition.**

Defendant concludes that trial counsel was also ineffective for failing to investigate "what evidence would be admitted" when she decided not to call Ms. Hillard to testify at the motion to quash. (Def. Br. 21) Defendant also claims that "defense counsel also failed to properly demonstrate that any alleged statement concerning who could steal the gun has no real value in proving existence of probable cause," for "this statement could not rise to the level of probable cause." (Def. Br. 19) However, these claims were not raised in defendant's *pro se* or supplemental petitions for post conviction relief, and are thus waived. See 725 ILCS 5/122-3.

Moreover, defendant fails to attach any support for the contention that trial counsel failed to investigate evidentiary matters. A post conviction petition must "have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2. Here, defendant's petition contained an affidavit from Loretha Hillard, but nothing supporting a contention that counsel failed to investigate the law. Thus, this claim is waived on this ground as well. See People v. Beronich, 334 Ill.

40

App. 3d 536, 540 (1st Dist. 2002) (where a defendant waived an issue by not presenting evidence to support a claim in his post conviction petition and the claim was not apparent from the record).

Moreover, defendant cannot establish that trial counsel was ineffective on this issue under the Strickland test. First, counsel's contention that Ms. Bormann failed to investigate evidentiary issues is refuted by the record where Ms. Bormann indicated she believed that Detective Bradley's testimony on what Ms. Hillard told him was hearsay. (R. 53F) Ms. Bormann testified that her strategy was to have only hearsay, rather than direct evidence, linking defendant to the gun recovered at the scene. (R. 53F) Nor does defendant satisfy the second prong of Strickland, for he does not allege any prejudice resulting from this alleged failure. Accordingly, in the absence of any support in the record that Ms. Bormann failed to investigate the rules of evidence, and in light of Ms. Bormann's testimony, defendant's claim that Ms. Bormann failed to investigate is without merit.

Defendant also claims that trial counsel did not demonstrate "that any alleged statement concerning who could steal the gun has no real value in proving existence of probable cause." (Def. Br. 19) Assuming that defendant is arguing that this failure rendered trial counsel ineffective, this claim was similarly not raised in defendant's *pro se* or supplemental petitions for post conviction relief, and is thus waived. See 725 ILCS 5/122-3. Moreover, this issue is waived because it could have been raised on direct appeal. See Britz, 174 Ill. 2d at 177. Additionally, as with the previously discussed claim, defendant has waived

41

this issue because defendant failed to attach "affidavits, records, or other evidence" supporting this allegation. 725 ILCS 5/122-2; Beronich, 334 Ill. App. 3d at 540.

Finally, probable cause is determined under a totality of the circumstances, People v. Love, 199 Ill. 2d 269, 279 (2002), and the record indicates that neither the trial court, nor this Court, determined that probable cause existed based solely on the alleged statement that defendant was the only person who could have stolen the gun. (C. 51-52); People v. Hillard, 1-99-0152 (unpublished order pursuant to Supreme Court Rule 23, June 11, 2001). Accordingly, defendant's contention must fail, for he has produced no evidence of the acts allegedly constituting ineffective assistance, and has not argued that he was prejudiced.

## E.
### As there was no ineffective assistance of trial counsel, defendant received effective assistance of appellate counsel. Moreover, defendant received reasonable assistance of post conviction counsel.

Defendant in one sentence on page 19 of his brief also claims that appellate counsel and post conviction counsel were ineffective for "failing to research and present controlling law." (Def. Br. 19) Earlier in his brief, at page 17, defendant devotes another sentence to a claim that "[a] review of the cases that deal with arrest based on general suspicion would have advised . . . defense counsel on appeal and defense counsel at post-conviction hearing that the arrest in this case could not be based on the general description." (Def. Br. 17)

In support of his contention that appellate counsel was ineffective, defendant has attached his brief on direct appeal to the appendix to this brief in the instant appeal. The

42

brief nevertheless fails to establish that the performance of appellate counsel was ineffective. First, appellate counsel did present case law on probable cause. (Defendant's Brief on Appeal, 13-14) Moreover, appellate counsel argued that under the totality of the circumstances, probable cause did not exist to arrest defendant, referring to facts contained in the record. (Def. Br. on App., 14-18) Counsel also compared and contrasted defendant's case with published cases concerning probable cause. (Def. Br. on Appeal, 17-18) Thus, defendant cannot show that appellate counsel rendered deficient performance on this issue. Fundamentally, however, since there was no ineffective assistance of trial counsel, there was no ineffective assistance of counsel on appeal.

Defendant here does not even argue that he suffered prejudice as a result of appellate counsel's argument on probable cause. Accordingly, defendant has made no showing of prejudice, and fails the second prong of the Strickland analysis.

Defendant also concludes that post conviction counsel was ineffective. (Def. Br. 13, 19) However, defendant concedes that in post-conviction proceedings, effective assistance of counsel is not the standard. (Def. Br. 9) Rather, only reasonable assistance is mandated at the post-conviction stage. People v. Flores, 153 Ill. 2d 264, 276 (1992). As defendant has not argued that post conviction counsel was not reasonable, this issue is also waived. Ill. Sup. Ct. R. 341(h)(7). Additionally, defendant has waived this argument for failing to cite any legal authority to support his contention that post conviction counsel was not reasonable. Ill. Sup. Ct. R. 341(h)(7).

Moreover, defendant did receive reasonable assistance of post conviction counsel.

43

Post conviction counsel is not required to comb the record on review for any possible claims the record may contain that a defendant did not raise in his *pro se* petition. People v. Rials, 345 Ill. App. 3d 636, 641 (1st Dist. 2003) (citation omitted). In fact, counsel fulfills his obligations by making the *pro se* petitioner's claims cognizable. Id. at 642.

Here, post conviction counsel examined the record, filed two supplements to defendant's *pro se* petition, secured an evidentiary hearing for defendant, and also secured a lower sentence for defendant. In addition, counsel at the evidentiary hearing argued the issue for which the hearing had been granted. In light of such actions, and absent any authority for the contention that post conviction counsel was not reasonable, the record refutes defendant's claim that post conviction counsel was unreasonable or "ineffective."

Ultimately, the trial court's ruling below that defendant received effective assistance of trial counsel was correct. Defendant, having failed to establish that his trial counsel was ineffective, has also failed to establish that his appellate counsel was ineffective. Finally, defendant received reasonable assistance of appellate counsel. Therefore, this Court must affirm the trial court's dismissal of defendant's post conviction petition.

## III.

**WHERE DEFENDANT'S COUNSEL FILED TWO CERTIFICATES IN COMPLIANCE WITH ILLINOIS SUPREME COURT RULE 651(C), IT IS IRRELEVANT THAT THE ATTORNEY WHO ARGUED AT THE EVIDENTIARY HEARING FAILED TO FILE A RULE 651(C) CERTIFICATE.**

Defendant contends that the trial court's ruling on his post-conviction petition following the evidentiary hearing must be reversed because, despite his counsel having filed two Rule 651(c) certificates, he was entitled to another certificate filed by the attorney who argued at the evidentiary hearing. (Def. Br. 23) However, post-conviction counsel provided defendant with a reasonable level of assistance during the post-conviction proceedings, and the trial court's denial of further post conviction relief should be affirmed.

It is well settled that a defendant has no constitutional right to the assistance of counsel at a post-conviction proceeding. People v. Guest, 166 Ill. 2d 381, 412 (1995). Instead, the right to counsel at post-conviction proceedings is a matter of legislative grace and favor which may be altered by the legislature at will. People v. Porter, 122 Ill. 2d 64, 72 (1988). Because the right to counsel in post-conviction proceedings is derived from statute rather than the Federal or State Constitutions, post-conviction defendants are guaranteed only the level of assistance provided for by the Act. People v. Flores, 153 Ill. 2d 264, 276 (1992). The Illinois Supreme Court has defined that assistance to mean a reasonable level of assistance. Id.

Supreme Court Rule 651(c) provides, in pertinent part:

The record filed in that court shall contain a showing,

45

which may be made by the certificate of petitioner's attorney, that
the attorney has consulted with petitioner either by mail or in
person to ascertain his contentions of deprivation of constitutional
right, has examined the record of proceedings at the trial, and has
made any amendments to the petitions filed *pro se* that are
necessary for an adequate presentation of petitioner's contentions.

134 Ill. 2d R. 651(c).

The language of Rule 651(c) states that the filing of a certificate may be used to
make the required showing. People v. Lilly, 291 Ill. App. 3d 662, 669 (5th Dist. 1997).
Post-conviction counsel complies with the requirements of Rule 651(c) where the record
demonstrates that counsel consulted with the defendant to ascertain his or her contentions of
deprivation of constitutional rights; that counsel read as much of the trial transcript as
necessary to present and support those constitutional claims adequately; and that counsel
made any necessary amendments to the *pro se* petition which had been filed. Lilly, 291 Ill.
App. 3d at 669. Here, that is exactly what occurred.

In the instant case, the attorney who handled defendant's post-conviction
proceedings, Ms. Krug Miller, prepared a certificate of compliance pursuant to Supreme
Court Rule 651(c) with each supplemental petition filed on defendant's behalf. (C. 53, 81)
The certificates indicated that post-conviction counsel consulted with defendant by letter and
telephone to ascertain his contentions of deprivations of constitutional rights, examined the
record of proceedings, examined defendant's *pro se* post conviction petition, and had filed

supplemental petitions. (C. 53, 81) Thus, the required showing of compliance was made by post-conviction counsel's certificates.

Nonetheless, defendant asks this court to reverse the dismissal of his post conviction petition because counsel at the evidentiary hearing did not file a separate Rule 651(c) certificate. (Def. Br. 23) However, the language of the rule contemplates a certificate being filed by counsel who handles a defendant's *pro se* petition for post conviction relief, not by every attorney who may participate in argument on the case at any phase. The Rule requires counsel to examine a defendant's *pro se* petition and make amendments to the petition as needed to represent a defendant's claims. Ill. Sup. Ct. R. 651(c). Clearly, such activity occurs before an evidentiary hearing is granted on the merits of a petition. See People v. Suarez, 2007 Ill. LEXIS 5, *12-13 (Ill. Jan. 19, 2007) (noting that *pro se* defendants lack the assistance of counsel in "framing their petitions" and that post conviction counsel must determine the defendant's claims, shape them into appropriate legal form, and present the claims to the court) (quoting People v. Slaughter, 39 Ill. 2d 278 (1968)).

Here, assistant public defender Elyse Krug Miller represented defendant at the majority of the stages of the post conviction proceedings. Ms. Krug Miller supplemented defendant's the petition (C. 39, 76); argued against the motions to dismiss (R. B1-17); and argued on defendant's behalf at the subsequent rehearing on sentencing. (R. H3-H19) That a different attorney argued at the evidentiary hearing does not call into question whether Ms. Krug Miller reviewed defendant's petition. Moreover, it is clear from the record that counsel at the hearing was thoroughly prepared. Thus, defendant's contention must fail. See Lilly,

291 Ill. App. 3d at 669 (no issue where counsel who was assigned to represent the defendant at the hearing on the post conviction petition did not file a certificate; court examined the work of the post conviction counsel who handled the defendant's case for compliance with Rule 651(c)).

Based on the foregoing reasons, the people respectfully request that this Court affirm the trial court's denial of post conviction relief following defendant's evidentiary hearing.

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm the trial court's order denying defendant's post conviction petition.

Pursuant to People v. Nicholls, 71 Ill. 2d 166 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h) and 55 ILCS 5/4-2002.1, the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill. 2d 275 (1985) and 55 ILCS 5/4-2002.1, the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Respondent-Appellee

JAMES E. FITZGERALD,
MARY L. BOLAND,
BOBBIE N. SENGUPTA,
Assistant State's Attorneys,
Of Counsel.

49

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341 (a) and (b). The length of this brief is 49 pages.

BY: _____

BOBBIE SENGUPTA,
Assistant State's Attorney

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| ) | |
| Respondent-Appellee, ) | |
| ) | |
| vs. ) | No. 04-3365 |
| ) | |
| TONY WILLARD, ) | |
| ) | |
| Petitioner-Appellant. ) | |
| ) | |

**PROOF OF SERVICE**

The undersigned, being first duly sworn, deposes and says that he served 3 copies of the Brief and Argument for Respondent-Appellee in the above entitled cause by depositing the same in the United States Mail at Chicago, on the 30th day of January, 2007 properly stamped and addressed to:

**FREDERICK F. COHN**
35 East Wacker Drive
Chicago, Illinois 60601

STATE OF ILLINOIS
COUNTY OF COOK
Signed or Attested Before Me
this 30th day of January, A.D., 2007.
JOSEPH LANIER

(Seal)

Signature of Notary Public

Official Seal
Pina Contacessi
Notary Public State of Illinois
My Commission Expires 03/29/08

File Date: _____7- 1- 2 0 0 8_____

Case No: _____0 8 c v 1 7 7 5_____

ATTACHMENT # _____

EXHIBIT _____P t o Q_____

TAB (DESCRIPTION)

_____

No. 04-3365

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

                                        Plaintiff-Appellee,

                    vs.

TONY HILLARD,

                                        Defendant-Appellant.

Appeal from the Circuit Court of Cook County, Illinois
County Department, Criminal Division
No. 97-CR-30453

Honorable Michael P. Toomin, Presiding.

APPELLANT'S REPLY BRIEF

RECEIVED
CRIMINAL APPEALS

MAY 1 5 2007

309 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

FREDERICK F. COHN
35 E. Wacker Drive
Suite 1525
Chicago, Illinois  60601
(312) 641-0692

Attorney for Appellant

ORAL ARGUMENT REQUESTED

EXHIBIT P

ARGUMENT

1.

The decision of the trial court denying defendant a new trial in a post-conviction hearing must be overruled because the Assistant Public Defender, Ms. Bormann, defendant's original trial counsel, who was accused of ineffective assistance of counsel in representing defendant, was a supervisor in the Public Defender's Office at the time of the post-conviction hearings, where defendant was represented by an Assistant Public Defender.

We agree with the State that defendant's relief would consist of remand to the trial court to inquire as to whether a conflict of interest existed, not a reversal of the court's decision. See People v. Vaughn, 200 Ill.App.3d 765, 770 (1st Dist. 1990).

The State argues:

"Here, at no point does the record reveal that defendant gave any indication to the trial court that he would claim a conflict of interest existed between trial and post-conviction counsel. Accordingly, the trial court was under no duty to conduct a hearing to inquire as to the alleged conflict. See Hardin, 217 Ill.2d at 301." (State's Brief, p. 27)

The State then argues waiver.

This is a view of the record with biased eyes. At the post-conviction hearing, defendant himself did nothing. He just sat there and expected all matters to be handled properly by his Public Defender. The concept of conflict was not part of his world view.

Conflict should have been raised by his lawyer. However, it was not raised because to do so would have

required her to assert her superior had rendered ineffective assistance. It could also involve raising her own ineffectiveness. Lawyers are not expected to so act. In People v. Parker, 288 Ill.App.3d 417, 680 N.E.2d 505, the court stated:

> "We agree with the reasoning in *People v. Keener*, 275 Ill.App.3d 1, 5, 211 Ill.Dec. 391, 394, 655 N.E.2d 294, 297 (1995), in which the second district held there was a *per se* conflict of interest in requiring trial counsel filing a post-trial motion to assert his or her own ineffectiveness and, therefore, failure to do so does not result in waiver of the issue on appeal."

The relationship between defendant's present counsel to defendant's prior counsel sufficiently demonstrates the possibility of conflict. This problem cannot be resolved without a hearing. Hence, this cause should be remanded to the trial court to hold a hearing to resolve this issue.

Because at the post-conviction hearing the court became aware that defendant's trial counsel was a supervisor (Tr. 43F) and there was no information as to how that affected her post-conviction counsel activity, this Court should remand for a hearing at which defendant should be represented by counsel not related to the Public Defender's Office.

2

2.

Counsel at the original proceedings that resulted in defendant's conviction rendered ineffective assistance of counsel by failing to do necessary research as to controlling law and failing to present controlling law, and hence, defendant was denied his Sixth Amendment (United States Constitution) rights. Counsel who represented defendant on appeal and at the post-conviction proceedings also provided ineffective assistance of counsel.

There is no res judicata where the issue was not properly presented to the prior trial or Appellate Court due to ineffective assistance of appellate counsel. People v. Parker, 288 Ill.App.3d 417, 680 N.E.2d 505; People v. Gaines, 105 Ill.2d 79, 473 N.E.2d 868; People v. Pitsonbarger, 205 Ill.2d 444, 793 N.E.2d 609.

Although in the prior appeal the issue of probable cause to arrest was raised, it was done so ineptly as to be the equivalent of not being raised at all.

The essence of the trial court's finding and the Appellate Court's finding is that probable cause exists where a description match between defendant and assailant justifies arrest. (See defendant's original Brief, pp. 15-16.)

This is true only where there is a closeness of time and location.

What would have destroyed this erroneous judicial conclusion would have been trial counsel's and appellate counsel's simple research. This research would demonstrate such descriptions match only produce probable cause when

3

there is close proximity in time and location of the match. (See defendant's original Brief, pp. 16-17.)

To re-state, the failure of counsel to know the controlling law and cite it to the court, thereby permitting the court to make an erroneous finding is ineffective assistance. <u>Dixon v. Snyder</u>, 266 F.3d 693 (7 Cir. 2001); <u>Workman v. Tate</u>, 957 F.2d 1339; <u>People v. Truly</u>, 230 Ill.App.3d 948, 595 N.E.2d 1230; <u>People v. McPhee</u>, 256 Ill.App.3d 102, 628 N.E.2d 523; <u>People v. Stewart</u>, 217 Ill.App.3d 373, 577 N.E.2d 177; <u>People v. Sommerville</u>, 193 Ill.App.3d 161, 549 N.E.2d 1315; <u>People v. Butler</u>, 23 Ill.App.3d 108, 318 N.E.2d 680; <u>People v. Karraker</u>, 261 Ill.App.3d 942, 633 N.E.2d 1250.

The State to avoid the important failure of trial counsel rambles on about what counsel did. The State then asserts that <u>res judicata</u> bars consideration of whether counsel was ineffective. The State never properly discussed that there was no probable cause because the match was not sufficient here where there was no closeness in time or location.

The State hides behind inadequate acts of various counsel. In this case, to be effective is to present the controlling law that defendant's similarity in general to that of the assailant is not a valid basis for the arrest where defendant is seen 24 days after the event and miles from the location.

4

The arrest of defendant is a flagrant violation of the Constitution.

Trial, appellate and post-conviction counsel's performance was so poor as to be inadequate counsel under either the Sixth Amendment or under the Post-Conviction Act. Dixon v. Snyder, supra.

Post-conviction relief must be granted to cure the error of all three counsels.

5

## CONCLUSION

Defendant requests that the dismissal of his Post-Conviction Petition be reversed.

Respectfully submitted,

FREDERICK F. COHN
Attorney for Appellant
35 E. Wacker Drive
Suite 1525
Chicago, Illinois 60601
(312) 641-0692

6

NOTICE
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

**APPENDIX A**

FIFTH DIVISION
June 15, 2007

No. 1-04-3365

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Cook County |
| | ) |
| v. | ) No. 97 CR 30453 |
| | ) |
| TONY HILLARD, | ) Honorable |
| | ) Michael P. Toomin, |
| Defendant-Appellant. | ) Judge Presiding. |

ORDER

Defendant Tony Hillard was convicted by a jury of armed robbery, armed violence,

aggravated kidnaping, and aggravated battery. He was sentenced to 50 years in the Illinois State

Penitentiary. On direct appeal, defendant raised four issues. We denied his direct appeal on June

11, 2001. People v. Hillard, No. 1-99-0152 (2001) (unpublished order pursuant to Supreme

Court Rule 23). Defendant filed a pro se petition for post-conviction relief and after being

appointed counsel, filed two supplemental petitions. He alleged ineffective assistance of counsel

and that the prosecution withheld exculpatory evidence in violation of Brady v. Maryland, 373

U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). He also challenged his sentence based on

1-04-3365

People v. Cervantes, 189 Ill. 2d 80 (1999).

The prosecution filed a motion to dismiss. The court dismissed defendant's Brady claim and granted a new sentencing hearing on the Cervantes issue. The court also granted an evidentiary hearing on the allegation of ineffective assistance of counsel based on his trial counsel's failure to call Loretha Hillard as a witness at the hearing on the motion to quash arrest. During the evidentiary hearing defendant was represented by assistant public defender Cheryl Miller and her partners, George Dykes and Marge Sanders. After closing arguments, the court found that defendant had "failed to establish any credible basis for this court to warrant that he was denied effective assistance of counsel by [trial counsel's] failure to call Loretha Hillard as a witness at the suppression hearing."

On appeal from the evidentiary hearing defendant raises three issues. Defendant contends that the trial court erred in denying him a new trial because original trial counsel who was accused of being ineffective was a supervisor in the Office of the Public Defender during his post-conviction hearing, when he was represented by an assistant Public Defender. Defendant also claims that the trial court's denial of his post-conviction petition should be reversed because he received ineffective assistance of trial counsel, appellate counsel, and post-conviction counsel. Defendant further contends that his post-conviction counsel failed to comply with Supreme Court Rule 651(c). We affirm.

## BACKGROUND

### I. Direct Appeal

Defendant and codefendant, Erven Walls, were tried simultaneously before two juries.

2

1-04-3365

Before trial, defendant litigated a motion to quash his arrest and suppress evidence. The trial court denied the motion and found that Detective Brady had reasonable grounds to believe that defendant had committed the offense and that probable cause to arrest him existed.

At trial, Yinka Jinadu testified that he came to the United States in 1994, worked for a car dealership, and eventually started his own trucking company. He met and married Delores Jinadu in 1995, and they separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10, 1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him, Delores explained that her car was broken and asked Jinadu to pick her up at her apartment. Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the apartment to wait while she finished getting ready. As Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat.

When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand, and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed, and hit him on the head again with an iron object. Walls then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Walls and the man with the bat then pulled Jinadu into the bathroom, handcuffed him, and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the

3

1-04-3365

bathroom and came back holding a pillow and the gun. Walls returned to the bathroom carrying handcuffs. Walls and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street where he saw the man with the baseball bat and Walls standing across the street. Upon seeing him, both men fled down the street.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open head wound. There was gray duct tape on his mouth and chin and he was handcuffed. Jinadu showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw hundreds of plastic bags, a scale, white powder, spoons, and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine, and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. Schmidt stated that Jinadu identified Delores by name but was

4

1-04-3365

unable to name any of the other offenders. Jinadu also described the height, weight, and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Craine. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up investigation. After talking to Jinadu, Detective Bradley had the names of Delores, defendant, and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven Walls and Delores at 1121 South State Street. Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Loretha Hillard. He called Loretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address.

Detective Bradley went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany the officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the location of his sister's gun. Defendant was arrested, taken to the

5

1-04-3365

police station, and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years in the Illinois State Penitentiary.

On direct appeal defendant raised four issues. He argued as follows: (1) the trial court erred in failing to grant his motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly sentenced defendant to a consecutive sentence. We addressed each of these issues on appeal and affirmed. Hillard, slip op. at 14.

## II. Post-Conviction Evidentiary Hearing

The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 1998)) provides that a defendant may challenge his conviction by alleging "that in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States of the State of Illinois or both." 725 ILCS 5/122-1 (West 1998); People v. Tenner, 175 Ill. 2d 372, 377 (1997). A petition filed under the Act must "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 1998). The petition shall have attached "affidavits, records, or other evidence" as required by section 122-2 of the Act "supporting its allegations or shall state why the same are not attached."

6

1-04-3365

725 ILCS 5/122-2 (West 1998); People v. Collins, 202 Ill. 2d 59 (2002). Post-conviction relief is a collateral proceeding, not an appeal from the underlying judgment. People v. Evans, 186 Ill. 2d 83, 89 (1999). All issues decided on direct appeal are res judicata, and all issues that could have been raised in the original proceeding but were not are waived. People v. Whitehead, 169 Ill. 2d 355, 371 (1996). If a claim of ineffective assistance of counsel is based on matters outside the record, then it could not have been raised on appeal, and consequently, is not waived in a post-conviction petition. People v. Owens, 129 Ill. 2d 303 (1989).

In cases not involving the death penalty, the Act establishes a three-stage process for adjudicating a petition for post-conviction relief. People v. Gaultney, 174 Ill. 2d 410, 418 (1996). At the first stage of a post-conviction proceeding, the court determines whether the petition alleges a constitutional infirmity that, if proven, would require relief under the Act. People v. Coleman, 183 Ill. 2d 366, 380 (1998). The first stage presents a pleading question. Unless positively rebutted by the record, all well-pleaded facts are taken as true at this stage, and the trial court's determination is subject to de novo review. Coleman, 183 Ill. 2d at 385.

If the petition is not dismissed and survives the first stage of the post-conviction process, then subsection (b) of section 122/2.1 of the Act provides that "the court shall order the petition to be docketed for further consideration in accordance with section 122-4 through 122-6." 725 ILCS 5/122-2.1(b) (West 1998). At this second stage counsel is appointed to represent the defendant, and if necessary, the State is allowed to file responsive pleadings. 725 ILCS 5/122-4, 122-5 (West 2004). At this stage, the circuit court considers the petition and any accompanying documentation and dismiss the petition if it does not indicate a substantial showing of a

1-04-3365

constitutional violation. People v. Edwards, 197 Ill. 2d 239, 246 (2001). A petition that makes a showing of a constitutional violation advances to the third stage, at which the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2004). An evidentiary hearing will be held only where the allegations of the post-conviction petition make a substantial showing that the defendant's constitutional rights have been violated.

This case was before the trial court at the third stage of the post-conviction process. An order granting or denying relief after an evidentiary hearing is a "final judgment upon such petition" and it is subject to review "in a manner pursuant to the rules of the Supreme Court." 725 ILCS 5/122-7 (West 2004). The post-conviction judge's ruling must be affirmed unless it is manifestly erroneous. People v. Morgan, 212 Ill. 2d 148, 155 (2004). Manifest error is error which is clearly evident, plain, and indisputable. Morgan, 212 Ill. 2d at 155.

In the instant case, the court, in resolving defendant's post-conviction petition, granted an evidentiary hearing on the allegation of ineffective assistance of counsel. Defendant claimed trial counsel rendered ineffective assistance because she failed to call his sister, Loretha Hillard, as a witness at the hearing on defendant's motion to quash arrest. Defendant was represented by assistant Public Defender Cheryl Miller and her partners, George Dykes and Marge Sanders, during the evidentiary hearing.

Loretha Hillard, defendant's sister, testified during the post-conviction hearing. She related that she worked as a security officer for a public housing development from 1993 to 1996. She testified that on May 17, 1997, her gun was missing and she reported this to the police. She denied telling the police that defendant took her gun.

8

1-04-3365

Loretha testified that defendant's trial counsel, assistant Public Defender Cheryl Bormann, contacted her "maybe 4 times" by telephone. According to Loretha, Bormann asked her who could have taken the gun, and she replied that she did not know. Bormann asked Loretha whether she told the police that only defendant could have stolen her gun, to which Loretha replied, no. Loretha testified that she did not recall whether Bormann had told her she wanted her to testify at the hearing on defendant's motion to suppress, but she was ready and willing to do so.

On cross-examination, Loretha admitted she completed the post-conviction affidavit almost 3 years after defendant was convicted and 15 days after defendant's direct appeal was denied. Loretha admitted to speaking to defendant's attorney, Bormann, several times on the telephone. She stated she only met Bormann once, in court, and did not recall attorney Bormann visiting her at her home.

Loretha denied telling Bormann that the door to her home was often unlocked and that defendant or other family members could have taken the gun. She testified she told Detective Bradley that her family members would not have taken her gun because they would not put her in jeopardy.

On re-direct examination Loretha testified that she was not subpoenaed to testify at the suppression hearing, although she was ready to testify. She indicated that she was never interviewed by attorney Bormann and denied telling Bormann that defendant could have taken her gun.

1-04-3365

During the post-conviction hearing defense counsel was allowed to enter into evidence a gun registration report and the police report Loretha filed regarding her stolen gun.

The prosecution called assistant Public Defender Cheryl Bormann to testify. She worked with a partner and two Rule 711 law clerks on defendant's case. She was an assistant Public Defender from January 1989 until 1998. She then spent five years in private practice and returned to the Office of the Public Defender as a supervisor.

Bormann, together with her law clerks, spoke to Loretha two to six times in connection with defendant's case. Bormann testified that on February 25, 1998, she and her law clerk met Loretha in person at her home for about an hour. Loretha told Bormann that she kept her gun under her mattress at home and that her friends and family knew she had a gun. Her door was left unlocked "about half the time and that anybody who knew where her gun was located, knew that she had a gun and knew that the apartment was open could obtain the gun." Bormann asked Loretha about defendant's access to her gun and she replied that defendant, like her other family members and friends, "would have known where the gun was and could have had he wanted to make himself—could have availed himself of the gun."

Bormann asked Loretha whether she told police that defendant was the only person who could have stolen the gun. Loretha indicated that she told the police that defendant and many other relatives and acquaintances could have taken the gun. Bormann testified that Loretha never told her that in her conversation with the police, she had told them that she knew her family would not take her weapon because they would not put her in jeopardy.

10

1-04-3365

Bormann testified that during the hearing on defendant's motion to quash arrest, she called a detective to testify. She did not call Loretha because she did not want any evidence linking defendant to the gun other than the link that the police would provide by hearsay. Bormann also determined that the credibility of Loretha would not outweigh the officer's credibility.

On cross-examination Bormann testified that the basis of the motion to quash arrest was that the police lacked probable cause to arrest defendant for the theft of Loretha's gun. Bormann had subpoenaed Loretha for the motion to quash arrest, but did not call her because she was not credible. Bormann believed her testimony would hurt defendant's case by creating a link between defendant and the gun. Bormann agreed that during the hearing on the motion to quash arrest, Officer Bradley testified that Loretha told him that only defendant could have stolen her gun.

On redirect examination Bormann explained as follows:

> "I didn't call Loretha Hillard for a variety of reasons, one was I didn't think she was going to make a credible witness. And I didn't think that Judge Toomin, who was going to be the trier of facts for the purposes of the motion was going to consider Ms. Hillard's testimony more credible that [sic] the officer's testimony; that was the issue for the purposes of the motion.
>
> Now the downside to calling Ms. Hillard at the motion was my biggest concern because if I called Ms. Hillard at the motion what would have happened she would have been put under oath, sworn to testify and then testified prior to the trial in this case.

11

1-04-3365

   At the trial, which I knew was going to be a jury at that
point, I anticipated a couple of things: One was a single finder ID
by the complainant in the case and then the possibility that gun
records registered the gun to Ms. Hillard would be attempted to be
introduced.

   I thought that I had a decent chance at that motion in limine
to prevent the State from doing that very thing if they couldn't - the
name Loretha Hillard, Tony Hillard because then the jury would be
left to speculation to any sorts of relationship. I didn't want to put
Mr. [sic] Hillard under oath saying that Mr. Hillard, defendant, had
an opportunity and access to steal the gun because that was given
[sic] evidence to the State they didn't have."

Defense counsel called Loretha in rebuttal. She admitted it was possible she had met in
person with Bormann, but did not remember. She denied telling Bormann that defendant knew
where she kept her gun. Loretha indicated that she did not recall signing the subpoena and that
the signature on the subpoena did not look like her signature. She did not recall if she was
subpoenaed for the motion to quash arrest or whether she was present at court for the hearing on
the motion to quash arrest and suppress evidence.

After closing arguments the court denied defendant's petition for post-conviction relief.
The court found that defendant had "failed to establish any credible basis for this court to warrant
that he was denied effective assistance of counsel by Ms. Bormann's failure to call Loretha Hillard

12

1-04-3365

as a witness at the suppression hearing."

## ANALYSIS

On appeal from the post-conviction evidentiary hearing, defendant raises three issues. Defendant contends the trial court erred in denying him a new trial because original trial counsel, who was accused of being ineffective, was a supervisor in the Office of the Public Defender at the time of his post-conviction hearing, when he was represented by an assistant Public Defender. Defendant also claims that the trial court's denial of his post-conviction petition should be reversed because he received ineffective assistance of trial counsel, appellate counsel, and post-conviction counsel. Defendant further contends that his post-conviction counsel failed to comply with Supreme Court Rule 651c. We take each argument in turn.

## INEFFECTIVE ASSISTANCE ALLEGED BASED ON CONFLICT OF INTEREST BETWEEN TRIAL AND POST-CONVICTION COUNSEL

There is no constitutional right to effective assistance of post-conviction counsel. See People v. Pinkonsly, 207 Ill. 2d 555, 567 (2003). The right to assistance of counsel in post-conviction proceedings is a matter of legislative grace, and a defendant is guaranteed only the level of assistance provided by the Post-Conviction Hearing Act. People v. Greer, 212 Ill. 2d 192, 204 (2004). The Illinois Supreme Court has labeled that level "reasonable" assistance. People v. McNeal, 194 Ill. 2d 135, 142 (2000). "However, when a defendant's appointed post-conviction attorney is called upon to assert that the defendant's appointed trial attorney was ineffective, the distinction between constitutional and statutory rights makes no difference. If post-conviction counsel is appointed to mold the defendant's allegations into legally cognizable shapes [citations], that counsel must be as conflict-free as trial counsel." [Citations.] People v.

13

1-04-3365

Hardin, 217 Ill. 2d 289, 300 (2005). The right to reasonable assistance of post-conviction counsel includes the correlative right to conflict free representation. People v. Hardin, 217 Ill. 2d 289, 299 (2005); citing People v. Banks, 121 Ill. 2d 36 (1988).

Defendant contends that a conflict of interest existed between his trial counsel and his post-conviction counsel and, therefore, the trial court should have conducted a hearing to inquire about the conflict. At the time of the post-conviction hearing, defendant's prior trial counsel, Cheryl Bormann, who was accused of providing ineffective assistance of counsel during defendant's trial, was a supervisor in the Office of the Public Defender. Defendant argues that because Bormann was a supervisor "[t]his should have required a hearing as to the relationship of Bormann and public defender, Elyse Krug Miller."

In conflict of interests cases the trial court must take adequate steps – i.e., conduct "a case-by-case inquiry" per Banks – to determine whether a risk of a conflict colored the defendant's representation, but only when the conflict is brought to the court's attention. Banks, 121 Ill. 2d 36; Hardin, 217 Ill. 2d 289. Shortly after deciding Banks, in People v. Spreitzer, 123 Ill. 2d 1, 14 (1988), the Illinois Supreme Court articulated the principles applicable when a defendant in a criminal case contends that he did not receive the effective assistance of counsel because his attorney had a conflict of interest. If the defendant shows a per se conflict of interest, he need not show prejudice resulting from that conflict in order to obtain relief. Spreitzer, 123 Ill. 2d at 15. If the defendant does not show a per se conflict of interest, the analysis depends upon when he raised the issue. Spreitzer, 123 Ill. 2d at 17-18. It is well settled that in Illinois, no per se conflict of interest exists where an assistant public defender alleges the ineffectiveness of

14

1-04-3365

another assistant public defender. Banks, 121 Ill. 2d at 36.

Defendant contends Banks is unconstitutional and "must be reconsidered." The Illinois Supreme Court recently discussed the principles articulated in Banks and concluded: "If Banks provides that no per se conflict of interest exists when one public defender argues that another public defender in the same office was ineffective, it cannot mean the trial court always must open an inquiry into a potential conflict." Hardin, 217 Ill. 2d at 310.

However, defendant claims that unlike Banks, in this case there is the additional factor of his trial counsel's position as a supervisor in the Public Defender's Office. Obviously, a subordinate might be reluctant to risk embarrassing his superior for fear of retaliation, whether overt or subconscious. This issue was addressed in People v. Munson, 256 Ill. App. 3d 765 (1994). The court in that case held that "given the diversity of organization of public defenders offices, we believe a case-by-case approach to potential conflicts between supervisors and subordinates is more rational than the blanket prohibition of a per se rule." Munson, 256 Ill. App. 3d at 771.

We note when a potential conflict is brought to the trial court's attention at an early stage, "a duty devolves upon the trial court to either appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel." Spreitzer, 123 Ill. 2d at 18. Furthermore, when the defendant does complain of the potential conflict he needs only to present the gist of such a conflict. People v. Edwards, 197 Ill. 2d 239, 244 (2001).

In the instant case, the record does not reflect that defendant gave any indication to the trial court that a conflict of interest existed between trial and post-conviction counsel. Trial

15

1-04-3365

courts are not required to conduct sua sponte investigations into possible conflicts. Hardin, 217 Ill. 2d at 301. In the instant case, the defendant presented no facts to the trial court suggesting a conflict. The defendant must provide some facts to demonstrate what the conflict entails. People v. Jones, 210 Ill. App. 3d 375, 378 (1991).

The record reflects no lack of diligence by post-conviction counsel. In fact, Miller amended defendant's post-conviction petition and raised the Cervantes issue. She not only obtained a post-conviction hearing on the Cervantes issue, but she successfully persuaded the trial judge to reduce defendant's sentence for armed violence from 25 years to 20 years' imprisonment.

Defendant makes no specific allegation that post-conviction counsel was deficient in any way as a result of Bormann's status as a supervisor in the Public Defender's Office. Defendant relies on conjecture and speculation, rather than identifying a specific defect in post-conviction counsel's strategy, tactics, or decision-making caused by the alleged conflict. Defendant generally alleges that "an assistant public defender may not want to jeopardize his job or his job assignment or other intangible benefits by too strenuously attacking a supervisor in the public defender's office" and that an assistant may have a "subliminal fear" of a supervisor's ineffectiveness. See Banks, 121 Ill. 2d at 46-47 ("in the absence of an evidentiary record of conflict, one should not be created based on mere speculation").

The record reflects no per se conflict. Defendant has not pointed to any specific defects in his post-conviction counsel's conduct so as to warrant relief by this court. Accordingly, the record reflects no error by the trial court for failing to conduct a hearing on the conflict of interest alleged by defendant.

16

1-04-3365

## INEFFECTIVE ASSISTANCE OF COUNSEL

In order to establish a violation of the constitutional right to effective assistance of counsel, a criminal defendant must first show that counsel's performance was deficient in that it was objectively unreasonable, and second, that the deficient performance so prejudiced the defense that defendant was deprived of a fair trial. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Albanese, 104 Ill. 2d 504 (1984). In People v. Albanese, the Illinois Supreme Court adopted the Strickland rule, stating that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Albanese, 104 Ill. 2d at 525-26. Moreover, any evaluation of counsel's conduct cannot properly extend into areas involving the exercise of judgment, discretion or trial tactics even where the appellate counsel or the reviewing court would have acted differently. People v. Mitchell, 105 Ill. 2d 1, 12 (1984). A defendant has the burden of demonstrating that he has received ineffective assistance of counsel. People v. Lundy, 334 Ill. 3d 819, 829 (2002). A defendant's failure to make a requisite showing of either deficient performance or sufficient prejudice defeats an ineffective assistance of counsel claim. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant first argues that trial counsel was ineffective for failing to call his sister, Loretha Hillard, to testify that she never told the police that the only person who could steal her gun was her brother. Police Officer Bradley, who was defendant's arresting officer, testified at defendant's trial that Loretha told him that her brother was the only person who could have taken her gun.

17

1-04-3365

However, defendant claims that Loretha later told defendant's trial counsel that she never made that comment and that she would testify to that at trial.

The trial court granted an evidentiary hearing on the issue of counsel's failure to call Loretha as a witness at the motion to quash arrest and suppress evidence. As previously noted, a trial court's determination following an evidentiary hearing on a post-conviction petition will not be disturbed on review unless it is manifestly erroneous. People v. Morgan, 212 Ill. 2d 148, 155 (2004).

Defendant's claim does not satisfy the first prong of the Strickland standard. Generally, trial strategy will not support a finding of ineffective assistance of counsel. People v. Smith, 177 Ill. 2d 53, 92 (1997). The decision to call a particular witness is typically a matter of trial strategy, and does not support a claim of ineffective assistance of counsel, particularly where the witness's testimony would have been harmful to a defendant. People v. Ward, 187 Ill. 2d 249, 261-62 (1999); People v. Ashford, 121 Ill. 2d 55, 74-75 (1988).

At the evidentiary hearing, defendant's trial counsel testified that she interviewed Loretha and determined that her credibility would not outweigh Detective Bradley's credibility. See People v. Dean, 226 Ill. App. 3d 465, 469 (1992) (no ineffective assistance of counsel where trial counsel did not call three witnesses because they were related to defendant and their credibility would carry little weight). Moreover, defendant's trial counsel indicated that Loretha's testimony would have established a direct link between the defendant and the gun. Loretha's testimony could have brought out the fact that the defendant had access to the gun and this could have been more detrimental to his case. See People v. Simms, 192 Ill. 2d 592, 635 (2000) (counsel's failure

18

1-04-3365

to call a witness whose testimony had "clear risks" was not ineffective assistance). Given these facts it was an objectively reasonable trial tactic by counsel to not call Loretha to testify. We are mindful of the Supreme Court's admonishment in Strickland that "it is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence," and that, as a result, a court reviewing an ineffective assistance of counsel claim should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

Defendant also cannot satisfy the second prong of the Strickland standard. To show prejudice, a defendant must establish that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. People v. Whitehead, 169 Ill. 2d 355, 380 (1996). In the instant case, the totality of the evidence, including the victim's identification of the defendant, the defendant's association with the codefendants, and the recovered gun, reflects that the outcome would not have changed with Loretha's testimony.

After the evidentiary hearing, the trial court found defendant failed to satisfy the Strickland standard for ineffective assistance of counsel. The trial court indicated that Loretha's testimony "detract[ed] from her credibility." The court concluded that "[t]his is not a situation where Ms. Bormann did not make an adequate investigation." The trial court noted that Bormann had contacted Loretha, met with her, observed her demeanor, and issued a subpoena, but was not

19

1-04-3365

required to call her as a witness. For the reasons previously discussed, the trial court's finding

that defendant's trial counsel did not provide ineffective assistance was proper and the record

reflected no manifest error.

Defendant next argues that trial counsel was ineffective for failing to research and argue at

the motion to suppress that "the arrest in this case could not be based on the general description"

of the defendant that the victim gave to the police. However, this claim is barred by res judicata

and the waiver doctrine.

A proceeding brought under the Post-Conviction Hearing Act is a collateral attack on a

judgment of conviction. The principles of waiver and res judicata limit the scope of post-

conviction review. People v. Winsett, 153 Ill. 2d 335, 346 (1992). Consequently, the inquiry in a

post-conviction petition is limited to allegations of constitutional violations that were not and

could not have been raised previously. People v. Eddmonds, 143 Ill. 2d 501, 510 (1991). The

Illinois Supreme Court has held that "it is well established that determinations of the reviewing

court on direct appeal are res judicata as to issues actually decided and issues that could have

been presented on the direct appeal, but were not, are deemed waived." People v. Britz, 174 Ill.

2d 163, 177 (1996).

In the instant case, defendant's allegation that counsel was ineffective for failing to argue

that the description of him was "general" at the motion to quash arrest could have been raised on

direct appeal. In fact, on direct appeal, appellate counsel challenged other issues related to

defendant's arrest including the finding of probable cause by the trial court after hearing the

motion to quash arrest and suppress evidence. Thus, the claim that trial counsel was ineffective

20

1-04-3365

for not focusing his argument on the general nature of the offender's description could have been brought on direct appeal, and is accordingly barred from consideration by this court. People v. Blair, 215 Ill. 2d 427, 443 (2005) (issues decided on direct appeal are res judicata).

Defendant contends that if trial counsel would have researched the issue, i.e., general description as basis for arrest, that the outcome of the trial would have been different. We note that in affirming defendant's conviction (Hillard, slip. op. at 8), we analyzed the probable cause for the arrest of the defendant consistent with the principles articulated in People v. Robinson, 299 Ill. App. 3d 426 (1998). The court in Robinson indicated that "[i]n determining whether probable cause existed to effectuate a warrantless arrest, a court must look to the totality of the circumstances and make a practical, commonsense decision whether there was a reasonable probability that an offense was committed and that the defendant committed it." Robinson, 299 Ill. App. 3d at 431. The Robinson court further recognized that a general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. Robinson, 299 Ill. App. 3d at 431.

In applying the above principles to the instant case on direct appeal, we concluded that based on the totality of the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. Therefore, applying this reasoning, it is clear that even if defendant's trial counsel was deficient for failing to argue the lack of a specific description, that failure did not prejudice defendant and was not outcome determinative. Probable cause is determined under the

21

1-04-3365

totality of the circumstances. People v. Love, 199 Ill. 2d 269, 279 (2002). The record reflects that, in affirming on direct appeal, we analyzed probable cause under a totality of the circumstances, not on any one factor alone. People v. Hillard, 1-99-0152 (2001) (unpublished order pursuant to Supreme Court Rule 23).

Defendant next claims that trial counsel was ineffective for failing to investigate "what evidence would be admitted" when she decided not to call Loretha to testify at the motion to quash arrest and suppress evidence. However, this claim was not raised in defendant's pro se or supplemental petitions for post-conviction relief, and is therefore waived. See 725 ILCS 5/122-3 (West 2000); see also People v. Moore, 189 Ill. 2d 521, 544 (2000).

Waiver aside, defendant did not establish that trial counsel was ineffective on this issue under the Strickland standard. Defendant has not demonstrated that his trial counsel failed to investigate this issue; he merely states that she did not pursue it, and therefore she must have not investigated it. Defendant's trial counsel testified at the evidentiary hearing that her strategy was to limit the evidence linking the defendant to the gun recovered at the scene to hearsay evidence, rather than direct evidence.

Moreover, defendant did not demonstrate that any prejudice resulted from this alleged error. For the reasons previously discussed, the outcome of the trial would have been the same with Loretha's testimony. Therefore no prejudice resulted from the alleged error. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069 (a defendant's failure to make a requisite showing of either deficient performance or sufficient prejudice defeats an ineffective assistance of counsel claim).

22

1-04-3365

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Defendant next claims that appellate counsel was ineffective for failing to research

controlling law. More specifically, he asserts that "a review of the cases that deal with arrest

based on general suspicion would have advised defense counsel at trial, defense counsel on appeal

and defense counsel at post-conviction hearing that the arrest in this case could not be based on

the general description."

The Supreme Court of the United States has determined that a defendant is entitled to the

effective assistance of counsel upon direct appeals which are allowed as a matter of right. Evitts

v. Lucey, 469 U.S. 387, 396-97, 83 L. Ed. 2d 821, 830-31, 105 S. Ct. 830, 836-37 (1985). The

Illinois Supreme Court has held that a defendant who contends that appellate counsel rendered

ineffective assistance, for example by failing to argue a particular issue, must show that "the

failure to raise that issue was objectively unreasonable" and that, "but for this failure, his sentence

or conviction would have been reversed." People v. Caballero, 126 Ill. 2d 248, 270 (1986); see

also People v. Williams, 209 Ill. 2d 227 (2004). Both prongs of the Strickland test must be

satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. Caballero,

126 Ill. 2d at 270. If the underlying issue is nonmeritorious, the defendant has suffered no

prejudice. People v. Rogers, 197 Ill. 2d 216, 223 (2001).

The record reflects that appellate counsel argued that under the totality of the

circumstances, probable cause did not exist to arrest defendant. Appellate counsel compared and

contrasted defendant's case with published cases concerning probable cause. The record does not

reflect that appellate counsel rendered deficient performance. Appellate counsel's failure to focus

23

1-04-3365

on the issue regarding the general description of the offender in the instant case was not outcome determinative for defendant's appeal. Moreover, since there was no ineffective assistance of trial counsel with regard to this issue, the record reflects no ineffective assistance of counsel on appeal.

For the reasons previously discussed, defendant failed to satisfy the <u>Strickland</u> standard.

## INEFFECTIVE ASSISTANCE OF POST-CONVICTION COUNSEL

Defendant also claims that post-conviction counsel was ineffective. However, there is no constitutional right to effective assistance of post-conviction counsel. See <u>People v. Pinkonsly</u>, 207 Ill. 2d 555, 567 (2003). As previously noted, the right to assistance of counsel in post-conviction proceedings is a matter of legislative grace, and a defendant is guaranteed only the level of assistance provided by the Post-Conviction Hearing Act. See <u>People v. Greer</u>, 212 Ill. 2d 192, 204 (2004). The Illinois Supreme Court has labeled that level "reasonable" assistance. See <u>People v. McNeal</u>, 194 Ill. 2d 135, 142 (2000).

The defendant did receive reasonable assistance of post-conviction counsel. Supreme Court Rule 651(c) outlines the specific requirements that post-conviction counsel must fulfill in representing post-conviction petitioners. 134 Ill. 2d R. 651(c). Under Rule 651(c), the record must demonstrate that post-conviction counsel consulted with the defendant to determine his claims, examined the record, and made any amendments to the <u>pro se</u> petition that are necessary for an adequate presentation of the defendant's assertions. 134 Ill. 2d R. 651(c); see also <u>People v. Greer</u>, 212 Ill. 2d 192, 205 (2004). Post-conviction counsel is not required to comb the record on review for any possible claims the record may contain that a defendant did not raise in his <u>pro se</u> petition. <u>People v. Rials</u>, 345 Ill. App. 3d 636, 641 (2003). In fact, counsel fulfills his

24

1-04-3365

obligations by making the pro se petitioner's claims cognizable. Rials, 345 Ill. App. 3d at 642.

In this case, post-conviction counsel examined the record, filed two supplements to defendant's pro se petition, secured an evidentiary hearing for defendant, and also secured a lower sentence for defendant. Moreover, two Rule 651(c) certificates were filed in the instant case. For the reasons previously discussed, we reject defendant's claim that post-conviction counsel was ineffective.

## RULE 651(c) CERTIFICATE

Defendant contends that the trial court's ruling on his post-conviction petition following the evidentiary hearing must be reversed because, despite his post-conviction counsel having filed two Rule 651(c) certificates, he was entitled to have another certificate filed by the attorney who argued at the evidentiary hearing. Under Rule 651(c), the record must show that post-conviction counsel "consulted with petitioner to ascertain his contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed pro se that are necessary for an adequate presentation of petitioner's contentions." 134 Ill. 2d R. 651(c); see also People v. Zambrano, 266 Ill. App. 3d 856, 868 (1994).

The right to post-conviction counsel is derived from statute rather than from the Federal or State constitutions; accordingly post-conviction defendants are guaranteed a reasonable level of assistance under the Post-Conviction Act. People v. Flores, 153 Ill. 2d 264, 276 (1992). Post-conviction counsel complies with the requirements of Rule 651(c) when the record reflects that counsel consulted with the defendant to determine his or her allegations of deprivation of

25

1-04-3365

constitutional rights, examined trial transcripts, and made any necessary amendments to the pro se petition which had been filed. People v Greer, 212 Ill. 2d at 205.

In the instant case, assistant public defender Miller prepared a certificate of compliance pursuant to Supreme Court Rule 651(c) with each supplemental petition filed on defendant's behalf. The certificates indicated that post-conviction counsel consulted with defendant by letter and telephone to ascertain his contentions of deprivations of constitutional rights, examined the record of proceedings, examined defendant's pro se post-conviction petition, and had filed supplemental petitions.

Miller represented defendant during various stages of the post-conviction proceedings. She supplemented defendant's petition, argued against the motions to dismiss, and argued at the rehearing on sentencing. That fact that a different attorney from the Office of the Public Defender argued at the post-conviction evidentiary hearing does not require that a third Rule 651(c) certificate be filed in the instant case. Moreover, it is clear from the record that counsel at the hearing was thoroughly prepared. See People v. Lilly, 291 Ill. App. 3d 662, 669 (1997) (no issue where counsel who was assigned to represent the defendant at the hearing on the post-conviction petition did not file a certificate; court examined the work of the post-conviction counsel who handled the defendant's case for compliance with Rule 651(c)).

Post-conviction counsel conducted a fully contested evidentiary hearing. Ms. Hillard was called to testify on behalf of defendant. Following Ms. Hillard's testimony post-conviction counsel successfully entered into evidence on behalf of defendant a gun registration report and the police report Ms. Hillard had filed about her stolen gun. Post-conviction counsel conducted

26

1-04-3365

appropriate direct and cross-examination. The record reflects defendant's case was well-prepared and well argued. The performance of post-conviction counsel thus complied on all grounds with Rule 651(c). See People v. Szabo, 144 Ill. 2d 525, 532 (1991) (substantial compliance with Rule 651(c) is all that is required).

For the reasons previously discussed, we conclude that post-conviction counsel provided defendant the reasonable assistance contemplated by the Act (Moore, 189 Ill. 2d at 542-43) and demonstrated compliance with Rule 651(c) (People v. Jennings, 345 Ill. App. 3d 265, 271 (2003)).

## CONCLUSION

The experienced trial judge conducted a thorough third stage evidentiary hearing. The resolution of the defendant's post-conviction petition was proper and the record reflected no error. For the reasons previously discussed, we affirm

Affirmed.

O'MARA FROSSARD, J., with O'BRIEN, P.J., and TULLY, J., concurring.

File Date: _7-1-2008_

Case No: _08cv1775_

ATTACHMENT # _____

EXHIBIT _R_

TAB (DESCRIPTION)

_____

No. 105011

---

IN THE

SUPREME COURT OF ILLINOIS

---

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Respondent,

vs.

TONY HILLARD,

Defendant-Petitioner.

---

Petition for Leave to Appeal from the Appellate Court
of Illinois, First Judicial District. There Heard on
Appeal from the Circuit Court of Cook County,
Illinois, Criminal Division.
No. 97-CR-30453

Honorable Michael P. Toomin, Presiding.

---

PETITION FOR LEAVE TO APPEAL

---

FREDERICK F. COHN
Attorney for Petitioner
35 E. Wacker Drive
Suite 1525
Chicago, Illinois   60601
(312) 641-0692

EXHIBIT R

IN THE
SUPREME COURT OF ILLINOIS

---

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Respondent,

vs.

TONY HILLARD,

Defendant-Petitioner.

---

Petition for Leave to Appeal from the Appellate Court
of Illinois, First Judicial District. There Heard on
Appeal from the Circuit Court of Cook County,
Illinois, Criminal Division.
No. 97-CR-30453

Honorable Michael P. Toomin, Presiding.

---

**PETITION FOR LEAVE TO APPEAL**

---

**PRAYER FOR LEAVE TO APPEAL**

Pursuant to Supreme Court Rules 315 and 612(b) (Ill. Rev. Stat. 1979, Chap. 110A, pars. 315 and 612(b)), defendant-petitioner, Tony Hillard, (hereafter, defendant) petitions for leave to appeal from the judgment entered by the Appellate Court, First District, Fifth Division, on June 15, 2007, affirming the denial of his Post-Conviction Petition, People v. Hillard, No. 1-04-3365. (A copy of the Appellate Court's Order is attached hereto as Appendix A.)

1

## REASONS FOR GRANTING LEAVE TO APPEAL

1.   The decision of the trial court denying defendant a new trial in a post-conviction hearing must be overruled because the Assistant Public Defender, Ms. Bormann, defendant's original trial counsel, who was accused of ineffective assistance of counsel in representing defendant, was a supervisor in the Public Defender's Office at the time of the post-conviction hearings, where defendant was represented by an Assistant Public Defender.

2.   Counsel at the original proceedings that resulted in defendant's conviction rendered ineffective assistance of counsel by failing to do necessary research as to controlling law and failing to present controlling law, and hence, defendant was denied his Sixth Amendment (United States Constitution) rights. Counsel who represented defendant on appeal and at the post-conviction proceedings also provided ineffective assistance of counsel.

3.   This case must be reversed because post-conviction appointed counsel for indigent defendant at the post-conviction hearing failed to comply with Supreme Court Rule 651(c).

## STATEMENT OF FACTS

This Statement of Facts is created both from facts presented in the original Motion to Suppress and original trial, which were reviewed by the trial court in making its

2

conclusion after hearing evidence in the post-conviction hearing and evidence presented in the post-conviction hearing.

On May 10, 1997, Yinka Jinadu entered the apartment of his estranged wife. He was there set upon, beaten and kidnapped by a number of men. He testified to a general description. His testimony was:

"Q: Was he able to give you any name or physical description of the other three male black offenders?

A: Yes.

Q: What were those descriptions that he gave you?

A: He described them as being in there twenties, one individual -- male blacks, one individual he had no height but for the weight was one sixty with brown eyes and black hair.

The second individual was five foot ten inches tall and he weighed -- No. Five foot eleven inches tall and he weighed two hundred pounds, black and brown eyes -- brown eyes and back hair.

The third offender was five foot eleven, one sixty-five, brown eyes, black hair. And another individual was five foot five, one forty-five, brown eyes, black hair." (B-12-B-13)

During the investigation, it was determined that a gun found at the apartment was registered to Loretha Hillard,

3

rejected this contention, reasoning that any such

loyalty to one's office was too remote to justify a *per*

*se* conflict of interest rule." (Emphasis added.)

The court's reasoning does not apply where one Public

Defender alleged to be incompetent is a supervisor, i.e., in

a superior position in the Public Defender's Office. An

Assistant Public Defender may not want to jeopardize his job

or his job assignment or other intangible benefits by too

strenuously attacking a supervisor in the Public Defender's

Office. The Assistant Public Defender making the attack may

have a subliminal fear of "self-harm" by attacking a person

with greater power--a supervisor in the Public Defender's

Office. Here, there should have been a hearing. Because

there was no such hearing held here, the judgment below must

be reversed.

The rule of People v. Banks, supra, is contrary to the

holding of other sister States. See State v. Florida, 617

So.2d 781 (State of Florida, 1993); Ryan v. Thoms, 261 Ga.

661, 409 S.E.2d 507 (Ga. 1991), cited with approval in Ware

v. State, 267 Ga. 510, 480 S.E. 999 (Ga. 1997); District

Court for the Twenty First Judicial District v. Buss, 783

P.2d 1223, Cal. Supreme Court. There, the court rejected the

Illinois Rule. See Angarano v. United States, 329 A.2d 453

(D.C. App. 1974) rejecting People v. Banks, supra rule and

adopting People v. Smith, 37 Ill.2d 622, 230 N.E.2d 169

10

(1967) rule.

The position in the above cases was based on United States Supreme Court precedent. This Court must re-evaluate the validity of Banks.

The Illinois Supreme Court in People v. Banks, supra, rejected the well-reasoned opinion in People v. Smith, supra, by distinguishing the loyalty of lawyers in a Public Defender's Office to the Public Defender's Office and to the other members of the Public Defender's Office, from the loyalty of private attorneys to their firms and other members of their firms.

This is an irrational distinction. It is unsupported by any data from any survey. It is based on an irrational presumption. Hence, it is unconstitutional. Tot v. United States, 319 U.S. 463, 87 L.Ed. 1514.

There is no real difference between how lawyers function in a private law firm and in a Public Defender's Office. The decision in Banks must be reconsidered.

2.

**Counsel at the original proceedings that resulted in defendant's conviction rendered ineffective assistance of counsel by failing to do necessary research as to controlling law and failing to present controlling law, and hence, defendant was denied his Sixth Amendment (United States Constitution) rights. Counsel who represented defendant on appeal and at the post-conviction proceedings also provided ineffective assistance of counsel.**

If defendant's Motion to Suppress his arrest had been granted, his out-of-court identification at the line-up must

11

be suppressed, <u>United States v. Crews</u>, 445 U.S. 463, 63
L.Ed.2d 537, and the State could only present an in-court
identification if it could prove there existed independent
origin. <u>United States v. Crews</u>, <u>supra</u>. If the out-of-court
or the in-court identifications had been suppressed,
defendant would have probably been acquitted.

The State had conceded that on June 3 at defendant's
house, defendant was arrested. Since the police had no
warrant and did not observe defendant committing a crime,
the State had the burden to prove there existed at the time
of defendant's seizure probable cause to arrest defendant.
<u>People v. Talley</u>, 34 Ill.App.3d 506, 340 N.E.2d 167.

The arrest of defendant was based primarily on a
general description. The victim testified:

"Q: Was he able to give you any name or physical
description of the other three male black offenders?

A:  Yes.

Q:  What were those descriptions that he gave you?

A:  He described them as being in there twenties,
one individual -- male blacks, one individual he had no
height but for the weight was one sixty with brown eyes
and black hair.

The second individual was five foot ten inches
tall and he weighed -- No. Five foot eleven inches tall
and he weighed two hundred pounds, black and brown eyes
-- brown eyes and back hair.

12

The third offender was five foot eleven, one sixty-five, brown eyes, black hair. And another individual was five foot five, one forty-five, brown eyes, black hair." (B-12-B-13)

If trial counsel had provided effective assistance of counsel, no court could find under controlling law the existence of probable cause. In finding the existence of probable cause, the trial court (later adopted by the Appellate Court) found three facts when combined provided probable cause. They were:

(a) Defendant fit a general description of a person involved in a crime.

(b) The alleged statement of Loretha Hillard "That the only person who would have taken her gun was her brother Tony Hillard." (00028)

(c) Defendant at first did not admit to his name.

The fact that defendant fit the general description was considered by the trial court and the Appellate Court as the most important fact in finding the existence of probable cause. Ruling of trial court. (Original Trial, Tr. B-112-B-113) There, the trial court stated:

"We have the defendant in a place where the sister indicated he would be, fitting the general description of one of the offenders and the defendant initially giving a phony name to the police. This adds up to reasonable grounds to believe that the defendant had

13

committed an offense and probable cause to arrest him."
(B-112-B-113)

The Appellate Court agreed. (Order of Affirmance, Appendix
B, p. 8)

Officer Brady testified defendant fit the general
description of all the people described by the victim. (B-
73) The Public Defender failed to effectively handle the
facts referred to in paragraphs (a) and (b). Here, the
general description relied on was a black man, 5'11", 165
pounds in his twenties. Defendant as 5'11", 170 pounds and
21. Although a general description may be a basis for an
arrest under certain circumstances it cannot be, not under
the circumstances here where there was a substantial time
and location difference between the crime and the
observation of defendant. The crime occurred on May 10.
Defendant was arrested on June 3. Defendant was not arrested
in the vicinity of the crime. For a general description to
provide a basis for arrest, defendant must be seen shortly
after the crime and in the vicinity of the crime.

People v. Robinson, 299 Ill.App.3d 426, 701 N.E.2d 231,
relied on by the Appellate Court, and the other cases relied
on in Robinson were factually very different than here. In
those cases, the police saw defendant shortly after the
crime in the general area of where the crime occurred. Here,
where the police saw defendant 20 or more days after the
crime and not in the vicinity of the crime and where the

14

description was very general, the general description, even
when joined by the other facts, cannot demonstrate probable
cause. In <u>Robinson</u>, <u>supra</u>, the court stated "Police stopped
defendant shortly after the incident occurred and in close
proximity to the scene of the crime." The other cases relied
on by the court in <u>Robinson</u> all related to incidents where
the time and place were in close proximity. The court in
<u>Robinson</u> stated:

> "In *People v. Wilson*, 141 Ill.App.3d 156, 95 Ill.Dec.
> 848, 490 N.E.2d 701 (1986), police received a
> description of a man with a gun walking north wearing a
> gray hat, maroon and gray striped sweater, black pants
> and a black coat.... <u>The court noted that police saw</u>
> <u>defendant in the area described, his clothing matched</u>
> <u>the description given, and he was walking in the</u>
> <u>direction noted in the description</u>....
>
> Likewise, in *People v. Starks*, 190 Ill.App.3d 503,
> 137 Ill.Dec. 447, 546 N.E.2d 71 (1989), a defendant
> convicted of attempted murder and armed robbery argued
> that he was improperly stopped and arrested by police.
> The description of the robbery suspect included his
> race, approximate height and weight, and color and type
> of clothing. <u>The defendant was stopped and arrested in</u>
> <u>a vehicle approximately 20 minutes after the robbery</u>
> <u>and a block and a half from the scene of the crime</u>."

(Emphasis added.)

In Search and Seizure, Fourth Edition, LaFave, Section 3.4(c), p. 253, in a summary of the case law, it is concluded where there is a most general description and the defendant is seized long after the crime and not in the general vicinity, there is no probable cause.

A review of the cases that deal with arrest based on general suspicion would have advised defense counsel at trial, defense counsel on appeal and defense counsel at post-conviction hearing that the arrest in this case could not be based on the general description. See in LaFave, supra, p. 254, case of Com v. Richards, 458 Pa. 455, 327 A.2d 63.

In the instant case, the description was very general and did not contain the uniqueness of the description where arrests have been upheld. (See LaFave, supra, p. 256.) Here, the crime occurred on May 10 and defendant was arrested on June 3. Also he was not seen in the general area of the crime. Defense counsel at the Motion to Suppress failed to argue this very important distinction and failed to support the argument with case law. (Original Trial, Tr. B-96-B-109)

The law as set out in LaFave is so persuasive that only total lack of effectiveness can explain the failure to cite these cases.

If trial defense counsel would have researched the issue, i.e., general description as basis for arrest, he

would have found that such general description, as here,
would not support an arrest when defendant is not seen
shortly after the crime and in the general area of the
crime.

The failure of a lawyer to research for controlling
case law is ineffective assistance of counsel. See People v.
Wright, 111 Ill.2d 18, 488 N.E.2d 973; Dixon v. Snyder, 266
F.3d 693 (7 Cir. 2001). The failure of counsel to
investigate the law is equivalent to failure to investigate
and find important exculpatory facts. Workman v. Tate, 957
F.2d 1339; People v. Truly, 230 Ill.App.3d 948, 595 N.E.2d
1230.

Defense counsel also failed to properly demonstrate
that any alleged statement concerning who could steal the
gun has no real value in proving existence of probable
cause. This statement, "That the only person who would have
taken her gun was her brother Tony Hillard." (C00028,
Opinion of Appellate Court), or as Det. Bradley testified,
"If her gun was stolen the only person who could have stolen
it would have been her brother." (Motion to Suppress,
Original Trial, March 5, 1998, Tr. B-20) are mere
speculations. It is surmise. Such speculation or surmise
cannot rise to the level of probable cause.

The other fact relied on by the court is not probable
cause. The mere fact that a person refuses to provide
cooperation with police investigation is not evidence of

17

guilt. Refusing to provide a name is not flight or physical resistance. It is not probable cause.

The other ineffective act of defense counsel is failure to call Ms. Hillard to testify she never told Police Officer Bradley that the only person who could steal the gun was her brother. Ms. Bormann testified she interviewed Miss Hillard and was told she never stated that. (Tr. 51) Ms. Bormann testified:

"Q: Did you ask her about whether Tony Hillard could have access to that gun?

A: I specifically ask that question because that was the issue and she told me that yes Tony, like all of her other family members and friends, would have known where the gun was and could have had he wanted to make himself -- could have availed himself of the gun.

Q: Did you also talk to her about a phone conversation she had with the police about that gun?

A: I did." (Tr. 50F-51F)

She testified she made a strategic decision not to call Miss Hillard because of credibility concerns. (Tr. 54F, 79F) She testified she was concerned that if she called Ms. Hillard, evidence from her would be similar to that provided by Det. Bradley. (Tr. 53F) She testified:

"Q: Did you call Loretha Hillard at the motion to quash arrest and suppress hearing?

A: No.

18

Q: Why not?

A: Because Ms. Hillard, under oath made it very clear that she would deny having that conversation with the officer on the phone, placed a link between Ms. Hillard on the gun in question. At that point no such link other than hearsay was going to be made at trial and I wanted to keep it that way." (Tr. 53F)

She could have made a determination if such evidence would have been admitted by making a pre-trial Motion in Limine. Her decision was flawed by her failure to make a Motion in Limine before the hearing on the Motion to Suppress. If she had, she would have known if the court would have admitted (as it ultimately did) Ms. Hillard's alleged statement to Officer Bradley. If the court was to admit this evidence, no harm would occur from providing the State with additional evidence of defendant's possible connection to the gun. Surely, no harm would have been done where Ms. Hillard would have testified that many others also had availability to steal the gun. Hence, an additional major defect in counsel's action was making a strategic decision without conducting proper investigation as to what evidence would be admitted. This is the equivalent of not properly researching the proper law or not investigating relevant facts. This is ineffective assistance. See People v. Wright, 111 Ill.2d 18, 488 N.E.2d 973; Workman v. Tate, 957 F.2d 1339. Here, because of ineffective assistance of counsel as described

19

above, defendant was prejudiced by defendant's illegal arrest and by the out-of-court identification not being suppressed, and possibly the in-court identification not being suppressed.

3.

**This case must be reversed because post-conviction appointed counsel for indigent defendant at the post-conviction hearing failed to comply with Supreme Court Rule 651(c).**

The lawyers who represented the defendant at the post-conviction proceeding did not file a petition pursuant to Illinois Supreme Court Rule 651(c). That a petition was filed by a different Assistant Public Defender is irrelevant. No such petition has been filed in this case. Under authority of People v. Bashaw, 361 Ill.App.3d 963, 838 N.E.2d 972, 298 Ill.Dec. 79, the denial of post-conviction relief must be reversed.

### CONCLUSION

Petitioner respectfully requests that this Court grant leave to appeal.

### CERTIFICATE OF COMPLIANCE

I certify that this Petition for Leave to Appeal conforms to the requirements of Supreme Court Rules 341(a) and (b). The length of this Petition for Leave to Appeal, excluding the Appendix, is 20 pages.

<div style="text-align: right">

Respectfully submitted,

F F C

FREDERICK F. COHN
Attorney for Petitioner

</div>

APPENDIX A

he foot of this order may be
hanged or corrected prior to the
nts for filing of a Petition for
reheating or the disposition of
he same.

FIFTH DIVISION
June 15, 2007

No. 1-04-3365

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 97 CR 30453 |
| | ) | |
| TONY HILLARD, | ) | Honorable |
| | ) | Michael P. Toomin, |
| Defendant-Appellant. | ) | Judge Presiding. |

ORDER

Defendant Tony Hillard was convicted by a jury of armed robbery, armed violence,

aggravated kidnaping, and aggravated battery. He was sentenced to 50 years in the Illinois State

Penitentiary. On direct appeal, defendant raised four issues. We denied his direct appeal on June

11, 2001. People v. Hillard, No. 1-99-0152 (2001) (unpublished order pursuant to Supreme

Court Rule 23). Defendant filed a pro se petition for post-conviction relief and after being

appointed counsel, filed two supplemental petitions. He alleged ineffective assistance of counsel

and that the prosecution withheld exculpatory evidence in violation of Brady v. Maryland, 373

U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). He also challenged his sentence based on

APPENDIX A

1-04-3365

People v. Cervantes, 189 Ill. 2d 80 (1999).

The prosecution filed a motion to dismiss. The court dismissed defendant's Brady claim and granted a new sentencing hearing on the Cervantes issue. The court also granted an evidentiary hearing on the allegation of ineffective assistance of counsel based on his trial counsel's failure to call Loretha Hillard as a witness at the hearing on the motion to quash arrest. During the evidentiary hearing defendant was represented by assistant public defender Cheryl Miller and her partners, George Dykes and Marge Sanders. After closing arguments, the court found that defendant had "failed to establish any credible basis for this court to warrant that he was denied effective assistance of counsel by [trial counsel's] failure to call Loretha Hillard as a witness at the suppression hearing."

On appeal from the evidentiary hearing defendant raises three issues. Defendant contends that the trial court erred in denying him a new trial because original trial counsel who was accused of being ineffective was a supervisor in the Office of the Public Defender during his post-conviction hearing, when he was represented by an assistant Public Defender. Defendant also claims that the trial court's denial of his post-conviction petition should be reversed because he received ineffective assistance of trial counsel, appellate counsel, and post-conviction counsel. Defendant further contends that his post-conviction counsel failed to comply with Supreme Court Rule 651(c). We affirm.

<center>BACKGROUND</center>

<center>I. Direct Appeal</center>

Defendant and codefendant, Erven Walls, were tried simultaneously before two juries.

<center>2</center>

1-04-3365

Before trial, defendant litigated a motion to quash his arrest and suppress evidence. The trial court denied the motion and found that Detective Brady had reasonable grounds to believe that defendant had committed the offense and that probable cause to arrest him existed.

At trial, Yinka Jinadu testified that he came to the United States in 1994, worked for a car dealership, and eventually started his own trucking company. He met and married Delores Jinadu in 1995, and they separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10, 1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him, Delores explained that her car was broken and asked Jinadu to pick her up at her apartment. Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the apartment to wait while she finished getting ready. As Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat.

When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand, and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed, and hit him on the head again with an iron object. Walls then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Walls and the man with the bat then pulled Jinadu into the bathroom, handcuffed him, and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the

3

1-04-3365

bathroom and came back holding a pillow and the gun. Walls returned to the bathroom carrying handcuffs. Walls and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street where he saw the man with the baseball bat and Walls standing across the street. Upon seeing him, both men fled down the street.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open head wound. There was gray duct tape on his mouth and chin and he was handcuffed. Jinadu showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw hundreds of plastic bags, a scale, white powder, spoons, and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine, and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. Schmidt stated that Jinadu identified Delores by name but was

4

1-04-3365

unable to name any of the other offenders. Jinadu also described the height, weight, and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Craine. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up investigation. After talking to Jinadu, Detective Bradley had the names of Delores, defendant, and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven Walls and Delores at 1121 South State Street. Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Loretha Hillard. He called Loretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address.

Detective Bradley went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany the officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the location of his sister's gun. Defendant was arrested, taken to the

5

1-04-3365

police station, and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years in the Illinois State Penitentiary.

On direct appeal defendant raised four issues. He argued as follows: (1) the trial court erred in failing to grant his motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly sentenced defendant to a consecutive sentence. We addressed each of these issues on appeal and affirmed. Hillard, slip op. at 14.

## II. Post-Conviction Evidentiary Hearing

The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 1998)) provides that a defendant may challenge his conviction by alleging "that in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States of the State of Illinois or both." 725 ILCS 5/122-1 (West 1998); People v. Tenner, 175 Ill. 2d 372, 377 (1997). A petition filed under the Act must "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 1998). The petition shall have attached "affidavits, records, or other evidence" as required by section 122-2 of the Act "supporting its allegations or shall state why the same are not attached."

6

1-04-3365

725 ILCS 5/122-2 (West 1998); People v. Collins, 202 Ill. 2d 59 (2002). Post-conviction relief is a collateral proceeding, not an appeal from the underlying judgment. People v. Evans, 186 Ill. 2d 83, 89 (1999). All issues decided on direct appeal are res judicata, and all issues that could have been raised in the original proceeding but were not are waived. People v. Whitehead, 169 Ill. 2d 355, 371 (1996). If a claim of ineffective assistance of counsel is based on matters outside the record, then it could not have been raised on appeal, and consequently, is not waived in a post-conviction petition. People v. Owens, 129 Ill. 2d 303 (1989).

In cases not involving the death penalty, the Act establishes a three-stage process for adjudicating a petition for post-conviction relief. People v. Gaultney, 174 Ill. 2d 410, 418 (1996). At the first stage of a post-conviction proceeding, the court determines whether the petition alleges a constitutional infirmity that, if proven, would require relief under the Act. People v. Coleman, 183 Ill. 2d 366, 380 (1998). The first stage presents a pleading question. Unless positively rebutted by the record, all well-pleaded facts are taken as true at this stage, and the trial court's determination is subject to de novo review. Coleman, 183 Ill. 2d at 385.

If the petition is not dismissed and survives the first stage of the post-conviction process, then subsection (b) of section 122/2.1 of the Act provides that "the court shall order the petition to be docketed for further consideration in accordance with section 122-4 through 122-6." 725 ILCS 5/122-2.1(b) (West 1998). At this second stage counsel is appointed to represent the defendant, and if necessary, the State is allowed to file responsive pleadings. 725 ILCS 5/122-4, 122-5 (West 2004). At this stage, the circuit court considers the petition and any accompanying documentation and dismiss the petition if it does not indicate a substantial showing of a

7

1-04-3365

constitutional violation. People v. Edwards, 197 Ill. 2d 239, 246 (2001). A petition that makes a

showing of a constitutional violation advances to the third stage, at which the circuit court

conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2004). An evidentiary hearing will be

held only where the allegations of the post-conviction petition make a substantial showing that the

defendant's constitutional rights have been violated.

      This case was before the trial court at the third stage of the post-conviction process. An

order granting or denying relief after an evidentiary hearing is a "final judgment upon such

petition" and it is subject to review "in a manner pursuant to the rules of the Supreme Court."

725 ILCS 5/122-7 (West 2004). The post-conviction judge's ruling must be affirmed unless it is

manifestly erroneous. People v. Morgan, 212 Ill. 2d 148, 155 (2004). Manifest error is error

which is clearly evident, plain, and indisputable. Morgan, 212 Ill. 2d at 155.

      In the instant case, the court, in resolving defendant's post-conviction petition, granted an

evidentiary hearing on the allegation of ineffective assistance of counsel. Defendant claimed trial

counsel rendered ineffective assistance because she failed to call his sister, Loretha Hillard, as a

witness at the hearing on defendant's motion to quash arrest. Defendant was represented by

assistant Public Defender Cheryl Miller and her partners, George Dykes and Marge Sanders,

during the evidentiary hearing.

      Loretha Hillard, defendant's sister, testified during the post-conviction hearing. She

related that she worked as a security officer for a public housing development from 1993 to 1996.

She testified that on May 17, 1997, her gun was missing and she reported this to the police. She

denied telling the police that defendant took her gun.

<div align="center">8</div>

1-04-3365

Loretha testified that defendant's trial counsel, assistant Public Defender Cheryl Bormann, contacted her "maybe 4 times" by telephone. According to Loretha, Bormann asked her who could have taken the gun, and she replied that she did not know. Bormann asked Loretha whether she told the police that only defendant could have stolen her gun, to which Loretha replied, no. Loretha testified that she did not recall whether Bormann had told her she wanted her to testify at the hearing on defendant's motion to suppress, but she was ready and willing to do so.

On cross-examination, Loretha admitted she completed the post-conviction affidavit almost 3 years after defendant was convicted and 15 days after defendant's direct appeal was denied. Loretha admitted to speaking to defendant's attorney, Bormann, several times on the telephone. She stated she only met Bormann once, in court, and did not recall attorney Bormann visiting her at her home.

Loretha denied telling Bormann that the door to her home was often unlocked and that defendant or other family members could have taken the gun. She testified she told Detective Bradley that her family members would not have taken her gun because they would not put her in jeopardy.

On re-direct examination Loretha testified that she was not subpoenaed to testify at the suppression hearing, although she was ready to testify. She indicated that she was never interviewed by attorney Bormann and denied telling Bormann that defendant could have taken her gun.

9

1-04-3365

During the post-conviction hearing defense counsel was allowed to enter into evidence a gun registration report and the police report Loretha filed regarding her stolen gun.

The prosecution called assistant Public Defender Cheryl Bormann to testify. She worked with a partner and two Rule 711 law clerks on defendant's case. She was an assistant Public Defender from January 1989 until 1998. She then spent five years in private practice and returned to the Office of the Public Defender as a supervisor.

Bormann, together with her law clerks, spoke to Loretha two to six times in connection with defendant's case. Bormann testified that on February 25, 1998, she and her law clerk met Loretha in person at her home for about an hour. Loretha told Bormann that she kept her gun under her mattress at home and that her friends and family knew she had a gun. Her door was left unlocked "about half the time and that anybody who knew where her gun was located, knew that she had a gun and knew that the apartment was open could obtain the gun." Bormann asked Loretha about defendant's access to her gun and she replied that defendant, like her other family members and friends, "would have known where the gun was and could have had he wanted to make himself—could have availed himself of the gun."

Bormann asked Loretha whether she told police that defendant was the only person who could have stolen the gun. Loretha indicated that she told the police that defendant and many other relatives and acquaintances could have taken the gun. Bormann testified that Loretha never told her that in her conversation with the police, she had told them that she knew her family would not take her weapon because they would not put her in jeopardy.

10

1-04-3365

Bormann testified that during the hearing on defendant's motion to quash arrest, she called a detective to testify. She did not call Loretha because she did not want any evidence linking defendant to the gun other than the link that the police would provide by hearsay. Bormann also determined that the credibility of Loretha would not outweigh the officer's credibility.

On cross-examination Bormann testified that the basis of the motion to quash arrest was that the police lacked probable cause to arrest defendant for the theft of Loretha's gun. Bormann had subpoenaed Loretha for the motion to quash arrest, but did not call her because she was not credible. Bormann believed her testimony would hurt defendant's case by creating a link between defendant and the gun. Bormann agreed that during the hearing on the motion to quash arrest, Officer Bradley testified that Loretha told him that only defendant could have stolen her gun.

On redirect examination Bormann explained as follows:

"I didn't call Loretha Hillard for a variety of reasons, one was I didn't think she was going to make a credible witness. And I didn't think that Judge Toomin, who was going to be the trier of facts for the purposes of the motion was going to consider Ms. Hillard's testimony more credible that [sic] the officer's testimony; that was the issue for the purposes of the motion.

Now the downside to calling Ms. Hillard at the motion was my biggest concern because if I called Ms. Hillard at the motion what would have happened she would have been put under oath, sworn to testify and then testified prior to the trial in this case.

11

1-04-3365

At the trial, which I knew was going to be a jury at that point, I anticipated a couple of things: One was a single finder ID by the complainant in the case and then the possibility that gun records registered the gun to Ms. Hillard would be attempted to be introduced.

I thought that I had a decent chance at that motion in limine to prevent the State from doing that very thing if they couldn't - the name Loretha Hillard, Tony Hillard because then the jury would be left to speculation to any sorts of relationship. I didn't want to put Mr. [sic] Hillard under oath saying that Mr. Hillard, defendant, had an opportunity and access to steal the gun because that was given [sic] evidence to the State they didn't have."

Defense counsel called Loretha in rebuttal. She admitted it was possible she had met in person with Bormann, but did not remember. She denied telling Bormann that defendant knew where she kept her gun. Loretha indicated that she did not recall signing the subpoena and that the signature on the subpoena did not look like her signature. She did not recall if she was subpoenaed for the motion to quash arrest or whether she was present at court for the hearing on the motion to quash arrest and suppress evidence.

After closing arguments the court denied defendant's petition for post-conviction relief. The court found that defendant had "failed to establish any credible basis for this court to warrant that he was denied effective assistance of counsel by Ms. Bormann's failure to call Loretha Hillard

12

1-04-3365

as a witness at the suppression hearing."

## ANALYSIS

On appeal from the post-conviction evidentiary hearing, defendant raises three issues. Defendant contends the trial court erred in denying him a new trial because original trial counsel, who was accused of being ineffective, was a supervisor in the Office of the Public Defender at the time of his post-conviction hearing, when he was represented by an assistant Public Defender. Defendant also claims that the trial court's denial of his post-conviction petition should be reversed because he received ineffective assistance of trial counsel, appellate counsel, and post-conviction counsel. Defendant further contends that his post-conviction counsel failed to comply with Supreme Court Rule 651c. We take each argument in turn.

### INEFFECTIVE ASSISTANCE ALLEGED BASED ON CONFLICT OF INTEREST BETWEEN TRIAL AND POST-CONVICTION COUNSEL

There is no constitutional right to effective assistance of post-conviction counsel. See People v. Pinkonsly, 207 Ill. 2d 555, 567 (2003). The right to assistance of counsel in post-conviction proceedings is a matter of legislative grace, and a defendant is guaranteed only the level of assistance provided by the Post-Conviction Hearing Act. People v. Greer, 212 Ill. 2d 192, 204 (2004). The Illinois Supreme Court has labeled that level "reasonable" assistance. People v. McNeal, 194 Ill. 2d 135, 142 (2000). "However, when a defendant's appointed post-conviction attorney is called upon to assert that the defendant's appointed trial attorney was ineffective, the distinction between constitutional and statutory rights makes no difference. If post-conviction counsel is appointed to mold the defendant's allegations into legally cognizable shapes [citations], that counsel must be as conflict-free as trial counsel." [Citations.] People v.

13

1-04-3365

Hardin, 217 Ill. 2d 289, 300 (2005). The right to reasonable assistance of post-conviction counsel

includes the correlative right to conflict free representation. People v. Hardin, 217 Ill. 2d 289,

299 (2005); citing People v. Banks, 121 Ill. 2d 36 (1988).

Defendant contends that a conflict of interest existed between his trial counsel and his

post-conviction counsel and, therefore, the trial court should have conducted a hearing to inquire

about the conflict. At the time of the post-conviction hearing, defendant's prior trial counsel,

Cheryl Bormann, who was accused of providing ineffective assistance of counsel during

defendant's trial, was a supervisor in the Office of the Public Defender. Defendant argues that

because Bormann was a supervisor "[t]his should have required a hearing as to the relationship of

Bormann and public defender, Elyse Krug Miller."

In conflict of interests cases the trial court must take adequate steps – i.e., conduct "a

case-by-case inquiry" per Banks – to determine whether a risk of a conflict colored the

defendant's representation, but only when the conflict is brought to the court's attention. Banks,

121 Ill. 2d 36; Hardin, 217 Ill. 2d 289. Shortly after deciding Banks, in People v. Spreitzer, 123

Ill. 2d 1, 14 (1988), the Illinois Supreme Court articulated the principles applicable when a

defendant in a criminal case contends that he did not receive the effective assistance of counsel

because his attorney had a conflict of interest. If the defendant shows a per se conflict of interest,

he need not show prejudice resulting from that conflict in order to obtain relief. Spreitzer, 123 Ill.

2d at 15. If the defendant does not show a per se conflict of interest, the analysis depends upon

when he raised the issue. Spreitzer, 123 Ill. 2d at 17-18. It is well settled that in Illinois, no per

se conflict of interest exists where an assistant public defender alleges the ineffectiveness of

14

1-04-3365

another assistant public defender. Banks, 121 Ill. 2d at 36.

Defendant contends Banks is unconstitutional and "must be reconsidered." The Illinois Supreme Court recently discussed the principles articulated in Banks and concluded: "If Banks provides that no per se conflict of interest exists when one public defender argues that another public defender in the same office was ineffective, it cannot mean the trial court always must open an inquiry into a potential conflict." Hardin, 217 Ill. 2d at 310.

However, defendant claims that unlike Banks, in this case there is the additional factor of his trial counsel's position as a supervisor in the Public Defender's Office. Obviously, a subordinate might be reluctant to risk embarrassing his superior for fear of retaliation, whether overt or subconscious. This issue was addressed in People v. Munson, 256 Ill. App. 3d 765 (1994). The court in that case held that "given the diversity of organization of public defenders offices, we believe a case-by-case approach to potential conflicts between supervisors and subordinates is more rational than the blanket prohibition of a per se rule." Munson, 256 Ill. App. 3d at 771.

We note when a potential conflict is brought to the trial court's attention at an early stage, "a duty devolves upon the trial court to either appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel." Spreitzer, 123 Ill. 2d at 18. Furthermore, when the defendant does complain of the potential conflict he needs only to present the gist of such a conflict. People v. Edwards, 197 Ill. 2d 239, 244 (2001).

In the instant case, the record does not reflect that defendant gave any indication to the trial court that a conflict of interest existed between trial and post-conviction counsel. Trial

15

1-04-3365

courts are not required to conduct sua sponte investigations into possible conflicts. Hardin, 217 Ill. 2d at 301. In the instant case, the defendant presented no facts to the trial court suggesting a conflict. The defendant must provide some facts to demonstrate what the conflict entails. People v. Jones, 210 Ill. App. 3d 375, 378 (1991).

The record reflects no lack of diligence by post-conviction counsel. In fact, Miller amended defendant's post-conviction petition and raised the Cervantes issue. She not only obtained a post-conviction hearing on the Cervantes issue, but she successfully persuaded the trial judge to reduce defendant's sentence for armed violence from 25 years to 20 years' imprisonment.

Defendant makes no specific allegation that post-conviction counsel was deficient in any way as a result of Bormann's status as a supervisor in the Public Defender's Office. Defendant relies on conjecture and speculation, rather than identifying a specific defect in post-conviction counsel's strategy, tactics, or decision-making caused by the alleged conflict. Defendant generally alleges that "an assistant public defender may not want to jeopardize his job or his job assignment or other intangible benefits by too strenuously attacking a supervisor in the public defender's office" and that an assistant may have a "subliminal fear" of a supervisor's ineffectiveness. See Banks, 121 Ill. 2d at 46-47 ("in the absence of an evidentiary record of conflict, one should not be created based on mere speculation").

The record reflects no per se conflict. Defendant has not pointed to any specific defects in his post-conviction counsel's conduct so as to warrant relief by this court. Accordingly, the record reflects no error by the trial court for failing to conduct a hearing on the conflict of interest alleged by defendant.

16

1-04-3365

## INEFFECTIVE ASSISTANCE OF COUNSEL

In order to establish a violation of the constitutional right to effective assistance of counsel, a criminal defendant must first show that counsel's performance was deficient in that it was objectively unreasonable, and second, that the deficient performance so prejudiced the defense that defendant was deprived of a fair trial. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Albanese, 104 Ill. 2d 504 (1984). In People v. Albanese, the Illinois Supreme Court adopted the Strickland rule, stating that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Albanese, 104 Ill. 2d at 525-26. Moreover, any evaluation of counsel's conduct cannot properly extend into areas involving the exercise of judgment, discretion or trial tactics even where the appellate counsel or the reviewing court would have acted differently. People v. Mitchell, 105 Ill. 2d 1, 12 (1984). A defendant has the burden of demonstrating that he has received ineffective assistance of counsel. People v. Lundy, 334 Ill. 3d 819, 829 (2002). A defendant's failure to make a requisite showing of either deficient performance or sufficient prejudice defeats an ineffective assistance of counsel claim. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant first argues that trial counsel was ineffective for failing to call his sister, Loretha Hillard, to testify that she never told the police that the only person who could steal her gun was her brother. Police Officer Bradley, who was defendant's arresting officer, testified at defendant's trial that Loretha told him that her brother was the only person who could have taken her gun.

17

1-04-3365

However, defendant claims that Loretha later told defendant's trial counsel that she never made that comment and that she would testify to that at trial.

The trial court granted an evidentiary hearing on the issue of counsel's failure to call Loretha as a witness at the motion to quash arrest and suppress evidence. As previously noted, a trial court's determination following an evidentiary hearing on a post-conviction petition will not be disturbed on review unless it is manifestly erroneous. People v. Morgan, 212 Ill. 2d 148, 155 (2004).

Defendant's claim does not satisfy the first prong of the Strickland standard. Generally, trial strategy will not support a finding of ineffective assistance of counsel. People v. Smith, 177 Ill. 2d 53, 92 (1997). The decision to call a particular witness is typically a matter of trial strategy, and does not support a claim of ineffective assistance of counsel, particularly where the witness's testimony would have been harmful to a defendant. People v. Ward, 187 Ill. 2d 249, 261-62 (1999); People v. Ashford, 121 Ill. 2d 55, 74-75 (1988).

At the evidentiary hearing, defendant's trial counsel testified that she interviewed Loretha and determined that her credibility would not outweigh Detective Bradley's credibility. See People v. Dean, 226 Ill. App. 3d 465, 469 (1992) (no ineffective assistance of counsel where trial counsel did not call three witnesses because they were related to defendant and their credibility would carry little weight). Moreover, defendant's trial counsel indicated that Loretha's testimony would have established a direct link between the defendant and the gun. Loretha's testimony could have brought out the fact that the defendant had access to the gun and this could have been more detrimental to his case. See People v. Simms, 192 Ill. 2d 592, 635 (2000) (counsel's failure

18

1-04-3365

to call a witness whose testimony had "clear risks" was not ineffective assistance). Given these facts it was an objectively reasonable trial tactic by counsel to not call Loretha to testify. We are mindful of the Supreme Court's admonishment in Strickland that "it is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence," and that, as a result, a court reviewing an ineffective assistance of counsel claim should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

Defendant also cannot satisfy the second prong of the Strickland standard. To show prejudice, a defendant must establish that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. People v. Whitehead, 169 Ill. 2d 355, 380 (1996). In the instant case, the totality of the evidence, including the victim's identification of the defendant, the defendant's association with the codefendants, and the recovered gun, reflects that the outcome would not have changed with Loretha's testimony.

After the evidentiary hearing, the trial court found defendant failed to satisfy the Strickland standard for ineffective assistance of counsel. The trial court indicated that Loretha's testimony "detract[ed] from her credibility." The court concluded that "[t]his is not a situation where Ms. Bormann did not make an adequate investigation." The trial court noted that Bormann had contacted Loretha, met with her, observed her demeanor, and issued a subpoena, but was not

19

1-04-3365

required to call her as a witness. For the reasons previously discussed, the trial court's finding
that defendant's trial counsel did not provide ineffective assistance was proper and the record
reflected no manifest error.

   ·· Defendant next argues that trial counsel was ineffective for failing to research and argue at
the motion to suppress that "the arrest in this case could not be based on the general description"
of the defendant that the victim gave to the police. However, this claim is barred by res judicata
and the waiver doctrine.

   A proceeding brought under the Post-Conviction Hearing Act is a collateral attack on a
judgment of conviction. The principles of waiver and res judicata limit the scope of post-
conviction review. People v. Winsett, 153 Ill. 2d 335, 346 (1992). Consequently, the inquiry in a
post-conviction petition is limited to allegations of constitutional violations that were not and
could not have been raised previously. People v. Eddmonds, 143 Ill. 2d 501, 510 (1991). The
Illinois Supreme Court has held that "it is well established that determinations of the reviewing
court on direct appeal are res judicata as to issues actually decided and issues that could have
been presented on the direct appeal, but were not, are deemed waived." People v. Britz, 174 Ill.
2d 163, 177 (1996).

   In the instant case, defendant's allegation that counsel was ineffective for failing to argue
that the description of him was "general" at the motion to quash arrest could have been raised on
direct appeal. In fact, on direct appeal, appellate counsel challenged other issues related to
defendant's arrest including the finding of probable cause by the trial court after hearing the
motion to quash arrest and suppress evidence. Thus, the claim that trial counsel was ineffective

20

1-04-3365

for not focusing his argument on the general nature of the offender's description could have been brought on direct appeal, and is accordingly barred from consideration by this court. People v. Blair, 215 Ill. 2d 427, 443 (2005) (issues decided on direct appeal are res judicata).

Defendant contends that if trial counsel would have researched the issue, i.e., general description as basis for arrest, that the outcome of the trial would have been different. We note that in affirming defendant's conviction (Hillard, slip. op. at 8), we analyzed the probable cause for the arrest of the defendant consistent with the principles articulated in People v. Robinson, 299 Ill. App. 3d 426 (1998). The court in Robinson indicated that "[i]n determining whether probable cause existed to effectuate a warrantless arrest, a court must look to the totality of the circumstances and make a practical, commonsense decision whether there was a reasonable probability that an offense was committed and that the defendant committed it." Robinson, 299 Ill. App. 3d at 431. The Robinson court further recognized that a general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. Robinson, 299 Ill. App. 3d at 431.

In applying the above principles to the instant case on direct appeal, we concluded that based on the totality of the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. Therefore, applying this reasoning, it is clear that even if defendant's trial counsel was deficient for failing to argue the lack of a specific description, that failure did not prejudice defendant and was not outcome determinative. Probable cause is determined under the

21

1-04-3365

totality of the circumstances. People v. Love, 199 Ill. 2d 269, 279 (2002). The record reflects

that, in affirming on direct appeal, we analyzed probable cause under a totality of the

circumstances, not on any one factor alone. People v. Hillard, 1-99-0152 (2001) (unpublished

order pursuant to Supreme Court Rule 23).

Defendant next claims that trial counsel was ineffective for failing to investigate "what

evidence would be admitted" when she decided not to call Loretha to testify at the motion to

quash arrest and suppress evidence. However, this claim was not raised in defendant's pro se or

supplemental petitions for post-conviction relief, and is therefore waived. See 725 ILCS 5/122-3

(West 2000); see also People v. Moore, 189 Ill. 2d 521, 544 (2000).

Waiver aside, defendant did not establish that trial counsel was ineffective on this issue

under the Strickland standard. Defendant has not demonstrated that his trial counsel failed to

investigate this issue; he merely states that she did not pursue it, and therefore she must have not

investigated it. Defendant's trial counsel testified at the evidentiary hearing that her strategy was

to limit the evidence linking the defendant to the gun recovered at the scene to hearsay evidence,

rather than direct evidence.

Moreover, defendant did not demonstrate that any prejudice resulted from this alleged

error. For the reasons previously discussed, the outcome of the trial would have been the same

with Loretha's testimony. Therefore no prejudice resulted from the alleged error. Strickland, 466

U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069 (a defendant's failure to make a requisite

showing of either deficient performance or sufficient prejudice defeats an ineffective assistance of

counsel claim).

22

1-04-3365

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Defendant next claims that appellate counsel was ineffective for failing to research controlling law. More specifically, he asserts that "a review of the cases that deal with arrest based on general suspicion would have advised defense counsel at trial, defense counsel on appeal and defense counsel at post-conviction hearing that the arrest in this case could not be based on the general description."

The Supreme Court of the United States has determined that a defendant is entitled to the effective assistance of counsel upon direct appeals which are allowed as a matter of right. Evitts v. Lucey, 469 U.S. 387, 396-97, 83 L. Ed. 2d 821, 830-31, 105 S. Ct. 830, 836-37 (1985). The Illinois Supreme Court has held that a defendant who contends that appellate counsel rendered ineffective assistance, for example by failing to argue a particular issue, must show that "the failure to raise that issue was objectively unreasonable" and that, "but for this failure, his sentence or conviction would have been reversed." People v. Caballero, 126 Ill. 2d 248, 270 (1986); see also People v. Williams, 209 Ill. 2d 227 (2004). Both prongs of the Strickland test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. Caballero, 126 Ill. 2d at 270. If the underlying issue is nonmeritorious, the defendant has suffered no prejudice. People v. Rogers, 197 Ill. 2d 216, 223 (2001).

The record reflects that appellate counsel argued that under the totality of the circumstances, probable cause did not exist to arrest defendant. Appellate counsel compared and contrasted defendant's case with published cases concerning probable cause. The record does not reflect that appellate counsel rendered deficient performance. Appellate counsel's failure to focus

23

1-04-3365

on the issue regarding the general description of the offender in the instant case was not outcome determinative for defendant's appeal. Moreover, since there was no ineffective assistance of trial counsel with regard to this issue, the record reflects no ineffective assistance of counsel on appeal.

For the reasons previously discussed, defendant failed to satisfy the Strickland standard.

## INEFFECTIVE ASSISTANCE OF POST-CONVICTION COUNSEL

Defendant also claims that post-conviction counsel was ineffective. However, there is no constitutional right to effective assistance of post-conviction counsel. See People v. Pinkonsly, 207 Ill. 2d 555, 567 (2003). As previously noted, the right to assistance of counsel in post-conviction proceedings is a matter of legislative grace, and a defendant is guaranteed only the level of assistance provided by the Post-Conviction Hearing Act. See People v. Greer, 212 Ill. 2d 192, 204 (2004). The Illinois Supreme Court has labeled that level "reasonable" assistance. See People v. McNeal, 194 Ill. 2d 135, 142 (2000).

The defendant did receive reasonable assistance of post-conviction counsel. Supreme Court Rule 651(c) outlines the specific requirements that post-conviction counsel must fulfill in representing post-conviction petitioners. 134 Ill. 2d R. 651(c). Under Rule 651(c), the record must demonstrate that post-conviction counsel consulted with the defendant to determine his claims, examined the record, and made any amendments to the pro se petition that are necessary for an adequate presentation of the defendant's assertions. 134 Ill. 2d R. 651(c); see also People v. Greer, 212 Ill. 2d 192, 205 (2004). Post-conviction counsel is not required to comb the record on review for any possible claims the record may contain that a defendant did not raise in his pro se petition. People v. Rials, 345 Ill. App. 3d 636, 641 (2003). In fact, counsel fulfills his

24

1-04-3365

obligations by making the pro se petitioner's claims cognizable. Rials, 345 Ill. App. 3d at 642.

In this case, post-conviction counsel examined the record, filed two supplements to defendant's pro se petition, secured an evidentiary hearing for defendant, and also secured a lower sentence for defendant. Moreover, two Rule 651(c) certificates were filed in the instant case. For the reasons previously discussed, we reject defendant's claim that post-conviction counsel was ineffective.

## RULE 651(c) CERTIFICATE

Defendant contends that the trial court's ruling on his post-conviction petition following the evidentiary hearing must be reversed because, despite his post-conviction counsel having filed two Rule 651(c) certificates, he was entitled to have another certificate filed by the attorney who argued at the evidentiary hearing. Under Rule 651(c), the record must show that post-conviction counsel "consulted with petitioner to ascertain his contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed pro se that are necessary for an adequate presentation of petitioner's contentions." 134 Ill. 2d R. 651(c); see also People v. Zambrano, 266 Ill. App. 3d 856, 868 (1994).

The right to post-conviction counsel is derived from statute rather than from the Federal or State constitutions; accordingly post-conviction defendants are guaranteed a reasonable level of assistance under the Post-Conviction Act. People v. Flores, 153 Ill. 2d 264, 276 (1992). Post-conviction counsel complies with the requirements of Rule 651(c) when the record reflects that counsel consulted with the defendant to determine his or her allegations of deprivation of

25

1-04-3365

constitutional rights, examined trial transcripts, and made any necessary amendments to the pro se petition which had been filed. People v Greer, 212 Ill. 2d at 205.

In the instant case, assistant public defender Miller prepared a certificate of compliance pursuant to Supreme Court Rule 651(c) with each supplemental petition filed on defendant's behalf. The certificates indicated that post-conviction counsel consulted with defendant by letter and telephone to ascertain his contentions of deprivations of constitutional rights, examined the record of proceedings, examined defendant's pro se post-conviction petition, and had filed supplemental petitions.

Miller represented defendant during various stages of the post-conviction proceedings. She supplemented defendant's petition, argued against the motions to dismiss, and argued at the rehearing on sentencing. That fact that a different attorney from the Office of the Public Defender argued at the post-conviction evidentiary hearing does not require that a third Rule 651(c) certificate be filed in the instant case. Moreover, it is clear from the record that counsel at the hearing was thoroughly prepared. See People v. Lilly, 291 Ill. App. 3d 662, 669 (1997) (no issue where counsel who was assigned to represent the defendant at the hearing on the post-conviction petition did not file a certificate; court examined the work of the post-conviction counsel who handled the defendant's case for compliance with Rule 651(c)).

Post-conviction counsel conducted a fully contested evidentiary hearing. Ms. Hillard was called to testify on behalf of defendant. Following Ms. Hillard's testimony post-conviction counsel successfully entered into evidence on behalf of defendant a gun registration report and the police report Ms. Hillard had filed about her stolen gun. Post-conviction counsel conducted

26

1-04-3365

appropriate direct and cross-examination. The record reflects defendant's case was well-prepared and well argued. The performance of post-conviction counsel thus complied on all grounds with Rule 651(c). See People v. Szabo, 144 Ill. 2d 525, 532 (1991) (substantial compliance with Rule 651(c) is all that is required).

For the reasons previously discussed, we conclude that post-conviction counsel provided defendant the reasonable assistance contemplated by the Act (Moore, 189 Ill. 2d at 542-43) and demonstrated compliance with Rule 651(c) (People v. Jennings, 345 Ill. App. 3d 265, 271 (2003)).

## CONCLUSION

The experienced trial judge conducted a thorough third stage evidentiary hearing. The resolution of the defendant's post-conviction petition was proper and the record reflected no error. For the reasons previously discussed, we affirm

Affirmed.

O'MARA FROSSARD, J., with O'BRIEN, P.J., and TULLY, J., concurring.

27

*Q. Silverstein / Buck*

**APPENDIX B**

FIRST DIVISION
June 11, 2001

RECEIVED

'01 JUN 11 P1:33

APPEAL DIVISION

NOTICE

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

IN THE APPELLATE COURT ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
|     Plaintiff-Appellee, | ) Cook County |
| | ) |
|     v. | ) No. 97 CR 30453 |
| | ) |
| TONY HILLARD, | ) Honorable |
| | ) Michael Toomin, |
|     Defendant-Appellant. | ) Judge Presiding. |
| | ) |

ORDER

Defendant Tony Hillard was convicted in a jury trial of armed robbery, armed violence, aggravated kidnaping, and aggravated battery. He was sentenced to 50 years' imprisonment. On appeal, defendant raises four issues. He contends that: (1) the trial court erred in failing to grant his motion to quash arrest where the police lacked probable cause for the arrest; (2) it was error for codefendant's counsel to cross-examine the victim in front of defendant's jury where defendant and codefendant had antagonistic defenses; (3) the trial court impermissibly acted as an advocate where he questioned a witness and clarified codefendant's alias names; and (4) the trial court improperly sentenced defendant to a consecutive sentence. We affirm.

**APPENDIX B**

1-99-0152

## BACKGROUND

In May 1997 as Yinka Jinadu entered the apartment of his estranged wife Delores he was hit over the head with a baseball bat. When he awoke, he found that he was stripped of his clothing and his feet were tied with electrical tape. He also saw his wife and three or four other men in the room. One man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw codefendant, Erven Walls, with a gun in his hand. The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed and hit him on the head again with an iron object. Codefendant then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Codefendant and the man with the bat then pulled Jinadu into the bathroom, handcuffed him and placed him in the bathtub.

Defendant Hillard came into the bathroom and put a gun into Jinadu's mouth, demanding that Jinadu tell him where his car and money were kept. Defendant then walked out of the bathroom and came back holding a pillow and the gun. Codefendant also returned to the bathroom carrying handcuffs. He and defendant put Jinadu's hands behind his back, cuffed him, and further taped his legs and hands together. Defendant then began to place the pillow on Jinadu's face but was stopped by the man holding the bat. Five hours elapsed during which time Jiandu was threatened at gunpoint to tell the men where he kept his money. Eventually, defendant placed a towel over Jinadu and turned on the faucet in the tub and left. Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street

-2-

1-99-0152

where he saw the man with the baseball bat and codefendant standing across the street. Upon seeing him, both men fled down the street.

Defendant and codefendant Walls were tried simultaneously before two juries. Prior to trial, defendant moved for a motion to quash his arrest and suppress evidence. The trial court denied the motion to quash finding that Detective Brady had reasonable grounds to believe that defendant had committed the offense and that probable cause to arrest him existed. Prior to trial, the trial court noted that both juries would be present during the cross-examination of the victim. At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership and eventually started his own trucking company. He met and married Delores in 1995 and they separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10, 1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him, Delores explained that her car was broken and asked Jinadu to pick her up at her apartment. Jinadu drove to her apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the door he was hit on the head with a baseball bat and lost consciousness. After regaining consciousness, Jinadu was placed in a bathtub and repeatedly beaten and threatened by the men in the apartment. After the men left the apartment, Jinadu was able to escape and call for help.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw

-3-

1-99-0152

hundreds of plastic bags, a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Jinadu also described the height, weight and clothing of one of the offenders that fit the description and the photo identification of one of the offenders named Germaine Crane. Officer Schmidt further explained that at that time the officers did not know whether the names retrieved from the apartment all pertained to one person or to multiple people.

Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested codefendant Erven and Delores at 1121 South State Street. Codefendant Erven Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha Hillard. He called Laretha and spoke to her on the phone. She told him that the only person who would have taken her gun was her brother, Tony Hillard. She also gave Detective Bradley her brother's address. He went to the address with other officers. The door was answered by a woman, Benicia Eberhardt, and Detective Bradley saw a man standing behind her. The man matched the description given by Jinadu as one of the offenders. Detective Bradley asked him his name and

.4.

1-99-0152

defendant gave the detective a fictitious name. Detective Bradley then asked defendant why he had stolen his sister's gun and defendant replied that he did not steal his sister's gun. When asked if he would accompany officers to the police station to discuss the theft of his sister's gun, defendant said that he would. Defendant then told the detectives his name and again denied any knowledge of the whereabouts of his sister's gun. Defendant was arrested, taken to the police station and placed in a lineup. He was later identified by Jinadu as one of the offenders.

Defendant presented the stipulated testimony of a court reporter who recorded Jinadu's testimony before the grand jury. Defendant was found guilty by the jury of armed robbery, aggravated kidnaping, aggravated battery, and armed violence, and was sentenced to 50 years' imprisonment.

## ANALYSIS

Defendant first challenges the trial court's finding in denying defendant's motion to quash arrest and suppress evidence. In denying defendant's motion, the trial court noted some of the facts known to the police at the time of the arrest. We will summarize some of those facts in order to illustrate why under the totality of the circumstances known to the police officers at the time of the arrest there was sufficient information to warrant a reasonably prudent person to believe that defendant had committed a crime.

Benicia Eberhardt testified on behalf of defendant. She stated that she was in her bedroom with defendant when there was a knock on the door. She opened the door and saw three or four police officers standing in the hallway. At the time, defendant was standing a few feet behind her. She stated that the police officers pushed her out of the way, walked into the apartment and

-5-

1-99-0152

grabbed defendant. Defendant was taken into his room to put on some clothes while two officers searched the apartment. Defendant was then handcuffed and taken to the police station.

Detective Bradley testified that he spoke to the victim two days after the incident. Jinadu immediately identified his wife, Delores. He also identified codefendant Erven Walls from a drivers license which was found in the apartment on the day of the incident. He identified Walls as his wife's boyfriend who he had seen on previous occasions. Jinadu also gave Detective Bradley the physical description of the other three offenders. He described them as being in their twenties. One offender was 5'11" and weighed 200 lbs with black hair and brown eyes. Another offender was 5'11", 165 lbs. Finally, the last offender was approximately 5'5", 145 lbs with brown eyes and black hair. Detective Bradley testified that one of the guns found in the apartment was registered to Loretha Hillard. He called Ms. Hillard and spoke to her on the telephone. Ms. Hillard informed Detective Bradley that she was an ex-security guard for the Chicago Housing Authority. She further told Detective Bradley that her gun had been taken and that the only person who would have taken it was her brother, Tony Hillard. Ms. Hillard told Detective Bradley the address and apartment number of where defendant and his girlfriend lived. Detective Bradley, along with other police officers, went to the address given to him by Ms. Hillard. They knocked on the door and it was opened by Benicia Eberhardt. Detective Bradley stated that he told the woman that he wanted to speak to defendant. Standing behind her was a man who fit the general description of one of the offenders which Jinadu had given to the officers.

When asked to identify himself, defendant gave Detective Bradley a fictitious name. Detective Bradley then asked him why he stole his sister's gun. Defendant replied that he did not

-6-

1-99-0152

take his sister's gun. He was then asked to accompany the police officer's to the police station to discuss the theft of his sister's gun. Defendant said that he would go but that he had to put on his shirt and shoes. Detective Bradley followed defendant into one of the bedrooms where he told detective Bradley that his name was Tony Hillard. Defendant was taken to the police station where he was later identified by Jinadu as one of the offenders. Detective Bradley further testified that at the time of the arrest defendant was 21 years old with black hair, brown eyes, was 5'11" and weighed 170 lbs.

We note that defendant's reliance on *People v Johnson*, 94 Ill. 2d 148 (1983) and *People v. Wilson*, 260 Ill. App. 3d 364 (1994), is not applicable to the factual scenario in this case. Both *Wilson* and *Johnson* stand for the proposition that a warrantless arrest based on an informant's tip must be sufficiently reliable and corroborated so as to provide probable cause. However, the situation in this case is not governed by that principle. Here, the basis for the probable cause did not center around an informants tip but rather was based on the information from Ms. Hillard which provided a link between the stolen gun and defendant and helped the police to locate defendant. That link, however, was not the sole basis of the arrest. In addition to that information once the police were at the specific location provided by Ms. Hillard, defendant fit the description given to them by the victim.

Both the United States and the Illinois Constitutions govern the conduct of police officers in performing warrantless arrests. U.S. Const., amends. IV, XIV; Ill. Const. 1970 art. 1, §6; *People v. Buss*, 187 Ill. 2d 144 (1999). These constitutional provisions allow the police to make a warrantless arrest but only if the police have knowledge "which would lead a reasonable man to

-7-

1-99-0152

believe that a crime has occurred and that it has been committed by the defendant." *People v. Robinson*, 167 Ill. 2d 397, 405 (1995). In reviewing a probable cause challenge, the court does not apply bright-line legal rules but evaluates the police conduct in accordance with practical, every-day principles. *People v. Kidd*, 175 Ill. 2d 1, 22 (1996).

Probable cause for an arrest exists when the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. *People v. Lumpp*, 113 Ill. App. 3d 694 (1983). The court determines under the totality of the circumstances whether the evidence available to the arresting officer at the time of the arrest provides a reasonable basis for the officer to believe that the suspect committed an offense. *People v. Dixon*, 297 Ill. App. 3d 880, 885 (1998). The question is whether a reasonable person in the police officer's position would have believed that the defendant committed a crime. *People v. Adams*, 131 Ill. 2d 387, 398 (1989). Moreover, although the standard for determining whether probable cause existed for a warrantless arrest requires more than a mere suspicion on the part of the police officers, it does not require arresting officers to have in their hands evidence sufficient to convict the defendant. *Dixon*, 297 Ill. App. 3d at 885. A general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. *People v. Robinson*, 299 Ill. App. 3d 426, 431 (1998).

When defendant solely challenges the trial court's legal conclusions for denying a motion to quash arrest and suppress evidence, as in this case, our review is *de novo*. *People v. Wright*, 183 Ill. 2d 16, 21 (1998).

-8-

1-99-0152

In applying the above principles to the present case we conclude that based on the information available to the police officers at the time of the arrest, a reasonable police officer would believe that the person they were talking to in the apartment was one of the offenders. The police officers were there as part of their investigation of a vicious beating and armed robbery. They had recovered a .38 caliber gun from the apartment which led them to defendant's apartment based on information which was provided by his sister. She reported that the gun was stolen from her home and informed the officers that she believed the person who stole it was defendant. She also provided the officers with defendant's name, address and apartment number. Thus, the gun found at the scene of the crime was linked to defendant. Armed with Jinadu's descriptions of the offenders and Ms. Hillard's information, the police were able to locate defendant at the exact address provided to them. Moreover, upon seeing defendant the officers realized that he fit the general description of one of the offenders. Jinadu had described one of the offenders as a black man that was 5'11" and weighed 165 lbs. He further stated that all of the offenders were in their twenties. At the time of the arrest defendant was 21 years old, was 5'11" and weighed 170 lbs. These characteristics where similar to those described by the victim. Further, when asked whether he was Tony Hillard, defendant lied and gave the officers a fictitious name. He later admitted that he was Tony Hillard. The general description of the offenders, coupled with other specific facts and circumstances provided by Ms. Hillard as well as defendant's behavior in the apartment, was sufficient to lead a reasonably prudent person to conclude that there was a reasonable probability that defendant was one of the offenders.

Defendant's second point of contention revolves around the fact that the trial court

-9-

1-99-0132

allowed codefendant Walls' counsel to cross-examine Jinadu in front of defendant's jury. Defendant maintains that because the defenses were antagonistic the cross-examination prejudiced defendant's jury. Here, both defendant and codefendant were tried simultaneously before separate juries. Prior to trial, both defense attorneys filed a motion for severance on the unlawful use of a weapon by a felon count which the trial court granted. During the trial, the trial court severed the cross-examination of Detective Bradley. Defendant argues that the trial court should have also severed the cross-examination of Jinadu. Defendant argues that during the cross-examination of the victim by codefendant's attorney, the victim named defendant as one of the offenders thus prejudicing defendant. Specifically, Jinadu stated that one of the offenders that pointed a gun at him was defendant.

As a general principle of law, defendants who are jointly indicted are jointly tried unless fairness to one of the defendant's requires a separate trial to avoid prejudice. *People v. Lee*, 87 Ill. 2d 182, 187 (1981). Prejudice exists where "a co-defendant takes the stand to point a finger at the defendant as the real perpetrator of the offense." *Lee*, 87 Ill. 2d at 187. Furthermore, the mere apprehension of prejudice is not enough to conduct separate trials; there must be actual hostility between the defendants in order to necessitate separate trials. *People v Bean*, 109 Ill. 2d 80, 92 (1985). Severance is not required when codefendants' defenses are merely contradictory. *People v. Rice*, 286 Ill. App. 3d 394 (1996), citing *People v. Lovelady*, 221 Ill. App. 3d 829, 836 (1991). The decision to grant a severance is within the sound discretion of the trial court and an appellate court will not reverse a trial court's ruling absent an abuse of discretion. *People v. Fornear*, 283 Ill. App. 3d 171 (1996).

-10-

1-99-0152

In this case, defendant and codefendant did not implicate each other as the perpetrators of the crime. Defendant presented an alibi defense. As defendant points out in his brief his defense was simply that he was not present at the time of the incident. Codefendant Walls' defense, on the other hand, was one of reasonable doubt. The trial court stated, in replying to defense counsel's assertion that codefendant would implicate defendant through cross-examination of the victim:

> "How does that help Mr. Wall's to point the finger at Mr. Hillard. I will wait and see if you do it. Then I'll move the jury out. I don't know why somebody who says their client wasn't there has to point the finger at another defendant and say he was there. That doesn't establish that your guy wasn't there.

> \*\*\*

> We'll have to wait and see if it happens. If it happens, I'll move the jury out to protect whatever defendant's right have to be protected. To me, this is nonsense. It's a lot of fiction that one has to point the finger to make a separate cross-examination and represent to me, I'm going to pin it on this guy in front of his jury, when it doesn't make any sense or rhyme, reason or rationale why she would do that if her client wasn't there. But, I'll hear it when I hear it."

The record in this case indicates that during the cross-examination of Jinadu by codefendant Walls' attorney there is one isolated instance in which Jinadu stated that defendant was one of the offenders who pointed a gun at him. This single reference, however, was a repetition of Jinadu's testimony on direct examination where Jinadu testified that defendant pointed a gun at him, placed the gun in Jinadu's mouth, ordered him to reveal where he kept his money, helped codefendant Walls bind Jinadu's legs and hands, placed a pillow on Jinadu's face and filled the bathtub with water. As the trial court correctly noted, the necessity of removing the

-11-

1-99-0152

jury due to an antagonistic defense did not arise in this case. Jinadu's testimony on cross-examination did not create an antagonistic defense but was cumulative of his direct testimony.

Moreover, the record indicates that the remainder of the cross-examination by counsel for codefendant Walls consisted of a series of questions designed to create a reasonable doubt that Walls was not one of the perpetrators. It did not revolve around implicating defendant as the main perpetrator. In addition, during closing arguments, codefendant's counsel argued reasonable doubt as opposed to placing the blame on defendant. In fact, defense counsel stated, "I don't know if Mr. Hillard was involved in that, in this case or not ***." Defense counsel then proceeded to attack the credibility of Jinadu and the inconsistencies in his testimony.

This court has clearly stated in *Rice* that the requirement for actual hostility which necessitates severance "is not met where, for example, one defendant claims an alibi defense and the other defendant asserts a reasonable doubt, but at no time do the defendants become rivals or accuse each other." *Rice*, 286 Ill. App. 3d at 402. Such is the situation in the present case. Given that the defenses were not antagonistic to each other and that defendant has failed to show any prejudice which resulted from Jinadu's single reference to defendant during cross-examination, the trial court correctly ruled in denying severance.

Defendant's final contention is one which he does not have standing to raise. Standing is met when: (1) the proponent of a particular legal right alleges an injury in fact; and (2) the proponent asserts his own legal rights and interests, rather than basing his claim for relief upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *People v. Bond*, 205 Ill. App. 3d 515 (1990). Here, defendant argues that it was judicial error for

-12-

1-99-0152

the trial court to question Detective Bradley as to whether codefendant Walls and Jermaine Craine

were the same person. Defense counsel objected to the court's questioning to which the trial

court replied, "[I] don't see how that affects Mr. Hillard at all." We agree with the trial court that

the trial court's questions regarding identification of Walls and Craine as the same person, did not

impact defendant Hillard or any of Hillard's legal rights. Defendant has failed to articulate how

the trial court's actions caused defendant an injury in fact. As such, defendant's claim lacks

standing for purposes of this appeal.

In a supplemental argument, defendant contends that the trial court erred in sentencing

him to a consecutive sentence pursuant to section 5-8-4(a) where the sentence violated his

constitutional right to due process and trial by jury according to the recent holding in the Supreme

Court case *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348,

2363-67, (2000). In *Apprendi*, the U.S. Supreme Court held that "[o]ther than the fact of a prior

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530

U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The trial court determined that the

crime was motivated by bias based on race and therefore increased the defendant's sentence. The

*Apprendi* Court concluded that it is unconstitutional, and a violation of a defendant's due process

rights, for a legislature to remove from the jury the assessment of facts that increase the

prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at

490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In this case the trial judge sentenced defendant

under 730 ILCS 5/5-8-4(a), which calls for the imposition of consecutive sentences in cases of

-13-

1-99-0152

multiple convictions arising out of a single course of conduct if one of the offenses is either a

Class 1 or Class X felony and the court finds that the defendant inflicted severe bodily injury.

Section 5-8-4(a) states in pertinent part:

> "The court shall not impose consecutive sentences for offenses
> which were committed as part of a single course of conduct during
> which there was no substantial change in the nature of the criminal
> objective, unless, one of the offenses for which defendant was
> convicted was a Class X or Class 1 felony and the defendant
> inflicted severe bodily injury ***." 730 ILCS 5/5-8-4(a) (West
> 1998).

Recently, in *People v. Wagener*, our supreme court held that *Apprendi* concerns are not

implicated by consecutive sentencing. *People v. Wagener*, No. 88843, slip op. at 14 (June 1,

2000). Noting that consecutive sentences remain discrete and do not transmute into a single

sentence, the *Wagener* court determined that consecutive sentences cannot run afoul of *Apprendi*,

as that case only addresses sentences for individual crimes. *Wagener*, slip op. at 14-15.

Accordingly, the *Wagener* court concluded that section 5-8-4(b), which allows the imposition of

consecutive sentences where the sentencing court is of the opinion that such a term is necessary to

protect the public from further criminal conduct by the defendant, passes constitutional muster.

*Wagener*, slip op. at 15. Following the reasoning of *Wagener*, we conclude that section 5-8-4(a),

under which defendant was sentenced, also passes constitutional muster. Thus, we affirm the trial

court's order imposing consecutive sentences.

For the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, J., with McNULTY, P.J., and TULLY, J., concurring.

-14-

File Date: _____7 - 1 - 2 0 0 8_____

Case No: _____0 8 c v 1 7 7 5_____

ATTACHMENT # _____

EXHIBIT  _S_____

TAB (DESCRIPTION)

_____

105011

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

November 29, 2007

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 105011 - People State of Illinois, respondent, v. Tony
           Hillard, petitioner.  Leave to appeal, Appellate
           Court, First District.


     The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.


     The mandate of this Court will issue to the Appellate Court

on January 4, 2008.

EXHIBIT S